# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

*Plaintiffs,*

v.

CITY OF MIAMI,

*Defendant.*

## PLAINTIFFS' EXPEDITED MOTION
## FOR PRELIMINARY INJUNCTION

Nicholas Warren
**ACLU Foundation of Florida, Inc.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley
Caroline A. McNamara
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
Jocelyn Kirsch*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com
jocelyn.kirsch@dechert.com

* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

Plaintiffs move under FRCP 65(a) for a preliminary injunction enjoining the City of Miami from conducting future elections, beginning with the 2023 regular elections,[1] using the districts enacted in Resolution 22-131 ("Enacted Plan"). As demonstrated below, the Enacted Plan is an unlawful racial gerrymander in violation of the Fourteenth Amendment's Equal Protection Clause. As explained in the Local Rule 7.1(d)(2) statement on page 36, Plaintiffs respectfully suggest a ruling on this motion is needed no later than May 23, 2023.

## **MEMORANDUM**

The City of Miami's Enacted Plan for the five City Commission districts sorts its residents by race. Miami's gerrymander is the product of a calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose of maintaining and enhancing racially segregated districts. As Commissioner Alex Díaz de la Portilla put it: "Our goal here is to have an African American district, . . . a white district, . . . and three Hispanic districts."

Race-based considerations were not simply a factor in redrawing district lines; they were the *predominant* factor. Race was the predominant factor in maintaining arbitrary racial quotas; in packing certain districts with as many Hispanic and Black residents as possible; in maintaining racial "purity" with the "same type of last name and faces"; in the decision to perpetuate existing districts' cores, which were themselves race-based; and in the Commission's overt command that Black, Hispanic, and Anglo residents *must* be separated as much as possible into different districts because, in the Commission's view, each race needs to be represented by a co-ethnic, irrespective of Miami's communities or their interests and values. There is no valid reason for this practice, which is "by [its] very nature odious to a free people whose institutions are founded upon the

---

[1]     District 2 became vacant on December 29, 2022 and a special election will be held on February 27, 2023. ECF 24-24 to 24-27. Plaintiffs do not seek an injunction for the special election.

doctrine of liberty." *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 643 (1993).

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). Because race was the predominant factor motivating district lines, the City must satisfy strict scrutiny by proving that its use of race "serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Bethune-Hill I*, 580 U.S. at 193). The City cannot meet that burden. Although courts assume governments have a compelling interest in complying with Section 2 of the Voting Rights Act (VRA), *id.*, the City's use of race was not narrowly tailored to achieve that laudable goal. The City cannot show that it narrowly tailored its use of race with a "functional analysis" assessing racial bloc voting to determine the proportion of minority voters needed in a district to allow those voters to usually elect their preferred candidates. *Bethune-Hill I*, 580 U.S. at 194.

Instead, the City set "mechanical racial targets," imposing a 50% Black voting-age population (BVAP) quota for District 5, and aiming to get the Hispanic and Anglo populations as high as possible in Districts 1, 3, and 4; and District 2, respectively. *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 267 (2015). Narrow tailoring requires far more than just picking a number or shooting for the maximum. Further, the City misused key metrics of VRA compliance and ignored the absence of fundamental preconditions for VRA liability in Districts 1, 2, 3, and 4.

The Supreme Court has condemned this type of unjustified use of race as resembling "political apartheid." *Shaw I*, 509 U.S. at 647. Plaintiffs seek preliminary relief enjoining use of the Enacted Plan to ensure these harms are not irreparably perpetuated in future elections.

## I.  Overview of the City Commission and Its Elections

Miami is governed by a five-member City Commission and a Mayor. Miami City Charter ("Charter") § 4(a). Except where the Charter provides otherwise, municipal elections are governed by the state's general election laws. *Id.* § 7. Since 1997, the City Commission has been elected from five single-member districts. *Id.* § 4(b); ECF 24-64. Candidates file to run during the qualifying period, which, for the November 2023 election, runs from September 8–23. *See id.* Commissioners are limited to two consecutive terms. *Id.* § 4. The current commissioners are:

| District | Commissioner | First Elected | Term Up | Eligible for Reelection | Race/Ethnicity/ National Origin Background |
|---|---|---|---|---|---|
| 1 | Alex Díaz de la Portilla | 2019 | 2023 | Yes | Hispanic/Cuban American |
| 2 | *Vacant* | — | — | — | — |
| 3 | Joe Carollo | 2017 | 2025 | No | Hispanic/Cuban American |
| 4 | Manolo Reyes | 2017* | 2023 | Yes | Hispanic/Cuban American |
| 5 | Christine King | 2021 | 2025 | Yes | Black/Not Hispanic |
| | * Special Election | | | | |

During the 2021–22 redistricting process, the District 2 commissioner was Ken Russell, who is Japanese American. ECF 24-21. Russell ran for Congress in the 2022 elections and therefore resigned from the Commission under Florida's resign-to-run law. ECF 24-24 to 24-27.

## II. Redistricting Background

Before 1997, the Commission was elected at-large, citywide. ECF 24-64. The original map (the "1997 Plan") was drawn by the Commission after a blue-ribbon panel appointed by then-Mayor Joe Carollo made its recommendations. *Id.*; ECF 24-58. The blue-ribbon panel included current Commissioner Reyes and Miguel De Grandy. ECF 24-47; Tr. 4B 19:15–18. The Commission map was redrawn in 2003 and again in 2013, with De Grandy and Stephen Cody serving as the City's consultants in both cycles. ECF 24-78. Race was a central, driving factor behind each of these maps. *See generally* ECF 24-42 to 24-79.[2]

---

[2]     These maps and the others discussed in this motion can be viewed on Google Maps at the

### III.  The 2021–22 Redistricting Process

Following the 2020 Census, the Commission began its redistricting process. The process proceeded through six Commission meetings, the records of which reveal that the mapmaking was driven by racial considerations at every turn.[3] The Commission again hired De Grandy and Cody as its redistricting consultants, and they first met with the Commission on November 18, 2021, when De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan. ECF 24-20; *see generally* Tr. 1; Abott Rep. 23.[4]

De Grandy shared that redistricting was needed to bring the districts within the allowable population range, to have no greater than 10% difference between the smallest and largest district. Tr. 1 4:1–11; *see* Abott Rep. 23.[5] Analyzing the 2013 Plan, Districts 1, 3, 4, and 5 were each under the ideal population and needed to gain population. Tr. 1 3:10–15. District 2 was overpopulated and needed to shed population. Tr. 1 3:12–13; Abott Rep. 23. Under the 2013 Plan, Districts 1, 3, and 4 were majority Hispanic, with Hispanic voting-age populations (HVAPs) of 91.0, 88.5, and 91.6%, and Hispanic citizen voting-age populations (HCVAPs) of 86.6, 86.8, and 90.1%.[6] *Id.*

---

links listed in the Maps section of the Notice of Filing Exhibits (ECF 24 at 6).

[3]     These meeting transcripts are at ECF 24-11 to 24-18 and cited here as "Tr. 1," "Tr. 2," etc.

[4]     Plaintiffs' counsel submitted a records request for the initial report in December 2022 and subsequently discussed it with defense counsel, but do not have a copy as of the time of filing.

[5]     Full statistics for the various plans and districts discussed herein are in the appendix to the Expert Report of Dr. Carolyn Abott (ECF 24-31 at 23–29).

[6]     Total population (POP) and voting-age population (VAP) figures cited herein are from the

District 5 was majority Black, with a Black voting-age population (BVAP) of 52.9% and a Black citizen voting-age population (BCVAP) of 59.4%. *Id.* District 2 under the 2013 Plan had the highest non-Hispanic white ("white" or "Anglo") population of the five districts, at 34.5% white voting-age population (WVAP) and 38.1% white citizen voting-age population (WCVAP). *Id.*

Also at the November 18 meeting, De Grandy explained the VRA's applicability to Miami and that "we can consider race as one of several factors that we will be conscious of in crafting a plan." Tr. 1 6:23. De Grandy warned, however, that under the Supreme Court's racial gerrymandering jurisprudence, race "cannot be the overriding factor." Tr. 1 7:6. The Commission consistently ignored De Grandy's warning as the process unfolded.

