UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED COMPLAINT**

Pursuant to S.D. Local Rule 7.1 and Fed. R. Civ. P. 12(b)(1) and (6), Defendant, City of Miami (the "City"), respectfully moves to Dismiss the First Amended Complaint[1] of Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro[2] (collectively, the "Plaintiffs").  As grounds, the Defendant states:

---

[1] The only substantive amendment to the complaint was the addition of Plaintiff Steven Miro.  The other amendments were essentially cosmetic.

[2] Grace, Engage Miami, South Dade NAACP, and Miami Dade NAACP are collectively referred to as "Organizational Plaintiffs."  Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro are collectively referred to as "Individual Plaintiffs."

I. **Introduction**

The City has had single member districts for its five commissioners (rather than at large elections) since 1997. DE 23 Am. Compl., ¶ 33-39, 59-64. In fact, as Plaintiffs now concede in their Expedited Motion for Preliminary Injunction, these districts have had substantially the same shape and essentially the same racial demographic make-up since the individual districts were first constituted and throughout the last several redistricting cycles. DE 26 p.4; DE 24-76 p.12 (2013 demographics prior to 2013 redistricting); DE 24-78 p.6 (2013 demographics of 2013 redistricting),; DE 24-80 p.1 (1997 map), p.2 (2003 map), p.3 (2013 map).[3]

The United States Census of 2020 (the "2020 Census") revealed that the City's Commission Districts became demographically unbalanced and no longer had substantial equality of population. *See Id*. ¶¶ 72-74. Following the 2020 Census, the ideal Commission district size was 88,448. *Id.*, ¶ 72. One district, the waterfront District 2, had once more grown significantly larger than the other four districts and needed to "shed" population to the other four districts. *Id.*, ¶ 75. Thus, in order to bring the population variance back to constitutionally acceptable levels, the City had to redistrict and had to shift people from District 2 to the other districts. This lawsuit challenges that redistricting as unconstitutional racial gerrymandering. It is unclear, however, why Plaintiffs brought the suit or what they want. The post-redistricting

---

[3] The papers cited are matters of public record and were attached to Plaintiff's motion and made part of the record in this case. "In determining whether to grant a Rule 12(b)(6) motion, the Court may also consider the allegations in the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Hodges v. Buzzeo*, 193 F.Supp.2d 1279, 1281 (S.D. Fla. 2002), citing *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996).

Districts are substantially the same as the pre-redistricting Districts. Compare figures 1 and 3 from the Amended Complaint.



Fig. 1. Miami City Commission districts under the 2013 Plan.



Fig. 3. The Feb. 22 Draft/Base Plan, showing the Feb. 7 Draft overlaid with blue lines.

After over twenty five years, Plaintiffs now challenge the racial composition of the districts as "packing" of minorities, even though, with each redistricting iteration including the present one, the racial concentrations reduced.

## II. Standard on a Motion to Dismiss

A complaint must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain sufficient factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possible and plausible relief. *See Iqbal*, 556 U.S. at 678. In this case, Plaintiffs have failed to satisfy their basic pleading burden.

## III. There Is No Factual Allegation Supporting That Racial Gerrymandering Occurred.

While Plaintiffs claim that all districts are racially gerrymandered, they base this on certain cherry picked statements made during the 2022 redistricting process. The Plaintiffs accuse the City of racial gerrymandering with the result of "packing" Black residents into District 5 and Hispanic residents into Districts 1, 3 and 4. DE 23 Am. Compl., ¶¶ 2, 15, 202, 277, 290, 308, 327, 331, 341, & Am Complaint § IV(C) at p.39. "[A] "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2492 (U.S. 2019) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018)). But Plaintiffs' allegation is conclusory.

