UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.

_____/

## DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

Pursuant to S.D. Local Rule 7.1 and Fed. R. Civ. P. 65(A), Defendant, City of Miami (the "City"), files this Memorandum of Law in Response to Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro[1] (collectively, the "Plaintiffs") Expedited Motion for Preliminary Injunction (the "Motion").  DE 26.  As grounds, the Defendant states:

---

[1] Grace, Engage Miami, South Dade NAACP, and Miami Dade NAACP are collectively referred to as "Organizational Plaintiffs."  Clarice Cooper,  Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro are collectively referred to as "Individual Plaintiffs."

## I.    Introduction

Plaintiffs baldly assert that, as a result of the redistricting of 2022, a city that has at least an 85% minority population (Black and Hispanic) has districts that both "pack and crack" based on race.   DE 26 p.22.   The redistricting did nothing of the kind, and Plaintiffs challenge core district divisions that have been in place for over 25 years.   Additionally, they make no cognizable case for either packing or cracking, let alone one likely to succeed on the merits. Cracking consists of breaking up a group across districts to prevent its members from having sufficient concentration to elect their chosen representative in any district.   Plaintiffs do not allege a single instance of cracking any minority group in either their pleadings or Motion.   They claim District 5, the majority Black District, was packed but admit it needed to be concentrated to comply with the Voting Rights Act (the "VRA").[2]   DE 26 p.33.   While they complain endlessly of reassigning a tiny sliver of the West Grove from District 2 to District 4, the numbers are insignificant and they do not allege this resulted in a diminishment of influence by any group in either district.

Plaintiffs also fail to make a case of packing.   Black voters are a bare majority of District 5, and Plaintiffs do not allege they have significant diminished influence in any other district as a result.   Additionally, the City is over 71% Hispanic. DE 26 p.32.   With a Black majority district, other districts will unavoidably have concentrations of Hispanics in excess of 71%.   Moreover, Plaintiffs do not point out that the redistricting diminished their influence elsewhere.   Hispanics are the majority in Districts 1, 3 and 4.   Even in District 2 they are the largest group.   District 2 is not "Anglo."   It never was.   DE 24-11 p.12 l.18-19 ("I will tell you, interesting fun fact, there is

---

[2] The Black Voting Age Populations (BVAP) is 50.3%.   DE 26 p.16.   Yet, Plaintiffs assert Black voters were "packed."

no Anglo district, District 2 is 52% Hispanic").  There was no actionable racial gerrymandering, and no group was either packed or cracked or had its influence diluted elsewhere.

## II.    History

The City has had single member districts for its five commissioners (rather than at large elections) since 1997.  DE 23 ¶ 33-39, 59-64.  These districts have had substantially the same shape and essentially the same racial demographic make-up since the individual districts were first constituted and throughout the last several redistricting cycles.  DE 24-80 to 83.  The shape of the districts are largely dictated by the municipal borders and certainly are not characterized by irregular shapes and appendages like those at issue in *Cooper v. Harris*, 581 U.S. 285, 323 (2017) (depicting challenged Districts 1 and 12 in North Carolina's enacted plan).



**Black majority in District 5 prior to 2013 redistricting**:

| DIST. | POP. 2010 | ACTUAL DEV. | % DEV. | % NON BLACK HISP | % NON HISP BLACK | % NON HISP WHITE |
|-------|-----------|-------------|--------|------------------|------------------|------------------|
| 1 | 77,741 | -2,150 | -2.69% | 82.20% | 6.34% | 4.54 |
| 2 | 96,080 | 16,189 | 20.26% | 50.40% | 12.57% | 31.85 |
| 3 | 77,690 | -2,201 | -2.76% | 86.65% | 1.40% | 7.21 |
| 4 | 80,680 | 789 | 0.99% | 89.83% | 0.49% | 6.66 |
| 5 | 67,266 | -12,625 | -15.80% | 19.84% | 71.59% | 3.74 |
| TOTAL | 399,457 | 28,814 | 36.06% | | | |

