# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

*Plaintiffs,*

v.

CITY OF MIAMI,

*Defendant.*

## PLAINTIFFS' REPLY IN SUPPORT OF
## EXPEDITED MOTION FOR PRELIMINARY INJUNCTION

Nicholas Warren
**ACLU Foundation of Florida, Inc.**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley
Caroline A. McNamara
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
Jocelyn Kirsch*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com
jocelyn.kirsch@dechert.com

\* *Admitted pro hac vice*

*Attorneys for Plaintiffs*

The City's Response, ECF 36 ("Opp."), to Plaintiffs' Motion for Preliminary Injunction, ECF 26 ("Mot."), does nothing to undermine Plaintiffs' case. It leaves key facts unrebutted or even concedes them, categorically dismisses facts it dislikes, and all but admits liability due to apparent misunderstandings of the law. The City's brief makes clear that Plaintiffs are likely to succeed on their claim that all five Commission districts were drawn predominantly to divide Miami residents by race, and that the City's use of race was not narrowly tailored to a compelling interest. The City's attempts to distort the irreparable injury prong and skew the balance of the equities fall flat.

## I. Plaintiffs Demonstrate a Substantial Likelihood as to Standing

As explained in Plaintiffs' Response (ECF 37) to the City's Motion to Dismiss (ECF 34), Plaintiffs undoubtedly have standing and their Amended Complaint is not a shotgun pleading. The "bright-line standing rule" for racial gerrymandering cases is clear: "if the plaintiff lives in the racially gerrymandered district, she has standing." *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000) (citing *United States v. Hays*, 515 U.S. 737 (1995). The City unsuccessfully tries to obfuscate this clear-cut test and (as discussed further below) the straightforward constitutional harm Plaintiffs seek redressed. *See* Mot. 11–12; *contra* Opp. 20–21.

## II. The City's Defenses Misapprehend the Law

### A. The Racial Gerrymander Subjects Plaintiffs to a Racial Classification

As in its Motion to Dismiss, the City misunderstands (or ignores) Plaintiffs' sole claim: that the City Commission racially gerrymandered the five districts in Resolution 22-131 (the "Enacted Plan"), drawing them based predominantly on race during the 2021–22 redistricting process. The constitutionally cognizable harm in a racial gerrymandering case is, itself, the use of race to draw the districts. *See Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 263 (2015). As with all racial classifications, the fact Plaintiffs are classified based on their race is itself

"actionable." *Id.*; *contra* Opp. 3. To prevail, Plaintiffs need not show any particular group had its influence "reduced" or was "prevented from electing their chosen representatives," or that, absent racial gerrymandering, a group's "influence" would "benefit." *Contra* Opp. 2–3, 6, 10, 17, 19–21. Those harms sound in vote dilution under the Voting Rights Act, which Plaintiffs do not allege.[1]

The City also contorts Plaintiffs' use of the term "packing," which has multiple meanings both colloquial and legal. Plaintiffs use "packing" to describe the City's practice of deliberately making the Hispanic, Black, and Anglo populations of the respective districts as high as it could—an aspect of how race predominated in these districts' designs. *See Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), --- F. Supp. 3d ---, 2022 WL 7089087, at *2 (M.D. Fla. Oct. 12, 2022) (describing similar practice in racial gerrymandering case). The City tries to conflate that meaning of the term with the more specific usage in the vote-dilution context. Again, Plaintiffs assert a claim for racial gerrymandering, not a vote dilution claim under the VRA.

**B. Core Preservation Cannot Immunize a Racial Gerrymander from Scrutiny**

The City attempts to justify the Enacted Plan on the grounds that it maintains the cores of prior districts. Opp. 3, 17. But courts have repeatedly held that core preservation cannot immunize racial gerrymanders from scrutiny. In *North Carolina v. Covington*, for example, the Supreme Court affirmed a rejection of remedial districts that "retained the core shapes of districts that [the trial court] had earlier found to be unconstitutional." 138 S. Ct. 2548, 2551 (2018) (per curiam) (internal punctuation omitted); *see also Jacksonville I*, 2022 WL 7089087, at *42 ("To apply core preservation in the way the City asserts in this case would mean that once enacted, a legislature

