**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      Plaintiffs,

v.

CITY OF MIAMI,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS

**THIS CAUSE** is before the Court upon Plaintiffs' Expedited Motion for Preliminary Injunction, filed on February 10, 2023.[1]  (ECF No. 26).[2]  Defendant City of Miami (the "City") filed a response in opposition (ECF No. 36), to which Plaintiffs filed a reply (ECF No. 39).  The matter was referred to the undersigned by the Honorable K. Michael Moore, United States District Court Judge, pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida, to take all necessary and proper action as required by law and/or to issue a report and recommendations regarding the Expedited Motion.  (ECF No. 27).  Accordingly,

---

[1]  Plaintiffs are organizational plaintiffs Grove Rights and Community Equity, Inc. ("GRACE"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch of the NAACP ("South Dade NAACP"), and Miami-Dade Branch of the NAACP ("Miami-Dade NAACP"), and individual plaintiffs Clarice Cooper, Jared Johnson, Steven Miro, Alexandra Contreras, and Yanelis Valdes.  (ECF No. 23). In accordance with Local Rule 7.1(d)(2) of the Local Rules of the Southern District of Florida, Plaintiffs request expedited consideration and a final ruling on their request for a preliminary injunction, by **May 23, 2023**, to permit sufficient time for the City to enact an interim remedial map in the event the District Court enters a preliminary injunction against the City.  (ECF No. 26 at 36) (citing S.D. Fla. L.R. 7.1(d)(2)).  The request for expedited relief is appropriate.  As set forth in the recommendations section of this Report and Recommendations, and upon the consent of the Parties at the March 29, 2023 Evidentiary and Preliminary Injunction Hearing, the undersigned has shortened the time in which the Parties may file objections.

[2]  All citations to page numbers for documents filed in the Court's electronic case filing system refer to the pagination assigned to a document by the Court's electronic case filing system (*i.e.*, the page number of the PDF).

I convened an Evidentiary and Preliminary Injunction Hearing on the Expedited Motion on March 29, 2023.  (ECF No. 48).  Having considered the Expedited Motion, Response, Reply, the evidence and argument advanced at the March 29, 2023 hearing, the record as a whole, and being otherwise fully advised, the undersigned respectfully **RECOMMENDS** that the Expedited Motion (ECF No. 26) be **GRANTED**.

## I.    BACKGROUND

This is an action alleging racial gerrymandering in the redistricting of the five commission districts for the Commission of the City of Miami (the "Commission") in Miami, Florida, following the 2020 United States Census ("2020 Census").

As background context for the discussion that follows, the Commission is a five-member governing body for the City, whose members are elected from single-member, numbered districts. On March 24, 2022, the Commission passed Resolution 22-131 (the "Enacted Plan"), which provides the new jurisdictional boundaries for the five Commission districts—Districts 1 through 5 (together, the "Commission Districts").  (ECF No. 24-1).  For visual reference, a map of the Commission Districts adopted in the March 24, 2022 Enacted Plan is provided on the following page.



**Figure 1.** Map of City Commission Districts in Enacted Plan. (Reproduced as depicted in ECF No. 24-83).

Plaintiffs commenced this action in this Court on December 15, 2022, invoking the Court's federal question jurisdiction under 28 U.S.C. § 1331. (ECF No. 1). The operative complaint asserts one claim for relief, arising under the Fourteenth Amendment's Equal Protection Clause. *See* (ECF No. 23 at ¶¶ 358–365) ("Am. Compl."). Plaintiffs allege in their First Amended Complaint that race was the predominant factor in the redrawing of each of the five Commission Districts adopted by the City in the Enacted Plan following the 2020 Census. Plaintiffs aver that, because the City is not able to establish that the City's use of race in drawing the Commission Districts was narrowly tailored to a compelling governmental interest, the five Commission Districts constitute unconstitutional racial gerrymanders, in violation of the Equal Protection Clause of the Fourteenth Amendment.

3

Plaintiffs seek the following relief: (i) a declaration that the five Commission Districts drawn and adopted in the most recent redistricting process are unconstitutional racial gerrymanders in violation of the Fourteenth Amendment; (ii) a preliminary and later a permanent injunction enjoining the City and its officers and agents from calling, conducting, supervising, or certifying any elections under the Enacted Plan; and (iii) an order requiring the City to hold special elections should adequate relief not be available prior to the next regularly scheduled election.[3]

Now, in their Expedited Motion for Preliminary Injunction (ECF No. 26), Plaintiffs move to preliminarily enjoin the City, and its officers and agents, from calling, conducting, supervising, or certifying any elections under the Enacted Plan, beginning with the general elections scheduled for November 2023, until the entry of final judgment in this case.

As set forth in greater detail below, the record before the Court contains substantial evidence that the Commission Districts are racial gerrymanders in violation of the Fourteenth Amendment. It is without meaningful dispute that race predominated the City's drawing of District 5, ostensibly in effort to comply with the Voting Rights Act of 1965. Race was the predominant factor the Commission considered in the redrawing of each of the five Commission Districts. The Commissioners expressly prioritized preserving the cores of the existing districts to preserve the Commission's composition of three Hispanic commissioners, one Black commissioner, and one white or "Anglo" commissioner. Based on this and other evidence, the Court finds that Plaintiffs are substantially likely to succeed in establishing that the City designed the Enacted Plan to preserve the Hispanic super-majorities in Districts 1, 3, and 4, and to preserve District 2 as an "Anglo access" district. The City does not argue that the Commission's use of race in this way to draw those districts was narrowly tailored to any compelling governmental

---

[3] Plaintiffs also request an award of nominal damages in the amount of $100.00 for each Plaintiff, and an award of attorney's fees and costs incurred in connection with this action.

interest.  Moreover, Plaintiffs are substantially likely to succeed in establishing that the Commission's consideration of race in the drawing of District 5 was not narrowly tailored to comply with the Voting Rights Act, because the record in this case does not reflect that the City had an evidentiary basis for the selection of a Black Voting Age Population quota of 50% for that district.  Because the Court also finds that Plaintiffs will be irreparably harmed absent a preliminary injunction, and because the balance of the equities weighs in favor of the entry of a preliminary injunction, the undersigned recommends to the District Court that the City be preliminarily enjoined from conducting any elections under the 2022 Enacted Plan.

A summary of the briefing on the Expedited Motion follows.

### A.    Plaintiffs' Expedited Motion

Plaintiffs first argue in their Expedited Motion that they have standing[4] to assert the cause of action here raised because the individual plaintiffs reside in the challenged districts and because the organizational Plaintiffs have members residing in each of the challenged districts.

Second, Plaintiffs argue that there is a substantial likelihood that they will succeed on the merits of their racial gerrymandering claim, because the direct and circumstantial evidence in the legislative record shows that race predominated in the City's redrawing of the five Commission Districts, and the City's consideration of race in that process does not withstand strict scrutiny.

As direct evidence that race predominated in the City's 2022 redistricting process, Plaintiffs cite to the Commissioners' explicit statements at transcribed, public meetings of the Commission that the Commissioners' objective in the most recent redistricting process was to preserve the existence of three Hispanic seats, one Black seat, and one "Anglo" seat on the Commission.  Specifically, Plaintiffs point to: (i) the Commission's creation of an "Anglo-Access

---

[4]  The City has moved to dismiss the Amended Complaint on the basis that Plaintiffs lack standing.  That Motion remains pending (ECF No. 34).

District" as District 2; (ii) the imposition of an arbitrary minimum Black Voting Age Population ("BVAP") quota of 50% in District 5 for compliance with Section 2 of the Voting Rights Act of 1965 ("VRA");[5] (iii) the packing and treatment as fungible of Hispanic residents into Districts 1, 3, and 4; and (iv) the subordination to race of traditional redistricting criteria (*e.g.*, neighborhoods, compactness, and manmade and natural boundaries).

As circumstantial evidence that race predominated in the City's 2022 redistricting process, Plaintiffs cite to the racial demographics and shapes of the geographic areas that were moved among the districts as between the City's 2013 redistricting plan and the 2022 Enacted Plan, and the rejected alternative map configurations considered leading up to the adoption of the Enacted Plan.

According to Plaintiffs, the predominance of race in the City's redistricting process does not withstand strict scrutiny. In this regard, Plaintiffs argue that the City did not have a strong basis in evidence for the maintenance of District 2 as an "Anglo access district"; for maximizing the population of Hispanic residents in Districts 1, 3, and 4; or for selecting a BVAP floor of 50% for District 5.

Third, Plaintiffs argue that they will suffer irreparable harm absent a preliminary injunction because the harm to their fundamental right to vote cannot be undone with monetary remedies. And fourth, Plaintiffs assert that the balance of the equities weighs in their favor, and that injunctive relief is in the public's interest.

### B.       The City's Response

In its Response, the City reiterates the argument advanced in its Motion to Dismiss that Plaintiffs lack standing to bring this action, seemingly on the ground that the First Amended

---

[5] Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (as codified in Title 52 of the United States Code).

Complaint is a shotgun pleading that does not specify whether any particular Plaintiff resides in any of the geographic areas or parcels moved between Commission Districts as part of the redistricting adopted in the Enacted Plan.

On the merits, the City argues that Plaintiffs are not substantially likely to succeed.  The City asserts that the geographic shape and racial demographic make-up of the five Commission Districts have remained largely the same since single-member districts were instituted in the City in the late 1990s.  According to the City, the districts were not improper when they were instituted, and Plaintiffs' citation to the legislative record from 2022 does not establish racial motive now. Rather, the City argues that Plaintiffs cannot establish "packing" because the specific geographic areas that were moved to create the Commission Districts did not result in the movement of a significant number of voters into or out of a particular district.  Moreover, the City asserts that Plaintiffs have not established that any racial or ethnic group has had its influence reduced anywhere as a result of the Enacted Plan.

As to District 5, the City argues that Plaintiffs concede compliance with the VRA required the preservation of a majority BVAP of 50% in that district.  *See* (ECF No. 36 at 16).  According to the City, the City is not required to prove that it determined the minimum BVAP required for VRA compliance in District 5 and that the City then drew the borders for that district with mathematical precision.  Moreover, the City asserts that Plaintiffs' First Amended Complaint focused on the splitting of a historically Black community within the Coconut Grove neighborhood (identified as the West Grove) that was largely kept together in the Enacted Plan within District 2. In this regard, the City asserts that the Commission Districts adopted in the Enacted Plan are facially compact.

As to Districts 1, 3, and 4, the City argues that it was not unconstitutional to deliberately

place Hispanic residents into these districts to preserve the Black majority in District 5.  Moreover, the City argues that Districts 1, 3, and 4, which all have Hispanic Voting Age Populations ("HVAP") of more than 80%, cannot have been "packed" because the borders for those districts, which are generally contiguous, cannot have packed one another.

Regarding the fourth factor for the entry of a preliminary injunction, the City argues that the entry of a preliminary injunction would disserve the public interest by lowering the Black Citizen Voting Age Population ("BCVAP") in District 5 without increasing the influence of Black residents elsewhere.

And last, the City argues that Plaintiffs unduly delayed filing the instant Expedited Motion, which is "either a year too late or 25 years too late."  (ECF No. 36 at 22).  The City asserts that the Expedited Motion is 25 years too late because Plaintiffs complain of redistricting decisions made in the late 1990s, and that the Expedited Motion is a year too late because the redistricting process culminating in the Enacted Plan was completed in March 2022 but Plaintiffs waited until February 2023 to seek a preliminary injunction.  The City notes the upcoming November 2023 general election is looming, and asserts Plaintiffs have not demonstrated diligence.

### C.    Plaintiffs' Reply

In their Reply, Plaintiffs argue that bright-line rules for standing in racial gerrymandering cases support that they have standing to bring this case.

On the merits, Plaintiffs reply that the City's arguments about packing and electoral influence in its Response are responsive to vote dilution claims under the VRA, but because Plaintiffs have not raised such a claim, the City's arguments are unresponsive to the racial gerrymander claim asserted here under the Fourteenth Amendment.  Rather, Plaintiffs argue that the City's "core preservation" redistricting priority cannot immunize the perpetuation of racial

gerrymanders.   Moreover, Plaintiffs argue that the City's focus on the individual parcels and geographic areas moved between districts is misplaced, as the determination whether race predominated focuses on a challenged district as a whole and not the particular portions moved in isolation.   With these arguments in mind, Plaintiffs reiterate that each of the five Commission Districts was drawn with race as the predominant factor.

As to District 5, Plaintiffs in essence argue that the Parties agree race predominated in the drawing of that district.   To that end, Plaintiffs reply that the City conflates a BVAP numerical majority with the ability of Black voters to elect preferred candidates of their choice—that is, that the City arbitrarily selected a BVAP floor of 50% for District 5 and thus the City's consideration of race is not narrowly tailored.   Plaintiffs reiterate that the City did not perform a functional analysis of the electoral behavior within District 5 and that the record lacks evidence that a pre-enactment analysis was completed.   Plaintiffs emphasize that they do not concede that District 5 required a BVAP of 50% in District 5 to comply with the VRA, given the City's redistricting consultant advised that lower BVAPs for District 5 were Section 2 compliant.

As to Districts 1, 2, 3, and 4, Plaintiffs note that the City denies that race was the predominant factor in the drawing of those districts, but that the City fails to argue the consideration of race was narrowly tailored to any compelling governmental interest.   In this regard, Plaintiffs contend that the City fails to rebut the direct and circumstantial evidence that race predominated in the drawing of those districts.   Plaintiffs reiterate that the City fails to rebut that the primary factor in the design of Districts 1, 3, and 4 was to maximize the population of Hispanic residents in those districts.

Last, Plaintiffs argue in their Reply that they were diligent in bringing the instant action. Plaintiffs note the record in this case is large, parts of which required time to compile through

public records requests; the harms Plaintiffs suffer will not be realized until an election takes place under the Enacted Plan; there is sufficient time for the City to design and enact a remedial plan before an August 1, 2023 deadline set by the Miami-Dade County Supervisor of Elections; the harm complained of here is a new harm resulting from the 2022 Enacted Plan and not historic maps; and at least one of the individual Plaintiffs, for example, was born after the institution of single-member Commission Districts in the late 1990s.  And, Plaintiffs assert that the *Purcell* principle,[6] militating against the entry of a preliminary injunction on the eve of an election, does not apply in this case.

## II.    FACTUAL BACKGROUND

Plaintiffs attached 93 exhibits in support of their Motion.  *See* (ECF No. 24).  All 93 exhibits were admitted without objection into evidence at the March 29, 2023 Evidentiary and Preliminary Injunction Hearing.  Included among these exhibits, Plaintiffs have filed the reports of two experts.  At the hearing, the Court also heard the testimony of the City's redistricting consultant, Miguel De Grandy, Esq. ("De Grandy").  And the City offered into evidence 12 exhibits, which were admitted without objection.

A review of the Commissioners' statements at six sessions of the Commission over five months, the presentations, reports, letters and memoranda in evidence, and the opinions of Plaintiffs' experts follows.

### A.    Redistricting Process

The City began the most recent redistricting process, culminating in the 2022 Enacted Plan, at the end of 2021 following the release of the 2020 Census results.  The Commission convened six times to discuss redistricting.  *See* (ECF Nos. 24-11 through 24-18).

---

[6] *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

*The Commission first met on November 18, 2021*, where it was announced that the City had hired De Grandy and Stephen M. Cody ("Cody") to serve as redistricting consultants.[7] (ECF No. 24-11, "Tr. Nov. 18", at 2).

Prior to the November 18, 2021 Commission session, De Grandy and Cody submitted to the City an initial report and legal primer (the "Initial Report"). (ECF No. 50-11, "Init. Rpt."). The Initial Report explained that the City's population had grown by 42,752, or 10.7%, to 442,241 and that this growth was not uniform across the City's five existing commission districts. (Init. Rpt. at 3). As examples, the Initial Report identified that the City's most populous district—District 2 along the coast—had grown to a population of 116,742, which was 28,364 persons above the ideal population of 88,448, whereas District 3 had 79,309 residents and was 9,069 persons below the ideal population. (Init. Rpt. at 3). Thus, to bring the City's commission districts to within substantially equal populations of one another, the Initial Report explained that the City would have to redistrict. (Init. Rpt. at 3).

The Initial Report identified potential redistricting criteria the City could consider, suggested a process and timeline, and provided a summary of the legal requirements in redistricting. (Init. Rpt. at 3–6, 9–15). The Initial Report advised the City that the Commission would need to determine which redistricting criteria it would prioritize. (Init. Rpt. at 4).

The Initial Report provided the City with a racial breakdown of the five Commission Districts after the 2020 Census, based on the borders of the districts prior to redistricting; the Court reproduces that racial breakdown below:

---

[7] De Grandy served on the 1997 panel that drew the City's single-member commissioner districts. De Grandy noted that he also had previously been hired as a redistricting consultant for the City during the 2000 and 2010 redistricting cycles. (Tr. Nov. 18 at 2).

| District | Hispanic Pop. | Non Hisp. Black Pop | Non Hisp. White Pop |
|---|---|---|---|
| 1 | 90.0% | 10.0% | 4.0% |
| 2 | 52.0% | 8.0% | 34.0% |
| 3 | 88.0% | 6.0% | 8.0% |
| 4 | 90.0% | 3.0% | 7.0% |
| 5 | 41.0% | 54.0% | 7.0% |
|  |  |  |  |
| Overall | 70% | 16.3% | 11.9% |

**Table 1.**  Racial Breakdown of District Populations Prior to the Adoption of the Enacted Plan, Following the 2020 Census.  (Reproduced as reported in Init. Rpt. at 7).[8]

At the first Commission session on redistricting on November 18, 2021, De Grandy gave a presentation titled "Redistricting the City of Miami," (ECF No. 24-3), that contained information previously submitted to the Commission in the Initial Report.  (Tr. Nov. 18 at 2:14–16).  De Grandy informed the Commission that analysis of the *Gingles*[9] preconditions for the City's Black population required race to be factored into the redistricting process under the VRA as one of several factors to be conscious of in drafting a redistricting plan.  (Tr. Nov. 18 at 6:12–7:6).

Commissioner Alex Díaz de la Portilla and De Grandy engaged in an exchange regarding the permissibility of redistricting to "protect an African American district."  (Tr. Nov. 18 at 11:21–23).  De Grandy responded that he had to "be clear because the record is very important" "[f]or any future actions."  (Tr. Nov. 18 at 12:3–5).  Commissioner Díaz de la Portilla responded that he was trying to ask his question "the right way."  (Tr. Nov. 18 at 12:6–7).  De Grandy informed Commissioner Díaz de la Portilla that "White, non-Hispanic, is not a protected class under the Voting Rights Act"; Commissioner Díaz de la Portilla confirmed his understanding that the 2022 redistricting process could result in the elimination of the "Anglo" seat: "[Y]ou in

---

[8]  Population totals exceed 100% because, as De Grandy noted in his Initial Report, some residents self-reported as being two or more races in the 2020 Census.  *See* (Init. Rpt. at 7).

[9]  *Thornburg v. Gingles*, 478 U.S. 30 (1986).  De Grandy summarized the *Gingles* preconditions: "First the majority group, minority group, excuse me, must be large enough and compact to comprise a majority in a single member district.  Second, minority voters must be politically cohesive.  And that means they generally coalesce around the same candidates or issues in elections.  And third, the majority must usually vote as a bloc to thwart the election of the minority-preferred candidate."  (Tr. Nov. 18 at 6:12–16).

essence, could be eliminating what we call here in Miami, in practical terms, an Anglo, right, the term that we use here, seat, potentially."  (Tr. Nov. 18 at 12:10–14).

Commissioner Díaz de la Portilla noted that his use of the word "protect" in reference to District 5 was making De Grandy "very nervous."  (Tr. Nov. 18 at 14:23–15:1).  Commissioner Christine King attempted to clarify for Commissioner Díaz de la Portilla that what she thought he was trying to say was "that you have to, you're going to attempt to try to maintain the core of the existing district."  (Tr. Nov. 18 at 15:2–3).

Commissioner Manolo Reyes agreed that maintaining the cores of the existing districts should be prioritized.  (Tr. Nov. 18 at 15:14–16).  He urged that the redistricting process should protect the core of District 5 and also protect District 2 as a white district, noting that the cores of the existing districts were designed so that every ethnic group in the City would be "protected" or represented on the Commission:

> Commissioner Reyes: And I want you to take that into consideration and in my case I will strongly request that the districts, you see, would be, remain as they are as possible.  You see?  Remain as the core of the district, remain as intact as possible.  Take that into consideration.  That's very important to me.  And also at the same time, you see, as Commissioner King said, we have to protect the core of District 5, and as much as we can also, the core of District 2, although there is not a white district anymore, but we will, and I'm going to be very clear on it.  This district, I remember the first time that it was, this was drawn, you were mayor, right?  You were mayor —
> Commissioner Carollo: Well —
> Commissioner Reyes: And it was done, excuse me Commissioner, it was drawn in a way that every single ethnic group would be represented.  And that's why this is the odd shape that we have now, you see, for every single district, and it was drawn, what was the name, this guy that drew them, [inaudible], was the one that presented this plan, and I was here, and I didn't agree with it.
> Commissioner Carollo: No.  No.
> Commissioner Reyes: Yes.  Yes.  Yes.
> Commissioner Carollo: That was the first one, there was then, I don't know.
> Commissioner Reyes: Well when he presented this plan, I was very upset about it because it divide[d] Flagami the way it was, but that's out of this question.
> Commissioner Carollo: This plan came after.  The one you have today was not the original one.

