UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

              Plaintiffs,

v.

CITY OF MIAMI,

              Defendant.

                                          /

**DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION DE 52**

Defendant, City of Miami (the "City"), objects to the Report and Recommendation ("R&R" DE 52) on Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP, Miami-Dade Branch Of The NAACP, Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro[1] (collectively, "Plaintiffs") Expedited Motion for Preliminary Injunction (the "Motion" DE 26), and requests the Court's de novo review. 28 U.S.C. § 636(b)(1)(B),  Fed. R. Civ. P. 72(b)(2)-(3); S.D. Fla. Mag. R. 4(b).

## II.    Memorandum of Law

### A.    Standard of Review

A party challenging a report and recommendation must "file . . . written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.,* 208 F. App'x 781, 783 (11th Cir. 2006) (cleaned up); *see also* Fed. R. Civ. P. 72(b)(2). A district court judge may accept, reject, or modify, in whole or in part, the recommendations. 28 U.S.C. § 636(b)(1)(C). The district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990)(citation omitted); *see also* 28 U.S.C. § 636(b)(1)(C). The district judge must "give fresh consideration to those issues to which specific objection has been made by a party." *Id.*  The parts of the report and recommendation to which no objection is made are reviewed for plain error. *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

### B.    Objections

The R&R recommends that the City of Miami's entire electoral map be thrown out and redrawn because the Commissioners discussed race during the redistricting process. The R&R

---

[1] The first three are the "Organizational Plaintiffs."  The others  are the "Individual Plaintiffs."

feels constrained to find this way, even though the redistricting did not increase the concentration of Black or Hispanic residents in any district, and instead reduced it throughout the entire redistricting plan, and even though there is no claim that the Black or Hispanic vote were diluted in any district. This case is therefore unique. It throws out the entire map for racial gerrymandering because the conversation was racial, even though there was in effect no racial gerrymandering.

The R&R repeatedly focuses on statements that the districts were drawn to create a Black District (District 5), three Hispanic Districts (Districts 1, 3, and 4) and the so-called "Anglo access" district (District 2).[2]  "The Court need not look much beyond what a majority of the Commissioners expressly stated on the record at public meetings …."  DE 52 p.64. But while a majority of Commissioners expressed various opinions and ideas throughout the process, only some of those ideas were put to a motion and voted upon, reflecting the will of the City. The R&R cites Mr. de Grandy's testimony in the inaugural redistricting meeting that he would do what a majority of the commissioners directed, DE 52 p.64, but ignores that Mr. de Grandy expressed the City should provide that direction through majority-approved motions. DE 24-11 p.17:9-15. The City provided such express directions which were adopted by motion without objection.  The City gave directions to maintain the core of existing districts. DE 24-11 p.17:18-19:2. The City gave directions to draw districts with politically cohesive minorities. DE 24-11 p.19:20-21:15. The City gave directions to

---

[2] "Anglo" is undefined. It is not a census term. The R&R uses it interchangeably with "white" but the Commission included Asians. DE 24-12 p.23:17-23; DE 24-18 p.56:16-18. Even in the 2013 benchmark map, there was no White district. District 2 maintained a HVAP of 51.9% and a WVAP of 34.5% at the close of the 2020 census. DE 24-31 p 4.  There is no "Anglo district" because even District 2 is more Hispanic than White (DE 52 p.40), and just elected a Hispanic commissioner.

draw districts with substantial equality of population, not mathematical equality. DE 24-11 p.21:21-22:4. These directions were memorialized in adopted Resolution R-21-0485. DE 50-1. The Commission's instructions to Mr. de Grandy in that official act were to:

> a. Comply with the United States Constitution and the Voting Rights Act;
> b. Maintain the core of existing districts to avoid voter confusion;
> c. Factor in voter cohesion;
> d. Achieve substantial equality of population as opposed to mathematical equality; and
> e. Maintain communities of interest and neighborhoods where feasible.

DE 50-1. At the hearing, Mr. de Grandy testified that these were the directions he followed in drawing the districts.

