IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

    *Plaintiffs*,

v.

CITY OF MIAMI,

    *Defendant*.

_____/

**PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS
TO REPORT & RECOMMENDATIONS**

Plaintiffs file this Response to the City's Objections (ECF 55–56) to the Report & Recommendations (ECF 52) on Plaintiffs' Expedited Motion for Preliminary Injunction (ECF 26). The Court should adopt the R&R, which is based on sound reasoning and well-supported factual findings. The City's Objections misstate the record, misapply the law, and otherwise fail to disrupt the R&R's appropriate findings and cogent analysis.

**I.   The Court Should Adopt the R&R**

Plaintiffs will not restate prior filings, but note that most of the City's Objections ("Obj.")[1] are adequately addressed by the R&R itself, Plaintiffs' Preliminary Injunction Motion ("Mot."), and Plaintiffs' Reply (ECF 39) in support. To the extent the City incorporates its Motion to Dismiss into its Objections, Plaintiffs incorporate into this filing their Response to the Motion to Dismiss (ECF 37) to rebut the City's shotgun pleading and standing arguments.

**II.   The City's Misstatements of the Record and Attempts to Lead the Court Astray Fail to Undermine the R&R's Sound Reasoning and Factual Findings**

Plaintiffs address just a few other points raised in the City's Objections.

---

[1] Citations to the Objections use ECF pagination.

1

### A. This is a Racial Gerrymandering Case

First, this case is not "unique." *Contra* Obj. 3. Legally, this case is quite ordinary. Plaintiffs seek to enjoin the City from enforcing five City Commission districts that were racially gerrymandered in violation of the Equal Protection Clause. That is to say: each district was drawn with race as the predominant factor, and this use of race was not narrowly tailored to a compelling governmental interest, such that each district is an unconstitutional racial classification. The law of racial gerrymandering is well-settled, and this case fits squarely within it. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017); *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254 (2015); *Easley v. Cromartie*, 532 U.S. 234, 249 (2001); *Shaw v. Hunt*, 517 U.S. 899, 907 (1996); *Miller v. Johnson*, 515 U.S. 900 (1995); *United States v. Hays*, 515 U.S. 737 (1995); *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

No part of the racial gerrymandering claim requires "increas[ing] the concentration of [racial group] residents in any district," or showing racial groups' "vote[s] were diluted."[2] *Contra* Obj. 3, 8, 12, 16. All the racial gerrymandering test asks is (1) was race the predominant factor behind a given district and (2) if so, does the use of race survive strict scrutiny.

---

[2] The R&R considers "the impact of the challenged law" and other factors relating to disparate impact as part of its assessment of the *Arlington Heights* evidentiary factors. Plaintiffs understand the R&R to use the *Arlington Heights* factors as an analytical tool to assist in answering the ultimate question: did race predominant in the design of each district? Because that is the relevant legal question, certain *Arlington Heights* factors are more relevant more than others.

Nonetheless, this racial classification had substantial impacts. Namely, Plaintiffs were sorted into different districts based on their race, with their neighborhoods and communities divided along racial lines as a result.

2

### B. Race Predominated in the Design of Each District

The exhaustive direct and circumstantial evidence in the record points inexorably to one conclusion: "the City designed the Enacted Plan to preserve the Hispanic super-majorities in Districts 1, 3, and 4, and to preserve District 2 as an 'Anglo access' district."[3] R&R 4. The City admits to racial predominance in District 5, for which it set a 50% Black voting-age population (BVAP) quota. *Id.* Evidence of racial predominance in each district is extensive and not limited to one neighborhood or area of the City.[4]

---

[3] Plaintiffs are unsure why the City objects to the "undefined" term "Anglo," which appears 44 times in the Commission meeting transcripts. *See* ECF 24-11 to 24-18. The transcripts make clear commissioners used "Anglo" to refer to non-Hispanic white people, using the term "interchangeably" just like the R&R. Obj. 3 n.2.

The City seems to misinterpret Commissioner Carollo's repeated gibes at Commissioner Russell's mixed-race Japanese American heritage. *See, e.g.*, ECF 24-11 (Tr. 1) at 28:6–9 (Carollo: "I decided that I was gonna put in my political capital and make districts to assure . . . there would be an Anglo. We've got half of one now but we're still good.").

