**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      Plaintiffs,

v.

CITY OF MIAMI,

      Defendant.

_____/

**<u>ORDER</u>**

THIS CAUSE came before the Court upon the Report and Recommendation of the Honorable Lauren F. Louis, United States Magistrate Judge ("R&R") (ECF No. 52).  Therein, Magistrate Judge Louis recommends that the Court grant Plaintiffs' Expedited Motion for Preliminary Injunction ("Motion" or "Mot.") (ECF No. 26).[1]  *See generally* R&R.  Defendant City of Miami ("City" or "Defendant") filed objections to the R&R ("Obj.") (ECF No. 55), Plaintiffs filed a response ("Resp.") (ECF No. 57), and Defendant filed a reply ("Reply") (ECF No. 59).  As set forth below, the Court ADOPTS the Report and Recommendation.

**I.      BACKGROUND**

The factual circumstances of this case have been discussed at length, both in the Parties' briefings and in the R&R.  Therefore, for the purposes of this Order, the Court presumes that the Parties are familiar with the relevant background and adopts the facts as set forth in the R&R.

---

[1] Plaintiffs in this Action are Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras Steven Miro, ("Individual Plaintiffs"), and GRACE, Inc., Engage Miami, Inc., South Dade Branch of the NAACP and Miami-Dade Branch of the NAACP ("Organizational Plaintiffs") (collectively, "Plaintiffs").

## II.     PROCEDURAL HISTORY

Plaintiffs bring this Action alleging that Defendant approved a new redistricting plan (the "Enacted Plan") for the five electoral districts in the City of Miami which resulted in a racial gerrymander, thereby violating the Equal Protection Clause of the Fourteenth Amendment.  *See* (ECF No. 23 ¶¶ 358–64) ("Am. Compl." or "Amended Complaint").  After initiating this Action, Plaintiffs filed the Motion requesting that the Court enjoin Defendant from conducting the election in November 2023 under the Enacted Plan.  *See generally* Mot.  The Court referred the Motion to Magistrate Judge Louis for an R&R, *see* (ECF No. 27), who in turn recommended that the Court grant the injunction.  *See generally* R&R.

## III.     LEGAL STANDARD

The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The Court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b)(3).  A *de novo* review is therefore required if a party files "a proper, specific objection" to a factual finding contained in the report.  *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).  "It is critical that the objection be sufficiently specific and not a general objection to the report" to warrant *de novo* review.  *Id.*

However, a party's objections are improper if they expand upon and reframe arguments already made and considered by the magistrate judge, or simply disagree with the magistrate judge's conclusions.  *See Melillo v. United States*, No. 17-CV-80489, 2018 WL 4258355, at *1 (S.D. Fla. Sept. 6, 2018); *see also Marlite, Inc. v. Eckenrod*, No. 10-23641-CIV, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) ("It is improper for an objecting party to . . . submit [ ] papers to a district court which are nothing more than a rehashing of the same arguments and

2

positions taken in the original papers submitted to the Magistrate Judge.  Clearly, parties are not

to be afforded a 'second bite at the apple' when they file objections to a R & R.") (quoting

*Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y.

1992))).

When the objecting party has improperly objected, or failed to object, to the magistrate

judge's findings, "the court need only satisfy itself that there is no clear error on the face of the

record in order to accept the recommendation."  Fed. R. Civ. P. 72(b) advisory committee's note

to 1983 addition; *see Lopez v. Berryhill*, No. 1:17-CV-24263, 2019 WL 2254704, at *2 (S.D. Fla.

Feb. 26, 2019) (stating that a district judge must "evaluate portions of the R & R not objected to

under a clearly erroneous standard of review").

## IV.    DISCUSSION

As set forth in the R&R, Magistrate Judge Louis recommended that the Court grant

Plaintiffs' Expedited Motion for Preliminary Injunction.  *See generally* R&R.  In doing so,

Magistrate Judge Louis found that Plaintiffs collectively had standing, met each of the Eleventh

Circuit's prerequisites for the granting of a preliminary injunction, and that the potential grant of

an injunction by Plaintiffs' requested May 23, 2023 deadline would not occur too close to an

election period such that a remedy would be impracticable.  *See generally id.*  Defendant's

Objections consisted of both generalized grievances with the R&R's conclusions, as well as

proper, specific objections to the R&R's findings.  *See generally* Obj.  Where the objections are

proper, the Court reviews the R&R's findings *de novo*.  *Macort*, 208 F. App'x at 784.  Where

Defendant makes an improper objection or raises no objection at all, the Court reviews the R&R

for clear error.  *Lopez*, 2019 WL 2254704, at * 2.

The Court's analysis below mirrors the structure of the R&R and proceeds in two parts. The Court first addresses whether Plaintiffs have standing to bring the instant Action. Next, the Court analyzes whether Plaintiffs have properly demonstrated that a preliminary injunction should be granted. In doing so, the Court specifically considers the findings of fact and law in the R&R, Defendant's Objections, Plaintiffs' Response to Defendant's Objections, and the record as a whole.

### A.  Standing

The R&R found that the Individual and Organizational Plaintiffs have standing to bring the instant Action. *See* R&R at 52–56. An individual who resides in a racially gerrymandered district "has standing to challenge the legislature's action" in that specific district. *United States v. Hays*, 515 U.S. 737, 745 (1995). The R&R found that the Individual Plaintiffs satisfied this standard because the Individual Plaintiffs each "submitted signed declarations supporting their averments that they reside in the challenged districts" and that Defendant produced no evidence to the contrary. R&R at 55–56. Regarding the Organizational Plaintiffs, standing exists when: (1) the interests at stake are germane to the organization's purpose; (2) the claim does not require the participation of individual members in the lawsuit, and (3) its members would otherwise have standing to bring suit. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Here, the R&R found that the unrefuted evidence demonstrates the Organizational Plaintiffs satisfied the requirements for standing. *See* R&R at 52–56; *see also* Am. Compl. ¶¶ 19–29 (noting that the Organizational Plaintiffs have members residing in each challenged district); (ECF No. 24-33); (ECF No. 24-34); (ECF No. 24-35); (ECF No. 24-36) (explaining the interests of each Organizational Plaintiff as relevant to the instant Action).

After carefully evaluating the R&R's findings, the Court agrees that Plaintiffs have standing to bring this Action. The record demonstrates that Plaintiffs reside in each challenged

district.  Further, as the R&R correctly identified, each Organizational Plaintiff attested to having members residing in each challenged district, and that the interests at stake in the instant Action were germane to the organization's purpose.  *See* R&R at 55 n.20.  Thus, the Court agrees with the R&R and finds that both the Individual and Organizational Plaintiffs satisfy the standing requirements to bring this Action.

Defendant raises three objections to this conclusion: (1) Plaintiffs assert a shotgun pleading; (2) Plaintiffs failed to demonstrate a link between any specific plaintiff and any specific districting decision; and (3) Plaintiffs have not suffered any harm.  *See* Obj. at 16–17.  The Court finds that the objections are properly pled and reviews them *de novo*.  For the following reasons, the Court finds each objection unavailing.

