UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.

_____/

**DEFENDANT'S MOTION TO STAY INJUNCTION ORDER [DE60]**

Pursuant to Rule 62(d) Florida Rules of Civil Procedure, Defendant, City of Miami (the "City"), moves for a stay of the injunction set forth in this Court's Order (the "Order")(DE 60) adopting the Report and Recommendation (the "R&R")(DE 52). The injunction enjoins the City from conducting the upcoming election pursuant to the districts enacted in City of Miami Resolution 22-131. It does not however implement a remedial map, but rather adopts the R&R that found all of the current districts unconstitutional. The City requests that this Court stay the injunction pending appeal.

**I.    Standard for a Stay**

"While an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Courts consider the following factors to determine whether a stay pending appeal is warranted:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

> irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*See Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019)). "'When the balance of equities . . . weighs heavily in favor of granting the stay'—[the Eleventh Circuit has] relax[ed] the likely-to-succeed-on-the-merits requirement." *Id*. (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).  But "the 'traditional test for a stay' likewise 'does not apply' in the particular circumstance that this case presents—namely, 'when a lower court has issued an injunction of a state's election law in the period close to an election.'" *League of Women Voters of Fla., Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1370 (11th Cir. 2022), quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence).

> [T]he reviewing court must be cognizant that "orders affecting elections ... can themselves result in voter confusion." Id. at 4-5. And that risk only increases as an election draws closer. Id. at 5, 127 S.Ct. 5. For that reason, the Purcell principle teaches that "federal district courts ordinarily should not enjoin state election laws in the period close to an election."

*Id*. at 1371; see also *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1238–39 (N.D. Ga. 2022).  In situations like this, where the Court has entered a preliminary injunction, "Purcell effectively serves to lower the state's bar to obtain the stay it seeks. The state need not show, for instance—as a plaintiff would to obtain a "late-breaking injunction" in the first place—that its position is "entirely clearcut." Id. Rather, it need only show that plaintiffs' position is not." *Id*. at 1372.

## II.     Likelihood of Success on the Merits

As explained below, the lynch pin of this case is District 5, and there is a likelihood of success on the merits with regard to District 5.  Racial considerations can predominate if the City had a compelling interest such as complying with the Voting Rights Act (the "VRA").  There is

2

no issue that District 5 must be drawn with racial intent to comply with the CRA. District 5 could then be drawn along racial lines as long as the drawing passed strict scrutiny. To meet strict scrutiny, the drawing of the district had to be narrowly tailored. In this context, it is not an exact science. As the R&R found, the percentage of Black voting age population in the district need not be determined with precision and the City has no duty to memorialize the analysis or compile a comprehensive record of that analysis. DE 52 p.82.

Narrow tailoring exists to protect the group being racially sorted.

> The purpose of the narrow tailoring requirement is to ensure that "the means chosen `fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.").

*Grutter v. Bollinger*, 539 US 306, 333 (2003)(quoting *Richmond v. J. A. Croson Co.*, 488 U. S. 469, 493 (1989)). For example, to "narrowly tailor" in this context the City cannot, in the guise of complying with the VRA, pack Black residents into the district to the diminishment of their influence elsewhere.[1] Because the city set the district at a bare 50% voting age population, it unsurprisingly believed that the district could not be more narrowly tailored, especially in light of undeniable demographic trends concerning the year to year decrease of Black residents. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

The Plaintiffs argued a novel theory, that the City had to set it at less than 50% voting age population.[2] This is truly novel because no case has ever held that. With regard to the cases

---

[1] *See*, *e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville*, Case No. 3:22-cv-493-MMH-LLL, 2022 WL 7089087, at *2 (M.D. Fla. Oct. 12, 2022)( "Plaintiffs argue that preliminary injunctive relief is warranted in advance of the upcoming election because the Enacted Plan packs Black voters into just four of fourteen districts, the result of which is to dilute and depress the influence of Black voters in City Council elections across the rest of the City.")

[2] There is no issue that it should have been higher, because that would be less narrowly tailored.

cited by this Court, the Court in *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville III")*, No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022), was careful to state that it was not a VRA case, and it did not find that less than 50% would satisfy the VRA. *Id* at * n.7.  The Court in *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992), created two majority-minority districts, and created a third "influence district" that was less than 50%. The Court did not find that the majority-minority districts needed to be less than 50%.

