UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.

_____/

## **DEFENDANT'S NOTICE OF PASSAGE OF REDISTRICTING PLAN**

Defendant, City of Miami (the "City"), pursuant to the Court's Scheduling Order, ECF 69, Defendant hereby gives notice that it has enacted a new redistricting plan, City of Miami Resolution 23-271, to replace the redistricting plan presented in City of Miami Resolution 22-131, which was enjoined by the Court (ECF 60). Additionally, Defendant provides the following materials related to its enactment of City of Miami Resolution 23-271:

1. City of Miami Resolution 23-271;

2. Statistical Tables for Enacted Plan, generated after passage of the plan and not considered by the City Commission prior to passage of City of Miami Resolution 23-271;

3. Miami City Commission Redistricting Presentation by Miguel DeGrandy, June 14, 2023;

4. Plaintiff's Correspondence, May 23, 2023, enclosing Plaintiffs' Plans 1 and 2;

5. Plaintiffs' Plan 3, June 13, 2023;

6. Verbatim Draft Minutes of City of Miami Commission meeting, June 14, 2023.

Dated this 30th day of June, 2023.

Respectfully submitted,

By: _/s/ Christopher N. Johnson_
GRAYROBINSON, P.A.
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile:  (850) 577-3311

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile:  (305) 416-1801
_Attorneys for Defendant_

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___*/s/ Christopher N. Johnson*___
       Christopher N. Johnson
       (FBN 69329)

-1-



**City of Miami**
**Certified Copy**

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

---

**File Number: 14173**                                    **Enactment Number: R-23-0271**

A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING THE NEW JURISDICTIONAL BOUNDARIES OF THE CITY COMMISSION DISTRICTS FOLLOWING THE RESULTS OF THE 2020 UNITED STATES CENSUS; OFFICIALLY DELINEATING THE BOUNDARIES OF EACH DISTRICT AS SET FORTH IN "COMPOSITE EXHIBIT 1," ATTACHED AND INCORPORATED; MAKING FINDINGS; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, the voters of the City of Miami ("City") adopted a Charter Amendment on September 4, 1997, providing for a non-voting Executive Mayor elected City-wide, and five (5) City Commissioners elected from districts; and

WHEREAS, the City Commission adopted Resolution No. 97-495 providing for the jurisdictional boundaries of the City Commission Districts; and

WHEREAS, on May 8, 2003, the City reapportioned district boundaries in Resolution No. 03-0448 following the results of the 2000 Census; and

WHEREAS, on May 23, 2013, the City reapportioned district boundaries in Resolution No. R-13-0208 following the results of the 2010 Census; and

WHEREAS, on March 24, 2022, the City Commission reapportioned the district boundaries in Resolution No. R-22-0131 ("2022 Map") following the results of the 2020 Census; and

WHEREAS, on December 15, 2022, nine (9) months after the adoption of the 2022 Map, certain community organizations filed a federal lawsuit against the City of Miami challenging the new redistricting plan alleging it violated the 14th Amendment's Equal Protection Clause; and

WHEREAS, the Federal court entered an order enjoining the City from calling, conducting, supervising, or certifying any elections using the 2022 map; and

WHEREAS, the City Commission retained the services of a professional redistricting consultant to provide redistricting advice to the City; and

WHEREAS, the results of the 2020 Census show that in 2020, the population of the City had grown to 442,241, an increase of 42,752 or 10.7 percent and that the growth has not been uniform across all five of the City's Commission districts; and

WHEREAS, the 14th Amendment to the U.S. Constitution as interpreted by federal case law requires "substantial equality" of population among single member districts and a review of the Census data shows that the current plan is malapportioned and cannot be used for subsequent elections; and

---

*City of Miami*                        *Page 1 of 3*                        *R-23-0271*

WHEREAS, Section 2, 52 U.S.C. § 10301 of the Voting Rights Act of 1965 (the "Voting Rights Act"), is a permanent nationwide prohibition on voting practices that discriminate on the basis of race, color, or membership in a language minority group (as defined in Sections 4(f)(2) and 14(c)(3) of the Act, 52 U.S.C. §§ 10303(f)(2), 10310(c)(3)) and prohibits both voting practices that result in citizens being denied equal access to the political process on account of race, color, or membership in a language minority group, and voting practices adopted or maintained for the purpose of discriminating on those bases; and

WHEREAS, the Supreme Court observed in Reynolds v. Sims, 377 U.S. 533 (1964), that all that is necessary when drafting state legislative districts is achieving "substantial equality of population among the various districts." The phrase "substantial equality of population" has come to generally mean that a legislative or local government plan will not be held to violate the Equal Protection clause if the overall deviation between the smallest and largest district is less than 10%. In Avery v. Midland County, 390 U.S. 474 (1968), the United States Supreme Court applied the Reynolds decision to local governments; and

WHEREAS, the City's redistricting consultant met individually with the five district City Commissioners for the purpose of getting input from them to develop a new map that addressed the concerns of the federal court and also achieved compliance with the Voting Rights Act and the Equal Protection Clause; and

WHEREAS, as a result of the meetings, the redistricting consultant developed an amalgamated proposed map that took into consideration the policy and political suggestions of the City Commissioners, resident input and the Court's order and named the map Version 12; and

WHEREAS, the City's redistricting consultant analyzed the polarized voting patterns in the City and determined that the Version 12 map was consistent with the three factors enunciated in the case of Thornburg v. Gingles, 478 U.S. 30 (1986); and

WHEREAS, on June 14, 2023, at a Special City Commission meeting, the redistricting consultant presented the Version 12 map to the City Commission and the public; and

WHEREAS, after hearing from the public, the City Commission considered the Version 12 map and made some modifications which among other changes included reuniting a portion of Coconut Grove into District 2, made changes between the boundaries of D3 And D4 to restore the Domino park area to D3, moved an area from District 1 into District 5 that contained a restaurant that the District 5 Commissioner had committed significant effort and funding to ensure its success and made other changes necessary to rebalance the population and reduce the Map's overall deviation; and

WHEREAS, the amendments to the Version 12 map were named the District 3 Version 3 Map ("D3 V3 Map"); and

WHEREAS, the D3 V3 Map achieves substantial equality of population among the districts; and

WHEREAS, the D3 V3 Map is legally sound and meets the City Commission's prime directive that the redistricting plan should abide by the Constitution and the Voting Rights Act;

NOW, THEREFORE, BE IT RESOLVED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1. The recitals and findings contained in the Preamble to this Resolution are adopted by reference and incorporated as fully set forth in this Section and represent findings of the City Commission.

Section 2. The City delineates the jurisdictional boundaries of each of the five (5) delineated City Commission districts, as set forth in "Composite Exhibit 1," attached and incorporated. These election districts shall be applicable for all purposes, including but not limited to, any election of City Commissioners, following the effective date of this resolution.

Section 3. This Resolution shall become effective immediately upon adoption and signature by the Mayor.[1]

| | |
|---|---|
| **DATE:** | 6/14/2023 |
| **RESULT:** | ADOPTED |
| **MOVER:** | Alex Diaz de la Portilla, Commissioner |
| **SECONDER:** | Manolo Reyes, Commissioner |
| **AYES:** | Christine King, Joe Carollo, Alex Diaz de la Portilla, Manolo Reyes |
| **NAYS:** | Sabina Covo |

I, Todd B. Hannon, City Clerk of the City of Miami, Florida, and keeper of the records thereof, do hereby certify that this constitutes a true and correct copy of Resolution No. R-23-0271, with attachment(s), passed by the City Commission on 6/14/2023.

**City Clerk, Deputy City Clerk
(for Todd B. Hannon, City
Clerk)**

June 29, 2023
**Date Certified**

---

[1] If the Mayor does not sign this Resolution, it shall become effective at the end of ten (10) calendar days from the date it was passed and adopted. If the Mayor vetoes this Resolution, it shall become effective immediately upon override of the veto by the City Commission.



# City of Miami

## Master Report

City Hall
3500 Pan American Drive
Miami, FL 33133
www.miamigov.com

### Enactment Number: R-23-0271

| | | |
|---|---|---|
| **File Number:** 14173 | **File Type:** Resolution | **Status:  ADOPTED** |
| **Revision:** | | **Controlling Body:**  City Commission |
| **File Name:**  Resolution Adopted Map D3 V3 - 3.6 Dev - Redistricting of City Commission Districts | | **Introduced:**  6/15/2023 |
| **Requesting Dept:**  City Commission | | **Final Action Date:**  6/14/2023 |

**Title:**   A RESOLUTION OF THE MIAMI CITY COMMISSION, WITH ATTACHMENT(S), PROVIDING THE NEW JURISDICTIONAL BOUNDARIES OF THE CITY COMMISSION DISTRICTS FOLLOWING THE RESULTS OF THE 2020 UNITED STATES CENSUS; OFFICIALLY DELINEATING THE BOUNDARIES OF EACH DISTRICT AS SET FORTH IN "COMPOSITE EXHIBIT 1," ATTACHED AND INCORPORATED; MAKING FINDINGS; AND PROVIDING AN EFFECTIVE DATE.

**Notes:**

**Links:**

**Attachments:**    14173 Composite Exhibit 1(PDF)

**History of Legislative File:**

| Revision: | Acting Body: | Date: | Action: | Result: |
|---|---|---|---|---|
| | City Commission | 6/14/2023 | Meeting | Completed |
| | City Commission | 6/14/2023 | ADOPTED | Passed |
| | Mayor's Office | 6/23/2023 | Unsigned by the Mayor | Completed |
| | City Clerk's Office | 6/23/2023 | Signed and Attested by the City Clerk | Completed |
| | Legislative Division | 6/27/2023 | Legislative Division Review | Completed |
| | George K. Wysong III | 6/29/2023 | ACA Review | Completed |
| | Marie Gouin | 6/29/2023 | Budget Review | Completed |
| | Victoria Méndez | 6/29/2023 | Approved Form and Correctness | Completed |
| | City Clerk's Office | 6/29/2023 | Rendered | Completed |



# City of Miami Commission Districts Adopted June 14, 2023



Legend

**Adopted Commission Districts**

City Boundary

Streets

# City of Miami Commission Districts Adopted June 14, 2023

## Commission District: 1

**Legend**

City Boundary

0 0.5 1
Miles

N

Author: O. Lopez Date: 6/24/2023 D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd

# City of Miami Commission Districts Adopted June 14, 2023

## Commission District: 2

**Legend**

City Boundary

0 0.5 1
Miles

N



# City of Miami Commission Districts Adopted June 14, 2023

**Commission District: 3**

**Legend**

City Boundary

0 0.5 1
Miles

N



# City of Miami Commission Districts Adopted June 14, 2023

## Commission District: 4

Legend

City Boundary

0 0.5 1

Miles

N

Author: O. Lopez Date: 6/24/2023 D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd



# City of Miami Commission Districts Adopted June 14, 2023

## Commission District: 5

Author: O. Lopez Date: 6/24/2023 D:\GIS\Commission_Redistricting_2023\Proposed_CommissionDistricts_BookLandscapeFinal2023.mxd

## STATISTICAL TABLES FOR ENACTED PLAN

*NOTE: This data was not presented to the Miami City Commission prior to enactment of City of Miami Resolution 23-271, but is provided to the Court.*

*Table 1 -  2020 Census Total Population for D3_V3 2023 Enacted Plan*

| District | Total | White NH | Black NH | BNH and BW NH (DOJ 1st Def) | AP Black NH | AP Black (DOJ 2nd Def) | Hisp |
|---|---|---|---|---|---|---|---|
| 1 | 87,455 | 3,941 | 4,722 | 4,819 | 4,934 | 9,484 | 77,291 |
| 2 | 89,593 | 32,465 | 5,026 | 5,612 | 5,911 | 7,086 | 44,375 |
| 3 | 89,194 | 9,775 | 1,702 | 1,862 | 2,008 | 4,824 | 74,755 |
| 4 | 89,555 | 7,393 | 663 | 755 | 874 | 2,882 | 79,491 |
| 5 | 86,444 | 8,255 | 40,334 | 40,941 | 41,507 | 45,110 | 34,560 |
| Totals: | 442,241 | 61,829 | 52,447 | 53,989 | 55,234 | 69,386 | 310,472 |

*Table 2 2020 Census Total Population Percentages for D3_V3 2023 Enacted Plan*

| District | White NH | Black NH | BNH and BW NH (DOJ 1st Def) | AP Black NH | AP Black (DOJ 2nd Def) | Hisp |
|---|---|---|---|---|---|---|
| 1 | 4.51% | 5.40% | 5.51% | 5.64% | 10.84% | 88.38% |
| 2 | 36.24% | 5.61% | 6.26% | 6.60% | 7.91% | 49.53% |
| 3 | 10.96% | 1.91% | 2.09% | 2.25% | 5.41% | 83.81% |
| 4 | 8.26% | 0.74% | 0.84% | 0.98% | 3.22% | 88.76% |
| 5 | 9.55% | 46.66% | 47.36% | 48.02% | 52.18% | 39.98% |
| Totals: | 13.98% | 11.86% | 12.21% | 12.49% | 15.69% | 70.20% |

*Table 3 -  2020 Census Voting Age Population for D3_V3 2023 Enacted Plan*

| District | Total | White NH | Black NH | BNH and BW NH (DOJ 1st Def) | AP Black NH | AP Black (DOJ 2nd Def) | Hisp |
|---|---|---|---|---|---|---|---|
| 1 | 72,422 | 2,482 | 3,862 | 3,937 | 4,022 | 7,869 | 64,982 |
| 2 | 78,060 | 28,523 | 4,318 | 4,771 | 5,003 | 5,973 | 38,677 |
| 3 | 74,010 | 7,768 | 1,385 | 1,500 | 1,599 | 4,004 | 62,511 |
| 4 | 76,272 | 5,478 | 551 | 608 | 709 | 2,372 | 68,668 |
| 5 | 68,436 | 7,177 | 30,860 | 31,316 | 31,764 | 34,436 | 27,814 |
| Totals: | 369,200 | 51,428 | 40,976 | 42,132 | 43,097 | 54,654 | 262,652 |

*Table 4 - 2020 Census Voting Age Population Percentages for D3_V3 2023 Enacted Plan*

| District | White NH | Black NH | BNH and BW NH (DOJ 1st Def) | AP Black NH | AP Black (DOJ 2nd Def) | Hisp |
|---|---|---|---|---|---|---|
| 1 | 3.43% | 5.33% | 5.44% | 5.55% | 10.87% | 89.73% |
| 2 | 36.54% | 5.53% | 6.11% | 6.41% | 7.65% | 49.55% |
| 3 | 10.50% | 1.87% | 2.03% | 2.16% | 5.41% | 84.46% |
| 4 | 7.18% | 0.72% | 0.80% | 0.93% | 3.11% | 90.03% |
| 5 | 10.49% | 45.09% | 45.76% | 46.41% | 50.32% | 40.64% |
| Totals: | 13.93% | 11.10% | 11.41% | 11.67% | 14.80% | 71.14% |

# Miami City Commission Redistricting

Presentation by Miguel A. De Grandy, Esq.



June 14, 2023

# The Draft Plan Proposal



# Plaintiff's Alternative Plans:

| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
|---|---|---|---|---|
| 1 | 85,162 | −3,005 | −3.4% | 1,407 |
| 2 | 89,078 | +911 | +1.0% | — |
| 3 | 87,666 | −501 | −0.6% | — |
| 4 | 89,091 | +924 | +1.0% | — |
| 5 | 89,837 | +1,670 | +1.9% | — |
| Citywide | 440,834 | 4,675 | 5.3% | |

| District 5 Racial Makeup | | | | |
|---|---|---|---|---|
| | Black | Hispanic | Non-Hispanic White | Asian, Pac. Islander, Am. Indian |
| 2020 Citizen Voting-Age Pop. (CVAP) | 53% | 32% | 12% | 2% |
| 2023 Voter Reg. | 52% | 28% | 18% | 2% |

| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
|---|---|---|---|---|
| 1 | 86,541 | −1,626 | −1.8% | — |
| 2 | 91,173 | 3,006 | +3.4% | 1,407 |
| 3 | 85,108 | −3,059 | −3.5% | — |
| 4 | 90,388 | +2,221 | +2.5% | — |
| 5 | 87,624 | −543 | −0.6% | — |
| Citywide | 440,834 | 6,065 | 6.9% | |

| District 5 Racial Makeup | | | | |
|---|---|---|---|---|
| | Black | Hispanic | Non-Hispanic White | Asian, Pac. Islander, Am. Indian |
| 2020 Citizen Voting-Age Pop. (CVAP) | 55% | 31% | 11% | 2% |
| 2023 Voter Reg. | 53% | 28% | 17% | 2% |



# District 4

Plaintiffs' ALT. 1
Hispanic VAP
95.05

Plaintiffs' ALT. 2
Hispanic VAP
95.55%



# District 5: Overtown

## Plaintiffs' ALT. 1



## Plaintiffs' ALT. 2



# Performance of D1 in Plaintiff's Alt 1 vs. Draft Proposal

- *Republican registered voters drop by 9%*

- *13.8% increase in presidential election vote for Biden.*

- *DeSantis 15% lower in 2018 Gubernatorial election.*

- *Republican candidate in Atty Gen. race also 15% lower*

# Performance of D1 in Plaintiff's Alt 2 vs. Draft Proposal

- **Republican registered voters drop by 6%**

- **7.5% increase in presidential election vote for Biden.**

- **DeSantis 9% lower in 2018 Gubernatorial election.**

- **Republican candidate in Atty Gen. race also 9% lower**

**Proposal District 5**

*Historic Overtown In Proposed Plan*

## Draft Proposal

## Plaintiffs' ALT. 2



## District 5

## The Voting Rights Act District

# District 1



# District 2: The Coastal District

## Proposal

## Plaintiffs' ALT 2



# District 2
## Compared to Prior Reyes Plan

Proposal





# District 2

## The Coastal District

# Plaintiffs' District 3

## Plaintiffs' ALT. 1
## Hispanic VAP 90.83%

## Plaintiffs' ALT. 2
## Hispanic VAP 84.81%





# Plaintiffs' District 4

## Plaintiffs' ALT. 1
## Hispanic VAP
## 95.03%

## Plaintiffs' ALT. 2
## Hispanic VAP
## 95.55%



# District 4





District 3

# Proposal overall Deviation: 2.6%





# The Draft Plan Proposal



# D1 alt. Map

Dev. 2.3%



# D5 alt. Map

## Dev. 3.4%



# D3 alt. Map

## Dev. 3.5%



# D3 alt. Map v.2

## Dev. 3.3%



**D3 alt. Map v.3**

Dev. 3.6%



# D2 alt. Map

## Dev. 4.2%



3680 Thomas Ave.
Miami, FL 33133

Christopher Hudson
*Board Secretary*



863 NE 79th St.
Miami, FL 33138

Rebecca Pelham
*Executive Director*



**South Dade Branch**

P.O. Box 971515
Miami, FL 33197

Harold Ford
*President*

**Miami-Dade Branch**

P.O. Box 315
Opa-Locka, FL 33054

Daniella Pierre
*President*

May 23, 2023

Miami City Commission
3500 Pan American Drive
Miami, FL 33133

**Re: Plaintiffs' Proposed Remedial City Commission Maps**

Dear City Commissioners,

Earlier today, the U.S. District Court for the Southern District of Florida issued a preliminary injunction in *GRACE, Inc., et al. v. City of Miami*, our challenge to the City Commission map. The Court found we are substantially likely to prevail on our claim that the map is an impermissible racial gerrymander that unconstitutionally divides voters along racial lines, slicing through our neighborhoods and violating our rights—as well as the rights of all Miamians.

The Court has given the City an opportunity to undo those violations and remedy those wrongs. As the Commission re-embarks on its mapmaking process, we submit for your consideration two new maps that cure the problems the Court identified. These maps can be viewed on Google Maps here: bitly.ws/FhIi. More materials and data files are at aclufl.org/miami-maps. Printed copies are enclosed here as well.

