UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT AS MOOT**

Pursuant to S.D. Local Rule 7.1 and Fed. R. Civ. P. 12(b)(1) and (6), Defendant, City of Miami (the "City"), respectfully moves to Dismiss the First Amended Complaint of Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro (collectively, the "Plaintiffs"). As explained further below, the passage of a new redistricting plan has mooted Plaintiffs' case or controversy, and the dispute is no longer justiciable.

**I. Introduction**

The City has had single member districts for its five commissioners (rather than at large elections) since 1997. DE 23 ¶ 33-39, 59-64. These districts maintained substantially the same

geographical areas and racial demographic make-up since the individual districts were first constituted. DE 24-80 to 83[1]; DE 26 p.4; DE 24-76, p.12 (2013 demographics prior to 2013 redistricting); DE 24-78 p.6 (2013 demographics of 2013 redistricting).

The United States Census of 2020 (the "2020 Census") revealed that the City's Commission Districts no longer had substantial equality of population. *See Id*. ¶¶ 72-74. Following the 2020 Census, the ideal Commission district size was 88,448. *Id.*, ¶ 72. One district, District 2, the waterfront district, had once more grown significantly larger than the other four districts and needed to "shed" population to the other four districts. *Id.*, ¶ 75. In order to bring the population variance back to constitutionally acceptable levels, the City had to redistrict and shift population from District 2 to the other districts. The City Commission adopted Resolution 22-131 on March 24, 2022, redrawing the district lines and balancing population among the 5 districts. This lawsuit challenges that redistricting as unconstitutional racial gerrymandering.

Nine months after the City had enacted Resolution 22-131, Plaintiff's filed a single count complaint asserting the City improperly considered race in the drawing of all five districts in violation of the Equal Protection Clause. DE 23. Eleven months after passage of that plan, Plaintiffs filed an Expedited Motion for Preliminary Injunction, seeking to enjoin the use of the

---

[1] The papers cited are matters of public record and were attached to Plaintiff's motion and made part of the record in this case. "In determining whether to grant a Rule 12(b)(6) motion, the Court may also consider the allegations in the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Hodges v. Buzzeo*, 193 F.Supp.2d 1279, 1281 (S.D. Fla. 2002), citing *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996).

redistricting plan adopted in Resolution 22-131. DE 26. On March 29, the Court's Magistrate conducted an evidentiary hearing on Plaintiffs' Expedited Motion, and issued her Report and Recommendations on May 3, 2023. *See* DE 52. The Magistrate found that the City failed to sufficiently justify using a 50% BVAP in drawing District 5 (D5)[2], and thus, the district was not narrowly tailored to serve a compelling state interest, i.e. compliance with the Voting Rights Act ("VRA"). Id, P. 57. Additionally, the Magistrate found that race impermissibly predominated the drawing of the remaining districts and could not withstand strict scrutiny. *Id*. In support of its findings, the Magistrate relied heavily on City Commissioners' statements in commission meetings that they intended to draw three Hispanic districts, one Black district, and one Anglo district. The Magistrate recommended that the plan adopted in Resolution 22-131 be preliminarily enjoined, that the Court adopt a schedule for the preparation of a remedial plan with new district lines, and that any replacement plan must not use race as a predominant factor in the design of any district unless that use of race is narrowly tailored to comply with a constitutionally permissible compelling government interest. Id., p. 100.

The Court, after considering Defendant's objections and Plaintiffs' response, granted Plaintiffs motion and preliminarily enjoined the plan adopted in Resolution 22-131 (the "Enjoined Plan"). DE 59. The Court directed the parties to mediation, gave Defendant until June 30, 2023, to enact an interim remedial plan, and directed Defendant to notify the Court by close of business that same day on the status of such efforts. *Id*. In the event mediation did not result in a settlement redistricting plan but the City still adopted an interim remedial redistricting plan, the Court additionally directed Plaintiffs, if they had no objection to the plan adopted by the

---

[2] The City Districts will be referenced by "D" immediately followed by the applicable number, e.g. "D1" refers to District 1.

