# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *ET AL.*,

*Plaintiffs,*

v.

CITY OF MIAMI,

*Defendant.*

# PLAINTIFFS' OBJECTIONS
## TO THE CITY'S PROPOSED INTERIM REMEDIAL PLAN

Nicholas L.V. Warren
**ACLU Foundation of Florida**
336 East College Avenue, Ste. 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley
Caroline A. McNamara
**ACLU Foundation of Florida**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*\* Admitted pro hac vice*

*Attorneys for Plaintiffs*

## INTRODUCTION

Six weeks ago, this Court found that all five districts in the City's 2022 redistricting plan ("Enjoined Plan") were substantially likely to be unconstitutional racial gerrymanders, and that Plaintiffs were entitled to a preliminary injunction to avoid serious and irreparable harm. ECF 60 ("PI"). The Court adopted Judge Louis's detailed R&R (ECF 52), finding that the Enjoined Plan embodied commissioners' goals that "Districts 1, 3, and 4 remain 'Hispanic districts'" with as high, optimally "balance[d]" Hispanic populations as possible, "that District 2 remain an 'Anglo district,'" and that "District 5 would be a 'Black district'" shaped by an "arbitrary" Black voting-age population (BVAP) quota of 50%. PI 10, 19; R&R 68.

The City has doubled down. Rather than accepting this Court's findings and abandoning their goal of dividing the city along racial lines to achieve "categorical representation," ECF 24-12 (Tr. 2) 13:11, the City created a "new" map that closely resembles the Enjoined Plan. The City pursued this goal from the moment the R&R first indicated it might have to create a new map. The City ignored Florida's Sunshine Law and worked in the shadows to replicate the Enjoined Plan with just enough difference to pretend otherwise. But the result is clear: under the City's proposal—dubbed Resolution 23-271—94.1% of Miamians remain in the same district. ECF 82-11 (McCartan Rep.) at 8. The City, in other words, chose to ignore the Court's injunction and passed the same map.

Because this Court has "its own duty to cure illegally gerrymandered districts," it cannot accept Res. 23-271. *North Carolina v. Covington* ("*Covington II*"), 138 S. Ct. 2548, 2553 (2018). While the City's map does not remedy the violations the Court identified, Plaintiffs presented several (P1, P2, P3) that do, and submit one (P4) to the Court. P4 also complies with all other legal requirements and honors the City's *legitimate*, non-race-based policy choices. The Court should

thus reject Res. 23-271 and adopt P4 as a "constitutionally conforming remedial map." PI 32.

### THE CITY'S INTERIM REMEDIAL PROCESS

The City's remedial process began shortly after the R&R. At the Commission's May 11 meeting, Commissioner Díaz de la Portilla suggested returning to at-large elections, noting "then there's no debate about where the lines are drawing, whether it's . . . like Flagami is cut in half where Allapattah's cut in half." ECF 82-1 (5/11 Tr.) 4:2–4. He doubled down on the Commission's view that representation was racially categorical, and that redistricting's goal was to reserve one Anglo and one Black seat, and to avoid having five Hispanic commissioners. *Id.* 4:16–20, 7:18–19. Reyes agreed. *Id.* 5:13, 5:20, 6:4–14 ("[S]ince day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by—I'm going to call a spade a spade—but gerrymandering."); *see also id.* 17:9–13. The two stressed that what the Commission did in the Enjoined Plan was right. *Id.* 8:12–16, 13:8–14, 16:17-20. Concluding the discussion, the Commission voted *unanimously* (with Carollo absent, ECF 82-3) to direct De Grandy to meet with them "and start redrawing a map, that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups." ECF 82-1 17:10-13, 17:14–21, 18:15–23.

The same day, the Court held a telephone conference and suggested both sides prepare for remapping. The Court issued its injunction on May 23 and ordered mediation. PI; ECF 61. That night, Plaintiffs submitted P1 and P2 to the Commission, along with a letter explaining them. ECF 77 at 46–51; 82-7 at 2–3. On June 9, Plaintiffs shared supplemental information on P1 and P2's compliance with the VRA. ECF 82-7 at 2; 82-8. Plaintiffs followed that up with Dr. Moy's full analysis on June 12. ECF 82-7 at 1; 82-9. The Parties mediated on June 13, adjourning at 6:20 P.M.

ECF 65, 75. Responding to mediation discussions, commissioners' comments on P1 and P2, and community input, Plaintiffs submitted a third map (P3) during mediation. ECF 77 at 53; 82-7 at 1.

After 5 P.M. on Friday, June 9, the Commission noticed a special redistricting meeting for 10 A.M. June 14. ECF 82-4. The agenda listed a single "Discussion Item." ECF 82-5 at 3. On June 14, the morning after mediation, the Commission met. Plaintiff Valdes gave a statement for the Plaintiffs. ECF 82-2 (6/14 Tr.) at 6:2–8:2. And De Grandy publicly presented his "draft plan proposal," named Version 12 ("V12"),[1] *e.g., id.* at 69:5, marking the first time the City shared a map in the interim remedial process. *Id.* at 8:3–16:13. De Grandy developed V12, and other drafts, after individual private meetings with commissioners to "amalgamate[]" their input, in possible violation of Florida's Sunshine Law, Fla. Stat. § 286.011 and FLA. CONST. art. 1, § 24(b). ECF 77 at 6; *Blackford v. Sch. Bd. of Orange Cnty.*, 375 So. 2d 578, 580-81 (Fla. 5th DCA 1979); Fla. Off. of Att'y Gen., *Gov't-in-the-Sunshine Manual* (2023 ed.), at 10. The Commission debated proposed changes to V12 and then took a recess after 103 minutes in session. 6/14 Tr. 31:22–56:5; ECF 82-6 at 1. During the recess, De Grandy met privately with commissioners and drew alternative maps at each's request. 6/14 Tr. 64:5–14. There are no records of these private meetings, either.

Commissioners returned from recess for a final 44-minute session where each pushed for changes to their districts. ECF 82-6 at 1. Díaz de la Portilla proposed "Version 14," a draft De Grandy had previously drawn, as the D1 Alt. Map; Covo, Carollo, and King each proposed maps of their own based on V12 (the D2, D3, and D5 Alt. Maps); and Reyes stood by the original V12. 6/14 Tr. 59:5–12. After some discussion, De Grandy and counsel Chris Johnson modified the D3 Alt. Map to move a portion of Overtown from D1 to D5, in a change agreed upon by King and

---

[1] Versions 1–11 and 13 were not made public. The City's counsel maintains that no such maps exist. ECF 82-18. It is unclear why De Grandy would pick the names Versions 12 and 14.

Díaz de la Portilla, resulting in "D3 Alt. v.2." *Id.* at 70:9–72:12. After Díaz de la Portilla objected to the change going too far, some territory was moved back into D1, yielding "D3 Alt. v.3." *Id.* at 80:16–19, 81:6–15, 87:1–9. The Commission approved that plan on a 4-1 vote, and it was later memorialized in writing as Res. 23-271. *Id.* at 91:9–19; ECF 77 at 5–7.

The resolution and map were not properly noticed under the Sunshine Law and City Code, and suffered from other deficiencies. ECF 83-1 ¶¶ 4–7, 9–17, 30–48; FLA. CONST. art. 1, § 24(b); Fla. Stat. § 286.011(1); City Code § 2-33. It is critical to note that the City represents "it has enacted a new redistricting plan, City of Miami Resolution 23-271," but the resolution filed on the docket was drafted after June 14 and never voted on by the Commission. ECF 77 at 1. Further, there is an unexplained discrepancy between the map the Commission passed and the plan submitted to the Court in Res. 23-271. McCartan Rep. ¶¶ 14–16; ECF 82-19; 82-20.

Seven days after Mayor Suarez let Res. 23-271 become law without his signature and sixteen days after the Commission voted, the City filed Res. 23-271 with the Court. ECF 77 at 8.

