UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

    Plaintiffs,

v.

CITY OF MIAMI,

    Defendant.
_____/

**DEFENDANT'S MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS'
OBJECTIONS TO THE CITY'S PROPOSED INTERIM REMEDIAL PLAN**

#50912351 v4

Defendant, City of Miami (the "City") responds to the Objections filed by Plaintiffs [DE 83 & DE 82]. On June 14, 2023, the City of Miami passed Resolution 23-271, adopting a new redistricting plan for the City, the Enacted Plan, which it filed with this Court. DE 77. It was not an interim remedial plan as labelled by Plaintiffs. Their attacks on the Enacted Plan are moot. This is addressed in the City's separate Motion to Dismiss which will not be reprised here.

Prior to the injunction, Plaintiffs were vague about any specifics that they sought. The thrust of Plaintiffs' complaints, both originally and in the current objection, was to decry the racial division of the City of Miami into three Hispanic Districts, a Black District and what they called an "Anglo" District. After the injunction issued, Plaintiffs then proposed four of their own maps, all of which divide the City into three Hispanic Districts, a Black District and a coastal District with a large White population. Plaintiffs' proposed maps are fundamentally similar to the City's.





All five plans have a coastal District 2 that is a non-minority majority.[1] Compare DE 82-24 to 34-37. In, fact Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the Enacted Plan. Compare DE 82-1 p.15 to 16. All of the plans have a Voting Rights Act ("VRA") protected Black District 5 in the North. While Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), Plaintiffs and the City now seem to be essentially in agreement on the size

---

[1] This so-called "Anglo" district is a misnomer since District 2 has no racial or ethnic majority. Plaintiffs said they didn't "designate" an Anglo access district (DE 82-2 p.6), but they created one in each plan and preserved the Whitest community in Miami, Coconut Grove, inviolate. They claimed not to "pack Hispanics" into three districts, but they did. DE 82-12 p.16. Districts 1, 3 and 4 are supermajority districts in every plan, and District 4 in exceeds 95% HVAP in each. Id.

of that District. Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% compared to the City's 57.4%. Compare DE 82-1 p.15 to 16; Exhibit A. If their plan is narrowly tailored, then so is the City's. See Exhibit B (Alford Report).

Rather than starting with the Enjoined Plan or the plan passed in 2013, the starting place for the Enacted Plan was Plaintiff's own Plan 2.[2] The entire process was explained by the City's consultant, Mr. De Grandy. DE 82-2 p.8:3-16:13. Plaintiffs also created a VRA-protected Black district in the North, a coastal district, and three Hispanic districts in the West. The parties agree on the general parameters. Plaintiffs vacillated over what parts of Overtown should be included in District 5, if at all, but their later plans include parts of it.[3] There are two common themes in Plaintiffs maps: (1) they preserve the integrity of Coconut Grove within a single coastal district, and (2) they keep the more politically conservative western part of the City packed into a single district, District 4. Neither of those goals is constitutionally required. It is clear that Plaintiffs' goal is to simply substitute their political judgment for that of the elected City Commission.

One primary difference between Plaintiffs' proposed plans and the Enacted Plan, is that Plaintiffs pack the Hispanic in the western part of the City into District 4 so that District 1 no

---

[2] The City saw Plan 3 the night before the meeting and Plan 4 when Plaintiffs filed the objection.

[3] Plaintiffs quibble over the boundaries of Overtown, an undefined neighborhood, and cite to the boundaries of the Overtown Advisory Board in the City Code (§2-1051), [DE 83 pp.14-16; DE 82-12 (Abott report)], which states that the boundaries of this purely advisory board are approximate and meant to be construed expansively. Plaintiffs are simply substituting their judgment for Commissioner King's. Regardless, as a VRA District, Plaintiffs concede race is a valid consideration as long as it is narrowly tailored, which the Plaintiffs can no longer dispute.

