UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

    Plaintiffs,

v.

CITY OF MIAMI,

    Defendant.
_____/

**MOTION TO STRIKE CAROLYN ABOTT'S IMPROPER OPINIONS ASSESSING THE CREDIBILITY OF WITNESSES AND SPECULATING ABOUT THE CITY'S CONSIDERATIONS AND MOTIVATIONS IN CREATING A NEW PLAN**

Defendant, City of Miami (the "City" or "Defendant"), hereby moves to strike Dr. Carolyn Abott's opinions, [DE 82-12], which improperly weigh the credibility of witnesses and speculate as to the City's motivations, intentions, or considerations in enacting a new redistricting plan, [*see* DE 77], and in support thereof, states as follows:

**INTRODUCTION**

The City of Miami enacted a new redistricting plan, City of Miami Resolution 23-271 (the "Plan" or the "Enacted Plan"), after this Court preliminarily enjoined its earlier plan, City of Miami Resolution 22-131. [*See* DE 77]. The Enacted Plan is based, in part, on a proposed plan submitted by Plaintiffs after the injunction issued. Prior to the City's enactment of the Plan, at a June 14, 2023 Miami City Commission meeting (the "June 14 Meeting"), Miguel De Grandy presented a proposed plan—which, with some minor changes, became the Enacted Plan. De Grandy explained

1

the considerations, motivations, and intentions in drawing that proposal and articulated the reasons for reworking parts of Plaintiffs' proposal.  The Miami City Commissioners also discussed their priorities and provided input.  The considerations were clear and unequivocal, and are reflected in the June 14 Meeting Transcript [DE 82-2]: neither De Grandy nor any of the City Commissioners improperly relied upon racial, ethnic, or other characteristics in creating the Enacted Plan.

On July 7, 2023, however, Plaintiffs filed Objections to the Enacted Plan, [DE 83], claiming that it "remains racially gerrymandered." [DE 83, at 8].  Plaintiffs rely in large part on the Second Expert Report of Dr. Carolyn Abott, dated July 5, 2023, [DE 82-12], in which— notwithstanding De Grandy's and the Commissioner's unequivocal statements about their considerations and concerns—Dr. Abott inexplicably "conclu[ded]" that the changes in the City's proposed new map "appear to continue to be designed around racial and ethnic considerations," and "[t]here is no basis on which to make the argument that these considerations were instead partisan in nature." [DE 82-12, at 13].  But Dr. Abott's so-called conclusions are irreconcilable with the City's stated intentions.  They are not an appropriate subject for expert testimony because they are speculative and impermissibly comment on the credibility of De Grandy and the City Commissioners.  The City respectfully requests the Court to strike these improper opinions and decline to consider them in connection with Plaintiff's Objections.

## FACTUAL BACKGROUND

### *De Grandy's Presentation at the June 14 Meeting*

De Grandy used one of Plaintiffs' proposed plans "as a template," [DE 82-2, at 9:1-3, 11:5-6], and made changes that took "into account the political and policy considerations, such as where commissioners have invested district resources in their projects, or the need to balance poor areas with areas that have significant economic potential . . . ." [DE 82-2, at 11:23-12:2].  In other

words, while Plaintiffs' plan "concentrate[d] the most conservative voters into" District 4, [DE 82-2, at 14:21-22, 15:22-23], De Grandy's changes to Plaintiffs' plan were intended to "result in a different political calculus." [DE 82-2, at 12:3-5]. His proposal used "natural and manmade boundaries," such as "municipal boundaries, the bay, the railroad, the Miami river, an expressway, and the contours of traditional neighborhoods," [DE 82-2, at 12:22-13:4, 15:16-17], and placed an emphasis on "keeping as many communities of interest together as feasible," [DE 82-2, at 12:10-11].

For example, in Plaintiffs' proposed plan, "the most conservative voters from the northwest part of Flagami and West Flagler" were removed from District 1, and parts of Overtown were moved into District 1, resulting "in a more liberal-leaning electorate . . . ." [DE 82-2, at 10:7-9]. But De Grandy felt that because Plaintiffs' plan "sever[ed] parts of Overtown," it could "negatively impact the ability of th[at] compact and cohesive community to have an equal opportunity to elect" its candidate of choice. [DE 82-2, at 8:15-17]. Thus, he proposed "keep[ing] historic Overtown intact in District 5." [DE 82-2, at 11:3-6]. This was in line with Commissioner King's "strong advoca[cy]" to keep Overtown in her district to improve "issues such as affordable housing [and] public transit solutions" and to promote economic growth in "what she has publicly described as the lowest per capita income district in the city." [DE 82-2, at 12:12-22].

