IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

    *Plaintiffs*,

v.

CITY OF MIAMI,

    *Defendant*.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
THE CITY'S MOTION TO STRIKE**

The City's Motion to Strike (ECF 87) seeks to strike statements from Dr. Carolyn Abott's expert report (ECF 82-12), filed in support of Plaintiffs' Objections to the City's remedial map (ECF 82). The Motion misconstrues both the factual record in this case and the law regarding expert testimony. Plaintiffs respectfully request that the Court deny the Motion.

As the City recognizes in the Motion on page 7, "Plaintiffs may challenge [the Commission's publicly] stated considerations in drawing the Enacted Plan through argument[.]" Plaintiffs do exactly that in their Objections, for example on pages 9, 16–17, and 20–22. (ECF 82). The paragraph quoted below demonstrates the flawed premise of the City's Motion:

> Despite De Grandy's efforts to push partisanship to the fore, the record reflects commissioners were not motivated by partisan considerations. The commissioners explicitly denied on the record any partisan motivations. The City's actual policymakers rejected their attorney-consultant's attempt to invoke partisanship to shield their handiwork from scrutiny. In the first commissioner speech of the day, Carollo emphasized the Commission's nonpartisan nature

1

> and disclaimed partisan motivations. 6/14 Tr. 32:13–20; *see id.* 30:15–17 (public comment he responded to). Covo agreed. *Id.* 45:6–8. No commissioner expressed a partisan motivation for any decision in Res. 23-271. *See generally id.* Dr. Abott's analysis confirms: claims that the map was drawn to increase the Republican performance of D1 individually, or D1, D3, and D4 as a group, simply do not add up. 2nd Abott Rep. 11–13.

Objections at 20 (ECF 82).

Dr. Abott's report provides expert analysis *to support the argument made by counsel* in Plaintiffs' Objections. Dr. Abott's report itself is not argumentative. Her report does not speculate about the subjective intent of the commissioners. It does not interpret any statements made by commissioners, comment on their credibility, or say anything whatsoever about truthfulness. Dr. Abott's report includes the same analysis she performed in her initial report concerning the Enjoined Plan—a report to which the City did not object, and which the Court found helpful. Her report assesses the demographics of the areas that changed from the Enjoined Plan to the City's remedial map. Her analysis does not take into account any intermediate maps the City may have created along the way—maps that the City has refused to provide to Plaintiffs or the Court. *See* Objections at 4 n.1 (ECF 82) (noting the City's refusal to disclose map versions 1–11 and 13).

The instructions counsel provided Dr. Abott, which are attached to this memorandum as Exhibit 1, ask her to use "the tools and methods from your initial report" to evaluate whether, in her expert opinion, the data she analyzed suggest the choices the City made in its remedial map are better explained by the use of race or politics. Dr. Abott was not instructed to assess, nor did

she even consider, the commissioners' statements.[1] Even when the instructions reference a statement from Mr. De Grandy (not a commissioner) regarding the boundaries of Overtown, the instructions ask Dr. Abott to compare those boundaries with two differing definitions of Overtown to assess how the choices Mr. De Grandy made impacted "the racial makeup of District 5 versus surrounding districts." And that instruction regarding Overtown does not relate to the race versus politics question—everyone agrees that District 5 was drawn based on race, not politics.

As Dr. Abott explains on page 13 of her report, "[t]here is no evidence to suggest that any areas were moved or not moved to shore up partisan advantages in district cores." (ECF 82-12) This conclusion is based on her comparison of the Enjoined Plan and the City's remedial map. Commissioners' statements were not part of her analysis. Her finding of "no evidence" refers only to evidence from the two maps enacted by the City and their objective demographics. Plaintiffs filed their Objections (ECF 82) and the City filed its Response (ECF 86). The City's legal memorandum (ECF 86) was the proper vehicle for the City to attack the legal arguments made by Plaintiffs and the conclusions Plaintiffs draw from Dr. Abott's report. To the extent the City uses the Motion to make additional legal argument it did not include in its Response (ECF 86), this is an improper use of a motion to strike and simply an effort to evade the Court's page limits. *See* Scheduling Order ¶ 3.b (ECF 69).

