# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      Plaintiffs,

v.

CITY OF MIAMI,

      Defendant.

_____/

## <u>ORDER</u>

THIS CAUSE came before the Court upon Defendant City of Miami's ("Defendant" or "the City") Notice of Passage of Redistricting Plan. ("Notice") (ECF No. 77). Therein, Defendant gives notice that it has enacted a new redistricting plan, Resolution 23-271 ("Remedial Plan"), to replace the redistricting plan that this Court previously enjoined, Resolution 22-131 ("2022 Enacted Plan" or "Enjoined Plan"). *See id.* Plaintiffs[1] filed Objections to Defendant's Proposed Interim Remedial Plan. ("Objections" or "Obj.") (ECF No. 83). In turn, Defendant filed a Memorandum of Law in Response to Plaintiffs' Objections. ("Reply") (ECF No. 86).

For the reasons discussed below, the Court finds that the Remedial Plan does not completely correct the constitutional defects the Court found were substantially likely to exist in the Enjoined Plan. Thus, the Court finds it necessary to adopt its own remedial plan.

---

[1] Plaintiffs in this action are Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras Steven Miro, GRACE, Inc., Engage Miami, Inc., South Dade Branch of the NAACP and Miami-Dade Branch of the NAACP (collectively, "Plaintiffs").

## I.      BACKGROUND AND PROCEDURAL HISTORY

Though the Parties are surely familiar with the background of the instant Action, the Court nonetheless finds it valuable to give a thorough recitation of the facts to provide necessary context for its decision.

### A.  Passage of the Enjoined Plan

On March 24, 2022, the Commission of the City of Miami (the "Commission") passed the 2022 Enacted Plan following the results of the 2020 United States Census.  The plan provided the new jurisdictional borders for each of the five commission districts.



On December 15, 2022, Plaintiffs commenced this action.  *See* (ECF No. 1).   In the First Amended Complaint ("Complaint" or "Compl."), Plaintiffs claim that the 2022 Enacted Plan violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution because Defendant improperly used race as the predominant factor in drawing each of Miami's five commission districts.  *See* (ECF No. 23 ¶¶ 358–365).  In the Complaint, Plaintiffs

seek:  (1) a declaration that each of the commission districts in the 2022 Enacted Plan are unconstitutional racial gerrymanders in violation of the Fourteenth Amendment; (2) a preliminary and permanent injunction enjoining Defendant from conducting elections under the 2022 Enacted Plan; and (3) an order requiring the City to hold special elections should adequate relief not be available prior to the next regularly scheduled election in November.  *See generally* Compl.

### B.  The Preliminary Injunction

On February 10, 2023, Plaintiffs filed an Expedited Motion for Preliminary Injunction ("Motion").  *See* (ECF No. 26).  Therein, Plaintiffs requested the Court enjoin Defendant from "calling, conducting, supervising, or certifying any elections under the [2022] Enacted Plan, beginning with the regular 2023 elections until the entry of a final judgment." *Id.* at 36.  Defendant opposed the Motion, *see* (ECF No. 36), and the Court referred the Motion to United States Magistrate Judge Lauren F. Louis for a Report and Recommendation.  *See* (ECF No. 27).

After an evidentiary hearing lasting over five hours, which included the presentation of ninety-three exhibits from Plaintiffs, twelve exhibits from Defendant, and the testimony of the City's redistricting consultant, Miguel De Grandy, Esq. ("De Grandy"), *see* (ECF No. 48), Magistrate Judge Louis issued a thorough Report and Recommendation ("R&R").  Therein, Magistrate Judge Louis recounted at length the redistricting process, expert reports, and other exhibits and record materials.  *See* (ECF No. 52).

First, by examining the contemporaneous statements of various Commissioners and examining the sequence of events leading to the passage of the 2022 Enacted Plan, Magistrate Judge Louis found that race predominated in the drawing of each of the five commission districts. *See id.* 76–77.  Magistrate Judge Louis explained the Commissioners' "intent was, as expressed, to preserve previously-drawn race-based lines of the Commission Districts in the 2022 redistricting

process." *Id.* at 67. Magistrate Judge Louis supplemented this finding with an examination of the *Arlington Heights* factors, which in her opinion, also "strongly support[ed] a finding that Plaintiffs are likely to succeed in establishing that racial considerations predominated in the City's design of Districts 1, 2, 3, and 4."[2] *Id.* at 77 (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). After finding that race predominated in the design of each district, Magistrate Judge Louis also opined that none of the districts withstood strict scrutiny as is required under the Fourteenth Amendment. *Id.* at 78–87. Accordingly, Magistrate Judge Louis concluded that Plaintiffs demonstrated a substantial likelihood of success on the merits. *See id.* at 87–88.

Turning next to irreparable harm and a balancing of equities between the parties, Magistrate Judge Louis found that Plaintiffs stand to suffer irreparable harm because "the injury to a plaintiff of voting under an unconstitutional electoral map, or an electoral map that violates § 2 of the VRA, 'cannot be undone through any form of monetary or post-election relief.'" *Id.* at 90 (quoting *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 687 F. Supp. 3d 1222, 1320–21 (N.D. Ga. 2022)). Magistrate Judge Louis found that the potential harm to Defendant, namely that there was insufficient time to enact a remedial map and that nonracial redistricting would disserve Black voters, was outweighed by the harm Plaintiffs would suffer from racial gerrymandering.[3] *See id.* at 88–100. After carefully considering each prong of the preliminary injunction test, Magistrate Judge Louis recommended that the Court: (1) enjoin Defendant from using the 2022 Enacted Plan

---

[2] The Parties did not dispute that Defendant was required under § 2 of the Voting Rights Act of 1965 ("VRA") to consider race when drawing District 5 in a manner where race would predominate.

[3] Magistrate Judge Louis rejected the argument that nonracial redistricting would disserve Black voters as non-responsive to the balance of the equities portion of the preliminary injunction test. R&R at 98. Rather, according to Magistrate Judge Louis, that argument is relevant to the likelihood of success on the merits. *See id.*

until the entry of a final judgment; and (2) establish a schedule for the preparation of a remedial plan which comports with the United States Constitution. *Id.* at 100.

Defendant filed Objections to the R&R, *see* (ECF No. 55), which "consisted of both generalized grievances with the R&R's conclusions, as well as proper, specific objections to the R&R's findings." *See* (ECF No. 60 at 3). Plaintiffs filed a Response to Defendant's Objections affirming their support for the R&R. *See* (ECF No. 57). Defendant also filed a Reply in Support of Objections. *See* (ECF No. 59).

After careful consideration of the R&R, the Parties' briefings, and the relevant record material, the Court granted Plaintiffs' preliminary injunction motion and adopted the R&R in full ("Order"). *See* (ECF No. 60). In the Order, the Court reaffirmed Magistrate Judge Louis's findings that: (1) race was the predominant factor in the drawing of each commission district, and Defendant could not demonstrate the design of any district withstood strict scrutiny; (2) Plaintiffs would likely suffer irreparable harm if they were required to vote in racially gerrymandered districts in the November 2023 election; (3) any harm Defendant may suffer would be outweighed by the harm to Plaintiffs; and (4) there was sufficient time to create a constitutionally conforming remedial map without running afoul of *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).[4] *See generally id.*

On June 2, 2023, the Court issued a Scheduling Order. *See* (ECF No. 69). Therein, the Parties were directed to complete mediation by June 22, 2023. *Id.* at 1. If the Parties could not reach a settlement, Defendant was ordered to enact a proposed remedial map and file it with the Court by June 30, 2023. *See id.* Upon Defendant's filing of the proposed remedial map, Plaintiffs

---

[4] Under *Purcell*, district courts should generally refrain from enjoining state election laws in the period close to an election. *League of Women Voters of Fla., Inc., v. Fla. Sec'y of State*, 32 F. 4th 1363, 1371 (11th Cir. 2022) (internal quotations omitted)

were informed that they needed to notify the Court within two days if they had no objections. *Id.* However, if Plaintiffs objected to the newly proposed remedial map, Plaintiffs would have seven days to file a memorandum in opposition, and in turn, Defendant would have five days to file a reply. *Id.* at 1–2. The Court set these deadlines to ensure Defendant would be able to provide the Court's Order approving any remedial plan to the Miami-Dade County Elections Department by August 1, 2023, the date the Miami-Dade County Supervisor of Elections requires a remedial map to administer the November 2023 elections. *See id.* at 2; *see also* (ECF No. 26 at 36).

### C. Passage of the Remedial Plan

After a series of meetings discussed below, Defendant passed the Remedial Plan. The Court provides background on what occurred at those meetings.

#### 1. The May 11, 2023 Meeting

On May 11, 2023, after Magistrate Judge Louis issued the R&R, but before the Court granted the preliminary injunction, the City Commissioners began discussing how to alter the commission districts if the Court were to enjoin the 2022 Enacted Plan. *See* ("May 11 Meeting" or "5/11 Tr.") (ECF No. 82-1).

Considering that Magistrate Judge Louis had recently issued the R&R, the May 11 Meeting began with Commissioner Díaz de la Portilla discussing the reason why Miami originally created single member districts, while also explaining his desire to maintain the diversity within those districts. *Id.* 4:16–5:20 ("Because what happened, the reason why single member districts were created back then was to make sure the diversity that Miami has, as we said, it's already in on the record, doesn't matter if I say it again, right. . . the reason [it] was created was to keep harmony in our city because we have a very diverse community. . . we want an African American representation, we want a non-Hispanic white representation, we want that."). According to

6

Commissioner Díaz de la Portilla, the Commissioners have been trying to "be fair and to provide representation for all communities in our city." *Id.* 5:12–13. Commissioner Reyes echoed the sentiment. *See id.* 5:14, 13:8–14.

Then, the Commissioners (mostly Commissioner Díaz de la Portilla) discussed a potential alternative to single member districts, suggesting the potential return to "at large districts throughout the city." *Id.* 3:8–9, 4:1–4, 7:19–21, 13:9–14. The City Commissioners then opened the meeting for public comment. *See id.* 8:19. Multiple citizens spoke about the Enjoined Plan and the importance of community representation. *See id.* 8:21–12:18. After permitting public comment, Defendant's counsel informed the Commissioners about the present state of the instant Action. *See id.* 13:3–14:1.

