UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

## DEFENDANT'S EMERGENCY MOTION TO STAY ORDER REJECTING REDISTRICTING MAP [DE94]

Pursuant to Rule 62(d) Florida Rules of Civil Procedure, Defendant, City of Miami (the "City"), moves for a stay of the Order Rejecting The Redistricting Map and Imposing a Court Ordered Remedial Map [DE 94] pursuant to the injunction set forth in this Court's Order (the "Order")(DE 60) adopting the Report and Recommendation (the "R&R")[DE 52] granting Plaintiffs' Motion for Injunction. DE 26. The City requests that this Court stay the injunction pending appeal.

The Court in the injunction found that the City's redistricting map set forth in City of Miami Resolution 22-131 (the "Enjoined Plan") unconstitutionally racially gerrymandered the City to preserve "three Hispanic districts, one Black district, and one Anglo district." DE 60 p.16; DE 94 pp.20-21. The Court then rejected the City's new plan enacted in Resolution 23-271 (the "New Plan") finding that it failed to correct the prior racial predominance of the Enjoined Plan. DE 94 pp.27,35-39. The Court mandated that the City adopt a plan proposed by Plaintiffs (Plan 4 or the "Mandated Plan") that did not just preserve that racial predominance, it

exacerbated it. The Court's articulated purpose was to ensure that the new districting plan "completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." DE 94 p.16. The Mandated Plan still preserves three Hispanic districts as supermajorities. Indeed, it is mathematically impossible not to have three supermajority Hispanic majority districts, but the Court now maximally packs one Hispanic district in excess of 95%. DE 82-12 p.16. The Mandated Plan also makes the so-called Anglo District whiter. *Compare Id. to* DE 82-12 p.15. And, while everyone agrees on the constitutionality of creating a Voting Rights Act ("VRA") Black District, the Court nevertheless rejected the City's version of the district for not being narrowly tailored before mandating a plan that is not statistically significantly different.[1] *Id*.

The Court emphasized core retention as a basis for finding racial predominance, but it divorced the notion of core retention from its context as a permissible traditional redistricting consideration. This is not a case of vote dilution. It is solely a case of alleged racial sorting, something that the Court has not "corrected." In the name of changing the core for three supermajority Hispanic districts,[2] it has intensified the racial sorting. The result imposes a very different map barely more than three months before an election, writes one commissioner out of his district, and substitutes Plaintiff's political decisions for those of the City's duly elected representatives. This violates the principal articulated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006):

---

[1] The Court has adopted an ephemeral distinction that the number may be narrowly tailored, but the City lacked sufficient evidence to establish it, and then the Court mandated a statistically similar number less than 2% off. This reverses the burden of proof.

[2] The map imposed by the Court preserves 96.7% of the core of District 2, a plurality district, and 92.5% of the core of District 5, the Black district. DE 86-2 p.6.

"[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election."

This Motion is an emergency because the Court has directed compliance by tomorrow, July 31, 2023.

I. **Standard for a Stay**

"While an appeal is pending from an interlocutory order or final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Courts consider the following factors to determine whether a stay pending appeal is warranted:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

See *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019)). "'When the balance of equities . . . weighs heavily in favor of granting the stay'—[the Eleventh Circuit has] relax[ed] the likely-to-succeed-on-the-merits requirement." *Id.* (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)). But "the 'traditional test for a stay' likewise 'does not apply' in the particular circumstance that this case presents—namely, 'when a lower court has issued an injunction of a state's election law in the period close to an election.'" *League of Women Voters of Fla., Inc. v. Florida Secretary of State*, 32 F.4th 1363, 1370 (11th Cir. 2022), quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence).

> [T]he reviewing court must be cognizant that "orders affecting elections ... can themselves result in voter confusion." Id. at 4-5. And that risk only increases as an election draws closer. Id. at 5, 127 S.Ct. 5. For that reason, the Purcell principle teaches that "federal district courts ordinarily should not enjoin state election laws in the period close to an election."

3

*Id*. at 1371; see also *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1238–39 (N.D. Ga. 2022). In situations like this, where the Court has entered a preliminary injunction, "Purcell effectively serves to lower the state's bar to obtain the stay it seeks. The state need not show, for instance—as a plaintiff would to obtain a "late-breaking injunction" in the first place—that its position is "entirely clearcut." *Id*. Rather, it need only show that plaintiffs' position is not." *Id*. at 1372.

