## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,
  Plaintiffs,
v.

CITY OF MIAMI,
  Defendant.
_____/

## ORDER

THIS CAUSE came before the Court upon Defendant City of Miami's ("Defendant") Emergency Motion to Stay Order Rejecting Redistricting Map. ("Motion" or "Mot.") (ECF No. 97). Therein, Defendant requests that the Court stay its Order Sustaining Objections to Defendant's Notice of Passing Remedial Plan, ("Order") (ECF No. 94), pending appeal. *See generally* Mot. Plaintiffs did not file a response.[1] For the following reasons, the Court DENIES Defendant's Motion.

### I. BACKGROUND

The Court assumes the Parties' familiarity with the background in this matter. Previously, the Court entered an order enjoining Defendant from conducting the November election pursuant to the election districts set forth in City of Miami Resolution 22-131 ("Enjoined Plan" or "2022 Enacted Plan"). *See* (ECF No. 60). Thereafter, Defendant filed a notice informing the Court that it passed Resolution 23-271 ("Remedial Plan"). *See* (ECF No. 77). The Court subsequently found that the Remedial Plan did not completely correct—but rather perpetuated—the unconstitutional

---

[1]Plaintiffs in this Action are Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras, Steven Miro, GRACE, Inc., Engage Miami, Inc., South Dade Branch of the NAACP and Miami-Dade Branch of the NAACP (collectively, "Plaintiffs").

racial gerrymandering that was substantially likely to exist in the Enjoined Plan. *See generally* Order. In the instant Motion, Defendant requests that the Court stay the Order pending a resolution of its appeal to the Eleventh Circuit. *See generally* Mot. The Court denied the Motion in a paperless order, *see* (ECF No. 98), but provides this supplemental order to explain its rationale.

## II.      LEGAL STANDARD

The issuance of a stay pending appeal is an "extraordinary remedy." *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citing *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). "It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'" *Id*. (quoting *Virginian Ry. Co.*, 272 U.S. at 672–73). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id*. at 433–44. Specifically, the movant must show: "(1) that the movant is likely to prevail on the merits on appeal; (2) that absent a stay the movant will suffer irreparable damage; (3) that the adverse party will suffer no substantial harm from the issuance of the stay; and (4) that the public interest will be served by issuing the stay." *Garcia-Mir*, 781 F.2d at 1453. "The first two factors are the most critical." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) (citing *Nken* at 434–35). "To satisfy its burden as to those factors, the party seeking the stay must show more than the mere possibility of success on the merits or of irreparable injury." *Id*.

## III.     DISCUSSION

Before addressing the merits of Defendant's Motion, the Court notes that the Eleventh Circuit addressed and denied a motion to stay under nearly identical circumstances. *See Jacksonville Branch of NAACP v. City of Jacksonville*, No.22-14260, 2023 WL 119425 (11th Cir.

Jan. 6, 2023).  In that case, the district court enjoined the City of Jacksonville from using a districting plan because it found that the districts were substantially likely to be unconstitutionally gerrymandered.  *Id.* at *1.  The City of Jacksonville then passed a remedial map, which the district court found did not remedy the unconstitutional aspects of the prior plan.  *Id.*  The City of Jacksonville then filed a motion to stay the district court's order which found the remedial plan unconstitutional and implemented one of the plaintiffs' alternative maps.[2]  *Id.*

Addressing the City of Jacksonville's Motion, the Eleventh Circuit explained that by ruling on the defendant's motion to stay, it "would have to hold on the merits that the City Council's proposed interim remedial plan is constitutional.  Such a determination would be a ruling on the merits of the City's appeal, and an order on a motion for stay pending appeal is not a resolution of the appeal itself."  *Id.* at *3.  The Eleventh Circuit denied the motion, explaining that the City was not asking to stay the order and restore the status quo.  *Id.*  Instead, what the City was really seeking was "a ruling on the merits of its appeal."  *Id.*

In this case, Defendant makes the same request.  Defendant asks the Court to stay its Order adopting Plaintiffs' P4 as the Court's remedial plan, and instead, to proceed forward with the Remedial Plan for the upcoming elections.  *See generally* Mot.  Like in *Jacksonville*, there is no status quo to which Defendant may return; the Court has already found that the Enjoined Plan is substantially likely to be racially gerrymandered, and the Remedial Plan is not a constitutional remedy.  *See generally* Order.  Asking the Court to stay its Order, when neither the Enjoined Plan nor the Remedial Plan is constitutional, would necessarily require the Court to reverse course on

---

[2]  Unlike Defendant in the instant Action, the defendant in *Jacksonville* only filed the motion to stay in the Eleventh Circuit.

the merits of its Order and uphold the Remedial Plan's constitutionality.  Just as in *Jacksonville*, the Court will not grant a motion to stay under these circumstances.

