## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; ALEXANDRA
CONTRERAS; and STEVEN MIRO,

     *Plaintiffs*,

v.

CITY OF MIAMI,

     *Defendant*.

_____/

## SUPPLEMENTAL COMPLAINT

1.      Plaintiffs file this Supplemental Complaint to redress ongoing harm due to the City of Miami's continued separation of its residents along racial lines into the five City Commission districts.

2.      As alleged in Plaintiffs' First Amended Complaint (ECF 23), the five Miami City Commission districts have been racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause.

3.      Plaintiffs' First Amended Complaint seeks injunctive and declaratory relief, and nominal damages, for the violation of their rights inflicted by the City's redistricting plan enacted in 2022 ("2022 Plan" or "Enjoined Plan"). The 2022 Plan went into effect after its adoption in 2022, and was used in the February 27, 2023 special election for District 2.

4.      In 2023, in response to this Court's preliminary injunction (ECF 60), the City redrew the Commission districts by enacting Res. 23-271 ("2023 Plan"). The 2023 Plan continues to separate Miamians along racial lines, is not justified by any compelling interest, and violates

Plaintiffs' rights to the equal protection of the laws.

## PARTIES

5.      Plaintiff GROVE RIGHTS AND COMMUNITY EQUITY, INC. (GRACE) is a nonprofit community-based membership organization serving Miami's West Coconut Grove neighborhood since 2019. GRACE advocates for equitable economic development while preserving the historic culture and community of the West Grove. GRACE's members, most of whom are Black, reside in Commission District 2 under the 2023 Plan.

6.      Plaintiff ENGAGE MIAMI, INC. is a nonprofit membership organization centering young people's participation in civic engagement, with members who are largely Gen Z and Millennial Black and Latino Miamians who reside in all five districts. Founded in 2015, the mission of Engage Miami is to build a more just, democratic, and sustainable Miami by developing a local culture of civic participation for young people that is bold, creative, and impactful.

7.      Plaintiff SOUTH DADE BRANCH OF THE NAACP (South Dade NAACP) is a nonprofit membership organization serving Miami-Dade County south of Flagler Street.

8.      Plaintiff MIAMI-DADE BRANCH OF THE NAACP (Miami-Dade NAACP) is a nonprofit membership organization serving Miami-Dade County north of Flagler Street.

9.      The South Dade NAACP and Miami-Dade NAACP (together, NAACP Branches) are affiliate branches of the Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in the state, formed in 1909. Their mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Consistent with this mission, the NAACP Branches advocate for the voting rights of African Americans and other voters of color in Miami, including their members. The NAACP Branches' members—most of whom are Black—reside in all five districts (the South

Dade NAACP's in Districts 2, 3, and 4; the Miami-Dade NAACP's in Districts 1, 2, 3, 4, and 5).

10.     If the 2023 Plan is not enjoined, the members of GRACE, Engage Miami, and the NAACP Branches (together, "Organizational Plaintiffs") will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

11.     Plaintiff CLARICE COOPER is Black, was a resident of District 2 under the 2022 Plan and is a resident of District 2 under the 2023 Plan.

12.     Plaintiff JARED JOHNSON is Black, was a resident of District 3 under the 2022 Plan and is a resident of District 3 under the 2023 Plan.

13.     Plaintiff STEVEN MIRO is Hispanic and Cuban American, was a resident of District 3 under the 2022 Plan and is a resident of District 3 under the 2023 Plan.

14.     Plaintiff ALEXANDRA CONTRERAS is Latina and Cuban American, and was a resident of District 4 under the 2022 Plan and of District 4 under the 2023 Plan.

15.     Plaintiff YANELIS VALDES is Latina and Cuban American, was a resident of District 5 under the 2022 Plan, and is a resident of District 2 under the 2023 Plan.

16.     The 2023 Plan placed Plaintiffs Cooper, Johnson, and Valdes, and Organizational Plaintiffs' members, in districts where they are not the predominant racial group. The 2023 Plan sent the message that their commissioner's job is to represent the predominant group, not them.

