UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
SUPPLEMENTAL COMPLAINT**

Pursuant to S.D. Local Rule 7.1 and Fed. R. Civ. P. 12(b)(6), Defendant, City of Miami (the "City"), respectfully renews its motion to Dismiss the Supplemental Complaint of Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro (collectively, the "Plaintiffs"). As grounds, the Defendant states:

**I.   Facts From Plaintiffs' Pleadings and Filings**

The City has had single member districts for its five commissioners (rather than at large elections) since 1997. DE 23 Am. Compl., ¶ 33-39, 59-64. These districts have had substantially the same shape and same racial demographic make-up since the individual districts were first constituted and throughout the last several redistricting cycles. DE 26 p.4; DE 24-76

p.12 (2013 demographics prior to 2013 redistricting); DE 24-78 p.6 (2013 demographics of 2013 redistricting),; DE 24-80 p.1 (1997 map), p.2 (2003 map), p.3 (2013 map).[1]

Following the 2020 Census, it was revealed that the City's Commission Districts were demographically unbalanced and that the ideal Commission district size was 88,448. *Id.*, ¶¶ 72-74. In particular, the waterfront District 2 needed to "shed" population to the other four districts. *Id.*, ¶ 75. The City thus had to redistrict and had to shift people from District 2 to the other districts. Plaintiffs brought a single count complaint challenging the redistricting plan enacted by the City of Miami in Resolution 22-131 as unconstitutional racial gerrymandering. DE 23.

In the Amended Complaint, Plaintiffs accused the City of "packing certain districts with as many Hispanic and Black residents as possible" predominantly in order to maintain "racial purity." DE 23 ¶ 2. They accused the City of "racial sorting" with the goal of "isolating Black from Hispanic from Anglo residents as much as possible into separate districts." DE 23 ¶ 9, 12, 18. They claimed the City was "packing" Black residents into District 5 and Hispanic residents into Districts 1, 3 and 4. DE 23 ¶¶ 2, 15, 202, 277, 290, 308, 327, 331, 341, & § IV(C) at p.39. "[A] "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2492 (U.S. 2019) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018)). Approximately 25% of the Amended Complaint focused heavily on a small sliver of the West Grove that was moved from District 2 to District 4. This

---

[1] "In determining whether to grant a Rule 12(b)(6) motion, the Court may also consider the allegations in the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Hodges v. Buzzeo*, 193 F.Supp.2d 1279, 1281 (S.D. Fla. 2002).

area is not moved in the current plan and remains in District 2. The Amended Complaint also focused heavily on the public comments of commissioners during public hearings on the plans under consideration as indicia of improper intent.

Plaintiffs filed a motion for preliminary injunction. Critically, at that time they did not propose any alternative map. This Court entered a preliminary injunction finding that Plaintiffs had a likelihood of prevailing that the City's redistricting map set forth in City of Miami Resolution 22-131 (the "Enjoined Plan") unconstitutionally racially gerrymandered the City to preserve "three Hispanic districts, one Black district, and one Anglo district." DE 60 p.16; DE 94 pp.20-21. After the injunction issued, Plaintiffs for the first time proposed alternative plans to the City. As discussed below, these plans had essentially the same ethnic demographic breakdown as the plan to which they objected. Rather than just adopt a temporary, interim remedial plan, on June 14, 2023, the City adopted Resolution 23-271, adopting a new redistricting plan (the "New Plan") to replace the Enjoined Plan. DE 77. Plaintiffs objected to that plan, and, eventually, proposed four alternative plans to this Court. DE 82-34 to DE 82-37.

There are critical features that are substantially similar as pertaining to the all the plans at issues in this litigation. First, Miami is a majority-minority city. Second, there is no White majority district, and no plan proposes one. All plans have a coastal District 2 with the largest concentration of White voters. *Compare* DE 82-24 *to* 34-37. Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the New Plan. Compare DE 82-12 p.15 to 16. All plans have a VRA-protected Black District 5. Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), but Plaintiff Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% compared to the New Plan's 57.4%. *Compare* DE 82-12 p.15 *to* 16. All plans have three

3

supermajority Hispanic districts, but Plaintiffs' Hispanic Voting Age Population ("HVAP") in District 4 in all plans is maximally packed at higher than 94%.  *Id*.

