**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

     *Plaintiffs*,

v.

CITY OF MIAMI,

     *Defendant*.

_____/

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE CITY'S MOTION TO DISMISS PLAINTIFFS' SUPPLEMENTAL COMPLAINT

For the third time, the City moves to dismiss this case. For the reasons discussed below, the Court should rebuff the City's latest attempt.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint must allege facts that, when accepted as true, state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014) (cleaned up). A court reviewing a motion to dismiss generally "do[es] not consider anything beyond the face of the complaint and any documents attached thereto." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). A limited exception applies where "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Id.*

1

**ARGUMENT**

I.      **The City Mischaracterizes the Operative Complaint and the Motion to Dismiss Standard.**

       A.      **The Supplemental Complaint and First Amended Complaint Together Comprise the "Operative Complaint."**

Much of the City's Motion to Dismiss ("Mot.") hinges on a fundamental misunderstanding of the nature of a supplemental complaint. A supplemental complaint does not supersede the earlier operative complaint; instead, as the name suggests, it *supplements* the earlier complaint. As the Eleventh Circuit has stated, a supplemental complaint "is an appropriate vehicle by which to set forth new facts in order to *update* the earlier pleading . . . ." *Lussier v. Dugger*, 904 F.2d 661, 670 (11th Cir. 1990) (cleaned up) (emphasis added). Where a supplemental complaint "is not designed as a substitute [for an earlier complaint] or intended to take its place, as where it refers to its allegations, or expressly reaffirms them, . . . or merely augments the original pleading by additional allegations, . . . the original pleading and the amendment are to be construed together." *Zousmer v. Canadian Pac. Air Lines, Ltd.*, 307 F. Supp. 892, 896 (S.D.N.Y. 1969) (cleaned up).

Here, the Supplemental Complaint was clearly intended to complement, rather than replace, the First Amended Complaint (ECF 23). In Plaintiffs' motion for leave to file the Supplemental Complaint, Plaintiffs told the Court that the allegations in the Supplemental Complaint "relate to their original claims—they both concern the City's racially gerrymandered Commission districts." ECF 105 at 3. But because the new allegations concern Resolution 23-271 (the "2023 Plan"), which was enacted after the First Amended Complaint was filed, the Supplemental Complaint was appropriate "to *update* the earlier pleading." *Id.* (emphasis added). The Supplemental Complaint itself unequivocally refers to and reaffirms the allegations in Plaintiffs' First Amended Complaint and expressly alleges "*Supplemental* Facts." ECF 109 at 4 (emphasis added). For instance, its second paragraph states: "As alleged in Plaintiffs' First

2

Amended Complaint ... the five Miami City Commission districts have been racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause." *Id.* ¶ 2. Thus, there can be no doubt that the two pleadings should be construed as one: the Operative Complaint.[1] So construed, the core allegations of the Operative Complaint are that the City enacted a racially gerrymandered map in Resolution 22-131 (the "2022 Plan") and then passed essentially "the same map, for the same reasons, under a new name." *Id.* ¶ 61.

A proper understanding of the Supplemental Complaint resolves many of the City's arguments. The City, for example, wrongly asserts that Plaintiffs have not sufficiently pled that the districts are noncompact. Mot. 10–11; *see also infra* pp. 8–9. But the First Amended Complaint alleges that the districts in the 2022 Plan were not compact—indeed, were not intended to be compact. ECF 23 ¶¶ 98–99, 215. The Supplemental Complaint augmented those allegations by alleging that districts in the 2023 Plan are even "*less* compact." ECF 109 ¶¶ 151, 159 (emphasis added).

