UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; ALEXANDER
CONTRERAS; and STEVEN MIRO.

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 for the Southern District of Florida, Defendant, City of Miami (the "City"), submits the following Statement of Undisputed Facts in Support of its Motion for Final Summary Judgment.

## I. BACKGROUND

1. The City has had single member districts for its five commissioners (rather than at large elections) since 1997. (DE 23, ¶¶33-39, 59-64).

2. Since their inception, these districts have had substantially the racial demographic make-up. (DE 24-76, p.12 (2013 demographics prior to 2013 redistricting); DE 24-78, p.6 (2013 demographics of 2013 redistricting)).

3. Following the 2020 U.S. Census (the "2020 Census"), the City's Commission Districts no longer had substantial equality of population, and the ideal Commission district size had increased to 88,448. (DE 23, ¶¶ 72-74).

4. District 2, the waterfront district, was substantially overpopulated and had to "shed" population to the other four districts to bring the population variance back to constitutionally acceptable levels. (*Id.*, ¶ 75; GRACE Dep. 32:7-23; 115:1-6 (attached hereto as Ex. A)).

5. On June 14, 2023, the City adopted the New Plan, which replaced the Enjoined Plan. (DE 77). The New Plan was certified on June 29, 2023. (*Id.*)

## II. GENERAL DEMOGRAPHICS

6. The racial and ethnic composition in the City's New Plan is as follows:

| Dist. | Total Pop. | Pop. Dev. | % Dev. | WVAP | HVAP | BVAP | WCVAP | HCVAP | BCVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 87,455 | −993 | −1.1 | 3.4 | 89.7 | 10.9 | 5.0 | 85.9 | 8.3 |
| 2 | 89,593 | +1,145 | +1.3 | 36.5 | 49.6 | 7.7 | 38.6 | 45.8 | 9.6 |
| 3 | 89,194 | +746 | +0.8 | 10.5 | 84.5 | 5.4 | 12.6 | 82.7 | 3.8 |
| 4 | 89,555 | +1,107 | +1.3 | 7.2 | 90.0 | 3.1 | 7.9 | 90.0 | 1.4 |
| 5 | 86,444 | −2,004 | −2.3 | 10.5 | 40.6 | 50.3 | 9.6 | 31.4 | 57.4 |
| Overall Range | 3,149 | 3.6 | | | | | | | |

Resolution 23-271 - Version 12 D3 alt v3 - City's Proposed Remedial Plan

(Dr. Abbot Dep., Ex. 1 at pp. 43-45 of 56 (attached hereto as Ex. B)).

7. Statistically, all four of Plaintiffs' Maps are substantially similar to the City's New Plan:

**P1**

| Dist. | Total Pop. | Pop. Dev. | % Dev. | WVAP | HVAP | BVAP | WCVAP | HCVAP | BCVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 86,569 | −1,879 | −2.1 | 14.9 | 70.1 | 16.1 | 14.8 | 66.3 | 16.5 |
| 2 | 89,078 | +630 | +0.7 | 31.2 | 57.9 | 5.8 | 33.2 | 56.3 | 6.4 |
| 3 | 87,666 | −782 | −0.9 | 5.8 | 90.8 | 5.2 | 7.4 | 88.6 | 3.6 |
| 4 | 89,091 | +643 | +0.7 | 3.5 | 95.0 | 3.0 | 4.5 | 94.1 | 0.8 |
| 5 | 89,837 | +1,389 | +1.6 | 13.8 | 41.2 | 45.2 | 12.4 | 32.3 | 53.0 |
| Overall Range | | 3,268 | 3.7 | | | | | | |

**P2**

| Dist. | Total Pop. | Pop. Dev. | % Dev. | WVAP | HVAP | BVAP | WCVAP | HCVAP | BCVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 86,541 | −1,907 | −2.2 | 4.3 | 86.6 | 13.7 | 6.0 | 81.0 | 12.4 |
| 2 | 89,897 | +1,449 | +1.6 | 36.9 | 48.7 | 7.9 | 39.6 | 44.3 | 10.1 |
| 3 | 85,108 | −3,340 | −3.8 | 10.6 | 84.8 | 4.3 | 12.3 | 84.5 | 2.4 |
| 4 | 90,388 | +1,940 | +2.2 | 2.9 | 95.6 | 3.3 | 3.5 | 94.5 | 1.5 |
| 5 | 90,307 | +1,859 | +2.1 | 13.3 | 41.0 | 46.2 | 11.9 | 31.8 | 54.3 |
| Overall Range | | 5,280 | 6.0 | | | | | | |

