Page 1

1      IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
                        DISTRICT OF FLORIDA
2                   CASE NO. 1:22-CV-24066-KMM

3

4    GRACE, INC., ET AL.,
5                  Plaintiffs,
6    -vs-
7

    CITY OF MIAMI,
8
                   Defendant.
9    _____/
10
11
12
                            Gray Robinson PA
13                          333 SE 2nd Aveunue
                            Suite  3200
14                          Miami, Florida 33131
                            Wednesday, October 11, 2023
15                          1:59 p.m. - 5:24 p.m.
16
            DEPOSITION OF REVEREND NATHANIEL ROBINSON, III
17
18
19
20
21
22
23
                            Taken before Robyn Maxwell, RPR, FPR,
24    RSA, and Notary Public in and for the State of Florida at
    Large, pursuant to Notice of Taking Deposition filed in
25    the above-mentioned cause.

```
                                                        Page 2

 1   APPEARANCES:
 2
 3       ON BEHALF OF THE PLAINTIFFS:
             CAROLINE A. MCNAMARA, ESQUIRE
 4           cmcnamara@aclufl.org
             ACLU FOUNDATION OF FLORIDA, INC.
 5           4343 West Flagler Street
             Suite 400
 6           Miami, FL 33134
             786.363.2714
 7
                   -AND-
 8
             CHRISTOPHER J. MERKEN, ESQUIRE
 9           christopher.merken@dechert.com
             DECHERT LLP
10           Cira Centre
             2929 Arch Street
11           Philadelphia, PA 19104
             215.994.2380
12
13
         ON BEHALF OF THE DEFENDANT:
14           GEORGE T. LEVESQUE, ESQUIRE
             george.levesque@gray-robinson.com
15           GRAY ROBINSON, P.A.
             301 South Bronough Street
16           Suite 600
             Tallahassee, Florida 32301-1724
17           850.577.9090
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX OF PROCEEDINGS
 2    WITNESS                                      PAGE
 3    REVEREND NATHANIEL ROBINSON, III
      DIRECT EXAMINATION BY MR. LEVESQUE             4
 4    CROSS-EXAMINATION BY MR. MCNAMARA            117
      REDIRECT EXAMINATION BY MR. LEVESQUE         122
 5
      CERTIFICATE OF OATH OF WITNESS              128
 6    REPORTER'S DEPOSITION CERTIFICATE           129
      READ & SIGN LETTER TO WITNESS               130
 7
 8
                        DEFENSE EXHIBITS
 9
         EXHIBIT              DESCRIPTION           PAGE
10
         Exhibit 1      Defendant's Notice of Taking   8
11                      Rule 30(b)(6) Deposition of
                        Grove Rights and Community
12                      Equity, Inc.
13       Exhibit 23     First Amended Complaint       50
14    Exhibit 24-13     Transcript of the city        21
                        commission meeting on
15                      February 7th, 2022
16       Exhibit 109    Supplemental Complaint        59
17      Exhibit 8224    The Enacted Map              102
18      Exhibit 8234    Plaintiffs' Map 1            67
19      Exhibit 8235    Plaintiffs' Map 2            85
20      Exhibit 8236    Plaintiffs' Map 3            92
21      Exhibit 8237    Plaintiffs' Map 4           100
22
23
24
25
```

```
                                                      Page 4
 1    Thereupon,

 2    the following proceedings began at 1:59 p.m.:

 3                THE COURT REPORTER:  Raise your right hand,

 4          please.

 5                Do you solemnly swear or affirm the

 6          testimony you are about to give in this matter

 7          will be the truth, the whole truth and nothing but

 8          the truth?

 9                THE WITNESS:  Yes, I do.

10    Thereupon,

11                REVEREND NATHANIEL ROBINSON, III,

12    having been first duly sworn or affirmed, was examined

13    and testified as follows:

14                      DIRECT EXAMINATION

15    BY MR. LEVESQUE:

16          Q.    Good afternoon, Reverend Robinson.  My name

17    is George Levesque.  I represent the City of Miami in

18    this litigation.

19                Before we get started, can you please state

20    your full name for the record?

21          A.    Sure.  My name is Reverend Nathaniel

22    Robinson, III.

23          Q.    Where you were born?

24          A.    Tallahassee, Florida.

25          Q.    Okay.  That's where I live now.  I was
```

Page 5

1    going to say it's my hometown, but it's not my hometown.

2          A.    Great city.

3          Q.    So have you ever had your deposition taken

4    before?

5          A.    No, sir.

6          Q.    Okay.  What I'm going do is go over some of

7    the rules of the road, as we're going over the

8    conversation.  Obviously, one of the aspects of the

9    conversation is we've got a court reporter here that is

10   taking down everything that we say.  As we're talking,

11   just like if we're in a restaurant and talk, we'd nod,

12   we'd shake our heads, and we'd know exactly what each

13   other means, but as she's taking everything down, head

14   shakes and head nods are a little bit heard harder to

15   transcribe.  So at different times, you might shake your

16   head in response to a question, and I might say is that a

17   "yes," or is that a "no"?  I'm not doing it to be rude

18   I'm just trying to make sure that we get a good record.

19         A.    I understand.

20         Q.    So I might prompt you on that sometimes.

21   Sometimes your counsel might because I'm not always the

22   best at doing it.

23               One of the other aspects of this is that

24   for the most part, I'll be asking questions, you'll be

25   giving answers.  If there's ever a question that you

Page 6

1    don't understand, please ask me to repeat it or ask me to

2    rephrase it, and I'll do the best that I can.

3              If you answer the question that I ask, I'm

4    going to assume that we were on the same page and that

5    you understood the question that I was asking; is that

6    fair?

7         A.    Yes, sir.

8         Q.    One of the other aspects of a deposition is

9    that at different times, your counsel may not like one of

10   the questions that I ask.  Sometimes the questions that I

11   ask are poorly worded or confusing, and they may object.

12   When they object, let them get their objection on the

13   record, and then I might ask for clarification or I might

14   ask you to answer.

15             At other times they may object and instruct

16   you not to answer.  We'll have a colloquy on that when

17   that comes up, but I do my best to try to avoid those

18   questions.

19             If -- if at any time you need a break,

20   please let me know.  This isn't intended to be torture

21   even though you're having to talk to your lawyer today.

22   So if you need to go to the restroom or anything like

23   that, just ask and we can take a break.  The only thing

24   that I would ask is, if we have a question pending, go

25   ahead and answer the question, and then we can go ahead

Page 7

```
 1    and take a break.
 2                  The other thing and the last thing that
 3    I'll bring up is that, as we're having a conversation you
 4    might know exactly where I'm going with my question and
 5    want to answer it.  Wait until I finish my question for
 6    lots of reasons:  I might put a little twist on the end
 7    before I get there, and you don't want to answer the
 8    wrong question, but also, if we're talking over each
 9    other, it makes it harder for the court reporter to take
10    things down.
11                  Are you currently on any medication that
12    would affect your ability to testify today?
13          A.    No.
14          Q.    Okay.  What is your current residential
15    address?
16          A.    1088 Northwest 208 Terrace, Miami Gardens,
17    Florida 33169.
18          Q.    And is that within the city limits?
19          A.    In the City of Miami Gardens.
20          Q.    City of Miami?
21          A.    No.
22          Q.    And you're aware that you're here as the
23    corporate representative for, what we'll call, GRACE?
24          A.    Yes.
25          Q.    Are you familiar with that organization
```

Page 8

1    that goes by that acronym?

2         A.    Yes.

3         Q.    And what does GRACE stand for?

4         A.    Grove Rights and Community Equity.

5         Q.    And what is GRACE?

6         A.    GRACE is an organization made up of

7    churches, civic groups, nonprofits, residents homeowners,

8    small business owners in West Coconut Grove.

9         Q.    Did you review any documents to get ready

10   for your deposition today?

11        A.    Yes.

12        Q.    What documents did you review?

13        A.    The bylaws for GRACE

14        Q.    Did you review any other documents?

15        A.    No.

16        Q.    Other than your attorneys, did you speak to

17   anyone to get ready for your deposition today?

18        A.    No.

19        Q.    And I am going to provide you a document

20   that we're going to mark Defendant's Exhibit 1.

21             (Defense Exhibit 1 was marked.)

22   BY MR. LEVESQUE:

23        Q.    Now, Reverand Robinson, if you wouldn't

24   mind taking a look at that document.

25             Have you seen that document before?

Page 9

1          A.    I don't remember seeing this document.

2          Q.    Okay.  If I can ask you to flip to Page 4.

3          A.    Okay.

4          Q.    Do you remember seeing that list before of

5     topics?

6          A.    Yes.

7          Q.    And I believe they continue over on to

8     Page 5.

9          A.    Yes.

10          Q.    So is it your understanding today that you

11     are the designated representative for GRACE that will be

12     addressing those topics?

13          A.    Yes.

14          Q.    Let's start with the first one.

15               What can you tell me about G.R.A.C.E.'s

16     organizational structure?

17          A.    Again, GRACE is made up of churches,

18     nonprofits, civic groups, homeowners, tenants, small

19     business owners in West Coconut Grove.  GRACE has

20     members, member organizations and a board of directors.

21     The board of directors has a chair, a vice -- a vice

22     chair, a treasurer and a secretary.

23          Q.    And who are on the board of directors?

24          A.    Currently myself, Reynold Martin, Carolyn

25     Donaldson, Christopher Hudson, Apostle John Chambers,

Page 10

1   Bruno Phanord and Anthony Alfieri.  Oh, I'm sorry.

2   Clarice Cooper, as well.

3       Q.    And who is the current chair?

4       A.    The current chair is Reynold Martin.

5       Q.    And the vice chair?

6       A.    Carolyn Donaldson.

7       Q.    And the treasurer?

8       A.    Clarice Cooper.

9       Q.    And the secretary?

10      A.    Christopher Hudson.

11      Q.    And when was GRACE formed?

12      A.    Jan- -- it -- GRACE became an official

13  nonprofit in January of 2019.

14      Q.    And you'd indicate that it became an

15  official nonprofit in January of 2019.

16          Prior to January of 2019, was it a loosely

17  associated group of individuals and businesses and

18  nonprofits and churches?

19      A.    Prior to GRACE being incorporated, it was

20  known as the West Coconut Grove -- I'm sorry.  It was --

21  let me start over.

22          It was known as the West Coconut Grove

23  Ministerial Alliance and the Homeowners and Tenants

24  Association West Grove Task Force.

25          And -- and yes, to your question, small

Page 11

```
 1   business owners, tenants, residents, homeowners,
 2   churches, civic groups.  Those are all people who are
 3   called to the table for -- for the task force.
 4        Q.    And you mentioned the Coconut Grove
 5   Ministerial Alliance?
 6        A.    Uh-huh.
 7        Q.    And the Homeowners and Tenants Association
 8   West Grove Task Force.
 9              Is that one organization, or were those two
10   organizations?
11        A.    I'm sorry.  Which organizations?
12        Q.    Start with, I guess, what's the full name
13   of the Coconut Grove Ministerial Alliance?
14        A.    That's the full name.
15        Q.    That's the full name?
16        A.    Yes, sir.
17        Q.    And the Homeowners Association -- or
18   Homeowners and Tenants Association of West Grove Task
19   Force, is that what I'll call HOTA; H-O-T-A?  Is that the
20   name of that organization?
21        A.    No.
22        Q.    Okay.  What is the name of that
23   organization?
24        A.    The name of the homeowners and tenants
25   association is the West Grove Homeowners and Tenants
```

Page 12

1    Association.

2              Q.    Okay.  And together, both of those

3    organizations formed the West Grove Task Force?

4              A.    Along with churches, civic groups,

5    nonprofit organization, small business owners, residents

6    and ten- -- and I'm sorry, homeowners and tenants all met

7    together to form the task force.

8              Q.    Okay.  The next question, a couple of

9    questions that I'm going to ask, I want to be careful

10   that what I'm asking you is when and how long you met

11   with your attorneys.  I don't want you to share anything

12   related to your conversations.

13             So let's start with the first question:  In

14   preparation for your deposition today, when did you meet

15   with your attorneys?

16             A.    Yesterday.

17             Q.    Did you have any meetings with them before

18   then, in preparation for this deposition?

19             A.    No.

20             Q.    And about how long was your meeting

21   yesterday?

22             A.    About an hour.

23             Q.    And just to clarify, other than your

24   attorneys, you haven't spoken to anyone else in getting

25   ready for your deposition today?

1          A.    No.  I haven't spoken to anyone else to

2    prepare.

3          Q.    Did you talk to Ms. Cooper just about --

4    not in preparation for this, but did you talk to her at

5    all about her deposition?

6          A.    No.

7          Q.    Okay.  What about Ms. Donaldson?

8          A.    No.

9          Q.    When was the last time that you would have

10   spoken to Ms. Donaldson?

11         A.    Oh, maybe over -- maybe a month or over a

12   month ago.

13         Q.    What about Ms. Cooper?

14         A.    Longer.

15         Q.    Okay.

16         A.    Yeah, I'm pretty busy so I don't get -- I

17   don't have a lot of time.

18         Q.    And what does it take to become a member of

19   GRACE?

20         A.    The desire.  The desire to be a member.

21         Q.    So if I wanted to become a member of GRACE,

22   what would I need to do to become a member?

23         A.    Fill out an application, and that

24   application would go before the board of directions, and

25   the board of directs would vote to allow an organization

Page 14

1    in.

2              Q.    You referenced that it would "allow an

3    organization in."

4                    If I'm an individual like the homeowner or

5    tenant that has property in the Grove, can I become a

6    member?

7              A.    You can.  Yes, you can.

8              Q.    Okay.  Would I fill out the same

9    application?

10             A.    No.

11             Q.    Okay.  Would there be a different

12   application?

13             A.    No, I don't think there are applications

14   for individuals as members; only applications for

15   organizations.

16             Q.    So if I was an individual, what would I

17   need to do?

18             A.    Participate in the meetings.

19             Q.    Do I need to pay any fees?

20             A.    No.

21             Q.    As an organization, do I need to pay any

22   fees?

23             A.    No.

24             Q.    Is it the same application for all

25   organizations that want to become a member?

Page 15

1          A.     Yes.

2          Q.     Okay.  And would the organizations that

3     would qualify for that process include churches?

4          A.     Churches qualified to be members, yes.

5          Q.     Would it include businesses?

6          A.     Yes.

7          Q.     And would it include nonprofit

8     organizations?

9          A.     Yes.

10          Q.     Are there any other types of organizations

11     that would apply there?

12          A.     Civic groups.

13          Q.     Anything else?

14          A.     Not that I can think of, no.

15          Q.     And what is the purpose of GRACE?

16          A.     To -- the purpose of GRACE is to protect

17     Black homeowners and tenants in West Coconut Grove who

18     are at risk of displacement, eviction or resegregation,

19     to restore the rights of those who have been wrongfully

20     displaced, to preserve the community, the culture and

21     history of West Coconut Grove and its people and to

22     advocate for equitable, economic development.

23          Q.     And would it be fair to say, from your

24     description, that the primary focus of GRACE is the West

25     Grove?

1        A.    Yes.

2        Q.    And you mentioned addressing the rights of

3  those who were displaced from the Grove.

4              How does it go about doing that?

5        A.    Well, that's a long response.  So we, with

6  the help of -- of counsel and other organizations,

7  created a map of people who were displaced.  We do

8  surveys of former addresses, and we were able to locate

9  them.  And we created a CGI map of where those persons

10  went.  We reached out to them, connected with them.  And

11  once we gathered the data, we started by going to the

12  different departments within the city and using the Fair

13  Housing Act to see that the City of Miami was in

14  compliance with the Fair Housing Act when those persons

15  were evicted, displaced and/or resegregated into other

16  hypersegregated communities.

17        Q.    Okay.  And you'd mentioned that that would

18  apply to the ones who were wrongfully displaced.

19              Did I understand that correctly?

20        A.    Yes.

21        Q.    What are circumstances that a Black

22  resident would have been wrongfully displaced?

23        A.    The City of Miami approved, they call them,

24  Special Area Plans now.  Before they were Special Area

25  Plans, they were called MUSP, Major Use Special Permits.

1              And so, property owners who owned

2    properties that housed multiple residents -- residents or

3    tenants, they were able to get Major Use Special Permits,

4    and they got those permits.  They needed to remove their

5    tenants so that they could demolish their buildings.  And

6    so, GRACE in -- in another lawsuit -- or in another

7    complaint rather -- another complaint; not lawsuit.

8              In another complaint we, you know, we

9    complained that proper -- the proper processes weren't

10   followed to remove those tenants, that they were

11   improperly and illegally evicted.

12        Q.    And is that litigation still ongoing?

13        A.    The complaint is still being processed by

14   the Housing and Urban Development.

15        Q.    Now talking about the 2022 redistricting

16   process.

17              What is your understanding, and I use the

18   term 2022 -- what is your understanding of when the City

19   kicked off its redistricting process after the 2020

20   census?

21        A.    What is my understanding of the process?

22        Q.    What is your understanding of when it

23   kicked off?  Just when did they start drawing maps after

24   the 2020 census?

25        A.    I -- I don't know exactly when that took

Page 18

1    place.

2            Q.    Did Grace's board meet and discuss how they

3    would engage in the city's map drawing process?

4            A.    Initially -- eventually, yes, but

5    initially, when the process kicked off, no, we did not

6    discuss how we would participate in -- in the process, in

7    the map drawing process.

8            Q.    And at some point in time, did GRACE make

9    the decision that it needed to engage with the city on

10   the map drawing process?

11           A.    Yes.

12           Q.    How did that come about?

13           A.    In a community meeting, our commissioner

14   informed the community that maps that -- you know, we

15   were going -- the city was going through the

16   redistricting process, and I believe once we -- if I

17   remember correctly, once we learned what the new maps

18   would look like or what the proposed maps would look

19   like, then there was a meeting -- a subsequent meeting

20   where our board decided that we needed to be more

21   involved.

22           Q.    Did they have a vote for that meeting?

23           A.    I don't believe there was a vote,

24   initially, because it was a query; it was factfinding.

25   So I don't believe at the initial meeting where we said,

Page 19

1  hey, let's -- let's get more involved, let's see what's

2  going on.  So I don't believe there was a vote at that --

3  at the initial meeting.

4        Q.    Does Grace's board keep board meeting

5  minutes?

6        A.    Yes.

7        Q.    Okay.  Do you know if board meeting minutes

8  were kept for that meeting?

9        A.    I'm pretty sure they were.

10        Q.    Do you recall roughly when that meeting

11  was?

12        A.    I don't.

13        Q.    Let me see if I can help us narrow it down.

14              I'll represent that the city started its

15  redistricting with its first public meeting on November

16  18th, 2021.  And there was a meeting in December 2021.

17  And if I'm correct, I believe the first public meeting

18  where maps were released would have been February 7th of

19  2022.

20              Do you recall within that time line where

21  GRACE might have had a board meeting that discussed?

22        A.    So not with -- I can't give you a date.

23  What I can say, that once the proposed maps were made

24  public and, you know, the community began to respond,

25  then GRACE met to decide what we were going to do, if it

Page 20

```
 1   was something we wanted to pursue.
 2         Q.    Who was the commissioner that alerted you
 3   at the community meeting?
 4         A.    That was Commissioner Ken Russell.
 5         Q.    Did the board take votes or designate
 6   certain individuals to present at committee meetings?
 7         A.    Which -- which committee meetings?
 8         Q.    Fair question.  Let me see if I can be more
 9   precise.
10         Did the GRACE Board take votes or designate
11   representatives to attend the city commission meetings
12   and present information and comment to the city
13   commission?
14         A.    Yes.  Mostly designations, but not votes,
15   but mostly designated people who were available.
16         Q.    Would those designations have been made by
17   the board, or would those have been made by either one of
18   the officers like the chair or vice chair?
19         A.    The board.
20         Q.    Okay.  Would there be many meeting minutes
21   that reflected the board's designation of certain
22   individuals to attend a city commission meeting and
23   testify on its behalf?
24         A.    There should be.
25         Q.    How were you selected by the board to be
```

Page 21

1    the corporate representative to testify today?

2          A.    I was the chair of the board during the --

3    during the process.

4          Q.    No good deed goes unpunished, right?

5                MS. MCNAMARA:  Do we need an affirmative

6          yes?  Is that a question?

7                MR. LEVESQUE:  No, not to that one.  I

8          won't put him on the spot.

9    BY MR. LEVESQUE:

10         Q.    Reverand Robinson, I'm going to show you an

11   exhibit that we're going to mark Defendant's

12   Exhibit 24-13.

13               (Defense Exhibit 24-13 was marked.)

14   BY MR. LEVESQUE:

15         Q.    Reverand Robinson, I'm going to represent

16   to you that this is a meeting transcript of the city

17   commission meeting on February 7th, 2022 that was

18   transcribed by your attorneys and filed with the Court

19   earlier in the litigation.  And what is attached to that

20   cover page is an excerpt of what I believe your comments

21   to the commission were on that date.

22               If you wouldn't mind take a moment to look

23   over that, and when you've had the opportunity to review

24   it, let me know.

25         A.    (Witness reading document.)

Page 22

1                    Okay.

2          Q.    Okay.  Does that accurately reflect your

3    comments, to the best of your recollection?

4          A.    Yes, to the best of my -- my memory.

5          Q.    Okay.  Are you still the Senior Pastor of

6    the Greater St. Paul A.M.E. Church in Coconut Grove?

7          A.    Yes.

8          Q.    And how long have you been in that

9    position?

10         A.    Six years.

11         Q.    And how many are in your congregation?

12         A.    Roughly 300.

13         Q.    And you indicated at the time all this was

14   going on you were Grace's chair.

15                   What are the dates for your term, as the

16   Chair of GRACE?

17         A.    The foundation date, I believe January of

18   2019.  I believe I was elected at our first meeting.  And

19   I stopped being the chair in this year, January of 2023.

20         Q.    Now, do the officers of GRACE have set

21   terms?

22         A.    Yes.

23         Q.    And so, would that roughly be a four-year

24   term then?

25         A.    It would -- it's three years, according to

Page 23

1    our bylaws.

2         Q.    Have your bylaws been amended since they

3    were first established in 2019?

4         A.    I don't think so.  I don't remember them

5    being amended.

6         Q.    Now, starting on Line 16 going to Line 18,

7    you state:  "We are facing nationwide voter suppression

8    and dilution while suppression in the diluting of the

9    African vote all throughout this country in different

10   states.

11              When you referenced "voter suppression and

12   dilution," what were you referencing?

13        A.    In -- in the United States and, in

14   particular, in the State of Florida, we had just, I

15   believe, experienced a redistricting of the state, which

16   had impacted Black communities throughout the State of

17   Florida and diluted the vote.  And so, I believe I was

18   referring to that, as well as we had seen this happening

19   throughout the country at that time.

20        Q.    Specifically related to Florida, are there

21   specific districts or specific areas where -- that you

22   had in mind when you made that statement?

23        A.    I think I did have them in mind at that

24   time, but I don't remember now.  That was a lot of

25   thoughts ago.

Page 24

1          Q.    Okay.  Well, and let me ask this:  At the

2     time that you made that statement -- sometimes people

3     will have a belief in their mind and then as time goes on

4     they might rethink or reconsider or become more convinced

5     that that's the way they felt or less convinced that

6     that's the way they felt.

7                As you sit here today, thinking of what you

8     might have been referencing in the State of Florida, are

9     you more convinced or less convinced that there was voter

10    dilution going on?

11         A.    I'm equally as convinced as I was that day.

12         Q.    Then starting on Line 18 and 19, you state:

13    "It appears that in the plan that was presented, we would

14    experience some things similar."

15               What were you referring to there?

16         A.    I believe that the map that was presented

17    at that time was separating Coconut Grove into different

18    parts, into different areas.  And so, then the voting

19    body of Coconut Grove at that time would have been split

20    into different commissioned dis- -- districts, and my

21    perception, that would be diluting the votes because

22    they're fewer and, particularly, African American voters,

23    if they were moved from one district to the other.

24         Q.    Okay.  Let's unpack that a little bit.

25               When a neighborhood is split between

```
 1    districts, does that, in your mind, always have the
 2    affect of diluting the influence of the neighborhood?
 3            A.    Always?
 4            Q.    Yes.
 5            A.    No.
 6            Q.    So there are certain circumstances that you
 7    would recognize where splitting a neighborhood might give
 8    them better representation, wouldn't you?
 9            A.    That's possible.
10            Q.    Sometimes that might depend on the
11    influence of who the representative is.
12                  You would agree with that, wouldn't you?
13            A.    I -- I don't quite understand.  I might
14    need to hear that question again.
15            Q.    Sure.  We'll use Congress as an example.
16            A.    Okay.
17            Q.    You might have a representative that was
18    from your district or your neighborhood that's a member
19    of one party, and then you might have, you know, part of
20    your neighborhood representing somebody that's in the
21    other party.  Whatever representative that is in the
22    controlling party probably going to have better influence
23    than the minority party, as a general rule.
24                  Would you agree with that?
25            A.    So I -- I -- this question is difficult for
```

1   me to answer with that example because we are nonpartisan

2   in the City of Miami.

3          Q.   Well, let me ask you this:  Commissioner

4   Russell fought to keep Coconut Grove as one single unit,

5   correct?

6          A.   Uh-huh.

7          Q.   Commissioner Russell ultimately was

8   unsuccessful in doing that, correct?

9          A.   Yes.  Commissioner Russell did fight for

10  Coconut Grove, and at this point Commissioner Russell was

11  unsuccessful.

12         Q.   Thank you.

13              MR. LEVESQUE:  Madam Court Reporter, sorry

14         about that.

15  BY MR. LEVESQUE:

16         Q.   So that would be an example where even

17  though you had a representative -- well, let me -- before

18  I ask that question, were you satisfied with Commissioner

19  Russell as your representative?

20         A.   Sometimes.

21         Q.   Fair enough.

22              In the 2013 plan, so before they did

23  redistricting, what district did the members of GRACE

24  reside/operate in?

25         A.   District 2.

Page 27

1          Q.    District 2.

2                Did the members of GRACE feel that they

3    were placed into District 2 because of their race or

4    their mission to help support and protect the Black

5    community?

6          A.    No.  GRACE felt that it was in District 2

7    because that's where the boundaries of District 2 were.

8          Q.    And the boundaries had been there for quite

9    a while, correct?

10         A.    I believe from -- since 2013, I believe.

11         Q.    And District 2 was generally a coastal

12   district for a good while, even before 2013.

13               Would you agree with that?

14         A.    I -- I don't know.

15         Q.    You mentioned you were born in Tallahassee.

16               When did you move to Miami?

17         A.    I moved to -- well, so I first -- I was

18   born in Tallahassee.  I moved to Miami when I was less

19   than a month old.

20         Q.    Okay.

21         A.    That was the initial move.  I moved away,

22   and I moved back to Miami in 1999.

23         Q.    All right.  And between Tallahassee and

24   Miami where were you?  You said you moved back to Miami

25   in 1999.

