UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS, and STEVEN MIRO,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rule 56.1, Defendant, City of Miami (the "City") respectfully moves for the entry of final summary final judgment against of Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras and Steven Miro (collectively, the "Plaintiffs") on their claim of racial gerrymandering in violation of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983 ("§ 1983").

**I.**     **SUMMARY OF THE ARGUMENT**

In their Amended and Supplemental Complaints, Plaintiffs portray the City as one that has engaged in "not merely a run-of-the-mill racial gerrymandering," but in a "calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose

of maintaining racially segregated districts." (DE 23, ¶1). Plaintiffs' testimony, both individually and collectively, tells a different story, which entitles the City to final summary judgment.

*First*, all of the Plaintiffs truthfully conceded that they have not suffered any personal injury traceable to the current redistricting plan, Resolution 23-271 (the "New Plan"). Instead, each Plaintiff seeks to vindicate harms allegedly suffered by others, even though Plaintiffs could not identify an actual injury to themselves. This very theory was rejected by the U.S. Supreme Court in *United States v. Hays*, 515 U.S. 737 (1995), in which the Court held that generalized grievances cannot support standing, even for claims of racial gerrymandering under the Equal Protection Clause. Therefore, Plaintiffs lack standing to challenge the New Plan in this Court.

*Second*, Plaintiffs also lack standing because, as they concede, their alleged injuries cannot be redressed by this Court. As the facts have shown, there is no plan (including none of Plaintiffs' four proposed plans) that can or would materially change the racial makeup of the City's districts. Instead, the reality is that the City has a majority Hispanic population, and the racial composition of the City's five districts will remain the same as it has been since 1997: three supermajority Hispanic districts, one VRA required majority African-American district, and one plurality district. Plaintiffs' four proposed maps confirm this reality, thereby completely undermining their claim that the City engaged in such division for "the predominant purpose of maintaining racially segregated districts[,]" as they allege. (DE 23, ¶1).

Article III requires Plaintiffs to prove they have *actually* suffered harm at the City's hands after the enactment of the New Plan, and that the Court can remedy that harm. Because they have failed to do so, the City respectfully requests that the Court grant the City final summary judgment with respect to Plaintiffs' equal protection claim.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986) (internal quotations omitted). Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp.*, 477 U.S. at 323. When the non-moving party bears the burden of proof on an issue, the moving party need not offer affidavits negating the opponent's claim. *Id.* Instead, the moving party may discharge its burden by showing the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

When a moving party meets its burden, the non-moving party must "go beyond the pleadings," and by affidavits or by "depositions, answers to interrogatories, and admissions on file," and designate specific evidence showing there is a "genuine issue for trial." *Id.* at 324. It is the non-moving party's obligation to come forward with *specific facts*, not "mere allegations or denials of his pleadings." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Id.* at 250. Summary judgment is proper if the non-moving party fails to make this requisite showing. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). As the Supreme Court has noted, "a scintilla of evidence in support of the [the non-moving party's] position will be insufficient [to overcome summary judgment]; there must be evidence on which the jury could reasonably find for the [the non-moving party]." *Anderson*, 477 U.S. at 252; *see also*, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir.

1987) ("Where the [moving party's] justification evidence completely overcomes any inference to be drawn from the evidence submitted by the [the non-moving party], the district court may properly acknowledge that fact and award summary judgment to the [moving party].").

### III.  BACKGROUND

The City has had five single-member districts for its five commissioners (rather than at large elections) since 1997. (SOF ¶1).[1] Since inception, these districts have had substantially the same racial demographic make-up. (SOF ¶2). Following the 2020 U.S. Census (the "2020 Census"), the City's districts no longer had substantial equality of population. (SOF ¶3). The ideal district size had increased to 88,448. *Id.* District 2, the waterfront district, had grown at a faster pace than the other four districts and needed to "shed" population to the other four districts in order to bring the population variance back to constitutionally acceptable levels. (SOF ¶4).

On March 24, 2022, the City Commission adopted Resolution 22-131, redrawing the district lines and balancing population among the five districts. (DE 23 ¶5). On February 10, 2023, Plaintiffs filed their Amended Complaint. (DE 23). In their Amended Complaint, Plaintiffs challenged the redistricting plan enacted by the City in Resolution 22-131, and alleged a single count of racial gerrymandering in violation of the Fourteenth Amendment to the U.S. Constitution. (DE 23).

