## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

       Plaintiffs,

v.

CITY OF MIAMI,

       Defendant.

_____/

## <u>ORDER</u>

THIS CAUSE came before the Court upon Defendant City of Miami's ("Defendant") Motion to Dismiss Plaintiffs' Supplemental Complaint.[1] ("Mot.") (ECF No. 117). Plaintiffs filed a response[2] ("Resp.") (ECF No. 119), and Defendant filed a reply.[3] ("Reply") (ECF No. 123). The Motion is now ripe for review.

Defendant's Motion is the latest in a long line of efforts to dismiss or discredit Plaintiffs' claim that the City of Miami's Commission Districts are racially gerrymandered. *See* (ECF Nos. 19, 34, 36, 40, 55, 59, 80, 85, 104, 117, 123). To the extent Defendant properly raises arguments

---

[1] For the reasons explained below, the Supplemental Complaint necessarily adds information to the Amended Complaint, *see* ("Amended Complaint" or "Am. Compl.") (ECF No. 23), and accordingly, the Court considers the two filings in tandem. Thus, the Court construes the instant Motion as seeking dismissal of the entire Action, not just the Supplemental Complaint.

[2] Plaintiffs in this Action are Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras Steven Miro, GRACE, Inc., Engage Miami, Inc., South Dade Branch of the NAACP and Miami-Dade Branch of the NAACP (collectively, "Plaintiffs").

[3] Plaintiffs moved to strike the Reply for failure to adhere to the Court's formatting and length instructions. *See* (ECF No. 124). Though Defendant's Reply is noncompliant, the Court issued a paperless order denying Plaintiffs' motion to strike, finding that Defendant's noncompliance was inadvertent. *See* (ECF No. 129). The Court therefore considers the Reply in adjudicating this Motion.

here, the arguments are largely identical to ones the Court has already considered and rejected. Like a broken record, Defendant once more raises the same unavailing arguments. Once more, the Court rejects them.

## I.     BACKGROUND AND PROCEDURAL HISTORY

After filing its original Complaint on December 15, 2022, Plaintiffs filed the Amended Complaint on February 10, 2023. Plaintiffs' sole claim alleges that, in violation of the Fourteenth Amendment's Equal Protection Clause, all five Miami City Commission districts as drawn in Resolution 22-131 ("2022 Enacted Plan" or "Enjoined Plan") are racially gerrymandered. *See generally* Am. Compl.

### A.  Preliminary Injunction

Also on February 10, 2023, Plaintiffs filed an Expedited Motion for Preliminary Injunction. *See* (ECF No. 26). Therein, Plaintiffs requested that the Court enjoin Defendant from "calling, conducting, supervising, or certifying any elections under the [2022] Enacted Plan, beginning with the regular 2023 elections, until the entry of a final judgment." *Id.* at 36. Defendant opposed the motion, *see* (ECF No. 36), and the Court referred the motion to United States Magistrate Judge Lauren F. Louis for a Report and Recommendation. *See* (ECF No. 27).

With the benefit of an evidentiary hearing that lasted over five hours, which included ninety-three exhibits from Plaintiff and twelve exhibits from Defendant, and testimony from the City's redistricting consultant, Miguel De Grandy, Esq. ("De Grandy"), *see* (ECF No. 48), Magistrate Judge Louis issued a Report and Recommendation ("R&R") (ECF No. 52). In the R&R, Magistrate Judge Louis described the redistricting process, expert reports, and other exhibits and record materials with great detail. *See generally id.* After examining the contemporaneous statements of various Commissioners and considering the relevant record

materials, Magistrate Judge Louis found that race predominated in the design of each district. *Id.* at 77–87. Evaluating each prong of the preliminary injunction test, Magistrate Judge Louis found that (1) Plaintiffs demonstrated a substantial likelihood of success on the merits, (2) Plaintiffs stood to suffer irreparable harm, and (3) any harm that Defendant would suffer was outweighed by the harm Plaintiffs would suffer as a result of racial gerrymandering. *See id.* at 60–100. Accordingly, Magistrate Judge Louis recommended that the Court enjoin Defendant from using the 2022 Enacted Plan until the entry of a final judgment. *Id.* at 100.

The Court carefully considered the R&R as well as the objections thereto. Ultimately, the Court adopted the R&R in full. *See* ("Injunction Order") (ECF No. 60). Following the issuance of the Injunction Order, the Court issued a scheduling order requiring Defendant to enact a proposed remedial map (in the event that the Parties did not settle by mediation) and file it with the Court by June 30, 2023. *See* (ECF No. 69). Plaintiffs were to notify the Court of any objections to Defendant's proposed remedial map, and in turn, Defendant was entitled to file a memorandum of law in support of it. *See id.* at 1–2. The Court issued this scheduling order to ensure that Defendant could provide the Court with a remedial plan, and that the Court could review such plan, by August 1, 2023, the date by which the Miami-Dade County Board of Elections required a remedial map to administer the then-upcoming November 2023 elections. *See id.* at 2; *see also* (ECF No. 26 at 36).

### B.  Passage of the Remedial Plan

Though the City Commission passed the plan on June 14, 2023, Defendant filed its Notice of Passage of Redistricting Plan ("Notice") two weeks later on June 30, 2023. (ECF No. 77). In doing so, Defendant informed the Court that it had passed a redistricting plan, Resolution 23-271 ("Remedial Plan"), in an effort to remedy the constitutional shortcomings of the Enjoined

Plan.  Defendant then advanced two arguments:  (1) the instant Action was moot because the Remedial Plan fully replaced the Enjoined Plan; and (2) the Remedial Plan would function as the operative map going forward.  *See* (ECF Nos. 77, 80)

### i.      *Motion to Dismiss for Mootness*

After filing the Notice, Defendant moved to dismiss this Action as moot.  *See* (ECF No. 80).  Its argument was quite simple:  the City did not adopt a remedial plan, but rather, Resolution 23-271 was a new redistricting plan that would replace the Enjoined Plan altogether.  *Id.* at 4.  By ignoring the remedial posture of the case, Defendant asserted that the passage of the Remedial Plan left the Court without jurisdiction to consider whether the Remedial Plan corrected the constitutional infirmities the Court found were substantially likely to exist in the Enjoined Plan.  *See generally id*.

