UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRACH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; and ALEXANDER
CONTRERAS, and STEVEN MIRO,

        Plaintiffs,

v.

CITY OF MIAMI,

        Defendant.
_____/

**DEFENDANT'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rules 56.1 and 7.1, Defendant, City of Miami (the "City") respectfully submits this reply memorandum in support of its motion for final summary final judgment against Plaintiffs, Grace, Inc. ("Grace"), Engage Miami, Inc. ("Engage Miami"), South Dade Branch Of The NAACP ("South Dade NAACP"), Miami-Dade Branch Of The NAACP ("Miami-Dade NAACP"), Clarice Cooper, Yanelis Valdes, Jared Johnson, *Alexandra* Contreras and Steven Miro (collectively, the "Plaintiffs") (ECF 131) and in reply to Plaintiffs' response memorandum of law (ECF 135).

**I.    Standing**

As a preliminary matter, throughout their Statement of Facts, Plaintiffs cite prior affidavits, the supplemental complaint, or other documents to counter the testimony of their Rule 30(b)(6) designated corporate representatives. *See* ECF 134, ¶ 11, 13, 17-18, 44, 53-54, 59, 62, 67, 70-71,

and 81-83.  The Supplemental Complaint is not evidence, and the prior declarations address a redistricting plan that is no longer in effect.  This Court should also decline to consider such proffered materials because the purpose of the Rule 30(b)(6) representative is to solicit binding testimony from the corporation about matters which the corporation has reasonable access.  *See* Fed. R. Civ. P. R. 30(b)(6); *see also Rainey v. American Forest and Paper Ass'n, Inc.*, 26 F. Supp. 2d 82 (D.D.C. 1998); *In re Seven Stars on Hudson Corp.*, 637 B.R. 180 (Bankr. S.D. Fla. Jan. 28, 2022) *affirmed*, 2022 WL 1006439 (S.D. Fla. Oct. 17, 2022); *Guangzhou v. Yuchen Tradic Co. v. DBest Prods. Inc.*, 2023 WL 2626373 (C.D. Ca. Feb. 24, 2023); *but see A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630 (7th Cir. 2001); and *In re 3M Combat Arms Earplug Products Liability Litigation*, 2021 WL 918214 (N.D. Fla. March 10, 2021).

### A. Associational Plaintiffs

None of the Associational Plaintiffs have standing.  Plaintiffs assert there is "no dispute" that Engage Miami has members in every district, but that is inaccurate.  As set forth in the statement of facts, there is no support for the assertion that Engage Miami has members in any district.  Compare ECF 130 to ECF 134 ¶¶ 72-7.  Under *Celotex*, it is Plaintiffs' obligation to come forward with evidence.  RCF 131 p.3.  In response, Engage Miami offers merely an unauthenticated list, without an affidavit.  *Compare* ECF 134 *with* Reply SOF ¶ 81.[1]  Similarly, Grace, which is composed of organizations,[2] in discovery could not establish that it had any individual members in any district.  Compare ECF 130 to ECF 134 to Reply SOF ¶¶ 63-71.

---

[1] The Reply Statement of Facts (Reply SOF) is filed contemporaneously herewith.

[2] Grace does not register individuals and asserted that they consider anyone who shows up at a meeting to be "a member."  Reply SOF ¶ 64.  Cooper claimed to be a member, but as set forth

Neither the South Dade NAACP nor the Miami-Dade NAACP could identify a single member in any district. *Compare* ECF 130 to ECF 134 *with* Reply SOF ¶¶ 51, 55-56. Their representatives claimed to know of members in various districts, but they admitted that they did not verify that information. *Compare* ECF 130 to ECF 134 *with* Reply SOF ¶¶ 50-51, 55-56. In response, they assert that they have objected to revealing this information. Compare ECF 134 to Reply SOF ¶¶ 82-83. NAACP Plaintiffs admit that they have never identified a single member in the City, refused discovery into their membership, and have never produced any information establishing their standing. The Eleventh Circuit held that where every one of the 20,000 members in the state faced a potential future harm, the organization need not name their names, but where plaintiff organizations allege their members suffered a harm, they are still required to identify at least one member who allegedly suffered it. *Fla State Conf. of NAACP Branches v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). Plaintiffs claim to have been racially gerrymandered and therefore must identify someone who was allegedly gerrymandered. *Id.* They have failed to do so.

