## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:22-cv-24066-KMM

GRACE, INC.; ENGAGE MIAMI, INC.;
SOUTH DADE BRANCH OF THE NAACP;
MIAMI-DADE BRANCH OF THE NAACP;
CLARICE COOPER; YANELIS VALDES;
JARED JOHNSON; ALEXANDRA
CONTRERAS; and STEVEN MIRO,

     *Plaintiffs*,

v.

CITY OF MIAMI,

     *Defendant*.

_____/

## SECOND AMENDED COMPLAINT

1.     This action challenges the five Miami City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. But Miami's is not merely a run-of-the-mill racial gerrymander in which the majority seeks to diminish minority voters' influence and power. Rather, it is the product of a calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose of maintaining racially segregated districts. As Commissioner Alex Díaz de la Portilla put it: "Our goal here is to have an African American district, . . . a white district, . . . and three Hispanic districts."

2.     Indeed, as detailed below, race-based considerations were not simply *a* factor in redrawing district lines; they were the *predominant* factor. Race was the predominant factor in maintaining arbitrary racial quotas for certain districts. It was the predominant factor in packing certain districts with as many Hispanic and Black residents as possible. It was the predominant factor in maintaining racial "purity" with the "same type of last name and faces." It was the predominant factor resulting in diminished Black and Hispanic influence. And it was the

1

predominant factor in the Commission's overt command that Black, Hispanic, and Anglo residents *must* be separated as much as possible into different districts because, in the Commission's view, each race needs to be represented by a co-ethnic, irrespective of communities, interests, and values.

3.      The predominance of race-based thinking in the City Commission's decisions does not advance representation and cannot be justified by compliance with the Voting Rights Act or any other compelling interest.

4.      Stated simply, Miami's racially gerrymandered redistricting scheme violates Plaintiffs' rights to the equal protection of the laws. They bring suit to vindicate those rights.

## INTRODUCTION

5.      On March 24, 2022, the Miami City Commission passed Resolution 22-131 (the "2022 Plan" or "Enjoined Plan"), redrawing the City Commission districts for the next decade. Mayor Francis X. Suarez declined to veto it, allowing the new map to go into effect for the next regularly scheduled City Commission elections on November 7, 2023.

6.      Plaintiffs—four community and civil rights organizations and five individual Miamians—bring suit to challenge all five City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment.

7.      While redistricting bodies "will … almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions.

8.      Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause. This type of excessively race-based line drawing is constitutional only where it

satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The 2022 Plan falls far short of this exacting standard.

9.     In developing the 2022 Plan, the Commission impermissibly elevated race above all other considerations. Commissioners and their consultants obsessed over an overriding racial goal: isolating Black from Hispanic from Anglo residents as much as possible into separate districts.

10.    In so doing, the Commission not only reduced the interests of Black, Hispanic, and Anglo Miamians to their race, but also ignored the interests of Miami's 14,000 American Indian, Asian American, and Pacific Islander residents, who were never once considered in the process.

11.    In furtherance of its goal of maximum racial separation, race dictated even the most granular line-drawing decisions in the 2022 Plan. The Commission was preoccupied by racial considerations, agonizing over the effects of minute changes on the racial composition of the districts, even debating the racial implications of moving individual city blocks and condo towers.

12.    The Commission presented no compelling governmental interest to justify this racial sorting. Compliance with Section 2 of the Voting Rights Act (VRA) is one of the few permissible justifications for allowing race to predominate when drawing district lines. But the Commission was not entitled to set racial targets based on uninformed guesses of what VRA compliance *might* look like. It was instead required to actually *assess* what VRA compliance involved. The Commission never attempted to do that. Nor do any facts indicate the 2022 Plan is necessary to achieve VRA compliance.

13.    The resulting harm to Plaintiffs is acute, and threefold. ***First***, racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their

constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993).

14.     ***Second***, Plaintiffs are further harmed because, in pursuit of its racial goals, the Commission sacrificed genuine communities of interest, dividing neighborhoods across the city. Coconut Grove, Little Havana, Flagami, Allapattah, Shenandoah, Omni/Downtown, Brickell, and others were broken up. Commissioners explicitly acknowledged dividing these communities to maintain and enhance the racial separation of the five districts.

15.     ***And third***, the Commission's racial gerrymandering packed Black and Hispanic voters into designated districts, stripping them from adjacent districts and reducing their influence there.

16.     The Commission was on notice of the unjustness of its work. Miamians—including many of the Plaintiffs in this suit—stepped up to call out the Commission's blatantly unconstitutional actions. But they were ignored.

17.     Indeed, the Commission's consultant responded to the public outcry with a PowerPoint slide bluntly titled: "Allegations of Racism are False and Inflammatory."

18.     His PowerPoint was wrong. The Commission's intentional sorting by race, absent narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the map—all five districts—an unconstitutional racial gerrymander.

19.     The 2022 Plan went into effect after its adoption in 2022, and was used in the February 27, 2023 special election for District 2.

20.     In 2023, in response to this Court's preliminary injunction (ECF 60), the City redrew the Commission districts by enacting Res. 23-271 ("2023 Plan"). The 2023 Plan continues to separate Miamians along racial lines, is not justified by any compelling interest, and violates Plaintiffs' rights to the equal protection of the laws

## PARTIES

21.     Plaintiff GROVE RIGHTS AND COMMUNITY EQUITY, INC. (GRACE) is a nonprofit community-based membership organization serving Miami's West Coconut Grove neighborhood since 2019. GRACE advocates for equitable economic development while preserving the historic culture and community of the West Grove. GRACE's members and the members of its constituent organizations, most of whom are Black, reside in Commission Districts 2 and 4 under the 2022 Plan and District 2 under the 2023 Plan.

22.     Plaintiff ENGAGE MIAMI, INC. is a nonprofit membership organization centering young people's participation in civic engagement, with members who are largely Gen Z and Millennial Black and Latino Miamians who reside in all five districts. Founded in 2015, the mission of Engage Miami is to build a more just, democratic, and sustainable Miami by developing a local culture of civic participation for young people that is bold, creative, and impactful.

23.     Plaintiff SOUTH DADE BRANCH OF THE NAACP (South Dade NAACP) is a nonprofit membership organization serving Miami-Dade County south of Flagler Street.

24.     Plaintiff MIAMI-DADE BRANCH OF THE NAACP (Miami-Dade NAACP) is a nonprofit membership organization serving Miami-Dade County north of Flagler Street.

25.     The South Dade NAACP and Miami-Dade NAACP (together, NAACP Branches) are affiliate branches of the Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in the state, formed in 1909. Their mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Consistent with this mission, the NAACP Branches advocate for the voting rights of African Americans and other voters of color in Miami, including their members. The NAACP Branches' members—most of whom are Black—reside in all five districts (the South

Dade NAACP's in Districts 2, 3, and 4; the Miami-Dade NAACP's in Districts 1 and 5).

26.     If the 2023 Plan is not enjoined, the members of GRACE, Engage Miami, and the NAACP Branches (together, "Organizational Plaintiffs") will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

27.     Plaintiff CLARICE COOPER is Black, was a resident of District 2 under the 2022 Plan and is a resident of District 2 under the 2023 Plan.

28.     Plaintiff JARED JOHNSON is Black, was a resident of District 3 under the 2022 Plan and is a resident of District 3 under the 2023 Plan.

29.     Plaintiff STEVEN MIRO is Hispanic and Cuban American, was a resident of District 3 under the 2022 Plan and is a resident of District 3 under the 2023 Plan.

30.     Plaintiff ALEXANDRA CONTRERAS is Latina and Cuban American, and was a resident of District 4 under the 2022 Plan and of District 4 under the 2023 Plan.

31.     Plaintiff YANELIS VALDES is Latina and Cuban American, was a resident of District 5 under the 2022 Plan, and is a resident of District 2 under the 2023 Plan.

32.     The 2022 and 2023 Plans placed Plaintiffs Cooper, Johnson, and Valdes, and Organizational Plaintiffs' members, in districts where they are not the predominant racial group. The 2022 Plan sent, and the 2023 Plan sends, the message that their commissioner's job is to represent the predominant group, not them.

33.     The 2022 and 2023 Plans placed Plaintiffs Miro and Contreras, and Organizational Plaintiffs' members, in districts where they *are* the predominant racial group. The 2022 Plan sent, and the 2023 Plan sends, the message that they were placed in their districts simply because of their race.

34.     Individual Plaintiffs and Organizational Plaintiffs' members are further harmed

because the 2022 and 2023 Plans split up their neighborhoods—and they are split along racial lines.

35.     Defendant CITY OF MIAMI is a Florida municipality. As a municipal corporation established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law. Fla. Const. art. VIII, §§ 2(b), 3; Fla. Stat. § 100.3605; Miami Code of Ordinances (City Code) ch. 16.

## JURISDICTION AND VENUE

36.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

37.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because the Defendant resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

38.     This Court has personal jurisdiction over the City of Miami.

## FACTS

### I.  Overview of the City Commission and Its Elections

39.     Miami is governed by a five-member City Commission and a Mayor. Miami City Charter (Charter) § 4(a).

40.     Except where the Charter provides otherwise, municipal elections are conducted according to the state's general election laws. *Id.* § 7.

41.     Since 1997, commissioners have been elected from single-member districts. *Id.* § 4(b).

42.     Commissioners run on a nonpartisan basis and serve four-year staggered terms,

with Districts 1, 2, and 4 last elected in 2023 and next up in 2027, and Districts 3 and 5 last elected in 2021 and next up in 2025. *Id.*

43.     General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years. *Id.* § 7.

44.     If no candidate receives a majority in the general election, a runoff between the top-two vote-getters is held fourteen days later. *Id.*

45.     Candidates file to run by filing an affidavit of candidacy with the City Clerk during the qualifying period, which is between 60 and 45 days before the general election. *Id.*

46.     The current commissioners are Miguel Angel Gabela (District 1), Damian Pardo (District 2), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5). The District 1 and 2 commissioners during the 2021–22 redistricting process were Alex Díaz de la Portilla and Ken Russell, respectively. The District 1 and 2 commissioners during the 2023 redistricting process were Alex Diaz de la Portilla and Sabina Covo, respectively.

47.     Díaz de la Portilla, Carollo, and Reyes are Hispanic and Cuban American. King is Black and not Hispanic. Russell is Japanese American and not Hispanic.

48.     Commissioners are limited to two consecutive terms. Charter § 4.

49.     Díaz de la Portilla was first elected in 2019 and lost reelection in 2023.

50.     King was first elected in 2021 and is eligible for reelection in 2025.

51.     Reyes was first elected in a 2017 special election and was reelected in 2023.

52.     Carollo was first elected in 2017 and cannot run for reelection when his current term ends in 2025.

53.     Before the redistricting process began, Russell planned to resign from the Commission to run for higher office in the 2022 election.

54.     Russell ran for Congress in the 2022 election and resigned on December 29, 2022.

55.     Covo was elected in a February 2023 special election and lost reelection in November 2023.

## II.  Miami Redistricting History

56.     Before 1997, the Commission was elected at-large, citywide.

57.     Carollo served as Mayor from 1996 to 1997, and in 1997, he appointed a blue-ribbon panel to recommend a single-member district map for the Commission.

58.     Among the members of the blue-ribbon panel were Reyes and Miguel De Grandy.

59.     The blue-ribbon panel made recommendations and the Commission further developed a map with the assistance of redistricting consultant Allan Lichtman.

