# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      *Plaintiffs*,

v.

CITY OF MIAMI,

      *Defendant*.

_____/

## JOINT PRETRIAL STIPULATION

Plaintiffs Grace, Inc., Engage Miami, Inc., South Dade Branch of the NAACP, Miami-Dade Branch of the NAACP, Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras, and Steven Miro (together, "Plaintiffs") and the City of Miami (the "City" or "Defendant" and, together with Plaintiffs, the "Parties"), by and through their respective attorneys, and pursuant to this Court's February 24, 2023 Scheduling Order, ECF 32, and S.D. Fla. Local R. 16.1(e), jointly submit this pretrial stipulation, and state:

**1.   A short, concise statement of the case by each party in the action.**

<u>Plaintiffs</u>:

This action challenges the five Miami City Commission districts as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause, both in the map passed by the City of Miami on March 24, 2022 (the "2022 Plan") and the subsequent map passed by the City of Miami on June 14, 2023 (the "2023 Plan"). In these two plans, the City sought to do more than merely impose a run-of-the-mill racial gerrymander in which the majority seeks to diminish minority voters' influence and power. Rather, the Plans are the product of a calculated scheme in which communities and neighborhoods were split along racial lines for the predominant purpose

1

of maintaining racially segregated districts. As Commissioner Alex Díaz de la Portilla put it: "Our goal here is to have an African American district, . . . a white district, . . . and three Hispanic districts."

In this scheme, race-based considerations were the *predominant* factor. Race was the predominant factor in maintaining arbitrary racial quotas; in packing certain districts with as many Hispanic and Black residents as possible; in maintaining racial "purity" with the "same type of last name and faces"; in the decision to perpetuate existing districts' cores, which were themselves race-based; and in the Commission's overt command that Black, Hispanic, and Anglo residents *must* be separated as much as possible into different districts because, in the Commission's view, each race needs to be represented by a co-ethnic, irrespective of Miami's communities or their interests and values. There is no valid reason for this practice, which is "by [its] very nature odious to a free people whose institutions are founded upon the doctrine of liberty." *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 643 (1993).

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). Because race was the predominant factor motivating district lines, the City must satisfy strict scrutiny by proving that its use of race "serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Bethune-Hill I*, 580 U.S. at 193). The City cannot meet that burden. Although courts assume governments have a compelling interest in complying with Section 2 of the Voting Rights Act (VRA), *id.*, the City's use of race was not narrowly tailored to achieve that laudable goal. The City cannot show that it narrowly tailored its use of race with a "functional analysis" assessing racial bloc voting to

determine the proportion of minority voters needed in a district to allow those voters to usually elect their preferred candidates. *Bethune-Hill I*, 580 U.S. at 194. Instead, the City set "mechanical racial targets," imposing a 50% Black voting-age population (BVAP) quota for District 5, and aiming to get the Hispanic and Anglo populations as high as possible in Districts 1, 3, and 4; and District 2, respectively. *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 267 (2015). Narrow tailoring requires far more than just picking a number or shooting for the maximum. Further, the City misused key metrics of VRA compliance and ignored the absence of fundamental preconditions for VRA liability in Districts 1, 2, 3, and 4. The predominance of race-based thinking in the City Commission's decisions does not advance representation and cannot be justified by compliance with the Voting Rights Act or any other compelling interest. Stated simply, the City's racially gerrymandered redistricting schemes—both under the 2022 Plan and 2023 Plan—violate Plaintiffs' rights to the equal protection of the laws.

<u>Defendant</u>:

Proving a racial gerrymandering claim under the Fourteenth Amendment requires a demonstration that "race was the predominant factor motivating the legislature's decision *to place a significant number of voters within or without a particular district*." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). The test for racial gerrymandering is not merely whether race was discussed, but whether it actually *resulted* in a racial gerrymander of a significant number of voters. *Id.* It applies district-by-district, and a whole map challenge is improper. *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). At the core of Plaintiffs allegations are that the City drew the district lines "for the predominant purpose of maintaining racially segregated districts." (DE 143, ¶1).

Here, the City has a supermajority Hispanic population, and the racial composition of the City's five districts has generally remained the same since districts were first created in 1997: three supermajority Hispanic districts, one VRA required majority African-American district, and one plurality district.

