**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

       *Plaintiffs*,

v.

CITY OF MIAMI,

       *Defendant*.

_____/

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       Pursuant to Rule 16.1(k) of the Local Rules of the Southern District of Florida and this Court's February 24, 2023 Scheduling Order (Doc. 32), Defendant, the City of Miami (the "City" or "Defendant"), hereby files its Proposed Findings of Fact and Conclusions of Law:

**I.**     **FINDINGS OF FACT**

       **a.**   **The Redistricting Process**

    1.      The City is a Florida municipal corporation established under Florida law. The City has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law.

    2.      The City is governed by a five-member City Commission and a Mayor.

    3.      Except where the City Charter provides otherwise, municipal elections are conducted according to the state's general election laws.

    4.      Since 1997, commissioners have been elected from single-member districts.

    5.      Since inception, the City's five districts have had substantially the same racial demographic make-up: three super majority Hispanic districts, a majority black district, and a plurality district.

6.      Following the 2020 U.S. Census (the "2020 Census"), the City's districts no longer had substantial equality of population. The ideal district size had increased to 88,448.  District 2, the waterfront district, had grown at a faster pace than the other four districts and needed to "shed" population to the other four districts in order to bring the population variance back to constitutionally acceptable levels.

7.      On February 25, 2021, the Commission hired Miguel De Grandy and Stephen M. Cody to serve as the City's redistricting consultants (the "Redistricting Consultants") and draw new commission maps.  The Redistricting Consultants had previously served in that role during the redistricting processes in 2003 and 2013.

8.      The demographics for the 2013 Plan, as it existed after the 2020 Census, are below.

| 2013 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| **Population and Deviation** | | | **2020 Census Voting Age Population** | | |
| **D#** | **Total Pop.** | **Pop. Dev.** | **Hisp. VAP** | **Black VAP** | **White VAP** |
| 1 | 81,449 | (6,999) | 91.0% | 10.1% | 3.0% |
| 2 | 117,281 | 28,833 | 51.9% | 7.7% | 34.5% |
| 3 | 80,169 | (8,279) | 88.5% | 5.6% | 7.4% |
| 4 | 80,601 | (7,847) | 91.6% | 2.9% | 6.0% |
| 5 | 82,741 | (5,707) | 41.6% | 52.9% | 7.8% |
| Total | 442,241 | | 71.1% | 14.8% | 13.9% |

9.      The Miami City Commission districts under the 2013 Plan are set forth in the map below:



10.     The City memorialized its directions to Mr. De Grandy and Mr. Cody to guide their map

drawing efforts in the directions adopted in City of Miami Resolution R-21-485.  Specifically,

that resolution directed the map drawers to:

a. Comply with the United States Constitution and the Voting Rights Act;
b. Maintain the core of existing districts to avoid voter confusion;
c. Factor in voter cohesion;
d. Achieve substantial equality of population as opposed to mathematical equality; and
e. Maintain communities of interest and neighborhoods where feasible.

11.     As part of the map drawing process, Stephen Cody analyzed the City's population

to determine whether a VRA district was required.  Additionally, during the first round of that

process, he performed a functional analysis that determined the variations of District 5 that would

still provide black residents the ability to elect their candidate of choice in District 5.  Additionally,

Plaintiffs concede that a VRA district is required.

12.     Plaintiffs' expert confirmed that District 5 in every plan provides Black voters in

District 5 the ability to elect the candidate of their choice.

13.     The Commission voted 4-1 to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting.

14.     The Commission took up the Base Plan again on March 11, 2022.

15.     On March 24, 2022, the City Commission held its last redistricting meeting of the 2021–22 process, and enacted Resolution R-22-131 (the "2022 Plan"), which redrew the district lines and balanced the population among the five districts.

16.     Mayor Suarez chose not to veto the 2022 Plan, which went into effect ten days after it became law and was used in the February 2022 special election for District 2.