The Commission gave De Grandy four ranked directives for map-drafting: (1) achieve substantial equality of population between districts, rather than precise mathematical equality; (2) "maintain the core constituencies of the districts;" (3) apart from what the VRA required, "the minority voters must be politically cohesive;" and (4) avoid splitting traditional communities and neighborhoods when feasible. Tr. 1 4:5–11, 17:19–20, 18:15–22, 19:22–23, 33:4–11, 35:21, 36:1–11. The first directive "is part of the redistricting background." *ALBC I*, 575 U.S. at 272. As to the second directive, the Commission made it clear throughout the process that it sought to maintain existing districts to carry the 2013 Plan's existing racial divisions forward, *and* to exacerbate them through further changes. With respect to the third directive, the phrase "political cohesion" was subsequently used throughout the process as a shorthand for keeping racially homogenous areas

_____

2020 Census and come from the Abott Report or the Commission record. Citizen voting-age population (CVAP) figures are from the Census Bureau's 2019 American Community Survey (ACS), as cited in the Abott Report. Voter registration figures come from the County Elections Department (ECF 24-92; 24-93) or the Expert Report of Dr. Bryant Moy (ECF 24-32).

together. *See, e.g.*, Tr. 1 28:20–21 (Carollo: "minority voters will be politically cohesive within these districts"); Tr. 3 9:7–8 (De Grandy: "this area has a high percentage of Hispanics and greater voter cohesion with D1 residents"), 10:7–8 ("we tried to find adjacent areas with similar demographics in order to maintain voter cohesion"); Tr. 4A 8:3–4 (same), 7:6–7 ("we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion"); Tr. 6 67:1 (Carollo discussing District 3 going into West Brickell as "not cohesive anymore" because the racial demographics change). The Commission abandoned the fourth-ranked directive whenever it got in the way of its race-based goals, splitting communities across the city as a result.

Also at the November 18 meeting, Carollo recounted why districts were instituted when he was mayor: "the original idea" was "that minority voters will be politically cohesive within these districts," Tr. 1 28:19–21, "to assure that there would be an African American sitting in this Commission and there would be an Anglo," and "to make sure that there were three Hispanic districts," Tr. 1 28:7–10. And he explained that during the 2022 redistricting, each district would have to change to carry forward that "original idea." Tr. 1 28:15–29:3.

The Commission next met on December 9, 2021, with De Grandy recapping his instructions and commissioners discussing what areas might be moved between districts. *See generally* Tr. 2. Some of the key elements of the Enacted Plan's racial gerrymander originated at this meeting, including the idea to remove parts of Coconut Grove[7] from District 2 to maintain the plan's racial

---

[7]     "Coconut Grove" refers to the area encompassing Neighborhood Conservation Districts (NCDs) 2 and 3, bounded by US 1, the Rickenbacker Causeway, Biscayne Bay, and the City limits. CITY OF MIAMI, bit.ly/40EMhT1; *see also* Tr. 5A 45:11–12. The "West Grove" largely overlaps

balance and avoid "jeopardiz[ing] the ethnic integrity of [the] districts," and to redraw District 5 to minimize reductions to its Black population. Tr. 2 9:4–10:10, 13:15–22. De Grandy also reiterated the Commission's four directives at this meeting and confirmed that drawing compact districts should not be a consideration since that would jeopardize the Commission's racial goals. Tr. 2 28:23–29:20. Further, the Commission could not reach a consensus on using major manmade and natural boundaries as a factor. Tr. 2 18:23–19:21. De Grandy agreed to take the Commission's directives, meet individually with each commissioner, and develop a draft plan. Tr. 2 33:18–35:14.

On February 7, 2022, De Grandy returned with his draft plan (the "Feb. 7 Draft"). Tr. 3 5:16–12:11; ECF 24-4 at 40; ECF 24-84. Walking through each draft district's racial demographics, De Grandy noted the many race-based decisions he made in developing them. Tr. 3 7:5–13, 8:4–12:11. Commissioners debated the draft, focusing especially on the decision to move part of the historically Black West Grove neighborhood from District 2 into District 4, extending District 4 across US Route 1. This proposal prompted intense public criticism from Miamians who objected to dividing a cohesive neighborhood and excising it from District 2. *See, e.g.*, Tr. 3 25:9–26:7, 30:12–31:14. De Grandy defended the choice in racialized terms, Tr. 3 41:23–42:11, 42:21–43:6, and the Commission voted 4-1 to direct De Grandy to consider going south of US 1 into District 2 to "obtain voter consistency" and balance population. Tr. 3. 95:15–16, 99:9–20.

De Grandy shared a new draft on February 22, 2022 (the "Feb. 22 Draft" or "Base Plan") and presented it at the February 25 meeting. ECF 24-7 at 32; ECF 24-8 at 15; ECF 24-85. This map incorporated certain feedback shared in earlier Commission meetings, and during private meetings De Grandy had with individual commissioners. Tr. 4A 4:5–10:2. Except for three

---

with NCD-2 and refers to the area of Coconut Grove bounded by US 1, McDonald Street, and Franklin Avenue, west to the City limits. *See* Tr. 5A 45:14–16.

unpopulated census blocks later moved from District 1 to District 5, the Feb. 22 Draft became the Enacted Plan. Tr. 6 7:12–14, 86:17–18. Public comment again centered on objections to splitting Coconut Grove, including the continued division of the West Grove. *See, e.g.*, Tr. 3 24:17–25:7, 25:9–26:7, 30:12–31:14. Russell sketched out his suggestion for the District 2 border at this meeting, which kept all of Coconut Grove in District 2. Tr. 4B 12:7–14:21; ECF 24-86. The Commission voted 4-1 to make the Feb. 22 Draft the "Base Plan" for future changes. Tr. 4B 37:6–11, 39:2, 42:9–23.

On March 11, 2022, the Commission discussed two suggested changes to the Base Plan: an unrealized suggestion of King's—whose racial impacts De Grandy noted—and the "Initial Russell Plan," which sought to unify Coconut Grove. *See generally* Tr. 5A; Tr. 5B; ECF 24-8 at 3–4; ECF 24-9. De Grandy also addressed "allegations of racism" in the Base Plan and defended the map with race-based logic. Tr. 5A 37:18–40:16, 47:20–23; ECF 24-8 at 6–13. Russell and members of the public disagreed with De Grandy by explaining all the race-neutral reasons why Coconut Grove should be unified in one district. *See, e.g.*, Tr. 5A 45:18–46:1, 47:1–8, 64:13–65:9. The meeting closed with the commissioners directing De Grandy to meet with them individually and craft different options accommodating each commissioner's wishes. Tr. 5B 40:5–22.

The Commission reconvened for its final meeting on March 24, 2022, with De Grandy presenting the options each commissioner directed him to develop. Tr. 6 5:14–8:19. King proposed a small, unpopulated change between Districts 1 and 5; Díaz de la Portilla suggested moving one condo tower from District 1 into District 5; Russell proposed the "Revised Russell Plan," which made changes to Districts 2, 3, and 4 to keep Coconut Grove whole; and Reyes had his own plan (the "Reyes Plan") which altered those same three districts to remove a portion of Coconut Grove from District 4. *Id.*; ECF 24-10 at 5–11. The Commission debated and eventually adopted the Base

Plan with King's small change on a 3-2 vote. Tr. 6 86:15–18, 89:20–22.

## LEGAL STANDARDS

### I.  Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. *Id.*

At the preliminary-injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *828 Mgmt., LLC v. Broward Cnty.*, 508 F. Supp. 3d 1188, 1193 (S.D. Fla. 2020) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995)).

### II.  Racial Gerrymandering

Racial gerrymandering claims involve "a two-step analysis." *Cooper*, 581 U.S. at 291. First, plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," and "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916). But they need not show actual conflict between district design and those principles: "Race may predominate even when a reapportionment plan respects traditional principles." *Id.* at 189. To meet their burden, plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's

shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). Alternative district configurations that satisfy non-racial criteria can also be probative of racial predominance. *Easley v. Cromartie*, 532 U.S. 234, 249 (2001). The use of race "remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7.

"Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 292. While courts assume VRA compliance is a compelling interest, "to meet the 'narrow tailoring' requirement," the State must prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (quoting *ALBC I,* 575 U.S. at 278). This requires a "functional analysis of the electoral behavior within the particular . . . district." *Bethune-Hill I*, 580 U.S. at 194.