While the Complaint is loaded with numbers and percentages, there is no "before and after" pleading. In other words, they do not allege that District 3 started with a Hispanic population of x % and now has a population of y %, where y is significantly larger than x. That

4

is because it did not happen. Additionally, the City's population is predominantly Hispanic.[4] Plaintiffs do not contend that redistricting could be accomplished without moving Hispanics. Even District 2, the so-called "Anglo" district, has more Hispanics than any other demographic group. *See* DE 23 Am. Compl., ¶ 78. Thus, Plaintiffs contend that the newly redrawn districts constituted racial gerrymandering that resulted in "packing" of Hispanic and Black residents into certain districts without alleging that the percentage of Black or Hispanic residents increased in any significant fashion or materially impacted the ability of those minority electors to elect the candidates of their choice as the result of the redistricting. In fact, with regard to Black residents of District 5, they allege the opposite. In paragraph 77 they allege that Black voting-age population was 52.9% prior to redistricting and that post redistricting it was 50.3%. *Compare id.*, ¶ 77 with ¶ 269. This is the opposite of packing, yet they assert without explanation that Blacks were packed into District 5 as part of this process. *Id.*, ¶ 15, 277.

Plaintiffs also do not break up their pleadings by District and Plaintiff. Instead, they try a shotgun approach, with hundreds of paragraphs related to different districts, and they finish with one cause of action. They provide a selective narrative of the Commission's process, cataloging each geographic area that was either moved or contemplated being moved, but fail to tie it to a particular allegation that the final moving of that parcel was unconstitutional. For example, Plaintiffs praise a particular redistricting map proposed by Commissioner Russel that was not

---

[4] Plaintiffs cherry pick the statistics that they quote and they jump between population counts, voting age population counts, and citizen voting age population counts without consistency. Nevertheless, one merely needs to look at paragraphs 76 and 103 and it is apparent that Districts 1, 3, and 4 were already overwhelmingly Hispanic and District 1 had more Hispanics than non-Hispanic White or Black residents.

adopted. *See* DE 23 Am. Compl. ¶ 137. That proposed plan moved a strip from the overpopulated District 2 into District 5. See Figure 4:



Fig. 4. The Russell Sketch (dark blue line).

Later, they complain that moving what is essentially the same strip constituted racial gerrymandering. *Id*. ¶¶ 217-269.



Fig. 10. Areas moved into and out of District 5 in the Feb. 7 Draft.

6

The result of the final drawing of District 5 was to "unpack" it and lower the percentage of Black residents. In essence, Plaintiffs complain that it should have been unpacked even more, making Black residents less than 50%, but they do not explain why. In other words, they do not allege that Black residents were moved out of District 2 into District 5 and that, as a result of the movement of the strip, it cost Black voters influence in District 2. It is not packing if it did not significantly affect the Plaintiffs' influence in the District. For example, District 2 is still the most populated, and District 5 is still the least. More of District 2 could be moved into District 5, increasing the number of white and Hispanic residents in District 5 and lowering the percentage of Black residents without increasing Black voter influence anywhere else.



*Fig. 1. Miami City Commission districts under the 2013 Plan.*

It would lower the percentage of Black voting age population solely for the sake of lowering it, jeopardizing their majority influence in District 5 in exchange for no benefit anywhere else.

Curiously, Plaintiffs also complain that one strip moved from District 2 to District 5, which had a Black voting age population of 32.1%, included a Federal Detention Center whose residents cannot vote. *Id*. ¶¶ 240-242. Plaintiffs allege that, if those incarcerated residents are

removed from the count, the Black voting age population of the strip is only 16.4%. *Id.* ¶ 243. Plaintiff include this observation even though the allegation is inconsistent with the accusation of Black voter packing and has no bearing on their claims.

One is left only with questions after reading the Amended Complaint. Which Plaintiff is complaining about the movement of which parcel in which District and why? The thrust of the complaint actually appears to be complaining about the movement of a small parcel of Coconut Grove consisting of 1597 residents, of whom only 114 are Black,[5] which parcel was moved from District 2 to District 4. Approximately 25% of the fact pleadings are devoted to a discussion of this area which only affects a tiny percentage of voters and only certain Plaintiffs.[6] Plaintiffs claim that the movement of this parcel was racial gerrymandering, but they don't explain why. In paragraphs 327-334 they assert that the result of this move was racial gerrymandering to "pack" Hispanics into District 4. As with District 5, the numbers pled belie the conclusory allegation. District 4 started with a Hispanic voting age population of 91.6 % and a Hispanic Citizen voting age population of 90.1% (*Id.*, ¶ 76), and ended with a Hispanic voting age population of 89.5 % and a Hispanic Citizen voting age population of 88.2% (*Id.*, ¶ 340). The District was not packed. Moreover, the parcel in question that was moved only had a Hispanic voting age population of 81.8% (*Id.*, ¶ 330). Reducing the Hispanic voter population in a district is the opposite of packing.