**Black majority in District 5 after 2013 redistricting:**

| DIST. | VAP 2010 | % BLACK | % HISPANIC | % WHITE |
|-------|----------|---------|------------|---------|
| 1 | 62,536 | 12.34 | 83.6 | 3.38 |
| 2 | 69,454 | 9.93 | 51.29 | 35.26 |
| 3 | 64,163 | 5.32 | 87.62 | 6.17 |
| 4 | 69,022 | 2.67 | 90.99 | 5.47 |
| 5 | 60,836 | 67.36 | 24.62 | 6.74 |

**Black majority in District 5 after 2022 redistricting:**

Population by Race & Ethnicity

| District No. | D1 | % | D2 | % | D3 | % | D4 | % | D5 | % |
|--------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Total Pop | 88,108 | | 89,309 | | 93,246 | | 85,000 | | 86,578 | |
| SR White | 4,011 | 4.55% | 32,913 | 36.85% | 9,575 | 10.27% | 7,020 | 8.26% | 8,310 | 9.60% |
| Black | 9,762 | 11.08% | 6,727 | 7.53% | 5,055 | 5.42% | 2,660 | 3.13% | 45,182 | 52.19% |
| Hisp | 77,604 | 88.08% | 43,876 | 49.13% | 78,948 | 84.67% | 75,473 | 88.79% | 34,571 | 39.93% |

Voting Age Population by Race & Ethnicity

| District No. | D1 | % | D2 | % | D3 | % | D4 | % | D5 | % |
|--------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Total VAP | 72,844 | | 77,482 | | 77,752 | | 72,388 | | 68,734 | |
| SR White | 2,523 | 3.46% | 28,777 | 37.14% | 7,695 | 9.90% | 5,190 | 7.17% | 7,243 | 10.54% |
| Black | 8,037 | 11.03% | 5,673 | 7.32% | 4,219 | 5.43% | 2,174 | 3.00% | 34,551 | 50.27% |
| Hisp | 65,206 | 89.51% | 38,058 | 49.12% | 66,247 | 85.20% | 65,212 | 90.09% | 27,929 | 40.63% |

DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6.

Notably, the Black majority in District 5 has shrunk with each redistricting since 1997.

### A.    District 5

As shown in the charts above, the Black voting age population has steadily decreased in both relative and absolute terms in both District 5 and the City as a whole.[3]  District 2 runs along

---

[3]  2013  BVAP  across  all  districts:  (62536*.1234)  +  (69454*.0993)  +  (64163*.0532)  + (69002*.0267)  +  (60836*.6736)  is  approximately  60,849  BVAP  in  2013.   Compare  this  to

the water and adjoins District 5 in the North and Districts 1 and 4 in the South.  It has grown in each iteration and had to shed population each time.  After the 2020 census, District 2 had to shed population again, and the other districts needed to gain population.  DE 24-3 p.6.



Plaintiffs concede that District 5 needed to be a majority Black District to comply with the VRA.  DE 26 p.33.  Thus, while a considerable amount of the Motion and Dr. Abott's expert report are dedicated to discussions about whether race was a motive in redistricting choices made with regard to District 5, that discussion is irrelevant.  Plaintiffs concede race was a legitimate, Constitutional factor and are only quibbling about what percentage majority was necessary. *Cooper*, 581 U.S. at 306 ("We by no means insist that a state legislature, when redistricting, determine precisely what percent minority population § 2 of the VRA demands.")(cleaned up). District 5 joins two Black population concentrations.  The first is in the North in the area labelled Little River, Liberty City and Little Haiti in the maps above.  The second is in the South in the vicinity of Overtown.  With a declining Black population in both absolute and relative terms, the City maintained this link and maintained the Black voting age population at just over 50%.

---

BVAP in 2022: (7760 + 6097 + 3941 + 2600 + 34292) = 54690.  This is a 10% reduction from 2013 citywide.