---

[1] *See, e.g.*, *Racial Gerrymandering vs. Racial Vote Dilution, Explained*, DEMOCRACY DOCKET (Aug. 17, 2022), https://www.democracydocket.com/analysis/racial-gerrymandering-vs-racial-vote-dilution-explained/.

could perpetuate racially gerrymandered districts into the future merely by invoking a 'neutral' desire to maintain existing lines.") Many other courts have held that core preservation cannot shield racial gerrymanders from scrutiny, even where prior districts were never challenged. *See, e.g., Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), 2022 WL 16754389, at *3 (11th Cir. Nov. 7, 2022) ("[T]he issue was not that [lawmakers] opted to preserve district cores, but rather that their intent was (substantially likely) to maintain the race-based lines created in the previous redistricting cycle. The Supreme Court has been equally clear that this is not a legitimate objective." (citing *Covington*, 138 S. Ct. at 2551)); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 n.16, 1271–72 (11th Cir. 2002) (racial gerrymander where previous plan was "preserved as much as possible"); *Chen v. City of Houston*, 206 F.3d 502, 518 (5th Cir. 2000) ("[E]vidence that impermissible racial intent had tainted the plan upon which the challenged plan was based has been allowed, even when enough time has elapsed for a substantial degree of familiarity and political reliance to emerge."); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1065 (M.D. Ala. 2017) (W. Pryor, J.) (striking down district that "maintained . . . core" of previous one); *Navajo Nation v. San Juan Cnty.*, 162 F. Supp. 3d 1162, 1177 (D. Utah 2016) (striking down district where "the overriding consideration . . . was to preserve [it] without any modification"), *aff'd*, 929 F.3d 1270 (10th Cir. 2019); *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544–45 (E.D. Va. 2015) ("[W]here 'core retention' seems to predominate, courts should also examine the underlying justification for the original lines or original district" because "core retention may be used to insulate the original basis for the district boundaries.") (subsequent history omitted); *Polish Am. Cong. v. City of Chicago*, 226 F. Supp. 2d 930, 937 (N.D. Ill. 2002) ("Adherence to established boundary lines . . . may or may not be a legitimate redistricting objective, depending in part on how the lines were drawn originally.").

Against this backdrop, the City's argument *helps* Plaintiffs. Ample evidence demonstrates the 2013 and prior plans were drawn primarily based on race, as commissioners recounted, Dr. Abott found, and the historical evidence suggests. Mot. 4, 6–7, 12; Tr. 1 28:7–10, 28:15–29:3; Tr. 3 51:10–14, 51:18–19, 52:5–53:2; Tr. 6 39:2–12, 79:19–20; Abott Rep. at 1, 3–4, 21; *see generally* ECF 24-42 to 24-79. The Commission's decision to perpetuate (and enhance) those existing racial divisions renders the 2022 Enacted Plan's districts race-based as well—"not just at [their] edges, but at [their] core[s]." *Jacksonville I*, 2022 WL 7089087, at *40 (quoting *Easley v. Cromartie*, 532 U.S. 234, 265 n.7 (Thomas, J., dissenting)).

### C. The Racial Predominance Inquiry is About the Entire District

Relatedly, Defendants misstate the legal standard for determining racial predominance. The test is not whether "the parcels moved" shifted "a significant number" of voters. Opp. 17. Rather:

> The ultimate object of the inquiry . . . is the legislature's predominant motive for the design of the district as a whole. A court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context. Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target. A holistic analysis is necessary to give that kind of evidence its proper weight.

*Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 192 (2017).

5

This is why focusing narrowly on a "tiny portion of the 'West Grove'"[2] or a single District 3 appendage is wrongly tunnel visioned. Opp. 9–10, 12, 20. Plaintiffs present unrebutted direct and circumstantial evidence that race was the predominant factor motivating not just decisions to move certain discrete areas between districts, but *for the design of each district as a whole.*

### D. The Use of Race to Draw District 5 Is Not Narrowly Tailored

The City concedes that race predominated in the drawing of District 5, focusing its defense on narrow tailoring. Opp. 5. Far from mere "quibbling," whether the use of race was narrowly tailored is the critical, final hurdle the City must clear to satisfy strict scrutiny. "[T]he requisite strong basis in evidence exists when the legislature has 'good reasons to believe' it must use race in order to satisfy the Voting Rights Act." *Bethune-Hill I*, 580 U.S. at 194 (quoting *ALBC I*, 575 U.S. at 278). Although the City need not "determine *precisely* what percent minority population § 2 of the VRA demands," "neither will [a court] approve a racial gerrymander whose necessity is supported by no evidence." *Cooper v. Harris*, 581 U.S. 285, 306 (2017) (cleaned up).