> Commissioner Reyes: No, no, I'm saying that this plan, it was changed to this plan after 10 years, but the original was different. But it was drawn in a way that every single ethnic group was protected. You see?

(Tr. Nov. 18 at 15:22–16:22) (annotation in original). De Grandy immediately explained that there were race neutral criteria that had been considered in that prior redistricting cycle. (Tr. Nov. 18 at 16:23–17:2).

Commissioner Joe Carollo and De Grandy also discussed as a priority identifying politically cohesive minority voters. De Grandy restated the direction as keeping neighborhoods and communities together that vote in a cohesive manner:

> Commissioner Carollo: . . . This is important . . . Minority voters must be politically cohesive. Okay?
> Mr. De Grandy: Yes sir.
> Commissioner Carollo: Okay and this to me is one of the most important aspects of what we need to give him instructions on. And I think we all understand why that is important. Minority voters must be politically cohesive. I will make a motion that this will be part of what you use to put the districts together, also. The minority voters must be politically cohesive.
> Mr. De Grandy: In other words, what you're saying is over and above the Voting Rights Act analysis, you want me to look at how different neighborhoods and communities vote, and if they vote in a cohesive manner, try to keep them together.
> Commissioner Carollo: Correct.

(Tr. Nov. 18 at 19:16–20:4).

De Grandy informed the Commission that not all of its redistricting priorities could be realized, for example stating as to compactness that he "can't do it on [the] core[s] of [the] existing districts[.]" (Tr. Nov. 18 at 21:4–5). De Grandy also spoke of the redistricting "wall that separates D[istrict] 2 and D[istrict] 5," in the northeast of the City, based on concerns of compliance with the VRA. (Tr. Nov. 18 at 23:9). Commissioner Díaz de la Portilla proposed moving residents from the southern part of "the white seats, for lack of a better term" (*i.e.*, District 2) into District 3 or District 4. (Tr. Nov. 18 at 23:16–18). He asked if De Grandy could "take some of those

14

communities that are white communities and incorporate them into some of the Hispanic seats, for lack of a better term, again, right, without diluting Hispanic minority power in those districts[.]" (Tr. Nov. 18 at 23:19–22). Commissioner Díaz de la Portilla cited as an example the area of Douglas Park as a politically cohesive community in District 2 that "probably doesn't belong there" that could be moved out of District 2 on the grounds that it has more commonalities with District 4 than it does with Coconut Grove in District 2. (Tr. Nov. 18 at 24:1–5, 14–19).

Commissioner Carollo explained his reason for the City switching to single-member commissioner districts:

> Commissioner Carollo: Let me go a little bit real quick into the history of this and Commissioner King was a lot younger than some of us so she won't remember as well as a bunch over here or Mr. Díaz de la Portilla. When we went to districts, we went to districts when I was mayor. We had no African American representation [o]n the commission. So, instead of waiting for more years to go on like that so there could be a solid case made in the court, I decided that I was gonna put in my political capital and make districts to assure that there would be an African American sitting in this commission and there would be an Anglo. We've got half of one now but we're still good. And I wanted to make sure that there were three Hispanic districts because that's the way that our population was and basically it still is. It passed. I knew that there were a lot of negative points from going to districts but there were even greater negativities if we didn't do that. That's why I pushed it and it passed.

(Tr. Nov. 18 at 28:2–12).

The Commission also discussed whether keeping traditional neighborhoods together or splitting them between districts would be a redistricting priority. Commissioners King, Reyes, and Díaz de la Portilla agreed that neighborhoods should be kept together when feasible. (Tr. Nov. 18 at 33:9–11). Commissioner Carollo noted "breaks in [his] district" that already existed. (Tr. Nov. 18 at 33:12–13). Commissioner Díaz de la Portilla suggested that it would be permissible to break up neighborhoods like Flagami among multiple districts because "the core constituency will elect the same kind of representative," noting that neighborhoods like Overtown and Liberty City

should not be moved.  (Tr. Nov. 18 at 33:14–17).   Commissioner Carollo urged that the

Commission would "have to also be careful" because "[t]here is a distinction between ethnicity

within a neighborhood," prompting Commissioner Díaz de la Portilla to state:

> Commissioner Díaz de la Portilla: Well, look, people in the Roads don't vote
> the same way as people in Allapattah.  Even though they may be Cuban American
> or Hispanic, they don't vote the same way, right?  Some of them are, I think you
> used the term once so I'm not gonna use it, but uppity.  Some of them are uppity
> something.  Do you remember that term?
> Commissioner Carollo: Yes.
> Mr. De Grandy: I think I referenced that in a legislative debate, yes, many years
> ago.
> Commissioner Díaz de la Portilla: Yes, uppity something, that one, and some
> are those kinda people and then they're different so even within racial groups or
> ethnic groups, there are differences, economic difference, they vote differently.
> Mr. De Grandy: Of Course.

(Tr. Nov. 18 at 33:22–34:10).

The Commissioners and De Grandy discussed the ranking of the redistricting priorities to

give De Grandy flexibility in designing a proposed map.  The rankings were: (1) target substantial

equality of population; (2) maintain the cores of the existing districts; (3) consider political

cohesion; and (4) keep traditional neighborhoods together, where feasible.  (Tr. Nov. 18 at 35–36).

These priorities were set forth in the November 18, 2021 Resolution 21-485 as: (a) Comply with

the United States Constitution and the Voting Rights Act; (b) Maintain the core of existing districts

to avoid voter confusion; (c) Factor in voter cohesion; (d) Achieve substantial equality of

population as opposed to mathematical equality; and (e) Maintain communities of interest and

neighborhoods where feasible.  (ECF No. 50-1).

***The Commission had a follow-up session with De Grandy on December 9, 2021***.  (ECF

No. 24-12, "Tr. Dec. 9").  De Grandy began the discussion by reiterating the criteria he understood

he was instructed to apply: "one, achieve substantial equality as opposed to mathematical equality.

Maintain the core of districts, wherever feasible.  Look at voter cohesion and preserve traditional

neighborhoods and communities of interest together, also when feasible." (Tr. Dec. 9 at 2:4–7).

Yet the discussion promptly featured race as a priority second only to achieving substantial

numerical equality. Commissioner Carollo noted that Commissioner Díaz de la Portilla's district

(District 1) would

> need to acquire seven, eight thousand more people. The only logical way that you
> get more is by going toward Wynwood, I believe. That's mainly a Hispanic area.
> That's because if you go some of the other ways, you start getting districts that get
> broken up. You got some other areas along the river.
>     On your side of the river, across from mine, that I think are also areas you could
> go and are attractive. Those are non-African American areas, mainly Hispanic or
> Anglo basically, that are in District 5. District 5 is going to have to acquire some
> additional areas also. What I suggest, strongly, is that you meet with Mr. De
> Grandy so you can go over it with him.

(Tr. Dec. 9 at 3:11–18).

Due to the borders of the City, Commissioner Díaz de la Portilla stated that District 1 would

have to extend to the south toward Districts 3 and 4, and that "to maintain the integrity of each

district, we sort of could figure out how these three districts, right, 1, 3, and 4 could be kept whole,

for a lack of a better term, without going into District 2 and other areas like that." (Tr. Dec. 9 at

6:13–15). Accordingly, Commissioner Díaz de la Portilla asked De Grandy if Coconut Grove

could be split among districts based on where Hispanic votes live:

> Commissioner Díaz de la Portilla: The question, the legal question to you, is
> there a problem with this. Coconut Grove is also — like Coral Gables is a different
> city but there's ethnic diversity in Coconut Grove too. Is there a problem with
> splitting Coconut Grove as an entity? Based on where the Hispanic voters live?
> Let's say Bay Heights, areas like that, verses other areas. Is there an issue with
> that?
>     Mr. De Grandy: Let me rephrase your question. Instead of problem if the
> question is, is there a legal impediment
>     Commissioner Díaz de la Portilla: That's what I meant.
>     Mr. De Grandy: There is no legal impediment to breaking up any community
> of interest. It's up to you to provide that policy.

(Tr. Dec. 9 at 7:14–23).

De Grandy again explained, as he did in November 2021, that a redistricting "wall" existed between Districts 2 and 5 in the northeastern part of the City, thus to honor the priority of preserving the cores of the existing districts, District 2 would have to shed population in the southwest of the City where it abutted Districts 3 and 4.  (Tr. Dec. 9 at 9:4–7).  Commissioner Díaz de la Portilla again expressed concern that doing so would dilute the "ethnic integrity" of those districts:

> Commissioner Díaz De La Portilla: How do you not dilute, then, District 3 and District 4?  Can you survive, can you keep the — again I'll call it the ethnic integrity, let's call it that for the lack of a better legal term.  I'm not talking about legalities, 'cause you're the lawyer, that's why you do what you do — the ethnic integrity of Districts 3 and 4, how far south can you go?  And are there enough precincts around or contiguous to District 3 and 4 that allows you to add to them, 'cause they don't need that many people.  Add to them without compromising the ethnic integrity of those Districts, 3 and 4.

(Tr. Dec. 9 at 10:4–10).  De Grandy responded that, given the Hispanic populations of Districts 3 and 4—approximately 88% and 90%, respectively—neither the "integrity" of those districts nor the ability of that community to elect candidates of choice would be compromised.  (Tr. Dec. 9 at 10:11–17).  After stating that he did not "have any interest in getting any part of [Coconut] Grove," (Tr. Dec. 9 at 13:3–5), Commissioner Díaz de la Portilla expressed that shifting voters out of District 2 into the surrounding districts should be done so as to minimize any changes to the "ethnic integrity" and "racial integrity" of those surrounding districts, adding:

> Commissioner Díaz De La Portilla: . . . My thinking is you sort of work with that way of thinking of how we're gonna get there.  We have to take away from District 2, no matter what.  Figure out a way to just give everybody a little bit, and we can because [looking at Commissioner Russell] you're not a protected category, by the way.  District 2 is not — white, Anglos are not protected.  So if the district happens to go Hispanic, it goes Hispanic.  Right?

(Tr. Dec. 9 at 13:19–14:1) (annotation in original).

Commissioner Carollo also expressed his concern that changing one or two of the Hispanic

seats on the Commission would upset the balance and harmony of the City:

> Commissioner Carollo: The purest of the Hispanic districts is District 4, much more than [looking at Commissioner Díaz de la Portilla] yours or mine. And I say that because while we have to go by law in making districts, based on how many people live in them, once we break down on how many of those people are voters, that make[s] a big difference. So they are not as pure in the percentage of the Hispanics that vote in these three districts. Particularly in my district and secondary in Commissioner Díaz de la Portilla's district. And we have to also look at that. Because otherwise, the concept that I championed and brought up for the change with districts, so that we could keep a balance and harmony of this city, it's gonna be changed. *And where the biggest danger lies in it being changed — and it's not in keeping an Anglo seat or a Black seat — will be in changing one or two of the Hispanic seats.*

(Tr. Dec. 9 at 14:5–14) (emphasis added) (annotation in original). Commissioner Carollo reiterated that his "main interest in my district and your district Commissioner Díaz de la Portilla and Mr. Reyes' district is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there." *See* (Tr. Dec. 9 at 22:21–23:7). Commissioner Díaz de la Portilla responded, "Of course." (Tr. Dec. 9 at 23:8). Citing to his concern that tremendous migration from other parts of "the country, South Florida, the state, a lot from up north, New York, Chicago, [and] out west," was driving racial demographic changes in the City, Commissioner Carollo stated:

> This is what I feel that I have an obligation to protect. Not just [District 5]. District 4, and District 1. The other districts, like I said, no matter how we carve them, they're going to have the representation that we intended those districts to have for some time to come.

(Tr. Dec. 9 at 24:8–10).

The Commissioners instructed De Grandy to consider the contiguity of districts. (Tr. Dec. 9 at 17). However, De Grandy informed the Commission that he would be unable to effectuate the Commission's desire to draw compact districts in light of its desire to maintain the cores of the existing districts. (Tr. Dec. 9 at 17:20–18:23). De Grandy informed the Commission that the

districts were not compact and three of the Commissioners agreed.  *See* (Tr. Dec. 9 at 18:7–8; 29:10–19).  De Grandy also responded in the affirmative to Commissioner Díaz de la Portilla's question whether it was a "foregone conclusion" that "[i]f you want to have an African American district and you want to have an Anglo district it's almost impossible.   To emphasize compactness."  (Tr. Dec. 9 at 28:22–29:2).

The Commissioners also discussed with De Grandy whether he should consider man-made or natural boundaries.  Commissioner Carollo and Commissioner Díaz de la Portilla discussed the need for a district to extend south over U.S. Highway 1 or extend to reach the Douglas Park neighborhood, which was a "[v]ery Hispanic area" that "should have always been part of District 4, but it wasn't."  (Tr. Dec. 9 at 19:22–20:2).  Commissioner Díaz De La Portilla asked if District 4 could be extended south to increase its population by acquiring Douglas Park without crossing U.S. Highway 1 into Coconut Grove.  (Tr. Dec. 9 at 21:3–5).

Commissioner Carollo raised the issues of undercounted populations in his, Commissioner King's, and Commissioner Díaz de la Portilla's districts.  Commissioner Carollo concluded that discussion noting that, "[i]n Commissioner Russell's district, no matter how you cut it, you're gonna have an Anglo elected to a district," to which Commissioner Russell responded, "[o]r even a Japanese American."[10]  (Tr. Dec. 9 at 23:19–21).

The Commissioners discussed with De Grandy the option of a plan that would retain the cores of their districts as much as possible while minimizing disruption.  Commissioner Russell noted that breaking up the Coconut Grove neighborhood would be disruptive, and that U.S. Highway 1 is a "pretty hard boundary."  (Tr. Dec. 9 at 26)  He noted that there were many places for District 2 to shed population consistent with population growth (*e.g.*, Brickell and/or Douglas

---

[10]  Commissioner Ken Russell is of Japanese heritage.

Park) and man-made barriers that would avoid breaking up the Coconut Grove neighborhood.  (Tr. Dec. 9 at 26–27).

*On February 7, 2022, the Commission convened a special meeting* for the presentation of the preliminary redistricting plan and to take public comment.  (ECF No. 24-13) ("Tr. Feb. 7"). At the February 7, 2022 special meeting, De Grandy presented the preliminary plan to the Commission and members of the public in attendance.   De Grandy summarized the racial demographics of the districts in the February 7 preliminary plan as follows: (1) District 1 would have a Hispanic population of 87.38% and HVAP of 88.7%; (2) District 2 would "remain[] a swing district, with 37.2% white, non-Hispanic population, 8% Black population, and roughly 48% Hispanic population," (Tr. Feb. 7 at 7:10–12); (3) District 3 would have a Hispanic population of 87.4% and HVAP of 88.4%; (4) District 4 would have a Hispanic population of 86.7% and HVAP of 88%; and (5) District 5 would have a Black population of 51.7% and a BVAP of 49.8%.  (Tr. Feb. 7 at 7–8).  De Grandy explained that the February 7 preliminary plan would underpopulate District 5 based on expectations that it would experience significant development activity and population growth over the next decade.  (Tr. Feb. 7 at 8).

De Grandy summarized particular areas moved as part of the proposed preliminary map and explained that the preliminary plan would largely retain the cores of the existing districts.  A visual representation of the February 7, 2022 preliminary map proposal is reproduced below from De Grandy's contemporaneous presentation:



**Figure 2.** February 7, 2022 Preliminary Map Proposal (Reproduced as depicted in ECF No. 24-4 at 40).

Members of the public expressed opposition to the proposed map, particularly with respect to the odd shape of the proposed District 2 and the breaking up of the Coconut Grove neighborhood by moving the historically Black West Grove into District 4.[11]  (ECF No. 24-13) (Tr. Feb. 7 at 12–14, 16–17, 19–26, 28–33, 38–39).  One person expressed concern that the Black population in the proposed District 5 was too low.  (Tr. Feb. 7 at 27–28).  The public suggested looking at the map with fresh eyes, rather than maintaining the cores, or increasing the number of commissioners from five to seven, a consideration Commissioner Russell had also raised during the December 9 Commission meeting.

De Grandy clarified that the triangle area described as the West Grove that he proposed moving from District 2 to District 4 had an approximately 48% Hispanic population and 10% Black population.  *See* (Tr. Feb. 7 at 42).  He also explained that the southern portion of District 5 near Downtown Miami along the Miami River that he proposed moving from District 5 to

---

[11]  A statement from Plaintiff South Dade NAACP expressing concern about moving the West Grove out of District 2 was read into the record at the February 7, 2022 session.  (Tr. Feb. 7 at 24–25).

District 1 was a predominantly Hispanic area that would be moved to rebalance District 5's population to preserve District 5 as a district in which Black voters can elect preferred candidates, upon moving portions of District 2 into District 5. *See* (Tr. Feb. 7 at 42:21–43:3).

Commissioner Díaz de la Portilla asked De Grandy whether the Commission was required to preserve District 2 as a white district:

> Commissioner Díaz de la Portilla: . . . Mr. De Grandy, is there any legal requirement or legal principle that we have in coastal district?
> Mr. De Grandy: No, there is no requirement but once you told me to maintain the core and configuration of the existing districts, I kept that coastal district as a coastal district, but there is no legal requirement. I mean I could start from scratch and create a new plan if you want, which is we discussed and this commission said no, maintain the core of existing districts to minimize voter confusion and disruption.
> Commissioner Díaz de la Portilla: This commission could change that vote, right, and reverse that and say we don't need a coastal district? There's no legal protection having a white, for lack of a better term, district, correct?
> Mr. De Grandy: No, there is no legal protection to having a coastal district.

(Tr. Feb. 7 at 45:6–16).

Commissioner Carollo again provided background on the City's adoption of single-member commissioner districts, explaining that, at a point in the past when he was the mayor, the City had city-wide commissioners. *See* (Tr. Feb. 7 at 50). Commissioner Carollo explained that the City's sole Black commissioner had lost an election such that there was no Black representative on the Commission; Commissioner Carollo also noted that the Commission's sole "Anglo" commissioner would likely have been the last white commissioner elected given population trends in the City. *See* (Tr. Feb. 7 at 50–51). Commissioner Carollo represented that, accordingly, the core of District 2 had been an intentional racial gerrymander to ensure the election of an "Anglo" commissioner:

> While the districts have good but they also have a lot of bad that come along with them. There's a lot of baggage to districts. Also, I thought that it far outweighed it having districts but having equal representation within the

commission and to assure that we would always have a balance of what our population in the district and that there would always be an African American commissioner and an Anglo commissioner because if we would've citywide elections, the trend was very different.

I believe that trend will show even today if we have citywide elections and the way that the original districts were made, this [is] why we've had a whole coastal one. It was made that way. *It was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner*.

(Tr. Feb. 7 at 51:10–15) (emphasis added).

After providing examples of neighborhoods that are split across Districts 1, 3, and 4, Commissioner Carollo again explained that the goal of redistricting was to ensure, consistent with the decision to adopt single-member commissioner districts, that there would be three Hispanic commissioners, one Black commissioner, and one Anglo commissioner elected to the Commission:

So, I'm bringing this so you could have a historical impact that this body is just not trying to cut up communities for the heck of it. We've had to do this in the past so that we could meet first of all the types of people that this was an impediment to elect. We needed to make sure and we need to make sure that there's gonna be an African American elected [a]nd up in this Commission. We need to make sure there's an Anglo American elected and up in this Commission that in the rest of the districts that are majority Hispanic, that they stayed that way so that the 67% of the population, 68, of the City of Miami, the Hispanic, will have three representatives in the Commission.

(Tr. Feb.7 at 52:18–53:2).

Commissioner Carollo explained that the need to preserve District 5 as a district in which Black voters could elect preferred candidates, and the amount of development in the coastal areas in District 2, limited the Commission's ability to shift population without affecting "why [the City] went into districts." (Tr. Feb. 7 at 53:9). Commissioner Carollo further explained that a small portion of Coconut Grove would have to be moved "in order to give balance, first of all protect the integrity of what was done in 2000 and making sure that we keep [an] African American district, that we keep an Anglo American district, but that we also keep that same balance and

having a balance in the Hispanic districts."  (Tr. Feb. 7 at 54:5–15).  He noted that other neighborhoods were split among districts; he stated that if neighborhoods could not be separated, "[t]hen the outcome of that would be that guys like— that look like us, with last names like us, in the near future might not be elected necessarily from the districts that we represent."  (Tr. Feb. 7 at 54:15–17).

Commissioner Reyes affirmed Commissioner Carollo's recounting that the City created single-member districts because, based on population trends, the election of city-wide commissioners would have resulted in an all-Hispanic Commission.  He asked if De Grandy's proposed plan was "the best" De Grandy could do to protect the Black and Anglo seats on the Commission:

> That's why they were formed.  That's the odd shape that they have now.  It was to make sure and let's call a spade a spade.  To make sure that an African American was gonna be elected and that an Anglo as they were called before, was gonna be elected.  That was brought to the people and the people voted.
>     Every year, I mean every ten years, in order to protect those two seats, which I think that it is just to that everybody has representation.  There have to be changes. . . . But I wanna ask Commissioner [*sic*] De Grandy.  I want you to be very honest because we gave you your marching order[s].  The most important question that we have is this the best you can do to protect the African American seat?  I'm gonna be blunt and the Anglo seat, but more important, the African American seat?