Critically, the R&R finds, without citation, that Plaintiffs' expert attests there were alternative rejected maps that "would have had less of a discriminatory impact."  DE 52 p.77. This is simply incorrect. Dr. Abott made no such assertion, and Plaintiffs did not even argue it. Rather, Dr. Abott lays out the demographics of these alternative plans, demonstrating they are essentially the same, if not more concentrated in the alternatives.[3]  "All maps tended to shore up existing racial

---

[3] Compare the Enacted Plan to the three alternative plans on page 24 of the R&R. DE 24-31 pp.23-24. They all break up so-called traditional neighborhoods. In each alternative plan the Black Voting Age Population ("BVAP") in District 5 would be the same, and the Black Citizen Voting Age Population ("BCVAP") would be higher than the Enacted Plan. The White Voting Age Population ("WVAP") of District 2, the so-called Anglo district, is either the same or a mere couple tenths of a percent lower in these plans, and the WCVAP is actually higher in the alternative plans. The Hispanic voting age populations ("HVAP") in Districts 1, 2 and 4 are essentially the same. The alternative plans lower the HVAP in District 3 slightly and raise it in District 4 slightly. But all three remain supermajorities, and there is no claim these minor variances would be significant.

compositions within individual Commission districts….” DE 24-31 p.16. There is no alternative plan where Miami does not maintain districts with supermajorities of Hispanic residents for one simple reason: the City has a supermajority of Hispanic residents. The R&R recommends an amorphous injunction: a “remedial plan with new district lines; that plan must not use race as a predominant factor in the design of any district unless that use of race is narrowly tailored to comply with a constitutionally permissible compelling government interest.” As described below, any such plan would closely resemble the existing plan. Because Plaintiffs fail to state a cognizable claim, the Court should deny the Motion for Preliminary Injunction.

The City posed the question at the hearing and in its papers: what do Plaintiffs want specifically? Plaintiffs gave no substantive answer other than to say they do not have to give an alternative map. DE 39 p.10. They assert that they just want the map to be drawn in a way that is not race based. *Id*. As the City has asked, if it redraws the same map without considering race, would it then pass muster? Or, could the City simply adopt one of the alternative plans alluded to in the R&R, even though the racial and ethnic compositions are essentially identical? This is an important question, given the R&R’s analysis, because either (a) the map will pass muster if it is adopted without looking at race, even if it is the same map, or (b) no map can pass muster.

It is undisputed the City had good reason to conclude that the Voting Rights Act (the “VRA”) required the preservation of a district where Black residents could elect a candidate of their choice.[4]   “[T]here is no dispute that the predominance of race in the design of District 5 was

_____

[4] To be clear, the VRA protects the rights of racial and language minorities to participate in the political process, it does not protect district boundaries or demographic make-up. *See* 52 U.S.C. § 10301. Though Hispanics make up a supermajority of the City’s population, they are still protected

in furtherance of a compelling governmental interest." DE 52 p.79.  While the R&R finds race predominated in drawing the City's Districts, it focuses primarily on areas surrounding District 5 where it indisputably serves a compelling governmental interest. When discussing racial predominance in the other districts, the R&R makes no distinction between districting choices made regarding areas abutting District 5 and other areas unrelated to District 5. Instead, the R&R blurs the distinction between the two.

For example, the R&R quotes Commissioner Reyes's statements in the penultimate meeting for the assertion that the overarching goal "was to preserve the racial composition of the Commission with three Hispanic commissioners, one Black commissioner, and one white Commissioner." DE 52 p.35. Yet Commissioner Reyes only referenced District 5, the lone Black district required by the VRA: "[M]y main concern is to save that seat that now is occupied by Ms. King. And I will vote for any plan that will save that seat. Is that clear? So let's get race out of this." DE 24-16, 44:8-10. While the Commissioners frequently referenced a Black district and three Hispanic districts—references inescapably descriptive of Districts 1, 3, 4, and 5 because of the majority minority populations in those districts—the references to the remaining district as a "White" district were more a function of poorly-worded descriptors and not improper intent. There would inevitably be at least three Hispanic majority minority districts in any redistricting plan, but no district would ever have a white majority. DE 24-21 p.2. Commissioner Diaz de la Portilla aptly if inadvertently articulated this distinction in the afternoon session on March 11, 2021: "Our goal