[4] Commissioners continue to insist that their redistricting goals were race-based. CITY OF MIAMI, *May 11, 2023 City Commission Meeting*, https://miamifl.granicus.com/MediaPlayer.php?view_id=1&clip_id=1182 (Díaz de la Portilla at 2:11:00: "We want an African American representation, we wanted non-Hispanic White representation"; Reyes at 2:13:37: "Since Day One when the boundaries were drawn, it was to assure diversity in the City of Miami. And the only way that we can assure diversity in the City of Miami is by—I'm going to call a spade a spade, but—gerrymandering. We have to bunch together ethnicity– ethnic voters in order to be able to

The City argues the Court should ignore commissioners' myriad explicit statements expressing their intent at the time they made the relevant mapping decisions, and instead cabin its review to just the formally adopted resolutions reduced to writing by the City Clerk and approved by the City Attorney. Obj. 3; *see* ECF 50-1 to 50-9. That argument makes sense from the City's perspective—the very first instruction in the very first resolution declares the Commission's "prime directive" to "Comply with the United States Constitution and the Voting Rights Act." ECF 50-1; *see* ECF 24-11 (Tr. 1) at 7:7. But courts do not require plaintiffs to show the government formally adopted a policy of violating the law in order to prevail. Nor does a "We Are Complying with the Law" declaration immunize government action. The better evidence of what the Commission intended is commissioners' statements of their intent at the time they debated and adopted the map.

Finally, while the racial predominance analysis is district-by-district and the record certainly reflects that the design of *each district as a whole* was race-based, Plaintiffs did not somehow "abandon" their argument that the individual areas moved between districts were *also* race-based. *Contra* Obj. 8. Race motivated both the Commission's decision to move individual areas between districts, and its decision to carry forward the race-based cores from the 2013 Plan. All these choices together support racial predominance with respect to each district as a whole.

### C. District 5's Arbitrary 50% BVAP Quota Fails Strict Scrutiny

The Commission's adoption of an uninformed 50% BVAP quota for District 5 was not narrowly tailored to compliance with Section 2 of the Voting Rights Act. The R&R correctly finds that "[t]he City ultimately misapprehends what the VRA required of it; as Plaintiffs note, the City

---

have an Afro American, make sure they are represented, and a non-Hispanic white, representing the City of Miami.")

4

has conflated a numerical 50% BVAP majority with the ability of Black voters to elect preferred candidates." R&R 83.

The City's argument on narrow tailoring rests on a fundamental error: it asserts Plaintiffs propose 48% BVAP as the Black share the VRA requires. Obj. 10, 13–14. This is false. As Plaintiffs explain in their Motion (at 33–35) and Reply (at 8–9), and as the R&R discusses (at 47, 81, 85), Dr. Moy estimated the proportion of *registered voters* needed to elect the Black-preferred candidate in the elections he studied. He estimated that, in the election with the highest level of racially polarized voting, 49% Black registration—corresponding to 48.8% Black *citizen* voting-age population (BCVAP)—would be sufficient to elect the Black-preferred candidate. The Enacted District 5, at 58.2% BCVAP, is nowhere close to this evidence-based number (which is itself a ceiling, on the high end of what may usually be sufficient for Black ability-to-elect).[5]

Nor can the City claim something "special" in 50% simply because it is "mathematically the definition of a majority." Obj. 15. The City continues to conflate the first *Gingles* precondition—what a Section 2 plaintiff must prove is *possible* to draw to establish Section 2 liability—with what the Section 2 *requires as a remedy*: "the ability of Black voters to elect preferred candidates." R&R 83. The City says it had trouble finding published cases where courts have approved maps with VRA-protected districts under 50% BVAP. Obj. 16. Well, such cases abound just within Florida. *See, e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville*

---

[5] Attempting to undermine Plaintiffs' case for a remedial District 5 that lowers the Black share while preserving Black voters' ability to elect preferred candidates, the City posits a version of District 5 that is 49% Black and 44% Hispanic by registration. Obj. 14. Enacted District 5 is 26.6% Hispanic and 12.9% Anglo by registration. ECF 24-93 at 37. It is mathematically hard to imagine the Hispanic share increasing 18 points if the Black share remains at least 49%.

(*Jacksonville III*), 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022) (ordering remedy with two VRA-protected districts of 46.9% and 38.6% BVAP) and Corr. Expert Rep. of Anthony E. Fairfax at 135, (Nov. 22, 2022), ECF 91-1 (table with BVAPs); *In re Senate Joint Resol. 100*, 334 So. 3d 1282, 1289 (Fla. 2022) (concluding five VRA-protected districts of 40.1, 44.3, 46.2, 48.0, and 48.5% BVAP "do not impermissibly dilute minority voting strength"), Pet. App'x at 435, 450 (Feb. 9, 2022) (tables with BVAPs), and Br. of Fla. House at 24 (Feb. 21, 2022) (noting that only 7 of the 18 Florida House districts in which Black voters have a legally pr otected ability to elect preferred candidates are majority-BVAP); *In re Senate Joint Resol. 2G*, 601 So. 2d 543, 546 (Fla. 1992) (finding 45.8%-BVAP district "best suited" to give "black voters [] a reasonable opportunity to elect a candidate of their choice"); *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992) (ordering plan—which "the De Grandy plaintiffs 'generally accept'"—with 45.7%-BVAP district, and finding "the evidence showed that African-Americans will have the opportunity to elect candidates of their choice in that district").