First, Defendant objects to the R&R's conclusion that Plaintiffs have standing because according to Defendant, Plaintiffs assert a shotgun pleading.  *Id.*  This argument has no bearing on the question of standing.  A shotgun pleading analysis is relevant to a determination of whether Plaintiffs have complied with the procedural requirements to give Defendant adequate notice of the claims against it, not whether the Court has power to adjudicate the dispute.  *See Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015) (explaining that a shotgun pleading involves the violation of Federal Rule of Civil Procedure 8(a)(2) or 10(b)).  Accordingly, the Court finds that this objection is irrelevant to the R&R's standing analysis.  Even so, the Court holds that the Amended Complaint is not a shotgun pleading because Plaintiffs assert a single cause of action, against one Defendant, with each factual allegation in the Amended Complaint supporting Plaintiffs' claim that the Defendant's redistricting process resulted in a racial gerrymander.  *See generally* Am. Compl.  The Amended Complaint surely "give[s] the defendant[] adequate notice of the claims against [it] and the grounds upon which [the] claim rests."  *Vibe*

*Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018) (internal quotations omitted). As such, Defendant's objection is overruled.

Next, Defendant argues that Magistrate Judge Louis erred because the R&R found that Plaintiffs bring a "whole map challenge," and the R&R failed to "match[] [any] particular plaintiff to any particular redistricting decision that affected their particular district." Obj. at 17. Both of Defendant's assertions are factually untrue. First, the R&R did not characterize the Action as a "whole map challenge," but rather stated that "the Court must decide whether race was the predominate factor that the City considered" and that this decision "must be made as to each Commission District, district-by-district, and not as to the [E]nacted [P]lan as a whole."[2] R&R at 56–57. The R&R did just that, identifying specific Plaintiffs who reside in each district and finding that each district was impacted by the redistricting decisions. *See id.* at 55–56. On these facts, the Court rejects this objection.

Finally, Defendant argues that the R&R incorrectly found Plaintiffs had standing because "Plaintiffs have not made a case they were harmed." Obj. at 17. As discussed later, a plaintiff suffers harm when the legislature racially gerrymanders its citizens because such assignment arises from the assumption that voters of a particular race, "think alike, share the same political interests, and will prefer the same candidate at the polls."[3] *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (internal quotations omitted). Here, the Court finds that a racial gerrymander did occur.

---

[2] Defendant mistakes the R&R's analysis with its own. Defendant cites to the following quote to support its argument that the R&R found that Plaintiffs bring a whole map challenge: "[t]hat Plaintiffs in essence bring a 'whole map challenge,' *as the City argued* at the March 29, 2023 hearing, does not preclude the instant Action. No Supreme Court precedent the Court is aware of forbids Plaintiffs from challenging all five of the Commission Districts." R&R at 59 (emphasis added). Defendant improperly cites to the R&R's restatement of Defendant's position on the issue, not the R&R's overall conclusion on the matter. And the R&R plainly found that Plaintiffs bring a district-by-district challenge. *See id.* at 55–56.
[3] *See* Section IV.B, *infra.*

Therefore, the Court finds that Plaintiffs, citizens of the City, were harmed when the City racially gerrymandered its districts. Accordingly, the Court rejects Defendant's objection.

Having dispensed with Defendant's objections to standing, the Court next proceeds to the merits of Defendant's arguments as to the preliminary injunction.

### B. Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65(a), the Court may enter a preliminary injunction "to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990) (quoting *Am. Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 483 F.2d 1, 4 (5th Cir. 1973)). Before a court grants a preliminary injunction, the plaintiff must establish four conditions: (1) a substantial likelihood of success on the merits; (2) a showing that the plaintiff will suffer irreparable injury if an injunction does not issue; (3) proof that the threatened injury to plaintiff outweighs any harm that might result to the defendant; and (4) a showing that the public interest will not be disserved by the granting of a preliminary injunction. *See id.* at 1284–85 (citing *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir. 1987)). The "[f]ailure to show any of the four factors is fatal" to a motion for a preliminary injunction. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Where the government is the opposing party, "[t]he third and fourth factors merge" in the preliminary injunction analysis. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (internal quotations omitted).

Finding that Plaintiffs satisfied their burden as to each of the four factors, the R&R recommended that the Court grant the Expedited Motion for Preliminary Injunction. *See generally* R&R. Defendant offers multiple objections. *See generally* Obj. The Court summarizes the R&R's

findings, analyzes each factor necessary to grant a preliminary injunction, and considers Defendant's objections in turn.

> i.   *Substantial Likelihood of Success on the Merits*

Plaintiffs bring this Action alleging each of the five Commission Districts were drawn in violation of the Fourteenth Amendment's Equal Protection Clause. *See* Am. Compl. ¶¶ 358–64. Specifically, Plaintiffs allege that the City impermissibly racially gerrymandered the districts. *See id*. Under the Fourteenth Amendment, "[w]hen a voter sues state officials for drawing such race-based lines," the court undertakes "a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). First, Plaintiffs must first prove that "race was the predominate factor motivating the legislature's decision to place a significant number of voters within or without a district." *Miller*, 515 U.S. at 916. Next, should Plaintiffs succeed, Defendant must demonstrate that its sorting of voters by race withstands strict scrutiny, that is, Defendant must show that the race-based sorting of citizens constitutes a compelling interest that is narrowly tailored to that end. *See Cooper*, 581 U.S. at 292 (citing *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 193 (2017)).

> a.   *Whether Race was the Predominate Factor*

When considering whether race was the predominant factor considered in the drawing of the districts, the Court considers each gerrymandering claim on a "district-by-district basis." *Bethune-Hill*, 580 U.S. at 191; *see also Ala. Legis. Black Caucus v. Ala.* ("*ALBC*")*,* 575 U.S. 254, 262 (2015). Plaintiffs must show that in each challenged district, Defendant "'subordinated traditional race-neutral districting principles' . . . to racial considerations." *Miller*, 515 U.S. at 916; *see also Cooper,* 581 U.S. at 291. To prove racial predominance, Plaintiffs can submit direct evidence of legislative intent and circumstantial evidence of a challenged district's shape and demographics. *See Bethune-Hill*, 580 U.S. at 187; *Cooper*, 581 U.S. at 291. Nevertheless, a court

must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race" because of the "intrusive potential of judicial intervention into the legislative realm." *Miller*, 515 U.S. at 916. Though "race-based decisionmaking is inherently suspect," the good faith of the Commissioners "must be presumed." *Id.* at 915.

The R&R found that "Plaintiffs are substantially likely to prevail in establishing that race was the predominant factor considered in the drawing of each of the five Commission Districts." R&R at 59. The Court addresses the R&R's findings as to each individual district.