Additionally, because Plaintiffs did not dispute that the influence of black voters was not diminished elsewhere, there was no issue that the number was being used for an illegitimate motive.  Without a dilution of their vote elsewhere, there is no legitimate claim that the number was set too high for an improper purpose, and therefore it could not be more narrowly tailored. The Court, instead of looking at whether the district was actually narrowly tailored, instead framed the issue in evidentiary terms.  The Court found, for purposes of the injunction, insufficient evidence to support the bare 50% majority.  While the R&R conceded that Mr. De Grandy testified that he performed the analysis and that the City has no duty to memorialize the analysis or compile a comprehensive record of that analysis (DE 52 p.82), it still found that the City did not meet its burden at the injunction phase and therefore entered an injunction.

At trial, it is likely that the City can establish that a bare 50% was in fact narrowly tailored enough to meet the *Bethune-Hill* standard,[3] especially in light of the demographic trend noted above.  Even so, the question is not whether 50% was required, but "whether the State had 'good reasons' to believe" a 50% BVAP was necessary to avoid liability under the § 2 *Gingles*

---

[3] *Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 195-96 (2017))( "The law cannot insist that a state legislature, when redistricting, determine *precisely* what percent minority population § 5 demands.") (emphasis in original).

analysis. *Bethune-Hill*, 580 U.S. at 195 (*quoting Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015). Where the *Gingles* test as a threshold question asks whether "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district," *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), the City's belief that bare compliance with that criteria at 50.3% BVAP is narrowly tailored. *Cf. Bethune-Hill*, 580 U.S. 193-94 ("the requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."). While the R&R stated that there was no modeling or analysis to support the undeniable numerical decrease in Black residents (DE 52 p.84-85), that is an easily met trial burden, particularly given *Gingles* bright-line threshold and the City was only required to have good reason to believe a 50% BVAP was required to comply with § 2. With regard to District 5, the City is likely to succeed. Moreover, in light of the foregoing and the dearth of case law suggesting less than 50% VAP is demanded, the Plaintiff's position on the merits is hardly "entirely clearcut." *League of Women Voters of Fla., Inc.,* 32 F.4th at 1372.

District 5 is the centerpiece to the surrounding districts. The R&R found fault with a number of districting choices that border District 5, but District 5's borders were drawn to comply with § 2 of the VRA. Addressing District 2, the R&R exclusively discusses areas 10/11 and the condo canyon between areas 10/11 and 12, all of which are between Districts 2 and 5. DE 52 p.73. District 2 had to shed population after the 2020 Census (DE 52 p.44), and shed it into District 5. Likewise, when discussing District 1, the R&R exclusively discussed Areas 6, 7 and 8, between District 1 and District 5. DE 52 p.74.



This Court found that "Defendant cites to no authority suggesting the Court is required to consider the portions of the other districts abutting District 5 differently from the other areas within those districts, nor is the Court aware of any such requirement." DE 60 p.15.  The Court necessarily must consider the abutting portions because the line between Districts 5 and 2 or between Districts 5 and 1 is the same line.  The border cannot be constitutional on one side and unconstitutional on the other.  If the drawing of District 5 meets strict scrutiny then its border meets strict scrutiny.  At the very least, the districting of the northern half of the City of Miami is beyond question, and the City is likely to succeed at trial.  Further, Plaintiff's case with regard to Districts in the north is certainly not "clearcut."

As explained in the City's Objection and Reply memorandum, there is no possible way to draw the rest of the Districts without essentially the same demographic effect.  The City is 70% Hispanic and they live in the West while the whiter communities are concentrated along the