These **Plaintiffs' Maps 1 and 2** present a new vision for Miami: one that moves us forward, rather than holds us back; one that advances representation for all residents, rather than constrains it; one that brings us together, rather than divides us.

Both maps feature compact and logical districts that respect neighborhoods, follow major geographic boundaries, and preserve genuine communities of interest. They undo the racial gerrymandering that has violated Miamians' rights to equal protection of the laws, while also complying with the crucial mandates of the Voting Rights Act.

<u>**Plaintiffs' Map 1**</u> is our first-preference map. In Map 1:

    **1. District 1** unites all of Allapattah and Downtown, plus much of Overtown, Omni, and areas between the Miami River and Dolphin Expressway. It is bordered on the south by the Miami River and Dolphin Expressway; on the west by NW 27th Avenue and the city limits; on the north by the city limits, SR 112, I-95, I-395, FEC Railway, and NE 21st Street; and on the east by the bay.

    **2. District 2** unites all of Brickell, Coconut Grove, and Silver Bluff, including Golden Pines. It is bordered by Coral Way, SW 17th Avenue, US 1,

I-95, the Miami River, the bay, and the city limits.

**3. District 3** unites Shenandoah, the Roads, and much of Little Havana east of 27th Avenue, including the heart of Calle Ocho. It is bordered on the north by the Dolphin Expressway and Miami River; on the east by I-95; on the south by US 1, SW 17th Avenue, and Coral Way; and on the west by 27th Avenue.

**4. District 4** sits compactly in the western end of the city, uniting all of Flagami and the West Flagler area. It encompasses everything west of 27th Avenue and north of Coral Way, including Coral Gate and Grapeland Heights.

**5. District 5** is situated on the northern end of the city, uniting all the neighborhoods north of the Julia Tuttle/SR 112, including Liberty City, Little Haiti, and the Upper East Side. It also encompasses portions of Overtown north of I-395, and part of Edgewater. Its southern border runs along SR 112, I-95, I-395, the FEC Railway, and NE 21st Street.



<u>**Plaintiffs' Map 2**</u> is our second-preference map. In Map 2:

**1. District 1** unites all of Allapattah, much of Little Havana, and part of Downtown. It is bordered on the south by the Miami River and SW 4th Street; on the west by 22nd Avenue, the Miami River, and the city limits; on the north by the city limits and SR 112; and on the east by I-95, NW 8th Street, and the Metrorail.



**2. District 2** includes everything on the bay side of US 1, I-95, the Metrorail, and the FEC Railway, from the southern city limits up to NE 23rd Street. It includes all of Coconut Grove, part of Brickell, and much of Downtown and Omni.

**3. District 3** unites Shenandoah, the Roads, Silver Bluff, and much of Little Havana, including the heart of Calle Ocho. It is bordered on the north by Callo Ocho, SW 22nd Avenue, SW 4th Street, and the Miami River; on the east and south by the Metrorail, I-95, and US 1; and on the west by the city limits.



**4. District 4** sits compactly in the western end of the city, uniting all of Flagami and the West Flagler area. It encompasses everything north of Calle Ocho and west of 22nd Avenue to the Miami River, including Grapeland Heights.

**5. District 5** is situated on the northern end of the city, uniting all the neighborhoods north of the Julia Tuttle/SR 112, including Liberty City, Little Haiti, and the Upper East Side. It also encompasses much of Overtown including down to the historic Lyric Theater, and some of Edgewater. Its southern border runs along SR 112, I-95, NW 8th Street, the FEC Railway, and NE 23rd Street.

<u>**The Voting Rights Act**</u>:

Consistent with the expert analysis credited by the Court, District 5 in both maps will continue to provide Black voters with the ability to elect preferred candidates, as the Voting Rights Act requires.

In Map 1, District 5 is:

- **53% Black**, 32% Hispanic, 12% non-Hispanic white, and 2% Asian, American Indian, or Pacific Islander by Citizen Voting-Age Population (CVAP) from the Census Bureau's 2020 American Community Survey.
- **52% Black**, 28% Hispanic, 18% non-Hispanic white, and 2% Asian, American Indian, or Pacific Islander by 2023 voter registration.[1]

In Map 2, District 5 is:

- **55% Black**, 31% Hispanic, 11% non-Hispanic white, and 2% Asian, American Indian, or Pacific Islander by CVAP.
- **53% Black**, 28% Hispanic, 17% non-Hispanic white, and 2% Asian, American Indian, or Pacific Islander by voter registration.[2]

We plan to provide you with further expert analysis regarding these maps' compliance with the Voting Rights Act in the coming weeks.







### Other Legal Requirements:

These maps fully comply with all other requirements of law, including the U.S. Constitution's equal-population mandate. In fact, both these maps better comply with the "One Person, One Vote" requirement than the unconstitutional 2022 map:



| Plaintiffs' Map 1 | | | | |
|---|---|---|---|---|
| **District** | **Population** | **Deviation** | **Percent Deviation** | **FDC-Miami Population[3]** |
| **1** | 85,162 | −3,005 | −3.4% | 1,407 |
| **2** | 89,078 | +911 | +1.0% | — |
| **3** | 87,666 | −501 | −0.6% | — |
| **4** | 89,091 | +924 | +1.0% | — |
| **5** | 89,837 | +1,670 | +1.9% | — |
| **Citywide** | **440,834** | *4,675* | *5.3%* | |

---

[1] These voter registration statistics exclude voters whose race is unknown, multi-race, or "other." These voters are 7% of District 5 in Map 1.

[2] Voters whose race is unknown, multi-race, or "other" are 7% of District 5 in Map 2.

[3] Consistent with recent caselaw in the Eleventh Circuit, we have excluded from the redistricting count the 1,407 individuals the 2020 Census counted as incarcerated at the Federal Detention Center in Downtown Miami. *See Calvin v. Jefferson Cnty.*, 172 F. Supp. 3d 1292 (N.D. Fla. 2016). Because these individuals come from across the county and region, because FDC-Miami is a federal facility, and because *nobody* is registered to vote at FDC-Miami, they lack the "representational nexus" with city commissioners required to include them in the population count for City Commission redistricting. *Id.* at 1310.

Regardless of whether the FDC population is included or excluded, however, Plaintiffs' Maps 1 and 2 conform to equal-population requirements, and do so better than the unconstitutional 2022 map.

| Plaintiffs' Map 2 | | | | |
|---|---|---|---|---|
| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
| 1 | 86,541 | −1,626 | −1.8% | — |
| 2 | 91,173 | 3,006 | +3.4% | 1,407 |
| 3 | 85,108 | −3,059 | −3.5% | — |
| 4 | 90,388 | +2,221 | +2.5% | — |
| 5 | 87,624 | −543 | −0.6% | — |
| Citywide | 440,834 | 6,065 | 6.9% | |

We urge you to consider these maps as you continue your legislative process. We look forward to following your deliberations in the coming days, and we welcome the opportunity to collaborate with you on a map that fairly represents all Miami. We submit these options in the spirit of collaborative and constructive dialogue.

Please do not hesitate to contact any of us if you would like to discuss this matter further. If you wish to have a meeting including our attorneys, please reach out to the City Attorney's Office to facilitate that.

Thank you for your consideration.

Sincerely,







**Christopher Hudson**
*Secretary, GRACE*
gracegrove@gmail.com
(786) 337-1703

**Rebecca Pelham**
*Executive Director, Engage Miami*
rebecca@engage.miami
(802) 522-4266

**Harold Ford**
*President, South Dade NAACP*
president@southdadenaacp.org
(786) 253-9400

**Daniella Pierre**
*President, Miami-Dade NAACP*
presidentofmiamidadenaacp@gmail.com
(877) NAACP-09

**Alexandra Contreras**

**Clarice Cooper**

**Jared Johnson**

**Steven Miro**

**Yanelis Valdes**



**Plaintiffs' Map 1**
*for the Miami City Commission*

May 23, 2023

| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
|---|---|---|---|---|
| 1 | 85,162 | -3,005 | 3.4% | 1,407 |
| 2 | 89,078 | +911 | +1.0% | — |
| 3 | 87,666 | −501 | −0.6% | — |
| 4 | 89,091 | +924 | +1.0% | — |
| 5 | 89,837 | +1,670 | +1.9% | — |
| Citywide | 440,834 | 4,675 | 5.3% | |

| District 5 Racial Makeup | | | | |
|---|---|---|---|---|
| | Black | Hispanic | Non-Hispanic White | Asian, Pac. Islander, Am. Indian |
| 2020 Citizen Voting-Age Pop. (CVAP) | 53% | 32% | 12% | 2% |
| 2023 Voter Reg. | 52% | 28% | 18% | 2% |



**Plaintiffs' Map 2**
*for the Miami City Commission*

May 23, 2023

| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
|---|---|---|---|---|
| 1 | 86,541 | −1,626 | −1.8% | |
| 2 | 91,173 | 3,006 | +3.4% | 1,407 |
| 3 | 85,108 | −3,059 | −3.5% | |
| 4 | 90,388 | +2,221 | +2.5% | |
| 5 | 87,624 | −543 | −0.6% | |
| Citywide | 440,834 | 6,065 | 6.9% | |

| District 5 Racial Makeup | | | | |
|---|---|---|---|---|
| | Black | Hispanic | Non-Hispanic White | Asian, Pac. Islander, Am. Indian |
| 2020 Citizen Voting-Age Pop. (CVAP) | 55% | 31% | 11% | 2% |
| 2023 Voter Reg. | 53% | 28% | 17% | 2% |



**Plaintiffs' Map 3**
*for the Miami City Commission*

| Plaintiffs' Map 3 | | | |
|---|---|---|---|
| District | Population | Deviation | Percent Deviation | FDC-Miami Population |
| 1 | 86,200 | −1,967 | −2.2% | 1,407 |
| 2 | 89,522 | +1,355 | +1.5% | — |
| 3 | 85,973 | −2,194 | −2.5% | — |
| 4 | 90,388 | +2,221 | +2.5% | — |
| 5 | 88,751 | +584 | +0.7% | — |
| Citywide | 440,834 | 4,675 | 5.0% | |

| District 5 Racial Makeup | | | | |
|---|---|---|---|---|
| | Black | Hispanic | Non-Hispanic White | AAPI, Am. Indian |
| 2020 Citizen Voting-Age Pop. (CVAP) | 56% | 32% | 10% | 2% |
| 2023 Voter Reg. | 56% | 28% | 15% | 1% |

June 13, 2023
for more information:
aclufl.org/miami-maps

draft

Chair King:  (INAUDIBLE) redrawing our maps for redistricting as we are required to do by federal law.  Today is June 14th, 2023, and we shall begin shortly.  We just have to get two more of my colleagues here.  I didn't want to start until we had everyone because this is important to the entire city of Miami.

Commissioner Reyes:  (INAUDIBLE).

Chair King:  No, we have five.  We have five.

Commissioner Reyes:  We have five?

Chair King:  Yes, we have five.

Commissioner Reyes:  (INAUDIBLE).

Chair King:  But I didn't -- although we had a quorum, I didn't want to start until we had everyone here because this is important to the entire city of Miami.  So, hold on one second.  As is tradition, we will open this meeting with prayer.  I am honored to have Father Denrick Rolle from St. Agnes located in Overtown.

Invocation delivered.

Chair King:  And at this time, Commissioner Alex Díaz de la Portilla, would you honor us with the pledge of allegiance?

Pledge of allegiance delivered.

Chair King:  At this time, I will have the City Attorney read a statement into the record.

Victoria Méndez (City Attorney):  Thank you, Madam Chair.  Detailed information about the processes, order of business, rules of procedure, scheduling or rescheduling of City Commission meetings can be found in Chapter 2, Article 2 of the City Code, a copy of which is available online at www.municode.com.  Any person who is a lobbyist pursuant to Chapter 2, Article 6 of the City Code must register with the City Clerk and comply with related City requirements for lobbyists before appearing before the City Commission.  A person may not lobby a city official, board member, or staff member until registering.  A copy of code section about lobbyists is available in the City Clerk's Office or online at www.municode.com.  Any person making a presentation, formal request or petition to the City Commission concerning real property must make the disclosures required by the Code in writing.  A copy of this Code section is available at the Office of the City Clerk or online at www.municode.com.  The City of Miami requires that anyone requesting action by the City Commission must disclose before the hearing any consideration provided or committed to anyone for agreement to support or withhold objection to the requested action pursuant to City Code Section 2-8.  In accordance with Section 2-33(f) and (g) of the City Code, the agenda and material for each item on the agenda is available during business hours and the City Clerk's Office, online 24 hours a day at www.miamigov.com.  Any person may be heard by the City Commission through the Chair for not more than two minutes on the proposition before

draft

the City Commission unless modified by the Chair. Public comment will begin at approximately 10:45 and remain open until public comment is closed by the chair. Members of the public wishing to address the body may do so by submitting written comments via the online comment form. Please visit www.miamigov.com/meetinginstructions for detailed instructions on how to provide public comment using the online public comment form. The comments submitted through the comment form have been and will be distributed to elected officials, their staff, and the City Administration throughout the day so that the elected officials may consider the comments prior to taking any action. Additionally, the online comment form will remain open during the meeting to accept comments and distribute to the elected officials, their staff, and City Administration up until the chair closes public comment. Public comment may also be provided live at City Hall located at 3500 Pan America Drive, Miami, Florida, subject to any and all rules as they may be amended. If the proposition is being continued or rescheduled, the opportunity to be heard may be at such later date before the City Commission takes action on such proposition. When addressing the City Commission, the member of the public must first state their name, their address, and what item will be spoken about. Any person with a disability requiring assistance, auxiliary aids, and services for this meeting may notify the City Clerk. The City has provided different public comment methods to indicate, among other things, the public's support, opposition, or neutrality on the items and topics to be discussed at the City Commission meeting in compliance with Section 286.0114(4)(c), Florida Statutes. The public has been given the opportunity to provide public comment during the meeting and within reasonable proximity and time before the meeting. Anyone wishing a verbatim record of the item considered at this meeting may request it at the Office of Communications or view it online at www.miamigov.com. Please silence all cell phones and other noise making devices at this time. This meeting will be viewed live on Miami TV, the City's Facebook page, the City's Twitter page, the City's YouTube channel, and Comcast Channel 77. The broadcast will also have closed captioning. Thank you.

Chair King: Thank you, Victoria. Mr. City Clerk, do you need to read a statement for the record?

Todd B. Hannon (City Clerk): No, ma'am.

Chair King: Okay.

Chair King: At this time, I will begin the public comment, but before I begin the public comment, I'd like to recognize seniors from my district who have come to participate in this process. Welcome, you guys. Good to see you.

Applause.

Chair King: So, at this time, I'm going to open the floor for public comment. Anyone wishing to make a comment on this matter, redistricting, please step forward.

Unidentified Speaker: May I speak?

Chair King: Better idea. The Plaintiffs have a presentation, and perhaps it would be better if the Plaintiffs made their presentation so that public comments can be borne after the Plaintiffs make

draft

their presentation.  So, I'm going to allow the Plaintiffs to make their presentation, and then we'll have public comments.  Plaintiffs?

Yanelis Valdes:  Hello.  Good morning.  My name is Yanelis Valdes.  I am the director of Organizing and Advocacy at Engage Miami.  I'm also a resident in the city of Miami.  I'm from the Omni area, and I'm an individual plaintiff on the lawsuit.  I want to start off by saying thank you for convening this special meeting to advance the process to remedy the racial gerrymander that unconstitutionally divides voters along racial lines and slices through our neighborhoods, violating our rights.  We sent a letter last month that we continue to stand by with two proposed maps that present a new vision for Miami.  One that moves us forward rather than holds us back.  One that advances representation for all residents rather than constrains it.  One that brings us together rather than divides us.  Yesterday we shared a new map incorporating community feedback and input from you all.  I have printed copies that I can share with you all.  All the maps that we've submitted feature compact and logical districts that respect neighborhoods, follow major geographic boundaries, and preserve genuine communities of interest.  They don't pack Hispanic voters into three specific districts and no longer designate one district as an Anglo-access seat.  They also fully comply with the VRA (Voting Rights Act) and provides black voters with the ability to elect their preferred candidate in District 5.  The new map, Map 3, unites Overtown once again in District 5, which was divided in the map passed last year.  It also keeps other key neighborhoods unified like Flagami, Edgewater, Allapattah, and Shenandoah.  The court has given you all an opportunity and the responsibility to undo the violations and remedy the wrongs in the map passed last year.  I hope that the community is centered throughout the discussion today and the maps that we've worked hard to put together are discussed at length and are very seriously considered.  Miami residents deserve to have their vote and voice reflected in the makeup of our city districts.  Thank you.

Chair King:  Thank you.

Victoria Méndez (City Attorney):  I'm sorry Madam Chair, I just wanted -- oh, are you passing out the maps?  Thank you.

Chair King:  And at this time, I will have the representatives for the City of Miami present the map that they have prepared.

Ms. Valdes:  I just want to add, we're out of the printed maps, but we'll be available to answer questions if you all have any.  Thank you.

Commissioner Díaz de la Portilla:  Can I ask a question, a quick one?  For Engage Miami, who are you?  Who do you represent?  You have to say it here.

Ms. Valdes:  Yeah, so we are one of the plaintiffs in the case.  We do civic engagement, civic education in the community.  So, redistricting was a really important process for us to be involved in.

Commissioner Díaz de la Portilla:  How long have you been in existence?

draft

Ms. Valdes:  I'm sorry?

Commissioner Díaz de la Portilla:  How long have you been in existence?

Ms. Valdes:  Since 2015.

Commissioner Díaz de la Portilla:  Since 2015.  And who are your members?

Ms. Valdes:  Our members are a variety of young folks from across the county.  We have, I don't know off the top of my head, but a good amount in the city of Miami as well.

Commissioner Díaz de la Portilla:  You don't remember how many members you have?

Ms. Valdes:  Not in the City of Miami, but we have about 150 members.  I would say somewhere between 30 and 50 are in the City of Miami.

Commissioner Díaz de la Portilla:  Okay, thank you.

Ms. Valdes:  Thank you.

Miguel DeGrandy:  Madam Chair, we just need a couple of minutes to set up, but while that's happening, the map that you have in front of you was delivered to me at 8 o'clock yesterday.

Unidentified Speaker:  (INAUDIBLE) closer to the mic, please?