City, to notify the Court within two days of their receipt of the interim remedial redistricting plan, and if they did object, file a memorandum in opposition within seven days of their receipt of the interim remedial redistricting plan.

Rather than just adopt an interim remedial plan, on June 14, 2023, the City adopted Resolution 23-271, adopting a new redistricting plan (the "Enacted Plan") to replace the Enjoined Plan.  DE 77.  The resolution was certified on June 29, 2023, and Defendant filed its Notice of Passage of Redistricting Plan, in which it informed the Court of the Defendant's adoption of the Enacted Plan, and provided the Court with a copy of the resolution adopting the Enacted Plan, the supporting statistical tables for the Enacted Plan (generated after passage of the plan and not considered by the City Commission prior to passage of City of Miami Resolution 23-271), the presentation made by Miguel DeGrandy on June 14, 2023, Plaintiff's Correspondence, May 23, 2023, enclosing Plaintiffs' Plans 1 and 2, and Plaintiffs' Plan 3 dated June 13, 2023, and the verbatim draft minutes of the City of Miami Commission meeting on June 14, 2023.

## II.  Standard on a Motion to Dismiss

"It is well-established that, to establish standing, a plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022) (quotation omitted).  While a plaintiff must establish standing at the time he files his complaint, "when events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief, the question becomes whether the case is moot." Id. (quotation omitted).  Mootness may occur when there is a change of circumstances, such as a change in the law. *Coral Springs Street Systems, Inc. v.*

*City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004). A suit that is moot "cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it." Id. The doctrine of voluntary cessation is an exception to this general rule. "[T]he 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.'" *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 868 F.3d 1248 (1th Cir. 2017) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, (1953)).

However, as it relates to constitutional challenges to statutes, a challenge is generally mooted by the repeal of the challenged statute. *Coral Springs Street Systems, Inc.*, 371 F.3d at 1329. When a city resolution is repealed by the enactment of a superseding resolution, the superseding statute resolution "moots a case only to the extent that it removes challenged features of the prior law." "Rarely will challenges to a law's validity survive a mootness analysis when that law is no longer effective." *Health Freedom Defense Fund v. President of United States*, 2023 WL 4115990 (11th Cir. June 22, 2023). While it is usually the burden of the party asserting mootness, "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Flanigan's Enterprises*, 868 F.3d at 1256 (quoting *Coral Springs*, 371 F.3d at 1328–29)). Once a challenged law is repealed, "the plaintiff bears the burden of presenting affirmative evidence that the case is no longer moot." *Id*. The justification for this rule is that the repeal of a challenged law is one of those "subsequent events that makes it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. (citations omitted). This is doubly true when one considers the presumption of good faith that applies even to a remedial plan. *Abbott v. Perez*, 138 S.Ct. 2305, 2324 ("The allocation of the burden of proof and the presumption of

legislative good faith are not changed by a finding of past discrimination.")  The "key inquiry" is "whether the evidence leads [the Court] to a reasonable expectation that the City will reverse course and reenact the allegedly offensive portion of its Code should this Court grant its motion to dismiss."  *Flanigan's Enterprises*, 868 F.3d at 1256.

**III.   The City's Enacted Plan has replaced the Enjoined Plan, and there is no indication that the City has any intention of reverting to the Enjoined Plan.**

In this case, Plaintiffs have yet to amend their First Amended Complaint which relied heavily on the process for enacting the Enjoined Plan, including statements of commissioners in prior commission meetings relating to the Enjoined Plan, and such claims do not relate in any way to the Enacted Plan, which has replaced the Enjoined Plan.  Moreover, there is no evidence to suggest that the City has any intention of reverting to the Enjoined Plan if this Court should dismiss this suit.