## SCOPE OF REVIEW

In assessing the City's proposed interim remedial plan, the Court "has a 'duty' to ensure that [the] remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future.'" *Covington v. North Carolina* ("*Covington I*"), 283 F. Supp. 3d 410, 424 (M.D.N.C. 2018) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)), *aff'd in part, rev'd in part*, 138 S. Ct. 2548; *see also Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville II*"), 2022 WL 17751416, at *11 (M.D. Fla. Dec 19, 2022), *stay denied*, 2023 WL 119425 (11th Cir. Jan. 6, 2023), *and appeal dismissed*, Doc. 37, No. 22-14260 (11th Cir. June 6, 2023). The Court may approve Res. 23-271 only if it provides a "full and adequate remedy" to the race-based sorting of voters. *United States v. Osceola Cnty.*, 474 F. Supp.

5

2d 1254, 1256 (M.D. Fla. 2006). As the Supreme Court recently reiterated, "a State [cannot] immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen v. Milligan*, 143 S. Ct. 1487, 1505 (2023).

"When . . . the districting plan is offered as a replacement for one invalidated by the [C]ourt," Plaintiffs no longer bear the burden they "[o]rdinarily" would in launching a racial gerrymandering claim. *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala.), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000). Instead, the Court has an "independent duty to assess its constitutionality." *Id.*; *see also Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville III*"), 2023 WL 119425, at *3 (11th Cir. Jan. 6, 2023) (noting district court's "independent obligation to decide whether [proposed] plan was constitutional and corrected the defects which rendered the initial plan unlawful").

As a consequence, it is no longer Plaintiffs' burden to "disentangle race from politics and prove that the former drove a district's lines." *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017). Instead, in exercising "its own duty to cure illegally gerrymandered districts," *Covington II*, 138 S. Ct. at 2553, the Court must be wary when remedial districts are drawn "through reliance on political data closely correlated with race," *Covington I*, 283 F. Supp. 3d at 431. Where, as in Miami, party and race are correlated, the City must do the disentangling, because the use of partisan data has "the potential to embed, rather than remedy, the effects of an unconstitutional racial gerrymander in a proposed remedial districting plan," *id.*, and risks "carr[ying] forward the effects of the identified racial gerrymanders," *id.* at 434.

Similarly, incumbent-protection is the type of political goal that must "give way to [the] duty to completely remedy the constitutional violation." *Id.* at 433; *see also Jeffers v. Clinton*, 756 F. Supp. 1195, 1199–1200 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991). Before approving the

6

remedy, the Court must therefore ensure that any desire of the Commission's to account for certain "political consideration[s]" has not eclipsed "the need to remedy a *Shaw* violation." *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 n.8 (E.D. Va. 2016).

While the Court must otherwise defer to the City's *legitimate* policy choices, it cannot defer to a plan that is "[in]consistent with constitutional norms and is [] itself vulnerable to legal challenge." *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 763 (5th Cir. 1993) (quoting *White v. Weiser*, 412 U.S. 783, 791 (1973)). This Court may defer to legislative judgments only insofar as they "do[] not detract from the requirements of the Federal Constitution." *Upham v. Seamon*, 456 U.S. 37, 41 (1982). The Court must not, "in the name of [legislative] policy, refrain from providing remedies fully adequate to redress constitutional violations which have been adjudicated and must be rectified." *Jacksonville II*, at *11 (quoting *White*, 412 U.S. at 795).

Additionally, the Court must ensure Res. 23-271 complies with other federal requirements, "consider[ing] whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place"—including the VRA. *Id.* (quoting *McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988)); *Personhuballah*, 155 F. Supp. 3d at 564. Upon a "finding of a constitutional or statutory violation," the Court cannot defer "to the legislative judgment the plan[] reflect[s]." *Upham*, 456 U.S. at 40–41.

If the Court determines that Res. 23-271 is not a suitable remedy, it must order one of its own. In doing so, the Court "should be guided by the legislative policies underlying the existing plan, to the extent [they] do not lead to violations of the Constitution or the Voting Rights Act of 1965." *Abrams v. Johnson*, 521 U.S. 74, 79 (1997). But the Court should not adhere to legislative policies closely correlated with the underlying violation, *see Covington I*, 283 F. Supp. 3d at 422,

"partisan or political objectives, even when the state redistricting body expressly adopted such objectives," *id.* at 452, or any legislative policies that stand in the way of "so far as possible eliminat[ing] the discriminatory effects of the racial gerrymander," *id.* at 435 (citation omitted); *see also Personhuballah*, 155 F. Supp. 3d at 564.

The above-described remedial procedure, in which the judiciary gives the legislature an opportunity to redraw an enjoined map, then reviews the legislature's submission to ensure it conforms to the court's order and all relevant legal requirements, is part of the federal redistricting caselaw basics. *See, e.g.*, *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338 (M.D. Ga. 2022) (reviewing government's proposed map enacted to be permanent map); *Harris v. McCrory*, 2016 WL 3129213 (M.D.N.C. June 2, 2016) (same), *aff'd sub nom. Harris v. Cooper*, 138 S. Ct. 2711 (2018); *Johnson v. Mortham*, 1996 WL 297280 (N.D. Fla. May 31, 1996) (same); *James v. City of Sarasota*, 611 F. Supp. 25 (M.D. Fla. 1985) (same); *Sobel v. Adams*, 214 F. Supp. 811 (S.D. Fla. 1963) (same and approving map), *rev'd sub nom. Swann v. Adams*, 378 U.S. 553 (1964) (rejecting map). This framework is supported by "well-known principles of equity," *Covington I*, 581 U.S. at 488 (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964), and makes good sense. Otherwise, the government could evade review by replacing an enjoined plan with an identical or similar one and demanding plaintiffs file a new case seeking a new injunction, inviting judicial whack-a-mole.

## THE CITY'S MAP REMAINS RACIALLY GERRYMANDERED

### I.   Res. 23-271 Was Motivated by the Same Racial Considerations as the Enjoined Plan

In its latest motion to dismiss, the City argues this case is nothing like *Covington*. ECF 80 at 6–8. In fact, this case is very similar to *Covington*, and its holdings squarely apply. But the City's remedial process diverged from *Covington*'s in one critical way—here, the remedial mapmakers *did* consider race. The Commission started the process by voting to "bunch together []

ethnic borders in order to be able to have Afro American . . . and non-Hispanic white . . . in representing the city of Miami." 5/11 Tr. 6:8–10. Individual commissioners reiterated their race-based motivations. The Commission use racial data to develop its plan and reject alternatives that did not yield the desired racial balance. The only place where race apparently *did not* factor into the Commission's analysis is the only place where it *should have:* ensuring VRA compliance.

### A. Commissioners Remained Motivated by Their Original Goal of Racial Separation

From the outset of their process, multiple commissioners repeated their attitude that representation on the Commission was racially categorical, that the redistricting's goal was to draw one Black, one Anglo, and three Hispanic seats (in part to avoid having all five commissioners be Hispanic), and that they had done the right thing. 5/11 Tr. 4:16–20, 5:13, 5:20, 6:4–13, 7:18–20, 8:11–13, 13:8–15, 16:21–23. The Commission unanimously directed De Grandy to "start drawing a map that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an African American to see that they're going to be properly represented as well as other groups"—*i.e.*, the two other groups the Commission had just discussed, Hispanics and Anglos. *Id.* 17:14–17, 17:21–19:4, 4:20, 6:9–10, 7:20, 13:13.