4

longer has any part of the Flagami area.  Plaintiffs' plans remove the most conservative voters from District 1 by pushing it further East, making it a more liberal seat on the Commission.  *Id*. 9:9-10:22.  This also removes the downtown area from District 5, which Commissioner King sought as an economic engine for her district, the poorest district. *Id*. 12:12-13:13.  As with District 5, many of the requests by Commissioners were geared toward maintaining communities in which they had invested District resources.  *Id*. 11:23-12:5.  That is why District 5 sought to maintain Overtown (*id*. 12:12-13:13); District 4, Shenandoah (*id*. at 15:2-12); and  District 3, Little Havana (*id*. 15:13-17).  Commissioners publicly allocated blocks based on where they had invested resources in parks.  *Id*. 35:11-36:23.  In light of the moves, they also reallocated other neighborhoods on the record  to maintain population variances at acceptable levels.  *Id*. 35:11-39:10.  All of this was done without any discussion of race.

Plaintiffs confuse the procedural posture of this case and the question for the Court.  This Court did not invalidate the City's previous plan.  It entered a preliminary injunction.  Plaintiff's citation of case law lifting the burden of proof is misplaced.[4]  Plaintiff still bears the burden of establishing that "race was the <u>predominant</u> factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (emphasis added)(quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)); *see also Abbott v. Perez*, 138 S.Ct. 2305, 2324 (2018)("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.").  There is still a presumption of good faith that applies to the Enacted Plan; thus, even if a move changes

---

[4] The plan in *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala.), was invalidated after a full trial.  45 F.Supp.2d 945 (S.D.Ala 1999).

the racial makeup of a district, it should not be presumed to have been made for predominantly racial reasons. *See Abbott*, 138 S. Ct. at 2324 (2018) (recognizing the presumption of good faith that attaches to legislative redistricting plans). The City's consultant and the Commissioners explained their motives on the record.[5] The City maintains the ethnically uniform Flagami in two districts for political considerations.[6] When it comes to political gerrymandering, courts lack jurisdiction to undo what is essentially a political question. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08 (U.S. 2019). Faced with this, Plaintiffs submit the report of Dr. Abott who seeks to opine on the credibility of the Commissioners' assertions.[7] The only question for the Court is whether race was a predominant motive for placing significant numbers of individuals within or without a particular district. It is absurd to claim it is when Plaintiff's own plans have essentially the same racial breakdown. They do not seek to undo any racial gerrymander. They simply seek to usurp the Commission's role and draw the districts to serve their own political preferences.

Perhaps the most suspect of Plaintiff's political preferences is their insistence on preserving all of the Coconut Grove neighborhoods together, thus causing their District 2 in most plans to have a higher WVAP than the Enacted Plan. Most of the people who spoke at the meeting were from Coconut Grove urging that Coconut Grove stay "united." DE 82-2 18:2-27:5. Plaintiffs are using race as a proxy to achieve this goal. The Commission observed that Coconut Grove is a

---

[5] Plaintiffs, claiming altruistic motives, fail to provide any record evidence of who drew their map, what data was used, or any testimony under oath about the how the map was constructed.

[6] Plaintiffs assert the Court must be wary of political data closely correlated with race (DE 83 p.6), but the division of Flagami is not a racial division. Plaintiffs consolidate an area that has been split for almost three decades, with no explanation and no public demand to do so.

[7] As set forth in the separate motion to strike, this is an inappropriate area for expert testimony.

large area that consists of separate neighborhoods. DE 82-2 39:11-41:5. The Commission had valid, non-racial reasons for the lines it drew. Coconut Grove is in District 2 which had to shed population. Commissioner Carollo has a house in Coconut Grove, and the Enjoined Plan incorporated that part of Coconut Grove into his District 3.[8] DE 24-22. In granting the injunction, this Court noted that the incorporation was an irregular "foot" and observed that Commissioner Reyes's proposed plan which smoothed out the foot, would have "less discriminatory impact." Compare R&R (DE 52 p.77 & Order (DE 60 p.14) to Motion (DE 26 p.19) and Abott Report (DE 24-31 pp.20-21). This ruling was explained to the Commission and incorporated into the Enacted Plan. DE 77 p.31; DE 82-2 14:4-8.