Similarly, De Grandy's proposed boundaries for Districts 3 and 4 were "based, in part, on the request of Commissioner Reyes to maintain in his district areas such as Shenandoah," [DE 82-2, at 15:2-12], so District 3 "wraps around District 4 . . . to preserve most of Shenandoah in [District 4], while preserving Little Havana intact in" District 3. [DE 82-2, at 15:13-14]. And the proposal shifted the entirety of "the Bahamian Grove" into District 2 which, Commissioner King noted, was

3

a "huge contention" with the previous map that split the Bahamian Grove out of District 2. [DE 82-2, at 84:1-18].

*Miami City Commissioners' Input*

After De Grandy's presentation, Commissioners Carollo and Reyes discussed certain changes to De Grandy's proposal to balance populations within the districts: Commissioner Reyes, for example, stated his "belief" that "Domino Park should be part of District 3, Little Havana," [DE 82-2, at 36:22-23], and Commissioner Carollo immediately proposed a "simple" solution to maintain that area intact—without first referencing or reviewing the demographics in the areas at issue. [DE 82-2, at 37:1-2].

The Commissioners also discussed "small, minute tweaks" to the map, concerned only with the population numbers and not improperly relying on demographics. [DE 82-2, at 37:4-39:10]. One such change was "cut[ting]" Coconut Grove, which Commissioner Carollo believed was acceptable because, although "One Grove" "sounds great," there are "many, many different communities" or "neighborhoods" within Coconut Grove, each with "major differences." [DE 82-2, at 40:9-15]. He explained, for example, that one "neighborhood" is "walled in" and "pay[s] for [its] own security"; another has "reduced" lot sizes, with less expensive, older homes that are being "fix[ed] up"; yet another has "a lot of townhouses" and apartments; in South Grove, "you get into, again, very expensive areas"; and then there is "what we now have named Little Havana, the old Black Grove," which is "changing every week because it's being gentrified like there's no tomorrow." [DE 82-2, at 39:18-40:12].

Additionally, Commissioners Covo and King discussed a desire to keep Morningside united, [DE 82-2, at 43:15-46:23], Commissioner Carollo wanted his district to retain a "little square" in Silver Bluff where his district had "just invested some significant amounts in a park,"

4

[DE 82-2, at 35:13-15], and Commissioners King and Diaz de la Portilla agreed to keep a restaurant, People's Bar-B-Que, in District 5 because it is "a historic restaurant that means a lot to that community," [DE 82-2, at 70:9-21]. The Enacted Plan was passed after the Meeting, on June 14, 2023.

***Dr. Abott's Second Report***

Without referencing any of the foregoing statements or discussions from the June 14 Meeting, and after essentially comparing only the demographics in the City's previously enjoined plan to the newly Enacted Plan, Dr. Abott concluded that race was the primary determinant of the district boundaries. [DE 82-12, at 1-2, 11-13]. She claimed that she reached her conclusions based upon her "personal knowledge," and "the standard methodology that political scientists use when investigating precinct and census data." [DE 82-12, at 1-2]. Respectfully, the City submits that they are speculative, unreliable, and should be stricken.

## ARGUMENT

**DR. ABOTT'S CONCLUSIONS ARE SPECULATIVE AND OUTSIDE THE BOUNDS OF PERMISSIBLE EXPERT TESTIMONY BECAUSE THEY COMMENT ON THE CITY'S MOTIVATIONS AND CONSIDERATIONS, AND IMPROPERLY WEIGH THE CREDIBILITY OF WITNESSES**

Under Federal Rule of Evidence 702, an expert may not opine on state of mind, motive, or intent: "[t]hese matters are not the proper subject of expert opinion" and, rather, are merely "matters to be argued by counsel based on the evidence." *In re Seroquel Products Liability Litigation*, No. 6:06-md-1769, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009); *see also Plain Bay Sales, LLC v. Gallaher*, No. 18-cv-80581, 2022 WL 585707, at *4 (S.D. Fla. Feb. 25, 2022) ("[N]either of the experts shall be permitted to testify, opine, or speculate about the intent or motive of any person, party, or witness, or whether any person, party, or witness was or is honest or truthful, or made misrepresentations, false statements, or omissions."); *Santos v. Experian*

5

*Information Solutions, Inc.*, No. 19-23084, 2021 WL 6144643, at *4 (S.D. Fla. Nov. 30, 2021) (expert opinion on "knowledge and motive" is "improper[]"); *Kirchman v. Novartis Pharmaceuticals Corp.*, No. 8:06-cv-1787, 2014 WL 12617778, at *2 (M.D. Fla. May 22, 2014) (precluding expert from "opin[ing] on [defendant's] intent, motive, or alleged bad faith").