Expert reports like Dr. Abott's, which analyze demographic data to assess whether race predominated in the drawing of district lines, are commonly used in racial gerrymandering cases;

---

[1] The City would already know this if it had requested the facts and data Dr. Abott relied on to write her report, including the instructions of Plaintiffs' counsel. It made no such request, nor did it request to depose Dr. Abott or to cross-examine her at an evidentiary hearing.

courts commonly find them helpful. Three examples from three-judge district courts are illuminating. In *Bethune-Hill v. Virginia State Board of Elections*, on remand from the Supreme Court, the district court credited two experts, both of whom opined on the same topic as Dr. Abott here. 326 F. Supp. 3d 128, 145 (E.D. Va. 2018) ("We conclude that both experts provided credible testimony based on sound methodology, and we will discuss their testimony in turn."); *id.* ("Dr. Rodden used geo-spatial data to determine whether it was plausible that the final shape of the districts could have emerged without race being used as the dominant consideration."); *id.* at 147 ("Dr. Palmer conducted statistical analyses regarding the populations of the challenged districts to determine whether race predominated in the construction of those districts.").

Likewise, the district court in *Harris v. McCrory* found that race predominated in North Carolina's congressional redistricting and that "politics not race was more of a post-hoc rationalization than an initial aim" of the state. 159 F. Supp. 3d 600, 620 (M.D.N.C. 2016). "This conclusion is further supported circumstantially by the findings of the Plaintiffs' experts, Drs. Peterson and Ansolabehere." *Id.* Dr. Peterson used "segment analysis" to weigh three racial measures and four partisan measures to reach this conclusion. *Id.* Dr. Ansolabehere used "different methods" and "similarly concluded that the new districts had the effect of sorting along racial lines" and made changes from the "benchmark plan" that "can be only explained by race and not party." *Id.* at 621.

Similarly, earlier this year, the District of South Carolina cited an expert report that "analyzed the movement of VTDs [voting tabulation districts] in and out of a district and whether it was based on factors such as race and partisanship" and credited the experts conclusion that "black voters were excluded from [a district] in both a statistically significant and substantively consequential fashion." *S.C. State Conf. of NAACP v. Alexander*, 2023 WL 118775, at *8 (D.S.C.

4

Jan. 6, 2023). This, despite contradictory testimony from lawmakers that they were motivated by nonracial considerations. *Id.* at *6.

Even if the Court does not consider Dr. Abott qualified as an expert to opine on whether race or partisanship explains the changes from the Enjoined Plan to the City's remedial map, the City misconstrues the Court's gatekeeping role over expert testimony. The Eleventh Circuit has made clear that Federal Rule of Evidence 702 "relax[es] the traditional barriers to opinion testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 588 (1993)). The court in *Brown* further held that "[t]hose barriers are even more relaxed in a bench trial situation, where the judge is serving as factfinder[.]" *Id.* After all, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Id.* at 1269; *see also Landivar v. Celebrity Cruises, Inc.*, 584 F. Supp. 3d 1150, 1158 (S.D. Fla. 2022).

Dr. Abott's report is properly before the Court to consider in the Court's evaluation of the City's remedial map. Her report does not speculate about the subjective motivations of Commissioners or attempt to opine on their credibility or truthfulness. For the reasons explained above, the Court should deny the City's Motion to Strike.

Respectfully submitted this 25th day of July, 2023,

*/s/ Caroline A. McNamara*

| | |
|---|---|
| Nicholas L.V. Warren (FBN 1019018)<br>**ACLU Foundation of Florida**<br>336 East College Avenue, Suite 203<br>Tallahassee, FL 32301<br>(786) 363-1769<br>nwarren@aclufl.org<br><br>Daniel B. Tilley (FBN 102882)<br>Caroline A. McNamara (FBN 1038312)<br>**ACLU Foundation of Florida**<br>4343 West Flagler Street, Suite 400<br>Miami, FL 33134<br>(786) 363-2714<br>dtilley@aclufl.org<br>cmcnamara@aclufl.org | Neil A. Steiner*<br>**Dechert LLP**<br>Three Bryant Park<br>1095 Avenue of the Americas<br>New York, NY 10036<br>(212) 698-3822<br>neil.steiner@dechert.com<br><br>Christopher J. Merken*<br>**Dechert LLP**<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19104<br>(215) 994-2380<br>christopher.merken@dechert.com<br><br>*\* Admitted pro hac vice* |

***Counsel for Plaintiffs***