The May 11 Meeting concluded with Commissioners Díaz de la Portilla and Reyes providing instruction to De Grandy to commence drawing a new map, which, according to Commissioner Reyes, "will guarantee that ten years from now we're going to have the diversity. . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups." *Id.* 17:10–13. With this instruction, combined with the additional directive to "explore the at large districts" as possible alternatives, the City Commissioners directed De Grandy to begin redrawing a map of the Enjoined Plan. *See id.* 17:17–18:1.

### 2. The June 14, 2023 Meeting

After the May 11 Meeting, and after this Court entered its Order adopting the R&R, thereby enjoining the use of the 2022 Enacted Plan, the City Commission convened on June 14, 2023 to discuss potential remedial plans. *See* ("June 14 Meeting" or "6/14 Tr.") (ECF No. 82-2).

At the beginning of the June 14 Meeting, the Plaintiffs presented and advocated for three alternative remedial maps ("P1," "P2," and "P3," respectively). *Id.* 5:21–7:2. Specifically, Plaintiff Yanelis Valdes argued that each of the three maps Plaintiffs created "feature compact and logical districts that respect neighborhoods, follow major geographic boundaries, and preserve genuine communities of interest. They don't pack Hispanic voters into three specific districts and no longer designate one district as an Anglo access seat. They also fully comply with the VRA and provide[] Black voters with the ability to elect their preferred candidate in District 5." *Id.* 6:13–17. Plaintiff Valdes then, for the first time, unveiled a new map, P3, "incorporating community feedback and input from [the Commissioners]" which kept together key neighborhoods such as "Flagami, Edgewater, Allapattah and Shenandoah." *Id.* 6:11–12, 6:19–20. In concluding the presentation, Plaintiff Valdes requested the City Commissioners seriously consider the alternative maps to "undo the violations and remedy the wrongs in the [Enjoined Plan]." *Id.* 6:21–7:1.

De Grandy also presented a thorough examination of his newly proposed plan ("V12"), as well as a comparison between V12 and the Plaintiffs' first two alternative maps.[5] *See id.* 8:5–16:13. According to De Grandy, he did not receive Plaintiffs' third alternative map until the day of the presentation and therefore he had not yet fully reviewed it. *Id.* 8:5.

---

[5] De Grandy's proposed map at the June 14 Meeting was entitled "V12." Despite the name, Defendant claims that there were no other versions of the proposed map, even though De Grandy discusses both V12 and V14 in the June 14 Meeting.



De Grandy began his presentation by explaining that his current proposal, V12, originated from Plaintiffs' second proposed alternative map, P2. *Id.* 9:1–3. Using P2 as a template, De Grandy explained that he then made "changes consistent with the policy choices of this elected body." *Id.* 9:2–3. When crafting V12, De Grandy informed the City Commission that he focused on "political and policy considerations," "where Commissioners have invested district resources in their projects," "the need to balance poor areas with areas that have significant economic potential or activity," "natural and manmade boundaries," and "keeping as many communities of interest together as feasible." *Id.* 11:23–12:3, 12:10.

Beginning with a discussion of District 5, De Grandy explained that V12 was crafted to ensure compliance with the Voting Rights Act, but also considered Commissioner King's directive to include areas that would generate significant economic activity. *See id.* 12:2–3. As a result, V12's District 5 kept together traditional neighborhoods such as Shorecrest, Belle Meade, Bayside, Little River, Lemon City, Liberty City, and Buena Vista, but also included areas with significant economic activity such as Wynwood, Midtown, and the Design District. *Id.* 12:15–17. Further,

portions of Overtown remained in V12's District 5 based on Commissioner King's prior work in that area regarding affordable housing and public transportation. *Id.* 12:19–22.

As to District 1, V12 "restored the connection to the western part of the city" and contained "the bulk of the Miami riverfront." *Id.* 13:5–8. De Grandy explained that the riverfront is an important business community worth keeping together in the district, as were other traditional neighborhoods such as Allapattah, Civic Center, Grapeland Heights, and parts of West Flagler and Flagami. *Id.* 13:8–16. V12's boundaries, according to De Grandy, track "significant manmade and natural boundaries such as water boundaries, major roads, the city's municipal boundaries. . . and the borders of traditional neighborhoods as well as I-95." *Id.* 13:16–19.

Regarding District 2, De Grandy explained that V12 extended District 2 north to take parts of Morningside, and to include "significant portions" of neighborhoods such as Bay Point, Omni, Downtown, Brickell and Coconut Grove. *Id.* 13:20–14:11.

Where V12 is markedly different from the Enjoined Plan, however, are Districts 3 and 4. Because De Grandy concluded that "there is no way to apportion the population of those two districts in a manner that would not result in majority Hispanic percentages in both," V12 delineates the borders of Districts 3 and 4 based on policy choices. *Id.* 14:16–18. In V12, District 4 splits Flagami, and "preserves the bulk of" Shenandoah, Silver Bluff, and Coral Gate. *Id.* 15:3– 6. Consequently, V12's District 3 "wraps around District 4" to ensure "most of Shenandoah" remained in District 4, "while preserving Little Havana intact" in District 3. *Id.* 15:13–15. Finally, De Grandy explained that District 3 "utilizes manmade and natural borders" like the Miami River and Bayshore Drive as logical boundaries. *Id.* 15:16–17.

De Grandy also used his time presenting to explain why, in his opinion, Plaintiffs' first two alternative maps, P1 and P2, were comparatively worse alternatives to V12.





Much of De Grandy's discussion about Plaintiffs' P1 and P2 revolved around his belief that Plaintiffs created their alternative maps based on their own political preferences. For example, De Grandy explained that "both plans pack the more conservative voters in the western part of the city into D[istrict] 4." *Id.* 9:12–13. "By packing more conservative voters into D[istrict] 4, shifting areas around, and submerging part of the compact and cohesive Overtown community in D[istrict]

1, the plan is geared to result in a more liberal voting pattern for D[istrict] 1." *Id.* 9:13–15.  De Grandy explained P1 and P2 had a decrease of Republican voters in District 1.  *See id.* 10:7–11:2.

Other than presupposing Plaintiffs' political motives for why P1 and P2 were drawn as they were, De Grandy's presentation was lacking in discussion as to the substantive merits or detriments of Plaintiffs' alternatives other than to identify where P1 and P2's district borders differed from V12.  De Grandy did, however, express his confusion regarding one aspect of P1 and P2, namely, that each alternative split parts of Overtown, thereby removing the neighborhood from consisting entirely within District 5.  *Id.* 10:2–3.  According to De Grandy, he did not understand Plaintiffs' "radical shift in position" and why Plaintiffs' alternative maps split Overtown into multiple districts.  *Id.* 10:5.  However, as mentioned above, De Grandy did not review P3, which included all of Overtown in District 5.



Following De Grandy's presentation, several citizens expressed their displeasure with V12 for varying reasons, and the Commissioners began negotiating among themselves about how to adjust V12.  *See id.* 16:17–31:22.  In response to Commissioner Carollo's comments that Coconut

Grove has many different communities, Commissioner Covo expressed her desire to keep Coconut Grove united within one district. *See id.* 39:11–40:12, 42:9–43:3. Commissioner King asked De Grandy if V12 could be altered so none of Morningside would be in District 5, but rather, if it could be moved entirely into District 2. *See id.* 43:21–47:2. Commissioner Carollo indicated that he wanted the entirety of Domino Park to be in District 3. *See id.* 52:21–53:5. Then, Commissioner Reyes informed De Grandy that multiple Commissioners, including Commissioners Covo and Díaz de la Portilla, also made copies of alternative maps. *See id.* 48:20–49:1, 50:4 (Commissioner Díaz de la Portilla explaining that his alternative map was entitled "V14"). Presuming each of the tweaks that each of the Commissioners wished to make to V12 would be minor, the Commission recessed for three hours so De Grandy could make the requested adjustments. *See id.* 55:3–22.

Upon reconvening, De Grandy had prepared another presentation, this time with five alternatives for the Commissioners to consider. *See id.* 58:21–23. Specifically, the presentation included the following five maps: an unaltered V12, V14, Commissioner Carollo's alternative map, Commissioner King's alternative map, and Commissioner Covo's alternative map.[6] *See id.* 59:5–12.

From this point on, the Commissioners used V12 and the alternate maps to create a finalized remedial map. Commissioner King, on behalf of Commissioner Carollo, indicated her support for a map where Domino Park would be placed entirely into District 3. *See id.* 69:11–18. Commissioner King then asked if People's Bar-B-Que (an historic restaurant) could be included in District 5. *See id.* 70:8–11. The Commission obliged, and the southern border of District 5 was

---

[6] At this juncture, the Commissioners were no longer considering Plaintiffs' proposed alternative maps.

moved to include only that restaurant.  *See id.* 72:16–17 (noting, however, that only that block containing People's Bar-B-Que would be moved to District 5, "nothing to the left, nothing to the right, nothing to the center").  Lastly, the Commissioners agreed to restore the "Bahamanian Grove" into District 2, though Commissioner Covo failed in her attempt to convince the other Commissioners to place all of Coconut Grove into one district.  *See id.* 87:21–22, 89:14–91:19. By majority vote, the Commissioners agreed to pass the Remedial Plan.  *See id.* 90:19.



Defendant timely notified the Court of the passage of the Remedial Plan on June 30, 2023. *See* Notice.  In their Objections, Plaintiffs allege that the Remedial Plan does not completely remedy the constitutional violation that the Court found was substantially likely to exist in the Enjoined Plan.  *See generally* Obj.  According to Plaintiffs, the Court should reject the Remedial Plan, and instead, implement Plaintiffs' fourth alternative map ("P4").  *See id.* at 26–31.  Plaintiffs aver that P4 remedies the likely constitutional violations of the Enjoined Plan, adheres to traditional redistricting criteria, complies with federal and state law, comports with the priorities of the city commission where possible, and does not segregate citizens on racial lines.  *See id.*  In

response, Defendant urges the Court to adopt the Remedial Plan as a constitutional remedy. *See generally* Reply.



Considering the relevant factual background, the Court evaluates the Remedial Plan to determine whether it is constitutionally compliant and if it provides a sufficient remedy for the Enjoined Plan.