II.   **Likelihood of Success on the Merits**

The Court acknowledged there is a "'presumption of legislative good faith,' even after a finding of past discrimination, and that the 'burden of proof lies with [Plaintiffs], not the State' to demonstrate the remedial map is unconstitutional." DE 94 p.16 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). Of course, there has been no finding of past discrimination here, the previous ruling was an interlocutory injunction order. The Court nevertheless did not grant deference to the City Commission. It instead presumed discriminatory intent and then mandated a map with greater racial gerrymandering.

> Redistricting "is primarily the duty and responsibility of the State,"
> and "[f]ederal-court review of districting legislation represents a
> serious intrusion on the most vital of local functions.

*Abbott*, 138 S .Ct. at 2324. This Court imposed a burden of proof on the City to provide non-racial reasons for districting decisions, and then it rejected those reasons as not being sufficiently proven. The Court then imposed on the City a Mandated Plan that exacerbated the alleged racial sorting that caused it to issue the injunction in the first place.

A.   **The May 11 Meeting Is Not Direct Evidence of Racial Gerrymandering**

The Court placed undue emphasis on statements made at a May 11, 2023 meeting wherein Commissioner Diaz de la Portilla suggested going to single member districts. He and Commissioner Reyes observed that in a city that is 70% Hispanic, that would likely lead to an all

4

Hispanic Commission. The Court has taken this as an announcement of an intention to racially sort.

> [T]he May 11 Meeting is better understood as the Commissioners explaining why they believed their initial approach when enacting the Enjoined Plan (i.e. creating the gerrymandered districts), was the correct approach, and after some discussion, unanimously directing De Grandy to maintain the racial breakdown of each district in a new map.

DE 94 p.24. Determining legislative intent from statements by a minority of the Commission is always problematic. *Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (observing "determining the intent of the legislature is a problematic and near-impossible challenge" and rejecting the assertion that discriminatory intent could be found in the statements of one legislator, even where the legislator may be the sponsor).

In this case, there was no expressed intent to racially sort; the Court is inferring it. That inference is mistaken. The Commission is due a presumption of good faith, not the opposite. Moreover, the Commissioners were commenting on a mathematical reality of a city with a supermajority Hispanic population that is likely to elect three Hispanic districts and a district that will perform for the Black candidate of choice—a reality reflected in every map considered by the Court. At-large elections have a likelihood of electing an all Hispanic Commission. Single member districts will all have a VRA protected Black District and then unavoidably have three Hispanic districts because the remainder of the City is 75% Hispanic. DE 82-2 p.9:1-8.

> Moreover, redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.

*Shaw v. Reno*, 509 U.S. 630, 646 (1993). The Court improperly inferred bad faith from an acknowledgment of a demographic fact.

5

The foregoing mathematical reality is demonstrated by the fact that each of Plaintiffs' four plans racially sort the City into three Hispanic Districts, a coastal district with the highest white population and a VRA protected Black district. All plans have a coastal District 2 that is a non-minority majority.[3] Compare DE 82-24 to 34-37. In, fact Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the Enacted Plan. Compare DE 82-1 p.15 to 16. All of the plans have a Voting Rights Act ("VRA") protected Black District 5 in the North. The only difference between Plaintiffs' plans, including the Mandated Plan, and the New Plan is that Plaintiffs exacerbate the racial sorting.

### B. Circumstantial Evidence Does Not Establish Racial Gerrymandering

The Court placed undue emphasis on the notion of core retention, divorcing it from its context. DE 94 p.16. "[R]etaining previous occupants in new legislative districts" is a traditional redistricting criterion. *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *3 (E.D. Wis. May 30, 2002)(citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983);). *See also Larios v. Cox*, 300 F. Supp. 2d 1320, 1334 (N.D. Ga. 2004). Core retention can only be suspect insofar as it perpetuates the harms of a racial gerrymander. The Court talismanically invoked the term core retention not to reduce racial predominance, but to exacerbate it. The Court has relied heavily upon *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville II")*, No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022), throughout

---

[3] This so-called "Anglo" district is a misnomer since District 2 has no racial or ethnic majority. Plaintiffs said they didn't "designate" an Anglo access district (DE 82-2 p.6), but they created one in each plan and preserved the Whitest community in Miami, Coconut Grove, inviolate. They claimed not to "pack Hispanics" into three districts, but they did. DE 82-12 p.16. Districts 1, 3 and 4 are supermajority districts in every plan, and District 4 in exceeds 95% HVAP in each of Plaintiffs' proposals. *Id*.

these proceedings. But that was a case of vote dilution. There the new plan still diluted the votes of minority voters, and the Court replaced it with a plan that did not dilute those votes. This is not a case of vote dilution. Plaintiffs have never even alleged it. It is solely a case of alleged racial sorting, something that the Court has not "corrected," but rather intensified. It would be akin to the *Jacksonville* Court finding the municipality's plan still diluted minority votes and then replacing it with a plan with greater packing and more dilution. The Court observed that there is insufficient time to appoint a special master and therefore simply adopted one of Plaintiffs' plans. DE 94 p.41.