Though the Court finds a stay inappropriate for the reasons previously discussed, for the sake of providing a thorough explanation, it turns now to the merits of Defendant's Motion. Defendant proffers two arguments:  (1) the Court should not apply the traditional standard to analyze a stay because the instant Action runs afoul of *Purcell v. Gonzalez*, 549 U.S. 1 (2006); and (2) even under the traditional standard, Defendant satisfies each element necessary for the Court to grant a stay.  *See generally* Mot.  Upon review, the Court reiterates, once again, that the circumstances of this case do not implicate *Purcell*, and thus, the Court will not consider Defendant's Motion under an alternative standard.  Reviewing the Motion under the traditional legal standard, the Court finds that granting a stay is not warranted given that Defendant has failed to satisfy the necessary elements.

### A.  The *Purcell* Principle

In the Motion, Defendant again raises the argument that *Purcell* applies to the instant Action.  *See* Mot. at 3–4.  In fact, Defendant copies its argument regarding how *Purcell* should alter the standard by which the Court considers the instant Motion verbatim from its prior motion to stay.  *See* (ECF No. 64 at 1–2).  The Court has already addressed whether *Purcell* applies, not just once, but twice.[3]  *See* (ECF No. 60 at 27–29) (comparing the instant Action to other cases in the Eleventh Circuit and concluding that *Purcell* is inapplicable); (ECF No. 70 at 3–4) (refusing to apply *Purcell* to Defendant's prior motion to stay because doing so "would extend the eve of an

---

[3] The proper time to raise a *Purcell* argument was prior to the Court's order enjoining the use of the 2022 Enacted Plan on May 23, 2023.  *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (explaining that "federal district courts ordinarily should not enjoin state election laws in the period close to an election") (internal quotations omitted).  The injunction has already occurred, and *Purcell* is inapplicable at this stage in the case.

election farther than the Eleventh Circuit has before") (internal quotations omitted).  It will not evaluate the argument a third time.[4]  Therefore, finding *Purcell* inapplicable to the instant Action, the Court reviews the Motion under the traditional framework.

### B.  Stay Analysis

A party requesting a stay must demonstrate (1) it is likely to succeed on the merits on appeal; (2) absent a stay, the moving party will suffer irreparable harm; (3) the adverse party will not suffer substantial harm from the issuance of a stay; and (4) the issuance of a stay will serve the public interest.  *Garcia-Mir*, 781 F.2d at 1453.  The Court addresses each factor in turn.

#### i. Likelihood of Success on the Merits

By filing the Emergency Motion, Defendant essentially asks the Court to reconsider vast swaths of its Order, and in doing so, Defendant seeks to relitigate much of its case.  *See* Mot. at 4–11.  Defendant advances the following arguments:  (1) the May 11 Meeting was not direct evidence of racial gerrymandering; (2) the Court improperly considered core-retention rates in the Remedial Plan; (3) the Court improperly disregarded legitimate, non-racial criteria when rejecting the Remedial Plan, including partisan considerations; (4) the Court applied the incorrect standard when finding District 5 was not narrowly tailored to Voting Rights Act ("VRA") compliance; and (5) the Court cannot find the Remedial Plan unconstitutional while adopting Plaintiffs' alternative map ("P4"), which is fundamentally similar.  *See id.*

---

[4] Separately from arguing that *Purcell* should alter the framework by which the Court analyzes a motion to stay, Defendant also argues that, because it believes *Purcell* applies, the Court should stay the injunction. Mot. at 14.  The Court does not address this argument because (1) it has already explained *Purcell* does not apply, and (2) the time to request a stay of the original injunction has passed.  It is unclear why Defendant advances this argument asking the Court to stay the injunction when the subject of this Motion is the Court's Order Sustaining Objections to the Remedial Plan.

To the extent Defendant seeks to use this Motion as a second opportunity to argue in favor of the Remedial Plan, it is too late. Defendant had an opportunity to pass a constitutional plan that would remedy the unconstitutional violations the Court found was substantially likely to exist in the Enjoined Plan. It did not do so. Accordingly, while the Court will explain why Defendant is not likely to succeed on the merits on appeal, it will not use this order to simply explain its rationale for rejecting the Remedial Plan once more.