17.     The 2023 Plan placed Plaintiffs Miro and Contreras, and Organizational Plaintiffs' members, in districts where they *are* the predominant racial group. The 2023 Plan sent the message that they were placed in their districts simply because of their race.

18.     Individual Plaintiffs and Organizational Plaintiffs' members are further harmed because the 2023 Plan splits up their neighborhoods—and they are split along racial lines.

19.     Defendant CITY OF MIAMI is a Florida municipality. As a municipal corporation

established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law. Fla. Const. art. VIII, §§ 2(b), 3; Fla. Stat. § 100.3605; Miami Code of Ordinances (City Code) ch. 16.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

21.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because the Defendant resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

22.     This Court has personal jurisdiction over the City of Miami.

## SUPPLEMENTAL FACTS

### I. The 2023 Redistricting Process

23.     On May 3, 2023, Magistrate Judge Louis issued a Report & Recommendation in this case (ECF 52), recommending that this Court grant Plaintiffs' Expedited Motion for Preliminary Injunction (ECF 26) and enjoin implementation of the five districts in the 2022 Plan.

24.     The City began a remedial mapmaking process shortly after the R&R.

25.     At the Commission's May 11 meeting, Commissioner Díaz de la Portilla suggested returning to at-large elections, noting "then there's no debate about where the lines are drawing, whether it's . . . like Flagami is cut in half where Allapattah's cut in half."

26.     He doubled down on the Commission's view that representation was racially categorical, and that redistricting's goal was to reserve one Anglo and one Black seat, and to avoid having five Hispanic commissioners.

27.     Díaz de la Portilla discussed why Miami originally created single-member districts and his desire to maintain racially categorical representation:

> Because what happened, the reason why single member districts were created back then was to make sure the diversity that Miami has, as we said, it's already in on the record, doesn't matter if I say it again, right . . . the reason [it] was created was to keep harmony in our city because we have a very diverse community . . . we want an African American representation, we want a non-Hispanic white representation, we want that.

28.     According to Díaz de la Portilla, the commissioners had been trying to "be fair and to provide representation for all communities in our city."

29.     Commissioner Reyes agreed with him, noting: "[S]ince day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by—I'm going to call a spade a spade—but gerrymandering."

30.     Commissioners Díaz de la Portilla and Reyes stressed that what the Commission did in the Enjoined Plan was right.

31.     Concluding the discussion, the Commission voted *unanimously* (with Commissioner Carollo absent) to direct their consultant Miguel De Grandy to meet with them "and start redrawing a map, that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups."

32.     The same day, the Court held a telephone conference and suggested both sides prepare for remapping.

33.     The Court issued a preliminary injunction on May 23 and ordered mediation. ECF 60–61.

34.     That night, Plaintiffs submitted two proposed maps—P1 and P2—to the

Commission, along with a letter explaining them.

35.     On June 9, Plaintiffs shared supplemental information on P1 and P2's compliance with the Voting Rights Act. Plaintiffs followed that up with a full analysis from Dr. Bryant Moy on June 12.

36.     The Parties mediated on June 13, adjourning at 6:20 P.M.

37.     Responding to mediation discussions, commissioners' comments on P1 and P2, and community input, Plaintiffs submitted a third map (P3) during mediation.

38.     After 5 P.M. on Friday, June 9, the Commission noticed a special redistricting meeting for 10 A.M. June 14. The agenda listed a single "Discussion Item" focused on redistricting.

39.     On June 14, the morning after mediation, the Commission met. Plaintiff Valdes gave a statement for the Plaintiffs, and Rev. Nathaniel Robinson III of Plaintiff GRACE also spoke.

40.     De Grandy publicly presented his "draft plan proposal," named Version 12 ("V12"), marking the first time the City shared a map in the interim remedial process.

41.     De Grandy developed V12, and other drafts, after individual private meetings with commissioners to "amalgamate" their input.