This Court rejected the City's New Plan finding that it failed to correct the prior racial predominance of the Enjoined Plan.  DE 94 pp.27,35-39.  This Court articulated that its purpose was to ensure that the new districting plan "completely corrects—rather than perpetuates—the defects that rendered the original districts unconstitutional or unlawful." DE 94 p.16.  This Court found the New Plan had "continued racial predominance.  DE 94 p.27, 35-40.  In other words, it preserved the alleged defect by preserving three Hispanic districts, one Black district, and one so-called Anglo district.  This Court mandated that the City adopt a plan proposed by Plaintiffs: Plan 4.  This Court acknowledged that Plaintiffs' Plan 4 was "fundamentally similar" to the New Plan but found that to be expected to a certain extent.  *Id*. at 49.  That ruling was appealed, and there is currently a stay of the ruling pending appeal.

There is a reason that the New Plan and Plaintiffs' plan are fundamentally similar.  As Plaintiffs' plans demonstrate, there is no way to draw the map without preserving the same racial demographics.  Plaintiffs acknowledge that District 5 is a Black Voting Rights Act ("VRA") required district.  DE 26 p.33; DE 109 ¶35. Given the fact that the City of Miami is 70% Hispanic, after drawing District 5, it is mathematically impossible to draw the rest of the map without at least three majority Hispanic Districts.  Moreover, because the largest White population lives near the coast, the coastal district will always have the largest concentration of White (or "Anglo") voters, as it does in all of Plaintiffs' plans.

Because the New Plan replaced the Enjoined Plan, Plaintiffs filed a twenty-three page Supplemental Complaint to address the New Plan.  DE 109.  Now that they have published four of their own allegedly constitutional plans, the Supplemental Complaint no longer accuses the

City of packing any race. Instead, it now accuses the City of "Avoiding 'Packing' Hispanics." DE 109 p.14, ¶¶ 115-120. It claims the City is now "balancing" the Hispanic population. *Id*. Plaintiffs changed the accusation from "packing" to "balancing" while at the same time alleging that the Enjoined Plan and the New Plan are "nearly identical" with 97.8% of the Miamians remaining in the same district. *Id*. ¶¶ 64-69. In a majority-minority city, there is literally no move where the City would not either be slightly increasing (alleged packing) or not slightly increasing (balancing) the population of some racial demographic.

Plaintiffs continue to challenge District 5 even though they themselves conceded, and in the course of the litigation have submitted reports establishing that racially polarized voting exists. DE 24-32 ("Moy Report"); 82-9 ("Supplemental Moy Report"). Plaintiffs have submitted plans they contended were narrowly tailored with nearly equivalent demographics to the New Plan. For example, Plan 3 has a 48.8 % BVAP and 56.5% BCVAP and Plan 4 has a 48.4% BVAP and 55.8% BCVAP in comparison to the New Plan's 50.3% BVAP and 57.4% BCVAP. [2] In the Supplemental Complaint, Plaintiffs no longer accuse the City of "packing" Black voters into District 5. Instead, Plaintiffs posit a purely subjective test and allege that the City failed to consider an appropriate functional analysis before creating the district. DE 109 ¶ 161 ("Commission was obligated to assess the level" of voters necessary); ¶ 162 ("no indication the Commission conducted an analysis of racially polarized voting"); ¶ 172 ("Without conducting a functional analysis of RPV, the Commission's race-based map drawing was not narrowly tailored to achieve VRA compliance.") Plaintiffs ignore that have filed in the record

---

[2] "BVAP" refers to Black Voting Aged Population; "BCVAP" refers to Black Citizen Voting Aged Population.

the transcript[3] of their own presentation to the Commission at the June 14 meeting where they presented their Plan 3, with its remarkably similar demographics, and represented that their plans "fully comply with the VRA." DE 82-2 p.6, l.16-17; *see also* DE 77 p.53 (Plaintiffs' handout).