The City also mistakenly argues that Plaintiffs have "changed the accusation[s]" underlying their racial gerrymandering claim. Mot. 4–5; *see also id.* at 4 ("[T]he Supplemental Complaint no

---

[1] The City briefly argues that Plaintiffs lack standing because the Supplemental Complaint does not "reallege the allegations of the Amended Complaint," but then incorporates by reference the standing arguments made in the City's motion to dismiss the First Amended Complaint. Mot. 14. This Court already rejected several of those arguments in its preliminary injunction order. *Compare* ECF 34 at 17–19 (motion to dismiss First Amended Complaint) *with* ECF 60 at 6–7 (rejecting the City's standing arguments). To the extent the City properly incorporates arguments it previously made, Plaintiffs incorporate the responses contained in their opposition to the City's motion to dismiss the First Amended Complaint (ECF 37).

longer accuses the City of packing any race."). For example, the City contends that Plaintiffs shifted their allegations regarding the City's treatment of the Hispanic population "from 'packing' to 'balancing.'" Mot. 5. That is plainly incorrect. The Supplemental Complaint alleges that the 2023 Plan, like the 2022 Plan, "packs" Hispanic voters into three of the five districts—Districts 1, 3, and 4. *See* ECF 109 ¶ 67 (describing the "three packed Hispanic districts"). It further alleges that in devising the 2023 Plan, the City made deliberate race-based decisions to avoid consolidating the Hispanic voters into a *single* district. *Id.* ¶ 115. Moreover, the First Amended Complaint repeatedly alleges that the City sought to optimally balance the Hispanic population in Districts 1, 3, and 4. *See, e.g.*, ECF 23 ¶¶ 115, 272, 324. In that sense, the Commission sought to "avoid packing Hispanics" and to balance them among the three packed districts instead.

Similarly, contrary to the City's suggestion, Mot. 5, Plaintiffs have not abandoned their position that the City packed Black voters into District 5. Both the First Amended Complaint and the Supplemental Complaint include extensive allegations on this issue. *See, e.g.*, ECF 23 ¶¶ 15, 217–69, 355 (alleging that the City maintained an arbitrary BVAP quota to pack as many Black residents as possible in District 5); ECF 109 ¶¶ 168–71 (alleging that the City made changes to the proposed remedial map to add even more Black voters to District 5). Regardless of the exact vocabulary and synonyms Plaintiffs use, their claim is clear: The City drew each of the five districts with race as a predominant factor, and the use of race was not narrowly tailored to a compelling interest with respect to any of the districts. All the allegations in the First Amended Complaint and Supplemental Complaint support this claim.

**B.      The City Misapplies the Motion to Dismiss Standard.**

The City's motion repeatedly asks the Court to weigh competing evidence in the preliminary injunction record—including expert reports, Plaintiffs' proposed maps, and related transcripts—in deciding whether to dismiss the Operative Complaint. *See, e.g.*, Mot. 5 (discussing

Plaintiffs' proposed maps and expert reports). Those arguments misapprehend the Court's function at the motion to dismiss stage.

*First*, none of those materials are part of the motion to dismiss record. The City cites only one non-binding case for the proposition that the Court may consider "items appearing in the record of the case" in deciding a motion to dismiss. Mot. 2, 6 (citing *Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1281 (S.D. Fla. 2002)). But the court in that case considered only a contract that the plaintiff in a breach-of-contract suit had attached as an exhibit to the complaint. *Hodges*, 193 F. Supp. 2d at 1284. The case certainly does not suggest that a court can properly weigh *competing* evidence *not* attached to the complaint when deciding a motion to dismiss. And the general rule is the opposite: A district court that "considers materials outside of the complaint . . . must [generally] convert [a] motion to dismiss into a summary judgment motion," which "requires notice to the parties and an opportunity for mutual discovery." *Adinolfe*, 768 F.3d at 1168.

*Second*, a motion to dismiss tests only the "legal sufficiency" of the complaint. *Id.* A court must "accept[] the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiffs." *Id.* at 1169 (cleaned up). A motion to dismiss is thus not the appropriate vehicle for defendants to "contest[] the accuracy" of the plaintiff's factual allegations. *Id.* at 1173. Yet the City over and over does just that. The City, for example, asks the Court to conclude (again, based on evidence outside the complaint) that the challenged districts *are* compact and the City's BVAP floor *was* necessary, despite the complaint's allegations to the contrary. Mot. 5–6, 7–8, 10–11. The City may present those arguments at trial, but it cannot properly do so on a motion to dismiss. *See Adinolfe*, 768 F.3d at 1168 ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial[.]" (cleaned up)).