**P3**

| Dist. | Total Pop. | Pop. Dev. | % Dev. | WVAP | HVAP | BVAP | WCVAP | HCVAP | BCVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 87,607 | −841 | −1.0 | 5.6 | 85.4 | 13.0 | 7.2 | 80.6 | 11.7 |
| 2 | 89,522 | +1,074 | +1.2 | 37.9 | 48.2 | 7.0 | 41.1 | 44.2 | 8.2 |
| 3 | 85,973 | −2,475 | −2.8 | 10.6 | 84.9 | 4.3 | 12.2 | 84.6 | 2.4 |
| 4 | 90,388 | +1,940 | +2.2 | 2.9 | 95.6 | 3.3 | 3.5 | 94.5 | 1.5 |
| 5 | 88,751 | +303 | +0.3 | 11.3 | 41.1 | 48.8 | 10.1 | 31.6 | 56.5 |
| Overall Range | | 4,415 | 5.0 | | | | | | |

**P4**

| Dist. | Total Pop. | Pop. Dev. | % Dev. | WVAP | HVAP | BVAP | WCVAP | HCVAP | BCVAP |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 87,556 | −892 | −1.0 | 5.6 | 85.8 | 13.0 | 7.2 | 80.3 | 11.9 |
| 2 | 89,522 | +1,074 | +1.2 | 37.9 | 48.2 | 7.0 | 41.1 | 44.2 | 8.2 |
| 3 | 87,829 | −619 | −0.7 | 10.4 | 85.1 | 4.2 | 12.1 | 84.7 | 2.4 |
| 4 | 87,667 | −781 | −0.9 | 2.9 | 95.6 | 3.2 | 3.4 | 94.5 | 1.5 |
| 5 | 89,667 | +1,219 | +1.4 | 11.2 | 41.5 | 48.4 | 10.0 | 32.3 | 55.8 |
| Overall Range | | 2,111 | 2.4 | | | | | | |

(*Id.*)

### III. PLAINTIFF CLARICE COOPER

8. Plaintiff Clarice Cooper ("Cooper") lives in the "West Grove," which is in District 2. (Cooper Dep. 12:16–13:4, 15:7–12 (attached hereto as Ex. C)).

3

9.      Cooper alleges that the City Commission "artificially stripped" Black residents like her from District 2 based on race. (Cooper Dep. 83:4–12).

10.     Cooper acknowledges that, under both the Enjoined Plan and the New Plan, she has remained in District 2 and that the New Plan returned Black residents of the West Grove to District 2. (Cooper Dep. 83:4–85:1, 89:5–13).

11.     Cooper believes that part of Coconut Grove was taken from District 2 and put in Districts 3 and 4 to decrease Coconut Grove's influence throughout District 2, not because of race. (Cooper Dep. 51:17–52:12, 55:16–56:25, 86:85:20–86:11, 87:2–15).

12.     Cooper preferred that District 2 return to its pre-Enjoined Plan state, and is in support of the West Grove being back in District 2 in the New Plan.  (Cooper Dep. 21:21–22:2; 49:17-50:12).

13.     Cooper does not believe that either the Enjoined Plan or the New Plan "diluted the voting power of Black voters." (Cooper Dep. 57:21-24).

### IV.    PLAINTIFF STEVEN MIRO

14.     Plaintiff Steven Miro ("Miro") is a Hispanic male who has lived in District 3 since 2014. (Miro Dep. 5:6–8, 11:19–12:2, 12:13–15, (attached hereto as Ex. D)).

15.     District 3 was predominantly Hispanic when Miro moved there in 2014. (Miro Dep. 69:17–70:9).

16.     Miro said the City Commissioners "pack[ed] the demographic [] they want[ed] within [] District 3" under the New Plan and his "voice wouldn't be heard" as a result. (Miro Dep. 33:12–34:19).