Page 28

```
 1              At some point did you move back to
 2     Tallahassee or --
 3         A.    I moved back to Tallahassee, I moved to
 4     Jacksonville, I moved to Orange Park, Florida, I moved to
 5     Tampa.  I lived in a lot of -- I lived in -- all over
 6     Florida.
 7         Q.    Okay.  Very good.
 8              Now going back to your statement where you
 9     say, "it appears that in the plan that was presented we
10     would experience something similar" --
11         A.    Uh-huh.
12         Q.    -- you mentioned the breaking up the Grove.
13              Did you have a problem with breaking up the
14     Grove or was it primarily the moving of West Grove into
15     what would be District 4?
16         A.    At -- at the time of this statement, you
17     know, representing GRACE, our focus was on West Grove at
18     the time of this statement.
19         Q.    Okay.  And so, would it be fair to say that
20     at the time of that statement, if you stood up and told
21     the city commission, we want the West Grove back in to
22     District 2, and they said Representative Robinson --
23     Reverand Robinson, I'm sorry if I denoted you there --
24     Reverand Robinson, you're right, we're going to do that,
25     we're going to take care of you, and we're going to move
```

Page 29

```
 1   the Grove back into District 2, would GRACE have been
 2   fine?
 3          A.    If that -- you know, I don't know.  We
 4   would've had to go on -- you know, that would have been a
 5   vote of the -- of the -- the body.  So as a -- as a
 6   single representative, I don't know what we would have
 7   done, if that would have happened.  But, you know -- but
 8   that's -- at the time of this statement, we were
 9   concerned about West Grove.
10          Q.    Was that your only concern at that time?
11          A.    Was what my only concern?
12          Q.    Well, when you were talking about voter
13   suppression and dilution, was it only the movement of
14   West Grove out of District 2, or were there other
15   concerns with the city's redistricting plan that you had
16   concerns about?
17          A.    So no other concern right away.  I know
18   one -- at least one other concern was that the -- the
19   opinions or -- of the community had not been taken into
20   consideration, so that was -- that was a concern for us.
21               Another concern was that other communities
22   of interest in other neighborhoods were not -- that
23   were -- that some other communities of interest and
24   neighborhoods were kept together in the draft that they
25   presented that day, but in oth- -- in some areas, that
```

Page 30

```
 1   was not taken into consideration.  So I think at that
 2   time, I was representing the lack of equity in the
 3   separation of neighborhoods.
 4                   Another concern was the natural boundaries
 5   weren't used.  Another concern, which I say in this
 6   statement here, was that the village council had not been
 7   taken into consideration.  I was also concerned that
 8   NCD-2, which is a part of Miami 21, had not been taken --
 9   it didn't appear to have been taken into consideration in
10   the draft, and we were also concerned at that time that
11   the community redevelopment agency that was in the
12   process of being newly formed would have been split into
13   multiple commissioned districts and would have had
14   representation of more than one commissioner.  And so, we
15   thought we had a challenge, to get things done.  So there
16   were a number of concerns.
17           Q.    Regarding the opinions of the community, do
18   you know if at some point meetings were held in the
19   community, workshopping the maps?
20           A.    I don't recall a workshop being held in the
21   community.  I recalled -- I recall kind of a Q & A and
22   informational type of session being held in the
23   community.
24           Q.    As part of that Q & A and information
25   session, was it also a listening session where the public
```

Page 31

```
 1    was given the opportunity to present their ideas?
 2             A.    In District 2, yes.
 3             Q.    And did you attend those meetings?
 4             A.    I don't remember attending but only but one
 5    of those meetings and for a short period of time.
 6             Q.    Do you know if there was more than one?
 7             A.    I believe there were, but I don't remember.
 8             Q.    Do you know if the members of GRACE were
 9    able to attend those meetings?
10             A.    I'm sure that if there was a meeting in the
11    West Grove that members of GRACE were there.
12             Q.    Do you know if members of GRACE presented
13    their ideas and opinions?
14             A.    I don't -- I don't remember.  I don't
15    remember.
16             Q.    What is your understanding of why the city
17    had to redraw districts?
18             A.    It -- it's a part of state law I believe.
19    Every ten years, the city has to reevaluate, you know,
20    based on census, based on -- you know, in order to keep
21    parity within the city so that there's an equitable
22    representation that this is something that has to be done
23    every ten years.
24             Q.    And do you know how many city districts
25    there are?
```

Page 32

```
 1        A.    In the City of Miami, there are five
 2   districts.
 3        Q.    Okay.  And do you know whether any of the
 4   districts were out of whack for population reasons?
 5        A.    Can -- you define "out of whack"?  I just
 6   want to make sure --
 7        Q.    Fair enough.  I knew as soon as I said it
 8   that was going to be an issue.
 9              Were you aware of whether any districts
10   were not equal in population, that they had to be
11   redrawn?
12        A.    I was aware of that, that there had been
13   population increase in some districts more than others.
14        Q.    Okay.  Do you know which districts had
15   experienced the population increase that would require
16   them being redrawn?
17        A.    Well, I do know that at that time
18   District 2 had experienced an increase.
19        Q.    Were you aware that District 2 had the
20   largest increase?
21        A.    Yes.
22        Q.    Were you aware that District 2 was the only
23   district that was overpopulated?
24        A.    Yes.
25        Q.    And all four of the other districts were
```

Page 33

1   underpopulated?

2          A.    I did not know they were underpopulated,

3   but, I guess, it makes sense, deductively.

4          Q.    What is your understanding then of what had

5   to happen to District 2, to equalize population?

6          A.    It's complicated to answer because I didn't

7   understand that there only needed to be something done to

8   District 2.  I understood that they were all -- all

9   districts were -- it was all moving parts, you know, to

10  kind of -- to balance things out.  So I didn't understand

11  that only District 2 needed to do something, but  that

12  all of the districts needed to work in concert to try to

13  make this work.

14         Q.    Are you familiar with how many districts

15  border District 2?

16         A.    There were definitely five.  I think

17  three -- three districts bordered 2, uh-huh.

18         Q.    You'd mentioned "NCD-2."

19               What is NCD-2?

20         A.    Neighborhood Conservation District.

21         Q.    And what is that, as it relates to Coconut

22  Grove?

23         A.    It is a protection, if you will, that's put

24  in place to preserve history.  It has restrictions for

25  development and the requirements for zoning changes and

Page 34

1    things that -- that are different from other parts of the

2    city.

3              Q.    Okay.  And is NCD-2 currently in place?

4              A.    To my knowledge, yes.

5              Q.    And you mentioned that a CRA was in the

6    works.

7                    Has the CRA been finalized?

8              A.    No.

9              Q.    And what areas would be covered by -- we'll

10   start with NCD-2.

11                   Did that cover the entirety of Coconut

12   Grove?

13             A.    No.

14             Q.    What area did it cover?

15             A.    I don't have a map in front of me, but --

16   so I don't know exactly what areas it covered, but there

17   was definitely a portion of Coconut Grove.

18             Q.    The portion of Coconut Grove that it did

19   cover, was it in the West Grove?

20             A.    Yes, I believe of West Grove -- I'm not

21   sure if it's the entirety of West Grove, but I do know

22   that it's -- quite a bit of West Grove is in NCD-2.

23             Q.    And are any parts of NCD-2 outside of West

24   Grove?

25             A.    I don't -- I don't know.  It's possible but

Page 35

1   I don't know.

2         Q.    Do you know what -- I'll rephrase that.

3               For your purposes, what would you describe

4   the boundaries of West Grove?

5         A.    You know, that's hard because that changes

6   depending on who you're talking to, but as a

7   representative of GRACE, I think what we considered to be

8   West Grove was Douglas Road on the -- I guess, that would

9   be the south.  You know, West Grove is sort of difficult

10  to describe.  So, I guess, that's the southern border;

11  Douglas Road, you know, all of the way up to U.S. 1 on

12  west.  So it's now it's kind of weird that's northeast

13  U.S. 1, Douglas Road.  I guess, 32nd Avenue and McDonald

14  -- McDonald, and I don't know how far back we go to the

15  east or southeast, but in those -- it's in there

16  somewhere.

17        Q.    Okay.  Are you aware of any official

18  designation of what constitutes West Grove?

19        A.    No official designation, that I know of.

20              And can I retract something?

21        Q.    Sure.

22        A.    Because I forgot about Armbrister Park and

23  all that stuff way down there.  I guess, that would

24  Brooker Street, you know, bordering Coral Gables, so I'm

25  even missing some now, but all of those things, all of

Page 36

1    that -- those neighborhoods.

2         Q.    And we'll go back to my question.

3               Are you aware of any official designation

4    that would constitute West Grove?

5         A.    I'm not aware of any official designation.

6         Q.    Are you aware of any official designation

7    for Coconut Grove?

8         A.    I think it's -- I think there's a sign that

9    says Coconut Grove, so I think that's official.

10        Q.    Okay.  But are you aware of anything that

11   officially establishes what the boundaries for Coconut

12   Grove are?

13        A.    I don't know that there's something that

14   officially establishes boundaries for Coconut Grove, for

15   West Coconut Grove.

16        Q.    Well, and I just want to be clear; when you

17   say "West Grove," is that the same as West Coconut Grove?

18        A.    Yes.  When I say "West Grove" or "West

19   Coconut Grove," I'm using those interchangeably.

20        Q.    Okay.  Great.

21              In the standpoint of Coconut Grove broadly,

22   it's my understanding there's the West Grove and then

23   there are other parts of Coconut Grove.

24              What are the other parts of Coconut Grove

25   that you would recognize?

Page 37

```
 1          A.    Well, unofficially, North Grove, East Grove
 2   Center Grove, South Grove.
 3          Q.    Are there any other parts?
 4          A.    Recently, there's Little Bahamas of Coconut
 5   Grove.
 6          Q.    And is that something that would be in
 7   addition; like an additional geographic area other than
 8   North, East, Center and Southwest or is it something that
 9   might sit on the lines or sit within one of those other
10   five that we've already talked about?
11          A.    I'm pretty sure it sits within.  I just
12   don't know where.
13          Q.    Okay.  Is it fair to say that the issues
14   that GRACE works on in the West Grove are not really
15   issues that are a problem in either North, East, Center
16   or South Groves?
17          A.    Not all the time.  It's not fair to say
18   that all the time.
19          Q.    What about most of the time?
20          A.    It depends on the issue.  It depends on the
21   issue.
22          Q.    Well, are the areas of North, East, Center
23   and South Grove generally characterized by higher
24   property values?
25          A.    Yes.
```

1        Q.     Residents with higher personal incomes?

2        A.     So here's where it's tricky because, you

3   know, in the West Coconut Grove, there are very wealthy,

4   you know, very famous attorneys and basketball players

5   and all who have homes -- baseball players, you know, so

6   it's hard to say that because, you know, West Coconut

7   Grove is so diverse.

8        Q.     Well, do you have the same type of

9   diversity in the North, East, Center and South Groves?

10        A.     I can't -- I wouldn't know.  I can't speak

11   to it.

12        Q.     All right.  Now, going back to your

13   statement on Line 22 -- actually, 21 and 22 is addressing

14   the chairwoman.  You say, "We do appreciate that, but as

15   it relates to substance, it appears that what was

16   presented today intentionally discriminate and

17   desperately impacts the voting rights of the Village West

18   Black residents by diluting their political impact.

19        What aspects of that plan do you believe

20   were intentional discrimination?

21        A.     Moving -- and it was based on the report

22   that was given by the consultant.  There were numbers I

23   think that were mentioned in that report.  And there were

24   Black voters that would be moved to a district where they

25   would be the overwhelming minority in that voting body.

```
1    And so, you know, by definition, that's dilution of
2    votes.
3             Q.    And when you say "by definition that's
4    diluting of votes," where do you get -- what's your basis
5    for making that statement?
6             A.    What do you mean, what's my basis?
7             Q.    Did you read that in a case?  Did you hear
8    that on the news?  I guess, where is your source of
9    information for making this statement that that's the
10   definition of dilution?
11            A.    I don't -- I don't recall exactly where I
12   read it, but with all that was happening in government at
13   that time, with redistricting and the state, you know, I
14   read so much material.  And so, at that particular time,
15   I think I was -- what was fresh in my mind was packing,
16   fracking, all of these -- this voter terminology that I
17   was familiar with at that time.  I've read probably a
18   hundred books since then.  But at that time, what was
19   fresh in my mind was were those upon packing, fracking,
20   you know, dilution of votes.  So I was pretty -- that's
21   what -- I think that was my basis at the time.
22            Q.    Do you know what percentage of voters
23   Blacks constituted in District 2?
24            A.    I don't.
25            Q.    Do you know if they were 30 percent of
```

Page 40

1    District 2?

2            A.    I -- I don't remember that.  I don't know

3    the -- the percentages.

4            Q.    Do you know what the race of Commissioner

5    Russell was?

6            A.    I think he was proud that he was Japanese.

7    He was very proud to share that quite often.

8            Q.    Do you know if his fellow commissioners

9    identified him as Japanese?

10           A.    I'm not sure how -- how they identified

11   him.  I re- -- I don't know how they identified him,

12   personally.

13           Q.    Do you know how he identified himself on

14   his campaign materials?

15           A.    I don't.

16           Q.    Do you know the race or ethnicity of the

17   current commissioner for District 2?

18           A.    Yes.

19           Q.    Who is currently the commissioner of

20   District 2?

21           A.    Sabina Covo.

22           Q.    And what is her race or ethnicity?

23           A.    She's Colombian, of Colombian descent.

24           Q.    Okay.  Does that make her also Hispanic?

25           A.    Sure, yes.

1          Q.    Did you have a problem with being

2     represented by a Hispanic commissioner?

3          A.    No.

4          Q.    Are you aware that the commissioner in

5     District 4 is a Hispanic commissioner?

6          A.    Which commissioner is that again?

7     District 4 is -- yes.

8          Q.    Do you recall who the commissioner of

9     District 4 is?

10         A.    I believe that's Manolo Reyes.

11         Q.    Do you have a problem with being

12    represented with -- I mean, let me back up.

13              Generally speaking, unless I indicate

14    otherwise, when I say "you," I'm referring to you --

15         A.    As GRACE?

16         Q.    -- as -- yes.

17         A.    Yes.

18         Q.    Does GRACE have a problem with its members

19    being represented by Commissioner Reyes?

20         A.    GRACE doesn't have a problem with the

21    community being represented by the commissioner that they

22    had to vote for.

23         Q.    Well, was there anything about any of the

24    plans that had been considered by the city that would

25    deprive any of G.R.A.C.E.'s members that can vote of the

Page 42

 1  ability to vote?

 2       A.   The ability to vote?  No, it doesn't

 3  deprive anyone of the ability to vote.

 4       Q.   Okay.  Is there anything about the plan

 5  that discourages them from voting?

 6       A.   Based on community meeting conversations,

 7  yes.  When people learned that they were moving out of

 8  District 2 into another district and they believed that

 9  their votes would be diluted because there would be

10  another population that would be represented well more

11  than them, they were discouraged from voting.

12       Q.   Let me ask this:  Do you know if the Black

13  residents in West Grove, if they were in District 2 or

14  District 4, whether they would have been the minority

15  population for that district?

16            And when I say "minority population," I

17  don't mean racial minority; I mean, minority in terms of

18  numbers.

19       A.   The Black voters would have been the

20  minority in whatever district they were in, I believe,

21  other than District 5.

22       Q.   Okay.  And so, no matter which district

23  they were anything to be in, they were going to be a

24  smaller proportion of the race in that district, whether

25  it's a small portion of Blacks in District 2 or a small

Page 43

1   portion of Blacks in District 4.

2          Would you agree with that?

3          A.    Yes, that's true, and that was the major

4   concern because you take an already minority group and

5   make them even smaller by splitting them into two

6   different districts, so I think that was the main

7   concern.

8          Q.    Is it your understanding that they were

9   splitting the West Grove or splitting Coconut Grove when

10  they moved those portions of West Grove into District 4?

11         A.    Well, with the information that I have now,

12  Coconut Grove was being divided or split in multiple

13  areas and multiple districts, but as it relates to

14  District 4, what I believe -- that first draft, and I'm

15  not looking at it, and at the time of this transcript, my

16  focus was West Coconut Grove.

17         Q.    And what is the basis -- going back to your

18  statement.

19         What is the basis for your assertion that

20  they were intentionally moving the West Grove because of

21  their race?

22         A.    I think at that time I was representing the

23  consensus of GRACE and its members, and that's just --

24  that's what we believed at that time, you know, after --

25  after, you know, assessing it, that's -- that was the

Page 44

1   belief of the body at that time.

2          Q.    Well, was there anything in terms of

3   objective evidence or statements from commissioners that

4   gave you that impression, or was it just a feeling?

5          A.    Well, after this comment, yes, the

6   commissioners made multiple statements that corroborated

7   our belief, so --

8          Q.    Sorry, I didn't mean to cut you off.

9          A.    No, it's okay.  I'll stop there.

10          Q.    If you have more to say, I want to hear it.

11          A.    No, no.  I'm good.

12          Q.    Okay.

13          A.    Thank you.

14          Q.    So the statements you're referencing, are

15   you referring to the fact that they talked about, you

16   know, having three Hispanics districts, a Black district

17   and an Anglo district?

18          A.    That's some of it.

19          Q.    Okay.  What else, other than that?

20          A.    I believe I remember one -- one

21   commissioner literally saying, we gerrymandered the

22   districts so that we can keep Latino or Cuban

23   commissioners in certain districts.  And so, there was

24   even specificity with what nationality of Latino would

25   represent districts.  So that just kind of reinforced

Page 45

1    what we were thinking.

2           Q.    Do you recall which commissioner said that?

3           A.    Oh, my gosh process of elimination.  It

4    wasn't Russell, of course.  It wasn't de la Portilla, it

5    wasn't King, it wasn't Reyes.  It was -- I cannot recall

6    his name. . .

7           Q.    Carollo?

8           A.    It was Commissioner Carollo.  Thank you for

9    helping me.

10          Q.    And you referenced there that he made the

11   statement that he wanted to elect Latino/Cuban.

12                Are those two different, or do you use

13   those interchangeably, or is that a particular name for a

14   subdivision of Hispanic?

15          A.    They are different.

16          Q.    Okay.  So Latino and Cuban are different?

17          A.    Well, I mean, you know, Cubans -- Cuban --

18   people of Cuban descent are Latino, but I believe when

19   the commissioner spoke, that they meant something

20   different; that they meant that they needed Latino

21   representation, and some districts, no matter what

22   ethnicity or where they were from, and that in other

23   districts, that they wanted specifically Cuban

24   representation.

25          Q.    Okay.  Do you believe that there is a way

Page 46

 1   to draw the city that doesn't have three Hispanic
 2   commissioners, a Black commissioner, and what I'll call a
 3   plurality commissioner?
 4           A.    And I don't know, and that -- that has
 5   never been our intent or goal.  I mean, and I don't want
 6   to say this disrespectfully, but we didn't care about the
 7   race of -- how the maps were drawn in a way that
 8   reflected what race a person was.  We just wanted people
 9   to be able to elect who they wanted and that it be done
10   in an equitable way.
11               And so, if they're Latino, if they're
12   German, if they're -- wherever they're, from we thought
13   every district should be able to decide, and the map
14   shouldn't be gerrymandered in a way that there has to be
15   people from certain races.
16           Q.    So is it your testimony today on behalf of
17   the G.R.A.C.E organization that you didn't have a concern
18   about being placed in a Hispanic district or a plurality
19   district or even a Black district, you would've been fine
20   with whatever, so long as the line wasn't set there
21   because of race?
22               MS. MCNAMARA:  Objection to form.
23               You can answer.
24           A.    I believe that GRACE was -- didn't
25   characterize the districts as Latino or Anglo or Black,

Page 47

1  but GRACE understood the dist- -- the commission

2  districts to be commissioned districts, and that as long

3  as the members of the district had an equal and fair

4  opportunity to elect who- -- whomever they wanted to

5  elect that was what was of greatest importance to us.

6  BY MR. LEVESQUE:

7      Q.   Well, again if Grace's members can still

8  vote, their vote is with equal population.  Their vote is

9  generally going to be the same if they're voting in

10  District 2 or District 4 or District 3 or District or

11  District 5, correct?

12     A.   I don't believe that to be correct.

13     Q.   Okay.  What are the circumstances where

14  their vote would count more; what are the circumstances

15  where their vote would count less?

16          And I'll go ahead and object for your

17  counsel about the compound question.

18          We'll start with the first one.

19          What are the circumstances where GRACE

20  might have their vote count more?

21     A.   The circumstances where the mem- -- the

22  members of the community and member organizations

23  represented by GRACE would have their vote count more is

24  if they are voting within the same district; not

25  necessarily for a race or -- you know, but it would count

Page 48

1    more if people who lived within a certain neighborhood

2    could vote together.

3           Q.    And the force that you're talking about

4    there is block voting?

5           A.    No, not by definition, no.

6           Q.    Okay.  Well, let me ask this:  If you have

7    folks in a neighborhood everybody's voting but they're

8    voting differently.

9           A.    Uh-huh.

10          Q.    Is their voice stronger or weaker?

11          A.    If everyone is in the same neighborhood and

12   they're voting differently, does it strengthen or weaken

13   their voice?

14          Q.    Yeah.

15          A.    I think it's equitable.  We're in the same

16   neighborhood, we can vote however we want.  I think that

17   doesn't strengthen or weaken.

18          Q.    Okay.  And that's true if you're in

19   District 2?

20          A.    Right.

21          Q.    You can vote however you want.  If you're

22   in District 4, you can vote however you want.  I'm having

23   a hard time seeing where the voter harm is if you're able

24   to vote and you can vote however you want in District 2

25   and you can do the same thing in District 4.

Page 49

1          What's the difference?

2          A.    I think when, you know, you look -- looking

3     at the demographics of those districts, I think when

4     you -- you know, if you take a group of people who live

5     in a certain neighborhood and share interests with, you

6     know, a community and then you put them into a district

7     where they don't share interests, don't really have the

8     same challenges as the group where they're being placed,

9     then I think that weakens the vote or weakens their voice

10    because they have -- they don't have the same interests,

11    and they don't share the same neighborhoods as the people

12    in the new district.

13         Q.    And you'll have to forgive me.  You

14    mentioned some famous sport stars that live in Coconut

15    Grove.  I should probably know this.

16             What are some famous sport stars that live

17    in Coconut Grove?

18         A.    Oh, man, I don't -- do I have to name them?

19    I would rather not answer that question.

20         Q.    Well, I'm not looking to pay them a visit.

21         A.    Okay.

22         Q.    You would agree that an athlete that lives

23    in, say, the North Grove, to pick an area, I don't know

24    if that's right or not, but an athlete that lives in the

25    North Grove is probably not going to experience the same

Page 50

1  type of problems and same type of issues that somebody

2  who lives in the West Grove experiences, where they might

3  have, you know, a property owner trying to evict them,

4  correct?

5          A.   Again, that's a challenging question for me

6  to answer, so I'll try the best I can.

7               Athlete or not, anyone who owns a home in

8  any part of the Grove would not experience the same

9  issues as a tenant who has a home own- -- as an owner

10  trying to evict them in any part of Coconut Grove or any

11  part of the city.  So -- so my answer to the question is:

12  Yes.  But however, I think those conditions apply to

13  anybody; not just an athlete.  Or anybody living in any

14  part of the City of Miami; not North Grove or West Grove.

15          Q.   Okay.  Okay.

16               Reverand Robinson, I'm just going to give

17  you what we're going to mark as Defendant's Exhibit 23.

18               (Defense Exhibit 23 was marked.)

19          A.   Thank you.

20  BY MR. LEVESQUE:

21          Q.   Do you recognize that document?

22          A.   I've seen -- I think I've seen this, yes.

23          Q.   Okay.  I'll represent to you that that is

24  the First Amended Complaint that was filed on behalf of

25  GRACE and other plaintiffs.

Page 51

```
 1                 If I could ask you to flip to Page 4.
 2         A.    Okay.  I'm on Page 4.
 3         Q.    Okay.  And the last sentence on that page,
 4    it says:  "Grace's members, most of whom are Black,
 5    reside in commissioned Districts 2 and 4."
 6                 Does GRACE keep a list of its individual
 7    homeowner and tenant members?
 8         A.    Do we keep a list of -- yes, we have a
 9    list.
10         Q.    Okay.  Did anybody with GRACE go through
11    that list -- well, let me back up.
12                 Does that list include their residential
13    address?
14         A.    Members, yes.
15         Q.    Okay.  Did anybody from GRACE go through
16    and figure out, yes, we've got somebody in District 2?
17         A.    Yes, I believe so, yes.
18         Q.    Who did that?
19         A.    I think it was an action of the board, I
20    believe.
21         Q.    Okay.
22         A.    Yeah.
23         Q.    So that would be reflected in the board
24    meetings minutes?
25         A.    If -- if we -- if we did, it should be.
```

Page 52

```
 1          Q.    Okay.  And did anybody go through the list
 2    of residential addresses and say, we also have somebody
 3    in District 4?
 4          A.    I believe so, yes.
 5          Q.    Okay.  And, again, that would be in the
 6    board minutes?
 7          A.    Yes, I -- it should be.
 8          Q.    If I could ask you to flip to Page 6.
 9                In Paragraph 30, it says, "The enacted plan
10    places Plaintiffs Cooper, Johnson and Valdez and
11    organizational plaintiffs members in districts where they
12    are not the predominant racial group."
13                For District 2, do you know what the
14    predominant racial group is?
15          A.    District 2 is so diverse, I don't know.
16          Q.    Okay.  Would it be fair to say that there's
17    not a majority racial group in District 2?
18          A.    I don't know.
19          Q.    Would it surprise you if there's not a
20    majority racial group in District 2?
21          A.    No, because Miami is -- is interesting.
22    You know, Miami is a majority minority city and county,
23    so that wouldn't be surprising.
24          Q.    Most of your members are Black, correct?
25          A.    Yes, most.
```

Page 53

```
 1          Q.    Is GRACE complaining because it's Black
 2    members were not placed in any Black district?
 3          A.    No.
 4          Q.    Would you agree that it's impossible to
 5    place Grace's members in a Black district?
 6          A.    GRACE doesn't characterize the districts as
 7    -- by race so, I mean, I would have to answer your
 8    question as yes, but I would also answer that with the
 9    understanding that GRACE doesn't characterize districts
10    as Black or white or whatever.
11          Q.    Do you understand that both your attorneys
12    and counsel for the city agree that the Voting Rights Act
13    requires the city maps to create an opportunity for at
14    least one district to elect a Black candidate of choice?
15          A.    Yes.
16          Q.    We won't get into where we disagree, but
17    that's good enough.
18                And do you also understand that at least
19    the Black district, and when I say Black district I mean,
20    a district that is likely to elect a Black candidate of
21    choice.
22                And that district is District 5, correct?
23          A.    And I would just -- so I do agree, and I
24    would like to say that because a district elects a Black
25    commissioner, we -- GRACE doesn't believe that the
```

Page 54

1   district is Black because if that would be the case, then

2   presently, commissioned District 2 is Colombian, you

3   know.  So we just don't agree that that's how a district

4   should be classified, but District 5 is the district

5   that, you know, typically elects Black -- Black

6   commissioners.

7        Q.    I understand perfectly.  Another example

8   might be President Obama.

9              I'm not sure anybody out there would say

10  that --

11       A.    Yeah, America is --

12       Q.    -- America is a Black country?

13       A.    Correct, correct.

14       Q.    So, obviously, there are diversity things

15  that can occur where someone is from a different race but

16  still elected by a majority that might be different?

17       A.    Correct.

18       Q.    So going back to that statement, the

19  statement is, "Organizational plaintiffs' members are

20  placed in districts where they are not the predominant

21  racial group."

22             For GRACE, that's probably going to be

23  true, no matter who's drawing the map.

24             Would you agree with that?

25       A.    Yes.

1      Q.    And have you examined the maps that were

2   proposed by plaintiffs in this litigation?

3      A.    Yes.

4      Q.    And you would agree that in all of those

5   maps, the members of GRACE are not placed in any district

6   where they are the predominant racial group, correct?

7      A.    Correct.

8      Q.    And you understand "organizational

9   plaintiffs" there to include GRACE, correct?

10     A.    Yes.

11     Q.    Now, I want you to look at Paragraph 31,

12  and there's a similar statement, but it has a little bit

13  of a different twist.  "The Enacted Plan places

14  Plaintiffs Miro and Contreras and Organizational

15  Plaintiffs' members, in districts where they are the

16  predominant racial group."

17           When we're talking about The Enacted Plan,

18  we're talking about the plan that the commission passed

19  in 2022.

20           Would you agree with that?

21     A.    Yes.

22     Q.    And so, my question to you is:  Is that an

23  accurate statement as it relates to G.R.A.C.E.'s members?

24     A.    Well, no, but -- but I believe that the

25  plaintiffs -- the members -- I'm sorry, that the

Page 56

```
 1    Organizational Plaintiffs' members that are being
 2    referred to here is Engage Miami, which is a
 3    predominantly Latino organization.
 4          Q.    Okay.  If I could refer you back to
 5    Paragraph 24, it says, "If The Enacted Plan is not
 6    enjoined, the members of GRACE, Engage Miami, and the
 7    NAACP Branches (together, 'Organizational Plaintiffs')
 8    will be harmed by living and voting in unconstitutionally
 9    racially gerrymandered districts."
10          A.    Okay.
11          Q.    So the way that I read that is, they have
12    defined Organizational Plaintiffs to include not just
13    Engage Miami and the NAACP, but also all of the members
14    of GRACE, as well.
15                Is that a fair reading of that based upon
16    that?
17          A.    Well, not in context, no, because in -- in
18    Line 30 they specify, I think -- I'm sorry, what were we
19    reading before?  Line 30 --
20          Q.    31, yeah.
21          A.    -- 1?  Yeah.
22                I think it specifies individual plaintiffs
23    and refers to the districts that they are in.  So I would
24    read it -- I would understand it as referring to the
25    districts that those particular plaintiffs and the
```

Page 57

1    organizational plaintiffs that are in those districts

2    are repre- -- where those groups are represented.  That's

3    how I would read it.

4          Q.    Okay.  Do you know if Miro or Contreras are

5    in either Engage or any of the other organizations?

6          A.    So this is tough because I call them by

7    their first names when -- we talk on a first-name basis,

8    so I don't remember by last name.

9          Q.    Okay.  Alexandra Contreras?

10         A.    Alexander.

11         Q.    Alexandra, sorry.

12         A.    And what was the question about Alexandra?

13         Q.    Do you know if she's a member of Engage

14   Miami or one of the NAACP organizations?

15         A.    I believe Alexandra is Engage.

16         Q.    Okay.  What about Steven Miro?

17         A.    I don't think Steven is a member of any of

18   those organizations.  I think he's just an individual

19   plaintiff.

20         Q.    What is the predominant racial group in

21   District 4?

22         A.    I can't -- I don't know.

23         Q.    Okay.  Does GRACE have any Hispanic

24   members?