On May 23, 2023, the Court preliminarily enjoined that plan (the "Enjoined Plan"), directed the parties to mediation, and gave Defendant until June 30, 2023 to enact an interim remedial plan. (DE 60).

---

[1] References to the contemporaneously filed Statement of Facts are in the form of "SOF ¶__."

On June 14, 2023, the City adopted the "New Plan," which replaced the Enjoined Plan. (SOF ¶5; DE 77). The New Plan was certified on June 29, 2023, *see id*, and the City filed its Notice of Passage of Redistricting Plan with the Court the following day. (DE 77).

### IV.     THE CITY IS ENTITLED TO FINAL SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM.

#### A.     Plaintiffs Lack Standing To Pursue Their Claim.

In order to bring a suit in federal court, a would-be plaintiff must have standing, a constitutional requirement that derives from the case-or-controversy clause in Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he standing question in its Art. III aspect is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant His invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).

"It is well-established that, to establish standing, a plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022) (internal citation omitted); *see also Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (explaining "[f]or there to be such a case or controversy, it is not enough that the party invoking the power of the court have a keen interest in the issue").

For redistricting, "[a] racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). An individual "plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (citing *United States v.*

5

*Hays*, 515 U.S. 737, 744-45 (1995)). And, as the U.S. Supreme Court expressly affirmed in *Hays*, generalized grievances do not support standing, even for claims of racial gerrymandering. 515 U.S. 737, 743 (1995).

In *Hays*, the Court held that the mere fact that appellees in that case were residents and voters of Louisiana was not sufficient to give them standing to challenge Louisiana's congressional redistricting plan. *Id*. at 743-744. Instead, "[o]nly those citizens able to allege *injury as a direct result of having personally been denied equal treatment*, may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits." *Id.* at 746 (internal citations omitted and emphasis added) ("The fact that Act 1 affects all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if Act 1 inflicts race-based injury on some Louisiana voters—that every Louisiana voter has standing to challenge Act 1 as a racial classification."); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) ("a plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has a personal stake in the outcome, distinct from a generally available grievance about government) (cleaned up).

In short, standing asks "whether a particular plaintiff even has the requisite stake in the litigation to invoke the federal 'judicial Power' in the first place." *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020). For Plaintiffs, the answer to that question is no.

### i. The Associational Plaintiffs have failed to establish an injury in fact.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 169 (2000) (citing *Hunt v. Washington State*

*Apple Adver. Com'n*, 432 U.S. 333, 343 (1977). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon*, 426 U.S. at 40. Instead, an organization "can establish standing *only as representatives of those of their members who have been injured in fact*, and thus could have brought suit in their own right." *Id.* (emphasis added). The standing question with respect to the Organizational Plaintiffs in this suit therefore turns upon whether the organizations have "established actual injury to any of their [ ] members." *Id.*

In *Anderson v. City of Alpharetta*, the Eleventh Circuit affirmed the district court's holding that the NAACP lacked associational standing to assert the constitutional claims of its members because the organization had not been able to identify any member who had been harmed by the city's allegedly unconstitutional actions. 770 F.2d 1575, 1582-83 (11th Cir. 1985). In that case, the NAACP had identified the "names, addresses, incomes, and the number of family members for 10 persons who allegedly would have desired to live in public housing," and identified another "four individuals who would have enjoyed social, economic and political benefits" of public housing. *Id.* at 1583. But, because the NAACP "failed to identify a single plaintiff who has been personally and concretely injured by the alleged discriminatory practices of the City of Alpharetta," the Eleventh Circuit held that "the NAACP ha[d] failed to aver adequately injury in fact, directly or derivatively to any of its members[,]" and held that it "is not the role of the court to speculate concerning the existence of standing nor to piece together support for the plaintiff." *Id.* at 1582.

Likewise, in *National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners of St. John's County*, the Eleventh Circuit affirmed dismissal of the associational plaintiff's claims for lack of standing because the plaintiff could not identify any members that

had been injured to the defendant's alleged actions. 376 F.3d 1292, 1296 (11th Cir. 2004). Therefore, the plaintiff's failure in that case "to identify an injured constituent prevent[ed] them from asserting associational standing." *Id.* (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66, 117 S.Ct. 1055, 1068, 137 L.Ed.2d 170 (1997) ("An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right.") (citations omitted).