The Court found that Defendant's argument squarely contradicted Supreme Court precedent and similarly, the Eleventh Circuit had rejected a nearly identical argument.  (ECF No. 91 at 4–5).  Specifically, the Court stated the following:

> Defendant's argument is unavailing.  In fact, the Supreme Court has addressed and rejected a mootness argument that is almost identical to Defendant's.  *See N.C. v. Covington* (*Covington III*), 138 S. Ct. 2548 (2018) (per curiam).  As is the case here, the defendants in *Covington III* argued that "plaintiffs' racial gerrymandering claims ceased to exist when the [legislature] enacted remedial plans for the State House and State Senate and repealed the old plans."  *Id.* at 2552.  The Court flatly rejected the argument.  According to the Court, "the plaintiffs' claims that they were organized into legislative districts on the basis of their race did not become moot simply because the General Assembly drew new district lines around them.  To the contrary, [the plaintiffs] argued in the District Court that some of the new districts were mere continuations of the old, gerrymandered districts."  *Id.* at 2553.  The Court further elaborated, "[b]ecause the plaintiffs asserted that they remained segregated on the basis of race, their

claims remained the subject of a live dispute, and the District Court properly retained jurisdiction."[4]  *Id.*

Equally as illustrative is the Middle District of Florida's consideration of how to approach the evaluation of a remedial map when a court has found the original map substantially likely to be unconstitutional.  *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022).  There, the court explained that when "the legislative body enacts a new redistricting plan in an effort to remedy the constitutional violation, this plan 'will then be the governing law unless it, too, is challenged and found to violate the constitution.'"  *See id.* (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)).  However, in concluding that a court has a continuing obligation to ensure the new map passed constitutional muster, the *Jacksonville II* Court explained that it had the "duty to ensure that any remedy 'so far as possible eliminate[s] the discriminatory effects of the past as well as bar[s] like discrimination in the future.'"  *See id.* (quoting *Covington II*, 283 F. Supp. 3d at 424).  With this in mind, the *Jacksonville II* Court undertook an analysis of whether the remedial plan, which was passed by the Jacksonville City Council and signed by the Mayor, was constitutionally adequate.  *See id.* at *1, *17.  Ultimately, the court concluded that it was not.  *See id.* at *17.

(ECF No. 91 at 4–6) (alterations in original).  Thus, the Court found that "in accord with nearly sixty years of Supreme Court precedent, the Court . . . has a continuing duty to ensure the Remedial Plan does not suffer from the same constitutional defects that the Court found were substantially likely to exist in the Enacted Plan."  *Id.* at 6.

In a last-ditch attempt to render this Action moot, Defendant also argued that *Abbott v. Perez*, 138 S. Ct. 2305 (2018) alters the framework by which a court must analyze mootness in the redistricting context.  *See generally* (ECF No. 85).  The Court quickly rejected Defendant's invitation to interpret *Abbott* as uprooting decades of well-established precedent.  *See* (ECF No. 91 at 6–10).  Instead, the Court held that it would afford the enacting legislature, in this case the City Commissioners, the good faith presumption to which they are entitled to receive under

---

[4] Plaintiffs asserted that under the Remedial Plan, they remain segregated on the basis of race. *See* (ECF No. 83 at 22) ("A district-by-district analysis reveals that the Commission perpetuated, rather than remedied, the [2022 Enacted Plan's] racial gerrymandering.").

*Abbott* when the Court analyzed the constitutionality of the Remedial Plan. *See id.* at 9–10. The Court also made clear, however, that it would not read *Abbott* as requiring it to shirk its duty to ensure the Remedial Plan did not perpetuate the same constitutional infirmities as the Enacted Plan.[5] *See id.* at 10. Thus, the Court denied Defendant's motion to dismiss the Action as moot.

### ii.    *The Court Rejects the Constitutionally Flawed Remedial Plan*

Upon disposing of Defendant's mootness argument, the Court turned to its examination of the Remedial Plan. Plaintiffs responded to the Notice and argued that by passing the Remedial Plan, "[Defendant] has doubled down" and created "a 'new' map that closely resembles the Enjoined Plan." (ECF No. 83 at 2). Since Plaintiffs believed that Defendant's Remedial Plan did not remedy the likely constitutional violations the Court identified, Plaintiffs argued that the Court should reject Defendant's Remedial Plan and adopt one of Plaintiffs' alternative maps ("P4") which allegedly complied with all legal requirements and honored Defendant's legitimate, non-race-based policy choices. *See id.* at 2–3.

In a fifty-page order ("Order") (ECF No. 94), the Court sustained Plaintiffs' objections and found that "the Remedial Plan does not completely correct the constitutional defects the Court found were substantially likely to exist in the Enjoined Plan." *Id.* at 1. To come to this conclusion, the Court began its analysis by stating "[l]egislative enactments, including a remedial plan, are still cloaked with the 'presumption of legislative good faith,' even after a finding of past discrimination, and the 'burden of proof lies with [Plaintiffs], not the State' to demonstrate the remedial map is unconstitutional." *Id.* at 16 (quoting *Abbott*, 138 S. Ct. at 2324) (alterations in original. While presuming the good faith of the City Commissioners, the Court nevertheless

---

[5] In a later motion to stay pending appeal, Defendant argued again that the passage of the Remedial Plan rendered the case moot, even though the Court had already dismissed this exact argument. *See* (ECF No. 104 at 1, 3). Fitting with the theme of the instant Motion, Defendant reiterates its already-rejected mootness argument again here.

found that Plaintiffs met their burden to demonstrate that the Remedial Plan was unconstitutional. In support of this holding, the Court relied first on direct evidence showing that the Commissioners intended to maintain the unconstitutional aspects of the Enjoined Plan. *See id.* at 20–24. Specifically, the Court focused on the explicit statements from multiple Commissioners expressing their intent to maintain the race-based sorting in any potential remedial plan, and how the Commissioners instructed De Grandy accordingly. *See id.* at 24 (finding "[t]he directive to De Grandy is clear, and the Commissioners' statements during the May 11 meeting combined with their directive to De Grandy support a finding that the Commissioners intended for the Remedial Plan to preserve the prior racial breakdown of the Enjoined Plan, thus perpetuating rather than remedying the unconstitutional racial gerrymandering"). Second, the Court considered circumstantial evidence demonstrating that racial considerations predominated when designing the Remedial Plan. *See id.* at 24–40. In doing so, the Court analyzed the Remedial Plan's core retention rate from the Enjoined Plan, how the alterations to one of De Grandy's proposed maps which culminated in the Remedial Plan preserved the Enjoined Plan's racial demographics, and how a district-by-district analysis demonstrated the continued racial predominance present in the Remedial Plan's design. *See id.* The Court therefore rejected the Remedial Plan after finding that both direct and circumstantial evidence demonstrated that race continued to be the predominant factor.