### B. Individual Plaintiffs

As set forth in the Motion for Summary Judgment and Statement of Facts (ECF 131 pp.11-14 and ECF 130 ¶¶ 8-48), none of the Individual Plaintiffs' depositions could support an injury in fact. Rather than specifically respond and refute the foregoing, Plaintiff instead asserts that each of the Individual Plaintiffs resides in a district in the City and that is sufficient for standing.[3] For standing they must have an injury. Plaintiffs plead that they were injured because they perceive that they were racially sorted and placed into a particular district based upon their race sending the

---

above that simply means that Cooper went to a meeting.

[3] Contreras moved out of the City. ECF 130 ¶ 130-33. Her alleged harm is no longer redressable.

message that, if they are in the majority, they were placed based on their race, or, if they are in the minority, that their commissioner's job is not to represent them. ECF 23 ¶¶ 30-31. But the individual plaintiffs refuted these allegations. As set forth in the statement of facts, when asked specific questions about why they contend that they are in a certain district or what they objected to in the redistricting, they refuted the pleadings. For example, when asked specific questions, they refuted <u>racial</u> gerrymandering of their district. Compare ECF 130 to ECF 134 to Reply SOF ¶ 11 (Cooper believes District 2 was gerrymandered to reduce Coconut Grove's influence); ¶ 18 (Miro believes that his district was gerrymandered to concentrate over 65 voters who live in affordable housing, not Hispanics); ¶ 23-25 (Johnson would simply rather live in District 2); ¶ 36-41 (Contreras could not identify any racial gerrymander in District 4 which is majority Hispanic under all Plaintiff and City plans); ¶ 44-47 (Valdes had no race based objections to her District). They do not feel inadequately represented by their respective Commissioner for race-based reasons. *Id*. The Individual Plaintiffs have not established that any of them have been harmed.

## II.     Redressability

Plaintiffs assert that the City has an "obsession" with the racial demographics of the City. It is not an obsession; racial demographics are at the core of this case and are central to Plaintiffs' pleadings. The Amended Complaint goes through the racial demographics of every potential iteration of the redistricting plans from 2013 through adoption of the plan enjoined by this Court (ECF 23 ¶¶ 76-78, 103, 121-29, 167-68, 218-19, 226, 231, 240-43, 246, 262, 285-89, 325-26, 330, 334-337, 340, 349). In that plan, Plaintiffs accused the City of "packing certain districts with as many Hispanic and Black residents as possible" predominantly in order to maintain "racial purity." ECF 23 ¶ 2. They accused the City of "racial sorting" with the goal of "isolating Black from Hispanic from Anglo residents as much as possible into separate districts." ECF 23 ¶ 9, 12, 18.

They claimed the City was "packing" Black residents into District 5 and Hispanic residents into Districts 1, 3 and 4.  ECF 23 ¶¶ 2, 15, 202, 277, 290, 308, 327, 331, 341, & § IV(C) at p.39.  The Supplemental Complaint similarly focuses on racial demographics. ECF 109 ¶¶ 67-69, 73, 84-85, 102, 111, 117, 126, 133, 146, 149, 153, 171).  It accuses the City's current plan of maintaining the racial sorting of the enjoined plan. ECF 109 ¶¶ 1, 10, 65, 160.  In the response memorandum, Plaintiffs reiterate that the harm is being racially sorted into a racially gerrymandered district. ECF 135 pp.1-2.  If the City was not racially sorting, then there is no case.  And if the so-called racial sorting simply reflects the demographics of the City under any potential plan, then Plaintiffs' alleged harm is not redressable.

In the Motion for Summary Judgment, the City pointed to Plaintiffs' own maps to show that all preserve a Black Voting Rights Act ("VRA") District 5, and because the City of Miami is 70% Hispanic, after drawing District 5, it is mathematically impossible to draw the rest of the map without at least three majority Hispanic Districts.  Because the largest White population lives near the coast, the coastal district will always have the largest concentration of White (or "Anglo") voters.[4]  Plaintiffs do not dispute the foregoing.  Instead, they refer to the Order on the Motion to Dismiss to argue that the City's actual demographics and Plaintiffs own plans are irrelevant.  This Court stated that they were irrelevant at the motion to dismiss stage and declined to look at materials outside the pleadings. ECF 132 pp.14-16.  At the summary judgment stage, however,

---

[4] Plaintiffs state that in one of their four maps, Plan 1, District 2 is actually a majority Hispanic District not a "plurality" district. ECF 135 p.8 n5. That is accurate.  The City was referring to the so-called Anglo district.  District 2 in their Plan 1 still has the largest concentration of White population. ECF 130 ¶ 7.