60.     The Commission adopted its 1997 map as Resolution 97-495 (the "1997 Plan").

61.     In September 1997, the voters adopted a charter amendment adopting single-member district elections. The 1997 Plan was implemented in the November 1997 elections.

62.     The Commission redistricted the map in 2003 and 2013 through Resolutions 03-448 and 13-208 (the "2003 Plan" and "2013 Plan").

63.     Miguel De Grandy and Stephen M. Cody served as the city's redistricting consultants for the 2003 and 2013 processes.

## III.  The 2021–22 Redistricting Process

64.     Following the 2020 Census, the Commission again embarked on redistricting.

65.     On February 25, 2021, the Commission again hired De Grandy and Cody to serve as the City's redistricting consultants.

66.     The process proceeded through six Commission meetings between November 18, 2021 and March 24, 2022.

67.     During these meetings, De Grandy—assisted by Cody—gave presentations on the law and brought draft maps for commissioners to workshop.

### A. The November 18, 2021 Meeting

68.     At the November 18 meeting, De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan.



**Fig. 1.** *Miami City Commission districts under the 2013 Plan.*

69.     The Census data revealed that Miami's population had grown by 42,752 residents over the decade, to 442,241. The ideal population of each Commission district was now 88,448.

70.     De Grandy shared that redistricting was needed to bring the districts within the constitutionally allowable population range, to have no greater than 10% difference between the smallest and largest district.

71.     Analyzing the 2013 Plan under the 2020 Census numbers, Districts 1, 3, 4, and 5 were each under the ideal population (by 6,999; 8,279; 7,847; and 5,707 people, respectively) and needed to gain population.

72.     District 2 was overpopulated by 28,833 residents and needed to shed population.

73.     Under the 2013 Plan, Districts 1, 3, and 4 were majority Hispanic, with Hispanic voting-age populations (HVAPs) of 91.0, 88.5, and 91.6%, respectively, and Hispanic citizen voting-age populations (HCVAPs) of 86.6, 86.8, and 90.1%, respectively.[1]

74.     Under the 2013 Plan, District 5 was majority Black, with a Black voting-age population (BVAP) of 52.9% and a Black citizen voting-age population (BCVAP) of 59.4%.

75.     District 2 under the 2013 Plan had the highest non-Hispanic white (hereinafter "white" or "Anglo") population of the five districts, at 34.5% white voting-age population (WVAP) and 38.1% white citizen voting-age population (WCVAP).

76.     De Grandy explained the applicability of the Voting Rights Act to Miami and that "we can consider race as one of several factors that we will be conscious of in crafting a plan."

77.     De Grandy warned, however, that under the Supreme Court's racial gerrymandering jurisprudence, race "cannot be the overriding factor."

78.     The Commission ignored De Grandy's warning as the process unfolded.

---

[1]     Total population and voting-age population figures cited herein are from the 2020 Census. Citizen voting-age population figures are from the Census Bureau's 2019 5-year American Community Survey (ACS).

79.     The Commission gave De Grandy four ranked directives for map-drafting. The first, moved by King, was to achieve substantial equality of population between districts, rather than precise mathematical equality.

80.     The second-ranked criterion, moved by Díaz de la Portilla, was to "maintain the core constituencies of the districts."

81.     The third-ranked instruction, moved by Carollo, was that, separate from what the VRA required, "the minority voters must be politically cohesive." The phrase "political cohesion" was subsequently used throughout the process as a shorthand for keeping racially homogenous areas together.

82.     The fourth-ranked instruction was to avoid splitting traditional communities and neighborhoods when feasible.

83.     However, Díaz de la Portilla noted that some neighborhoods could be divided if they "will elect the same kind of representative," for example Flagami—which is overwhelmingly Hispanic—being split between Reyes and himself. But, he said, putting part of Overtown or Liberty City (both predominantly Black) in his district would be unacceptable.

84.     Also at that meeting, Carollo recounted why single-member City Commission districts were instituted when he was Mayor: "The original idea" was "to keep an even population and that minority voters would be politically cohesive within these districts," so that "there would be an African American sitting in this Commission and there would be an Anglo," and "that there were three Hispanic districts." And he explained that during the 2022 redistricting, each district would have to change to carry forward that "original idea."

### B.  The December 9, 2021 Meeting

85.     The Commission met again on December 9, with De Grandy recapping his

instructions and commissioners discussing what areas might be moved between districts.

86.     Some of the key elements of the 2022 and 2023 Plans' racial gerrymandering originated at this meeting.

87.     Díaz de la Portilla stated that underpopulated Districts 3 and 4 would have to gain from overpopulated District 2, and cautioned De Grandy to add to each only "peripherally, a little bit into District 2" so as not to disrupt "the ethnic integrity" of Districts 3 and 4.

88.     With that warning in mind, Díaz de la Portilla asked if there was a problem with splitting Coconut Grove—which was wholly in District 2 under the 2013 Plan—and adding parts to Districts 3 and 4, given "there's ethnic diversity in Coconut Grove." He clarified that his question was "based on where the Hispanic voters live," giving Bay Heights as an example.

89.     De Grandy responded that there was no legal impediment to breaking up any community of interest.

90.     De Grandy continued that he functionally had "a wall" between Districts 2 and 5 and could only "play around the edges there without diluting that minority community." So, District 2 would have to shed population from its southern end—bordering Districts 3 and 4.

91.     Díaz de la Portilla urged De Grandy to shift the 2/5 "wall" eastward as much as he could, "without impacting the minority district, District 5," and De Grandy confirmed he would do so, "without diluting," but that he couldn't move it much.

92.     Given that explanation, Díaz de la Portilla suggested giving Districts 3 and 4 a little bit of Coconut Grove "to make sure we don't jeopardize the ethnic integrity of our districts."

93.     Carollo echoed that suggestion, stating that parts of Coconut Grove would have to be moved out of District 2 but "the biggest danger lies . . . in changing one or two of the Hispanic seats," given Districts 1 and 3 "are not as pure in the percentage of Hispanics" as District 4.

94.     Finally, De Grandy clarified a few additional criteria at this meeting. He confirmed the Commission wanted districts to be contiguous (*i.e.*, not broken up into different pieces).

95.     De Grandy advised that drawing compact districts should not be a consideration. The Commission agreed.

96.     On that subject, Díaz de la Portilla noted that "if you want to have an African American district and you want to have an Anglo district, it's almost impossible to emphasize compactness," so it's "a foregone conclusion" that districts would not be compact. De Grandy concurred.

97.     Finally, De Grandy asked if using man-made and natural boundaries should be a factor, but there was no consensus.

98.     De Grandy agreed to take the Commission's directives, meet with commissioners one-on-one, and develop a draft plan to be presented at the next meeting.

### C. The February 7, 2022 Meeting

99.     De Grandy presented a draft plan on February 7, 2022 (the "Feb. 7 Draft") (Fig. 2).

100.    De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 88.7, 88.4, and 88.0%; District 2 "remains a swing district" at 37.2% white population (WPOP) and 48% Hispanic population (HPOP); and District 5 was 51.7% Black population (BPOP) and 49.8% BVAP.

101.    Explaining the draft, De Grandy noted many of the race-based decisions he made in developing it.

102.    The Feb. 7 Draft proposed moving part of the historically Black West Grove neighborhood from District 2 into District 4, extending the southern boundary of District 4 across US 1. This proposal prompted intense criticism from members of the public, who objected to the

division of a cohesive neighborhood and its excision from District 2.



*Fig. 2. The Feb. 7 Draft, showing the 2013 Plan overlaid with blue lines.*

103.    Among the members of the public who spoke against the division of Coconut Grove were Plaintiff Cooper; then-GRACE Chair Rev. Nathaniel Robinson III; and West Grove native and current GRACE Chair Reynold Martin, who spoke on behalf of the South Dade NAACP. As Mr. Martin said: "We oppose anything that removes the area of the Grove as a unit. We work together as a family and we'd like to stay that way."

104.    Rev. Robinson explained how GRACE objected to the map's "sever[ing] the cultural, social and historical ties to Coconut Grove and District 2 governance" and "disparately

impact[ing] the voting rights of Village West Black residents by diluting their political impact," adding, "although it might be small, we do have a political impact."

105.    Responding to the public comment, De Grandy "put into context what we're moving into a majority-Hispanic district," noting the West Grove portion moved had 2,460 Hispanic, 1,915 white, and 497 Black residents—*i.e.*, it was nearly a majority-Hispanic area.

106.    And, De Grandy made clear that, because he "cannot take any more population out of D2 into D5" without reducing District 5's Black numbers, he had to remove population from District 2 either from the Downtown area or from Coconut Grove.

107.    Carollo, also responding to the public criticism, objected to claims that by moving a portion of "the Black part of Coconut Grove to a district that's Hispanic, this disenfranchises them"—but "leav[ing] it in an Anglo area" would be fine.

108.    Carollo pointed out that no African Americans had ever been elected to District 2, implying that, since District 2 was the "Anglo seat" and District 4 was a "Hispanic seat," Black residents of the West Grove had no grounds to complain about being moved from one to the other.

109.    Carollo's comments exemplify the Commission's approach to the redistricting process: the preeminent consideration was ethnic/racial solidarity, and their mapmaking must revolve around that.

110.    Speaking more generally about the map's history, Carollo recounted that districts were established "to assure . . . that there would always be an African American commissioner and an Anglo commissioner," and that the other three districts stayed majority Hispanic.

111.    To accomplish that, Carollo explained, neighborhoods across the city were split: Silver Bluff, Shenandoah, Little Havana, and Flagami. Díaz de la Portilla mentioned another: Allapattah.

112.    So, to keep "that same balance and having a balance in the Hispanic districts," Carollo went on, a portion of Coconut Grove would have to be split as well.

113.    Following that discussion, the Commission voted 4-1 to direct De Grandy to consider going south of US 1 into District 2 to "obtain voter consistency" and balance population, as he had done in Feb. 7 Draft. Only Russell voted no.

114.    The 2022 Plan would indeed have Districts 3 and 4 "go south" of US 1 into District 2, moving portions of Coconut Grove.

115.    De Grandy received further feedback from commissioners and would return with a revised plan.

### D. The February 25, 2022 Meeting

116.    On February 25, De Grandy presented a revised plan he had submitted three days prior (the "Feb. 22 Draft") (Fig. 3). Except for three unpopulated census blocks that were later moved from District 1 to 5, the Feb. 22 Draft became the 2022 Plan.

117.    The Feb. 22 Draft incorporated certain feedback shared during earlier Commission meetings, and during private meetings De Grandy had with individual commissioners.

118.    The Feb. 22 Draft differed from the Feb. 7 Draft in several respects. **First**, District 4 added only 1,597 residents from the West Grove, rather than 5,071 under the Feb. 7 Draft. The portion moved into District 4 now had a higher Hispanic population—59.2% HVAP compared to 49.1% in the Feb. 7 Draft.

119.    **Second**, District 3 added from District 2 an area near Bay Heights, including Natoma Manors, between 22nd Avenue and Alatka Street, rather than adding the area from 17th Avenue to 15th Road.

120.    **Third**, a 76.6%-HVAP area in Allapattah was moved into District 1 from 5, and a

66.7%-HVAP area was moved out of District 1 into 5.