Neither the 2022 nor the 2023 Plan were drawn to affect a racial gerrymander—it is indisputable that if one were to draw a Black VRA district as the parties agree was required, then the resulting districts would necessarily be at least three supermajority Hispanic districts and a plurality district, or alternatively, three supermajority Hispanic districts and a Hispanic majority district, as demonstrated by the redistricting plans Plaintiffs have proposed.  Plaintiffs rely primarily on statements made by the City's commissioners with respect to the enactment of the 2022 Plan in support of their racial gerrymandering claim, despite none of those commissioners expressing any specific direction to racially sort specific groups of voters into any particular district based upon their race, nor any intent to increase or decrease the racial makeup of any district.  The City Commission is entitled to a presumption of good faith and the Commissioners' discussions were in the context of the mathematical reality the City faces with respect to its obligation to draw a VRA-compliant Black district and its densely concentrated supermajority Hispanic population.

The Parties agree that the City was required to maintain a district that would continue to perform for the Black candidate of choice to comply with the Voting Rights Act.  To make out a vote-dilution claim under Section 2 of the VRA, a racial or language minority group must satisfy three preconditions: (1) the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group "is politically cohesive," and (3) the "majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's

preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986) (cleaned up).  At the time redistricting was required, District 5 had a Black voting age population of 52.9% and needed to gain population to comply with the Equal Protection Clause.  When the City retained District 5, it reduced the Black voting age population in the district, maintaining a bare 50.3% majority Black voting age population. Objectively, this district was narrowly tailored to comply with the VRA at 50.3%.  The City analyzed, and the 2022 Plan validated, that 50.3% was sufficient to continue to perform for the Black candidate of choice in District 5.

As alluded to, it is not only likely that the City will continue to have three supermajority Hispanic districts, a district that will provide Black voters an equal opportunity to elect their candidate of choice, and a plurality district, Plaintiffs' four proposed maps confirm this reality, thereby undermining their claim that the City engaged in such division for "the predominant purpose of maintaining racially segregated districts." (DE 23, ¶1).  Logically, if Plaintiffs four alternative plans are not considered racially gerrymandered because they maintain the same substantial racial makeup, then neither can the City's 2022 and 2023 Plans.

**2.  The basis of federal jurisdiction.**

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

**3.  The pleadings raising the issues.**

Plaintiffs filed a Second Amended Complaint on December 29, 2023. ECF 143.  Defendant plans to file an Answer and Affirmative Defenses to the Second Amended Complaint on January 12, 2024.

**4.  A list of all undisposed of motions or other matters requiring attention by the Court.**

Plaintiffs filed an unopposed Motion to Permit Dr. Cory McCartan to Testify Remotely on January 11, 2024.

**5.  A concise statement of uncontested facts which will require no proof at trial, with reservations, if any.**

1)  Defendant CITY OF MIAMI is a Florida municipality. As a municipal corporation established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law.

2)  Miami is governed by a five-member City Commission and a Mayor.

3)  Except where the Miami City Charter provides otherwise, municipal elections are conducted according to the state's general election laws.

4)  Since 1997, commissioners have been elected from single-member districts.

5)  Commissioners run on a nonpartisan basis and serve four-year staggered terms, with Districts 1, 2, and 4 last elected in 2023 and next up in 2027, and Districts 3 and 5 last elected in 2021 and next up in 2025.

6)  General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years.

7)  Except for candidate qualifying, which is managed by the City Clerk, the Miami-Dade County Elections Department administers municipal elections for the City.

8)  Commissioners are limited to two consecutive terms.

9)  The current commissioners are Miguel Angel Gabela (District 1), Damian Pardo (District 2), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5).

10)  The 2021–22 redistricting process produced the 2022 Plan, enacted in Resolution R-22-131.

11) The 2023 redistricting process produced the 2023 Plan, enacted in Resolution R-23-271.

12) The District 1 and 2 commissioners during the 2021–22 redistricting process were Alex Díaz de la Portilla and Ken Russell, respectively.

13) The District 1 and 2 commissioners during the 2023 redistricting process were Alex Diaz de la Portilla and Sabina Covo, respectively.

14) Díaz de la Portilla, Carollo, Reyes, and Gabela are Hispanic and Cuban American. Covo and Pardo are Hispanic.  King is Black and not Hispanic. Russell is White and Japanese American and not Hispanic.

15) Díaz de la Portilla was first elected in 2019 and lost reelection in the November 2023 election held under the 2023 Plan.

16) King was first elected in 2021 and is eligible for reelection in 2025.

17) Reyes was first elected in a 2017 special election and was reelected in the November 2023 election held under the 2023 Plan.

18) Carollo was first elected in 2017, was reelected in 2021 under the 2013 plan, and is ineligible for reelection when his current term ends in 2025.