17.     The demographics for the 2022 Plan are below.

| 2022 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 88,108 | (340) | 89.5% | 11.0% | 3.5% |
| 2 | 93,300 | 4,852 | 48.6% | 7.3% | 37.4% |
| 3 | 87,658 | (790) | 88.3% | 5.4% | 7.7% |
| 4 | 86,597 | (1,851) | 89.5% | 3.1% | 7.6% |
| 5 | 86,578 | (1,870) | 40.6% | 50.3% | 10.5% |
| Total | 442,241 | 7.6% | 71.1% | 14.8% | 13.9% |

18.     On December 15, 2022, Plaintiffs filed this action, alleging that the 2022 Plan constituted racial gerrymandering in violation of the Fourteenth Amendment's Equal Protection Clause.  (DE 1).

19.     On February 10, 2023, Plaintiffs filed a First Amended Complaint and moved for a preliminary injunction against the implementation of the five districts in the 2022 Plan. (DE 23, 26).

20.      On May 3, 2023, Magistrate Judge Louis issued a Report & Recommendation in this case, recommending that this Court grant Plaintiffs' motion for a preliminary injunction and enjoin implementation of the five districts in the 2022 Plan. ECF 52.

21.      On May 11, 2023, the Commission met to discuss the Magistrate's Report & Recommendation, and this litigation.  Mr. De Grandy was not present at this meeting, and to the extent that the Commission issued directions at that meeting, they were never communicated to him and were not considered in drawing a remedial plan.

22.      On May 23, the Court adopted Magistrate Judge Louis's Report & Recommendation, issued a preliminary injunction, and ordered the parties to mediate. ECF 60–61. That night, Plaintiffs submitted two proposed maps—"P1" and "P2"—to the Commission, along with a letter explaining them.

23.      On June 14, the City Commission met, during which De Grandy publicly presented a draft plan proposal, named Version 12 ("V12").

24.      During the course of that meeting, the Commission discussed Plan V12 and discussed and approved changes to that plan.  The City Commissioners approved "D3 Alt. Map v.3" (the "2023 Plan") on a 4-1 vote, and the 2023 Plan was later memorialized in writing as Res. 23-271.

25.      Mayor Suarez let Res. 23-271 become law without his signature, and the City filed Res. 23-271 with the Court.

26.      The 2023 Plan wholly replaced the 2022 Plan.  No current Commissioner has stood for election under the 2022 Plan, and no part of the 2022 Plan remains in effect.[1]

_____

[1] On January 11, 2024, the City passed Resolution R-24-1 (the "2024 Plan"), amending the 2023

27.     The demographics for the 2023 Plan are below.

| 2023 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| **Population and Deviation** | | | **2020 Census Voting Age Population** | | |
| **D#** | **Total Pop.** | **Pop. Dev.** | **Hisp. VAP** | **Black VAP** | **White VAP** |
| 1 | 87,455 | (993) | 89.7% | 10.9% | 3.4% |
| 2 | 89,593 | 1,145 | 49.6% | 7.7% | 36.5% |
| 3 | 89.194 | 746 | 84.5% | 5.4% | 10.5% |
| 4 | 89,555 | 1,107 | 90.0% | 3.1% | 7.2% |
| 5 | 86,444 | (2,004) | 40.6% | 50.3% | 10.5% |

28.     Only three of the present City Commissioners have been elected under the 2023 Plan: Commissioner Reyes (District 4) was re-elected to a second four-year term in 2023; and Commissioners Miguel Gabela (District 1) and Damian Pardo (District 2) were elected to their first four-year term in 2023.

29.     In 2021, Commissioners Joe Carollo and Christine King were elected under the 2013 Plan for a four-year term that expires in 2025. Neither Commissioner Carollo nor Commissioner King have not stood for election under either the 2022 or the 2023 Plan.

30.     The next election to elect City Commissioners is scheduled for November 4, 2025. *See* City of Miami Charter, Subpart A, § 7.

31.     The Miami-Dade County Supervisor of Elections has indicated that she would need a final, non-appealable map by March 31, 2024, in order to hold a special election concurrent with the State's 2024 general election cycle.

**b.  Plaintiffs' Claims And Maps**

32.     Plaintiffs only challenge and seek relief from the City's 2022 and 2023

_____

Plan. The 2024 Plan is currently in effect.