## ARGUMENT

### I.  Plaintiffs Are Substantially Likely to Prevail on the Merits

At the outset, there can be no doubt that Plaintiffs have standing to bring these claims. *United States v. Hays*, 515 U.S. 737 (1995), "set forth a bright-line standing rule for . . . cases alleging illegal racial gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing." *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000). Individual Plaintiffs have standing because they live in Districts 2, 3, 4, and 5. ECF 24-37 to 24-41. Organizational Plaintiffs have associational standing because they have members who live in all five districts and voting rights are germane to the organizations' purposes. ECF 24-33 to 24-36; *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), No. 3:22-cv-493, 2022 WL 7089087, at *29 (M.D. Fla. Oct. 12, 2022) (finding individuals and

organizations have standing on preliminary injunction), *stay denied*, No. 22-13544, 2022 WL 16754389 (11th Cir. Nov. 7, 2022) (per curiam); *Johnson v. Mortham*, 915 F. Supp. 1529, 1537 & n.11 (N.D. Fla. 1995). Plaintiffs have certainly shown a substantial likelihood as to their standing.

### A. Race Predominated in the Drawing of the Enacted Districts

Plaintiffs are likely to prevail because there is overwhelming "'direct evidence' of legislative intent," and ample "circumstantial evidence of [the] district[s'] shape[s] and demographics" reveals racial predominance. *Cooper*, 581 U.S. at 291.

### 1. Direct Evidence of Legislative Intent

The legislative record is replete with direct evidence of the Commission's predominant racial intent. The Commission's explicit, overriding goal was to separate Anglo from Black from Hispanic voters into separate districts as much as possible, with the aim to have commissioners of particular races and ethnic backgrounds elected. Carollo set the stage from the start: "[T]he original idea" of districts was "that minority voters would be politically cohesive within these districts," so that "there would be an African American sitting in this Commission and there would be an Anglo," and "that there were three Hispanic districts." Tr. 1 28:19–21, 28:7–10. In the 2022 process, Carollo went on, each district would have to change to carry forward that "original idea." Tr. 1 28:15–19, 28:21–29:1. This objective drove the Commission's entire redistricting process and formed the core of every mapmaking decision: separating Miamians, as much as possible, by race. *See, e.g.*, Tr. 1 13:13–14 (Carollo urging mapmaking "in a way that the balance is not really shifted" after De Grandy and Díaz de la Portilla discussed racial demographics); Tr. 3 51:10–14 (Carollo: districts were established "to assure" a particular racial composition), 100:13–17 (Carollo's "goals:" "to have guaranteed Anglo representation, and to have three districts that were Hispanic"); Tr. 5B 8:14–16 (Díaz de la Portilla); Tr. 4B 22:14–15 (Reyes: "Yes, we are

gerrymandering to preserve those seats"); Tr. 6 68:14–17 (Carollo: "I do not want to change the District 3 voting patterns, the types of people that are there with different people. I don't want to do that to District 4, nor to District 1. Just like I want to be able to leave District 2 where it could still elect a guy like you [Russell] . . . . District 5 [] will be a majority-African American district.").

The Commission carried out this policy in three specific ways. *First*, the Commission created an "Anglo-access district" in District 2. *Second*, the Commission "purposefully established a racial target" of 50% Black voting-age population (BVAP) for District 5. *Cooper*, 581 U.S. at 299. *Third*, the Commission packed Hispanic residents into Districts 1, 3, and 4 as much as possible. In so doing, the Commission explicitly "subordinated traditional race-neutral districting principles . . . to racial considerations"—splitting neighborhoods, ignoring compactness, and straying from major manmade and natural boundaries to draw districts almost solely based on race. *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916). "Race was the criterion that, in the [Commission's] view, could not be compromised," with every proposal viewed through the lens of racial targets. *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996).

### a. Creating an "Anglo-Access District" in District 2

Throughout the process, the Commission acknowledged that District 2 was historically drawn to elect an Anglo commissioner and sought to maintain it as such. Originally, Carollo explained, District 2 "was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner." Tr. 3 51:18–19. That remained his goal—a goal others shared. Tr. 6 at 56:16–18 (Carollo: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected."), 68:15–16 (Carollo: "I want to be able to leave District 2 where it could still elect a guy like you [Russell], if they want to."), 39:9–11 (Reyes: "What we

13

want to achieve now is" that "the probabilities of electing an Anglo . . . are great"); Tr. 3 68:7–9

(Reyes asking De Grandy if the Feb. 7 Draft is "the best you can do to protect . . . the Anglo seat");

Tr. 4B 19:21–20:4 (Reyes confirming with De Grandy that "the so-called Anglo district will . . .

stand the test of time" and "the probability of electing . . . an Anglo" is "very probable"); Tr. 5B

8:14–16 (Díaz de la Portilla: "Our goal here is to have . . . a white district"). The Commission

succeeded in its race-based goal: De Grandy confirmed that District 2 had a high probability of

electing an Anglo commissioner. Tr. 4B 20:11–12. It has the highest Anglo population of the five

districts, at 37.4% WVAP, 41.5% WCVAP, and 43.4% white voter registration—higher even than

under the 2013 Plan. Abott Rep. 23; Supervisor of Elections, District Demographic Analysis at 34,

https://bit.ly/3HU5iIi (Feb. 1, 2023); Supervisor of Elections, District Demographic Analysis at

32, https://bit.ly/3HQgiGD (Feb. 1, 2022).

### b. Maintaining an Arbitrary BVAP Quota for District 5

At the beginning of this 2020 redistricting cycle, District 5 under the 2013 Plan was 52.9%

BVAP, 59.4% BCVAP, and 56.9% Black by voter registration, but needed to add population.

Abott Rep. 23; ECF 24-92 at 35. The Commission's overriding goal was to keep the Black

population as high as possible by "purposefully establish[ing] a racial target: African-Americans

should make up no less than a majority of the voting-age population." *Cooper*, 581 U.S. at 299.

From the outset, De Grandy and the Commission were sensitive to maintaining District 5's Black

share, with a particular reluctance to change significantly the District 2/5 boundary lest that

decrease District 5's Black population. *See, e.g.*, Tr. 1 23:6–10.

In De Grandy's initial Feb. 7 Draft, District 5 was 51.7% Black by total population (BPOP),

49.8% BVAP, and 58.7% BCVAP. Tr. 3 8:17; Abott Rep. 23. De Grandy explained he deliberately

underpopulated District 5, "because bringing in additional population from most any side of the

district might reduce the African American population percentage." Tr. 3 8:13–15. He set the boundary "wall" between Districts 2 and 5, explaining "we could not move further east without affecting the African American population's ability to elect a candidate of its choice in D5." Tr. 3 9:19–20.[8] In exchange for moving the "wall" east into less-Black areas of Downtown and Edgewater, De Grandy "rebalance[d] the ethnic and racial population" by removing "overwhelmingly Hispanic" areas along the Miami River from District 5 and moving them into District 1. Tr. 3 43:1–3; 11:17–20; ECF 24-84 at 3.

The Commission reacted to De Grandy's Feb. 7 Draft—and its District 5 with a BVAP under 50%—with skepticism. Tr. 3 68:7–8 (Reyes: "is this the best you can do to protect the African American seat?"), 71:22–23 (King likewise "concerned . . . that District 5 is 51% African American." De Grandy interpreted this and other feedback as a "directive" to "increase[] D5's Black voting age population above 50%," which he did in his Feb. 22 Draft, "by reconfiguring areas around the boundaries" of the district. Tr. 4A 7:1–2, 9:15, 9:17, 5:13–15; ECF 24-85 at 7; *cf. Cooper*, 581 U.S. at 299–300 (elected officials "were not coy in expressing that goal," an "objective [that] was communicated in no uncertain terms to [their] consultant"). De Grandy again deliberately underpopulated District 5 to increase its Black share. Tr. 4A 6:15–16. Maintaining the minimum-50% BVAP quota remained a priority through all the redistricting meeting. *See, e.g.*, Tr. 5A 37:5–9 (De Grandy explaining King proposal would "lower the Black VAP to 49%, but this could be remedied by making additional changes to . . . increase D5's Black voting age population"); ECF 24-8 at 4 (describing same proposal as a "deficiency"); Tr. 6 8:7–9 (De Grandy

---

[8]     As De Grandy explained, this caused him to turn to District 2's southern end to equalize its population, resulting in moving areas of District 2 into Districts 3 and 4 in Coconut Grove. Tr. 3 9:20–21. Adherence to a Black population target also impacted District 1. Tr. 6 70:21.