---

[5] DE 23 Am. Compl. ¶¶ 121, 152. Originally, 497 black voters would have been moved (*id.* ¶ 108), but this was reduced to 114.

[6] *See* DE 23 Am. Compl. ¶¶ 91-96, 105-117, 121, 130-142, 148-161, 167-172, 176-180, 183-84, 265-267, 291-295, 297-302, 315, 327-328, 337-340.

The gripe about District 3 suffers the same infirmity.  District 3 started with a Hispanic voting age population of 88.5% and a Hispanic Citizen voting age population of 86.81% (*Id*., ¶ 76), and ended with a Hispanic voting age population of 88.3 % and a Hispanic Citizen voting age population of 86.9% (*Id*., ¶ 326).  It was not packed as part of the redistricting.

No individual plaintiff is from District 1.  District 1 in the enacted redistricting plan has a Hispanic voting age population of 89.5% and a Hispanic citizen voting age population 84.8%. *Id*., ¶ 289.  This too is less than before redistricting, where the percentages were 91% and 86.8%..  *See Id*., ¶ 76.  District 1 was not packed as part of redistricting.

Bizarrely, Plaintiffs freely admit that Districts 1, 3, and 4 were predominantly Hispanic and remain predominantly Hispanic, and yet they complain that the internal boundaries between the three Districts resulted in "packing."  *Id*., ¶¶ 341-350.  The allegation is a non-sequitur.  An internal boundary between the three districts with very similar Hispanic populations cannot result in the packing of all three of them.  By definition, if one of them is being "packed" at the expense of the others, than the others are not being packed.  They can't all be packed, and they can't pack each other.  And Plaintiffs cannot claim that Hispanic influence was diluted in any of them.

As set forth above, Plaintiffs do not dispute that residents had to move from District 2 into the other districts.  As also set forth above, no district was racially packed as a result of the redistricting.  Similarly, Plaintiffs do not allege that any population was diluted within District 2 by the redistricting.  In fact, while Plaintiffs appear to acknowledge that Districts 1, 3, 4 and 5 are majority minority districts that may be required to comply with the VRA, *Id*., ¶ 12, the Amended Complaint fails to identify any specific provision of the VRA or the *Gingles* factors, set forth in *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986), that did not justify the drawing of

each District. *See Broward Citizens for Fair Districts v. Broward Cnty.*, No. 12-60317-CIV, 2012 WL 1110053, at *9 (S.D. Fla. Apr. 3, 2012). Once more, these essential minority districts with the same racial composition have been in place since 1997. The only change has been a reduction of the racial concentrations.

If Plaintiffs are challenging alleged racial gerrymandering that occurred in 1997 when the original single member districts were drawn in order to ensure that the City would have the opportunity to elect a Black representative on the Commission [DE 26 p.4; DE 24-42 to 65], then of what relevance is a 55-page Amended Complaint rife with statements made in a 2022 redistricting that simply maintained the status quo and resulted in a lowering of the racial concentrations? Plaintiffs do not challenge the 1997 establishment of these districts at all.

While Plaintiffs allege that race was discussed during the 2022 process, Plaintiffs do not allege that racial electoral outcomes were affected in any way by the redistricting except in the most conclusory terms. The numbers pled refute the conclusory allegation. In the end, the Amended Complaint does not support that racially gerrymandering actually occurred as a result of the redistricting process. The Amended Complaint fails to state a claim upon which relief may be granted.