Plaintiffs assert that Black residents were "packed" into District 5 during the redistricting, even though the percentage of Black voting age population was reduced as part of the redistricting, even though they admit that the VRA required the maintenance of a majority Black district, and even though the Black voting age population majority is a mere 50.27%.  DE 26 p.34 (citing to DE 24-32 pp. 42, 55).  They make this assertion by referencing their expert's analysis of one of the circuit court races where the Black voters were able to elect their preferred candidate with a 49% share of the voters (which they extrapolate to 48.8% of the Black voting age citizens).  Id.  They claim that District 5 has a 58.2% majority of Black citizen voting age population to make their case for packing.  In actuality, Dr. Moy does not opine that Black voters in District 5 need any particular percentage of the voting age citizens to elect the candidates of their choice.  He simply analyzes past races to conclude that there is racially polarized voting. DE 24-32 pp. 58.

Plaintiffs do not allege that Black residents were moved out of any other district into District 5 and that, as a result of the movement of the strip, it cost Black voters influence in that other district.  As explained below in the argument, it is not packing if the alleged concentration did not significantly affect the Plaintiffs' influence in another district.  Plaintiffs do not dispute that District 5 had to grow, and District 2 had to shrink.  The three districts bordering District 5, Districts 1, 2 and 3, are all larger than District 5.  More of Districts 1, 2 and 3 could be moved into District 5, increasing the number of white and Hispanic residents in District 5 and lowering the percentage of Black residents, without increasing Black voter influence anywhere else.[4]   It

---

[4] While Plaintiffs are quick to point out that there is a larger percentage of citizenship among Black residents than Hispanic residents citywide, that does not hold true on a district by district basis.  Accepting Dr. Abott's numbers, the percentage of Black voting age residents is lower than

would lower the percentage of Black voting age population solely for the sake of lowering it, jeopardizing their majority influence in District 5 in exchange for no benefit anywhere else.

### B. The Historic West Grove

Plaintiffs spend an in ordinate amount of the Amended Complaint and the Motion addressing Coconut Grove. Prior to the 2022 redistricting, all of Coconut Grove was part of District 2. Because District 2 had to shed population, the City looked at reassigning part of Coconut Grove to District 4. The original plan discussed on February 7, 2022 would have taken that portion of District 2 bordered by SW 25th Street in the North, Day Avenue in the South and SW 27th Avenue in the East and assigned it to District 4. DE 24-5 p. 6. The portion of this area South of US 1 is part of the Coconut Grove community. It is demonstrated on the map below.



DE 24-4 p.26.

---

the percentage of Black citizens voting age residents in Districts 1, 3 and 4. DE 24-31 p.23. Similarly, Hispanics are 41.6% of the voting age population in District 5, but only 30.9% of the citizen voting age population. But this discrepancy does not exist in the other districts. In other words, as more residents are brought in from the neighboring districts, the percentage of Black citizen voting age population will drop quickly.

Plaintiffs make much of the fact that, at the February 7 meeting, there was considerable complaint that the plan would split the historically Black West Grove neighborhood.  DE 26 p.8. This is a historic Black community settled by Bahamian immigrants and that still has some of original historic Florida pine homes and the iconic Coconut Grove Cemetery with its above ground internments.  Plaintiffs define this neighborhood as the area bounded by US 1, McDonald Street and Franklin Avenue.  DE 26 p.7 n.7.  That area is highlighted in light blue below in the February 7 plan.



The complaint was that this neighborhood would be split between two districts.  As a result, the City modified the plan to leave the West Grove intact.  The Plan for February 25 that shows the final parcel of the Grove that was incorporated into District 4 is set forth below and labelled D17.



DE 24-7.  The Consultant explained this change at the meeting.

> [W]e reduced the number of residents moved from the Grove to other districts by more than half, from 6,384 to 2,930 and 89.  All of that reduction came from the area south of US 1 that was initially moved into D4. By moving the boundary up from Day Avenue to Bird Avenue, we reduced the amount of residents moved into D4 from 5,071 to 1,597. As to that area, there were concerns expressed that we were moving 497 Black residents from D2 to D4. The revised plan reduces that number to 114.