There were no such "good reasons" or "strong basis in evidence" here. **First,** the City failed to perform the "functional analysis of the electoral behavior within the particular election district" required to "determin[e] what minority population percentage will satisfy [the VRA's] standard." *Bethune-Hill I*, 580 U.S. at 194 (cleaned up). The record is simply devoid of any evidence the City

---

[2] On this subject, the City entirely misses the point. *See* Opp. 7–11, 19–20. Yes, Plaintiffs Cooper, GRACE, and the South Dade NAACP are concerned about the Enacted Plan's dividing their West Grove neighbors—any of them—into different districts. They are also concerned about the tripartite division of the whole of Coconut Grove. Most of all, they object that these divisions were *for racial reasons*, not to advance representation or serve the interests of their community. ECF 24-37 ¶¶ 8–10; ECF 24-33 ¶¶ 6–9; ECF 24-35 ¶¶ 6–7.

conducted such a "pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). Instead, the City adhered to an "uncritical" 50% BVAP numerical quota supported by "no other evidence or analysis." *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022); *cf. Bethune-Hill I*, 580 U.S. at 194–95 (affirming district court's findings that legislature performed required functional analysis of electoral behavior and made a "careful assessment of local conditions and structures," and praising as "well supported" the findings of how the legislature arrived at its BVAP target). Nothing in the record suggests the City conducted a "well supported" "careful assessment of local conditions and structures" or anything close to the "functional analysis of electoral behavior" required to support its 50% BVAP target.

The City repeatedly claims that Plaintiffs "concede" District 5 needs to have a majority of Black voting-age population. Opp. 5–6, 13–14, 16–17, 20. Not so. Mot. 33 ("Plaintiffs disagree that the 50% BVAP quota was necessary or appropriate to provide that opportunity."). Plaintiffs were clear: the VRA requires a district where Black voters have an opportunity to elect preferred candidates, but a 50% BVAP quota (resulting in an Enacted District 5 with 58.2% BCVAP) was inappropriate to provide that opportunity—as Dr. Moy's unrebutted report and De Grandy's own statements demonstrate. Mot. 33–35. The City's continued conflation of "Black opportunity to elect, as the VRA requires" and "Black numerical majority" underscores the legal error at the heart of its failure to narrowly tailor its use of race.

**Second,** the City claims it relied on De Grandy's advice in tailoring District 5. Opp. 19. In fact, De Grandy advised that *lower BVAPs were acceptable*—but the Commission rejected his advice, demanding adherence to their 50% target.[3] Tr. 3 8:17–19; Tr. 6 8:6–9. "Strict scrutiny

---

[3] That said, the record suggests De Grandy's conclusions were not "well supported" by a

7

requires much more" than "uncritical majority-minority district maximization." *Wis. Legislature*, 142 S. Ct. at 1249. Uninformed guesses at what the VRA requires—contradicted by the advice of the City's own consultant—will not do. *See Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F. Supp. 3d 128, 176 (E.D. Va. 2018) (lack of tailoring where legislature applied a "mechanically numerical" BVAP target and "produced no evidence . . . showing that [it] engaged in an analysis of *any* kind to determine the percentage of black voters necessary to comply with" the VRA). "Selecting a BVAP figure entirely without evidentiary foundation plainly does not satisfy this burden." *Id.* at 179.