(Tr. Feb. 7 at 67:19–68:9).  De Grandy responded that the shifting of population into and out of District 5 required rebalancing the population of District 1.  Commissioner Reyes and De Grandy discussed alternate borders for the extension of District 4 southward into Coconut Grove in District 2 to minimize disruption.  *See* (Tr. Feb. 7 at 68–70).  De Grandy explained the rippling effects of border changes, to which Commissioner Reyes stated the goal of representation included that, "The Anglos and the African Americans, they're gonna have somebody sitting here who's gonna look like them.  I'm committed."  (Tr. Feb. 7 at 71:16–17).

Commissioner Carollo expressed a similar commitment in addition to concern that the

redistricting process would dilute the Hispanic populations of Districts 1 and 3 such that the

Commission would risk "ending up with two districts of Hispanics" instead of three:

> Commissioner Carollo: . . . What I am trying to do is, number one: As I stated, were my goals from day 1 in the year 2000.  When I put all my political whereabouts to get a referendum passed for districts, so that we could have African American representation first and foremost.  Then into the future be able to have guaranteed Anglo representation, and to have three districts that were Hispanic.  These are my intentions here today.  I have no doubt that the way that we'll break in District 5 is gonna be an African American representation.  Anyway we cut District 2 the same would happen, because when you look at the voting population, they'll be very high, they'll be able to accomplish that.
>
> My concern now is just the opposite of back in 2000.  My concern is that if we dilute some of these districts, or one district or another.  In particular District 3 and possibly District 1, because District 4 is the most Hispanic by far of any of these three districts.  That we're risking into the future, ending up with two districts of Hispanics.  So we might have a population that is very plus-majority Hispanic, but because the voting power is not there, you end up differently.  This is why I'm going this way.  And let's begin in the Grove so that we can finish that and then I'll jump into the rest of the districts.

(Tr. Feb. 7 at 100:13–101:4).

Accordingly, the Commissioners discussed the Douglas Park area, which Commissioner

Carollo noted was a "huge Hispanic area on the other side of US [Highway] 1" from the western

portions of Coconut Grove.  (Tr. Feb. 7 at 103:11–12).  Commissioner Carollo and Commissioner

Reyes discussed the redistricting of that area.  Comparing Hispanic voters to the sirloin of a steak

and non-Hispanic voters to the bone in a steak, Commissioner Carollo stated, "[t]here has to be a

balance into the future.  So that District 3 — which I can't run again so it's not me — and District 1,

can keep the same type of last names, faces that they have, and that we don't end up with diluting

artificially, Hispanic population in the City of Miami."  (Tr. Feb. 7 at 103:18–21).  Commissioner

Carollo explained that that "whole area here which is a very rich area of voters that own their own

homes, like the rest of Commissioner Reyes's district.  Hispanic. . . .  But he's only going to get a

slice, sliver, here in this part of the Grove, of areas that are not as Hispanic like the rest of his district." (Tr. Feb. 7 at 104:4–7).

Commissioner Carollo discussed the balancing of Hispanic voters among Districts 1, 3, and 4, explaining that moving the Douglas Park area to Commissioner Reyes's district would result in that district gaining territory in "prime Hispanic area" while "diluting the Hispanic vote" overall. (Tr. Feb. 7 at 105:2–3); *see* (Tr. Feb. 7 at 105–106); *see also* (Tr. Feb. 7 at 106:19–21) ("Commissioner Reyes' District is still gonna be highly, highly Hispanic. That there is not gonna be any problem for him or any other Hispanic after him to get elected there."). Commissioner Carollo stated, "What I care is that in the future, there is sufficient Hispanic votes [in Districts 1, 3, and 4] to elect a Hispanic. And a Hispanic that is not going to be a lap dog for anybody." (Tr. Feb. 7 at 105:22–23). He expressed concern for placing "sufficient Hispanic voters in [District 1], because the one district that is in most danger into the future of losing a Hispanic representative is District 3[.]" (Tr. Feb. 7 at 106:13–14).

And, also at the February 7, 2022 Commission meeting, Commissioner Russell asked whether population growth in District 2 could be offset by shifting the particular areas within District 2 that experienced the most population growth, and explained District 2's role as the financial generator for the City. He asked that the Commission avoid disrupting neighborhoods within District 2, particularly Coconut Grove, as much as possible, noting the diversity within District 2 and in that neighborhood. He rejected the characterization of himself as the "white commissioner" and opined that the "common denominator of District 2 is diversity." *See* (Tr. Feb. 7 at 64:1–4). Thus, he proposed an alternate map configuration. *See* (Tr. Feb. 7 at 62–66).

***On February 25, 2022, the Commission convened again to discuss redistricting.*** De Grandy presented the revised February 25, 2022 plan based on the direction he received from the

Commission at the February 7, 2022 meeting.  According to De Grandy, the February 25, 2022

revised plan would reduce the number of residents moved to District 4 from Coconut Grove in

District 2, retain the Bay Heights neighborhood in District 2, retain the Miami Riverside Center

(MRC) area in District 5, and slightly increase the BVAP proportion of District 5.  De Grandy also

noted that the February 25, 2022 plan would result in greater population deviation across districts.

*See* (ECF No. 24-14, "Tr. Feb. 25 AM", at 5–6).  *See generally* (ECF No. 24-7) (accompanying

slide-show presentation).  De Grandy's presentation again identified District 2 as a "swing district"

on racial grounds, and otherwise focused on the racial demographic breakdown of each of the

districts and the changes made under the revised February 25, 2022 plan.  De Grandy explained:

> Okay, next slide, District 1 is at a -.41 deviation, which is 340 residents below
> the ideal.  It has an 88% Hispanic population with 89.5% Hispanic voting age
> population, it clearly complies with the Voting Rights Act.  District 2, next slide,
> now has a +5.46 deviation, which is 4,832 residents above the ideal.  District 2
> remains a swing district with 37% white non-Hispanic population, approximately
> 7.5% Black population, and roughly 48.7% Hispanic population.  Voting age
> percentages are almost the same as the total population percentages.  D[istrict] 3 is
> slightly underpopulated at a -0.92 or 810 people under the ideal population.  District
> 3 has an 87.25% Hispanic population and approximately 88.3% Hispanic voting
> age population, and consistent with the Voting Rights Act, the Hispanic community
> has an equal opportunity to elect the candidate of its choice.  District 4 is now
> slightly underpopulated with a -2% deviation or 1,774 residents below the ideal.
> 88.2% of the population is Hispanic, with 89.5% Hispanic voting age population.
> As I said before, the drop in population compared to our preliminary plan was a
> direct result of reducing the number of Grove residents that we had moved from
> D[istrict] 2 to D[istrict] 4.  The district also complies with the requirements of the
> Voting Rights Act.
> Now finally, we underpopulated D[istrict] 5 by roughly 2.14 under the ideal,
> this allowed us to slightly increase the Black voting percentage.  The proposed
> district is now approximately 52.2% Black, with approximately 50.3% Black
> voting age population.  Our analysis of voting patterns indicates that, consistent
> with the requirements of the VRA, the Black community does have an equal
> opportunity to elect the candidate of its choice.

(Tr. Feb. 25 AM at 6:1–19).  Despite referencing analyses of voting patterns, no such analyses

have been described or made part of the record of the instant case.

De Grandy explained the decision to change the border between District 1 and District 5 near Downtown Miami near the Miami Riverside Center on racial grounds:

> The next slide shows the movement we made in the south part of D[istrict] 1, taking population from D[istrict] 5. Now the preliminary plan had this movement going even further southeast. But however, in order to keep the MRC in D[istrict] 5, we had to reduce this movement with a new boundary at the I-95 expressway. Again, we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion, which is one of the factors you asked us to consider with D[istrict] 1 residents.

(Tr. Feb. 25 AM at 7:3–8). Moreover, because of the racial demographics in District 2 where the Brickell neighborhood is located, De Grandy did not feel it was appropriate to extend District 3 into Brickell; he instead proposed moving population from District 4 into District 3 in the Little Havana area identified as Areas 14 and 15 to maintain the racial demographics of the districts, *see* (ECF No. 24-7 at 23):

> The next slide is of the proposed District 3. As the most underpopulated district, D[istrict] 3 also needed to increase in population. It was not feasible to cross the river to the north, so our options were to move east, west or south. We did not feel it was appropriate to move east because of dissimilar demographics. And the next slide now shows the movements we made, taking population from D[istrict] 4 into D[istrict] 3. It spans from NW 7th Street to the north to SW 8th Street to the south, and from 27th to 32nd Avenue. Again, this was done to balance population, and in that regard we tried to find adjacent areas with similar demographics in order to maintain voter cohesion, one of your standards, while rebalancing population.

(Tr. Feb. 25 AM at 7:20–8:4). Summarizing the February 25, 2022 revised plan, De Grandy said:

> Every district maintains the core configuration and the vast majority of its existing population. We restored the MRC to D[istrict] 5. We increased D[istrict] 5's Black voting age population above 50%. Wherever possible, we tried to move population based on similar demographics and voting patterns in order to maintain voter cohesion. We stayed well below the 10% threshold. Finally, there was a directive to maintain communities of interest and traditional neighborhoods when feasible. However, as you know, many of the city's traditional neighborhoods were already split in the current plan. Moreover, because the current configurations and the directives to maintain the core of existing districts as well as a need to balance population, the directive to maintain communities of interest and traditional neighborhoods could not be substantially achieved. And with that, I'm happy to answer any questions you may have.

(Tr. Feb. 25 AM at 9:15–10:2).  As in the previous presentations, the statistics highlighted in the February 25, 2022 presentation for the Commission, apart from the population totals, focused on the racial breakdown of each district: the total white, Black, and Hispanic populations, and the BVAP, HVAP, and WVAP for each district.  *See generally* (ECF No. 24-7).

The Commission took public comment.  A representative from Plaintiffs South Dade NAACP and Miami-Dade NAACP read a statement into the record, expressing concerns that splitting the West Grove between Districts 2 and 4 would dilute the voting power of Black voters within District 2.  (Tr. Feb. 25 AM at 14).  Other members of the public commented on the record advocating against splitting the Coconut Grove neighborhood between districts, including Plaintiff Cooper and a representative from Plaintiff GRACE, (Tr. Feb. 25 AM at 16, 41).

A representative from the ACLU of Florida, which is Plaintiffs' counsel in this case, also spoke at the February 25, 2022 morning session to summarize concerns detailed in a letter to the Commission that had been emailed to the City earlier that day.  Specifically, Plaintiffs' counsel raised concerns regarding the arbitrary BVAP floor of 50% selected for District 5, overconcentrating Black voters in District 5, discrepancies in the population figures that De Grandy had presented (*e.g.*, population totals that did not add up to the 2020 Census count for the City and the inclusion in the population totals of precincts from outside the City's borders), and the splitting of Coconut Grove.  (Tr. Feb. 25 AM at 34:4–23).  These concerns were argued in further detail in Plaintiffs' counsel's letter, which explained that Black voters make up a substantially higher share of registered voters and actual voters in District 5 than the 2020 Census figures indicate.  (ECF No. 24-28, "Feb. 25 ACLU Ltr.", at 2–3).  These same concerns were reiterated in the ACLU of Florida's second letter, dated March 31, 2022, addressed to the Mayor of the City, Francis X. Suarez.  *See generally* (ECF No. 24-29, "Mar. 31 ACLU Ltr.").

In the afternoon session of the Commission on February 25, 2022, De Grandy responded to comments made by the representative from the ACLU of Florida: "What they're basically saying is I put too many Black folks into District 5."  (ECF No. 24-15, "Tr. Feb. 25 PM", at 2:7–8).  De Grandy further stated that he was not

> looking at creating a plan that will perform for the Black community just in the next election, I'm trying to create a plan that performs for the community for a decade.  And I know that this community is subject to some degree of gentrification.  And so, to me, the most important thing is to put, you know, the district in a position that complies with the Voting Rights Act.

(Tr. Feb. 25 PM at 2:10–14).  De Grandy explained that he was not proposing a plan that would "pack" or "crack" the Black vote in District 5.

In response to a member of the public's comment that Commissioner Carollo had been involved in the creation of single-member commission districts in the City, Commissioner Carollo again explained that the City switched to single-member commissioner districts with the goal of creating three Hispanic seats, one Black seat, and one Anglo seat.   In that explanation, Commissioner Carollo explained the City had intentionally split up predominantly Hispanic neighborhoods among Districts 1, 3, and 4 to permit the City to intentionally racially gerrymander District 2 to be a white district and to establish District 5 as a predominantly Black district.  Commissioner Carollo stated that preserving that framework drove the City's redistricting process in 2022:

> But let me be as clear as I can.  When I did that, I was mayor of the city.  We had had an election that someone that looked like her [pointing to Commissioner King] was no longer here.  You had four Hispanic commissioners and you had my dear friend J.L. Plummer, that Coconut Grove uh – after serving so many years decided that they don't want him when we went to districts.  So Plummer was the only non-Hispanic in the commission and if we would've had another election, and Plummer would not have ran, you probably would have had five Hispanics on the commission.  Just like now, if it would be a citywide vote, you would have five Hispanics up here.  So I put my neck on the line and I said, no, I'm not going to wait for a couple more elections and not have an African American in this

commission, because that's what it would've required.  Just because you don't have a representation from a certain minority group automatically you don't get to go to court and you get that.  You have to show that it's a pattern, not necessarily that the guy that they voted out is someone that people didn't want, and you can't do that in one election.  So I went out knowing the pluses and frankly, all the negatives the districts bring and ask[ed] for the residents of Miami to vote for districts and for the mayor to be an executive mayor like it is today, and I was the first executive mayor of the city of Miami.   And that's how the district came.   *We, yes, gerrymandered District 2, so that someone that would be of an Anglo background, not Hispanic, would be elected*.  And that's why District 2 crossed into – across the highway, and a big chunk of a Hispanic district was put into District 2 because we had to balance the population within the five districts.  In order to accommodate that and to make sure that there were enough African Americans in District 5 to elect an African American from District 5, *we gerrymandered and broke up numerous neighborhoods into the other three – in the other three districts, and particularly District 3 and District 4*.  And that's how we came about today.  And we've had since then a couple of more revisions, I think Mr. De Grandy has been the guy who's been doing it all these years so, I mean, we haven't gone and try to pick anybody else to put something different or hoodwink people.  We kept the same guy that we've had, so throughout the different revisions since then, uh we've had to cut into other areas.  Originally District 2 went all the way to the end of the city of Miami past Biscayne Boulevard to 86th Street.  That had to be changed in the prior revision because of the growth that came, other areas had to be changed and this is why we have the dilemma that we are discussing today.

(Tr. Feb. 25 AM at 60:17–61:22) (annotation in original) (emphasis added).

Commissioner Carollo repeated his understanding that the City had purposefully divided traditional neighborhoods in other districts to create District 2 as a racial gerrymander from which a white commissioner could be elected:

Commissioner Carollo: Look, what I'm most amazed at is that when we created districts from the get-go, and then the redistricting that has been done each decade, every 10 years, we have purposely divided neighborhoods in the other districts to try to keep District 2 into a district that a non-Hispanic would be elected.  And that's why Coconut Grove was kept together.  In fact, from the beginning, a big chunk across US 1 was given to Coconut Grove because there would not have been enough population to balance it out otherwise in District 2.  Nobody objected to that at the time, nobody objected to numerous neighborhoods in the city of Miami in having been divided.
Like someone sen[t] me recently on Silver Bluff some some information and the history of it which was interesting, this is from an old newspaper article I believe is a short history of Silver Bluff platted in 1941 incorporated in 1920 — excuse me platted in 1911 and incorporated in 1921 the town of Silver Bluff.  Was independent

for a short period of time, it was one of several municipalities that was annexed by the city of Miami in 1925.  Nestled between Miami's original southern boundary and the town of Coconut Grove.  Silver Bluff is named for the bluff located along the eastern edge of the quarter that appears silver when touched by morning light.  And Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell —

Commissioner Ken Russell: Japanese American.

Commissioner Carollo: I didn't hear — well you didn't quite mention the Oriental part when you were running, only the yo-yo at the time.[12]  But I'll leave it at that.  It was the — after you got elected that I guess it was more convenient, the — but Silver Bluff, Shenandoah, Little Havana, I mean Little Havana has really been kept major, Little Havana goes to 37th Avenue, so from 27th to 37th Avenue, huge area of Little Havana was cut up.  You got Flagami that not originally, but then when growth came in, Flagami was then cut in the second round I think after districts were originally created.  Down the middle.  You got other neighborhoods within District 4, others within District 1.  Some in District 5.  So the arguments that I've heard here today just don't hold any water.  As this city grows in population, we have to make adjustments and the adjustments have to be made in — in the best way to try to keep all five of these districts in proportion to our population *for the reasons that we went into districts*.

(Tr. Feb. 25 PM at 4:6–5:10) (emphasis added).

Commissioner Reyes expressed similar concerns as Commissioner Carollo regarding the preservation of a racial framework of the Commission.  He asked De Grandy whether Districts 5 and 2 could perform as Black and Anglo districts, respectively, under De Grandy's proposed February 25 plan.  De Grandy confirmed that the probability was high that District 2 would perform as an "Anglo" district despite the plurality of Hispanic residents in that district:

Commissioner Reyes: . . . My commitment is that everyone be represented.  According to your — all the movement that you have done of population and the way that will the, the, Afro American district and the so-called Anglo district will stand time.  I mean the next ten years, for the next ten years, given the movement of population that we are going to experience, we — there stand the test of time and we will be able, or the probability of electing an Afro American and an Anglo are that you will — are confident that it is very probable that we, because nothing is sure but death and taxes, but it is very probable that we will — we will continue to have a mixed commission, which is my — my main concern.

Mr. De Grandy: To answer your question commissioner, we have done our level best to ensure that District 5 performs for the African American community and that they will continue throughout the decade to have the ability to elect the

---

[12]  It is the Court's understanding that this is a reference to Commissioner Russell's background in yo-yo'ing.

candidate of their choice. As to District 2, as I said in my report, District 2 is a competitive district, it actually has a greater percentage of Hispanics than of single-race white individuals, as was self-identified by, in the census. It is my belief that that 48+% will continue to grow. So, it's gonna be very competitive —
Commissioner Reyes: It's competitive but is there still the probability is high?
Mr. De Grandy: Yes.

(Tr. Feb. 25 PM at 19:13–20:12).

Commissioner Reyes asked De Grandy to confirm that his proposed plan prioritized

preserving the existing District seats:

Commissioner Reyes: Okay, and I heard people, no gerrymandering! Yes, we are gerrymandering to preserve those seats. And that's it. And if you want to take us to court for it, —
Mr. De Grandy: That that actually wouldn't be called gerrymandering —
Commissioner Reyes: But that's what —
Mr. De Grandy: That's a tradition —
Commissioner Reyes: Just what — just what some of the —
Mr. De Grandy: Yeah.
Commissioner Reyes: Some —
Mr. De Grandy: But that is a traditional redistricting principle.
Commissioner Reyes: Okay.

(Tr. Feb. 25 PM at 22:14–23).

The map proposed at the February 25, 2022 session of the Commission was approved as

the draft redistricting or "base" plan, to be discussed with community stakeholders and considered

at a meeting on redistricting on March 11, 2022 for a final vote. (Tr. Feb. 25 PM at 42); *see also*

(ECF No. 50-7).

***On March 11, 2022, the Commission met to consider community stakeholder feedback***

***on the February 25, 2022 draft map***. (ECF No. 24-16) ("Tr. Mar. 11 AM"). The meeting began

with a statement by Commissioner Carollo challenging Commissioner Russell's residency in his

District and thus qualification to partake in the redistricting vote; Commissioner Carollo was

apparently responding to some public criticism regarding his own residency within District 3 and

concluded his remarks by reporting that he would abstain from the vote to prevent anyone later

blaming him in any future court case over the redistricting.[13]

When the discussion finally turned to the redistricting plan, Commissioner Reyes again

noted the overarching goal of the redistricting plan was to preserve the racial composition of the

Commission with three Hispanic commissioners, one Black commissioner, and one white

commissioner:

> The only race that we're gonna bring to this equation, I'm gonna tell you what
> it is. We have to keep diversity on this dais and that's why we have districts. And
> we have to say and do everything that is needed to make sure that there is diversity
> in this dais. If not, if we are not gonna do whatever it takes to have diversity in this
> dais, let's do away with the districts then and then everybody will be — we will
> have five Hispanics right here since we are 70% of the population. And in order to
> avoid that, the districts were created. And I will always — my main concern and I
> have said it and I repeat it — my main concern is to save that seat that now is
> occupied by Ms. King. And I will vote for any plan that will save that seat. Is that
> clear? So let's get race out of this.

(Tr. Mar. 11 AM at 44:2–10); *see also* (ECF No. 24-17, "Tr. Mar. 11 PM," at 8:8–21)

(Commissioner Díaz de la Portilla).

De Grandy also presented on a revised plan that Commissioner Russell had asked him to

look into that would keep Coconut Grove together, *see* (ECF No. 24-9) (accompanying slide-show

presentation); De Grandy noted that that plan would still provide for a Black district and three

Hispanic districts and comply with the VRA, (Tr. Mar. 11 AM at 52:12–16).