---

under the VRA. In a redistricting plan in which at least four of the five districts are inescapably majority minority districts, the discussion of race should not be surprising. There is no White majority district, and it would be impossible to make one. DE 24-21 p.2 (Abott report).

here is to have an African American district, for the lack of a better term, a white district, which is the coastal district, and three Hispanic districts." District 2 is a *coastal district by design*, not a White district. *See* DE 24-14, 8:19-20. If it was intended to be a gerrymandered White district, an impossible task, it is an incompetent gerrymander: Hispanics make up the largest plurality in District 2. DE 52 p.40; DE 24-31 p.6. It is plain the Commission's focus was preserving District 5, because the other districts would invariably result in at least three, and possibly four, majority Hispanic districts.

In another example, the R&R quotes from Plaintiffs' expert, Dr. Abott, who primarily discussed moves into or out of District 5 as racially motivated. DE 52 pp.44-45.[5]  The areas are highlighted on the map from Dr. Abott's report (page 41 of the R&R).



---

[5] As discussed below, the redistricted areas not abutting District 5 were not racial motivated.

In its findings, the R&R addresses the shape and demographics of the districts. Addressing District 2, the R&R exclusively discusses areas 10/11 and the condo canyon between areas 10/11 and 12, all of which are between Districts 2 and 5. DE 52 p.73. District 2 had to shed population after the 2020 Census (DE 52 p.44), and allowing race to predominate redistricting decisions where it abuts District 5 is permissible. The R&R asserts that the WVAP increased in District 2 because of the change, rising from 34.5% to 37.4%. (DE 52 p.73)  This is still a minority White district with a higher percentage of Hispanics.  DE 52 p.40.

 Likewise, when discussing District 1, the R&R exclusively discussed Areas 6, 7 and 8, between District 1 and District 5. DE 52 p.74. In discussing District 3, the R&R first addresses an area that does not adjoin District 5, the so-called irregular appendage at Area 13. This area was moved from District 2 to District 3, but the R&R concedes that Dr. Abott concluded that it was not moved for racial reasons. DE 52 p.45. The R&R even addresses Area 14/15, from District 3 to 4. As Dr. Abott noted: "Area 14/15 did not strongly differ from the areas immediately surrounding it, either in District 3 or District 4."   DE 24-31 p.12. This move did not change the racial demographics of either district. As noted previously, the minority racial concentrations of every district decreased because of the redistricting, but this reflected the City's population growth. Compare DE 24-31 p.4 with p.6. More importantly, the City is being dunned for redistricting moves even if they raise or lower concentrations of minority voters, or even keep them the same.

In their Amended Complaint and in their Motion, Plaintiffs never claimed that any group had their vote diluted anywhere. They alleged that there was packing of groups, but only in the "colloquial" sense, not the legal sense. DE 39 p.3. In their reply brief, Plaintiffs abandoned defending the claim that any particular area being moved as part of the redistricting was impermissibly racially motivated. Instead their case changed and instead focused solely on the

argument that the redistricting "preserved" the core of areas *originally* drawn based on race. Id. at pp.3-6. In other words, this case ceased being about what the City did as part of the redistricting, and instead focused on what it did not do. Despite this, the R&R still goes through each redistricting area changed. Those changes to preserve District 5 were permissible, and the others were not racial, but were intended to equalize population.

Like Plaintiffs, the R&R then turns to the claim that the original districts were drawn based on race and that decision was preserved by the current map. DE 52 p.4,77-78. In so doing, the R&R primarily but impermissibly relies on post-enactment statements of prior intent of Commissioner Carollo—who was mayor, not a commissioner at the time. But such post-enactment statements are not proper indicia of legislative intent. *Blanchette v. Connecticut Gen. Ins. Corps*., 419 U.S. 102, 132 (1974) ("[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage); and *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (observing "determining the intent of the legislature is a problematic and near-impossible challenge" and rejecting the assertion that discriminatory intent could be found in the statements of one legislator, even where the legislator may be the sponsor).