Regardless, *nothing* in the record reflects that the City's 50% BVAP quota was supported by the requisite "strong basis in evidence"—no "functional analysis of the electoral behavior within the particular election district," no "determin[ation] [of] what minority population percentage will satisfy [the VRA's] standard." *Bethune-Hill*, 580 U.S. at 194 (quoting *ALBC I*, 575 U.S. at 278). The City points to "population trends," but the R&R correctly finds De Grandy's assessment of whether past population trends will continue, and by how much, failed to support a 50% target—which in any event was contradicted by De Grandy's own advice that lower BVAPs would comply with the VRA. R&R 48–50, 82–86.

Further, in support of its "trends" argument, the City asserts District 5's Black registration dropped from 56.86% to 52.76% in a single year. Obj. 15. This is false. 56.86% is the Black

6

registration of the *pre-redistricting* configuration of District 5, under the 2013 Plan. ECF 24-92 at 35 (dated Feb. 1, 2022). The City's "trends" analysis compares two different geographic areas of the City (the 2013 District 5 and the 2022 Enacted District 5).

### D. Any Delay Is Part of Balancing the Equities, Which Tip Firmly for Plaintiffs

The R&R correctly weighs the "immense" irreparable harm Plaintiffs and the public will suffer if elections proceed under unconstitutional districts against other equitable factors, finding the equities balance in Plaintiffs' favor and an injunction is in the public interest. R&R 92–100; *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), 2022 WL 16754389, at *5 (11th Cir. Nov. 7, 2022). Any delay in the litigation timeline fails to disrupt this balance.

The R&R correctly notes Plaintiffs challenge new harms in a new enactment. R&R 94. Historical evidence that the inherited district cores were also raced-based is relevant to whether *this* Commission's decision to carry forward (and exacerbate) those cores was itself race-based.[6] *Jacksonville II*, 2022 WL 16754389, at *3. The City's insistence that Plaintiffs should have challenged the 1997, 2003, or 2013 Plans ignores the crucial fact that racial predominance *now*

---

[6] The City objects to the R&R's citations to "post-enactment statements of prior intent of Commissioner Carollo—who was mayor, not a commissioner at the time" the 1997 Plan was adopted. In fact, Carollo *was* a member of the City Commission at the time, under the City's then-existing commission-manager structure. In that role, he actively participated in both proposing the single-member district system and the 1997 Plan. *See generally* ECF 24-44 to 24-63. Voters adopted the current strong-mayor system in the very same election they approved single-member districts. ECF 24-63 (9/5/97 Viglucci Article).

Further, the R&R correctly gives weight to commissioners' statements on historical events as relevant to their *present* intent in drawing the Enacted Plan. R&R 65–66.

must be justified by narrow tailoring *now*.

Further, the City's assertion that GRACE and Plaintiff Johnson should have filed suit in 2019[7] and 2021,[8] respectively, neglects that laches bars late-in-decade redistricting suits, when the next census is around the corner. *See, e.g.*, *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (three-judge court), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000) (mem.) ("[I]f the Court were to impose redistricting [in 1999] before the 2000 census, such redistricting would necessarily be based on 1990 census figures. Such old census figures have been recognized as unduly prejudicial . . . .").[9]

In any event, this litigation came as no surprise to the City. The City was put on notice when it received the two ACLU letters in February and March 2022. ECF 24-28 at 2; ECF 24-29 at 2 (both raising "equal protection concerns"). Even before then on February 10, 2022, Carollo predicted, "we're gonna be sued." ECF 24-15 (Tr. 4B) at 42:1; *cf. League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 438 (Fla. 2015) ("Litigation over their plans was 'a moral certainty,' as their lawyers put it earlier in this case . . . ."); *see also* ECF 24-16 (Tr. 5A) at 39:21–40:5 (De

---

[7] The City faults GRACE for not challenging "the 2020 or 2021 elections." Obj. 19. There were no City Commission elections in 2020. *Election Results Archive*, MIAMI-DADE CNTY. ELECTIONS DEP'T, https://www.miamidade.gov/global/elections/election-results-archive.page.

[8] 2021 is the year before Plaintiffs sued.

[9] As for the District 2 special election, Plaintiffs stand by their arguments in footnote 7 of their Reply (ECF 39). The special election for just one of five districts could not have been anticipated until the Commission failed to fill the vacancy by appointment on January 8, 2023. District 2 is up again in November. *See Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 2022 WL 7089087, at *50 n.68 (M.D. Fla. Oct. 12, 2022).