At the outset, the Court notes that neither Party objects to the R&R's finding that "race was the predominant factor considered in the design of District 5" because Defendant attempted to design this district to comply with the Voting Rights Act ("VRA"). *Id.* at 60; *see also* Obj. at 15 ("The Court concluded that race was the predominant factor in placing a significant number of voters within a particular district. That was permissible regarding District 5."). Accordingly, the Court reviews this finding for clear error. *Lopez*, 2019 WL 2254704, at * 2. Here, the R&R analyzed Defendant's argument that "Section 2 of the VRA required the City to draw the borders of District 5 such that it has a BVAP of more than 50%," and further, Defendant's concession that District 5 must withstand strict scrutiny, to conclude that Defendant itself recognized race was the predominant factor considered. R&R at 60. Finding no clear error in this analysis, the Court adopts the R&R's findings that race predominated in the drawing of District 5.

As to Districts 1–4, the R&R found that race predominated in the design of each of the remaining districts through a review of direct evidence of legislative intent and the weighing of circumstantial evidence. *See id.* at 60–78. In support of this finding, the R&R thoroughly catalogued multiple occasions where a majority of Commissioners expressed their intent on the

public record that District 2 would be an "Anglo district," Districts 1, 3, and 4 would be "Hispanic districts," and District 5 would be a "Black district." *See id.* at 65–71.

Regarding Districts 1–4, the Court agrees that it "need not look much beyond what a majority of the Commissioners expressly stated on the record at public meetings regarding their understanding of historical redistricting cycles and their goal for the 2022 redistricting process resulting in the Enacted Plan." *Id.* at 64. When the record is replete with evidence that legislators instructed a mapmaker to draw districts to comport with a "purposefully established [] racial target," as is the case here, the Court may properly conclude that race predominated. *See Cooper*, 581 U.S. at 300–01 (holding that when legislators instructed the mapmaker to draw districts so that a particular district would be "a majority black district," and the mapmaker followed such instructions, that this evidence showed the announced racial target "subordinated other districting criteria"); *see Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville II*"), No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) ("relevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes").

As the R&R meticulously catalogued, multiple Commissioners over the course of six meetings expressed their desire that Districts 1, 3, and 4 remain "Hispanic districts," and that District 2 remain an "Anglo district."[4] *See, e.g.*, (ECF No. 24-14) (Tr. Feb. 25 AM at 60:17–61:22) (Carollo stated: "[w]e, yes, gerrymandered District 2, so that someone that would be of an Anglo

---

[4] The R&R thoroughly catalogued statements demonstrating this intent. *See, e.g.*, R&R at 65 (citing (Tr. Nov. 18 at 15:22–16:22); (Tr. Nov. 18 at 28:2–29:3); (Tr. Dec. 9 at 14:5–14); (Tr. Dec. 9 at 24:8–10); (Tr. Feb. 7 at 50–51); (Tr.Feb. 7 at 54:5–15); (Tr. Feb. 7 at 67:19–68:9); (Tr. Mar. 11 PM at 8:8–21); (Tr. Mar. 24 at 56:12–57:1); (Tr. Mar. 24 at 38:23–39:20)). The Court adopts these facts as stated in the R&R. For a more elaborate discussion of the Commissioners expressing their goals with respect the redistricting plan, see R&R at 11–40, 65–71.

background, not Hispanic, would be elected"); (ECF No. 24-17) (Tr. Mar. 11 PM at 8:8–21)
(Commissioner Díaz de la Portilla stated: "[o]ur goal here is to have an African American district,
for the lack of a better term, a white district, which is the coastal district, and three Hispanic
districts"). The Commissioners instructed De Grandy, the consultant charged with proposing the
redistricted map, to adhere to their redistricting goals to preserve the racial makeup of these
districts, and De Grandy explained that he followed these instructions.[5] *See* (ECF No. 24-12) (Tr.
Dec. 9 at 24:8–10). Speaking to the other Commissioners and De Grandy, Commissioner Carollo
stated; "[t]his is what I feel that I have an obligation to protect. Not just [District 5]. District 4,
and District 1. The other districts, like I said, no matter how we carve them, they're going to have
the representation that we intended those districts to have for some time to come."); *see also* (ECF
No. 24-11) (Tr. Nov. 18 at 17:9–15) (De Grandy stated: "[i]f there's three of you [Commissioners]
that want to maintain the core of existing districts, that's what I do."). Accordingly, the Court
considers the repeated, explicit statements from the majority of Commissioners in conjunction
with De Grandy's admission that he followed such instructions, and that the Enacted Plan largely
preserved this racial breakdown, to be sufficient in finding that Districts 1–4 were also drawn with
race as the predominate factor.

     Defendant proffers multiple objections, proper and improper, to these findings. *See*
*generally* Obj. Specifically, Defendant objects to the following findings in the R&R:

(1) The R&R improperly focused on the Commissioners' statements that the districts were
drawn to create a Black district, three Hispanic districts, and a so-called White district,
when the city provided Mr. De Grandy with instructions adopted in Resolution R-21-
0485 that did not incorporate such statements;

---

[5] Miguel De Grandy, Esq. was Defendant's redistricting consultant during the 2022 redistricting
process.

(2) The R&R improperly found that Plaintiffs' expert attested that there were alternative maps that would have had less of a discriminatory impact;

(3) The R&R recommended a remedial plan with new district lines, but any such plan would closely resemble the existing plan, or alternatively, a new, constitutionally conforming map could not be created under the R&R's guidance;

(4) The R&R made no distinction between districting choices made regarding areas abutting District 5 and other areas unrelated to District 5;

(5) The changes to Districts 1–4 were not racial, but were intended to equalize population;

(6) The R&R impermissibly relied on post-enactment statements from Commissioner Carollo to determine legislative intent;

(7) The R&R impermissibly relied on the personal understanding of various Commissioners about the history of the how the districts were designed;

(8) The R&R incorrectly found the division of traditional neighborhoods, shape of the borders, and designs of the districts support a finding that the consideration of race was a predominate factor.

*See generally id.* As discussed below, the Court finds that each of these objects are unavailing, irrelevant to the analysis, or improper.

Regarding Defendant's first objection, the Court does not find that the R&R erred by reviewing "what a majority of Commissioners expressly stated on the record at public meetings." R&R at 64. To prove that districting decisions were made with race as the predominant factor, a plaintiff is entitled to use direct evidence of legislative intent. *Cooper* 581 U.S. at 291 ("The plaintiff may make the required showing through direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both.") (internal quotations omitted). Here, the record is replete with evidence suggesting the Commissioners intended that the districts be drawn in a particular manner to ensure candidates of certain ethnicities would be elected. *See* R&R at 64–71. And, while it is true that Defendant instructed its consultant to comply with the United States Constitution and VRA, maintain the core of existing districts,

consider voter cohesion, achieve substantial equality of population as opposed to mathematical equality, and maintain communities of interest and neighborhood where feasible in Resolution R-21-0485, *see* (ECF No. 50-1), the R&R correctly noted that the Commissioners frequently and explicitly emphasized over the course of six public meetings their intention to maintain three Hispanic districts, one Black district, and one Anglo district. *See* R&R at 64–71. Therefore, the R&R did not err in relying on the Commissioners' repeated instructions to De Grandy to preserve the "ethnic integrity" of each district, even if those instructions were not contained in the resolution itself. *See id.* at 68–69.