6

coast. Neither the Plaintiffs nor the Court has suggested it could be drawn any differently. Once more, the Court relied on statements by Commissioners as evidence that that the districts were drawn for predominantly racial reasons as sufficient evidence to support an injunction. The Court considered it premature to consider whether they could be drawn to any different effect, but the Plaintiffs never claimed that they could be. There is no evidence that they could be. The entire thrust of Plaintiffs' amended complaint is to preserve the integrity of the coastal, demographically whiter, Coconut Grove area. The residents were not actually racially sorted. At trial the City need merely show that in the southern part of the City, race was not the predominant factor, the reality of the map was. The map could not be drawn any other way to any different effect. The Plaintiffs have never claimed otherwise. Rather they steadfastly held to their position that they are not required to show an alternative map. The "alterative maps" spoken of by Dr. Abott in her report are demographically essentially the same as the existing map. This Court cited to the introduction of Dr. Abott's report where she summarized that "other areas could have been moved without further segregating the districts by race but were rejected by the Commission." DE 60 p.13 (citing DE 24–31, at 2). But the actual body of the report states otherwise. "All maps tended to shore up existing racial compositions within individual Commission districts…." DE 24-31 p.16. The numbers are detailed in that report. DE 24-31 pp.23-24. They all break up traditional neighborhoods, the Black Voting Age Population ("BVAP") in District 5 would be the same; the Black Citizen Voting Age Population ("BCVAP") would be higher than the Enacted Plan; the White Voting Age population ("WVAP") of District 2 is either the same or a mere couple tenths of a percent lower in these plans, but the WCVAP is actually higher in the alternative plans; the Hispanic voting age populations (HVAP) in Districts 1, 2 and 4 are essentially the same. The alternative plans lower the HVAP in District 3 slightly and raise it in District 4 slightly, but all three remain

7

supermajorities. At trial, the Plaintiffs will not be able to prevail based on that stray sentence from the introduction when the body of the report belies it.

The crux of the Court's ruling for issuing the injunction rested on evidentiary issues at the hearing, including creating a heightened evidentiary burden for narrow tailoring, but that will not carry over to trial. At trial, the City has a likelihood of success. Further, Plaintiffs' case is not "clearcut."

**II.      Irreparable Injury**

Irreparable injuries are those that cannot be compensated by money damages. This Court's injunction does not preserve the status quo in any sense, but directs an express deviation from the status quo by directing the City to redistrict for the November 2023 election. That bell cannot be unrung, the election will have occurred. The types of injuries were recently cataloged. Such districting changes are "prescriptions for chaos." *Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence). They will "affect candidates, campaign organizations, independent groups, political parties, and voters, among others." *Id*. As in *Milligan*, currently candidates and elected officials no longer even know what the district they live, where they may run, and where they must campaign.

The Order doesn't just affect Commissioners who are up for reelection in November. Redistricting may draw incumbents out of the districts they represent and candidates out of districts in which they are running. Miami has residency requirements. A candidate, to qualify must "[h]ave resided within the district they wish to represent for at least one year prior to qualifying." City of Miami, Code of Ordinances § 16-6(b)(3). "[C]andidates for the city commission shall have resided within the district at least one (1) year before qualifying and be electors in that district, and shall maintain residence in that district for the duration of their term of office." Miami Charter § 4(c). Commissioners who are up for reelection may be drawn out of their districts with no opportunity to qualify in a new district.

The preliminary injunction is an "extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986)).

The Order finds that the core creation of districts in 1997 was fundamentally, constitutionally flawed as racial sorting. Regardless, incumbents seeking reelection have a constitutionally permissible interest in preserving as much of the core of their districts that elected them, regardless of the racial history leading to the creation of the districts. The City pointed out that failure to bring prior challenges this militates against an injunction. In response the Court observed that some of the organizations did not exist back then and some Plaintiffs moved into their district more recently. If they are complaining about decisions made 25 years ago when they lived in the district or when the organization existed, then those Plaintiffs should have sued 25 years ago. If, however, a Plaintiff is complaining about districting decisions made long before they moved into a district or created, then they weren't "sorted" by race by decisions that had been made long before, but are simply sorted based upon the current Commission's desire to maintain the core of an existing district as a permissible form of incumbent protection.