Mr. DeGrandy:  Can you hear me?  So, we haven't had a chance to do a full review of that map. However, I could tell you, you know, some of the things is very similar in performance to their Alternative 2, which is what we had prepared to discuss today and compare to our proposal.  So, at the end, I'll give you some thoughts on the map that's in front of you that was delivered yesterday.  But again, it works the same political calculus as the maps in Alternative 2.  And with that, let's go to slide two.  And again, good morning, Commissioners.  Now on the screen right now is our proposed plan.  But before I walk you through it, let me take a few minutes to discuss where we are in comparison to the Plaintiff's proposals.  We've now had an opportunity to review their Alternative 1 and their Alternative 2 fully.  And the one thing that this Commission and the Plaintiffs agree with is that District 5 is required by the Voting Rights Act.  But we believe the configuration of Plaintiffs' D5 (District), which includes severing parts of Overtown, may negatively impact the ability of this compact and cohesive community to have an equal opportunity to elect a candidate of choice throughout the decade that this plan will be in place.  Indeed, Plaintiffs seem to ignore the fact that in the last 30 years, the demographic trends evidence significant gentrification in D5 and the fact that the black population in the city has continued to decline both in absolute and relative terms.  Now I know this commission has reviewed and is very aware of these gentrifying development issues because they necessarily come before this body, so I will not spend time in our presentation going through what you already know.  Now, we approached the draft of a new plan by using Plaintiff's proposed Alternative 2 as a template and making changes consistent with the policy choices of the majority of the selected body.  And at the outset, it is important to acknowledge the obvious.  Approximately 70 percent of Miami's

draft

population is Hispanic.  And once you draw District 5 in compliance with the VRA, the fact remains that the remaining population of the city is now approximately 75 percent Hispanic.  It is also a fact that the majority of the Hispanic residents live in the central and western parts of the city.  Now, because of this reality, both of the Plaintiff's alternative plans necessarily include three majority Hispanic districts in that area.  Next slide.  The Plaintiff's alternatives, which are on the board, intentionally pack the more conservative Hispanic voters in the western areas of the city.  Next slide.  Plaintiff's preferred alternative makes D4's voting age population slightly over 95 percent Hispanic.  Plaintiff's Alternative 2 results in making D4's voting age population almost 96 percent Hispanic.  Now, this slide illustrates how both plans pack the more conservative voters in the western part of the city into D4.  By packing more conservative voters into D4, shifting areas around, and submerging part of the compact and cohesive Overtown community in D1, the plan is geared to result in a more liberal voting pattern for D1.  In their correspondence, Plaintiff's claim that the reason they drew D4 the way that they did it is because they wanted to unite all of Flagami and West Flagler.  This despite the fact that in the six publicly noticed hearings we had before this Commission and the five publicly noticed hearings we had in your respective districts, not one resident that I am aware of came to complain that Flagami or West Flagler was divided into two districts.  On a side note, it's important to point to the fact that Plaintiff's alternatives also split some traditional neighborhoods, such as Little Havana.  And that is because, as in our draft plan, the goal of keeping traditional communities intact in one district is necessarily subordinate to the need to comply with the constitutional requirement of substantially equalizing district populations.  And in that regard, which traditional community may have to be divided is quintessentially a legislative choice.  Both of Plaintiff's alternatives also remove parts of Overtown from D5.  Again, in the six public meetings and five district meetings that we had, not one resident or organization, including Plaintiff NAACP (National Association for the Advancement of Colored People), suggested that you should move Overtown out of D5, so we are at a loss to understand this radical shift in position.  Next slide.  So, again, moving Overtown into D1 in both alternatives and removing from D1 the most conservative voters from the northwest part of Flagami and West Flagler results in a more liberal leaning electorate in that district.  Next slide.  For example, in Plaintiffs' Alternative 1, the percentage of Republican registered voters in D1 drops by close to 9 percent compared to our proposal.  In our proposal, President Biden would have received 50 percent of the vote in the 2020 presidential election in D1, while in the Plaintiffs' alternative, he garners 68 -- 63.8 percent of the vote.  In the 2018 race for governor, DeSantis, the conservative candidate, was over 15 percentage points lower in the Plaintiffs' Alternative 1 than in our proposal.  And in the 2018 Attorney General race, the conservative candidate, Moody, drops just under 15 percent compared to our proposal.  Next slide.  In their Alternative 2, the percentage of Republican registered voters in D1 drops by 6 percent in the Plaintiffs' plan compared to our proposal.  In our proposal, President Biden would have received 50 percent of the vote in the 2020 presidential election in D1, while in the Plaintiffs' proposal, he enjoys 57.5 percent of the vote.  In the 2018 race for governor, DeSantis, the conservative candidate, was 9 percentage points lower in the Plaintiffs' D1 plan than in our proposal.  And in the 2018 Attorney General race, the conservative candidate also drops 9 percent compared to our proposal.  So, the political objectives of the Plaintiffs' plans are clear, measurable, and significant.  And Plaintiffs' plan may also negatively impact the ability of black voters to elect the candidate of choice throughout the decade in D5 while submerging parts of the compact and cohesive black community of Overtown in a district in which they will not have such equal opportunity.  Next slide.  In contrast, you will see in this slide our proposed plan keeps historic Overtown intact in District 5.  Now, as I stated at the beginning,

draft

in developing the draft plan that I'm going to present for your consideration, we actually began our work off the Plaintiffs' plan, specifically Alternative 2. Next slide. In fact, as you can see, the general configuration of the districts in Plaintiffs' Alternative 2 are in many respects very similar to our plan. And while it is true that the Plaintiffs' Plan is certainly visually more compact than our proposal, compactness is not a constitutional requirement. Indeed, federal case law clearly holds that a district may take any shape, even a bizarre shape, as a result of policy or political objectives as long as they are not racially driven. As you will see, the Plaintiffs' alternative plan shows three districts in the central part of the city going east to west, a district going north to south, District 5, and a narrow coastal district, District 2. Frankly, we agree that this is generally the only configuration that makes sense, but there are notable differences in how they draw the lines to distribute the population among the districts in order to achieve a political objective. In the Plaintiffs' proposed alternative, District 1 remains in the north central part of the city, although its connection to the west is completely cut off, and those are the conservative voters. District 2 remains a coastal district, although it shifts more to the south. District 3 does change significantly, resulting in splitting Little Havana. District 4 migrates west and packs more conservative voters all into one district, and District 5 generally runs north to south, but removed parts of Overtown and D5's connection to the river, the Wharf, and the MRC (Miami Riverside Center). Now, our plan takes into account the political and policy considerations, such as where commissioners have invested district resources in their projects, or the need to balance poor areas with areas that have significant economic potential or activity as requested by Commissioner King and the majority of this commission. Thus, we've made modifications to the Plaintiffs' alternatives that would result in a different political calculus than the considerations which clearly drive the Plaintiffs' plans. As you can see in the slide -- let me make sure that I've got the right slide. Yes, as you can see in the slide before you, the configuration of Plaintiffs' D5 is similar and in most of the northern end, identical to the D5 proposed in our plan. Now, recognizing that D5 is subject to the VRA, the legal directive in crafting this district was to ensure compliance with the Voting Rights Act, but we did so with an emphasis on using natural and man-made boundaries and keeping as many communities of interest together as feasible. Next slide. We were also cognizant of Commissioner King's desire to include areas that would generate significant economic activity and would enhance what she has publicly described as the lowest per capita income district in the city. So, logically we started at the northern end of the city's municipal boundaries and worked our way down. As you can see in the northern end, D5 includes all of the traditional neighborhoods of Shorecrest, Belle Meade, Bayside, Little River, Lemon City, Liberty City, and Buena Vista. Going further south, areas such as Wynwood, Midtown, and the Design District, which have significant economic and employment activity, were included. Commissioner King is working diligently on issues such as affordable housing, public transit solutions, et cetera, and she has strongly advocated to have Overtown remain in her district because the residents of that area share the same concerns and needs with regard to those issues as the more central and northern parts of her district, and our proposed plan accommodates that request. Finally, we included a small part of the riverfront and downtown based on the chairwoman's request to include the Wharf and the MRC in her district. We also had to make minor jagged edges to keep the overall deviation low. Nevertheless, District 5 boundaries consistently -- consist mainly of natural and man-made boundaries, such as the City's municipal boundaries, the bay, the railroad, the Miami River, an expressway, and the contours of traditional neighborhoods. Now in regard to District 1 -- next slide -- we restored the connection to part of the western part of the city, thereby distributing the more conservative voters in the west within two districts. Both our plan and the Plaintiffs' alternative acknowledge that there should

draft

be a district containing the bulk of the Miami riverfront.  This is an important business community organized through the Miami River Commission that is politically active in matters such as land use and other issues affecting the river and its shores.  However, we approach it in a different configuration only because of the decision to keep Overtown in D5 and Commissioner King's request to keep the economic potential of the Wharf, the redeveloping MRC, as well as portions of downtown in her district.  As you can see when you look at the southeast portion of D1, that finger coming down looks irregular only because the eastern part follows the contours of Overtown.  Now, apart from the river constituency, the district includes traditional neighborhoods of Allapattah, Civic Center, Grapeland Heights, and parts of West Flagler and Flagami.  The majority of District 1's boundaries also track significant man-made and natural boundaries, such as water boundaries, major roads, the city's municipal boundaries, the borders -- and the borders of traditional neighborhoods, as well as I-95.  Next slide.  Now Plaintiffs' alternatives demonstrates that it makes logical and planning sense to configure D2 as a coastal district, and in fact, they did so, just like we did.  In both the Plaintiffs' alternatives and our proposed plan, D2 remains a coastal district.  Indeed, the residential uses in the central and northeastern coastal areas consist to a significant degree of high-rise condominiums and apartments in the city's waterfront and are markedly different than the suburban residential uses and infrastructure challenges to the west.  Both plans do move a sliver of the North Grove south of US-1 that had been placed in D4 back into D2.  Next slide.  However, our proposed plan smooths out and extends the area north that was in D2 and was assigned to D3 in a similar manner as in the plan Commissioner Reyes had proposed back when in order to equalize population, which was ultimately not adopted by this commission.  And this approach was actually referred to by the court as an alternative map with less of a discriminatory impact.  Next slide.  Our proposed D2 goes further north than the Plaintiffs' alternative to take parts of Morningside while Plaintiffs' alternative ends around Edgewater.  D2 includes significant portions of traditional neighborhoods such as Morningside, Bay Point, Omni, Downtown, Brickell, and Coconut Grove.  Now the Plaintiffs' configurations of D3 and D4 are markedly different in our proposed plan than in the Plaintiffs' alternative.  However, it's important to first note the obvious.  Put the first -- the next slide up.  As I said, it's important to note the obvious, which is -- put the other slide up, and the next slide up if you may.  These two slides show of the Plaintiffs' own alternatives help to illustrate that there is no way to apportion the population of those two districts in a manner that would not result in majority Hispanic percentages in both simply because the great majority of Hispanics live in that area.  That is just a fact based on the demographics of the folks that live in those areas.  Accepting this fact, it is clear that the different approaches in crafting the two districts between our proposal and the Plaintiffs' alternative are nothing but a difference in policy and political considerations.  Now, as I explained before, the Plaintiffs' Plan was designed to concentrate the most conservative voters into D4, and you see it right there.  Thus, the Plaintiffs' plan makes policy choices as to which communities belong in the respective districts.  But those policy choices are uniquely a legislative prerogative.  For example, Plaintiffs' configuration removes all of Shenandoah and parts of Silver Bluff from D4 and joins those communities with parts of a fractured Little Havana.  Next slide.  Our proposed plan unpacks their District 4 in the West, which does result in a split of Flagami, but District 4's configuration in our draft preserves the bulk of Shenandoah in D4, Silver Bluff and Coral Gate in one district.  Now it's important to note that the decision to design D4 in that manner was based in part on the request of Commissioner Reyes to maintain in his district areas such as Shenandoah, which through his leadership, the City has invested and will be investing significant resources and capital to improve parks and infrastructure.  Now we also extended the southern border of D4 to US-1 in

draft

order to use that highway as a logical boundary.  D4's other boundaries include the City's municipal boundaries, the border between most of Shenandoah and other traditional communities. Now, next slide please. Finally, District 3 now wraps around District 4.  Again, that configuration was necessary to preserve most of Shenandoah in D4 while preserving Little Havana intact in D3, as well as the need to equalize population.  In our draft, the traditional neighborhoods of Little Havana and the Roads, as well as significant parts of Riverside, are kept within D3.  D3 utilizes man-made and natural borders, such as the Miami River, Bayshore Drive, as logical boundaries. Next slide.  Finally, Plaintiffs' proposed alternative has a 6.9 percent deviation while our plan better complies with the goal of substantial equality among districts with 2.6 percent deviation, making it more consistent with constitutional requirements.  Now, let me make a couple of comments, if I can pull them up on the map that we received yesterday.  On visual observation, you could see the same political objective of packing conservative voters in District 4, because it is the same District 4 as in the alternative that we were able to fully review.  The configuration of District 1 looks very similar to the configuration we reviewed, and I would expect the same political performance.  Indeed, the initial data that we were able to extract last night indicates almost identical political performance than the Alternative 2 that we evaluated.  I could also tell you, as I understand the community of Overtown, that it fractures the cohesive Overtown community.  I think Plaintiffs have their own impression of where Overtown is, but if you Google for Miami neighborhood maps, the ones I've seen, including your NET (Neighborhood Enhancement Team) map, shows a configuration consistent with our understanding.  But I'll leave that to the district commissioner, who is in the best position to tell us what constitutes Overtown. Their plan also continues their Alternative 3 to split Little Havana.  So, in summary, Commissioners, we believe our plan better reflects the political and policy choices of this Commission.  It incorporates much of the input provided in previous public hearings and complies with both the Constitution and the Voting Rights Act.  And with that, I thank you for the time and opportunity to make this presentation.

Commissioner Covo:  Madam Chair, can we make -- do questions now or later on?

Chair King:  After public comment.

Commissioner Covo:  Okay, because I have some.  Thank you.

Chair King:  At this time, I'll open the floor for public comment.  You have seen what the Plaintiffs are proposing, and you are seeing what the City's attorneys are proposing and now you may make your comments.

Victoria Méndez (City Attorney):  Madam Chair, the Plaintiffs said that they're available -- the Plaintiffs' attorneys are available if the Commission has any questions.

Chair King:  Good morning.

Nathaniel Robinson:  Good morning, Commissioner -- Chairwoman King.  My name is Reverend Nathaniel Robinson III, Senior Pastor of Greater St. Paul AME (African Methodist Episcopal) Church and one of the plaintiffs in the case.  What I want to say very quickly today is that the City Commission is the only body with the authority to adopt a map.  It's the only -- we -- the Plaintiffs

draft

in the case don't have the authority to do that.  As a result of the ruling that the judge gave, the Plaintiffs in the case were given three days to offer a recommendation to the City Commission. What's being presented here today is somewhat a false narrative in my opinion that the Plaintiffs have a plan.  There's no plan from the Plaintiffs.  It's an opportunity to present a recommendation for the Commission to consider as they are the only governing body with the authority to vote on a map.  What we did do that we believe was not done by the consultants who had months and months to do this is, since we made those recommendations, we had conversations with communities.  And after mediation that ended at 6 p.m. yesterday, in two hours, we responded to the conversations we've had with community members and council for the City and made adjustments.  That's why the map was only given at 8 o'clock last night.  But it took into consideration what the BNA (Biscayne Neighborhood Association) asked for.  It took into consideration the new map that we presented as a recommendation, puts Overtown back, the entirety of traditional Overtown, back into District 5.  It also includes economic drivers like the Southwest CRA (Community Redevelopment Agency) and parts and portions of the Omni CRA. So these are things that we're doing on the fly within hours, within days, that our City consultants were not able to do, but only as recommendations, because we don't have the authority to present any plan or implement anything.  But as Plaintiffs and as residents of the city and organizations from our city, we're doing our best to help and assist the City by offering recommendations.  And for our recommendations to be attacked seems to be somewhat of a false narrative today.  In addition, we talked -- we looked at 0.5 percent of a change.  And 0.5 percent is not a big change but thank you for your time.

Chair King:  Thank you.  Good morning.

James Fried:  Hi, hi.  James Fried, 2575 South Bayshore Drive, Miami.  I support neighborhoods. I believe that the ACLU (American Civil Liberties Union) states voting districts should respect neighborhoods.  Drawing borders to show prejudice to race is illegal.  Why is the consultant talking about race and politics?  It sounds like gerrymandering.  I have seen how eager the residents of the West Grove have been to remain part of the traditional Coconut Grove.  I believe that the North Grove should remain intact.  I want to thank everybody for their time and consideration.  Please keep our neighborhoods together and please keep the North Grove part of District 2.  Thank you so much, Madam Commissioner.

Chair King:  Thank you.  Good morning.

Sam Latimore:  Good morning, good morning.  My name is Professor Sam Latimore, 937 Northwest 55 Street.  I've been a resident of the City of Miami, Liberty City, for a number of years, going back to the '59.  We are here to advocate for some things that I think we have just become involved in.  And we feel very strongly that Overtown needs to remain in District 5.  And our assumption is not based upon what I hear all the time and what is fractioning our community, is that we have a conservative base versus a progressive base, a conservative base versus a liberal base.  And that seems to be the tenor of much of the discussion, not only in Miami, but around the state.  Our point is that that has always been a historically black community.  We grew up in there. It was the foundation of a lot of things that happened in the city of Miami.  And so we would be arguing and suggesting that it remain as it was and we keep politics out of it.  It's becoming frustrating for us to hear the conservative.  What is a conservative?  Is a conservative one person

draft

that adopts a political position versus another assertion?  And that's what I've heard all this morning, that we want to put conservatives here and liberals here.  My point is that we will be arguing that Overtown remains that.  It's always been historically black.  It is a foundation of what the City of Miami arose out of.  And we also would like to see that the Wharf and the MRC remain in District 5 as well.  We have -- because of the conservatives and this, we have a community which has been disfranchised, which will not -- which do not have the economic basis that other groups have.  And we would suggest and we would like to offer that MRC and the Wharf remain in District 5 because it begins to give back to those communities some of the things that conservatively have been taken away.  This is a tremendously underserved community, and it's not underserved because it chose to do that but because of the fractionalization of this community.  There is a financial report, support that this particular place has for us, and it is critical that for those of us who have been here long before the change in our communities, that we put -- we leave those two positions and areas intact.  Thank you very much, Commissioner.

Chair King:  Thank you.

Mr. Latimore:  Thank you.

Chair King:  Good morning.

Marcos Loureiro:  Good morning.  Thanks for the opportunity.  My name is Marcos Loureiro.  I'm the vice president of Biscayne Neighborhood Association.  We have the Biscayne Neighborhood Association, BNA, goes from the Arsht Center to the 38th Street, all the way to the track of the train.  This is an association that is in place for over 10 years, almost 15 years, and we have made a lot of progress.  I have reached the Plaintiff.  I spoke with Commissioner Covo, Commissioner Reyes, and I had the opportunity today to discuss with the consultant.  Our ask, don't divide us.  Don't put an Edgewater, one piece in one district, another piece in another district.  We want to continue having the success that we are having.  Thank you.

Chair King:  Thank you.  Good morning.

Vivian Perkins:  Good morning.  My name's Vivian Perkins.  My address is 1150 Northwest 49th Street.  I am here to speak on PS.1 [sic], 14148.  Districting, to the Commissioners, please, listen very carefully.  Everything that lives together, grows together.  To split up a community that has been traditionally put there and the CRA growing it, and because it's a low-income area, let's keep it growing.  Let's keep it loving.  Let's keep it by law.  And the law shows love.  In order to give that love, we're determined to face equal challenges, and those challenges would be to keep it the same.  Why change?  Why change it in the way that it's not going to help anyone?  How can you help anyone if you change and change and go on with things that you're determined to do it by data, by people?  But it does take people and their votes.  So let's remember that we are about people.  The people I represent and the community I represent, we're all Commissioner Christine King's plan, mainly because it's the right one.  Thank you.

Chair King:  Thank you.

Ms. Perkins:  Oh, it's flag day.

draft

Commissioner Díaz de la Portilla:  And Trump's birthday.

Anthony Parrish:  Good morning, Commissioners.

Chair King:  Good morning.

Mr. Parrish:  Andy Parrish, 3940 Main Highway.  I'm grateful to be here.  I've been in a lot of these.  I'm learning a lot about redistricting.  I thought I knew a little bit, but I didn't.  Every one of these meetings I come to, I learn more.  I started out saying, I know there's a 10 percent requirement that all the districts have to be within 10 percent of each other.  And I thought it was mainly about making sure that the black vote is not disenfranchised.  And that's about all I knew.  And now, as I've come to more of these meetings, I see what the Voting Rights Act to me is about is communities of interest.  Communities of interest, while they do take into account ethnicity and race, it's much more than that.  It's really, from my take of what I've learned so far, and I'm learning every day, it's about neighborhoods.  So, to me, communities of interest, which the Voting Rights Act talks about, is using the building blocks of neighborhoods and also geographic boundaries and natural boundaries and US-1 and all that, but also to put voters together in a community based on neighborhoods.  So, any plan that supports neighborhoods to the maximum amount, I think is what should be done.  And then I think we'll start getting voter participation again in the city, which as we all know, is abysmally low.  The turnout for local elections is probably less than 15 percent.  If we reunite neighborhoods, I think we're going to see the voting percentage go up hugely and we're going to see people say, yes, this is my neighborhood and it includes black, white, Hispanic.  We all know that the city is mostly Hispanic, but I think communities of interest bridges over that and it's based on neighborhoods.  Thank you so much for letting me speak.