On June 14, the City unequivocally replaced the Enjoined Plan with the Enacted Plan. "for all purposes, including but not limited to, any election of City Commissioners, following the effective date of this resolution."  DE 77, p. 8.  Resolution 23-0271 became effective on June 29, 2023.  Thus, it would apply unconditionally to all elections held after that date.  Specifically, the Enacted Plan is not an "interim" plan, but a plan that wholly replaces the Enjoined Plan.  The controlling precedents plainly dictate that this matter is now moot in light of the Enacted Plan.

Plaintiffs may assert that the Enacted Plan maintains the cores of the districts, and thus still retains the same racial intent and effects of the Enjoined Plan. *Compare North Carolina v. Covington*, 138 S.Ct. 2548, 2553 (2018) (rejecting defendants' arguments that the case was moot because the plaintiffs still asserted "they remained segregated on the basis of race.")  However,

the Enacted Plan is not afflicted with the same improper intent as the Enjoined Plan, and the racial effect will be the same regardless of how one draws the district lines.[3]

There is no indication that lines were drawn to separate residents on the basis of race. To the contrary, the entire discussion was centered around race-neutral reasons for the changes. As Mr. DeGrandy presented, the drafting was commenced using Plaintiffs' Plan 2 as a starting point, and then made changes consistent with the Commission's policy choices. DE 77, p. 58. For example, one of the changes retained a historic barbecue restaurant in an area where the incumbent commissioner had invested significant resources. *Id*. at 105. While the Enacted Plan still retains three Hispanic districts and a Black district, so did the Plaintiffs' alternative plans. See DE 77, p. 59. Mr. DeGrandy explained:

> And once you draw District 5 in compliance with the VRA, the fact remains that the remaining population of the city is now approximately 75 percent Hispanic. It is also a fact that the majority of the Hispanic residents live in the central and western parts of the city. Now, because of this reality, both of the Plaintiff's alternative plans necessarily include three majority Hispanic districts in that area.

*Id.*

*Covington* does not control the present case. *Covington* dealt with a remedial process after the Court had already granted judgment in favor of plaintiffs finding the North Carolina State Assembly impermissibly gerrymandered 28 State Senate and State House of Representatives districts comprising majorities of Black voters. *See Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *summarily aff'd*, 137 S.Ct. 2211 (2017). After the

---

[3] As discussed below, each of Plaintiffs' proposed plans also maintained the core of the prior districts and maintained the same racial demographics as the Enjoined Plan, i.e. the Black VRA district, three Hispanic districts, and an "Anglo" district.

North Carolina Legislature adopted a remedial plan, the plaintiffs maintained that four districts still segregated voters based upon race. But the issues in Covington dealt with not just intent, but actual racial effects—like "the exclusion of numerous majority-white precincts in downtown Fayetteville," all of the black residents in a portion of Greensboro, all but one of the majority black precincts in two counties, and irregular shapes that corresponded with the racial make-up of the geographic area." *Covington*, 138 S.Ct. at 2558. The Plaintiffs have made no such similar allegations here, and this Court has not granted judgment at all, or even made such conclusions in support of its findings supporting its preliminary injunction.

The facts are that the Enacted Plan, and the Plaintiffs' alternative plans retain substantial portions of the existing districts, and naturally result in three Hispanic Districts and one Black District.[4] But unlike the Enjoined Plan, the changes reflected in the Enacted Plan represent race-neutral line drawing intended to rebalance population, not sorting residents on the basis of race.

For the foregoing reasons, we respectfully suggest this Court lacks jurisdiction to consider the case further and should dismiss the First Amended Complaint as moot.

WHEREFORE, Defendant respectfully requests that the Court dismiss Plaintiffs' Amended Complaint.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

By: ___*s/ Christopher N. Johnson*___
Christopher N. Johnson

---

[4] In fact, Plaintiffs' plans pack Hispanics into District 4 at above a 95% level, and preserve the cohesion of the whitest neighborhoods in Miami: the various Coconut Grove neighborhoods.

Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

9

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___s/ *Christopher N. Johnson*___
       Christopher N. Johnson