A key commissioner—King—reiterated the City's commitment to dividing Miamians by race on the eve of Res. 23-271's passage. She asserted in a June 13 news article, "The Supreme Court ruling [in *Allen v. Milligan*, 143 S.Ct. 1487 (2023)] proves that our original redistricting was constitutional and in the best interest of our community." ECF 82-16 at 2. She went on, "My top priority is keeping District 5 neighborhoods intact . . . Overtown, Liberty City, Little Haiti, Wynwood and the Upper East Side share the same needs. It would be unconstitutional to redraw those lines." *Id.* Taken together, commissioners' statements before De Grandy even publicized his first draft evince an intent to pass the same map, for the same reasons, under a new name.

9

**B. Adopting Res. 23-271 is Tantamount to Ignoring the Court's Injunction Altogether**

Res. 23-271 is 94.1% the same as the Enjoined Plan. McCartan Rep. 8. Only 5.9% of Miamians are moved into a different district. *Id.* Narrowing in on the three Hispanic-majority districts which the Commission previously sought to optimally "balance" with as high Hispanic populations as possible, 97.8% of Miamians who were sorted into those districts—because of their race—remain there in Res. 23-271. *Id.* These are staggeringly high core-retention rates. *See In re SJR 1176*, 83 So. 3d 597, 662, 665, 669 (Fla. 2012) (describing 82.6% retention as "overwhelming" and 69.7% as "high"); *Jacksonville II*, 2022 WL 17751416, at *13; *see also* Robert Yablon, *Gerrylaundering*, 97 N.Y.U. L. Rev. 985, 1005–07, 1038–39 (2022) (describing core retention); *id.* at 994 n.36 (using 80% core-retention as threshold).

The makeup of the 5.9% of Miamians moved confirms the map's continued race-based nature. 5,125 residents were moved into D2 and D5 from the three packed Hispanic districts, but those residents are disproportionately *less* Hispanic (59% HVAP compared to the enjoined districts' 88–90%). 2nd Abott Rep. 8–9. The 4,735 residents moved out of the enjoined D5 are just 16.6% Black, compared to the enjoined D5's 50.3% BVAP. *Id.* Meanwhile, 90% HVAP areas are shuffled *among* D1, D3, and D4, creating the illusion they changed while maintaining their demographics. *Id.* These figures point to continued racial predominance, with Black residents packed in D5 (still 50.3% BVAP), D2 retaining an intentionally large Anglo concentration, and the Hispanic populations of D1, D3, and D4 deliberately "balanced" at an artificially high level. R&R at 67–71; *see Jacksonville II*, 2022 WL 17751416, at *13 (rejecting new map because Black voters "shuffled among—*but not out of*—the Packed Districts"); *Bethune-Hill v. Va. State Bd. of Elections* ("*Bethune-Hill II*"), 326 F. Supp. 3d 128, 173 (E.D. Va. 2018) (relevant question is "which voters the legislature decides to choose" in redrawing; disproportionate racial shifts

support predominance); *Ketchum v. Byrne*, 740 F.2d 1398, 1407 (7th Cir. 1984) (disproportionate movement of one racial group out of districts is "strong evidence of intentional discrimination").

Thus, Res. 23-271 is not "a full and adequate remedy" that "completely remedies the identified constitutional violation" and its effects. *Osceola Cnty.*, 474 F. Supp. 2d at 1256; *Covington I*, 283 F. Supp. 3d at 424, 435. The City's policy of hewing to the enjoined (and 2013) districts—a policy apparent on the map's face as well as in the words and actions of commissioners who sought to claw back aspects of the unconstitutional districts out of V12—cannot stand. "[W]here a government opts to preserve district cores to maintain the race-based lines created in previous redistricting cycles, '[t]he Supreme Court has been equally clear that this is not a legitimate objective.'" R&R 71 (quoting *Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville I*"), 2022 WL 16754389, at *3 (11th Cir. Nov. 7, 2022)); *see also* ECF 39 at 3–5 (citing cases). Just as in their initial process, "Commissioners directed the redistricting consultant to preserve the cores of the existing districts reflecting th[e] racial composition" they wanted to see on the dais. R&R 77–78. "And the racial demographic data for the resulting 2022 Enacted Plan reflect that the Commission succeeded in preserving the racial breakdowns of the prior redistricting." *Id.* at 78; *see* 2nd Abott Rep. 1–2, 14–15.

### C. The Requested Changes to Version 12 Walked Back Closer to the Enjoined Plan

The City's remedial mapmaking process began with the Commission's directive to De Grandy to preserve the categorical racial divisions in the Enjoined Plan. From there, De Grandy operated in the shadows before emerging with V12—the first version shared publicly—during the June 14 Commission meeting. It is unsurprising that V12 reaffirms the Commission's original handiwork, but even De Grandy's proposal was not enough for commissioners. They made several changes to claw back even more elements of the Enjoined Plan that V12 had altered.

*1. The D2/D3 Border in the North Grove and Brickell:* Carollo homed in on an area of the North Grove between 22nd and 27th Avenues which V12 added to D3 (Area 21 in ECF 82-32). 6/14 Tr. 40:12–41:11. At Carollo's request, Area 21 was returned to D2. 6/14 Tr. 65:6–7. This area is one of the whitest in the city (54.8% WVAP, 35.9% HVAP), and in fact is the exact same area Carollo previously compared to the bone in a steak, in contrast to Hispanic-rich "sirloin" areas elsewhere. Tr. 3 101:11–14, 102:2–3, 102:10–12, 103:11–12, 105:2–3; 2nd Abott Rep. 19; *see* PI Mot. 20–21. To compensate for the lost population, Carollo requested that D3 add a plurality-HVAP area along South Miami Avenue to Brickell (Area 24). 6/14 Tr. 38:8–39:9; 77:6–9; 2nd Abott Rep. 19. Somehow, an *additional* area of Brickell (Area 25) was moved *into* D2, forming an irregular finger along the Miami River. That movement was never requested or explained publicly. Area 25 is plurality-white. 2nd Abott Rep. 19.

*2. The D3/D4 Border:* Carollo's only other requested change was along the D3/D4 border. V12 shifted the border three blocks eastward in Shenandoah and Silver Bluff, from 17th Avenue under the 2013 and Enjoined Plans, to 14th Avenue. This united all of Silver Bluff in D4 for the first time, and meant most of Shenandoah—all but two-block-wide slice from 12th to 14th Avenues—was united in D4 as well. 6/14 Tr. 15:2–9, 15:13–14. Carollo requested restoring the boundary to 17th Avenue south of Coral Way, while also restoring "in that same line as before" an area further north along SW 8th and 9th Streets that both he and Reyes wanted snapped back to the enjoined boundary, "keeping it in District 3 like it was." *Id.* 35:11–15, 37:1–23, 53:4.

As for the 17th Avenue/Coral Way restoration, after City Attorney Méndez recast Carollo's "main concerns [as] to keep certain communities together and certain neighborhoods together," Carollo justified "leav[ing] that section as it was" for "the simple purpose of the park we're building . . . in that part of Silver Bluff." *Id.* 41:12–13, 53:9–10. But earlier, he stated the park was

*still* on the D4 side of the line. 35:23. Indeed, the park is five blocks from the line, on the far side of 22nd Avenue. *Silver Bluff Dog Run Park*, CITY OF MIA., https://bit.ly/silverbluffdogrunpark.

As a result of Carollo's request, nearly 2,000 people between 14th and 17th Avenues moved back into D3. 2nd Abott Rep. 19. In response, "to equalize population," De Grandy moved from D3 to D4 an area in Auburndale/Little Havana—most of which had been in D4 under the 2013 Plan. 65:13–14. Thus, the D3/D4 border walked back closer to the Enjoined (and 2013) Plan at commissioners' requests, continuing the division of "distinct" and "historical" Shenandoah, Silver Bluff, and Little Havana that commissioners had kept divided in the Enjoined Plan to balance Hispanic populations and facilitate racial separation. Tr. 3 52:5–14, Tr. 6 38:9–16, 79:19–20.