Dr. Abott asserts that moving that same area (Area 11) is now racially motivated. DE 82-12 pp.6-7, 13. Drawing Commissioner Carollo's house into his district is not a "racial motivation" no matter how many experts seek to opine to the contrary. Dr. Abott now refers to District 2, the so-called "Anglo District" from the injunction motion, as the most racially "diverse" (DE 82-12 p.6), and Plaintiffs urge this Court to adopt their plans many of which have a higher WVAP in District 2 than the Enacted Plan. They attacked the Enjoined Plan for alleged racial segregation and now urge this Court to impose greater racial segregation.

Plaintiffs also claim race was the primary motive because, at the start of the Consultant's presentation, he critiqued Plaintiffs' plans for racial packing. At no other point was race discussed except to the extent it was necessary to confirm that District 5 would be a VRA performing district. Other than that, racial data was not presented. In order to falsely accuse the City Commission of redistricting based upon race and to baselessly assert that the Commission voted to bunch together ethnic borders to have an "Afro American . . . and non-Hispanic white . . . in representing the city

---

[8] Florida Law Chapter 2023-101, § 2, effective July 1, 2023, did not apply to the Enacted Plan.

of Miami" (DE 83 pp.8-9), Plaintiffs cite to a May 11 meeting, not the June 14 meeting adopting the Enacted Plan. At the May 11 meeting, redistricting plans were not considered and the consultant was not present. Plaintiffs fill their brief with snippets of quotes from the meeting, taken out of context, or simply misleadingly editorialized. The transcripts speak for themselves and are utterly devoid of racial intent. On May 11, the Commission considered whether to abandon districts and go back to at-large elections "as it used to be before." DE 82-1 2:7-13. A Commissioner discussed what was on the record from 1997, "why single member districts <u>were created back then</u>" to reflect the diversity of the City and provide an opportunity to elect an African American and a non-Hispanic White. *Id*. 4:16-21 (emphasis added). Commissioner Reyes summarized the ACLU's position, in which they accused the City of gerrymandering, and said that at-large districts could eliminate diversity on the Commission.

> I'm gonna say the ACLU, they're claiming that it was not fair. You see? You be careful what you wish for because the way that we have been dealing for a long time, every time that they have been since day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by – I'm going to call a spade a spade – but gerrymandering. We have to bunch together ethnicity, ethnic borders in order to be able to have Afro American, make sure that they are represented, and non-Hispanic white in the – in representing the city of Miami. So, if they are – now they are accusing us of gerrymandering, if we go now on and instead of having districts and we don't draw the districts to assure ourself that we have that representation. You have a point there and see, what do they think, because they are going to be the culprit of eliminating diversity in the city of Miami government.

*Id*. 6:2-14. Commissioner Diaz de la Portilla stated that if they had at-large districts the City would probably elect five Hispanics. *Id*. 7:20-21. Commissioner Reyes agreed this could be the effect. *Id*. 13:11-14. Commissioner Reyes wanted to preserve the VRA District 5 and to weigh all options.

> Manolo Reyes: And accepted by us. Therefore, I am suggesting that we ask our expert, Mr. De Grandy, to redraw a map, and – I mean, meet with us and start redrawing a map, that will guarantee that ten years from now we're going to have the diversity in this – in the, in the, in the, in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups. And it is not binding, the maps, it's not binding, but I think

8

> that we should be prepared. Be prepared because I don't want a judge to draw the map. We – I agree with you. We, if we're going to draw a map, we draw the map. That is my suggestion, I don't know if you guys agree with it and –
> Alex Díaz de la Portilla: Yes I do. And also, to explore obviously my original point of the pocket item is to explore the at large districts to look at a possible alternatives, that's directive. This will be the motion, right, including yours as an amendment to what we're doing, we'll do it together.
> Manolo Reyes: Yes.
> Alex Díaz de la Portilla: Look at all the possible options, that gives this policymaking body the options.

*Id*. 17:9-23. The Commissioners were also concerned about not being drawn out of their districts.

*Id*. 18:7:12. Plaintiffs took that discussion of at-large districts and tortured it into a direction to draw three Hispanic Districts, an Anglo District and a Black District. It is simply not the case.