In the same vein, "[i]t is settled law in the Eleventh Circuit that expert testimony concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility." *Day v. Edenfield*, No. 5:19cv506, 2022 WL 972430, at *8 (N.D. Fla. March 31, 2022); *Jetport, Inc. v. Landmark Aviation Miami, LLC*, No. 1:16-cv-23303, 2017 WL 7734095, at *9 (S.D. Fla. July 19, 2017) (excluding expert opinion regarding causation because they were, "in effect, expert opinions concerning witnesses' credibility, which is improper under *Daubert*"); *Ibarra v. Future Motion, Inc.*, No. 22-cv-14067, 2023 WL 3215817, at *4 (S.D. Fla. May 2, 2023) (precluding testimony regarding "the credibility of Plaintiff or any other party or witness," the "interpretation" of testimony, and "the meaning behind certain statements made by [p]laintiff," because "[t]his is not the proper role of any expert witness")

Dr. Abott's report violates these fundamental principles.  In concluding that "[r]ace is still the primary determinant of the shapes of the districts" in the Enacted Plan, [DE 82-12, at 1], and that "[t]here is no basis on which to make the argument that these considerations were instead partisan in nature," [DE 82-12, at 13], Dr. Abott is effectively declaring that she does not believe De Grandy or the Commissioners, who unequivocally stated their concerns and considerations— none of which impermissibly involved race—on the record at the June 14 Meeting.  [DE 82-2]. Further, she is improperly *speculating* about their intentions, which she has no way of knowing.

Indeed, directly contrary to Dr. Abott's "conclusions," De Grandy explained that the district boundaries were created beginning with Plaintiffs' proposed plan, with changes to account

6

for Commissioners' concerns and priorities in their respective districts—including economic growth, political concerns, and maintaining the integrity and unity of particular neighborhoods. This was further confirmed and underscored by multiple comments and requests made by each of the Commissioners; notably, during the June 14 Meeting while the Commissioners proposed and discussed changes to the district boundaries, no one questioned the demographics or racial makeup of any area; on the contrary, they were concerned with balancing the *size* of the districts, in terms of population numbers only. [*See* DE 82-2, at 41:12-19]. The Enacted Plan also takes into account (and corrects) certain objections to the enjoined plan: for example, by moving the entirety of the "Bahamian Grove" into District 2.

Of course, Plaintiffs may challenge these stated considerations in drawing the Enacted Plan through *argument* or *cross-examination*[1] at the appropriate time. But the law makes clear that credibility determinations rest squarely within the purview of the factfinder—not an expert. Stated simply, Dr. Abott's conclusions amount to nothing more than improper speculation, and they should thus be stricken. *In re Trasylol Products Liability Litigation*, No. 08-MD-01928, 2010 WL 1489793, at *9 (S.D. Fla. Feb. 24, 2010) (finding opinion "inadmissible because it rests on speculation about . . . subjective motivations, which is not a proper subject for expert testimony"); *Hilson v. GEICO Gen. Ins. Co.*, No. 8:11-cv-00013, 2013 WL 12156414, at *4 (M.D. Fla. Aug. 13, 2013) (excluding expert and lay testimony as to motive); *Taylor v. Novartis Pharmaceuticals Corp.*, No. 06-61337, 2013 WL 5118945, at *3 (S.D. Fla. Apr. 22, 2013) ("The question of intent

---

[1] This is not to suggest that any City commissioner has waived their legislative privilege, but even if they refuse to do so, speculative attacks on their intent are not justified by the assertion of a privilege. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (discussing the types of evidence that may indicate "whether invidious discriminatory purpose was a motivating factor" and observing that in "extraordinary circumstances" commissioners may be called to testify, but "even then such testimony frequently will be barred by privilege").

or motive is a classic jury question and not one for experts.") (quoting *In re Trasylol Products Liability Litigation*, 2010 WL 1489793, at *8 (excluding expert testimony regarding FDA and corporate defendant's desire and state of mind)).

## CONCLUSION

For these reasons, the City respectfully requests the Court to strike Dr. Abott's report and decline to consider her opinions regarding the credibility of any witnesses or the City's motivations, intentions, and considerations in creating the Enacted Plan.

Respectfully submitted,

<div style="margin-left: 3em;">

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

By: *s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

CITY OF MIAMI
VICTORIA MENDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney

</div>

<div style="text-align: right">

Florida Bar No. 119067
KERRI L. MCNULTY
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801

*Attorneys for Defendant*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/ Christopher N. Johnson*
Christopher N. Johnson, Esq.