## II.   LEGAL STANDARD

In the instant Action, the Court is not confronted "with an original racial gerrymandering challenge" to the Remedial Plan, but rather, it evaluates the Remedial Plan after a finding that the Enjoined Plan was substantially likely to violate the Equal Protection Clause of the Fourteenth Amendment. *Covington v. North Carolina* ("*Covington I*"), 283 F. Supp. 3d 410, 431 (M.D. Fla. 2018), *aff'd in relevant part*, 138 S. Ct. 2548 (2018). "As such, 'when a federal court concludes that a . . . districting plan violates the Constitution, the appropriate [legislative] redistricting body should have the first opportunity to enact a plan remedying the Constitutional violation.'" *Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville II*"), No. 3:22-cv-493-MMH-

LLL, 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022) (alterations in original).  Indeed, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978).

Should the legislature proffer a "new legislative plan. . . [it] will then be the governing law unless it too, is challenged and found to violate the constitution." *Id.* at 540.  At that point, the "remedial posture impacts the nature of [a court's] review." *Covington I*, 283 F. Supp. 3d at 431.  Legislative enactments, including a remedial plan, are still cloaked with the "presumption of legislative good faith," even after a finding of past discrimination, and the "burden of proof lies with [Plaintiffs], not the State" to demonstrate the remedial map is unconstitutional.  *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).  But the Court must also ensure that any remedial plan "so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965).  "In the remedial posture, courts must ensure that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Covington I*, 283 F. Supp. 3d at 431 (citing *Abrams v. Johnson*, 521 U.S. 74, 86 (1997)).  If the legislature fails to enact "a constitutionally acceptable" remedial plan, then "the responsibility falls on the District Court" to reconfigure the unconstitutional districts.  *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *see also White v. Weiser,* 412 U.S. 783, 795 (1973) (holding that a court should not "refrain from providing remedies fully adequate to address constitutional violations"); *Abrams*, 521 U.S. at 86 (holding a remedial districting plan cannot be sustained if it "would validate the very maneuvers that were a major cause of the unconstitutional districting").

## III.    DISCUSSION

At this juncture, the Court has granted Plaintiffs' motion for a preliminary injunction. *See*

*generally* Order. Now, while affording great deference to the City Commission and presuming

good faith on their behalf when passing the Remedial Plan, *see Abbott*, 138 S. Ct. at 2324, the

Court must determine whether the Remedial Plan completely corrects the constitutional infirmities

the Court found were substantially likely to exist in the Enjoined Plan. *Covington I*, 283 F. Supp.

3d at 431. If the Remedial Plan does not make the necessary corrections, the Court has the duty

to "cure [the] illegally gerrymandered districts" by creating a constitutional reapportionment plan

or choosing an alternative. *North Carolina v. Covington* ("*Covington II*"), 138 S. Ct. 2548, 2553

(2018) (per curiam); *see also White*, 412 U.S. at 794.

When considering whether the Remedial Plan is a sufficient remedy to the Enjoined Plan,

the Court first assesses Defendant's arguments in favor of the Remedial Plan's constitutionality.

Next, the Court considers Plaintiffs' argument that, based on direct evidence of the

Commissioners' stated intent when redistricting and circumstantial evidence that the Remedial

Plan perpetuates the unconstitutional aspects of the Enjoined Plan, the Remedial Plan fails to

provide a constitutional remedy. Finally, after determining that the Remedial Plan is not a

constitutional remedy, the Court analyzes whether Plaintiffs alternative map, P4, passes

constitutional muster.

### A. Defendant's Arguments in Favor of the Remedial Plan's Constitutionality are Unavailing

Defendant proffers two main arguments in support of why, in its view, the Remedial Plan

is constitutional. First, Defendant would have the Court evaluate the Remedial Plan as a new

redistricting plan, and "not an interim remedial plan."[7] Reply at 2; *cf. Jacksonville II*, 2022 WL

---

[7] According to Defendant, because the Remedial Plan was "not an interim remedial plan," Plaintiffs' "attacks on the [Remedial] Plan are moot." Reply. at 2; *see also* (ECF No. 80)

17751416, at *13 (explaining "the City would have the Court start its review of racial predominance on a clean slate"). According to Defendant, because the new plan is not "remedial," the Court must consider the action anew, meaning the Court should not consider whether the Remedial Plan completely corrects the constitutional infirmities that are substantially likely to exist in the Enjoined Plan. Reply at 5–6, *see also* (ECF No. 80). In Defendant's view, it follows that when the Remedial Plan is considered anew, it is constitutional. Reply at 5–6. Secondly, Defendant avers that aside from District 5 (the VRA district), the entire process by which the Remedial Plan was enacted occurred "without any discussion of race" and is thus constitutional. *See id.* at 5, 7 ("At no other point was race discussed except to the extent it was necessary to confirm that District 5 would be a VRA performing district."). Instead, according to Defendant, the Commissioners focused on "maintaining communities in which they had invested District resources," "maintaining population variances at acceptable levels," "political considerations," and ensuring the Commissioners would "not be[] drawn out of their districts." *Id.* at 5–6, 9. The Court addresses each argument in turn.

Defendant's first argument—that the Remedial Plan should be considered anew, as if it were entirely untethered to the Enjoined Plan—is unavailing. Try as it may, Defendant's attempt to classify the Remedial Plan as an entirely new plan will not alter the remedial nature of this action, nor will it alter the Court's review. *See* Section II, *supra*. As the Court has already made clear, the "remedial posture impacts the nature of our review." *Covington I*, 283 F. Supp 3d at 431; *see also Jacksonville II*, 2022 WL 17751416, at *1 (following the issuance of a preliminary injunction, the court reviewed the remedial plan to determine whether it "cure[d] the constitutional

---

(Defendant's Motion to Dismiss on mootness grounds). Finding Defendant's argument unsupported by decades of Supreme Court and Eleventh Circuit precedent, the Court denied Defendant's Motion to Dismiss. *See generally* (ECF No. 91).

violations that the Court found were substantially likely to exist").  While the Remedial Plan still enjoys a presumption of good faith, "courts must ensure that a proposed remedial districting plan completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." *Covington I*, 283 F. Supp. 3d at 431 (citing *Abrams*, 521 U.S. at 86).  The Remedial Plan is not insulated from this type of review simply because Defendant claims the plan is not remedial; the Court's duty to assess the constitutionality of a remedial map does not turn on whether Defendant classifies it as such.

Defendant is also mistaken that the Remedial Plan is constitutional because, in Defendant's view, there was no discussion of race during its enactment (other than to ensure VRA compliance regarding District 5).  But as courts have made clear, "the race-blind criterion alone does not immunize the districts in the Remedial Plan from further review nor does it necessarily remedy the constitutional violation." *Jacksonville II*, 2022 WL 17751416, at *14.  "[T]he Supreme Court long has recognized that a statute enacted by a state legislature to remedy an unconstitutional race-based election law can perpetuate the effects of the constitutional violation, and thereby fail to constitute a legally acceptable remedy, even when the remedial law is facially race-neutral." *Covington I,* 283 F. Supp. 3d at 434.  Such an approach is only logical.  Otherwise, "a state redistricting body tasked with redrawing districts to remedy a racial gerrymander could adopt the exact same districts as those held unconstitutional so long as the redistricting body relied on prior district lines, not race, in drawing the purportedly remedial districts." *Id.* at 435 (emphasis omitted).  Therefore, Defendant's argument that race was not a factor in the process of enacting the Remedial Plan is not dispositive, because even if the Remedial Plan was enacted in a facially race-neutral manner, circumstantial evidence may yet demonstrate that the plan unconstitutionally

sorted voters based on race.  *See Covington II*, 138 S. Ct. at 2553.  And, as discussed later, *see* Section III.B.1, *infra*, the Court finds that race *did* factor into the creation of the Remedial Plan.

Based on the aforementioned discussion, the Court disagrees with Defendant's arguments.

### B. Considering Direct and Circumstantial Evidence, the Court Finds that the Remedial Plan Does Not Remedy the Enjoined Plan

Now the Court must evaluate whether the Remedial Plan "completely corrects" the unconstitutional gerrymanders the Court found was substantially likely to exist in each district in the Enjoined Plan.  The Court examines whether: (1) direct evidence demonstrates the Commissioners intended the Remedial Plan to perpetuate the unconstitutional aspects of the Enjoined Plan; and (2) circumstantial evidence demonstrates that the Commissioners chose "to rely on redistricting considerations that have the potential to carry forward the effects of the constitutional violation—like preserving district cores." *Covington I*, 283 F. Supp 3d at 435.  The Remedial Plan will be unconstitutional if Defendant "prioritized criteria that were predestined to perpetuate, rather than correct, the preexisting racial gerrymandering." *Jacksonville II*, 2022 WL 17751416, at *14.

### 1. Direct Evidence

A party can demonstrate that a remedial plan perpetuates the unconstitutional aspects of its predecessor by relying on "direct evidence going to legislative purpose" in the drawing of the remedial plan.  *See Miller v. Johnson*, 515 U.S. 900, 916 (2018).  Such evidence would clearly demonstrate that a remedial plan's "new districts were mere continuations of the old, gerrymandered districts" and that voters "remain segregated on the basis of race." *Covington II*, 138 S. Ct. at 2553.

Plaintiffs argue that "from the outset of their process, multiple Commissioners repeated their attitude that representation on the Commission was racially categorical, that the redistricting's

goal was to draw one Black, one Anglo, and three Hispanic seats. . . and that [the Commissioners] had done the right thing [when enacting the Enjoined Plan]."  Obj. at 9.  According to Plaintiffs, the Commissioners reiterated their commitment to drawing a map that would ensure the aforementioned racial breakdown of the districts would remain during the May 11 Meeting.  *See id.*  Defendant retorts that the relevant meeting to determine legislative intent is the June 14 Meeting where the Remedial Plan was adopted, not the May 11 Meeting.  *See* Reply at 7–8. Further, Defendant argues that the statements of legislative intent Plaintiffs identify are "taken out of context, or simply misleadingly editorialized."  *Id.* at 8.

Before examining the content of the statements at the May 11 Meeting, the Court pauses briefly to explain that it *should* consider the May 11 Meeting when determining the Commissioners' intent.  Defendant attempts to convince the Court otherwise, arguing that "[a]t the May 11 meeting, redistricting plans were not considered and [De Grandy] was not present." *Id.*  Yet, at the May 11 Meeting, the Commissioners discussed potential redistricting solutions, and the conversation ultimately culminated in the Commissioners unanimously agreeing to direct De Grandy to begin redrawing a map based on certain criteria discussed during the meeting.  *See* 5/11 Tr. 17:9–20.  Thus, the Court finds the May 11 Meeting relevant insofar as it provides insight to both the Commissioners' legislative intent and their directions to De Grandy.