The Commissioners focused on legitimate, non-racial criteria, such as political considerations, where they had invested substantial district resources, and where candidates reside. DE 94 p.12. The Court nevertheless disregarded those publicly-expressed reasons because it found those considerations "had the impact of perpetuating, rather than completely correcting, the constitutional infirmities." *Id.*[4] That finding is belied by the fact that each of Plaintiffs' plans, including the Mandated Plan all resulted in the same racial demographics. If it is inconceivable that a plan could be adopted for race neutral reasons that would still perpetuate the alleged constitutional infirmity of racial sorting, than the Mandated Plan is unconstitutional for perpetuating the same Constitutional infirmity. The Court highlights that "areas that were approximately 90% HVAP were shuffled among Districts 1, 3, and 4—'creating the illusion they

---

[4] The Court also outright rejected that partisan considerations formed any part of the New Plan. DE 94 p.40. The Court bases this on the statements of one commissioner. *Id*. The political consideration was laid out in the record after consultations with the Commissioners. DE 82-2 p.9:9 to 11:2; DE 77 pp.24-25. When it comes to political gerrymandering, courts lack jurisdiction to undo what is essentially a political question. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507-08 (U.S. 2019). Yet that is what the Court did in the Mandated Plan.

changed while maintaining their demographics.'" DE 94 p.27. This is precisely what the Mandated Plan does. In the Enjoined Plan those districts were 89.5%, 88.3% and 89.5% Hispanic Voting Age Population (HVAP) respectively. DE 82-12 p.14. In the New Plan they are 89.7%, 84.5% and 90%. *Id*. p.15. In the Mandated Plan they are 85.8% 85.1% and 95.6% respectively. *Id*. p.16. The Mandated Plan simply shuffles Hispanics from Districts 1 and 3 to District 4 to effect maximal packing in District 4. Likewise the Court observed District 2 "retains a large Anglo population." DE 94 p.27. The White Voting Age Population (WVAP) in the New Plan is 36.5%. In the Enjoined Plan it was 37.4%. In the Mandated Plan it is 37.9%. The only real difference between the New Plan and the Mandated Plan is that the Commission was entitled to a presumption of constitutionality and good faith, the Plaintiffs and the Court are not.

As it did in the injunction, the Court focuses on District 5 to finds alleged racial gerrymandering. The Court's discussion of the borders of Overtown and Morningside are misplaced. Racial motivations are not unconstitutional where, like here, it is a VRA protected district as the Court acknowledges. DE 94 p.4 n.2. The Court goes onto find that there is insufficient evidence District 5 is narrowly tailored. DE 94 pp.38-39.

As the R&R found, which was adopted and became part of the injunction, the percentage of Black voting age population in the district need not be determined with precision and the City has no duty to memorialize the analysis or compile a comprehensive record of that analysis. DE 52 p.82. Yet this is precisely the burden the Court is now imposing.

> When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 187 (2017)(quoting *Alabama Legis. Black Caucus v. Alabama (ALBC I)*, 575 U.S. 254 (2015)). The City does not have to prove that it pared the majority down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196 (citations omitted).

Narrow tailoring exists to protect the group being racially sorted.

> The purpose of the narrow tailoring requirement is to ensure that "the means chosen `fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.").

*Grutter v. Bollinger*, 539 US 306, 333 (2003)(quoting *Richmond v. J. A. Croson Co.*, 488 U. S. 469, 493 (1989)). For example, to "narrowly tailor" in this context the City cannot, in the guise of complying with the VRA, pack Black residents into the district to the diminishment of their influence elsewhere.[5] Because the city set the district at a bare 50% voting age population, it unsurprisingly believed that the district could not be more narrowly tailored, especially in light of undeniable demographic trends concerning the year to year decrease of Black residents. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

---

[5] *See*, *e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville*, Case No. 3:22-cv-493-MMH-LLL, 2022 WL 7089087, at *2 (M.D. Fla. Oct. 12, 2022)( "Plaintiffs argue that preliminary injunctive relief is warranted in advance of the upcoming election because the Enacted Plan packs Black voters into just four of fourteen districts, the result of which is to dilute and depress the influence of Black voters in City Council elections across the rest of the City.")