Addressing Defendant's first argument about the May 11 Meeting, Defendant asserts that "there was no expressed intent to racially sort [from the Commissioners]; the Court is inferring it." Mot. at 5. To Defendant, the Court's finding contradicts the legal requirement that "the Commission is due a presumption of good faith." *Id.*

The Court's findings were not inferred. Rather, while the Court explained the Commissioners were entitled to a presumption of good faith, the Court evaluated multiple statements and described how each demonstrated the Commission's legislative intent that a remedial plan should perpetuate the unconstitutional aspects of the Enjoined Plan. *See* Order at 20–24. One such statement was a unanimous directive from the Commissioners to the redistricting consultant, De Grandy, to "start redrawing a map[,] that will guarantee that ten years from now we're going to have the diversity. . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups." *Id.* at 23 (quotations omitted) (alterations in original). Based on the Commissioners' explicit, unequivocal statements from the May 11 Meeting, the Court found direct evidence "that the Commissioners intended the Remedial Plan to carry forward the very same race-based characteristics of the Enjoined Plan." *Id.* To describe the Court's analysis of the expressed intent

6

of multiple commissioners about their desire for a future map to maintain the gerrymandered voting districts as an "inference" is at best inaccurate, and at worst disingenuous.[5]

Turning to the next argument, Defendant argues the Court "placed undue emphasis on the notion of core retention" and in doing so, improperly relied upon *Jacksonville Branch of NAACP v. City of Jacksonville* ("*Jacksonville II*"), No. 3:22-cv-493-MMH-LLL, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022).[6]  Mot. at 6–7.  But, by Defendant's own words, "[c]ore retention can only be suspect insofar as it perpetuates the harms of a racial gerrymander."  *Id.* at 6.  That is precisely how the Court analyzed it.  *See* Order at 26 ("The Court agrees with Plaintiffs that the core retention rates between the Remedial Plan and the Enjoined Plan are 'staggeringly high' and . . . indicate that the Remedial Plan does not completely correct the unconstitutional aspects of the Enjoined Plan.").  The Court's analysis of core retention was therefore appropriately limited to an evaluation of whether the Remedial Plan perpetuated the harms of racial gerrymandering, which the Court found it did.

Defendant also argues that the Court improperly disregarded the Commission's "legitimate, non-racial criteria, such as political considerations, where [the Commissioners] had

---

[5] Defendant also asserts that "[d]etermining legislative intent from statements by a minority of the Commission is always problematic."  Mot. at 5 (quoting *Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021)).  While a true statement of law, Defendant's assertion is entirely divorced from the Court's finding.  The Court identified specific statements from Commissioners Díaz de la Portilla and Reyes, and then considered the *unanimous* directive to De Grandy mentioned above to determine legislative intent.  *See* Order at 22–23.

[6] Defendant argues that the Court should not rely upon *Jacksonville II* because this is not a claim of vote dilution, and there, "the new plan still diluted the votes of minority voters [so] the Court replaced it with a plan that did not dilute these votes."  Mot. at 7.  *Jacksonville II* directly addressed the question of whether the City of Jacksonville's remedial plan remedied the unconstitutional gerrymander from the enjoined plan, and in doing so, the *Jacksonville II* Court evaluated core retention rates as one factor to demonstrate that it did not.  *See id.* at *14.  To the extent the Court analogized to *Jacksonville II*, it did so to demonstrate that, as in that case, the Remedial Plan in the instant Action "perpetuates the impact of the Enjoined Plan's unconstitutional racial gerrymandering of the election districts."  Order at 40.

invested substantial district resources, and where candidates reside" because the Court found those reasons "'had the impact of perpetuating, rather than completely correcting the constitutional infirmities [of the Enjoined Plan].'"  Mot. at 7 (quoting Order at 12).  As a matter of law, Defendant's argument is unavailing.  In the remedial posture, courts must ensure that a proposed remedial districting plan "completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful."  *Covington v. North Carolina* ("*Covington I*"), 283 F. Supp. 3d 410, 431 (M.D. Fla. 2018) (citing *Abrams v. Johnson*, 521 U.S. 74, 86 (1997), *aff'd in relevant part,* 138 S. Ct. 2548 (2018)).  Thus, while the Court properly considered the Commission's legitimate goals, it nevertheless found that those considerations did not completely correct the unconstitutional aspects of the Enjoined Plan.  *See* Order at 25, 29–33.  The Court's analysis was not just appropriate; it was also legally necessary.