42.     There are no records of those private meetings.

43.     The Commission debated proposed changes to V12 and then took a recess after 103 minutes in session.

44.     During the recess, De Grandy met privately with commissioners and drew alternative maps at each's request.

45.     There are no records of these private meetings, either.

46.     Commissioners returned from recess for a final 44-minute session where each pushed for changes to their districts.

47.     Díaz de la Portilla proposed "Version 14," a draft De Grandy had previously drawn, as the D1 Alt. Map; Covo, Carollo, and King each proposed maps of their own based on V12 (the D2, D3, and D5 Alt. Maps); and Reyes stood by the original V12.

48.     After some discussion, De Grandy and counsel Christopher Johnson modified the D3 Alt. Map to move a portion of Overtown from District 1 to 5, in a change agreed upon by King and Díaz de la Portilla, resulting in "D3 Alt. v.2."

49.     After Díaz de la Portilla objected to the change going too far, some territory was moved back into District 1, yielding "D3 Alt. v.3."

50.     The Commission approved that plan on a 4-1 vote, and it was later memorialized in writing as Res. 23-271.

51.     The resolution and map were not properly noticed under the Sunshine Law and City Code.

52.     Mayor Suarez let Res. 23-271 become law without his signature and seven days later, the City filed Res. 23-271 with the Court.

53.     The resolution submitted to the Court on the docket was drafted after June 14 and never voted on by the Commission.

54.     There is a discrepancy between the map the Commission passed on June 14 and the plan submitted to the Court in Res. 23-271. The discrepancy falls on the border between Districts 2 and 3.

## II.  Racial Considerations Predominated in the Line-Drawing Process

55.     Just as the 2022 Plan, the Commission's overriding goal in crafting the 2023 Plan was to separate Hispanic, Black, and Anglo voters as much as possible into "their" respective districts.

56.     Improper racial considerations predominated throughout the Commission's line-drawing process. Race-neutral, traditional redistricting criteria were subordinated to race in the design of each of the districts.

57.     These race-based decisions resulted in a map that splits neighborhoods, ignores traditional redistricting criteria, and eschews fair, public-minded representation.

58.     On May 11, Commissioners repeated their attitude that representation on the Commission was racially categorical, that the redistricting's goal was to draw one Black, one Anglo, and three Hispanic seats (in part to avoid having all five commissioners be Hispanic), and that they had done the right thing.

59.     The Commission unanimously directed De Grandy to "start drawing a map that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an African American to see that they're going to be properly represented as well as other groups"—*i.e.*, the two other groups the Commission had just discussed, Hispanics and Anglos.

60.     Referring to *Allen v. Milligan*, 143 S. Ct. 1487 (June 8, 2023), Commissioner King asserted in a June 13 news article, "The Supreme Court ruling proves that our original redistricting was constitutional and in the best interest of our community." She went on, "My top priority is keeping District 5 neighborhoods intact . . . Overtown, Liberty City, Little Haiti, Wynwood and the Upper East Side share the same needs. It would be unconstitutional to redraw those lines."

61.     Taken together, commissioners' statements before De Grandy even publicized his first draft evinced an intent to pass the same map, for the same reasons, under a new name.

62.     Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates. Unless the use of race is *necessary* to ensure fair

and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

63.     But rather than advancing representation, the Commission continued racial separation.

### III. The Commission Adopted a Nearly Identical Map with the 2023 Plan

64.     The 2023 Plan is 94.1% the same as the 2022 Plan. Only 5.9% of Miamians are moved into a different district.

65.     Narrowing in on the three Hispanic-majority districts which the Commission previously sought to optimally "balance" with as high Hispanic populations as possible, 97.8% of Miamians who were sorted into those districts remain there in the 2023 Plan.

66.     The makeup of the 5.9% of Miamians moved confirms the map's continued race-based nature.

67.     5,125 residents were moved into Districts 2 and 5 from the three packed Hispanic districts, but those residents are disproportionately *less* Hispanic (59% HVAP compared to the enjoined districts' 88–90%).