**II.    Standard on a Motion to Dismiss**

A complaint must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain sufficient factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possible and plausible relief. *See Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, the Court may consider the allegations in the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Hodges v. Buzzeo*, 193 F.Supp.2d 1279, 1281 (S.D. Fla. 2002), citing *Watson v. Bally Mfg. Corp.*, 844 F. Supp. 1533, 1535 n.1 (S.D. Fla. 1993), *aff'd*, 84 F.3d 438 (11th Cir. 1996).

**III.   Argument**

There are two threshold legal questions that go to the core of Plaintiffs' case. First, is narrow tailoring a purely subjective test in the redistricting context, or is it an objective test with a subjective safe harbor? In other words, can a plaintiff challenge a VRA district that was objectively drawn narrowly on the grounds that the legislative body did not have a good enough reason to believe it? If it's not a purely subjective test, then Plaintiffs do not plead a cause of action regarding to District 5 for any of the alleged gerrymandering that occurred along its

---

[3] Plaintiffs liberally quote from the transcript throughout the Supplemental Complaint.

6

borders. The second issue is whether Plaintiffs have pled an actual racial gerrymander, rather than simply an alleged intent to racially gerrymander. If the Districts are simply a reflection of the demographics of the City, and significant numbers of people were not racially gerrymandered, then Plaintiffs do not state a claim.

### A.  District 5

Plaintiffs' attack on District 5 in the Supplemental Complaint arises out of the Supreme Court's ruling in *Bethune-Hill*.

> When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." … [T]he requisite strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the Voting Rights Act, "even if a court does not find that the actions were necessary for statutory compliance."

*Bethune-Hill v. Va. State Bd. of Elections (Bethune-Hill I)*, 580 U.S. 178, 187 (2017) (quoting *Alabama Legis. Black Caucus v. Alabama (ALBC I)*, 575 U.S. 254 (2015)). Plaintiffs assert that the City did not perform enough analysis to justify District 5.

There are several levels to the *Bethune-Hill inquiry*. The first is whether a VRA district is required at all. This is the classic *Gingles* analysis.[4] From an objective standpoint, this is not an issue in the case. Plaintiffs have conceded racially polarized voting exists and that a VRA District is required, and they have urged on this Court their own versions of the VRA District. They also presented to the Commission their own versions of such a District to be considered at the June 14 meeting, and those versions look remarkably like the City's. As a result, Plaintiffs only contend that the District is not "narrowly tailored." DE 109 ¶¶ 160-172.

> The purpose of the narrow tailoring requirement is to ensure that "the means chosen `fit' th[e] compelling goal so closely that there

---

[4] *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986),

> is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Richmond v. J. A. Croson Co.*, 488 U. S., at 493 (plurality opinion).

*Grutter v. Bollinger*, 539 U.S. 306, 333 (2003). In other words, it is an objective test.

> If a court finds a firm basis in evidence to support a compelling government interest in taking race-based action, it will look to see if the action is narrowly tailored to address that interest. On the whole, the court will consider whether the racial distinctions are necessary and whether they are over-inclusive or under-inclusive

*Id*. In the Voting Rights Act context, it is used to prevent packing of the protected class in one district so as to deprive them of influence elsewhere. That is not contended here. There is not and has never been a claim of vote dilution.

From an objective standpoint, Plaintiffs cannot assert that District 5 is not narrowly tailored. As an initial matter, the BVAP was set at just over 50%. It is mathematically the definition of a majority. It is also the threshold required to bring a claim under Section 2 of the VRA. It is a paradox to conclude that a plaintiff must assert that a minority population is sufficiently large and geographically compact to draw a majority minority district to state a valid claim, but it is constitutionally impermissible to draw that same district in the first instance. Additionally, Plaintiffs have in the record of this case, and at the Commission meeting where the New Plan was adopted, presented their own allegedly compliant plans of essentially the same demographics. The difference in the BVAP and BCVAP between Plaintiffs' plans and the New Plan is as small as 1.5% and .9% respectively. There is no requirement that the required majority be pared down to the minimum with mathematical precision.