5

**II.     The Operative Complaint States a Claim of Unconstitutional Racial Gerrymandering.**

The only question relevant to the City's motion to dismiss is whether Plaintiffs plead facts sufficient to state a plausible claim that the City Commission districts were racially gerrymandered in the 2022 Plan and continue to be racially gerrymandered in the 2023 Plan. A racial gerrymandering claim requires a two-step analysis. *See Cooper v. Harris*, 581 U.S. 285, 291 (2017). First, a plaintiff must allege that race was the "predominant factor" motivating district line-drawing. *Id.* (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Second, if race was the predominant factor motivating a district's design, the defendant must satisfy strict scrutiny by proving that its use of race "serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 292 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193 (2017)).

In the Operative Complaint, Plaintiffs allege facts constituting *at least* a plausible showing that race was the predominant factor motivating the design of all five City Commission districts. This alone would defeat a motion to dismiss, since the burden shifts to the City to justify its use of race, *see id.*, and Plaintiffs' complaint need not refute the City's arguments in advance. Plaintiffs, however, have gone further and alleged facts that show the design of the districts cannot survive strict scrutiny. Against these allegations, the City's motion to dismiss must fail.

**A.     The Operative Complaint Sufficiently Alleges That Race Was the "Predominant Factor" in the Design of All Five Districts.**

The City does not dispute that race was the predominant factor motivating the design of District 5, *see* Mot. 4, 7; ECF 60 at 9, and Plaintiffs have adequately alleged that race predominated in the drawing of the remaining districts as well. The First Amended Complaint quotes extensively from the record of public meetings where Commissioners explained the goal of the redistricting process—namely, to ensure one "Anglo district," three "Hispanic districts," and one "Black district." ECF 23 ¶¶ 188–350. The Supplemental Complaint alleges that the City approached the

2023 redistricting process with that very same goal. ECF 109 ¶¶ 26–31, 55–63, 134–59. That is

sufficient to state a plausible claim that the 2023 Plan's districts were each motivated primarily by

racial considerations. The City makes three principal arguments in response, none of which

supports dismissal.

      *First*, the City argues that the Commission districts "simply reflect the demographic

reality" in Miami, a majority-minority city, and therefore are not racially gerrymandered. Mot. 11.

In the City's view, a racial gerrymandering case cannot be based on the "motives and statements

of legislators." *Id.* at 14. As an initial matter, the City relies heavily on a comparison between the

2023 Plan and maps Plaintiffs proposed during the interim remedial phase of this case to make this

argument. That is improper for the reasons described above—namely, that the City is asking the

Court to consider and weigh evidence that is outside the motion to dismiss record. *See supra* pp.

4–5.[2]

      The City's argument also contradicts decades of precedent. The key question in a racial

gerrymandering case is whether race predominated in the design of the challenged districts, and

plaintiffs have long been able to make that showing by pointing to "direct evidence going to

---

[2] Moreover, the maps Plaintiffs submitted during the interim remedial phase have little or

no bearing on the question of whether race predominated in the City's districts, and, if so, whether

they survive strict scrutiny. Plaintiffs' plans will not be on trial. And should Plaintiffs prevail at

trial, the City will have another opportunity to submit a new plan to the Court, Plaintiffs will have

an opportunity to challenge that plan and submit new ones of their own for the Court's

consideration, and the Court will have the duty to ensure a constitutionally permissible plan is in

place—incorporating to the extent possible any new, race-neutral policy considerations the City

Commission chooses to adopt after trial.

legislative purpose." *Miller*, 515 U.S. at 916. Here, the complaint recites extensive direct evidence in the public record that race motivated the design of all five Commission districts, which is sufficient to state a racial gerrymandering claim. To be clear, Plaintiffs are not arguing that the Commission could never lawfully draw a map with similar demographics to the 2023 Plan. What the City *cannot* do is draw that map with the express intention of segregating people on the basis of race.