17.     Miro's issue with District 3 in the Enjoined Map was how it crossed US-1 into Coconut Grove and did not keep that area together. (Miro Dep. 21:9-16).

18. Miro's objection is not based on race; he believes that District 3's Commissioner Carollo packed his elder "voter base" of "65-plus [residents] living in affordable housing" into District 3 and, "therefore[,] [] dilute[d] voices like [Miro's]." (Miro Dep. 38:6–25).

19. Miro testified that none of Plaintiffs' Maps would have "made any change to [his] being put into a majority Hispanic district." (Miro Dep. 71:9–12; 80:10–17).

20. Miro testified that "it's physically impossible" to draw District 4 to not be predominantly Hispanic, and that it would be "very hard" to draw Districts 1 and 3 in a way that would not be predominantly Hispanic, as it would require crossing US-1 and reaching into Brickell. (Miro Dep. 53:25–18).

## V. PLAINTIFF JARED JOHNSON

21. Plaintiff Jared Johnson ("Johnson") moved to District 3 in July 2021. (Johnson Dep. 7:12-14; 60:13-19 (attached hereto as Ex. E)).

22. Johnson remains in District 3 in the New Plan. (Johnson Dep. 7:5-7; 17:23-18:4; 60:13-19).

23. Johnson would prefer to be in District 2, but acknowledges that buying or renting a residence, as he did in 2021, is the only way for an individual to choose the district in which they reside. (Johnson Dep. 58:21-59:9).

24. Johnson felt that Black residents were categorized and stripped from his district on the basis of race. (Johnson Dep. 58:9-17).

25. Johnson acknowledges that, with respect to the Brickell area where he lives, Hispanics and whites make up the vast majority of residents in that area, and he is a minority living in Brickell. (Johnson Dep. 61:2-22).

26. Johnson remained in District 3 in all but one of Plaintiffs' Maps. (Johnson Dep. 29:21-25).

5

27.     Johnson could not identify any statements by the City Commission regarding the creation of the New Plan that were "racially motivated." (Johnson Dep. 83:10-25).

28.     Johnson agrees that District 2 in Plaintiffs' Map 4 is generally the same as it was in the 2013 Plan. (Johnson Dep. 22:19-22, 80:17-81:21).

**VI.     PLAINTIFF ALEXANDRA CONTRERAS**

29.     Plaintiff Alexandra Contreras ("Contreras") identifies as Hispanic and White. (Contreras Dep. 8:4-16 (attached hereto as Ex. F)).

30.     Contreras moved into District 4 after the enactment of the Enjoined Map, but no longer lives in District 4. (Contreras Dep. 4:12–22, 7:18–20, 9:13–25, 11:3–14, 22:4–10).

31.     Contreras did not have any issue with the fact that District 4 was predominantly Hispanic when she moved there in August 2022. (Contreras Dep. 11:19–12:23, 68:12–19).

32.     While Contreras alleged her injury was being "packed" by the Enjoined Plan, she admitted having no issue with the percentage of Hispanic population when she moved into District 4, and she admitted it became less packed by redistricting.  (Contreras Dep. 61:7-62:2).

33.     Contreras does not have any plans to move back into the City. (Contreras Dep. 8:17–21).

34.     Contreras has never voted in a City of Miami election, and will not vote in the City's next election. (Contreras Dep. 9:7–9, 10:9–11).

35.     Contreras admits that she "want[s] to be a plaintiff . . . [and] to be involved, . . . love[s] Miami[,] . . . [and] plan[s] on living in the City of Miami in the future," but has "no specific plan" to do so.  (Contreras Dep. 14:3–22).

36.     Contreras's grievance with the Enjoined Plan was that (a) the shapes of the Districts were "atypical"; and (b) the Districts were drawn "based on race." (Contreras Dep. 15:4–22).

37.     Hispanic voting-age population predominates District 4 in all four of Plaintiffs' Maps, despite Contreras's concern that the Enjoined Plan placed her in a district where she was the predominant racial group. (Contreras Dep. 59:3–60:21).

38.     Contreras does not dispute that District 4 has a higher Hispanic voting-age population in Plaintiffs' Maps 1 through 3 than it does in the Enjoined Plan. (Contreras Dep. 43:24–44:23).