25         A.    Do we have any?  So yeah, we have member

Page 58

1    organizations who have Hispanic members.

2            Q.    Okay.

3            A.    Yes.

4            Q.    So what would be one of those member

5    organizations that have Hispanic members?

6            A.    Greater St. Paul.

7            Q.    And there you're referring to the church

8    that you're a pastor of?

9            A.    Yes.

10           Q.    So you have Hispanic parishioners?

11           A.    Yes.  And the West Grove Crime Watch has

12   Hispanic members and HOTA -- or not HOTA, I'm sorry.  The

13   Ministry Alliance has other churches that have Hispanic

14   members, so yes, there are Hispanic members within GRACE

15   membership.

16           Q.    I'm sorry.

17                 What was the name of the church that you're

18   a pastor of?

19           A.    Greater St. Paul.

20           Q.    And what's the full name of --

21           A.    Greater St. Paul African Methodist

22   Episcopal Church.

23           Q.    And that's a denomination that has a

24   longstanding distinguished Black history, correct?

25           A.    That's a longstanding distinguished

Page 59

1    American history, but yes, Black history, as well.

2         Q.    And would you identify it as a Hispanic

3    church?

4         A.    No.

5         Q.    Okay.  And to be clear, it's the church

6    that's a member, and the church's members would be

7    indirectly members of GRACE.

8              Would that be a fair characterization?

9         A.    No, without indirectly.

10        Q.    Without indirectly?

11        A.    Yeah.

12        Q.    So if you're a member of one of the

13   organizations, you're automatically a member --

14        A.    Yes.

15        Q.    -- of GRACE?

16              So one of your parishioners would be able

17   to come to board meetings and have a voice?

18        A.    Yes, and they do.

19        Q.    Reverand Robinson, I'm going to show you

20   what we're going to mark as Defendant's Exhibit 109.

21              (Defense Exhibit 109 was marked.)

22   BY MR. LEVESQUE:

23        Q.    Have you seen that document before?

24        A.    Yes.

25        Q.    What is that document?

Page 60

1           A.      This is the Supplemental Complaint.

2           Q.      If I could ask you to flip to Paragraph 5

3    on Page 2.

4           A.      Okay.  I'm at Paragraph 5 on Page 2.

5           Q.      Okay.  In that paragraph, the last

6    sentence, it says, "Grace's members, most of whom are

7    Black, reside in Commission District 2 under the 2023

8    plan."

9                   Now, if I understood your objections to the

10   earlier versions of the map before the city passed the

11   2022 plan, your chief objection was the fact that the

12   West Grove was being moved into District 4.

13                  As I read this complaint you're recognizing

14   that all of your members are now in District 2; is that

15   fair?

16          A.      Can you state the question one more time

17   for me?

18          Q.      Sure:  As I read this --

19          A.      Uh-huh.

20          Q.      -- all your members are in District 2; is

21   that correct?

22          A.      No.  All of our members are not in

23   District 2, but most of them reside in District 2.

24          Q.      Okay.  Do you have members that are

25   residing in other districts?

1          A.     Yes.

2          Q.     What districts do your members or other

3     districts do your members reside at?

4          A.     I'm not sure.  I don't want to say the

5     wrong thing, but there are members that certainly live

6     outside of District 2.

7          Q.     Do they live within the City of Miami?

8          A.     Yes.

9          Q.     Has anybody in your organization gone

10    through and identified which districts your members live

11    in?

12         A.     If we have, I don't remember going -- not

13    every individual member.

14         Q.     Would that something -- would that be

15    something that would have been directed in a board

16    meeting?

17         A.     Yes.

18         Q.     And if it was directed in a board meeting,

19    would it be in the minutes?

20         A.     It should be.

21         Q.     And would it fair to say that if it wasn't

22    in the minutes, it didn't happen?

23         A.     I don't think that's fair to say.

24         Q.     Okay.  When you're conducting your board

25    meetings and taking minutes, do you normally record the

Page 62

1   major actions that are taken?

2          A.     Yes.

3          Q.     Okay.  And so, would it be unusual if a

4   major action wasn't recorded?

5          A.     It would be unusual if something that was

6   voted on wasn't recorded.

7          Q.     Okay.  What if something wasn't voted on;

8   it was just discussed and direction was given?

9          A.     That -- that should be recorded.

10         Q.     Okay.  Is that the type of activity that

11  normally would have been recorded if the board was

12  directing somebody to do something?

13         A.     It should have -- yes, it should have been

14  recorded.

15         Q.     If I could ask you to flip to Page 3.

16         A.     Okay.  I'm on Page 3.

17         Q.     And Paragraph 17.

18                Is it your interpretation then of the

19  complaint that Paragraph 17 would not apply to GRACE?

20         A.     Yes.

21         Q.     But Paragraph 16 would apply to GRACE?

22         A.     Yes.  And just additionally, from what

23  we -- the exhibit we looked at earlier, I think the

24  meeting transcript, which was 24B, I believe, from --

25  from February of 2022 to the time that we filed the

1   complaint, that -- "we" meaning GRACE filed -- and the

2   other plaintiffs filed -- filed the complaint, we had

3   educated ourselves tremendously.  We were -- so the focus

4   at that -- at this point was not only on West Grove.  At

5   this point the focus was on the entire -- all of the

6   residents in the City of Miami having fair and equal

7   representation.  So -- so we had -- our focus was no

8   longer just on West Grove when we get to the complaints.

9   Now the focus was on, we want to do the right thing for

10  the entire city.

11          Q.   Do you know if you have residents in all

12  the districts of the city?

13          A.   I don't know that.

14          Q.   Do you know if anybody at GRACE has ever

15  made any effort to verify if they've got residents in all

16  of the districts of the city?

17          A.   I don't -- I don't -- -- I don't know if we

18  have.  I don't know that we have, but I think that was

19  our motivation for having conversations with people from

20  other parts of the city.  And -- and after learning that

21  they felt the same way we did about the maps, they

22  willingly, or even in some cases asked, could they join

23  the cases as complainants -- join the case as

24  complainants -- as plaintiffs.

25          Q.   I struggle with it, too.

Page 64

1          Let me ask this:  In the second sentence of

2     paragraph 16, it says, "The 2023 plan sent a message that

3     their commissioner's job is to represent the predominant

4     group; not them."

5          I'm going to represent to you that from the

6     time individual districts were drawn, that the members of

7     the Black community in District 2, which is where the

8     West Grove was from 1997 all the way to the present, was

9     never the predominant racial group in District 2.  They

10    were always the minority.

11         What changed with the 2022 plan that sent

12    the message that the commissioner's job was not to

13    represent them?

14         A.    So I don't know that that was the message

15    sent to District 2 or to GRACE in particular; however,

16    the -- the complaint was filed as a collective and with

17    the intent of representing all of the residents of the

18    City of Miami; not only District 2, which is why we have

19    joint plaintiffs.  So these -- you know, these complaints

20    don't only represent the interest of GRACE, but they

21    represent the interest of all of the plaintiffs.

22         So it doesn't -- so it's not specific to --

23    to District 2 at this point once we get to the

24    complaints.  Now we're talking about equal representation

25    through the entire city.  So some of these things that

```
 1   are here don't represent GRACE particularly but the
 2   entire group of plaintiffs.
 3         Q.    Okay.  Well, I'm here talking to Grace's
 4   corporate representative.
 5         A.    Right.
 6         Q.    I appreciate that there are other
 7   plaintiffs that might have other beefs with -- again, my
 8   term, not necessarily anything that you'll read in your
 9   complaint, that's well written, but I'm talking about
10   GRACE, and I want to know about GRACE.
11              So from Grace's perspective does GRACE
12   feel -- what changed for GRACE or did nothing change for
13   GRACE with the 2022 plan or the 2023 plan in terms of
14   where the West Grove was placed?
15              MS. MCNAMARA:  Objection to form.
16   BY MR. LEVESQUE:
17         Q.    I'll rephrase.
18              What changed for GRACE related to the 2023
19   plan, once all of your members, the ones that you've
20   identified that live in District 2, what changed for
21   those members that were kept in District 2 that they
22   believe that their commissioner's job is to represent the
23   predominant group; not them?
24         A.    I don't -- I don't know that that refers to
25   GRACE.
```

Page 66

```
 1          Q.    Okay.  So that's not a statement that GRACE
 2    would necessarily attribute to its members.
 3                It's something that GRACE would say, that
 4    might apply to the NAACP organizations, it might apply to
 5    Engage, but that's not referring to us.
 6          A.    (Witness reading document.)
 7                So a little bit of time has lapsed, so one
 8    more time with the question.
 9          Q.    Sure:  If I understand what you're saying,
10    that is a statement that GRACE would ascribe to the other
11    plaintiffs; it's not something that GRACE would say
12    applies to Grace's members?
13          A.    Yeah, I don't know.
14          Q.    Okay.
15          A.    I don't know.
16          Q.    And I will tell you, Reverand Robinson, "I
17    don't know" is a great answer, if it's the truthful
18    answer.
19          A.    Yeah it is.  It is.  I don't know.
20                MR. MERKEN:  Okay.  Can we take a
21          five-minute break?
22                MR. LEVESQUE:  Yeah, we're at a good
23          breaking point.
24                (Recess taken, 3:43 p.m. to 3:51 p.m.)
25
```

1    BY MR. LEVESQUE:

2         Q.    Reverand Robinson, I am going to show you

3    what we are going to mark as Defendant's Exhibit 8234.

4              (Defense Exhibit 8234 was marked.)

5    BY MR. LEVESQUE:

6         Q.    Do you recognize that map?

7         A.    Yes.

8         Q.    What is that map?

9         A.    This is Plaintiffs' Map 1.

10        Q.    Okay.  Did you have any input into that

11   map?

12        A.    Yes.

13        Q.    Did you draw that map?

14        A.    No, I didn't draw it.

15        Q.    Do you know who did draw it?

16        A.    Not personally.  I know we have a great

17   team of attorneys and experts.  And so, somebody who does

18   all that did all that, but I did give input.

19        Q.    And if I remember correctly, you stopped

20   being the Chair of GRACE in January of 2023?

21        A.    Yes.

22        Q.    Were you still on the board playing any

23   role in the organization at that time?

24        A.    I was still on the board.

25        Q.    Did the board vote to approve this map?

Page 68

```
 1          A.    You know, I don't remember.  I don't
 2   remember if we voted to approve this map, but I know we
 3   were all a part of the conversation.
 4          Q.    Other than your attorneys, who else was
 5   involved in the conversation?
 6          A.    The other plaintiffs.
 7          Q.    Would everyone get together, either in one
 8   space or on a Zoom call?  How did those conversations
 9   occur?
10          A.    Lots of conversations on Zoom with
11   everybody.
12          Q.    All right.  Is that the way the map was
13   shared with you?
14          A.    Initially, yes.
15          Q.    Do you recall when this particular map was
16   shared with GRACE?
17          A.    I don't recall exactly when, but I do know
18   that it was after the enacted map was made public and
19   after -- so it was after that, and then it was after --
20   you know, we started out with a small, you know, civil
21   rights group, and then after, we were able to retain ACLU
22   counsel and after several meetings, and then we were able
23   to come up with this.  So it was -- I don't remember the
24   date, I'm sorry.
25          Q.    Was it before or after a complaint was
```

Page 69

1    filed?

2          A.    I don't remember.

3          Q.    Do you recall if it was before or after the

4    First Amended Complaint was filed, which would have been

5    February 10th, 2023?

6                MS. MCNAMARA:  February 10th, 2023 is the

7          date on the First Amended Complaint.

8                MR. LEVESQUE:  Thank you.

9          A.    So I don't remember the dates, and I'll --

10   I'll tell you why, you know.  I resigned as the board --

11   the chair, well, because, you know, the term was up, but

12   we kind of didn't have an extra year because of COVID,

13   but I started a doctoral program.  So my doctoral program

14   is in Dayton, Ohio.  So I fly back and forth from Miami

15   to Dayton, Ohio for my doctorate program.  And at the

16   same time, my wife completed her doctorate.  And so, it's

17   just -- and my daughter is 16.  So just, it was one of

18   the reasons I needed to move -- you know, not be the

19   chair because I had so much going on.  So there are tons

20   of dates in my head, and so I apologize.  I don't

21   actually remember the dates.

22   BY MR. LEVESQUE:

23         Q.    Do you know who in GRACE would know the

24   dates?

25         A.    Probably the -- the vice chair was most --

Page 70

```
 1   most active in all of the meetings so, and -- and she
 2   keeps copious notes, so she would probably have those
 3   dates.
 4          Q.    And would that be Ms. Donaldson?
 5          A.    Yes.
 6          Q.    Is there a reason why you didn't speak to
 7   her about getting ready for this deposition?
 8          A.    Just busy.
 9          Q.    Okay.  Do you know if the board of GRACE
10   approved this map?
11          A.    I -- I know we were okay with it.  I don't
12   remember a vote.  If the vote happened, I don't remember
13   it.  But I know that we were in agreement with this map
14   along with the other plaintiffs.
15                And can I add something?
16          Q.    Sure.
17          A.    I would like to add that at this point
18   when -- at this map, what I do remember is that, we had
19   been -- I don't know if we had been told or heard or we
20   believed, but the implication was that there was no other
21   map possible, right, that could keep neighborhoods
22   together, that could do all the things that we were --
23   that we had questions about.  And so, this map was
24   just -- initially it was just to prove that it could be
25   done differently.
```

1          So initially, this map wasn't -- we don't,

2    you know, create this map with the intent that it would

3    be the final map.  The intent for this map was you, city

4    commission, said it can't be done, so we've gotten

5    together with experts and we -- and we're just showing

6    you it can be done.  So let's try to get it done.

7          Q.    Okay.  One of the features of this map

8    is -- that's different from every other map that the city

9    commission has adopted is Flagami is united into

10   one district.

11         A.    Uh-huh.

12         Q.    Let me ask this:  Does GRACE have any

13   members that live in the Flagami neighborhood?

14         A.    I don't know.

15         Q.    Is GRACE aware of anyone from that area who

16   requested that Flagami be united into one district?

17         A.    I'm not aware of any.

18         Q.    Do you know why GRACE was -- Grace's map

19   united Flagami into one district, if nobody requested it?

20         A.    Again, I believe that at this time, we were

21   just trying to prove to the city commission who implied

22   that just, you know, uniting neighborhoods and using

23   natural boundaries and all these other things could not

24   be done.  I think this was just to say, listen, it can be

25   done, if you try.  And so, I think this map attempted to

Page 72

```
 1   unite neighborhoods, traditional neighborhoods just to
 2   show that, hey, this can be done and still meet the
 3   standard deviation.
 4        Q.    What is so important about keeping
 5   neighborhoods together?
 6        A.    What's been important about it?
 7        Q.    Yeah.
 8        A.    People share interests, people share
 9   history.  And as a part of, you know -- Grace's purpose
10   is to preserve the culture, the community, the history.
11   And so -- and so, keeping neighborhoods together is
12   important because it does that.
13        Q.    Okay.  What type of history does a tenant
14   in the West Grove share with an unnamed athlete in the
15   North Grove?
16        A.    I mean, it could be none because they may
17   not be from -- usually, the athletes are from somewhere
18   else, so it could be none, it could be a lot, it could be
19   of Bahamian descent or, you know, that -- so that's tough
20   to answer directly.
21        Q.    But let's say they grew up in Philadelphia
22   or Cleveland --
23        A.    Uh-huh.
24        Q.    -- and they're just living there because
25   they're playing for the Miami Heat or Miami -- the
```

Page 73

1  Florida Marlins or the Miami Marlins?

2          A.     Miami now, yeah.

3          Q.     Okay.  They're probably not going to have a

4  whole lot in common with the person who lives in -- who's

5  a tenant living in, you know, an apartment, correct?

6          A.     That's probably not -- yeah.  Well, maybe

7  not now.  Maybe when they were younger, you know,

8  depending on what circumstances they grew up in.

9          Q.     But they wouldn't have a history not being

10 from the area; that's not going to be something that's

11 shared?

12         A.     Yeah, they wouldn't share that history.

13 They could have some things in common.

14         Q.     When this map was drawn and you united

15 neighborhoods, was there anything that was relied on to

16 say, okay, these are the official boundaries for this

17 neighborhood?

18         A.     Yeah, there was.  There was tons of

19 research and data.  There was, like, a lot of work that

20 was done.  And so, I mean, it was impressive, you know,

21 down the street numbers, and I mean, there was a lot --

22 lot of work that went into what was a neighborhood, what

23 wasn't, a lot of conversation amongst the members of

24 GRACE and other plaintiffs to try and figure out what was

25 what.

Page 74

1          Q.    Okay.  Would you agree that if you have a

2     District that's been in place for a long time,

3     significantly revising that district such that that

4     community unit is now linked with a community that they

5     were never linked with before might be confusing to

6     voters?

7          A.    I don't know.  There are a lot of variables

8     to consider.  Could it be confusing?  Yes, it could be.

9     Or, you know, there may be situations where people can't

10    really understand it so. . .

11         Q.    It all depends kind of on the person?

12         A.    Yeah.

13         Q.    Okay.  In your experience with pastoring a

14    church -- well, let me ask this:  Is your church within

15    the city limits?

16         A.    Yes.

17         Q.    And you're experiencing pastoring a church

18    with a minority community.

19               Do they always sort of understand what's

20    going on with city government, or do they sometimes get

21    confused?

22         A.    Oh, yeah people get confused.  I mean, we

23    live in Miami.

24         Q.    So sometimes, any type of change might be

25    confusing in other situations, even if they do the best

Page 75

1  to explain it?

2         A.    Yeah, it can be confusing.

3         Q.    Would you agree that Plaintiffs' Map 1

4  represents a significant change from the districts that

5  had been in place for a good number of years?

6         A.    I think it does.  I mean, it is -- it shows

7  change.  And, again, I say that with this qualification

8  that this map wasn't drawn to be the map.  It was drawn

9  in response to the implication that a map that kept

10  neighborhoods together used natural boundaries, you know,

11  that it couldn't be done.  So this was just to say, hey,

12  commissioner, it can be done, so please go back to the

13  drawing board and try again.  I think that was the intent

14  of this first map.

15        Q.    You would agree that this map doesn't

16  identify all of the neighborhoods in the City of Miami,

17  correct?

18        A.    Yeah, there are other neighborhoods.

19        Q.    For example, West Grove is not on this map?

20        A.    Correct.

21        Q.    And so, is it fair to say that -- would

22  you -- strike that.

23              Would you agree that this map does actually

24  split some neighborhoods because sometimes when you're

25  equalizing population, you have to split neighborhoods?

1          A.     Yes, it does.

2          Q.     And sometimes, when you're drawing those

3    lines and you're making the decision of, do I keep a

4    neighborhood whole, or do I follow a natural geographic

5    boundary, there's going to be some tension there?

6          A.     There is, yes.  And I think -- and again --

7    and my understanding at that time was that this is to

8    show the city commission that we aren't unreasonable,

9    right?  That we understand that this isn't easy to do.

10   We understand that there may be neighborhoods that need

11   to be split, you know, but let's do it in a way that, you

12   know, the residents are agreeable or at least as much as

13   possible because you can't please everybody, but the

14   intent was not to say, this is what we want to be

15   implemented.  I think the intent of this was to say, hey,

16   there are other ways to do this.  Can you please have the

17   consultants and experts that -- you know, our tax dollars

18   are contributing to, can you have them go try again.  I

19   think that was the intent of this.

20         Q.     Let me ask this about that:  Were you aware

21   that the city commission established criteria for their

22   map drawers to follow when they sent them off to draw

23   maps?

24         A.     Yes.

25         Q.     Okay.  What is your understanding of what

Page 77

1    that criteria was?

2           A.    Ah, man, I don't remember all of them.

3           Q.    Okay.

4           A.    But I do remember them being, you know, the

5    main voice at commission meetings, and -- but I don't --

6    I don't remember all of the criteria.

7           Q.    Do you remember compliance with the Voting

8    Rights Act being one of them?

9           A.    Yes, yes.

10          Q.    Do you remember them having a discussion or

11   designating that they wanted substantial equal population

12   versus the exact population?

13          A.    I don't remember that, but that makes sense

14   to me.

15          Q.    Do you remember them saying that they

16   wanted to keep the core of the existing districts?

17          A.    I don't remember that.

18          Q.    Are you aware of whether keeping the core

19   of existing districts is considered a traditional

20   redistricting criteria?

21          A.    I'm not aware of that.

22          Q.    Are you aware of whether keeping

23   neighborhoods whole is a tradition for redistricting

24   criteria?

25          A.    Yes, I understand that it is.

Page 78

1          Q.     And following natural and geographic

2     boundaries?

3          A.     Yes, I understand that, as well.

4          Q.     And drawing compact districts?

5          A.     I'm not familiar with compact districts.

6          Q.     Okay.  Did GRACE have any questions or

7     concerns about the way District 5 was drawing its map?

8          A.     I'm sure the members of GRACE had concerns

9     about this.  You know, but, again, this was just -- this

10    was not, hey, let's go implement this, you know.  This

11    was, see, it can be done, city commission, please, try

12    again.  But so yeah, I think there were concerns

13    all-around.  I don't think -- I don't think at this map

14    everybody was content like this is what we want.  I think

15    this was to say, there are other ways of doing this.

16         Q.     Well, this was one of the maps that was

17    provided to the commission shortly after the District

18    Court enjoined the 2022 plan.

19                Would you agree with that?

20         A.     Yes.

21         Q.     Do you know how long this map had been in

22    existence before the Court enjoined the 2022 plan?

23         A.     I don't know.

24         Q.     Do you know if was days, weeks or months?

25         A.     I'm so sorry.  The dates are the only thing

Page 79

1    that I would be challenged with today.  I don't remember
2    the date or time.
3          Q.    So if I understood you correctly, if this
4    was proposed to the city, GRACE would have still wanted
5    changes, potentially, to this map versus the city just
6    picking it up and passing it?
7          A.    I think, yes -- I think GRACE was opened to
8    conversation.
9          Q.    Okay.  Well my question was, because you
10   indicated that there might be some things that GRACE
11   might have wanted to change:  What are the things that
12   GRACE would have wanted to change about this map?
13         A.    You know, I don't re- -- I don't recall.  I
14   don't know, you know, all of the discussion.  You know, I
15   just remember the point -- I just remember the point, you
16   know, like the main point was, you know, there is a --
17   there's another way to do it.  So, you know, we just want
18   to show you that so you can try because we just felt like
19   the city wasn't even going to try, like this is the map,
20   this is it.  And that's what I think they voted on, on
21   the enacted map.
22         Q.    And at least as it pertains to Grace's
23   concerns with the 2022 plan --
24         A.    Uh-huh.
25         Q.    -- this map addressed it because West Grove

Page 80

1    is back in District 2, correct?

2            A.    Yes, one -- one of those concerns, yeah.

3            Q.    And what were the other concerns that GRACE

4    had?

5            A.    I think it was the CRA district, the

6    natural boundaries, keeping neighborhoods together.

7            Q.    Well, this map would have done all of that

8    correct?

9            A.    I think this map started that, it helped us

10   out for sure.  And then I also -- I also would like to

11   add that this map was before substantial conversations

12   with other residents in the city.  And, you know, so we

13   came back later with some other things because, you know,

14   we started showing this to the city, to the residents of

15   the City of Miami.  And they started saying, hey, well,

16   what about this and that and that?  So we got other

17   input, you know, as well.  So we knew that there was

18   going to need to be some changes.

19           Q.    So if I understand that then, it sounds

20   like there was some dissatisfaction, even amongst the

21   plaintiffs, but everybody was willing to live with it,

22   but then when you started sharing it broadly, you were

23   getting more constructive feedback that this doesn't work

24   for us, this doesn't work for us; is that fair?

25           A.    Yes.  We were doing what we wanted the city

Page 81

1   commission to do; was to talk to the residents and get

2   input.  So we modeled our approach after what we had

3   hoped and what we were requesting the city commission to

4   do.

5           Q.    What gives you the impression that the city

6   commission was not listening to its residents?

7           A.    Because at the commission meeting, they

8   called us actors.  They made very degrading statements

9   about us.  One commissioner referred to, you can't get

10  all of the meat, you've got to get some of the bone

11  referring to what I understood as the Black community or

12  Black population as the bone rather than the meat.  So

13  those comments from the desk are what led us to believe

14  that they weren't listening.  And then I think, I don't

15  know the exact number, but it felt like a hundred people

16  came here one day, and that may not be the number, but

17  there were quite a few residents and business owners and

18  others who came in and said it, we don't agree with this.

19  And the city commission didn't wink.  They approved their

20  map without taking into consideration what the residents

21  had to say.

22          Q.    When you say they didn't take it into

23  consideration, they didn't follow the request, but it

24  doesn't necessarily mean they didn't consider it, does

25  it?

Page 82

```
 1          A.    It doesn't mean that.  I know it could have
 2   been considered without my knowledge -- without our
 3   knowledge, yeah.
 4          Q.    And I'm familiar with the meat and bone
 5   comment.
 6          A.    Yeah.
 7          Q.    You took that as referring to the Black
 8   community.
 9                Which part of the meat or the bone would
10   you identify with the Black community?
11          A.    I understood the commissioner to be
12   referring to the Black community as the bone or the poor
13   community as the bone.  And the, you know, communities
14   that were either not Black or, you know, not impoverished
15   as the meat.  We can't take all of the meat and not give
16   some of the bone or something like that.
17          Q.    Were you present for that meeting?
18          A.    I was.  I was there.
19          Q.    Were you listening?
20          A.    I think -- I think I was listening.  Yeah.
21          Q.    Do you recall if in the course of that
22   colloquy leading up to the meat/bone comment, they were
23   discussing a park?
24          A.    I don't remember.
25          Q.    Is it possible that that was more in
```

Page 83

1    reference to a commissioner wanting to both have a park

2    in his district and the other commissioner saying, I can

3    give you the park but you can't just take the park,

4    you've got to take the neighborhood that the park serves?

5         A.    Uh-huh.

6         Q.    And what's your understanding of the

7    surrounding neighborhood -- well, first of all, do you

8    understand, do you know what park they were talking

9    about?

10         A.    I don't remember.  I don't remember.  It

11    was a while ago.  I think I probably knew.  I was kind of

12    probably more attentive to it at the time, but I don't

13    remember now.  But I do just remember that comment.

14         Q.    And that was a colloquy between

15    commissioners for District 3 and District 4, correct?

16         A.    Just to make -- just for clarity, I believe

17    de la Portilla and Reyes.

18         Q.    Okay.

19         A.    De la Portilla and Carollo.

20         Q.    And Carollo was the one who made the

21    comment?

22         A.    Yeah.

23         Q.    But I had it in my head that it was Reyes,

24    but Díaz de la Portilla?

25         A.    Díaz de la Portilla, yes.

Page 84

1          Q.    It works just as well.

2                That didn't involve anything in District 2,

3     as well, did it?

4          A.    It didn't.

5          Q.    Okay.  And that wasn't your issue in terms

6     of Grace's members; Grace's issue was primarily what was

7     happening to West Grove and making sure that West Grove

8     stayed in District 2?

9          A.    I think by that time, it had evolved,

10    right?  I think by that time, you know, initially, it was

11    just District 2, but by the time we got to, you know,

12    maps and things, at that point we realized that there

13    were other residents and other people from other parts of

14    the city who shared our concerns.  So now we are, as

15    GRACE, yes, we are concerned about our community, but

16    we're now a collective, a group of people, and we're

17    concerned about everybody's concerns --

18         Q.    Okay.

19         A.    -- within the city, so. . .

20         Q.    So then if I understand correctly there,

21    even though Grace is referring to the 2023 plan, even

22    though Grace's concerns with what was going on with the

23    West Grove might have been addressed, GRACE shared the

24    concerns that members of other organizations and

25    individuals and other organizations and other districts

Page 85

```
 1  had?

 2          A.    Correct.

 3          Q.    Okay.

 4          A.    Correct.

 5                MR. LEVESQUE:  I'm going to mark this as

 6          Defendant's Exhibit 8235.

 7                (Defense Exhibit 8235 was marked.)

 8  BY MR. LEVESQUE:

 9          Q.    Reverand Robinson, do you recognize this

10  map?

11          A.    Yes.

12          Q.    And what is this map?

13          A.    This is Plaintiffs' Map 2.

14          Q.    And in this map, was this intended to

15  communicate to the city that hey, there's a different way

16  to draw it, or was this a map that GRACE was hoping the

17  city would actually pass?

18          A.    Both of these maps are -- from my

19  recollection, were submitted to the city at the same

20  time.  So I think, again, we were proving the point that,

21  you know, this can be done differently.  Of course, we

22  presented maps that we would be okay with, you know, if

23  the city took what -- but I think the intent at that

24  point was listen, there's another way that this can be

25  done.  So both of these maps were -- we discussed both of
```

Page 86

1   these options at the same time and agreed to submit both

2   of them, along with the other plaintiffs simultaneously.

3           Q.   Now, what about this map is notable

4   compared to P1?