Here, Plaintiffs Grace, Engage Miami, South Dade Branch of the NAACP, Miami-Dade NAACP (together, the "Associational Plaintiffs"), lack standing on their equal protection claim because they have failed to identify *any member* who had been harmed by the City's allegedly unconstitutional actions, and have therefore failed to establish having suffered an injury that is: (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical, both as required to under applicable precedent. *See Lujan*, 504 U.S. at 556 (plaintiffs lacked standing "on the ground that the statute's citizen-suit provision confers on all persons the right to file suit to challenge the Secretary's failure to follow the proper consultative procedure, notwithstanding their inability to allege any separate concrete injury flowing from that failure").

### 1. Plaintiff Miami Dade NAACP has failed to identify any members who have been injured by the City's actions.

While the Miami-Dade NAACP claims it maintains a membership list, it has not checked that membership list to determine whether it has any members within the confines of the City of Miami, much less District 5 (the District with which it claims to have had an issue in the Enjoined Plan). (SOF ¶¶ 50, 51). The Miami-Dade NAACP assumes it has members in every district because they "have members and volunteers," generally. (SOF ¶51). Even if Miami-Dade NAACP did have a membership list, its members are not required to update their address information after they initially sign up. (SOF ¶50).

8

Miami-Dade NAACP's corporate representative, the President of Miami-Dade NAACP, lives in unincorporated Miami-Dade County, and not in the City of Miami. (SOF ¶49). While the branch's President claimed to know specific members that lived in every District in the City, she refused to identify any such members during her deposition. (SOF ¶52) (Q: "I'm just asking you to tell me the name of the person you are referring to in your testimony in response to the question provided by your counsel?" A: "Yeah. We don't share.") (Q: "What's the name?" A: "An NAACP member.") (Q: "Are you going to tell me the identify of these people you were thinking of when you were responding to your counsel's questions?" A: "No.").

Like in *National Alliance for the Mentally Ill*, the Court should dismiss Miami-Dade NAACP's claim for lack of standing because it has failed to identify *any* members, much less members that reside in a particular district and have been injured as a result of the City's alleged drawing of that particular district. 376 F.3d at 1296.

> **2.** Plaintiff South Dade NAACP has failed to identify any members who have been injured by the City's actions.

Like the Miami-Dade NAACP, Plaintiff South Dade NAACP does not keep a list of its members, and no one from South Dade NAACP has done an analysis to determine where members live. (SOF ¶55). The South Dade NAACP does not keep a roster, and it admits that there is no way for South Dade NAACP to verify where its members live, unless someone knows them personally. (SOF ¶56). South Dade NAACP's corporate representative testified knowing people in District 2, and maybe knowing "a couple of people" in District 4. (SOF ¶58). However, she does not know anyone living in District 3 for certain, and South Dade NAACP does not have any

members in District 5. (*Id.*). Nevertheless, South Dade's NAACP representative never identified any members that reside in any of the districts.

The South Dade NAACP admits that it has not, at any point, determined whether it has a member within District 2, which is the district to which the South Dade NAACP took exception in the Enjoined Plan (but, not in the New Plan). (SOF ¶55). Most problematic for the South Dade NAACP, its Board has never taken a position on the New Plan. The South Dade NAACP Corporate Representative was unable to testify if the Board had any objection at all to the New Plan or the New Plan's impact on its members. (SOF ¶62). Not only is the South Dade NAACP unable to identify any of its members, it is also unable to say whether it objects to the New Plan at all. An organizational plaintiff that cannot articulate whether their members are injured at all by a challenged law certainly lacks standing under *Lujan* and *Hayes*.

### 3. Plaintiff GRACE has failed to identify any members who have been injured by the City's actions.

GRACE does not have individual members. (SOF ¶64). GRACE only has organizational members. (*Id.*). Organizations have to fill out an application to become members of GRACE. (SOF ¶65). GRACE does not require individuals to fill out an application or pay a fee in order to participate in meetings. (*Id.*).