Because Defendant could not enact a constitutional remedial map by August 1, 2023, the date by which the Miami-Dade Board of Elections required a remedial map to conduct the November elections, and because there was no time for the City Commission to draw a new map or for the Court to order a special master to craft an alternative plan, the Court faced the "unwelcome burden" associated with crafting a new map for implementation. *See id.* at 40–41.

7

Accordingly, the Court reviewed Plaintiffs' proposed map, P4, to determine whether it (1) was a sufficient constitutional remedy to the Enjoined Plan, (2) complied with the City Commission's legitimate, non-race-based policy goals, (3) complied with traditional redistricting criteria, and (4) complied with state and federal law.  *See id.* at 41–50.  The Court found that P4 properly satisfied each of those criteria and subsequently adopted it as the Court's Interim Remedial Plan ("Court's Map") pending final judgment in this Action.  *Id.* at 50.

## C.  Defendant Appeals to the Eleventh Circuit

On July 31, 2023, immediately after the Court issued its Remedial Order, Defendant filed an emergency motion to stay with the Eleventh Circuit Court of Appeals.[6]  Defendant raised many arguments in favor of its motion, including one brief paragraph based on *Purcell v. Gonzalez*, 549 U.S. 1 (2006).[7]  *See* App. Doc. 2 at 25–26. Simply put, Defendant argued that the "*Purcell* principle" should prevent this Court from implementing a remedial map ahead of the November elections to avoid potential chaos and voter confusion that may ensue.[8]  *See id.*

In support of its *Purcell* argument, Defendant made serious misrepresentations to the Eleventh Circuit regarding the feasibility of election administration.  First, with regard to the Court's Remedial Order, Defendant stated that "[w]ith the [Court's] Map, the County would have to start from scratch, adding further confusion and delay."  App. Doc. 12 at 9 n.3.  Not so. The Miami-Dade Board of Elections specified that it was prepared to use either the Court's Map, or the Remedial Plan, depending on the outcome of the motion to stay, and it was preparing to

---

[6] Defendant also filed an emergency motion to stay before this Court. *See* (ECF No. 97).  The Court denied the motion.  *See* (ECF Nos. 98, 101).

[7] References to filings at the Eleventh Circuit will be cited as "App. Doc. __."

[8] While Defendant invoked the *Purcell* principle, the Court notes that much of the delay was attributable to Defendant.  Though Defendant passed the Remedial Plan on June 14, 2023, it waited until June 30, 2023 to file the Notice with the Court.  *See* Notice.

implement both.  *See* Christina Vazquez and Chris Gothner, *City, 'Frustrated' Plaintiffs Await New Ruling After Court Pauses New Miami Commission Map,* WPLG Local 10 (updated Aug. 2, 2023, 8:14 AM), https://www.local10.com/news/local/2023/08/01/city-frustrated-plaintiffs-await-new-ruling-after-court-pauses-new-miami-commission-map/ ("The spokesperson [for the Miami-Dade Elections Department] explained, 'We did ask for the map so that we can do certain preliminary work with both sets of maps while waiting for an order from the Appellate Court.'").

Defendant next asserted that the Miami-Dade Board of Elections would need to engage in a "time-consuming" precinct redrawing process to implement the Court's Plan, *see* App. Doc. 12 at 9 n.3, but in doing so, Defendant did not inform the Eleventh Circuit that:  (1) the re-precincting process at that time had not taken into account either the Court's Plan or the Remedial Plan, or (2) the Miami-Dade Board of Elections indicated that they would implement either map without redrawing precincts at all.  *See Reprecincting*, MIAMI-DADE COUNTY, https://www.miamidade.gov/global/elections/reprecincting.page ("On June 21, 2023, the Miami-Dade Board of County Commissioners passed Resolution R-536-23, approving the reprecincting plan."); (ECF No. 24-30) (explaining that "any major or wholesale changes to district boundaries made after March[] will most likely have to wait until after the City of Miami's November 2023 municipal election.").

But, in perhaps the most misleading aspect of its motion to stay, Defendant invoked the *Purcell* principle to assert that the August 1, 2023 deadline was suddenly too close to the November election, *see* App. Doc. 2 at 25–26, even though Defendant repeatedly acknowledged that date as one by which a remedial plan would need to be in place.  *See* (ECF Nos. 24-30, 36 at 22, 73 at 139:12–15).  Indeed, the Miami-Dade Board of Elections, Defendant's agent, was the entity which informed the Court that a remedial map was required by August 1, 2023.  *See* (ECF

No. 24-30) ("As it relates to the conduct of the City of Miami November 2023 municipal election, any changes in the City of Miami Commission District boundaries which would be reflected in the November 2023 election must be provided through a final, non-appealable order setting those boundaries by August 1, 2023."). Based on the Parties understanding of the August 1, 2023, deadline, the Court worked backwards from that date to craft a briefing schedule to ensure there was time to implement a sufficient remedy. Injunction Order at 27 n.11 (citing *Jacksonville Branch of NAACP v. City of Jacksonville*, --- F. Supp. 3d ---, No. 3:22-CV-493-MMH-LLL, 2022 WL 7089087, at *4 (M.D. Fla. Oct. 12, 2022)). In fact, in its proposed scheduling order following the preliminary injunction, Defendant averred that it was amendable to Plaintiffs' proposal that the Court approve an interim remedial plan by August 1, 2023.[9]

Relying in part on Defendant's (mis)representations about the election's feasibility, a divided Eleventh Circuit panel granted the stay solely on *Purcell* grounds. *See Grace et. al v. City of Miami*, No. 23-12472, 2023 WL 528232 (11th Cir. 2023). There was no constitutional map in place to return to, and thus, the appeal solely focused on whether the Remedial Plan or the Court's Plan would govern in the interim remedial period.[10] Therefore, the Commission Districts were necessarily going to change; to the extent any hardship on election administration or voter confusion would result from the Court's Plan, so too would it result from the Remedial

---

[9] The Parties each submitted proposed scheduling orders to the Court. Both Plaintiffs' and Defendant's proposed scheduling orders are attached to this Order as Exhibits A and B, respectively. Therein, Defendant affirmatively indicates that it was amenable to Plaintiffs' proposed schedule if the City could not pass a remedial map and the Court would not stay the injunction. Despite such qualifiers, Defendant's language, at a minimum, implicitly admits that it understood August 1, 2023 as the date by which a map must be implemented.