5

Plaintiffs can no longer ignore their own maps. They are evidence that the alleged harm is not redressable. Under *Celotex*, Plaintiffs had to show evidence of redressability. The failed to do so.

In the pleadings, Plaintiffs claimed that their harm was being racially gerrymandered which signals to the elected officials that they represent a particular racial group. If the City's Redistricting was so nefarious as Plaintiffs' assert, one would expect any remedial plan would have significantly different demographics with very different racial performance—but none of the plans do. Swapping Hispanic voters between the three super majority Hispanic districts does not redress that alleged harm. Their maps establish that the City was not actually racially sorted. The City's map simply reflects the demographic reality. Plaintiffs cannot procced with a case of racial gerrymandering where there is no actual gerrymander, and where they are essentially seeking to simply shuffle the Hispanic population between the three supermajority Hispanic districts. What they are seeking makes this case unique.

Plaintiffs cite to the record in *Jacksonville Branch of NAACP v. City of Jacksonville,* 635 F. Supp. 3d 1229, 1247 (M.D. Fla. 2022) (And ECF 34-18 and 92-1 thereof) ("*Jacksonville*"), as support for the argument that their harms are still redressable even if they are simply swapping around the Hispanic population. They ignore what *Jacksonville* was about: racial packing of Black voters to diminish their influence in other districts.

> Plaintiffs contend that it was and that the result of focusing on race is that Black voters are packed into Districts 7-10, pulled from Districts 2, 12, and 14, diluting the Black vote in these latter Districts, and diminishing the efficacy of the elected officials' ability to provide meaningful representation to the geographically disparate population in all of the Challenged Districts.

*Jacksonville Branch of NAACP v. City of Jacksonville*, Case No. 3:22-cv-493-MMH-LLL, 2022 WL 7089087, *3 (Oct. 12, 2022, U.S. Dist. Ct. M.D. Fla.). "[T]he Court found compelling evidence that the district lines were drawn so as to artificially pack Black voters into Districts 7,

6

8, 9, and 10 (the Packed Districts), thereby stripping them from the surrounding Districts 2, 12, and 14 (the Stripped Districts). *Jacksonville,* ECF 101 p.4. The harm to remediate was the packing of Black voters in some districts with the consequent dilution of their influence in other districts. *Id*. p.27-28, 36-38. The plaintiffs' plan in *Jacksonville* fixed that harm. *Id*. p.40. While *Jacksonville*, like this case, was not an intentional vote dilution case, that only meant that the plaintiffs did not have to prove invidious intent. *Id*. at n.62. Nevertheless, the Court there was addressing the vote dilution harm caused by redistricting. It was not merely moving Black voters between the packed districts to achieve the same outcome.

*Bethune-Hill v. Va. State Bd. of Elections,* 368 F. Supp. 3d 872, 883, 885 (E.D. Va. 2019) was a Voting Rights Act ("VRA") case where the Black Voting Age Population in the VRA districts was set artificially high (*Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017)) and the Supreme Court remanded for the trial court to evaluate those districts. As Plaintiffs show, the court did reduce the percentages in them; it did not simply swap the Black voters between those districts. ECF 135 p.8. Further, as Plaintiff's citation on page 8 of their memorandum shows, even when reset, they were still higher than the bare 50.3% set in District 5 here. The court in *Bethune-Hill* did not set those Black voting age population below 50%. Similarly, the *Perez* case cited by Plaintiffs was a VRA case that involved vote dilution that was cured by the Court.

Here, there is no racial packing of the districts and there is no dilution of any group's influence in any district. If the alleged gerrymander was racial sorting, then Plaintiffs must show it is possible to create a plan that does not result in the same alleged racial sort. As their plans show, that is impossible. They do not even contend otherwise.

### III.  CONCLUSION

For each of the foregoing reasons, the City respectfully requests that the Court grant this motion on Plaintiffs' sole claim in their Amended Complaint.

Respectfully submitted,

GRAYROBINSON, P.A.

By: *s/ George T. Levesque*
GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887


CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

8

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                              */s/* George T. Levesque
                                              Counsel for City of Miami