**Fig. 3.** *The Feb. 22 Draft/Base Plan, showing the Feb. 7 Draft overlaid with blue lines.*

121.   ***Fourth***, at King's request, District 5 gained a small, 40% BVAP area of Downtown around the Miami Riverside Center (MRC) from District 1. In exchange, District 1 gained a 71.1% HVAP area between NW 6th and 8th Streets and NW 7th Avenue and I-95. As part of this shift, District 2 regained some area from District 1 that the Feb. 7 Draft had removed.

122.   ***Fifth***, certain Downtown areas were swapped along the District 2/5 "wall:" Two census blocks with a BVAP of 13.0% were moved into District 2; and a 32.2% BVAP area was moved into District 5.

123.    *Finally*, the boundaries between Districts 1, 3, and 4 shifted around Little Havana.

124.    As he did with his first draft, De Grandy walked through the populations and racial demographics of each draft district, noting Districts 1, 3, and 4 had HVAPs of 89.5, 88.3, and 89.5%; District 2 "remains a swing district" at 37% WPOP and 48.7% HPOP; and District 5 was 52.2% BPOP and 50.3% BVAP.

125.    De Grandy had managed to increase the dominant-group VAP in Districts 1, 4, and 5 from the Feb. 7 Draft. Of the three majority-Hispanic districts, the HVAP of the least-Hispanic district increased. The average HVAP of those three districts also increased.

126.    In terms of citizen voting-age population, Districts 1, 3, and 4 were 84.8, 86.9, and 88.2% HCVAP. District 2 was 41.5% WCVAP and 45.6% HCVAP. District 5 was 59.0% BCVAP.

127.    Public comment at this meeting again centered on objections to splitting Coconut Grove, including the continued division of a portion of the West Grove.

128.    Among those who gave comments were South Dade NAACP Second Vice President Carole Jackson, who spoke on behalf of the NAACP Branches; GRACE Board Vice Chair, South Dade NAACP Housing Committee Chair, and West Grove native Carolyn Donaldson; Plaintiff Valdes, who represented Engage Miami; and Engage Miami member Jessica Saint-Fleur. Plaintiff Cooper and Mr. Martin both spoke again as well.

129.    Díaz de la Portilla, Carollo, and Reyes were satisfied with the Feb. 22 Draft, though Reyes was willing to make some changes, including to remove the part of Coconut Grove in District 4. Russell wanted to try to avoid splitting Coconut Grove. King wanted more time to consider the map and to see if Russell's concerns could be accommodated.

130.    Russell sketched out his own suggestion for the border of District 2 at this meeting (the "Russell Sketch"), which showed how it might be possible for District 2 to keep all of Coconut

Grove, rather than splitting the neighborhood across Districts 2, 3, and 4.



**Fig. 4.** *The Russell Sketch (dark blue line).*

131.    Referencing the overwhelming public comment, Russell discussed the many

nuanced reasons for keeping Coconut Grove in District 2—not just to preserve an African

American community in the West Grove, but also because of the area's history, architecture,

cultural diversity, natural aesthetic, walkable character, access to the water, common tree canopy

issues, affordable housing concerns, and its placement in two of Miami's three Neighborhood

Conservation Districts (NCD-2 and NCD-3).

132.    Compared to the Feb. 22 Draft, the Russell Sketch kept all of Coconut Grove in

District 2 and removed from District 2 the strip west of South Miami Avenue from 32nd Road to

the Miami River (including part of Brickell).

133.    The Russell Sketch did not alter the boundary between Districts 2 and 5 from the

Feb. 22 Draft.

134.    The Russell Sketch better equalized District 2's population, with its deviation dropping to within 2% of the ideal, compared to being 5.49% overpopulated in the Feb. 22 Draft.

135.    De Grandy confirmed that Russell's proposal did not violate any of the mapmaking directions the Commission had given him, and that it complied with all legal standards.

136.    But the Commission would reject the proposal for racial reasons later in the process.

137.    The meeting concluded with the Commission voting 4-1 to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting. Only Russell voted no.

### E.  The March 11, 2022 Meeting

138.    The Commission took up the Base Plan again on March 11.

139.    The meeting opened with Carollo discussing allegations that the map moved a portion of North Coconut Grove into District 3 because he owned a house there, on Morris Lane.

140.    Carollo clarified that he was not supporting the changed District 2/3 boundary because it included his house.

141.    Carollo said he wanted to make sure that the fact that his house was being moved into District 3 would not be raised as grounds for challenging the redistricting in court later. So, he decided to abstain from the discussions that day.

142.    De Grandy summarized where they were in the process: the Commission had advanced the Base Plan and two commissioners had suggested additional changes.

143.    He walked through those two changes. *First*, King wanted part of the riverfront area that the Base Plan moved from District 5 to District 1 restored to her district.

144.    De Grandy noted this request's racial impacts and said he needed more direction.

145.    *Second*, Russell had renewed his request to restore all of Coconut Grove to District

2, rather than moving portions into Districts 3 and 4.



**Fig. 5.** *Slide from De Grandy's March 11 presentation, showing areas the Initial Russell Plan moved from the Base Plan.*

146.   To equalize population, Russell proposed moving a strip west of South Miami Avenue from District 2 to 3, starting at the US 1/I-95 fork and going north to the Miami River ("Area 6" in Fig. 5).

147.   This proposal (the "Initial Russell Plan") was similar to what Russell sketched out on February 25. It did not alter Districts 1 or 5 in the Base Plan, or the District 3/4 border.

148.   De Grandy also addressed "allegations of racism" in the Base Plan. In so doing, he walked through the Black population of each district and of the West Grove area proposed to be moved into District 4 from District 2, as well as the number of Hispanic residents "represented by a Black commissioner in a Black-majority district" in District 5, and "represented by a non-Hispanic commissioner" in District 2.

149.   He went on: "the only allegation of racism results from the proposed movement of

114 Black residents who are currently represented by a commissioner who is not Black to a district that is represented by a commissioner who is not Black."

150.    De Grandy concluded, "you do not have to be a redistricting expert to conclude that the allegation of this plan is somehow racist is simply false and inflammatory."

151.    Russell pushed back, explaining that Black West Grove residents weren't simply looking for a Black commissioner, but one who will be responsive to their neighborhood's needs and issues: "displacement, gentrification, social justice, affordable housing." Russell asked De Grandy if Black residents in the West Grove formed a cohesive voting bloc with the rest of Coconut Grove, and De Grandy acknowledged they did.

152.    Continuing to defend his map, De Grandy pointed out that more Black residents were moved out of District 2 in Golden Pines on the north side of US 1, than were moved out of District 2 in the West Grove.

153.    Russell responded by explaining that the dividing line should not be reduced to race: Black residents of Golden Pines have different interests and priorities than Black residents of the West Grove, whose shared interests with the rest of Coconut Grove were "not based on color."

154.    Russell's arguments failed to win in the end.

155.    Significant public comment again focused on residents objecting to the division of Coconut Grove, and in particular the West Grove. Among those who spoke was then-South Dade NAACP President Dwight Bullard, who described Coconut Grove as "a community of common interest irrespective of race, irrespective of ethnicity."

156.    Responding to the public comment and Russell's explanations, Reyes asked what would happen if just the West Grove triangle was returned to District 2. De Grandy explained he would need to take from elsewhere in District 2 to equalize population, pointing to two areas as

options: between 22nd and 27th Avenues in North Coconut Grove, and the "Area 6" strip that Russell had proposed moving.

157.    Reyes then expressed that he would honor the community's desires and support keeping the West Grove intact in District 2 instead of including a slice of it in his district.

158.    The Commission adjourned after directing De Grandy to meet with commissioners individually and bring back different options that accommodated each commissioner's wishes.

### F. *The March 24, 2022 Meeting and 2022 Plan Adoption*

159.    The Commission reconvened on March 24 for its last redistricting meeting.

160.    Carollo announced he would participate since he had no actual or apparent conflict of interest.

161.    De Grandy then presented the options that each commissioner directed him to develop since March 11. There were proposals from King, Díaz de la Portilla, Russell, and Reyes.

162.    King requested only one change to the Base Plan: moving the unpopulated Wharf development along the Miami River from District 1 into District 5.



**Fig. 6.** *Slide from De Grandy's March 24 presentation showing King's proposed change to the Base Plan.*



**Fig. 7.** *De Grandy's slide showing Díaz de la Portilla's suggested change to the Base Plan.*

163.    Díaz de la Portilla advised he supported the Base Plan but had one change he would

not object to: moving a single block just to the north of the Wharf, encompassing the Flagler on

the River tower, from District 1 and back into District 5, where it was in the 2013 Plan.



**Fig. 8.** *De Grandy's slide showing the Revised Russell Plan's changes to the Base Plan.*

164.    Russell had a revised proposal (the "Revised Russell Plan"). As with the Initial

Russell Plan, the Revised Russell Plan restored all of Coconut Grove to District 2. However, it

shifted less population from District 2 into District 3, with the one-block-wide strip running along

South Miami Avenue from the I-95/US 1 fork north to 10th Street, rather than all the way to the

Miami River. De Grandy announced the racial demographics of this strip: 44.6% HVAP, 39%

WVAP. Russell's new plan also included King's Wharf change.



**Fig. 9.** *De Grandy's slide showing the Reyes Plan's changes to the Base Plan.*

165.    Reyes proposed a plan (the "Reyes Plan") that restored the West Grove triangle to District 2. In exchange, the proposal moved from District 2 to District 3 an area on the north/west side of South Miami Avenue between Alatka and 13th Streets. De Grandy reported that area's demographics: 51% HVAP, 39% WVAP. Reyes' plan also included King's Wharf change.

166.    Unlike the Revised Russell Plan, the Reyes Plan kept in District 3 the portion of North Coconut Grove that the Base Plan had moved into District 3.

167.    Carollo did not propose any amendment.

168.    De Grandy concluded by advising that each proposed amendment complied with the Constitution and the Voting Rights Act.

169.    Public comment, yet again, centered on keeping Coconut Grove whole. Among the speakers were then-South Dade NAACP Secretary Brad Brown and Miami-Dade NAACP President Daniella Pierre.

170.    Each commissioner then spoke in turn. Díaz de la Portilla and Carollo both stated they would support the Base Plan with King's Wharf amendment.

171.    Revisiting the subject of his Morris Lane house moving into District 3, Carollo stated he had "no problem, none whatsoever" with it being moved into District 4 instead.

172.    He did, however, object to the Reyes and Russell proposals to move more territory from District 2 into District 3.

173.    Russell advocated for his plan and keeping Coconut Grove whole in District 2, listing how his plan met all the criteria the Commission had adopted at the beginning of the process.

174.    Reyes stood by his earlier support for removing the West Grove triangle from District 4.

175.    Russell proposed adopting his Revised Russell Plan, but that failed 4-1.

176.    Díaz de la Portilla then moved to adopt the Base Plan with King's Wharf amendment, *and* with removing the West Grove triangle from District 4.

177.    But De Grandy and Carollo explained that moving the West Grove triangle would necessitate shifting District 3 further into Brickell to bring the plan's overall population deviation range under 10%.