19) Russell ran for Congress in the 2022 election and resigned on December 29, 2022.

20) Covo was elected in a February 2023 special election held under the 2022 Plan and lost reelection in the November 2023 election held under the 2023 Plan.

21) Damian Pardo was first elected in the November 2023 election held under the 2023 Plan.

22) Miguel Gabela was first elected in the November 2023 election held under the 2023 Plan.

III.     *The 2021-2022 Redistricting Process*

       A.     *The February 25, 2021 Meeting*

23)     On February 25, 2021, the Commission hired Miguel De Grandy and Stephen M. Cody to serve as the City's redistricting consultants and draw new commission maps.  De Grandy and Cody had previously served as the City's redistricting consultants in redistricting processes in 2003 and 2013.

24)     The demographics for the 2013 Plan are below.

| 2013 Plan Demographics | | | | | |
| --- | --- | --- | --- | --- | --- |
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 81,449 | (6,999) | 91.0% | 10.1% | 3.0% |
| 2 | 117,281 | 28,833 | 51.9% | 7.7% | 34.5% |
| 3 | 80,169 | (8,279) | 88.5% | 5.6% | 7.4% |
| 4 | 80,601 | (7,847) | 91.6% | 2.9% | 6.0% |
| 5 | 82,741 | (5,707) | 41.6% | 52.9% | 7.8% |
| Total | 442,241 | | 71.1% | 14.8% | 13.9% |

25)     A true and accurate representation of the Miami City Commission districts under the 2013 Plan is below:



26)     The Voting Rights Act requires the districts to be drawn in such a way to afford Black voters an equal opportunity to elect candidates of their choice in at least one district.

B.      *The November 18, 2021 Meeting*

27)     At a Commission meeting on November 18, 2021, De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan.

28)     Following the 2020 U.S. Census (the "2020 Census"), the City's Commission Districts no longer had substantial equality of population, and the ideal Commission district size had increased to 88,448.

29)     District 2 was substantially overpopulated and had to "shed" population to the other four districts to bring the population variance back to constitutionally acceptable levels.

D.     *The February 7, 2022 Meeting*

30)     At a Commission meeting on February 7, 2022, De Grandy presented a draft redistricting plan (the "Feb. 7 Draft") to the Commission.  A true and accurate representation of the Miami City Commission districts under the Feb. 7 Draft, showing the 2013 Plan overlaid with blue lines, is below:



31)     The demographics for the February 7 Draft are below:

| February 7 Draft Demographics | | | | | |
|---|---|---|---|---|---|
| **Population and Deviation** | | | **2020 Census Voting Age Population** | | |
| **D#** | **Total Pop.** | **Pop. Dev.** | **Hisp. VAP** | **Black VAP** | **White VAP** |
| 1 | 88,775 | 327 | 88.7% | 10.5% | 4.3% |
| 2 | 88,363 | (85) | 47.8% | 7.8% | 37.6% |
| 3 | 87,600 | (848) | 88.4% | 5.5% | 7.6% |
| 4 | 90,437 | 1,989 | 88.1% | 3.4% | 8.7% |
| 5 | 87,066 | (1,382) | 41.6% | 49.8% | 10.1% |
| Total | 442,241 | | 71.1% | 14.8% | 13.9% |

*E.      The February 25, 2022 Meeting*

32)     On February 25, De Grandy presented a revised plan he had submitted three days prior (the "Feb. 22 Draft"). Except for three unpopulated census blocks that were later moved from District 1 to 5, the Feb. 22 Draft became the 2022 Plan.  A true and accurate representation of the Feb. 22 Draft, showing the Feb. 7 Draft overlaid with blue lines, is below:



33)     The Commission voted 4-1 to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting. Only Russell voted no.

> ### F.     The March 11, 2022 Meeting

34)     The Commission took up the Base Plan again on March 11, 2022.

35)     Russell proposed to restore all of Coconut Grove to District 2, rather than moving portions into Districts 3 and 4. A true and accurate representation of Russell's proposed plan (the "Initial Russell Plan") is below:



*G.    The March 24, 2022 Meeting*

36)    The Commission reconvened on March 24, 2022 for its last redistricting meeting of the 2021–22 process.

37)    De Grandy then presented the options that each commissioner directed him to develop since March 11. There were proposals from King, Díaz de la Portilla, Russell, and Reyes.

38)    A true and accurate representation of King's proposed plan is below.



39)     A true and accurate representation of Díaz de la Portilla's proposed plan is below.