6

Redistricting Plans.[2] .

33.     Plaintiffs have neither alleged, nor proven, the City engaged in gerrymandering to diminish any group's ability to have influence in any district.  Plaintiffs do not contend that any group's vote has been diluted by the redistricting process.

34.     The City is a majority-minority city and, every plan that the City has passed, and that the Plaintiffs have proposed, reflect the substantially similar racial demographics.

35.     District 5 was drawn in a way that afforded Black voters an equal opportunity to elect a candidate of their choice, in compliance with the Voting Rights Act ("VRA").

36.     Because most White residents reside near the coast, all plans have a coastal District 2 with the largest concentration of White voters, but that group still fails to comprise a majority. Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the 2023 Plan.

37.     All plans have a VRA-protected Black District 5.  Both the 2022 Plan and the 2023 Plan reduce the BVAP percentage from 52.9% in the 2023 plan to 50.3% in each respective plan. Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), but the 2013 Plan had a BCVAP of 59.4%, compared to Plaintiff Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% and the 2023 Plan's 57.4%.

38.     The influence of Black voters is not alleged to have been diluted in any other district as a result of the redistricting.

39.     All plans have three supermajority Hispanic districts, but Plaintiffs' Hispanic

---

[2] Plaintiffs have not challenged the 2013 Plan or the 2024 Plan, and they have not sought relief from those plans

Voting Age Population ("HVAP") in District 4 in all plans is maximally packed at higher than 94%.

40.     Given the fact that the City of Miami is 70% Hispanic, after drawing District 5, it is mathematically impossible to draw the rest of the map without at least three majority Hispanic Districts.  Moreover, because the largest White population lives near the coast, the coastal district will always have the largest concentration of White (or "Anglo") voters, as it does in all of Plaintiffs' plans.

### c.   Lack Of Intent To Gerrymander Districts

41.     Plaintiffs have not brought forward any facts to support their claim that the City engaged in racial gerrymandering to diminish any group's ability to have influence in any district or presented evidence that the Commission subordinated traditional race-neutral districting principles—like the retention of the core of districts which was a primary directive to the City's map drawers—to racial considerations or otherwise demonstrated that a significant number of voters were placed in a particular district because of their race.

42.     The City is legally required to move residents as part of the redistricting process. Because of the City's demographics and its rare position as a majority-minority city, it must move minority residents among those districts.  The Plaintiffs' proposed plans confirm this reality.

43.     At no point during either the 2022 or 2023 Plan redistricting meetings did any of the City's Commissioners vote on, or approve, on any unconstitutional criteria for its map drawers. The City Commissioners also did not direct the Redistricting Consultants to take make any particular change to the plans on the basis of the race of any resident.

44.     The June 14, 2023 Commission meeting leading to the adoption of the 2023 Plan, in which several Plaintiffs and their representatives appeared and participated, included

discussions concerning the merits of the draft plan, additional proposed alterations of the proposed draft plan, and ultimately approval a revised draft plan.  None of these discussion reveal any racial motive or intent.

### d.  <u>The Individual Plaintiffs Failed To Establish An Injury-In-Fact</u>

45.     None of the Individual Plaintiffs established that he or she suffered an injury-in-fact, as opposed to a generalized grievance, such that any of them has standing to bring this case.

46.     First, Plaintiff Valdes, a Latina Cuban-American, resided in District 5 under the 2022 Plan, but resides in District 2 under the 2023 Plan.  She testified that she has no problem being in District 2, no problem being represented by the then-sitting Hispanic Commissioner of District 2, and no race-based objection to the 2023 Plan.  While Valdes testified taking issue with the fact that Coconut Grove is split in the 2023 Plan, but she does not know whether that boundary was based upon race and presented no evidence showing that it was.

47.     Plaintiff Contreras, who identifies as Hispanic and White, has never voted in a City of Miami election and will not vote in the City's next election.  While she moved into District 4 in August 2022, after the enactment of the 2022 Plan, she no longer lives there and has no specific plans to move back into the City.  Regardless, Contreras did not have any issue with the percentage of Hispanic population when she moved to District 4 or with the fact that District 4 was predominantly Hispanic.  Her love of Miami, an unspecified desire to live in the City in the future, and her mere desire to be a Plaintiff in this case do not establish the requisite injury-in-fact necessary to support her standing.