"recommend[ing] additional tweaks to the plan to bring the Black voting age population back above 50%"), 56:12–16 (Carollo: "The only reason [King] doesn't take the rest [of Downtown] is . . . we have to keep one district that is going to have a majority of African Americans."), 64:23–65:2 (De Grandy: "I cannot put one more resident into Commissioner King's district. . . . [G]oing further east would dilute the Black majority."), 68:16–17 (Carollo: "In District 5, that will be a majority-African American district."), 70:21 (Díaz de la Portilla: "I can't go north, because if I go north I jeopardize the African American seat."). The Commission hit its target: District 5 in the Enacted Plan has a BVAP of 50.3%. Abott Rep. 23.

### c. Packing Hispanic Residents into Districts 1, 3, and 4

Race likewise predominated in the drawing of Districts 1, 3, and 4. The Commission's overriding goal for these districts was to make their Hispanic populations as high as possible, thereby artificially stripping Hispanic residents from Districts 2 and 5 and diminishing their influence in those two districts. Carollo set the tone before any maps were drafted: "My main interest in my district and [Districts 1 and 4] is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there." Tr. 2 23:4–7. That goal pervaded the Commission's attitude toward these three districts. *See, e.g.*, Tr. 2 14:8–9 (Carollo discussing relative "purity" of Hispanic percentages in the three districts); Tr. 3 103:18–21 (Carollo expressing desire to "keep the same type of last names, faces" in the districts), 107:13–14 (Reyes agreeing to "working out in a way that we can make it as Hispanic as you can"); Tr. 6 56:19–20 (Carollo: "we have to keep three districts that are going to be majority-Hispanic"), 70:22–71:2 (Díaz de la Portilla expressing same views).

### *1. District 1/5 Border*

As outlined below, the District 1/5 border was drawn along racial lines, to put Hispanic

residents in District 1 and strip them from District 5. Simultaneously, the border packed Black residents into District 5 and stripped them from District 1. District 1, which under the 2013 Plan was underpopulated by about 7,000 residents, Abott Rep. 23, gained all its new population from District 5. Rather than, for example, pairing communities of interest with shared values and needs, from the outset, discussions of where District 1 could gain population focused almost exclusively on race, with Carollo highlighting both Wynwood and the north side of the Miami River as "logical" and "attractive" because they are "mainly Hispanic." Tr. 2 3:12–17. Díaz de la Portilla reflected how he "really can't go north" to gain population in Allapattah or Liberty City, because "[i]t's an African American area." Tr. 2 4:19–20. Carollo noted there might be an area by 36th Street (District 1's northern border under the 2013 Plan) that District 1 might add, depending on how Hispanic the area was. Tr. 2 5:6–8. Díaz de la Portilla agreed the line might extend north to 40th Street, but not past State Road 112, because "north of 112 we are entering into African American neighborhoods—and we can't touch that area." Tr. 2 5:14–19.

De Grandy's Feb. 7 Draft added to District 1 the riverside areas Carollo suggested. ECF 24-84 at 4. De Grandy explained he did so "because this area has a high percentage of Hispanics and greater voter cohesion with D1 residents." Tr. 3 9:7–8. The Base Plan moved a small portion of that riverside area around the Miami Riverside Center back into District 5. In exchange, the plan moved another eight city blocks into District 1. ECF 24-85 at 4. De Grandy explained, "[a]gain, we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion" with the rest of District 1. Tr. 4A 7:6–8.

Besides the changes Downtown, the Enacted Plan also moved territory between Districts 1 and 5 in Allapattah. ECF 24-85 at 5. These areas were moved to increase District 1's Hispanic share, decrease its Black share, and do the opposite for District 5. *See, e.g.*, Tr. 4A 6:23–7:2.

### 2. District 2/3 Border

The Commission also drew the District 2/3 border along racial lines, to pack Hispanic residents into District 3 and strip them from District 2. Díaz de la Portilla first suggested moving areas "where Hispanic voters live" from District 2 and into Districts 3 and 4 at the second redistricting meeting, mentioning Coconut Grove and Bay Heights specifically. Tr. 2 7:16–17. De Grandy incorporated this suggestion into his Feb. 7 Draft (ECF 24-84 at 5), moving portions of District 2 into District 3, stretching from SW 15th Road in the north to SW 17th Avenue in the south, over to South Miami Avenue. Tr. 3 9:21–23. After Russell questioned why De Grandy moved this area from District 2 rather than parts of Brickell/Downtown further north, De Grandy said he did so "because the demographics were dissimilar" further north. Tr. 3 90:10.

Walking through the Base Plan (ECF 24-85 at 6), De Grandy reiterated he "did not feel it was appropriate to move east" into Brickell "because of dissimilar demographics." Tr. 4A 7:22–23; Tr. 5B 36:17–37:2 (De Grandy explaining he didn't move parts of Brickell into District 3 because its Hispanic population was "in the 40's, whereas District 3 is in the 80's"); Tr. 6 75:11–13 (reiterating same point). Commissioners supported this reasoning, which compelled District 3 to pick up part of Coconut Grove instead. Tr. 4A 7:6–8 (Carollo); Tr. 4B 41:13–19 (Carollo: "throw[ing] District 3 into Brickell" is "truly going to change the whole component of one district" with "a domino effect" for other districts' demographic compositions), 9:15–17 (Díaz de la Portilla agreeing that the Grove is "the only place to go" to remove population from District 2).

The Commission's rejection of alternatives for the 2/3 border further demonstrate its race-based decision-making. *See Ala. Legis. Black Caucus v. Alabama (ALBC II)*, 231 F. Supp. 3d 1026, 1391 (M.D. Ala. 2017) (rejected alternative plans constitute evidence of racial predominance). The Initial Russell Plan (ECF 24-87) proposed extending District 3's eastern boundary one block east

to South Miami Avenue, to allow all of Coconut Grove to be united in District 2. ECF 24-9 at 3. Even though De Grandy advised the proposal complied with the VRA, Tr. 5A 52:12–13, that was not enough for the rest of the commissioners, who objected to moving a less-Hispanic area into District 3. Tr. 5B 32:11–13 (Reyes: "I don't agree with it because [] there is a lot of Anglos in that area"), 32:10 (Díaz de la Portilla).

The Revised Russell Plan (ECF 24-88) again united Coconut Grove in District 2 while moving even less of the Brickell area into District 3. The area moved—44.6% HVAP, 39% WVAP—would have decreased District 3's HVAP. Abott Rep. 24, 29. De Grandy again advised that the proposal complied with the VRA, Tr. 6 at 8:6–7, and it met the criteria the Commission originally adopted, Tr. 6 at 61:10–62:8, but the Commission rejected it because it decreased District 3's Hispanic population. Tr. 6 at 64:10–13, 74:2–10 (Reyes explaining why he rejected Russell plans), 70:15–18, 71:7–16, 72:1–3 (Díaz de la Portilla).

The Reyes Plan (ECF 24-89) made even smaller changes to the 2/3 border, restoring the West Grove sliver to District 2 while moving a bare-HVAP-majority area from District 2 into 3 (51% HVAP). Tr. 6 at 77:6–7; Abott Rep. 29. Even though De Grandy advised the Reyes Plan complied with the VRA, Tr. 6 at 8:6–7, the Commission rejected it for the same reasons as Russell's proposals. Tr. 6 at 66:14–18, 67:1–5, 68:13–15, 70:13. De Grandy summed up the perceived benefit of his District 3 versus Russell's or Reyes' proposals: "Is it [a] stronger Hispanic district under the base plan, absolutely." Tr. 6 75:21; *see also* Tr. 6 at 78:3–18.

Under the Revised Russell Plan, District 3 was 86.6% HVAP and 84.8% HCVAP. Abott Rep. 24. Under the Reyes Plan, it was 87.3% HVAP and 86.0% HCVAP. *Id.* In the Base Plan and Enacted Plan, it is 88.3% HVAP and 86.9% HCVAP. *Id.* at 23.