### IV. The Amended Complaint Does Not Allege Significant Numbers of any Minority Group Were Moved as Part of a Racial Gerrymander

In a racial gerrymandering case, the plaintiff bears the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of *a*

*significant number of voters*. *Id.* As discussed above, none of the parcels moved in the redistricting resulted in the change of a significant number to justify packing or dilution.[7]

In the Amended Complaint, Plaintiffs take great exception to the notion that District 5 is a majority Black district. They claim that there was an arbitrary racial quota for Black residents, and that it failed to account for the voting age citizen population. DE 23 Am. Compl. ¶¶ 217-269. Ironically, they cite *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997). In *Negron*, the Court held that to prove a dilution case, a plaintiff needed to establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided among districts to dilute their impact. In *Negron*, the Court stated that in some cases, you could refine the voting age population numbers by citizenship (because non-citizens cannot vote). Plaintiffs here do not bring a voter dilution case. They do not contend that the Black population was large enough to elect an additional commissioner in a second district. It is not. In fact, they claim the opposite. They assert that the slim Black majority in District 5, should have been further reduced, thus jeopardizing the one Black seat in return for nothing. Plaintiffs do not even allege there would be a significant increase of influence in the other districts, and the percentage could be lowered by moving more of District 2 into 5 with no increased Black voter influence in any other District. Plaintiffs do not allege any number of sufficient significance to support a dilution claim. For example, they imply that the movement of 114 Black voters in Coconut Grove from District 2 to District 4 diluted the Black voter influence in the Coconut Grove area of District 2. This is absurd. In a district of over 88,000

---

[7] The Plaintiffs do not actually allege dilution. Instead, they quote the Chair of one of the plaintiffs making a public comment alleging that there was dilution. DE 23 Am. Compl., ¶ 107. As set forth above, the numbers do not support the claim.

11

members, 114 people are 0.1%. Approximately 0.1% of the population of a district is not a significant number of voters. *Compare Perez v. Abbott*, 267 F. Supp. 3d 750, 792 (W.D. Tex. 2017), *aff'd in part, rev'd in part and remanded*, 138 S. Ct. 2305 (2018) (concluding 14,102 voters comprising 8.4% of a district's ideal total population was a significant number of voters). In fact, the term significant describing the number of voters being placed within or outside a district is found nowhere in the Amended Complaint.

### V. The Amended Complaint Does Not Support That District 5 Should Not Be a Majority Minority District.

Governments cannot make race a predominating factor in the drawing of districts without justification. Compliance with the Voting Rights Act (the "VRA") is one such justification. DE 23 Am. Compl. ¶ 12. Therefore, governmental bodies can consider race and create majority minority districts if the factors set forth in *Gingles* are met (1) the minority group must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured district, (2) the group must be "politically cohesive," and (3) the majority must "vote[] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." 478 U.S. at 50–51. Plaintiffs do not allege that any of these conditions are not satisfied. While Plaintiffs appear to complain about the fact that District 5 is a majority Black voter district, they don't allege that it should not be one.

Even if one were to ignore the numbers in the Amended Complaint and engage in the fiction that the redistricting process created this majority minority district, it is Plaintiff's burden to plead facts demonstrating the drawing of a majority minority district was not required. There is no requirement that the City demonstrate its analysis for Plaintiffs at public meetings. In this case, the consultant performed the analysis. DE 23 Am. Compl., ¶ 231. Plaintiffs also assert that the City did not demonstrate a Voting Rights Act ("VRA") analysis sufficient to justify a

compelling interest in having a majority Black district. *Id*. ¶¶ 12, 220-225, 354-357. First, as set forth above, this was a pre-existing district. The redistricting process did not create it, and in fact, lowered the percentage of Black voters. Second, Plaintiffs forget the burden here.

> When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 187 (2017)(quoting *Alabama Legis. Black Caucus v. Alabama (ALBC I)*, 575 U.S. 254 (2015)). Miami had good reason to believe that it needed to maintain the majority minority district.

Plaintiffs do not dispute that the first two *Gingles* factors are met. They allege that that there is no indication that there was an analysis as to whether racially polarized voting occurs, [DE 23 p.53] but they do not allege that it does not occur. In their Expedited Motion for Preliminary Injunction they now concede that racially polarized voting occurs and that a majority Black district is required by the Voting Rights Act. DE 26 p.33. So why have they set forth dozens of pages of irrelevant pleadings decrying racial discussions during the meetings when Plaintiffs concede that a majority minority district was indeed required? In light of the concessions in the Expedited Motion for Preliminary Injunction, it seems that the only gripe is that the district is not narrowly tailored enough and the black majority, a bare 50%, should have been pared down a few percentage points more.