DE 24-14 p.5.  D17 of the revised plan is in red below.  Only a tiny corner of what Plaintiffs define as the West Grove is affected.  That area is highlighted with the arrow below.



The tiny portion of the "West Grove" that intersects with D17 (highlighted with the red arrow) is not the historic Bahamian West Grove.  It consists of some businesses just west of the Home Depot, including a car wash, a gas station, and a fast food restaurant, and some apartment and condominium buildings.



A representative of both NAACP plaintiffs appeared at the February 25 hearing to ensure that the Black vote would not be diluted in District 5 and that the West Grove would remain together in the same district and not dilute the Black vote in District 2.   DE 24-14 p.14.   She was assured that the West Grove was staying intact and the Black vote would not be diluted in either District 2 or 5.   Id.   She thanked the Commission and stated she was looking forward to seeing the numbers.   Id.   Similarly, a representative of Plaintiff GRACE spoke and stated she was glad to hear that the historic Black West Grove was remaining intact.   Id. p.16.   The numbers bear out the promise made at the hearing.   The Black vote was not diluted in District 5 and remained a majority.[5]   The historic Black West Grove also remained intact, and, with only 114 Black residents being moved; thus the community's influence was not diluted in District 2.

In the Motion, however, Plaintiffs claim that at the February 25, 2022 meeting, "[p]ublic comment again centered on objections to splitting Coconut Grove, including the continued division of the West Grove."   DE 26 p.9.   This is patently false.   Plaintiffs are quoting from Transcript 3, which is the February 7 meeting.   DE 26 p.9 (citing DE 24-13).   Plaintiffs cite liberally to Transcript 3, which was the February 7 meeting after which substantial changes were made to the plan to accommodate public concern.   Later in the Motion, Plaintiffs continue to quote from the February 7 meeting when discussing the plan, claiming that the West Grove was split for racial reasons. [6]   DE 26 p.23-24.   As set forth above, a review of the actual plan proves

---

[5] Ironically, the NAACP parties are suing the City for not diluting the Black vote in District 5.

[6] Plaintiffs themselves seem confused by current state of affairs.   Ms. Donaldson and Ms. Cooper filed declarations expressing concern about breaking up the historic West Grove (DE 24-33 and 24-37), which is no longer happening.

this is far from the truth.  Plaintiffs seek to use the discussion of a discarded plan to challenge the adopted plan and simply hope that it won't be examined too closely.

### C.      Compactness.

The City districts are all facially compact.  None of them are the convoluted gerrymandered districts of the cases cited by Plaintiffs in cases like <u>Cooper v. Harris</u>, 581 U.S. 285, 292 (2017):



Congressional District 1 (Enacted 2011)            Congressional District 12 (Enacted 2011)

Most of Plaintiffs' complaints about compactness are along the District 5 border.  As explained below, Plaintiffs concede that the VRA required that a Black majority District be created therefore it was not unconstitutional to gerrymander that district to achieve that result.  The only other real complaint is about the so called "irregular appendage" added to District 3, scooping up part of District 2 South of US1.  DE 26 p.25.  The area is labeled Area 13 in the picture on the left below.  Originally, a larger more contiguous portion of the Grove was planned to be included in District 3 which would have been less irregular (as shown in the picture on the right below), but there were complaints about moving that Bay Heights area.  DE 24-12 p.26; DE 24-13 pp.16, 65.  As a result it was redrawn to take the area south of Bay Heights.  DE 24-14 p.8.