Dr. Moy supplies that evidentiary foundation. Analyzing ten city, county, statewide, and judicial elections in which he found voting was racially polarized (not a single judicial election, *contra* Opp. 18), Dr. Moy estimates for each race "the proportion of registered voters needed to elect the group-preferred candidate." Moy Rep. at 42. For Black voters, that effectiveness number ranges from single digits (for elections where the Black-preferred candidate is also heavily favored by Latino or Anglo voters) to 30, 43, or 49% in contests where voting is highly polarized. *Id.* at 46–57. Thus, 49% Black registration (corresponding to 48.8% BCVAP, *id.* at 42) is a *conservatively high* estimate of the share necessary for Black voters to elect their preferred

---

"careful assessment" and "analysis with justifiable conclusions," either. Mot. 14–16; Moy Rep. at 42–58; Tr. 3 8:17–19 (advising sub-50% BVAP would comply with VRA), 9:19–20 (stating he could not move District 5 further east in Feb. 7 Draft despite later doing so in Base Plan); Tr. 4A 9:15–17 (accepting Commission's directive to hit 50% BVAP target); Tr. 5A 37:5–9 (advising increasing BVAP from 49% to above 50%); Tr. 6 8:7–9 (advising same for 49.97% BVAP proposal); ECF 24-8 at 4 (calling 49% BVAP a "deficiency"); *see generally* ECF 24-3 to 24-10 (absence of pre-enactment analysis with justifiable conclusions among consultant materials).

candidates, supported by sound, data-driven, unrebutted expert analysis. Thus, the Enacted District 5, at 58.2% BCVAP, is far from narrowly tailored.[4] *See Bethune-Hill II*, 326 F. Supp. 3d at 177–78 (crediting expert's opinion that legislature's 55% BVAP target was not required for Black voters to elect preferred candidates, when expert found Black-preferred candidates would regularly prevail at 45% BVAP); *id.* at 179 (rejecting legislature's argument that its BVAP target was "close enough" to what the VRA actually required given the ten-point gap).

*Third,* the City continues to misconstrue (either obliviously or intentionally) Plaintiffs' legal claim. Plaintiffs do not seek a "nonracial redistricting" that dilutes the Black vote in District 5. *Contra* Opp. 21–22. Plaintiffs seek a redrawn District 5 that complies with the VRA by using

---

[4] The City muddles Plaintiffs' arguments regarding VAP, CVAP, and voter registration. Opp. 17–18. In *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997), the Eleventh Circuit held that, in areas where citizenship rates differ among different racial groups, the first *Gingles* precondition requires Section 2 vote-dilution plaintiffs to prove that the minority group is sufficiently large and geographically compact to form a majority of the "voting age population as refined by citizenship" in a single-member district. This is because "[i]n order to vote or to register to vote, one must be a citizen." *Id.* For the same reason, BCVAP is a much better metric to estimate whether Black voters will have the opportunity to elect preferred candidates in a given remedial district, as Section 2 requires. As Dr. Moy explained, voter registration is even better as "a more accurate measure of the racial composition of the electorate." Moy Rep. at 3.

Plaintiffs never suggested that citizen population be used for the entirely unrelated purpose of calculating whether the five Commission districts are equally populated in conformity with the "one person, one vote" principle. Plaintiffs agree that for that purpose, total population is an appropriate metric. *Evenwel v. Abbott*, 578 U.S. 54, 64 (2016).

race in a narrowly tailored way—guided by a functional analysis of voting behavior like Dr. Moy's. Throughout its brief, the City suggests the Court deny Plaintiffs' Motion because Plaintiffs cannot show that a new map would achieve what they want. *E.g.* Opp. 2, 6–7, 14. What Plaintiffs come to this Court to achieve is simple: districts that are either not race-based, or which use race in a narrowly tailored way. Plaintiffs need not submit an alternative map to prevail at this stage. *Cooper*, 581 U.S. at 319 ("An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim.").

### III. The City Fails to Rebut the Overwhelming Evidence Against It

As to Districts 1, 2, 3, and 4, the City does not argue that its use of race was narrowly tailored to a compelling interest, waiving this defense. Instead, the City denies these districts were drawn with race as the predominant factor in the first place. But the City fails to rebut the tremendous direct and circumstantial evidence of racial predominance, choosing to nit-pick Plaintiffs' evidence rather than putting forward any of its own.

#### A. Direct Evidence of Intent Conclusively Establishes Racial Predominance

A comprehensive review of every commission meeting, at which all mapmaking decisions were decided, leads to one conclusion: race was the predominant, overriding, and pervasive factor motivating the 2021–22 redistricting. The numerous quotes from commissioners and their consultants, far from being "selective," Opp. 16, fairly represent the major theme of the process: dividing Miami along racial lines.