There was substantial public comment about keeping Coconut Grove together, including

comments from Plaintiff Cooper and representatives from Plaintiffs Engage Miami and South

Dade NAACP. The Commissioners also continued their discussion with De Grandy about

compiling alternate maps, to include (i) the transfer of an unpopulated area back to District 5

containing a venue known as The Wharf Miami, (ii) what has been described as Commissioner

---

[13] Carollo did participate in the vote when it was ultimately conducted, not at this hearing.

Russell's plan, and (iii) a separate request from Commissioner Reyes.  A final vote was deferred to March 24, 2022.

*On March 24, 2022, the Commission again convened at a special session to discuss redistricting.*  (ECF No. 24-18, "Tr. Mar. 24"); *see also* (ECF No. 24-10) (De Grandy's contemporaneous presentation).  De Grandy summarized the effect on racial demographics within the Commission Districts under the Commissioners' proposed plans, which included a proposal to retain the "Flagler on the River" development within District 5; Commissioner Russell's initial proposal to retain Natoma Manors and the West Grove south of U.S. Highway 1 within District 2 while transferring western Brickell to District 3, *see* (ECF No. 24-10 at 6) (visual representation); Commissioner Russell's revised proposed plan to retain the West Grove and Natoma Manors in District 2 and reduce the number of residents moved into District 3 by moving a smaller portion of western Brickell into that district, *see* (ECF No. 24-10 at 7) (visual representation); and Commissioner Reyes' revised plan to restore The Wharf to District 5, and restore the West Grove to District 2 while moving a strip of land from District 2 to District 3 from Natoma Manors north through Bay Heights and up to Simpson Park near Brickell, *see* (ECF No. 24-10 at 9).  As to each of the proposed changes, De Grandy reported the racial demographics of the particular areas.

De Grandy represented that he and Cody believed that all of the alternative map configurations complied with the U.S. Constitution and the Voting Rights Act based on their analyses, but nonetheless recommended that additional changes be made to ensure that the BVAP in District 5 would be above 50%.  (Tr. Mar. 24 at 8:5–9).

Public comment again focused on not splitting Coconut Grove between districts.  In response to a public comment that the other commissioners should give deference to District 2's commissioner in the redistricting process because District 2 would be the most affected,

Commissioner Carollo suggested that the City should consider going back to city-wide commissioners, adding: "maybe that's what we need to do.  Put a referendum, a charter amendment, that we go back and run citywide, like I did and won many, many times.  So that everyone gets represented, we wouldn't have to worry about districts anymore.  Now, if it happens, then you end up with five Hispanics, then don't cry."  (Tr. Mar. 24 at 13:4–7).

Commissioner Carollo also asked a member of the public who had been part of the 1997 committee with De Grandy that designed the City's five single-member commissioner districts upon switching from city-wide districts if she remembered why the Little Havana, Shenandoah, Silver Bluff, and Flagami neighborhoods had been divided.  (Tr. Mar. 24 at 37).  She answered that the City switched to single-member commission districts in response to a federal lawsuit.  (Tr. Mar. 24 at 37–38).  Commissioner Carollo explained that in 1997, Coconut Grove was kept together in District 2 because:

> We could not have separated Coconut Grove and kept one Anglo district.  In fact, what we had to do was what we're discussing today.  To give Coconut Grove enough of a population, even though we were going from one end of the water all the way to the end of the city in the northeast, we had to cross across US 1 to give District 2, the Anglo district, more of a population to balance those populations. And this is why you and the committee recommended that Little Havana had to be broken up, Shenandoah, Silver Bluff, Flagami, and I could go on and on.  And that's the only point that I'm trying to make.

(Tr. Mar. 24 at 38:9–15).  Commissioner Carollo reiterated at the March 24, 2022 session that the districts in the 2022 redistricting process would have to be drawn so that Districts 1, 3, and 4 would be Hispanic districts, District 2 would be an Anglo access district, and District 5 would be a Black district:

> The only reason [District 5] doesn't take the rest [of Downtown Miami] is we need to keep a sliver on Biscayne Boulevard so that the northeast, the part of the northeast that's left, can be connected with Downtown and Coconut Grove, and Brickell etcetera.  The reason we're having to do this is because the growth we've had – and we have to keep one district that is going to have a majority of African Americans.

> We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected.  And City of Miami still has a population that is at least 70%, maybe more, I don't know, maybe De Grandy can clarify that, that's Hispanic.  And we have to keep three districts that are going to be majority-Hispanic.  But since Hispanic comes in all types, colors, creeds, races, religions, not all think alike, not all act alike, we're trying – and based on the federal guidelines – are trying to keep those Hispanic-majority districts within those guidelines of people that are closer to each other so that three Hispanics could be elected in those districts too.  And this is why we're going through that process.

(Tr. Mar. 24 at 56:12–57:1).

Commissioner Reyes reiterated these points and expressed that the purpose of the redistricting process in 2022 was to ensure that there would be a likelihood that an Anglo commissioner and a Black commissioner would be elected to the Commission to ensure diversity. (Tr. Mar. 24 at 38:23–39:20).

Commissioner Russell urged his colleagues to adopt his revised plan that would retain U.S. Highway 1 as the border between Districts 2, 3, and 4 north of Coconut Grove.  (Tr. Mar. 24 at 65).  He asserted that population equalization among the districts and the preservation of a Black resident numerical majority in District 5 required population to be shifted from District 2 to District 3.  (Tr. Mar. 24 at 65).  Commissioner Russell informed the other commissioners that his revised proposed plan would move areas in west Brickell racially similar into District 3 to the extent needed to equalize population.  (Tr. Mar. 24 at 69).

Commissioner Carollo asserted that Commissioner Russell's plan would put at risk the ability of a Hispanic commissioner to be elected in District 3:

> it would put District 3 into the future in possible jeopardy – and Commissioner Russell knows that too – in bringing in a transplant from another part of the country, and because they speak a little Spanish and they smile all the time, they feel they can sneak in.  Or they give a chance to another transplant that tried this time to run against me and crashed.  And this district now is gonna be skewed where it's not gonna be clear on the kind of person that could get elected from it.

(Tr. Mar. 24 at 66:13–18).  He explained that he did not want "to change the District 3 voting patterns, the types of people that are there with different people.  I don't want to do that to District 4, nor to District 1.  Just like I want to be able to leave District 2 where it could still elect a guy like you, if they want to.  In District 5, that will be a majority-African American district."  (Tr. Mar. 24 at 68:14–17).

Commissioner Díaz de la Portilla agreed that Commissioner Russell's revised proposed plan would, "in 2026 or '27, . . . disintegrate that Hispanic district, District 3."  (Tr. Mar. 24 at 70:16–17).  He stated that he had thought about demographic changes into the future and that he had "looked at my district will remain the same, whoever replaces me.  That Commissioner Reyes' district will remain a Hispanic American seat.  But Commissioner Carollo's district, whoever replaces him, it's jeopardized to having an Hispanic American commissioner.  And that's wrong. There's no one here, me and you Commissioner Russell, that can argue this Commission should be majority non-Hispanic.  The same way that we fought for you [looking at Commissioner King] Madam Chair, to be there, same way we fought for you [looking at Commissioner Russell] to be there, you have to fight for the majority of the city."  (Tr. Mar. 24 at 70:22–71:6) (annotations in original).  Commissioner Díaz de la Portilla urged that by incorporating western portions of Brickell into District 3 the Commission would be "shifting the balance of power in a Hispanic district to the east, you're jeopardizing its future."  (Tr. Mar. 24 at 71:15); *see also* (Tr. Mar. 24 at 72:2).  He expressed concern for the "future of this Commission, the future of this city" in that respect.  (Tr. Mar. 24 at 71:18).

De Grandy explained that he did not move District 3 east into Brickell because doing so would result in "approximately forty-some percent Hispanic, going into a district that's approximately 88% Hispanic."  (Tr. Mar. 24 at 75:12–13).  He summarized, "Now, in any of the

plans is District 3 still a majority Hispanic district?  The answer is yes.  Is it stronger Hispanic district under the base plan, absolutely."  (Tr. Mar. 24 at 75:20–21).  De Grandy agreed with Commissioner Díaz de la Portilla that, for District 3, "the best move will be to go south and not to go east, because there are more people in Bay Heights that are more similar . . . than to the people that live at Brickell and East Little Havana," despite west Brickell being approximately evenly split racially among Hispanic and Anglo residents.  (Tr. Mar. 24 at 78:14–18).

The Commission voted 3-to-2 to adopt the base plan while moving the unpopulated The Wharf into District 5.  (Tr. Mar. 24 at 89–90).

***Under the Enacted Plan***, the racial demographics of the Commission Districts are as follows:

| District | Black VAP | White VAP | Hispanic VAP |
|----------|-----------|-----------|--------------|
| 1 | 11.0% | 3.5% | 89.5% |
| 2 | 7.2% | 37.4% | 48.6% |
| 3 | 5.4% | 7.7% | 88.3% |
| 4 | 3.1% | 7.6% | 89.5% |
| 5 | 50.3% | 10.5% | 40.6% |

**Table 2**.  Demographics of the Commission Districts Under the Enacted Plan, by Voting Age Population.  (Reproduced as reported in Abbott Rpt. at 5–6, ECF No. 24-31).[14]

For comparison, the racial demographics of the Commission Districts under the 2013 plan borders prior to the 2022 redistricting are as follows:

| District | Black VAP | White VAP | Hispanic VAP |
|----------|-----------|-----------|--------------|
| 1 | 10.1 % | 3.0% | 91.0% |
| 2 | 7.7% | 34.5% | 51.9% |
| 3 | 5.6 % | 7.4% | 88.5% |
| 4 | 2.9% | 6.0% | 91.6% |
| 5 | 52.9% | 7.8% | 41.6% |

**Table 3**.  Demographics of the Commission Districts Under the 2013 Plan Borders, by Voting Age Population.  (Reproduced as reported in Abbott Rpt. at 4, ECF No. 24-31)

---

[14] *See*, *supra* note 8, which states that the City's consultant's Initial Report explained that population percentages may exceed 100% because residents reported as being two or more races on the 2020 Census.

Specific geographic areas moved among the Commission Districts in the 2022 Enacted Plan are visually represented in the map below, which the Court has reproduced from the report of Plaintiffs' expert, Carolyn B. Abbott, Ph.D.



**Figure 3.** Areas Moved Between 2013 Plan and 2022 Enacted Plan.  (Reproduced as depicted in Abbott Rpt. at 8).

Areas 10 and 11 above, which include the Midtown Miami development and the western portions of the Edgewater and Omni neighborhoods, and Area 12, which contains portions of Downtown Miami west of Biscayne Boulevard (including courthouses for the United States Court of Appeals for the Eleventh Circuit, this Court, and the Federal Detention Center in Miami ("FDC-Miami")), were moved from District 2 to District 5.

Area 13, which encompasses the Natoma Manors area, was moved from District 2 north into District 3.

Area 16, which encompasses Douglas Park, and Area 17, which contains portions of the West Grove, were moved from District 2 north into District 4.

Areas 14 and 15 in Little Havana were moved from District 4 to District 3.

Area 6, containing portions of Overtown and Spring Garden, along the Miami River was moved from District 5 to District 1.

And Areas 7 and 8 in Allapattah were exchanged between Districts 1 and 5, with Area 8 moved from District 5 south into District 1, and Area 7 moved east from District 1 into District 5.

***De Grandy Memo to Mayor Suarez.***  As noted above, in response to the 2022 Enacted Plan, the ACLU of Florida submitted a second letter to the City, dated March 31, 2022 expressing concerns with the Enacted Plan.  (ECF No. 24-29) (Mar. 31 ACLU Ltr.).  The ACLU of Florida's second letter reiterated its earlier concern that the Commission had "adopted an arbitrary numerical demographic target for District 5" by selecting "a quota of 50% Black voting-age population (BVAP)" for that district.  (Mar. 31 ACLU Ltr. at 2).  The letter asserted that the adoption of that target was an "express racial target, divorced from such a functional analysis to determine what is necessary to achieve compliance with the Voting Rights Act," that overconcentrated Black voters in that district beyond what was required for Section 2 compliance because it neglected Black voters' voting patterns, voter turnout, and voter registration rates.  (Mar. 31 ACLU Ltr. at 2–3).  The second letter concluded that Black voters can "maintain an ability to elect candidates of their choice even if the BVAP were to drop below 50%."  (Mar. 31 ACLU Ltr. at 3).  The Mayor was urged to veto the Enacted Plan.  (Mar. 31 ACLU Ltr. at 4).

The Mayor asked De Grandy to submit a Memorandum in response to the ACLU of Florida's second letter.  *See* (ECF No. 50-12, "De Grandy Mem.").  In his Memorandum, De Grandy asserted that District 5 is relatively compact as drafted.  He also noted that the BVAP in

District 5 had decreased from 52.9% prior to redistricting, to 50.3% under the Enacted Plan.  (De Grandy Mem. at 4).  De Grandy's Memorandum asserted that Black voter registration rates and election turnout was factored into the analyses he and Cody had conducted.  (De Grandy Mem. at 4).  De Grandy asserted that the ACLU of Florida's second letter "ignores the fact that this plan is a plan for the next decade, not simply a snapshot in time" in light of development, growth, and gentrification in the City.  (De Grandy Mem. at 5).  De Grandy's Memorandum asserted that the ACLU of Florida's letter ignores that there are three majority-Hispanic districts, noted that Hispanic residents are also a protected class under the VRA, and warned that the ACLU of Florida's stance on "packing" could result in four majority Hispanic districts (as opposed to the current plurality in District 2), "and potentially a fifth district with roughly equal black and Hispanic population."  (De Grandy Mem. at 5).

### B.    Expert Reports

Plaintiffs also submitted reports from two experts who concluded that the geographic areas moved between districts in the Enacted Plan were moved because of race and that there is some evidence of racially polarized voting in the City, respectively.  The City in its Response challenges only the relevance of the inferences to be drawn from the findings in the two reports.  The City has advanced no rebuttal expert of its own, apart from the testimony of its redistricting consultant, De Grandy, discussed in further detail below.

### 1.    Carolyn B. Abbott, Ph.D.

Plaintiffs' first expert is Carolyn B. Abbott, Ph.D., an Assistant Professor in the Department of Political Science at Baruch College, City University of New York, in New York, New York.  (ECF No. 24-31) ("Abbott. Rpt.").  Her research and teaching focuses on American politics and public policy with emphasis on the state and local levels of government.  (Abbott Rpt.

at 2).   In her report, Abbott used data on voting-age populations ("VAP"), citizen voting-age populations ("CVAP"), and voting patterns within City electoral precincts to determine whether and to what extent race explains the shapes of the Commission Districts in the Enacted Plan. (Abbott. Rpt. at 1).   Based on her analysis, Abbott concluded that the particular geographic areas moved between the districts in the Enacted Plan were moved on the basis of race, and that other geographic areas could have been moved without segregating the Commission Districts by race. (Abbott Rpt. at 2).

Abbott looked at VAPs by race at the block-level based on data from the 2020 Census, which was then aggregated to the precinct and "split-precinct" levels.   (Abbott Rpt. at 3).   She also looked at CVAPs by race, obtained from the 2019 American Community Survey 5-Year Estimates. (Abbott Rpt. at 3).   According to Abbott, the City's 2013 commission map exhibited clear patterns of racial segregation, and the City needed to shift population out of District 2 after the 2020 Census. (Abbott. Rpt. at 3–5).   Abbott observed that "there was no statistical difference between VAP by race before and after redistricting at the district level," but that there were "significant patterns of change at a more granular level."   (Abbott Rpt. at 5).   The Court summarizes Abbott's findings with respect to each Commission District.   A map identifying the specific areas noted in Abbott's report is reproduced above as Figure 3, *supra*.

Abbott observed that District 1 is a majority Hispanic district that only needed to gain minimal population as part of the 2022 redistricting process, but ended up growing relative to the other districts nonetheless.   (Abbott Rpt. at 6).   According to Abbott, the transfer of population between District 5 and District 1 was entirely motivated by race—the areas moved from District 5 to District 1 (Areas 6 & 8) had higher HVAP and lower BVAP proportions than the areas surrounding them that remained in District 5, whereas the area moved from District 1 to District 5

(Area 7) had a higher BVAP and a lower HVAP proportion than the areas surrounding it that remained in District 1.[15]  (Abbott Rpt. at 6–7).

According to Abbott, areas moved out of District 2 were largely moved for racial reasons, as well.  Areas moved from District 2 to District 5 (*e.g.*, Areas 10 and 11) had higher BVAP and HVAP proportions than the areas that remained in District 2.  An area moved from District 2 to District 4 (the West Grove portion encompassed in Area 17) "differed markedly from the racial composition of the receiving District 4."  (Abbott Rpt. at 9).  Abbott also concluded that an area moved from District 2 to District 3 (Area 13), was notable because it resulted in District 3 being less compact; however, Abbott concluded that this area was not moved for racial reasons.  (Abbott Rpt. at 10–12).  Nonetheless, Abbott opined that other areas (Areas 14 and 15 in Little Havana) were moved from District 4 to District 3 to offset the lower proportion of Hispanic voters gained upon moving Area 13 (Natoma) from District 2 into District 3.  (Abbott Rpt. at 11–12).

Abbott opined that explanations other than race do not account for the areas moved in the 2022 Enacted Plan.  According to Abbott, partisan gerrymandering does not explain the geographic areas moved because the Commission elections are nonpartisan.  Maintaining the partisanship of the district cores also did not explain the particular moves because the precincts moved did not resemble the receiving districts, based on voting patterns in the 2018 Florida gubernatorial election.  That is, Abbott observed that the areas moved were either much more or much less likely to vote for the 2018 Republican Party gubernatorial candidate than the districts into which they were moved.

---

[15]  These observations also were made when the precincts and "split-precincts" comprising the moved areas were analyzed: Abbott observed that the portions of the precincts split during the redistricting that remained in their prior district looked different in terms of VAPs from the other portions of those precincts that were moved.  (Abbott Rpt. at 6–7).

Abbott also observed that the 2022 Enacted Plan is visually less compact than the 2013 plan, and thus maintaining compactness does not explain the moves.

Abbott also reviewed the alternative proposed maps that were not adopted which "tended to shore up existing racial compositions within individual Commission districts, particularly those of Districts 1, 2, and 5." (Abbott Rpt. at 16–21). Abbott nonetheless concluded that the Commission's 2022 Enacted Plan was "designed around racial and ethnic considerations." (Abbott Rpt. at 21). Abbott found "no evidence that any factors other than race and ethnicity affected the drawing of district lines" apart from a small portion of District 2 that was moved into District 3. (Abbott Rpt. at 21–22).

### 2.    Bryant J. Moy, Ph.D.

Also before the Court is the expert report of Bryant J. Moy, Ph.D. (ECF No. 24-32) ("Moy Rpt."). Moy holds a Ph.D. in Political Science and currently serves as a Visiting Assistant Professor in the Department of Politics and as a Data Science Faculty Fellow in the Center for Data Sciences at New York University in New York, New York. (Moy Rpt. at 2). Moy's area of expertise relates to local government, race and ethnic politics, and the use of advanced statistical models to understand political phenomena. (Moy Rpt. at 2).

As part of his analysis, Moy examined twenty elections from between 2017 and 2021 to determine whether and to what extent racially polarized voting exists in the City.[16] (Moy Rpt. at 1). Moy summarized his conclusions as follows: (i) racially polarized voting existed in ten of those twenty elections; (ii) two of six municipal elections examined showed signs of racially polarized voting with the Latino-preferred candidate prevailing over the Anglo-preferred

---

[16] As the Supreme Court has explained, "[f]or purposes of § 2 [of the Voting Rights Act], the legal concept of racially polarized voting incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Gingles*, 478 U.S. at 62.

candidate; (iii) eight of fourteen federal, state, or county elections showed signs of racially polarized voting with Latino-preferred candidate prevailing over Black or Anglo-preferred candidates in five of the eight RPV elections; (iv) Latino-preferred candidates prevailed in a majority of the RPV elections, followed by Black-preferred candidates, and then Anglo-preferred candidates; and (v) there was overlap in the Black and Anglo-preferred candidates (six of ten the RPV elections), but minimal overlap in the Black and Latino-preferred candidates (one of ten RPV elections).  (Moy Rpt. at 2).

Moy estimated the proportion of Black, Anglo, and Hispanic registered voters required for their preferred candidate to prevail in the ten elections for which he found evidence of racially polarized voting.  (Moy Rpt. at 42).  He found that in elections where there was racially polarized voting, the Black preferred candidate would prevail when Black registered voters made up shares of as low as 5% of the registered voting population, to as high as approximately 49% of the registered voting population when racially polarized voting was more pronounced.  *See generally* (Moy Rpt.).  In none of the elections Moy examined in which he found racially polarized voting did he conclude that Black registered voters would need to make up more than 50% of the registered voter population for the Black preferred candidate to prevail.

### C.      Testimony of the City's Redistricting Consultant, Miguel De Grandy

At the March 29, 2023 Evidentiary and Preliminary Injunction Hearing, the City tendered as a witness its redistricting consultant for the 2022 redistricting cycle, Miguel De Grandy, Esq. De Grandy testified that he is an attorney who is a member of The Florida Bar and the Bar of this Court, whose practice focuses on legislative redistricting, among other areas.

***On direct examination***, De Grandy testified that the City Commission provided ranked criteria to direct the redistricting of the Commission Districts.  These included complying with the

United States Constitution and the Voting Rights Act, maintaining the cores of the districts, voter cohesion, and maintaining traditional neighborhoods if feasible.  The order of the criteria provided mattered, De Grandy testified, because some of the Commission's redistricting criteria were mutually exclusive of one another.