Additionally, the R&R's reliance on various commissioners' statement about their personal understanding of the history of the districts is misplaced. DE 52 p.65-66. For example, the R&R highlights Commissioner Carollo's statement "[t]hen the outcome of that would be that guys like—that look like us, with last names like us, in the near future might not be elected necessarily from the districts that we represent," and implies this was done to preserve "the racial balance of the commission." DE 52 p.69. This statement is taken out of context. The Commissioner was talking about "them" being voted out of "their district" but that could not change the balance of the

Commission in a City that is 70% Hispanic. As shown in this Objection, there is no way to subdivide the City without creating at least three Hispanic Districts.

The R&R puts the City in a mathematically impossible position. The City is 70% Hispanic. As demonstrated by the R&R, the Western parts of the City, which are the most compact, have the highest concentrations of Hispanic voters. It is impossible to create three districts that will not have a supermajority of Hispanic residents. Even if one were to intensively racially gerrymander the districts to overcome the existing residential segregations and evenly spread the Hispanic population out to make the supermajority as small as possible, one would still have five 70% Hispanic districts. This would be impermissible by definition because it would use race as the predominant factor without a compelling government interest, something the Equal Protection Clause forbids. DE 52 p.100. And according to Plaintiffs, this would violate the VRA because the City had to create a district where Black residents can elect a candidate of their choice. If one were to draw District 5 with a 48% BVAP—the number proffered by Plaintiffs—the  district would be at most 52% HVAP, and the other four districts necessarily would be greater than 70% HVAP.[6]

District 2 had to shed population. To move population from District 2 to Districts 3 or 4, that population would have to mostly come from Coconut Grove. Plaintiff's pleadings and motion are replete with allegations railing against any division of Coconut Grove, but there is no evidence the City's map drawer made this specific move for predominantly racial reasons. District 2 had one area in the South that adjoined District 4, which was not in Coconut Grove, because it was on

---

[6] Ironically, the VRA Black district would potentially be a majority Hispanic district. For reasons discussed below, this would be problematic and could result in a district that would not perform for Black residents, as the Plaintiffs concede the existence of racially polarized voting.

the Northwest side of US-1 (the Golden Pines area, or Area 16). Areas 16 had an 81.8% HVAP (7,291/8,912). DE 24-6, p.9. Compare this to District 2 before redistricting, which had a 51.9% HVAP, or District 4 which had a 91.6% HVAP . DE 24-31 p.4. The Golden Pines area was the most Hispanic area of District 2, but still less than District 4. It lowered both District 4 and District 2's HVAP as a percentage, but necessarily raised the WVAP in District 2. The R&R argues the WVAP increased slightly in District 2 to find race predominated in the making of District 2. DE 52 p.73. This finding ignores the realities of both the map and the math. Had Area 16 stayed in District 2, it would have been necessary to intensely gerrymander the southern part of the City, ignore the significant boundary of US-1, further break up traditional neighborhoods like Coconut Grove and all for racial reasons.[7]  It is a Catch-22. And it cannot be overstated that District 2 was the only district that needed to shed population. Overall, the racial changes to any of the districts were insignificant. DE 52 p.40. Whether a move changes the racial makeup of a district to concentrate it or dilute it, it should not be presumed to have been made for predominantly racial reasons. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (recognizing the presumption of good faith that attaches to legislative redistricting plans).

The R&R also incorrectly finds that the division of traditional neighborhoods supports the finding that race predominated in the designs of Districts 1, 2, 3, and 4. DE 52 p.75-76. This finding underscores the impossible situation created by the R&R. The division of neighborhoods  for racial

---

[7] When the NAACP entities addressed the Commission, they requested that the City not break up the historic West Grove into two different districts and not dilute the Black vote in District 5. DE 24-14 p.14.  The City honored that request and then got sued for not breaking up Coconut Grove more and for not diluting the Black vote in District 5.

reasons to preserve District 5 is permissible as discussed above. The division of Coconut Grove is also faulted by the R&R as breaking up a traditional neighborhood thus demonstrating race predominated as a factor. Coconut Grove is in District 2, which had to lose population. As the R&R pointed out, District 2 had the highest proportion of white population. To keep the whiter Coconut Grove intact would be to preserve the white population in District 2, which the R&R also said shows that race predominated. DE 52 p.73. If the City cannot keep it together and cannot break it apart, the City cannot draw a map. The same issue applies to Brickell. To keep it together in District 2 preserves District 2's WVAP and demonstrates racial motive, but to break it up divides a traditional neighborhood and does the same.