8

Grandy recounting involvement in numerous redistricting litigation); R&R 50 (De Grandy invoking attorney-client privilege for conversations with commissioners occurring nearly a year, or more, before litigation was filed). The City had ample notice of potential litigation and ample time to prepare for it.

Finally, the R&R correctly notes that the City did *not* argue any delay was "intentional, strategic, or even negligent." R&R 95 (quoting *Jacksonville I*, 2022 WL 7089087, at *52). But now, the City tries to assert Plaintiffs finagled a strategic advantage from the litigation timeline. Far from it. Any delay makes Plaintiffs' ability to secure an injunction *harder*. Considering that "the record is large, [] Plaintiffs' evidentiary burden is high," and their "harms will not be fully realized until the November 2023 election," Plaintiffs have demonstrated reasonable diligence in prosecuting this case. R&R 95, 97. Indeed, Plaintiffs sought preliminary relief in a "sweet spot" "close enough to the election that Plaintiffs' irreparable harm would be imminent, but possibly not too close in time to November 2023 to implicate the *Purcell* principle." *Id.* 97. Regardless, any delay is just one factor to be weighed, and the equities balance firmly in Plaintiffs' favor.

### E.  *Purcell* Does Not Apply to this Case

The City waived arguments based on *Purcell v. Gonzalez*, 549 U.S. 1 (2006). R&R 99. Regardless, *Purcell* is inapplicable for the reasons explained in the R&R (at 97) and in Plaintiffs' Reply (at 15–16). There is ample time to have a new map in place following an injunction. August 1 is the date by which the County Elections Department needs a new map. This date-certain renders *Purcell* inapplicable. Reply 16 (citing *Jacksonville II*, 2022 WL 16754389, at *2 and *Rose v. Raffensperger*, 143 S. Ct. 58 (2022) (mem.)).

The City tries to confuse the Court by reinventing *Purcell*'s prohibition on changing rules too close to an election into a prohibition on changing election rules too close to *August 1*. That is

9

simply not how *Purcell* works. If the City had not waived *Purcell* arguments and had the Elections Department not given a date-certain by which it needs a new map, the *Purcell* clock would run from the date of this Court's negative injunction. A ruling by May 23 or shortly thereafter would obviate any possible *Purcell* issues given recent Supreme Court and Eleventh Circuit caselaw. *See* Mot. 36; Reply 14.

### F. Questions of Remedy are Premature and, in Any Event, Plaintiffs Will Propose Remedial Plans Promptly After an Injunction

The City predicts Plaintiffs will inevitably challenge their redrawn map, and argues that their prognostication somehow undermines Plaintiffs' entitlement to an injunction. Obj. 20. Should an injunction issue, Plaintiffs intend to work with the City and commissioners in good faith to adopt a new, constitutional map. Plaintiffs earnestly hope the City intends to do the same.

Far from being "impossible," Obj. 10, complying with the Constitution is quite easy. De Grandy himself advised commissioners they could emphasize different priorities than maintaining the cores of the existing race-based districts. R&R 49. The City chose not to explore different types of maps that prioritized serving neighborhoods and drawing compact districts, *id.*, and now throws up its hands. This is not a reason to deny Plaintiffs' Motion.

In response to the City's suggestion that perhaps the Enacted Plan "will pass muster if it is adopted without looking at race," such an ostensible "race-blind" approach that coincidentally stumbles into an eerily similar configuration as the Enacted Plan would fail to provide a "full and adequate remedy" to the race-based sorting of voters. *United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); *Jacksonville III*, 2022 WL 17751416, at *14 ("[T]he race-blind criterion alone does not immunize the districts in the Remedial Plan from further review nor does it necessarily remedy the constitutional violation."); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 424 (M.D.N.C. 2018), *aff'd in part, rev'd in part*, 138 S. Ct. 2548.

Relatedly, as Plaintiffs' counsel noted during the May 11, 2023 status conference, Plaintiffs are prepared to propose one or more potential remedial maps to the Commission very shortly after a ruling granting an injunction. Plaintiffs hope such proposals spark productive dialogue with the City and yield an agreed-upon map that remedies all the constitutional defects the Court identifies in an order granting an injunction.

### III. Conclusion

Far from being the product of a Court "who probably knows nothing about our city," *May 11, 2023 City Commission Meeting*, at 2:12:10 (comments of Commissioner Díaz de la Portilla), the R&R thoroughly reviews the record, makes well-supported factual findings, and properly applies the law. The Court should adopt the R&R and grant Plaintiffs' Motion.

Respectfully submitted this 18th day of May, 2023,

/s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc**.
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc**.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
Jocelyn Kirsch*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com
jocelyn.kirsch@dechert.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*