Defendant's second objection takes issue with one particular aspect of circumstantial evidence that the R&R considered: namely, the R&R's finding that Plaintiffs' expert opined there were alternative rejected maps that would have had less of a discriminatory impact than the Enacted Plan.[6] *See* Obj. at 3. Specifically, Defendant argues that Plaintiffs' expert, Dr. Abott, only "lays out the demographics of these alternative plans, demonstrating they are essentially the same [as the Enacted Plan]." *Id.* Yet, Defendant's argument is factually incorrect because it mischaracterizes Dr. Abott's report. Dr. Abott opined that the current districts' configurations were discriminatory because "areas moved from one district to another were done so on the basis of race and that other areas could have been moved without further segregating the districts by race but were rejected by the Commission." (ECF No. 24–31, at 2). As the R&R also found, Defendant "does not respond or rebut this evidence." R&R at 77. Because Defendant failed to rebut the evidence that these alternative maps could have had less of a discriminatory impact, the

---

[6] Defendant's objection on this point purports to undermine the R&R's conclusion regarding one of the eight factors to determine circumstantial evidence of legislative intent articulated in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

R&R found this evidence "weighs slightly in favor of finding race predominated." *Id.* Given that Defendant incorrectly characterizes the R&R and Plaintiffs' expert report, the Court rejects this objection. Rather, the Court finds that the R&R did not err in its consideration of the expert report on less discriminatory alternative map configurations as circumstantial evidence that race predominated.

Defendant also improperly objects to the overall conclusion of the R&R by asserting that should the R&R be adopted, a new map "will pass muster [either] if it is adopted without looking at race, even if is the same map, or [] no map can pass muster." Obj. at 4. Additionally, Defendant argues that as a practical matter, new districts cannot be created without creating "supermajorities of Hispanics," and that Defendant is in a "mathematically impossible position." *See id.* at 4, 9, 14. To the extent Defendant objects to the R&R as a whole, the objection is improper because Defendant does not identify the "portions of the proposed findings and recommendation" which it claims to be erroneous. *See Macort*, 208 F. App'x at 783. Further, any practical argument is misplaced and premature at this point in the litigation; the inquiry here focuses solely on if Plaintiffs are substantially likely to succeed on the merits and whether an injunction should be granted. The Court therefore rejects this objection.

Likewise, the Court also considers improper Defendant's objection that the changes to Districts 1–4 "were not racial, but were intended to equalize population." Obj. at 8. To reiterate, objections must "specifically identify the portions of a proposed finding" to which objection is made. *Macort*, 208 F. App'x at 783. Here, Defendant has not identified any specific factual finding it disputes, but rather, objects generally to the R&R's analysis of each district and its conclusion regarding racial predominance in each of Districts 1–4. *See* Obj. at 8. This objection is thus improper.

Defendant also objects to the R&R's findings of racial predominance insofar as it allegedly fails to make a "distinction between districting choices made regarding areas abutting District 5 and other areas unrelated to District 5." *See id.* at 5. According to Defendant, the R&R fails here by erroneously "focus[ing] primarily on areas surrounding District 5 where [race-based sorting] indisputably serves a compelling government interest." *Id.* Not so. The R&R properly and thoroughly conducted a district-by-district analysis examining factors relevant to each district on an individualized basis. *See* R&R at 60–78. Defendant cites to no authority suggesting the Court is required to consider the portions of the other districts abutting District 5 differently from the other areas within those districts, nor is the Court aware of any such requirement. Obj. at 5; *see also Bethune-Hill*, 580 U.S. at 192 ("Concentrating on particular portions [of district lines] in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target."). Thus, the Court overrules this objection.

The Court next addresses Defendant's objection that the R&R improperly relied on Commissioner Carollo's statements about the history of why the City originally adopted a five-district electoral map with one "Black district," one "Anglo district," and three "Hispanic districts" as circumstantial evidence of legislative intent in the 2022 redistricting cycle.[7] *See* Obj. at 8. Defendant argues that the R&R cannot rely on statements that Carollo made when he was Mayor about why the City originally designed the districts in this manner. *Id.* (citing *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 132 (1974)) (explaining that generally, a court cannot rely on post-enactment statements of a legislator to determine legislative intent).

---

[7] Commissioner Carollo recounted this decision which occurred in 1997, when he was mayor. *See* (ECF No. 24-1) (Tr. Nov. 18 at 28:2–12).

However, that is not what the R&R does.  Rather, the R&R considered Commissioners' statements regarding the history of the City's change to a single-member district system only insofar as it informed the Commissioners' present intent to preserve the racial breakdown of the districts *in this 2022 redistricting process*.  *See* R&R at 65 ("But the Court need not delve into that historical evidence in this case because the Court need not draw inferences from that historical evidence.").  The R&R's consideration of the Commissioners' statements in this context is permissible, even if the Commissioners based their current intent on their understanding of the historic evidence.  *Cf. Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville I*"), --- F. Supp. 3d ---, No. 3:22-CV-493-MMH-LLL, 2022 WL 7089087, at *41 (M.D. Fla. Oct 12, 2022), (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2315 (2018)) ("[T]he Court considers the 2011 historical evidence only to the extent it gives rise to inferences regarding the intent of the City Council in 2022.").  Instead of relying on Commissioner Carollo's description of why the City originally changed to single-member districts to determine legislative intent, the R&R instead focused on the myriad of statements from multiple Commissioners explaining that they desired to preserve three Hispanic districts, one Black district, and one Anglo district in the *2022 redistricting process*.  *See* R&R at 11–40, 65–71.  Therefore, the Court finds that contrary to Defendant's assertions, the R&R did not improperly rely on Commissioner Carollo's understanding of the history of the electoral districts, but rather, the R&R properly analyzed the *contemporaneous* statements of multiple Commissioners as relevant to their *present legislative intent*.

For the same reasons, the Court rejects Defendant's objection that the R&R mistakenly relied upon other various Commissioner's "statement[s] [sic] about their personal understanding of the history of the districts."  Obj. at 8 (annotations omitted).  Defendant proffers no additional argument why the R&R is not permitted to rely on such statements, nor does it refute the R&R's

assertion that the R&R considered the Commissioners' statements regarding the history of the districts only insofar as it informed their contemporaneous statements intending to preserve the racial breakdown of these districts in the 2022 redistricting cycle. *See id.* As noted above, the Court finds that the stated intent of multiple Commissioners is sufficient to demonstrate that the body considered race as the predominant factor in redistricting decisions. Because the R&R extensively details multiple Commissioners' statements regarding their desire to implement a plan to preserve the racial breakdown of each of the districts in the 2022 redistricting cycle, the Court finds that this objection is also unavailing. *See* R&R at 64–71.