### III.  Purcell Applies

"[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election." *Purcell v. Gonzalez*, 549 U.S. 1 (2006). The Court found the *Purcell* principle inapplicable because the injunction order issued on May 23, 2023 was more than four months before the election set on November 7, 2023. It is five and a half months away. But the Court's injunction enjoins going forward on the existing map, and will require a new remedial map to be made for the upcoming election. Currently, of course, there is no such map. Drawing such a map will not be "easy" as stated by Plaintiffs because, as described in the Objection,

9

which is adopted here and incorporated [DE 55] there is no way to draw it without running afoul of some part of the R&R that this Court adopted. The Court found such practical considerations premature because they went to likelihood of success on the merits. DE 60 p.14. But it also goes to whether a new map can be implemented more than four months before the election. The Court can enter an injunction a year before an election, but without a map in place, all of the harms set forth in Purcell are still present.

> Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence)(to overcome *Purcell*, Plaintiff must establish "changes in question are at least feasible before the election without significant cost, confusion, or hardship"); *Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. at 1238–39. Until a map is in place, this Court will still be "tinkering" with the election law. This Court must weigh these "practical considerations." "The Court has recognized that 'practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.'" *Id*. at 880, quoting *Riley v. Kennedy*, 553 U. S. 406, 426 (2008). Additionally, four months is not a safe harbor for an injunction. Sweeping changes need more time than minor changes. *Id*. at n.1. This Court has not even considered how sweeping a change, but given that the Order throws out the core of districts for the entire redistricting plan that have been in place since 1997, it is safe to assume that the change will be sweeping and disruptive.

Any new legislatively-imposed map must be adopted by the City Commission. These are five separate elected officials who must vote on the map at a public meeting. The City retained experts to perform redistricting work in July 2021 (DE 50-11), had the first meeting in

November 2021 and follow up meetings in December, February and March (DE 24-11 to 24-18), agreed to and adopted a resolution on March 24, 2022, which went through the City's charter mandated process and was rendered on April 19, 2022 (DE 24-2). The City and the nine plaintiffs are not the only affected constituency. As the transcripts for the last meetings show, redistricting generated a huge amount of public interest even though relatively minor changes were implemented. Now that the entire map is being changed, that will not generate less public interest and input. In spite of that, even were this process to be compressed into 6 weeks, that would not allow for the inevitable challenge from Plaintiffs or some other aggrieved party who prefers a different map, the necessary subsequent briefing and a ruling by this Court.

This all presumes, of course, that the City is able to agree upon a remedial map. Another scenario is that a majority of the Commission is unable to agree on a proposed redistricting plan, leaving the Court in a position to adopt a remedial plan on an even tighter timeframe. And while we know this Court will do its utmost to impose a valid map, even this Court's ruling is not immune from such challenges. *See e.g, Johnson v. Mille*r, 922 F. Supp. 1556 (S.D. Ga. 1995), *aff'd sub nom. Abrams v. Johnson*, 521 U.S. 74 (1997); *Perez v. Perry*, 835 F. Supp. 2d 209 (W.D. Tex. 2011), *vacated and remanded*, 565 U.S. 388 (2012). *Purcell* is present. The injunction should be stayed.

### IV. Public Interest

There is no doubt that the injunction jeopardizes the ability of the voters of District 5 to elect a candidate of their choice. This Court did not find that less than 50% would be sufficient, only that Defendant did not meet its burden of establishing that it had sufficient support for selecting 50%. On that basis, however a remedial map, will have to be drawn diluting their vote in District 5, automatically creating risk of a section 2 VRA challenge. As set forth above, the injunction will also throw the upcoming election into chaos, especially given the residency requirements. Moreover, it makes uncertain the status of incumbent commissioners who are up

11

for election. They are incumbent elected officials seeking to retain their elected offices. All of these findings were grounded on the Court not seeing what it deemed to be sufficient evidence pertaining to the entire redistricting plan. As set forth above, these burdens are easily met at trial, and a stay will prevent the harm caused by the injunction in the next election. Staying the injunction serves the public interest.

### Certificate of Conferral

I certify that prior to filing this motion, I attempted to resolve the matter in good faith by discussing the relief requested via email on Tuesday, May 30, 2023 with opposing counsel and they oppose the relief sought.

WHEREFORE, Defendant respectfully asks this Court to stay the Order pending appeal.

Dated this 31st day of May, 2023.

    Respectfully submitted,

By: *s/ Christopher N. Johnson*
GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

GRAYROBINSON, P.A.
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile:  (305) 416-1801
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/ Christopher N. Johnson*
Christopher N. Johnson, Esq.

13