Chair King:  Thank you.

Barbara Lang:  My name is Barbara Lang, 3901 Braganza Avenue, Coconut Grove.  I'm going to be quick.

Unidentified Speaker:  Microphone.

Commissioner Díaz de la Portilla:  Come closer.

Ms. Lang:  This is a bad map.  You need to reunite Coconut Grove.

Applause.

Miguel Gabela  Hello, good afternoon.  My name is Miguel Gabela, 1701 Northwest South River Drive, Miami, Florida 33125.  I am a candidate and I'd like to ask, it's not clear to me, I can't see the map here.  My house is right on the very border on 17th Avenue.  Can somebody tell me please if my house is inside the district or not?  Because here's the --

Chair King:  I'm sorry, sir.

draft

Mr. Gabela:  -- problem that we're going to have.

Chair King:  I'm sorry, sir.

Mr. Gabela:  Well -- okay.

Chair King:  What district?

Mr. Gabela:  My -- I'm in District 1.  I am a candidate against this gentleman here in the City of Miami since February, and it appears that in this map that you've drawn up, my house is right outside the district.  What a coincidence.  Can I see the map?  Maybe I'm talking out of line.  That's why I'd like to see the map so I can determine whether my house has been intentionally left outside the district or whether it's in the district.  If it's in the district, there's no problem.  I walk away. I'm not going to give any speech.  Can I -- can somebody tell me?  1111 Northwest 17th Court, Miami, Florida 33125, 1701 Northwest South River Drive.  I've been there for 23 years.  I need to know if my house is there.  I am a contender candidate since February of this year, walking, knocking on doors against this gentleman here with all due respect.  And I just need to know if my house has been left intentionally outside the district or not.  If it's in the district, I have no problem, ma'am.  I will turn away and walk away.

Chair King:  Hold on one second.  Let me get the --

Mr. Gabela:  Can somebody find out for me please?

Chair King:  Where's attorney?

Mr. Gabela:  Because I don't want to give you a speech for no reason if my house is in the district and waste your time.

(COMMENTS MADE OFF THE RECORD)

Chair King:  Did Mr. DeGrandy leave the building?

Mr. Gabela:  It's moved to District 3.  What a coincidence it's moved to District 3.  Well, okay, now I do have a speech to say.

Chair King:  Wait, wait.  Let me get -- from the consultants.

Mr. Gabela:  Okay, okay.

Chair King:  Victoria.

Ms. Méndez:  We will -- we will go find Mr. DeGrandy.  Mr. Gabela, we'll go find him and if you could just wait a moment.

draft

Mr. Gabela:  No, no, I'd like to say my speech because I know you're going to find him --

Chair King:  Okay, let --

Mr. Gabela:  -- and he's going to give me excuses why he left me out and I think this was done intentionally by this gentleman here.

Chair King:  Okay, sir, sir.

Mr. Gabela:  Yes, ma'am.  Can I give my speech and I'll be out of here?

Chair King:  No, let me -- let me -- maybe you don't need to give your speech.

Mr. Gabela:  Okay.

Chair King:  Let us see and then if so --

Mr. Gabela:  But have you seen the map?  Have you seen where my house is?

Chair King:  Yes, I --

Mr. Gabela:  Have you seen --

Chair King:  I don't -- sir --

Mr. Gabela:  -- have you seen the map of my (UNINTELLIGIBLE)?

Chair King:  Sir, this is the first --

Mr. Gabela:  What a coincidence.

Chair King:  -- sir, this is the first --

Mr. Gabela:  What a coincidence that I'm a candidate --

Chair King:  Sir, sir.

Mr. Gabela:  -- against this gentleman and my house is left out.  My house is --

Ms. Méndez:  (INAUDIBLE) moment to find this.

Chair King:  Mr. DeGrandy, could you please pull up the map so we can confirm?  Thank you. Good morning.

Fleta Stamen:  Good morning.  My name is Fleta Stamen.  I'm a long-time resident of Coconut Grove, and I'm at 3078 Aviation Avenue, Coconut Grove, Florida.  I'm also a native of Miami.

draft

And I would just like to ask you all to please preserve and put back together the 30 neighborhoods that were divided.  And also, I would like to stress that each of us needs to be fully represented by a commissioner.  But I would also like to point out today, I'm not used to coming to these hearings except on this particular matter, which I find very important, and I'm stunned that we're getting maps from two different groups at this in the audience.  We didn't even get your map.  So, it's very hard to respond appropriately without the information in our hands, and I would like to request that.

Chair King:  I understand.  As the Plaintiff said, they were working on these maps till 8 o'clock last night.  So were our consultants.  I just got the map this morning.

Ms. Stamen:  Right.

Chair King:  So it's not that we're not trying to get the information.  They were working both sides diligently late into the night last night.

Ms. Stamen:  No, no, I respect that, but maybe we need another hearing so we have an opportunity --

Chair King:  I don't think we have time.

Ms. Stamen:  -- to respond.

Chair King:  We are on a tight deadline imposed by the court.

Ms. Stamen:  But that kind of cuts the --

Ms. Méndez:  Here's a copy -- a copy of the --

Ms. Stamen:  No, I accept that, but you know, it just cuts us out of the process and we're the constituents.  That's all I'd like to mention but thank you.

Chair King:  Thank you.  Good morning.

Andres Althabe:  Morning.  Andres Althabe, 1900 North Bayshore.  You all know me.  I've been before this Commission many times and I appreciate the words of the new officers of BNA saying that in the last ten years, we have accomplished many things because, in those ten years, I was the president of BNA getting those accomplishments.  I don't have any doubt on the good intentions of the commissioners when they approved the last map in March of 2022.  But there were -- you accomplished something and it's that nobody liked it, especially in Coconut Grove, which is a neighborhood where people have lived there for 30 years.  It has a history as a community and is probably the only one neighborhood that has that kind of history.  Second would be Brickell, and I have been advocating for keeping Edgewater and Omni together, but that doesn't mean that necessarily on District 2.  Everybody agrees that District 2 has to be reduced.  And this last map that came from bad to worse, they keep -- they just take out of District 2 Morningside and they keep on District 2 the most affluent people in the city.  What I don't think that is the philosophy

draft

of anybody, especially it didn't seem to have been the philosophy of this lawsuit. The philosophy was diversification and integration in every district. I don't blame anybody because they have not been participating. The Edgewater has probably more connection to Wynwood than to other districts. So, my message is definitely to integrate Coconut Grove again and don't try to keep all the most affluent people in the coast in District 2 when there is a history of Edgewater working together, especially with Wynwood and the Design District. So, I think that is my message. Keep Omni and Edgewater together. Definitely keep Coconut Grove together. And Omni and Edgewater, I think it would be a much more smooth integration to District 5 than keep complaining that the District 2 Commissioner doesn't do anything for us because it's ridiculously large. Thank you.

Chair King: Thank you. Good morning.

Nathan Kurland: Good morning. Nathan Kurland, 3132 Day Avenue. I was thinking today about a riddle that I heard. The riddle goes like this, what do you call 14 rabbits walking backwards? And the answer is a receding hairline. And what I notice about this particular discussion is that we seem to be going backward. The Plaintiffs gave us easily to understand map of what they are recommending for our districts. The City gave us nothing but maps we couldn't even see from the seats in this auditorium. That's backwards. Las Vegas already has a line on how late the city commission of Miami will meet. I lost, I bet on the under and it was on the over, backwards. Changing our communities, as Mr. Parrish mentioned, changing the neighborhoods which change our communities make for a population that really, you know, separates itself from the governing body and the city of Miami. Backwards. Commissioners, it is time to move forward. The fact that we don't even get to see a map on the fact -- you know, by the City is making this public comment kind of moronic. We're supposed to be talking intelligently about a map we can't see and we don't even know what it says. Mr. DeGrandy did as good a job as he could, but again, if the Plaintiffs can do this, why can't the City? We believe the neighborhood should stay the same. And certainly, and I really don't understand why a third of the City's presentation had to do with who voted for Biden, who voted for this. I understand that we can't have districts based on race, but we also can't have districts based on who's voting for who. Thank you very much.

Chair King: Thank you.

Mr. Kurland: Keep neighborhoods together, keep Coconut Grove together.

Chair King: Thank you. Victoria, do we have the answer to the question?

Vice Chair Carollo: What question?

Chair King: Where is his house?

Vice Chair Carollo: Oh.

Mr. Gabela: May I speak?

Chair King: No, not yet.

draft

Chris Johnson:  May I, Madam Chair?  Yes, so the line between those districts runs along a canal, and the property the gentleman showed me is on the eastern side of the canal in the District 3.

Vice Chair Carollo:  Now --

Todd B. Hannon (City Clerk):  Chair, can I have the speaker's name?  Sir, sir if you just --

Mr. Johnson:  Oh, I'm sorry.  I beg your pardon.  My name is Chris Johnson.  I'm here as part of the presentation.

Vice Chair Carollo:  Chris, since I have you up here, where -- if we could put that map up here again -- where is 17th Avenue here?  I'm a little lost with this map and the boundaries.  What I have is very small to -- maybe if you could kind of draw it and we could see it.

Mr. Johnson:  So, this is the map zoomed in to the area --

Vice Chair Carollo:  Right.

Mr. Johnson:  -- the gentleman was asking about.

Vice Chair Carollo:  Right.

Mr. Johnson:  The --

Vice Chair Carollo:  Where would 17th Avenue be?

Mr. Johnson:  17th Avenue runs along -- trying to get the mouse to show you.  Sorry, Commissioner, I'm trying to get the mouse to show.  17th Avenue runs -- if you look at the -- where the road intersects the river, that's 17th Avenue.

Vice Chair Carollo:  Could you write with a magic marker in there so we can all see it up there?  Is it possible?

Mr. Johnson:  One moment.

Vice Chair Carollo:  Thank you.

Mr. Johnson:  So, this is 17th Avenue, Commissioner.

Vice Chair Carollo:  Where at?

Mr. Johnson:  I'm going to make the line brighter.  That would be 17th Avenue.

Vice Chair Carollo:  Oh, okay.

draft

Mr. Johnson:  Right there.

Vice Chair Carollo:  Way over there.  I was looking to the right.

Mr. Johnson:  This is a canal that runs along that section right along there.

Vice Chair Carollo:  I see.  So, that's 17th Avenue there.  Yeah, so 7th Street is right almost at the tip there, right above where you got the circle at the bottom -- correct? -- on the line?

Mr. Johnson:  I beg your pardon, Commissioner?

Vice Chair Carollo:  Northwest 7th Street is right above where you have the circle?

Mr. Johnson:  That is correct.  This is Northwest 7th Street.

Vice Chair Carollo:  Okay, all right.  And can -- Madam Chair, can I take him lower into the district to ask him a question now or should I wait for later?

Chair King:  We should wait.

Vice Chair Carollo:  Okay, alright, that's fine.  Thank you.

Chair King:  Sir, go ahead.

Mr. Gabela:  Thank you, ma'am.  My name is Miguel Gabela, 1701 Northwest South River Drive, Miami, Florida, 33125 for the record.  It has now become evident that my house, 1111 Northwest 17th Court, Miami, Florida, 33125 and 1701 Northwest South River Drive, which is a vacant land adjacent to my house, which I have lived there for 23 years as my residence along with my wife and my daughters, homesteaded for 23 years.  I ran in 2019 against this gentleman here and I was the runner-up.  I've been running since February.  Okay, this is quite obvious that this is a political move on somebody's behalf.  This will not stand.  There is case law about this.  I was warned about this on Saturday morning.  I was warned about this on Saturday morning.  I couldn't believe that somebody would be capable of doing this obvious.  Because if you look at that map, you will see that I am the only one on that corner of the northeast of the intersection.  I am on the northeast of the intersection, right next to the 17th Avenue Bridge.  There's no other house there.  That's my house, right there.  So, what a coincidence that you guys, or somebody decided that they were going to cut it right there when it's been like that in the district for years, since I first ran in 2015.  Okay, what I have to say, I know this is politically motivated, okay, and here's what I'm going to say.  You, Mrs. King, Commissioner Covo, Commissioner King, Commissioner Reyes, have the authority to stop this when it comes to the vote, okay.  You don't need any more lawsuits in the city of Miami.  You have enough right now.  Please don't do this to me and don't make me go out and get myself an attorney and have to sue the city because I don't want to do this.  Okay, put me back.  The remedy is, put me back as I was before so I can continue running against this gentleman.

Chair King:  Thank you.

draft

Mr. Gabela:  Okay, I haven't finished.

Chair King:  No, your two minutes are up.

Mr. Gabela:  Oh, my two minutes are up.

Chair King:  Thank you.

Mr. Gabela:  I see.

Chair King:  Thank you.

Mr. Gabela:  Thank you very much.

Chair King:  Good morning.

Christi Tasker:   Good morning, Commissioners.   Thank you very much for allowing public comment.  My name is Christi Tasker.  I live at 150 Southeast 25th Road in the Roads.  My district is not -- will remain District 2 no matter what, but what we've heard here today is absolutely appalling and could potentially cost the City a lot more money.  Furthermore, it is gerrymandering. We've heard even the City consultants state facts based on national elections, when all of you sitting in the seats are supposed to be nonpartisan, working together.  I simply ask that you keep the communities together.  Furthermore, avoid lawsuits.  I don't know the gentleman that just spoke, but the reality is when you have someone running against Mr. De La Porta [sic] -- Portilla -- sorry, I apologize, Mr. De La Portilla.

Commissioner Díaz de la Portilla:  Okay, Díaz de la Portilla, but okay.

Ms. Tasker:  I'm not going to waste my two minutes trying to pronounce your name, so I apologize.

Commissioner Díaz de la Portilla:  That's okay.

Ms. Tasker:  But regardless, we need to --

Commissioner Díaz de la Portilla:  Okay.

Ms. Tasker:   -- make sure that we are keeping communities together instead of dividing communities.  District 2 needs to be further divided in terms of squaring it up, very much like the ACLU maps are, and the lines need to be clean.  Right now, it looks like a divot of a mess.  You've got little sections divoting down.  And Ms. King, I understand that you are working on different portions, you know, throughout the city and your district is rather large.  So I would just ask for you to consider working with the future commissioner of each district if it happens to be divided so that we can keep the district nice, square, and clean.  Thank you very much.

Chair King:  Thank you.  Good morning.

draft

Rose Pujol:  Good morning.  Rose Pujol, 2455 South Bayshore Drive.  Commissioners, Chairman, I would like to say that you have heard from the community that obviously we'd like to see the neighborhoods intact.  That's overwhelming.  It's almost deafening.  I would not like to see what happened in Michigan in 2018 when they actually passed a commission initiative that the legislature made the decision as to who would be representing the people.  I ask you -- we know you.  Commissioner Carollo, in the middle of all your scrutiny, I really appreciate that you took the time to take a look at that map and ask where this gentleman's address is.  Commissioner Alex DLP, I love -- personally, I love mischievous people and I understand where you're coming from but do the right thing.  Add him.  It doesn't take much.  Thank you to everybody.

Chair King:  Thank you.  Anyone else for public comment?  Is there anyone else who'd like to speak on behalf of this redistricting process?  Seeing none, the public comment period is now closed.

Chair King:  I am going to start with my Vice Chair.  Do you have any questions?

Vice Chair Carollo:  I do.

Chair King:  Mr. DeGrandy, can you put the map up that we are working from?

Vice Chair Carollo:  Okay, before I inquire into boundaries, because it's very small for me to figure out where boundaries are at.  I can't see avenues or streets.

Mr. DeGrandy:  Would you like me to blow up -- I'll blow up a D3 (District).

Vice Chair Carollo:  If you would, to begin with.

Mr. DeGrandy:  Okay, if we could blow up a D3.

Vice Chair Carollo:  I'd appreciate it, but while you're doing with that, Chair, if I may say --

Chair King:  Can you put the streets and the avenues --

Vice Chair Carollo:  Yeah.

Chair King:  -- on the map as well?

Mr. DeGrandy:  They would show if the plan is augmented enough.

Vice Chair Carollo:  Yeah.

Mr. DeGrandy:  It does show the streets.

Chair King:  Oh, okay.

draft

Vice Chair Carollo:  Well, while they're doing that, if I may make the following statement, Chair. Our positions, whether commissioners or even the mayor of the city, they are and always have been nonpartisan positions, meaning we don't run by parties.  We're nonpartisan.  And I, for one, that's the philosophy that I very strongly have followed, not to get into the petty politics of either parties or French parties.  I've worked with everyone from both sides of the aisle, as they say, from both parties, major parties, even other smaller parties, and I guess that's why I was able to win my re-election with a majority from Republicans, Democrats, and Independents.  I've been very non-partisan.  To me, some of the things I've heard here are what clearly have been described as.  The area of my district, we went up already, so I know now where 17th Avenue is going.  On the new border with District 4, between District 4 and District 3, what avenue is that?

Chris Johnson:  May I, Commissioner?

Vice Chair Carollo:  Yes, sir.

Mr. Johnson:  So, the western border is 32nd Avenue, the far western border.  The northern border is 8th Street.

Vice Chair Carollo:  Right, then I'm going down.

Mr. Johnson:  And this border is --

Vice Chair Carollo:  What avenue is that?

Mr. Johnson:  I believe that is 4th.  Let me double check.

Vice Chair Carollo:  No, no, it can't be 4th.

Mr. Johnson:  14th, I believe.

Vice Chair Carollo:  No.

Mr. Johnson:  Yeah, hang on.

Vice Chair Carollo:  It could be 14th, I don't know.

Commissioner Reyes:  It could be --

Victoria Méndez (City Attorney):  4th Avenue?

Mr. Johnson:  14th, 14th.

Vice Chair Carollo:  It's 14th Avenue?

Mr. Johnson:  Yes, Commissioner.

draft

Vice Chair Carollo:  Okay, now, as --

Ms. Méndez:  I'm sorry.  Are we looking at the yellow, Commissioner?

Commissioner Reyes:  Yes.

Vice Chair Carollo:  Yeah, between the yellow and the blue.

Ms. Méndez:  And the blue, right so that --

Vice Chair Carollo:  So --

Ms. Méndez:  -- should be 4th Avenue because the next one says 3rd Avenue.

Vice Chair Carollo:  No, no, no, no, no, no, no, no, that's got to be 14th Avenue.

Unidentified Speaker:  It's 14th.

Vice Chair Carollo:  There's no 4th Avenue there.

Unidentified Speaker:  14th.

Mr. Johnson:  14th.

Vice Chair Carollo:  Yeah.

Mr. Johnson:  It's 14th.

Vice Chair Carollo:  Now, it -- you have 8th Street and then it cuts off at 14th Avenue, correct?

Unidentified Speaker:  Yes.

Mr. Johnson:  Correct.

Vice Chair Carollo:  Okay, now coming down where it kind of does like a triangle at the bottom, where does it do the extreme part of the triangle?  Is that 16th Avenue?

Mr. Johnson:  So, this is 3rd Avenue that curves along here.  The blocks are shaped irregularly.

Vice Chair Carollo:  Right.

Mr. Johnson:  So, it comes down to 3rd and then runs along 3rd to Dixie Highway.

Vice Chair Carollo:  Okay, so that -- yeah, that's what we call 3rd Avenue.  The -- down here -- okay, where would Coral Way be?  Just up a little bit.

draft

Mr. Johnson:  The far western boundary?

Vice Chair Carollo:  Yeah.

Mr. Johnson:  I'm sorry, I don't under -- were you asking me to --?