*3. Morningside:* V12 proposed moving part of Morningside between 55th Terrace and 61st Street out of D2 and into D5. At 11.8% BVAP and 41.9% WVAP, the area (Area 26) has a much lower Black population and much higher white population than D5. 2nd Abott Rep. 19. And indeed, V12's D5 BVAP drops from the Enjoined Plan's 50.3% to 50.0%. Covo objected to Morningside being split, but acknowledged that parts of the 2013 D2 would have to be moved out to equalize population. 6/14 Tr. 42:14, 42:18–21, 45:1–6.[2] Realizing that part of Morningside had moved into D5, King objected. *Id.* 43:15–22. De Grandy asked if she preferred to keep the neighborhood whole by including all of it into D5, but King said, "No, I don't think that any of Morningside should go to my district. Wouldn't that be splitting up neighborhoods?" *Id.* 44:2–3. King requested De Grandy bring back a revision with all of Morningside restored to D2. *Id.* 45:13–15. The two then had a mostly-inaudible sidebar. *Id.* 46:1–12; video at 1:32:21–50.

During the recess, King commented in her office that she was "looking out for the minorities" or had "to look out for the minorities" and did not want a "white affluent" area or areas

---

[2] Covo had given De Grandy a plan that moved *all* of Morningside into D5. 6/14 Tr. 45:13–14.

in her district. ECF 82-17 ¶ 13. The only change from V12 made in King's proposed alternative map, the D5 Alt., was returning that piece of Morningside to D2. 6/14 Tr. 64:21–65:1. That change was incorporated into Res. 23-271. Significantly, the Commission rejected at least four alternative plans that avoided "splitting up neighborhoods" in and around Morningside by adding the neighborhood to D5. ECF 82-26 (D1 Alt.); 82-34 to -36 (P1–P3). Res. 23-271 excludes from D5 the low-BVAP neighborhoods south of the existing district boundary. *See* 2nd Abott Rep. 20 (entire Morningside/Bay Point area is 10.6% BVAP; southern part King declined adding from V12 to make Morningside whole in D5 is 10.1% BVAP).

*4. Defining Overtown Along Racial Lines:* The only other change to V12 impacting D5 was in Overtown. Overtown is significant, not only as a historic and culturally rich part of the city, but for the controversy it generated in the Commission's process. King and the Overtown CRA sharply criticized Plaintiffs for moving part of Overtown out of D5 in P1 and P2. ECF 82-14. Responding to this criticism and mediation discussions, Plaintiffs submitted P3, which unites in D5 all parts of Overtown that had been in the Enjoined D5 (following the CRA boundary), *plus* reunited eleven HVAP-majority Overtown blocks that the Enjoined Plan had moved into D1 (between NW 5th and 8th Streets, from I-95 to 7th Avenue. R&R 41-42 (part of Overtown moved from D5 in 2013 to D1 in Enjoined Plan); 6/14 Tr. 6:18–19, 17:14–15 (Plaintiffs explaining P3).

Neither De Grandy nor commissioners discussed P3's treatment of Overtown. Instead, De Grandy criticized P1 and P2's "severing parts of Overtown" and explained how V12 "keeps historic Overtown intact in District 5" at King's request. 6/14 Tr. 8:15, 10:2–5, :22–11:3, 12:20–22. Contrasting Plaintiffs' "own impression of where Overtown is," De Grandy explained how Google Maps and the City's now-defunct Neighborhood Enhancement Team (NET) "shows a configuration consistent with our understanding" and how, "as [he] understand[s] the community

of Overtown," V12 included all of it in D5. *Id.* 16:4–7. His presentation included slides with his definition of "Historic Overtown." ECF 77 at 23, 26.

But De Grandy's Overtown *excludes* large areas that are part of the Google Maps and NET definitions of Overtown—the very sources he cited. *Id.*; 2nd Abott Rep. 9–11 & n.3; *Overtown*, Google Maps, https://www.google.com/maps/place/Overtown. Those definitions are shared by the City's Police Department (MPD) and the Convention & Visitors Bureau (GMCVB). 2nd Abott Rep. 9–10 & n.2–4. The area De Grandy defined as Overtown is 60.5% BVAP. *Id.* at 21. The parts of the Google/NET/MPD/GMCVB definition De Grandy excluded are disproportionately non-Black (63.7% HVAP, 26.2% BVAP). *Id.* Further, the City Code has an official definition of Overtown that is even broader than Google/NET/MPD/GMCVB. City Code § 2-1051. The parts of the City Code definition De Grandy excluded from his neighborhood boundary are less Black, and more Hispanic. 2nd Abott Rep. 21. In other words, "De Grandy defined Historic Overtown along racial lines, resulting in the area being split into District 1 and District 5 on the basis of race," with his "definition shor[ing] up the existing racial composition of District 5 and . . . the Hispanic supermajority in District 1." *Id.* 11. No commissioner objected to his definition of Overtown to surgically exclude Hispanic-majority areas, and Res. 23-271 tracks this division.

The Commission did object, however, to one small part of V12's boundary in Overtown. Their discussion is illuminating. King requested adding to D5 a restaurant, People's Bar-B-Que, located in Overtown under the Google/NET/MPD/GMCVB definition and City Code definition, but outside Overtown under De Grandy's definition. 6/14 Tr. 69:22, 70:9–10. Díaz de la Portilla consented to the change—stressing *only* the restaurant should move, nothing more—and the restaurant moved into D5 in the D3 Alt. Map v.2. *Id.* 70:11, 71:14–72:17; ECF 77 at 42. But De Grandy and counsel Chris Johnson incurred too much into the Hispanic-majority part of Overtown

for Díaz de la Portilla's taste, moving four whole city blocks between NW 7th and 8th Streets. 6/14 Tr. 78:5–6, 80:16–19, 2nd Abott Rep. 21. Díaz de la Portilla directed De Grandy and Johnson to restore to D1 all but the single block with the restaurant, which they did in the final map. 6/14 Tr. 81:6–15. The three blocks returned to D1 are over 70% Hispanic. 2nd Abott Rep. 21. Adding just the restaurant block deviates as little as possible from the Enjoined Plan in this area. *See* ECF 82-33 (Overtown Maps). The block's 10 residents are two-thirds Black. 2nd Abott Rep. 19.

In sum, the Commission objected to removing Overtown from D5, but ignored P3's efforts to do so. The Commission ratified a definition of Overtown that defined it along racial lines, excluding majority-Hispanic areas, contrary to the official city definition and the sources De Grandy cited for his proposal. The Commission then adopted a map that followed the racially-defined boundary they set. In doing so, they strenuously ensured that *none* of the majority-Hispanic parts of the area would move out of D1. Their final product tracks the Enjoined Plan's boundary along NW 8th Street in that part of the neighborhood, deviating only to add one small majority-Black block. Thus, the line between D1 and D5 in the Overtown area is predominantly a function of the Commission's goal to hew to the Enjoined Plan and separate Hispanic from Black residents. The Commission split Overtown along racial lines, trying to cover its tracks by starting with a race-based definition of the neighborhood. *See* ECF 82-15 (comment of Gerald Reed Jr.).

**D. The Parts of Version 12 the Commission Chose to Accept Were Race-Based, Too**

The portions of V12 the Commission chose *not* to alter were principally driven by racial considerations as well. Some specific features unaltered from V12 are particularly enlightening.

***1. Avoiding "Packing Hispanics":*** One of the first criticisms of P1 and P2 lodged during the Commission's meeting was how they "intentionally pack the more conservative Hispanic voters in the western areas of the city" into D4. 6/14 Tr. 9:9–10, *see also* 14:21–22 ("the plaintiffs'

plan was designed to concentrate the most conservative voters into D4. And you see it right there," showing slide noting 95.03 and 95.55% HVAP in P1/P2); ECF 77 at 34; video at 31:09–17); *see also infra* 20–22. This was a race-based objection to a naturally occurring compact district unifying neighborhoods in Miami's west—an area the Commission deliberately split to "balance" the Hispanic populations of D1, D3, and D4, and to maintain the desired racial balance of D2 and D5. R&R 67–71, 75. To explain the "problem," De Grandy emphasized D4's HVAP under P1/P2 and showed slides featuring those figures. 6/14 Tr. 9:10–12; ECF 77 at 22, 34.