Plaintiffs also throw out a red herring, attacking the notice process. DE 83 p.5, DE 83-1. Plaintiffs cannot pursue a claim in Federal Court that a State entity failed to comply with State law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121-25 (1984). Additionally, the Supreme Court in *North Carolina v. Covington ("Covington II")*, 138 S. Ct. 2548, 2553 (2018), cited by Plaintiffs, overturned findings that some of the Districts created as part of the remedial process in that case violated a State Constitutional ban on mid-year redistricting.

> The District Court's decision to override the legislature's remedial map on that basis was clear error. "[S]tate legislatures have primary jurisdiction over legislative reapportionment," … and a legislature's "freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands" of federal law…. A district court is "not free ... to disregard the political program of" a state legislature on other bases. ... Once the District Court had ensured that the racial gerrymanders at issue in this case were remedied, its proper role in North Carolina's legislative districting process was at an end.

*Id*. at 2554-55 (citations omitted).

Lastly, Plaintiffs launch a scurrilous attack on Commissioner King based upon a snippet of a conversation allegedly eavesdropped upon by Plaintiff's counsel. Injecting himself as a witness, Plaintiffs' counsel claims he overheard Commissioner King talking about not wanting

"white affluent" areas in her district. Because he was eavesdropping, counsel provides no context and cannot quote even a complete sentence.[9] His more contemporaneous text only provided that she said she didn't want some white affluent areas… Perhaps she was simply saying that she did not want people from the White affluent areas dictating her redistricting decisions. The majority of the public to speak were from Coconut Grove. The Morningside Community was split between Districts 2 and 5 and members of the public complained. The Commissioners from District 2 & 5 publicly discussed keeping that community together and where it should go. DE 82-2 43:15-46:23. Even though District 5 is a VRA protected District and race could constitutionally be considered, there was nothing nefarious about the conversation or the decision.

The lynchpin of the injunction and Plaintiff's case was whether the 50.3% BVAP of District 5 was arbitrary or whether the City had a sufficient basis for deeming it sufficiently narrowly tailored. If it was sufficiently narrowly tailored, then none of the so-called racial gerrymandering around it would be constitutional. As set forth in the report of John Alford, the BVAP and BCVAP of District 5 are narrowly tailored. Exhibit B. As Dr. Alford observes, if the 56.5% BCVAP of Plaintiffs' Plan 3 is narrowly tailored then so is the City's 57.4.% BCVAP.

> When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order

---

[9] Plaintiffs' counsel's only quoted sentence is "I'm looking out for the minorities." DE 82-17 ¶ 20. One would think that would be part of every Commissioner's job. Plaintiff's counsel also implies that she was speaking with counsel at the time. If he could overhear conversations in the room with counsel, he was professionally obligated to remove himself, not take notes.

10

to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 187 (2017)(quoting *Alabama Legis. Black Caucus v. Alabama (ALBC I)*, 575 U.S. 254 (2015)). The City does not have to prove that it pared the majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196 (citations omitted). Dr. Alford demonstrates that the performance in District 5 may not be as robust as Dr. Moy claims, noting recent primary elections involving Black and White candidates show much narrower margins than those observed by Dr. Moy.[10] Exhibit B.

As Dr. Alford points out, the remainder of Plaintiff's case is really about swapping population between the three Hispanic districts to claim their plans are "more different" from the Enjoined Plan, and to change the political performance of those districts. Exhibit B. It is not a contest to see who can create the most compact districts or the most different. Plaintiffs are not a competing Commission. As longs as the Enacted Plan is not unconstitutional, it cannot be enjoined in order to swap Plaintiff's political decisions for the elected Commission's decisions.

The City respectfully requests that the Court not disturb the duly adopted map in Resolution 23-271, and dismiss the Complaint as moot. If the Court is inclined to conduct an evidentiary hearing, the City requests the opportunity to depose Plaintiffs' witnesses and experts.

---

There is no duty to memorialize the analysis at the meeting or compile a comprehensive record. Bethune Hill, 580 U.S. at 194-95.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida  33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

By:   *s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile:  (850) 577-3311

CITY OF MIAMI
VICTORIA MENDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile:  (305) 416-1801

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 12, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                By:   *s/ Christopher N. Johnson*
                                                         Christopher N. Johnson, Esq.