Regarding the Commissioners' statements during the May 11 Meeting, the Court agrees with Plaintiffs that some statements reaffirm Defendant's intent to ensure that one district would have a Black representative, one would have an "Anglo" representative, and the other three representatives would be Hispanic.  Obj. at 9.   As noted above, Defendant argues that these statements were "taken out of context" and "are utterly devoid of racial intent."  Reply at 8–9.  To a certain extent, Defendant is correct.  For example, one such statement Plaintiffs cite to, a

statement from Commissioner Reyes, appears to summarize the drafters' approach in the Enjoined Plan rather than demonstrate any present intent to perpetuate the racial gerrymandering in the forthcoming Remedial Plan.

> I'm gonna say the ACLU, they're claiming that it was not fair. You see? You be careful what you wish for because the way that we have been dealing for a long time, every time that they have been since day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by—I'm going to call a spade a spade— [sic] gerrymandering. We have to bunch together ethnicity, ethnic borders in order to be able to have Afro American, make sure that they are represented, and non-Hispanic white in the—in representing the city of Miami. So, if they are—now they are accusing us of gerrymandering, if we go now on and instead of having districts and we don't draw the districts to assure [sic] that we have that representation. You have a point there and see, what do they think, because they are going to be the culprit of eliminating diversity in the city of Miami government.

*Id.* at 8 (quoting 5/11 Tr. 6:2–14).

But, while this one statement does not demonstrate present legislative intent, the multiple other statements Plaintiffs identify during the May 11 Meeting do. For example, when discussing the lawsuit and the possibility of returning to a citywide election system in light of the R&R's findings, Commissioner Díaz de la Portilla stated: "we want an African American representation, we want a non-Hispanic white representation, we want that. I think it adds to the—to the fiber of our city and adds to the representation that we provide up here." 5/11 Tr. 4:21–22. With this comment, Commissioner Díaz de la Portilla reiterated his belief that the racial breakdown of the districts in the Enjoined Plan was actually beneficial, thus suggesting his intent that any remedial plan should also retain these race-based characteristics.

Further, when explaining what he believed to be the consequences of eliminating election districts altogether, Commissioner Reyes stated: "what are the consequences if we go and we eliminate the districts. . . if we eliminate the districts, we're going to have five Hispanics sitting here, just because of the composition of the population. It is just that simple. You see?" *Id.*

13:10–14.  As noted above, the Commissioners believed the Enjoined Plan assured diversity in Miami, and if election districts were removed, the Commissioners believed it would "eliminate diversity" of representation.  *Id.*  Commissioner Reyes's commentary supports the notion that the Commissioners' intended any remedial plan moving forward should not "eliminate diversity" of representation in the electoral districts.

Then, as a result of the conversation explaining the original rationale for using electoral districts, and after the Commissioners had the opportunity to explain that they passed the Enjoined Plan (and plans prior) to provide for representation of "all groups in our city," the Commissioners unanimously directed De Grandy to "start redrawing a map[,] that will guarantee that ten years from now we're going to have the diversity. . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups."  *Id.* 17:9–13.  This explicit directive provides the strongest evidence that the Commissioners intended the Remedial Plan to carry forward the very same race-based characteristics of the Enjoined Plan that the Court found was substantially likely to be unconstitutional.

Defendant argues that the "transcripts [of the May 11 Meeting] speak for themselves."  Reply at 8.  Indeed, they do.  After review of the May 11 Meeting and the quotations referenced above, the Court does not view the Commissioners as only discussing "why single member districts were created back then," or whether to return to an at-large electoral system.  Reply at 8 (quotations and emphasis omitted).  Instead, the May 11 Meeting is better understood as the Commissioners explaining why they believed their initial approach when enacting the Enjoined Plan (*i.e.* creating the gerrymandered districts), was the correct approach, and after some discussion, unanimously directing De Grandy to maintain the racial breakdown of each district in

a new map.[8]  The directive to De Grandy is clear, and the Commissioners' statements during the May 11 Meeting combined with their directive to De Grandy support a finding that the Commissioners intended for the Remedial Plan to preserve the prior racial breakdown of the Enjoined Plan, thus perpetuating rather than remedying the unconstitutional racial gerrymandering.

### 2.  Circumstantial Evidence

In addition to direct evidence, a plaintiff may rely upon "'circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing' the lines of legislative districts." *Covington II*, 138 S. Ct. at 2553 (quoting *Miller*, 515 U.S. at 913).  During the remedial portion of a case, "circumstantial evidence [can] demonstrate[] that the effects of prior racial gerrymandering . . . remain present in [a] [r]emedial plan." *Jacksonville II*, 2022 WL 17751416, at *17 (reviewing circumstantial evidence such as core retention data, demographic shifts between the enjoined and remedial plan, and that district borders were drawn to ensure incumbency protection).

Here, Plaintiffs identify multiple circumstantial reasons as to why the Remedial Plan perpetuates the racial gerrymandering from the Enjoined Plan.  First, Plaintiffs argue that the Remedial Plan is staggeringly similar to the Enjoined Plan, and accordingly, the Remedial Plan suffers from the same impact of the unconstitutional race-based sorting as its predecessor.  *See*

---

[8] Defendant attempts to describe the Commissioners' directive to De Grandy as something entirely different—a discussion where Commissioner Reyes explained his desire to preserve the VRA-required District 5 among a greater discussion of at-large districts.  Reply at 9.  The Court does not ascribe much weight to this argument given that during the relevant portion of the May 11 Meeting, Commissioner Reyes only references District 5 implicitly when directing De Grandy to preserve a "Afro American to a seat" along with other groups and doesn't mention at-large electoral districts at all.  *See* 5/11 Tr. 17:9–16.  Though this directive may have occurred in the context of a larger discussion, it still included instructions to begin drawing a map preserving the racial breakdown from the Enjoined Plan.

Obj. at 10–11.  Further, Plaintiffs aver that Defendant's alterations to V12 during the June 14 Meeting "claw[ed] back even more elements of the Enjoined Plan," thereby reaffirming "the Commission's original handiwork."[9]  *Id.* at 11.  Likewise, Plaintiffs argue race remains the predominant factor the Commission considered in the unaltered aspects of V12 which the Commissioners incorporated in the Remedial Plan, and Defendant has not made a showing of satisfying strict scrutiny.  *See id.* at 16–26.

In turn, Defendant argues the Remedial Plan is constitutional because the Commissioners focused on legitimate, non-racial criteria, such as political considerations, where they had invested substantial district resources, and where candidates reside.  *See* Reply at 5–6, 9.  For the following reasons, the Court finds that even if the Commissioners did employ the above-mentioned criteria, those considerations had the impact of perpetuating, rather than completely correcting, the constitutional infirmities of the Enjoined Plan.

Specifically, the Court considers the following circumstantial evidence:  the Remedial Plan's core retention rate, whether the Commissioners' alterations (or lack thereof) to V12 incorporated in the Remedial Plan preserve the unconstitutional aspects of the Enjoined Plan, and whether race still predominates in each district in the Remedial Plan.

> ### i.  *The Remedial Plan's Core Retention Rate Provides Evidence of the Commissioners' Intent to Maintain the Enjoined Plan's Features*

---

[9] As previously discussed, after this Court enjoined Defendant from using the 2022 Enacted Plan, De Grandy proposed V12.  Plaintiffs argue the Commissioners made changes to V12 such that V12 became more similar to the Enjoined Plan than V12 was originally.  *See* Obj. at 11–15.  These alterations were incorporated in the Remedial Plan.  *Id.* at 11.  Plaintiffs argue that these alterations, resulting in the Remedial Plan more closely resembling the Enjoined Plan than V12 did, is circumstantial evidence that the Remedial Plan does not fully remedy the Enjoined Plan.  *Id.*

When determining "core retention rate," "mapmakers lock in prior district configurations with the aim of populating each new district with the residents of its predecessor district, adjusting as needed to restore population equality."  Robert Yablon, *Gerrylaundering*, 97 N.Y.U. L. Rev. 985, 1006 (2022).   Generally, high core retention rates provide circumstantial evidence of legislative intent to preserve the features of the previously unconstitutional district.  *See Covington II*, 138 S. Ct. at 2551.  Indeed, the Supreme Court affirmed the rejection of a remedial plan where the districts "retain[] the core shapes of districts that [the trial court] had earlier found to be unconstitutional."  *Id.*

The core retention rates in the instant Action show that nearly all Miamians remain in the same district under the Remedial Plan as in the Enjoined Plan.  *See* Obj. at 10 (citing ("McCartan Rep.") (ECF No. 82-11 at 8)).  When core retention rates in a remedial plan are high, *Jacksonville II* is instructive.  In *Jacksonville II*, the court found that the "unrebutted data [shows] that the vast majority of Black residents living in the Packed Districts under the Enjoined Plan remain in one of the Packed Districts under the Remedial Plan."  *Id.* at *13.  According to the *Jacksonville II* Court, the high core retention rates demonstrated that the remedial plan perpetuated "the harmful effects of the City's decades-long history of racial gerrymandering."  *Id.* at *14.  Similarly, in the instant Action, 94.1% of Miamians remain in the same district under the Remedial Plan.  *See* McCartan Rep. at 8; *cf. In re SJR 1176*, 83 So. 3d 597, 662, 665 (Fla. 2012) (finding a core retention rate of 82.6% to be overwhelming).  The Court agrees with Plaintiffs that the core retention rates between the Remedial Plan and the Enjoined Plan are "staggeringly high," and, like in *Jacksonville II*, indicate that the Remedial Plan does not completely correct the unconstitutional aspects of the Enjoined Plan.  Obj. at 10.