To undercut the facial validity of a bare 50%,[6] the injunction observed that the BCVAP of the Enjoined Plan was 58%. DE 52 p.85. This line of reasoning is based on a misreading of *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997), in Plaintiffs' briefing. No case has *required* a City, when drawing a district under the VRA, to base it on the *citizen* population.[7] *Negron* stood for the inverse. To prove a dilution case, a plaintiff needed to establish that they had a sufficiently large and compact minority voter population to elect a representative, and that the population was divided among districts to dilute their impact. In *Negron*, the Court stated that if a plaintiff claims they have sufficient numbers to create a majority minority district in compliance with the VRA, but there are not enough voting eligible minority residents to allow that minority group to elect their desired representative, it is impossible for them to meet the standard. But the opposite is not true. Not all citizens vote, or even can vote. Plaintiffs proffered evidence that only 52.76% (25,307/47,958) of registered voters in District 5 were Black as of February 1, 2023. DE 24-93 p.37. It also ignores the population trend. Black registered voters were down from 56.86% the previous year (26477/45562). DE 24-93 p.35. Plaintiffs' own filings show that the Black population in the City of Miami decreased in both relative and absolute terms in each cycle; there were 10% fewer Black residents in the City in 2023 as compared to the previous census. DE 36 pp.4-5 (citing DE 26 p.4; DE 24-76 p.12; DE 24-78 p.6; DE 24-9 pp.5-6).

This is truly novel because no case has ever held that. The Court in *Jacksonville Branch of NAACP v. City of Jacksonville ("Jacksonville III")*, No. 3:22-cv-493-MMH-LLL, 2022 WL

---

[6] There is no issue that it should have been higher, because that would be less narrowly tailored.50.3% is hardly "uncritical majority-minority district maximization." DE 52 p.86.

[7] Legislatures are not required to draw boundaries by citizenship rather than total population. *Evenwel v. Abbott*, 578 U.S. 54, 58 (2016).

17751416 (M.D. Fla. Dec. 19, 2022), was careful to state that it was not a VRA case, and it did not find that less than 50% would satisfy the VRA. *Id* at * n.7. The Court in *De Grandy v. Wetherell*, 794 F. Supp. 1076, 1088, 1089 n.5 (N.D. Fla. 1992), created two majority-minority districts, and created a third "influence district" that was less than 50%. The Court did not find that the majority-minority districts needed to be less than 50%.

Additionally, because Plaintiffs did not dispute that the influence of black voters was not diminished elsewhere, there was no issue that the number was being used for an illegitimate motive. Without a dilution of their vote elsewhere, there is no legitimate claim that the number was set too high for an improper purpose, and therefore it could not be more narrowly tailored. The Court, instead of looking at whether the district was actually narrowly tailored, instead framed the issue in evidentiary terms finding that there was insufficient proof that Alford's analysis was presented prior to the passage of the New Plan.

The Order does not address the question of whether District 5 in the New Plan is <u>actually</u> narrowly tailored. It nevertheless goes on to adopt a plan with very similar percentages. The BVAP in the Mandated Plan is 48.4% and in the New Plan it is 50.3%. In the Injunction, this Court focused on the BCVAP. The BCVAP in the Mandated Plan is 55.8%. In the New Plan it is 57.4%. Bearing in mind that mathematical precision is not required, if the Mandated Plan is constitutional, then so is the New Plan. The Court has enjoined a constitutional plan three months before an election.

### III. Irreparable Injury

Irreparable injuries are those that cannot be compensated by money damages. This Court's injunction does not preserve the status quo in any sense, but directs an express deviation from the status quo by directing the City to redistrict for the November 2023 election on the eve of an election deadline. The Court has substantially changed the shapes of districts where commissioners have already been running, and drawn one commissioner out if his district.

Compare DE 24-22 to DE 94 p.15. That bell cannot be unrung, the election will have occurred. The types of injuries were recently cataloged. Such districting changes are "prescriptions for chaos." *Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence). They will "affect candidates, campaign organizations, independent groups, political parties, and voters, among others." *Id*. As in *Milligan*, currently candidates and elected officials no longer even know what the district they live, where they may run, and where they must campaign.

The Order doesn't just affect Commissioners who are up for reelection in November. The Court drew an incumbent out of the districts he represents and candidates out of districts in which they are running. Miami has residency requirements. A candidate, to qualify must "[h]ave resided within the district they wish to represent for at least one year prior to qualifying." City of Miami, Code of Ordinances § 16-6(b)(3). "[C]andidates for the city commission shall have resided within the district at least one (1) year before qualifying and be electors in that district, and shall maintain residence in that district for the duration of their term of office." Miami Charter § 4(c). Commissioners who are up for reelection may be drawn out of their districts with no opportunity to qualify in a new district.