Relatedly, Defendant asserts that political considerations influenced the creation of the Remedial Plan, in contrast to the Court's findings that they did not.  *See* Mot. at 7 n.4.  According to Defendant, the court "lack[s] jurisdiction to undo what is essentially a political question."  *See id.*  (quoting *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507–08 (2019)).  In support of its argument, Defendant cites to a portion of the June 14 Meeting and its accompanying presentation materials.  *Id.*  During that portion of the June 14 Meeting, De Grandy only discusses the political outcomes of two unadopted alternative maps, P1 and P2.  (ECF No. 82-2 at 9:9–11:2).  For example, De Grandy explained that in "[P]laintiffs['] Alternative 1, the percentage of Republican registered voters in D[istrict] 1 drops by close to 9% compared to our proposal."  *Id.* 10:9–10.  Further, De Grandy explained that in Plaintiffs' "Alternative 2, the percentage of Republican registered voters in D[istrict] 1 drops by 6% . . . compared to our proposal."  *Id.* 10:16–17.

At no point during that meeting, however, did De Grandy opine that he factored in political considerations when drafting V12 or the Remedial Plan. *See generally id.* Nor did any Commissioner. *See id.* Contrary to Defendant's argument, the Court concluded that partisanship did not play a role in the Remedial Plan's creation based on an absence of any record material demonstrating otherwise. *See* Order at 40 (finding "nothing in the record demonstrates that partisanship played any role"). Accordingly, the Court is satisfied that it correctly determined partisanship did not influence the creation of the Remedial Plan.

Defendant also takes issue with how the Court analyzed whether District 5 was narrowly tailored under the Remedial Plan. *See* Mot. at 8–10. Specifically, Defendant argues that the Court used an incorrect legal standard when evaluating the Remedial Plan and did not actually consider whether District 5 in P4 is narrowly tailored. *See id.* at 8.

As to the Remedial Plan, Defendant asserts that the Court imposed the duty upon Defendant to "determine[] with precision" the Black Voting Age Population ("BVAP") required in District 5, and to "memorialize the analysis or compile a comprehensive record" of how Defendant calculated the BVAP figure. *Id.* at 8. Defendant misconstrues the Court's analysis. The Court explained that "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." Order at 38 (emphasis omitted). To demonstrate a strong basis in evidence, the Court explained that Defendant was required to conduct a functional analysis of the electoral behavior within District 5 to determine how District 5 would comply with the VRA's requirements. *See id.* (citations omitted). The Court further elaborated that by having this strong basis in evidence, Defendant "could demonstrate it had 'good reason to believe' it must use race to satisfy § 2 of the VRA." *Id.* (citation omitted)

Nowhere in this explanation did the Court require Defendant to memorialize or compile a comprehensive record of that analysis, nor did it require Defendant to demonstrate with precision the necessary BVAP.  Rather, the Court explained that the record did not contain any evidence suggesting a *functional analysis ever occurred*, meaning there was no record evidence demonstrating what "good reason" Defendant had for drawing District 5 as it did in the Remedial Plan.  *See id.* at 38–40.  Accordingly, the Court properly evaluated District 5 to determine if it was narrowly tailored in the Remedial Plan.

Secondly, the Court did evaluate whether P4 was narrowly tailored.  *See id.* at 47–48.  In doing so, the Court considered Dr. Moy's functional analysis to conclude that P4's District 5 would enable Black voters to regularly elect a candidate of their choosing, as is required under § 2 of the VRA.  *See id.*  Because Plaintiffs used Dr. Moy's analysis to craft P4, the Court found that P4 was narrowly tailored to ensure VRA compliance.  *See id.* at 48.  Defendant's assertion that the Court did not undergo this analysis is patently false.

Defendant's final argument regarding its likelihood of success on the merits is that the Court cannot possibly find the Remedial Plan unconstitutional, but simultaneously find P4 constitutional, when the maps are fundamentally similar.  *See* Mot. at 7–8, 11.  To Defendant, the Court's conclusion is "inconceivable," and if the Remedial Plan perpetuates the constitutional infirmities from the Enjoined Plan, then P4 must do the same.  *See id.* at 7.  But, as the Court explicitly noted in its Order, "'[w]hen faced with the necessity of drawing district lines by judicial order, a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or Voting Rights Act.'"  Order (citing *Abrams*, 521 U.S. at 79).  Thus, when evaluating P4, the Court had to ensure

that P4 reconciled two goals:  (1) adherence to the Commission's lawful objectives, and (2): that the map remedied the unconstitutional aspects of the Enjoined Plan.