68.     The 4,735 residents moved out of the 2022 District 5 are just 16.6% Black, compared to the enjoined District 5's 50.3% BVAP.

69.     Meanwhile, 90% HVAP areas are shuffled *among* Districts 1, 3, and 4, creating the illusion they changed while maintaining their demographics.

### IV. Changes Made on June 14 Walked Back Closer to the Enjoined Plan

70.     Commissioners made several changes to De Grandy's Version 12 to claw back even more elements of the Enjoined Plan that Version 12 had altered.

9

### A. The District 2/3 Border in the North Grove and Brickell

71.     Carollo requested moving an area of the North Grove between 22nd and 27th Avenues which Version 12 added to District 3.

72.     At Carollo's request, this area was returned to District 2.

73.     This area is one of the whitest in the city (54.8% WVAP, 35.9% HVAP), and in fact is the exact same area Carollo previously compared to the bone in a steak, in contrast to Hispanic-rich "sirloin" areas elsewhere.

74.     To compensate for the lost population, Carollo requested that District 3 add a plurality-HVAP area along South Miami Avenue to Brickell.

75.     Somehow, an *additional* area of Brickell was moved *into* District 2, forming an irregular finger along the Miami River. That movement was never requested or explained publicly. It is plurality-white.

### B. The District 3/4 Border

76.     Carollo's only other requested change was along the District 3/4 border.

77.     Version 12 shifted the border three blocks eastward in Shenandoah and Silver Bluff, from 17th Avenue under the 2013 and Enjoined Plans, to 14th Avenue. This united all of Silver Bluff in District 4 for the first time, and meant most of Shenandoah—all but two-block-wide slice from 12th to 14th Avenues—was united in District 4 as well.

78.     Carollo requested restoring the boundary to 17th Avenue south of Coral Way, while also restoring "in that same line as before" an area further north along SW 8th and 9th Streets that both he and Reyes wanted snapped back to the enjoined boundary, "keeping it in District 3 like it was."

79.     As for the 17th Avenue/Coral Way restoration, after City Attorney Méndez recast

Carollo's "main concerns [as] to keep certain communities together and certain neighborhoods together," Carollo justified "leav[ing] that section as it was" for "the simple purpose of the park we're building . . . in that part of Silver Bluff."

80.    But earlier, he stated the park was *still* on the District 4 side of the line.

81.    Indeed, the park (Silver Bluff Dog Run Park) is five blocks from the line, on the far side within District 4.

82.    As a result of Carollo's request, nearly 2,000 people between 14th and 17th Avenues moved back into District 3. In response, "to equalize population," De Grandy moved from District 3 to 4 an area in Auburndale/Little Havana—most of which had been in District 4 under the 2013 Plan.

83.    Thus, the District 3/4 border walked back closer to the Enjoined (and 2013) Plan at commissioners' requests, continuing the division of "distinct" and "historical" Shenandoah, Silver Bluff, and Little Havana that commissioners had kept divided in the Enjoined Plan to balance Hispanic populations and facilitate racial separation.

### C. Morningside

84.    Version 12 proposed moving part of Morningside between 55th Terrace and 61st Street out of District 2 and into District 5. At 11.8% BVAP and 41.9% WVAP, the area (Area 26) has a much lower Black population and much higher white population than District 5.

85.    And indeed, Version 12's District 5 BVAP drops from the Enjoined Plan's 50.3% to 50.0%.

86.    Covo, who had previously given De Grandy a plan that moved *all* of Morningside into District 5, objected to Morningside being split, but acknowledged that parts of the 2013 District 2 would have to be moved out to equalize population.

87.    Realizing that part of Morningside had moved into District 5, King objected.

88.    De Grandy asked if she preferred to keep the neighborhood whole by including all of it into District 5, but King said, "No, I don't think that any of Morningside should go to my district. Wouldn't that be splitting up neighborhoods?"

89.    King requested De Grandy bring back a revision with all of Morningside restored to District 2. The two then had a mostly-inaudible sidebar.