> "The law cannot insist that a state legislature, when redistricting, determine precisely what percent minority population § 5 demands." The question is whether the State had "good reasons" to believe a 55% BVAP floor was necessary to avoid liability under § 5. The State did have good reasons under these circumstances. Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing

8

> hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 195-96 (citations omitted).

> Holding otherwise would afford state legislatures too little breathing room, leaving them "trapped between the competing hazards of liability" under the Voting Rights Act and the Equal Protection Clause.

*Id*. at 196.

*Bethune-Hill* then creates a good-faith safe harbor. As long as there is a basis for a good faith reason to believe that the district is narrowly tailored, courts should not second guess the decision. Plaintiffs, however, assert an untested theory: that even if there is valid basis for a VRA district, and even if that district is objectively narrowly tailored so as not to be overly inclusive, the district can still be challenged on the grounds that the legislative body did not subjectively have a good enough reason to believe it was narrowly tailored.

Plaintiffs' theory makes little sense for a number of reasons. First, it is based on an interpretation of the law that upends the purpose of "narrow tailoring," which is to prevent over inclusiveness. It is to ensure that the solution is narrow tailored to fit the goal. In the VRA context, that means that the district is not packed with the protected class. The *Gingles* test is the test of the legislature's decision to create such a district. The purpose of narrow tailoring is to insure that even if such a district is created, it does not go too far and become a vehicle for packing. Second, if that were the purpose of judicial review, just to make sure that the Legislature considered enough data before adopting an objectively narrow district, the remedy in such a case would not be to redraw the district and call a special election. The remedy would be to have another meeting of the legislative body to review the analysis and bless the District as it currently exists.

9

Because District 5 is a VRA district, racial gerrymandering is permissible. As a result, Plaintiffs do not state a cause of action with respect to its borders. The complaints about Morningside, Overtown, and its other borders do not state a claim. DE 109 ¶¶ 84-114, 135-137, 142-151, 156-158.

### B. Plaintiffs Fail to Allege Lack of Compactness

Before discussing that Plaintiffs bring a racial gerrymandering case without any actual, significant racial gerrymandering, it must be noted that Plaintiff is challenging compact districts. Plaintiffs allege only that District 2 is non-compact, (DE 109 ¶¶ 135, 141), and that Districts 3 and 5 are "less compact" in the New Plan than the Enjoined Plan.[5] DE 109 ¶¶ 151, 159. Thus they do not allege that Districts 1 and 3-5 are not compact. How could they? As this Court observed Plaintiffs' Plan 4 is "fundamentally similar" to the New Plan,[6] (DE 94 p.49). Facially, the New Plan's districts are relatively compact and do not have the sort of gerrymandered shapes present in gerrymandering cases. Some lack of compactness is driven by the irregular shape of the city. District 5 is a VRA district and can be drawn with race as a factor. That forces a certain level of non-compactness on Districts 1 and 2. Accounting for this, the City is relatively compact as demonstrated by Plaintiffs' own plans and data. Plaintiffs' Reock compactness scores reinforce this. While District 1 receives a relatively low Reock score (21) so does Plaintiffs' Plan 1 (18). DE 82-11 p.6. Plaintiffs other plans are all in the low 30s. *Id*. Similarly, District 2, the only District Plaintiffs claim is non-compact, is essentially no less compact than Plaintiffs' plans. They and the New Plan are all in the 30's. *Id*. The City's District 1 is only 10% less compact than Plaintiffs' Plans 3 and 4 (30 versus 34). The City's District 3 (43) is more compact than three of Plaintiffs' plans. The City's District 4 and the Plaintiffs' Plans 2 and

---

[5] Stating that they became slightly less compact does not mean that they are not compact.
[6] The Eleventh Circuit agreed, and in its stay order stated that one "looks a lot like" the other.