      *Second*, the City invokes the Supreme Court's statement that plaintiffs must prove "race was the predominant factor motivating the legislature's decision to place *a significant number of voters* within or without a particular district." Mot. 11 (emphasis added) (quoting *Cooper*, 581 U.S. at 291). But the City (again) misunderstands Plaintiffs' argument. Plaintiffs are not claiming that the City moved a "significant number of voters" between the 2022 Plan and the 2023 Plan. *See id.* at 12. Nor must they to state a claim. Rather, Plaintiffs allege that in both the 2022 and 2023 Plans, *every Miamian* was placed within or without their City Commission district based on their race. The City already made this faulty argument, and the Court rightly rejected it. ECF 52 at 76. The Court should do so again.

      *Finally*, the City argues that the districts in the 2023 Plan are "relatively compact"—again improperly citing to Plaintiffs' proposed plans and data and asking the Court to draw inferences in its favor. Mot. 10–11. The Court should reject that invitation. The First Amended Complaint alleges that the districts in the 2022 Plan are not compact, *see* ECF 23 ¶¶ 98–99, 215, and the Supplemental Complaint alleges that the districts became even *less* compact in the 2023 Plan, ECF 109 ¶¶ 151, 159. Those allegations are sufficient to plead a lack of compactness, regardless of the compactness scores of Plaintiffs' proposed districts.

      In any event, a plaintiff may prove that race predominated "*either* through circumstantial

evidence of a district's shape and demographics *or* more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916 (emphases added). A plaintiff need not prove (let alone plead) that a redistricting plan departs from every or even any traditional districting principle. As the Supreme Court recognized in *Bethune-Hill*, "[r]ace may predominate even when a reapportionment plan respects traditional principles" like compactness. 580 U.S. at 189; *see also id.* ("[A] conflict or inconsistency may be persuasive circumstantial evidence tending to show racial predomination, but there is no rule requiring challengers to present this kind of evidence in every case."). Here, the extensive direct evidence that race drove the City's decisionmaking is sufficient to conclude that the City subordinated traditional redistricting criteria to racial considerations.

**B.      The Operative Complaint Sufficiently Pleads That the City's Use of Race in District 5 Was Not Narrowly Tailored to a Compelling Government Interest.**

Because the City concedes that race predominated in the drawing of District 5, *it* bears the burden of justifying its use of race as "narrowly tailored" to serve a compelling interest. *See Cooper*, 581 U.S. at 292. Plaintiffs have no obligation to plead facts demonstrating that the Commission's use of race was *not* narrowly tailored. The City's accusations of shortcomings in Plaintiffs' narrow tailoring allegations (Mot. 7–10) are therefore legally irrelevant.

Plaintiffs, in any event, *have* adequately pled that the City's use of race in drawing District 5 is not narrowly tailored to the only "compelling interest" the City has invoked—namely, achieving compliance with the Voting Rights Act. Narrow tailoring requires the legislature to "have a strong basis in evidence in support of the (race-based) choice that it has made." *Bethune-Hill*, 580 U.S. at 193 (quoting *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). The complaint here alleges that the City lacked *any* basis in evidence to support the blanket racial

target adopted in both the 2022 and 2023 Plans,[3] and the ways in which the City took race into account to draw District 5 were wholly unrelated to VRA compliance. ECF 23 ¶¶ 351–56; ECF 109 ¶¶ 160–73. Neither the City nor its consultants conducted a sufficient analysis of racially polarized voting or took other steps to meaningfully assess VRA compliance. *Id.* The City does not explain how the City could have the necessary evidentiary basis for race-based decisionmaking when it failed to review the evidence about what it would take to afford Black voters the ability to elect candidates of their choice.

None of the City's responses has merit. For one, the City improperly relies on documents neither attached to nor incorporated by reference into the Operative Complaint, including Plaintiffs' proposed plans. Mot. 8. As discussed above, the Court may not consider these documents on a motion to dismiss without converting the motion into a summary judgment motion. *See supra* pp. 4–5.