39.     Contreras admits that, in all of Plaintiffs' Maps, District 4 has a Hispanic voting-age population of at least 95%. (Contreras Dep. 69:9–13).

40.     Contreras could not articulate what her issue was with the shape of District 4. (Contreras Dep. 22:11–23:7).

41.     Contreras did not have any issues with how District 4 was drawn in the New Plan, and instead only takes issue with how certain parts of other districts were drawn. (Contreras Dep. 54:18–55:19, 56:16–21).

**VII.    PLAINTIFF YANELIS VALDES**

42.     Plaintiff Yanelis Valdes ("Valdes") identifies as a Latina Cuban-American. (Valdes Dep. 15:5–16:1 (attached hereto as Ex. G)).

43.     Valdes resides in District 5 under the Enjoined Plan and District 2 under the New Plan. (Valdes Dep. 20:22–21:5).

44.     Valdes' grievance was redressed by the New Plan, where she was put back in the predominantly Hispanic District 2. (Valdes Dep. 20:14–21:5, 24:3–12, 59:16–21).

45.     Valdes has no problem being in District 2 or represented by the currently-sitting Hispanic Commissioner. (Valdes Dep. 24:13–17, 60:5–10, 60:5–7, 67:9–20, 69:15–19).

46.     Additionally, Valdes has no race-based objection to the New Plan and only takes issue with the City "split[ting] up" the Coconut Grove area in District 2 wherein Commissioner Carrollo's

7

home is in Natoma Manors, which she admits not knowing whether it was based on race. (Valdes Dep. 29:4–30:23, 31:14–17).

47. Valdes testified she does not have a problem with having been placed in a plurality District 2 under the New Plan, and "do[es]n't think [she] ha[s] an issue" with her representation anymore. (Valdes Dep. 67:9–20, 69:15–19).

48. Valdes did not recall if she ever examined Engage's membership to assess whether they had members in each district. (Valdes Dep. 12:2-8)

### VIII. PLAINTIFF MIAMI-DADE NAACP

49. The President of Plaintiff Miami-Dade Branch of the NAACP ("Miami-Dade NAACP") lives in unincorporated Dade County, FL, and not in the City of Miami. (MD NAACP Dep. 5:15-23 (attached hereto as Ex. H)).

50. Miami-Dade NAACP maintains a membership list, but members are not required to update their address information. (MD NAACP Dep. 14:10-16; 17:2-17).

51. The Miami-Dade NAACP has not checked whether it has members in any districts within the City of Miami, and does not have any factual support for that proposition with respect to Districts 1, 2, 3, and 5, but it assumes that it does because they "have members and volunteers," generally. (MD NAACP Dep. 18:2-19, 19:11-17, 20:3-11, 20:12-15, 41:25-43:1).

52. While Miami-Dade's corporate representative claimed to know members that lived in every District in the City, she refused to identify any during her deposition. (MD NAACP Dep. 71:21-73:7; 91:5-8).

53. Miami-Dade NAACP's issue was specifically with West Grove getting separated from the rest of the Grove. (MD NAACP Dep. 23:17-24:14; 24:11-14; 26:14-22). Yet, Coconut Grove is not within the Miami-Dade NAACP's jurisdictional limits. (MD NAACP Dep. 70:6-10.).

54. The Miami-Dade NAACP did not have any objection to the Enjoined Plan or the New Plan. (MD NAACP Dep. 30:23-31:16, 31:24-32:1).

### IX. PLAINTIFF SOUTH DADE NAACP

55. Plaintiff South Dade Branch of the NAACP ("South Dade NAACP") does not keep a list of its members and, no one from South Dade NAACP has done an analysis to determine where members live, only at the national level. (South NAACP Dep. 16:14-24, 23:15-18 (attached hereto as Ex. I)).

56. The South Dade NAACP does not keep a roster. (South NAACP Dep. 81:21-25). There is no way to verify where members live, unless someone knows them personally. (South NAACP Dep. 24:2-6).

57. All of South Dade NAACP's board members reside in District 2. (South NAACP Dep. 80:21-81:9).

58. South Dade NAACP's corporate representative knows people in District 2, and may know "a couple of people" in District 4. (South NAACP Dep. 24:2-10). However, she does not know anyone living in District 3 for certain. (South NAACP Dep. 24:11-18). South Dade NAACP does not have members in District 5. (South NAACP Dep. 17:6-8).