5           A.   Well, we'll start with District 2.  It goes

6   up a little further north, up to Edgewater.

7           Q.   And let me stop you there.

8           A.   Okay.

9           Q.   It splits the Community of Edgewater, does

10  it not?

11          A.   It does.

12          Q.   Okay.  Is there a reason why that community

13  was split?

14          A.   No particular reason, I think, other than

15  to try to meet, you know, the standards of deviation and

16  to follow all of the redistricting requirements.  I think

17  that was the only reason, but later we had conversations

18  with, I think, the Biscayne Neighborhood Association, and

19  they rep- -- they represented the population Edgewater,

20  so they told us -- they talked to us about what they

21  would like to see there.  And in a subsequent map, we

22  included what they -- they recommended, so. . .

23          Q.   Okay.  Is there a reason why Little Havana

24  was split in this map?

25          A.   I -- again, I don't think any particular

Page 87

1    reason, other than, you know, to try to meet the

2    requirements of redistricting.  And, again, our -- our

3    goal here was to say, we'd like you to do the work that

4    we did and try to -- you know, try to do something.  It

5    can be done differently and still meet all the

6    requirements.  So -- so no -- no particular reason other

7    than to try it to meet the requirements.

8         Q.    And in this map, the West Grove is kept

9    with the rest of Coconut Grove, correct?

10        A.    Yes.

11        Q.    And in this map, you still include Flagami

12   into one district, correct?

13        A.    Correct.

14        Q.    Even though nobody from Flagami has ever

15   asked for that?

16        A.    Correct.

17        Q.    Is there a reason why you would do

18   something so dramatic for a community that never

19   requested it?

20        A.    No.  Again, I think at that point we had

21   never -- we hadn't, you know, had any conversation with

22   anybody from Flagami.  And so, just in an attempt to meet

23   the requirements we just, you know, try and keep

24   neighborhoods together.  You know, that's all.  And,

25   again, the intent wasn't to say, Flagami, you got to be

Page 88

1   in one district.  That wasn't, you know, to tell them

2   what to do.  It was to show the city that there were

3   other options and to ask them to go back and try.

4          Q.    Are you aware that in every single map that

5   the plaintiffs had presented Flagami is kept whole?

6          A.    I believe so, yeah.

7          Q.    And no idea why that is?

8          A.    No intention at all.  You know, I don't

9   think we sat down and said, hey, let's -- you know, let's

10  do something that Flagami wants or doesn't want.  I think

11  we're just trying to meet the criteria.

12         Q.    When you shopped these maps in the

13  community, which communities did you go to?

14         A.    We didn't -- so we did at one point.  We

15  went to Overtown.  We had a meeting in Overtown at a

16  theatre or somewhere in Overtown.  I can't remember

17  exactly where.  The Biscayne Neighborhood Association,

18  that was a Zoom meeting, so we didn't go to them.  And

19  then we had open community meeting at Greater St. Paul,

20  and quite a few people from other districts and other

21  neighborhoods showed up at that meeting to voice their

22  concerns and opinions.

23         Q.    Were there any other community meetings

24  that you had to get input?

25         A.    There were other communities in Coconut

Page 89

```
 1    Grove, but not that GRACE hosted.  GRACE was the host of
 2    the meeting at Greater St. Paul, but there were other
 3    community meetings that GRACE attended.
 4           Q.    Okay.  What were some of those other
 5    meetings?
 6           A.    HOTA, the Homeowner and Tenant's
 7    Association held a community meeting where they got
 8    feedback and input.  The Coconut Grove Ministerial
 9    Alliance, which is a member of GRACE, had a community
10    meeting where there were extensive conversations back and
11    forth about -- about the maps, the proposed maps.  Those
12    are two that I know I'm aware.
13           Q.    And one of your board members, Clarice
14    Cooper, is a member of HOTA, correct?
15           A.    I believe she's the President of HOTA.
16           Q.    And the Coconut Grove Ministerial Alliance,
17    is that an organization of churches, or is it an
18    organization of pastors and churches or both?
19           A.    Coconut Grove Ministerial Alliance, the
20    churches are the members, and the pastors are the
21    board -- make up the board.
22           Q.    You've mentioned a communication with
23    Overtown for a community meeting in Overtown.
24           A.    Uh-huh.
25           Q.    What prompted that meeting?
```

Page 90

1          A.    Oh, there were some folks in Overtown

2    who had some concerns.  Now, I think one -- one of the

3    other plaintiffs, the NAACP, you know, brought to one of

4    our collective meetings as plaintiffs that folks in

5    Overtown wanted to have some input, so we scheduled a

6    meeting with them.

7          Q.    And that's because in Map 1, Overtown was

8    completely cut out of District 5; is that correct?

9          A.    I don't know if that was the reason.  I

10   know what -- what was --- what I remember was that O- --

11   the people in Overtown have some concerns, and they would

12   like to meet with us.

13         Q.    Tell me what you know about Overtown.

14         A.    Oh, man.  There -- so I know Bethel --

15   Greater Bethel Miami Church is in.  Overtown, I know that

16   Overtown is a changing community.  I know that Over- --

17   Wyn-- -- Wynwood used to be Overtown.  It's historic.

18   You know, old Black neigh- -- neighborhood.  A lot of

19   African American history there.

20         Q.    In fact, that's one of Miami's older Black

21   neighborhoods, correct?

22         A.    Of course.

23         Q.    And for the Black residents of Overtown,

24   being carved out of the only Black district was probably

25   not acceptable to them.

Page 91

```
 1              Would you agree?
 2       A.    Well, it wasn't acceptable in -- in the
 3  enacted map.  There -- there are portions of Ov- --
 4  Overtown -- in fact, I think there's a church that sat
 5  right on a street, and they got carved out, so a church
 6  that was traditionally in Overtown and served the
 7  Overtown community, so Overtown, the city's map, you
 8  know, cut Overtown, as well.
 9       Q.    Are you referring to the 2022 plan or the
10  2023 plan?
11       A.    The plan that we were responding to, so I'm
12  not sure which one that is, but the one that these maps
13  were in response to.
14       Q.    Well, at this point in time, from a
15  timeline, the city hadn't enacted a plan yet.
16       A.    Okay.  So it was in -- what's that word?
17       Q.    And let me kind of put a finer point on
18  that.
19              The District Court had enjoined the 2022
20  plan.
21       A.    There you go.
22       Q.    The 2023 plan was not enacted yet.
23       A.    Okay.
24       Q.    So were these efforts to address those
25  Overtown concerns from the 2022 plan?
```

Page 92

1          A.    It was all of their concerns because we --

2    we had not -- I think they were represented by the NAACP.

3    And the NAACP said, hey, we need to go and have a meeting

4    and talk to them.  And so, we went over to hear.  So they

5    had concerns about the -- at that time the enjoined map

6    and what we had proposed to the city as, you know, other

7    options.  So they just had concerns that they wanted to

8    share.  And I think we -- after we spoke with them, I

9    think we addressed their concerns in our -- in the

10   subsequent map after having those conversations.

11         Q.    Okay.  Let's go ahead and look at that map.

12         I'm going to show what you you're going to

13   mark as Defendant's Exhibit 8236.

14         (Defense Exhibit 8236 was marked.)

15   BY MR. LEVESQUE:

16         Q.    Reverand Robinson, do you recognize that

17   exhibit?

18         A.    Yes, I recognize it.

19         Q.    And what is that exhibit?

20         A.    This is Plaintiffs' Map 3.

21         Q.    Okay.  And in terms of keeping Overtown

22   whole, does this keep Overtown whole?

23         A.    I believe it does.  I believe that's what

24   we were trying to do here.

25         Q.    Okay.  And even there --

Page 93

1          A.     But I think they made a concession there

2     because I remember that meeting, we talked about this

3     east/west little portion that I think was left out to the

4     west there.  And I think they, in that meeting, those

5     residents said that they didn't really consider that to

6     be Overtown.

7          Q.     Are you aware if they considered areas

8     south of there still part of Overtown?

9          A.     I believe -- I believe they did.

10              No.  The part that's down into downtown?

11         Q.     Yes.

12         A.     I don't -- I don't think so.  I think they

13    were very clear on what they understood to be traditional

14    Overtown or historical Overtown.  I think even in that

15    meeting they said that we couldn't even go over there

16    when we were kids, you know.  Somebody like an older

17    gentleman said, yeah, we -- they put that in Overtown,

18    but we couldn't even go over there when we were kids, so

19    they didn't -- you know, they really were vocal about

20    what they considered to be historical Overtown.

21         Q.     Are you aware that Commissioner King wanted

22    certain areas of downtown because she wanted an economic

23    engine for her district?

24         A.     Yeah, I am aware of that.  Yes, sir.

25         Q.     Okay.  You would agree that wanting an

Page 94

1   economic engine for your district has nothing to do with

2   race, correct?

3          A.    Yeah, I don't think so.

4          Q.    Okay.  Do you think there was anything

5   improper about her wanting those areas in her district?

6          A.    I -- I don't know of anything improper, if

7   there is.  I do know -- I do believe there are other

8   economic engines in that district though.  For example,

9   the Omni.

10         Q.    Do you know if the Omni is entirely in her

11  district or if it's shared with District 2?

12         A.    I think it's shared with District 2.  And

13  I'm not sure about this, but I know that -- I do believe

14  the Omni CRA and I believe there's another CRA in

15  District 5, as well, that has been -- I mean, we know

16  that there are other economic engines there.

17         Q.    Is West Grove one of the older, if not the

18  oldest, Black community in Miami?

19         A.    We believe it is.  You know, some people

20  say other parts, but, you know, we believe -- we believe

21  it is.

22         Q.    What about Little Havana for the Hispanic

23  Cubans?

24         A.    Is it the oldest part, one of the oldest

25  parts of Miami?

Page 95

1          Q.     Yeah.

2          A.     Not to my knowledge.

3          Q.     Do you know what one of the older Hispanic

4     communities for Miami would be?

5          A.     I don't.

6          Q.     And this was the plaintiffs' third effort

7     to draw a map.

8                 And were there still constituencies that

9     you were working with that were not happy with this map?

10         A.     That we were working with, I don't think

11    that we had anybody who was just unhappy.  At this point,

12    we all understood that, you know, some concessions would

13    have to be made.  I think the folks that we were working

14    with were happy to have input, you know, to have -- if we

15    were going to have something new or different, at least

16    to allow us to have some say so in what it looks like.

17    And so, I don't remember after this point any of the

18    folks we were working with being unhappy.

19         Q.     Did you work with any of the commissioners

20    on coming up with either Plaintiffs' Map 1, 2 or 3?

21         A.     So we tried to for Map 3 in -- because we

22    had mediation, court -- court ordered mediation, which I

23    understood to be an opportunity for us to try to work

24    together.  However, I was very disappointed in that

25    mediation process because I didn't feel as though the

Page 96

1    city really made an attempt to work with us.  And -- and

2    we -- during those mediations we provided what we had to

3    them, to the city.  I think you might have been there.

4         Q.    Uh-huh.

5         A.    And we left that meeting understanding or

6    believing that the city had nothing, and then the next

7    day, the city has, like, all these maps.  So we -- we

8    didn't feel that the city, you know, did -- gave a best

9    effort to really try to work with us on trying -- putting

10   something together that we all could be agreeable to.

11        Q.    Do you know if things like the way the

12   plaintiffs have universally treated Flagami were

13   agreeable or nonstarters for the city?

14        A.    I don't know if they were nonstarters.  I

15   think I learned the next day in the commission meeting or

16   in the special-called meeting that there was some concern

17   about that.  But it would have been great to know that

18   prior that day because I think it's apparent that

19   everybody we talked to we gave, you know, serious

20   consideration to their concerns.

21        Q.    Well, once you were aware of their

22   concerns, plaintiffs didn't do anything with their plan

23   forward to try to address those concerns, did they?

24        A.    I don't think so.  I don't know if we had

25   time.  I think they -- I think the commission held that

Page 97

1    meeting I think, like, on the last day something had to

2    be presented to the Judge, to the Court.  So I'm not sure

3    if there was time.  I think -- I think we may have tried

4    to rush and do something really quickly, but it wasn't --

5    didn't really have enough time do a good job.

6          Q.    Okay.  Let me represent to you that the

7    commission meeting where they adopted the map was

8    June 14th.

9          A.    Okay.

10         Q.    I'll also represent to you that the city

11   was obligated to inform the Court what it was going to do

12   in terms of adopting a map by June 30th.

13         A.    Yep.

14         Q.    Plaintiffs' Map Plan 4 first saw the light

15   of day sometime in July.

16         A.    Uh-huh.

17         Q.    So if GRACE was made aware at that

18   June 14th meeting that the configuration of Flagami was a

19   nonstarter, and why it was a nonstarter, they had three

20   weeks, two to three weeks to do something different, do

21   you know if there was any effort made to draw something

22   differently than what is reflected in Plan 4?

23         A.    I don't know, and I don't believe so.  I

24   don't -- I'm not sure if at that point GRACE was

25   confident in what the commission represented for their

Page 98

1    individual constituents because in our conversations with

2    other groups, what the citizens represented was not

3    consistent with what the commission represented.  And

4    so -- so I'm -- I'm not sure if that was taken into

5    consideration at that point; I'm not sure.  But, again,

6    like I say, I have to look at Map 4 to remember but I do

7    remember Map 1, 2 and 3 for sure in those processes.

8         Q.    Let me ask this:  What community meetings

9    did you hold in Flagami to get their feedback on whether

10   they wanted to be split or kept whole?

11        A.    We didn't hold any in Flagami.

12        Q.    What community meetings did you hold in

13   Little Havana to discuss whether Little Havana should be

14   split or kept whole?

15        A.    We didn't hold any.

16        Q.    What about Allapattah.

17              MR. LEVESQUE:  A-L-L-A-P-A-T-T-A-H.

18        A.    We didn't hold any in Allapattah.

19   BY MR. LEVESQUE:

20        Q.    What about Shenandoah?

21        A.    We didn't hold any meetings in Shenandoah.

22        Q.    Did you hold any meetings either of the

23   three Hispanic districts?

24        A.    No, I don't -- I don't remember us holding

25   any meetings in those districts.

1      Q.    Is there a reason for that?

2      A.    I don't ever remember those districts being

3  represented at the commission meetings or saying that

4  they had any issues, but that -- I don't think that

5  was -- I don't know if that was our reason, but I do know

6  that, you know, the districts that had the major concerns

7  were 2 and 5.

8      Q.    Could that be because they were generally

9  happy with the way their districts were drawn previously?

10     A.    Could be.

11     Q.    You mentioned problems with District 5.

12           Do you know if the commissioner from

13  District 5 was happy with her district?

14     A.    With which map?

15     Q.    We'll start with the 2022 plan.

16           Do you know if she was happy with her

17  district in the 2022 plan?

18     A.    I don't know.

19     Q.    Are you aware of whether she voted for it

20  or not?

21     A.    Yes, I believe she did.

22     Q.    That would probably be an indicator that

23  she's willing to live with that district?

24     A.    Yeah.  I mean, and so, willing to live with

25  something doesn't necessarily mean you're happy with it.

Page 100

1        Q.    It also doesn't mean it's unconstitutional

2    either, correct?

3        A.    Correct.

4        Q.    Because as you indicated, even as your maps

5    progress, there are people who are making concessions,

6    giving up things that they want, getting things that, you

7    know, other people don't want to give them.

8              Everybody is sort of giving and taking a

9    little, correct?

10       A.    Correct.

11       Q.    That's all part of the process?

12       A.    That's a part of the process.

13       Q.    Reverand Robinson, I am going to show you

14   what we're going to mark as Defendant's Exhibit 8237?

15             (Defense Exhibit 8237 was marked.)

16             THE WITNESS:  All right.  Thank you.

17             Oh, yeah, okay.

18   BY MR. LEVESQUE:

19       Q.    Reverand Robinson, do you recognize that?

20       A.    Yes, this is Map -- Plaintiffs' Map 4.

21       Q.    Did the GRACE Board approve this map?

22       A.    I think the GRACE Board -- oh, so it wasn't

23   just our GRACE Board meeting, but at the GRACE Board in

24   concert with the other plaintiffs agreed to -- to --

25   agreed to this map.

Page 101

1          Q.    And it looks like in this map, GRACE is

2    making -- or GRACE and your other partners are trying to

3    keep Overtown whole?

4          A.    Yeah.  So I think, again, just more

5    response to the community.

6          Q.    Was that also in response to Commissioner

7    King?

8          A.    I believe it may have been.

9          Q.    Do you recall when she saw your first three

10   maps, that she was very upset with the way you had

11   proposed the district?

12         A.    I -- I do remember that.

13         Q.    And in this map, the West Grove is still in

14   Coconut Grove?

15         A.    Yes.

16         Q.    And in terms of the 2023 plan that the

17   commission enacted, the West Grove is also in District 2,

18   correct?

19         A.    It's hard for me to -- I can't -- I

20   don't -- I can't see it, you know.  I think it would be

21   helpful if I can look at it.

22         Q.    Okay.  Did GRACE have any concerns about

23   the Black voting age population in either Maps 1

24   through 4 in District 5?

25         A.    Yes, because it's a requirement for

Page 102

1    redistricting.

2          Q.    Okay.  And what is your understanding of

3    the requirement for drawing a district that would be

4    compliant with the Voting Rights Act?

5          A.    That at least one district has to have the

6    opportunity to elect a Black or Black representation.

7          Q.    And is it your understanding that all four

8    of plaintiffs' maps are compliant?

9          A.    Yes, it's my understanding that they are.

10         Q.    Reverand Robinson, I'm going to show you

11   Defendant's Exhibit 8224.

12              (Defense Exhibit 8224 was marked.)

13              THE WITNESS:  Thank you.

14   BY MR. LEVESQUE:

15         Q.    Do you recognize that map?

16         A.    Yes.

17         Q.    And what is that map?

18         A.    I believe this is the enacted map.

19         Q.    And in this plan, is it fair to say that

20   the West Grove is kept in Coconut -- in District 2?

21         A.    Yes.

22         Q.    And so, from core of Grace's concerns that

23   relates to GRACE specifically, this map addressed those

24   concerns?

25         A.    So no -- it would be hard to say that

Page 103

 1  because when we filed the complaint, our concerns became
 2  the concerns of our co-complaints.
 3          Q.   And I want to be careful.  I understand
 4  that their concerns became your concerns.  Right now I'll
 5  talk about what was specific to GRACE and then what was
 6  shared with everybody else.
 7          A.   Uh-huh.
 8          Q.   So Grace's core concern, if I remember the
 9  comments to the commission, were keeping the West Grove
10  in District 2.
11          A.   Those are Grace's initial concerns.
12          Q.   Okay.  And then now with this map, that
13  concern was addressed but GRACE had --
14          A.   Evolved.
15          Q.   -- evolved.
16               They shared concerns of the way other
17  organizations and other individuals were being treated?
18          A.   (Nods head.)
19          Q.   But, again, their core concerns were
20  addressed; they just shared the concerns of others.
21               Is that a fair characterization?
22          A.   Grace's initial concerns were addressed.
23          Q.   Now, in this map you see where Flagami is
24  split between District 1 and District 4.
25          A.   Uh-huh.

Page 104

1      Q.    Are you aware if it has been like that

2   since 1997 when the districts were first drawn?

3      A.    I'm not sure how long it's been like that,

4   but I believe this is the way it was prior to the 2022.

5      Q.    Is there anything about that configuration

6   that you think is improper?

7      A.    No.

8           MR. LEVESQUE:  Let's take a five-minute

9           break, and I think I might be able to wrap up

10          soon.

11          THE WITNESS:  Okay.

12          (Recess taken, 4:48 p.m. to 4:53 p.m.)

13          MR. LEVESQUE:  Back on the record.

14   BY MR. LEVESQUE:

15      Q.    Reverand Robinson, your bylaws does GRACE

16   have a records custodian?

17      A.    A records custodian?

18      Q.    Yes, somebody who keeps the minutes, the

19   bylaws, the official records?

20      A.    Our secretary does that.

21      Q.    Okay.  Is that Clarice Cooper?

22      A.    No, that's Christopher Hudson.

23      Q.    Christopher Hudson.

24           Do you know if Mr. Hudson keeps those

25   personally, or does GRACE have an office or headquarters

Page 105

1    where those records are kept?

2         A.    I think everything is kept electronically,

3    I believe.  So I believe Christopher Hudson should be

4    able to access them.

5         Q.    Okay.  Are those documents on, like, a

6    network somewhere or are they on his personal laptop

7    or --

8         A.    I'm not sure exactly where they're kept.

9         Q.    Okay.  Do you know if GRACE has, like, an

10   email server or a computer that gets, like, passed from

11   board member to board member?

12        A.    We don't.

13        Q.    Okay.  Are you aware of anything that might

14   have happened in those records that would make them

15   otherwise unavailable at this time?

16        A.    I'm not aware of anything.

17        Q.    Have you looked at or studied the

18   demographic data for any of the plans?

19        A.    I think some of that information was a part

20   of our conversations, but have I studied them?  I

21   wouldn't say I've studied.

22        Q.    Were you aware that each of plaintiffs'

23   plans produces a map that would likely elect three

24   Hispanic candidates, likely elect a Black candidate and

25   then likely elect a candidate from a plurality district?

1        A.    I wasn't aware of that.

2        Q.    Would it surprise you if that was the case?

3        A.    Oh, I don't know.  I wouldn't be surprised.

4        Q.    Okay.  That's certainly something that

5    would be foreseeable in a city like Miami with a

6    majority/minority population between its Hispanic

7    residents and its African American/Black residents and

8    everybody else who's left over, correct?

9              MS. MCNAMARA:  Objection to form.

10   BY MR. LEVESQUE:

11       Q.    I didn't mean anything pejorative by

12   anybody who was left over, but if you understood what I

13   was asking, you can answer.

14       A.    Yes.  I understand.

15       Q.    Talking about the map as a whole, do you

16   believe the city commission sorted the voters into

17   Hispanic, Black and Anglo districts?

18       A.    Yes.

19       Q.    Okay.  What is your basis for that belief?

20       A.    They said it.

21       Q.    If organizations and individuals like the

22   plaintiffs have submitted plans that also perform the

23   same way for electoral purposes, would it be fair to say

24   that they also meant to draw districts that would likely

25   elect three Hispanic candidates, likely elect a Black

Page 107

```
 1   candidate and likely perform in a way that plurality
 2   districts perform?
 3          A.    Who is "they"?
 4          Q.    The plaintiffs.
 5          A.    Okay.  So can you restate the question?
 6          Q.    Sure.
 7                We just talked about the plaintiffs, each
 8   of the plaintiffs' plans.  It wouldn't surprise you if
 9   they performed, essentially, the same way as the city map
10   does.
11                Does that mean that the plaintiffs also
12   sorted people into districts based upon their race?
13          A.    No.
14          Q.    And why not?
15          A.    Well, throughout this process, we never
16   con- -- we didn't consider race.  When the plaintiffs
17   were drawing maps, there was a list of requirements, and
18   it was those requirements that were -- were looked at;
19   you know, keeping neighborhoods together, using those --
20   those are the two that I'm really familiar with.  And I
21   know there were other requirements.  I know there was a
22   standard percentage of deviation, there's all of these
23   different things that have to, you know -- have to be
24   covered, which our -- our attorneys and our experts, you
25   know, they did all of that.  So -- so if I -- you know, I
```

Page 108

1    think if by chance they were performed the same way, it

2    doesn't mean the same things were taken into

3    consideration.

4           Q.    Okay.  Were any of your meetings recorded?

5           A.    The meetings with -- that met with the

6    group of plaintiffs?

7           Q.    Yes.

8           A.    I don't remember them being recorded.

9           Q.    Were any of your meetings in the community

10   recorded?

11          A.    Yes, actually.  The meeting at Great- -- at

12   Greater St. Paul was recorded by WLRN, and they took

13   photos, but I do -- I do remember about halfway through

14   the meeting, either they left or they were asked not to

15   record, but he did share that he recorded some of the

16   meetings.

17          Q.    Who asked them not to record?

18          A.    I don't remember.  I don't remember who --

19   who asked, but it was whoever -- I don't remember who

20   asked.

21          Q.    Do you know why they were asked not to

22   record?

23          A.    I don't think we -- because we were in the

24   middle of a litigation I think or, you know, we don't

25   want to -- you know, I don't think that we wanted that to

Page 109

1    be on the news or something like that; I don't know.

2          Q.    Okay.  But that meeting wasn't just the

3    plaintiffs, was it?

4          A.    No, it wasn't.

5          Q.    Were your attorneys at that meeting?

6          A.    No, I don't remember any of our attorneys

7    being -- oh, yes, yes, there were attorneys at that

8    meeting.

9          Q.    You've mentioned that you didn't consider

10   race or didn't discuss race, but you never held any

11   meetings in any of the Hispanic districts, if I

12   understood correctly; is that right?

13         A.    That's correct.

14         Q.    Okay.  Well, is there a reason why you

15   didn't give anyone from the Hispanics the -- those

16   districts that represented those districts have a seat at

17   the table?

18         A.    Well, it's because GRACE didn't consider

19   districts -- we didn't characterize districts by

20   nationality, so we -- we didn't believe there were

21   Hispanic districts, we didn't believe that there were

22   city commissioned districts.  And so, GRACE had many

23   conversations with Latinos or Hispanic or people of

24   Hispanic/Latino descent.  You know, we talked to many --

25   the Biscayne Neighborhood Association was full of -- I

1    think everybody in the meeting was of -- was Hispanic.

2    So we had many conversations with Hispanics, but we

3    didn't have con- -- I don't remember us having meetings

4    -- or we didn't have meetings in Commission Districts 4

5    or 1 or 3.  We didn't host meetings there, not because

6    they were Hispanic districts but because, you know, I

7    just don't think we ever had anyone from those districts

8    express concerns to us.  The B & A expressed concern, so

9    we met with them.  Overtown expressed concerns, so we met

10   with them.  No one from the other districts called us and

11   said, hey, we want to add something to this.  And so, I

12   don't think we met with them because of that.

13           Q.    Did you publicize those meetings in those

14   districts?

15           A.    Yes.  I mean -- no, did we publicize them

16   in those districts?  I don't think we publicized in any

17   district.  I think we did use -- I think we used -- did

18   we use social media?  I think we used social media.  I

19   believe we used social media to publicize.

20           Q.    Other than the statements that you

21   referenced, is there anything else that you base your

22   opinion on, that the commission sought to sort Hispanic

23   Blacks and Anglo voters into districts?

24           A.    Other than?

25           Q.    Other than the statements that they made in

Page 111

1    the 2022 commission meetings.

2         A.    So, again, give me a little room to answer

3    this.  When she -- you know, when -- when they said

4    that's what they were doing, then for me, that set the

5    grounds for their actions to be considered, that that was

6    what they were doing.  So the actions that followed those

7    statements to me or to GRACE became their effort to do

8    what they said.  So every time we saw what they were

9    doing, it was attached to their -- their statements.  So

10   all of the actions that sought to bring their statements

11   into fruition, thereafter, for me, were considered their

12   efforts to have three Hispanic districts and whatever

13   else they said.

14        Q.    Well, I guess, what about their efforts

15   then enhanced or complimented whatever they said?  What

16   is it specifically about the efforts that supported your

17   conclusion that what they said was what they were

18   actually doing?

19        A.    I'm not sure how -- how to answer that.

20        Q.    Well, would you agree that if the criticism

21   of the city commission is that they passed a map that

22   elected three Hispanics but it is likely to elect three

23   Hispanics or likely to elect a Black candidate, likely to

24   elect an Anglo or Hispanic candidate based upon the

25   population in that plurality district, if you look at the

Page 112

1    plaintiffs' maps, they do the same thing, would you agree

2    then that that might undermine some of those suspicions,

3    that that might be the only way to draw up the city so

4    that it elects those candidates with that racial

5    representation?

6           A.    No, I don't agree that it's the same thing.

7           Q.    Why is it not the same thing?

8           A.    Well, I think -- I think intent is, you

9    know -- you know, it's the statements.  You know, it's --

10   the intent was to use race to draw the maps.  Grace's

11   intent, along with the other plaintiffs, was to draw the

12   maps in a way that met the criteria for redistricting.

13          My understanding is that the city, you

14   know, wanted to use the criteria for redistricting to

15   implement a map that allowed them to racially

16   gerrymander.  This is what our goal is.  This is -- I

17   think one commissioner said, I have a duty to protect.

18   That's what they wanted to do.  So the map, the

19   differences in the maps reflect that intent, right?  And

20   in my opinion, or from Grace's perspective.  And so, the

21   maps come out different because the intent is different.

22   And so --

23          Q.    What is different about the maps?

24          A.    The neighborhoods that are kept together,

25   the input of the -- the input of the residents on how

Page 113

1    they would like their communities to look, for the

2    natural boundaries, a couple of other things.