Like the other Associational Plaintiffs, GRACE has not identified where, and in which districts, its members live, and it does not know whether it has residents in all of the City's districts. (SOF ¶66). Just as in *National Alliance for the Mentally Ill*, the Court should dismiss GRACE's claim for lack of standing because it has failed to identify *any* members, much less members that reside in a particular district and have been injured as a result of the City's alleged drawing of that particular district. 376 F.3d at 1296.

      **4.** <u>Plaintiff Engage has failed to identify any members who have been injured by the City's actions.</u>

Plaintiff Engage's Executive Director, who testified as its corporate representative, lives in Miami Beach, FL, and not in the City of Miami. (SOF ¶72). Engage maintains a membership list that includes residential addresses, but it does not verify residential addresses after members are on-boarded and fill out a membership form with their address. (SOF ¶74). Moreover, while Engage's corporate representative testified that she thought she had seen a workbook that had been compiled by Valdes[2] that indicated it had members in all five districts, she could not testify to whether anyone reviewed their race to verify whether they had members in each district that were or were not members of the predominant racial group to validate their claims. (SOF ¶76).

As the Eleventh Circuit explained in *Doe v. Stincer*, the right of an association to sue on behalf of its constituents does not relieve it of its obligation to show that one of its constituents otherwise had standing to sue. 175 F.3d 879, 886 (11th Cir. 1999). Here, Engage admits that it has not, at any point, verified whether the race or ethnicities of its members to know whether they are or are not the predominant race in any district. (SOF ¶76-77).

    **ii. The Individual Plaintiffs have failed to establish an injury in fact.**

  **1.** <u>Plaintiff Valdes</u>

Valdes identifies as a Latina Cuban-American. (SOF ¶42). Valdes resided in District 5 under the Enjoined Plan, but now in District 2 under the New Plan. (SOF ¶43). Valdes' personal grievance with the City's redistricting was redressed by the New Plan, where she was put back in District 2. (SOF ¶44). Valdes has no problem being in District 2 in the New Plan or represented

---

[2] Notably, Valdes did not recall if she ever examined Engage's membership to assess whether they had members in each district. (SOF ¶48).

11

by the currently-sitting Hispanic Commissioner. (SOF ¶45). Additionally, Valdes has no race-based objection to the New Plan and only takes issue with the City "split[ting] up" part of the Coconut Grove area in District 2, wherein Commissioner Carrollo's home is in Natoma Manors, but she admits not knowing whether it was based on race. (SOF ¶46).

Valdes has no objection to her placement in District 2 under the New Plan. (SOF ¶47). Her statement that she personally did not have an issue with the way District 2 was drawn in the New Plan demonstrates she has no individualized injury as a result of the way her district is drawn, and only claims the type of generalized grievance *Hays* rejected. *See Hays*, 515 U.S. at 743-44.

### 2. Plaintiff Contreras

Plaintiff Contreras, who identifies as Hispanic and White, moved into District 4 after the enactment of the Enjoined Map, but no longer lives in District 4. (SOF ¶29-30). She does not even live in the City of Miami. (SOF ¶30). Contreras has never voted in a City of Miami election, and will not vote in the City's next election. (SOF ¶34). Contreras did not have any issue with the fact that District 4 was predominantly Hispanic when she moved there in August 2022. (SOF ¶31). While she does not have any plans to move back into the City, Contreras admits that she "want[s] to be a plaintiff . . . [and] to be involved, . . . love[s] Miami[,] . . . [and] plan[s] on living in the City of Miami in the future," but has "no specific plan" to do so. (SOF ¶33, 35). While Contreras alleged her injury was being "packed" by the Enjoined Plan, she admitted having no issue with the percentage of Hispanic population when she moved into District 4, and admitted it became less packed by redistricting. (SOF ¶37-41).

Like the appellees' in *Hays*, Contreras has failed to put forward any evidence to support that she has suffered an injury "as a direct result of having personally been denied equal treatment." *Hays*, 515 U.S. at 746 (quoting *Allen v. Wright*, 468 U.S. 737, 738 (1984), abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

### 3. Plaintiff Cooper

Cooper lived in District 2 when the City first drew districts in 1997. (SOF ¶8). Under both the Enjoined Plan and the New Plan, Cooper has remained in District 2. (SOF ¶10). While she testified preferring that District 2 return to its pre-Enjoined Plan state, she admits that she remained in District 2 under both the Enjoined Plan and the New Plan, and that the New Plan returned Black residents of the West Grove to District 2. (SOF ¶¶10, 12).