[10] Defendant initially appealed the preliminary injunction, but voluntarily dismissed it. (ECF No. 88). Thus, the outcome of the appeal could not result in the return to the Enjoined Plan. The subject of this appeal was solely to determine whether the Remedial Plan (which the Court held unconstitutional) or the Court's Plan would take effect in the upcoming election.

Plan's implementation.  But the Eleventh Circuit concluded that *Purcell* could apply under these circumstances and granted the stay.  *See generally id.*; *but see* Injunction Order at 28 ("The Eleventh Circuit has found the *Purcell* principle to apply when an election is set to begin in less than four months, but not when the elections for a single county occurred five months after an injunction.  From the time of this [Injunction] Order, the November 2023 election is over four months away from May.  To find that this Order implicates the *Purcell* Principle would extend the eve of an election farther than the Eleventh Circuit has before.") (internal quotations and citations omitted).  While the Court does not second guess the Eleventh Circuit's decision, the Court notes that Defendant's *Purcell* arguments misrepresented key facts related to that analysis.

### D.  Supplemental Complaint

After the Eleventh Circuit granted Defendant's Emergency Motion to Stay, Plaintiffs filed the Supplemental Complaint.  *See* ("Supp. Compl.") (ECF No. 109).  Plaintiffs filed the Supplemental Complaint to "allege[] that the five Miami City Commission districts continue to be racially gerrymandered in violation of the Equal Protection Clause."  (ECF No. 105 at 1).  In doing so, Plaintiffs "include[] supplemental facts" relating to the Remedial Plan.  *Id.*  In response, Defendant filed the instant Motion to Dismiss.

### II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (internal citation and alterations omitted).  The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements.  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007).  A pleading that offers "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

## III.    DISCUSSION

As a threshold matter, the Court makes two findings which are vital to the adjudication of this Motion.  First, the Court construes the Supplemental Complaint in conjunction with the Amended Complaint and hereafter refers to the combination of the two pleadings as the "Operative Complaint."  Second, the Court will not consider evidence outside the Operative Complaint given that the instant Motion seeks dismissal based on Federal Rule of Procedure 12(b)(6).

Regarding how the Court should consider the Supplemental Complaint, Defendant argues that "Plaintiffs' Amended [sic] [Complaint] and Supplemental Complaint *cannot* be read together because they are contradictory and inconsistent in their allegations."  Reply at 2 (emphasis in original).  Defendant avers that because the Amended Complaint and Supplemental Complaint are allegedly inconsistent, the Court should dismiss both pleadings.  *See id.* at 6–7 (arguing that the two pleadings plead inconsistent allegations regarding packed districts and racial gerrymandering).  Plaintiffs respond that under Eleventh Circuit precedent, a supplemental

pleading is clearly treated as an update to the original complaint and urge the Court to consider the two pleadings jointly.  *See* Resp. at 2–3.  According to Plaintiffs, construing the pleadings together results in an operative pleading where the core allegations "are that the City enacted a racially gerrymandered map in [the Enjoined Plan] and then passed essentially 'the same map, for the same reasons, under a new name.'"  *Id.* at 3 (citations omitted).

A basic review of civil procedure forecloses Defendant's argument.  Federal Rule of Civil Procedure 15(d) provides:  "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  *Id.*  An amended pleading differs from a supplemental pleading because "[t]he former relate[s] to matters that occurred prior to the filing of the original pleading and entirely replace[s] the earlier pleading; the latter deal with events *subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings*."  6A C. Wright, A. Miller, & M. K. Kane, 4 *Federal Practice and Procedure* § 1504 at 177 (emphasis added).  Here, as Plaintiffs correctly argue, the Supplemental Complaint operates as an extension of the Amended Complaint.  The Court will therefore consider the factual allegations together from both pleadings when adjudicating the instant Motion.[11]

---

[11] Defendant's argument about factual inconsistencies between the two pleadings, namely, that Plaintiffs first accused Defendant of packing Hispanic voters into three districts but now alleges Defendant sought to "balance" these voter populations, does not undermine the requirement that the Court consider the two pleadings together as a matter of procedural law.  *See* Mot. at 5.  Rather, Defendant's argument is substantive in nature.  By asserting it, Defendant argues that Plaintiffs cannot plausibly state a claim given the alleged contradictions in their pleadings.  *See* Reply at 2.  Such an argument is not the basis for considering the two pleadings separately.  Moreover, the Court does not find that Plaintiffs' allegations are inconsistent because the Amended Complaint alleges that the City originally packed Hispanic voters into three districts, and then when creating the Remedial Plan, the City made race-based decisions to avoid consolidating Hispanic voters into one single district.  *See* Supp. Compl. ¶¶ 67, 115.

As to the second issue, the Court will not accept Defendant's invitation to examine evidence in the record contained outside the four corners of the Operative Complaint. Throughout its Motion, Defendant refers to Plaintiffs' proposed alternative maps and related materials to support its arguments. *See* Mot. at 3, 4, 8, 10, 11. Defendant argues that the Court should consider this record material when adjudicating the instant Motion. *See id.* at 2 (citing *Hodges v. Bezzeo*, 193 F. Supp. 2d 1279, 1281 (S.D. Fla. 2002)); Reply at 4 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997); *Kelly Auto., Inc. v. Wells Fargo Bank, N.A.*, No. 11-60910-CIV, 2011 WL 13217400, at *1 (S.D. Fla. Aug. 18, 2011), *report and recommendation adopted*, No. 11-60910-Civ, 2011 WL 13217401 (S.D. Fla. Nov. 4, 2011)).

A motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014). The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). "In general, if [the Court] considers materials outside of the complaint, a district court must convert the motion to dismiss into a summary judgment motion," which requires notice of the conversion to the parties. *SFM Holdings, Ltd. v. Banc of Am. Securities, LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). There is an exception to this general rule, however, which allows a district court to consider materials outside the complaint if those materials are "(1) central to plaintiff's claim, and (2) [the] authenticity [of such materials] [are] not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Maxcess, Inc. v. Lucent Tech. Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005).

Defendant avers that reference to these materials, particularly insofar as they may be used to compare Plaintiffs' proposed alternative maps to the Remedial Plan, are central to Plaintiffs' claim. *See* Reply at 3. Defendant's attempt to redirect the Court's focus to Plaintiffs' proposed maps demonstrates a fundamental misunderstanding of this Action. The Operative Complaint alleges that all five of Miami's City Commission Districts are racially gerrymandered in violation of the Fourteenth Amendment in the Enjoined Plan, and the Remedial Plan does not remedy the unconstitutional racial gerrymandering. *See generally* Am. Compl.; Supp. Compl. How can it be that Plaintiffs' proposed plans from the remedial stage of this Action, which are not functional, are central to the claim contesting the constitutionality of the Enjoined and Remedial Plans? Contrary to Defendant's assertions, nowhere in the Operative Complaint do Plaintiffs rely on their proposed alternative maps in support of their claims that the Enjoined Plan or Remedial Plan are racially gerrymandered; Plaintiffs mention their alternative maps in passing to demonstrate why De Grandy and the City Commissioners did not approve of them in the remedial process. *See* Supp. Compl. ¶¶ 34, 35, 37, 96–98, 116–17, 167. Whether Plaintiffs' proposed maps (which do not form a basis of their claim) could pass constitutional muster has no bearing on whether the Enjoined Plan or Remedial Plan can do the same.

Asking the Court to consider Plaintiffs' alternative maps when adjudicating this Motion is central to Defendant's misplaced argument that it parrots throughout: if the Remedial Plan is similar to Plaintiffs' proposed alternative maps, then "[Plaintiffs'] plans demonstrate that the City did not racially gerrymander any districts." Reply at 4. But by advancing this argument, Defendant turns this Action on its head. It is not Plaintiffs' proposed maps from the remedial stage of this case that are on trial—the inquiry is solely focused on the legal sufficiency of Plaintiffs' allegations regarding the Enjoined Plan and the Remedial Plan. At this stage, the

Court will not accept Defendant's invitation to consider its factual arguments and evidence involving Plaintiffs' proposed alternative maps—these are materials outside the motion to dismiss record, and evaluating those materials would be wholly inappropriate at this stage in the proceeding.

### A.  **Plaintiffs Have Standing**

Defendant reasserts its argument that Plaintiffs do not have Article III standing.  *See* Mot. at 14.  Before filing this Motion, Defendant filed a prior motion to dismiss alleging, among other things, that Plaintiffs lacked standing, *see* (ECF No. 34), which the Court subsequently denied as moot.  (ECF No. 110).  Though it does not restate the allegations in this Motion, Defendant seeks to incorporate the standing argument from its prior motion to dismiss here.  *See* Mot. at 14; *see also* Reply at 8–9 (reiterating standing arguments that were brought in the prior motion to dismiss).

Defendant conveniently omits that the Court has already adjudicated the issue of whether Plaintiffs have standing.  *See* (ECF No. 60 at 4–7).  In the briefing for the preliminary injunction motion, Defendant raised the same standing argument.  *See* (ECF No. 36 at 20–21).  The Court gave extended consideration to the argument and rejected it.  *See* (ECF No. 60 at 4–7).  Unhappy with the result, Defendant raises the argument again, even though there are no new Plaintiffs and no new facts that would alter the standing analysis.  *See* Mot. at 14; Reply at 8–9.  The Court incorporates its reasoning from the Injunction Order and will not expend its resources repeating to Defendant what it has already made clear.  Plaintiffs have standing.

### B.  **The Action is Not Moot**

Defendant also reasserts the stale argument that the instant Action is moot.  *See* Mot. at 15.  According to Defendant, the Court should first dismiss only the Supplemental Complaint.

*See id.*  Then, with only the Amended Complaint remaining, Defendant argues that "Plaintiffs cannot proceed solely on a challenge of the Enjoined Plan when it has been superseded by the [Remedial] Plan."  *Id.*  Defendant argues because the remedial stage of this case has ended, Plaintiffs cannot proceed once the Supplemental Complaint has been dismissed.  *See id.*  In response, Plaintiffs aver that "[n]early every sentence of [Defendant's] mootness argument is legally incorrect" because (1) the Court must consider the Amended Complaint jointly with the Supplemental Complaint, meaning the Court cannot dismiss only the latter, and (2) the Court has already ruled that Defendant's mootness argument is incorrect.  *See* Resp. at 11–12.

As the Court explained above, the Supplemental Complaint updates the Amended Complaint—it does not amend or supersede it.  6A C. Wright, A. Miller, & M. K. Kane, 4 *Federal Practice and Procedure* § 1504 at 177.  Thus, the scenario that Defendant identifies where the Court dismisses the Supplemental Complaint but not the Amended Complaint cannot exist—either the two pleadings considered together are dismissed, or neither are.  Procedurally, there is no instance where the Court would dismiss only the Supplemental Complaint but leave the Amended Complaint intact.  Therefore, to the extent Defendant's mootness argument hinges on such a scenario, its argument is unavailing.