178.    So, Díaz de la Portilla withdrew that motion and moved to adopt the Base Plan with King's Wharf amendment.

179.    That motion carried 3-2, and the Base Plan with the Wharf change passed as the 2022 Plan.

180.    Reyes explained he was opposed because District 4 still included a portion of the West Grove.

181.    Similarly, Russell voted no because the plan divided Coconut Grove.

182.     Díaz de la Portilla, Carollo, and King voted yes.

183.     Community members and advocacy organizations urged Mayor Suarez to veto the map. For example, the NAACP Branches wrote a letter to Suarez, requesting he reject the plan as an unfair redistricting plan that goes against traditional redistricting principles and threatens equal representation under the law.

184.     Ignoring Miamians' concerns, Suarez let the plan become law without his signature.

### IV.  Racial Considerations Predominated in the Line-Drawing Process

185.     The Commission's overriding goal in crafting the 2022 Plan was to separate Hispanic, Black, and Anglo voters as much as possible into "their" respective districts.

186.     Improper racial considerations predominated throughout the Commission's line-drawing process. Race featured centrally at every redistricting meeting, with race placed above all race-neutral, traditional redistricting criteria.

187.     These race-based decisions resulted in a map that splits neighborhoods, ignores traditional redistricting criteria, and eschews fair, public-minded representation.

188.     Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates. Unless the use of race is *necessary* to ensure fair and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

189.     But rather than advancing representation, the Commission delivered separation.

190.     At the very first redistricting meeting, Reyes and Carollo discussed how the existing map "was drawn in a way that every single ethnic group would be represented," and that explained "the odd shape that we have now" and why certain neighborhoods were split.

191.     Indeed, Carollo explained on February 25, to accommodate maximal racial

separation, the Commission "broke up numerous neighborhoods."

192.    Reyes agreed: "just ask all the communities who are divided, because we have to preserve a seat that will represent every single community of the City of Miami."

193.    Racially heterogeneous districts were out of the question. After discussing the racial dynamics and demographics of the districts on November 18, Carollo stressed how they needed to ensure "that the balance is not really shifted."

194.    Again on February 7, Carollo explained his "goals from day one:" "to have guaranteed Anglo representation, and to have three districts that were Hispanics," concluding "these are my intentions here today."

195.    This attitude which elevated racial considerations above all other redistricting decisions was shared by other commissioners.

196.    Díaz de la Portilla, for example, explained on March 11, "our goal here is to have an African American district, for lack of a better term, a white district, . . . and three Hispanic districts."

197.    In response to public criticism of gerrymandering, Reyes was blunt: "Yes, we are gerrymandering to preserve those seats"—to preserve and enhance the maximal division of races into separate districts as much as possible.

198.    Shortly before the final vote, Carollo summarized his goals in locking in a particular and precise racial division in the map:

> I do not want to change the District 3 voting patterns, the types of people that are there with different people. I don't want to do that to District 4, nor to District 1. Just like I want to be able to leave District 2 where it could still elect a guy like you [referring to Russell], if they want to. In District 5, that will be a majority-African American district.

199.    The Commission's policy of maximal racial separation manifested in three specific

ways: (1) creating an "Anglo access district" in District 2; (2) maintaining an arbitrary BVAP quota for District 5; and (3) packing Hispanic residents into Districts 1, 3, and 4 as much as possible.

### A.  Creating an "Anglo Access District" in District 2

200.    Race predominated in the design of District 2.

201.    At its first redistricting meeting on November 18, Díaz de la Portilla asked De Grandy whether the VRA required the Commission to maintain "what we call here in Miami, in practical terms, an Anglo . . . seat."

202.    De Grandy explained that "white, non-Hispanic, is not a protected class under the Voting Rights Act."

203.    The Commission would ignore this legal advice, instead increasing the Anglo population of District 2 as much as possible, stripping Black and Hispanic residents from it with the explicit goal that it would elect an Anglo commissioner.

204.    At the February 7 meeting, Carollo shared that originally, District 2 "was gerrymandered—but it was a legal gerrymander so that you would have an Anglo elected commissioner."

205.    As the Commission drew new lines, it sought to maintain and enhance this. On February 7, for example, Reyes expressed that they had to make changes to protect "the Anglo seat" and asked De Grandy if his Feb. 7 Draft was the best he could do to protect it. During that same meeting, Carollo stated his "intention here today" to "have guaranteed Anglo representation." On February 25, Reyes too stated his "commitment" that "the so-called Anglo-district will . . . stand the test of time." At the final meeting, Carollo reiterated "we're going to have to keep one district that you could get an Anglo."

31

206.   To achieve this goal, the Commission "purposely divided neighborhoods in other districts to try to keep District 2 into a district that a non-Hispanic would be elected," as Carollo explained on February 25. For example, he continued, "Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell"—someone "of an Anglo background, not Hispanic."[2]

207.   Carollo listed others divided to achieve that goal: Shenandoah, Little Havana, Flagami—split "down the middle"—and more.

208.   Díaz de la Portilla recounted how, as Mayor, Carollo "broke up Hispanic neighborhood after Hispanic neighborhood because he had to for the greater good"—to "have *a white* on our City Commission."

209.   Reyes and Carollo reprised this theme at the final meeting. If Shenandoah, Silver Bluff, Flagami, and Little Havana had not been divided, Reyes said, "probably we would not have Mr. Russell sitting there."

210.   Reyes continued that "it was fine to divide" these neighborhoods, "because we wanted to achieve what we want to achieve now:" "great" "probabilities of electing an Anglo."

211.   Finally, in his last speech before passing the 2022 Plan, Carollo summed it up again: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get

---

[2]   When Russell interrupted to point out he was Japanese American, Carollo dismissed him, saying "you didn't quite mention the Oriental part when you were running." Carollo's comment exemplifies the Commission's essentialist and reductive attitude toward race and representation: there are Hispanic residents, there are Black residents, and there are Anglo residents. To the Commission, "representation" means having a co-ethnic commissioner.

elected."

212.    The Commission sacrificed other traditional redistricting criteria to draw an explicitly Anglo district, including compactness. As Díaz de la Portilla explained, "if . . . you want to have an Anglo district, it's almost impossible to emphasize compactness."

213.    On February 25, to assuage his "main concern," Reyes sought to confirm with De Grandy that District 2 would still have a high probability of electing an Anglo. De Grandy replied simply: "Yes."

### B.   Maintaining an Arbitrary BVAP Quota for District 5

214.    Race predominated in the design of District 5.

215.    Coming into the process, District 5 under the 2013 Plan was 54.4% BPOP, 52.9% BVAP, and 59.4% BCVAP, but was underpopulated and needed to add population.

216.    The Commission's overriding goal for District 5 was to keep those numbers as high as possible while equalizing population, and particularly to attain a BVAP above 50%.

217.    This arbitrary threshold was not based on any functional analysis of what was necessary to afford Black voters the ability to elected preferred candidates, or justified by any compelling interest, including compliance with the VRA.

218.    Moreover, the Commission ignored key markers of District 5's functional performance, like CVAP, voter registration, and turnout in recent elections.

219.    At the first redistricting meeting on November 18, De Grandy commented how during the 2013 cycle, he moved the northern end of District 2 into District 5, but "that did dilute the Black voting percentage."

220.    Moving much more in this area, though, concerned him. He warned against doing so, because "District 5 may not be a performing district anymore for the minority community." "I

have a wall that separates D2 and D5," De Grandy said.

221.    De Grandy did not explain what analysis he did to conclude District 5 would be at risk of vote dilution in violation of the VRA.

222.    De Grandy's analysis—focused on making District 5's Black population as high as possible—was nothing more than an arbitrary numerical target based on uninformed guesswork.

223.    In De Grandy's initial, Feb. 7 Draft, District 5 was 51.7% BPOP, 49.8% BVAP, and 58.7% BCVAP.

224.    De Grandy explained he deliberately underpopulated District 5, "because bringing in additional population from most any side of the district might reduce the African American population percentage."

225.    In particular, De Grandy explained that around the District 2/5 border, "we could not move further east without affecting the African American population's ability to elect a candidate of its choice in D5."



**Fig. 10.** *Areas moved into and out of District 5 in the Feb. 7 Draft.*

226.    "There were only roughly 1,000 African Americans" in that area added from District 2 so, "the only reason we were able to rebalance the ethnic and racial population" was to remove the riverside areas from District 5 and move them into District 1, he continued.

227.    He went on: "That was essential because as you moved east . . . , there was less and less African American population."

228.    Notwithstanding the fact that the Feb. 7 Draft featured a District 5 with a BVAP under 50% and a BPOP under 52%, De Grandy said his analysis of voting patterns confirmed Black voters had an equal opportunity to elect the candidate of their choice.

229.    But this did not satisfy the Commission.

230.    First, Reyes pressed De Grandy if "this is the best you can do to protect the African American seat," calling it his "main concern."

231.    King also stated she was "concerned . . . that District 5 is 51% African American."

232.    De Grandy responded to their concerns in his Feb. 22 Draft, the Base Plan.

233.    He explained that "by reconfiguring areas around the boundaries of D5, we were also able to slightly increase the total Black population, as well as the voting-age population, above 50%."

234.    De Grandy explained that underpopulating District 5 also allowed for an increase in its Black population.

235.    He was firm that District 5 could not move further east into District 2 without "diminishing the African American community's opportunity to elect a candidate of choice."

236.    He concluded his presentation of the Base Plan by recapping "the directives you gave." Third on the list: "We increased D5's Black voting-age population above 50%."



**Fig. 11.** *Downtown changes to District 5 in the Base Plan, compared to the Feb. 7 Draft.*

237.    The Base Plan's reconfigurations included swapping areas between Districts 2 and 5 in Downtown. 1,638 people in two city blocks bounded by NW 8th and 10th Streets, Miami Avenue, and the railroad tracks were moved back into District 2, where they had been in the 2013 Plan. These two blocks are 13.0% BVAP.

238.    In exchange, 2,521 people in a two-block-wide strip between Miami and NE/SE 2nd Avenues were moved into District 5. This strip is 32.1% BVAP.

239.    However, 1,407 people in this strip—more than half—are incarcerated at the Federal Detention Center (FDC). A plurality of the FDC population is Black.

240.    Not including the incarcerated population, the strip De Grandy moved into District 5 to satisfy the Commission's 50% quota is 16.4% BVAP.

241.    When the public raised concerns about the Commission's arbitrary BVAP quota, they were dismissed out of hand.

242.    On February 25, the ACLU of Florida raised these concerns, noting that setting an

arbitrary 50% target, divorced from any actual analysis of what is necessary to afford Black voters an opportunity to elect preferred candidates, raised equal protection concerns and may constitute unlawful packing.

243.    The ACLU of Florida reminded the Commission that it was required to take the full breadth of available data into account, rather than looking merely at surface-level Census population totals. It further pointed out that voter registration and actual turnout data showed that Black voters make up a substantially higher share of registered voters and actual voters than Census VAP figures indicated for the proposed District 5: 55.5% of registered voters, 53.2% of voters at the last state general election, and 61.3% of voters at the last state primary election.

244.    Moreover, the district was nearly 60% Black "as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997).

245.    In response to the ACLU of Florida's statement, De Grandy said "it was hard for me to understand that."

246.    Further, De Grandy claimed that "packing doesn't apply."

247.    The Commission's consideration—and rejection—of alternatives to the Base Plan also illustrates its fixation on the racial targets.

248.    For example, after Russell presented his sketch for District 2 on February 25, King was interested in considering it—but only if it wouldn't reduce District 5's Black share: "Would that upset the balance in my district? Would it take me from 52 to less or more?"