40)     A true and accurate representation of Russell's revised plan is below.



41) A true and accurate representation of the Reyes' proposed plan is below.



42)     De Grandy advised that each proposed amendment complied with the Constitution and the Voting Rights Act.

43)     The Base Plan with the change proposed by King passed as the 2022 Plan. Díaz de la Portilla, Carollo, and King voted yes. Reyes and Russell voted no.

44)     Mayor Suarez chose not to veto the 2022 Plan, which went into effect ten days after it became law and was used in the February 2022 special election for District 2.

45)     The demographics for the 2022 plan are below.

| 2022 Plan Demographics | | | | | |
| --- | --- | --- | --- | --- | --- |
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 88,108 | (340) | 89.5% | 11.0% | 3.5% |
| 2 | 93,300 | 4,852 | 48.6% | 7.3% | 37.4% |
| 3 | 87,658 | (790) | 88.3% | 5.4% | 7.7% |
| 4 | 86,597 | (1,851) | 89.5% | 3.1% | 7.6% |
| 5 | 86,578 | (1,870) | 40.6% | 50.3% | 10.5% |
| Total | 442,241 | 7.6% | 71.1% | 14.8% | 13.9% |

*IV.     The 2023 Redistricting Process*

46)     On December 15, 2022, Plaintiffs filed this action, alleging that the 2022 Plan constituted racial gerrymandering in violation of the Fourteenth Amendment's Equal Protection Clause.  ECF 1.

47)     On February 10, 2023, Plaintiffs filed a First Amended Complaint and moved for a preliminary injunction against the implementation of the five districts in the 2022 Plan. ECF 23, 26.

48)     On May 3, 2023, Magistrate Judge Louis issued a Report & Recommendation in this case, recommending that this Court grant Plaintiffs' motion for a preliminary injunction and enjoin implementation of the five districts in the 2022 Plan. ECF 52.

49)     On May 23, the Court adopted Magistrate Judge Louis's Report & Recommendation, issued a preliminary injunction, and ordered the parties to mediate. ECF 60–61. That night, Plaintiffs submitted two proposed maps—"P1" and "P2"—to the Commission, along with a letter explaining them.

50)     On June 14, the Commission met.

51)     De Grandy publicly presented the "draft plan proposal," named Version 12 ("V12").

52)     The Commission debated proposed changes to V12 and then took a recess.

53)     Commissioners returned from recess and approved V12 with adopted changes (the "2023 Plan") on a 4-1 vote; the 2023 Plan was later memorialized in writing as Res. 23-271.

54)     Mayor Suarez let Res. 23-271 become law without his signature, and the City filed Res. 23-271 with the Court.

55)     The demographics for the 2023 Plan are below.

| 2023 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 87,455 | (993) | 89.7% | 10.9% | 3.4% |
| 2 | 89,593 | 1,145 | 49.6% | 7.7% | 36.5% |
| 3 | 89.194 | 746 | 84.5% | 5.4% | 10.5% |
| 4 | 89,555 | 1,107 | 90.0% | 3.1% | 7.2% |
| 5 | 86,444 | (2,004) | 40.6% | 50.3% | 10.5% |

56)     The Parties stipulate to the accuracy and veracity of the population and voting-age population statistics as presented in the tables above.

**6.   A statement in reasonable detail of issues of fact which remain to be litigated at trial.**

1)      Whether Grove Rights and Community Equity, Inc. (GRACE) has standing to challenge the City's districts, and which districts they have standing to challenge under the 2023 Plan.

2)      Whether Engage Miami, Inc. has standing to challenge the City's districts, and which districts they have standing to challenge under the 2023 Plan.

3)      Whether South Dade Branch of the National Association for the Advancement of Colored People (South Dade NAACP) has standing to challenge the City's districts, and which districts they have standing to challenge under the 2023 Plan.

4)      Whether Miami-Dade Branch of the National Association for the Advancement of Colored People (Miami-Dade NAACP) has standing to challenge the City's districts, and which districts they have standing to challenge under the 2023 Plan.

5)      Whether Clarice Cooper has standing to challenge District 2 under the 2023 Plan.

6)      Whether Jared Johnson has standing to challenge District 3 under the 2023 Plan.

7)      Whether Steven Miro has standing to challenge District 3 under the 2023 Plan.

8)      Whether Alexandra Contreras has standing to challenge District 4 under the 2023 Plan.

9)      Whether Yanelis Valdes has standing to challenge District 2 under the 2023 Plan.