48.     Plaintiff Cooper has lived in District 2 since the City first drew districts in 1997, and she remains in District 2 under the 2022 Plan and the 2023 Plan.  Her only objection was

that Black residents of the West Grove had been moved out of District 2 in the 2022 Plan; but she admitted that the 2023 Plan remedied that concern by moving the West Grove back into District 2.  She thus has no cognizable or individualized injury.

49.     Plaintiff Miro, who is Hispanic, moved to District 3 in 2014 and has lived there since.  That District was predominantly Hispanic when he moved there, and he admitted that it would be difficult to draw Districts 1 or 3 in a way that would not be predominantly Hispanic. Moreover, Miro's objection to District 3 was based upon non-racial reasons: specifically, he believed that the District packed residents who are "65-plus" and "living in affordable housing," thus, he believed, diluting his voice.  But this is not a claim for racial gerrymandering, and Miro therefore failed to establish that he suffered an individualized injury on the basis of his race.

50.     Plaintiff Johnson moved to District 3 in 2021 and, under the 2022 Plan and 2023 Plan, remains in District 3.  He is also located in District 3 in three out of the four maps proposed by the Plaintiffs.  Johnson testified that he would prefer to be represented in District 2, but a preference for another district—especially where Johnson's residence remained in the same district as when he moved there—does not establish injury-in-fact or anything more than a generalized grievance.

51.     While the Individual Plaintiffs articulated generalized complaints and criticisms of the 2022 Plan and the 2023 Plan, none of them demonstrated actual injury-in-fact sufficient to support their standing to assert a claim for racial gerrymandering.

### e.   The Associational Plaintiffs Failed To Establish An Injury-In-Fact

52.     The Associational Plaintiffs, which include Miami Dade NAACP, South Dade NAACP, GRACE, and Engage also failed to establish injury-in-fact sufficient to support their

standing.

53.     Miami-Dade NAACP did not check its membership list to determine whether any of its members reside within the City of Miami limits, much less within District 5 (with which it takes issue).  Its President and corporate representative does not live in the City.  While she testified that unspecified members lived in unspecified places within the City, that is not enough.

54.     Plaintiff South Dade NAACP does not maintain a list of members and did not perform an analysis to determine where its members reside.  While it took issue with District 2 in the 2022 Plan, it never identified a member who resides within that District.  Most problematic for its claims, it does not have any issue with the 2023 Plan, instead testifying through its corporate representative that it could not say whether the Board had an objection to the 2023 Plan.  In other words, Miami-Dade NAACP has not asserted an injury-in-fact as a result of the 2023 Plan.

55.     Plaintiff GRACE allows individuals to participate in meetings, but it does not have individual members and does not require individuals to submit an application or pay a fee; GRACE's only members are organizational.  GRACE did not present evidence establishing where, and in which districts, the members of its member organizations reside.  Indeed, GRACE admitted that it does not know whether its residents reside in all of the City's districts.

56.     Plaintiff Engage never verified the race or ethnicity of any of its members to determine whether they make up a predominant race in any district, and that it does not verify its members' residential addresses after they are on-boarded.  Thus, like the other Plaintiffs, Engage did not satisfy its burden of establishing standing.