### *3. District 2/4 Border*

The Commission also drew the line between Districts 2 and 4 to pack Hispanic residents into the majority-Hispanic district and strip them from the "Anglo-access" district. This border was shaped by two major decisions: (1) moving a supermajority-Hispanic area of Golden Pines north of US 1 around Douglas Park into District 4, and (2) moving areas south of US 1 in Coconut Grove (ECF 24-85 at 6). Both originated in the very first redistricting meetings. Díaz de la Portilla and Carollo discussed the "very Hispanic area" around Douglas Park in District 2 as one that "probably doesn't belong there" because it has "more commonalities" in terms of "political cohesion" with District 4 than the rest of District 2. Tr. 1 24:1–4, 24:14–16; Tr. 2 19:22–20:2. This area, which is 81.8% HVAP, was moved into District 4 in all drafts the Commission considered. Abott Rep. 25.

The second area moved into District 4, a piece of Coconut Grove, followed Díaz de la Portilla's early suggestion to move areas "where the Hispanic voters live" given the "ethnic diversity in Coconut Grove." Tr. 2 7:16–17. The area moved is a 59.2%-HVAP triangle bounded by US 1, Day Avenue, and SW 27th Avenue. Abott Rep. 26. That triangle was not as Hispanic as the rest of District 4, but because the Commission considered District 4 to be the "purest" Hispanic district already, it was acceptable for it to add "only" "a slice, sliver" of less-Hispanic "bone." Tr. 2 14:5–6; Tr. 3 103:18, 104:4–7. Eventually, Reyes begrudgingly accepted adding part of Coconut Grove because he thought it was needed to maintain District 5's racial balance. Tr. 5A 50:13–14.

Rejected proposals for District 4 clarify the Commission's intent to "balance" its Hispanic population. On February 7, De Grandy proposed giving District 4 a chunk of the North Grove between 22nd and 27th Avenues. Tr. 3 101:11–14, 102:2–3. To convince Reyes to take this 55% WVAP area, Carollo reminded him he has "the most Hispanic" and "Cuban district," and that the Feb. 7 Draft already gave him "a huge Hispanic area on the other side of US 1"—the Douglas Park

area. Tr. 3 102:10–12, 103:11–12, 105:2–3; Abott Rep. 28; *see also* Tr. 3 103:16 (Reyes welcoming the Douglas Park area: "I'll take it."). Comparing that 82% HVAP Douglas Park addition to his 55% WVAP North Grove proposal, Carollo explained Reyes cannot be "*getting all the sirloin but none of the bone.*" Tr. 3 103:18. In the end, the Hispanic-rich "sirloin" was moved into the packed Hispanic-majority District 4, while most of the majority-white "bone" remained in District 2. District 4 in the Enacted Plan is 89.5% HVAP and 88.2% HCVAP. Abott Rep. 23.

### 4. Internal Borders of Districts 1, 3, and 4

The borders that Districts 1, 3, and 4 share were also drawn to facilitate the Enacted Plan's packing of Hispanic voters into these districts and, more generally, to accomplish the tripartite racial separation throughout the map. ECF 24-85 at 7. The Commission treated Hispanic voters on the borders of these districts as fungible because these areas are all predominantly Hispanic. *See, e.g.*, Tr. 1 33:14–16 (Díaz de la Portilla explaining it did not matter whether Flagami was in District 1 or 4 because those residents "will elect the same kind of representative"). As commissioners recounted multiple times, Hispanic neighborhoods like Flagami and Little Havana were split between Districts 1, 3, and 4 to effectuate the policy of maximum racial separation. *See, e.g.*, Tr. 3 52:5–53:2 (Carollo); Tr. 6 39:2–12 (Reyes), 79:19–20 (Díaz de la Portilla); *infra* pp. 24–25.

De Grandy followed the Commission's direction in his Feb. 7 Draft, shifting parts of Little Havana between Districts 3 and 4 because they were "adjacent areas with similar demographics." Tr. 3 10:7–8. Workshopping that map and following his comments about District 4 not keeping all the "sirloin," Carollo suggested moving into District 3 a different portion of Little Havana, between SW 27th and 32nd Avenues. Tr. 3 104:21–23; 2/7/22 video, https://youtu.be/foXmqENNpRY, at 4:30:25–:50. When Reyes objected, Carollo explained why it was necessary to add that territory to District 3: "you're getting more than two squares here," referring to the Douglas Park area, "in

prime Hispanic area, and you're diluting the Hispanic vote." Tr. 3 105:1–3; 2/7/22 video, https://youtu.be/foXmqENNpRY, at 4:30:50–:58. "There has to be a balance," Carollo continued, and in exchange for getting "a huge chunk of rich Hispanic voters" around Douglas Park, District 4 needed to balance its Hispanic population out with District 3. Tr. 3 106:3–23. Reyes agreed to "working out in a way that we can make it as Hispanic as you can." Tr. 3 107:13–14. The area Carollo wanted to move into District 3 was indeed moved in the Enacted Plan. De Grandy explained the change: "we tried to find adjacent areas with similar demographics in order to maintain voter cohesion." Tr. 4A 8:3–4. The area is 96.2% HVAP. Abott Rep. 27.

### d. The Commission Explicitly and Consistently Subordinated Traditional Redistricting Criteria to Race

Throughout the map, the Commission "subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916). Because "[i]n general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so," it is unsurprising that evidence of this subordination is manifold. *Id.* at 190.

#### 1. Neighborhoods

Respecting traditional communities like neighborhoods is not just a judicially acknowledged traditional principle, *ALBC I*, 575 U.S. at 272, but also a criterion the Commission itself adopted. Tr. 1 36:6–11. But from the start, the Commission wanted to split certain neighborhoods to pack and crack voters based on their race. *Cf. Covington v. North Carolina*, 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016) (splitting of neighborhoods "strongly suggests" racial predominance), *aff'd*, 137 S. Ct. 2211 (2017); *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F.Supp.3d 128, 148 (E.D. Va. 2018) (split subdivisions indicate racial predominance). Díaz de la Portilla noted that some neighborhoods like Flagami could be divided between districts

if they "will elect the same kind of representative." Tr. 1 33:14–16. But putting part of (predominantly Black) Overtown or Liberty City in his district was unacceptable.[9] Tr. 1 33:16–17.

At the second redistricting meeting on December 9, 2021, Díaz de la Portilla suggested splitting another neighborhood: Coconut Grove. He proposed adding portions to both District 3 and 4 "based on where the Hispanic voters live" to maintain the districts' "ethnic integrity," noting "there's ethnic diversity in Coconut Grove." Tr. 2 7:15–16, 13:15–17. The decision to split the Grove stemmed also from the desire to avoid "touching the racial integrity of District 5." Tr. 2 13:17–18. The District 2/5 "wall" that prevented District 5 from dropping below 50% BVAP compelled the Commission to remove population from overpopulated District 2's southern end instead. *See, e.g.*, Tr. 2 9:4–7; Tr. 3 42:21–43:6.

De Grandy's Feb. 7 Draft followed the Commission's direction, going into the Grove to move population from District 2 into 4. Responding to public comment opposing splitting parts of the historically Black West Grove, De Grandy justified his choice in racial terms. Tr. 3 41:23–42:11 ("put[ting] into conte[x]t what we're moving into, a majority-Hispanic district" and noting statistics of the area moved, indicating it is nearly majority-Hispanic). After continued public objection to the Base Plan splitting the West Grove, De Grandy stressed "the only allegation of racism results from the proposed movement of 114 Black residents who are currently represented by a commissioner who is not Black to a district that is represented by a commissioner who is not Black. . . . [Y]ou do not have to be a redistricting expert to conclude that the allegation of this plan is somehow racist is simply false and inflammatory." Tr. 5A 39:17–20, 40:6–7.

Commissioners' defenses for splitting the West Grove similarly highlighted their race-

---

[9]     Part of Overtown did end up in District 1—a 74.4% HVAP part. Abott Rep. 28. In contrast, the portion placed in District 5 is 61.0% BVAP. *Id.*; MIAMI CRA, https://bit.ly/3jseTOv.

based motivations. Carollo was explicit: splitting Coconut Grove was required to keep racial "balance and having a balance in the Hispanic districts." Tr. 3 54:5–9. Further, he objected to claims that by moving a portion of "the Black part of Coconut Grove to a district that's Hispanic, this disenfranchises them"—but "leav[ing] it in an Anglo area" would be fine. Tr. 3 18:2–6. He pointed out that no African Americans had ever been elected to District 2, implying that, since District 2 was the "Anglo seat" and District 4 was a "Hispanic seat," Black Groveites had no grounds to complain about being moved from one to the other. Tr. 3 18:7–11.