There is no requirement that the City prove that it pared the required majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5

13

> demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 195-96 (citations omitted).

> Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196. The Amended Complaint concedes that the City's consultant advised that the vote cannot be diluted anymore without "affecting the African American population's ability to elect a candidate of its choice in D5." DE 23 Am. Compl. ¶¶ 228, 238. The Commission was concerned that a mere 51% majority may not be sufficient. *Id*. ¶¶ 233-34, 251. They were particularly concerned that current population trends would cause members of the minority group to lose the ability to elect the representative of their choice. *Id*. ¶ 258.[8] The Amended Complaint establishes that Miami had good reason to believe it was setting the population appropriately.

In the end, Plaintiffs do not allege any significant form of vote dilution of Black residents in any other district. Shifting residents for the sole purpose of narrowing the Black majority down to some mathematically precise knife's edge is not Constitutionally required, and would not benefit the voters of District 5.

---

[8] As described above, the Motion for Preliminary Injunction exhibits demonstrate that the percentage of black voters in District 5 has declined with each iteration. District 2, along the water, continues to grow.

VI. **The Amended Complaint Creates Conflict Between the Hispanic Population And the Black Population**

The City of Miami is over 71% Hispanic. DE 24-31, p.23. There is no way to create districts without supermajorities of Hispanic residents. Districts 1, 3 and 4 currently have supermajorities of Hispanic residents. As part of redistricting, they each had to gain population and District 2 had to shed population. As set forth above, the Hispanic resident and voter concentrations decreased slightly as part of this process. Ignoring that for the moment, do Plaintiffs challenge the original compositions dating back to 1997 as packing? If so, one must question where Hispanic influence is diluted. Plaintiffs do not allege it, but one District is obvious. Hispanic voter concentration is the lowest in District 5. *Id*. This is the only district that is not predominantly Hispanic. Even District 2 is 48.6% Hispanic. *Id*. Plaintiffs appear to be at cross purposes with one another. This is not an intellectual exercise. They are challenging the districts where citizens vote. If they succeed, those districts' composition will change. What is it they want? Are they asking the City to eliminate the Black majority district and replace it with a Hispanic majority district?

VII. **The Amended Complaint Is a Shotgun Pleading that Must Be Broken Down by Plaintiff and District**

As set forth above, Plaintiffs have tried the kitchen sink approach to pleading. They start with nine plaintiffs, challenge all five districts, throw in 364 paragraphs cataloging the redistricting process, add paragraphs regardless of whether they support or refute their claims, and then finish with a single cause of action seeking to throw out all five districts on behalf of all plaintiffs. That is a quintessential shotgun pleading. In the end it is impossible to tell which Plaintiff is complaining about the movement of which parcel as part of the redistricting that resulted in what form of racial gerrymandering.

"A racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district." *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). A plaintiff only has standing to challenge that plaintiff's particular district and an organization only has standing to challenge districts where its members reside. *Id*. at 269. Therefore, not every Plaintiff here would have standing to challenge every district.

> The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked. This "disadvantage to [the voter] as [an] individual[]," *Baker*, 369 U.S., at 206, 82 S.Ct. 691 therefore results from the boundaries of the particular district in which he resides. And a plaintiff's remedy must be "limited to the inadequacy that produced [his] injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In this case the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district.
>
> For similar reasons, we have held that a plaintiff who alleges that he is the object of a racial gerrymander — a drawing of district lines on the basis of race — has standing to assert only that his own district has been so gerrymandered. *See United States v. Hays*, 515 U.S. 737, 744-745, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, "assert[s] only a generalized grievance against governmental conduct of which he or she does not approve." *Id*., at 745, 115 S.Ct. 2431. Plaintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed "district-by-district." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. ___, ___, 135 S.Ct. 1257, 1265, 191 L.Ed.2d 314 (2015).

*Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018).

A "shotgun" pleading fails "to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.* 792 F.3d 1313, 1323 (11th Cir. 2015). Causes of action that "present more than one discrete claim for relief" are classified as "shotgun pleadings." *See Bickerstaff Clay Prods. Co., Inc. v. Harris Cty., Ga. By & Through Bd. of*

*Comm'rs*, 89 F.3d 1481, 1484 n.4 (11th Cir. 1996). Here, each Individual Plaintiff and each Organizational Plaintiff fail to assert their own discreet claim.