All of it is irrelevant because Plaintiffs concede that that the appendage was not drawn for racial reasons. "Secondly, while Area 13 does not differ markedly from the surrounding areas in terms of Black VAP, it has considerably lower Hispanic VAP than both the surrounding areas of District 2 and – by quite a bit – of the receiving District 3…. Area 13 was moved from District 2 to 3 for reasons that appear to be unmotivated by race as the precinct splits are not substantively distinct across district line." DE 24-31 pp.10-11.[7]

Other than the Area 13 appendage, Plaintiffs cannot point to any other unusual shapes in what are facially relatively compact districts. Bizarrely, the Plaintiffs contend that the border between Districts 1 and 4, which has been unchanged for the last 20 years, was drawn to "divide Flagami for racial purposes." DE 26 p.25. The accusation is insupportable. Districts 1 and 4

---

[7] Plaintiffs devote two pages to discussing the boundary between Districts 2 and 3 asserting that the redistricting should have shifted West Brickell from 2 to 3 as a not racially motivated line. DE 26 pp.18-19. This would have been in lieu of the appendage discussed above, which they admit was not racially motivated. Therefore the discussion is irrelevant.

have very similar demographics; they are both predominantly Hispanic.  The Plaintiffs' need to point to that division to try to create a case of racial gerrymandering simply demonstrates how far they are overreaching to make a case that has no likelihood of success on the merits.

**D.     Districts 1, 3 and 4.**

The redistricting did not pack Hispanics into any district.  District 4 started with a Hispanic voting age population ("HVAP") of 91.6 % and a Hispanic Citizen voting age population ("HCVAP") of 90.1% (DE 23 ¶ 76), and ended with a HVAP of 89.5 % and a HCVAP of 88.2% (*Id.*, ¶ 340).  District 3 started with a HVAP of 88.5% and a HCVAP of 86.81% (*Id.*, ¶ 76), and ended with a HVAP of 88.3 % and a HCVAP of 86.9% (*Id.*, ¶ 326).  District 1 in the enacted redistricting plan has a HVAP of 89.5% and a HCVAP 84.8%.  *Id.*, ¶ 289.  This too is less than before redistricting, where the percentages were 91% and 86.8%..  *See Id.*, ¶ 76.  District 1 was not packed as part of redistricting.

Plaintiffs nevertheless assert that Districts 1, 3, and 4 are "packed" with Hispanics and that this diminishes the Hispanic influence in Districts 2 and 5.  DE 26 p.16.  Plaintiffs make this assertion even though they submit the expert report of Dr. Moy, who establishes that there is racially polarized voting in Miami, especially between Black and Hispanic voters.  Clearly in a city that is 71% Hispanic, and where District 5 is only 50% Black, District 5 can be turned into a Hispanic District.  But Plaintiffs also  contend that the VRA does require District 5 to be a majority Black district.  DE 26 p.33.  It is thus not clear what Plaintiffs are contending.  If the VRA requires a Black district, then it is not unconstitutional to deliberately place Hispanics in other Districts in order to diminish their influence there and preserve the Black majority.  District 1 borders District 5 and Districts 3 and 4, the other Hispanic districts.  Reducing the

concentration of Hispanics in District 1 would necessarily entail reducing the Black majority in District 5.

In the North, District 2 adjoins District 5. Only in the South does District 2 border Districts 3 and 4. That area is Coconut Grove. In order to reduce the concentration of Hispanics in Districts 3 and 4, they would need to further encroach on Coconut Grove, which plaintiffs decry throughout their Amended Complaint and Motion.

Plaintiffs allege that the internal boundaries in Districts 1, 3 and 4 caused them all to pack Hispanics into each other. DE 23 ¶¶ 341-350; DE 26 p. 21. Districts 1, 3 and 4 are all heavily Hispanic districts. An internal boundary between the three districts with very similar Hispanic populations cannot result in the packing of all three of them. By definition, if one of them is being "packed" at the expense of the others, than the others are not being packed. They can't all be packed, and they can't pack each other. And Plaintiffs cannot claim that Hispanic influence was diluted in any of them.

Plaintiffs acknowledge that the City has a "robust Hispanic majority" and assert that there is no good reason to believe that they need to be protected by the VRA. DE 26 p.32. Plaintiffs do not point to their diminished influence anywhere else except as explained above. Plaintiffs cannot both preserve the majority Black District 5 and keep Coconut Grove together while at the same time breaking up Coconut Grove and turning District 5 into a Hispanic majority district.