This is true too of the Commission's use of the term "political cohesion" as a shorthand for keeping racially homogeneous areas together. Mot. 6–7. Contrary to the City's claims, Opp. 16, Dr. Abott found partisanship *cannot* explain the mapmaking decisions. Abott Rep. at 12–15. Her findings and opinions are unrebutted. In fact, commissioners never once mentioned partisanship

as a reason for preferring one configuration over another. *See generally* Trs. 1–6. More fundamentally, the "fact that other considerations may have played a role in . . . redistricting does not mean that race did not predominate." *Putnam Cnty.*, 293 F.3d at 1270. If political affiliation played a role to some extent, it was secondary to race.

### B. The Districts' Noncompact Shapes Confirm They Are Race-Based

While the direct evidence is, by itself, enough to create a substantial likelihood as to racial predominance, the circumstantial evidence reinforces that finding. The City pokes holes at only one piece of circumstantial evidence suggesting racial predominance: the districts' lack of compactness. Opp. 3, 11–13. The district shapes speak for themselves, as do commissioners' and De Grandy's admissions that the districts are not compact, and that they subordinated compactness to race. Mot. 8, 25–26.

The City falsely asserts Plaintiffs only complain about the compactness of District 5 and the Coconut Grove appendage added to District 3, and falsely asserts Plaintiffs concede the appendage was not drawn for racial reasons. Opp. 11–12, 20. All five districts are noncompact or include irregular appendages that evince racial motivations. Mot. 25–26. As for the District 3 appendage, the direct evidence is that the Commission added it—incurring into Coconut Grove where "there's ethnic diversity" but not elsewhere "because of dissimilar demographics"—for racial reasons. Mot. 18, 20 (quoting Tr. 2 7:16–17; Tr. 4A 7:22–23). Dr. Abott's conclusion as to the *objective* indicators, based on comparing the *actual* demographics of this appendage to surrounding areas, does nothing to undermine the ample direct evidence of commissioners' intent, grounded on what they perceived to be an area "where the Hispanic voters live." Tr. 2 7:16–17.[5]

---

[5] Dr. Abott concludes the appendage had ripple effects to other districts that were largely

11

### C. Race was the Predominant Factor Behind Districts 1, 3, and 4

The City fails to undermine Plaintiffs' direct and circumstantial evidence proving the three Hispanic-majority districts were drawn predominantly based on race. *See* Opp. 12–14, 20. The legislative record leaves no doubt that the Commission's primary goal for these districts was to make their Hispanic populations as high as they could get them and optimally "balance" the Hispanic population between them. Mot. 16–22. Race-based decisions elsewhere in the map directly impacted these districts as well, for example the breaking up of "Hispanic neighborhood after Hispanic neighborhood" to maintain District 2 as (in the Commission's view) "Anglo" and achieve District 5's 50% BVAP quota. Mot. 24–25.

### IV. Plaintiffs Worked Expeditiously to Bring and Prosecute this Case

Contrary to the City's contentions, Opp. 15, 22–23, this case's timing does nothing to undermine Plaintiffs' entitlement to preliminary relief. Plaintiffs worked swiftly under the circumstances to bring this case. The City cites inapposite cases to lament the litigation timeline. Opp. 22–23: *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018), where plaintiffs "did not move for a preliminary injunction in the District Court until six years after the 2011 map was adopted, over three years after the plaintiffs' first complaint was filed"; *Antoine ex rel. I.A. v. Sch. Bd. of Collier Cnty.*, 301 F. Supp. 3d 1195, 1202 (M.D. Fla. 2018), where the court denied an injunction on the irreparable-injury prong only, since plaintiffs failed to show they would be irreparably injured by failing to attain high school diplomas when they were on track to earn GEDs, and because they waited an entire school year to seek preliminary relief; *People's Party of Fla. v. Fla. Dep't of State*, 608 F. Supp. 3d 1195, 1199 (M.D. Fla. 2022), where the court, applying *Purcell v. Gonzalez*, 549

---

driven by race, and she still concludes that the overall shape of District 3—of which the appendage forms 1.6% of the population—can only be explained by race. Abott Rep. at 1–2, 11–12.