De Grandy noted his view that the Hispanic community in the City of Miami is not monolithic, as the new Commissioner elected in District 2, who is Hispanic, would likely not be elected in the more conservative Districts 1, 3, or 4, which have large Cuban-American populations.  Regarding the Commissioners' continued reference to District 2 as an "Anglo" district, De Grandy testified that District 2 is, in actuality, majority Hispanic and is not an Anglo district.

De Grandy also testified to the Commission's priority of maintaining a BVAP majority of over 50% in District 5.  De Grandy testified that, with each redistricting cycle, the Black population majority in District 5 has decreased.  According to De Grandy, District 5 is undergoing gentrification, and thus the desire to preserve a BVAP majority in District 5 was determined in light of this population trend.

When asked why the Black Registered Voting Age Population percentage for District 5 is higher than the BCVAP, De Grandy explained that District 5 was redrawn to contain FDC-Miami.

De Grandy was asked about specific geographic areas that were moved as part of the redistricting plan adopted in the Enacted Plan.[17]  The geographical triangle identified as Area 17 (the portion of the West Grove), De Grandy testified, was moved from District 2 to District 4 for population rebalancing.  Area 6 along the Miami River near Overtown was described as a "natural"

---

[17]  A visual depiction of the specific areas that were the subject of De Grandy's testimony are located in the March 24, 2022 Redistricting the City of Miami Commission presentation by De Grandy and Stephen Cody.  *See* (ECF No. 24-10 at 4).

move from District 5 to District 1 because District 1 already included portions of the Miami River. And, according to De Grandy, Areas 14 and 15 were moved from District 4 to District 3 in Little Havana because Commissioner Carollo desired to have influence in those areas.

De Grandy testified that the geographic areas moved into District 5 were more cohesive with District 5. According to De Grandy, the eastern portions of the City of Miami located along the water constituted a community of interest that is more affluent and, in De Grandy's words, the population residing there is more concerned with "first world issues" and social justice, whereas the population of District 5 is more concerned with potholes and having parks in their neighborhoods. An area described as the "condo canyon" remained in District 2 whereas the blocks directly north and south were moved to District 5 out of concerns that this condo canyon would dilute the Black voting power in District 5. *See* Figure 3, *supra* (providing a visual representation of the "condo canyon" which is located between Areas 10/11 and Area 12).

Overall, De Grandy testified that, in his opinion, the alternative configurations and maps proposed by the individual Commissioners were all constitutionally compliant. However, he noted that none of those plans received majority support.

***On cross-examination***, De Grandy was asked whether he raised the possibility with the Commission of redrawing the electoral map from scratch/anew. Because the Commission ranked higher in preference the criterion of maintaining the cores of the existing districts, the criterion of maintaining neighborhoods together could not be achieved; De Grandy testified that that criterion had not been honored in prior redistricting processes. Rather, De Grandy testified that, once he had received instructions to maintain the cores of the existing districts, compact districts could not be drawn given the shape of the geographic borders of the City.

Regarding the BVAP for District 5, De Grandy testified on cross-examination to his belief

49

that compliance with the Voting Rights Act required a BVAP of more than 50% in District 5, irrespective of the Commission's expressed objective to that effect.

De Grandy testified on cross-examination that based on an analysis conducted by his co-consultant Cody, the *Gingles* preconditions were met for the Black and Hispanic populations in the City.  When asked if the *Gingles* pre-conditions were met for the white population in the City, De Grandy responded that that population was not a protected class under the Equal Protection Clause.

De Grandy was also asked on cross-examination about gentrification and the potential impact of gentrification in District 5.  He testified that no studies had been conducted to assess the potential impact of gentrification in that district, and that his assessment of the effects of gentrification were based on (i) his personal experience having grown up in the City, (ii) his general awareness of construction and land use permitting activity in the City, and (iii) his understanding of general demographic trends in the City.  However, De Grandy testified that no models or studies were conducted to assess the extent to which the Black population in the City would decrease over the next 10 years.  De Grandy testified that his concerns about gentrification were communicated to the individual Commissioners in separate meetings with them, but that those communications are shieled by the attorney-client privilege.

De Grandy further testified on cross-examination about the decision to move FDC-Miami, which is located in Area 12, from District 2 to District 5.  According to De Grandy, Area 12 including FDC-Miami was moved at the request of the Commissioners to preserve a 50% BVAP in District 5.

III.   **STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 65(a), the Court may enter a preliminary injunction

50

to preserve the status quo "until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (quoting *Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973). To prevail on a motion for a preliminary injunction, a plaintiff must establish: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "Failure to show any of the four factors is fatal" to the preliminary injunction inquiry. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) ("*ACLU of Fla.*").

The Eleventh Circuit has recognized that the first factor—a substantial likelihood of success on the merits—is "generally the most important" of the four factors. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)). Moreover, "[t]he third and fourth factors 'merge' when, as here, the government is the opposing party." *Gonzalez*, 978 F.3d at 1271 (cleaned up) (quoting *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)).

But courts must be mindful that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *ACLU of Fla.*, 557 F.3d at 1198). This is especially so where a plaintiff seeks a preliminary injunction over a legislative enactment, in which case a preliminary injunction must be entered "reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution

and by the other strict legal and equitable principles that restrain courts."[18]   *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285.

## IV.   DISCUSSION

The Court's analysis broadly proceeds in four parts.  First, the Court addresses the City's argument that Plaintiffs lack standing to bring their racial gerrymandering claim.  Second, finding that Plaintiffs establish they have standing, the Court finds that Plaintiffs have met their burden that they are substantially likely to succeed in establishing that the drawing of Districts 1, 2, 3, 4, and 5 violates the Fourteenth Amendment's Equal Protection Clause.  Third, the Court finds Plaintiffs are irreparably harmed absent the entry of a preliminary injunction.  And fourth, the Court finds that the balance of the equities weighs in favor of the entry of a preliminary injunction. Accordingly, the undersigned recommends that a preliminary injunction issue.

### A.   Standing

For purposes of this Motion, the City raises standing only to argue that Plaintiffs are unable to establish irreparable harm, the second showing they must make to seek preliminary relief.  But, because standing implicates the Court's subject matter jurisdiction, and therefore its power over this case, the Court must first assure itself of its jurisdiction before proceeding to the merits of Plaintiffs' Motion.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case.").  Accordingly, the Court first takes up the City's argument, summarized above, that Plaintiffs lack standing to bring this action.[19]

---

[18]   This is because, in such contexts, preliminary injunctions "interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285

[19]   The Court's evaluation of Plaintiffs' standing is made for the limited purpose of providing this Report and Recommendations to the District Court.

In its Response, the City poses a string of seemingly rhetorical questions challenging Plaintiffs' standing to bring this action.  Specifically, the City asserts that Plaintiffs lack standing because the First Amended Complaint fails to comply with procedural pleading requirements, on the grounds that it is a "shotgun pleading" under Eleventh Circuit jurisprudence.  According to the City, the First Amended Complaint is a shotgun pleading because it alleges a single claim for the racial gerrymandering of all five Commission Districts, without specifying which district each individual Plaintiff resides in.  Because, the City argues, the First Amended Complaint does not allege whether any individual Plaintiff resides in the particular parcels moved in the redistricting process, Plaintiffs fail to establish that their injuries are reparable, and thus treat themselves as "fungible."  (ECF No. 36 at 21).

Article III of the United States Constitution vests the judicial power in the federal courts and limits that power to "Cases" and "Controversies."  U.S. Const. art. III, §§ 1–2; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  A challenge to a plaintiff's standing to assert a claim presents a challenge to the Court's power to entertain the suit, as standing is one of the components of a justiciable case or controversy required for the Court to possess subject matter jurisdiction. *L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cnty., Fla.*, 879 F.3d 1274, 1281 (11th Cir. 2018).  To establish standing, the burden is on a plaintiff to show that that plaintiff: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

As relevant here, in actions alleging racial gerrymandering brought under the Fourteenth Amendment's Equal Protection Clause, it is well-established that "[w]here a plaintiff resides in a

racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995) (citing *Ne. Fla. Chapter, Associated Gen. Contractors of Am.*, 508 U.S. 656).  However, a plaintiff only has standing to challenge as racially gerrymandered the district in which that plaintiff resides.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (citing *Hays*, 515 U.S. at 744–45) ("[A] plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered.").

Moreover, it is well-established that an association "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc.*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)); *see also Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 268–71 (2015) ("*ALBC*") (reversing district court's *sua sponte* finding that state-wide political caucus lacked standing in racial gerrymandering case where common-sense supported an inference that the state-wide political caucus had members in every district based on the testimony of its representative that it had members in every county and the organization's representations regarding the purpose of its founding).

The City's challenge to Plaintiffs' standing on the ground that the First Amended Complaint is a shotgun pleading is a matter of procedural compliance implicating the rules for pleading under Federal Rules of Civil Procedure 8(a) and 10(b).  This procedural pleading concern is distinct from the more substantive constitutional concern of Plaintiffs' standing to bring this

case, which goes to subject matter jurisdiction and the heart of the Court's power to hear this dispute under Article III of the United States Constitution.  Indeed, whether the First Amended Complaint is a shotgun pleading relates to whether that pleading gives adequate notice to the City of Plaintiffs' claim, not whether Plaintiffs have Article III standing.  *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.").  In any event, the Court need not resolve whether the First Amended Complaint is a shotgun pleading to determine that Plaintiffs have standing to bring their claim, because Plaintiffs' standing is supported by the record.

Here, Plaintiffs expressly pled in the First Amended Complaint that the organizational plaintiffs each have members residing in multiple of the five Commission Districts.  Plaintiff GRACE has members residing in Districts 2 and 4, Plaintiff Engage Miami has members residing in all five Commission Districts; Plaintiff South Dade NAACP has members residing in Districts 2, 3, and 4; and Plaintiff Miami-Dade NAACP has members residing in all five districts.  (Am. Compl. ¶ 23).  Moreover, the First Amended Complaint alleges that Plaintiff Cooper resides in District 2, Plaintiff Johnson resides in District 3, Plaintiff Miro resides in District 3, Plaintiff Contreras resides in District 4, and Plaintiff Valdes resides in District 5.  (Am. Compl. ¶¶ 25–29). These averments all are supported by Plaintiffs' declarations: representatives from the organizational Plaintiffs each have submitted declarations attesting that their organizations have members residing in the five Commission Districts.[20]  These declarations also attest to the

---

[20]  *See* (ECF No. 24-33 at ¶ 4) (attesting that GRACE has members living in Districts 2 and 4); (ECF No. 24-34 at ¶ 4) (attesting that Engage Miami has members living in each of the five districts); (ECF No. 24-35 at ¶ 5) (attesting that South Dade NAACP has members living in Districts 2, 3, and 4); (ECF No. 24-36 at ¶ 5) (attesting that Miami-Dade NAACP has members living in Districts 1, 2, 3, and 5).

organizational Plaintiffs' missions, local natures, and focuses.  *See ALBC*, 575 U.S. at 270–71. The individual Plaintiffs have likewise submitted signed declarations supporting their averments that they reside in the challenged districts.[21]  No evidence has been advanced to the contrary.

Well-established authority does not, as the City argues, require that a plaintiff reside in the particular or specific parcels or geographic areas that were moved between districts as part of the Enacted Plan.  As explained in further detail below, the focus of a racial gerrymandering claim is the challenged *district*.  *See ALBC*, 575 U.S. at 262.  Thus, Plaintiffs need not reside in the particular parcels and geographic areas moved among the Commission Districts as part of the Enacted Plan to establish standing to bring their claim in this case.

Accordingly, the Court will not recommend a finding that Plaintiffs lack standing, and thus the Court turns to the four factors Plaintiffs must establish to obtain a preliminary injunction.

## B.     Substantial Likelihood of Success on the Merits

At the outset and to frame the analysis that follows, the Court begins by noting that the sole claim raised in the First Amended Complaint asserts that *all* of the five Commission Districts are unconstitutional racial gerrymanders, in violation the Fourteenth Amendment's Equal Protection Clause.  (Am. Compl. ¶¶ 358–364).  Plaintiffs do not here assert any statutory claim arising under the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (as codified in Title 52 of the United States Code).

As described in further detail below, the Court must determine whether race was the predominant factor that the City considered in drawing the borders of each of the five Commission Districts.  The determination must be made as to each Commission District, district-by-district,

---

[21]  *See* (ECF No. 24-37 at ¶ 1) (Plaintiff Cooper – District 2); (ECF No. 24-38 at ¶ 1) (Plaintiff Johnson – District 3); (ECF No. 24-39 at ¶ 1) (Plaintiff Miro – District 3); (ECF No. 24-40 at ¶ 1) (Plaintiff Contreras – District 4); (ECF No. 24-41 at ¶ 1) (Plaintiff Valdes – District 5).

and not as to the Enacted Plan as a whole.  *ALBC*, 575 U.S. at 262 ("A racial gerrymandering claim, however, applies to the boundaries of individual districts.  It applies district-by-district."). Finding that race was the predominant factor the Commission considered in drawing each of the five Commission Districts, the burden shifts to the City to show that the City's use of race in designing the districts withstands strict scrutiny.  However, the City did not argue or present evidence that the consideration of race in the design of Districts 1, 2, 3, and 4 withstands strict scrutiny.  The Court accordingly finds that the City has not met its burden and thus Plaintiffs are likely to prevail on showing that the City's consideration of race in drawing the borders of Districts 1, 2, 3, and 4 violates the Fourteenth Amendment's Equal Protection Clause.  And because the City's consideration of race in drawing the borders of District 5 was not narrowly tailored to comply with the VRA, the Court finds that the consideration of race in the design of District 5 does not withstand strict scrutiny.

The Court takes a moment to recognize the unusual circumstance this case presents.  As the Commissioners' explicit statements during the 2022 redistricting process reveal, their primary concern in this redistricting process was to ensure the preservation of a Commission to which three Hispanic, one Black, and one Anglo commissioner could be elected.  The goal was expressed in laudable terms: the City of Miami is an ethnically and racially diverse majority-minority city. Indeed, approximately 70% of its residents are Hispanic, 16% are Black non-Hispanic, and 12% are white non-Hispanic.  (Init. Rpt. at 7).  Thus, the Commissioners' expressed intent was to draw the borders of the Commission Districts to facilitate the election of commissioners who reflect that diversity—maximizing the Hispanic populations in Districts 1, 3, and 4; preserving the core of District 2 so that an Anglo commissioner had a high probability of being elected; and drawing District 5 as a district in which Black voters had an opportunity to elect preferred candidates.  But

in that regard, race and ethnicity came close to being the *only* factors that the Commissioners considered during the six public redistricting sessions over 5 months.  The law generally does not permit race to predominate in the drawing of districts unless there is a compelling reason to do so.  And to that end the City misapprehended that, because it was required consider race in drawing District 5, it therefore could consider race in drawing the other four districts.  The City does not argue in defense against Plaintiffs' Motion that any compelling reason existed for race to predominate in the drawing those other four Commission Districts.  And as to the fifth—District 5—there is no evidence in the record before this Court of the kinds of analyses required to guide the City's consideration of race in drawing the borders of that district.

The Court turns to the law governing Plaintiffs' claim.

### 1.    Legal Framework

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"[22] *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (alteration in original) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).  As the United States Supreme Court has reiterated, "districting maps that sort voters on the basis of race 'are by their very nature odious.'"  *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (quoting *Shaw v. Reno*, 509 U.S. 630, 643 (1993)).  This is because, "[w]hen the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'"

---

[22]  It is well-established that political subdivisions of a state, including the City in the instant action, must comply with the Fourteenth Amendment.  *See Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 480 (1968) ("Although the forms and functions of local government and the relationships among the various units are matters of state concern, it is now beyond question that a State's political subdivisions must comply with the Fourteenth Amendment."); *see also Jacksonville Branch of NAACP v. City of Jacksonville*, --- F. Supp. 3d ---, No. 3:22-CV-493-MMH-LLL, 2022 WL 7089087, at *5 n.9 (M.D. Fla. Oct. 12, 2022), *appeal dismissed*, No. 22-13544-HH, 2023 WL 2966338 (11th Cir. Jan. 12, 2023) ("*Jacksonville I*").

*Miller*, 515 U.S. at 911–12 (quoting *Shaw*, 509 U.S. at 647).  Indeed, the Supreme Court has described "[t]he harms that flow from racial sorting [to] 'include being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group.'"  *Bethune-Hill*, 580 U.S. at 187 (quoting *ALBC*, 575 U.S. at 263).

Courts engage in a two-step analysis when a voter sues government officials for "drawing such race-based lines[.]"  *Cooper v. Harris*, 581 U.S. 285, 291–92 (2017).  "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'"  *Id.* at 291 (quoting *Miller*, 515 U.S. at 916).  Second, "if racial considerations predominated over others," the burden shifts to the state to establish that "the design of the district . . . withstand[s] strict scrutiny."  *Id.* at 292 (citing *Bethune-Hill*, 580 U.S. at 193).  That is, "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end."  *Id.*  While the Court's application of law is reviewed *de novo*, "the court's findings of fact—most notably, as to whether racial considerations predominated in drawing district lines—are subject to review only for clear error."  *Id.* at 293.

In this case, Plaintiffs allege in their First Amended Complaint that race was the predominant factor considered in the drawing of all of the five Commission Districts.  "Racial gerrymandering claims proceed 'district-by-district.'"  *Bethune-Hill*, 580 U.S. at 191 (quoting *ALBC*, 575 U.S. at 262).  That Plaintiffs in essence bring a "whole map challenge," as the City argued at the March 29, 2023 hearing, does not preclude the instant action.  No Supreme Court precedent the Court is aware of forbids Plaintiffs from challenging all five of the Commission Districts in this action.  Rather, Supreme Court precedent appears to contemplate that possibility,

so long as Plaintiffs comply with the standing and evidentiary requirements that their challenges be brought with respect to the districts within which they reside and on a district-by-district basis. *See ALBC*, 575 U.S. at 263 (emphasis in original) (internal citations omitted) ("Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district. And voters might make the claim that *every* individual district in a State suffers from racial gerrymandering. But this latter claim is not the claim that the District Court, when using the phrase "as a whole," considered here."). Plaintiffs may, and do, in essence challenge the map as a whole by challenging each Commission District, district-by-district. *See id.* The Court thus turns to the first step of the analysis—whether race predominated.

## 2.    Whether Race Predominated

The Court finds that Plaintiffs are substantially likely to prevail in establishing that race was the predominant factor considered in the drawing of each of the five Commission Districts.

At the outset, the Court finds that race was the predominant factor considered in the design of District 5. Neither side disputes that District 5 was designed to preserve a BVAP of more than 50%. Indeed, throughout the City's Response, the City argues that Section 2 of the VRA required the City to draw the borders of District 5 such that it has a BVAP of more than 50%—the City argues that Plaintiffs have conceded this point. Moreover, at the March 29, 2023 hearing, the City agreed that the design of District 5 must withstand strict scrutiny—inherent in that agreement is the recognition that race was the predominant factor considered in the drawing of District 5. Thus, the Court finds that race was the predominant factor in the design of District 5. *See ALBC*, 575 U.S. at 267 (explaining that "expressly adopt[ing] and appl[ying] a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines").

Accordingly, the following analysis focuses on whether Plaintiffs are substantially likely to establish that race was the predominant factor considered in the drawing of Districts 1, 2, 3, and 4. The Court makes such a finding. *See Miller*, 515 U.S. at 911–12 (quoting *Shaw*, 509 U.S. at 647) ("When the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'"). The principles governing that determination are as follows.

a.    *Applicable Law*

Plaintiffs, through direct evidence of legislative intent and/or circumstantial evidence of a challenged district's shape and demographics, bear the burden of "demonstrating that the [City] 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 581 U.S. at 291. "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 189–90. The City's efforts to create districts of approximately equal population are not considered when conducting a racial predominance analysis. *See ALBC*, 575 U.S. at 272 (stating that that factor "is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met").

As noted above, the burden lies with Plaintiffs at this step, not the City. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 945 (N.D. Ala. 2022). That burden has been described as demanding. *See, e.g.*, *Cooper*, 581 U.S. at 319 (citing *Easley v. Cromartie*, 532 U.S. 234, 241 (2001)). Indeed, the Supreme Court has emphasized that federal courts must "exercise extraordinary caution in

61

adjudicating claims that a State has drawn district lines on the basis of race." *Bethune-Hill*, 580

U.S. at 187 (internal quotation marks omitted) (quoting *Miller*, 515 U.S. at 916). "Federal-court

review of districting legislation represents a serious intrusion on the most vital of local functions."

*Miller*, 515 U.S. at 915.

"Although race-based decisionmaking is inherently suspect, until a claimant makes a

showing sufficient to support that allegation the good faith of a . . . legislature must be presumed."

*Id.* (internal citations omitted). As the Supreme Court has explained, "redistricting differs from

other kinds of [governmental] decisionmaking in that the legislature always is *aware* of race when

it draws district lines, just as it is aware of . . . a variety of other demographic factors." *Bethune-*

*Hill*, 580 U.S. at 187 (alteration and emphasis in original) (quoting *Shaw*, 509 U.S. at 646). Despite

the awareness, racial considerations must nonetheless not be the motivating factor in the

redistricting process. *Miller*, 515 U.S. at 916 ("The distinction between being aware of racial

considerations and being motivated by them may be difficult to make.").