The R&R also incorrectly found that splitting neighborhoods between the three Hispanic Districts was evidence of racial motive: Silver Bluff and Shenandoah between Districts 3 and 4; Flagami between Districts 1 and 4; and Little Havana among Districts 1, 3 and 4. DE 52 p.75. These divisions did not disenfranchise or dilute any community. They were race neutral in effect. Yet the R&R found that any division of any traditional neighborhood proved the districting was predominantly for racial reasons without regard to whether there was any racial effect.

The R&R found that:

> The shapes of the borders, the racial makeup of the Commission Districts, and the splitting up of neighborhoods, all support a finding that race predominated in the City's design of Districts 1, 2, 3, and 4 and that these districts were drawn in furtherance of the Commission's express goal to preserve the composition of the Commission as having three Hispanic seats, one Black seat, and one Anglo or Anglo-access seat.

DE 52 p.71. The shapes of the borders, the splitting of neighborhoods, and the design of the districts do no such thing. Rather, the R&R's analysis, if adopted by the Court, will create a situation where any map made by the City will be unconstitutional. Once one draws a performing Black district required under the VRA, one will have three supermajority Hispanic districts and a

coastal district with a racial plurality of Hispanic and White voters. No redistricting decision could be made where Plaintiffs or a future plaintiff could not point to a section of the R&R to claim that that decision was impermissible. Conversely, if the R&R's position is these districts are only made impermissible because they were created in the context of the Commissioners' statements, then an identical map would be acceptable as long as it is adopted without the offending racial justification discussion. But taken at face value, the R&R would create a round robin where different constituencies could shoot down every possible combination.

The only issue with District 5 is whether the City gave it an excessively high percentage of Black residents by setting it at a mere 50.3% BVAP. The R&R couched this in evidentiary terms. It does not find that the number was too high. Rather it states that, while the number need not be precise, and while the City has no duty to memorialize the analysis or compile a comprehensive record, and while Mr. de Grandy testified that he performed the analysis, the R&R concluded there was insufficient evidence to support strict scrutiny. DE 52 pp.82-86. The R&R would grant Plaintiff's preliminary injunction and leave the number to be decided, but this should be resolved now. The R&R conceded that the population did not have to be set precisely. DE 52 p.82 (citing *Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 195-96 (2017)). Otherwise governments would be "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause. *Id*. at 196. If Plaintiffs prevail on their number, it effectively sandwiches the City between 50.3% and 48% BVAP. This is the exact danger about which the Supreme Court warned. If they don't prevail, however, it stays at 50.3%. Either way, the injunction should not issue.

The City's plan had BVAP at a mere 50.3%. Plaintiff's expert, Dr. Moy did not opine that Black voters in District 5 need any particular percentage of the voting age citizens to elect the

candidates of their choice. He simply analyzed past races to conclude that there is racially polarized voting. DE 24-32 p.58. For example, the Plaintiffs and the R&R highlight one race discussed by Dr. Moy where he concluded that for the Black preferred candidate to prevail, they would need to be 49% of the registered voters (or 48% of VAP). DE 39 p.8 & DE 52 p.85 (both citing DE 24-32 p.55). He also opined for the Latino candidate to prevail in that race, they would only need to be 44% of the voters. *Id.* In other words, decreasing the percentage of Black voters to 49% by increasing the percentage of Hispanic voters to 44% would cause it to no longer be a district where Black candidates could elect the candidate of their choice, even with 49%. Dr. Moy did not opine that any particular percent was needed. He opined that there was racially polarized voting—a fact not in dispute and compels the conclusion a majority minority district should have been drawn.