Defendant's last objection argues the R&R improperly found that the splitting of neighborhoods, the racial makeup of the districts, and the shape of districts supported a finding that race predominated. *See* Obj. at 11. Defendant argues that the R&R should not have found the splitting of neighborhoods supports racial motive because "[t]hese divisions did not disenfranchise or dilute any community." *Id.* This argument fails; legally, a Fourteenth Amendment claim involves whether race was the predominate factor in drawing district lines, not whether vote dilution occurred. *Cooper*, 581 U.S. at 291. Further, Defendant argues that the R&R's finding regarding the splitting of neighborhoods, the racial makeup of the districts, and the shapes of the districts was an improper analysis, and if adopted, "will create a situation where any map made by the City will be unconstitutional." Obj. at 11. Again, rather than contesting a specific finding in the R&R or alleging that it improperly considered certain evidence, Defendant proffers an argument about the practical difficulties in drawing a constitutional map. As noted above, such a practical argument is not relevant to the question of whether race predominated in the districting decisions. Consequently, these objections are also unavailing.

In sum, the Court adopts the R&R's finding that race was the predominate consideration in each of the challenged districts and overrules each of Defendant's objections.

      b.  *Strict Scrutiny*

Once the R&R found that Plaintiffs were likely to succeed in establishing that racial considerations predominated in the drawing of each district, Magistrate Judge Louis then addressed whether Defendant met its burden of establishing that its use of race withstands strict scrutiny. *See* R&R at 78–88. To withstand strict scrutiny, "the burden [] shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292. For the following reasons, the Court adopts the R&R's conclusion that Defendant has failed to demonstrate any of the challenged districts withstand strict scrutiny.

First, regarding District 2, Defendant failed to proffer any argument or justification for its consideration of race. *See* R&R at 87. As such, the R&R found that the design of this district does not withstand strict scrutiny because Defendant did not demonstrate that its consideration of race constituted a compelling governmental interest. *See id.* For that same reason, the Court agrees that District 2's design does not withstand strict scrutiny.

As to Districts, 1, 3, and 4, Defendant argued that it had to consider race when designing these districts as a necessary consequence of its mandate to consider race in District 5 pursuant to the VRA. *See id.* at 86–88. Notably, Defendant argued that it could consider race in Districts 1, 3, and 4, but never explained how doing so would constitute a compelling governmental interest as to those specific districts. *See id.* The R&R found that Defendant's argument for why it could consider race was not a compelling governmental interest because Defendant failed to produce any evidence that (1) it had "good reason to believe that the VRA required the City to create three

districts each with HVAP super-majorities," and (2) "review of the transcripts does not suggest that the City's consideration of race in drawing Districts 1, 3, and 4 was directed to VRA compliance whatsoever." *Id.* at 79, 86. Explaining that racial gerrymandering in one district "does not necessarily license the exaggerated consideration of race in other districts," the R&R found that the racial considerations in Districts 1, 3, and 4 also failed to withstand strict scrutiny because Defendant failed to articulate a compelling governmental reason to consider race in the design of these districts. *Id.* at 87.

Regarding the R&R's findings as to 1, 3, and 4, Defendant proffers no objection, and accordingly, the Court reviews the findings for clear error. *See generally* Obj. The Court first notes that Defendant only argued that racial considerations with respect to Districts 1, 3, and 4 were permissible when considering the design of District 5 under the VRA, but it did not demonstrate on an individualized basis how each district would withstand strict scrutiny. *See id.* at 57. Because Defendant does not argue that that the racial considerations of any of Districts 1–4 were justified by a compelling governmental interest that was narrowly tailored to that end, the Court finds that Defendant failed to meet its burden. Accordingly, Defendant's use of racial considerations in the design of Districts 1–4 fails to withstand strict scrutiny.

Lastly, as to District 5, Defendant argued that (1) its consideration of race was a compelling governmental interest because it was required to ensure District 5 complied with the VRA, and (2) in doing so, its use of a 50% Black Voting Age Population ("BVAP") was narrowly tailored to achieve that goal. *See* Obj. at 12–15. The R&R acknowledged that the consideration of race when designing this district to comport with the VRA was a compelling governmental interest. *See* R&R at 79–86. However, the R&R found that Defendant's attempt to comply with the VRA was not narrowly tailored because its "adherence to a minimum BVAP of 50% for District 5 was arbitrary,

and not necessary to afford Black voters an opportunity to elect preferred candidates of their choice, and not informed by pre-enactment functional analysis of Black voters." *Id.* at 81. Thus, because the R&R found Defendant's method for complying with the VRA was not narrowly tailored to that end, the R&R found that racial considerations within District 5 also did not withstand strict scrutiny. *See id.* at 86.

The Court agrees that Defendant has not met its burden to demonstrate that the racial considerations in the design of District 5 withstand a strict scrutiny analysis. Though the Court also acknowledges that VRA compliance is a compelling governmental interest, Defendant has failed to provide "good reason" for its belief that a 50% BVAP figure was required when designing that district. *See Abbott*, 138 S. Ct. at 2315. As the Court explains further below when addressing Defendant's objection, Defendant failed to provide sufficient pre-enactment analysis explaining what good reason it had for selecting the 50% BVAP figure, and without such evidence in the record, the Court cannot conclude that Defendant's consideration of race in the design of District 5 was narrowly tailored to achieve VRA compliance. *See* R&R at 83; *see generally* Obj. As such, the Court adopts the R&R's finding that the racial considerations which predominated in District 5 do not withstand strict scrutiny.

Defendant proffers one objection to this portion of the R&R, asserting that its method of complying with the VRA in District 5 was narrowly tailored.[8] Specifically, Defendant argues that the R&R erred when finding the Defendant's adherence to a minimum BVAP of 50% for District

---

[8] Defendant also argues "there is no way to redistrict without diminishing Black voter influence and jeopardizing the slim majority in District 5, other than to leave it as is." Obj. at 15. The Court does not construe this as a proper objection because it fails to identify any dispute to a finding within the R&R. As explained several times above, the focus at this juncture is on the potential infraction, not the remedy. Further, Defendant does not advance this argument to demonstrate its design of District 5 was narrowly tailored to a compelling interest and is therefore irrelevant to this analysis. *See id.* (arguing that redistricting could impact Black voter influence).

5 was arbitrary and not narrowly tailored to the goal VRA compliance.  *See* Obj. at 14.  Defendant

avers that it had to ensure District 5 was designed so that it contained a BVAP of at least 50%

because that is "the threshold required to bring a claim under Section 2 of the VRA," and further,

that 50% is "the mathematical definition of a majority," which would ensure Black voters could

elect a candidate of their choosing.  *Id.*  According to Defendant, it would be "reversible error" for

the Court to conclude "that an election district that needed to be created under the VRA

nevertheless had to be created at less than [a BVAP of] 50%."  *Id.* at 15.