(COMMENTS MADE OFF THE RECORD)

Mr. Johnson:  Right here?

Commissioner Díaz de la Portilla:  No, (INAUDIBLE).  Go down.

Mr. Johnson:  22nd is right here.

Vice Chair Carollo:  22nd is Coral Way, just up a little bit.

Mr. Johnson:  Right here.

Commissioner Díaz de la Portilla:  No, that's (INAUDIBLE).

Mr. Johnson:  Okay, I'm sorry.

Vice Chair Carollo:  Yeah.

Mr. Johnson:  Right.

Vice Chair Carollo:  In the bottom.

Commissioner Díaz de la Portilla:  Go down, go down (INAUDIBLE).

Mr. Johnson:  22nd Street is right here, Commissioner.

Vice Chair Carollo:  Yeah, okay.  Miguel, this area between 22nd Street, Coral Way, then on the left, as we look at it, is 17th Avenue that goes all the way to US-1 and then back to the district border.  That little square there, that divides that part of Silver Bluff even more, where we just invested some significant amounts in a park.  How many people does that little square have?  It can't be that many.

Mr. DeGrandy:  I'd have to actually run the program, but we can get you those numbers.

Vice Chair Carollo:  Yeah, but what I want to be able is whatever we do, we can do today.

Mr. DeGrandy:  Yes, no, absolutely.  We can take a break --

Vice Chair Carollo:  Okay.

draft

Mr. DeGrandy:  -- whenever you want, Commissioners.

Vice Chair Carollo:  Can you get those numbers in that minute square, if we can?  You see what I'm pointing to?

Commissioner Reyes:  Yes, you are --

Vice Chair Carollo:  The park is right on the other side.

Commissioner Reyes:  That's right.  You're talking about Silver Bluff.

Vice Chair Carollo:  Well, yeah, it's the other side of Silver Bluff.

Commissioner Reyes:  Yes.

Vice Chair Carollo:  Now we're dividing it --

Commissioner Reyes:  Yes.

Vice Chair Carollo:  -- into even more.

Commissioner Reyes:  Yes, that's right.  And I also have a comment also on this now that you are mentioning it.  You're taking District 4 out west to 14th Avenue.  That will cut also from District 1, which is Little Havana, Domino Park, you see.

Vice Chair Carollo:  No, not really.  On 14th Avenue, it's fine because Domino Park is really from --

Commissioner Reyes:  15.

Vice Chair Carollo:  -- 9th Street -- 15th Avenue.

Commissioner Reyes:  15th Avenue.

Vice Chair Carollo:  Yeah, and it goes from 9th Street to 8th Street, the -- what we call Domino Plaza.

Commissioner Reyes:  That's right, Domino Plaza, but it's cut from District 3 in this map.

Vice Chair Carollo:  I don't believe so.

Commissioner Reyes:  Yes, sir.

Vice Chair Carollo:  Because -- well, you -- no because the plaza still goes from 9th Street to 8th Street.

draft

Commissioner Reyes:  From 9th to 8th, but it is on 15th Avenue.

Vice Chair Carollo:  It's 15th, but it will go from 8th Street to --

Commissioner Reyes:  What I'm trying to say, Commissioner, is that my belief is that Domino Park should be part of District 3, of Little Havana.

Vice Chair Carollo:  Well, the -- that would be simple.  We could just, in that same line as before, where the cut was 9th Street, leave it at 9th Street.

Commissioner Reyes:  Leave it at 9th Street, okay.  That's right.

Vice Chair Carollo:  You know, I -- I'm fine with the Commissioner.  I'm glad you pointed that out.  These are small, minute tweaks that don't matter much in population basis.  But -- so, Mr. DeGrandy, on the bottom, so that we can see what we're doing, down in Silver Bluff, that little square that we mentioned, from 22nd Street, Coral Way, down 17th, you know, back into the district, 17th to US-1 to the district, if he could figure out how many people we have there.  And then on the top, from your cut on 14th Avenue that you made, instead of bringing it all the way to 8th Street, if you could maybe bring it to 9th Street, up until 17th Avenue.

Commissioner Reyes:  Yeah.

Vice Chair Carollo:  A little less.

Commissioner Reyes:  So we can keep --

Vice Chair Carollo:  Yeah.

Commissioner Reyes:  Okay.

Vice Chair Carollo:  9th Street to 17th Avenue, that would be part from 14th to 17th Avenue.

Mr. DeGrandy:  Okay.

Vice Chair Carollo:  8th Street to 9th Street, it's a minute amount of population.

Mr. DeGrandy:  Of course.

Vice Chair Carollo:  I doubt it if you have more than 50 people living there but --

Mr. DeGrandy:  Okay.

Vice Chair Carollo:  -- the other question that I would have, down in the bottom, across US-1, what you did, it stops at the expressway there going into Virginia Key and Key Biscayne.

Mr. DeGrandy:  Basically, yes.

draft

Vice Chair Carollo:  Yeah, the little strip where, I don't know if my eyesight -- I can't see it, but where District 3 would end, from there to Simpson Park.

Mr. DeGrandy:  You're looking north.

Vice Chair Carollo:  Yeah, way in the bottom --

Mr. DeGrandy:  North and south of US-1.

Vice Chair Carollo:  -- way in the bottom to the right.

Mr. DeGrandy:  North and south of US-1.

Vice Chair Carollo:  Yeah, there's a little strip where South Miami Avenue is, so that you make it more square.  If you could figure out in that little strip how many people you have, I would estimate you have somewhere between 200 to 300 people that live there, because those are very large lots compared to others.

Mr. DeGrandy:  To get to Simpson Park?

Vice Chair Carollo:  Yeah, to get to Simpson Park.  Between South Miami Avenue, the boundary line that you have for the district and the two point -- Simpson Park and where you had ended the district as you turn into Virginia Key.  And then over 3rd Avenue, which is Coral Way, the other side of Simpson Park, that little strip that's in District 2 that goes up to a strip that's been in my district, how many voters do we have in that strip?

Mr. DeGrandy:  That's probably more dense.

Vice Chair Carollo:  Yeah, that's more dense.

Mr. DeGrandy:  Yeah.

Vice Chair Carollo:  That's why I'm inquiring that.  And that little strip in 3rd to --

Mr. DeGrandy:  Maybe a couple thousand.

Vice Chair Carollo:  I think it would be less than that, but you know --

Mr. DeGrandy:  Okay.

Vice Chair Carollo:  -- that's why I'm asking you to run it and see what we have to there.

Mr. DeGrandy:  We'll run all the numbers on that.

draft

Vice Chair Carollo:  Yeah, and last but not least, you have from 27 to 22nd.  You know, when we talk about the Grove, and I've lived there and I've lived in this city for a lot longer than a lot of the people that I've been hearing from, when you talk about the Grove, you're talking about different neighborhoods.  I know the -- it sounds great, one Grove, but you're talking about different people, different neighborhoods.  And let me start all the way to the end.  The area where Stallone and Madonna used to live in, South Miami Avenue, that was the Grove into itself.  Then you cut across the street from Vizcaya and you look at Bay Heights.  That's a different Grove.

Mr. DeGrandy:  To (UNINTELLIGIBLE) neighborhood.

Vice Chair Carollo:  Yeah.  They even pay for their own security there.  Then you go across 17th Avenue to 22nd Avenue, you've got some of the biggest lots that you have in the whole city of Miami, and certainly, I would say the biggest lots that are not in the bay, in the whole city, in that section there.  That's very different than when you go across 22nd Avenue to 27th Avenue, that now the homes are reduced in lots, they're not as expensive, and it's a very changing area from what I've been seeing.  Frankly, you have a lot more Hispanics moving in there with younger families and so on, and they're fixing up the older homes there and making them a lot more expensive.  Then from 27th Avenue, when you go into the Center Grove, it's totally different than all the other areas that I mentioned.  You have more townhouses, a lot of townhouses.  You have more apartments.  Then you go into the South Grove, and you get into, again, very expensive areas.  You take that South Grove almost to Cocoplum.  That's a whole different Grove than the rest that I described.  And last, but not least, you go into the -- what we now have named Little Havana, the old Black Grove, and that's very different.  And that's changing every week as we speak because it's being gentrified like there's no tomorrow in that area.  So, in what we call Coconut Grove, you have many, many different communities within that Grove that have major differences in many ways, in more ways than I've described here.  And you also have certain similarities, like you do with any community.  Having said that, in -- I'm just trying to get numbers from you.  On the part where you cut the Grove beginning in 27th down to 22nd --

Mr. DeGrandy:  Hold on.  Let me wait till it's on the --

Vice Chair Carollo:  Yeah.

Mr. DeGrandy:  -- on the screen.

Vice Chair Carollo:  If you could give me numbers also and how many people live there.  Okay, and then, if you would come down -- in other words, this whole area that you did, the full amount of people that lived there, and then if you would come down Aviation, 27th through Aviation, where you make it a little tighter, the other side of Aviation is practically very few homes.  It's -- in other words, you're going to give me amounts of people in the square that you did there from 27th to 22nd, and then you're going to make it even tighter.  From 27, you cut it on Aviation to 22nd, a second one.  Do you follow me, Miguel, in what I'm asking?

Mr. DeGrandy:  I'll -- yeah, I'll certainly look at the map.

Vice Chair Carollo:  Yeah, the --

draft

Mr. DeGrandy:  And if I have any questions --

Vice Chair Carollo:  -- the one in Aviation is just going to make it a little lesser in population.

Mr. DeGrandy:  Okay.

Vice Chair Carollo:  That's all.  And when we break, if we could see that then --

Ms. Méndez:  So, Commissioner, your main concerns were to keep certain communities together and certain neighborhoods together with regard to that as well?  And you need just some questions on numbers.

Vice Chair Carollo:  I'm asking just for numbers now --

Ms. Méndez:  Okay, thank you.

Vice Chair Carollo:  -- so that I could see the shifts.  The area that I did express a concern was on --

Ms. Méndez:  Well, he'll give us numbers in the break and then we'll talk about it.

Vice Chair Carollo:  Yeah, sure.

Ms. Méndez:  Thank you.

Vice Chair Carollo:  Thank you.

Mr. DeGrandy:  And we've had -- I'm happy to do that and we'll come back to you with numbers.  We've had other commissioners also make requests for review of plans.  I know Commissioner Díaz de la Portilla has proposed an alternative that we found to be compliant.  Commissioner Covo sent me a couple.  One I couldn't evaluate, but the other I could and gave her my response that that was also constitutionally compliant.  So, we're happy to review any --

Chair King:  So, that is exactly what we -- I'd like for us to get all of our comments out and then take a break for lunch.

Mr. DeGrandy:  Yes, ma'am.

Chair King:  Have you work on it to present and then we can come back and vote.  Commissioner Covo, do you have --?

Commissioner Covo:  Yes, I do.  I am extremely confused with the presentation because, as I expressed when we were going back and forth with this situation, I am an advocate of keeping the identity of Coconut Grove together.  I do understand Commissioner Carollo's point that it's very diverse, but I think the city as a whole is very diverse.  And what I'm seeing in District 2, which

draft

is the district that I represent with a lot of effort, because it's very diverse, is that we're splitting Coconut Grove and we're splitting Morningside. Those two are neighborhoods that have been together, that are historic. It doesn't matter how much they're changing in many ways because the whole city is changing. And probably in 10 years, we're going to be going through this with a totally different map, because we're very multicultural. So, I would like to see the same breakdown, please, that you presented for the other two districts, for District 2, because I do understand that District 2, because it is the one going vertical, and it is going to continue to go vertical because we have the zoning for that. We are overpopulated. So, I do understand that we need changes. I just want to make sure that the changes that we have represent the community, because as commissioners, we are the ones that draw the lines, right? But we are the voice for our community. And what my community has expressed to me is that they want to keep Coconut Grove together. So, it's tough, you know, trying to see the emails, listen to what they think. And also as a commissioner, I think that the type of service that we could give, if the districts look alike, of course, is much, much better. So, that would be my request.

Mr. DeGrandy: Yes, ma'am. And I think you can confirm, I did speak with your chief of staff yesterday. I did give him my analysis of your map, Alternative 1. The overall deviation was in the six point something, which is within constitutional parameters. So, if you'd like us to, you know, basically model that and give you a photocopy of it and you can present it, that's fine, you're absolutely correct. I'm just here to make proposals. I don't make the decisions. You all will make those decisions. So, I'm happy to present, you know, to give you a copy of your plan so you could present it. We'll also put it on the board. Whatever Commissioner Carollo, you know, has requested, we will model that. I know Commissioner Díaz de la Portilla has a version that we've been able to look at also, like we did with yours. And we will come back after the break and tell you here's our proposal, here's the different alternatives, and you all are elected to make that decision, not me.

Chair King: Now did I hear, did I hear that you split Morningside? No?

Mr. DeGrandy: Yes, Morn --

Commissioner Covo: Morningside is split in this map.

Mr. DeGrandy: Yeah.

Chair King: Into D5?

Mr. DeGrandy: Half of Morningside goes into D5. Half of Morningside is on the --

Chair King: Okay, so up to last night, I did not get a briefing on that. I did not know that Morningside -- I was getting half of Morningside. So, I would have something to say about that.

Mr. DeGrandy: What would you like? Would you like to see a plan with all of Morningside in your district?

draft

Chair King:  No, I don't think that any of Morningside should go to my district.  Wouldn't that be splitting up neighborhoods?

Mr. DeGrandy:  Okay.

Applause.

Chair King:  I mean, not that I don't love Morningside, don't get me wrong, and I'm in Morningside all the time.  They are my neighbors, but I, you know -- is that what you want?

Mr. DeGrandy:  Commissioner Covo's plan -- well, do you permit me to comment on it?

Commissioner Covo:  Of course.

Commissioner Reyes:  Well, I haven't --

Mr. DeGrandy:  Commissioner Covo --

Commissioner Reyes:  Excuse me.  I haven't seen her map.

Chair King:  Right, I haven't seen --

Mr. DeGrandy:  Right.

Chair King:  Well, you know, I haven't seen --

Commissioner Reyes:  I want to know what she's coming with.

Chair King:  -- right, I haven't seen her map and I had --

Commissioner Reyes:  And if --

Commissioner Covo:  I -- just I love Morningside, and I've been working super hard, not only in my few hundred days, but when I was campaigning.  But when we were trying to see what would make sense, Madam Chair, we noticed that, of course, our district is overpopulated.  So, we felt, okay, if the sense of the community and even of the Plaintiff was to keep Coconut Grove together, it wouldn't make sense to split Morningside.  And that's what this plan is doing, splitting Morningside.  If I was for me, I wouldn't lose any of my neighborhoods.  I love my constituents and I've been working hard towards all of them, but I do understand that I'm the district that has more population and we need to be fair.

Mr. DeGrandy:  Yes.

Commissioner Covo:  And I also understand that, again, this should be based on the right of the people to vote and population as well.  Not only -- I just don't get the partisan topic and it's just not --

draft

Mr. DeGrandy:  All right.  Now, if I understand, just to clarify.

Commissioner Reyes:  I have a question.  I have a question.

Mr. DeGrandy:  Can I clarify for a second?

Commissioner Reyes:  Oh, sure, sure, sure.

Mr. DeGrandy:  If I understand, Commissioner Covo's plan would seek to put Morningside into D5.  What you're telling me is you want Morningside in D2.  Do I understand that correctly?

Chair King:  Yes, I'd like to see the impact of the proposal.

Commissioner Covo:  And me as well, Madam Chair.  Me as well.

Chair King:  Because --

Commissioner Covo:  It's not that I want to put it in her district.

Chair King:  -- you know --

Commissioner Covo:  I just want to see the difference.

Mr. DeGrandy:  All right, I'll show you and then you'll see the numbers.

Commissioner Covo:  See -- see the difference.

Chair King:  If this is --

Commissioner Covo:  If it's something that makes sense.

Chair King:  Morningside is in this -- because in the map that I received last night, I don't believe that Morningside was in my district.

Commissioner Covo:  No, it's split.

(COMMENTS MADE OFF THE RECORD)

Ms. Méndez:  So, just to be clear, I believe that Commissioner Covo wanted to keep Morningside in District 2.  That was your direction, and you want to see the numbers.

Mr. DeGrandy:  No, no, the direction that she asked, if I understand it correctly, is to put Morningside together into D5.

draft

Commissioner Covo:  So, technically what we proposed was to analyze how that would look.  So, I'm not redrawing it finally.  I just want to make sure what makes more sense to keep the neighborhoods together.  I just think that for District 2 to have Coconut Grove divided and Morningside divided doesn't make sense.

Mr. DeGrandy:  Okay, so we will present --

Chair King:  But I don't think there was ever an effort to divide Morningside, correct?  At least not in any of our conversations.

Mr. DeGrandy:  Yeah, I -- there's not a conscious effort, Commissioner, to divide any community.  It's all driven by numbers and the need to equalize.  But just to be clear, because I want to be responsive to every Commissioner, you want the plan consistent with the map -- the one you sent me.  Would that be correct?

Commissioner Covo:  Yes, but of course if you provide different numbers, we can also analyze it.  That's why we're here.

Mr. DeGrandy:  Of course.

Commissioner Covo:  Because it was also until 8 p.m. yesterday.  This morning, I hadn't seen any plan.  That's the whole situation.  We need to make clear where we're heading.

Mr. DeGrandy:  Sure.  I got your plans yesterday, so all I could do was respond by yesterday.

Chair King:  So, can you give us a copy of each of our maps?

Mr. DeGrandy:  If you all release them.

Chair King:  And we'll take a recess.

Mr. DeGrandy:  Commissioner Covo has told me that she has no problem releasing her plans, so I can model it and release it.  Now, to tell you what I mean by modeling is Commissioner Covo's plan delineates her district.  Now, I can see by the way she's delineated her district that it involves changes between these districts but doesn't impact the others.  So, when I responded to her chief of staff, I said, I assume, other than these changes, you're not impacting the other districts.  If that's correct, I can model that plan, which means I can give her a five-district plan that has all the numbers based on where she would like the lines drawn in D2.  So we --

Commissioner Covo:  Exactly.  And we also have other lines that we have changed that my chief of staff is telling me.  But at the same time, what I wanted to say is that my main request was to see what works for everyone and how we can keep the neighborhoods integrated.  I reiterate this because the attorneys came to our office and said, what's your priority?  So, it's not like we're just coming out with a definite plan.  We're just seeing the priorities of our constituents.  So, it's not about this is the final plan that you drew.  No.  I want to make sure that what I'm doing is aligned

draft

to what my constituents are petitioning, if the numbers -- and of course, under the Constitution, make sense.

Mr. DeGrandy:  Yes, yes.

Commissioner Covo:  It's not that I want to -- I don't want to lose any of the neighborhoods.  I love my district, but I do understand that I'm the most conflicted district because it is the one that is growing.  It has 75 percent -- probably more than 75 percent of the taxes.  So, I mean, I'm willing to work.

Mr. DeGrandy:  Understood.  To your comment about the second plan, let me explain to you why I couldn't give your chief of staff an opinion on that plan.  That plan drew the lines for District 2 but changed the lines for District 3 and did not contain lines for the other three districts.  And so, I cannot tell you whether the overall deviation complies with the Constitution, et cetera because to do that I would have to have five drawn districts.  Now, once you reconfigure District 3, I'm not the one that can say, you'd like 4 this way, you'd like 5 this way, et cetera.  It's up to you to tell me, here's how I'd like the plan drawn, and then I'm happy to generate the data for you.

Commissioner Covo:  Thank you.

Mr. DeGrandy:  Sir, I'm sorry.

Commissioner Reyes:  Madam Chair, I heard that there is another map in the making also, because we are all in the business of making maps, you see.  I don't know why we are hiring you, man.  You see, we're all making maps.  So, I heard there is another map by Commissioner Díaz de la Portilla.  I would like to have a copy of it also when we go to -- if we are going to be analyzing all the maps, you see.