To fix the "packing" of Hispanics, V12 "restored [D1's] connection to . . . the western part of the city" where "the great majority of Hispanic voters live." 6/14 Tr. 13:5–6, 14:17–18; video at 30:19–46. Except for a single block, D1's boundary is *identical* to the Enjoined (and 2013) Plan from the city limit at 65th Avenue all the way to 22nd.[3] Satisfied by the "restoration" of the Enjoined Plan's optimal division of Hispanic residents, the Commission left this line untouched on June 14.

As the City eventually conceded at the preliminary injunction hearing, Section 2's effects test does not protect Miami's Hispanic voters from vote dilution. Hr'g Tr. 135:8–14; *see* R&R 86–87; PI Mot. 32–33. But given the City's initial position that D1, D3, and D4 *are* protected by Section 2, *id.* 44:18–45:3; De Grandy's testimony that the VRA protects them, and that Miami's Hispanic voters satisfy the *Gingles* preconditions, *id.* 49:23–25, 76:20–22; and the Commission's initial direction to ensure the three racial groups were "properly represented," it is no surprise that Res. 23-271 was drawn to optimally balance the Hispanic population among D1, D3, and D4 in a manner akin to the Enjoined Plan. *See* 2nd Abott Rep. 14–16 (enjoined districts' HVAPs ranging

---

[3] The fewer than 1,000 people moved between D1, D3, and D4 along the D1 border swapped high-Hispanic areas between the predominantly Hispanic districts, thus did not alter the racial "balance" the plan achieved. 2nd Abott Rep 5, 7, 8.

from 88.3–89.5%, compared to 84.5–90.0% in Res. 23-271, but 70.1–95.6% in Plaintiffs' plans).

      ***2. Adding Back an Area "Where the Hispanic Voters Live" to District 3:*** V12 made one notable change from the Enjoined Plan along the D2/D3 border, which the Commission chose to accept on June 14. De Grandy proposed moving the Bay Heights region of Coconut Grove from D2 into D3. In the Commission's first redistricting process, Bay Heights was an area Díaz de la Portilla named specifically as "where the Hispanic voters live," suggesting adding it and other parts of the Grove to D3 and D4 because "there's ethnic diversity in Coconut Grove too." Tr. 2 7:15–17. Following this direction, De Grandy's Feb. 7, 2022 draft moved Bay Heights into D3. ECF 24-84; Tr. 3 9:21–23, 10:6–12 (De Grandy describing "find[ing] adjacent areas with similar demographics" to add to D3). After Russell objected, Tr. 2 26:15–16; Tr. 3 65:9–13, De Grandy restored Bay Heights to D2 in the Feb. 22, 2022 Base Plan, instead adding to D3 another "ethnically diverse" part of the Grove "with similar demographics" around Natoma Manors, ensuring D3's HVAP dropped only a tenth of a point. Tr. 4A 5:9–11, 6:7–8, 7:22–8:4, 9:18–19; ECF 24-31 (1st Abott Rep.) 23; R&R at 36, 41.

      Nonetheless, Bay Heights' high Hispanic population was the subject of later discussion, and Carollo even expressed interest in adding the area back to D3 and "tak[ing] it all the way down to Simpson Park" northward. Tr. 4B 7:21–22; Tr. 5B 36:5–37:14 (De Grandy explaining that Natoma and Bay Heights have more similar demographics to D3 than whiter areas that he excluded from D3); Tr. 6 74:9–10 (Reyes stating his proposed addition to D3, including Bay Heights, is majority Hispanic), 75:11–16 (De Grandy explaining he added Bay Heights to D3 in Feb. 7 Draft rather than adding less-Hispanic areas further north), 77:5–7 (De Grandy explaining Reyes Plan added majority-Hispanic area from Bay Heights to Simpson Park, in contrast to moving D3 straight east in just Brickell), 78:1–18 (Díaz de la Portilla noting Brickell's "predominantly Anglo"

population and confirming De Grandy chose to add Bay Heights "because there are more people in Bay Heights that are more similar to the people that live behind Casola's Pizza [in D3] . . . [t]han to the people that live at Brickell"). But the Enjoined Plan kept Bay Heights in D2.

Back to June 2023: De Grandy again moved Bay Heights—and its 62% HVAP—into D3. 2nd Abott Rep. 20. Just as in 2022, Carollo was happy to add it, and again requested "taking it all the way down to Simpson Park," a request accommodated in Res. 23-271. 6/14 Tr. 38:15–20. (As in the Enjoined Plan, the whitest and northernmost parts of Brickell were kept out of D3, *see supra* pp. 11–12.) Three minutes before the Commission voted on the D3 Alt. Map v.3, Covo—who wanted to unify as much of the Grove as possible in D2—questioned why Bay Heights had to be moved and asked if keeping it in D2 would "make a real difference in the numbers" for population equality. *Id.* 76:14–77:2, 89:14–16. De Grandy's response: "It would make a difference," suggesting it would "increase the deviation" and cause ripple effects. *Id.* 89:17. But that was false. Simply moving Bay Heights' 604 residents from D3 to D2 would *better* equalize D3's population (going from +746 to +142 from ideal) and raise the plan's overall range to just 4.2%—well within the 10% range De Grandy repeatedly advised Carollo and King was permissible minutes prior, and less than the Enjoined Plan's 7.6%. *Id.* 66:18–21, 79:20–23; 2nd Abott Rep. 14.[4]

---

[4] De Grandy suggested Bay Heights couldn't move to D2 without cutting off Natoma Manors from the rest of D3. 6/14 Tr. 89:22–90:1. This was false. Covo pointed out that the Enjoined D3 followed the same boundary she suggested—coming down to US 1 along 17th Avenue, grabbing Natoma west of Alatka Street, but avoiding Bay Heights. *Id.* 90:2–3. Pointing at the map (which Johnson had zoomed into this area), De Grandy falsely claimed the boundary was now different north of US 1, so it wasn't possible. *Id.* 90:4–9; video at 2:25:09–27:00. In fact, D3 continued to

Thus, the Commission adopted Res. 23-271 with Natoma (and its "similar demographics") retained in D3, *plus* the 62%-HVAP Bay Heights—"where the Hispanic voters live" added too.

## II. De Grandy's Ham-Handed Attempt to Deploy Partisanship as a Talisman Fails

Despite De Grandy's efforts to push partisanship to the fore, the record reflects commissioners were *not* motivated by partisan considerations. The commissioners explicitly denied on the record any partisan motivations. The City's actual policymakers rejected their attorney-consultant's attempt to invoke partisanship to shield their handiwork from scrutiny. In the first commissioner speech of the day, Carollo emphasized the Commission's nonpartisan nature and disclaimed partisan motivations. 6/14 Tr. 32:13–20; *see id.* 30:15–17 (public comment he responded to). Covo agreed. *Id.* 45:6–8. *No* commissioner expressed a partisan motivation for *any* decision in Res. 23-271. *See generally id.* Dr. Abott's analysis confirms: claims that the map was drawn to increase the Republican performance of D1 individually, or D1, D3, and D4 as a group, simply do not add up. 2nd Abott Rep. 11–13.