Importantly, the Remedial Plan not only retains the vast majority of the district cores from the Enjoined Plan, but the actual citizens who were moved to a different district under the Remedial Plan "point to continued racial predominance." *Id.* Plaintiffs' expert Dr. Abott explains that, though 5,125 residents were moved from Districts 1, 3, and 4 (the predominantly "Hispanic districts" under the Enjoined Plan) to Districts 2 and 5, these citizens were only 58.8% Hispanic Voting Age Population ("HVAP") (compared to the HVAP of Districts 1, 3, and 4, in the Enjoined Plan ranging from 88–90%).[10] *See* ("2nd Abott Rep.") (ECF No. 82-12 at 8–9). Moreover, Dr. Abott showed that, of the 4,735 residents removed from District 5 in the Remedial Plan, only 16.6% are Black, even though the Black Voting Age Population ("BVAP") of District 5 is 50.3%. *Id.* at 4, 9. Moreover, areas that were approximately 90% HVAP were shuffled among Districts 1, 3, and 4—"creating the illusion they changed while maintaining their demographics." Obj. at 10 (citing 2nd Abott Rep. at 5, 7, 8–9) (explaining that the approximately 1,000 people moved between Districts 1,3, and 4 were predominantly Hispanic and did not alter the racial breakdown from the Enjoined Plan). These changes suggest that the voters who were either moved out of, or among Districts 1, 3, and 4, did not result in meaningful changes from the Enacted Plan.

The Court finds it illustrative to see which voters the Commissioners chose to move in the Remedial Plan. As explained above, District 2 retains a large Anglo population with a disproportionately "less-Hispanic" population moved into it, District 5 remains a 50.3% BVAP,

---

[10] The Court notes that Defendant has filed a Motion to Strike Carolyn Abott's Improper Opinions Assessing the Credibility of Witnesses and Speculating About the City's Considerations and Motivations in Creating a New Plan. (ECF No. 87). Therein, Defendant argues that Dr. Abott improperly "conclu[ded] that the changes in the City's proposed new map appear to continue to be designed around racial and ethnic considerations, and there is no basis on which to make the argument that these considerations were instead partisan in nature." *Id.* at 2. (internal quotations omitted) (alterations in original). Because the Court does not rely upon her conclusions about the Commissioners' intent or state of mind, but solely considers the underlying data and related analyses from her expert report, the Court will issue an order denying as moot the Motion to Strike.

and the Hispanic populations of Districts 1, 3, and 4, are shuffled among each other. *See Jacksonville II*, 2022 WL 1775146, at *13 (rejecting a remedial plan, in part, because "Black voters [were] shuffled among—but not out of—the Packed Districts") (emphasis omitted). The populations that were moved, and what districts they were moved into, conspicuously align with the racial breakdown of the Enjoined Plan. Considering that 94.1% of Miamians remain in the same district as they were under the Enjoined Plan, and which citizens were moved indicate a legislative intent to retain the racial breakdown of the Enjoined Plan, the Court finds that this circumstantial evidence supports the conclusion that the Remedial Plan perpetuates the unconstitutional aspects of the Enjoined Plan.

### ii. The Commissioners' Adjustments to V12 Provide Circumstantial Intent to Preserve the Racial Breakdown of the Enjoined Plan

A party may also provide circumstantial intent that a remedial plan preserves the unconstitutional aspects of prior plan by demonstrating that a remedial plan does not meaningfully alter an enjoined plan's district borders. *Jacksonville II*, 2022 WL 17751416, at *14; *see also Covington I*, 283 F. Supp 3d at 436 (examining circumstantial evidence that the remedial version of a map still retains the core of the unconstitutional version of a district). Here, Plaintiffs argue that, following De Grandy's initial presentation unveiling V12, the Commissioners suggested alterations to V12 (which were included in the Remedial Plan). According to Plaintiffs, these alterations "claw back even more elements of the Enjoined Plan."[11] Obj. at 11. Because these alterations were incorporated into the Remedial Plan, Plaintiffs argue that the similarities between Remedial Plan and the Enjoined Plan demonstrate the Commissioners' intent to preserve the Enjoined Plan's unconstitutional components.

---

[11] Darker shaded areas in the below figure represent the alterations to V12 that were ultimately incorporated into the Remedial Plan.



**Areas Shifted Between District 2 and District 3**

Multiple changes to V12 that were incorporated into the Remedial Plan preserved elements of the Enjoined Plan.  Recall, in the Enjoined Plan, District 2 was intended to be the so-called "Anglo-District."  At Commissioner Carollo's request, Area 21 in V12 was removed from District 3 and returned to District 2, just as it was in the Enjoined Plan.  *See* 6/14 Tr. 65:6–7.  Area 21 has one of the highest White Voting Age Populations ("WVAP") in the city, 54.8%.  *See* 2nd Abott Rep. at 19.  The Commissioners also added Area 25—with no instruction to do so during the May 11 or June 14 Meetings—to District 2.  *See* Obj. at 12.  Area 25 is a plurality-white part of the city.  *See* 2nd Abott Rep. at 19.  Then, the Commissioners moved the plurality HVAP Area 24 into District 3.  *See* 6/14 Tr. 38:5–39:10; Obj. at 12.  Plaintiffs argue that these changes not only altered V12 so that the eventual remedial map would be more like the Enjoined Plan, but that the specific

alterations were done to "preserve the categorical racial divisions in the Enjoined Plan."  Obj. at 11–12.

Defendant argues that "[t]he Commission had valid, non-racial reasons for the lines it drew," "Coconut Grove. . . had to shed population," and that "[d]rawing Commissioner Carollo's house into his district is not a racial motivation."[12]  Reply at 7.  All of these points may be true. But, simply ensuring that Commissioner Carollo maintains a residence in District 3 does not explain the other alterations along the District 2 and District 3 border.  Moreover, that Coconut Grove had to shed population does not explain why the Commissioners decided that majority and plurality WVAP portions of District 3 would be added back to District 2, as opposed to any other area.  *See* 6/14 Tr. 65:6–7 (Commissioner Carollo requested that an area of the North Grove between 22nd and 27th Avenues (Area 21) be returned to District 2 without providing any explanation).  Nor does it explain why the plurality HVAP Area 24 was moved out of District 2 to District 3.  *See id.* 38:5–39:10 (Commissioner Carollo asked for this area to be moved but again provided no rationale).  While Defendant avers there were non-racial reasons for the alterations it made to V12, it provides very little, if any explanation.

Thus, the Court finds that the areas shifted between Districts 2 and 3 in the Remedial Plan provide circumstantial evidence that the Commissioners intended the Remedial Plan retain the race-based characteristics of the Enjoined Plan.

### Areas Shifted Between District 3 and District 4

Next, Commissioner Carollo requested a change to V12 involving the border of District 3 and District 4, which in the Enjoined Plan, were majority Hispanic districts.  Initially, in V12, all

---

[12] Commissioner Carollo owns a residence in Coconut Grove, and his residence was incorporated into District 3 in both the Enjoined and Remedial Plan.

of Silver Bluff existed within District 4, as did all but two blocks of Shenandoah. *See* 6/14 Tr. 15:2–6 (V12 shifted the border of the two districts eastward from 17th Avenue in the Enjoined Plan to 14th Avenue). Commissioner Carollo requested that De Grandy adjust V12 so that the border of 17th Avenue in the Remedial Plan be restored to "that same line as before" (i.e., in the Enjoined Plan). *Id.* 37:1–2. De Grandy obliged, and the 17th Avenue border was restored in the Remedial Plan to mirror its predecessor. *See id.* 77:6–9.

According to Plaintiffs, the consequences of this alteration resulted in the splitting of traditional neighborhoods. Obj. at 13. Plaintiffs aver that "nearly 2,000 people between 14th and 17th Avenues moved back into D[istrict] 3." *Id.* (citing 2nd Abbott Report at 19). To equalize population, Plaintiffs argue De Grandy then moved portions of Auburndale and Little Havana into District 3. *See id.* Therefore, Plaintiffs aver that "at Commissioners' requests, [the alterations to V12] continu[ed] the division of 'distinct' and 'historical' Shenandoah, Silver Bluff, and Little Havana that Commissioners had kept divided in the Enjoined Plan to balance Hispanic populations and facilitate racial separation." *Id.*

Defendant (and Commissioner Carollo in the June 14 Meeting) explain that this specific alteration occurred because the "Commissioners publicly allocated blocks based on where they had invested resources in parks." Reply at 5. Indeed, when discussing a potential alteration to include the 17th Avenue border, Commissioner Carollo explained that the area was "where we just invested significant amounts in a park." 6/14 Tr. 34:13–14. Plaintiffs, however, argue that Defendant's explanation is insufficient because the "park [i]s *still* on the D[istrict] 4 side of the line." Obj. at 12–13 (emphasis in original). After a thorough review of the record, the Court finds that the transcripts of the June 14 Meeting do not indicate which park Commissioner Carollo was referencing, nor does Defendant provide an address of the park. *See generally* Reply; 6/14 Tr.

Accordingly, the Court is unable to fully evaluate the rationale of the shift of the border between District 3 and District 4, and thus, does not consider these changes to perpetuate the unconstitutional features of the Enjoined Plan.

### Morningside

Plaintiffs also argue that the Commission's alterations of Morningside from V12, which culminated in the neighborhood being split in the Remedial Plan, perpetuated the unconstitutional impact of the Enjoined Plan. *See* Obj. at 13–14. V12 proposed moving Area 26 (41.9% WVAP and 11.8% BVAP) out of District 2 and into District 5, which would split the neighborhood. *Id.* at 13 (citing 2nd Abott Rep. at 19). Upon review of V12, Commissioners Covo and King discussed the alteration. *See* 6/14 Tr. 42:13–47:6. Specifically, Commissioner Covo objected to Morningside being split between districts, and Commissioner King opined that the entirety of Morningside should be restored to District 2. *See id.* 42:13, 44:2. Commissioner King requested that De Grandy revise V12 accordingly. *See id.* 45:13–15. De Grandy partially obliged, and the Remedial Plan includes Area 26, but not all of Morningside, in District 2.

According to Plaintiffs, the Remedial Plan's inclusion of Area 26 in Districts 2 is problematic. *See* Obj. at 13–14. Plaintiffs argue that this change "excludes from D[istrict 5] the low-BVAP neighborhoods south of the existing district boundary" and that the "southern part [Commissioner] King declined adding from V12 to make Morningside whole in District 5 is 10.1% BVAP." *Id.* at 14. Moreover, Plaintiffs find it significant that the Commission rejected "at least four alternative plans that avoided 'splitting up neighborhoods' in and around Morningside by adding the neighborhood to D[istrict] 5." *Id.* (noting that the Commissioners rejected the following Plans: P1, P2, P3, and one of De Grandy's alternatives, D1). To Plaintiffs, this evidence

demonstrates that the Remedial Plan divided Morningside along racial lines to preserve the racial breakdown of Districts 2 and 5 from the Enjoined Plan. *See id.* at 13–14.