The preliminary injunction is an "extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986)).

The Order finds that the core creation of districts in 1997 was fundamentally, constitutionally flawed as racial sorting. Regardless, incumbents seeking reelection have a constitutionally permissible interest in preserving as much of the core of their districts that elected them, regardless of the racial history leading to the creation of the districts.

### IV.     The Plaintiffs Unduly Delayed Seeking Preliminary Injunctive Relief.

The ordinance being challenged was enacted in March, 2022. This case was filed in December 2022, nine months later. Plaintiffs then waited two more months before filing the Motion.  A special election was held on February 27, 2023, and another election is coming on November 7, 2023. DE 26 pp.2, 4. Moreover, the challenge essentially boils down at an attack on decisions not made in March 2022, but made 25 years earlier when the alleged racial districts were first drawn.

If Plaintiffs are challenging decisions that have been in place for 25 years and simply preserved in 2022, then Plaintiffs as a group are 25 years too late. The alleged harms have been in place for every election cycle. If anything, the New Plan lessens those alleged harms, and the Mandated Plan exacerbates them.

Further, Plaintiffs admit that the new districts would have to be set by August 1. DE 26 p.36. "[A] party seeking a preliminary injunction must generally show reasonable diligence. That is true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). Yet, Plaintiffs waited nine months after the City passed the redistricting ordinance to file their lawsuit, and an additional two months to seek preliminary injunctive relief. The R&R recognizes this delay was problematic [DE 52 p.95], but concluded that it was justified because, as Plaintiffs "explain in their reply"  they needed the time to prepare their case. DE 52 p.95. Plaintiffs put on no evidence other than argument of counsel to justify or excuse the delay. Rather, the R&R implies that the City bore the burden to prove that the delay was "intentional, strategic, or even negligent."  That is not the standard. Plaintiffs must show reasonable diligence where there has been delay.

## V. Purcell Applies

"[F]ederal district courts ordinarily should not enjoin state election laws in the period close to an election." *Purcell v. Gonzalez*, 549 U.S. 1 (2006). The next election is November 7, 2023, three months and a week away.

> Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill v. Milligan*, 142 S. Ct. 879, 880, (2022) (Kavanaugh, J. concurrence)(to overcome *Purcell*, Plaintiff must establish "changes in question are at least feasible before the election without significant cost, confusion, or hardship"); *Alpha Phi Alpha Fraternity Inc.*, 587 F. Supp. at 1238–39. This Court is "tinkering" with the election law less than four months before an election by mandating a new plan that significantly changes three incumbants' districts. This new plan was not even disclosed by Plaintiffs until three weeks ago. The Court then issued an order mandating that plan Sunday, July 30, 2023, directing a submission of all materials necessary to implement it the next day, one day before the deadline provided by the Miami-Dade County elections department.  DE 94 p.6.  This Court must weigh these "practical considerations."  "The Court has recognized that 'practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.'" *Id*. at 880, quoting *Riley v. Kennedy*, 553 U. S. 406, 426 (2008).  The Order throws out the core of districts for the entire redistricting plan that have been in place since 1997 and draws an incumbent out of his district. The change is sweeping and disruptive. *Purcell* is present. The injunction should be stayed.

## VI. Public Interest

The Order jeopardizes the ability of the voters of District 5 to elect a candidate of their choice. This Court did not find that less than 50% would be sufficient, only that Defendant did

14

not meet its burden of establishing that it had sufficient support for selecting 50%. The Mandated Plan dilutes their vote in District 5, automatically creating risk of a section 2 VRA challenge. As set forth above, the Mandated Plan throws the upcoming election into chaos makes sweeping changes to three districts that have elections in November, and draws an incumbent out of his district, arguably in violation of the residency requirements. Staying the injunction serves the public interest.

### Certificate of Emergency

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

### Certificate of Conferral

I certify that prior to filing this motion, I attempted to resolve the matter in good faith by discussing the relief requested via email on Sunday, July 30, 2023 with opposing counsel. They did not respond. Because the order issue on a Sunday and required compliance by the next day, this motion is being filed.

WHEREFORE, Defendant respectfully asks this Court to stay the Order pending appeal.

Dated this 30th day of July, 2023.

Respectfully submitted,

By:  *s/ Christopher N. Johnson*
GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street

Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

GRAYROBINSON, P.A.
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *s/ Christopher N. Johnson*
      Christopher N. Johnson, Esq.