The Court evaluated the process by which P4 was created accordingly.  In doing so, it considered how P4 incorporated the Commission's goals of substantial equality of population, respect for traditional neighborhoods and communities of interest, and the use of significant and natural boundaries, while also considering traditional districting criteria, which the Enjoined Plan did not.  After undergoing this analysis, the Court found that P4 properly reconciled those two objectives.  *See* Order at 40–49.  *Cf. Jacksonville II*, 2022 WL 17751416, at *18–19 (evaluating a remedial plan to ensure it "adheres to the legitimate redistricting criteria advocated by the City Council" while also ensuring it did not result in the perpetuation of the unconstitutional effects from the enjoined plan).  Accordingly, even if P4 is facially similar to the Remedial Plan, as Defendant suggests, P4 is a constitutional remedy if it reconciles the two objectives mentioned above.  Because the Court found that it does, the Court is satisfied that P4 is a sufficient remedial plan based on the underlying considerations that factored into its creation.  *See* Order 40–49.

In sum, none of Defendant's arguments indicate a "strong showing that [it] is likely to succeed on the merits."  *Nken*, 556 U.S. at 434.

### ii. *Irreparable Harm*

Defendant does not suffer irreparable harm because it "has no legitimate interest in enforcing an unconstitutional ordinance."  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  "[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute."  *Id.* (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).  Defendant's claims that it will be harmed absent a stay of the

Court's Order finding the Remedial Plan unconstitutional are thus unavailing. The Court could properly end its analysis there.

Nevertheless, Defendant argues that absent a stay, it will suffer irreparable harm because the Court's Order created "districting changes [which] are 'prescriptions for chaos.'" *See id.* at 12 (citing *Merrill v. Milligan,* 142 S. Ct. 879, 880 (2022) (Kavanaugh, J. concurring)). According to Defendant, the Court's Order "will 'affect candidates, campaign organizations, independent groups, political parties, and voters, among others.'" *Id.* (citing *Milligan*, 142 S. Ct. at 880). Defendant gives one example of the consequence of the Court's Order, explaining that like in *Milligan*, "candidates and elected officials no longer even know what [sic] district they live [sic] in, where they may run, and where they must campaign."[7] *Id.* Defendant believes that the ensuing "chaos" from the Court Order constitutes irreparable harm. *See id.*

But the instant Action is not like *Milligan*. In *Milligan*, an Alabama district court concluded that "Alabama's congressional districts [must] be completely redrawn" seven weeks prior to the next election. *Id.* at 779. Importantly, because no map existed and the election was fast-approaching, the Supreme Court opined that the district court's injunction was "a prescription for chaos." *Id.* at 880. Accordingly, the Supreme Court stayed the district court's order, explaining that individuals and entities "now do not know who will be running against whom," "candidates cannot be sure what district they need to file for," and "potential candidates do not even know which district they live in." *Id.*

---

[7] Lastly, Defendant argues that based on Miami residence requirements, "Commissioners who are up for reelection may be drawn out of their districts with no opportunity to qualify in a new district." *See* Mot. at 12 (citing City of Miami, Code of Ordinances § 16-6(b)(3)). Defendant cites to no authority to suggest that a Commissioner who *may* be drawn out of his district constitutes harm on behalf of Defendant, the City of Miami. Moreover, the Court finds that any potential harm that a Commissioner may suffer by virtue of no longer residing in a particular district must give way to the Court's duty to remedy the Defendant's unconstitutional districting decisions.

There is no such chaos here.  Unlike in *Milligan*, the Court already adopted its own remedial map.  The Court has done so before August 1, 2023, the date by which the Miami-Dade Board of Elections stated it would need a map to conduct the November Election.  The map clearly delineates the borders of each district.  Consequently, it strains credulity to claim, as Defendant does, that candidates do not know the district in which they live or where they may run.  Mot. at 12.  The Court's remedial map specificizes it clearly.  Otherwise, Defendant fails to explain what other "chaos" will result from the Court's Order, much less explain how it will be harmed.  *See id.*

As noted above, the "first two factors are the most critical" when analyzing a motion for a stay pending appeal:  likelihood to prevail on the merits and irreparable harm absent a stay.  *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1317.  Here, both factors weigh against the stay Defendant now proposes.  Accordingly, the Court need not examine the other two factors, and denies Defendant's Motion.

## IV.    CONCLUSION

UPON CONSIDERATION of the Motion, the Court finds that a stay is not warranted.  For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Defendant's Emergency Motion to Stay Order Rejecting Redistricting Map (ECF No. 97) IS DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this __3rd___ day of August, 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record