90.    During the recess, King commented in her office that she was "looking out for the minorities" or had "to look out for the minorities" and did not want a "white affluent" area or areas in her district.

91.    The only change from Version 12 made in King's proposed alternative map, the D5 Alt., was returning that piece of Morningside to District 2.

92.    That change was incorporated into the 2023 Plan.

93.    Significantly, the Commission rejected at least four alternative plans that avoided "splitting up neighborhoods" in and around Morningside by adding the neighborhood to District 5.

94.    The 2023 Plan excludes from District 5 the low-BVAP neighborhoods south of the existing district boundary.

### D. The Commission Defined Overtown Along Racial Lines

95.    The only other change to Version 12 impacting District 5 was in Overtown.

96.    King and the Overtown CRA sharply criticized Plaintiffs for moving part of Overtown out of District 5 in P1 and P2.

97.    Responding to this criticism and mediation discussions, Plaintiffs submitted P3, which unites in District 5 all parts of Overtown that had been in the Enjoined District 5 (following

the CRA boundary), *plus* reunited eleven HVAP-majority Overtown blocks that the Enjoined Plan had moved into District 1 (between NW 5th and 8th Streets, from I-95 to 7th Avenue).

98.     Neither De Grandy nor commissioners discussed P3's treatment of Overtown. Instead, De Grandy criticized P1 and P2's "severing parts of Overtown" and explained how Version 12 "keeps historic Overtown intact in District 5" at King's request.

99.     Contrasting Plaintiffs' "own impression of where Overtown is," De Grandy explained how Google Maps and the City's now-defunct Neighborhood Enhancement Team (NET) "shows a configuration consistent with our understanding" and how, "as [he] understand[s] the community of Overtown," Version 12 included all of it in District 5. His presentation included slides with his definition of "Historic Overtown."

100.    But De Grandy's Overtown *excludes* large areas that are part of the Google Maps and NET definitions of Overtown—the very sources he cited.

101.    Those definitions are shared by the City's Police Department (MPD) and the Convention & Visitors Bureau (GMCVB).

102.    The area De Grandy defined as Overtown is 60.5% BVAP. The parts of the Google/NET/MPD/GMCVB definition De Grandy excluded are disproportionately non-Black (63.7% HVAP, 26.2% BVAP).

103.    Further, the City Code has an official definition of Overtown that is even broader than Google/NET/MPD/GMCVB. City Code § 2-1051.

104.    The parts of the City Code definition De Grandy excluded from his neighborhood boundary are less Black, and more Hispanic.

105.    De Grandy defined Historic Overtown along racial lines, resulting in the area being split into District 1 and District 5 on the basis of race, with his definition shoring up the existing

racial composition of District 5 and the Hispanic supermajority in District 1.

106.    No commissioner objected to his definition of Overtown that surgically excludes Hispanic-majority areas, and the 2023 Plan tracks this division.

107.    The Commission did object, however, to one small part of Version 12's boundary in Overtown. King requested adding to District 5 a restaurant, People's Bar-B-Que, located in Overtown under the Google/NET/MPD/GMCVB definition and City Code definition, but outside Overtown under De Grandy's definition.

108.    Díaz de la Portilla consented to the change—stressing *only* the restaurant should move, nothing more—and the restaurant moved into District 5 in the D3 Alt. Map v.2.

109.    But De Grandy and counsel Chris Johnson incurred too much into the Hispanic-majority part of Overtown for Díaz de la Portilla's taste, moving four whole city blocks between NW 7th and 8th Streets.

110.    Díaz de la Portilla directed De Grandy and Johnson to restore to District 1 all but the single block with the restaurant, which they did in the final map.

111.    The three blocks returned to District 1 are over 70% Hispanic.

112.    Adding just the restaurant block deviates as little as possible from the Enjoined Plan in this area.

113.    The block's 10 residents are two-thirds Black.

114.    The line between Districts 1 and 5 in the Overtown area is predominantly a function of the Commission's goal to hew to the Enjoined Plan and separate Hispanic from Black residents.