3 are all in the 20's (24 versus P3 and P4's 29). Only in District 5 does the City have an appreciably better Reock score, the one district that Plaintiffs concede is a VRA district and may be racially gerrymandered. There has never been a requirement to make the districts maximally compact or to disregard the legislature's plan if plaintiffs offer a slightly more compact plan.

### C.    Districts 1 through 4.

Plaintiffs' next threshold issue concerns whether there was actually a racial gerrymander at all. Miami is a majority-minority city. It is approximately 15% Black and 70% Hispanic. *See*, *e.g.*, DE 26 p.32; DE 24-31 p.23. When Plaintiffs first pled this case, they pled that the City racially segregated the City to pack certain districts with as many Hispanic residents as possible. They now allege the City was trying to "avoid packing" to "balance." Any district map with a VRA protected Black District will unavoidably have three Hispanic districts because the remainder of the City is 75% Hispanic. DE 82-2 p.9:1-8. Now that Plaintiffs have presented their own maps, every map proposed by Plaintiffs also had a VRA District 5 for Black voters, three Hispanic districts, and a coastal district with more White voters than the other districts.

In a racial gerrymandering case, the plaintiff bears the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). The test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of a significant number of voters. *Id.* If the Districts simply reflect the demographic reality, then they are not racial gerrymanders, regardless of what the legislators may say. The priests of an ancient religion may say that they have to perform a yearly ritual to make the sun rise, but just because they are claiming credit for it, does not mean that they are making the sun rise.

The core of Plaintiffs' case was that the City was originally racially gerrymandered to preserve three Hispanic, one Black, and one Anglo district.[7]  DE 23 ¶¶ 87, 197-202.  Plaintiffs also originally alleged that the Enjoined Plan was meant to further pack those districts, but the numbers belied that allegation; the redistricting reduced racial concentrations.  *Compare id.*, ¶ 76-77 with ¶ 269, 289, 326, 340.  There is nothing the City can do to avoid having at least three Hispanic Districts.  Every map it draws will have roughly the same demographic breakdown, as do all of Plaintiffs' maps.  Moreover, as a majority-minority city, every move will either move or not move a minority, and thus will be either packing or balancing.  In Plaintiffs' view, the City can never draw a lawful map.

Plaintiffs allege that the New Plan is 94.1% the same as the Enjoined Plan, and that three Hispanic Districts have a 97.8% overlap with the Enjoined Plan.  DE 109 ¶¶ 64, 154; *see also* p.15 n.1 ("The fewer than 1,000 people moved between Districts 1, 3, and 4 along the District 1 border swapped high-Hispanic areas between the predominantly Hispanic districts, thus did not alter the racial "balance" the plan achieved"). If anything, the New Plan had the effect of lowering racial concentrations compared to the Enjoined Plan.  The New Plan lowered the WVAP in District 2 from 40.5% to 38.6%, had the same BVAP, less than a 1% difference in the HVAP in Districts 1 and 4, and lowered the HVAP in District 3 from 88.3% to 84.5%.  DE 82-12 p.14-15.

If the New Plan did not move a significant number of people, then it did not, in its own right, place a significant number of voters for racial reasons.  It cannot be both.  The New Plan cannot have failed to appreciable change from the Enjoined Plan, and still be a racial

---

[7] There is no Anglo District. The majority of the White voters live near the water.  The coastal district thus has a higher WVAP than other districts, but the White voters are still a minority.

12

gerrymander in its own right. At most, Plaintiff is making a case that the New Plan, like the Enjoined Plan, preserved the original racial "separation" from the original 1997 establishment of the districts. There is nothing inherently wrong with having a district with lopsided racial demographics if that is the natural result of residential segregation. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Additionally, preserving the core of those Districts is a legitimate, permissible redistricting criterion. *Id.* at 906.

Plaintiffs can plead what they like, but their allegations that everything was "motivated" by race is belied by the actual numbers. Plaintiffs ask this Court to invalidate the map adopted by the Commission based on alleged racial separations that have existed from inception and are based on demographic realities—every map Plaintiffs proposed preserved that same alleged racial separation. The City's New Plan simply preserves the cores of those original districts.