For another, the City baselessly asserts that the narrow tailoring requirement is only about avoiding packing. Mot. 9. This is simply false. The Supreme Court has long explained why racial classifications in redistricting are impermissible: "Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (cleaned up). Race-based redistricting without sufficient tailoring "reinforces the perception that members of the

---

[3] The Court has already rejected the City's argument that its chosen arbitrary quota is a magic number. *Compare* Mot. 8 *with* ECF 52 at 82–83 ("The City ultimately misapprehends what the VRA required of it; as Plaintiffs note, the City has conflated a numerical 50% BVAP majority with the ability of Black voters to elect preferred candidates.").

same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." *Id.* at 647. This is harmful because "elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Id.* at 648. Never has the Supreme Court held that racial gerrymandering is permissible as long as a racial group isn't "packed."

The City's pat conclusion that "[b]ecause District 5 is a VRA district, racial gerrymandering is permissible" fails to satisfy strict scrutiny. Mot. 10. The City does not rebut or even acknowledge that the Operative Complaint alleges specific facts showing that the use of race in the City's redistricting plan was unrelated to VRA compliance—for instance, that the City failed to conduct an adequate analysis of racially polarized voting or any other analysis key to assessing VRA compliance. *See* ECF 109 ¶¶ 161–72. The Operative Complaint alleges that the City instead *ignored* functional analyses and evidence-based assessments presented to it, using race in ways wholly disconnected from any effort to comply with the VRA. *Id.* ¶¶ 164–72.[4]

## III.    The Case Will Not be Moot if the Supplemental Complaint is Dismissed.

Nearly every sentence of the City's mootness argument is legally incorrect. Together, these sentences create an argument that is not only meritless, but that *this Court has already rejected*.

First, the City argues that if the Supplemental Complaint—meaning the supplemental

---

[4] The City also suggests that District 5 must be narrowly tailored because its Black population is similar to those proposed by Plaintiffs. Mot. 5. Even if this argument were appropriate for the motion to dismiss stage, it is fallacious. Plaintiffs allege that the City's use of race to draw District 5 was not sufficiently narrowly tailored to VRA compliance, resulting in the configuration (and Black population share) of the enacted District 5.

allegations about the 2023 Plan—is dismissed, the entire case "must be dismissed." Mot. 15. This is incorrect because the Supplemental Complaint by itself *cannot* be dismissed. As discussed above, the Supplemental Complaint does not stand alone: it must be read in conjunction with the First Amended Complaint to make up the Operative Complaint.

Even if the Supplemental Complaint's allegations about the 2023 Plan are struck, leaving only the allegations from the First Amended Complaint, this matter will not be moot. The City argues that Plaintiffs "cannot proceed solely on a challenge" to the 2022 Plan "when it has been superseded by" the 2023 Plan. *Id.* This is wrong. This Court has already ruled that this is wrong.[5] And even if the Court were to treat the allegations in the Supplemental Complaint as standing alone and dismiss them, Plaintiffs' claims against the 2022 Plan still survive. Plaintiffs seek to redress the City's unconstitutional classification of them on the basis of their race. This classification was done through the 2022 Plan—which went into effect in 2022, served as the basis for City Commission representation for over a year, and was used in a February 2023 special election, *see* ECF 109 ¶ 3—as well as through the 2023 Plan. Plaintiffs seek to redress their injury flowing from the 2022 Plan through, among other relief, nominal damages. ECF 23 at 55. That nominal damages claim would merit a full trial on the merits even if Plaintiffs sued only to redress injuries relating to the 2022 Plan. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

## CONCLUSION

For these reasons, and for the reasons explained in Plaintiffs' opposition to the City's motion to dismiss the First Amended Complaint (ECF 37), the Court should deny the City's motion to dismiss Plaintiffs' Operative Complaint.

---

[5] *See, e.g.*, ECF No. 91 at 6.

Respectfully submitted this 5th day of October, 2023,

  /s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Gregory P. Luib*
**Dechert LLP**
1900 K Street NW
Washington, DC 20006
(202) 261-3413
gregory.luib@dechert.com

Neil A. Steiner*
Julia Markham-Cameron*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
julia.markham-cameron@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*\* Admitted pro hac vice*

*Counsel for Plaintiffs*

13