59. South Dade NAACP's concern with the Enjoined Plan was that the West Grove would be split into fractions, particularly how part of District 4 broke into District 2. (South NAACP Dep. 35:12-17, 37:8-19; 42:23-43:4; 52:18-23).

60. South Dade NAACP was also concerned with a piece of District 3 that covered Coconut Grove, but could not dispute that it was drawn that way to capture Commissioner Carrollo's house and did not consider the capturing of that piece of the Coconut Grove to have been done for racially motivated reasons. (South NAACP Dep. 38:1-17, 39:18-23).

61. In the New Plan, the "West Grove" and its historically Black residents, remained in District 2. (South NAACP Dep. 46:17-47:11).

62. South Does NAACP could not articulate any objection to the New Plan. (South NAACP Dep. 48:2-11, 54:23-55:23; 82:13-24; 102:9-20).

### X. PLAINTIFF GRACE

63. Plaintiff GRACE Inc. ("GRACE") "is an organization made up of churches, civic groups, nonprofits, residents [sic] homeowners, small business owners in West Coconut Grove." (GRACE Dep. 8:5-8 (attached hereto as Ex. A)).

64. GRACE does not have individual members. (South NAACP Dep. 82:1-9). GRACE only has organizational members. (*Id.*).

65. Organizations have to fill out an application to become members of GRACE. (GRACE Dep. 13:18-14:20). GRACE does not require individuals to fill out an application or pay a fee in order to participate in meetings. (*Id*.).

66. GRACE has not identified the districts where its members live and does not know whether it has residents in all of the Districts of the City. (GRACE Dep. 61:9-17, 62:17-63:24).

67. GRACE's concern with the Enjoined Plan was that "West Grove" was being taken out of District 2. (GRACE Dep. 24:12-23, 28:12:).

68. Prior to the enactment of the Enjoined Plan, GRACE felt that it was included in District 2 not because of the race of its members, but "because that's where the boundaries of District 2 were" and had been for a long time. (GRACE Dep. 26:21-27:10).

69. GRACE does not dispute that its members would not be the predominant racial group in any district, regardless of who draws the map. (GRACE Dep. 54:18-25).

70. GRACE did believe that the New Plan sent the message to that their commissioner's job is to represent the predominant racial group. (GRACE Dep. 64:1-66:19).

71. After the enactment of the New Plan, GRACE's concerns regarding the West Grove were addressed, and they only shared the concerns of how other organizations and individuals were being treated. (GRACE Dep. 103:3-22; 117:6-8).

## XI. PLAINTIFF ENGAGE MIAMI

72. Engage's Executive Director, and corporate representative, lives in Miami Beach, FL, and not in the City of Miami. (Engage Dep. 6:8-10 (attached hereto as Ex. J)).

73. Engage Miami has members that reside outside of the City. (Engage Dep. 49:9-20).

74. Engage Miami maintains a membership list that includes residential addresses, but it does not verify residential addresses after members are on-boarded and fill out a membership form with their address. (Engage Dep. 25:4-6, 27:7-17, 27:24-28:8).

75. Engage testified that it believes its members will be harmed under the New Plan because "race played an outsized factor in how the districts were drawn rather than [race] neutral redistricting criteria and using race . . . only as necessary to comply." (Engage Dep. 58:3-9).

76. Engage's corporate representative testified that she thought had seen a workbook that had been compiled by Valdes that indicated it had members in all five districts (Engage Dep., 25:7-26:13), but could not testify to whether anyone reviewed their race to verify whether they had members in each district that were or were not members of the predominant racial group. (Engage Dep, 66:9-72:5).

77. Other than individuals that became Plaintiffs in this lawsuit, Engage did not verify what its members' races or ethnicities are, or whether they are predominant or not predominant in a particular district. (Engage Dep. 71:22-72:5).

Respectfully submitted,

GRAYROBINSON, P.A.

By: */s/ Christopher N. Johnson*
Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801

*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                                   */s/* Christopher N. Johnson
                                                   Counsel for City of Miami