3            Q.    Well, would it be fair to say then, though,

4    that the maps that you present keep more neighborhoods

5    whole and respect more of the feedback that you got for

6    Districts 2 and 5?

7            A.    Yes.

8            Q.    But not necessarily 1, 3 and 4?

9            A.    I think it does for 1, 3 and 4.

10           Q.    Well, so far I've asked you a couple of

11   times, you're not aware of anybody saying, hey, let's

12   unite Flagami, correct?

13           A.    No, I'm not.

14           Q.    So that doesn't reflect feedback?

15           A.    But I'm not aware of anybody saying, let's

16   not unite Flagami.

17           Q.    Right, but that was a common feature in all

18   your plans, that you don't know why that was done, but

19   that was a big change from the existing maps.

20                 Wouldn't you agree?

21           A.    I would agree that I do know why it was

22   done, and I think I said earlier it was done to meet the

23   redistricting criteria, which is to keep neighborhoods

24   together.

25           Q.    Do you realize in that district that

Page 114

1    creates a 95 percent or more Hispanic district?

2           A.    Was it not that before?

3           Q.    No.

4           A.    Okay.

5           Q.    There was no district in the city plan that

6    has a Hispanic district that high.

7           A.    Okay.

8           Q.    Are you aware that the city is accusing the

9    plaintiffs of packing Hispanics in that district because

10   of the way they drew that?

11          A.    Yes.

12          Q.    And if nobody requested that change, do you

13   think that would be a fair criticism?

14          A.    I don't think it's a fair criticism because

15   nobody requested the change.  I think it's a fair

16   criticism because the data shows that those are the

17   numbers.

18          Q.    Okay.

19          A.    Because nobody really requested any of the

20   changes anywhere.  It's just something that has to be

21   done during the redistricting process.

22          Q.    And in that regard, most of the feedback

23   is, don't change us.

24                Would you agree with that?

25          A.    Yeah, that's the best -- pretty much, yes.

Page 115

1    Q.   For example, West Grove, they didn't want

2    anything to change.  They would've loved to have

3    District 2 just stay the same, but it couldn't.

4    A.   Well, GRACE understood that that District 2

5    had to change because District 2 had overwhelming growth

6    in population over the last ten years.  So District 2 and

7    GRACE -- and District 2 understood that District 2 needed

8    to change.  And in order to facilitate that change, it

9    had to work in concert with the other districts.  And so,

10   I think one of the criteria was keeping neighborhoods

11   together.  So as it relates to Flagami, keeping

12   neighborhoods together as a requirement was probably what

13   prompted, you know, us to draw the maps that way.

14   Q.   Okay.  But they kept Flagami whole, but

15   they didn't keep Little Havana whole?

16   A.   Right.

17   Q.   Because you've got to make choices?

18   A.   And we didn't make Edgewater whole because

19   we had to make choices.  So it wasn't like we were

20   picking on Little Havana.  It was, you know --

21   Q.   But you kept Edgewater whole in Map 4

22   though?

23   A.   Is there not an east/west split in

24   Little -- in Edgewater Map 4?

25   Q.   My understanding is, it would be --

Page 116

```
1    Edgewater's primarily east of that border, but I could be
2    wrong.
3            A.    Oh, yeah, it looks like it is.  Hmm.
4            Q.    Well, if the data shows that, generally
5    speaking, District 5 has a pretty similar ethnic and
6    racial makeup, District 2 has a pretty similar ethic and
7    racial makeup as the 2023 plan, just taking those two
8    districts, would you say that if you're comparing the
9    plaintiffs's Plan 4 and the 2023 plan and those numbers
10   are pretty similar, then that might be an indicator that
11   those districts weren't drawn with racial intent?
12           A.    No.
13           Q.    Even though that's not what the numbers
14   say?
15           A.    No.
16           Q.    Why not?
17           A.    Because, and I want to keep -- you know,
18   because the commissioner said that wasn't their intent.
19           Q.    Did they say that wasn't their intent in
20   2022 when they were passing the 2022 plan, or did they
21   say that wasn't their intent when they were passing the
22   2023 plan?
23           A.    They -- they said it, and I don't -- I
24   don't -- I don't believe they evolved.
25           Q.    Okay.  So they said it in 2022, and you
```

```
                                               Page 117
```

```
 1    don't think they evolved to 2023?

 2           A.    I don't believe so.

 3           Q.    Okay.

 4           A.    And I don't think -- representing GRACE, I

 5    don't think GRACE believes so.

 6           Q.    Okay.  But they went in to fix Grace's

 7    initial issue, didn't they?

 8           A.    They did.

 9           Q.    Okay.

10                 MR. LEVESQUE:  No further questions.

11                    CROSS-EXAMINATION

12    BY MS. MCNAMARA:

13           Q.    I have a couple of questions for you.

14           A.    Okay.

15           Q.    Reverand Robinson, do you remember you were

16    asked earlier about the time you spent preparing for

17    today's deposition?

18           A.    Yes.

19           Q.    And did you testify that the only meeting

20    you had to prepare was yesterday?

21           A.    I did testify to that, yes.

22           Q.    Do you remember if there were any other

23    meetings besides yesterday's meeting?

24           A.    There was another meeting.

25           Q.    When?
```

Page 118

```
 1          A.    And I believe that meeting took place on
 2   last Thursday, and I was -- I was traveling, so I was on
 3   my phone -- Zoom on my phone, so that may be why I missed
 4   that.
 5          Q.    And at that meeting, there was discussion
 6   to prepare for representing GRACE as the corporate
 7   representative in today's deposition?
 8          A.    Yes, there -- yes, there was conversation.
 9          Q.    Do you have any -- let's focus on the
10   parishioners of your church, Greater St. Paul AME.
11               Do you have any parishioners that would
12   classify themselves as both Black and Hispanic?
13          A.    Yes.
14          Q.    What type of parishioners?  Is there a
15   specific group that identifies that way?
16          A.    Yes.  So we have a family who are -- are, I
17   guess -- I don't know the proper way to say this, but
18   they're Black Cubans, so they are -- they are, you know,
19   Black and Latino.
20          Q.    Do you have any members who identify --
21   this is still within Greater St. Paul parishioners.
22               Do you have any members who identify as
23   Hispanic but do not identify as Black?
24          A.    Yes.
25          Q.    And can you describe generally -- is there
```

Page 119

1  a general description of who those people are?

2          A.    We've got -- we've got -- we've got Puerto

3  Rico family who attends our church, we have a family from

4  Colombia who attends our church or who are members of our

5  church -- our congregation, and I don't -- there's

6  another lady, and I'm not sure of where she is from, but

7  she's also Latino.  So we've got multiple Latino members.

8          Q.    Are there other membership organizations

9  that are part of GRACE that have Latino members or

10  Hispanic members?

11         A.    Yes.

12         Q.    When GRACE advocates, does it advocate on

13  behalf of all its members or just the members that

14  identify as Black?

15         A.    All members.

16         Q.    Do you recall that Ken Russell used to be

17  the District 2 Commissioner?

18         A.    Yes.

19         Q.    During the period in which Ken Russell was

20  the commissioner for District 2, did GRACE ever get is

21  any indication that Commissioner Russell was interested

22  politically in GRACE as -- you know, the constituents of

23  GRACE politically -- as representative of District 2,

24  that he was concerned about their political views or

25  their voting patterns?

Page 120

1          A.    Yes.

2          Q.    Why is that?

3          A.    Well, because GRACE represented a large

4    part of its constituency, and to hear the -- to hear

5    GRACE would be to hear the concerns of a large group.

6    Additionally, GRACE had the resources to -- we had

7    resources.  We had attorneys and we had other groups that

8    worked with us, that provided, you know, services that

9    could help us to make cases.  And so, I think he was

10   interested in what we brought to the table.

11         Q.    Do you believe that Grace's members who

12   live in District 2 have an impact on who is elected from

13   District 2?

14         A.    Yes.

15         Q.    Why do you believe they had that impact?

16         A.    Because District 2's elections are won by

17   such a small -- or determined by such a small margin that

18   all of the voters there, their votes are important.  So

19   because of the small margin of people that vote, the

20   people that GRACE represents, their votes are extremely

21   important.

22         Q.    If the West Grove were moved into

23   District 4, do you think that Grace's members in the West

24   Grove would have an impact on who ends up getting elected

25   to represent District 4?

Page 121

1          A.     Not as much as it would in District 2.

2          Q.     And why is that?

3          A.     Because the demographics are much

4    different.  And so, if there are more voters who don't

5    share your concerns or your issues, then it -- you know,

6    it dilutes the impact of your vote.

7          Q.     Now, do you remember just a little bit ago

8    we were talking about a meeting in which WLRN attended

9    and was recording?

10         A.     I remember that.

11         Q.     Do you know what meeting that was?

12         A.     That was a community meeting where we

13   discussed the redistricting.  I believe at that meeting

14   we talked about maps, and we heard the concerns of people

15   from the community and what they wanted to see or did not

16   want to see.

17         Q.     Do you know if that meeting took place

18   before the mediation that was held in this case?

19         A.     I believe that meeting took place after --

20   well, wait, no.  Sorry, I always get the dates mixed up.

21              I remember that being a long day.

22         Q.     Which day was a long day?

23         A.     The day that we had that meeting at Greater

24   St. Paul.  That was a long day.

25         Q.     So was the meeting in the evening?

Page 122

```
 1          A.    It was in the evening; it was dark.  It was

 2   a long day.  And I believe that -- I don't know if that

 3   meeting was before.  I think that meeting was before the

 4   mediation, I believe.  I don't remember.  I'm sorry with

 5   the dates.

 6              MS. MCNAMARA:  No further questions from

 7          plaintiffs.

 8                  REDIRECT EXAMINATION

 9   BY MR. LEVESQUE:

10          Q.    I've got just a couple followups.  I'm

11   always reluctant to say I've got just one more question

12   because that usually doesn't turn out to be the case.

13              Did Commissioner Russell attend any of the

14   meetings where maps were shared?

15          A.    No.

16          Q.    Has Commissioner Russell been in any

17   meetings that you have had with your attorneys?

18          A.    No.

19          Q.    And you mentioned, when we were discussing

20   it, that WLRN was recording the committee meeting.

21              As a practical matter, no one from GRACE or

22   any of the other plaintiffs made a habit of recording any

23   of those community meetings, correct?

24          A.    Correct.

25          Q.    So I know you testified that you weren't
```

Page 123

1   talking about things in racial terms, and I certainly

2   take your word for it, but it's possible that another

3   plaintiff or somebody else might have been raising those

4   issues, correct?

5        A.    Yes.

6        Q.    You just wouldn't have heard it?

7        A.    At a meeting?

8        Q.    Yes.

9        A.    Oh, no.  I think racial concerns were

10   brought up at meetings, but that wasn't taken into

11   consideration with our -- with our maps -- the maps we

12   had drawn -- that we drew.

13        Q.    Okay.  So the communities were expressing

14   themselves in racial terms, but from what I understand

15   you to say is, when you were drawing your maps, you

16   didn't consider that particular feedback as you were

17   making changes?

18        A.    No.

19        Q.    And is that true for the evolution of

20   District 5 where Overtown was included?

21        A.    Yes, that is true that we didn't take race

22   into consideration; we took feedback into consideration.

23        Q.    So the inclusion of the historically Black

24   neighborhood like Overtown, that wasn't included for

25   racial reasons; that was included just because it was

Page 124

1   feedback?

2          A.    Just because it was feedback.  We -- I

3   believe my -- from my recollection, we believed that

4   District 5 had the necessary number of voters to elect,

5   if they chose a Black representative, with what we

6   already submitted or we had already drawn or proposed,

7   being the evolution of that -- of District 5 in our maps

8   was taking into consideration the feedback that we got

9   from the community and from the District 5 Commissioner.

10         Q.    If you already had enough population to

11  have the district perform for a Black candidate, wouldn't

12  adding more population be packing Black residents into

13  that district to diminish their votes elsewhere?

14         A.    I don't know that to be true.

15         Q.    Okay.  What is your understanding of

16  "packing"?

17         A.    Adding a certain voting group into a

18  district to strengthen their vote.

19         Q.    Okay.  Isn't that the effect of what adding

20  Overtown to that district did?

21         A.    I believe so.

22         Q.    Okay.

23         A.    But I don't think that was our intent when

24  we made the changes.

25         Q.    Okay.

Page 125

1          A.    We know that redistricting requires that

2     there be at least one district that can elect.  So

3     there's almost a require- -- I guess, a requirement to

4     pack, I guess, if you want to break it down that way.

5     But our -- the evolution of District 5 in our maps were,

6     from my recollection, responses to community members and

7     the commissioner for District 5 saying, hey, this is

8     actually a part of our neighborhood and we would like

9     to -- you know, that was why it evolved.

10          Q.    And in the 2023 plan, that was also a

11    District 5 that the commissioner from District 5 voted

12    for, correct?

13          A.    Yes.

14          Q.    So she was at least supportive enough and

15    thought it reflected her community and her community's

16    interest enough to vote for that plan, correct?

17          A.    I don't know why she show voted for it, but

18    I know she voted for it.

19                    MR. LEVESQUE:  Okay.  That's all.

20                    THE WITNESS:  Okay.  Thank you.

21                    MR. LEVESQUE:  Read?

22                    MS. MCNAMARA:  No, that's good.

23                    MR. LEVESQUE:  No, I meant read?

24                    MS. MCNAMARA:  Oh, yes.  Yes.

25                    (Thereupon, the deposition was concluded at

1        approximately 5:24 p.m.  Signature and formalities

2        were not waived.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 127

1            EXCEPT FOR ANY CORRECTIONS MADE ON

             THE ERRATA SHEET BY ME, I CERTIFY

2            THIS IS A TRUE AND ACCURATE TRANSCRIPT.

3

4            REVEREND NATHANIEL ROBINSON, III

5

             Sworn to and subscribed before me this

6

        day of              2023.

7

    Personally known        or I.D. _____

8

9

10

                        Notary Public in and for the

11                      State of Florida at Large

12   My commission expires:

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

1                    CERTIFICATE OF OATH OF WITNESS

2

3    THE STATE OF FLORIDA        )
                                 )  SS:
4    COUNTY OF PALM BEACH        )

5

6

7                    I, Robyn Maxwell, Registered Professional

8    Reporter, Registered Professional Reporter, Notary Public

9    in and for the State of Florida at Large, certify that

10   the witness, REVEREND NATHANIEL ROBINSON, III, personally

11   appeared before me on October 11, 2023 and was duly sworn

12   by me.

13                   WITNESS my hand and official seal this

14   25th day of August, 2017.

15                   *Roy Maxwell*

16                   _____

                     Robyn Maxwell, RPR, FPR, CLR
17                   Realtime Systems Administrator
                     Notary Public, State of Florida at Large

18

19   Notary No. HH 232817

20   My Commission Expires: 4/4/2028

21

22

23

24

25

Page 129

```
 1                 REPORTER'S DEPOSITION CERTIFICATE

 2

 3    THE STATE OF Florida  )

 4    COUNTY OF PALM BEACH  )

 5

 6                  I, Robyn Maxwell, Florida Professional

 7    Reporter, certify that I was authorized to and did

 8    stenographically report the deposition of REVEREND

 9    NATHANIEL ROBINSON, III, the witness herein on

10    October 11, 2023; that a review of the transcript was

11    requested; that the foregoing pages numbered pages 1

12    through 131; and that the transcript is a true and

13    complete record of my stenographic notes.

14                  I further certify that I am not a

15    relative, employee, attorney, or counsel of any of the

16    parties, nor am I a relative or employee of any of the

17    parties' attorney or counsel connected with the action,

18    nor am I financially interested in the action.

19

20                  DATED this 25th day of August, 2017.

21

22                  _Roy Maxwell_

23    _____

      Robyn Maxwell, RPR, FPR, CLR

24    Realtime Systems Administrator

25
```

Page 130

1    Caroline A. McNamara, Esquire

     cmcnamara@aclufl.org

2

3    25th of October, 2023

4    RE:  GRACE, Inc. Et al  vs. City Of Miami

     10/11/2023, REVEREND NATHANIEL ROBINSON, III, FLA 6121410

5

6        The above-referenced transcript is available for

7    review.

8        The witness should read the testimony to verify its

9    accuracy. If there are any changes, The witness should

10   note those with the reason on the attached Errata Sheet.

11       The witness should, please, date and sign the Errata

12   Sheet and email to the deposing attorney as well as to

13   Veritext at Transcripts-fl@veritext.com and copies will

14   be emailed to all ordering parties.

15       It is suggested that the completed errata be returned

16   30 days from receipt of testimony, as considered

17   reasonable under Federal rules*, however, there is no

18   Florida statute to this regard.

19       If the witness fails to do so, the transcript may be

20   used as if signed.

21

22       Yours,

23       Veritext Legal Solutions

24   *Federal Civil Procedure Rule 30(e)/Florida Civil

25   Procedure Rule 1.310(e)

1  RE:  GRACE, Inc. Et al  vs. City Of Miami | FLA 6121410

2  DEPO OF:  REVEREND NATHANIEL ROBINSON, III

3  TAKEN:  10/11/2023

4                E R R A T A   S H E E T

5  PAGE_____ LINE_____ CHANGE_____

6  _____

7  REASON_____

8  PAGE_____ LINE_____ CHANGE_____

9  _____

10 REASON_____

11 PAGE_____ LINE_____ CHANGE_____

12 _____

13 REASON_____

14 PAGE_____ LINE_____ CHANGE_____

15 _____

16 REASON_____

17 PAGE_____ LINE_____ CHANGE_____

18 _____

19 REASON_____

20

21 Under penalties of perjury, I declare that I have
   read the foregoing document and that the facts

22 stated in it are true.

23

24

   _____      _____

25 REVEREND NATHANIEL ROBINSON, III          DATE

**&**

**&**   3:6 30:21,24
110:8

**1**

**1**   3:10,18 8:20
8:21 35:11,13
56:21 67:9 75:3
90:7 95:20 98:7
101:23 103:24
110:5 113:8,9
129:11
**1.310**   130:25
**10/11/2023**
130:4 131:3
**100**   3:21
**102**   3:17
**1088**   7:16
**109**   3:16 59:20
59:21
**10th**   69:5,6
**11**   1:14 128:11
129:10
**117**   3:4
**122**   3:4
**128**   3:5
**129**   3:6
**130**   3:6
**131**   129:12
**14th**   97:8,18
**16**   23:6 62:21
64:2 69:17
**16987**   128:15
129:22
**17**   62:17,19

**18**   23:6 24:12
**18th**   19:16
**19**   24:12
**19104**   2:11
**1997**   64:8 104:2
**1999**   27:22,25
**1:22**   1:2
**1:59**   1:15 4:2

**2**

**2**   3:19 26:25
27:1,3,6,7,11
28:22 29:1,14
30:8 31:2 32:18
32:19,22 33:5,8
33:11,15,17,18
33:19 34:3,10
34:22,23 39:23
40:1,17,20 42:8
42:13,25 47:10
48:19,24 51:5
51:16 52:13,15
52:17,20 54:2
60:3,4,7,14,20
60:23,23 61:6
64:7,9,15,18,23
65:20,21 80:1
84:2,8,11 85:13
86:5 94:11,12
95:20 98:7 99:7
101:17 102:20
103:10 113:6
115:3,4,5,6,7,7
116:6 119:17,20
119:23 120:12
120:13 121:1

**2's**   120:16
**2013**   26:22
27:10,12
**2017**   128:14
129:20
**2019**   10:13,15
10:16 22:18
23:3
**2020**   17:19,24
**2021**   19:16,16
**2022**   3:15 17:15
17:18 19:19
21:17 55:19
60:11 62:25
64:11 65:13
78:18,22 79:23
91:9,19,25
99:15,17 104:4
111:1 116:20,20
116:25
**2023**   1:14 22:19
60:7 64:2 65:13
65:18 67:20
69:5,6 84:21
91:10,22 101:16
116:7,9,22
117:1 125:10
127:6 128:11
129:10 130:3
**208**   7:16
**21**   3:14 30:8
38:13
**215.994.2380**
2:11

**22**   38:13,13
**23**   3:13 50:17,18
**232817**   128:19
**24**   56:5
**24-13**   3:14
21:12,13
**24066**   1:2
**24b**   62:24
**25th**   128:14
129:20 130:3
**2929**   2:10
**2nd**   1:13

**3**

**3**   3:20 47:10
62:15,16 83:15
92:20 95:20,21
98:7 110:5
113:8,9
**30**   3:11 39:25
52:9 56:18,19
130:16,24
**300**   22:12
**301**   2:15
**30th**   97:12
**31**   55:11 56:20
**3200**   1:13
**32301-1724**
2:16
**32nd**   35:13
**33131**   1:14
**33134**   2:6
**33169**   7:17
**333**   1:13
**3:43**   66:24

**3:51**   66:24

**4**

**4**   3:3,21  9:2
28:15  41:5,7,9
42:14  43:1,10
43:14  47:10
48:22,25  51:1,2
51:5  52:3  57:21
60:12  83:15
97:14,22  98:6
100:20  101:24
103:24  110:4
113:8,9  115:21
115:24  116:9
120:23,25
**4/4/2028**   128:20
**400**   2:5
**4343**   2:5
**4:48**   104:12
**4:53**   104:12

**5**

**5**   9:8  42:21
47:11  53:22
54:4  60:2,4  78:7
90:8  94:15  99:7
99:11,13  101:24
113:6  116:5
123:20  124:4,7
124:9  125:5,7
125:11,11
**50**   3:13
**59**   3:16
**5:24**   1:15  126:1

**6**

**6**   3:11  52:8
**600**   2:16
**6121410**   130:4
131:1
**67**   3:18

**7**

**786.363.2714**
2:6
**7th**   3:15  19:18
21:17

**8**

**8**   3:10
**8224**   3:17
102:11,12
**8234**   3:18  67:3,4
**8235**   3:19  85:6,7
**8236**   3:20  92:13
92:14
**8237**   3:21
100:14,15
**85**   3:19
**850.577.9090**
2:17

**9**

**92**   3:20
**95**   114:1

**a**

**a.m.e.**   22:6
**ability**   7:12  42:1
42:2,3
**able**   16:8  17:3
31:9  46:9,13

48:23  59:16
68:21,22  104:9
105:4
**above**   1:25
130:6
**acceptable**
90:25  91:2
**access**   105:4
**accuracy**   130:9
**accurate**   55:23
127:2
**accurately**   22:2
**accusing**   114:8
**aclu**   2:4  68:21
**aclufl.org**   2:4
130:1
**acronym**   8:1
**act**   16:13,14
53:12  77:8
102:4
**action**   51:19
62:4  129:17,18
**actions**   62:1
111:5,6,10
**active**   70:1
**activity**   62:10
**actors**   81:8
**actually**   38:13
69:21  75:23
85:17  108:11
111:18  125:8
**add**   70:15,17
80:11  110:11
**adding**   124:12
124:17,19

**addition**   37:7
**additional**   37:7
**additionally**
62:22  120:6
**address**   7:15
51:13  91:24
96:23
**addressed**   79:25
84:23  92:9
102:23  103:13
103:20,22
**addresses**   16:8
52:2
**addressing**   9:12
16:2  38:13
**administrator**
128:17  129:24
**adopted**   71:9
97:7
**adopting**   97:12
**advocate**   15:22
119:12
**advocates**
119:12
**affect**   7:12  25:2
**affirm**   4:5
**affirmative**   21:5
**affirmed**   4:12
**african**   23:9
24:22  58:21
90:19  106:7
**afternoon**   4:16
**age**   101:23
**agency**   30:11

**ago** 13:12 23:25
    83:11 121:7
**agree** 25:12,24
    27:13 43:2
    49:22 53:4,12
    53:23 54:3,24
    55:4,20 74:1
    75:3,15,23
    78:19 81:18
    91:1 93:25
    111:20 112:1,6
    113:20,21
    114:24
**agreeable** 76:12
    96:10,13
**agreed** 86:1
    100:24,25
**agreement**
    70:13
**ah** 77:2
**ahead** 6:25,25
    47:16 92:11
**al** 1:4 130:4
    131:1
**alerted** 20:2
**alexander** 57:10
**alexandra** 57:9
    57:11,12,15
**alfieri** 10:1
**allapattah**
    98:16,18
**alliance** 10:23
    11:5,13 58:13
    89:9,16,19

**allow** 13:25
    14:2 95:16
**allowed** 112:15
**ame** 118:10
**amended** 3:13
    23:2,5 50:24
    69:4,7
**america** 54:11
    54:12
**american** 24:22
    59:1 90:19
    106:7
**anglo** 44:17
    46:25 106:17
    110:23 111:24
**answer** 6:3,14
    6:16,25 7:5,7
    26:1 33:6 46:23
    49:19 50:6,11
    53:7,8 66:17,18
    72:20 106:13
    111:2,19
**answers** 5:25
**anthony** 10:1
**anybody** 50:13
    50:13 51:10,15
    52:1 54:9 61:9
    63:14 87:22
    95:11 106:12
    113:11,15
**apartment** 73:5
**apologize** 69:20
**apostle** 9:25
**apparent** 96:18

**appear** 30:9
**appearances** 2:1
**appeared**
    128:11
**appears** 24:13
    28:9 38:15
**application**
    13:23,24 14:9
    14:12,24
**applications**
    14:13,14
**applies** 66:12
**apply** 15:11
    16:18 50:12
    62:19,21 66:4,4
**appreciate**
    38:14 65:6
**approach** 81:2
**approve** 67:25
    68:2 100:21
**approved** 16:23
    70:10 81:19
**approximately**
    126:1
**arch** 2:10
**area** 16:24,24
    34:14 37:7
    49:23 71:15
    73:10
**areas** 23:21
    24:18 29:25
    34:9,16 37:22
    43:13 93:7,22
    94:5

**armbrister**
    35:22
**ascribe** 66:10
**asked** 63:22
    87:15 108:14,17
    108:19,20,21
    113:10 117:16
**asking** 5:24 6:5
    12:10 106:13
**aspects** 5:8,23
    6:8 38:19
**assertion** 43:19
**assessing** 43:25
**associated**
    10:17
**association**
    10:24 11:7,17
    11:18,25 12:1
    86:18 88:17
    89:7 109:25
**assume** 6:4
**athlete** 49:22,24
    50:7,13 72:14
**athletes** 72:17
**attached** 21:19
    111:9 130:10
**attempt** 87:22
    96:1
**attempted** 71:25
**attend** 20:11,22
    31:3,9 122:13
**attended** 89:3
    121:8
**attending** 31:4

**attends** 119:3,4
**attentive** 83:12
**attorney** 129:15
129:17 130:12
**attorneys** 8:16
12:11,15,24
21:18 38:4
53:11 67:17
68:4 107:24
109:5,6,7 120:7
122:17
**attribute** 66:2
**august** 128:14
129:20
**authorized** 129:7
**automatically** 59:13
**available** 20:15
130:6
**avenue** 35:13
**aveunue** 1:13
**avoid** 6:17
**aware** 7:22 32:9
32:12,19,22
35:17 36:3,5,6
36:10 41:4
71:15,17 76:20
77:18,21,22
88:4 89:12 93:7
93:21,24 96:21
97:17 99:19
104:1 105:13,16
105:22 106:1
113:11,15 114:8

**b**

**b** 3:11 110:8
**back** 27:22,24
28:1,3,8,21 29:1
35:14 36:2
38:12 41:12
43:17 51:11
54:18 56:4
69:14 75:12
80:1,13 88:3
89:10 104:13
**bahamas** 37:4
**bahamian** 72:19
**balance** 33:10
**base** 110:21
**baseball** 38:5
**based** 31:20,20
38:21 42:6
56:15 107:12
111:24
**basis** 39:4,6,21
43:17,19 57:7
106:19
**basketball** 38:4
**beach** 128:4
129:4
**beefs** 65:7
**began** 4:2 19:24
**behalf** 2:3,13
20:23 46:16
50:24 119:13
**belief** 24:3 44:1
44:7 106:19
**believe** 9:7
18:16,23,25

19:2,17 21:20
22:17,18 23:15
23:17 24:16
27:10,10 31:7
31:18 34:20
38:19 41:10
42:20 43:14
44:20 45:18,25
46:24 47:12
51:17,20 52:4
53:25 55:24
57:15 62:24
65:22 71:20
81:13 83:16
88:6 89:15
92:23,23 93:9,9
94:7,13,14,19
94:20,20 97:23
99:21 101:8
102:18 104:4
105:3,3 106:16
109:20,21
110:19 116:24
117:2 118:1
120:11,15
121:13,19 122:2
122:4 124:3,21
**believed** 42:8
43:24 70:20
124:3
**believes** 117:5
**believing** 96:6
**best** 5:22 6:2,17
22:3,4 50:6
74:25 96:8