Cooper has lived in District 2 since its inception and, because the New Plan reinserted the West Grove back into that District, her only objection with the Enjoined Plan has been addressed. Accordingly, she demonstrates that she has no individualized injury as a result of the way District 2 is drawn. *See Hays*, 515 U.S. at 743-44.

### 4. Plaintiff Miro

Miro is a Hispanic male who has lived in District 3 since 2014. (SOF ¶14). District 3 was predominantly Hispanic when Miro moved there in 2014. (SOF ¶15). Miro believes that "it's physically impossible" to draw District 4 to not be predominantly Hispanic, and that it would be "very hard" to draw Districts 1 and 3 in a way that would not be predominantly Hispanic, as it would require crossing US-1 and reaching into Brickell. (SOF ¶20). Miro's objection to his district is not based on race, but on non-racial voter demographics: he believes that District 3's Commissioner Carollo packed his elder "voter base" of "65-plus [residents] living in affordable housing" into District 3 and, "therefore[,] [] dilute[d] voices like [Miro's]." (SOF ¶18).

Miro's claim is not a race-based claim. The law is clear that it is Plaintiffs' burden to show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

13

### 5. Plaintiff Johnson

Johnson moved to District 3 in July 2021. (SOF ¶21). Johnson remains in District 3 in the New Plan. (SOF ¶22). Johnson would prefer to be in District 2, but acknowledges that buying or renting a residence, as he did in 2021, is the only way for an individual to choose the district in which they reside. (SOF ¶23). Johnson felt that Black residents were categorized and stripped from his district on the basis of race. (SOF ¶24). However, Johnson acknowledged that, with respect to the Brickell area where he lives, Hispanics and whites make up the vast majority of residents in that area, and he is a minority living in Brickell. (SOF ¶25). Johnson remained in District 3 in all but one of Plaintiffs' Maps. (SOF ¶26). Johnson could not identify any statements by the City Commission regarding the creation of the New Plan that were "racially motivated." (SOF ¶27). Johnson agrees that District 2 in Plaintiffs' Map 4 is generally the same as it was in the 2013 Plan. (SOF ¶28).

Johnson does not have a race-based objection related to his placement in District 3 under the New Plan. Instead, Johnson merely has a generalized desire to live in District 2, despite having moved into District 3 in 2021, prior to either the Enacted Plan or the New Plan having been enacted. Johnson cannot demonstrate that he has an individualized injury as a result of the way his district is drawn, and only claims the type of generalized grievance *Hays* rejected. *See Hays*, 515 U.S. at 743-44.

### iii. Plaintiffs have failed to establish an injury that is redressable by this Court.

Plaintiffs also lack standing because their alleged injuries cannot be redressed by this Court. Although Plaintiffs assert the City racially gerrymandered the districts, there is no plan (including any of Plaintiffs' four proposed plans) that materially changes the racial makeup of the City's districts. First, Miami is a majority-minority city with no White majority district, and no

plan proposes one. (SOF ¶7). All plans have a coastal District 2 with the largest concentration of White voters, but which still fail to comprise a majority. (SOF ¶7); *compare* DE 82-24 *with* 34-37. Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the New Plan. (SOF ¶7); *compare* DE 82-12, p.15 *with* p. 16. All plans have a VRA-protected Black District 5. (SOF ¶7). Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), but Plaintiff Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% compared to the New Plan's 57.4%. (SOF ¶¶6, 7). All plans have three, supermajority Hispanic districts, but Plaintiffs' Hispanic Voting Age Population ("HVAP") in District 4 in all plans is maximally packed at higher than 94%. (SOF ¶7).

The differences between the plans' demographics are simply not significant. For example, the Hispanic population in District 1 in Plaintiffs' Plans ranges from 70.1% HVAP to 86.6% HVAP, compared to 89.7% in the New Plan. (SOF ¶7; DE 82-12, p.16). For District 3, Plaintiffs' Plans ranges from 84.8% HVAP to 90.1% HVAP, compared to 89.7% in the New Plan. (SOF ¶¶6, 7). In each instance there is a more than 15% and 5% deviation in Hispanic population, respectively. (SOF ¶7). If such deviations are not constitutionally significant in each of Plaintiffs plans, the deviations between Plaintiffs plans and the New Plan are even less significant, regardless of which population is being examined.