But as a substantive matter, Defendant's mootness argument is incorrect.  *See* Section I.b.i., *supra*.  Defendant has now raised this argument *four times*.  (ECF Nos. 80, 86, 104, 117).  Defendant's persistence in raising this argument does not suddenly alter the Court's analysis— the Court has already rejected the argument and clearly explained its rationale.  *See* (ECF Nos. 91, 112 at 2 n.2).  Relitigating and rejecting the same argument is hardly an efficient use of

17

scarce judicial resources, and the Court will not entertain Defendant's argument again.  The Remedial Plan does not render this Action Moot.[12]

### C.  Plaintiffs State a Claim for Relief

Finally, the Court turns to the crux of the Motion:  whether Plaintiffs' Operative Complaint states a claim upon which relief may be granted.  The Operative Complaint's sole claim is that, in violation of the Fourteenth Amendment, the City Commission Districts were racially gerrymandered in the Enjoined Plan and continue to be racially gerrymandered in the Remedial Plan.  *See generally* Am. Compl.; Supp. Compl.  For the following reasons, the Court finds that Plaintiffs have made a showing that their claim is at least plausible.  Thus, the Court denies Defendant's Motion.

A racial gerrymandering claim under the Fourteenth Amendment requires the Court to undertake "a two-step analysis."  *Cooper v. Harris*, 581 U.S. 285, 291 (2017).  First, Plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995).  Then, if Plaintiffs successfully demonstrate that race was the predominant factor used in district line-drawing, the burden shifts to Defendant to demonstrate that its race-based sorting of voters withstands strict scrutiny, that is, Defendant must show that consideration of race when designing the Commission Districts constitutes a compelling interest that is narrowly tailored to that end.  *See Cooper*, 581 U.S. at 292 (citing *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 193 (2017)).

---

[12] Plaintiffs identify that the Operative Complaint seeks recovery for Plaintiffs' "injury flowing from the [Enjoined Plan], through, among other relief, nominal damages.  That nominal damages claim would merit a full trial on the merits even if Plaintiffs sued only to redress injuries relating to the Enjoined Plan."  Resp. at 12 (citing *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021)).  The Court agrees.  Notwithstanding Defendant's meritless argument above, that Plaintiffs seek damages in addition to other relief defeats Defendant's mootness argument.

In the Motion, Defendant separates its arguments into two segments:  one focused on Districts 1 through 4, and one focused on District 5.  The Court addresses each in turn.

### i.       Districts 1–4.

Defendant argues that Plaintiffs' claim fails for two reasons:  (1) the districts "reflect the demographic reality" of the City and "are not racial gerrymanders, regardless of what the legislators may say;" and (2) because the Remedial Plan is nearly identical to the Enjoined Plan, the Remedial Plan "did not, in its own right, place a significant number of voters for racial reasons."  Mot. at 11–12.  Neither argument warrants dismissal.

### a.   Plaintiffs May Rely on Direct Evidence of Legislative Intent

As to Defendant's first argument, it asserts that "[t]he test for racial gerrymandering is not merely whether race was discussed, but whether it actually resulted in a racial gerrymander of a significant number of voters."[13]  *Id.* at 11.  To Defendant, this case is unprecedented because "[i]t confronts the question of whether a racial gerrymander[ring] case may proceed based upon alleged motives and statements of legislators, when there is no actual gerrymandering . . . [that is] inconsistent with the City's actual demographics."  *Id.* at 14.  First, Defendant contests whether the Commissioners intended to racially gerrymander, instead suggesting that they were merely aware "of these racial demographic realities" when engaging in districting decisions.  *Id.* at 13.  Next, to the extent the Court finds that Plaintiff plausibly alleges it was the Commissioners' intent to racially gerrymander, Defendant argues that the Court should not consider such statements of intent as sufficient to support a racial gerrymandering claim because

---

[13] In support of its argument, Defendant offers the following illustration:  "[t]he priests of an ancient religion may say that they have to perform a yearly ritual to make the sun rise, but just because they are claiming credit for it, does not mean that they are making the sun rise."  Mot. at 11.  While no doubt a creative analogue, Defendant's illustration is inapplicable when, as discussed below, Plaintiffs allege that City Commissioners explicitly instructed the mapmaking consultant to draw districts to racially sort citizens, and in turn, the consultant obliged.

"the Districts simply reflect the demographic reality [of the City] . . . regardless of what the legislators may say." *Id.* at 11.   In sum, Defendant does not believe that race could have predominated in the design of Districts 1–4 because, despite the Commissioners' stated intent, the Enjoined Plan and the Remedial Plan are consistent with Miami's racial demographics.

Defendant's argument ignores both decades of precedent and the substance of the Operative Complaint.  Courts have long held that, to demonstrate racial predominance, a plaintiff may show "circumstantial evidence of a district's shape and demographics or more *direct evidence* going to legislative purpose." *Miller*, 515 U.S. at 916 (emphasis added); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Hunt v. Cromartie,* 526 U.S. 541, 547 (1999); *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 905 (1996).  The notion that a racial gerrymandering claim "may proceed based upon alleged motives and statements of legislators" is hardly a novel concept, despite Defendant's argument to the contrary.  *See* Mot. at 14.  Accepting Defendant's argument would yield the perverse result that, when faced with a racial gerrymandering claim, the Court should not consider the stated intent of the relevant legislators during the districting process.  The Court makes no such finding here.

Just as important, Defendant's argument misrepresents the allegations in the Operative Complaint.  While Defendant is correct that a legislature's mere awareness of race in the districting process does not give rise to a racial gerrymandering claim, that is not what the Operative Complaint alleges.  *See id.* at 13–14 (citing *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 646 (1993)).   The Operative Complaint contains extensive allegations that multiple Commissioners, over the course of six public meetings, expressed their intent that Districts 1, 3 and 4 be designed such that they would remain "Hispanic districts," and that District 2 would remain an "Anglo district."  *See* (ECF Nos. 23 ¶¶ 188–350); *see, e.g., id.* ¶ 197 ("Again on