249.    De Grandy assured her it wouldn't impact District 5, and King was willing to consider it at the next meeting.

250.    At that next meeting on March 11, De Grandy noted how King had requested moving riverside areas back into District 5 from District 1. King's request had a problem: it would

"lower the Black VAP to 49%," as De Grandy explained.

251.    Díaz de la Portilla crystalized the Commission's reaction to the slight BVAP decline in a single word: "Worse."

252.    De Grandy expressed confidence this problem "could be remedied" to "increase D5's Black voting-age population."

253.    Indeed, De Grandy took a recess to "work on that better and maybe that would solve the problem."

254.    He came back from recess with a new amendment to the Base Plan that moved several unpopulated riverfront blocks (the Wharf development) from District 1 into District 5— ensuring District 5 stayed above the 50% BVAP threshold.

255.    Even so, Díaz de la Portilla shared his worry with King that "the growth that's going to occur over the next ten years" would "make your district minority African American." Because the area proposed to be moved back into District 5 from District 1 was "an area that's predominantly Hispanic."

256.    Eventually, Díaz de la Portilla was satisfied with District 5's demographics, once he understood that it was still majority-BVAP, at 50.3%.

257.    The Commission eventually adopted King's change, going back to the Base Plan with the minor Wharf alteration, rather than the draft proposal with a 49% BVAP District 5.

258.    The Commission's adherence to the 50% BVAP quota was underscored by another proposed riverfront change. On March 24, De Grandy discussed moving the Flagler on the River condo development into District 5 from District 1, a suggestion of Díaz de la Portilla's.

259.    De Grandy reported the single block in question had 510 residents and was roughly 73% HVAP. He said moving it into District 5 would drop District 5's BVAP to 49.97%.

260.    De Grandy advised the proposal was VRA-compliant, but nevertheless counseled "additional tweaks to the plan to bring the Black voting-age population back above 50%."

261.    The Commission did not end up accepting the Flagler on the River suggestion.

262.    As the Commission neared a final vote on March 24, the 50% BVAP quota and its impact on the map continued to be a point of discussion. Carollo stressed "we have to keep one district that is going to have a majority of African Americans," explaining that hitting that target was "the reason we're having to do this"—referring to dividing Coconut Grove.

263.    Indeed, the "wall" between Districts 2 and 5 was a large reason why part of Coconut Grove ended up removed from District 2. Because removing more of District 2 from its northern end would further reduce District 5's Black proportion, the Commission instead removed areas from District 2 at its southern end, in Coconut Grove, to equalize District 2's population.

264.    As Reyes, Russell, and King tried unsuccessfully to reach agreement on Coconut Grove, De Grandy stressed he "cannot put one more resident into Commissioner King's district" because it "would dilute the Black majority."

265.    Díaz de la Portilla discussed how striving for the quota also impacted another area of the map, his own District 1 in Allapattah: "I can't go north, because if I go north I jeopardize the African American seat" by taking Black voters from District 5.

266.    The Commission successfully hit its target: the BVAP of District 5 is 50.3%.

### C. Packing Hispanic Residents into Districts 1, 3, and 4

267.    Race predominated in the design of Districts 1, 3, and 4 as well.

268.    The Commission's goal was to make the Hispanic populations of Districts 1, 3, and 4 as high as possible, thereby stripping Hispanic residents from Districts 2 and 5 and diminishing their influence in those two districts.

269.     Carollo set the tone at the second redistricting meeting, before any maps were drafted: "My main interest in my district and your district, Díaz de la Portilla, and Mr. Reyes' district, is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there."

270.     Carollo reiterated on February 7 that Districts 1 and 3 need to "keep the same type of last name and faces."

271.     Shortly before the 2022 Plan passed, Carollo again stated, "We have to keep three districts that are going to be majority-Hispanic."

272.     Commissioners were concerned by the relative Hispanic populations of these three districts and obsessed over small changes in Hispanic population. For example, Carollo discussed the relative "purity" of the three districts on December 9, noting the Commission had to keep in mind that Districts 1 and 3 "are not as pure in the percentage of the Hispanics that vote" compared with District 4.

273.     But at no point did the Commission undertake an actual analysis of voting patterns to determine what Hispanic population a district needs to have to comply with the VRA, instead shooting for as high a population as possible.

*1. District 1/5 Border*

274.     The border between Districts 1 and 5 was drawn along racial lines, to put Hispanic residents into District 1 and strip them from District 5. At the same time, the border packed Black residents into District 5 and stripped them from District 1.

275.     District 1, which under the 2013 Plan was underpopulated by 6,999 residents and needed to grow, ended up gaining all its new population from District 5.

276.     The Commission first discussed specific areas to add into District 1 on December

9. Carollo highlighted two "logical" and "attractive" areas: Wynwood—noting "that's mainly a Hispanic area"—and along the north side of Miami River—"non-African American areas, mainly Hispanic or Anglo basically."

277.    At the same meeting, Díaz de la Portilla reflected on how he "really can't go north" to gain population in Allapattah, because "it's an African American area."

278.    Carollo interjected, noting there might be an area by 36th Street (which served as District 1's northern border under the 2013 Plan) that could be added to District 1, but he wasn't sure "if it's mainly Hispanic or if it's more African American." Díaz de la Portilla agreed he might be able to extend north to 40th Street, but not past State Road 112, because "north of 112 we are entering into African American neighborhoods—and we can't touch that area."



**Fig. 12.** *Riverside area moved into District 1 from District 5 in the Feb. 7 Draft. The 2013 Plan is overlaid in blue.*

279.    De Grandy's Feb. 7 Draft moved the riverside area Carollo had suggested. De Grandy explained: "We felt this movement was needed because this area has a high percentage of Hispanics and a greater voter cohesion with D1 residents."

280.    The Base Plan moved a small portion of that riverside area around the MRC back into District 5. In exchange, the draft moved another part of Downtown—eight city blocks bounded by NW 7th Avenue, I-95, and NW 6th and 8th Streets—into District 1.



**Fig. 13.** *Riverside areas moved between Districts 1 and 5 in the Base Plan. The Feb. 7 Draft is overlaid in blue.*

281.    De Grandy explained that "again, we felt this movement was needed because Hispanics in the area constitute roughly 70% of the population. Thus, they have greater voter cohesion" with the rest of District 1.

282.    The 2022 Plan ended up moving a supermajority-Hispanic area of Downtown from District 5 into District 1, giving District 1 an irregular appendage that splits neighborhoods along

racial lines, including historic Overtown. The entire area moved is 70.7% HVAP.

283.    The 2022 Plan ended up extending District 1 north to 40th Street/SR 112 but no further, moving a supermajority-Hispanic chunk from District 5 between NW 12th and 19th Avenues that is 76.6% HVAP and 33.0% BVAP.



**Fig. 14.** *Allapattah areas moved between Districts 1 and 5 in the Base Plan.*

284.    Even though District 1 needed to gain population, the 2022 Plan also ended up moving a less-Hispanic area of Allapattah *out* of District 1 and into District 5, creating a jagged stair-step border that chopped up the neighborhood along racial lines.

285.    This area, bounded by NW 32nd and 36th Streets, NW 8th Avenue, and I-95, is 66.7% HVAP and 37.1% BVAP.

286.    District 1 in the 2022 Plan is 89.5% HVAP and 84.8% HCVAP.

*2. District 2/3 Border*

287.    The boundary between Districts 2 and 3 was also drawn along racial lines, to pack Hispanic residents into District 3 and strip them from District 2.

288.    Díaz de la Portilla first suggested moving areas "where Hispanic voters live" from District 2 and into Districts 3 and 4 at the second redistricting meeting, mentioning Coconut Grove

and Bay Heights specifically.

289.    De Grandy incorporated this suggestion into his Feb. 7 Draft. That map moved portions of District 2 into District 3, stretching from SW 15th Road in the north to SW 17th Avenue in the south, over to South Miami Avenue. This area included Bay Heights.



**Fig. 15.** *Areas moved out of District 2 and into 3/4 in the Feb. 7 Draft (compared to 2013 Plan).*

290.    Discussion of Feb. 7 Draft's 2/3 border focused on whether part of Downtown/Brickell should be moved into District 3 instead. Russell suggested doing that so District 2 could keep all of Coconut Grove and avoid splitting the West Grove.

291.    De Grandy explained he didn't move District 3 into Downtown "because the demographics were dissimilar," but acknowledged that was a choice the Commission could make. He clarified that he could equalize the district populations and keep Coconut Grove whole within District 2 by adding part of Downtown to District 3.

292. The Commission considered that option at the next meeting, but rejected it for racial reasons.

293. Walking through the Base Plan on February 22, De Grandy again explained that he "did not feel it was appropriate to move east" and grow District 3 into Downtown "because of dissimilar demographics." At a later meeting, De Grandy was more explicit: "the Hispanic population in that area was in the 40's," "whereas District 3 is in the 80's."



**Fig. 16.** *Areas moved out of District 2 and into 3/4 in the Base Plan (compared to 2013 Plan).*

294. Carollo supported this approach, explaining Brickell was "totally different in your demographics" from District 3, so they had no choice but to move people from the Grove into Districts 3 and 4 instead: "we can't go anywhere else."

295. To Carollo, "throwing" Brickell into District 3 would unacceptably "change the whole component of one district" with "a domino effect" to "change the composition of the other

districts."

296.    Díaz de la Portilla agreed, saying the Grove was "the only place to go."

297.    This subject came up again when the Commission considered the Initial Russell Plan. That proposed extending District 3's eastern boundary one block east to South Miami Avenue, from where US 1 and I-95 fork on the south end, northward to the Miami River.



**Fig. 17.** *Areas moved out of District 2 into 3/4 in the Initial Russell Plan (compared to 2013 Plan).*

298.    Even De Grandy advised that the Initial Russell Plan's District 3 was still a "Hispanic district" and complied with the VRA.

299.    But that assurance was not enough for the Commission. Reyes first flagged the issue: "I don't agree with it because [] there is a lot of Anglos in that area and it's going to affect them. The district as such, is going to be affected."

300.    This prompted Russell to ask De Grandy about the relative Hispanic population of the strip he proposed moving into District 3, versus the area around Natoma Manors moved in the

Base Plan.

301.    De Grandy explained Russell's strip had a Hispanic population "in the 40's," dissimilar from the rest of District 3.

302.    Meanwhile, the Natoma area De Grandy had proposed moving into District 3 was "in the 50 range," so he felt it more appropriate to move.

303.    Further, the Natoma area was smaller in population, so De Grandy wasn't concerned about that reducing District 3's Hispanic population.

304.    Russell concluded the areas were close enough in their impact on District 3's Hispanic population "to where we're splitting hairs."

305.    But the majority of the Commission wanted to split those hairs to achieve its overall goal: packing as many Hispanic residents as possible into District 3.



**Fig. 18.** *Areas moved out of District 2 into 3/4 in Revised Russell Plan (compared to 2013 Plan).*

306. The Commission revisited this theme at its final meeting, as it debated the Revised Russell Plan.

307. De Grandy again explained he "did not go east" into Brickell "when I was doing District 3 [] because I found the population to be dissimilar. It was approximately 40-some percent Hispanic, going into a district that's approximately 88% Hispanic."

308. Zooming in on individual city blocks, Díaz de la Portilla pressed De Grandy on the demographics of the "buildings in the West Brickell area" the Revised Russell Plan moved: "those buildings that are now inhabited are predominately Anglo."