10)      Whether race was the predominant factor in the design of Districts 1, 2, 3, and 4 in the 2022 Plan.

11)      Whether race was the predominant factor in the design of Districts 1, 2, 3, and 4 in in the 2023 Plan.

12)     Whether the City's use of race in the design of District 5 in the 2022 Plan was narrowly tailored to a compelling state interest.

13)     Whether the City's use of race in the design of District 5 in the 2023 Plan was narrowly tailored to a compelling state interest.

**7.  A concise statement of issues of law on which there is agreement.**

1)     Venue properly rests with this Court.

2)     "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

3)     Racial gerrymandering claims involve "a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

4)     *First*, plaintiffs must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," and "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916).

5)     To meet their burden, plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).

6)     "Race may predominate even when a reapportionment plan respects traditional principles" like compactness and respect for major man-made and natural boundaries. *Id.* at 189; *see Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996) (a district's "irregular contours," "bizarre designs," and "unnecessary appendage[s]" were probative of racial predominance); *In re SJR 1176*,

83 So. 3d at 618, 636–38 (explaining that respect for major boundaries is a traditional principle for redistricting, as embodied in the Florida Constitution).

7)       Alternative district configurations that satisfy non-racial criteria can also be probative of racial predominance, but no alternative map is required to prove racial predominance. *Easley v. Cromartie*, 532 U.S. 234, 249 (2001); *Cooper v. Harris*, 581 U.S. 285, 319 (2017) ("An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim."); *see Ala. Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F. Supp. 3d 1026, 1391 (M.D. Ala. 2017) (rejected alternative plans constitute evidence of racial predominance). Similarly, splitting of neighborhoods and other subdivisions along racial lines "strongly suggests" racial predominance. *Covington v. North Carolina*, 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017); *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F.Supp.3d 128, 148 (E.D. Va. 2018) (split subdivisions indicate racial predominance).

8)       There is no "special evidentiary prerequisite" for proving racial predominance. *Cooper*, 581 U.S. at 318.

9)       ***Second***, "if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292.

10)       While courts assume compliance with the Voting Rights Act (VRA) is a compelling interest, "to meet the 'narrow tailoring' requirement," the State must prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (citation omitted). This requires a "functional analysis of the electoral behavior within the particular . . . district," *Bethune-Hill I*,

580 U.S. at 194, and the record must support "a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

11)     The constitutionally cognizable injury in a racial gerrymandering case is the fact that plaintiffs are classified based on their race. *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 263 (2015) ("Those harms are personal. They include being personally . . . subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group.") (cleaned up). "Where a plaintiff resides in a racially gerrymandered district, [] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995) (cleaned up); *see also Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000) ("If the plaintiff lives in the racially gerrymandered district, she has standing" to bring a claim alleging racial gerrymandering.)

12)     An organization has associational standing to assert racial gerrymandering claims where the organization's members "would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires individual[] members' participation in the lawsuit." *ALBC*, 575 U.S. at 269 (cleaned up).

13)     *If* race was the predominant factor in the design of Districts 1, 2, 3, or 4, the use of race was not justified by a compelling state interest.

## 8.  A concise statement of issues of law which remain for determination by the Court.

1)     Whether Plaintiffs have standing to challenge the City's districts under the 2023 Plan and which districts they have standing to challenge.

21

2)      Whether the 2022 Plan constitutes racial gerrymandering in violation of the Fourteenth Amendment.

3)      Whether the 2023 Plan constitutes racial gerrymandering in violation of the Fourteenth Amendment.

4)      Whether the City's use of race in the design of District 5 in the 2022 Plan was narrowly tailored to a compelling state interest.

5)      Whether the City's use of race in the design of District 5 in the 2023 Plan was narrowly tailored to a compelling state interest.

**9. Each party's numbered list of trial exhibits, other than impeachment exhibits, with objections, if any, to each exhibit, including the basis of all objections to each document, electronically stored information and thing.**

Plaintiffs' list of trial exhibits with Defendant's objections is attached hereto as Exhibit 1.

Defendant's list of trial exhibits with Plaintiffs' objections is attached hereto as Exhibit 2.