**f.** **The Plaintiffs Failed To Establish An Injury That Is Redressable By This Court**

57.     Plaintiffs also lack standing because they failed to establish an injury that is redressable by this Court.  None of the Plaintiffs' proposed plans materially changes the racial makeup of the City's districts.  The racial makeup of the City of Miami mandates this result. Indeed, all of the plans—both those proposed by Plaintiffs and the City's Plans they claim are unconstitutional—contain a coastal District 2 with the largest concentration of White voters, but which is either a Hispanic-leaning plurality district or a Hispanic district; a VRA-protected Black District 5; and three supermajority Hispanic Districts.  While Plaintiffs accused the City of packing Black voters into District 5 based upon the BCVAP in the 2023 Plan, two of Plaintiffs' proposed plans (3 and 4) have a BCVAP within 1.6% of the 2023 Plan's BCVAP. And the range of HVAP in Plaintiffs' proposed maps (all of which they contend are constitutional) further demonstrates that their claimed injury is not redressable: the Hispanic population in District 1 in Plaintiffs' Plans ranges from 70.1% HVAP to 86.6% HVAP, compared to 89.7% in the 2023 Plan; in District 3, Plaintiffs' Plans range from 84.8% HVAP to 90.1% HVAP, compared to 89.7% in the 2023 Plan.  Plaintiffs thus concede that a 15% deviation in HVAP is permissible; the deviation between Plaintiffs' Plans and the City's Plans falls well within that range.

58.     These similarities between the demographics across all of the maps at issue—proposed and enacted—illustrate the practical difficulty of crafting a remedy that addresses what the Plaintiffs claim as their injury—that a significant number of voters were placed within or without a district for predominantly racial reasons.  In other words, regardless of what any individual commissioner may have said, no actual racial gerrymander occurred.  In fact, apart from uniting the areas loosely identified as the Grove, Plaintiffs' proposed maps do not resolve

their complaints.  Johnson, for example, complains about being stripped from his district based upon race, but he lived in District 3 when he moved to the City, remains in District 3 under the 2022 Plan and 2023 Plan, and is located within District 3 in three out of Plaintiffs' four proposed maps.  Stated simply, it appears to the Court to be impossible to fashion a remedy for Plaintiffs' purported injuries; the racial composition of the City's five districts is the result of the City's demographics, which the Court cannot change.  Thus, Plaintiffs' claimed injuries are not redressable, and they lack standing to bring this lawsuit.

## II.   CONCLUSIONS OF LAW

### a.  Jurisdiction

1.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

### b.  Standing

2.    Plaintiffs lack standing, so their claims fail as a matter of law. To bring a lawsuit in federal court, a plaintiff must have standing; that is, he must have "such a personal stake in the outcome of the controversy as to warrant [h]is invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Simon v. E. Kentucky Welfare Rts. Org.,* 426 U.S. 26, 38 (1976).  But "it is not enough" for the plaintiff to "have a keen interest in the issue." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  Rather, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Schultz v. Alabama,* 42 F.4th 1298 (11th Cir. 2022) (internal citation omitted).  The plaintiff bears the burden of proving these elements of his claim.  *See United States v. Hays,* 515 U.S. 737, 744-45 (1995) ("citizens who

[bring a case for gerrymandering] carry the burden of proving their standing, as well as their case on the merits"); *see also Gill v. Whitford,* 138 S. Ct. 1916, 1923 (2018) ("a plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has a personal stake in the outcome, distinct from a generally available grievance about government) (internal quotations and citations omitted).

3.     In the context of a claim for racial gerrymandering, an individual plaintiff has standing only to assert "that his own district" has been gerrymandered.  *Gill,* 138 S. Ct. at 1930 (citing *Hays,* 515 U.S. at 744-45).  But generalized grievances are not enough.  *Hays*, 515 U.S. at 743.  On the contrary "only those citizens able to allege injury as a direct result of having been denied equal treatment" have standing to challenge a redistricting plan.  *Id.*  Relatedly, an association may only "bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 169 (2000) (citing *Hunt v. Washington StateApple Adver. Com'n*, 432 U.S. 333, 343 (1977).  But, as with individuals, "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon,* 426 U.S. at 40.  In other words, whether an organization has standing turns on whether it has "established actual injury to any of [its] . . . members."  *Id.*; *see also Anderson v. City of* Alpharetta, 770 F.2d 1575, 1582-83 (11th Cir. 1985) (where NAACP "failed to identify a single plaintiff who ha[d] been personally and concretely injured by the alleged discriminatory practices of the City of Alpharetta," it failed to establish its standing); *National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners of St. John's County*, 376 F.3d 1292, 1296 (11th Cir. 2004)

(failure to "identify an injured constituent prevent[ed] [association] from asserting associational standing").

4.      "[A] "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2492 (U.S. 2019) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018)).