Remarkably, the *only* reasons De Grandy and the Commission majority *ever* gave for splitting Coconut Grove and moving portions into Districts 3 and 4 were race-based. In contrast, members of the public, including Plaintiffs, repeatedly implored the Commission to consider the numerous race-neutral reasons for keeping the neighborhood together in District 2, and the ways in which Coconut Grove constituted a "communit[y] defined by actual shared interests" rather than by race. *ALBC I*, 575 U.S. at 272 (quoting *Miller*, 515 U.S. at 916); *see, e.g.*, Tr. 3 24:17–26:7, 30:12–31:14; Tr. 4A 13:23–14:13, 16:10–20, 27:19–28:18; Tr. 5A 63:17–64:3, 64:13–65:9, 71:6–18, 77:23–78:14, 80:9–81:4; Tr. 6 22:13–23. Russell made similar appeals. Tr. 4B 18:20–19:2 (citing area's distinctive interests); Tr. 5A 45:18–46:1 ("they're looking for not a Black commissioner, but they're looking for someone to solve those issues"), 47:1–8, 48:4–6, 49:13–18 (responding to De Grandy's point that more Black residents were moved out of District 2 in Golden Pines than in the West Grove, by noting the neighborhoods' Black residents face different issues).

The Commission split many other neighborhoods to achieve their preferred racial divisions, harming these communities as a result. Little Havana straddles all three majority-Hispanic districts; Silver Bluff and Shenandoah ("distinct" and "historical" communities) are divided between Districts 3 and 4; and Flagami is split between 1 and 4. Tr. 3 52:5–7, 52:8–14, 52:16–17.

Allapattah and Overtown ("traditional communities") cross Districts 1 and 5, with more-Hispanic portions going to District 1 and less-Hispanic parts going to District 5. Tr. 1 17:20–22; Tr. 3 60:16; Abott Rep. 28. The Commission "cut up communities" like these to facilitate racial separation: "to make sure that there's gonna be an African American . . . to make sure there's an Anglo American" and "that in the rest of the districts that are majority Hispanic, that they stayed that way." Tr. 3 52:18–23; *see also* Tr. 6 38:9–16 (Carollo explaining why they split Little Havana, Shenandoah, Silver Bluff, Flagami), 38:23–39:20 (Reyes agreeing that splitting "real established communities" "has to be done in order to keep diversity"), 79:19–20 (Díaz de la Portilla: Carollo "broke up Hispanic neighborhood after Hispanic neighborhood cause he had to for the greater good.").

### *2. Compactness*

The Commission rejected directing De Grandy to draw geographically compact districts early in the process, subordinating this traditional criterion to race. Tr. 2 29:10–16. Díaz de la Portilla noted that "if you want to have an African American district and you want to have an Anglo district, it's almost impossible to emphasize compactness," so it's "a foregone conclusion" that districts would not be compact. Tr. 2 28:23–29:3. De Grandy concurred. Tr. 2 29:2–6. The districts are indeed visibly non-compact, featuring "irregular contours," "bizarre designs," and "unnecessary appendage[s]." *Shaw II*, 517 U.S. at 939; *In re Senate Joint Resol. 1176*, 83 So. 3d 597, 634 (Fla. 2012); *see* ECF 24-1 at 6–10. District 3 gains an irregular appendage south of US 1 into Coconut Grove, to pick up a more ethnically diverse, Hispanic area. Tr. 2 7:16–17. District 2 features a bizarre spur in Downtown, scooping out six less-Black city blocks from District 5. Abott Rep. 28. District 1 snakes along the north side of the Miami River to Flagler Street, an appendage designed to move more-Hispanic areas into District 1 from District 5. *Id.* at 27; Tr. 3 9:5–8; Tr. 4A 7:3–8. Districts 1 and 4 feature long tails stretching west to divide Flagami for racial purposes.

Tr. 6 38:9–15, 39:3–12. "[N]o matter how many ways one might try to describe the shape of [these districts], the word compact would not apply, elongated, or sprawling, perhaps—but certainly not 'compact.'" *Jacksonville I*, 2022 WL 7089087, at *37; *accord* Tr. 2 18:9–11 (Reyes stating only one district is compact), 18:4–5 (Russell: District 2 "the least compact as a district"), 2:10–11 (De Grandy: "Compactness, quite frankly, in this plan would be extremely difficult to achieve."), 17:20 ("Compactness, again, I don't think compactness is a feasible alternative."), 18:7–8 ("I mean look at the districts the way they are drawn, they are not compact."), 29:2–6 ("[Y]our plan is not really a plan of compact districts."); *contra* ECF 24-23 ("The districts in the adopted plan are relatively compact."). Such "highly irregular and geographically non-compact" shapes are "evidence of racial predominance." *Bethune-Hill II*, 326 F. Supp. 3d at 141 (quoting *Shaw II*, 517 U.S. at 905–06); *see also ALBC II*, 231 F. Supp. 3d at 1252–53 (non-compactness probative of racial intent).

### *3. Respecting Major Manmade and Natural Boundaries*

Drawing districts to respect major manmade and natural boundaries is another traditional redistricting principle the Commission subordinated to race. *See In re SJR 1176*, 83 So. 3d at 618, 636–38 (explaining this criterion as embodied in the Florida Constitution). De Grandy suggested the Commission consider using such boundaries as a factor, but there was no consensus to ratify it as a priority. Tr. 2 18:23–19:21. This debate largely focused on whether US 1 was a boundary that should be respected as the border of District 2, or whether Districts 3 and/or 4 should cross US 1 into Coconut Grove. Tr. 2 19:5–21. Ultimately, the Commission opted to cross US 1 "where the Hispanic voters live" to maintain Districts 3 and 4's "ethnic integrity." Tr. 2 7:17, 7:3.

The Enacted Plan deviates from major geographic boundaries for racial reasons elsewhere, too. The District 1/4 border in Flagami winds along two-lane residential streets. *See* Tr. 2 4:15–17 (De Grandy explaining major boundaries include section-line roads as opposed to local streets).

The piece of Allapattah moved into District 5 is bounded by two-lane streets, rather than I-95 and a federal highway as in the 2013 Plan. Further south, the District 1/5 border again deviates from I-95 to ensure a 61% BVAP tract stays in District 5. Abott Rep. 28. Downtown, the District 2/5 border departs from NE 2nd Avenue to scoop out an irregular, 14.2% BVAP six-block area. *Id.* The border strays from 2nd Avenue again just before the river to ensure a 5.5% BVAP tract stays on the District 2 side of the 2/5 "wall." *Id.*; *see ALBC II*, 231 F. Supp. 3d at 1253, 1300 (finding bizarre district protrusions racially motivated); *Bethune-Hill II*, 326 F. Supp. 3d at 161 (same).

### 2. Circumstantial Evidence of Racial Predominance

In addition to the staggering direct evidence, robust "circumstantial evidence of [the] district[s'] shape[s] and demographics" points to racial predominance. *Cooper*, 581 U.S. at 291.

#### a. Demographics of the Districts and Areas Moved

In her report, Dr. Abott examines the districts' shapes and demographics, studies the areas moved between the 2013 Plan and Enacted Plan, and concludes that race explains both the overall shapes of the Enacted Plan's districts, as well as the changes made from the 2013 Plan. Abott Rep. 1–2. In particular, Dr. Abott scrutinizes how the map splits precincts along racial lines to achieve even the most granular of racial sorting. *Id.* at 6–12. At every turn, district lines were carved with surgical precision to sort residents based on race. Dr. Abott also describes how alternative explanations—such as partisan gerrymandering, maintaining the existing districts' partisan makeups, and keeping incumbents in their districts—cannot explain the enacted districts' shapes or the areas moved from the 2013 Plan. *Id.* at 12–16. Further, the only discussion of incumbent protection during the process arose with respect to Carollo and District 3. Members of the public accused Carollo of wanting a property he owned in Coconut Grove moved into his District 3, so he could move there. ECF 24-22. But Carollo denied any such motivation—going so far as to state

27

he would support the area being moved into District 4 instead. Tr. 5A 7:9–8:4, 21:18–22:6; Tr. 6 57:14–16; *see also* Tr. 6 4:21–23.