The Amended Complaint should only assert allegations that support a cause of action for racial gerrymandering in the redistricting process. Each challenge to the redistricting of a district should only include those Plaintiffs with standing to challenge that drawn district and only incorporate those allegations that support an actual racial gerrymandering of a particular district in relation to a specific Plaintiff.

**VIII.   The Amended Complaint Does Not Allege Facts Sufficient to Demonstrate Standing.**

For many of the same reasons that Plaintiffs' shotgun-pled Amended Complaint is deficient, Plaintiffs also lack standing. "[T]he irreducible constitutional minimum of standing contains three elements. **First**, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, *not conjectural or hypothetical*. . . . **Second**, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action *of the defendant*. . . . **Third**, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted) (emphases supplied). An "imminent" injury sufficient to confer standing is one that will "proceed with a high degree of immediacy." *Id.* at 563, n.2; *31 Foster Children v. Bush*, 329 F.3d 1255, 1266–67 (11th Cir. 2003) (same). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561, (1964)). An aggrieved plaintiff must allege facts "showing disadvantage to

17

themselves" to demonstrate standing. *Id*. (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). A plaintiff alleging that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered. *See United States v. Hays*, 515 U.S. 737, 744–745 (1995).

Here, the Amended Complaint fails to identify how each Plaintiff is harmed. For example, all Plaintiffs universally claim that Hispanics are packed into Districts 1, 3, and 4, *see* DE 23 Am. Compl., ¶ 202, 271, and that Black residents were packed into District 5, *see Id*. ¶ 15, 245, 277. Nonetheless, the Complaint only identifies Alexandra Contreras in District 4 and Steven Miro in District 3 as the only Hispanic plaintiffs in Hispanic districts. *Id*., ¶ 27. In contrast, Yanelis Valdes is a Hispanic that was placed in District 5, the majority Black district. *Id*., ¶ 27. It is unclear how Contreras, Miro or Valdes are harmed because there are no factual allegations that their vote has been diluted as a result of the number of Hispanics placed in any district. Clarice Cooper is a black resident in District 2 and Jared Johnson, is a Black resident in District 3. *Id*., ¶ 25-26. Likewise, there are no allegations that Cooper and Johnson's vote has been diluted by virtue of the packing of Blacks in District 5. The only alleged resident of District 5 is a Valdes, a Hispanic. There is no Individual Plaintiff residing in District 1. Despite the lengthy narrative of the legislative process that produced the City's redistricting plan, it is unclear the racial harm Plaintiffs claim arose from each allegedly gerrymandered District, or how that harm impacts each Plaintiff in each District as a result of their race. And Plaintiffs have not brought a vote dilution challenge under Section 2 of the VRA. As such, the claims of Individual Plaintiffs fail for lack of standing.

The claims of the Organizational Plaintiffs fare no better. An association must show that "its members would have standing to sue in their own right, the interests at stake are germane to

the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 269 (2015) (citations and quotations omitted). As to the Organizational Plaintiffs, there is only a single conclusory allegation of harm: the Organizational Plaintiffs will be harmed by living and voting in unconstitutionally racially gerrymandered districts. DE 23 Am. Compl. ¶ 24. There are no allegations that spell out how the members of the Organizational Plaintiffs are actually harmed by any of the re-drawn districts. And as the Supreme Court has made clear, allegations of racial gerrymandering require a "district-by-district" analysis. *Gill v. Whitford*, 138 S. Ct. 1916 at 1930. Such allegations of standing are lacking as to the Organizational Plaintiffs and their members. Lacking clear allegations of harm, Organizational Plaintiffs' claims should also be dismissed.

WHEREFORE, Defendant respectfully requests that the Court dismiss Plaintiffs' Amended Complaint.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887


By:     *s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311


CITY OF MIAMI
Kevin Jones, Esquire
Florida Bar No. 119067
Bryan Capdevila, Esquire
Florida Bar No. 119286
Eric Eves, Esquire
Florida Bar No. 91053
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   s/ *Christopher N. Johnson*
         Christopher N. Johnson