## III.    Standard for Preliminary Injunctions

A district court may grant a preliminary injunction only if the moving party establishes that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party; and (4) the injunction would not be adverse

to the public interest. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270-71 (11th Cir. 2020). The movant bears the burden of persuasion as to each requirements. See *Ne. Fla. Chapter of Ass'n of Gen Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

A preliminary injunction is an extraordinary and drastic remedy. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A preliminary injunction is a powerful exercise of judicial authority in advance of trial." *Ne. Fla.*, 896 F.2d at 1284 (11th Cir. 1990). This is especially true for preliminary injunctions of legislative enactments, which "must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts." *Id*. at 1285 (emphasis added). Such injunctions "interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits . . . ." *Id*.; *see also Robinson v. Attorney General*, 957 F.3d 1171, 1178-79 (11th Cir. 2020) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated").

Even more caution should be taken in granting an injunction before an election. As Justice Kavanaugh stated in his concurrence in the redistricting case of *Merrill v. Milligan*, 142 S. Ct. 879 (2022), an injunction should not be granted near an election unless

> (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id*. at 881 (Kavanaugh, J., concurring), cited in *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).

15

IV.     **Argument**

A.     **There Is No Substantial Likelihood of Success on the Merits.**

As set forth above, Plaintiffs complain about demographic choices that were made in the 1990s.  They present no evidence that those choices made then were made for improper reasons. To the extent that Plaintiffs are challenging districting decisions made in 1997, or even 2003 or 2013, they simply have not made their case.

Additionally, Plaintiffs selectively quote from the transcripts to create an aura of racial gerrymandering.  With respect to District 5, Plaintiffs concede racial gerrymandering was not just appropriate, but required by the VRA.  Thus all of the substantial amount of the Motion "proving" the racial motive with regard to the borders of District 5 are beside the point. Plaintiffs also assert that in general all of the redistricting was racial, which they seek to establish by providing quotes from the current commission at meetings last year discussing maintaining cohesiveness.  Plaintiffs allege that this is code for race.  It's not.  It was explained by the Consultant at the outset.  First, when defining political cohesiveness in the voting rights context, he explained:  "[T]hat means they generally coalesce around the same candidates or issues in elections."   DE 26-11, p. 6 l.13-15.   The Commissioners also expressed an interest in maintaining the <u>political</u> cohesiveness of the Districts without regard to race.

> Mr. De Grandy: In other words, what you're saying is over and
> above the Voting Rights Act analysis, you want me to look at how
> different neighborhoods and communities vote, and they vote in a
> cohesive manner, try to keep them together.
> Commissioner Carollo: Correct

DE 26-11, p. 20 l.1-4.  Partisan gerrymandering cannot be challenged.  When it comes to political gerrymandering, the Courts lack jurisdiction to undo what is essentially a political question. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08  (U.S. 2019).

Additionally, as set forth above, other than District 5, while Plaintiffs devote a lot of effort to trying to prove motive, they do not establish any actual racial gerrymandering. The reference to "cracking" was thrown in to the Motion gratuitously. It is not mentioned in the Amended Complaint, and the Plaintiffs do not establish that any group's influence was significantly diminished anywhere by any move in the redistricting process.

Plaintiffs do allege packing. "[A] "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2492 (U.S. 2019) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018)). To prove packing, a plaintiff bears the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of *a significant number of voters*. *Id.* As discussed above, none of the parcels moved in the redistricting resulted in the change of a significant number to justify packing or dilution.[8]

The first "packed" district that receives a lot of focus is District 5, the majority Black district. Plaintiffs concede that the VRA required this result, therefore they cannot challenge racial gerrymandering to achieve it. Instead they raise the novel complaint, that 50% is an unnecessarily high number. This fails for a number of reasons. Plaintiffs cite *Negron v. City of*

---

[8] As set forth in the Motion to Dismiss, Plaintiffs do not actually allege dilution. Instead, they quote the Chair of one of the plaintiffs making a public comment alleging that there was dilution. DE 23 Am. Compl., ¶ 107. As set forth above, the numbers do not support the claim.

*Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).  In *Negron*, the Court held that to prove a dilution case, a plaintiff needed to establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided among districts to dilute their impact.  In *Negron*, the Court stated that in some cases, you could refine the voting age population numbers by citizenship (because non-citizens cannot vote).  If a plaintiff claims they have sufficient numbers to create a majority minority district in compliance with the VRA, then *Negron* stands for the proposition that the effort is hollow if there aren't enough voting eligible residents to allow that minority group to elect their desired representative.  But the inverse is not true.  Legislatures are not required to draw boundaries by citizenship rather than total population.  *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016).

> In agreement with Texas and the United States, we reject appellants' attempt to locate a voter-equality mandate in the Equal Protection Clause. As history, precedent, and practice demonstrate, it is plainly permissible for jurisdictions to measure equalization by the total population of state and local legislative districts

*Id*. at 64.  There are sound policy reasons for this determination.

> Nonvoters have an important stake in many policy debates—children, their parents, even their grandparents, for example, have a stake in a strong public-education system—and in receiving constituent services, such as help navigating public-benefits bureaucracies. By ensuring that each representative is subject to requests and suggestions from the same number of constituents, total-population apportionment promotes equitable and effective representation.

*Id*. at 74.

Plaintiffs' position is also unsupported.  They point to Dr. Moy's report to state that in one judicial election, the Black vote in the City was able to elect its preferred candidate with 49% of the voters.  He did not say that that would carry through in all future elections.  Plaintiffs are inventing a hypothetical number, and they seek a preliminary injunction to enforce it.  There

is no requirement that the City prove that it pared the required majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 195-96 (2017).

> Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196.  The Amended Complaint concedes that the City's consultant advised that the vote cannot be diluted anymore without "affecting the African American population's ability to elect a candidate of its choice in D5."  DE 23 Am. Compl. ¶¶ 228, 238.  The Commission was concerned that a mere 51% majority may not be sufficient.  *Id*. ¶¶ 233-34, 251.  They were particularly concerned that current population trends would cause members of the minority group to lose the ability to elect the representative of their choice.  *Id*. ¶ 258.  As set forth above, the Black population has been declining in both absolute and relative terms in District 5 and the City.  District 2 has been the highest growth area.  Plaintiffs themselves asked that District 5 not be diluted and now bring the Motion seeking precisely that.

The allegation about packing or cracking with regard to the West Grove is similarly baseless.  As described above, the historic West Grove community is unaffected by the Redistricting.  The tiny sliver of what Plaintiffs define into the West Grove does not affect a number of sufficient significance to support a dilution claim.  The movement of 114 Black voters

in Coconut Grove from District 2 to District 4 did not dilute the Black voter influence in the Coconut Grove area or District 2.  In a district of over 88,000 members, 114 people are 0.1%. Approximately 0.1% of the population of a district is not a significant number of voters. *Compare Perez v. Abbott*, 267 F. Supp. 3d 750, 792 (W.D. Tex. 2017), *aff'd in part, rev'd in part and remanded*, 138 S. Ct. 2305 (2018) (concluding 14,102 voters comprising 8.4% of a district's ideal total population was a significant number of voters).

As set forth in detail in the fact section, Plaintiffs do not set forth any facts supporting that any group had its influence reduced significantly anywhere as a result of the redistricting. They complain about the "irregular appendage" of District 3, then concede it was not racially motivated and had no racial effect.  They complain about the borders between three Hispanic districts of similar demographics, and then make the conclusory and mathematically insupportable accusation that they "packed" each other with Hispanics.  Plaintiffs make this claim and then state Hispanics are a majority that do not need to be protected under the VRA. Finally, Plaintiffs never confront the elephant in the room.  The only District where Hispanics are not the largest voting block is District 5, the district that Plaintiffs assert must be maintained as a Black District.  This lawsuit is a case without a claim, and it does not support preliminary injunctive relief.