12

U.S. 1 (2006), found a political party's nine-month delay between registering as a party and seeking to enjoin a ballot-access deadline that had already elapsed weighed against finding irreparable injury; and *Wreal, LLC v, Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016), which concerned trademark infringement.

Plaintiffs had good reason not to rush to the courthouse. It benefits nobody, not least the Court, for anyone to walk out of City Hall and march straight to the courthouse before soberly assessing the pros and cons of litigation. Plaintiffs—including the boards of the four Organizational Plaintiffs—had much to consider before deciding to file suit. They had much to prepare as well, both to file the Complaint and to file the instant Motion, as their two expert reports based on copious data, nine declarations, eight lengthy meeting transcripts, and decades of historical research—all totaling hundreds of pages—attest.

This case, although straightforward in many ways, is fact-intensive. *See Bethune-Hill I*, 580 U.S. at 192 (requiring "holistic analysis" of different types of evidence). Plaintiffs took the time required to gather the evidence they needed to be able to plead a claim and then move for preliminary relief.[6] *See Jacksonville I*, 2022 WL 7089087, at *52 ("[G]iven Plaintiffs' high evidentiary burden and the voluminous record they developed, including the comprehensive reports of two experts, the Court accepts that Plaintiffs were moving expeditiously under the circumstances in compiling their evidence."). Unlike a company facing trademark infringement or a student seeking to enroll in school, the harms Plaintiffs suffer are not fully realized until an election takes place. So, Plaintiffs' efforts were geared to ensure enough time for an interim

---

[6]  Plaintiffs had to wait for the City to produce some evidence through public records requests, like the consultant reports and slide presentations. Some, like De Grandy's initial 2021 report, the City *still* has not produced. *See* Mot. 5 n.4.

remedial plan to be in place for the November 2023 elections—when the racial gerrymander's harms becomes irreparable.[7] *Jacksonville II*, 2022 WL 16754389, at *4 (similar facts mitigated against plaintiffs' delay in filing their suit and preliminary injunction motion). The City does not allege any delay was "intentional, strategic, or even negligent"—because it was not. *Jacksonville I*, 2022 WL 7089087, at *52; *see also Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 561 (6th Cir.), *stay granted on other grounds*, 573 U.S. 988 (2014) ("Defendants have not . . . produced any evidence that Plaintiffs purposefully delayed.").

Further, there is ample time for the City to have an opportunity to draw a constitutional map and for the Court to review it and order an interim remedial map by the Elections Department's August 1 deadline. *See, e.g.*, *Jacksonville I*, 2022 WL 7089087, at *54 (setting 27-day deadline for city to submit proposed remedy); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 937 (N.D. Ala. 2022) (fourteen days), *prob. juris. noted and stay granted on other grounds sub nom. Merrill v. Milligan*, 142 S. Ct. 879 (2022); *Calvin v. Jefferson Cnty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1326 (N.D. Fla. 2016) (sixteen days); *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (fourteen days); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004) (nineteen days).

Finally, the City's contention that Plaintiffs should have filed suit in past decades fails. Plaintiffs "complain about a new harm—the map[] enacted in 2022." *Jacksonville I*, 2022 WL 7089087, at *51. Plaintiffs take no position on whether the historic maps were sufficiently narrowly

---

[7] Plaintiffs did not anticipate the Commission would fail to fill the District 2 vacancy by appointment, as City Charter § 12(a) mandates, instead calling a snap election. Regardless, "[i]t is certainly not unreasonable for Plaintiffs to decide to focus their resources on the [November] 2023 election when [three] seats are up for election." *Jacksonville I*, 2022 WL 7089087, at *50 n.68.

tailored in their time, but the fact that they were also race-based is probative of the current Commission's predominant racial purpose in carrying forward their race-based district cores. *Jacksonville II*, 2022 WL 16754389, at *3 ("[P]revious redistricting iterations can be relevant circumstantial evidence to help understand the actions taken by the Council in 2021." (citing *Abbott*, 138 S. Ct. at 2325)). And the City must ensure the use of race is narrowly tailored *now*. Moreover, "Plaintiffs" are not some platonic ideal of a civil rights litigant. They are real people and organizations. Two Organizational Plaintiffs did not even exist a decade ago. ECF 24-33 ¶ 2; ECF 24-34 ¶ 2. Plaintiff Johnson only moved to Miami in 2021. ECF 24-38 ¶ 4. If the City had its way, Plaintiff Valdes (born 1993) would have filed her first lawsuit before her first day of kindergarten. Plaintiff Contreras was born after the 1997 Plan was even enacted. These Miamians cannot be doomed to live and vote under unconstitutional district lines for yet another election—perhaps forever—just because they failed to sue 10, or 20, or 25 years ago.