To determine legislative intent, courts look to the relevant evidentiary factors set forth in

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

*See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) ("In conducting this inquiry, courts

should look to our decision in *Arlington Heights* for guidance."). The evidentiary factors, as

recently summarized by the Eleventh Circuit, with supplementation, are:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific
> sequence of events leading up to its passage; (4) procedural and substantive
> departures; and (5) the contemporary statements and actions of key legislators.
> And, because these factors are not exhaustive, the list has been supplemented:
> (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and
> (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321–22 (11th

Cir. 2021).

As the Supreme Court has explained, the "ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott v. Perez*, 138 S. Ct. 2305, 2324–25 (2018). Thus, any evidence of past discrimination in the form of "historical background" is but one factor that is considered and does not change the presumption of legislative good faith. *See id.* at 2324. Moreover, "*Arlington Heights*'s 'historical background' factor should be 'focus[ed] . . . on the specific sequence of events leading up to the challenged decision' rather than 'providing an unlimited lookback to past discrimination.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (alterations in original) (quoting *Greater Birmingham Ministries*, 992 F.3d at 1325).

Nonetheless, "[r]ace may predominate even when a reapportionment plan respects traditional principles . . . if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189 (alterations in original) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)). Evidence of a bizarre shape or a conflict or inconsistency between an enacted plan and traditional redistricting principles may be "persuasive circumstantial evidence" that tends to show that race predominated in the design of a district. *Id.* at 189–90. The Supreme Court has explained that "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Id.* at 190. However, "such evidence loses much of its value when the [government] asserts partisanship as a defense, because a bizarre shape . . . can arise from a 'political motivation' as well as a racial one." *Cooper*, 581 U.S. at 308. Where such a defense is raised, the Court must "must make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to

disentangle race from politics and prove that the former drove a district's lines." *Id.*  (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

> b.      Analysis

The evidence before the Court supports a finding that Plaintiffs are substantially likely to succeed in establishing that race predominated in drawing the borders of Districts 1, 2, 3, and 4. The Court need not look much beyond what a majority of the Commissioners expressly stated on the record at public meetings regarding their understanding of historical redistricting cycles and their goal for the 2022 redistricting process resulting in the Enacted Plan.  Indeed, on multiple occasions, a majority of the Commissioners expressed that their main concern for the redistricting process was to ensure that there would be three Hispanic commissioners, one Black commissioner, and one Anglo commissioner on the Commission, consistent with past redistricting cycles and the reason the City switched from city-wide commissioners to single-member commissioner districts. Those Commissioners reiterated that priority to the retained consultant tasked with proposing the redistricted map, as recounted above.  And he acknowledged that he took instruction from the majority of Commissioners.[23]  The resulting shapes of each of the individual Commission Districts adopted in the Enacted Plan and the racial demographic data before the Court for the Commission Districts reflects that the City achieved that goal by ensuring that the HVAPs in Districts 1, 3 and 4 were as high as possible, and through the preservation of the core of District 2.  The Court nonetheless considers all the relevant *Arlington Heights* factors and begins with the presumption that the City acted in good faith in the most recent redistricting cycle.

> ***Historical Background, Contemporaneous Statements of Key Commissioners, and Sequence of Events Leading to the Passage of the Enacted Plan***.   The Court begins with

---

[23] *See* (ECF No. 24-11) (Tr. Nov. 18 at 17:9–15).

statements by the Commissioners made during the 2022 redistricting process.  Given the intertwined nature of the historical background and the statements of key commissioners, the Court assesses these factors together.  In this case, a majority of the Commissioners unambiguously expressed on the record, at six legislative sessions held over the course of approximately 5 months, their understanding of the City's switch from city-wide commissioners to single-member commission districts, their understanding of how that switch factored into prior redistricting cycles, and their intention for how that switch would factor into the 2022 redistricting process culminating in the Enacted Plan.

The Court is mindful that its assessment of the *Arlington Heights* historical background factor should be focused on the specific sequence of events that led up to the Enacted Plan rather than an unlimited lookback to past discrimination.  *See League of Women Voters of Fla.*, 32 F.4th at 1373.  In this respect, the record contains evidence of contemporaneous news coverage regarding the City's 1997 switch to single-member districts, as well as news coverage, legislative documents, and consultant reports from the 2013 redistricting process.  *See* (ECF Nos. 24-42 through 24-79).

But the Court need not delve into that historical evidence in this case because the Court need not draw inferences from that historical evidence.  *Cf. Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *41 (citing *Abbott*, 138 S. Ct. at 2327) ("[T]he Court considers the 2011 historical evidence only to the extent it gives rise to inferences regarding the intent of the City Council in 2022.").  This is because a majority of the Commissioners during the 2022 redistricting process expressly discussed their own understanding of the historical context that informed their decision-making.  That is, a majority of the Commissioners were abundantly clear on the record in *this* 2022 redistricting process that the City had switched from city-wide commissioners to single-member commissioner districts in the past to ensure there would be three Hispanic Commissioners, one

Black Commissioner, and one Anglo Commissioner. *See, e.g.*, (Tr. Nov. 18 at 15:22–16:22); (Tr. Nov. 18 at 28:2–29:3); (Tr. Dec. 9 at 14:5–14); (Tr. Dec. 9 at 24:8–10); (Tr. Feb. 7 at 50–51); (Tr. Feb. 7 at 54:5–15); (Tr. Feb. 7 at 67:19–68:9); (Tr. Mar. 11 PM at 8:8–21); (Tr. Mar. 24 at 56:12–57:1); (Tr. Mar. 24 at 38:23–39:20).

The Commissioners' statements speak for themselves and are recounted at great length above. *See* Section II.A, *supra*. The City asserts that the Commissioners' discussion of race was in reference to the political cohesiveness of minority groups. It was not so limited, as the passages above reveal. There was indeed some discussion of voter cohesion, including guidance to the consultant to consider evidence of voter cohesion. However there is a dearth of evidence that voter cohesion was in fact analyzed or considered in the Commissioners' approval or revisions to the consultant's proposed plans.

The City also asserts that "[t]he test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of a significant number of voters." (ECF No. 36 at 17) (emphasis omitted). The evidence reveals not only that race was discussed but that the Commissioners themselves characterized the district map as a product of gerrymandering. Indeed, Commissioner Carollo expressly stated on the record that District 2 under the prior plans had been intentionally gerrymandered to be an Anglo district. (Tr. Feb. 7 at 51:10–15) ("It was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner."). At another session, Commissioner Carollo explained that, not only was District 2 historically gerrymandered, but also the Commission had "gerrymandered and broke[n] up numerous neighborhoods into the other three – in the other three districts, and particularly District 3 and District 4." (Tr. Feb. 25 AM at 60:17–61:22); *see also* (Tr. Feb. 25 PM at 22:14–23).

The record in this case for the 2022 redistricting process contains substantial evidence that a majority of the Commissioners believed the cores of the existing districts had been intentionally designed with race as the predominant factor considered in that design, such that the composition of the Commission would be three Hispanic Commissioners, one Black Commissioner, and one Anglo Commissioner.

Nonetheless, and putting aside achieving substantially equal populations which is part of the redistricting background, *see ALBC*, 575 U.S. at 272, the Commissioners ranked preserving the cores of the existing districts as their top redistricting priority.  (Tr. Nov. 18 at 35–36).  This supports a finding that their intent was, as expressed, to preserve previously-drawn race-based lines of the Commission Districts in the 2022 redistricting process.

Indeed, the Commissioners were clear that they intended to honor in the 2022 redistricting process the overarching plan created in the late 1990s—that there would be three Hispanic districts, one Black district, and one Anglo district.  *See, e.g.*, (Tr. Dec. 9 at 22:21–23:7) (Carollo); (Tr. Dec. 9 at 24:8–10) (Carollo); (Tr. Feb.7 at 52:18–53:2) (Carollo); (Tr. Feb. 7 at 71:16–17) (Reyes); (Tr. Mar. 24 at 38:23–39:20) (Reyes); (Tr. Feb. 7 at 67:19–68:9) (Reyes).

Commissioner Díaz de la Portilla repeatedly spoke of maintaining the ethnic integrity and avoiding the dilution of the majority-Hispanic districts—Districts 1, 3, and 4.  *See, e.g.*, (Tr. Dec. 9 at 6:13–15) ("[T]o maintain the integrity of each district, we sort of could figure out how these three districts, right, 1, 3, and 4 could be kept whole, for a lack of a better term, without going into District 2 and other areas like that."); *see also* (Tr. Dec. 9 at 7:2–3); (Tr. Dec. 9 at 10:4–10); (Tr. Dec. 9 at 13:8–14:1).  Again, after describing the relative "purities" of Districts 1, 3, and 4, Commissioner Carollo noted the danger to the balance and harmony of the City of changing one or two "of the Hispanic seats."  (Tr. Dec. 9 at 14:5–14).  He also expressly stated that it was his

"main interest in my district and your district Commissioner Díaz de la Portilla and Mr. Reyes' district is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there."  (Tr. Dec. 9 at 22:21–23:7).  Indeed, and for example, Commissioner Russell's revised plan, which would have extended District 3 east into parts of Brickell and not south into Coconut Grove, was rejected because it purportedly put at risk the ability of a Hispanic commissioner to be elected in District 3.  *See* (Tr. Mar. 24 at 66:13–18) (Carollo); (Tr. Mar. 24 at 70:16–17, 71:15) (Díaz de la Portilla).  De Grandy agreed that District 3 was a "stronger Hispanic district" under the base plan and not under Commissioner Russell's revised plan.  (Tr. Mar. 24 at 75:20–21).

Moreover, while the record reflects that Commissioners Reyes and Carollo were cognizant of the need to shift residents out of District 2 into neighboring districts, they were also expressly concerned with ensuring that District 2 would remain a competitive district that an Anglo would have a high probability of winning.  *See* (Tr. Feb. 25 PM at 19:13–20:12) (Reyes); (Tr. Mar. 24 at 38:23–39:20) (Reyes); (Tr. Mar. 24 at 68:14–17) (Carollo).  Commissioner Reyes told De Grandy the "most important question" the Commission had was whether the racial breakdown for both Districts 2 and 5 "was the best [De Grandy] can do to protect the African American seat?  I'm gonna be blunt and the Anglo seat, but more important, the African American seat?"  (Tr. Feb. 7 at 67:19–68:9).  Commissioner Reyes also committed to making sure that Anglos would have someone sitting on the Commission who looked like them.  (Tr. Feb. 7 at 71:16–17).  This was despite De Grandy informing the Commission at the first session in November 2021 that white voters are not a protected class under the VRA.  (Tr. Nov. 18 at 12:3–5).

This understanding of the historical background, and the explicit intention to draw the borders of Districts 1, 2, 3, and 4 to preserve the "ethnic integrity" of Districts 1, 3, and 4 and

preserve District 2 as a district where an Anglo could be elected, all was repeated on the record on multiple occasions across six sessions of the Commission over a period of 5 months, from November 2021 through March 2022.  And in deference to the Commissioners' repeated emphasis on retaining the cores of the existing districts as much as possible, De Grandy's presentations of the preliminary plans focused on the racial breakdown of the proposed districts.  (Tr. Feb. 7 at 8); (Tr. Feb. 25 AM at 6:1–19).  As set forth below with respect to the "impact of the challenged law" factor, the 2022 Enacted Plan largely did preserve the racial breakdown of the prior districts, with three majority HVAP districts, one majority BVAP district, and one district with approximately 37% WVAP.

The Commissioners also unambiguously expressed that neighborhoods would be split to preserve the racial balance of the Commission.  As noted above, Commissioner Carollo expressly stated at the February 7, 2022 Commission session that, if neighborhoods could not be separated, "[t]hen the outcome of that would be that guys like— that look like us, with last names like us, in the near future might not be elected necessarily from the districts that we represent."  (Tr. Feb. 7 at 54:15–17).  Commissioner Díaz de la Portilla and Commissioner Reyes echoed that traditional Hispanic neighborhoods had been broken up to preserve the racial balance of the Commission. *See, e.g.*, (Tr. Mar. 24 at 79:17–20) (Díaz de la Portilla); (Tr. Mar. 24 at 38:23–39:20) (Reyes).  In this respect, the Commission disregarded its redistricting priority of keeping traditional neighborhoods together whenever feasible—the evidence before the Court is that this traditional redistricting criterion was set aside to preserve the racial composition of the Commission. *See Bethune-Hill*, 580 U.S. at 190–91 ("In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so.").

Indeed, Commissioner Carollo urged his colleagues that compromise and the splitting up of traditional neighborhoods would be required to carry forward the overarching goal of preserving the racial composition of the Commission Districts and of the Commission.

The intention of preserving Districts 1, 3, and 4 as majority-Hispanic districts and District 2 as a district in which an Anglo could be elected was expressed by a majority of the Commissioners.  The Court does not here impute the expressed intentions of one influential councilmember to a 19-member council as a whole.  *Cf. Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) ("*Jacksonville II*") (finding that the district court did not afford too much weight to the statements of one councilmember who "was a key figure in the nineteen-member Council," the appellants' expert supported that conclusion, and "numerous direct quotes . . . suggested race was a primary motivating factor for that councilmember").

In its Response, the City denies that the Commissioners' references to political cohesion throughout the redistricting cycle were not, as Plaintiffs allege, code for race but rather evidence of the City's prioritization of political cohesion.  (ECF No. 36 at 16).  The City argues that such partisan gerrymandering is not justiciable.  (*Id.*).  Indeed, the Court must take care when there are claims of partisan as opposed to racial gerrymandering.  But there is an absence of evidence that the Commissioners actually considered political cohesion when discussing race—there is instead an abundance of evidence in the record that "cohesion" was used as a proxy for race, despite De Grandy's efforts to rephrase the Commissioners' comments.  And in any event, Abbott opined that partisan gerrymandering did not explain the designs of the Commission Districts.  *See* (Abbott Rpt. at 12–13).  No rebuttal expert evidence has been adduced to the contrary.

The Commissioners were clear on the record that the priority of preserving the cores of the existing district, the preservation of the ethnic integrity of Districts 1, 3, and 4 as majority-Hispanic districts, the preservation of District 2 as a district where an Anglo could be elected, and the splitting up of neighborhoods, all was in furtherance of the wider goal of preserving three Hispanic seats, one Black seat, and one Anglo seat on the Commission.  As the Court noted above, ensuring diversity of representation is undoubtedly a laudable goal.   But where a government opts to preserve district cores to maintain the race-based lines created in previous redistricting cycles, "[t]he Supreme Court has been equally clear that this is not a legitimate objective." *Jacksonville II*, 2022 WL 16754389, at *3 (citing *See North Carolina v. Covington*, 138 S. Ct. 2548, 2551 (2018) (per curiam)) (denying emergency motion to stay on appeal preliminary injunction entered against the City of Jacksonville, on the ground that the City of Jacksonville was not likely to succeed on the merits of their appeal of the district court's preliminary injunction).  Indeed, the evidence before the Court is that the Commissioners here "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria[.]" *ALBC*, 575 U.S. at 267.

Accordingly, the Court finds that these three *Arlington Heights* factors weigh strongly in favor of finding that racial considerations predominated in the City's drawing of Districts 1, 2, 3, and 4.

**Impact of the Challenged Law**.   The shapes of the borders, the racial makeup of the Commission Districts, and the splitting up of neighborhoods, all support a finding that race predominated in the City's design of Districts 1, 2, 3, and 4 and that these districts were drawn in furtherance of the Commission's express goal to preserve the composition of the Commission as having three Hispanic seats, one Black seat, and one Anglo or Anglo-access seat.

"In the context of redistricting, the Court judges the impact of the law by examining the [c]hallenged [d]istricts' shapes and demographics." *Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *37.

*Shape and Racial Demographics of District 2*.  The Court begins its analysis of this factor with District 2 because of its connection to District 5.  Starting with the shapes of the districts, the Court finds that District 2 is not compact.  A visual inspection of the map of District 2 under the Enacted Plan reveals that it is a relatively thin strip confined to the coast, extending from the northeast in the Morningside area, south through Edgewater, the eastern portion of Downtown and the eastern portion of Brickell, and continuing southwest along the water through Coconut Grove to the southern border of the City.  *See* Figure 1, *supra*.  As discussed above, neighborhoods were split in the design of District 2: Edgewater and Downtown Miami have been split between Districts 2 and 5.  According to Plaintiffs' expert, Abbott, the portions of Edgewater moved from District 2 to District 5, identified as Areas 10 and 11, had lower a lower WVAP proportion and greater BVAP and HVAP proportions than the areas around them that remained in District 2.  (ECF No. 24-31) (Abbott Rpt. at 8–9).

A "condo canyon" south of Interstate I-395 and the MacArthur Causeway between Downtown Miami and the Omni area, bounded by Northwest 1st Avenue, Northwest 8th Street, and Northwest 10th Street, bulges into District 5—De Grandy testified on cross-examination that this "condo canyon" was kept in District 2 whereas all the areas around it were moved into District 5 out of concerns that moving the "condo canyon" would dilute the Black vote in District 5. Notably, De Grandy testified at the March 29, 2023 hearing that the border between District 2 and District 5 was redrawn so that District 2 lost and District 5 now includes parcels home to FDC-

Miami, the federal temporary detention center across the street from this Court.  But only a few blocks north of FDC-Miami is the "condo canyon" that was retained in District 2.

Indeed, the City does not rebut that District 2 was designed and later preserved, as discussed in further detail above, as an Anglo district or district where an Anglo could be elected, apart from arguing that District 2 necessarily was racially gerrymandered to preserve the Black majority in District 5 that has shrunk with each redistricting cycle.  As set forth in Table 2, *supra*, District 2 has the highest WVAP proportion of all the Commission Districts, at 37.4%.  (Abbott Rpt. at 5–6).  This represents an increase: prior to the 2022 redistricting under the borders in place from the 2013 plan, the WVAP in District 2 was 34.5%.  *See* Table 3, *supra*; *see also* (Abbott Rpt. at 4).  District 2's HVAP and BVAP proportions are 48.6% and 7.2%, respectively, under the 2022 Enacted Plan.  Under the 2013 plan borders prior to the 2022 redistricting process, the HVAP in District 2 was 51.9%.

Accordingly, based on the evidence in the record, this factor weighs in favor of finding that race predominated in the design of District 2.

*Shapes and Racial Demographics of Districts 1, 3, and 4*.  As to Districts 1, 3, and 4, the Court does not find upon visual inspection of those districts that Districts 1, 3, and 4 are facially non-compact.  *See* Figure 1, *supra*.  Plaintiffs have not adduced quantitative evidence assessing the compactness of the Commission Districts.  Nonetheless, the Court notes some irregular features in the shapes of those districts.  The Court finds that the particular lines drawn in designing these districts and the resulting racial demographics weigh slightly in favor of a finding that race predominated in the designs of Districts 1, 3, and 4.

Indeed, the City's redistricting consultant, De Grandy, agreed generally on cross-examination that once he had received instructions to maintain the cores of the existing

districts, compact districts could not be drawn given the shape of the geographic borders of the City.   As noted above, De Grandy responded in the affirmative to Commissioner Díaz de la Portilla's question that it was a "foregone conclusion" that "[i]f you want to have an African American district and you want to have an Anglo district it's almost impossible.   To emphasize compactness."   (Tr. Dec. 9 at 28:22–29:2).   And the Commissioners themselves at the Commission's December 9, 2021 session recognized that the districts under the 2013 plan were not compact.  (Tr. Dec. 9 at 18:7–8).  In the Enacted Plan, the cores of all the Commission Districts were preserved and, visually, the cores of Districts 1, 2, 3, and 4 in the Enacted Plan do not facially differ from the cores adopted part of the 2013 plan.  This observation was also made by Plaintiff's expert, Abbott, who concluded that compactness did not explain the shapes of the districts in the Enacted Plan.  *See* (ECF No. 24-31) (Abbott Rpt. at 15–16).

As to District 1, the shape of District 1 follows a staircase-like stepping pattern in its northeastern corner in Allapattah, denoted as Areas 7 and 8 in Abbott's report.  *See* Figure 3, *supra*. As Abbott noted, and as was summarized above, the drawing of the borders of District 1 with respect to Areas 7 and 8 was race-driven.  *See* (Abbott Rpt. at 6–7).  District 1 also has an appendage extending toward Downtown Miami along the Miami River (Area 6 in Abbott's report): this area previously in District 5 was described by the Commissioners as an "attractive" area that was "mainly Hispanic or Anglo." (Tr. Dec. 9 at 3:11–18).  Abbott concluded that the portion of a precinct that was moved from District 5 to District 1 in Area 6 had a higher HVAP proportion and lower BVAP proportion than the portion of that precinct that remained in District 5.  (Abbott Rpt. at 6–7).  The demographics of District 1 under the Enacted Plan are: BVAP of 11.0%; WVAP of 3.5% and HVAP of 89.5%.  (Abbott Rpt. at 5–6).

District 3 has an irregular appendage in its southern portion that extends across U.S.

Highway 1 to the Natoma Manors area identified as Area 13 in Abbott's Report.  This irregular appendage juts into District 2.  While Abbott concluded that this area was not moved for racial reasons, Abbott did conclude, as noted above, that *other* areas (Areas 14 and 15) were moved from District 4 into District 3 to offset the lower proportion of Hispanic voters gained upon moving Area 13 (which has a HVAP of 37.6%) into District 3.  (Abbott Rpt. at 11–12).  Indeed, the racial demographics of District 3 under the Enacted Plan are: BVAP of 5.4%; WVAP of 7.7% and HVAP of 88.3%.  (Abbott Rpt. at 5–6).