To undercut the facial validity of a bare 50%,[8] the R&R observed that the BCVAP is 58%. DE 52 p.85. This line of reasoning is based on a misreading of *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997), in Plaintiffs' briefing. The City is aware of no case that *required* a City, when drawing a district under the VRA, to base it on the *citizen* population.[9] *Negron* stood for the inverse. To prove a dilution case, a plaintiff needed to establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided among districts to dilute their impact. In *Negron*, the Court stated that if a plaintiff claims they have sufficient numbers to create a majority minority district in compliance with the VRA, but there are not enough voting eligible minority residents to allow that minority

---

[8] 50.3% is hardly "uncritical majority-minority district maximization." DE 52 p.86.

[9] Legislatures are not required to draw boundaries by citizenship rather than total population. *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016).

group to elect their desired representative, it is impossible for them to meet the standard. But the opposite is not true. Not all citizens vote, or even can vote. Plaintiffs proffered evidence that only 52.76% (25,307/47,958) of registered voters in District 5 were Black as of February 1, 2023. DE 24-93 p.37. It also ignores the population trend. Black registered voters were down from 56.86% the previous year (26477/45562). DE 24-93 p.35. As laid out in the City's response memorandum, Plaintiffs' own filings show that the Black population in the City of Miami decreased in both relative and absolute terms in each cycle; there were 10% fewer Black residents in the City in 2023 as compared to the previous census. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6). Despite the foregoing, and Mr. de Grandy's testimony about why that trend was occurring due to gentrification—and that he drew the district to perform not just for the next election but the next decade, DE 24-15 2:6-14—the R&R finds that "no analysis grounded in any data was conducted into population trends" and no models were done. DE 52 p.84-85. The trend is a fact, not an opinion. Modelling may play a role to rebut the fact of this demographic trend and argue that, despite it, there would be a reversal. But no one argued that. An actual existing trend need not be modeled. It exists. An expert need not say, "yes, that is a decrease."

The R&R rejected a bare 50% majority as arbitrary. It is not arbitrary. It is mathematically the definition of a majority. In the voting context over 50% wins, under 50% loses.[10]  It is also the threshold required to bring a claim under Section 2 of the VRA. It is a paradox to conclude that a plaintiff must assert that a minority population is sufficiently large and geographically compact to draw a majority minority district to state a valid claim, but it is constitutionally impermissible to

---

[10] While the Commissioners had good reason to be concerned that 50% might not be sufficient for future elections in light of the demographic trends, they set the BVAP at barely over 50% anyway.

draw that same district in the first instance. To argue it is arbitrary, Plaintiffs alleged, and the R&R accepted, that a less than 50% population would vote in coalition with others to allow them to elect a candidate of their choice. This would upend the VRA. *See Bartlett v. Strickland*, 556 U.S. 1, 15 (2009) ("Nothing in § 2 grants special protection to a minority group's right to form political coalitions."). In *Negron*, the Eleventh Circuit found that the Plaintiffs did not establish a claim under the VRA because they did not have 50% Hispanic majority that would be eligible to vote. 113 F.3d at 1563. Plaintiffs are asking this Court to make reversible error. No published case of which the City is aware has ever found that an election district that needed to be created under the VRA nevertheless had to be created at less than 50%.

The R&R concludes at the end "[t]hus, the City should be required to redistrict applying these principles, which does not necessarily lead to the conclusion that the Black voters' influence would be diminished in a revised plan." DE 52 p.99. As the City pointed out, District 5's population is smaller than the surrounding areas. The Black vote is not alleged to be diluted in any other district. The City protected the District by not moving more non-Black residents into it. If it lowers the BVAP percentage by moving more non-Black voters in, it will dilute that vote without a corresponding increase elsewhere. If it moves some Black voters out of District 5 to lower the majority a percent or two, more non-Black residents must move in, and a percent or two in a different district would not give Black voters meaningful influence there. Plaintiffs do not even claim that Black voter influence is diminished elsewhere or could be increased. Despite the R&R's optimism, there is no way to redistrict without diminishing Black voter influence and jeopardizing the slim majority in District 5, other than to leave it as it is.