   The Court agrees with the R&R that Defendant confuses its burden under the Fourteenth

Amendment with a VRA claim.  Plaintiffs brings their claim under the Fourteenth Amendment.

*See generall*y Am. Compl.   And as the Court has made clear, Defendant therefore must

demonstrate that its use of predominately racial considerations was narrowly tailored to a

compelling interest, (here, compliance with the VRA).  Not only has it failed to do so, but among

Defendant's scattered arguments about what BVAP figure is required under the VRA, the phrase

"narrowly tailored" is never even mentioned.  *See* Obj. at 14–15.  Thus, even if the Court were to

conclude the R&R was incorrect when finding the Defendant's use of the 50% figure for BVAP

in District 5 was arbitrary, Defendant still advances no argument as to how that figure is narrowly

tailored to achieve the goal of compliance with the VRA.  *See id*.

   And to be clear, the Court finds that the R&R correctly concluded the 50% figure for BVAP

in District 5 was arbitrary and not narrowly tailored to VRA compliance.  Though Defendant was

not required to "determine precisely what percent minority population" is required for VRA

compliance, it must have "good reasons" to believe the BVAP figure it selected is sufficient to

avoid violating the VRA.  *Bethune-Hill*, 580 U.S. at 194 (emphasis omitted).  As the R&R correctly

identified, Defendant failed to offer sufficient pre-enactment analysis presented to the

Commissioners explaining why it had for selected the 50% BVAP figure.  *See* R&R at 83.  Indeed, at various points in the pre-enactment process, both De Grandy and various Commissioners stated their belief that a BVAP figure would be VRA compliant with a figure below 50%.  *See id.* at 84 (citing Tr. Feb. 7 at 8:12–19); (Tr. Mar. 24 at 8:5–9)).  And, despite Defendant's assertion that "[n]o published case of which the City is aware has ever found that an election district that needed to be created under the VRA nevertheless had to be created at less than 50%," Plaintiffs have identified multiple such examples.  *See* Resp. at 5–6 (citing *Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville III*"), No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022); *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992)).

In sum, Defendant fails to provide sufficient evidence demonstrating why and how the Commissioners decided that the 50% BVAP figure was sufficient for VRA compliance.  To the extent Defendant provides any justification for choosing the 50% figure, it fails to demonstrate how that justification constituted a "good reason" to believe it complied with the VRA.  Without a showing that Defendant had "good reason" to use the 50% BVAP figure in the design of District 5, the Court finds that Defendant's method of attempting to comply with the VRA was not narrowly tailored and thus, does not withstand strict scrutiny.

After careful review of the R&R's findings, the Court finds that Plaintiffs are substantially likely to succeed on the merits to demonstrate:  (1) race was a predominate factor in the design of each individual district; and (2) Defendant has not met its burden to demonstrate that the design of these districts withstands strict scrutiny.  Consequently, Plaintiffs have met the first requirement necessary to grant a preliminary injunction.

     ii.     *Irreparable Harm*

The R&R found that Plaintiffs would likely suffer irreparable harm if elections were held under the Enacted Plan in November 2023. *See* R&R at 88–92. In a racial gerrymandering case, a plaintiff suffers harm by virtue of the racial sorting itself and the subsequent participation in an election conducted pursuant to an unconstitutional map. *See ALBC*, 575 U.S. at 263. The R&R concluded that Plaintiffs would likely suffer irreparable harm here based on two factors: (1) Supreme Court and Eleventh Circuit precedent establishing that a plaintiff who votes under an unconstitutional electoral map suffers a harm that cannot be undone; and (2) Defendant does not specifically refute Plaintiffs' argument that they stand to suffer irreparable harm. *See* R&R at 89–91.[9] Consequently, the R&R found that Plaintiffs have also satisfied the second prerequisite necessary to grant a preliminary injunction.

The Court agrees with the R&R that Plaintiffs will likely suffer irreparable harm should they be required to vote in racially gerrymandered districts in the November 2023 election. Well-established precedent supports this proposition. *See, e.g.*, *Miller*, 515 U.S. at 911–12 ("When the [government] assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'") (quoting *Shaw v. Reno*, 509 U.S. 630, 657 (1993)); *Bethune-Hill*, 580 U.S. at 187 ("The harms that flow from racial sorting 'include being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group.'") (quoting *ALBC*, 575 U.S. at 263); *Jacksonville II*, 2022 WL 16754389, at *5 ("Given that such gerrymandering would constitute irreparable harm to the Appellees . . . we

---

[9] The R&R noted that Defendant does not refute the argument about irreparable harm, but "asserts that the issue of irreparable harm is tied to the issue of standing." R&R at 91. As noted before, the Court adopts the R&R's conclusion that Plaintiffs have standing for the purposes of this Motion.

decline to require the residents of Jacksonville to live for the next four years in districts defined by a map that is substantially likely to be unconstitutional").  Furthermore, the harm that Plaintiffs would suffer from voting under an unconstitutional electoral map without the grant of an injunction "are egregious harms that cannot be redressed once an election has occurred." *Jacksonville I*, 2022 WL 7089087, at *49 (citations omitted).  Once the Court has concluded that Plaintiffs have demonstrated a substantial likelihood of success on the merits regarding their claim that each district has been racially gerrymandered in violation of the Fourteenth Amendment, the harm that flows from such racial sorting is apparent.  *See ALBC*, 575 U.S. at 263.  Should Plaintiffs vote in the November 2023 election pursuant to the Enacted Plan, they will suffer a fundamental harm which cannot be remedied.

Defendant erroneously attempts to refute this finding by alleging that no group's voting power was diluted.  *See* Obj. at 16.  Defendant once again confuses the issues.  Plaintiffs' burden in demonstrating irreparable harm under the Fourteenth Amendment does not require a showing of vote dilution, as Defendant seems to repeatedly suggest.  *See Miller*, 515 U.S. at 911–12. Rather, Plaintiffs' harm arises by virtue of the racial sorting itself and the subsequent participation in an election where voting occurred under an unconstitutional map.  *See ALBC*, 575 U.S. at 263. As such, the Court adopts the R&R's finding that Plaintiffs are likely to establish irreparable harm.

Aside from vote dilution, Defendant essentially offers one objection: "Plaintiffs have not made a case they were harmed either by the core districts remaining the same or by any redistricting change."  Obj. at 17.  Like much of Defendant's filing, this argument is not a proper objection because it fails to "specifically identify the portions of the proposed findings and recommendation" that Defendant disputes.  *Macort*, 208 F. App'x at 783.  A blanket assertion that the Defendant disagrees with the R&R's conclusion will not do.  At no point in the Objection does

the Defendant dispute any factual finding or portion of the R&R's analysis regarding irreparable harm. *See generally* Obj. And as mentioned above, a harm exists because Plaintiffs were racially gerrymandered in an unconstitutional map. *See ALBC*, 575 U.S. at 263. Therefore, the Court rejects this objection and finds that the R&R correctly concluded that Plaintiffs are likely to suffer irreparable harm.