Mr. DeGrandy:  Sure.

Commissioner Reyes:  Now --

Mr. DeGrandy:  If Commissioner --

Chair King:  I thought --

Commissioner Reyes:  I would have -- I would like a copy of Commissioner -- copy -- Covo and Commissioner Díaz de la Portilla --

Mr. DeGrandy:  Sure.

Commissioner Reyes:  -- and anybody else that has a map, I would like to see it too.

Chair King:  I thought this map was representative of all of our interests.

Commissioner Reyes:  It is.

draft

Chair King:  I thought this was the map that you were working from that expressed --

Commissioner Reyes:  Absolutely, that's what I heard.

Chair King:  -- all of the priorities.

Ms. Méndez:  Right, Version -- so Version 12 --

Chair King:  12.

Ms. Méndez:  -- is the only one that he initially crunched numbers on to give a baseline --

Commissioner Reyes:  Okay.

Ms. Méndez:  -- and then it's a presentation for all of you to move around.

Chair King:  Okay, so what I'd like to do is recess so that you can speak with all of us and we could -- we're working off of this map, you could speak with all of us, reiterate our priorities, and then we come back.  So, I'm proposing a three-hour recess so we could grab a bit of lunch and you have adequate time to meet with all of us so that we can come back and vote on a map.

Mr. DeGrandy:  Yeah, and here's what -- I don't know that you can vote on a map.  I'm being a realistic, Commissioner, because if each one of you makes different tweaks, it's impossible to generate all those into one map.

Commissioner Díaz de la Portilla:  Well --

Mr. DeGrandy:  Some may be mutually exclusive.  So, this is what I would suggest.  You know, anyone that wants to present a plan, I'm happy to do the analysis.  I'm happy to tell you does it comply with the Constitution.  And you can all pick from those versions which map you would like.

Commissioner Díaz de la Portilla:  Madam Chair, Version 14, which is the map that I put together, you've already said on the record that it's constitutionally compliant.  Is that correct?

Mr. DeGrandy:  That's my understanding, yes.

Commissioner Díaz de la Portilla:  So -- all right, so there's no tweaking on that plan.  That's already constitutionally compliant, correct?

Mr. DeGrandy:  That would be your proposal, yes.

Commissioner Díaz de la Portilla:  My proposal, yes, sir.

Mr. DeGrandy:  Yes.

draft

Commissioner Díaz de la Portilla:  Correct.

Vice Chair Carollo:  What is that?

Mr. DeGrandy:  And Commissioner --

Commissioner Díaz de la Portilla:  That's Version 14, which is -- was submitted about a week ago, about five days ago, and he's reviewed it and he's -- that plan, I'm not changing anything else. That plan itself was Version 14, is constitutionally compliant.  That's the only thing I'm interested in right now in terms of what the record should reflect.

Mr. DeGrandy:  Yes, as Commissioner Covo was also --

Commissioner Díaz de la Portilla:  That we may very well end up voting for a very tweaked -- because tweaking is tweaking and changing is changing, it's two different things, right?  So, if there's a couple of blocks, Domino Park, things of that nature, that could be a slight adaptation of Version 12, right?  So, it's minor changes in Version 12.  We also have the option available to us to recess the meeting at a particular juncture and come back tomorrow morning.  We don't adjourn; we recess.  I mean, I'm telling you what the options are.  You can deny it if you want, but I mean, we can.

Mr. DeGrandy:  I can't be here tomorrow morning.  I'm in --

Commissioner Díaz de la Portilla:  Well, you don't have to be here.  He can be here.  We have like seven lawyers, don't we?

Chair King:  Well, I can't be here tomorrow morning either.

Commissioner Díaz de la Portilla:  But you can answer a lot of the questions, right, today and then tomorrow's a different conversation, you know.

Mr. DeGrandy:  Absolutely.

Commissioner Díaz de la Portilla:  Yeah.

Mr. DeGrandy:  But what I'll tell you is this.

Commissioner Reyes:  Which version --

Mr. DeGrandy:  You know --

Commissioner Reyes:  -- is this?

Chair King:  Version 12.

draft

Commissioner Díaz de la Portilla:  That's Version 12.  That's Version 12.

Chair King:  Version 12.

Mr. DeGrandy:  Version 12.

Chair King:  Which incorporates your Version 14?

Commissioner Reyes:  I haven't seen --

Commissioner Díaz de la Portilla:  No, no.

Chair King:  Oh.

Commissioner Reyes:  -- Version 14.

Commissioner Díaz de la Portilla:  No, no, no.  Version --

Mr. DeGrandy:  Commissioner -- Commissioners, may I -- may I please?

Commissioner Díaz de la Portilla:  There's two different --

Vice Chair Carollo:  I don't think I have either.

Commissioner Díaz de la Portilla:  Wait, hold on a second.  It's very simple.  Version 12 is the City's map, the ones that takes into account everybody's input in different conversations.

Commissioner Covo:  Not mine, not mine.

Commissioner Díaz de la Portilla:  Well --

Commissioner Covo:  My input is not in this version.

Commissioner Díaz de la Portilla:  Well, okay, not yours.  But my understanding is that it's been discussed for about over a week in long meetings, with different commissioners independently of each other, right?  So, that's Version 12.  That's the plan that you presented to us today.  Is that correct?

Mr. DeGrandy:  That's correct.

Commissioner Díaz de la Portilla:  Okay.  Version 14 is my version.  We may very well not use that.  That's fine.  It's the will of the body, right?  But you've already reviewed Version 14.

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  And that's constitutionally compliant, correct?

draft

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  Okay.  The other tweaks that are going to happen in the break, that's a different conversation for later.  We may very well come back and debate Version 12 with some minor adaptations.  I agree with Commissioner Carollo, I think they both agree -- what I heard is that, you know, it should be probably 16th Avenue, not 14th Avenue, something like that, and Domino Park stays in District 3, if Commissioner Carollo -- if I'm phrasing your position correctly.

Vice Chair Carollo:  Well, the --

Commissioner Díaz de la Portilla:  And if you want to keep Domino Park, you've represented, you've invested a lot in it.

Vice Chair Carollo:  I believe Domino Park is still going to stay in the district.  What Commissioner Reyes pointed out, rightly so, that Domino Plaza would then go --

Commissioner Reyes:  That's right.

Vice Chair Carollo:  -- towards 9th Street.  So, what we're looking at is really from 15th Avenue to 17th Avenue, 9th Street, keeping it --

Commissioner Reyes:  That's all.

Vice Chair Carollo:  -- in District 3 like it was.  You're looking maybe 50 people that live in those two blocks.

Commissioner Reyes:  Yeah.

Commissioner Díaz de la Portilla:  Well, that's what I meant, right.

Vice Chair Carollo:  And then the other area --

Commissioner Díaz de la Portilla:  It's minor.  It's a minor change.

Vice Chair Carollo:  -- that I asked for the simple purpose of the park we're building that's about an acre or so in that part of Silver Bluff, to leave that section as it was from Coral Way down 17th Avenue to the highway.  And I can't imagine that you have more than 100 people there or less. So, between both areas that I'm talking about, maybe I'm guessing we have 150 people or so, not much more than that, I don't think.  Certainly under 200.

Commissioner Díaz de la Portilla:  What my understanding is --

Vice Chair Carollo:  So, it's a minute --

draft

Commissioner Díaz de la Portilla:   What my understanding, Commissioner Carollo and Chairwoman King, what my understanding is that these are minor changes that can take place.  I think what I heard here today, that you're happy with the way it looks.  Commissioner Carollo and Commissioner Reyes share a boundary there.  They can move around.  It appears they're both happy with those changes.  I can live with Version 12 at the end of the day.  So, to me, it's not that it wasn't proposed.  So, at the end, you know, that's four at least that I can hear.  I know you have concerns of the Grove, and obviously, your concerns will be addressed, and you have every right to have those concerns, but we just need to vote out a map so that the City has a map --

Chair King:  Right, so --

Commissioner Díaz de la Portilla:  -- to go to the courts and say this is the official -- because we don't have any official map.  We don't have an official map here until this Commission votes it out.

Chair King:  Right.

Mr. DeGrandy:  Absolutely.

Commissioner Díaz de la Portilla:  It's not when anybody comes to us and presents this in Version 1, 2, 3 to 14.

Chair King:  Right.

Commissioner Díaz de la Portilla:  Because we have to vote it out --

Chair King:  So --

Commissioner Díaz de la Portilla:  -- by a majority of the Commission.

Chair King:  So, I'd like to take a recess.

Commissioner Díaz de la Portilla:  Yes.

Mr. DeGrandy:  Well, let me just --

Commissioner Díaz de la Portilla:  I have ribs, Commissioner Carollo.

Mr. DeGrandy:  -- be clear as to what's --

Commissioner Díaz de la Portilla:  I'll leave you happy today.  I have ribs.

Chair King:  I'm sorry.

Commissioner Díaz de la Portilla:  Flanigan ribs in my office.

draft

Chair King:  I'm sorry, what did you --

Commissioner Díaz de la Portilla:  You too, Flanigan ribs.

Chair King:  What happened?

Commissioner Díaz de la Portilla:  Ribs.

Mr. DeGrandy:  May I be --?

Chair King:  Go ahead.

Mr. DeGrandy:  Okay.  I just want to be clear as to what we can do and what we will do.  We will sit with each one of you, make whatever changes to the plan you need.  I don't think you need any.  We will then publish three hours from now --

Chair King:  Yes.

Mr. DeGrandy:  -- whatever you want to publish, three, four alternatives.  It's your decision.  It's not my decision.

Ms. Méndez:  Yes.

Mr. DeGrandy:  All I can do is give you the version.

Chair King:  Understood.

Commissioner Díaz de la Portilla:  And I do not need to meet with you.  Now, you're going to miss out on the ribs.

Chair King:  Understood.

Commissioner Díaz de la Portilla:  That's your loss.

Chair King:  So, we're going to be --

Mr. DeGrandy:  Well, it's a three-hour lunch, so I --

Commissioner Díaz de la Portilla:  You can come by.

Mr. DeGrandy:  -- may take you up on it.

Commissioner Díaz de la Portilla:  I'll save you a rack.  I'll save you a rack.

Chair King:  So, we're in recess.

draft

Mr. DeGrandy:  Yes.

Chair King:  We will adjourn -- we will return at 3.30.  Can I see you in my office?

Commissioner Reyes:  3:30 in the morning --

Mr. DeGrandy:  Right now?

Commissioner Reyes:  -- or in the afternoon.

Chair King:  Right now.  In the afternoon.

Commissioner Reyes:  Okay.

Commissioner Covo:  What time (INAUDIBLE)?

Chair King:  3:30.

[Later…]

Chair King:  Good afternoon, everyone.  Welcome back to the second half of the June 14th, 2023 redistricting hearing.  We are going to now begin.  I believe our attorneys are printing -- they're in the process of printing the final maps or map --

Unidentified Speaker:  Yes.

Chair King:  -- maps.

(COMMENTS MADE OFF THE RECORD)

Chair King:  Okay, no, he told me that.  So, we're just waiting for us to get a copy of the versions that we discussed during the break.  And prayerfully, we will be ready to make a motion and a second and settle on a map.

Commissioner Díaz de la Portilla:  Can we make the motion now?

Ms. Méndez:  No, no.  There has to be a --

Commissioner Díaz de la Portilla:  For the purpose of discussion?

Ms. Méndez:  -- a presentation.  He has a little presentation -- a mini presentation.

Commissioner Díaz de la Portilla:  We can still make the motion now for the purpose of discussion, right?

Ms. Méndez:  Okay.

draft

Commissioner Díaz de la Portilla:  Right?

Ms. Méndez:  Yes.

Commissioner Díaz de la Portilla:  Okay.

Vice Chair Carollo:  Make a motion for what?

Commissioner Díaz de la Portilla:  A motion for the Version 12 map that we've agreed to and everybody's spoken to.  And then we can discuss it.

Vice Chair Carollo:  Well, I haven't seen what the final --

Chair King:  Yes, we need to see the final --

Vice Chair Carollo:  Yeah.

Chair King:  -- version of it.

Commissioner Díaz de la Portilla:  Okay.

Chair King:  Here they come.

Commissioner Díaz de la Portilla:  I thought we were reconvening the meeting because we had -- everybody was ready.

Commissioner Reyes:  Yes, but --

Commissioner Díaz de la Portilla:  Yeah, right?

Commissioner Reyes:  Yeah.

Chair King:  Well, we were and then he was going to (INAUDIBLE).

Commissioner Reyes:  Map 12 -- through the Chair, Map 12, I think that it had some additions and subtractions.  I would like to see --

Commissioner Díaz de la Portilla:  Right, right.

Commissioner Reyes:  That's right, as amended.

Commissioner Díaz de la Portilla:  That --

Chair King:  As amended.

draft

Commissioner Díaz de la Portilla:  As amended --

Commissioner Reyes:  As amended.

Commissioner Díaz de la Portilla:  -- was a motion, really, yeah.

Commissioner Reyes:  Yes.

Commissioner Díaz de la Portilla:  But instead of waiting for the maps to come in, we know what --

Vice Chair Carollo:  Remember, when you take out from one area, you've got to make it up in another, so that's what we've got to see --

Commissioner Díaz de la Portilla:  Correct.

Vice Chair Carollo:  -- what they have.

Commissioner Díaz de la Portilla:  Correct.

Commissioner Covo:  So, technically, we're not going to see the other maps?

Chair King:  Huh?

Commissioner Covo:  We're not going to see the other maps that you're going to do?

Chair King:  If there's more than one, we will see.

Commissioner Covo:  I have a different one that I would like you to see.

Chair King:  We will see.

Commissioner Covo:  And would like you all to see.

Chair King:  We will see.  Whatever they have, we will all review.  Good afternoon, guys.

Mr. DeGrandy:  Good afternoon.

Mr. Johnson:  Good afternoon, Madam Chair.

Mr. DeGrandy:  We'll take a minute to load up.  What we're going to do, we've set up a PowerPoint with the five different alternatives for your consideration.

Chair King:  These are five alternatives of Version 12?

Mr. DeGrandy:  No, ma'am.

draft

Chair King:  No.

Mr. DeGrandy:  Let me walk through.

Chair King:  Okay.

Mr. DeGrandy:  Commissioner Reyes was satisfied with district -- with Version 12, but would like to hear from his colleagues.  Commissioner Carollo had an alternative.  Commissioner King has an alternative --

Chair King:  Of Version 12.

Mr. DeGrandy:  Of Version 12, yes.  Commissioner Díaz de la Portilla has Version 14 and Commissioner Sabina Covo also did a different version.  So there -- there's four versions plus V12.  That's five.

Chair King:  Okay, so -- but my version was from Version 12.

Mr. DeGrandy:  That is correct, ma'am.

Chair King:  And Commissioner Carollo's version is Version 12?

Mr. DeGrandy:  Yes.

Vice Chair Carollo:  Yes.

Chair King:  And your version worked off of Version 12.  So the three of us worked off of Version 12, he has Version 14.

Commissioner Díaz de la Portilla:  No, I said before the break.

Chair King:  He's with Version 12.

Commissioner Díaz de la Portilla:  As amended.

Chair King:  As amended.

Commissioner Díaz de la Portilla:  Discussed over the break.  So, Version 14 remains as part of the record as a constitutionally compliant map for future reference.  Remember, we vote on it today, but then we have to go to -- it's a judicial process in place, right?  So, I want to make sure that on the record, he's already said three times that it's constitutionally compliant, Version 14.

Chair King:  Okay.

draft

Commissioner Díaz de la Portilla:  But I'm okay with Version 12 as amended.  I think publicly we've all stated what we want, and I think Commissioner Covo has a totally different perspective on what you want to do, but I think I'm okay with Version 12.  I'm confident I'm okay with Version 12.

Chair King:  Okay.

Commissioner Díaz de la Portilla:  So, I think we could very quickly come to a consensus, so just --

Mr. DeGrandy:  So, let me do this.  Let me walk you through the changes --

Chair King:  Okay.

Mr. DeGrandy:  -- in each version.

Chair King:  Okay.

Commissioner Díaz de la Portilla:  No, walk us through the changes on Version 12 and see if people are okay with it.

Chair King:  As amended, yes.

Commissioner Díaz de la Portilla:  We get to four votes or five votes, we're good to go. and not waste people's time anymore, right?

Chair King:  Okay.  Ready for your presentation?

Mr. DeGrandy:  Ready.

Chair King:  Go ahead.

Commissioner Reyes:  I have a question.  I mean, that's to the attorney.  Commissioner Díaz de la Portilla says that he wants to keep -- I mean, include in the record, and it is constitutional right, but can the judge use that map instead of the other?

Commissioner Díaz de la Portilla:  No.

Ms. Méndez:  I'm sorry.  The version that he had suggested earlier, Version 14, you're asking about that?

Commissioner Reyes:  Yes.

Ms. Méndez:  That's a -- it's a constitutional map.

Commissioner Reyes:  Okay.  But by including --

draft

Ms. Méndez:  But you have to vote on it.

Commissioner Reyes:  -- but including it in the record, could the judge say, okay, instead of the one that you voted on, I am going to force this one.

Mr. DeGrandy:  The answer to your question, if I may, the judge is free to make an independent determination.  He may take any one of the five versions, and he may elect to have a special master draw his own plan.  If and only if he determines that whatever is voted on today is constitutionally infirm.  If what is voted on today he finds to be constitutionally compliant, then that will be the map.

Chair King:  But let me ask you, for the record, our versions, each version is constitutionally sound, correct?

Mr. DeGrandy:  Yes, each ver --

Chair King:  Each version.

Mr. DeGrandy:  -- each version is within the acceptable deviations.  Each version is available for you all to debate and vote on.

Commissioner Covo:  And Madam Chair, just to add, I want to make a clarification.  My version was also gotten from Map 12.

Mr. DeGrandy:  That is correct.

Commissioner Covo:  As well.

Chair King:  Okay.

Commissioner Covo:  So, it's also changes to Map 12 as well.

Mr. DeGrandy:  Yeah, all versions basically --

Commissioner Covo:  Come from --

Mr. DeGrandy:  -- make changes to Version 12.

Chair King:  Okay.

Commissioner Reyes:  Okay.

Chair King:  All right.  Let's start with the presentations then.

Commissioner Díaz de la Portilla:  But only one version is going to be voted on today probably --

draft

Commissioner Reyes:  That's right.

Commissioner Díaz de la Portilla:  -- ideally, right?  So that's fair.  That's fair.

Vice Chair Carollo:  Correct.

Commissioner Díaz de la Portilla:  So, we vote on that one version as amended, and that's the official position of the City of Miami.

Commissioner Reyes:  Okay, okay.

Mr. DeGrandy:  What I would --

Commissioner Díaz de la Portilla:  That's it.

Mr. DeGrandy:  -- envision is once I present the five versions, you all will discuss, you all will debate, there will be a motion for --

Commissioner Díaz de la Portilla:  Right.

Mr. DeGrandy:  -- one or more plans and, you know, eventually whatever reaches majority support will be the plan.

Commissioner Reyes:  I think we all agree -- we all agree on 12 amended.

Chair King:  It's just like the last one.

Commissioner Reyes:  That's right, just -- I would like to see Version 12 with all the amendments that are in front of us.

Mr. DeGrandy:  Of course.

Commissioner Reyes:  Okay, that -- please.

Mr. DeGrandy:  I will walk through every version before you.

Commissioner Reyes:  Okay.

Mr. DeGrandy:  Okay.

Commissioner Díaz de la Portilla:  Well, I'm not sure we need to do that, do we?  You want to do that?  You want to walk through every version?  Okay.

Chair King:  There's only five.

draft

Mr. DeGrandy:  Okay, so --

Commissioner Díaz de la Portilla:  It's only five.

Mr. DeGrandy:  -- on the screen is a draft version.  You've seen that, so I don't think I need to discuss that, so let's go through.