But to the extent the Commission used partisan data, it just embedded the effects of the constitutional violations. Race and party are correlated in Miami, with Black and Anglo voters usually preferring Democrats, and Hispanic voters often preferring Republican candidates (albeit at lower margins). ECF 24-32 (Moy Rep.) 5–41; 82-13 (Supp. Moy Rep.) 2–3. During the remedial process, De Grandy treated party and race interchangeably, criticizing P1 and P2 for packing "conservative Hispanic voters." 6/14 Tr. 9:9–10. Indeed, De Grandy accompanied his comparison of P1/P2's and V12's partisan impact with slides prominently showing the HVAP of D3 and D4 in P1 and P2—which De Grandy criticized as too high. ECF 77 at 22, 33–34; 6/14 Tr. 9:10–12;

---

meet US 1 at 17th, because *Carollo had just requested the line snap back to the enjoined boundary along 17th.* 6/14 Tr. 27:16–28:19, 33:7–34:10, 37:4–21, 53:9–11, 65:11–12.

*see also* ECF 80 at 8 n.4 (single-spaced footnote accusing "Plaintiffs' plans [of] pack[ing] Hispanics into District 4 at above a 95% level").

After criticizing P1/P2 for allegedly "packing conservative Hispanic voters" into D4, De Grandy explained how V12 "restored [D1's] connection to [] the western part of the city, thereby distributing the more conservative voters in the west within two districts." 6/14 Tr. 13:5–6. In other words, P1/P2 were unacceptable because they made D4 too Hispanic (95.0 or 95.6% HVAP), disrupting "the balance of the Hispanic population" with D1 (70.1 or 86.6% HVAP). Tr. 2 23:6; ECF 77 at 22; 2nd Abott Rep. 16. So De Grandy "restored" the *exact same line* between D1 and D4—moving just a single city block—slicing "down the middle" through Flagami, a "cohesive" and "distinct" "Hispanic neighborhood" the Commission originally split "for the greater good" to achieve their desired racial division. Tr. 3 52:16–53:2, 60:7–10, 91:11–13; Tr. 4B 5:5–6, 21:21–22:4; Tr. 6 38:13–15, 39:3–18, 79:19–20; *see* R&R 75. As a result, Res. 23-271's D1, D3, and D4 have HVAPs between 84.5 and 90.0%. 2nd Abott Rep. 15.

To the extent partisanship motivated the Commission's decision to adopt a near-identical map, "the consideration of political data" was inappropriate because it "carr[ied] forward the discriminatory effect of the original violation." *Covington I*, 283 F. Supp. 3d at 433. The City cannot "seek[] to ensure incumbents will prevail in their remedial districts—if doing so would prevent it from completely remedying the identified constitutional violation." *Id*. at 435 (rejecting legislature's attempt to justify redrawn map on partisan, incumbent-protection, and core-preservation grounds, even though legislature did not consider race *at all*, because proposed map bore features of the enjoined plan that suggested racial predominance); *see also Personhuballah*, 155 F. Supp. 3d at 564 (rejecting need to maintain partisan balance in curing racial gerrymander, because "at some point political concerns must give way when there is a constitutional violation

that needs to be remedied"); *Covington II*, 138 S.Ct. at 2553 ("The defendants' insistence that the [] legislature did not look at racial data in drawing remedial districts does little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race."). Nor can the City "rel[y] on redistricting criteria closely correlated with race"—such as partisanship—"in its pursuit of the far more suspect goal of seeking to ensure that incumbents elected in a racially gerrymandered district prevail in their remedial district." *Covington I*, 283 F. Supp. 3d at 433; *see also Jeffers*, 756 F. Supp. at 1199–1200.

### III. A District-by-District Analysis Shows Continued Hallmarks of Racial Predominance

A district-by-district analysis reveals that the Commission perpetuated, rather than remedied, the Enjoined Plan's racial gerrymandering. As described above, the Commission began from an already-flawed starting point: V12. The Commission then made several key decisions to claw back even more features of the Enjoined Plan to fine-tune racial divisions between Hispanic, Black, and Anglo Miamians. As a result, districts continue to have strange shapes and split communities. As this Court noted, bizarre shapes, irregular features, noncompactness, and the splitting of neighborhoods are hallmarks of racially gerrymandered districts; the subordination of traditional criteria is strong circumstantial evidence of racial predominance in the design of those districts. R&R at 61, 71– 75, 77–78; *see also Bethune-Hill v. Va. State Bd. of Elections* ("*Bethune-Hill I*"), 580 U.S. 178, 190 (2017); *Miller v. Johnson*, 515 U.S. 900, 913 (1995).

#### A. District 5

Res. 23-271's D5 is driven by a decision to define every distant corner of the enjoined D5 as part of a common "community of interests," locking in place the unconstitutional borders from the get-go. King delineated a non-negotiable list of neighborhoods to ensure the replication of the enjoined D5's boundaries—including Overtown (itself racially defined, *see supra* 14–16), Liberty

City, Little Haiti, Wynwood, and the Upper East Side. ECF 82-14; 6/14 Tr. 12:15–22. Together, these areas constitute every corner of the enjoined D5 except its Downtown tail. But King requested specific landmarks at the extreme southern end of the Downtown appendage too, yielding "jagged edges" that scooped up FDC-Miami and its disproportionately Black inmate population (just as in the Enjoined Plan), while carefully avoiding less-Black areas like "Condo Canyon" and Overtown south of NW 8th Street that the enjoined D5 excluded. 6/14 Tr. 12:23– 13:2; Hr'g Tr. 67:1–68:8, 103:20–106:6; 2nd Abott Rep. 20 (Area 28); R&R at 72–73.

Indeed, Res. 23-271 moves from D5 to D2 an area around Omni (which the Enjoined Plan moved from D2 to D5, and which King neglected to include in her "community of interests") that is even *less* Black than the Condo Canyon corridor immediately south (11.9% versus 14.2%). 2nd Abott Rep. 17; 1st Abott Rep. 28. D5's incursion into Northeast Allapattah across I-95 and SR 112 remains too, reconfigured slightly, but still dividing the neighborhood along racial lines by following local streets. R&R at 74–75; 2nd Abott Rep. 5–6, 20 (Area 31). The Commission rejected adding adjacent areas like Morningside and Edgewater because of their whiter makeup. ECF 82-17 ¶ 13; 82–26 (D1 Alt.); 82-34 to -35 (P1–P2). Just as in 2022, the Commission rejected plans with sub-50% BVAPs, and inched the BVAP back up to 50.3%, from V12's 50.0%, by restoring the Enjoined Plan's racially-motivated Morningside/Upper East Side border. 2nd Abott Rep. 14–16; *see infra* 25–26. The new D5 retains 94.7% of the enjoined population, and is less compact than the enjoined D5 across all metrics. McCartan Rep. 6–8.

### B. District 2

District 2 remains "not compact," a "relatively thin strip confined to the coast, extending from the northeast in the Morningside area . . . and continuing southwest along the water through Coconut Grove." R&R 72; *see* Tr. 1 16:21–17:1 ("District 2 was justified on the basis of being a

coastal district"); Tr. 3 41:19–22, 45:8–16, 50:11–54:19 ("[T]his [is] why we've had a coastal one. It was made that way. It was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner. Even today, the only way that that could happen is if you have that whole coastal area. There's no way that you can separate the Grove or that you can separate downtown or what's left of the Upper East Side and create just a district for a District 2 so that someone Anglo could be elected.") It is shaped by the Commission's intent to reserve it as an "Anglo-access" seat, and surgically exclude more-Black or more-Hispanic areas on the north and south end, respectively. To the north, D2 retains "white affluent" Morningside, and adds a thin, low-BVAP adjacent strip. ECF 82-17 ¶ 14; 2nd Abott Rep. 17 (Area 18); R&R 72–73. The border zig-zags from NE 2nd Avenue, to the railroad tracks, back to 2nd, and back to the tracks to retain whiter Condo Canyon, add an additional lower-BVAP area around Omni, and separate higher-BVAP areas of Downtown kept in D5. 2nd Abott Rep. 17 (Area 19), 20 (Area 28).