Defendant responds, but only to explain "[t]he Commissioners from District 2 & 5 publicly discussed keeping that community together and where it should go." Reply at 9. Defendant does not address Plaintiffs' allegation that the low-BVAP neighborhoods were deliberately excluded from District 5 in the Remedial Plan, nor does it provide a response regarding why, after the Commissioners expressed their concern about splitting Morningside, Morningside was not wholly included in District 2. Rather, Defendant only explains that "there was nothing nefarious about the conversation or the decision." *Id.*

Because Defendant provides little explanation, if any, on why Area 26 (but not all of Morningside) was restored to District 2, and Plaintiffs have provided evidence that the Remedial Plan (1) splits neighborhoods in and around Morningside; and (2) excludes low-BVAP neighborhoods from District 5, the Court finds Plaintiffs' more argument persuasive. The alterations to Morningside from V12 to the Remedial Plan provide circumstantial evidence that the Remedial Plan perpetuated the unconstitutional aspects of the Enjoined Plan.

### Overtown

Lastly, Plaintiffs argue that the Commissioners' alterations to V12 regarding Overtown were racially motivated. *See* Obj. at 14–16. During the June 14 Meeting, De Grandy's presentation of V12 as it pertained to Overtown included an extended discussion of Plaintiffs' P1 and P2 alternative maps. First, De Grandy criticized Plaintiffs' suggested alternative district configurations that would divide Overtown.[13] *See* 6/14 Tr. 16:4–8. Then, De Grandy explained

---

[13] As referenced, Section I, *supra*. De Grandy mentioned that he did not have time to review Plaintiffs' P3. Plaintiffs' P3 included all of Overtown in District 5.

how his review of Google Maps and the Neighborhood Enhancement Team ("NET") confirmed that all of Overtown was included in District 5 in V12.  *See id.* 16:6–7.

But, according to Plaintiffs, De Grandy's definition of Overtown and its inclusion in V12's District 5 is not as straightforward as the consultant would suggest.  *See* Obj. at 15.  Plaintiffs' expert, Dr. Abott, opined that De Grandy excluded portions of Overtown in V12 which are included in Google Maps and NET, the very sources upon which De Grandy relied.  *See* 2nd Abott Rep. at 9–11.  Further, Dr. Abott explained that the portions De Grandy omitted from his definition of Overtown are included in both the Miami Police Department ("MPD") and Convention & Visitors Bureau's ("CVP") description of the neighborhood.  *See id.* at 9–10.  Plaintiffs also identify that the City Code provides an even broader definition of Overtown than the MPD and CVP, all three of which provide a broader definition of Overtown than the one De Grandy used when drawing the border of V12's District 5.  Obj. at 15 (citing City Code § 2-1051).  According to Plaintiffs, "'De Grandy defined Historic Overtown along racial lines, resulting in the area being split into District 1 and District 5 on the basis of race,' with his 'definition shor[ing] up the existing racial composition of District 5 and . . . the Hispanic supermajority in District 1.'"[14]  *Id.* (quoting 2nd Abott Rep. at 11) (alterations in original).

Consequently, Plaintiffs argue that "[t]he Commission ratified a definition of Overtown that defined it along racial lines, excluding majority Hispanic areas," and "[i]n doing so, [Defendant] strenuously ensured that none of the majority-Hispanic parts of the area would move out of D[istrict] 1."  *Id.*  (emphasis omitted).  The result, to Plaintiffs, is that the definition of

---

[14] Plaintiffs also identify the Commissioners' discussion of one minor alteration—the addition to District 5 of the Overtown restaurant People's Bar-B-Que—as further evidence that V12's borders separated Overtown along racial lines because no other portion of the border was moved. Specifically, Plaintiffs emphasize Commissioner Díaz de la Portilla's comments that "*only* the restaurant should move, nothing more" into District 5.  Obj. at 15 (emphasis in original).

Overtown as incorporated into the Remedial Plan "is predominantly a function of the Commission's goal to hew to the Enjoined Plan and separate Hispanic from Black residents." *Id.*

Defendant hardly engages with Plaintiffs' arguments.  Defendant only states that "Plaintiffs quibble over the boundaries of Overtown, an undefined neighborhood, and cite to the boundaries of the . . .  City Code (§2-1051). . . which states that the boundaries of this purely advisory board are approximate and meant to be construed expansively."  Reply at 4 n.3.  Otherwise, Defendant does not refute Plaintiffs' description of Overtown as defined by the multiple other sources, and it does not even attempt to engage with the findings of Plaintiffs' expert.  Just as importantly, Defendant also fails to offer any explanation of why the Remedial Plan's conception of Overtown splits the historic neighborhood as Plaintiffs suggests it does.  After reviewing the record and considering Plaintiffs' evidence as proffered by their expert, Dr. Abott, the Court finds that Defendant selectively defined Overtown to entrench the racial divisions from the Enjoined Plan.

In sum, though the Court presumes the good faith of the Commissioners when making alterations for V12 in the Remedial Plan, their explanations for the alterations are often entirely unsubstantiated in the record.  And, the Commissioners consistently altered V12 so that the Remedial Plan would have districts coinciding with the racial breakdown the Commissioners intended to exist within the Enjoined Plan, without justification.  Therefore, the Court agrees with Plaintiffs' argument that alterations to V12 serve as circumstantial evidence of the Remedial Plan's perpetuation, rather than the eradication, of the unconstitutional aspects of the Enjoined Plan.

### iii. The Analysis of Each District Demonstrates Continuing Racial Predominance

Though the Court has recognized that direct evidence and circumstantial evidence indicate the Remedial Plan is not an adequate remedy to the Enjoined Plan, the Court nevertheless examines each district in the Remedial Plan to determine whether race predominates.

**Districts 1, 3, and 4**

The Court begins its analysis first with the Remedial Plan's Districts 1, 3, and 4, the so-called "Hispanic districts" in the Enjoined Plan. Plaintiffs argue that these districts collectively retain nearly identical portions of the Hispanic population. Indeed, according to Plaintiffs' expert, Dr. McCartan, these districts, in the aggregate, have a core retention rate of 97.8% of the Enjoined Plan. *See* McCartan Rep. at 8; Obj. at 24 (explaining that individually the districts have core retention rates ranging from 90.6% to 98.2%); *see also* Section III.B.2.i, *supra* (discussing that generally, high core retention rates are evidence of legislative intent to preserve the features of the previously unconstitutional district). Further, Plaintiffs argue that the border between Districts 1 and 4, as well as the border connecting Districts 3 and 4, remain "nearly untouched" and divide Flagami, Silver Bluff, Shenandoah, and Little Havana as in the Enjoined Plan. Obj. at 25. Plaintiffs also explain that the Remedial Plan's District 1 maintains a slightly reconfigured version of the "staircase-like stepping pattern in the northeastern corner in Allapattah" that the Court found problematic in the Enjoined Plan, *see* R&R at 74, and selectively included portions of Overtown in majority-HVAP areas. Obj. at 25. Lastly, Dr. McCartan explains that District 3 has become less compact by adding portions of Bay Heights and "minimizing additions from the whiter northern end of Brickell." *Id.* Defendant does not respond to any of these arguments. *See generally* Reply.

Based on a review of the evidence and the unrebutted arguments described above, the Court agrees with Plaintiffs. The Remedial Plan's high core-retention rates, the irregular shape of District 1, the selective inclusion and exclusion of certain areas in District 1, and the fact that District 3 became less compact in the Remedial Plan, all support the Court's conclusion that the Remedial Plan entrenches, rather than remedies, the Enjoined Plan.

**District 2**

Turning next to District 2, otherwise described as the "Anglo District" in the Enjoined Plan, Plaintiffs make similar arguments. Plaintiffs assert that District 2 in the Remedial Plan was "shaped by the Commission's intent to reserve it as an 'Anglo-access' seat, and surgically exclude more-Black or more-Hispanic areas on the north and south end, respectively." Obj. at 24. Plaintiffs argue that District 2 retains a "white affluent" portion of Morningside, and "adds a thin, low BVAP adjacent strip." *Id.* (citing 2nd Abott Rep. at 17) (explaining the District 2 border retains the "whiter Condo Canyon, add[s] an additional lower-BVAP area around Omni, and separate[s] higher BVAP areas of Downtown kept in D[istrict] 5"). On the southern border, Plaintiffs argue that areas of Coconut Grove which contain more Hispanic voters were kept in District 3 and out of District 2. *Id.* Likewise, "whiter areas on Brickell's north end remain excised from District 3, achieved via an irregular finger [in District 2]." *Id.* Plaintiffs note that District 2 also had a strikingly high core-retention rate of 92.2%, and its compactness scores were identical to the Enjoined Plan. *See id.* (citing McCartan Rep. at 8). As a result of these districting decisions, core-retention, and identical compactness cores, Plaintiffs argue that District 2 maintains the hallmarks of racial predominance. *See id.* at 23–24.

As with Districts 1, 3, and 4, Defendant offers no rebuttal to Plaintiffs' proffered evidence. *See generally* Reply. Rather, Defendant only notes that "Coconut Grove is in District 2 which had to shed population." *Id.* at 7. Here, the crucial question is not whether District 2 had to shed population, but whether the changes Defendant was required to make in District 2 completely correct, rather than perpetuate, the constitutional defects of the Enjoined Plan. After review of the which voters were retained or excluded from District 2 in the Remedial Plan, as well as the core retention rates and compactness scores, the Court agrees with Plaintiffs that race still predominates

in the design of District 2. Therefore, the Court finds that District 2 in the Remedial Plan does not change the racial predominance that existed prior.

### District 5

Finally, the Court turns to District 5, the VRA protected district. The relevant question for this district is not whether the Remedial Plan's District 5 continues to perpetuate the hallmarks of racial predominance, but whether Defendant's consideration of race when drawing the borders of District 5 to ensure a BVAP floor of 50%, *see* ("Alford Rep.") (ECF No. 86-2), was narrowly tailored to satisfy strict scrutiny. *See Bethune-Hill*, 580 U.S. at 195. The Parties contest whether District 5 is indeed narrowly tailored. *See* Obj. at 25–26; Reply at 10–11.