**V. The Parts of Version 12 the Commission Chose to Accept Were Race-Based, Too**

*A. Avoiding "Packing Hispanics"*

115.    The Commission's treatment of Districts 1, 3, and 4 was driven by a desire to avoid

"packing Hispanic voters" into a single district, and optimally "balance" the Hispanic population among the three districts at a uniformly high level.

116.    One of the first criticisms of P1 and P2 lodged during the Commission's meeting was how they "intentionally pack the more conservative Hispanic voters in the western areas of the city" into District 4.

117.    De Grandy commented that "the plaintiffs' plan was designed to concentrate the most conservative voters into District 4. And you see it right there," showing a slide noting 95.03 and 95.55% HVAP in P1 and P2

118.    To fix the "packing" of Hispanics, Version 12 "restored [District 1's] connection to . . . the western part of the city" where "the great majority of Hispanic voters live."

119.    Except for a single block, District 1's boundary is *identical* to the Enjoined (and 2013) Plan from the city limit at 65th Avenue all the way to 22nd.[1]

120.    Satisfied by the "restoration" of the Enjoined Plan's optimal division of Hispanic residents, the Commission left this line untouched on June 14.

### B. Adding Back an Area "Where the Hispanic Voters Live" to District 3

121.    Along the District 2/3 border, De Grandy proposed moving the Bay Heights region of Coconut Grove from District 2 into 3.

122.    In the Commission's first redistricting process, Bay Heights was an area Díaz de la Portilla named specifically as "where the Hispanic voters live," suggesting adding it and other parts of the Grove to Districts 3 and 4 because "there's ethnic diversity in Coconut Grove too."

---

[1] The fewer than 1,000 people moved between Districts 1, 3, and 4 along the District 1 border swapped high-Hispanic areas between the predominantly Hispanic districts, thus did not alter the racial "balance" the plan achieved.

123.    Following this direction, De Grandy's Feb. 7, 2022 draft moved Bay Heights into District 3.

124.    After Russell objected, De Grandy restored Bay Heights to District 2 in the Feb. 22, 2022 Base Plan, instead adding to District 3 another "ethnically diverse" part of the Grove "with similar demographics" around Natoma Manors, ensuring District 3's HVAP dropped only a tenth of a point.

125.    Nonetheless, Bay Heights' high Hispanic population was the subject of later discussion, and Carollo even expressed interest in adding the area back to District 3 and "tak[ing] it all the way down to Simpson Park" northward. But the Enjoined Plan kept Bay Heights in District 2.

126.    In Version 12, De Grandy again moved Bay Heights—and its 62% HVAP—into District 3.

127.    Just as in 2022, Carollo was happy to add it, and again requested "taking it all the way down to Simpson Park," a request accommodated in the 2023 Plan.

128.    As in the Enjoined Plan, the whitest and northernmost parts of Brickell were kept out of District 3.

129.    Three minutes before the Commission voted on the D3 Alt. Map v.3, Covo—who wanted to unify as much of the Grove as possible in District 2—questioned why Bay Heights had to be moved and asked if keeping it in District 2 would "make a real difference in the numbers" for population equality.

130.    De Grandy's response: "It would make a difference," suggesting it would "increase the deviation" and cause ripple effects.

131.    But simply moving Bay Heights' 604 residents from District 3 to 2 would *better*

equalize District 3's population (going from +746 to +142 from ideal) and raise the plan's overall range to just 4.2%.

132.     That range is well within the 10% range De Grandy repeatedly advised Carollo and King was permissible minutes prior, and less than the Enjoined Plan's 7.6%.

133.     Thus, the Commission adopted Res. 23-271 with Natoma (and its "similar demographics") retained in District 3, *plus* the 62%-HVAP Bay Heights—"where the Hispanic voters live" added too.

### VI. District-by-District, Race Predominated in the 2023 Plan

#### A.  District 2

134.     Race predominated in the design of District 2.

135.     District 2 remains "not compact," a "relatively thin strip confined to the coast, extending from the northeast in the Morningside area . . . and continuing southwest along the water through Coconut Grove." R&R at 72.