The largest differences between the New Plan and plans proposed by Plaintiffs concern those three Hispanic Districts: 1, 3 and 4. Plaintiffs seek to realign them. This case is unique insofar as Plaintiffs are complaining of either being placed in a Hispanic district because of their race, and are suing to be placed in a different Hispanic district. If Miami were a majority White city, would White plaintiffs be able to sue to claim that they were placed in a majority White District because they are White, and seek to be placed in a different majority White district? Why is this a claim in a majority Hispanic city? If Plaintiffs have a cause of action to seek such relief, majority-minority cities would essentially be deprived of the ability to govern themselves—federal courts would have to draw their districts.

Legislatures may be aware of these racial demographic realities. That alone does not state a case for racial gerrymandering in violation of the Equal Protection Clause

> Moreover, redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when

13

> it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.

*Shaw v. Reno*, 509 U.S. 630, 646 (1993).  There must actually be a gerrymander.

This is not a case where Plaintiffs have alleged any diminution or dilution of any group's ability to vote in any other district.  These are the harms that Courts are meant to guard against: the dilution of minority voting power by spreading minority voters throughout different districts or by packing minority voters into a single district. *Shaw v. Reno*, 509 U.S. 630, 646 (1993).  The so-called racial divisions here simply reflect the actual racial make-up of the City as reflected in Plaintiffs' own maps.  This case is thus unprecedented.  It confronts the question of whether a racial gerrymander case may proceed based upon alleged motives and statements of legislators, when there is no actual gerrymandering placing significant numbers of minority voters in any district in any way inconsistent with the City's actual demographics.  The Courts should not be in the business of simply swapping minority populations between Districts in order to disrupt the Core as Plaintiffs seek.

### D. Plaintiffs Lack Standing

In response to the Motion to Dismiss the Amended Complaint, the City moved to dismiss for lack of standing.  DE 34.  This Court denied it as Moot because of the Supplemental Complaint.  DE 110.  Plaintiffs did not reallege the allegations of the Amended Complaint in their Supplemental Pleading.  To the extent that the Supplemental Complaint is deemed to incorporate the Amended Complaint, the City incorporates its Motion to Dismiss the same and will not restate the allegations here.

### E. Without the Supplemental Pleading, this Case Is Moot.

As set forth above, the Supplemental Complaint should be dismissed. Plaintiffs' own proposed maps are part of the record and should be considered. If the Supplemental Complaint is Dismissed, then the case must be dismissed. Plaintiffs cannot proceed solely on a challenge of the Enjoined Plan when it has been superseded by the New Plan. A challenge is generally mooted by the repeal of the challenged statute. *Coral Springs Street Systems, Inc. v. City of Sunrise*, 371 F.3d 1320, 1329 (11th Cir. 2004). When a city resolution is repealed by the enactment of a superseding resolution, the superseding statute resolution "moots a case only to the extent that it removes challenged features of the prior law." "Rarely will challenges to a law's validity survive a mootness analysis when that law is no longer effective." *Health Freedom Defense Fund v. President of United States*, 2023 WL 4115990 (11th Cir. June 22, 2023). While this Court earlier exercised its remedial authority to order a remedial process (DE 91), that process has been terminated. DE 112 p.2 n.1. Plaintiffs cannot proceed once their challenge to the New Plan has been dismissed.

## IV. Conclusion

The City of Miami is a majority-minority city. It is not, and is not even accused of, gerrymandering to diminish any group's ability to have influence in any district. District 5 is a valid VRA District, as demonstrated by Plaintiffs' own maps. Otherwise, the City is solely accused of racial sorting when there is no actual sorting other than that reflected in the demographics of the City as demonstrated by the demographics of Plaintiffs' own maps. Every plan will perpetuate that same balance. The Supplemental Complaint should be dismissed.

WHEREFORE, Defendant respectfully requests that the Court dismiss Plaintiffs' Supplemental Complaint.

Respectfully submitted,

GRAYROBINSON, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887


By: *s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    s/ *Christopher N. Johnson*
       Christopher N. Johnson