114:25
**bethel** 90:14,15
**better** 25:8,22
**big** 113:19
**biscayne** 86:18
88:17 109:25
**bit** 5:14 24:24
34:22 55:12
66:7 121:7
**black** 15:17
16:21 23:16
27:4 38:18,24
42:12,19 44:16
46:2,19,25 51:4
52:24 53:1,2,5
53:10,14,19,19
53:20,24 54:1,5
54:5,12 58:24
59:1 60:7 64:7
81:11,12 82:7
82:10,12,14
90:18,20,23,24
94:18 101:23
102:6,6 105:24
106:7,17,25
111:23 118:12
118:18,19,23
119:14 123:23
124:5,11,12
**blacks** 39:23
42:25 43:1
110:23
**block** 48:4
**board** 9:20,21
9:23 13:24,25

18:2,20 19:4,4,7
19:21 20:5,10
20:17,19,25
21:2 51:19,23
52:6 59:17
61:15,18,24
62:11 67:22,24
67:25 69:10
70:9 75:13
89:13,21,21
100:21,22,23,23
105:11,11
**board's** 20:21
**body** 24:19 29:5
38:25 44:1
**bone** 81:10,12
82:4,9,12,13,16
82:22
**books** 39:18
**border** 33:15
35:10 116:1
**bordered** 33:17
**bordering** 35:24
**born** 4:23 27:15
27:18
**boundaries** 27:7
27:8 30:4 35:4
36:11,14 71:23
73:16 75:10
78:2 80:6 113:2
**boundary** 76:5
**branches** 56:7
**break** 6:19,23
7:1 66:21 104:9
125:4

**breaking** 28:12
28:13 66:23
**bring** 7:3
111:10
**broadly** 36:21
80:22
**bronough** 2:15
**brooker** 35:24
**brought** 90:3
120:10 123:10
**bruno** 10:1
**buildings** 17:5
**business** 8:8
9:19 11:1 12:5
81:17
**businesses**
10:17 15:5
**busy** 13:16 70:8
**bylaws** 8:13
23:1,2 104:15
104:19

**c**

**call** 7:23 11:19
16:23 46:2 57:6
68:8
**called** 11:3
16:25 81:8
96:16 110:10
**campaign** 40:14
**candidate** 53:14
53:20 105:24,25
107:1 111:23,24
124:11
**candidates**
105:24 106:25

112:4
**care** 28:25 46:6
**careful** 12:9
103:3
**caroline** 2:3
130:1
**carollo** 45:7,8
83:19,20
**carolyn** 9:24
10:6
**carved** 90:24
91:5
**case** 1:2 39:7
54:1 63:23
106:2 121:18
122:12
**cases** 63:22,23
120:9
**cause** 1:25
**census** 17:20,24
31:20
**center** 37:2,8,15
37:22 38:9
**centre** 2:10
**certain** 20:6,21
25:6 44:23
46:15 48:1 49:5
93:22 124:17
**certainly** 61:5
106:4 123:1
**certificate** 3:5,6
128:1 129:1
**certify** 127:1
128:9 129:7,14

**cgi** 16:9
**chair** 9:21,22
10:3,4,5 20:18
20:18 21:2
22:14,16,19
67:20 69:11,19
69:25
**chairwoman**
38:14
**challenge** 30:15
**challenged** 79:1
**challenges** 49:8
**challenging**
50:5
**chambers** 9:25
**chance** 108:1
**change** 65:12
74:24 75:4,7
79:11,12 113:19
114:12,15,23
115:2,5,8,8
131:5,8,11,14
131:17
**changed** 64:11
65:12,18,20
**changes** 33:25
35:5 79:5 80:18
114:20 123:17
124:24 130:9
**changing** 90:16
**characterization**
59:8 103:21
**characterize**
46:25 53:6,9
109:19

**characterized** 37:23

**chief** 60:11

**choice** 53:14,21

**choices** 115:17 115:19

**chose** 124:5

**christopher** 2:8 9:25 10:10 104:22,23 105:3

**christopher.m...** 2:9

**church** 22:6 58:7,17,22 59:3 59:5 74:14,14 74:17 90:15 91:4,5 118:10 119:3,4,5

**church's** 59:6

**churches** 8:7 9:17 10:18 11:2 12:4 15:3,4 58:13 89:17,18 89:20

**cira** 2:10

**circumstances** 16:21 25:6 47:13,14,19,21 73:8

**citizens** 98:2

**city** 1:7 3:14 4:17 5:2 7:18,19 7:20 16:12,13 16:23 17:18 18:9,15 19:14

20:11,12,22 21:16 26:2 28:21 31:16,19 31:21,24 32:1 34:2 41:24 46:1 50:11,14 52:22 53:12,13 60:10 61:7 63:6,10,12 63:16,20 64:18 64:25 71:3,8,21 74:15,20 75:16 76:8,21 78:11 79:4,5,19 80:12 80:14,15,25 81:3,5,19 84:14 84:19 85:15,17 85:19,23 88:2 91:15 92:6 96:1 96:3,6,7,8,13 97:10 106:5,16 107:9 109:22 111:21 112:3,13 114:5,8 130:4 131:1

**city's** 18:3 29:15 91:7

**civic** 8:7 9:18 11:2 12:4 15:12

**civil** 68:20 130:24,24

**clarice** 10:2,8 89:13 104:21

**clarification** 6:13

**clarify** 12:23

**clarity** 83:16

**classified** 54:4

**classify** 118:12

**clear** 36:16 59:5 93:13

**cleveland** 72:22

**clr** 128:16 129:23

**cmcnamara** 2:4 130:1

**coastal** 27:11

**coconut** 8:8 9:19 10:20,22 11:4,13 15:17 15:21 22:6 24:17,19 26:4 26:10 33:21 34:11,17,18 36:7,9,11,14,15 36:17,19,21,23 36:24 37:4 38:3 38:6 43:9,12,16 49:14,17 50:10 87:9 88:25 89:8 89:16,19 101:14 102:20

**collective** 64:16 84:16 90:4

**colloquy** 6:16 82:22 83:14

**colombia** 119:4

**colombian** 40:23,23 54:2

**come** 18:12 59:17 68:23 112:21

**comes** 6:17

**coming** 95:20

**comment** 20:12 44:5 82:5,22 83:13,21

**comments** 21:20 22:3 81:13 103:9

**commission** 3:14 20:11,13 20:22 21:17,21 28:21 47:1 55:18 60:7 71:4 71:9,21 76:8,21 77:5 78:11,17 81:1,3,6,7,19 96:15,25 97:7 97:25 98:3 99:3 101:17 103:9 106:16 110:4,22 111:1,21 127:12 128:20

**commissioned** 24:20 30:13 47:2 51:5 54:2 109:22

**commissioner** 18:13 20:2,4 26:3,7,9,10,18 30:14 40:4,17 40:19 41:2,4,5,6 41:8,19,21

44:21 45:2,8,19
46:2,3 53:25
75:12 81:9
82:11 83:1,2
93:21 99:12
101:6 112:17
116:18 119:17
119:20,21
122:13,16 124:9
125:7,11
**commissioner's**
64:3,12 65:22
**commissioners**
40:8 44:3,6,23
46:2 54:6 83:15
95:19
**committee** 20:6
20:7 122:20
**common** 73:4
73:13 113:17
**communicate**
85:15
**communication**
89:22
**communities**
16:16 23:16
29:21,23 82:13
88:13,25 95:4
113:1 123:13
**community** 3:11
8:4 15:20 18:13
18:14 19:24
20:3 27:5 29:19
30:11,17,19,21
30:23 41:21

42:6 47:22 49:6
64:7 72:10 74:4
74:4,18 81:11
82:8,10,12,13
84:15 86:9,12
87:18 88:13,19
88:23 89:3,7,9
89:23 90:16
91:7 94:18 98:8
98:12 101:5
108:9 121:12,15
122:23 124:9
125:6,15
**community's**
125:15
**compact** 78:4,5
**compared** 86:4
**comparing**
116:8
**complainants**
63:23,24
**complained**
17:9
**complaining**
53:1
**complaint** 3:13
3:16 17:7,7,8,13
50:24 60:1,13
62:19 63:1,2
64:16 65:9
68:25 69:4,7
103:1
**complaints** 63:8
64:19,24 103:2

**complete** 129:13
**completed**
69:16 130:15
**completely** 90:8
**compliance**
16:14 77:7
**compliant** 102:4
102:8
**complicated**
33:6
**complimented**
111:15
**compound**
47:17
**computer**
105:10
**con** 107:16
110:3
**concern** 29:10
29:11,17,18,20
29:21 30:4,5
43:4,7 46:17
96:16 103:8,13
110:8
**concerned** 29:9
30:7,10 84:15
84:17 119:24
**concerns** 29:15
29:16 30:16
78:7,8,12 79:23
80:2,3 84:14,17
84:22,24 88:22
90:2,11 91:25
92:1,5,7,9 96:20
96:22,23 99:6

101:22 102:22
102:24 103:1,2
103:4,4,11,16
103:19,20,22
110:8,9 120:5
121:5,14 123:9
**concert** 33:12
100:24 115:9
**concession** 93:1
**concessions**
95:12 100:5
**concluded**
125:25
**conclusion**
111:17
**conditions**
50:12
**conducting**
61:24
**confident** 97:25
**configuration**
97:18 104:5
**confused** 74:21
74:22
**confusing** 6:11
74:5,8,25 75:2
**congregation**
22:11 119:5
**congress** 25:15
**connected** 16:10
129:17
**consensus** 43:23
**conservation**
33:20

**consider**  74:8
  81:24 93:5
  107:16 109:9,18
  123:16
**consideration**
  29:20 30:1,7,9
  81:20,23 96:20
  98:5 108:3
  123:11,22,22
  124:8
**considered**  35:7
  41:24 77:19
  82:2 93:7,20
  111:5,11 130:16
**consistent**  98:3
**constituencies**
  95:8
**constituency**
  120:4
**constituents**
  98:1 119:22
**constitute**  36:4
**constituted**
  39:23
**constitutes**
  35:18
**constructive**
  80:23
**consultant**
  38:22
**consultants**
  76:17
**content**  78:14
**context**  56:17

**continue**  9:7
**contreras**  55:14
  57:4,9
**contributing**
  76:18
**controlling**
  25:22
**conversation**
  5:8,9 7:3 68:3,5
  73:23 79:8
  87:21 118:8
**conversations**
  12:12 42:6
  63:19 68:8,10
  80:11 86:17
  89:10 92:10
  98:1 105:20
  109:23 110:2
**convinced**  24:4
  24:5,9,9,11
**cooper**  10:2,8
  13:3,13 52:10
  89:14 104:21
**copies**  130:13
**copious**  70:2
**coral**  35:24
**core**  77:16,18
  102:22 103:8,19
**corporate**  7:23
  21:1 65:4 118:6
**correct**  19:17
  26:5,8 27:9
  47:11,12 50:4
  52:24 53:22
  54:13,13,17

55:6,7,9 58:24
  60:21 73:5
  75:17,20 80:1,8
  83:15 85:2,4
  87:9,12,13,16
  89:14 90:8,21
  94:2 100:2,3,9
  100:10 101:18
  106:8 109:13
  113:12 122:23
  122:24 123:4
  125:12,16
**corrections**
  127:1
**correctly**  16:19
  18:17 67:19
  79:3 84:20
  109:12
**corroborated**
  44:6
**council**  30:6
**counsel**  5:21 6:9
  16:6 47:17
  53:12 68:22
  129:15,17
**count**  47:14,15
  47:20,23,25
**country**  23:9,19
  54:12
**county**  52:22
  128:4 129:4
**couple**  12:8
  113:2,10 117:13
  122:10

**course**  45:4
  82:21 85:21
  90:22
**court**  1:1 4:3
  5:9 7:9 21:18
  26:13 78:18,22
  91:19 95:22,22
  97:2,11
**cover**  21:20
  34:11,14,19
**covered**  34:9,16
  107:24
**covid**  69:12
**covo**  40:21
**cra**  34:5,7 80:5
  94:14,14
**create**  53:13
  71:2
**created**  16:7,9
**creates**  114:1
**crime**  58:11
**criteria**  76:21
  77:1,6,20,24
  88:11 112:12,14
  113:23 115:10
**criticism**  111:20
  114:13,14,16
**cross**  3:4 117:11
**cuban**  44:22
  45:11,16,17,18
  45:23
**cubans**  45:17
  94:23 118:18
**culture**  15:20
  72:10

**current** 7:14
10:3,4 40:17
**currently** 7:11
9:24 34:3 40:19
**custodian**
104:16,17
**cut** 44:8 90:8
91:8
**cv** 1:2

**d**

**dark** 122:1
**data** 16:11
73:19 105:18
114:16 116:4
**date** 19:22
21:21 22:17
68:24 69:7 79:2
130:11 131:25
**dated** 129:20
**dates** 22:15 69:9
69:20,21,24
70:3 78:25
121:20 122:5
**daughter** 69:17
**day** 24:11 29:25
81:16 96:7,15
96:18 97:1,15
121:21,22,22,23
121:24 122:2
127:6 128:14
129:20
**days** 78:24
130:16
**dayton** 69:14,15

**de** 45:4 83:17,19
83:24,25
**december** 19:16
**dechert** 2:9
**dechert.com** 2:9
**decide** 19:25
46:13
**decided** 18:20
**decision** 18:9
76:3
**declare** 131:21
**deductively**
33:3
**deed** 21:4
**defendant** 1:8
2:13
**defendant's**
3:10 8:20 21:11
50:17 59:20
67:3 85:6 92:13
100:14 102:11
**defense** 3:8 8:21
21:13 50:18
59:21 67:4 85:7
92:14 100:15
102:12
**define** 32:5
**defined** 56:12
**definitely** 33:16
34:17
**definition** 39:1
39:3,10 48:5
**degrading** 81:8
**demographic**
105:18

**demographics**
49:3 121:3
**demolish** 17:5
**denomination**
58:23
**denoted** 28:23
**departments**
16:12
**depend** 25:10
**depending** 35:6
73:8
**depends** 37:20
37:20 74:11
**depo** 131:2
**deposing** 130:12
**deposition** 1:16
1:24 3:6,11 5:3
6:8 8:10,17
12:14,18,25
13:5 70:7
117:17 118:7
125:25 129:1,8
**deprive** 41:25
42:3
**descent** 40:23
45:18 72:19
109:24
**describe** 35:3,10
118:25
**description** 3:9
15:24 119:1
**designate** 20:5
20:10
**designated** 9:11
20:15

**designating**
77:11
**designation**
20:21 35:18,19
36:3,5,6
**designations**
20:14,16
**desire** 13:20,20
**desk** 81:13
**desperately**
38:17
**determined**
120:17
**development**
15:22 17:14
33:25
**deviation** 72:3
86:15 107:22
**difference** 49:1
**differences**
112:19
**different** 5:15
6:9 14:11 16:12
23:9 24:17,18
24:20 34:1 43:6
45:12,15,16,20
54:15,16 55:13
71:8 85:15
95:15 97:20
107:23 112:21
112:21,23 121:4
**differently** 48:8
48:12 70:25
85:21 87:5
97:22

**difficult**  25:25
35:9
**diluted**  23:17
42:9
**dilutes**  121:6
**diluting**  23:8
24:21 25:2
38:18 39:4
**dilution**  23:8,12
24:10 29:13
39:1,10,20
**diminish**  124:13
**direct**  3:3 4:14
**directed**  61:15
61:18
**directing**  62:12
**direction**  62:8
**directions**  13:24
**directly**  72:20
**directors**  9:20
9:21,23
**directs**  13:25
**dis**  24:20
**disagree**  53:16
**disappointed**
95:24
**discouraged**
42:11
**discourages**
42:5
**discriminate**
38:16
**discrimination**
38:20

**discuss**  18:2,6
98:13 109:10
**discussed**  19:21
62:8 85:25
121:13
**discussing**
82:23 122:19
**discussion**
77:10 79:14
118:5
**displaced**  15:20
16:3,7,15,18,22
**displacement**
15:18
**disrespectfully**
46:6
**dissatisfaction**
80:20
**dist**  47:1
**distinguished**
58:24,25
**district**  1:1,1
24:23 25:18
26:23,25 27:1,3
27:6,7,11,12
28:15,22 29:1
29:14 31:2
32:18,19,22,23
33:5,8,11,15,20
38:24 39:23
40:1,17,20 41:5
41:7,9 42:8,8,13
42:14,15,20,21
42:22,24,25
43:1,10,14

44:16,17 46:13
46:18,19,19
47:3,10,10,10
47:10,11,24
48:19,22,24,25
49:6,12 51:16
52:3,13,15,17
52:20 53:2,5,14
53:19,19,20,22
53:22,24 54:1,2
54:3,4,4 55:5
57:21 60:7,12
60:14,20,23,23
61:6 64:7,9,15
64:18,23 65:20
65:21 71:10,16
71:19 74:2,3
78:7,17 80:1,5
83:2,15,15 84:2
84:8,11 86:5
87:12 88:1 90:8
90:24 91:19
93:23 94:1,5,8
94:11,11,12,15
99:11,13,13,17
99:23 101:11,17
101:24 102:3,5
102:20 103:10
103:24,24
105:25 110:17
111:25 113:25
114:1,5,6,9
115:3,4,5,6,7,7
116:5,6 119:17
119:20,23

120:12,13,16,23
120:25 121:1
123:20 124:4,7
124:9,11,13,18
124:20 125:2,5
125:7,11,11
**districts**  23:21
24:20 25:1
30:13 31:17,24
32:2,4,9,13,14
32:25 33:9,12
33:14,17 43:6
43:13 44:16,22
44:23,25 45:21
45:23 46:25
47:2,2 49:3 51:5
52:11 53:6,9
54:20 55:15
56:9,23,25 57:1
60:25 61:2,3,10
63:12,16 64:6
75:4 77:16,19
78:4,5 84:25
88:20 98:23,25
99:2,6,9 104:2
106:17,24 107:2
107:12 109:11
109:16,16,19,19
109:21,22 110:4
110:6,7,10,14
110:16,23
111:12 113:6
115:9 116:8,11
**diverse**  38:7
52:15

diversity 38:9
54:14
divided 43:12
doctoral 69:13
69:13
doctorate 69:15
69:16
document 8:19
8:24,25 9:1
21:25 50:21
59:23,25 66:6
131:21
documents 8:9
8:12,14 105:5
doing 5:17,22
16:4 26:8 78:15
80:25 111:4,6,9
111:18
dollars 76:17
donaldson 9:25
10:6 13:7,10
70:4
douglas 35:8,11
35:13
downtown
93:10,22
draft 29:24
30:10 43:14
dramatic 87:18
draw 46:1 67:13
67:14,15 76:22
85:16 95:7
97:21 106:24
112:3,10,11
115:13

drawers 76:22
drawing 17:23
18:3,7,10 54:23
75:13 76:2 78:4
78:7 102:3
107:17 123:15
drawn 46:7 64:6
73:14 75:8,8
99:9 104:2
116:11 123:12
124:6
drew 114:10
123:12
duly 4:12
128:11
duty 112:17
díaz 83:24,25

**e**

e 130:24,25
131:4,4,4
earlier 21:19
60:10 62:23
113:22 117:16
east 35:15 37:1
37:8,15,22 38:9
93:3 115:23
116:1
easy 76:9
economic 15:22
93:22 94:1,8,16
edgewater 86:6
86:9,19 115:18
115:21,24
edgewater's
116:1

educated 63:3
effect 124:19
effort 63:15
95:6 96:9 97:21
111:7
efforts 91:24
111:12,14,16
either 20:17
37:15 57:5 68:7
82:14 95:20
98:22 100:2
101:23 108:14
elect 45:11 46:9
47:4,5 53:14,20
102:6 105:23,24
105:25 106:25
106:25 111:22
111:23,24 124:4
125:2
elected 22:18
54:16 111:22
120:12,24
elections 120:16
electoral 106:23
electronically
105:2
elects 53:24
54:5 112:4
elimination 45:3
email 105:10
130:12
emailed 130:14
employee
129:15,16

enacted 3:17
52:9 55:13,17
56:5 68:18
79:21 91:3,15
91:22 101:17
102:18
ends 120:24
engage 18:3,9
56:2,6,13 57:5
57:13,15 66:5
engine 93:23
94:1
engines 94:8,16
enhanced
111:15
enjoined 56:6
78:18,22 91:19
92:5
entire 63:5,10
64:25 65:2
entirely 94:10
entirety 34:11
34:21
episcopal 58:22
equal 32:10
47:3,8 63:6
64:24 77:11
equalize 33:5
equalizing
75:25
equally 24:11
equitable 15:22
31:21 46:10
48:15

equity 3:12 8:4
30:2
errata 127:1
130:10,11,15
esquire 2:3,8,14
130:1
essentially
107:9
established 23:3
76:21
establishes
36:11,14
et 1:4 130:4
131:1
ethic 116:6
ethnic 116:5
ethnicity 40:16
40:22 45:22
evening 121:25
122:1
eventually 18:4
everybody
68:11 76:13
78:14 80:21
96:19 100:8
103:6 106:8
110:1
everybody's
48:7 84:17
evict 50:3,10
evicted 16:15
17:11
eviction 15:18
evidence 44:3

evolution
123:19 124:7
125:5
evolved 84:9
103:14,15
116:24 117:1
125:9
exact 77:12
81:15
exactly 5:12 7:4
17:25 34:16
39:11 68:17
88:17 105:8
examination 3:3
3:4,4 4:14
117:11 122:8
examined 4:12
55:1
example 25:15
26:1,16 54:7
75:19 94:8
115:1
except 127:1
excerpt 21:20
exhibit 3:9,10
3:13,14,16,17
3:18,19,20,21
8:20,21 21:11
21:12,13 50:17
50:18 59:20,21
62:23 67:3,4
85:6,7 92:13,14
92:17,19 100:14
100:15 102:11
102:12

exhibits 3:8
existence 78:22
existing 77:16
77:19 113:19
experience
24:14 28:10
49:25 50:8
74:13
experienced
23:15 32:15,18
experiences
50:2
experiencing
74:17
experts 67:17
71:5 76:17
107:24
expires 127:12
128:20
explain 75:1
express 110:8
expressed 110:8
110:9
expressing
123:13
extensive 89:10
extra 69:12
extremely
120:20

**f**

facilitate 115:8
facing 23:7
fact 44:15 60:11
90:20 91:4

factfinding
18:24
facts 131:21
fails 130:19
fair 6:6 15:23
16:12,14 20:8
26:21 28:19
32:7 37:13,17
47:3 52:16
56:15 59:8
60:15 61:21,23
63:6 75:21
80:24 102:19
103:21 106:23
113:3 114:13,14
114:15
familiar 7:25
33:14 39:17
78:5 82:4
107:20
family 118:16
119:3,3
famous 38:4
49:14,16
far 35:14 113:10
feature 113:17
features 71:7
february 3:15
19:18 21:17
62:25 69:5,6
federal 130:17
130:24
feedback 80:23
89:8 98:9 113:5
113:14 114:22

123:16,22 124:1 124:2,8
**feel** 27:2 65:12 95:25 96:8
**feeling** 44:4
**fees** 14:19,22
**fellow** 40:8
**felt** 24:5,6 27:6 63:21 79:18 81:15
**fewer** 24:22
**fight** 26:9
**figure** 51:16 73:24
**filed** 1:24 21:18 50:24 62:25 63:1,2,2 64:16 69:1,4 103:1
**fill** 13:23 14:8
**final** 71:3
**finalized** 34:7
**financially** 129:18
**fine** 29:2 46:19
**finer** 91:17
**finish** 7:5
**first** 3:13 4:12 9:14 12:13 19:15,17 22:18 23:3 27:17 43:14 47:18 50:24 57:7,7 69:4,7 75:14 83:7 97:14 101:9 104:2

**five** 32:1 33:16 37:10 66:21 104:8
**fix** 117:6
**fl** 2:6 130:13
**fla** 130:4 131:1
**flagami** 71:9,13 71:16,19 87:11 87:14,22,25 88:5,10 96:12 97:18 98:9,11 103:23 113:12 113:16 115:11 115:14
**flagler** 2:5
**flip** 9:2 51:1 52:8 60:2 62:15
**florida** 1:1,14 1:24 2:4,16 4:24 7:17 23:14,17 23:20 24:8 28:4 28:6 73:1 127:11 128:3,9 128:17 129:3,6 130:18,24
**fly** 69:14
**focus** 15:24 28:17 43:16 63:3,5,7,9 118:9
**folks** 48:7 90:1 90:4 95:13,18
**follow** 76:4,22 81:23 86:16
**followed** 17:10 111:6

**following** 4:2 78:1
**follows** 4:13
**followups** 122:10
**force** 10:24 11:3 11:8,19 12:3,7 48:3
**foregoing** 129:11 131:21
**foreseeable** 106:5
**forgive** 49:13
**forgot** 35:22
**form** 12:7 46:22 65:15 106:9
**formalities** 126:1
**formed** 10:11 12:3 30:12
**former** 16:8
**forth** 69:14 89:11
**forward** 96:23
**fought** 26:4
**foundation** 2:4 22:17
**four** 22:23 32:25 102:7
**fpr** 1:23 128:16 129:23
**fracking** 39:16 39:19
**fresh** 39:15,19

**front** 34:15
**fruition** 111:11
**full** 4:20 11:12 11:14,15 58:20 109:25
**further** 86:6 117:10 122:6 129:14

### g

**g.r.a.c.e** 46:17
**g.r.a.c.e.'s** 9:15 41:25 55:23
**gables** 35:24
**gardens** 7:16,19
**gathered** 16:11
**general** 25:23 119:1
**generally** 27:11 37:23 41:13 47:9 99:8 116:4 118:25
**gentleman** 93:17
**geographic** 37:7 76:4 78:1
**george** 2:14 4:17
**george.levesque** 2:14
**german** 46:12
**gerrymander** 112:16
**gerrymandered** 44:21 46:14 56:9

**getting** 12:24
70:7 80:23
100:6 120:24
**give** 4:6 19:22
25:7 50:16
67:18 82:15
83:3 100:7
109:15 111:2
**given** 31:1 38:22
62:8
**gives** 81:5
**giving** 5:25
100:6,8
**go** 5:6 6:22,24
6:25 13:24 16:4
29:4 35:14 36:2
47:16 51:10,15
52:1 75:12
76:18 78:10
88:3,13,18
91:21 92:3,11
93:15,18
**goal** 46:5 87:3
112:16
**goes** 8:1 21:4
24:3 86:5
**going** 5:1,6,7
6:4 7:4 8:19,20
12:9 16:11
18:15,15 19:2
19:25 21:10,11
21:15 22:14
23:6 24:10
25:22 28:8,24
28:25,25 32:8

38:12 42:23
43:17 47:9
49:25 50:16,17
54:18,22 59:19
59:20 61:12
64:5 67:2,3
69:19 73:3,10
74:20 76:5
79:19 80:18
84:22 85:5
92:12,12 95:15
97:11 100:13,14
102:10
**good** 4:16 5:18
21:4 27:12 28:7
44:11 53:17
66:22 75:5 97:5
125:22
**gosh** 45:3
**gotten** 71:4
**government**
39:12 74:20
**grace** 1:4 7:23
8:3,5,6,13 9:11
9:17,19 10:11
10:12,19 13:19
13:21 15:15,16
15:24 17:6 18:8
19:21,25 20:10
22:16,20 26:23
27:2,6 28:17
29:1 31:8,11,12
35:7 37:14
41:15,18,20
43:23 46:24

47:1,19,23
50:25 51:6,10
51:15 53:1,6,9
53:25 54:22
55:5,9 56:6,14
57:23 58:14
59:7,15 62:19
62:21 63:1,14
64:15,20 65:1
65:10,10,11,12
65:13,18,25
66:1,3,10,11
67:20 68:16
69:23 70:9
71:12,15,18
73:24 78:6,8
79:4,7,10,12
80:3 84:15,21
84:23 85:16
89:1,1,3,9 97:17
97:24 100:21,22
100:23,23 101:1
101:2,22 102:23
103:5,13 104:15
104:25 105:9
109:18,22 111:7
115:4,7 117:4,5
118:6 119:9,12
119:20,22,23
120:3,5,6,20
122:21 130:4
131:1
**grace's** 18:2
19:4 22:14 47:7
51:4 53:5 60:6

65:3,11 66:12
71:18 72:9
79:22 84:6,6,22
102:22 103:8,11
103:22 112:10
112:20 117:6
120:11,23
**gray** 1:12 2:14
2:15
**great** 5:2 36:20
66:17 67:16
96:17 108:11
**greater** 22:6
58:6,19,21
88:19 89:2
90:15 108:12
118:10,21
121:23
**greatest** 47:5
**grew** 72:21 73:8
**grounds** 111:5
**group** 10:17
43:4 49:4,8
52:12,14,17,20
54:21 55:6,16
57:20 64:4,9
65:2,23 68:21
84:16 108:6
118:15 120:5
124:17
**groups** 8:7 9:18
11:2 12:4 15:12
57:2 98:2 120:7
**grove** 3:11 8:4,8
9:19 10:20,22