The significance of these demographics also demonstrate the practical difficulty of crafting a remedy that addresses what the Plaintiffs' claim as their injury. For example, Johnson complains about being stripped from his district based upon race, but he lived in District 3 when he moved there in 2021, was in District 3 in the Enjoined Plan and the New Plan, and was placed in District 3 in three of the four plans proposed by Plaintiffs. There is no evidence that Johnson was placed

in District 3 because of racial gerrymandering, and the remedies proposed by Plaintiff support that conclusion.

The reality is that the City has a majority Hispanic population, and the racial composition of the City's five districts will generally remain the same as it has been since 1997: three majority Hispanic districts, one majority African-American district, and one plurality district. Plaintiffs' four proposed maps confirm this reality, thereby completely undermining their claim that the City engaged in such division for "the predominant purpose of maintaining racially segregated districts[,]" as they allege. (DE 23, ¶1).

In *Hays*, the Court noted that the record contained "evidence tending to show that the legislature was aware of the racial composition of [the districts]," but the Court also noted that "the legislature *always is aware of race* when it draws district lines." 515 U.S. at 744 (emphases added) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)) (internal quotation marks omitted). "That sort of race consciousness does not lead inevitably to impermissible race discrimination" and proof of that race consciousness "in the redistricting process is inadequate to establish injury in fact." *Id.* at 745–46. "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up).

Under applicable U.S. Supreme Court precedent, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations omitted). Here, the only adverse effects Plaintiffs have advanced are that the City drew a map for the purpose of maintaining racially segregated districts and that alleged racial

gerrymandering discriminatorily resulted in three majority Hispanic districts, one majority African-American district, and one plurality district. Yet, as Plaintiffs have confirmed in their four proposed maps, the only remedy that may be proposed is the same poison that Plaintiffs complain of: three supermajority Hispanic districts, one VRA-required Black district, and a plurality district.

Plaintiffs' ability to have standing in this case relied upon them demonstrating that their proposed remedy looked very different than the City's New Plan, but that is simply not the case. Consequently, Plaintiffs lack standing on their equal protection claim because they have demonstrated that their claimed injuries are not redressable given that no plan would result in the material changes to the racial makeup of any of the City's Districts. As such, the City is entitled to final summary judgment as a matter of law.

## VI. CONCLUSION

For each of the foregoing reasons, the City respectfully requests that the Court grant this motion on Plaintiffs' sole claim in their Amended Complaint.

    Respectfully submitted,

    GRAYROBINSON, P.A.

    By: *s/ George T. Levesque*
    GRAYROBINSON, P.A.
    Jason L. Unger, Esquire
    Florida Bar No. 991562
    George T. Levesque
    Florida Bar No. 55551
    Andy Bardos
    Florida Bar No. 822671
    301 S. Bronough Street
    Suite 600
    Tallahassee, Florida 32301
    Telephone: (850) 577-9090
    Facsimile: (850) 577-3311

        Christopher N. Johnson
        Florida Bar No. 69329
        Email: Christopher.Johnson@gray-robinson.com
        Marlene Quintana, B.C.S.
        Florida Bar No. 88358
        Email: Marlene.Quintana@gray-robinson.com
        333 S.E. 2nd Avenue, Suite 3200
        Miami, Florida 33131
        Telephone: (305) 416-6880
        Facsimile: (305) 416-6887

        CITY OF MIAMI
        VICTORIA MÉNDEZ, City Attorney
        Florida Bar No. 194931
        JOHN A. GRECO, Chief Deputy City Attorney
        Florida Bar No. 991236
        KEVIN R. JONES, Deputy City Attorney
        Florida Bar No. 119067
        KERRI L. MCNULTY,
        Litigation & Appeals Division Chief
        Florida Bar No. 16171
        Office of the City Attorney
        444 S.W. 2nd Avenue
        Miami, FL 33130
        Telephone: (305) 416-1800
        Facsimile: (305) 416-1801
        *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

      I hereby certify that on November 10, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

        */s/* George T. Levesque
        Counsel for City of Miami