February 7, Carollo explained his 'goals from day one:' 'to have guaranteed Anglo representation, and to have three districts that were Hispanics,' concluding 'these are my intentions here today.'"); ¶ 199 ("Diaz de la Portilla, for example, explained on March 11, 'our goal here is to have an African American district, for a lack of a better term, a white district, . . . and three Hispanic districts.'"); ¶ 200 ("In response to public criticism of gerrymandering, Reyes was blunt: 'Yes, we are gerrymandering to preserve those seats' – to preserve and enhance the maximal division of races into separate districts as much as possible."); ¶ 207 ("At the February 7 meeting, Carollo shared that originally, District 2 'was gerrymandered—but it was a legal gerrymander so that you would have an Anglo elected commissioner'").  Those quotes are just a few of many examples—the Operative Complaint is rife with allegations that the Commissioners intentionally gerrymandered each City Commission District and instructed De Grandy to racially sort Miamians in the Enjoined Plan.  *See id.* ¶¶ 86–101, 104–118, 133–140, 148–161, 188–357 (discussing direct and circumstantial evidence, such as the shapes of district borders and the splitting up of traditional neighborhoods, each indicating that race was the predominant factor in districting decisions).  Moreover, the Operative Complaint alleges that the Remedial Plan was implemented to preserve the same race-based sorting from the Enjoined Plan.  *See* Supp Compl. ¶¶ 26–31, 55–63, 134–59.  Thus, the Operative Complaint clearly alleges that the legislators were not just aware of race when drawing the districts—they designed the districts with the intent to racially gerrymander them.  Defendant's attempt to suggest the Operative Complaint only alleges that City Commissioners were *aware* of race when drawing the districts, when the Operative Complaint clearly alleges it was the city Commissioners' *intent* to racially gerrymander the districts, is a gross mischaracterization.

And lastly, Defendant's assertion that the districts are not racially gerrymandered because they reflect the demographic reality of the city is inapposite.  Plaintiffs' claim alleges that, as drawn, the Enjoined Plan and Remedial Plan were designed "with the express intention of segregating people on the basis of race."  Resp. at 8.  Plaintiffs are not claiming that no similar map could ever be constitutionally drawn, rather, they are simply stating that Defendant cannot draw a map with the deliberate intent to racially gerrymander the Commission Districts.  *See id.* In any event, the Court need not evaluate other alternative maps at the motion to dismiss stage.[14] Accordingly, Defendant's argument regarding the city's demographics is unavailing.

In short, the Court finds that Plaintiffs have made a plausible showing that race was the predominant factor in the design of Districts 1–4.  Under the two-step analysis of a racial gerrymandering claim, that is all Plaintiffs are required to show.[15]  *Cooper*, 581 U.S. at 291 (holding that Plaintiffs must make a showing that race was the predominant factor in the districting decision, and upon making that showing, the burden shifts to the defendant to demonstrate that its race-based sorting survives strict scrutiny).

### b.  Defendant Improperly Compares Voters Moved Between the Enjoined Plan and the Remedial Plan

Defendant's second argument regarding Districts 1–4 relates to the concept that Plaintiffs must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  *Miller*, 515 U.S. at 916. Defendant argues that because Plaintiffs allege the New Plan is nearly identical to the Enjoined

---

[14] Notably, the Court has already found that an alternative map could be drawn.  *See* Order at 40–49 (holding Plaintiffs' P4 was a constitutional remedial map).

[15] Though the Court need not address it at this juncture, Plaintiffs also allege that the districts do not survive strict scrutiny.  *See* Supp. Compl. ¶ 179.

Plan, the Remedial Plan cannot be said to have moved a significant number of people for racial reasons.  *See* Mot. at 12.  According to Defendant, "[t]he [Remedial] Plan cannot have failed to [sic] [have appreciably] change[d] from the Enjoined Plan, and still be a racial gerrymander."  *Id.* at 12–13.  Plaintiffs respond that Defendant misunderstands their claim and erroneously focuses its argument on the movement of individuals between the Enjoined and Remedial Plans.  *See* Resp. at 8.

Plaintiffs are correct.  At risk of being repetitive, the Court reiterates that Plaintiffs are claiming that in both the Enjoined and Remedial Plan, "every Miamian was placed within or without their City Commission district based on their race."[16]  *Id.* (emphasis omitted).  The analysis is therefore focused on whether the districting process resulting in the Enjoined Plan was a racial gerrymander, and subsequently, whether the Remedial Plan perpetuated the alleged racial gerrymandering.  Defendant's argument about the differences between the Enjoined and Remedial Plan is therefore improper and misunderstands the required analysis in this case.  Defendant's argument does not disturb the Court's prior analysis that Plaintiffs made a plausible showing that race was the predominant factor in the design of Districts 1–4.

Defendant's Motion is denied insofar as it seeks dismissal of Plaintiffs' claim as to Districts 1–4.

---

[16] In the Reply, Defendant argues that dismissal is warranted because the Supreme Court "expressly rejected" claims where plaintiffs proffered a racial gerrymandering claim as applied to the whole state.  Reply at 8 (quoting *Ala. Legis. Black Caucus v. Ala.* ("*ALBC I*"), 575 U.S. 254, 262 (2015)).  An accurate reading of that case explains that racial gerrymandering claims "appl[y] to the boundaries of individual districts. . . We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more specific electoral districts."  *ALBC I*, 575 U.S. at 262–63 (emphasis omitted).  That passage precisely describes Plaintiffs' claims in this case.  Plaintiffs are not challenging Miami's districts as an "undifferentiated whole," but rather, they challenge each district individually.  *See generally* Am. Compl.; Supp. Compl.  Indeed, the Court has rejected this exact argument already.  For an extended discussion on the topic, see Injunction Order at 6.

## ii.    District 5

In the Operative Complaint, Plaintiffs allege that race was the predominant factor in designing District 5.  Am. Compl. ¶ 217.  Plaintiffs also allege that because race predominated in District 5's design, the burden shifts to Defendant to demonstrate that its use of racial considerations withstands strict scrutiny.  Supp. Compl. ¶ 160.  Subsequently, Plaintiffs allege that though Defendant may be able to demonstrate that it considered race when designing District 5 to comply with the Voting Rights Act ("VRA"), and that doing so is a compelling government interest, Defendant is unable to demonstrate that its use of race to design District 5 was narrowly tailored to achieve VRA compliance.  *See id.* ¶¶ 160–173.

In the instant Motion, Defendant does not contest that race predominated in the design of District 5, but instead, focuses its argument entirely on whether District 5 is narrowly tailored to achieve VRA compliance.  *See* Mot. at 7–10.  For example, Defendant argues that District 5's Black Voting Age Population "was set at just over 50%," one of Plaintiffs' proposed plans had similar demographics in their version of District 5, and that "[a]s long as there is a basis for a good faith reason to believe the district is narrowly tailored, courts should not second guess the decision."[17]  *See id.* at 8–9 (citing *Bethune-Hill*, 580 U.S. at 196).  At no point does Defendant dispute that race predominated in the design of District 5.