309. De Grandy confirmed those buildings were "markedly different than the population in District 3."

310. So instead of shifting District 3 eastward into Brickell, De Grandy "decided that the best move will be to go south and not go east" into Brickell, because the people to the south "are more similar" to the rest of District 3, he again explained.

311. He advised that "in any of the plans," "District 3 is still a majority-Hispanic district," but was a "stronger Hispanic district under the base plan, absolutely."

312. Discussing the Reyes Plan and Revised Russell Plan's removing the West Grove triangle from District 4, Carollo stressed that District "is still the most Hispanic district out of the three Hispanic districts in the city" "even with the [West Grove] sliver of 1,600 additional people."

313. District 3, on the other hand, would be forced to gain more than 1,600 people from District 2 to balance the population deviations, as Carollo explained it.

314. That population would come from Brickell, where "it's not cohesive anymore" and where "the numbers also change" compared to the rest of District 3.

315. And, he continued, that "would put District 3 into the future in possible jeopardy."

316.     Carollo spelled out the problem in blunt terms: "bringing in a transplant from another part of the country, and because they speak a little Spanish and they smile all the time, they feel they can sneak in. . . . And this district now is gonna be skewed where it's not gonna be clear on the kind of person that could get elected from it."

317.     That is why, he concluded, he would "strongly object to West Brickell going into District 3."

318.     Reyes agreed, saying he "totally, totally oppose[d] that," and explaining that he originally agreed with De Grandy's first suggestion to shift District 3 into Bay Heights rather than Brickell, since Bay Heights was "close to 52% Hispanic." But he opposed moving District 3 eastward into Brickell.

319.     Díaz de la Portilla agreed too, saying "Carollo hit the nail on the head."

320.     He explained why the Revised Russell Plan did not adequately pack Hispanic voters: "What Mr. Russell's plan does, down the line, . . . is disintegrate that Hispanic district, District 3."

321.     "And then we'll have a minority-Hispanic Commission in a majority-Hispanic city. How's that democracy?" Díaz de la Portilla concluded, "You're shifting the balance of power in a Hispanic district."

322.     Under the Revised Russell Plan, District 3 was 86.6% HVAP and 84.8% HCVAP.

323.     In the Base Plan and 2022 Plan, it is 88.3% HVAP and 86.9% HCVAP.

*3.  District 2/4 Border*

324.     The boundary between Districts 2 and 4 was also drawn to pack Hispanic residents into District 4 and strip them from District 2.

325.     At the first redistricting meeting, Díaz de la Portilla highlighted the Douglas Park

area, which was in District 2 under the 2013 Plan, that "probably doesn't belong there." Using the phrase "political cohesion" to euphemistically refer to racial groups, Díaz de la Portilla opined, "if you look at political cohesion, it probably belongs in Commissioner Reyes' district," because it has "more commonalities" with the rest of District 4 "than with Coconut Grove or Edgewater."

326.    Carollo agreed, stating at the following meeting that this "very Hispanic area" "should have always been part of District 4."

327.    The area referred to, bounded by SW 25th Street, SW 27th Avenue, and US 1, is 81.8% HVAP and 13.6% WVAP.

328.    That overwhelmingly Hispanic area was moved into District 4 in the 2022 Plan, thereby packing Hispanic residents into District 4 and stripping them from District 2 (*see* Fig. 16).

329.    As with other areas of the map, the rejected proposals for District 4 clarify the Commission's racial intent.

330.    On February 7, Carollo proposed moving a chunk of North Coconut Grove between 22nd and 27th Avenues and South Bayshore Drive into District 4 from District 2.

331.    Reyes objected strongly to this area—which is 54.4% WVAP—being added to his district. Carollo tried to reassure Reyes by reminding him that he has "the most Hispanic" and "the most Cuban district" in the city, and that the Feb. 7 Draft already gave him "a huge Hispanic area on the other side of US 1," referring to the Douglas Park area.

332.    Comparing that 82% HVAP Douglas Park addition to his 54% WVAP North Grove proposal, Carollo explained Reyes can't be "getting all the sirloin but none of the bone."

333.    In the end, the Commission moved the Hispanic-rich "sirloin" into District 4, while most of the majority-white "bone" remained in District 2.

334.    District 4 did, however, add a portion of Coconut Grove from District 2. Following

Díaz de la Portilla's early suggestion to move areas "where Hispanic voters live" given the "ethnic diversity in Coconut Grove," District 4 added a 59.2% HVAP triangle from the West Grove, bounded by US 1, Day Avenue, and SW 27th Avenue (*see* Fig. 16).

335.    That triangle was not as Hispanic as the rest of District 4, but given the Commission considered District 4 to be the "purest" Hispanic district already, it was acceptable for it to add just "a slice, sliver" of less-Hispanic "bone."

336.    In later meetings, Reyes begrudgingly accepted adding part of Coconut Grove because he thought it necessary to maintain the racial balance of District 5: "The only reason that I will accept that is to save that seat that is there," he said on March 11, pointing to King.

337.    District 4 in the 2022 Plan is 89.5% HVAP and 88.2% HCVAP.

### 4. Internal Borders of Districts 1, 3, and 4

338.    The Commission also drew the borders that Districts 1, 3 and 4 share to facilitate the 2022 and 2023 Plans' packing of Hispanic voters into these districts and more generally, to accomplish the tripartite racial separation throughout the map.

339.    The commission largely treated Hispanic voters on the borders of these districts as fungible because these areas are all predominately Hispanic.

340.    As Carollo, Reyes, and Díaz de la Portilla recounted multiple times, Flagami, Little Havana, Shenandoah, and Silver Bluff were all split between these three districts to effectuate the Commission's policy of maximum racial separation.

341.    When he presented his Feb. 7 Draft, De Grandy acknowledged shifting areas between Districts 3 and 4 because he "tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

342.    Following Carollo's discussion of District 4 not keeping all the "sirloin," Carollo

suggested moving into District 3 a heavily Hispanic portion of District 4 between SW 27th and 32nd Avenues, in Little Havana.

343.    When Reyes objected, Carollo explained to him why it was necessary to add that territory to District 3: "you're getting more than two squares here," referring to the Douglas Park area, "in prime Hispanic area, and you're diluting the Hispanic vote."

344.    "There has to be a balance," Carollo continued, and in exchange for getting "a huge chunk of rich Hispanic voters" around Douglas Park, District 4 needed to balance its Hispanic population out with District 3.

345.    Reyes eventually agreed to "work[] out in a way that we can make it as Hispanic as you can."



**Fig. 19.** *2022 Plan borders between Districts 1, 3, and 4, showing neighborhoods split and areas moved (compared to 2013 Plan).*

346.    The area Carollo wanted to add to District 3—bounded by SW 27th and 32nd Avenues, NW 7th Street, and SW 8th Street—was indeed moved into District 3 in the 2022 Plan. It is 89.5% HVAP.

347.    Explaining the shift on February 25, De Grandy explained, "we tried to find adjacent areas with similar demographics in order to maintain voter cohesion."

## V. The 2023 Redistricting Process

348.    On May 3, 2023, Magistrate Judge Louis issued a Report & Recommendation in this case (ECF 52), recommending that this Court grant Plaintiffs' Expedited Motion for Preliminary Injunction (ECF 26) and enjoin implementation of the five districts in the 2022 Plan.

349.    The City began a remedial mapmaking process shortly after the R&R.

350.    At the Commission's May 11 meeting, Commissioner Díaz de la Portilla suggested returning to at-large elections, noting "then there's no debate about where the lines are drawing, whether it's . . . like Flagami is cut in half where Allapattah's cut in half."

351.    He doubled down on the Commission's view that representation was racially categorical, and that redistricting's goal was to reserve one Anglo and one Black seat, and to avoid having five Hispanic commissioners.

352.    Díaz de la Portilla discussed why Miami originally created single-member districts and his desire to maintain racially categorical representation:

> Because what happened, the reason why single member districts were created back then was to make sure the diversity that Miami has, as we said, it's already in on the record, doesn't matter if I say it again, right . . . the reason [it] was created was to keep harmony in our city because we have a very diverse community . . . we want an African American representation, we want a non-Hispanic white representation, we want that.

353.    According to Díaz de la Portilla, the commissioners had been trying to "be fair and to provide representation for all communities in our city."

354.    Commissioner Reyes agreed with him, noting: "[S]ince day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by—I'm going to call a spade a spade—but

gerrymandering."

355.    Commissioners Díaz de la Portilla and Reyes stressed that what the Commission did in the Enjoined Plan was right.

356.    Concluding the discussion, the Commission voted *unanimously* (with Commissioner Carollo absent) to direct their consultant Miguel De Grandy to meet with them "and start redrawing a map, that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups."

357.    The same day, the Court held a telephone conference and suggested both sides prepare for remapping.

358.    The Court issued a preliminary injunction on May 23 and ordered mediation. ECF 60–61.

359.    That night, Plaintiffs submitted two proposed maps—P1 and P2—to the Commission, along with a letter explaining them.

360.    On June 9, Plaintiffs shared supplemental information on P1 and P2's compliance with the Voting Rights Act. Plaintiffs followed that up with a full analysis from Dr. Bryant Moy on June 12.

361.    The Parties mediated on June 13, adjourning at 6:20 P.M.

362.    Responding to mediation discussions, commissioners' comments on P1 and P2, and community input, Plaintiffs submitted a third map (P3) during mediation.

363.    After 5 P.M. on Friday, June 9, the Commission noticed a special redistricting meeting for 10 A.M. June 14. The agenda listed a single "Discussion Item" focused on redistricting.

364.    On June 14, the morning after mediation, the Commission met. Plaintiff Valdes

gave a statement for the Plaintiffs, and Rev. Nathaniel Robinson III of Plaintiff GRACE also spoke.

365.   De Grandy publicly presented his "draft plan proposal," named Version 12 ("V12"), marking the first time the City shared a map in the interim remedial process.

366.   De Grandy developed V12, and other drafts, after individual private meetings with commissioners to "amalgamate" their input.

367.   There are no records of those private meetings.

368.   The Commission debated proposed changes to V12 and then took a recess after 103 minutes in session.

369.   During the recess, De Grandy met privately with commissioners and drew alternative maps at each's request.

370.   There are no records of these private meetings, either.

371.   Commissioners returned from recess for a final 44-minute session where each pushed for changes to their districts.

372.   Díaz de la Portilla proposed "Version 14," a draft De Grandy had previously drawn, as the D1 Alt. Map; Covo, Carollo, and King each proposed maps of their own based on V12 (the D2, D3, and D5 Alt. Maps); and Reyes stood by the original V12.

373.   After some discussion, De Grandy and counsel Christopher Johnson modified the D3 Alt. Map to move a portion of Overtown from District 1 to 5, in a change agreed upon by King and Díaz de la Portilla, resulting in "D3 Alt. v.2."

374.   After Díaz de la Portilla objected to the change going too far, some territory was moved back into District 1, yielding "D3 Alt. v.3."

375.   The Commission approved that plan on a 4-1 vote, and it was later memorialized in writing as Res. 23-271.

376.     The resolution and map were not properly noticed under the Sunshine Law and City Code.

377.     Mayor Suarez let Res. 23-271 become law without his signature and seven days later, the City filed Res. 23-271 with the Court.

378.     The resolution submitted to the Court on the docket was drafted after June 14 and never voted on by the Commission.