**10. Each party's numbered list of trial witnesses, with their addresses, separately identifying those whom the party expects to present and those whom the party may call if the need arises.**

Plaintiffs expect to present the following witnesses at trial:

1.  Miguel De Grandy, c/o undersigned counsel for Defendant

2.  Dr. Carolyn Abott, c/o undersigned counsel for Plaintiffs

3.  Dr. Bryant Moy, c/o undersigned counsel for Plaintiffs

4.  Dr. Cory McCartan, c/o undersigned counsel for Plaintiffs

5.  Rebecca Pelham, c/o undersigned counsel for Plaintiffs

6.  Rev. Nathaniel Robinson III, c/o undersigned counsel for Plaintiffs

7.  Carolyn Donaldson, c/o undersigned counsel for Plaintiffs

8.  Daniella Pierre, c/o undersigned counsel for Plaintiffs

    9.   Clarice Cooper, c/o undersigned counsel for Plaintiffs

    10.  Jared Johnson, c/o undersigned counsel for Plaintiffs

    11.  Steven Miro, c/o undersigned counsel for Plaintiffs

    12.  Yanelis Valdes, c/o undersigned counsel for Plaintiffs

    13.  Alexandra Contreras, c/o undersigned counsel for Plaintiffs

Plaintiffs may call the following witnesses at trial if the need arises:

    1.  Harold Ford, c/o undersigned counsel for Plaintiffs

    2.  Christopher Johnson, c/o undersigned counsel for Defendant

    3.  Nicholas Warren, c/o undersigned counsel for Plaintiffs

    4.  Stephen Cody, c/o undersigned counsel for Defendant

    5.  All persons identified or called by Defendant

    6.  Any other witnesses needed for impeachment or rebuttal

Plaintiffs plan to designate testimony from the depositions of the following witnesses instead of calling them at trial, while reserving the right to call them at trial if the need arises:

    1.  Christina White, Miami-Dade County Elections Department, 2700 NW 87th Ave, Doral, FL 33172, (305) 499-8683

    2.  Larry Spring, c/o undersigned counsel for Defendant

    3.  Todd Hannon, c/o undersigned counsel for Defendant

Defendant expects to present the following witnesses at trial:

    1.  Miguel De Grandy, c/o undersigned counsel for Defendant

    2.  Dr. John Alford, c/o undersigned counsel for Defendant

Defendant may call the following witnesses at trial if the need arises:

    1.  Dr. Cory McCartan, c/o undersigned counsel for Plaintiffs

2.   Rebecca Pelham, c/o undersigned counsel for Plaintiffs

3.   Rev. Nathaniel Robinson III, c/o undersigned counsel for Plaintiffs

4.   Carolyn Donaldson, c/o undersigned counsel for Plaintiffs

5.   Daniella Pierre, c/o undersigned counsel for Plaintiffs

6.   Harold Ford, c/o undersigned counsel for Plaintiffs

7.   Clarice Cooper, c/o undersigned counsel for Plaintiffs

8.   Jared Johnson, c/o undersigned counsel for Plaintiffs

9.   Steven Miro, c/o undersigned counsel for Plaintiffs

10.   Yanelis Valdes, c/o undersigned counsel for Plaintiffs

11.   Alexandra Contreras, c/o undersigned counsel for Plaintiffs

12.   Christopher Johnson, c/o undersigned counsel for Defendant

13.   Nicholas Warren, c/o undersigned counsel for Plaintiffs

14.   Stephen Cody, c/o undersigned counsel for Defendant

15.   All persons identified or called by Plaintiff.

16.   Any other witnesses needed for impeachment or rebuttal.

Defendant will present counter-designations of testimony from the depositions of the following witnesses instead of calling them at trial, while reserving the right to call them at trial if the need arises:

1.   Christina White, Miami-Dade County Elections Department, 2700 NW 87th Ave, Doral, FL 33172, (305) 499-8683

2.   Larry Spring, c/o undersigned counsel for Defendant

3.   Todd Hannon, c/o undersigned counsel for Defendant

24

**11. Estimated trial time.**

Estimated trial time is 6 days.

**12. Where attorney's fees may be awarded to the prevailing party, an estimate of each party as to the maximum amount properly allowable.**

Plaintiffs estimate their attorneys' fees through the end of trial will be $2,000,000.

Respectfully submitted this 11th day of January, 2024,

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
Janine M. Lopez (FBN 1038560)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Gregory P. Luib*
**Dechert LLP**
1900 K Street NW
Washington, DC 20006
(202) 261-3413
gregory.luib@dechert.com

Neil A. Steiner*
Julia Markham-Cameron*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
julia.markham-cameron@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*

GRAYROBINSON, P.A.

By: *s/ George T. Levesque*
GRAYROBINSON, P.A.
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
Fabian A. Ruiz
Florida Bar No. 117928
Email: Fabian.Ruiz@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

26