5.      Plaintiffs truthfully conceded that they have not suffered any personal injury traceable to the 2022 or 2023 Plans. Instead, each Plaintiff seeks to vindicate harms allegedly suffered by others, even though Plaintiffs could not identify an actual injury to themselves.  This very theory was rejected by the U.S. Supreme Court in *Hays*, 515 U.S. 737 (1995), in which the Court held that generalized grievances cannot support standing, even for claims of racial gerrymandering under the Equal Protection Clause.

6.      Additionally, none of the Plaintiffs' proposed plans materially change the racial makeup of the City's districts, further evidencing that their claim is not redressable, given that no plan would result in a material change to the racial makeup of any of the City's districts.

### c.  Plaintiffs Have Failed To Establish Racial Gerrymandering

7.      To prove a racial gerrymandering claim under the Fourteenth Amendment, Plaintiffs bear the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  But "redistricting differs from other kinds of state decision making in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646

(1993).  Thus, "[t]hat sort of race consciousness does not lead inevitably to impermissible race discrimination," *id.*, and, instead, "[t]he test for racial gerrymandering" goes beyond "merely whether race was discussed," and requires a showing that redistricting actually resulted in a racial gerrymander of a significant number of voters. *Cooper*, 591 U.S. at 291.  This analysis must be conducted as to each district alleged to be unconstitutional; a challenge to a map as a whole is improper.  *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015).

8.     If the Plaintiff establishes that race was the predominant factor in a particular district, then the burden shifts to the City to satisfy strict scrutiny: that is, to prove that the use of race "serve[d] a 'compelling interest and is 'narrowly tailored' to that end.'"  *Cooper*, 581 U.S. at 292. The purpose of requiring a district to be narrowly tailored is "to ensure that "the means chosen fit th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype."  *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (citing *Richmond v. J. A. Croson Co.*, 488 U. S., at 493 (plurality opinion) (internal quotations omitted)).  But the government *does* have a compelling interest to consider race in order to comply with the Voting Rights Act (VRA) and maintain a majority-minority district that will perform for a minority candidate of choice.  Thus, the state's burden to prove narrow tailoring in this respect requires only that the State prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action."  *Cooper*, 581 U.S. at 292.  This standard "gives States 'breathing room' to adopt reasonable compliance measure[.]'"  *Id.*

9.     In *Hays*, the Court noted that the record contained "evidence tending to show that the legislature was aware of the racial composition of [the districts]," but the Court also noted that "the legislature *always is aware of race* when it draws district lines." 515 U.S. at 744 (emphases added) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)) (internal quotation marks omitted). "That

sort of race consciousness does not lead inevitably to impermissible race discrimination" and proof of that race consciousness "in the redistricting process is inadequate to establish injury in fact." *Id.* at 745–46. "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up).

### i. The VRA-District—District 5—Is Narrowly Tailored To Serve A Compelling Government Interest And Is Thus Constitutional.

#### 1. District 5 Was Narrowly Tailored.

10.    In evaluating the narrow tailoring of a district, the Court examines "whether the racial distinctions are necessary and whether they are over-inclusive or under-inclusive." *Grutter*, 539 U.S. at 333. But "[t]he law cannot insist that a state legislature, when redistricting, determine *precisely* what percent minority population" is required by section 5 of the VRA. *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017) (internal quotations omitted; emphasis in original). Such a requirement would "afford state legislatures too little breaching room, leaving them 'trapped between the competing hazards of liability' under the Voting Rights Act and the Equal Protection Clause." *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)). Thus, instead, "the question is whether the State had 'good reasons' to believe'" that a particular "BVAP floor was necessary to avoid liability under § 5." *Id.* If there was a good reason, the Court does not second-guess the decision.