### b. Rejected Alternative Configurations

Separate from the direct evidence of the Commission's race-based reasons for rejecting alternative configurations, circumstantial evidence about alternative rejected configurations and the evolution of draft plans further illuminates the race-based decisions behind the Enacted Plan. These include several key changes between the Feb. 7 Draft and the Feb. 22 Draft/Base Plan that served to better separate Anglo from Black from Hispanic residents into their designated districts:

- The Base Plan moved less of Coconut Grove into District 4. The portion moved now had a higher Hispanic population—59.2% HVAP versus 49.1%. Abott Rep. 25–26.

- A 76.6% HVAP area in Allapattah was moved into District 1 from 5, and a 66.7% HVAP area was moved out of District 1 into 5 in exchange. ECF 24-85 at 5. This swap increased District 1's Hispanic share while increasing District 5's Black share. Abott Rep. 23, 26.

- District 5 gained a small, 40.4% BVAP area of Downtown from District 1. In exchange, District 1 gained a 72.1% HVAP area west of I-95. ECF 24-85 at 4. This change increased District 1's Hispanic share and increased District 5's Black share. Abott Rep. 23, 26.

- Areas were swapped along the District 2/5 "wall": Two 13% BVAP blocks moved into District 2; and a 32.1% BVAP area moved into District 5. *Id.* at 26; ECF 24-85 at 4.

Each of these changes increased the dominant racial group's population share in each district, exacerbating the racial packing and stripping already present in the Feb. 7 Draft. Indeed, the Base Plan managed to increase the dominant-group VAP in Districts 1, 4, and 5. Abott Rep. 23. Of the three majority-Hispanic districts, the HVAP of the least-Hispanic district increased. *Id.* The average HVAP of those three districts also increased. *See id.*

Three other abandoned changes are probative as well. *First*, King requested restoring to District 5 part of the riverfront area that the Base Plan moved to District 1. Tr. 5A 37:5–6. De Grandy noted the request would lower District 5's BVAP to 49% and suggested "remedying" this to increase the BVAP. Tr. 5A 37:6–9. After consulting with King, this change was abandoned in favor of moving just the unpopulated Wharf into District 5, which did not impact the district's BVAP. Tr. 5B 4:21–5:7; Tr. 6 7:12–14; ECF 24-10 at 11.

*Second*, at the final meeting, Díaz de la Portilla suggested moving into District 5 a single 73% HVAP city block with a total population of 510 residents—the Flagler on the River condo tower. Tr. 6 6:12–15. De Grandy reported this change would lower District 5's BVAP to 49.97%— just below the 50% target. Tr. 6 6:16–17. De Grandy acknowledged that BVAP would comply with the VRA, but still recommended changing the proposal to bring the BVAP above 50%. Tr. 6 8:6–9. The Commission rejected the proposal, making further changes unnecessary.

*Third*, Carollo and De Grandy floated an alternative to moving the West Grove sliver into District 4: moving an area roughly between 22nd and 27th Avenues in the North Grove. Tr. 3 101:11–14, 102:2–3; Tr. 5B 3:8–9; 3/11/22 afternoon video, https://youtu.be/SyxiRlMTqu0, at 7:07. This area was even less Hispanic than the West Grove sliver—36.7% HVAP compared to 59.2%—and De Grandy never presented this option as a fully realized map. Abott Rep. 26, 28.

Altogether, the evidence demonstrates adherence to "announced racial target[s] that subordinated other districting criteria and produced boundaries amplifying divisions between blacks[,] whites" and Hispanics. *Cooper*, 581 U.S. at 300–01. Facing similar evidence, the Supreme Court noted a factfinder "could hardly have concluded anything but" racial predominance. *Id.* at 391.

**B. The Use of Race Does Not Satisfy Strict Scrutiny**

Plaintiffs are substantially likely to prevail because the City cannot prove that its unabashed race-based sorting of voters is narrowly tailored to a compelling interest, namely to comply with the VRA. To survive strict scrutiny, the City must prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* at 292 (quoting *ALBC I*, 575 U.S. at 278).

The City falls far short of the requisite showing. The Commission failed to conduct a "functional analysis of the electoral behavior within the particular . . . election district[s]" to ensure Black or Hispanic candidates of choice could usually prevail. *Bethune-Hill I*, 580 U.S. at 194 (citation omitted). Nor is there anything else in the record resembling "a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). Instead, the Commission set arbitrary racial thresholds, misused key metrics of VRA compliance, and ignored the absence of fundamentals of VRA liability with respect to four districts. Altogether, the Commission lacked the "strong basis in evidence" necessary to show its use of race was narrowly tailored to comply with the VRA.

## 1. There Was No Strong Basis in Evidence for an "Anglo Access District"

The Commission's overriding goal for District 2, drawing an "Anglo access district" with as many Anglo voters as possible "to have guaranteed Anglo representation," Tr. 3 100:16, lacked the "strong basis in evidence" required for narrow tailoring. Indeed, De Grandy advised at the very first meeting that "white, non-Hispanic, is not a protected class under the Voting Rights Act." Tr. 1 12:13–14. The Commission ignored this advice.[10]

To make out a vote-dilution claim under Section 2, a racial or language minority group

---

[10]     De Grandy was not quite correct on this point. Non-Hispanic white voters can make out VRA claims if they satisfy the elements for Section 2 liability. *United States v. Brown*, 561 F.3d 420, 433–35 (5th Cir. 2009). As explained below, Anglo voters in Miami clearly cannot do so.

must satisfy three preconditions: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group "is politically cohesive," and (3) the "majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (cleaned up). If the minority group satisfies the *Gingles* preconditions, the group must then prove that, "based on the totality of the circumstances," they "have less opportunity than other members of the electorate." 52 U.S.C. § 10301(b); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425–26 (2006). Section 2 then requires the creation of a district in which minority voters have an equal "opportunity . . . to elect representatives of their choice." 52 U.S.C. § 10301(b). Critically, the protected group need not necessarily form a majority of the population in a Section 2 remedial district, as long as protected-group "voters otherwise have an opportunity to elect a representative of their choice" in the remedial district. *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *83 (N.D. Ala. Jan. 24, 2022), *cert. granted before judgment sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022); *see Wright v. Sumter Cnty. Bd. of Elections*, 979 F.3d 1282, 1299 (11th Cir. 2020) (affirming district court's conclusion that "[t]he remedial plan should give[ ] African American voters a realistic opportunity to elect candidates of their choice").

In areas like Miami where there are significant differences between racial groups' citizenship rates, the first *Gingles* precondition requires a showing that it is possible to draw a district in which the minority group comprises a majority of the "voting age population as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997). But it is impossible to draw a majority-Anglo district. Abott Rep. 21. "If a State has good reason to think that all the 'Gingles preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper*, 581 U.S. at 302

(citations omitted). With a majority-WCVAP district impossible, the Commission lacked good reasons to believe an "Anglo-access district" was necessary to comply with the VRA. Its race-based decision to draw a predominantly Anglo district, therefore, was not narrowly tailored to achieve a compelling interest.[11] *Id.* at 306 ("[N]either will we approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake.").

### 2. There Was No Strong Basis in Evidence for Drawing Max-Hispanic Districts

Likewise, the Commission did not have a strong basis in evidence to maximize the Hispanic populations in Districts 1, 3, and 4. De Grandy repeatedly told the Commission that districts with lower Hispanic majorities than the ones eventually adopted would afford Hispanic voters the opportunity to elect preferred candidates. Tr. 3 at 7:6–8, 8:7–11 (Districts 1, 3, and 4 at 88.7, 88.4, and 88.0% HVAP "clearly compl[y] with the Voting Rights Act"); Tr. 5A at 52:12–13 (Initial Russell Plan's District 3 "would comply with the federal Voting Rights Act" at 85.2% HVAP); Tr. 6 at 8:6–7 (Revised Russell Plan and Reyes Plan "comply with the Constitution and the Voting Rights Act" with District 3 at 86.6 and 87.3% HVAP). The Commission rejected these lower-HVAP proposals in favor of even larger Hispanic majorities of 89.5, 88.3, and 89.5% HVAP for Districts 1, 3, and 4, respectively. Abott Rep. 23.