### B.    Plaintiffs Face Threshold Standing Issues.

As set forth in the Motion to Dismiss, and will not be fully restated here, Plaintiffs assert a shotgun pleading.  Racial gerrymandering claims are brought on a district by district basis. Each plaintiff must have standing to support their individual claim as to each particular district they challenge.  The Complaint is full of alleged challenges to districting decisions that are irrelevant, that undermine their claims, or that were done 25 years ago.  They do not match any

particular plaintiff to any particular redistricting decision that affected their particular district. Until that is sorted out, it's not even clear who is challenging what. Has any individual plaintiff even been affected by any of the decisions? For example, there is much hue and cry about what is essentially a tiny sliver of Coconut Grove that can't even legitimately be called part of the historic West Grove. The numbers aren't significant enough for anyone to claim that their vote was diluted in any way by the move. But does any plaintiff even live there? Plaintiffs seek to enjoin first and state a claim later. Until they state legitimate claims, how can they be said to have a likelihood of success on the merits?

These issues are closely tied to Plaintiffs' allegations of irreparable harm. It is not clear if any Plaintiff actually resides in any parcel that was redistricted. Some of them complain about districting decisions made decades ago. See DE 24-39 & 40 (complaining about Little Havana being in several districts). They all express concern about vote dilution, but, as set forth above, there is no vote dilution and the concentrations of Hispanic and Black groups were reduced as part of the redistricting. Rather than tying any particular plaintiff to any particular redistricted parcel and explaining how they were actually harmed by the move, Plaintiffs instead treat themselves as "fungible" and assert generalized claims of harm.

### C.     A Preliminary Injunction Would Disserve the Public Interest.

As set forth above, District 5 is the smallest of the surrounding districts. A nonracial redistricting equalizing the areas by bringing more of the surrounding districts into District 5 would lower the Black citizen voting age population in District 5 without increasing their influence anywhere else. There is no support for the position that a lower Black population in District 5 would still allow them to elect the candidate of their choice. There would literally be

no benefit to that population by the injunction, and only the threat of a real Constitutional harm. The preliminary injunction should be denied.

    **D.**    **The Plaintiffs Unduly Delayed seeking Preliminary Injunctive Relief.**

Plaintiffs' Motion seeking an injunction is either a year too late or 25 years too late. The redistricting occurred in March of 2022. This case was filed nine months later, in December. Plaintiffs then waited two more months before filing the Motion. A special election has already occurred last month, and another election is coming in November. DE 26 pp.2, 4. Plaintiff admit that the new districts would have to be set by August 1. DE 26 p.36. Even if there is a ruling on the Motion, new districts would have to be drawn, face inevitable challenges by Plaintiffs, and be ruled on by this Court, and this does not even factor in any appellate remedies. Plaintiffs make no excuse and give no explanation for their delay.

As set forth above, the redistricting itself did not cause the harm about which Plaintiffs complain: packing. Rather, the concentration of race was reduced in each district as a result of the redistricting. Plaintiffs are challenging decisions that were made over 25 years ago. Their Motion is a quarter century too late.

"[A] party seeking a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). Yet, Plaintiffs waited nine months after the City passed the redistricting ordinance to file their lawsuit, and an additional two months to seek preliminary injunctive relief. To the extent Plaintiffs assert that the districts at issue have been gerrymandered since at least 1997, their failure to challenge district lines in prior years undermines their claim of irreparable harm. *Antoine v. School Bd. of Collier Cty*., 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018) (plaintiff's delay in seeking relief undermines irreparable harm); *People's Party of Fla. v. Florida*, Case No.

8:22-cv-1274-TPB-AEP, 2022 WL 2238439 at *2 (M.D. Fla. June 22, 2022); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

WHEREFORE, Defendant respectfully requests that the Court deny Plaintiffs' Motion.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

By:    *s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

CITY OF MIAMI
Kevin Jones, Esquire
Florida Bar No. 119067
Bryan Capdevila, Esquire
Florida Bar No. 119286
Eric Eves, Esquire
Florida Bar No. 91053
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 10, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: <u>    s/ *Christopher N. Johnson*                  </u>
Christopher N. Johnson