### V. *Purcell v. Gonzalez* Does Not Govern

The City cites Justice Kavanaugh's concurrence in *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (mem.), to imply a heightened standard for preliminary relief applies in this case. Not so. Justice Kavanaugh's opinion explains his interpretation of the "*Purcell* principle"—that "lower federal courts should ordinarily not alter the election rules on the eve of an election"—and the heightened burden he thinks *Purcell* erects for plaintiffs seeking preliminary relief. *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *Merrill*, 142 S. Ct. at 879–81 (Kavanaugh, J., concurring in grant of applications for stays). There are two threshold problems.

*First,* we are not "on the eve of an election" such that *Purcell* applies. As of the date of this filing, the election is <u>seven months and twenty days away</u>. The candidate qualifying period runs to over six months from today. In *League of Women Voters of Florida v. Florida Secretary of State*,

15

32 F.4th 1363, 1372 (11th Cir. 2022) (per curiam), the Eleventh Circuit found a statewide injunction to be at *Purcell*'s "outer bounds" when the next statewide election was four months away. In contrast, the Eleventh Circuit just *maintained* an injunction affecting seven racially gerrymandered districts, issued five months before the election and three months before candidate qualifying, in a city with more than double Miami's population. *Jacksonville II*, 2022 WL 16754389, at *2 (denying city's stay request). Plaintiffs can find no case—and the City has cited none—where a court applied *Purcell* and denied preliminary injunctive relief this far ahead of an election, even assuming the Court does not rule until May 23, 2023, the date by which Plaintiffs suggest a ruling is needed.

**Second,** *Purcell* does not apply where, as here, election administrators give assurances that they can comply with an injunction without throwing the election into "chaos." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring in grant of applications for stays); *Jacksonville II*, 2022 WL 16754389, at *2 (citing *Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (mem.)); ECF 24-30 (providing such assurances). Thus, the familiar framework for preliminary relief applies in this case. In any event, the City fails to even argue that the concerns motivating *Purcell*—risk of voter confusion and throwing the election into "chaos"—would be implicated if the Court enjoins the unconstitutional racial gerrymander challenged here and an interim remedy is in place by the Elections Department's August 1 deadline. *See Jacksonville II*, 2022 WL 16754389, at *3.

## CONCLUSION

Plaintiffs' Motion makes a strong showing of likelihood on the merits, demonstrates that an injunction is in the public interest, and makes clear that the equities balance in their favor. The Court should grant their Motion.

Respectfully submitted this 16th day of March, 2023,

 /s/ Nicholas L.V. Warren

| | |
|---|---|
| Nicholas L.V. Warren (FBN 1019018)<br>**ACLU Foundation of Florida, Inc**.<br>336 East College Avenue, Suite 203<br>Tallahassee, FL 32301<br>(786) 363-1769<br>nwarren@aclufl.org<br><br>Daniel B. Tilley (FBN 102882)<br>Caroline A. McNamara (FBN 1038312)<br>**ACLU Foundation of Florida, Inc**.<br>4343 West Flagler Street, Suite 400<br>Miami, FL 33134<br>(786) 363-2714<br>dtilley@aclufl.org<br>cmcnamara@aclufl.org | Neil A. Steiner\*<br>**Dechert LLP**<br>Three Bryant Park<br>1095 Avenue of the Americas<br>New York, NY 10036<br>(212) 698-3822<br>neil.steiner@dechert.com<br><br>Christopher J. Merken\*<br>Jocelyn Kirsch\*<br>**Dechert LLP**<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19104<br>(215) 994-2380<br>christopher.merken@dechert.com<br>jocelyn.kirsch@dechert.com<br><br>*\* Admitted pro hac vice* |

*Counsel for Plaintiffs*