District 4, likewise, has racial demographic breakdowns similar to Districts 1 and 3 under the Enacted Plan: BVAP of 3.1 %; WVAP of 7.6% and HVAP of 89.5%.  (Abbott Rpt. at 5–6).

Notably, the HVAP percentages of Districts 1, 3, and 4 remained largely the same both pre- and post-redistricting, with only slight percentage decreases.  *Compare* Table 2, *supra*, *with* Table 3, *supra*.

*Division of Traditional Neighborhoods*.  Moreover, the Court notes that traditional neighborhoods are divided among Districts 1, 2, 3, and 4 under the Enacted Plan.

The Enacted Plan divides traditional neighborhoods just as prior plans had.  Among other neighborhoods, the Enacted Plan divides: Edgewater and Downtown Miami between Districts 2 and 5; Coconut Grove between Districts 2 and 4; Brickell between Districts 2 and 3; Silver Bluff and Shenandoah between Districts 3 and 4; Flagami between Districts 1 and 4; Allapattah between Districts 1 and 5; and Little Havana among Districts 1, 3, and 4.  Indeed, Commissioner Díaz de la Portilla explained that Hispanic communities in the City had been divided by redistricting for decades, stated that "Coconut Grove doesn't have a monopoly on being a community," and therefore justified that Coconut Grove could also be split for the greater good of preserving the racial and ethnic composition of the Commission.  (Tr. Feb. 7 at 60:6–18).

*The City's Response*.  In its Response, the City argues that the shapes of the Commission Districts are all facially compact because they do not resemble the convoluted district shapes that were at issue in *Cooper v. Harris*, 581 U.S. 285 (2017).  *See* (ECF No. 36 at 11).  The City defends the shape of the border between District 2 and District 5 (*i.e.*, the redistricting "wall" De Grandy referred to in the November 18, 2021 and December 9, 2021 Commission sessions) on the ground that compliance with Section 2 of the VRA did not make it unconstitutional for the City to gerrymander District 5.  (*Id.*).  The City asserts that the only irregular aspect of the Enacted Plan is the area identified as Area 13 discussed above.  And according to the City, the border between Districts 1 and 4, which has been largely unchanged for 20 years, could not have been drawn for racial reasons because Districts 1 and 4 have similar demographics.  The City argues that the particular geographical movements in this case were contiguous and had minimal racial effect, and therefore the Enacted Plan did not affect a significant number of voters.

Again, the City's argument addresses only the changes made in redistricting and fails to consider the District as a whole.  The Supreme Court has made clear that the Court must look to the *districts* that are challenged, not in isolation to the particular lines drawn.  *See Bethune-Hill*, 580 U.S. at 191–92 ("Courts evaluating racial predominance therefore should not divorce any portion of the lines—whatever their relationship to traditional principles—from the rest of the district.").

Assuming at this stage of the proceedings that the City in good faith was motivated by politics, not race, in making those minor changes, the Court is nonetheless required to look beyond those changes to determine the predominant motive for the design of the district as a whole.  *See Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *39.

Accordingly, the Court finds that this factor supports a finding that it was substantially

likely that race predominated in the designs of Districts 1, 2, 3, and 4.

*Procedural and Substantive Departures*.  Plaintiffs have neither argued nor adduced evidence that the City failed to comply with procedures for redistricting set forth in relevant provisions of Florida law or the City's municipal code, and the record does not suggest any such failure.  The Commission held six sessions regarding redistricting on the public record.  And the Commission heard comments from the public.

Accordingly, the Court finds that this factor does not weighs in favor of a finding that racial considerations predominated in the designs of Districts 1, 2, 3, and 4.

*Availability of Less Discriminatory Alternatives*.  Plaintiffs recount in their Motion a series of alternative proposals advanced but rejected by a majority of the Commissioners that Plaintiffs' expert attests would have had less of a discriminatory impact on the Commission Districts.  The City does not respond or rebut this evidence, which the Court finds weighs slightly in favor of finding race predominated.

*Summary*.  In sum, the Court's assessment of the *Arlington Heights* factors strongly supports a finding that Plaintiffs are substantially likely to succeed in establishing that racial considerations predominated in the City's design of Districts 1, 2, 3, and 4.  The evidence in the record at this posture includes the unambiguous statements of a majority of the Commissioners that they: (i) believed that the City had in the past established single-member districts with the intention of creating a Commission with three Hispanic seats, one Black seat, and one Anglo seat; (ii) understood that some of the districts created in prior redistricting cycles were intentionally gerrymandered to preserve that overarching goal; and (iii) intended to preserve the cores of the existing districts in the 2022 Enacted Plan to perpetuate a Commission with three Hispanic districts, one Black district, and one Anglo-access district.  The Commissioners directed the

redistricting consultant to preserve the cores of the existing districts reflecting that racial composition.  *See Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *40 ("As stated in the underlying *Bethune-Hill* decision, core retention 'holds a special place in the predominance balance' because, among other reasons, it 'may be used to insulate the original basis for the district boundaries.'").   Indeed, the Commissioners expressed their concerns that specific, proposed changes to the borders of Districts 1, 3, and 4 would dilute the "ethnic integrity" of those districts as majority-Hispanic districts; they redrew borders to avoid diluting those majorities and instead to preserve the HVAP super-majorities in those districts.  The Commissioners expressed that District 2 should be preserved as a district in which an Anglo could be elected, and the core of that district, which Commissioner Carollo asserted had been gerrymandered in the past, was drawn to encompass the highest WVAP among the Commission Districts.  The Commissioners directed the redistricting consultant to divide neighborhoods in furtherance of preserving the racial composition of all the districts consistent with previous redistricting cycles.  The shapes of the Commission Districts contain irregular appendages and indeed reflect that neighborhoods were divided in the 2022 Enacted Plan.  District 2 is facially not compact.  And the racial demographic data for the resulting 2022 Enacted Plan reflect that the Commission succeeded in preserving the racial breakdowns of the prior redistricting.

Accordingly, the evidence before the Court supports a finding that Plaintiffs are substantially likely to succeed in establishing that racial considerations predominated in the designs of Districts 1, 2, 3, and 4.

### 3.    Strict Scrutiny

Having found that Plaintiffs are substantially likely to succeed in establishing that racial considerations predominated in the designs of Districts 1, 2, 3, and 4, and given the Parties'

agreement that race did predominate in the design of District 5, the burden shifts to the City to establish that the City's use of race in designing the challenged Commission Districts withstands strict scrutiny. The Court first turns to District 5.

> ### a.    District 5

The Parties do not dispute that the City drew the borders of District 5 to comply with Section 2 of the VRA, and thus there is no dispute that the predominance of race in the design of District 5 was in furtherance of a compelling governmental interest. *See Abbott*, 138 S. Ct. at 2315. Accordingly, the dispute in this case centers on whether the City's consideration of race in the design of District 5 was narrowly tailored to comply with Section 2 of the VRA.

In a racial gerrymandering case, the burden is on the City to establish that "its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292. Because the "Equal Protection Clause restricts consideration of race and the VRA demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to 'competing hazards of liability.'" *Abbott*, 138 S. Ct. at 2315 (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996)). Accordingly, the Supreme Court has consistently assumed that "compliance with the VRA may justify the consideration of race that would not be otherwise allowed," and therefore that complying with the VRA is a compelling governmental interest. *Id.* at 2315; *see also Bethune-Hill*, 580 U.S. at 193 ("As in previous cases, therefore, the Court assumes, without deciding, that the State's interest in complying with the Voting Rights Act was compelling."). In this regard, courts will find that the government's "consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the [government] has 'good reasons' for believing that its decision is necessary in order to comply with the VRA." *Id.* (quoting *Cooper*, 581 U.S. at 293).

As the Supreme Court has explained, "[t]hat standard does not require the [the City] to show that its action was 'actually . . . necessary' to avoid a statutory violation, so that, but for its use of race, the [City] would have lost in court. Rather, the requisite strong basis in evidence exists when the legislature has '*good reasons* to believe' it must use race in order to satisfy the Voting Rights Act, 'even if a court does not find that the actions were necessary for statutory compliance.'" *Bethune-Hill*, 580 U.S. at 194 (emphasis in original) (internal citation omitted) (quoting *ALBC*, 575 U.S. at 278); *see also ALBC*, 575 U.S. at 278 ("[A] court's analysis of the narrow tailoring requirement insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice that it has made. . . . [L]egislators 'may have a strong basis in evidence to use racial classifications in order to comply with a statute when they have *good reasons* to believe such use is required, even if a court does not find that the actions were necessary for statutory compliance.").

So, as relevant here, "[i]f [the City] has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not."[24]  *Cooper*, 581 U.S. at 302 (internal citation omitted) (citing *Bush*, 517 U.S. at 978).

---

[24] The *Gingles* preconditions are as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

*Gingles*, 478 U.S. at 50–51 (internal citations and footnotes omitted).

According to Plaintiffs, the City's adherence to a minimum BVAP of 50% for District 5 was arbitrary, not necessary to afford Black voters an opportunity to elect preferred candidates of their choice, and not informed by any pre-enactment functional analysis of the voting patterns of Black voters.  Rather, Plaintiffs argue that the City's consideration of BVAP (Black Voting Age Population), as opposed to BCVAP (Black *Citizen* Voting Age Population), Black voter registration, or Black voter turnout, underestimates Black voting strength.  (ECF No. 26 at 34). Plaintiffs assert that their expert, Moy, concluded that a Section 2 compliant district would afford Black voters the ability to elect candidates of their choice with Black *Citizen* Voting Age Population proportions of at least 48.8%, and District 5's current BCVAP proportion of 58.2% far-exceeds that minimum.  Plaintiffs also note that De Grandy opined that BVAPs of less than 50% were Section 2 compliant for District 5.

The City responds that the VRA required a BVAP of more than 50% for District 5 in light of the declining size of City's Black population in both relative and absolute terms.  The City disputes that Plaintiffs' expert opines District 5 needed any particular BCVAP proportion to permit Black voters to elect candidates of their choice, and that he instead only analyzes past races to conclude that racially polarized voting exists in the City.  According to the City, it was not required to draw the borders of District 5 based on citizenship as opposed to total population.  The City ultimately argues that it is not required to prove that it with mathematical precision determined and then drew the borders of District 5 to encompass the minimum population necessary for Black voters to have an opportunity to elect candidates of their choice.  Rather, the City notes that the Commissioners were concerned, based on population trends, that a 51% Black majority in District 5 would not be sufficient.

Plaintiffs' Reply correctly points out that the City's Response addresses Plaintiffs' claims as though Plaintiffs brought a VRA challenge.  Instead of addressing its burden, the City attacks Plaintiffs' ability to prove that the 50% BVAP floor set by the City was improper.  The City simply ignores its burden to demonstrate that its use of race in redistricting was narrowly tailored.

The Court is mindful that "[d]etermining what minority population percentage will satisfy that standard is a difficult task[.]"  *Bethune-Hill*, 580 U.S. at 194.  The City is not necessarily required to memorialize in writing the functional analysis undertaken in determining the minority population percentage required for compliance with the VRA—but the City's determination of a minority population percentage for VRA compliance must nonetheless be well-supported.  *See id.* at 195 (internal citations omitted) ("First, the challengers contest the sufficiency of the evidence showing that Delegate Jones in fact performed a functional analysis, in part because that analysis was not memorialized in writing.  But the District Court's factual findings are reviewed only for clear error.  The findings regarding how the legislature arrived at the 55% BVAP target are well supported, and 'we do not . . . require States engaged in redistricting to compile a comprehensive administrative record." (omission in original)).  Moreover, the City is not required to, "when redistricting, determine *precisely* what percent minority population" compliance with the VRA demands.  *Bethune-Hill*, 580 U.S. at 195 (emphasis in original) (quoting *ALBC*, 575 U.S. at 278).  Rather, the question is whether the City "had '*good reasons*' to believe" the BVAP floor it selected "was necessary to avoid liability" under the VRA.  *Id.* (emphasis in original).

With the foregoing principles in mind, the Court concludes that Plaintiffs are substantially likely to prevail in establishing that the City's design of District 5 does not withstand strict scrutiny.  The City argues throughout its Response that the VRA required the City to maintain a BVAP of 50% in District 5.  The City's Response does not clearly identify how that figure was determined,

beyond noting that the Commissioners were concerned about lower BVAPs in light of population trends within the City.  The City ultimately misapprehends what the VRA required of it; as Plaintiffs note, the City has conflated a numerical 50% BVAP majority with the ability of Black voters to elect preferred candidates.

Nonetheless, the Court has reviewed De Grandy's presentations, initial report, and the transcripts of the redistricting sessions of the Commission.  The Court notes that De Grandy in his Initial Report alluded to having conducted an analysis of the *Gingles* preconditions.  *See* (ECF No. 50-11) (Init. Rpt. at 6, 15).  The City has not offered into evidence in this proceeding any pre-enactment report memorializing that analysis—nor does the City argue in its Response that any such analysis, though not in evidence, would nonetheless support the City's decision.  Indeed, as Plaintiffs note, the City has not adduced any evidence in this proceeding memorializing any pre-enactment analysis that was presented or provided to the Commissioners regarding the BVAP *or* BCVAP proportions that would facilitate Section 2 compliance.  To the extent presentations and reports discussed BVAP proportions throughout the redistricting process, they provided summary-level, race-focused Voting Age Population breakdowns for the Commission Districts under different proposed plan configurations.  *See* (ECF Nos. 24-3 through 24-10); (ECF No. 50-11).

The Court recognizes that De Grandy's April 2, 2022 Memorandum to Mayor Suarez, issued in response to the ACLU of Florida's second letter from March 31, 2022, does also assert that Black registered voter and Black actual voter proportions in District 5 were taken account into De Grandy's and Cody's analysis.[25]  (ECF No. 50-12) (De Grandy Mem. at 4).  However, the City does not direct the Court to any point in the six redistricting Commission sessions at which De

---

[25] De Grandy's Memorandum also argues that the Enacted Plan is a plan for the next decade and accounts for expected population trends, which he claimed that the ACLU of Florida had neglected in its second letter.  (ECF No. 50-12 at 5).

Grandy made the Commission aware of that fact.  The Court is, again, mindful that the City is not required to compile a comprehensive administrative record.  *See Bethune-Hill*, 580 U.S. at 195. But to the extent the Commission relied upon De Grandy's pre-enactment analyses, those analyses have not been offered into evidence on the record in *this case*, and thus there is no evidence on the record before the Court that those analyses were completed, beyond De Grandy's passing references.

So, the Court is left only with the statements of the Commissioners and De Grandy at sessions of the Commission to determine the basis for the City's selection of a 50% BVAP quota in District 5.  The Court declines to afford De Grandy's testimony much weight, given his testimony at the March 29, 2023 hearing contradicted his statements made during the redistricting process.  For example, De Grandy presented on February 7, 2022 a preliminary plan with a BVAP of less than 50% in District 5 but later testified on March 29, 2023 that he believed the VRA required a BVAP of more than 50% in District 5.

Moreover, based on the Commissioners' statements, and as Plaintiffs note, the Commission was aware that the BVAP of District 5 would be Section 2 compliant even below 50% based on proposed plans that De Grandy presented to or discussed with the Commissioners.  *See* (Tr. Feb. 7 at 8:12–19); (Tr. Mar. 24 at 8:5–9).  Nonetheless, from the Commissioners' statements, it appears that they selected 50% as a floor in light of generalized expectations regarding population trends, *see, e.g.*, (Tr. Feb. 25 PM at 19:13–20:12); (Tr. Mar. 11 PM at 8:8–21), or possibly in light of what they believed Section 2 compliance required.  But as to the former, and despite De Grandy's explanation that he too was designing a plan for the next 10 years, (Tr. Feb. 25 PM at 2:10–14), no analysis grounded in any data was conducted into population trends.[26]  De Grandy further

---

[26]  As noted above, De Grandy testified on cross-examination at the March 29, 2023 hearing that no studies were conducted to assess the potential impact of gentrification in District 5, and that his assessment of the effects were

testified that he did not develop models or attempt to quantify the need to preserve the ability of the Black minority voters to elect the candidate of their choice.

Plaintiffs' expert concluded based on statistical analysis that, where racially polarized voting existed, there were elections conducted in the City where the Black preferred candidate prevailed when Black *registered voters* made up 49% of the registered voting population.  (Moy Rpt. at 54).  Plaintiffs interpret the range of similar findings in terms of Black Citizen Voting Age Population, arguing that on the more conservatively-estimated end, only a BCVAP of approximately 48% was needed to ensure compliance with the VRA and afford Black voters the ability to elect preferred candidates, but the BCVAP of District 5 is 58% under the Commission's BVAP target of 50%.  That is, Plaintiffs have adduced evidence in the form of expert analysis that Section 2 compliance might not necessarily require the City to select a BVAP minimum of 50% for District 5, which was what the Commissioners appeared to believe the law required.

Based on the foregoing, the Court finds that the City lacked strong evidence for drawing District 5, but instead mechanically set a minimum BVAP for the District.  There is no evidence in the record before the Court of any pre-enactment analysis that informed the Commission's decision to select 50% as a BVAP floor; nor does the City point the Court to evidence that the Commissioners considered in selecting 50%.  *See Cooper*, 581 U.S. at 306 (internal citation omitted) ("We by no means 'insist that a state legislature, when redistricting, determine precisely what percent minority population [§ 2 of the VRA] demands.'  But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose raison d'être is a legal

---

based on his personal experience having grown up in the City, based on his general awareness of construction and land use permitting activity in the City, and based on his understanding of general demographic trends in the City.  De Grandy would not reveal the extent to which he shared his personal forecasts with the individual Commissioners in private discussions invoking privilege for withholding any such communications.  Accordingly I cannot assume, as it was suggested at the hearing, that a further basis in fact existed for the Commissioners' application of a greater than 50% BVAP.

mistake.").     Strict   scrutiny   requires   more   than   "uncritical   majority-minority   district

maximization."  *See Wis. Legislature*, 142 S. Ct. at 1249 (finding that the Wisconsin Governor

failed to satisfy strict scrutiny in his design of an electoral map because "[h]e provided almost no

other evidence or analysis supporting his claim that the VRA required the seven majority-black

districts that he drew.").   Accordingly, the Court finds that Plaintiffs are substantially likely to

succeed in establishing that the redistricting of District 5 does not withstand strict scrutiny.

### b.     Districts 1, 2, 3, and 4

As to Districts 1, 3, and 4, the City raises no argument that it had a good reason for drawing

those districts to preserve their HVAP super-majorities.   Nor does the City advance evidence that

it had good reason to believe that the VRA required the City to create three districts each with

HVAP super-majorities.   In fact, review of the transcripts does not suggest that the City's

consideration of race in drawing Districts 1, 3, and 4 was directed to VRA compliance whatsoever.

The Court recognizes that De Grandy testified on cross-examination that based on an

analysis conducted by his co-consultant Steve Cody, the *Gingles* preconditions were met for the

Black *and* Hispanic populations in the City.   The Court also observes that at the February 25, 2022

morning session of the Commission, De Grandy stated that Districts 1, 3, and 4 complied with the

VRA because they enable the Hispanic majorities in those districts to elect preferred candidates.[27]

There is no indication that the Commissioners' consideration of race when drawing those districts

was aimed at VRA compliance; notwithstanding that the Commissioners were simply attempting

to maximize the HVAP of those districts, the basis for De Grandy's opinion, that Districts 1, 3,

and 4 are VRA compliant, has not been explained on the record before the Court.

---

[27] As noted above, the Court is unable to locate any *Gingles* analysis performed by the City's redistricting consultants in the record and the City has not pointed the Court to or advanced any argument regarding any pre-enactment analysis for Districts 1, 3, and 4.

The City does not here assert that the consideration of race in the design of Districts 1, 3, and 4 withstands strict scrutiny.  At best, the City argues that it was not impermissible for racial considerations to predominate in the drawing of Districts 1, 3, and 4 because it was required to create District 5 with a BVAP of more than 50% and therefore it was "not unconstitutional to deliberately place Hispanics in other Districts in order to diminish their influence [in District 5] and preserve the Black majority."  (ECF No. 36 at 13).  This misapprehends the permissible use of race with respect to the design *of each Commission District*.  Again, racial gerrymandering claims apply district-by-district, *see ALBC*, 575 U.S. at 262, and so permissible gerrymandering in one district does not necessarily license the exaggerated consideration of race in *other* districts, even where, like here, each Commission District is contiguous with at least three other Commission Districts.  The record reveals moreover that the City's predominant consideration of race and ethnicity to draw Districts 1, 3, and 4 was not limited to the impact on District 5.  The City has failed to meet its burden to show that the redistricting of Districts 1, 3, and 4 withstands strict scrutiny.

These same considerations apply to District 2.  The City advances no argument or evidence whatsoever to demonstrate that its consideration of race in the design of District 2 withstands strict scrutiny.  No argument or evidence is advanced that the VRA required the City to draw the borders of District 2 so that an Anglo could be elected there; De Grandy testified that no determination of the *Gingles* factors for District 2 was even conducted, because it is not a protected class.  Based on the City's failure to offer any response or justification explaining the explicit gerrymandering of District 2, the Court finds that the redistricting of District 2 does not withstand strict scrutiny.