In summation, the Court concluded that race was the predominant factor in placing a significant number of voters within a particular district. That was permissible regarding District 5.

Regarding the other districts, demographic reality was the most significant factor. It would be impossible to create districts that did not have supermajorities of Hispanics.  The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of a significant number of voters. *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). The redistricting changes themselves did not result in any racial gerrymandering, and the lines of the districts can be shimmied about but they won't significantly change the racial makeup of the districts. The plaintiffs do not contend that any group's vote was diminished anywhere. This is a racial gerrymandering case without a racial gerrymander.

### C.     Plaintiffs Face Threshold Standing Issues.

As set forth in the Motion to Dismiss, and will not be fully restated but which is incorporated here, Plaintiffs assert a shotgun pleading. Racial gerrymandering claims are brought on a district by district basis. Each Plaintiff must have standing to support their individual claim as to each particular district they challenge. The Complaint is full of alleged challenges to districting decisions that are irrelevant, that undermine their claims, or that were done 25 years ago. The R&R finds that their harms were not based on the decisions of 25 years ago but "new harms" from the current plan. DE 52 p.94. As set forth in the City's filings, no one was harmed by any redistricting choice. The R&R also finds they bring a whole map challenge. *Id*. p.59.

"A racial gerrymandering claim, however, applies to the boundaries of *individual districts*. It applies *district-by-district.*" *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) (emphasis added). A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, "assert[s] only a generalized grievance against governmental conduct of which he or she does not approve." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018) (citing

*United States v. Hays*, 515 U.S. 737, 745 (1995)). Plaintiffs who complain of racial gerrymandering in their State cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed "district-by-district." *Id*. (citing *Alabama Legis. Black Caucus*).

The R&R, like the Plaintiffs, matches no particular plaintiff to any particular redistricting decision that affected their particular district. The R&R states that their harm arises from "[w]hen the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" DE 52 p.89 (quoting *Miller*, 515 U.S. at 911–12). The harms flow from "racial sorting." *Id*. (quoting *Bethune-Hill*, 580 U.S. at 187). The City understands why observations at the Commission meetings raised concerns, and does not seek to make light of it. The issue here is that comments on their own are not enough because they are not directly or causally linked to the drawing of any particular line or any decision to place a group of voters within or without a district based on their race. Plaintiffs were not actually racially sorted. No impermissible racial gerrymander occurred, and it is impossible to create districts that will not have substantially the same demographics. Neither the Plaintiffs nor the R&R claim otherwise. Plaintiffs have not made a case they were harmed either by the core districts remaining the same or by any redistricting change.

**D.      The Plaintiffs Unduly Delayed Seeking Preliminary Injunctive Relief.**

The ordinance being challenged was enacted in March, 2022. This case was filed in December 2022, nine months later. Plaintiffs then waited two more months before filing the Motion.  A special election was held on February 27, 2023, and another election is coming on November 7, 2023. DE 26 pp.2, 4. Moreover, the challenge essentially boils down at an attack on decisions not made in March 2022, but made 25 years earlier.

The R&R brushes off the Special Election because it did not involve most of the challenged districts. DE 52 p.96. This is inaccurate. Plaintiffs bring a "whole map challenge." *Id*. p.59. While the special election was for District 2, the redistricting plan shed parcels from District 2, making cascading movements through Districts 1, 3, 4, and 5, thus all were affected if one accepts the reasoning that each move was constitutionally infirm. If the R&R is correct that District 2 was drawn to create a White district (that incidentally elected a Hispanic candidate), then elections have undoubtedly occurred under affected districts. Given the R&R's conclusion that the Organizational Plaintiffs had standing to challenge all Districts (DE 52 p.55), and given that no Individual Plaintiff resides in District 1, the Special Election affected every Plaintiff.