       *iii.*     *Balance of Harms*

Turning to the last prerequisites required to grant a preliminary injunction, the R&R assessed the remaining two factors together: (1) whether the threatened injury to Plaintiffs outweighs any harm that might result to Defendant; and (2) whether the public interest will not be disserved by the granting of a preliminary injunction. *See* R&R at 92 (citing *Fla. v. Dep't of Health & Hum. Servs.*, 19 F. 4th 1271, 1293 (11th Cir. 2021)) ("Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest."). In its analysis, the R&R weighed the harm that Plaintiffs would suffer against Defendant's argument that Plaintiffs unduly delayed in seeking a preliminary injunction. *See id.* at 92–97. Further, the R&R addressed Defendant's arguments that an injunction would disserve the public because redistricting would lower the Black Citizen Voting Age Population ("BCVAP") in District 5 without increasing Black voters' influence, and secondly, that there is insufficient time to adopt an interim remedial map. *See id.* at 97–98. Ultimately, the R&R concluded that: (1) Plaintiffs' potential injury outweighs any harm Defendant may suffer "even despite [Plaintiffs'] relative lack of diligence" in filing the Motion; (2) the alleged harm that nonracial redistricting "would disserve black voters" is "not responsive to the balance of the equities prong for a preliminary injunction;" and (3) given that the next election is six months

away, there is sufficient time for the City to draw a map that comports with the Constitution.[10] *See id.* at 96, 98, 99.

First, the Court finds that Plaintiffs demonstrated a relative, but not fatal, lack of diligence in filing the Motion. Any lack of diligence must be weighed against the harm a plaintiff suffers. *Jacksonville II*, 2022 WL 16754389, at *2 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). Further, while the Court is wary that "[a] delay in seeking a preliminary injunction of even only a few months" can "militate[] against a finding of irreparable harm," such delay is not necessarily fatal. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Here, the Enacted Plan was adopted in March 2022, but Plaintiffs did not file the instant Action until December 2022 and they did not file the Motion until February 2023 (a period of nearly nine and eleven months, respectively). *See* R&R at 94–95. Though in relative terms this delay is lengthy, the Court gives credence to Plaintiffs' argument that its delay arose from caution and a need to ensure that Plaintiffs could satisfy their high evidentiary burden on such a large record. *See id.* at 95. Indeed, despite the relative delay, at the time the Motion was filed, the November election was still nine months away. Furthermore, despite the amount of time it took Plaintiffs to file the Motion, the delay was not so "egregious" that the Court would deny Plaintiffs relief from the grave harm they stand to suffer. *Cf. Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)) (denying a preliminary injunction where the plaintiffs filed a motion for preliminary injunction "six years, and three general elections[] after the 2011 map was adopted, and over three years after the plaintiffs' first complaint was filed"). To the extent

---

[10] The R&R also explained Defendant's argument that "there is insufficient time to adopt a remedial map" was "implied and not directly argued or substantiated." R&R at 99. In fact, Defendant "does not [] raise or invoke" the *Purcell* principle when alleging this harm. *Id.* Defendant raises this argument for the first time in its Objection.

that the Court finds that Plaintiffs lacked diligence, it also finds that any lack of diligence does not weigh strongly in favor of denying the Motion.

On the other hand, the Court finds that Plaintiffs suffer serious harm when the legislature sorts its citizens based on race, and subsequently, when those individuals vote in racially gerrymandered districts. *See ALBC*, 575 U.S. at 263. Such harm to Plaintiffs cannot be redressed with monetary remedies. *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). Weighing the serious nature of this harm against the Plaintiffs' relative lack of diligence, the Court finds Plaintiffs' potential harm is greater.

Turning to Defendant's next argument, the Court disagrees that there is insufficient time to redraw constitutionally conforming maps. *Cf. Jacksonville I*, 2022 WL 7089087, at *54–55 (granting an injunction against the City of Jacksonville on October 12, 2022 and ordering the City to file an interim remedial plan by November 8, 2022, to be finalized by December 16, 2022 for a March election).[11] Ordering Defendant to draw a conforming map on May 23, 2023, the date of this Order, allows for a 70 day window prior to August 1, 2023 (i.e. the date the Miami-Dade County Elections Department said that it would need a map transmitted to it). The election will not occur until November. Such a timeline is within the date that Plaintiffs requested, is less condensed than the remedial plan that the court ordered in *Jacksonville I*, and accordingly, the Court sees no reason why the Parties could not comply with the Order here.

Finally, the Court also finds that based on the aforementioned timeline, this case does not fall within the *Purcell* principle. "Federal district courts ordinarily should not enjoin state election

---

[11] Much like in *Jacksonville I*, the Parties in this case "worked backwards" from the August 1, 2023 deadline to craft a briefing schedule considering the potential time needed for a remedy. *Id.* at *4 (finding the Parties knew that to proceed with the March 2023 general elections, the City Council needed district boundaries by December 16, 2022, which in turn, informed the Parties briefing schedule).

laws in the period close to an election.*" League of Women Voters of Fla., Inc., v. Fla. Sec'y of State* ("*LOWV*"), 32 F. 4th 1363, 1371 (11th Cir. 2022) (internal quotations omitted).  The Supreme Court "has never specified precisely what it means to be on the eve of an election for *Purcell* purposes."  *Jacksonville I*, 2022 WL 7089087, at *3 (internal quotations omitted).  The Eleventh Circuit has found the *Purcell* principle to apply when an election is set to begin in less than four months, *see LOWV*, 32 F. 4th at 1371, but not when the elections for a single county occurred five months after an injunction.  *See Jacksonville II*, 2022 WL 16754389 at *2.  From the time of this Order, the November 2023 election is over four months away from May.  To find that this Order implicates the *Purcell* Principle "would extend the eve of an election" farther than the Eleventh Circuit has before.  *See id.* (internal quotations omitted).

Thus, after a careful review of the R&R, the Court determines that given the Plaintiffs' likelihood of success on the merits, the harm Plaintiffs will suffer outweighs any harm to Defendant—namely harm arising from Plaintiffs' alleged lack of diligence and the practical concerns about how quickly a constitutionally conforming map could be enacted.

Defendant offers two categories of objections to the R&R's findings, one of which relates to various findings in the R&R supporting the conclusion that Plaintiffs did not unreasonably delay filing the Motion, and the other relating to legal questions arising under *Purcell* and whether there is sufficient time to implement a remedial map that comports with the Constitution.  Obj. at 17–20.  Regarding the first category, Defendant asserts three objections: (1) Plaintiffs are challenging decisions that, in essence, were made twenty-five years prior to the Enacted Plan; (2) because a Special Election already occurred in February 2023, the R&R should have found the filing of the Motion had been unreasonably delayed; and (3) the R&R erroneously concluded that Defendant had the burden to prove the delay was "intentional, strategic, or even negligent," when actually

Plaintiffs had the burden to demonstrate "reasonable diligence." *Id.* at 18–19.  As to *Purcell*, Defendant argues this Court should not grant the injunction largely because the R&R stated that "the consideration of the *Purcell* principle may be required [by] the time at which a final ruling on the Expedited Motion is entered." *Id.* at 20.