Ms. Méndez:  So, for the record, just so that we're clear, the draft plan proposal --

Commissioner Díaz de la Portilla:  Is 12.

Ms. Méndez:  -- as labeled right now is your original Version 12?

Mr. DeGrandy:  It's Version 12, which is the version that Commissioner --

Commissioner Díaz de la Portilla:  Without being -- without it being amended.

Mr. DeGrandy:  -- Commissioner Reyes said he is okay with, but wants to listen to any other changes.

Commissioner Díaz de la Portilla:  Okay.

Mr. DeGrandy:  So, for -- I put it as a draft plan.  I could have said this is Commissioner Reyes' plan, but it is the draft plan.

Commissioner Covo:  When did the amendments to Version 12 happen?  During the break?  I have not seen those so --

Mr. DeGrandy:  Yeah, the amendment --

Chair King:  You're going to see them (INAUDIBLE).

Mr. DeGrandy:  -- all the changes have been -- I have met with each one of you --

Commissioner Reyes:  Every one of us.

Mr. DeGrandy:  -- as I was directed and I have made changes --

Chair King:  You're going to see them now.

Commissioner Covo:  Okay.

Mr. DeGrandy:  -- that each one of you have asked for.  All right, so let's go to the next one.  Okay, this is the Version 14, this is the D1 alternative map with a deviation of 2.3.  It basically -- you know, if I'm going to explain it, it basically does some changes to D4, brings it down past US-1. It leaves most of what was District 3 in the draft plan intact.  District 1 stays intact.  District 5 also

draft

stays intact.  No, District 5 actually on the coast comes down further to the south up to the 195 and the overall deviation is 2 percent.  I'll go through each one and then if you have more questions on them, we'll go back to them.  So, let's go to the next alternative.  Okay, this is the D5 alternative. The D5 alternative leaves District 1, 3, and 4 intact.  It makes a change between District 5 and District 2 at the north coastal end to bring all of Morningside into D2.  Is that correctly stated? Okay.

Chair King:  It puts Morningside back in D2.

Mr. DeGrandy:  Yes.  All right.  So, let's go to the next one.  And it has a deviation of 3.4 percent way within constitutional parameters.  Okay, this is the D3 alternative map.  It has a deviation of 3.5.  It also puts Morningside back into D2.  So, it is the same D5 as Commissioner King has configured.  D1 was not touched.  There are changes between D2, D3, and D4.  At the bottom of -- at the south end of D3, what it did was it took from, I believe, 27th to 22nd Avenue back into D2, which is, you know, some people consider the Groves, you know, you could be argue as to whether that's part of the traditional Grove or not, but that -- it is what it is.  That's what it's done. What it then does is that bottom part continues to go up, it goes past Simpson Park, and it goes further east into the downtown area.  In the division between 3 and 4, it moves a district line a couple of blocks to address the issue that was discussed regarding Domino Park, and at the bottom it also does a little turn.  Basically, that and the change that was done at the north end between 3 and 4 were issues that we had to deal with to equalize population.  So, district -- the alt 3 map has District 5's alternative to District 5 and does not touch District 1, only changes between 2, 3, and 4.  Okay, next.  District 2's alternative map has a 4.2 percent deviation.  It also brings Morningside back into D2 and it takes basically all the area south of US-1 that in the base plan was wrapping around District 4, was part of D3 wrapping around District 4, all of that is incorporated now into D2.  So, the major changes are all area south of US-1 goes back into D2 and Morningside goes back into D2.  Have I accurately described your plan?  Okay.

Commissioner Covo:  And keeps the Grove united.

Mr. DeGrandy:  And keeps the Grove united, okay.  Next.

Mr. (COMMENTS MADE OFF THE RECORD)

Commissioner Covo:  This is the fifth one.

Commissioner Díaz de la Portilla:  Into the microphone.

Mr. DeGrandy:  That's the last one?

Mr. Johnson:  Yes.

Mr. DeGrandy:  Oh, okay.

Commissioner Reyes:  That's the last one.

draft

Mr. DeGrandy:  Okay, so I gave you all of them.

Commissioner Díaz de la Portilla:  Yeah, that's it.

Mr. DeGrandy:  All right, so those are the, you know, the different alternatives.  As I've said many times to you before, and not necessarily to you, Commissioner Covo, because you weren't there at the first round, but there are literally thousands of ways to draw a constitutional map.  We approached the draft plan from the point of view of looking only at race as was necessary to comply with the Voting Rights Act in D5.  We have otherwise not considered any racial or ethnic considerations, have basically provided a different political and policy alternative from the Plaintiff based on my conversations with the majority of you.  And with that, Madam Chair, I am available to answer questions and I leave it to you to debate, discuss, and vote.

Vice Chair Carollo:  I've got a quick question, Madam Chair.  What is by law the highest deviation that we can go to?

Mr. DeGrandy:  Normally the courts have set kind of a bright line, overall deviation should not exceed 10 percent.  That is what they consider substantial equality.

Vice Chair Carollo:  10 percent?

Mr. DeGrandy:  Yes.

Vice Chair Carollo:  And we're way below the --

Mr. DeGrandy:  I believe, and again, you know, since we've done this pretty fast, but I believe there's no map that goes beyond 5 percent overall deviation.

Vice Chair Carollo:  No.  In fact, they're quite low.  The alternative maps that we were shown by Plaintiffs, what deviation were they in?  What range?

Mr. DeGrandy:  I forget Alternative 1.  From memory I could tell you Alternative 2 was 6.9 percent and the alternative that they dropped on us last night was 5 percent.

Vice Chair Carollo:  Okay.  So, they're all much higher than any of the deviations that we have?

Mr. DeGrandy:  They are higher.  They are within acceptable range, but they are higher.

Vice Chair Carollo:  Yeah.

Commissioner Díaz de la Portilla:  The draft --

Mr. DeGrandy:  Alternative 1, Commissioner had 5.3 -- the Plaintiffs had 5.3 deviation.

Commissioner Díaz de la Portilla:  The -- if I may, Madam Chair.  The draft plan proposal that we have here is identical to Version 12.  Is that correct?

draft

Mr. DeGrandy:  The draft plan proposal is Alternative 12.

Commissioner Díaz de la Portilla:  Identical to Version 12.

Mr. DeGrandy:  The draft plan is Version 12.

Commissioner Díaz de la Portilla:  Is Version 12, okay.

Mr. DeGrandy:  Yes, sir.

Commissioner Díaz de la Portilla:  o changes.

Mr. DeGrandy:  No change.

Commissioner Díaz de la Portilla:  Okay.

Mr. DeGrandy:  All changes were made from Version 12 by the different commissioners.

Commissioner Díaz de la Portilla:  So, for the purpose of discussion, without any motion or anything yet, we can talk a little bit, I think, about the amendments, the minor tweaks that we want to do to this draft plan proposal, right, instead of having a back and forth on five different plans. So, if what's being presented before us as a draft plan proposal, which is the city manager and city attorney and our experts, there are some tweaks that have to be made to that.  I understand the conversation we had before the break.  Can we, for practical purposes, just work off that version and say, well, add this, take that out, whatever it is, it is, right?  And then we still could have the debate about the other five or the other four plans, right?  Because I think it's just a back and forth that's not going to result in anything other than what the final result everyone knows is going to be, right?

Commissioner Covo:  I have a suggestion, Madam Chair.  To your point, Commissioner Díaz de la Portilla, if we have five maps and we already saw them, right, and we have this as a base plan, we might discuss from this one, including the petitions that we have in each of our plans.

Commissioner Díaz de la Portilla:  That's the idea, yeah.

Commissioner Covo:  I mean, that would like, for instance, if my priority is actually to keep Coconut Grove together, then we can discuss it and see what I can get from that.  Because in this second plan --

Commissioner Díaz de la Portilla:  Of course.

Commissioner Covo:  -- from the one that I had before, I lose, from what I've seen, about 4,000 people.  So, things like that, I think that if everyone agrees, we could work it out of Version 12, since all of them come from Version 12.

draft

Mr. DeGrandy:  Yes.

Commissioner Covo:  We already saw each of our ideas.  I'm not sure what you guys think about that.

Mr. Johnson:  Yeah, and --

Chair King:  Yes.

Commissioner Díaz de la Portilla:  Yes.

Chair King:  I'd like to make one tweak.

Commissioner Díaz de la Portilla:  We are going to go to tweaking in a minute.  The idea is we start, I would think, from Version 12 and then we could do the -- you know, for example, Version 14, my version I already put on the record that it's constitutionally compliant as every other version is, so that's already done.  So, I'm done with that.  And now I'm in Version 12, the draft plan proposal.  Let's take it from there.  And everybody can say what they want, what they don't want, and then we move forward from that.  It's an easier way to get there.  It's a better roadmap than discussing five plans that are going to take us all over the place.

Chair King:  Right.  I don't think we need to discuss five plans.  I think from what I heard --

Commissioner Díaz de la Portilla:  Of course.

Chair King:  -- D3 alternative map incorporates all of us.  And then the map that doesn't coincide with the D3 alternative map is the D2 alternative map.  I think those are the only two that we need to -- because for Commissioner Reyes, for Commissioner Carollo, for myself, I don't know if you're in favor of D3 -- the D3 alternative map, which is the --

Commissioner Díaz de la Portilla:  The D3 alternative plan is the amended draft plan proposal that takes --

Chair King:  Yes.

Commissioner Díaz de la Portilla:  -- it two blocks down to include Domino Park and back into Commissioner Carollo's district.

Chair King:  Yes, yes, yes, yes.

Commissioner Díaz de la Portilla:  That's fine.  There's no other change, right?

Chair King:  I have one other change that I'd like to make.  There's --

Commissioner Díaz de la Portilla:  Well, there's no other change as far as Commissioner Carollo's concerned?

draft

Chair King:  No.

Commissioner Díaz de la Portilla:  Okay, we're done with that.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  So, 3 and 4 are happy with each other?

Chair King:  Yes.

Commissioner Díaz de la Portilla:  So, there's kumbaya going on over there.

Chair King:  And 5.

Commissioner Díaz de la Portilla:  What you want here is you want People's Barbecue.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  Okay, I'm going to give you that.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  You've got People's Barbecue.

Chair King:  I'd like --

Commissioner Díaz de la Portilla:  All right, that's fine.

Chair King:  That was an oversight.

Commissioner Díaz de la Portilla:  That's -- and I'll tell you why.  Because you've invested -- your Overtown CRA has invested a lot of dollars in a historic restaurant that means a lot to that community and to your community.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  And I understand.  I would like every once in a while to be able to have some ribs and some oxtail there, but that's a different conversation.  I'll pay for it, not a problem.  But I can still go there, right?

Chair King:  Absolutely.

Commissioner Díaz de la Portilla:  Are you sure?

Chair King:  Absolutely.

draft

Commissioner Díaz de la Portilla:  For the record, let the record reflect that I can still go to People's Barbecue.

Chair King:  Absolutely.

Commissioner Díaz de la Portilla:  All right, so we'll include that in the amendment.

Chair King:  Right.

Commissioner Díaz de la Portilla:  That's fine.

Chair King:  So, if you can include that into the D3 alternative map --

Commissioner Díaz de la Portilla:  The D3 -- yes.

Chair King:  -- so that keeps it in line with the consensus that we have.

Mr. DeGrandy:  Could you, Commissioner, give us bearings, directions?

Commissioner Díaz de la Portilla:  We will, and I want to make sure it's only People's Barbecue, nothing else.

Chair King:  It is.

Commissioner Díaz de la Portilla:  Don't get greedy.

Chair King:  It will be -- it's 7th Street.  It's just after you get -- it's just one block --

Commissioner Díaz de la Portilla:  350 Northwest 8th Street.

Chair King:  Is that the address?

Commissioner Díaz de la Portilla:  Yeah, that's the address.

Chair King:  Okay.

Commissioner Díaz de la Portilla:  350 Northwest 8th Street.  350 Northwest 8th Street.  Best oxtail.

Mr. Johnson:  So, I will bring the block --

Commissioner Díaz de la Portilla:  Best oxtail in town whenever you open, right?  Right?

Mr. Johnson:  So, I'd bring the southern border down the 7th Street from 8th Street?

draft

Commissioner Díaz de la Portilla:  Yes.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  It's one block.

Chair King:  Please.

Commissioner Díaz de la Portilla:  No, you bring it up from 7th Street to 8th Street.

Mr. Johnson:  The current southern border --

Commissioner Díaz de la Portilla:  Oh, yeah, yeah, I'm sorry, you bring down the southern border, that's correct.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  You're correct, yes.

Chair King:  Yes.

Commissioner Díaz de la Portilla:  350 -- again --

Chair King:  Leave that in D3, the alternate D3 alternative map and --

Commissioner Díaz de la Portilla:  As amended, 350 Northwest 8th Street is now included in District 5, no longer in District 1.

Mr. DeGrandy:  Okay.

Commissioner Díaz de la Portilla:  But only one block, only that place, nothing else.  Nothing to the left, nothing to the right, nothing to the south, nothing to the north.

Mr. DeGrandy:  And precisely, so there is no misunderstanding and also, so the record reflects what's being done, certainly, you're free to continue to debate different plans, et cetera.  But before --

Commissioner Díaz de la Portilla:  The involvement and the investment.

Mr. DeGrandy:  Yeah, before there is a motion, we'd actually like to model and put on the screen --

Chair King:  Please.

Mr. DeGrandy:  -- that change.

draft

Commissioner Díaz de la Portilla:  Yes.

Chair King:  And tell us about the deviation.

Mr. DeGrandy:  Make sure that everybody is okay with it.

Chair King:  Yes, yes, sir.

Commissioner Díaz de la Portilla:  Yes, sir.

Vice Chair Carollo:  Good idea.

Mr. DeGrandy:  Okay?  So, that -- once your debate is finished -- will take us ten minutes to do, and I'll show it up on the screen.

Commissioner Covo:  So, are we still debating from D3 or from 12?

Chair King:  D3.

Commissioner Covo:  Okay.

Commissioner Díaz de la Portilla:  D3 is 12.

Chair King:  The -- they're all the Version 12, but the D3 alternative map --

Commissioner Covo:  Is the one that looks more similar.

Chair King:  Is the one that there's most consensus about.

Commissioner Covo:  Okay.

Mr. DeGrandy:  Do you want to put that one up and me to go over it again or no?

Commissioner Díaz de la Portilla:  No.

Mr. DeGrandy:  I'm yours all day.

Commissioner Díaz de la Portilla:  We're not going to be here all day.  And neither are you, because we're done.  I think we're almost there, right?  Yeah.

Chair King:  I think so.

Commissioner Díaz de la Portilla:  Yeah.

draft

Ms. Méndez:  So, for purposes just of the record, while he's putting it up, while Chris is putting it up, Mr. DeGrandy, can we just place on the record the D3 alternative map and just what you wanted to say really quickly?

Mr. DeGrandy:  No, no.  The only thing that I wanted to make sure is to have Chris make that change, the People's Barbecue.

Chair King:  And does that change the deviation any?  I'd like to know that.

Mr. DeGrandy:  I understand, but, you know, I'd like to see --

Commissioner Díaz de la Portilla:  It's People's Barbecue, how much can it change the deviation?

Chair King:  I don't think --

Mr. DeGrandy:  It may be zero.

Chair King:  I don't think it would --

Commissioner Díaz de la Portilla:  There are no residents.  There are no residents --

Chair King:  Right.  I don't think it would change it at all.

Commissioner Díaz de la Portilla:  -- at People's Barbecue.

Chair King:  I don't think it would change it at all, but I just want to put it on the record.

Commissioner Díaz de la Portilla:  Yes.

Mr. DeGrandy:  But I understand, Madam Chair, but I'd like you to see it --

Commissioner Díaz de la Portilla:  Of course.

Mr. DeGrandy:  -- visually and say, that's what I asked for --

Commissioner Díaz de la Portilla:  So, we take a --

Mr. DeGrandy:  -- or that's not what I asked for.

Commissioner Díaz de la Portilla:  -- so, we take a ten-minute recess?

Vice Chair Carollo:  No, no, no.

Commissioner Díaz de la Portilla:  Well, but they --

Chair King:  No, no, no.  Because if I lose you, I might lose you for thirty minutes.

draft

Commissioner Díaz de la Portilla:  No, I'm saying it's going to take ten minutes.

Vice Chair Carollo:  Madam Chair.

Mr. DeGrandy:  It'll take him less than ten minutes to --

Vice Chair Carollo:  Can I ask --

Commissioner Covo:  Before -- okay.

Vice Chair Carollo:  -- him to put in the record a couple of things while we're waiting?

Chair King:  Yes.

Vice Chair Carollo:  Mr. DeGrandy --

Mr. DeGrandy:  Sir.

Vice Chair Carollo:  -- what is --?  Since in these three districts we're not going to have People's Barbecue doing a deviation, in District 4, 3, and 2, what is the population on each of these districts the way you have it now?

Mr. DeGrandy:  I have to wait for my data guy to give us the numbers.

Vice Chair Carollo:  What did we hire you for?  Is it the data guy that we need?

Mr. DeGrandy:  There's only one computer and I don't have it.

Commissioner Covo:  Can I ask a question, Madam Chair?

Mr. DeGrandy:  Yes.

Commissioner Covo:  I want to know because I'm extremely committed and I want to put it on the record to keep Coconut Grove united, as you already know.  Can you give me the number of how many -- from the map that we have now currently under which we're working, what else do I lose from the North Grove with this map?  Can we see those numbers?

Mr. DeGrandy:  Yes.

Commissioner Covo:  That's important to see if at least I can get part of the Grove united because I see that I don't have a consensus, but I really need to fight for this.

Mr. DeGrandy:  Yes, ma'am.  As soon as Chris finishes with that and gets back on the screen, I will walk you through that.

draft

Vice Chair Carollo:  I believe --

Mr. DeGrandy:  I mean, I could tell you from memory, it restores the 1,571 in the plan that was struck down that went south in the Grove back into D2.  So, that's 1,571 and it keeps that line of US-1 intact.  And then there was a portion in the draft plan that went from 27th Avenue to 22nd Avenue that was in the draft plan in D3, Commissioner Carollo ceded that property or that land back into D2.  So, those are the gains for --

Commissioner Covo:  What about the west of Emathla Street and Bay Heights?

Mr. DeGrandy:  Bay Heights remains in D3.

Commissioner Covo:  Remains in D3?

Mr. DeGrandy:  Yes.

Commissioner Covo:  But it was in D2.  So, now I'm giving up Bay Heights technically.

Mr. DeGrandy:  That is correct.

Commissioner Covo:  I want to see those numbers.  I'm not going to vote for that.  I'm getting less from the Grove.

Mr. DeGrandy:  You're -- well --

Commissioner Covo:  I mean, from uniting Coconut Grove, I'm getting less now.

Mr. DeGrandy:  If you look at --

Commissioner Covo:  And that's what my constituents are asking for.

Mr. DeGrandy:  Yeah, if I -- if you look at numbers, I can walk you through those numbers.  It's really --

Commissioner Covo:  I mean, I just want to put the numbers on the record.

Mr. DeGrandy:  Sure, sure.  But I'm trying to respond to your question.  It's a trade-off.  What that amendment does is it gives back to the Grove from 27th to 22nd, and then it continues to go up where it ended in the draft plan, up all the way to Simpson Park and into part of downtown.  So, it creates a straight line on South Miami Avenue.

Commissioner Covo:  Okay, let's keep rolling.  I don't see the logic in it, but --

Mr. DeGrandy:  I -- that's not for me to say.  That's -- you're the policy makers.

draft

Commissioner Díaz de la Portilla:  Okay.  That's the point of the recess, right?  We'll be here.  Right here.

Ms. Méndez:  Now, he's going to tweak it with People's Barbecue.

Mr. DeGrandy:  You're going to put it up now, as soon as he connects.