To the south, "ethnically diverse" areas of the Grove "where the Hispanic voters live" are either kept in D3 (Natoma), or moved back in after having been returned to D2 under the Enjoined Plan for non-racial reasons (Bay Heights to Simpson Park). Whiter areas on Brickell's north end remain excised from D3, achieved via an irregular finger. D2 retains 92.2% of its enjoined population, and its compactness scores are identical to the enjoined D2. McCartan Rep. 8.

### C. Districts 1, 3, and 4

The three predominantly Hispanic districts continue to be driven by a desire to optimally "balance" the Hispanic population and avoid concentrating Hispanic voters into one 95%+ HVAP district. Together, these districts are 97.8% the same as the Enjoined Plan; individually, they still have staggeringly high core retention (90.6 to 98.2%). *Jacksonville II*, 2022 WL 17751416, at *10 (rejecting redrawn map with collective 88.6% and 87.4% core retention among two sets of seven

districts). The D1/D4 and D3/D4 borders maintain the nearly untouched division of Flagami, Silver Bluff, Shenandoah, and Little Havana to balance Hispanic population and "preserv[e] the racial and ethnic composition of the Commission." R&R 75.

D1 maintains the "staircase-like stepping pattern in its northeastern corner in Allapattah," reconfigured slightly. R&R 74. It maintains "an appendage extending toward Downtown Miami along the Miami River," "described by the Commissioners as an 'attractive' area that was 'mainly Hispanic or Anglo.'" *Id.* It excludes De Grandy's racially-defined Overtown, while scooping up Overtown landmarks in majority-HVAP areas. *See supra* 14–16; ECF 82-15.

D3 becomes less compact, McCartan Rep. 6–7, even as it smooths out its "ethnically diverse" Natoma Manors appendage by adding Bay Heights "where the Hispanic voters live," all while minimizing additions from the whiter northern end of Brickell.

## IV. The Commission Failed to Conduct Any Narrow-Tailoring with Respect to District 5

The City again failed to narrowly tailor its use of race in D5. "The City's determination of a minority population percentage for VRA compliance must . . . be well-supported." R&R 82 (citing *Bethune-Hill I*, 580 U.S. at 195). Since the City failed to conduct the required "functional analysis of the electoral behavior within the particular election district" required to "determin[e] what minority percentage will satisfy [the VRA's] standard," Plaintiffs did it for them. *Bethune-Hill I*, 580 U.S. at 194 (cleaned up). Dr. Moy's initial report supplied the "evidentiary foundation" to support "[s]electing a BVAP figure." *Bethune-Hill II*, 326 F. Supp. 3d at 176. He also analyzed P1 and P2, concluding that they "make it easier for Black voters to translate their preferences to higher vote totals for their preferred candidate[s]," who "received the vast majority of the top two-candidate vote share across both newly proposed districts." ECF 82-9 at 1; 82-8; 82-7 at 1–2.

The City had other ideas. Ignoring Moy's analysis, De Grandy concluded "plaintiffs' plan

*may* also negatively impact the ability of Black voters to elect a candidate of choice throughout the decade in D5," 6/14 Tr. 10:22–11:2, without explaining how he expected their margins (ranging from 56.4 to 82.7%, compared to 58.4 to 84.3% in the Enjoined Plan) to decline such that Black voters' choice would fail to *usually* prevail. ECF 82-9 at 3; *see LULAC v. Perry*, 548 U.S. 399, 428 (2006) (noting VRA is not a guarantee of electoral success). De Grandy then gave away the game: his VRA analysis boiled down to "keeping as many communities of interest"—King's proxies for the enjoined D5—"together as feasible." 6/14 Tr. 12:8–20. And tellingly, De Grandy advised that the D1 Alt.—which kept all of King's proxies but had near-identical BVAP and BCVAP to P3—was VRA-compliant, even when he concluded Plaintiffs' maps weren't. *Id.* at 50:4–9; 2nd Abott Rep. 14, 16. This is not the "pre-enactment analysis with justifiable conclusions" strict scrutiny demands. *Abbott v. Perez*, 138 S.Ct. 2305, 2335 (2018).

Even from this fatally flawed starting place, the Commission went downhill. V12's D5 was too white for King, so Morningside was removed. The Commission rejected proposals to solve the "splitting up neighborhoods" problem, 6/14 Tr. 44:2–3, by uniting Morningside within D5. Those proposals would have yielded a sub-50% BVAP. 2nd Abott Rep. 14, 16. And commissioners fastidiously ensured not one inch of Hispanic-majority parts of Overtown moved into D5. *See supra* 14–16. Through these changes, D5's BVAP increased from 50.0 to 50.3%—the same as the Enjoined Plan. 2nd Abott Rep. 14–15.

### THE COURT SHOULD ADOPT PLAINTIFFS' PROPOSED PLAN (P4)

Plaintiffs present a plan, P4, that fully remedies the City's constitutional violations while comporting with state and federal law and respecting the Commission's legitimate policy choices. P4 stands in stark contrast to Res. 23-271's failure to cure the substantially likely constitutional violations the Court identified in its Order and the R&R.

P4 was drawn with communities in mind. It evolved from P2, which De Grandy claims formed the basis of his own V12, and P3, which Plaintiffs presented at mediation in response to mediation discussion, feedback from commissioners, and public input. P4 unites neighborhoods that the Commission divided along racial lines in either the original or remedial process, and avoids splitting other communities identified by commissioners or the public as closely united. In so doing, P4 features compact districts with smooth edges that adhere to traditional, race-neutral redistricting criteria and which respect, where possible, the Commission's legitimate, non-race-based policy goals. P4 thus "reconcil[es] the requirements of the Constitution with the goals of state political policy." *Upham*, 456 U.S. at 43 (quoting *Connor v. Finch*, 431 U.S. 407, 414 (1977).

## I.  P4 Complies with the Commission's Lawful Stated Objectives

### A.  Equal Population

P4 is within the population equality limits the Commission set in its proposed remedy. P4 has a total population deviation of 2.4%, less than the City's 3.6%, and far less than the Enjoined Plan (7.6%). 2nd Abott Rep. 14–16.

### B.  P4 Respects Communities of Interest and Neighborhoods

P4 respects traditional communities of interest that the Commission identified as worthy of recognition throughout its process. First, **Overtown**—all of it east of the Seybold Canal and south to NW 5th Street, the neighborhood's southern boundary under the Google/GMCVB/NET/MPD definition—is made whole within D5, except for one city block moved to better equalize population, and three unpopulated blocks east of I-95. Unlike Res. 23-271, which excised less-Black portions from D5, Overtown in P4 is not divided along racial lines. The other "part[s] of a larger community of interest" King listed are wholly within D5: **Liberty City, Little Haiti, Wynwood, and the Upper East Side.** ECF 82-14; *see* 6/14 Tr. 12:16–18. Adjacent Morningside

is also made whole within D5, rather than excluding it as a "white affluent" area.

The **West Grove** or **Little Bahamas** is kept whole within D2. 6/14 Tr. 83:23–84:20; ECF 82-15. But unlike in Res. 23-271, the remainder of Coconut Grove is also kept whole, rather than having "ethnically diverse" portions "where the Hispanics live" like Natoma Manors and Bay Heights excised from the "Anglo" district. *See infra* at 17–19; R&R 36, 41. **Edgewater** continues to be kept whole in D2. *See* 6/14 Tr. 19:15–22. **Grapeland Heights** (a "traditional neighborhood") continues to be kept whole. *Id.* at 13:15–16. P4 defers, to the extent possible, to the Commission's decision "that there should be a district containing the bulk of the **Miami riverfront**." 6/14 Tr. 13:7–10. In fact, P4 was able to accommodate this goal *better* than Res. 23-271 once it unwound the Commission's race-based goals, moving more of the riverfront into D1.