As the Supreme Court has explained, "the narrow tailoring requirement insists only that the legislature have a *strong basis in evidence* in support of the (race-based) choice that it has made." *Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 262 (2015) (emphasis added) (quotations omitted). To demonstrate a strong basis in evidence, Defendant was required to conduct a "functional analysis of the electoral behavior within the particular. . . election district" to determine "what minority population percentage satisfy[ies] [§2 of the VRA's] standard." *Bethune-Hill*, 580 U.S. at 194. By performing such analysis, Defendant could demonstrate it had "good reasons to believe" it must use race to satisfy § 2 of the VRA. *Id.* at 187. Nowhere in the record is this functional analysis present. Accordingly, District 5 of the Remedial Plan is not narrowly tailored.

Defendant argues otherwise, relying largely on the legal conclusions of its expert, Dr. Alford. *See* Reply at 10–11. Dr. Alford's report explains that the Remedial Plan is narrowly tailored to satisfy § 2 of the VRA because "Black-preferred candidates always prevail[] and typically by large margins." Alford Rep. at 4. Dr. Alford also explains, "if the plaintiffs' District

5 in P4 is narrowly tailored, as they assert, then so are [Defendant's] versions of District 5." *Id.* at 8.

In reliance upon Dr. Alford's conclusion, Defendant misunderstands the "narrowly tailored" standard.  And so, the Court reiterates:  Defendant must have had good reason to select its BVAP target in District 5, meaning Defendant was required to conduct a functional analysis of the electoral behavior to determine what minority population percentage would satisfy § 2 of the VRA.  *Bethune-Hill*, 580 U.S. at 194.  As demonstrated by *Bethune-Hill*, this functional analysis must occur when deciding upon the BVAP target, *not after the decision has already been made*. *Id.* (finding "the legislature performed that kind of functional analysis of District 75 when deciding upon the 55% BVAP target").  To the extent Dr. Alford's report conducts the appropriate analysis, he completed his report on July 12, 2023, nearly a month after the Remedial Plan was enacted. *See generally* Alford Rep.  In other words, Defendant may not rely on the post-hoc findings of its expert to justify why it determined the 50% BVAP figure was necessary to comply with the VRA in District 5.  Doing so is hardly the type of functional analysis required.

Apart from Dr. Alford's report, the record contains no further discussion of how District 5 might be narrowly tailored in the Remedial Plan.  In the June 14 Meeting, De Grandy told the Commissioners without justification that V12 "fully compl[ied] with the VRA."  6/14 Tr. 6:16–17.  Though he offered this conclusory statement frequently, at no point did De Grandy ever discuss what functional analysis occurred to ensure that District 5 was narrowly tailored to VRA compliance.  *See id.* 9:4, 12:8–10, 16:11–12, 66:10–11.  With no other evidence in the record, the Court finds Defendant's arguments regarding the constitutionality of District 5 in the Remedial Plan unavailing.

*iv. Partisanship Does Not Explain Districting Decisions in the Remedial Plan*

Finally, though the Court has disposed of most of Defendant's arguments above, one broad argument Defendant advances in support of the Remedial Plan warrants addressing specifically. Throughout its Reply, Defendant emphasizes that some of its districting decisions were the result of the Commissioners' political judgment, and that Plaintiffs impermissibly seek to "substitute their political judgment for that of the elected City Commission." Obj. at 4, 6. This argument has no merit. First, Commissioner Carollo expressly denied the idea that the commissioner position is partisan in nature, thus suggesting partisan politics did not influence the Remedial Plan's creation. *See* 6/14 Tr. 32:13–21. Further, as Plaintiffs correctly identify, "[n]o Commissioner expressed a partisan motivation for any decision in [the Remedial Plan]." Obj at 20; *see generally* 6/14 Tr. The Court is satisfied that nothing in the record demonstrates that partisanship played any role in the districting decisions in the Remedial Plan.

In sum, after extensively reviewing the direct and circumstantial evidence surrounding the enactment of the Remedial Plan, the Court finds that the Remedial Plan fails to correct the constitutional violations it found substantially likely to exist in the Enjoined Plan, and that the Remedial Plan perpetuates the impact of the Enjoined Plan's unconstitutional racial gerrymandering of the election districts.

### C. Plaintiffs' Alternative Map is a Constitutional Remedy

Because Defendant could not enact a constitutionally sufficient remedial map, and the date by which the Miami-Dade Board of Elections requires a map is August 1, 2023, there is no longer enough time to order the Commissioners to draw another map. Nor is there sufficient time to appoint a special master to draw one for the upcoming election. Regardless, Miami requires a new map, and "it now becomes this Court's unwelcome burden to craft a new plan for implementation

40

on an interim, remedial basis." *Jacksonville II*, 2022 WL 17751416, at *17.  Before doing so, the Court also emphasizes that it "endeavors to address the unconstitutionality of the Enjoined and Remedial Plans and no more.  Broader or more systemic changes to [the City of Miami's] electoral maps are the province of the legislators, not the Court." *Id.* at *21.

With this limited goal in mind, the Court examines Plaintiffs' most recent alternative map, P4, which Plaintiffs urge the Court to adopt.  *See* Obj. at 26–31.  The Court reviews P4 to determine whether it, when possible, respects the Commission's legitimate, non-race-based policy goals, complies to traditional districting criteria, and complies with state and federal law. The Court reviews P4, and Defendant's arguments against its adoption, below.

### 1.  P4 Incorporates Defendant's Lawful Stated Objectives

"When faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or Voting Rights Act." *Abrams*, 521 U.S. at 79.  Under such circumstances, a court must reconcile the goals of state political policy with the requirements of the Constitution.  *See Connor v. Finch,* 431 U.S. 407, 414 (1977); *see also Upham v. Seamon*, 456 U.S. 37, 43 (1982) ("An appropriate reconciliation of these two goals can only be reached if the district court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect.").  The Court therefore reviews P4 to determine if it properly considers Defendant's lawful political preferences (substantial equality of population, respecting communities of interest, and use of natural and manmade boundaries), while simultaneously remedying the constitutional defects of the Enjoined Plan.



### i.  *Substantial Equality of Population*

First the Court addresses whether P4 complies with the Commission's lawful (and constitutionally required) goal of substantial equality of population among the districts.  *See Reynolds v. Sims*, 377 U.S. 533, 579 (1964).  Plaintiffs aver that P4 "is within the population equality limits the Commission set in its [Remedial Plan]."  *See* Obj. at 27.  Indeed, Plaintiffs rely on Dr. Abott's expert report to demonstrate that P4's population deviation among each district is 2.4%, an improvement on the Remedial Plan's total population deviation of 3.6%.  *See id.* (citing 2nd Abott Rep. at 14–16).  Based on the unrebutted expert report, the Court is satisfied that P4 achieves Defendant's goal for population equality limits.

### ii.  *Respecting Traditional Neighborhoods and Communities of Interest*

Another one of Defendant's goals throughout the redistricting process was to ensure the Remedial Plan retained traditional communities of interest within one district.  *See, e.g.*, Reply at 5 (explaining "many of the requests by Commissioners were geared towards maintaining communities in which they had invested district resources"); 6/14 Tr. (referencing throughout the

importance of towns such as Allapattah, Civic Center, Grapeland Heights, West Flagler, Flagami, Overtown, Coconut Grove, and Morningside).  For the following reasons, the Court finds that P4 adequately preserves the Defendant's goal of maintaining the unity of traditional neighborhoods, without dividing them among racial lines.

In P4's District 5, Overtown's southern boundary is consistent with how Google Maps, NET, CVB, and MPD define it.  *See* Obj. at 27 (explaining that all of Overtown "east of the Seybold Canal and south to NW 5th Street. . . is made whole within D[istrict] 5").  P4 includes in District 5 the entirety of the more-broadly-defined Overtown except for "one city block moved to better equalize population" and "three unpopulated blocks east of I-95."  *Id.*  According to Plaintiffs, where the Remedial Plan "excised less-Black portions from D[istrict] 5," P4 restores them.  *Id.*  Indeed, certain traditional communities of interest that Commissioner King emphasized should remain in District 5 are there in P4, including Liberty City, Little Haiti, Wynwood, the Upper East Side, and Morningside.  *See id.*; *see also* (ECF No. 82-16) (Miami Times article expressing same); 6/14 Tr. 12:17–22 (Commissioner King expressing her desire to retain Wynwood as a significant economic driver for District 5).

Similarly, in other districts, P4 unites communities of interest.  In line with Commissioner Covo's request, Coconut Grove is kept whole in District 2.  *See* 6/14 Tr. 42:9–43:3.  District 2 also contains areas such as the West Grove, Edgewater, and Grapeland Heights.  *See* Obj. at 28.  Throughout the June 14 Meeting, De Grandy identified the importance of these areas as traditional neighborhoods.  *See* 6/14 Tr. 6:19–20, 13:15–16.  Further, P4 also ensures that Domino Park remains in District 3.  *See id.* 36:22–37:2 (Commissioners emphasizing the need for District 3 to retain Domino Park in its entirety).

Other neighborhoods that P4 splits are neighborhoods that the Commission did not prioritize. For example, "P4 splits Brickell between D[istrict] 2 and D[istrict] 3, but the dividing line is the Metrorail rather than [the Remedial Plan's] jagged border that scoops whiter blocks into D[istrict] 2." Obj. at 28 (emphasis omitted). Moreover, the "Downtown/Omni area remains divided among three districts, but no longer surgically separates more-Hispanic, more-Anglo, and more-Black areas into D[istrict] 1, D[istrict] 2, and D[istrict] 5, respectively." *Id.* And, while P4 divides the traditional neighborhoods of Little Havana and Auburndale, so too did the Remedial Plan. *See id.*

Therefore, the Court agrees with Plaintiffs that, to the extent practicable, P4 unites many traditional neighborhoods into one district, largely in accord with the Commissioners' expressed intent. The Court is also satisfied that P4 delineates districts in a manner that preserves communities of interest, without dividing the neighborhoods among racial lines. Where some neighborhoods were split, P4 largely mirrors the Remedial Plan, but does so in a manner that is race-neutral.