136.     To the north, District 2 retains "white affluent" Morningside, and adds a thin, low-BVAP adjacent strip.

137.     The border zig-zags from NE 2nd Avenue, to the railroad tracks, back to 2nd, and back to the tracks to retain whiter Condo Canyon, add an additional lower-BVAP area around Omni, and separate higher-BVAP areas of Downtown kept in District 5.

138.     To the south, "ethnically diverse" areas of the Grove "where the Hispanic voters live" are either kept in District 3 (Natoma), or moved back in after having been returned to District 2 under the Enjoined Plan for non-racial reasons (Bay Heights to Simpson Park).

139.     Whiter areas on Brickell's north end remain excised from District 3, achieved via an irregular finger.

140.     District 2 retains 92.2% of its enjoined population.

141.     Its compactness scores on the Polsby-Popper, convex hull, and Reock measures are identical to the enjoined District 2.

### B.   District 5

142.     Race predominated in the design of District 5.

143.     The 2023 Plan's District 5 is driven by a decision to define every distant corner of the enjoined District 5 as part of a common "community of interests," locking in place the unconstitutional borders from the get-go.

144.     Commissioner King delineated a non-negotiable list of neighborhoods to ensure the replication of the enjoined District 5's boundaries—including Overtown (itself racially defined), Liberty City, Little Haiti, Wynwood, and the Upper East Side.

145.     Together, these areas constitute every corner of the enjoined District 5 except its Downtown tail. But King requested specific landmarks at the extreme southern end of the Downtown appendage too, yielding jagged edges that scooped up FDC-Miami and its disproportionately Black inmate population (just as in the Enjoined Plan), while carefully avoiding less-Black areas like "Condo Canyon" and Overtown south of NW 8th Street that the enjoined District 5 excluded.

146.     Indeed, the 2023 Plan moves from District 5 to 2 an area around Omni (which the Enjoined Plan moved from District 2 to 5, and which King neglected to include in her "community of interests") that is even *less* Black than the Condo Canyon corridor immediately south (11.9% versus 14.2%).

147.     District 5's incursion into Northeast Allapattah across I-95 and SR 112 remains too, reconfigured slightly, but still dividing the neighborhood along racial lines by following local streets.

148.    The Commission rejected adding adjacent areas like Morningside and Edgewater because of their whiter makeup.

149.    Just as in 2022, the Commission rejected plans with sub-50% BVAPs, and inched the BVAP back up to 50.3%, from Version 12's 50.0%, by restoring the Enjoined Plan's racially-motivated Morningside/Upper East Side border.

150.    The new District 5 retains 94.7% of the enjoined population.

151.    The new District 5 is less compact than the enjoined District 5 based on the Polsby-Popper, Reock, and Convex Hull measures.

### C. Districts 1, 3, and 4

152.    Race predominated in the design of Districts 1, 3, and 4 as well.

153.    The three predominantly Hispanic districts continue to be driven by a desire to optimally "balance" the Hispanic population and avoid concentrating Hispanic voters into one 95%+ HVAP district.

154.    Together, these districts are 97.8% the same as the Enjoined Plan; individually, they high core retention from 90.6 to 98.2%.

155.    The District 1/4 and District 3/4 borders maintain the nearly untouched division of Flagami, Silver Bluff, Shenandoah, and Little Havana to balance Hispanic population and "preserv[e] the racial and ethnic composition of the Commission." R&R 75.

156.    District 1 maintains the "staircase-like stepping pattern in its northeastern corner in Allapattah," reconfigured slightly. R&R 74.

157.    It maintains "an appendage extending toward Downtown Miami along the Miami River," "described by the Commissioners as an 'attractive' area that was 'mainly Hispanic or Anglo.'" *Id.*

158.    It excluded De Grandy's racially-defined Overtown, while scooping up Overtown landmarks in majority-HVAP areas.

159.    District 3 became less compact, even as it smoothed out its "ethnically diverse" Natoma Manors appendage by adding Bay Heights "where the Hispanic voters live," all while minimizing additions from the whiter northern end of Brickell.