10:24 11:4,8,13
11:18,25 12:3
14:5 15:17,21
15:25 16:3 22:6
24:17,19 26:4
26:10 28:12,14
28:14,17,21
29:1,9,14 31:11
33:22 34:12,17
34:18,19,20,21
34:22,24 35:4,8
35:9,18 36:4,7,9
36:12,14,15,17
36:17,18,19,21
36:22,23,24
37:1,1,2,2,5,14
37:23 38:3,7
42:13 43:9,9,10
43:12,16,20
49:15,17,23,25
50:2,8,10,14,14
58:11 60:12
63:4,8 64:8
65:14 72:14,15
75:19 79:25
84:7,7,23 87:8,9
89:1,8,16,19
94:17 101:13,14
101:17 102:20
103:9 115:1
120:22,24

**groves** 37:16
38:9

**growth** 115:5

**guess** 11:12 33:3
35:8,10,13,23
39:8 111:14
118:17 125:3,4

## h

**h** 11:19 98:17
131:4

**habit** 122:22

**halfway** 108:13

**hand** 4:3 128:13

**happen** 33:5
61:22

**happened** 29:7
70:12 105:14

**happening**
23:18 39:12
84:7

**happy** 95:9,14
99:9,13,16,25

**hard** 35:5 38:6
48:23 101:19
102:25

**harder** 5:14 7:9

**harm** 48:23

**harmed** 56:8

**havana** 86:23
94:22 98:13,13
115:15,20

**head** 5:13,14,16
69:20 83:23
103:18

**headquarters**
104:25

**heads** 5:12

**hear** 25:14 39:7
44:10 92:4
120:4,4,5

**heard** 5:14
70:19 121:14
123:6

**heat** 72:25

**held** 30:18,20
30:22 89:7
96:25 109:10
121:18

**help** 16:6 19:13
27:4 120:9

**helped** 80:9

**helpful** 101:21

**helping** 45:9

**hey** 19:1 72:2
75:11 76:15
78:10 80:15
85:15 88:9 92:3
110:11 113:11
125:7

**hh** 128:19

**high** 114:6

**higher** 37:23
38:1

**hispanic** 40:24
41:2,5 45:14
46:1,18 57:23
58:1,5,10,12,13
58:14 59:2
94:22 95:3
98:23 105:24
106:6,17,25
109:11,21,23,24

110:1,6,22
111:12,24 114:1
114:6 118:12,23
119:10

**hispanics** 44:16
109:15 110:2
111:22,23 114:9

**historic** 90:17

**historical** 93:14
93:20

**historically**
123:23

**history** 15:21
33:24 58:24
59:1,1 72:9,10
72:13 73:9,12
90:19

**hmm** 116:3

**hold** 98:9,11,12
98:15,18,21,22

**holding** 98:24

**home** 50:7,9

**homeowner**
14:4 51:7 89:6

**homeowners**
8:7 9:18 10:23
11:1,7,17,18,24
11:25 12:6
15:17

**homes** 38:5

**hometown** 5:1,1

**hoped** 81:3

**hoping** 85:16

**host** 89:1 110:5

**hosted** 89:1
**hota** 11:19
  58:12,12 89:6
  89:14,15
**hour** 12:22
**housed** 17:2
**housing** 16:13
  16:14 17:14
**hudson** 9:25
  10:10 104:22,23
  104:24 105:3
**huh** 11:6 26:6
  28:11 33:17
  48:9 60:19
  71:11 72:23
  79:24 83:5
  89:24 96:4
  97:16 103:7,25
**hundred** 39:18
  81:15
**hypersegregat...**
  16:16

**i**

**i.d.** 127:7
**idea** 88:7
**ideas** 31:1,13
**identified** 40:9
  40:10,11,13
  61:10 65:20
**identifies**
  118:15
**identify** 59:2
  75:16 82:10
  118:20,22,23
  119:14

**iii** 1:16 3:3 4:11
  4:22 127:4
  128:10 129:9
  130:4 131:2,25
**illegally** 17:11
**impact** 38:18
  120:12,15,24
  121:6
**impacted** 23:16
**impacts** 38:17
**implement**
  78:10 112:15
**implemented**
  76:15
**implication**
  70:20 75:9
**implied** 71:21
**importance**
  47:5
**important** 72:4
  72:6,12 120:18
  120:21
**impossible** 53:4
**impoverished**
  82:14
**impression** 44:4
  81:5
**impressive**
  73:20
**improper** 94:5,6
  104:6
**improperly**
  17:11
**include** 15:3,5,7
  51:12 55:9

56:12 87:11
**included** 86:22
  123:20,24,25
**inclusion**
  123:23
**incomes** 38:1
**incorporated**
  10:19
**increase** 32:13
  32:15,18,20
**index** 3:1
**indicate** 10:14
  41:13
**indicated** 22:13
  79:10 100:4
**indication**
  119:21
**indicator** 99:22
  116:10
**indirectly** 59:7
  59:9,10
**individual** 14:4
  14:16 51:6
  56:22 57:18
  61:13 64:6 98:1
**individuals**
  10:17 14:14
  20:6,22 84:25
  103:17 106:21
**influence** 25:2
  25:11,22
**inform** 97:11
**information**
  20:12 30:24
  39:9 43:11

105:19
**informational**
  30:22
**informed** 18:14
**initial** 18:25
  19:3 27:21
  103:11,22 117:7
**initially** 18:4,5
  18:24 68:14
  70:24 71:1
  84:10
**input** 67:10,18
  80:17 81:2
  88:24 89:8 90:5
  95:14 112:25,25
**instruct** 6:15
**intended** 6:20
  85:14
**intent** 46:5
  64:17 71:2,3
  75:13 76:14,15
  76:19 85:23
  87:25 112:8,10
  112:11,19,21
  116:11,18,19,21
  124:23
**intention** 88:8
**intentional**
  38:20
**intentionally**
  38:16 43:20
**interchangeably**
  36:19 45:13
**interest** 29:22
  29:23 64:20,21

125:16
**interested**
119:21 120:10
129:18
**interesting**
52:21
**interests** 49:5,7
49:10 72:8
**interpretation**
62:18
**involve** 84:2
**involved** 18:21
19:1 68:5
**issue** 32:8 37:20
37:21 84:5,6
117:7
**issues** 37:13,15
50:1,9 99:4
121:5 123:4

**j**

**j** 2:8
**jacksonville**
28:4
**jan** 10:12
**january** 10:13
10:15,16 22:17
22:19 67:20
**japanese** 40:6,9
**job** 64:3,12
65:22 97:5
**john** 9:25
**johnson** 52:10
**join** 63:22,23
**joint** 64:19

**judge** 97:2
**july** 97:15
**june** 97:8,12,18

**k**

**keep** 19:4 26:4
31:20 44:22
51:6,8 70:21
76:3 77:16
87:23 92:22
101:3 113:4,23
115:15 116:17
**keeping** 72:4,11
77:18,22 80:6
92:21 103:9
107:19 115:10
115:11
**keeps** 70:2
104:18,24
**ken** 20:4 119:16
119:19
**kept** 19:8 29:24
65:21 75:9 87:8
88:5 98:10,14
102:20 105:1,2
105:8 112:24
115:14,21
**kicked** 17:19,23
18:5
**kids** 93:16,18
**kind** 30:21
33:10 35:12
44:25 69:12
74:11 83:11
91:17

**king** 45:5 93:21
101:7
**kmm** 1:2
**knew** 32:7 80:17
83:11
**know** 5:12 6:20
7:4 17:8,25
18:14 19:7,24
21:24 25:19
27:14 28:17
29:3,3,4,6,7,17
30:18 31:6,8,12
31:19,20,24
32:3,14,17 33:2
33:9 34:16,21
34:25 35:1,2,5,9
35:11,14,19,24
36:13 37:12
38:3,4,5,6,10
39:1,13,20,22
39:25 40:2,4,8
40:11,13,16
42:12 43:24,25
44:16 45:17
46:4 47:25 49:2
49:4,6,15,23
50:3 52:13,15
52:18,22 54:3,5
57:4,13,22
63:11,13,14,17
63:18 64:14,19
65:10,24 66:13
66:15,17,19
67:15,16 68:1,2
68:17,20,20

69:10,11,18,23
69:23 70:9,11
70:13,19 71:2
71:14,18,22
72:9,19 73:5,7
73:20 74:7,9
75:10 76:11,12
76:17 77:4 78:9
78:10,21,23,24
79:13,14,14,14
79:16,16,17
80:12,13,17
81:15 82:1,13
82:14 83:8
84:10,11 85:21
85:22 86:15
87:1,4,21,23,24
88:1,8,9 89:12
90:3,9,10,13,14
90:15,16,18
91:8 92:6 93:16
93:19 94:6,7,10
94:13,15,19,20
95:3,12,14 96:8
96:11,14,17,19
96:24 97:21,23
99:5,5,6,12,16
99:18 100:7
101:20 104:24
105:9 106:3
107:19,21,21,23
107:25,25
108:21,24,25
109:1,24 110:6
111:3 112:9,9,9

112:14 113:18
113:21 115:13
115:20 116:17
118:17,18
119:22 120:8
121:5,11,17
122:2,25 124:14
125:1,9,17,18
**knowledge** 34:4
82:2,3 95:2
**known** 10:20,22
127:7

**l**

**l** 98:17,17
**la** 45:4 83:17,19
83:24,25
**lack** 30:2
**lady** 119:6
**lapsed** 66:7
**laptop** 105:6
**large** 1:24 120:3
120:5 127:11
128:9,17
**largest** 32:20
**latino** 44:22,24
45:11,16,18,20
46:11,25 56:3
109:24 118:19
119:7,7,9
**latinos** 109:23
**law** 31:18
**lawsuit** 17:6,7
**lawyer** 6:21
**leading** 82:22

**learned** 18:17
42:7 96:15
**learning** 63:20
**led** 81:13
**left** 93:3 96:5
106:8,12 108:14
**legal** 130:23
**letter** 3:6
**levesque** 2:14
3:3,4 4:15,17
8:22 21:7,9,14
26:13,15 47:6
50:20 59:22
65:16 66:22
67:1,5 69:8,22
85:5,8 92:15
98:17,19 100:18
102:14 104:8,13
104:14 106:10
117:10 122:9
125:19,21,23
**light** 97:14
**likely** 53:20
105:23,24,25
106:24,25 107:1
111:22,23,23
**limits** 7:18
74:15
**line** 19:20 23:6
23:6 24:12
38:13 46:20
56:18,19 131:5
131:8,11,14,17
**lines** 37:9 76:3

**linked** 74:4,5
**list** 9:4 51:6,8,9
51:11,12 52:1
107:17
**listen** 71:24
85:24
**listening** 30:25
81:6,14 82:19
82:20
**literally** 44:21
**litigation** 4:18
17:12 21:19
55:2 108:24
**little** 5:14 7:6
24:24 37:4
55:12 66:7 86:6
86:23 93:3
94:22 98:13,13
100:9 111:2
115:15,20,24
121:7
**live** 4:25 49:4,14
49:16 61:5,7,10
65:20 71:13
74:23 80:21
99:23,24 120:12
**lived** 28:5,5
48:1
**lives** 49:22,24
50:2 73:4
**living** 50:13
56:8 72:24 73:5
**llp** 2:9
**locate** 16:8

**long** 12:10,20
16:5 22:8 46:20
47:2 74:2 78:21
104:3 121:21,22
121:24 122:2
**longer** 13:14
63:8
**longstanding**
58:24,25
**look** 8:24 18:18
18:18 21:22
49:2 55:11
92:11 98:6
101:21 111:25
113:1
**looked** 62:23
105:17 107:18
**looking** 43:15
49:2,20
**looks** 95:16
101:1 116:3
**loosely** 10:16
**lot** 13:17 23:24
28:5 72:18 73:4
73:19,21,22,23
74:7 90:18
**lots** 7:6 68:10
**loved** 115:2

**m**

**madam** 26:13
**made** 8:6 9:17
19:23 20:16,17
23:22 24:2 44:6
45:10 63:15
68:18 81:8

83:20 93:1
95:13 96:1
97:17,21 110:25
122:22 124:24
127:1
**main** 43:6 77:5
79:16
**major** 16:25
17:3 43:3 62:1,4
99:6
**majority** 52:17
52:20,22 54:16
106:6
**make** 5:18 18:8
32:6 33:13
40:24 43:5
83:16 89:21
105:14 115:17
115:18,19 120:9
**makes** 7:9 33:3
77:13
**makeup** 116:6,7
**making** 39:5,9
76:3 84:7 100:5
101:2 123:17
**man** 49:18 77:2
90:14
**manolo** 41:10
**map** 3:17,18,19
3:20,21 16:7,9
18:3,7,10 24:16
34:15 46:13
54:23 60:10
67:6,8,9,11,13
67:25 68:2,12

68:15,18 70:10
70:13,18,21,23
71:1,2,3,3,7,8
71:18,25 73:14
75:3,8,8,9,14,15
75:19,23 76:22
78:7,13,21 79:5
79:12,19,21,25
80:7,9,11 81:20
85:10,12,13,14
85:16 86:3,21
86:24 87:8,11
88:4 90:7 91:3,7
92:5,10,11,20
95:7,9,20,21
97:7,12,14 98:6
98:7 99:14
100:20,20,21,25
101:1,13 102:15
102:17,18,23
103:12,23
105:23 106:15
107:9 111:21
112:15,18
115:21,24
**maps** 17:23
18:14,17,18
19:18,23 30:19
46:7 53:13 55:1
55:5 63:21
76:23 78:16
84:12 85:18,22
85:25 88:12
89:11,11 91:12
96:7 100:4

101:10,23 102:8
107:17 112:1,10
112:12,19,21,23
113:4,19 115:13
121:14 122:14
123:11,11,15
124:7 125:5
**margin** 120:17
120:19
**mark** 8:20
21:11 50:17
59:20 67:3 85:5
92:13 100:14
**marked** 8:21
21:13 50:18
59:21 67:4 85:7
92:14 100:15
102:12
**marlins** 73:1,1
**martin** 9:24
10:4
**material** 39:14
**materials** 40:14
**matter** 4:6
42:22 45:21
54:23 122:21
**maxwell** 1:23
128:7,16 129:6
129:23
**mcdonald** 35:13
35:14
**mcnamara** 2:3
3:4 21:5 46:22
65:15 69:6
106:9 117:12

122:6 125:22,24
130:1
**mean** 39:6
41:12 42:17,17
44:8 45:17 46:5
53:7,19 72:16
73:20,21 74:22
75:6 81:24 82:1
94:15 99:24,25
100:1 106:11
107:11 108:2
110:15
**meaning** 63:1
**means** 5:13
**meant** 45:19,20
106:24 125:23
**meat** 81:10,12
82:4,9,15,15,22
**media** 110:18
110:18,19
**mediation** 95:22
95:22,25 121:18
122:4
**mediations** 96:2
**medication** 7:11
**meet** 12:14 18:2
72:2 86:15 87:1
87:5,7,22 88:11
90:12 113:22
**meeting** 3:14
12:20 18:13,19
18:19,22,25
19:3,4,7,8,10,15
19:16,17,21
20:3,20,22

21:16,17 22:18
31:10 42:6
61:16,18 62:24
81:7 82:17
88:15,18,19,21
89:2,7,10,23,25
90:6 92:3 93:2,4
93:15 96:5,15
96:16 97:1,7,18
100:23 108:11
108:14 109:2,5
109:8 110:1
117:19,23,24
118:1,5 121:8
121:11,12,13,17
121:19,23,25
122:3,3,20
123:7
**meetings** 12:17
14:18 20:6,7,11
30:18 31:3,5,9
51:24 59:17
61:25 68:22
70:1 77:5 88:23
89:3,5 90:4 98:8
98:12,21,22,25
99:3 108:4,5,9
108:16 109:11
110:3,4,5,13
111:1 117:23
122:14,17,23
123:10
**mem** 47:21
**member** 9:20
13:18,20,21,22

14:6,25 25:18
47:22 57:13,17
57:25 58:4 59:6
59:12,13 61:13
89:9,14 105:11
105:11
**members** 9:20
14:14 15:4
26:23 27:2 31:8
31:11,12 41:18
41:25 43:23
47:3,7,22 51:4,7
51:14 52:11,24
53:2,5 54:19
55:5,15,23,25
56:1,6,13 57:24
58:1,5,12,14,14
59:6,7 60:6,14
60:20,22,24
61:2,3,5,10 64:6
65:19,21 66:2
66:12 71:13
73:23 78:8 84:6
84:24 89:13,20
118:20,22 119:4
119:7,9,10,13
119:13,15
120:11,23 125:6
**membership**
58:15 119:8
**memory** 22:4
**mentioned** 1:25
11:4 16:2,17
27:15 28:12
33:18 34:5

38:23 49:14
89:22 99:11
109:9 122:19
**merken** 2:8
66:20
**message** 64:2,12
64:14
**met** 12:6,10
19:25 108:5
110:9,9,12
112:12
**methodist** 58:21
**miami** 1:7,14
2:6 4:17 7:16,19
7:20 16:13,23
26:2 27:16,18
27:22,24,24
30:8 32:1 50:14
52:21,22 56:2,6
56:13 57:14
61:7 63:6 64:18
69:14 72:25,25
73:1,2 74:23
75:16 80:15
90:15 94:18,25
95:4 106:5
130:4 131:1
**miami's** 90:20
**middle** 108:24
**mind** 8:24 21:22
23:22,23 24:3
25:1 39:15,19
**ministerial**
10:23 11:5,13
89:8,16,19

**ministry** 58:13
**minority** 25:23
38:25 42:14,16
42:17,17,20
43:4 52:22
64:10 74:18
106:6
**minute** 66:21
104:8
**minutes** 19:5,7
20:20 51:24
52:6 61:19,22
61:25 104:18
**miro** 55:14 57:4
57:16
**missed** 118:3
**missing** 35:25
**mission** 27:4
**mixed** 121:20
**modeled** 81:2
**moment** 21:22
**month** 13:11,12
27:19
**months** 78:24
**motivation**
63:19
**move** 27:16,21
28:1,25 69:18
**moved** 24:23
27:17,18,21,22
27:24 28:3,3,4,4
38:24 43:10
60:12 120:22
**movement**
29:13

**moving**  28:14
   33:9 38:21 42:7
   43:20
**multiple**  17:2
   30:13 43:12,13
   44:6 119:7
**musp**  16:25

**n**

**naacp**  56:7,13
   57:14 66:4 90:3
   92:2,3
**name**  4:16,20,21
   11:12,14,15,20
   11:22,24 45:6
   45:13 49:18
   57:7,8 58:17,20
**names**  57:7
**narrow**  19:13
**nathaniel**  1:16
   3:3 4:11,21
   127:4 128:10
   129:9 130:4
   131:2,25
**nationality**
   44:24 109:20
**nationwide**  23:7
**natural**  30:4
   71:23 75:10
   76:4 78:1 80:6
   113:2
**ncd**  30:8 33:18
   33:19 34:3,10
   34:22,23
**necessarily**
   47:25 65:8 66:2

81:24 99:25
   113:8
**necessary**  124:4
**need**  6:19,22
   13:22 14:17,19
   14:21 21:5
   25:14 76:10
   80:18 92:3
**needed**  17:4
   18:9,20 33:7,11
   33:12 45:20
   69:18 115:7
**neigh**  90:18
**neighborhood**
   24:25 25:2,7,18
   25:20 33:20
   48:1,7,11,16
   49:5 71:13
   73:17,22 76:4
   83:4,7 86:18
   88:17 90:18
   109:25 123:24
   125:8
**neighborhoods**
   29:22,24 30:3
   36:1 49:11
   70:21 71:22
   72:1,1,5,11
   73:15 75:10,16
   75:18,24,25
   76:10 77:23
   80:6 87:24
   88:21 90:21
   107:19 112:24
   113:4,23 115:10

115:12
**network**  105:6
**never**  46:5 64:9
   74:5 87:18,21
   107:15 109:10
**new**  18:17 49:12
   95:15
**newly**  30:12
**news**  39:8 109:1
**nod**  5:11
**nods**  5:14
   103:18
**nonpartisan**
   26:1
**nonprofit**  10:13
   10:15 12:5 15:7
**nonprofits**  8:7
   9:18 10:18
**nonstarter**
   97:19,19
**nonstarters**
   96:13,14
**normally**  61:25
   62:11
**north**  37:1,8,15
   37:22 38:9
   49:23,25 50:14
   72:15 86:6
**northeast**  35:12
**northwest**  7:16
**notable**  86:3
**notary**  1:24
   127:10 128:8,17
   128:19

**note**  130:10
**notes**  70:2
   129:13
**notice**  1:24 3:10
**november**  19:15
**number**  30:16
   75:5 81:15,16
   124:4
**numbered**
   129:11
**numbers**  38:22
   42:18 73:21
   114:17 116:9,13

**o**

**o**  11:19 90:10
**oath**  3:5 128:1
**obama**  54:8
**object**  6:11,12
   6:15 47:16
**objection**  6:12
   46:22 60:11
   65:15 106:9
**objections**  60:9
**objective**  44:3
**obligated**  97:11
**obviously**  5:8
   54:14
**occur**  54:15
   68:9
**october**  1:14
   128:11 129:10
   130:3
**office**  104:25
**officers**  20:18
   22:20

**official** 10:12,15
35:17,19 36:3,5
36:6,9 73:16
104:19 128:13
**officially** 36:11
36:14
**oh** 10:1 13:11
45:3 49:18
74:22 90:1,14
100:17,22 106:3
109:7 116:3
123:9 125:24
**ohio** 69:14,15
**okay** 4:25 5:6
7:14 9:2,3 11:22
12:2,8 13:7,15
14:8,11 15:2
16:17 19:7
20:20 22:1,2,5
24:1,24 25:16
27:20 28:7,19
32:3,14 34:3
35:17 36:10,20
37:13 40:24
42:4,22 44:9,12
44:19 45:16,25
47:13 48:6,18
49:21 50:15,15
50:23 51:2,3,10
51:15,21 52:1,5
52:16 56:4,10
57:4,9,16,23
58:2 59:5 60:4,5
60:24 61:24
62:3,7,10,16

65:3 66:1,14,20
67:10 70:9,11
71:7 72:13 73:3
73:16 74:1,13
76:25 77:3 78:6
79:9 83:18 84:5
84:18 85:3,22
86:8,12,23 89:4
91:16,23 92:11
92:21,25 93:25
94:4 97:6,9
100:17 101:22
102:2 103:12
104:11,21 105:5
105:9,13 106:4
106:19 107:5
108:4 109:2,14
114:4,7,18
115:14 116:25
117:3,6,9,14
123:13 124:15
124:19,22,25
125:19,20
**old** 27:19 90:18
**older** 90:20
93:16 94:17
95:3
**oldest** 94:18,24
94:24
**omni** 94:9,10,14
**once** 16:11
18:16,17 19:23
64:23 65:19
96:21

**ones** 16:18
65:19
**ongoing** 17:12
**open** 88:19
**opened** 79:7
**operate** 26:24
**opinion** 110:22
112:20
**opinions** 29:19
30:17 31:13
88:22
**opportunity**
21:23 31:1 47:4
53:13 95:23
102:6
**options** 86:1
88:3 92:7
**orange** 28:4
**order** 31:20
115:8
**ordered** 95:22
**ordering** 130:14
**organization**
7:25 8:6 11:9,20
11:23 12:5
13:25 14:3,21
46:17 56:3 61:9
67:23 89:17,18
**organizational**
9:16 52:11
54:19 55:8,14
56:1,7,12 57:1
**organizations**
9:20 11:10,11
12:3 14:15,25

15:2,8,10 16:6
47:22 57:5,14
57:18 58:1,5
59:13 66:4
84:24,25 103:17
106:21 119:8
**oth** 29:25
**outside** 34:23
61:6
**ov** 91:3
**overpopulated**
32:23
**overtown** 88:15
88:15,16 89:23
89:23 90:1,5,7
90:11,13,15,16
90:17,23 91:4,6
91:7,7,8,25
92:21,22 93:6,8
93:14,14,17,20
101:3 110:9
123:20,24
124:20
**overwhelming**
38:25 115:5
**own** 50:9
**owned** 17:1
**owner** 50:3,9
**owners** 8:8 9:19
11:1 12:5 17:1
81:17
**owns** 50:7

**p**

**p** 98:17
**p.a.** 2:15
**p.m.** 1:15,15 4:2
66:24,24 104:12
104:12 126:1
**p1** 86:4
**pa** 1:12 2:11
**pack** 125:4
**packing** 39:15
39:19 114:9
124:12,16
**page** 3:2,9 6:4
9:2,8 21:20 51:1
51:2,3 52:8 60:3
60:4 62:15,16
131:5,8,11,14
131:17
**pages** 129:11,11
**palm** 128:4
129:4
**paragraph** 52:9
55:11 56:5 60:2
60:4,5 62:17,19
62:21 64:2
**parishioners**
58:10 59:16
118:10,11,14,21
**parity** 31:21
**park** 28:4 35:22
82:23 83:1,3,3,4
83:8
**part** 5:24 25:19
30:8,24 31:18
50:8,10,11,14

68:3 72:9 82:9
93:8,10 94:24
100:11,12
105:19 119:9
120:4 125:8
**participate**
14:18 18:6
**particular**
23:14 39:14
45:13 56:25
64:15 68:15
86:14,25 87:6
123:16
**particularly**
24:22 65:1
**parties** 129:16
129:17 130:14
**partners** 101:2
**parts** 24:18 33:9
34:1,23 36:23
36:24 37:3
63:20 84:13
94:20,25
**party** 25:19,21
25:22,23
**pass** 85:17
**passed** 55:18
60:10 105:10
111:21
**passing** 79:6
116:20,21
**pastor** 22:5 58:8
58:18
**pastoring** 74:13
74:17

**pastors** 89:18
89:20
**patterns** 119:25
**paul** 22:6 58:6
58:19,21 88:19
89:2 108:12
118:10,21
121:24
**pay** 14:19,21
49:20
**pejorative**
106:11
**penalties** 131:21
**pending** 6:24
**people** 11:2
15:21 16:7
20:15 24:2 42:7
45:18 46:8,15
48:1 49:4,11
63:19 72:8,8
74:9,22 81:15
84:13,16 88:20
90:11 94:19
100:5,7 107:12
109:23 119:1
120:19,20
121:14
**percent** 39:25
114:1
**percentage**
39:22 107:22
**percentages**
40:3
**perception**
24:21

**perfectly** 54:7
**perform** 106:22
107:1,2 124:11
**performed**
107:9 108:1
**period** 31:5
119:19
**perjury** 131:21
**permits** 16:25
17:3,4
**person** 46:8
73:4 74:11
**personal** 38:1
105:6
**personally**
40:12 67:16
104:25 127:7
128:10
**persons** 16:9,14
**perspective**
65:11 112:20
**pertains** 79:22
**phanord** 10:1
**philadelphia**
2:11 72:21
**phone** 118:3,3
**photos** 108:13
**pick** 49:23
**picking** 79:6
115:20
**place** 18:1 33:24
34:3 53:5 74:2
75:5 118:1
121:17,19

**placed** 27:3
46:18 49:8 53:2
54:20 55:5
65:14
**places** 52:10
55:13
**plaintiff** 57:19
123:3
**plaintiffs** 1:5
2:3 3:18,19,20
3:21 50:25
52:10,11 54:19
55:2,9,14,15,25
56:1,7,12,22,25
57:1 63:2,24
64:19,21 65:2,7
66:11 67:9 68:6
70:14 73:24
75:3 80:21
85:13 86:2 88:5
90:3,4 92:20
95:6,20 96:12
96:22 97:14
100:20,24 102:8
105:22 106:22
107:4,7,8,11,16
108:6 109:3
112:1,11 114:9
122:7,22
**plaintiffs's**
116:9
**plan** 24:13
26:22 28:9
29:15 38:19
42:4 52:9 55:13

55:17,18 56:5
60:8,11 64:2,11
65:13,13,19
78:18,22 79:23
84:21 91:9,10
91:11,15,20,22
91:25 96:22
97:14,22 99:15
99:17 101:16
102:19 114:5
116:7,9,9,20,22
125:10,16
**plans** 16:24,25
41:24 105:18,23
106:22 107:8
113:18
**players** 38:4,5
**playing** 67:22
72:25
**please** 4:4,19
6:1,20 75:12
76:13,16 78:11
130:11
**plurality** 46:3
46:18 105:25
107:1 111:25
**point** 18:8 26:10
28:1 30:18 63:4
63:5 64:23
66:23 70:17
79:15,15,16
84:12 85:20,24
87:20 88:14
91:14,17 95:11
95:17 97:24

98:5
**political** 38:18
119:24
**politically**
119:22,23
**poor** 82:12
**poorly** 6:11
**population** 32:4
32:10,13,15
33:5 42:10,15
42:16 47:8
75:25 77:11,12
81:12 86:19
101:23 106:6
111:25 115:6
124:10,12
**portilla** 45:4
83:17,19,24,25
**portion** 34:17
34:18 42:25
43:1 93:3
**portions** 43:10
91:3
**position** 22:9
**possible** 25:9
34:25 70:21
76:13 82:25
123:2
**potentially** 79:5
**practical** 122:21
**precise** 20:9
**predominant**
52:12,14 54:20
55:6,16 57:20
64:3,9 65:23