---

[17] Defendant spends much time discussing the "good-faith safe harbor" from *Bethune-Hill*.  *See* Mot. at 8–9.  Defendant frames the issue by stating that District 5 was "objectively drawn narrowly," and thus, the Court must determine whether it may hold that the district was not narrowly tailored "on the grounds that the legislative body did not have a good enough reason to believe it."  *Id.* at 6.  Then, Defendant asserts that, under *Bethune-Hill*, "[a]s long as there is a basis for a good faith reason to believe that the district is narrowly tailored, courts should not second guess that decision."  *Id.* at 9.  The Court expresses no opinion on what it means for a district to be "objectively drawn narrowly," nor does it opine on the correctness of how Defendant has framed the narrow tailoring issue.  For the reasons articulated above, the Court need not address factual arguments about narrow tailoring at this time.

As noted above, Plaintiffs' burden is to demonstrate only that race-predominated in the design of District 5. *See Cooper*, 581 U.S. at 291. Once Plaintiffs have made such a showing, the burden shifts to Defendant to demonstrate that its use of race in designing the district satisfies strict scrutiny. *See id.* Here, Plaintiffs have alleged, and Defendant has conceded, that race predominated in District 5. On a motion to dismiss, that is all Plaintiffs must demonstrate. As a matter of procedure, Defendant's arguments regarding whether District 5 is narrowly tailored is legally irrelevant at this juncture. The inquiry could end there.

Even so, Plaintiffs have sufficiently alleged that Defendant's attempt to comply with the VRA when designing District 5 was not narrowly tailored. *See* Supp. Compl ¶¶ 160–173. Accepting the allegations in the Operative Complaint as true, as the Court must on a motion to dismiss, Plaintiffs have plausibly stated a claim that District 5 was racially gerrymandered in violation of the Fourteenth Amendment. To consider Defendant's argument about narrow tailoring would necessarily entail considering a variety of evidence regarding why the City Commission chose to design District 5 in the manner that they did, and whether such evidence comports with *Bethune-Hill*. While weighing such evidence against Plaintiffs' allegations would be appropriate at a different stage of the case, such as during summary judgment, it is inappropriate on a motion to dismiss.

Accordingly, the Court finds that Plaintiffs have sufficiently alleged that race was the predominant factor in District 5 and thus, the Motion is denied as to this District as well.

### iii.      *Plaintiffs Need Not Plead a Lack of Compactness*

Though the Court has already found that Plaintiffs have plausibly stated a claim that each of the five City Commission Districts were racially gerrymandered in violation of the Fourteenth Amendment, the Court finds it appropriate to separately address an additional argument that

Defendant advances throughout its Motion.  Specifically, Defendant argues that Plaintiffs do not allege a lack of compactness with respect to Districts 1, 3, 4, and 5.  *See* Mot. at 10–11. Defendant further claims that the Remedial Plan's districts are relatively compact "and do not have the sort of gerrymandered shapes present in gerrymandering cases." *Id.* at 10.  Then, after improperly comparing one of Plaintiffs' proposed alternative map's compactness (which the Court explained above it will not consider) to the Remedial Plan, Defendant asserts that "[s]ince Plaintiffs fail to allege facts sufficient to establish a lack of compactness, their Amended and Supplemental Complaints should be dismissed."  Reply at 10.

Defendant's argument reflects a fundamental misunderstanding of racial gerrymandering claims.  To sustain this claim, "[t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor" in designing the districts.  *Miller*, 515 U.S. at 916. "That entails demonstrating that the legislature subordinated other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to racial considerations." *Cooper*, 581 U.S. at 291 (internal quotations omitted).  But the case law does not indicate that a plaintiff must demonstrate that a challenged plan departs from all traditional redistricting criteria.  *See Bethune-Hill*, 580 U.S. at 189 (holding "race may predominate even when a plan respects traditional principles") (citations omitted).  Indeed, the Supreme Court has held that "a conflict or inconsistency between the [challenged] plan and traditional redistricting criteria [like compactness] is not a threshold requirement or mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Id.*

That is especially true in instances where, as here, Plaintiffs are alleging both circumstantial and direct evidence of racial gerrymandering.  *See generally* Am. Compl.; Supp.

Compl.  The argument that dismissal is appropriate because Plaintiffs failed to allege that some districts were not compact utterly misconstrues what Plaintiffs are required to plead.

## IV.     CONCLUSION

Defendant argues that this Action "bring[s] a racial gerrymandering case without any actual, *significant* racial gerrymandering."  Mot. at 10 (emphasis added).  Notwithstanding that the Court has already found that Plaintiffs have plausibly stated a claim that every Miamian was subject to a racial gerrymander, the Court pauses to acknowledge Defendant's assertion that its alleged racial gerrymandering was *insignificant.*

Whether Defendant believes that the allegations against it are serious is irrelevant; the Supreme Court has clearly delineated the harms that victims of racial gerrymandering suffer.  In *Miller*, the Supreme Court explained:

> When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests and will prefer the same candidates at the polls. . . Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to criterion barred to the Government by history and the Constitution.

*Miller*, 515 U.S. at 911–12 (internal citations and quotations omitted).

This was not the first time the Supreme Court expressed its profound distaste for racial classifications when making districting decisions.  In *Shaw I*, the Court explained:

> Racial classifications with respect to voting carry particular dangers.  Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.  It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

*Shaw I*, 509 U.S. at 657 (1993).

Thus, Defendant's blasé remarks about the seriousness (or lack thereof) of the alleged gerrymandering miss the mark.  Plaintiffs' allegations about Defendant's conduct, if proven, offend fundamental constitutional rights to which every citizen is entitled.   Racial gerrymandering is not analyzed on a spectrum of varying magnitude where a defendant may argue that it sorted voters on race, but the resulting harm was not that serious.  If Miami's citizens were racially gerrymandered, Defendant may not escape liability by insisting that its constitutional violation was not as bad as other, more blatant instances where voters have been segregated by race.  Any proven case of racial gerrymandering is unequivocally serious.

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant's Motion (ECF No. 117) is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this 17th  day of November 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record