379.     There is a discrepancy between the map the Commission passed on June 14 and the plan submitted to the Court in Res. 23-271. The discrepancy falls on the border between Districts 2 and 3.

### A.  Racial Considerations Predominated in the Line-Drawing Process

380.     Just as the 2022 Plan, the Commission's overriding goal in crafting the 2023 Plan was to separate Hispanic, Black, and Anglo voters as much as possible into "their" respective districts.

381.     Improper racial considerations predominated throughout the Commission's line-drawing process. Race-neutral, traditional redistricting criteria were subordinated to race in the design of each of the districts.

382.     These race-based decisions resulted in a map that splits neighborhoods, ignores traditional redistricting criteria, and eschews fair, public-minded representation.

383.     On May 11, Commissioners repeated their attitude that representation on the Commission was racially categorical, that the redistricting's goal was to draw one Black, one Anglo, and three Hispanic seats (in part to avoid having all five commissioners be Hispanic), and that they had done the right thing.

384.     The Commission unanimously directed De Grandy to "start drawing a map that will

guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an African American to see that they're going to be properly represented as well as other groups"—*i.e.*, the two other groups the Commission had just discussed, Hispanics and Anglos.

385.    Referring to *Allen v. Milligan*, 143 S. Ct. 1487 (June 8, 2023), Commissioner King asserted in a June 13 news article, "The Supreme Court ruling proves that our original redistricting was constitutional and in the best interest of our community." She went on, "My top priority is keeping District 5 neighborhoods intact . . . Overtown, Liberty City, Little Haiti, Wynwood and the Upper East Side share the same needs. It would be unconstitutional to redraw those lines."

386.    Taken together, commissioners' statements before De Grandy even publicized his first draft evinced an intent to pass the same map, for the same reasons, under a new name.

387.    Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are ignored, race predominates. Unless the use of race is *necessary* to ensure fair and equal opportunity for voters of color to participate in the electoral process, its use is constitutionally suspect.

388.    But rather than advancing representation, the Commission continued racial separation.

### B. The Commission Adopted a Nearly Identical Map with the 2023 Plan

389.    The 2023 Plan is 94.1% the same as the 2022 Plan. Only 5.9% of Miamians are moved into a different district.

390.    Narrowing in on the three Hispanic-majority districts which the Commission previously sought to optimally "balance" with as high Hispanic populations as possible, 97.8% of Miamians who were sorted into those districts remain there in the 2023 Plan.

391.     The makeup of the 5.9% of Miamians moved confirms the map's continued race-based nature.

392.     5,125 residents were moved into Districts 2 and 5 from the three packed Hispanic districts, but those residents are disproportionately *less* Hispanic (59% HVAP compared to the enjoined districts' 88–90%).

393.     The 4,735 residents moved out of the 2022 District 5 are just 16.6% Black, compared to the enjoined District 5's 50.3% BVAP.

394.     Meanwhile, 90% HVAP areas are shuffled *among* Districts 1, 3, and 4, creating the illusion they changed while maintaining their demographics.

### C. Changes Made on June 14 Walked Back Closer to the Enjoined Plan

395.     Commissioners made several changes to De Grandy's Version 12 to claw back even more elements of the Enjoined Plan that Version 12 had altered.

#### 1. The District 2/3 Border in the North Grove and Brickell

396.     Carollo requested moving an area of the North Grove between 22nd and 27th Avenues which Version 12 added to District 3.

397.     At Carollo's request, this area was returned to District 2.

398.     This area is one of the whitest in the city (54.8% WVAP, 35.9% HVAP), and in fact is the exact same area Carollo previously compared to the bone in a steak, in contrast to Hispanic-rich "sirloin" areas elsewhere.

399.     To compensate for the lost population, Carollo requested that District 3 add a plurality-HVAP area along South Miami Avenue to Brickell.

400.     Somehow, an *additional* area of Brickell was moved *into* District 2, forming an irregular finger along the Miami River. That movement was never requested or explained publicly.

It is plurality-white.

*2. The District 3/4 Border*

401.    Carollo's only other requested change was along the District 3/4 border.

402.    Version 12 shifted the border three blocks eastward in Shenandoah and Silver Bluff, from 17th Avenue under the 2013 and Enjoined Plans, to 14th Avenue. This united all of Silver Bluff in District 4 for the first time, and meant most of Shenandoah—all but two-block-wide slice from 12th to 14th Avenues—was united in District 4 as well.

403.    Carollo requested restoring the boundary to 17th Avenue south of Coral Way, while also restoring "in that same line as before" an area further north along SW 8th and 9th Streets that both he and Reyes wanted snapped back to the enjoined boundary, "keeping it in District 3 like it was."

404.    As for the 17th Avenue/Coral Way restoration, after City Attorney Méndez recast Carollo's "main concerns [as] to keep certain communities together and certain neighborhoods together," Carollo justified "leav[ing] that section as it was" for "the simple purpose of the park we're building . . . in that part of Silver Bluff."

405.    But earlier, he stated the park was *still* on the District 4 side of the line.

406.    Indeed, the park (Silver Bluff Dog Run Park) is five blocks from the line, on the far side within District 4.

407.    As a result of Carollo's request, nearly 2,000 people between 14th and 17th Avenues moved back into District 3. In response, "to equalize population," De Grandy moved from District 3 to 4 an area in Auburndale/Little Havana—most of which had been in District 4 under the 2013 Plan.

408.    Thus, the District 3/4 border walked back closer to the Enjoined (and 2013) Plan at

commissioners' requests, continuing the division of "distinct" and "historical" Shenandoah, Silver Bluff, and Little Havana that commissioners had kept divided in the Enjoined Plan to balance Hispanic populations and facilitate racial separation.

### 3. Morningside

409. Version 12 proposed moving part of Morningside between 55th Terrace and 61st Street out of District 2 and into District 5. At 11.8% BVAP and 41.9% WVAP, the area (Area 26) has a much lower Black population and much higher white population than District 5.

410. And indeed, Version 12's District 5 BVAP drops from the Enjoined Plan's 50.3% to 50.0%.

411. Covo, who had previously given De Grandy a plan that moved *all* of Morningside into District 5, objected to Morningside being split, but acknowledged that parts of the 2013 District 2 would have to be moved out to equalize population.

412. Realizing that part of Morningside had moved into District 5, King objected.

413. De Grandy asked if she preferred to keep the neighborhood whole by including all of it into District 5, but King said, "No, I don't think that any of Morningside should go to my district. Wouldn't that be splitting up neighborhoods?"

414. King requested De Grandy bring back a revision with all of Morningside restored to District 2. The two then had a mostly-inaudible sidebar.

415. During the recess, King commented in her office that she was "looking out for the minorities" or had "to look out for the minorities" and did not want a "white affluent" area or areas in her district.

416. The only change from Version 12 made in King's proposed alternative map, the D5 Alt., was returning that piece of Morningside to District 2.

417.    That change was incorporated into the 2023 Plan.

418.    Significantly, the Commission rejected at least four alternative plans that avoided "splitting up neighborhoods" in and around Morningside by adding the neighborhood to District 5.

419.    The 2023 Plan excludes from District 5 the low-BVAP neighborhoods south of the existing district boundary.

### 4. The Commission Defined Overtown Along Racial Lines

420.    The only other change to Version 12 impacting District 5 was in Overtown.

421.    King and the Overtown CRA sharply criticized Plaintiffs for moving part of Overtown out of District 5 in P1 and P2.

422.    Responding to this criticism and mediation discussions, Plaintiffs submitted P3, which unites in District 5 all parts of Overtown that had been in the Enjoined District 5 (following the CRA boundary), *plus* reunited eleven HVAP-majority Overtown blocks that the Enjoined Plan had moved into District 1 (between NW 5th and 8th Streets, from I-95 to 7th Avenue).

423.    Neither De Grandy nor commissioners discussed P3's treatment of Overtown. Instead, De Grandy criticized P1 and P2's "severing parts of Overtown" and explained how Version 12 "keeps historic Overtown intact in District 5" at King's request.

424.    Contrasting Plaintiffs' "own impression of where Overtown is," De Grandy explained how Google Maps and the City's now-defunct Neighborhood Enhancement Team (NET) "shows a configuration consistent with our understanding" and how, "as [he] understand[s] the community of Overtown," Version 12 included all of it in District 5. His presentation included slides with his definition of "Historic Overtown."

425.    But De Grandy's Overtown *excludes* large areas that are part of the Google Maps

and NET definitions of Overtown—the very sources he cited.

426. Those definitions are shared by the City's Police Department (MPD) and the Convention & Visitors Bureau (GMCVB).

427. The area De Grandy defined as Overtown is 60.5% BVAP. The parts of the Google/NET/MPD/GMCVB definition De Grandy excluded are disproportionately non-Black (63.7% HVAP, 26.2% BVAP).

428. Further, the City Code has an official definition of Overtown that is even broader than Google/NET/MPD/GMCVB. City Code § 2-1051.

429. The parts of the City Code definition De Grandy excluded from his neighborhood boundary are less Black, and more Hispanic.

430. De Grandy defined Historic Overtown along racial lines, resulting in the area being split into District 1 and District 5 on the basis of race, with his definition shoring up the existing racial composition of District 5 and the Hispanic supermajority in District 1.

431. No commissioner objected to his definition of Overtown that surgically excludes Hispanic-majority areas, and the 2023 Plan tracks this division.

432. The Commission did object, however, to one small part of Version 12's boundary in Overtown. King requested adding to District 5 a restaurant, People's Bar-B-Que, located in Overtown under the Google/NET/MPD/GMCVB definition and City Code definition, but outside Overtown under De Grandy's definition.

433. Díaz de la Portilla consented to the change—stressing *only* the restaurant should move, nothing more—and the restaurant moved into District 5 in the D3 Alt. Map v.2.

434. But De Grandy and counsel Chris Johnson incurred too much into the Hispanic-majority part of Overtown for Díaz de la Portilla's taste, moving four whole city blocks between

NW 7th and 8th Streets.

435.   Díaz de la Portilla directed De Grandy and Johnson to restore to District 1 all but the single block with the restaurant, which they did in the final map.

436.   The three blocks returned to District 1 are over 70% Hispanic.

437.   Adding just the restaurant block deviates as little as possible from the Enjoined Plan in this area.

438.   The block's 10 residents are two-thirds Black.

439.   The line between Districts 1 and 5 in the Overtown area is predominantly a function of the Commission's goal to hew to the Enjoined Plan and separate Hispanic from Black residents.

**D. The Parts of Version 12 the Commission Chose to Accept Were Race-Based, Too**

*1. Avoiding "Packing Hispanics"*

440.   The Commission's treatment of Districts 1, 3, and 4 was driven by a desire to avoid "packing Hispanic voters" into a single district, and optimally "balance" the Hispanic population among the three districts at a uniformly high level.

441.   One of the first criticisms of P1 and P2 lodged during the Commission's meeting was how they "intentionally pack the more conservative Hispanic voters in the western areas of the city" into District 4.

442.   De Grandy commented that "the plaintiffs' plan was designed to concentrate the most conservative voters into District 4. And you see it right there," showing a slide noting 95.03 and 95.55% HVAP in P1 and P2

443.   To fix the "packing" of Hispanics, Version 12 "restored [District 1's] connection to . . . the western part of the city" where "the great majority of Hispanic voters live."