11.    District 5 is, objectively, narrowly tailored. It is neither over-inclusive nor under-inclusive: the BVAP in both the 2022 Plan and the 2023 Plan is just over 50%—the mathematical minimum to constitute a majority. The "50% target" claimed by Plaintiffs was not an arbitrary

target—it was not even a target—but it was significant to Mr. de Grandy, the City's map drawer, because it represents part of the *Gingles* threshold criteria.  *See Thornburg v. Gingles,* 478 U.S. 30, 50–51 (1986) (establishing three "preconditions" for bring a violation of § 2 of the Voting Rights Act: (1) that the minority group is be sufficiently large and geographically compact *to constitute a majority in a district*; (2) that the minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate of choice);  *see also* <u>*Allen v. Milligan*</u>, 599 U.S. 1, 18 (2023).  Notably, the difference between the BVAP and BCVAP between Plaintiffs' plans and the 2023 Plan is as small as 1.5% and .9% respectively.  The law does not mandate that the majority required by the VRA be pared down to the absolute minimum with zero margin for error.

12.     Plaintiffs argue, based upon *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017), that the Court should apply a purely subjective test to evaluate whether District 5 was narrowly tailored: namely, Plaintiffs contend that the court should evaluate whether the legislative body subjectively had a "*good enough*" reason to believe that the map was narrowly tailored.  The law does not require such an analysis, and this Court rejects it.  The purpose of a "narrow tailoring" inquiry is to prevent over- and under-inclusivity; that is, to prevent vote-packing or vote-dilution. Where the data does not support a finding that either of these concerns is valid or present, the Court declines to look beyond that objective evidence to speculate about the legislature's subjective intent.  However, even if such was the standard, Mr. Cody performed an analysis that indicated a Black VRA district was required – a requirement not disputed by the Plaintiffs. Moreover, the plans adopted by the City would continue to perform as required by the VRA—a fact confirmed by Plaintiffs' expert.  There is no requirement that one must jettison minority population after a

district has been drawn in order to have the district "narrowly" perform.  Such a holding runs

contrary to the principles articulated in *Bethune-Hill* that repudiated such precision as a standard.

> **b.  The Remaining Districts—1, 2, 3, And 4—Were Not Racially Gerrymandered And Were Based Upon Permissible Criterion, So They Are Constitutional.**

13.  The numbers belie Plaintiffs' assertion that the remaining districts in the City's 2022

Plan or 2023 Plan demonstrate any sort of impermissible racial gerrymandering.  Again, the Court

observes that it is undisputed that the City of Miami is a majority-minority city, with approximately

15% of its population Black and 70% of its population Hispanic.  As a result of the City's

demographics, it appears to the Court that any district map with a VRA-protected Black District

will also have three majority-Hispanic Districts.  Plaintiffs' proposed maps merely reinforce this

point and undermine their claims: each, like the 2022 Plan and 2023 Plan, has a VRA-protected

Black District and three supermajority Hispanic Districts.

14.  Although Plaintiffs assert that the 2022 Plan was meant to further pack districts that

were originally racially gerrymandered when they were drawn in 1997, redistricting through the

2022 Plan actually *reduced* racial concentrations.  And the 2023 Plan reduced them still further: it

lowered the WVAP in District 2 from 40.5% to 38.6%, had the same BVAP, less than a 1%

difference in the HVAP in Districts 1 and 4, and lowered the HVAP in District 3 from 88.3% to

84.5%.

15.  Far from proving that the 2022 Plan or the 2023 Plan were motivated by race, the

evidence established that the demographics in both Plans are the result of demographic realities in

the City and the preservation of the cores of the original, 1997 districts—which is a legitimate,

permissible redistricting criterion and does not support a claim for racial gerrymandering.  *Miller*

*v. Johnson*, 515 U.S. 900, 906 (1995).  Stated simply, the evidence presented by both the Plaintiffs

and the Defense merely established that the maps at issue reflect the racial makeup of the City,

and there was no gerrymandering which placed significant numbers of minority voters in any district in any way inconsistent with the City's actual demographics.

16.     The 2022 and 2023 Plans are constitutional.

> **c. Alternatively, If The Court Finds A Constitutional Violation Pertaining To Any District, The Court Should Only Grant Prospective Relief In Those Districts Found Not To Be Unconstitutionally Compliant And Should First Afford The Commission The Opportunity To Remedy The Constitutional Defect.**

17.     As an initial matter, "redistricting 'is primarily the duty and responsibility of the State,' and '[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions.'" <u>Abbott v. Perez</u>, 138 S. Ct. 2305, 2324 (2018) (quoting *Miller v. Johnson,* 515 U.S. 900, 915 (1995).