Even more significantly, Miami is 71.1% HVAP, 66.4% HCVAP, and 58.0% Hispanic by voter registration. *Id.*; ECF 24-93 at 76. Given the City's robust Hispanic majority, there was no "good reason" to believe that Hispanic voters were an effective "minority" in the City, or that the "majority votes sufficiently as a bloc to enable it . . . usually to defeat [Hispanic voters'] preferred

---

[11] Even if a majority-WCVAP district *were* possible, there is no factual basis, much less a strong showing, that in the "totality of the circumstances," the political process is less open to Anglos than the Hispanic majority. *See Wright*, 979 F.3d at 1288–89 (factors relevant to totality).

candidate." *Gingles*, 478 U.S. at 46–51. To the contrary, the evidence shows that, when voting is racially polarized, Hispanic-preferred candidates usually *prevail* citywide. Moy Rep. 2, 58. "Strict scrutiny requires much more" than "uncritical majority-minority district maximization." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022).

Because "proof of the *Gingles* threshold factors is a necessary precondition to Section 2 relief," *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994) (en banc), the Commission lacked good reasons to believe that drawing deliberately Hispanic-majority districts was necessary to comply with the VRA. *See also Cooper*, 581 U.S. at 304 ("[T]he State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions . . . ."). Its race-based decision to draw three districts with as large Hispanic majorities as possible, therefore, fails strict scrutiny.

### 3. The Arbitrary 50% BVAP Quota for District 5

The Commission also fell far short of strict scrutiny's demands when it adopted an uninformed 50% BVAP target for District 5. The Parties agree the VRA requires a district in which Black voters have an opportunity to elect candidates of their choice. *See, e.g.*, *PULSE v. City of Miami*, No. 1:96-cv-3327-JLK (S.D. Fla. Aug. 18 and Nov. 3, 1997) (granting partial summary judgment for Black voters in VRA case); Moy Rep. 2 (finding racially polarized voting and that Black voters' choice is usually defeated). But Plaintiffs disagree that the 50% BVAP quota was necessary or appropriate to provide that opportunity. In fact, such an arbitrarily high target limited Black voters' influence by stripping them from adjacent districts. "Determining what minority population percentage will" allow "members of a minority group to elect their preferred candidates" "is a difficult task requiring . . . a functional analysis of the electoral behavior within the particular election district." *Bethune-Hill I*, 580 U.S. at 801 (cleaned up). "[A] strong showing of a pre-enactment analysis with justifiable conclusions" can satisfy strict scrutiny. *Abbott*, 138 S.

Ct. at 2335. The Commission can make no such showing. Rather, its 50% BVAP floor was an "uncritical" assumption free of "other evidence or analysis." *Wis. Legislature*, 142 S. Ct. at 1249.

As a threshold matter, BVAP was deficient as a metric to gauge whether Black voters in District 5 had an opportunity to elect preferred candidates. As discussed above, it is not a majority-BVAP district—but rather, a majority-BCVAP district—that triggers Section 2 protection. *Negron*, 113 F.3d at 1569. Because of the differing citizenship and registration rates between Black and other racial groups, the BVAP proportion of a given area in Miami is generally lower than BCVAP, Black voter registration, or Black turnout in recent elections. Abott Rep. 23; Moy Rep. 42. Looking at BVAP therefore underestimates Black voting strength in a given district.

Dr. Moy conducted the "functional analysis of the electoral behavior within the particular . . . election district" to show the concentration of Black voters necessary to ensure an opportunity to elect their candidate of choice. *Bethune-Hill I*, 580 U.S. at 194 (citation omitted). Consistent with best practices, Dr. Moy conducted a racially polarized voting (RPV) analysis to determine VRA compliance. Moy Rep. 3–5. He finds RPV between Black and other voters in Miami and that Black voters are cohesive, confirming the second and third *Gingles* prongs. *Id.* at 2–42. The first prong is satisfied by the existence of a majority-BCVAP district in the Enacted Plan. Abott Rep. 23. But as discussed above, a Section 2 *remedy* district need only afford Black voters an opportunity to elect candidates of choice, and need not necessarily be 50% BCVAP or BVAP. Dr. Moy's examination of recent elections finds that Black voters will be able to elect candidates of choice when the BCVAP is at least 48.8%. Moy Rep. 42, 55. So, District 5's Black share—58.2% BCVAP—far exceeded what was necessary for Black voters to have the opportunity to elect their preferred candidates. Abott Rep. 23.

Moreover, the public implored the Commission to avoid packing Black voters into District

5 and even warned the Commission it risked violating the Constitution if it did not meaningfully assess the Black share necessary to achieve VRA compliance. *See, e.g.*, Tr. 4A at 34:7–14; ECF 24-28; 24-29. Even De Grandy advised sub-50% BVAPs would comply with the VRA. Tr. 3 at 8:17–19. In other words, not only did the Commission lack "good reasons" or a "strong basis in evidence" to conclude the VRA required its packing of Black voters, *Cooper*, 581 U.S. at 292–93, it had "good reasons" to know the *opposite*—that District 5's Black share far exceeded what was necessary to comply with the VRA.

## II.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

"Racial classifications with respect to voting carry particular dangers," *Shaw I*, 509 U.S. at 657, and Plaintiffs will suffer irreparable harm if elections are held under the Enacted Plan. Plaintiffs will be classified, sorted, and represented in districts resembling "political apartheid." *Id*. at 647. Meanwhile, commissioners elected under these lines will be "more likely to believe that their primary obligation is to represent" only one racial group "rather than their constituency as a whole." *Id.* at 648. These are serious, irreparable, "immense" harms. *Jacksonville II*, 2022 WL 16754389, at *5  (denying stay of preliminary injunction in racial gerrymandering case).

Plaintiffs seek no less than their fundamental right "to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). When impaired, this injury "cannot be undone through monetary remedies," *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). "Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." *Ga. State Conf. of NAACP v. Fayette Cnty.*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015).

## III.  The Balance of the Equities Weighs in Favor of Plaintiffs and Injunctive Relief is in the Public Interest

The irreparable harm Plaintiffs face outweighs any burden an injunction might create for

the City, and an injunction is in the public interest. The Miami-Dade County Elections Department can administer the November 2023 elections if it has district lines by August 1, 2023. ECF 24-30. "[C]autious protection of the Plaintiffs' franchise-related rights is without question in the public interest," *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005), and allowing elections to proceed under unconstitutional lines "would be harmful to the public's perception of the election's legitimacy," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). The public "has no interest in enforcing an unconstitutional law." *Scott*, 612 F.3d at 1297; *Abbott*, 138 S. Ct. at 2324 (irreparable harm "[u]nless that statute is unconstitutional"). The balance here is not a close call.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin the City, its officers, and agents from calling, conducting, supervising, or certifying any elections under the Enacted Plan, beginning with the regular 2023 elections, until entry of a final judgment.

## LOCAL RULE 7.1(d)(2) STATEMENT

To conduct the November 2023 elections, the Miami-Dade County Elections Department needs a map transmitted to it by the City Clerk by **August 1, 2023**. ECF 24-30. Therefore, if the Court grants this motion, a final ruling on an interim remedial map is needed before that date. To provide the City with "a reasonable opportunity . . . [to] adopt[ ] a substitute measure," *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978), and to give the Court time to review the parties' submissions on remedy, Plaintiffs suggest that a ruling on this motion is needed by **May 23, 2023**. A ruling by that date would provide 70 days for the City to enact a proposed interim remedy, for the Parties to submit briefs on remedy, for the Court to issue a ruling approving an interim remedy, and for the City to transmit it to the Elections Department. *See Jacksonville I*, 2022 WL 7089087, at *54.

## REQUEST FOR HEARING

In accordance with Local Rule 7.1(b)(2), Plaintiffs request oral argument should the Court find it useful to ask questions of counsel. Plaintiffs do not request an evidentiary hearing, but are prepared for one should Defendant request it.

Respectfully submitted this 10th day of February, 2023,

 /s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc**.
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc**.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
Jocelyn Kirsch*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com
jocelyn.kirsch@dechert.com

* *Admitted pro hac vice*

*Counsel for Plaintiffs*