The Court therefore finds that Plaintiffs are substantially likely to succeed in establishing that Districts 1, 2, 3, and 4 are racial gerrymanders in violation of the Equal Protection Clause of

the Fourteenth Amendment.  The permission to consider race in drawing District 5 did not warrant the City's exaggerated consideration of race in the other districts.

As the Court noted above, this is not to say that the Commissioners' goal of ensuring diversity of representation on the Commission is not a laudable one.  The Court's conclusion should not be understood as a finding that the Commission's and therefore the City's focus on the laudable goal of diversity of representation is what renders the Commission Districts racial gerrymanders in violation of the Fourteenth Amendment.  Rather, the Commissioners' own statements expressly show that they viewed means of achieving that goal through mechanical racial quotas.  The Commissioners believed that doing so was required by law.  But the categorization of residents and voters on the basis of their race, for compliance with the Fourteenth Amendment's Equal Protection Clause and the Voting Rights Act, requires more searching and fulsome analysis than that done here.

### C.    Irreparable Harm

Next, the Court finds that Plaintiffs have established that they will suffer irreparable harm absent the entry of a preliminary injunction.

Plaintiffs argue that, if elections are held under the Enacted Plan, they will be classified and sorted based on race.  Plaintiffs also assert that commissioners elected under the Enacted Plan will be more likely to believe that their primary obligation is to represent only one racial group.  Plaintiffs assert that impairments to their fundamental right to vote cannot be undone through monetary remedies.

The Court is mindful that irreparable injury is not here presumed.  *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) ("The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right

of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether."). Moreover, "[t]he plaintiff's 'success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors*, 896 F.2d at 1285 (quoting *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983). Rather, to establish entitlement to a preliminary injunction, the "standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Here, Plaintiffs have filed declarations attesting to the injuries Plaintiffs suffer under the Enacted Plan. The attested-to injuries include that the Enacted Plan classifies them on the basis of their race and sends the message to their commissioners that their duty is to represent the majority racial group within the respective Commission Districts.[28] There is no dispute that Plaintiffs' concerns constitute injuries. As previously noted, "[w]hen the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller*, 515 U.S. at 911–12 (quoting *Shaw*, 509 U.S. at 647). Moreover, the Supreme Court has explained, as noted above, that "[t]he harms that flow from racial sorting

---

[28] *See* (ECF No. 24-33 at ¶ 9) (Plaintiff GRACE: stating that the Enacted Plan unfairly classifies Plaintiff GRACE's members on the basis of race); (ECF No. 24-34 at ¶ 6) (Plaintiff Engage Miami: same for Plaintiff Engage Miami's members); (ECF No. 24-35 at ¶ 6) (Plaintiff South Dade NAACP: same for Plaintiff South Dade NAACP's members); (ECF No. 24-36 at ¶¶ 6, 8) (Plaintiff Miami-Dade NAACP: same for Plaintiff Miami-Dade NAACP's members and also expressing concern that commissioners or districts surrounding District 5 "will think their job is primarily *not* to serve and represent Black constituents"); (ECF No. 24-37 at ¶¶ 6–7) (Plaintiff Cooper: stating that the Enacted Plan redistricts her based on her race and expressing concern that the Enacted Plan "sends a message to [her] commissioner that their job is to primarily serve white residents and be the commissioner for white voters"); (ECF No. 24-38 at ¶¶ 6–7) (Plaintiff Johnson: same but stating that the Enacted Plan sends the message that his commissioner is "elected to represent the interests of Hispanic voters only"); (ECF No. 24-39 at ¶ 5) (Plaintiff Miro: expressing concern that Hispanic residents had been packed into District 3 based on race); (ECF No. 24-40 at ¶ 6) (Plaintiff Contreras: same as to District 4); (ECF No. 24-41 at ¶ 6) (Plaintiff Valdes: expressing concern that Hispanic residents had been redistricted based on their race).

'include being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group.'" *Bethune-Hill*, 580 U.S. at 187 (quoting *ALBC*, 575 U.S. at 263).

Having found that Plaintiffs are substantially likely to succeed in establishing that the City's use of race in the design of the challenged districts violates the Fourteenth Amendment and therefore that those districts are racial gerrymanders, and with the November 2023 general elections forthcoming, Plaintiffs' injuries will likely become fully realized this fall. Monetary remedies cannot undo the impairments to Plaintiffs' (or their members') right to vote. *See Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)) (observing in the context of a First Amendment case that "[a]n injury is irreparable 'if it cannot be undone through monetary remedies.'"); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015) (quoting *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986)) ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance.").

Indeed, in recent cases district courts in the Eleventh Circuit have found that plaintiffs in voting rights cases have established irreparable harm on motions for preliminary injunctions, noting that the injury to a plaintiff of voting under an unconstitutional electoral map, or an electoral map that violates Section 2 of the VRA, "cannot be undone through any form of monetary or post-election relief[.]" *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1320–21 (N.D. Ga. 2022) (citing *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), for the proposition that "once the election occurs, there can be no do-over and no redress," but ultimately denying the motion for a preliminary injunction

upon application of the *Purcell* principle upon balancing the equities); *Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *49 (citing *League of Women Voters of N.C.*, 769 F.3d at 247) ("Plainly these are egregious harms that cannot be redressed once an election has occurred.").

And, recently, the Eleventh Circuit denied a motion to stay a district court's preliminary injunction entered against the City of Jacksonville, Florida in a Fourteenth Amendment racial gerrymandering case similar to the instant case, observing as follows:

> Briefly, we also note Appellees have shown that the issuance of this stay would likely injure them and the people of the Challenged Districts. Numerous cases have described the immense harm caused by racial gerrymandering. *See, e.g.*, *Bethune-Hill*, 137 S. Ct. at 797; *Miller*, 515 U.S. at 911–12; *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Given that such gerrymandering would constitute irreparable harm to the Appellees, and the public has no interest in enforcing unconstitutional redistricting plans, we decline to require the residents of Jacksonville to live for the next four years in districts defined by a map that is substantially likely to be unconstitutional.

*Jacksonville II*, 2022 WL 16754389, at *5.

The City does not advance specific argument to refute that Plaintiffs fail to establish they stand to suffer irreparable harm. To the extent the City does so argue, it asserts that the issue of irreparable harm is tied to the issue of standing—that Plaintiffs fail to allege that any of the Plaintiffs reside in the particular parcels that were moved between districts upon the adoption of the 2022 Enacted Plan. (ECF No. 36 at 21). The Court has rejected that argument above in finding that Plaintiffs have standing to sue. As the Court noted above, a plaintiff in a racial gerrymandering case is not required to reside in the particular or specific parcels or geographic areas that were moved between districts as part of the Enacted Plan. *See ALBC*, 575 U.S. at 262. Rather, the Supreme Court has emphasized that the harms underlying a racial gerrymandering claim are personal and "directly threaten a voter who lives in the *district* attacked." *Id.* at 263 (emphasis in original).

Accordingly, the Court finds that Plaintiffs have established that they stand to suffer irreparable harm absent the entry of a preliminary injunction.

### D.        Balance of Harms

Last, the Court turns to the balance of the equities.  "The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021).  "Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." *Id.* (citing *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).  Accordingly, the Court addresses the third and fourth prongs for a preliminary injunction together.

Plaintiffs assert that the irreparable harm to them outweighs any burden on the City, and that the entry of a preliminary injunction is in the public interest.  According to Plaintiffs, the Miami-Dade County Supervisor of Elections requires the borders of the Commission Districts be set by August 1, 2023 to administer the November 2023 elections on behalf of the City.  Plaintiffs claim the balance here "is not a close call."  (ECF No. 26 at 36).

The City raises two arguments in response.  First, the City asserts that the entry of a preliminary injunction would disserve the public interest because a nonracial redistricting would lower the BCVAP in District 5 without increasing Black voters' influence elsewhere.  To that end, the City argues that there is no benefit to Black voters if the City is preliminarily enjoined.  Second, the City argues that Plaintiffs unduly delayed seeking a preliminary injunction because they are both a year too late and 25 years too late.  (ECF No. 36 at 22).  According to the City, Plaintiffs are a year too late because they did not seek a preliminary injunction until over 11 months after the adoption of the Enacted Plan.  The City proffers that a special election for District 2 has already

occurred, in February 2023.  The City argues that there is insufficient time to enact a remedial map prior to August 1, 2023, and argues that Plaintiffs have not been diligent.  The City asserts that Plaintiffs are 25 years too late because they complain of redistricting choices made in the late 1990s.

In their Reply, Plaintiffs aver that they diligently brought this case.  Plaintiffs distinguish the City's caselaw and argue that they had to compile voluminous record evidence and wait for public records requests to be fulfilled.  Plaintiffs also argue that their harms are not realized until an election takes place.  Plaintiffs also aver that the City has sufficient time to adopt a remedial map by August 1, 2023, citing voting rights cases where 14 to 27 days were provided to submit an interim remedial map.  Last, Plaintiffs assert that the *Purcell* principle does not warrant a heightened standard for preliminary relief in this case because Plaintiffs' Motion is not before the Court on the eve of an election, and because election administrators have provided assurances that they can comply with an injunction without throwing an election into chaos.

The Court first addresses Plaintiffs' diligence before discussing the harms and public interest.

### 1.    Plaintiffs' Delay Versus Diligence

The Court first addresses whether Plaintiffs have been diligent or whether they have unduly delayed seeking preliminary relief.  The Supreme Court has explained that "a party requesting a preliminary injunction must generally show reasonable diligence.  That is as true in election law cases as elsewhere."  *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)) (affirming denial of preliminary injunction where the plaintiffs did not seek preliminary injunctive relief "until six years, and three general elections,

after the 2011 map was adopted, and over three years after the plaintiffs' first complaint was filed").

At the outset, the Court rejects the City's argument that Plaintiffs are 25 years too late in seeking a preliminary injunction. The harms in this case are new harms resulting from the 2022 Enacted Plan, which is a different electoral map from that enacted in 1997 (although, with the same cores). *See Jacksonville I*, --- F. Supp. 3d ---,  2022 WL 7089087, at *51 ("To the extent the City contends that injunctive relief is not warranted because the alleged harms have been in existence since at least 2011 if not before, the Court is not persuaded. Plaintiffs in this case complain about a new harm—the maps enacted in 2022, and the harms posed by those maps, as described above, are irreparable and ongoing."). Indeed, as Plaintiffs note, two of the organizational plaintiffs GRACE and Engage Miami were founded in 2019 and 2015, respectively. (ECF No. 24-33 at ¶ 2); (ECF No. 24-34 at ¶ 2). One of the individual plaintiffs, Johnson, moved to Miami in 2021. (ECF No. 24-38 at ¶ 4). And there is no reason not to accept Plaintiffs' proffer in their Reply that one of the individual Plaintiffs, Contreras, was born after the City switched to single-member commissioner districts. (ECF No. 39 at 15). Thus, the Court rejects that Plaintiffs were 25 years too late in seeking preliminary relief.

However, the City's argument that Plaintiffs have delayed in seeking a preliminary injunction by approximately one year is well placed. As noted above, the Enacted Plan was adopted in March 2022; this suit was initiated 9 months later in December 2022. Moreover, Plaintiffs did not move for a preliminary injunction until February 10, 2023, just under 11 months after the Enacted Plan was adopted. A special election has already occurred in that intervening time—Commissioner Russell resigned as the commissioner of District 2 effective December 29,

2022 and a special election to fill that vacancy occurred on February 27, 2023.  *See* (ECF Nos. 24-24 through 24-27).

Plaintiffs explain in their Reply that the delay was driven by prudence, the difficulties of coordinating among multiple organizational plaintiffs, and the collection of a voluminous record that, in part, necessitated public records requests of the City.  Plaintiffs note for example that as of the time of their Reply in March 2023, they had still not received through a December 2022 public records request a copy of De Grandy and Cody's Initial Report—that Initial Report was made part of the record in this case when the City offered it into evidence at the March 29, 2023 hearing. But it is not clear why Plaintiffs waited from March 2022 until December 2022 to submit a public records request for a report that was created prior to a Commission session that occurred in November 2021.  Moreover, six of the eight transcripts in this case bear transcription certifications reflecting August 2022 certification dates.[29]  A large number of Plaintiffs' exhibits consist of news articles relating to redistricting cycles from decades past.  Two of Plaintiffs' exhibits were authored by Plaintiffs' counsel.  Nonetheless, the record is large, and Plaintiffs' evidentiary burden is high. While Defendant contends that Plaintiffs' delay is unexplained, there is no argument advanced that Plaintiffs' delay was "intentional, strategic, or even negligent."  *Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *52.

The delay is exacerbated by the occurrence of the special election to fill the vacancy in District 2.  However, the Court notes that the vacancy that culminated in that election occurred after Plaintiffs' Complaint was filed and the special election occurred after the instant Motion was filed.  Commissioner Russell's letter of resignation, providing the date and time certain for his resignation, was submitted to the City's Clerk after the filing of the Complaint in the instant

---

[29]  One of the transcripts bears an October 2022 date, and one of the transcripts bears no certification but was nonetheless admitted into evidence without objection.

action.[30]  Moreover, as Plaintiffs note, the City's Charter provided for the vacancy appointment of Commissioner Russell's successor by a majority of the remaining Commissioners, with a special election to be called only if the remaining Commissioners failed to or refused to fill that vacancy. *See* Miami City Charter § 12.  Thus, while a possibility, it was not a foregone conclusion that a special election to fill the vacancy would be called.  And in any event, unlike *Benisek* where three general elections had occurred, the February 2023 election was a special election and no general election involving a majority of the challenged districts has yet happened in this case. *Cf. Benisek*, 138 S. Ct. at 1944.

The Court is mindful that the Eleventh Circuit has explained, generally, that "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal— militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming denial of preliminary injunction in trademark infringement case where the plaintiff "failed to offer any explanation for its five-month delay" between filing the complaint and seeking preliminary relief).  And courts in racial gerrymandering cases similar to this one have noted that "every single day matters" where plaintiffs seek to compel a city to entirely redraw the district maps prior to an election. *Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *52 (finding "not egregious" a delay of 6 weeks between adoption of map and filing of the suit and 2-and-a-half-month delay between filing the suit and seeking preliminary relief).  While this factor weighs against the issuance of an injunction, it must be balanced with the other harms.

---

[30]  Commissioner Russell's first letter of resignation, dated June 3, 2022, provided an effective date of resignation conditioned upon the earlier of the date he would take office if elected to other office or the date his successor was required to take office as Commissioner of District 2.  See (ECF No. 24-26).  A concrete effective date of resignation was not known until Commissioner Russell's second letter of resignation, dated December 29, 2022, which provided an effective date of that same day, December 29, 2022, at 5:00 P.M.  (ECF No. 24-27).

Plaintiffs' harms in this case are irreparable even despite their relative lack of diligence, as noted above; those harms will not become realized fully realized until the November 2023 election. While the delay in this case is more "egregious" than in *Jacksonville I*, it is by no means as egregious as the delay in *Benisek*. Here, the Enacted Plan was adopted at the end of March 2022. This case was brought approximately 9 months later in December 2022. Plaintiffs sought their preliminary injunction 2 months after the Complaint was filed, and approximately 10-and-a-half-months after the Enacted Plan was adopted. From the vantage of when the Enacted Plan was adopted, the election for which Plaintiffs now seek to enjoin the use of the Enacted Plan was November 2023, approximately 20 months after the Enacted Plan was adopted. Thus, the request for preliminary relief in this case was filed near the midpoint between the adoption of the Enacted Plan and the November 2023 general election: close enough to the election that Plaintiffs' irreparable harm would be imminent, but possibly not too close in time to November 2023 to implicate the *Purcell* principle.[31]

## 2.     Harm

Accordingly, the Court turns to an assessment of the harms the City and the public would stand to suffer should the District Court preliminarily enjoin the City from calling any elections

---

[31] *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) teaches that "federal district courts ordinarily should not enjoin state election laws in the period close to an election." *League of Women Voters of Fla.*, 32 F.4th at 1371 (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring)). This is because "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. When *Purcell* applies, it "only (but significantly) 'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference." *League of Women Voters of Fla.*, 32 F.4th at 1372 (citing *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring)). To that end, the Eleventh Circuit has explained that "courts issuing injunctions close to elections are 'required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures.'" *Jacksonville II*, 2022 WL 16754389, at *2 (quoting *Purcell*, 549 U.S. at 4). While the Supreme Court has not defined what constitutes the eve of an election under the *Purcell* principle, a case fits within those bounds when an election is set to begin in less than four months. *See id.* at 1371. *But see Jacksonville II*, 2022 WL 16754389, at *2 (denying motion to stay preliminary injunction where the district court "issued its injunction three months prior to the candidate qualifying period and five months prior to the elections for a single county" and noting that "[a]pplying *Purcell* to this case would extend the 'eve of an election' farther than [the court] ha[d] before").

under the 2022 Enacted Plan. The City identifies two harms. As noted above, the City first argues that the entry of a preliminary injunction would disserve the public because a nonracial redistricting would lower the BCVAP in District 5 without increasing Black voters' influence elsewhere, and thus there would be no benefit to Black voters if the City is preliminarily enjoined. Second, in arguing that Plaintiffs have unduly delayed seeking preliminary relief, the City implies that there is insufficient time to adopt an interim remedial map, asserting that "[e]ven if there is a ruling on the Motion, new districts would have to be drawn, face inevitable challenges by Plaintiffs, and be ruled on by this Court, and this does not even factor in any appellate remedies." (ECF No. 36 at 22).

The first harm the City identifies—that a "nonracial redistricting" would disserve Black voters—is not responsive to the balance of the equities prong for a preliminary injunction and is instead responsive to the first prong: whether Plaintiffs are substantially likely to succeed on the merits of their racial gerrymandering claim under the Fourteenth Amendment. In arguing that there is no support for Plaintiffs' position, that a lower BVAP in District 5 would still afford Black voters an opportunity to elect preferred candidates, the City in effect argues that the predominance of race in the design of District 5 was narrowly tailored; that is, that the BVAP the Commission selected for District 5 "was necessary to avoid liability" under the VRA. *Bethune-Hill*, 580 U.S. at 195.

In any event, a "nonracial redistricting" is not the result should the District Court enjoin the City. Rather, the City would have to create an interim remedial map in compliance with the Voting Rights Act and the Fourteenth Amendment's Equal Protection Clause, which pull in opposite directions. *See Abbott*, 138 S. Ct. at 2314 ("At the same time that the Equal Protection Clause restricts the consideration of race in the districting process, compliance with the Voting

Rights Act of 1965, 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.* (VRA), pulls in the opposite direction: It often insists that districts be created precisely because of race."); *see also Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ("When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan."). Thus, the City should be required to redistrict applying these principles, which does not necessarily lead to the conclusion that the Black voters' influence would be diminished in a revised plan.

The second harm—that there is insufficient time to adopt a remedial map—is implied and not directly argued or substantiated by the City. The harm, which is implied in passing, relates to the *Purcell* principle, which the City does not here raise or invoke. The next election is six months away; the City has not identified and this Court is not aware of any case where the Eleventh Circuit or the Supreme Court has applied *Purcell* under similar circumstances. *See also Jacksonville I*, --- F. Supp. 3d ---, 2022 WL 7089087, at *3.

The District Court's review of the Motion, Response, Reply, this Report and Recommendations, and any objections thereto, necessarily will occur closer in time to the upcoming November 2023 election than the issuance of this Report and Recommendation. Given the passage of time between the entry of this Report and Recommendations and a final ruling on the Expedited Motion for Preliminary Injunction, the consideration of the *Purcell* principle may be required the time at which a final ruling on the Expedited Motion is entered, if necessary.

*** 

In sum, the Court finds that the balance of the equities weighs in favor of the entry of a preliminary injunction. While Plaintiffs' lack of diligence weighs against the issuance of an

injunction, in this case, the balance of harms militates in favor of its issuance. Having found the Enacted Plan constitutionally infirm, and mindful of the undertaking that remains ahead to remediate the Enacted Plan, this Court nonetheless recommends that the City be enjoined from conducting an election implementing that Plan. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.").

## V.      RECOMMENDATIONS

Based on the foregoing, having found upon assessment of the requirements for a preliminary injunction and weighed the equities, the undersigned respectfully **RECOMMENDS** that:

(1) Plaintiffs' Expedited Motion for Preliminary Injunction (ECF No. 26) be **GRANTED**;

(2) The City of Miami, and its officers, agents, employees, and attorneys, be **PRELIMINARILY ENJOINED** from calling, conducting, supervising, or certifying any elections using the City Commission districts enacted in City of Miami Resolution 22-131 until the entry of final judgment in this case; and,

(3) The District Court establish a schedule for the preparation of a remedial plan with new district lines; that plan must not use race as a predominant factor in the design of any district unless that use of race is narrowly tailored to comply with a constitutionally permissible compelling government interest.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable K. Michael Moore, United States District Judge for the Southern District of Florida, on or before **May 13, 2023**.[32]  Any response to a Party's objections are due on or before

---

[32] The objections period is shortened upon the consent of the Parties.

May 20, 2023.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

     **RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, on this 3rd day of May, 2023.

                                       _____
                                   LAUREN F. LOUIS
                                   UNITED STATES MAGISTRATE JUDGE

cc:    Honorable K. Michael Moore
       Counsel of record