If Plaintiffs are challenging decisions that have been in place for 25 years and simply preserved in 2022, then Plaintiffs as a group are 25 years too late. The R&R's conclusion that 25 years of elections are irrelevant because Plaintiffs are suing for "new harms" is inconsistent with the R&R's findings that the redistricting "preserved the cores" of racially segregated districts. DE 52 pp.4, 77-78. The redistricting itself reduced concentrations of Black and Hispanic residents. The alleged harms have been in place for every election cycle. If anything, the current plan lessens those alleged harms. The R&R observes that not each Plaintiff had standing for all of the 25 years, but that avoids the issue. Engage Miami was founded in 2015. It may not have delayed 25 years, but it did for 7. GRACE, formed in 2019, delayed 3 years, and did not challenge the 2020 or 2021 elections. Even Plaintiff Johnson allowed the 2021 election to go unchallenged. The R&R's rejection that the challenge was "25 years" too late misses the point. Plaintiffs' delay is undeniable.

Further, Plaintiffs admit that the new districts would have to be set by August 1. DE 26 p.36. "[A] party seeking a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). Yet,

Plaintiffs waited nine months after the City passed the redistricting ordinance to file their lawsuit, and an additional two months to seek preliminary injunctive relief. The R&R recognizes this delay was problematic [DE 52 p.95], but concluded that it was justified because, as Plaintiffs "explain in their reply" they needed the time to prepare their case. DE 52 p.95. Plaintiffs put on no evidence other than argument of counsel to justify or excuse the delay. Rather, the R&R implies that the City bore the burden to prove that the delay was "intentional, strategic, or even negligent." That is not the standard. Plaintiffs must show reasonable diligence where there has been delay.[11]

The R&R also finds the *Purcell* principle inapplicable because the next election is not until November.[12] DE 52 p.97,99. The Miami-Dade County Supervisor of Elections requires any new plan be in place by August 1, 2023. If the Court issues an injunction, that deadline will be a mere two months away. DE 52 p.10. Any new plan would have to go through a public hearing process, be adopted by the Commission, face an inevitable challenge,[13] and have to be resolved.

The R&R concedes that the Supreme Court found that issuing an injunction four months

---

[11] Plaintiffs had a year to work on the Injunction; the City had thirty days to respond. Given the timetable, the City had a mere ten calendar days to object to a 101 page R&R (actually less given the late filing of the R&R and the last day being a Saturday), and had to do so before the transcript of the hearing was even prepared. The delay certainly was a strategic benefit to Plaintiffs. The City objects to being forced to object to a 101 page R&R under such a foreshortened schedule.

[12] "*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) teaches that 'federal district courts ordinarily should not enjoin state election laws in the period close to an election.'" DE 52 p.97.

[13] As stated above, in light of the comprehensive R&R faulting every decision regardless of racial effect, a challenge to any plan is essentially guaranteed.

before an election would fit within the *Purcell* principle. Any injunction here would only enjoin using the old plan, it would not put the new plan in place. A new plan in place by August 1 would be barely more than three months before the November 7, 2023 election. Moreover, it is not simply the administration of the election at issue: there are the issues of voter confusion and candidate qualifying that are implicated. The *Purcell* harms of voter confusion and consequent incentive to remain away from the polls are squarely present here. This is particularly true if the end result is a massive change to the Districts rather than a minor change such as the adoption of one of the alternative plans referred to by the R&R. Because the R&R leaves it an open question, it acknowledges that " the consideration of the *Purcell* principle may be required [by] the time at which a final ruling on the Expedited Motion is entered."  DE 52 p.99.

All of this is compounded by Plaintiffs' refusal to propose any specifics other than to repeat they do not have to provide alternative plans to bring a challenge. While they may sit back under some circumstances and take shots at subsequent adopted remedial plans, they cannot do so in one breath, and then say in the next breath they have not unreasonably delayed and that the *Purcell* principle is inapplicable. Because of the foregoing, the City respectfully submits that *Purcell* applies right now. The scheduled election should go forward on the current map, the case should proceed to a January trial on the merits, and the process should not be rushed.

WHEREFORE, the City respectfully objects to the Report and Recommendation (DE 52), and requests this Court deny Defendant Plaintiffs' Expedited Motion for Preliminary Injunction (DE 26).

Respectfully submitted,

By:   *s/ George T. Levesque*

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

GRAYROBINSON, P.A.
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___*s/ George T. Levesque*___
     George T. Levesque