Beginning with Defendant's objection that Plaintiffs are actually challenging a districting decision from twenty-five years ago, the Court notes that Defendant is seeking a "second bite at the apple." *Marlite, Inc. v. Eckenrod*, No. 10-23641-CIV, 2012 WL 3614212, at *2 (S.D. Fla. Aug. 21, 2012) ("It is improper for an objecting party to . . . submit [ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge") (internal quotation omitted).  Defendant has already argued this exact point and the R&R expressly considered and rejected it.  *See* R&R at 94 ("At the outset, the Court rejects the City's argument that Plaintiffs are 25 years too late in seeking a preliminary injunction. The harms in this case are new harms resulting from the 2022 Enacted Plan, which is a different electoral map from that enacted in 1997.").

After careful review, the Court agrees with the R&R that this is not a case brought twenty-five years too late.  *Jacksonville I* is instructive.  There, the "racial percentage of a district's residents was a significant factor" in designing voting districts during the 2011 redistricting cycle. *Id.* at *9.  In the 2021 redistricting cycle, "it was immediately apparent that equalizing the district populations would not require drastic changes [to the 2011 plan]." *Id.* at *11.  Ultimately, the court found that the "contemporary statements of key legislators in the 2021 redistricting cycle," demonstrated an "unequivocal intention to maintain the shape of these Challenged Districts," with slight alterations, to preserve the racial demographics of the 2011 redistricting cycle. *Id.* at *48. The *Jacksonville I* Court rejected the defendant's argument that the plaintiffs delayed in filing the

preliminary injunction motion because plaintiffs were essentially attempting to enjoin decisions from the 2011 redistricting cycle. *Id*. at *51–52. In doing so, the court held that "to the extent the City contends that injunctive relief is not warranted because the alleged harms have been in existence since at least 2011 if not before, the Court is not persuaded. Plaintiffs in this case complain about a new harm—the maps enacted in 2022." *Id.*

In the instant Action, Defendant presents the same unavailing argument. While true, the contemporary statements of multiple Commissioners demonstrate that their intent was to preserve the demographic breakdown of each district from the original redistricting decisions in the late 1990s, like in *Jacksonville I*, the harms in this case arise from the new Enacted Plan and the result of the most recent redistricting. Accordingly, the Court finds that R&R correctly rejected Defendant's argument that "Plaintiffs are 25 years too late in seeking a preliminary injunction." R&R at 94.

The Court now turns to Defendant's second objection regarding the February 2023 Special Election and what bearing it has on the R&R's finding that Plaintiffs did not delay in filing the Motion. From what the Court can decipher, Defendant appears only to take issue with the fact that the R&R allegedly "brushes off the Special Election because it did not involve most of the challenged districts." Obj. at 18.

The R&R did no such thing. Rather, the R&R carefully considered the timing of the Special Election in relation to when the Motion and Amended Complaint were filed. *See* R&R at 95–96. Indeed, the R&R explained that "the vacancy that culminated in [the Special Election] occurred after Plaintiffs' Complaint was filed and the [S]pecial [E]lection occurred after the [M]otion was filed." *Id.* at 95. Moreover, the R&R noted that, based on the City's Charter, "it was not a foregone conclusion that a [S]pecial [E]lection to fill the vacancy" regarding

Commissioner Russel's successor "would be called." *Id.* at 96.  Considering these facts, the R&R found that the Special Election contributed to a finding that Plaintiffs unreasonably delayed filing the Motion, but the delay was not as egregious as the delay in *Benisek*.  *See id.* at 96.

At no point did the R&R "brush off" the Special Election.  *See* Obj. at 18; R&R at 95–96.  Nor did the R&R's analysis of the Special Election mention how the election would or would not impact the other challenged districts.  *See* R&R at 95–96.  Defendant's characterization of the R&R's findings regarding the Special Election is flatly incorrect and has no basis in the text of the R&R.  Rather, the Court finds that the R&R properly evaluated Plaintiffs' diligence in filing the Motion by assessing the timing of both the Motion itself and the Amended Complaint in relation to the Special Election.  Defendant's objection to this point is therefore unavailing.

Lastly, Defendant argues that the R&R applied the incorrect standard to determine whether Plaintiffs unreasonably delayed in filing their Motion.  Obj. at 19.  Defendant states that the "R&R implies that [Defendant] bore the burden to prove that the delay was 'intentional, strategic or even negligent.'"  *Id.* (citing R&R at 95).  Correctly, Defendant notes that the proper standard mandates that "Plaintiffs must show reasonable diligence where there has been delay" in filing the Motion.  *Id.*; *see also Benisek*, 138 S. Ct. at 1944.  However, for the following reasons, the Court reiterates that Plaintiffs' relative delay was not unreasonable.

"The Supreme Court has explained that a party requesting a preliminary injunction must generally show reasonable diligence."  R&R at 93 (quoting *Benisek*, 138 S. Ct. at 1944) (internal quotations omitted).  Here, the R&R properly examined the arguments regarding the alleged filing delays through a lens of Plaintiffs' reasonableness.  *See id.* at 94–96.  Specifically, the R&R examined whether Plaintiffs' delay was reasonable by analyzing (1) the time it took for Plaintiffs to file the Complaint and the Motion after the Enacted Plan was executed; (2) the impact of the

Special Election that occurred in February 2023; and (3) the time it took for Plaintiffs to gather sufficient evidence to file their Motion. *See id.* at 96–98. In doing so, the R&R even found that Plaintiffs demonstrated a "relative lack of diligence." *See id.* at 97. After a *de novo* review, the Court finds that the R&R properly analyzed whether Plaintiffs' delay was reasonable. Considering Plaintiffs' evidentiary burden in filing the Motion, the impact of the February Special Election, and that the Motion was filed well before the November election, the Court finds that Plaintiffs' delay was not unreasonable. The Court therefore rejects each of Defendant's objections.

To conclude, the Court finds that Plaintiffs have satisfied each element necessary for the granting of a preliminary injunction. For the foregoing reasons, the Court ADOPTS the R&R.

## V.  CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Report & Recommendation (ECF No. 52) is ADOPTED. Plaintiffs' Expedited Motion for Preliminary Injunction (ECF No. 26) is GRANTED. Upon the entry of this Order, the Court shall issue separate Orders referring the Parties to supplemental mediation and setting a Status Conference. At the Status Conference, the Parties shall be prepared to discuss a potential timeline to create and implement a constitutionally conforming remedial map.

DONE AND ORDERED in Chambers at Miami, Florida, this  23rd  day of May 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

32