Ms. Méndez:  Right.  (INAUDIBLE).

Commissioner Díaz de la Portilla:  That was fast.

Mr. DeGrandy:  Less than 10 minutes.  Okay, could you blow up that area?  I just want to make sure --

Mr. Johnson:  So, we just moved the border here in the Overtown region down from 8th Street down to 7th.

Mr. DeGrandy:  Can you blow it up more?

Mr. Johnson:  That's as much as it's letting me blow up on this thing.

Commissioner Díaz de la Portilla:  How many -- if I may.

Mr. DeGrandy:  Okay.

Commissioner Díaz de la Portilla:  How many people are you adding and subtracting?

Mr. Johnson:  It actually reduces the deviation slightly to --

Commissioner Díaz de la Portilla:  I know, that's what I thought.

Commissioner Díaz de la Portilla:  But by how much?

Chair King:  What's the deviation now?

Commissioner Díaz de la Portilla:  3.3, okay.

Vice Chair Carollo:  What's the deviation?

Chair King:  3.3.

Commissioner Díaz de la Portilla:  3.3.

Commissioner Reyes:  That's right.

Chair King:  D3.

draft

Vice Chair Carollo:  D3?

Chair King:  Oh, it's the whole map.

Commissioner Díaz de la Portilla:  The whole map is 3.3.

Mr. DeGrandy:  Yeah.

Commissioner Reyes:  Yeah.

Chair King:  3.3.

Commissioner Díaz de la Portilla:  But how many people are you adding to District 5 when you take away from District 1?  Or, right, you're adding a block.  How many people?

Mr. Johnson:  Give me one moment and I can look that up.

Commissioner Díaz de la Portilla:  Okay.  I thought that's what you were doing in the 10-minute break you had.

Chair King:  The deviate -- the -- is it --

Commissioner Díaz de la Portilla:  I'm being rough on him.

Chair King:  The lower the deviation, is that better?

Commissioner Díaz de la Portilla:  I've been rough --

Mr. Johnson:  The lower the deviation, the better.

Chair King:  Is better.

Commissioner Díaz de la Portilla:  Of course, yeah.

Chair King:  The lower the devia --

Mr. Johnson:  Zero is perfect.

Commissioner Díaz de la Portilla:  And by the way --

Chair King:  Zero is perfect, but the lower our deviation is, the better.

Mr. DeGrandy:  Yes.

Chair King:  But we can go as high as 10 percent.

draft

Mr. DeGrandy:  You could.  At that point, the court is probably going to need justifications --

Chair King:  To look -- right.

Mr. DeGrandy:  -- on the record, but the three --

Commissioner Díaz de la Portilla:  What's the deviation of the Plaintiffs' map that they're proposing?

Mr. DeGrandy:  There was -- one was 5.3, I believe.  Alt 2 was 6.9.

Commissioner Díaz de la Portilla:  Right.

Mr. DeGrandy:  And Alt 3 was 5 percent.

Commissioner Díaz de la Portilla:  So, ours is a lot better --

Mr. DeGrandy:  It's the lowest deviation.

Commissioner Díaz de la Portilla:  -- in terms of devi -- absolutely.

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  Okay.  How many people are you adding?

Mr. Johnson:  530 people are being moved, Commissioner.

Commissioner Díaz de la Portilla:  530 people are being moved.

Mr. Johnson:  Five three zero, yes.

Commissioner Díaz de la Portilla:  From that one block.

Mr. Johnson:  It's actually three blocks.  It is a strip across the southern side.

Commissioner Díaz de la Portilla:  No, we had this conversation before.  Your software may not allow you to do it, but you can do it, right, without -- if we had better software, basically.  So, in essence, why -- yeah, they do the whole strip.

Vice Chair Carollo:  Yeah, but you're actually going to make the deviation a lot better and even it out.  If you could --

Commissioner Díaz de la Portilla:  Yes.

Vice Chair Carollo:  -- let me ask him --

draft

Commissioner Díaz de la Portilla:  Yes.

Vice Chair Carollo:  -- a question, and you'll get the better feel.

Mr. DeGrandy:  And the software, Commissioner, if I could interrupt for a second, goes to the block level.  We can't go any further than that.

Vice Chair Carollo:  Yeah.  If you could give us --

Mr. Johnson:  I could move just that one block.

Commissioner Díaz de la Portilla:  Yes.

Mr. Johnson:  But --

Commissioner Díaz de la Portilla:  Of course, you can.

Mr. Johnson:  -- the other two blocks -- I could do that.  I understood you wanted me to bring the border down to 7th Street.

Commissioner Díaz de la Portilla:  No, no, no.  I gave you an address.

Mr. Johnson:  Okay.

Commissioner Díaz de la Portilla:  There's a reason why I gave you a specific address.  I didn't say -- I said it's a block south, but I gave you a specific address, which is 350 --

Mr. Johnson:  Can I have one minute?

Commissioner Díaz de la Portilla:  Of course.  You can have more than one.

Vice Chair Carollo:  Before you go the one minute --

Commissioner Díaz de la Portilla:  350.

Vice Chair Carollo:  -- can you give me -- because these three are not going to change -- the total population for D4, D3, and D2?

Mr. Johnson:  Yes, Commissioner.

Commissioner Díaz de la Portilla:  I know what he did, yeah.

(COMMENTS MADE OFF THE RECORD)

Mr. Johnson:  Commissioner, the total population of District 3 is 89,194 in that version of the map.

draft

Vice Chair Carollo:  Okay, right.

Mr. Johnson:  D4 is 89,555 and D5 is 86,690.

Vice Chair Carollo:  No, no, no, I said D2.

Mr. Johnson:  Oh, D2 is 89,593.

Vice Chair Carollo:  Okay, so these three districts are right together in numbers.

Mr. Johnson:  Yes, Commissioner, very close.

Vice Chair Carollo:  Okay, all right.  So, let's see, once you've worked it out, what these two others have.

Commissioner Díaz de la Portilla:   Right, correct.

Vice Chair Carollo:  Obviously, there are considerations and which districts in the future are going to grow, have the most growth.

Commissioner Díaz de la Portilla:  That's the issue, right?  So, we don't want to go beyond -- it doesn't impact any other district, it's really a debate between District 5 and District 1, right?

Commissioner Covo:  I want to --

Commissioner Díaz de la Portilla:  But hold on a second.  I'm not finished.

Commissioner Covo:  Okay, sorry, I'll go after you.

Commissioner Díaz de la Portilla:  I'm sorry.  So, the debate at this part, at this particular part to get this off the table, you're right, it's a growth, but we have to be concerned about the growth. Commissioner Covo, your district's way overpopulated.  So, at the end of the day --

Commissioner Covo:  That's what --

Commissioner Díaz de la Portilla:  -- you're going to have to lose stuff.

Commissioner Covo:  I know that.

Commissioner Díaz de la Portilla:  So, you got to pick your poison, whether you like it or not. You got to lose some stuff.

Commissioner Covo:  If --

draft

Commissioner Díaz de la Portilla:  But that's that part -- that's not the point I'm making.  The point I'm making is between District 5 and District 2.

Commissioner Covo:  Okay, but --

Commissioner Díaz de la Portilla:  On District 1, I'm sorry.  So, in essence, you got the map there.  We want People's Barbecue to get -- to stop talking about People's Barbecue if we can.  District 5 has publicly agreed that she's okay with only having that.  You already have the map, what's given to you right now on the record, so you're fully aware of what we want to do, fix that, and leave it alone, and then we can talk about everything else.

Mr. Johnson:  I'm going to put it up on the screen for you right now.

Commissioner Covo:  No, but Madam Chair, I want to answer your question.  So, what's happening is that when we draw my map -- and if you want, you can also pull it again -- we're still within the constitutional lines, we still are compliant with District 5, we are still in the deviation that is correct.  We reunite the Grove.  I keep Bay Point and Morningside as well.  I'm still a bit overpopulated because we went through the numbers.  What I'm asking for, again, is, with all your respect, to try and keep the Grove more united.  Because in this version, I lose even more voters of the North Grove.  And that's part of the amount of people that came to us and say we really want the Grove united.  So, I'm fighting for what my constituents want, technically.

Chair King:  Let me ask a question.  Is the Bahamian community in the Grove in the D3 alternative map?

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  Yes.

Chair King:  The Bahamian community is in the Grove?  Okay.

Mr. DeGrandy:  Yeah.  What we did, Commissioner, if you recall, the original plan had, I believe it was 1,571 folks that we crossed south of US-1, created a little triangle to bring that into D4 to equalize population.  We have taken that out.  So, the line at that part of the Grove is US-1, which is, you know, I would argue it was only a little sliver of the Bahamian Grove, but nevertheless, the answer to your question is the Bahamian Grove is now in the Grove.

Chair King:  Okay, because that was a huge contention the first time around that the Bahamian Grove was taken out of D1.

Mr. DeGrandy:  D2.

Chair King:  D2.

Commissioner Díaz de la Portilla:  D2.

draft

Chair King:  But now the Bahamian Grove --

Mr. DeGrandy:  Is back in D2.

Chair King:  -- is back in D2.

Mr. DeGrandy:  Yes.

Chair King:  Okay.

Commissioner Díaz de la Portilla:  So, Commissioner Covo, you've done a heck of a lot of a better job than your predecessor did by the way.

Commissioner Covo:  Thank you, but I still need to do it better.  I still need a chunk --

Commissioner Díaz de la Portilla:  I understand.

Commissioner Covo:  -- of the North Grove to make sure that I'm happy.

Commissioner Díaz de la Portilla:  You're doing a lot better than Commissioner Russell ever did for keeping that community divided.  The problem that you have and that we all have is that your district is overly populated.

Commissioner Covo:  I could keep --

Commissioner Díaz de la Portilla:  And that's the problem.

Commissioner Covo:  -- the North Grove together and give up some of the West Brickell part as well if we can see those numbers.

Mr. DeGrandy:  Again, that --

Commissioner Díaz de la Portilla:  Do you have the new map?

Mr. DeGrandy:  That's up to you.

Chair King:  So this --

Mr. DeGrandy:  Yeah, it'll come up in a minute.

Chair King:  So, you have -- you're putting up the D3 alternative map, which is now the deviation is 3.3.

Commissioner Díaz de la Portilla:  Correct.

Chair King:  And it includes the Bahamian Grove.

draft

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  And it includes --

Mr. DeGrandy:  The deviation, I don't believe it'll be 3.3, because 3.3 --

Commissioner Díaz de la Portilla:  3.6, that's fine.

Mr. DeGrandy:  Yeah, it's 3.6.

Commissioner Díaz de la Portilla:  And you only took out --

Chair King:  Now it's 3.6?

Mr. DeGrandy:  It's 3.6.

Commissioner Díaz de la Portilla:  That's fine.

Chair King:  With the inclusion of People's Barbecue?

Mr. DeGrandy:  Yes.

Commissioner Díaz de la Portilla:  Yes.

Mr. DeGrandy:  With the inclusion of People's Barbecue.

Commissioner Díaz de la Portilla:  I'm looking at it, but...

Chair King:  Oh, I thought he just said it was 3.3.  It was --

Mr. DeGrandy:  It was 3.3 when he put in three blocks.

Commissioner Díaz de la Portilla:  But he's putting in one block.

Mr. DeGrandy:  And you all said, no, it's just People's Barbecue.

Commissioner Díaz de la Portilla:  Yes.

Chair King:  Oh.

Mr. DeGrandy:  So, he re-ran the numbers.

Chair King:  Okay.

Mr. DeGrandy:  It runs to 3.6.

draft

Vice Chair Carollo:  So, why don't you put in the three blocks --

Chair King:  Right, so we can get --

Vice Chair Carollo:  -- so we get a deviation of 3.3?

Commissioner Díaz de la Portilla:  No, but it's not that much of a difference in the growth.

Ms. Méndez:  We need --

Commissioner Díaz de la Portilla:  No, 3.3 and 3.6 versus 5.9 for the Plaintiffs' map.

Mr. DeGrandy:  5.3, 6.9 and 5.0.

Commissioner Díaz de la Portilla:  Right, but we're still in good constitutional ground and I think we have a good case.  The growth there is going to be very interesting moving forward.  I think it works.  It's not the end of the world.

Ms. Méndez:  So, what is --?  Just for the record, what is the map that we're looking at right now is --

Commissioner Díaz de la Portilla:  3.6.

Ms. Méndez:  -- the D3 alternative map?

Commissioner Díaz de la Portilla:  It's District 3 --

Mr. Johnson:  Version 2.

Commissioner Díaz de la Portilla:  -- alternative map, Version 3, I think, right?

Mr. Johnson:  No, Version 2.

Commissioner Díaz de la Portilla:  Version 3.  Yeah, Version 3.

Mr. DeGrandy:  We did a 2 that they didn't accept.  Okay, Version 3.

Commissioner Díaz de la Portilla:  Version 3, District 3.

Chair King:  And the deviation is?

Mr. DeGrandy:  3.6.

Commissioner Díaz de la Portilla:  3.6.

draft

Ms. Méndez:  And it includes what change?  The People's --

Commissioner Díaz de la Portilla:  She already said that.

Ms. Méndez:  -- Barbecue.

Commissioner Díaz de la Portilla:  That's the only change it includes right there on the map.

Ms. Méndez:  Okay, perfect.

Commissioner Díaz de la Portilla:  So, we already -- we're clear.

Ms. Méndez:  I just wanted -- remember that --

Commissioner Díaz de la Portilla:  I understand.

Ms. Méndez:  -- we just need to be clear for the written record.

Commissioner Díaz de la Portilla:  It's very clear.

Ms. Méndez:  Okay.

Commissioner Díaz de la Portilla:  We've said it three times, very clear.  3.6 deviation, it includes People's Barbecue to District 5 from District 1, and it includes the Bahamian Grove into District 2, back into District 2.  The argument that the Plaintiffs made that the Black Grove, as they call it, for lack of a better term, was divided and now it's united.  It also includes every other amendment and suggestion from every other commissioner that's been made.  And I think that it's clear that we can now move this and then have a discussion about it because I think we're in a good place --

Vice Chair Carollo:  Yeah.

Commissioner Díaz de la Portilla:  -- instead of prolonging the debate.

Vice Chair Carollo:  Can I get for the record now with the change of those two blocks of People's Barbecue, is it two blocks or one block?

Commissioner Díaz de la Portilla:  One block.

Vice Chair Carollo:  One block of People's Barbecue.

Commissioner Díaz de la Portilla:  One versus three, yeah.

Vice Chair Carollo:  What is then the final population of D1 and D5?

Mr. DeGrandy:  Total pop.

draft

Vice Chair Carollo:  Yeah.

Commissioner Díaz de la Portilla:  Yeah.

Mr. Johnson:  So, Commissioner, D1 is now 87,455.

Vice Chair Carollo:  Okay.

Mr. Johnson:  And D5 is now 86,444.

Commissioner Díaz de la Portilla:  Yeah.

Vice Chair Carollo:  So, it's only a 10-person difference from what I --

Mr. Johnson:  Correct, Commissioner.

Vice Chair Carollo:  -- thought I had before.  Okay.

Commissioner Díaz de la Portilla:  Yeah, that's fine.

Vice Chair Carollo:  All right.

Commissioner Díaz de la Portilla:  Not a big deal.

Vice Chair Carollo:  So, there --

Ms. Méndez:  And also, for the record, Mr. DeGrandy, it is fully compliant with all your constitutional bells and whistles?

Mr. DeGrandy:  Yes, ma'am.

Ms. Méndez:  Okay.  Thank you so much.

Commissioner Díaz de la Portilla:  Can I now move it?  Or not yet?

Commissioner Covo:  Can I get one more question, please, before you move it?

Commissioner Díaz de la Portilla:  Yeah, I can move it and you can discuss anything you want after.

Commissioner Covo:  Then please move it and we'll discuss it after.

Commissioner Díaz de la Portilla:  Okay, can I move it?

Commissioner Covo:  Madam Chair says yes.

draft

Chair King:  (INAUDIBLE) motion.

Commissioner Díaz de la Portilla:  I move it.

Commissioner Reyes:  I second.

Commissioner Díaz de la Portilla:  Commissioner Reyes seconds and now we discuss it.  What's happened to your microphone?  It died.  There comes Todd.

Chair King:  I have a motion --

Ms. Méndez:  Todd to the rescue.

Commissioner Díaz de la Portilla:  Here comes Todd.

Chair King:  -- I have a motion and a second.  And now we open it up for discussion.

Commissioner Covo:  So, my first question and request would be why Coconut Grove would lose also Bay Heights?  When Bay Heights was part of it, it doesn't make a real difference in the numbers because Bay Heights had been historically part of Coconut Grove as well.

Mr. DeGrandy:  It would make a difference.  Anything you do makes a difference in the numbers and the issue is how does that ripple and how does that increase the deviation.  But all of them are policy choices for you to make.

Commissioner Covo:  Can we see, please, those numbers?  To see what -- see exactly what happens when Bay Heights comes back to D2?

Mr. DeGrandy:  Bay Heights?  You would have to take everything that wraps around D4 from the south border all the way up because you can't just take Bay Heights, that disconnects the southern part of that -- District 3.

Commissioner Covo:  But our lines before went like that.  I mean the lines before were like going down and --

Mr. DeGrandy:  Before the configuration --

Commissioner Covo:  -- they were going --

Mr. DeGrandy:  -- before the configuration of D4 was somewhat different.  I mean, you know, I can tell you where the lines -- where the streets are.  If you look at where the border of District 4 is with District 3, that street that comes down, I believe if I'm not mistaken, that's the north -- that's the south wall of Bay Heights right there.  So, I cannot connect the remaining meaning southern portion to D3.  I would have to take from D4 to be able to connect to that southern part of D3, which is what was done in the previous map.

draft

Commissioner Covo:  What happens after we vote on these maps if the judge doesn't like it?

Mr. DeGrandy:  If the judge doesn't like it --

Commissioner Covo:  Because it doesn't look very similar to the Plaintiffs' maps.  I just -- I'm just curious to see what the process is moving forward.

Mr. DeGrandy:  The Plaintiffs' maps are their concept of what should be done.  It doesn't have any more validity.  And as a matter of fact, each one of your maps that you would adopt comes to the court with a presumption of good faith.  So, actually, your plan has more weight for a court than the Plaintiffs' map.

Commissioner Covo:  But they can also say that they don't like it as well.  I just want to know, due process, how it -- does it -- is it going to go?

Mr. DeGrandy:  When you talk about "they," do you mean the court or the Plaintiffs?

Commissioner Covo:  The court.

Mr. DeGrandy:  Of course, the court could say, I don't like it.  And if your question is what happens then, what happens then, as I said before, is the court could accept any one of the alternatives that have been proposed, and the court could elect to have a special master to draw its own plan, or the court can elect to take one of the Plaintiffs' plans.  The court is the court.  The court has the power to do what it feels is correct.

Commissioner Covo:  Got it.

Chair King:  Are we ready to take a vote?

Commissioner Reyes:  Yes.

Commissioner Díaz de la Portilla:  I'm ready.  I'll call the question then, right?

Chair King:  All in favor of the D3 alternative map as amended.

Mr. DeGrandy:  V3.

Chair King:  V3 -- well, I'm going to read the whole thing.  D3 alternative map, as amended, V3.

Mr. DeGrandy:  With a 3.6 percent deviation.

Commissioner Díaz de la Portilla:  Correct.

Chair King:  With a 3.6 percent deviation.

draft

Commissioner Díaz de la Portilla:  Aye.

Chair King:  All in favor?

Commissioner Covo:  I'm voting no.

Chair King:  All in favor?

The Commission (Collectively):  Aye.

Chair King:  Motion carries 4-1.  We have our map.

Mr. DeGrandy:  Thank you.

Chair King:  This meeting has now -- is now concluded.  Thank you all.

Vice Chair Carollo:  Thank you.