Certain other neighborhoods the Commission chose *not* to prioritize continue to be divided in P4, albeit not along racial lines or to otherwise facilitate the Commission's desired racial makeup. P4 splits **Brickell** between D2 and D3, but the dividing line is the Metrorail rather than Res. 23-271's jagged border that scoops whiter blocks into D2. P4 divides parts of **Little Havana/ Auburndale** along SW 4th and 8th Streets and 32nd Avenue, just like Res. 23-271 does. But iconic **Domino Park** remains in D3—a priority for the Commission. 6/14 Tr. 36:22–37:2, 52:18–23. The **Downtown/Omni** area remains divided among three districts, but no longer surgically separates more-Hispanic, more-Anglo, and more-Black areas into D1, D2, and D5, respectively.

### C.  P4 Follows Boundaries the Commission Recognized as Significant

Where possible, P4 utilizes natural and manmade boundaries the Commission recognized as "logical." 6/14 Tr. 15:17. Expressways, interstates, and the Miami River form large portions of the borders. *See id.* at 13:4, :17–19, 15:16–17. In Auburndale and Little Havana, SW 4th and 8th Streets and 32nd Avenue continue to form boundaries. Lines follow other major roads and

"section line roads" like SE/NE 2nd Avenue, 22nd Avenue, and US 1. Tr. 2 4:10–17.

## II. P4 Complies with other Traditional Redistricting Criteria

In addition to deferring to any permissible legislative policy choices, courts tasked with redistricting often apply other "traditional redistricting criteria." *See, e.g.*, *Favors v. Cuomo*, 2012 WL 928223, at *4 (E.D.N.Y. Mar. 19, 2012) (considering compactness, contiguity, respect for political subdivisions, and communities of interest); *Essex v. Kobach*, 874 F. Supp. 2d 1069, 1094 (D. Kan. 2012); *Smith v. Hosemann*, 852 F. Supp. 2d 757, 767 (S.D. Miss. 2011); *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1084, 1086 (N.D. Fla. 1992) (contiguity, compactness, respect for political subdivisions, communities of interest, and partisan competitiveness); *see also Allen v. Milligan*, 143 S. Ct. 1487, 1503–04 (2023) (listing compactness and respect for political subdivisions as traditional criteria); *Bethune-Hill I*, 580 U.S. at 183 (compactness, contiguity of territory, and respect for communities of interest).

### A. P4's Districts are Compact

P4's districts are compact, with an average Polsby-Popper score of 39.6, Reock of 35.4, convex hull of 77.0, and an edge-cut score of 237. McCartan Rep. 6–7. In contrast, Res. 23-271 has worse average compactness scores across all four metrics, at 26.4, 30.2, 60.8, and 398. *Id*. And visually, P4 is much more compact than the City's plan.

### B. P4 Otherwise Respects Other Communities of Interest

P4 keeps neighborhoods the Commission identified as "distinct," "traditional," "historical," or "cohesive" communities, but which Res. 23-271 splits to effectuate racial divisions. These include Silver Bluff, Shenandoah, Flagami, West Flagler, and Allapattah. R&R 75; Tr. 3 52:5–7, 52:8–14, 52:16–17; Tr. 1 17:20–22; Tr. 3 60:16; 6/14 Tr. 13:15–16, 15:11, 35:13, 36:4.

### III. P4 Complies with Applicable Federal and State Law

29

**A.  P4 Complies with Fla. Stat. § 166.0321**

Federal courts tasked with redistricting must adhere to all relevant state legal requirements, to the extent not preempted by federal law. *Perry v. Perez*, 565 U.S. 388, 394 (2012); *White*, 412 U.S. at 794; *Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 861 (E.D. Wis. 2012). The only state legal requirement is newly enacted Fla. Stat. § 166.0321, which prohibits municipal districts from "be[ing] drawn with the intent to favor or disfavor a candidate . . . or an incumbent . . . based on the candidate's or incumbent's residential address." ECF 82-21. Tracking the language of Florida's Fair Districts Amendments for legislative and congressional redistricting, FLA. CONST. art. III, §§ 20–21, the statute prohibits mapmakers from considering the residences of incumbents or candidates. *See In re SJR 1176*, 83 So. 3d 597, 670 & n.50 (Fla. 2012).

P4 has no irregular appendages or bizarre lines "that serve as objective indicators of intent" to favor or disfavor a candidate or incumbent. *Id.* at 617. Nor is there any indication in the record that the City, commissioners, or the public have even *accused* Plaintiffs of drawing P4's predecessors, P1–P3, with malintent in violation of § 166.0321. Instead, P4's districts were drawn to unite neighborhoods, follow major roads and other geographic boundaries, and result in compact, logical shapes. P4 fully complies with § 166.0321.

**B.  P4 Complies with Section 2 of the VRA**

The City admits (as it must) that Section 2 of the VRA protects Black Miamians from vote dilution. PI 9; ECF 77 at 6, 28. Yet, as discussed above, the City declined to conduct a VRA analysis during the remedial process, and ignored Plaintiffs' functional analysis. Plaintiffs therefore offer Dr. Moy's report to show that P4 complies with Section 2. Experts commonly assess VRA compliance by conducting a reconstituted election analysis. *See, e.g.*, *LULAC*, 548 U.S. at 488 (Souter, J., concurring) (citing Bernard Grofman *et al.*, *Drawing Effective Minority Districts:*

30

*A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. REV. 1383 (2001). That involves re-aggregating historical election results in the newly drawn districts and counting how many votes would have been cast for the various candidates in the elections. If a district would usually elect the minority community's candidate of choice, then it is considered an opportunity (or performing) district. *See, e.g, id.* While minority voters need not be *guaranteed* to elect their preferred candidates in every election, *see LULAC*, 548 U.S. at 428, they should at least regularly be able to do so. *See, e.g.*, *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 799–800 (M.D. La. 2022), *cert. dismissed as improvidently granted*, 2023 WL 4163160 (U.S. June 26, 2023).

Dr. Moy performed a reconstituted elections analysis for P4's D5. (He did so for P1 and P2 as well, ECF 82-9.) His results confirm that this new district would usually allow Black voters to elect their preferred candidates. In fact, he finds that Black-preferred candidates in 11 racially polarized statewide and local contests from 2020 and 2022 would *always* prevail in P4's D5, garnering between 56.0 and 81.6% of the vote (compared to 55.9–80.6% in Res. 23-271 and 52.2–76.8% in the Enjoined Plan). Supp. Moy Rep. 4. Therefore, P4 includes a reasonably compact Black opportunity district, ensuring VRA compliance.[5]

## CONCLUSION

For the foregoing reasons, the Court should reject Res. 23-271 and adopt P4 as the interim remedial plan for the Miami City Commission until entry of final judgment in this case.

---

[5] P4 uses race narrowly to ensure VRA compliance, resulting in the unpacking Black voters compared to the Enjoined Plan and Res. 23-271. Those plans impose the arbitrary 50% BVAP quote, while the BVAP of P4 ends up at 48.4%. This naturally means Black voters will now have greater influence in surrounding districts that they are no longer artificially stripped from. *See* 2nd Abott Rep. 15–16 (D1 BCVAP of 11.9% in P4 compared to 8.3% in Res. 23-271).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiffs request oral argument on their objections to the City's proposed interim remedy to more fully explain the evidentiary and legal issues raised in the briefing. Plaintiffs do not request an evidentiary hearing, but wish to reserve the right to call witnesses at a hearing should the City do so, or should the City submit additional written evidence with its reply. Plaintiffs would also seek to depose any witnesses the City plans to call at a hearing, to ensure an efficient hearing and narrow the scope of cross examination.

Respectfully submitted this 7th day of July, 2023,

 /s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida, Inc**.
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc**.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

* *Admitted pro hac vice*

*Counsel for Plaintiffs*