### iii.    Recognition of Significant and Natural Boundaries

Plaintiffs also assert that P4, where possible, "utilizes natural and manmade boundaries the Commission recognized as logical." Obj. at 28 (internal quotations omitted). Indeed, the Remedial Plan incorporated "natural and manmade boundaries such as the city's municipal boundaries, the bay, the railroad, the Miami River, an expressway, and the contours of traditional neighborhoods," along with "water boundaries" and "major roads." 6/14 Tr. 13:3–4, 13:18. P4 follows this directive, with "SW 4th and 8th Streets and 32nd Avenue coninu[ing] to form boundaries." Obj. at 28. Further, P4 also contains borders tracking "SE/NE 2nd Avenue, 22nd

Avenue, and US 1." *Id.* at 28–29.   Accordingly, the Court finds that Plaintiffs incorporated Defendant's lawful goal of using natural and manmade boundaries into P4.

## 2.   P4 Properly Considers Traditional Redistricting Criteria

When tasked with redistricting, courts must also consider traditional redistricting criteria. *See Bethune-Hill*, 580 U.S. at 183.   Traditional redistricting criteria "include[e] compactness, contiguity, respect for political subdivisions or communities defined by shared interests, incumbency protection, and political affiliation." *ALBC*, 575 U.S. at 254 (internal citation omitted).   The list of traditional criteria is not exhaustive, nor is the reviewing court required to consider each consideration when evaluating the redistricting plan. *See Jacksonville II*, 2022 WL 17751416, at *18–19 (evaluating the remedial plan only for compactness, respect for traditional communities, and incumbency protection).   Nevertheless, a court must use these criteria when drawing its own map or selecting one suggested by one of the Parties.[15]

### i.   Compactness

Here, the Court notes that P4's districts are compact, both visually and according to statistical compactness scores.   Plaintiffs' expert, Dr. McCartan, calculated the compactness of P4 using a simulation algorithm.[16]   *See generally* McCartan Rep.   As part of his analysis, Dr. McCartan calculated P4's Polsby-Popper compactness scores, Reock compactness scores, Convex Hull compactness scores, and edge-cut measures.   *See id.*; *see also Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. 3d at 1258 (identifying the Polsby-Popper and Reock measures as "widely acceptable tests to determine compactness scores").   The Polsby-Popper, Reock, and Convex Hull

---

[15] The Court will not consider incumbency protection. *See* Section III.C.3, *infra*.   Further, as there is no factual dispute regarding contiguity, the Court finds P4's districts contiguous.

[16] All Polsby-Popper, Reock, and Convex Hull scores were multiplied by 100 for ease of reference. McCartan Rep. at 5–6.   Accordingly, when the Court refers to these scores, or any comparators, it will refer to the scores with such a multiplier.

scores lie on a 0–100 scale, with higher values indicating more compact districts.  McCartan Rep. at 6–7.  As for the edge-cut score, lower values indicate more compact districts.  *Id.* at 7.  P4 had an average compactness score of 39.6 on the Polsby-Popper scale, 35.4 on the Reock scale, and 77.0 on the Convex Hull scale.  *Id.* at 6–7; *see also Alpha Phi Alpha Fraternity*, 587 F. Supp. 3d at 1277 (rejecting the argument that districts in an illustrative plan were not compact with an average Polsby-Popper scores ranging from of 17 to 34, and Reock Scores ranging from 22 to 57).  On the edge-cut measure, P4 had a compactness score of 237, a score lower than the Remedial Plan.  McCartan Rep. at 7.  Accordingly, the Court finds that P4 is more statistically compact than the Remedial Plan, is more visually compact, and thus, P4 properly considered compactness as a traditional districting criterion.

*ii.      Respect for Traditional Neighborhoods*

As discussed extensively above, the Court finds that P4 keeps traditional neighborhoods and communities of interest united.  *See* Section III.C.1.ii, *supra*.  P4 was crafted to ensure that communities would be united within a single district to the extent possible.  The Court finds that P4 properly considered traditional neighborhoods and respects communities of interest.

**3.  P4 Complies with Applicable Federal and State Law**

When a federal court is tasked with redistricting, it must ensure that any remedial map adheres to relevant state and federal law.  *Perry v. Perez*, 565 U.S. 388, 394 (2012).  The Court thus analyzes whether P4 complies with the applicable state and federal statutes.

Beginning first with the applicable state law, the Court must ensure any remedial plan adheres to state law, so long as the state law "does not detract from the requirements of the Federal Constitution."  *White*, 412 U.S. at 795.  As Plaintiffs correctly identify, in this instance, the only applicable state law is Fla. Stat. § 166.0321.  Obj. at 30.  According to the statute, no electoral

46

district may be "drawn with the intent to favor or disfavor a candidate. . . or an incumbent. . . based on the candidate's or incumbent's residential address."  Fla. Stat. § 166.0321.  Here, the record does not indicate, nor has Defendant argued, that Plaintiffs drew P4 with the intent to favor or disfavor any candidate or incumbent based on where the candidate may reside.  Obj. at 30; *see generally* Reply.  Moreover, the Court agrees with Plaintiffs that "P4 has no irregular appendages or bizarre lines 'that serve as objective indicators of intent'" to consider any candidate's residence.  Obj. at 30 (quoting *In re SJR 1176*, 83 So. 3d at 670).  Therefore, the Court is satisfied that P4 complies with Florida state law.

P4 must also comply with applicable federal law.  Here, the crucial question is whether District 5 in P4 complies with § 2 of the VRA.  Both Parties agree that § 2 "protects Black Miamians from vote dilution, *see id.* at 30, (citing Notice at 6), and thus, P4 must adhere to the VRA in a manner that satisfies strict scrutiny.

When drafting P4, Plaintiffs relied on their expert Dr. Moy's functional analysis to ensure the BVAP of P4's District 5 was narrowly tailored to comply with § 2 of the VRA.  *Id.* at 30; *see also* (ECF No. 82-13) ("Moy Supp. Rep.").   Regarding the ability to elect a candidate of their choice under § 2 of the VRA, minority voters are entitled to "equality of opportunity, not a guarantee of electoral success."  *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 428 (2006) (citation omitted).  Put differently, "[w]hile minority voters need not be guaranteed to elect their preferred candidates in every election. . . they should at least regularly be able to do so."  Obj. at 31 (internal citation omitted) (emphasis omitted).  Dr. Moy's report demonstrates that P4 fits that criterion and explains that based on his reconstituted election analysis of P4, a Black-preferred candidate would prevail in P4's District 5.  *See* Moy Supp. Rep. at 10.  Dr. Moy's process involved "re-aggregating historical election results in the newly drawn districts and counting how

many votes would have been cast for the various candidates in the elections." Obj. at 31. According to his report, Black-preferred candidates, in eleven racially polarized state and local elections ranging from 2020 to 2022, would always prevail in P4's District 5. *Id.* Based on this analysis, Plaintiffs argue that P4's District 5 complies with the VRA, and Plaintiffs underwent the required functional analysis to ensure VRA compliance, thereby ensuring that District 5 was narrowly tailored.

To the extent Defendant responds, it reiterates that the Remedial Plan's version of District 5 was narrowly tailored. *See* Reply at 10. As mentioned above, Defendant relies mostly on its expert, Dr. Alford, for the proposition that "if the plaintiffs' District 5 in P4 is narrowly tailored, as they assert, then so are the City's versions of District 5." Alford Rep. at 8. But importantly, Dr. Alford never opines that P4's District 5 is not narrowly tailored, and in fact, states that P4 "provide[s] highly secure election margins for Black-preferred candidates." *Id.* Thus, Dr. Alford's Report does not provide the basis for any argument that P4's District 5 is not narrowly tailored. And most importantly, aside from relying on Dr. Alford's Report, Defendant advances no other theory regarding whether District 5 in P4 is not narrowly tailored.

After considering Plaintiffs' largely unrebutted argument and the expert reports of Dr. Moy and Dr. Alford, the Court finds that P4 complies with § 2 of the VRA in a manner consistent with the United States Constitution.

### 4. The Political Consequences of P4 Do Not Alter the Court's Analysis

In response to Plaintiffs' proposed P4, Defendant offers two interrelated arguments against its adoption, both of which are misguided. First, Defendant argues that Plaintiffs' proposed maps (including P4) are "fundamentally similar" to the Remedial Plan, including a VRA protected district, and a coastal district. Reply at 2. Where the similarities end, according to Defendant, is

that Plaintiffs' P4 "keep[s] the more politically conservative western part of the City packed into a single district, District 4." *Id.* at 4. Citing its expert, Dr. Alford, Defendant even claims "the remainder of Plaintiffs['] case is really about swapping population between three Hispanic districts to claim their plans are 'more different' from the Enjoined Plan, and to change the political performance of those districts." *Id.* at 11.

Neither argument is appropriate given the posture of the instant Action. The Court is only reviewing P4 because, after being given the opportunity to proffer a constitutional remedial plan, Defendant was unable to do so. *See* Section III.A–B, *supra*. At this juncture, the Court reviews P4 only to ensure that it (1) retains Defendant's lawful objectives of the Remedial Plan and remedies only the aspects of the plan the Court found unconstitutional; (2) adheres to traditional redistricting criteria; and (3) does not otherwise violate state or federal law. Because P4 must retain the legislature's lawful objectives, that P4 is "fundamentally similar" to the Remedial Plan, to a certain extent, should be expected. Moreover, that P4 results in a different political outcome is irrelevant at this point in the Court's review.

Lastly, it is telling that aside from the above arguments, Defendant provides no rebuttal to any portion of Plaintiffs' P4 arguments. *See generally* Reply. Defendant does not even attempt to rebut Plaintiffs' claims about the merits and legalities of P4. *See id.* In the Court's view, rather than contesting P4 as a constitutional remedy, Defendant has proffered a variety of grievances about potential political outcomes that would result from its implementation. Such grievances are misplaced when the Court is evaluating a remedy to resolve the unconstitutional aspects of the Enjoined Plan.

**IV.    CONCLUSION**

UPON CONSIDERATION of the NOTICE, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiffs' Objections to the City's Proposed Interim Remedial Plan (ECF No. 83) are SUSTAINED.

IT IS FURTHER ORDERED THAT:

1.  Plaintiffs' Alternative Map P4 is ADOPTED as the Court's Interim Remedial Plan pending final judgment in this Action.
2.  Defendant City of Miami is DIRECTED to implement the Court's Remedial Plan (P4) beginning with the City of Miami November 2023 Municipal Election.
3.  Defendant City of Miami is DIRECTED to transmit the Court's Remedial Plan (P4), along with any other necessary materials, to the Miami-Dade County Elections Department by July 31, 2023.

DONE AND ORDERED in Chambers at Miami, Florida, this __30th__ day of July, 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record