### VII.  Lack of Narrow Tailoring to Achieve a Compelling Interest in Racial Predominance

160.    Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden . . . shifts to the [government] to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (internal quotations omitted). Traditionally, compliance with the Voting Rights Act, namely Section 2, has served as the primary justification for predominant considerations of race. The Commission's use of race, however, was not narrowly tailored to any compelling government interest, including compliance with the VRA.

161.    To ensure its use of race was narrowly tailored to achieve VRA compliance, the Commission was obligated to assess the level of minority citizen voting-age population or registered voters necessary for those voters to have the opportunity to usually elect their candidates of choice.

162.    Despite their facial concern for protecting diverse representation, neither the Commission nor its consultants took steps to meaningfully assess VRA compliance. There is no indication the Commission conducted an analysis of racially polarized voting (RPV) or any other analysis key to assessing VRA compliance.

163.    Instead, the Commission carried forward the blanket racial target adopted in the 2022 Plan and sought to increase the Black, Anglo, and Hispanic populations of the respective

districts as much as possible.

164.    Furthermore, the Commission ignored the functional analyses and evidence-based assessments Plaintiffs provided that indicated what population or registered voter percentage would afford Black voters an ability to elect candidates of choice.

165.    The City's only comment on Plaintiffs' analysis was De Grandy's comment concluding that "plaintiffs' plan *may* also negatively impact the ability of Black voters to elect a candidate of choice throughout the decade in D5," without explaining how he expected their margins (ranging from 56.4 to 82.7%, compared to 58.4 to 84.3% in the Enjoined Plan) to decline such that Black voters' choice would fail to usually prevail.

166.    De Grandy's VRA analysis boiled down to "keeping as many communities of interest"—King's proxies for the enjoined District 5—"together as feasible."

167.    De Grandy advised that the D1 Alt.—which kept all of King's proxies but had near-identical BVAP and BCVAP to P3—was VRA-compliant, even when he concluded Plaintiffs' maps weren't.

168.    The Commission made changes to Version 12 to make District 5 even more Black, removing Morningside at King's request.

169.    The Commission rejected proposals to solve the problem of splitting Morningside by uniting it within District 5. Those proposals would have yielded a sub-50% BVAP.

170.    And commissioners ensured not one inch of Hispanic-majority parts of Overtown moved into District 5.

171.    Through these changes, District 5's BVAP increased from 50.0 to 50.3%—the same arbitrary numerical target as the Enjoined Plan.

172.    Without conducting a functional analysis of RPV, the Commission's race-based

map drawing was not narrowly tailored to achieve VRA compliance.

173.    The Commission identified no other compelling interest to justify its use of race when it drew the 2023 Plan.

## CLAIM FOR RELIEF

**Racial Gerrymandering
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

174.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

175.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

176.    Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

177.    As alleged in detail above, race was the predominant factor in the design of all five Miami City Commission districts. Race predominated over all other redistricting criteria when each of these districts was drawn.

178.    The use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the VRA.

179.    Consequently, the districts do not survive strict scrutiny.

180.    Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.    Declare the five Miami City Commission districts to be unconstitutional in

violation of the Fourteenth Amendment as racially gerrymandered;

B.  Permanently enjoin the City and its officers and agents from calling, conducting, supervising, or certifying any elections under the unconstitutional districts;

C.  Order the City to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

D.  Award each Plaintiff nominal damages of $100;

E.  Award Plaintiffs their attorneys' fees in this action;

F.  Award Plaintiffs their costs of suit;

G.  Retain jurisdiction to render any further orders this Court may deem necessary; and

H.  Grant any other relief this Court deems just and proper.

Respectfully submitted this 28th day of August, 2023,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Neil A. Steiner*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

 * *Admitted pro hac vice*

*Counsel for Plaintiffs*