**predominantly**
56:3
**preparation**
12:14,18 13:4
**prepare** 13:2
117:20 118:6
**preparing**
117:16
**present** 20:6,12
31:1 64:8 82:17
113:4
**presented** 24:13
24:16 28:9
29:25 31:12
38:16 85:22
88:5 97:2
**presently** 54:2
**preserve** 15:20
33:24 72:10
**president** 54:8
89:15
**pretty** 13:16
19:9 37:11
39:20 114:25
116:5,6,10
**previously** 99:9
**primarily** 28:14
84:6 116:1
**primary** 15:24
**prior** 10:16,19
96:18 104:4
**probably** 25:22
39:17 49:15,25
54:22 69:25
70:2 73:3,6

83:11,12 90:24
99:22 115:12
**problem**  28:13
37:15 41:1,11
41:18,20
**problems**  50:1
99:11
**procedure**
130:24,25
**proceedings**  3:1
4:2
**process**  15:3
17:16,19,21
18:3,5,6,7,10,16
21:3 30:12 45:3
95:25 100:11,12
107:15 114:21
**processed**  17:13
**processes**  17:9
98:7
**produces**
105:23
**professional**
128:7,8 129:6
**program**  69:13
69:13,15
**progress**  100:5
**prompt**  5:20
**prompted**  89:25
115:13
**proper**  17:9,9
118:17
**properties**  17:2
**property**  14:5
17:1 37:24 50:3

**proportion**
42:24
**proposed**  18:18
19:23 55:2 79:4
89:11 92:6
101:11 124:6
**protect**  15:16
27:4 112:17
**protection**
33:23
**proud**  40:6,7
**prove**  70:24
71:21
**provide**  8:19
**provided**  78:17
96:2 120:8
**proving**  85:20
**public**  1:24
19:15,17,24
30:25 68:18
127:10 128:8,17
**publicize**
110:13,15,19
**publicized**
110:16
**puerto**  119:2
**purpose**  15:15
15:16 72:9
**purposes**  35:3
106:23
**pursuant**  1:24
**pursue**  20:1
**put**  7:6 21:8
33:23 49:6
91:17 93:17

**putting**  96:9

**q**

**qualification**
75:7
**qualified**  15:4
**qualify**  15:3
**query**  18:24
**question**  5:16
5:25 6:3,5,24,25
7:4,5,8 10:25
12:8,13 20:8
21:6 25:14,25
26:18 36:2
47:17 49:19
50:5,11 53:8
55:22 57:12
60:16 66:8 79:9
107:5 122:11
**questions**  5:24
6:10,10,18 12:9
70:23 78:6
117:10,13 122:6
**quickly**  97:4
**quite**  25:13 27:8
34:22 40:7
81:17 88:20

**r**

**r**  131:4,4
**race**  27:3 40:4
40:16,22 42:24
43:21 46:7,8,21
47:25 53:7
54:15 94:2
107:12,16

109:10,10
112:10 123:21
**races**  46:15
**racial**  42:17
52:12,14,17,20
54:21 55:6,16
57:20 64:9
112:4 116:6,7
116:11 123:1,9
123:14,25
**racially**  56:9
112:15
**raise**  4:3
**raising**  123:3
**rather**  17:7
49:19 81:12
**reached**  16:10
**read**  3:6 39:7,12
39:14,17 56:11
56:24 57:3
60:13,18 65:8
125:21,23 130:8
131:21
**reading**  21:25
56:15,19 66:6
**ready**  8:9,17
12:25 70:7
**realize**  113:25
**realized**  84:12
**really**  37:14
49:7 74:10 93:5
93:19 96:1,9
97:4,5 107:20
114:19

**realtime** 128:17
129:24
**reason** 70:6
86:12,14,17,23
87:1,6,17 90:9
99:1,5 109:14
130:10 131:7,10
131:13,16,19
**reasonable**
130:17
**reasons** 7:6 32:4
69:18 123:25
**recall** 19:10,20
30:20,21 39:11
41:8 45:2,5
68:15,17 69:3
79:13 82:21
101:9 119:16
**recalled** 30:21
**receipt** 130:16
**recently** 37:4
**recess** 66:24
104:12
**recognize** 25:7
36:25 50:21
67:6 85:9 92:16
92:18 100:19
102:15
**recognizing**
60:13
**recollection**
22:3 85:19
124:3 125:6
**recommended**
86:22

**reconsider** 24:4
**record** 4:20
5:18 6:13 61:25
104:13 108:15
108:17,22
129:13
**recorded** 62:4,6
62:9,11,14
108:4,8,10,12
108:15
**recording** 121:9
122:20,22
**records** 104:16
104:17,19 105:1
105:14
**redevelopment**
30:11
**redirect** 3:4
122:8
**redistricting**
17:15,19 18:16
19:15 23:15
26:23 29:15
39:13 77:20,23
86:16 87:2
102:1 112:12,14
113:23 114:21
121:13 125:1
**redraw** 31:17
**redrawn** 32:11
32:16
**reevaluate**
31:19
**refer** 56:4

**reference** 83:1
**referenced** 14:2
23:11 45:10
110:21 130:6
**referencing**
23:12 24:8
44:14
**referred** 56:2
81:9
**referring** 23:18
24:15 41:14
44:15 56:24
58:7 66:5 81:11
82:7,12 84:21
91:9
**refers** 56:23
65:24
**reflect** 22:2
112:19 113:14
**reflected** 20:21
46:8 51:23
97:22 125:15
**regard** 114:22
130:18
**regarding** 30:17
**registered** 128:7
128:8
**reinforced**
44:25
**related** 12:12
23:20 65:18
**relates** 33:21
38:15 43:13
55:23 102:23
115:11

**relative** 129:15
129:16
**released** 19:18
**relied** 73:15
**reluctant**
122:11
**remember** 9:1,4
18:17 23:4,24
31:4,7,14,15
40:2 44:20 57:8
61:12 67:19
68:1,2,23 69:2,9
69:21 70:12,12
70:18 77:2,4,6,7
77:10,13,15,17
79:1,15,15
82:24 83:10,10
83:13,13 88:16
90:10 93:2
95:17 98:6,7,24
99:2 101:12
103:8 108:8,13
108:18,18,19
109:6 110:3
117:15,22 121:7
121:10,21 122:4
**remove** 17:4,10
**rep** 86:19
**repeat** 6:1
**rephrase** 6:2
35:2 65:17
**report** 38:21,23
129:8
**reporter** 4:3 5:9
7:9 26:13 128:8

128:8 129:7
**reporter's** 3:6
129:1
**repre** 57:2
**represent** 4:17
19:14 21:15
44:25 50:23
64:3,5,13,20,21
65:1,22 97:6,10
120:25
**representation**
25:8 30:14
31:22 45:21,24
63:7 64:24
102:6 112:5
**representative**
7:23 9:11 21:1
25:11,17,21
26:17,19 28:22
29:6 35:7 65:4
118:7 119:23
124:5
**representatives**
20:11
**represented**
41:2,12,19,21
42:10 47:23
57:2 86:19 92:2
97:25 98:2,3
99:3 109:16
120:3
**representing**
25:20 28:17
30:2 43:22
64:17 117:4

118:6
**represents** 75:4
120:20
**request** 81:23
**requested** 71:16
71:19 87:19
114:12,15,19
129:11
**requesting** 81:3
**require** 32:15
125:3
**requirement**
101:25 102:3
115:12 125:3
**requirements**
33:25 86:16
87:2,6,7,23
107:17,18,21
**requires** 53:13
125:1
**research** 73:19
**resegregated**
16:15
**resegregation**
15:18
**reside** 26:24
51:5 60:7,23
61:3
**resident** 16:22
**residential** 7:14
51:12 52:2
**residents** 8:7
11:1 12:5 17:2,2
38:1,18 42:13
63:6,11,15

64:17 76:12
80:12,14 81:1,6
81:17,20 84:13
90:23 93:5
106:7,7 112:25
124:12
**residing** 60:25
**resigned** 69:10
**resources** 120:6
120:7
**respect** 113:5
**respond** 19:24
**responding**
91:11
**response** 5:16
16:5 75:9 91:13
101:5,6
**responses** 125:6
**rest** 87:9
**restate** 107:5
**restaurant** 5:11
**restore** 15:19
**restrictions**
33:24
**restroom** 6:22
**retain** 68:21
**rethink** 24:4
**retract** 35:20
**returned** 130:15
**reverand** 8:23
21:10,15 28:23
28:24 50:16
59:19 66:16
67:2 85:9 92:16
100:13,19

102:10 104:15
117:15
**reverend** 1:16
3:3 4:11,16,21
127:4 128:10
129:8 130:4
131:2,25
**review** 8:9,12
8:14 21:23
129:10 130:7
**revising** 74:3
**reyes** 41:10,19
45:5 83:17,23
**reynold** 9:24
10:4
**rico** 119:3
**right** 4:3 21:4
27:23 28:24
29:17 38:12
48:20 49:24
63:9 65:5 68:12
70:21 76:9
84:10 91:5
100:16 103:4
109:12 112:19
113:17 115:16
**rights** 3:11 8:4
15:19 16:2
38:17 53:12
68:21 77:8
102:4
**risk** 15:18
**road** 5:7 35:8,11
35:13

**robinson** 1:12
1:16 2:15 3:3
4:11,16,22 8:23
21:10,15 28:22
28:23,24 50:16
59:19 66:16
67:2 85:9 92:16
100:13,19
102:10 104:15
117:15 127:4
128:10 129:9
130:4 131:2,25
**robinson.com**
2:14
**robyn** 1:23
128:7,16 129:6
129:23
**role** 67:23
**room** 111:2
**roughly** 19:10
22:12,23
**rpr** 1:23 128:16
129:23
**rsa** 1:24
**rude** 5:17
**rule** 3:11 25:23
130:24,25
**rules** 5:7 130:17
**rush** 97:4
**russell** 20:4 26:4
26:7,9,10,19
40:5 45:4
119:16,19,21
122:13,16

**s**

**s** 131:4
**sabina** 40:21
**sat** 88:9 91:4
**satisfied** 26:18
**saw** 97:14 101:9
111:8
**saying** 44:21
66:9 77:15
80:15 83:2 99:3
113:11,15 125:7
**says** 36:9 51:4
52:9 56:5 60:6
64:2
**scheduled** 90:5
**se** 1:13
**seal** 128:13
**seat** 109:16
**second** 64:1
**secretary** 9:22
10:9 104:20
**see** 16:13 19:1
19:13 20:8
78:11 86:21
101:20 103:23
121:15,16
**seeing** 9:1,4
48:23
**seen** 8:25 23:18
50:22,22 59:23
**selected** 20:25
**senior** 22:5
**sense** 33:3 77:13
**sent** 64:2,11,15
76:22

**sentence** 51:3
60:6 64:1
**separating**
24:17
**separation** 30:3
**serious** 96:19
**served** 91:6
**server** 105:10
**serves** 83:4
**services** 120:8
**session** 30:22,25
30:25
**set** 22:20 46:20
111:4
**several** 68:22
**shake** 5:12,15
**shakes** 5:14
**share** 12:11
40:7 49:5,7,11
72:8,8,14 73:12
92:8 108:15
121:5
**shared** 68:13,16
73:11 84:14,23
94:11,12 103:6
103:16,20
122:14
**sharing** 80:22
**sheet** 127:1
130:10,12
**shenandoah**
98:20,21
**shopped** 88:12
**short** 31:5

**shortly** 78:17
**show** 21:10
59:19 67:2 72:2
76:8 79:18 88:2
92:12 100:13
102:10 125:17
**showed** 88:21
**showing** 71:5
80:14
**shows** 75:6
114:16 116:4
**sign** 3:6 36:8
130:11
**signature** 126:1
128:15 129:22
**signed** 130:20
**significant** 75:4
**significantly**
74:3
**similar** 24:14
28:10 55:12
116:5,6,10
**simultaneously**
86:2
**single** 26:4 29:6
88:4
**sir** 5:5 6:7 11:16
93:24
**sit** 24:7 37:9,9
**sits** 37:11
**situations** 74:9
74:25
**six** 22:10
**small** 8:8 9:18
10:25 12:5

42:25,25 68:20
120:17,17,19
**smaller**  42:24
  43:5
**social**  110:18,18
  110:19
**solemnly**  4:5
**solutions**  130:23
**somebody**  25:20
  50:1 51:16 52:2
  62:12 67:17
  93:16 104:18
  123:3
**soon**  32:7
  104:10
**sorry**  10:1,20
  11:11 12:6
  26:13 28:23
  44:8 55:25
  56:18 57:11
  58:12,16 68:24
  78:25 121:20
  122:4
**sort**  35:9 74:19
  100:8 110:22
**sorted**  106:16
  107:12
**sought**  110:22
  111:10
**sounds**  80:19
**source**  39:8
**south**  2:15 35:9
  37:2,16,23 38:9
  93:8

**southeast**  35:15
**southern**  1:1
  35:10
**southwest**  37:8
**space**  68:8
**speak**  8:16
  38:10 70:6
**speaking**  41:13
  116:5
**special**  16:24,24
  16:25 17:3
  96:16
**specific**  23:21
  23:21 64:22
  103:5 118:15
**specifically**
  23:20 45:23
  102:23 111:16
**specificity**  44:24
**specifies**  56:22
**specify**  56:18
**spent**  117:16
**split**  24:19,25
  30:12 43:12
  75:24,25 76:11
  86:13,24 98:10
  98:14 103:24
  115:23
**splits**  86:9
**splitting**  25:7
  43:5,9,9
**spoke**  45:19
  92:8
**spoken**  12:24
  13:1,10

**sport**  49:14,16
**spot**  21:8
**ss**  128:3
**st**  22:6 58:6,19
  58:21 88:19
  89:2 108:12
  118:10,21
  121:24
**stand**  8:3
**standard**  72:3
  107:22
**standards**  86:15
**standpoint**
  36:21
**stars**  49:14,16
**start**  9:14 10:21
  11:12 12:13
  17:23 34:10
  47:18 86:5
  99:15
**started**  4:19
  16:11 19:14
  68:20 69:13
  80:9,14,15,22
**starting**  23:6
  24:12
**state**  1:24 4:19
  23:7,14,15,16
  24:8,12 31:18
  39:13 60:16
  127:11 128:3,9
  128:17 129:3
**stated**  131:22
**statement**  23:22
  24:2 28:8,16,18

28:20 29:8 30:6
38:13 39:5,9
43:18 45:11
54:18,19 55:12
55:23 66:1,10
**statements**  44:3
  44:6,14 81:8
  110:20,25 111:7
  111:9,10 112:9
**states**  1:1 23:10
  23:13
**statute**  130:18
**stay**  115:3
**stayed**  84:8
**stenographic**
  129:13
**stenographica...**
  129:8
**steven**  57:16,17
**stood**  28:20
**stop**  44:9 86:7
**stopped**  22:19
  67:19
**street**  2:5,10,15
  35:24 73:21
  91:5
**strengthen**
  48:12,17 124:18
**strike**  75:22
**stronger**  48:10
**structure**  9:16
**struggle**  63:25
**studied**  105:17
  105:20,21

**stuff** 35:23
**subdivision**
   45:14
**submit** 86:1
**submitted** 85:19
   106:22 124:6
**subscribed**
   127:5
**subsequent**
   18:19 86:21
   92:10
**substance** 38:15
**substantial**
   77:11 80:11
**suggested**
   130:15
**suite** 1:13 2:5,16
**supplemental**
   3:16 60:1
**support** 27:4
**supported**
   111:16
**supportive**
   125:14
**suppression**
   23:7,8,11 29:13
**sure** 4:21 5:18
   19:9 25:15
   31:10 32:6
   34:21 35:21
   37:11 40:10,25
   54:9 60:18 61:4
   66:9 70:16 78:8
   80:10 84:7
   91:12 94:13

97:2,24 98:4,5,7
   104:3 105:8
   107:6 111:19
   119:6
**surprise** 52:19
   106:2 107:8
**surprised** 106:3
**surprising**
   52:23
**surrounding**
   83:7
**surveys** 16:8
**suspicions**
   112:2
**swear** 4:5
**sworn** 4:12
   127:5 128:11
**systems** 128:17
   129:24

**t**

**t** 2:14 11:19
   98:17,17 131:4
   131:4
**table** 11:3
   109:17 120:10
**take** 6:23 7:1,9
   13:18 20:5,10
   21:22 28:25
   43:4 49:4 66:20
   81:22 82:15
   83:3,4 104:8
   123:2,21
**taken** 1:23 5:3
   29:19 30:1,7,8,9
   62:1 66:24 98:4

104:12 108:2
   123:10 131:3
**talk** 5:11 6:21
   13:3,4 57:7 81:1
   92:4 103:5
**talked** 37:10
   44:15 86:20
   93:2 96:19
   107:7 109:24
   121:14
**talking** 5:10 7:8
   17:15 29:12
   35:6 48:3 55:17
   55:18 64:24
   65:3,9 83:8
   106:15 121:8
   123:1
**tallahassee** 2:16
   4:24 27:15,18
   27:23 28:2,3
**tampa** 28:5
**task** 10:24 11:3
   11:8,18 12:3,7
**tax** 76:17
**team** 67:17
**tell** 9:15 66:16
   69:10 88:1
   90:13
**ten** 12:6 31:19
   31:23 115:6
**tenant** 14:5 50:9
   51:7 72:13 73:5
**tenant's** 89:6
**tenants** 9:18
   10:23 11:1,7,18

11:24,25 12:6
   15:17 17:3,5,10
**tension** 76:5
**term** 17:18
   22:15,24 65:8
   69:11
**terminology**
   39:16
**terms** 22:21
   42:17 44:2
   65:13 84:5
   92:21 97:12
   101:16 123:1,14
**terrace** 7:16
**testified** 4:13
   122:25
**testify** 7:12
   20:23 21:1
   117:19,21
**testimony** 4:6
   46:16 130:8,16
**thank** 26:12
   44:13 45:8
   50:19 69:8
   100:16 102:13
   125:20
**theatre** 88:16
**thing** 6:23 7:2,2
   48:25 61:5 63:9
   78:25 112:1,6,7
**things** 7:10
   24:14 30:15
   33:10 34:1
   35:25 54:14
   64:25 70:22

**[things - true]**

71:23 73:13
79:10,11 80:13
84:12 96:11
100:6,6 107:23
108:2 113:2
123:1
**think** 14:13
15:14 23:4,23
30:1 33:16 35:7
36:8,8,9 38:23
39:15,21 40:6
43:6,22 48:15
48:16 49:2,3,9
50:12,22 51:19
56:18,22 57:17
57:18 61:23
62:23 63:18
71:24,25 75:6
75:13 76:6,15
76:19 78:12,13
78:13,14 79:7,7
79:20 80:5,9
81:14 82:20,20
83:11 84:9,10
85:20,23 86:14
86:16,18,25
87:20 88:9,10
90:2 91:4 92:2,8
92:9 93:1,3,4,12
93:12,14 94:3,4
94:12 95:10,13
96:3,15,18,24
96:25,25 97:1,3
97:3 99:4
100:22 101:4,20

104:6,9 105:2
105:19 108:1,23
108:24,25 110:1
110:7,12,16,17
110:17,18 112:8
112:8,17 113:9
113:22 114:13
114:14,15
115:10 117:1,4
117:5 120:9,23
122:3 123:9
124:23
**thinking** 24:7
45:1
**third** 95:6
**thought** 30:15
46:12 125:15
**thoughts** 23:25
**three** 22:25
33:17,17 44:16
46:1 97:19,20
98:23 101:9
105:23 106:25
111:12,22,22
**thursday** 118:2
**time** 6:19 13:9
13:17 18:8
19:20 22:13
23:19,24 24:2,3
24:17,19 28:16
28:18,20 29:8
29:10 30:2,10
31:5 32:17
37:17,18,19
39:13,14,17,18

39:21 43:15,22
43:24 44:1
48:23 60:16
62:25 64:6 66:7
66:8 67:23
69:16 71:20
74:2 76:7 79:2
83:12 84:9,10
84:11 85:20
86:1 91:14 92:5
96:25 97:3,5
105:15 111:8
117:16
**timeline** 91:15
**times** 5:15 6:9
6:15 113:11
**today** 6:21 7:12
8:10,17 9:10
12:14,25 21:1
24:7 38:16
46:16 79:1
**today's** 117:17
118:7
**together** 12:2,7
29:24 48:2 56:7
68:7 70:22 71:5
72:5,11 75:10
80:6 87:24
95:24 96:10
107:19 112:24
113:24 115:11
115:12
**told** 28:20 70:19
86:20

**tons** 69:19 73:18
**took** 17:25 82:7
85:23 108:12
118:1 121:17,19
123:22
**topics** 9:5,12
**torture** 6:20
**tough** 57:6
72:19
**tradition** 77:23
**traditional** 72:1
77:19 93:13
**traditionally**
91:6
**transcribe** 5:15
**transcribed**
21:18
**transcript** 3:14
21:16 43:15
62:24 127:2
129:10,12 130:6
130:19
**transcripts**
130:13
**traveling** 118:2
**treasurer** 9:22
10:7
**treated** 96:12
103:17
**tremendously**
63:3
**tricky** 38:2
**tried** 95:21 97:3
**true** 43:3 48:18
54:23 123:19,21

124:14 127:2
129:12 131:22
**truth**  4:7,7,8
**truthful**  66:17
**try**  6:17 33:12
50:6 71:6,25
73:24 75:13
76:18 78:11
79:18,19 86:15
87:1,4,4,7,23
88:3 95:23 96:9
96:23
**trying**  5:18 50:3
50:10 71:21
88:11 92:24
96:9 101:2
**turn**  122:12
**twist**  7:6 55:13
**two**  11:9 43:5
45:12 89:12
97:20 107:20
116:7
**type**  30:22 38:8
50:1,1 62:10
72:13 74:24
118:14
**types**  15:10
**typically**  54:5

**u**

**u.s.**  35:11,13
**uh**  11:6 26:6
28:11 33:17
48:9 60:19
71:11 72:23
79:24 83:5

89:24 96:4
97:16 103:7,25
**ultimately**  26:7
**unavailable**
105:15
**unconstitutional**
100:1
**unconstitution...**
56:8
**under**  60:7
130:17 131:21
**undermine**
112:2
**underpopulated**
33:1,2
**understand**
5:19 6:1 16:19
25:13 33:7,10
53:11,18 54:7
55:8 56:24 66:9
74:10,19 76:9
76:10 77:25
78:3 80:19 83:8
84:20 103:3
106:14 123:14
**understanding**
9:10 17:17,18
17:21,22 31:16
33:4 36:22 43:8
53:9 76:7,25
83:6 96:5 102:2
102:7,9 112:13
115:25 124:15
**understood**  6:5
33:8 47:1 60:9

79:3 81:11
82:11 93:13
95:12,23 106:12
109:12 115:4,7
**unhappy**  95:11
95:18
**unit**  26:4 74:4
**unite**  72:1
113:12,16
**united**  1:1 23:13
71:9,16,19
73:14
**uniting**  71:22
**universally**
96:12
**unnamed**  72:14
**unofficially**
37:1
**unpack**  24:24
**unpunished**
21:4
**unreasonable**
76:8
**unsuccessful**
26:8,11
**unusual**  62:3,5
**upset**  101:10
**urban**  17:14
**use**  16:25 17:3
17:17 25:15
45:12 110:17,18
112:10,14
**used**  30:5 75:10
90:17 110:17,18
110:19 119:16

130:20
**using**  16:12
36:19 71:22
107:19
**usually**  72:17
122:12

**v**

**valdez**  52:10
**values**  37:24
**variables**  74:7
**verify**  63:15
130:8
**veritext**  130:13
130:23
**veritext.com**
130:13
**versions**  60:10
**versus**  77:12
79:5
**vice**  9:21,21
10:5 20:18
69:25
**views**  119:24
**village**  30:6
38:17
**visit**  49:20
**vocal**  93:19
**voice**  48:10,13
49:9 59:17 77:5
88:21
**vote**  13:25 18:22
18:23 19:2 23:9
23:17 29:5
41:22,25 42:1,2
42:3 47:8,8,8,14

47:15,20,23
48:2,16,21,22
48:24,24 49:9
67:25 70:12,12
120:19 121:6
124:18 125:16
**voted** 62:6,7
68:2 79:20
99:19 125:11,17
125:18
**voter** 23:7,11
24:9 29:12
39:16 48:23
**voters** 24:22
38:24 39:22
42:19 74:6
106:16 110:23
120:18 121:4
124:4
**votes** 20:5,10,14
24:21 39:2,4,20
42:9 120:18,20
124:13
**voting** 24:18
38:17,25 42:5
42:11 47:9,24
48:4,7,8,12
53:12 56:8 77:7
101:23 102:4
119:25 124:17
**vs** 1:6 130:4
131:1

**w**

**wait** 7:5 121:20
**waived** 126:2
**want** 7:5,7 12:9
12:11 14:25
28:21 32:6
36:16 44:10
46:5 48:16,21
48:22,24 55:11
61:4 63:9 65:10
76:14 78:14
79:17 88:10
100:6,7 103:3
108:25 110:11
115:1 116:17
121:16 125:4
**wanted** 13:21
20:1 45:11,23
46:8,9 47:4
77:11,16 79:4
79:11,12 80:25
90:5 92:7 93:21
93:22 98:10
108:25 112:14
112:18 121:15
**wanting** 83:1
93:25 94:5
**wants** 88:10
**watch** 58:11
**way** 24:5,6
35:11,23 45:25
46:7,10,14
56:11 63:21
64:8 68:12
76:11 78:7

79:17 85:15,24
96:11 99:9
101:10 103:16
104:4 106:23
107:1,9 108:1
112:3,12 114:10
115:13 118:15
118:17 125:4
**ways** 76:16
78:15
**we've** 5:9 37:10
51:16 71:4
119:2,2,2,7
**weaken** 48:12
48:17
**weakens** 49:9,9
**weaker** 48:10
**wealthy** 38:3
**wednesday** 1:14
**weeks** 78:24
97:20,20
**weird** 35:12
**went** 16:10
73:22 88:15
92:4 117:6
**west** 2:5 8:8
9:19 10:20,22
10:24 11:8,18
11:25 12:3
15:17,21,24
28:14,17,21
29:9,14 31:11
34:19,20,21,22
34:23 35:4,8,9
35:12,18 36:4

36:15,17,17,18
36:18,22 37:14
38:3,6,17 42:13
43:9,10,16,20
50:2,14 58:11
60:12 63:4,8
64:8 65:14
72:14 75:19
79:25 84:7,7,23
87:8 93:3,4
94:17 101:13,17
102:20 103:9
115:1,23 120:22
120:23
**whack** 32:4,5
**white** 53:10
**wife** 69:16
**willing** 80:21
99:23,24
**willingly** 63:22
**wink** 81:19
**witness** 3:2,5,6
4:9 21:25 66:6
100:16 102:13
104:11 125:20
128:1,10,13
129:9 130:8,9
130:11,19
**wlrn** 108:12
121:8 122:20
**won** 120:16
**word** 91:16
123:2
**worded** 6:11

**work** 33:12,13
  73:19,22 80:23
  80:24 87:3
  95:19,23 96:1,9
  115:9
**worked** 120:8
**working** 95:9,10
  95:13,18
**works** 34:6
  37:14 84:1
**workshop** 30:20
**workshopping**
  30:19
**would've** 29:4
  46:19 115:2
**wrap** 104:9
**written** 65:9
**wrong** 7:8 61:5
  116:2
**wrongfully**
  15:19 16:18,22
**wyn** 90:17
**wynwood** 90:17

**y**

**yeah** 13:16
  48:14 51:22
  54:11 56:20,21
  57:25 59:11
  66:13,19,22
  72:7 73:2,6,12
  73:18 74:12,22
  75:2,18 78:12
  80:2 82:3,6,20
  83:22 88:6
  93:17,24 94:3

95:1 99:24
  100:17 101:4
  114:25 116:3
**year** 22:19,23
  69:12
**years** 22:10,25
  31:19,23 75:5
  115:6
**yep** 97:13
**yesterday** 12:16
  12:21 117:20
**yesterday's**
  117:23
**younger** 73:7

**z**

**zoning** 33:25
**zoom** 68:8,10
  88:18 118:3

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is transcribed, the transcript shall be furnished to the witness for examination and shall be read to or by the witness unless the examination and reading are waived by the witness and by the parties. Any changes in form or substance that the witness wants to make shall be listed in writing by the officer with a statement of the reasons given by the witness for making the changes. The changes shall be attached to the transcript. It shall then be signed by the witness unless the parties waived the signing or the witness is ill, cannot be found, or refuses to sign. If the transcript is not signed by the witness within a reasonable time after it is furnished to the witness, the officer shall sign the transcript and state on the transcript the waiver, illness, absence of the witness, or refusal to sign with any reasons given therefor. The deposition may then be used as fully as though signed unless the court holds that the reasons given for the refusal to sign require rejection of


the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.