444.   Except for a single block, District 1's boundary is *identical* to the Enjoined (and

2013) Plan from the city limit at 65th Avenue all the way to 22nd.[3]

445.    Satisfied by the "restoration" of the Enjoined Plan's optimal division of Hispanic residents, the Commission left this line untouched on June 14.

   *2. Adding Back an Area "Where the Hispanic Voters Live" to District 3*

446.    Along the District 2/3 border, De Grandy proposed moving the Bay Heights region of Coconut Grove from District 2 into 3.

447.    In the Commission's first redistricting process, Bay Heights was an area Díaz de la Portilla named specifically as "where the Hispanic voters live," suggesting adding it and other parts of the Grove to Districts 3 and 4 because "there's ethnic diversity in Coconut Grove too."

448.    Following this direction, De Grandy's Feb. 7, 2022 draft moved Bay Heights into District 3.

449.    After Russell objected, De Grandy restored Bay Heights to District 2 in the Feb. 22, 2022 Base Plan, instead adding to District 3 another "ethnically diverse" part of the Grove "with similar demographics" around Natoma Manors, ensuring District 3's HVAP dropped only a tenth of a point.

450.    Nonetheless, Bay Heights' high Hispanic population was the subject of later discussion, and Carollo even expressed interest in adding the area back to District 3 and "tak[ing] it all the way down to Simpson Park" northward. But the Enjoined Plan kept Bay Heights in District 2.

451.    In Version 12, De Grandy again moved Bay Heights—and its 62% HVAP—into

---

[3] The fewer than 1,000 people moved between Districts 1, 3, and 4 along the District 1 border swapped high-Hispanic areas between the predominantly Hispanic districts, thus did not alter the racial "balance" the plan achieved.

District 3.

452.    Just as in 2022, Carollo was happy to add it, and again requested "taking it all the way down to Simpson Park," a request accommodated in the 2023 Plan.

453.    As in the Enjoined Plan, the whitest and northernmost parts of Brickell were kept out of District 3.

454.    Three minutes before the Commission voted on the D3 Alt. Map v.3, Covo—who wanted to unify as much of the Grove as possible in District 2—questioned why Bay Heights had to be moved and asked if keeping it in District 2 would "make a real difference in the numbers" for population equality.

455.    De Grandy's response: "It would make a difference," suggesting it would "increase the deviation" and cause ripple effects.

456.    But simply moving Bay Heights' 604 residents from District 3 to 2 would *better* equalize District 3's population (going from +746 to +142 from ideal) and raise the plan's overall range to just 4.2%.

457.    That range is well within the 10% range De Grandy repeatedly advised Carollo and King was permissible minutes prior, and less than the Enjoined Plan's 7.6%.

458.    Thus, the Commission adopted Res. 23-271 with Natoma (and its "similar demographics") retained in District 3, *plus* the 62%-HVAP Bay Heights—"where the Hispanic voters live" added too.

### E. District-by-District, Race Predominated in the 2023 Plan

#### 1. District 2

459.    Race predominated in the design of District 2.

460.    District 2 remains "not compact," a "relatively thin strip confined to the coast, extending from the northeast in the Morningside area . . . and continuing southwest along the water

through Coconut Grove." R&R at 72.

461.    To the north, District 2 retains "white affluent" Morningside, and adds a thin, low-BVAP adjacent strip.

462.    The border zig-zags from NE 2nd Avenue, to the railroad tracks, back to 2nd, and back to the tracks to retain whiter Condo Canyon, add an additional lower-BVAP area around Omni, and separate higher-BVAP areas of Downtown kept in District 5.

463.    To the south, "ethnically diverse" areas of the Grove "where the Hispanic voters live" are either kept in District 3 (Natoma), or moved back in after having been returned to District 2 under the Enjoined Plan for non-racial reasons (Bay Heights to Simpson Park).

464.    Whiter areas on Brickell's north end remain excised from District 3, achieved via an irregular finger.

465.    District 2 retains 92.2% of its enjoined population.

466.    Its compactness scores on the Polsby-Popper, convex hull, and Reock measures are identical to the enjoined District 2.

*2.  District 5*

467.    Race predominated in the design of District 5.

468.    The 2023 Plan's District 5 is driven by a decision to define every distant corner of the enjoined District 5 as part of a common "community of interests," locking in place the unconstitutional borders from the get-go.

469.    Commissioner King delineated a non-negotiable list of neighborhoods to ensure the replication of the enjoined District 5's boundaries—including Overtown (itself racially defined), Liberty City, Little Haiti, Wynwood, and the Upper East Side.

470.    Together, these areas constitute every corner of the enjoined District 5 except its

Downtown tail. But King requested specific landmarks at the extreme southern end of the Downtown appendage too, yielding jagged edges that scooped up FDC-Miami and its disproportionately Black inmate population (just as in the Enjoined Plan), while carefully avoiding less-Black areas like "Condo Canyon" and Overtown south of NW 8th Street that the enjoined District 5 excluded.

471.     Indeed, the 2023 Plan moves from District 5 to 2 an area around Omni (which the Enjoined Plan moved from District 2 to 5, and which King neglected to include in her "community of interests") that is even *less* Black than the Condo Canyon corridor immediately south (11.9% versus 14.2%).

472.     District 5's incursion into Northeast Allapattah across I-95 and SR 112 remains too, reconfigured slightly, but still dividing the neighborhood along racial lines by following local streets.

473.     The Commission rejected adding adjacent areas like Morningside and Edgewater because of their whiter makeup.

474.     Just as in 2022, the Commission rejected plans with sub-50% BVAPs, and inched the BVAP back up to 50.3%, from Version 12's 50.0%, by restoring the Enjoined Plan's racially-motivated Morningside/Upper East Side border.

475.     The new District 5 retains 94.7% of the enjoined population.

476.     The new District 5 is less compact than the enjoined District 5 based on the Polsby-Popper, Reock, and Convex Hull measures.

### 3. Districts 1, 3, and 4

477.     Race predominated in the design of Districts 1, 3, and 4 as well.

478.     The three predominantly Hispanic districts continue to be driven by a desire to

optimally "balance" the Hispanic population and avoid concentrating Hispanic voters into one 95%+ HVAP district.

479.    Together, these districts are 97.8% the same as the Enjoined Plan; individually, they high core retention from 90.6 to 98.2%.

480.    The District 1/4 and District 3/4 borders maintain the nearly untouched division of Flagami, Silver Bluff, Shenandoah, and Little Havana to balance Hispanic population and "preserv[e] the racial and ethnic composition of the Commission." R&R 75.

481.    District 1 maintains the "staircase-like stepping pattern in its northeastern corner in Allapattah," reconfigured slightly. R&R 74.

482.    It maintains "an appendage extending toward Downtown Miami along the Miami River," "described by the Commissioners as an 'attractive' area that was 'mainly Hispanic or Anglo.'" *Id.*

483.    It excluded De Grandy's racially-defined Overtown, while scooping up Overtown landmarks in majority-HVAP areas.

484.    District 3 became less compact, even as it smoothed out its "ethnically diverse" Natoma Manors appendage by adding Bay Heights "where the Hispanic voters live," all while minimizing additions from the whiter northern end of Brickell.

### VI.  Lack of Narrow Tailoring to Achieve a Compelling Interest in Racial Predominance

485.    Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden . . . shifts to the [government] to prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (internal quotations omitted). Traditionally, compliance with the Voting Rights Act, namely Section 2, has served as the primary justification

for predominant considerations of race. The Commission's use of race, however, was not narrowly tailored to any compelling government interest, including compliance with the VRA.

486.   To ensure its use of race was narrowly tailored to achieve VRA compliance, the Commission was obligated to assess the level of minority citizen voting-age population or registered voters necessary for those voters to have the opportunity to usually elect their candidates of choice.

487.   In enacting the 2022 Plan, the Commission centered its "analysis" on total population and voting-age population figures instead of reviewing "voting-age population *as refined by citizenship*." *Negron*, 113 F.3d at 1569 (emphasis added).

488.   Despite their facial concern for protecting diverse representation, neither the Commission nor its consultants took steps to meaningfully assess VRA compliance. There is no indication the Commission conducted an analysis of racially polarized voting (RPV) or any other analysis key to assessing VRA compliance.

489.   Instead, the Commission relied on in 2022, and carried forward in 2023, blanket racial targets and sought to increase the Black, Anglo, and Hispanic populations of the respective districts as much as possible.

490.   Furthermore, in 2023, the Commission ignored the functional analyses and evidence-based assessments Plaintiffs provided that indicated what population or registered voter percentage would afford Black voters an ability to elect candidates of choice.

491.   The City's only comment on Plaintiffs' analysis was De Grandy's comment concluding that "plaintiffs' plan *may* also negatively impact the ability of Black voters to elect a candidate of choice throughout the decade in D5," without explaining how he expected their margins (ranging from 56.4 to 82.7%, compared to 58.4 to 84.3% in the Enjoined Plan) to decline

such that Black voters' choice would fail to usually prevail.

492.    De Grandy's VRA analysis boiled down to "keeping as many communities of interest"—King's proxies for the enjoined District 5—"together as feasible."

493.    De Grandy advised that the D1 Alt.—which kept all of King's proxies but had near-identical BVAP and BCVAP to P3—was VRA-compliant, even when he concluded Plaintiffs' maps weren't.

494.    The Commission made changes to Version 12 to make District 5 even more Black, removing Morningside at King's request.

495.    The Commission rejected proposals to solve the problem of splitting Morningside by uniting it within District 5. Those proposals would have yielded a sub-50% BVAP.

496.    And commissioners ensured not one inch of Hispanic-majority parts of Overtown moved into District 5.

497.    Through these changes, District 5's BVAP increased from 50.0 to 50.3%—the same arbitrary numerical target as the Enjoined Plan.

498.    Without conducting a functional analysis of RPV, the Commission's race-based map drawing in both 2022 and 2023 was not narrowly tailored to achieve VRA compliance.

499.    The Commission identified no other compelling interest to justify its use of race when it drew the 2022 and 2023 Plans.

<u>**CLAIM FOR RELIEF**</u>

**Racial Gerrymandering
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

500.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

501.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

502.    Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

503.    As alleged in detail above, race was the predominant factor in the design of all five Miami City Commission districts in the 2022 and 2023 Plans. Race predominated over all other redistricting criteria when each of these districts was drawn.

504.    The use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the VRA.

505.    Consequently, the districts do not survive strict scrutiny.

506.    Therefore, the districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.    Declare the five Miami City Commission districts in 2022 and 2023 Plans to be unconstitutional in violation of the Fourteenth Amendment as racially gerrymandered;

B.    Permanently enjoin the City and its officers and agents from calling, conducting, supervising, or certifying any elections under the unconstitutional districts;

C.    Order the City to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regularly scheduled elections;

D.    Award each Plaintiff nominal damages of $1;

E.    Award Plaintiffs their attorneys' fees in this action;

F.    Award Plaintiffs their costs of suit;

G.    Retain jurisdiction to render any further orders this Court may deem necessary; and

H.    Grant any other relief this Court deems just and proper.

Respectfully submitted this 29th day of December, 2023,

 /s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
Janine M. Lopez (FBN 1038560)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Gregory P. Luib*
**Dechert LLP**
1900 K Street NW
Washington, DC 20006
(202) 261-3413
gregory.luib@dechert.com

Neil A. Steiner*
Julia Markham-Cameron*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
julia.markham-cameron@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*