18.     Relief in redistricting cases is "fashioned in the light of well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 487 (2017). A district court must therefore consider "what is necessary, what is fair, and what is workable." *Id.* (quoting *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977)). Factors to consider in deciding relief in a racial gerrymander case includes (i) the severity and nature of the particular constitutional violation, (ii) the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and (iii) the need to act with proper judicial restraint when intruding on state sovereignty. *Id.* at 488.

19.     First, proper deference to state processes requires the City to be afforded the opportunity remedy any constitutional defects. The Court's prior rulings granting preliminary injunctive relief did not definitively rule on the merits of the case. *See* <u>Jacksonville Branch of NAACP v. City of Jacksonville</u>, No. 22-14260, 2023 WL 119425, at *1 (11th Cir. Jan. 6, 2023) (observing district court's ruling on preliminary injunction did not definitively rule on the merits).

The next general election is not to be held until November 4, 2025.  There is sufficient time for the City to pass a remedial plan and provide this Court with ample time to review to ensure constitutional compliance.

20.    Moreover, the Court finds that the holding of special elections in all five districts is not warranted under the present circumstances.

21.    First, the current Commissioners from Districts 3 and 5 were not elected under either the 2022 or the 2023 Plan.  Truncating the terms of the elected representatives from Districts 3 and 5 and requiring those current commissioners to stand for re-election does not remedy any constitutional violation because those duly elected Commissioners have not been elected to a district under a plan that this Court has found to be unconstitutional.

22.    Second, the Court concludes the equities do not require a special election to be held before the next regularly scheduled City election.  In so holding, the Court does not in any way diminish the harm arising from the racial sorting of City residents; however, there is no evidence that the racial intent that made a particular district constitutionally infirm had any discriminatory racial effect.  The City's efforts have not disenfranchised any voters or otherwise diminished the ability of minority voters to elect their candidates of choice.

23.    Commissioners Gabela, Pardo, and Reyes were recently elected by the voters of their respective districts to four-year terms for their respective offices.  The City's Charter provides that commissioners serve staggered four-year terms.  Truncating the current terms Commissioners Gabela, Pardo, and Reyes defeats the purpose of having defined length of term.  Also, requiring such special elections injects greater uncertainty into the City's processes by creating another potential change in City leadership outside the regularly planned election cycles.

24.     Additionally, truncating the terms of Commissioners Gabela, Pardo, and Reyes has the effect of kicking them out of office for the term to which they have just been elected, overriding the will of the voters who just elected them.

25.     The Court, having invalidated the 2023 Plan, directs the City to adopt a remedial plan by.  The City may consider race in the drawing of only District 5, but such consideration must be limited to ensure compliance with Section 2 of the Voting Rights Act and ensure that the district is narrowly tailored for such purpose.  The City should not consider race in the drawing of any other district, but may consider the directions adopted in City of Miami Resolution R-21-485, which includes the directions to their map drawer to:

    a. Comply with the United States Constitution and the Voting Rights Act;
    b. Maintain the core of existing districts to avoid voter confusion;
    c. Factor in voter cohesion;
    d. Achieve substantial equality of population as opposed to mathematical equality; and
    e. Maintain communities of interest and neighborhoods where feasible.

26.     Once the City has adopted a remedial plan, Defendant shall notify the Court within three days of the remedial plan becoming law.  If the City fails to adopt a remedial plan by that date, the Court will issue a notice for a scheduling conference to address the City's failure adopt a remedial plan, and the need to provide a remedial plan before the 2025 elections.

GRAYROBINSON, P.A.

By: _s/ George T. Levesque_
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090
Facsimile: (850) 577-3311

Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
Fabian A. Ruiz
Florida Bar No. 117928
Email: Fabian.Ruiz@gray-robinson.com
Jessica D. Santos
Florida Bar No. 1038776
Email: Jessica.Santos@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of January, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ George T. Levesque*
Counsel for Defendant