## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

     *Plaintiffs*,

v.

CITY OF MIAMI,

     *Defendant*.

_____/

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Local Rule 16.1(k) and the Court's Paperless Pretrial Order (ECF 32), Plaintiffs submit the following proposed findings of fact and conclusions of law.

### I.  LEGAL STANDARDS

#### A.  Standing

1.    To have Article III standing, Plaintiffs must demonstrate an injury-in-fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

2.    The injury-in-fact in a racial gerrymandering case is the use of race to draw the districts: the fact that a plaintiff is classified based on their race. *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 263 (2015) ("Those harms are personal. They include being personally . . . subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group.") (cleaned up).

3.    Causation is established by the City's enactment and imposition of each challenged plan, each of which took effect shortly after it was enacted.

4.    Plaintiffs' injuries are redressed when they are no longer subject to a racial

1

classification—when they live in districts that are not drawn predominantly based on race, or where the use of race is narrowly tailored to a compelling interest.

5.     "Where a plaintiff resides in a racially gerrymandered district, [] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744–45 (1995) (cleaned up).

6.     An organization has associational standing to assert racial gerrymandering claims where the organization's members "would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires individual[] members' participation in the lawsuit." *ALBC I*, 575 U.S. at 269 (cleaned up).

7.     When one plaintiff has demonstrated standing to sue, the Court need not inquire as to the standing of any other plaintiff. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009). Thus, Plaintiffs need only demonstrate that a single Individual Plaintiff—or a single member of an Organizational Plaintiff—resides in each district. Plaintiffs made this showing.

### B. Racial Gerrymandering

8.     "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

9.     Racial gerrymandering claims involve "a two-step analysis." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). First, plaintiffs must prove that "race was the predominant factor motivating

the legislature's decision to place a significant number of voters within or without a particular district," and "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916).

10.     There is no "special evidentiary prerequisite" for proving racial predominance. *Cooper*, 581 U.S. at 318. Plaintiffs need not show actual conflict between district design and traditional race-neutral districting principles: "Race may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill I*, 580 U.S. at 189. Moreover, the use of race "remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7.

11.     To meet their burden, plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller*, 515 U.S. at 916).

12.     Alternative district configurations that satisfy non-racial criteria can also be probative of racial predominance, but an alternative map is not required to prove racial predominance. *Easley v. Cromartie*, 532 U.S. 234, 249 (2001); *Cooper*, 581 U.S. at 319 ("An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim."); *see also Ala. Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F. Supp. 3d 1026, 1391 (M.D. Ala. 2017) (rejected alternative plans constitute evidence of racial predominance).

13.     Splitting of neighborhoods and other subdivisions along racial lines "strongly suggests" racial predominance. *Covington v. North Carolina* (*Covington I*), 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017); *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F.Supp.3d 128, 148 (E.D. Va. 2018) (split subdivisions indicate racial

predominance).

14.     "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill I*, 580 U.S. at 193). While courts assume VRA compliance is a compelling interest, "to meet the 'narrow tailoring' requirement," the State must prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* (citation omitted). This requires a "functional analysis of the electoral behavior within the particular . . . district," *Bethune-Hill I*, 580 U.S. at 194, and the record must support "a strong showing of a pre-enactment analysis with justifiable conclusions." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

### C.  Remedy and Special Elections

15.     "Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.' *Reynolds v. Sims*, 377 U. S. 533, 585 (1964). A district court therefore must undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified, *NAACP v. Hampton County Election Comm'n*, 470 U. S. 166, 183, n.36 (1985), taking account of 'what is necessary, what is fair, and what is workable,' *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977)." *North Carolina v. Covington* (*Covington II*), 581 U.S. 486, 488 (2017).

16.     "[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering . . . are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (cleaned up), *aff'd sub nom. Cooper*, 581 U.S. 285. "[I]t would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under" a map held to be constitutionally invalid. *Reynolds*, 377 U.S. at 585.

17.     "When a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate . . . to afford a reasonable opportunity for the legislature to . . . adopt[ ] a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).

18.     When weighing whether special elections are warranted to remedy a racial gerrymander, courts consider "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Covington II*, 581 U.S. at 488.

## II.  FINDINGS OF FACT

### A.  Individual Plaintiffs

19.     Plaintiff Cooper is a Black resident of District 2 under both the 2022 Plan and 2023 Plan.[1] Pls. Ex. 59.

20.     Plaintiff Valdes is Latina, resided in District 2 under the 2022 Plan, and resides in District 5 under the 2023 Plan. Pls. Ex. 60.

21.     Plaintiff Johnson is a Black resident of District 3 under both the 2022 Plan and 2023 Plan. Pls. Ex. 61.

22.     Plaintiff Miro is a Hispanic resident of District 3 under both the 2022 Plan and 2023 Plan. Pls. Ex. 63.

23.     Plaintiff Contreras is Latina and resided in District 4 under both the 2022 Plan and 2023 Plan from the time this action was filed until about a month after the 2023 Plan was enacted, when she moved out of the City of Miami. Pls. Ex. 62.

_____

[1] "2022 Plan" refers to the redistricting plan adopted on March 24, 2022 by Resolution 22-131. "2023 Plan" refers to the redistricting plan adopted on June 14, 2023 by Resolution 23-271.

**B. Organizational Plaintiffs**

24.    Plaintiff Engage Miami, Inc. is a 501(c)(4) membership organization founded in 2015, whose mission is to advance justice, sustainability, and democracy by building a culture of civic participation for young people that is bold, local, and impactful. Pls. Ex. 55. Engage Miami fulfills this mission by focusing on increasing the civic engagement of young people through voter engagement—voter registration, civic education, leadership development, and advocacy related to this issues that its members priorities. Engage Miami advocates for issues including democracy and voting rights. Pls. Ex. 57, 58. Engage Miami has members who live in all five City Commission districts under both the 2022 and 2023 Plans.

25.    Plaintiff GRACE (Grove Rights and Community Equity), Inc. is a 501(c)(3) membership organization whose mission is to advocate for equitable economic development while preserving the historic Black and Bahamian community, culture, and residents of Miami's West Grove neighborhood, protecting vulnerable Black tenants and homeowners at risk of eviction and displacement, restoring the rights of the wrongfully displaced, and preserving the community, culture, and history of the West Grove and its people. Pls. Ex. 43. As part of its mission, GRACE has advocated for the voting rights of its members, African Americans, and other voters of color in Miami. Pls. Ex. 45, 46, 57, 58. GRACE and its constituent organizations have members who reside in Districts 2 and 4 under the 2022 Plan, and District 2 under the 2023 Plan.

26.    The South Dade Branch of the NAACP and Miami-Dade Branch of the NAACP are affiliate branches of the Florida State Conference of Branches Florida State Conference of Branches and Youth Units of the NAACP, the oldest civil rights organization in Florida, formed in 1909. Pls. Ex. 47, 48. Their mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Consistent with this

mission, the NAACP Branches advocate for the voting rights of African Americans and other voters of color in Miami, including their members. Pls. Ex. 49–54, 57, 58. The South Dade NAACP serves Miami-Dade County south of Flagler Street; the Miami-Dade NAACP serves Miami-Dade County north of Flagler Street. The South Dade NAACP has members residing in Districts 2, 3, and 4. The Miami-Dade NAACP has members residing in Districts 1, 2, 3, and 5.

### C.  Overview of the City Commission and Its Elections

27.     Defendant City of Miami is a Florida municipality. As a municipal corporation established under Florida law, Miami has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law. ECF 148 (J. Stip.) ¶ 1.

28.     Miami is governed by a five-member City Commission and a Mayor. J. Stip. ¶ 2.

29.     Except where the Miami City Charter provides otherwise, municipal elections are conducted according to the state's general election laws. J. Stip. ¶ 3.

30.     Since 1997, commissioners have been elected from single-member districts.  J. Stip. ¶ 4.

31.     Commissioners run on a nonpartisan basis and serve four-year staggered terms, with Districts 1, 2, and 4 last elected in 2023 and next up in 2027, and Districts 3 and 5 last elected in 2021 and next up in 2025. J. Stip. ¶ 5.

32.     General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years. J. Stip. ¶ 6.

33.     Except for candidate qualifying, which is managed by the City Clerk, the Miami-Dade County Elections Department administers Miami's municipal elections. J. Stip. ¶ 7.

34.     Commissioners are limited to two consecutive terms. J. Stip. ¶ 8.

35.     The current commissioners are Miguel Angel Gabela (District 1), Damian Pardo (District 2), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5). J. Stip. ¶ 9.

36.     The 2021–22 redistricting process produced the 2022 Plan, enacted in Resolution R-22-131. J. Stip. ¶ 10.

37.     The 2023 redistricting process produced the 2023 Plan, enacted in Resolution R-23-271. J. Stip. ¶ 11.

38.     The District 1 and 2 commissioners in office during the 2021–22 redistricting process were Alex Díaz de la Portilla and Ken Russell, respectively. J. Stip. ¶ 12.

39.     The District 1 and 2 commissioners in office during the 2023 redistricting process were Alex Diaz de la Portilla and Sabina Covo, respectively.  J. Stip. ¶ 13.

40.     Díaz de la Portilla was first elected in 2019 and lost reelection in the November 2023 election held under the 2023 Plan. J. Stip. ¶ 15.

41.     King was first elected in 2021 and is eligible for reelection in 2025. J. Stip. ¶ 16.

42.     Reyes was first elected in a 2017 special election, was reelected to his first full term in 2019, and was reelected again in the November 2023 election held under the 2023 Plan. J. Stip. ¶ 17.

43.     Carollo was first elected in 2017, was reelected in 2021 under the 2013 plan, and is ineligible for reelection when his current term ends in 2025. J. Stip. ¶ 18.

44.     Russell ran for United States Congress in the 2022 election and resigned on December 29, 2022. J. Stip. ¶ 19.

45.     Covo was elected in a February 2023 special election held under the 2022 Plan and lost reelection in the November 2023 election held under the 2023 Plan. J. Stip. ¶ 20.

46.     Damian Pardo was first elected in the November 2023 election held under the 2023 Plan. J. Stip. ¶ 21.

47.     Miguel Gabela was first elected in the November 2023 election held under the 2023 Plan. J. Stip. ¶ 22.

48.     Díaz de la Portilla, Carollo, Reyes, and Gabela are Hispanic and Cuban American. Covo and Pardo are Hispanic. King is Black and not Hispanic. Russell is White and Japanese American and not Hispanic. J. Stip. ¶ 14.

**D.  Miami Redistricting History**

49.     Before 1997, the Commission was elected at-large, citywide. Pls. Ex. 95; ECF 143 (2nd Am. Compl.) ¶ 56; ECF 150 (Answer) ¶ 56.

50.     Carollo served as Mayor when single-member districts were instituted in 1997. That same year, he appointed a blue-ribbon panel to recommend a single-member district map for the Commission, in response to a VRA lawsuit brought of behalf of Black voters. Pls. Ex. 97, 100; 2nd Am. Compl. ¶ 57; Answer ¶ 57.

51.     Among the members of the blue-ribbon panel were Reyes and Miguel De Grandy. Pls. Ex. 100; 2nd Am. Compl. ¶ 58; Answer ¶ 58.

52.     The blue-ribbon panel made recommendations to the Commission, which developed a map (the "1997 Plan"). Pls. Ex. 103, 104, 106, 107, 108, 109, 111, 112; 2nd Am. Compl. ¶¶ 59–60; Answer ¶¶ 59–60.

53.     In September 1997, the voters adopted a charter amendment adopting single-member district elections. The 1997 Plan was implemented for the November 1997 elections. Pls. Ex. 116, 117, 118; 2nd Am. Compl. ¶ 61; Answer ¶ 61.

54.     As part of the decennial redistricting process, the Commission revised the City

Commission map in 2003 and 2013 through Resolutions 03-448 and 13-208 (the "2003 Plan" and "2013 Plan"). 2nd Am. Compl. ¶ 62; Answer ¶ 62.

55.     De Grandy and Stephen M. Cody served as the city's redistricting consultants for the 2003 and 2013 processes. 2nd Am. Compl. ¶ 63; Answer ¶ 63.

56.     Race played a central role in the drawing of the 1997, 2003, and 2013 Plans.

57.     In 1997, the plan was drawn to "give[] representation to *all* the main groups . . . three districts for Hispanics, one district that will certainly have an African-American representative, and one . . . Anglo American representative." Pls. Ex. 112 (quoting then-Mayor Carollo).

58.     The one Anglo commissioner in 1997, J.L. Plummer, successfully advocated for a five-district map that provided the greatest concentration of Anglo residents in one district. Plummer sought to have Anglo residents concentrated in one district because, "In the same way this lawsuit is demanding guaranteed representation of the blacks, Anglos have the same right to demand representation . . . . It is inconceivable we would not have representation on this commission." Pls. Ex. 107 (quoting Plummer).

59.     One Hispanic commissioner, Humberto Hernandez, advocated for a five-district plan over a six-district plan because six districts would result in "overrepresentation" of Black residents. Pls. Ex. 107 (quoting Hernandez). Instead, Hernandez favored a map that moved fewer Hispanic voters into Black-majority districts, criticizing the alternative as "disenfranchising those Hispanics who have no common interest with the rest of the district." Pls. Ex. 107 (quoting Hernandez); *see also* Pls. Ex. 114 (Hernandez "had voiced his fear that . . . that if Jose Marti Park were to fall within a black district, its name might be changed to Martin Luther King Jr. Park.").

60.     All five districts were drawn primarily to sort voters along racial lines in 1997, as

reflected in the City's demographics and contemporaneous statements of commissioners.

61.     The 2003 and 2013 Plans made minimal changes to the districts to equalize population.

62.     In 2013, the Commission's consultants conducted a study of racially polarized voting (RPV) in the City and concluded that the voting was racially polarized between Black and non-Black voters such that the preconditions the Supreme Court outlined in *Thornburg v. Gingles*, 478 U.S. 30 (1986) (the "*Gingles* preconditions") were present. Pls. Ex. 92.

63.     The Commission's consultants advised that the VRA compliance required the City to maintain a district with a Black voting age population majority. Pls. Ex. 92.

64.     The Commission adopted a 65% Black voting-age population (BVAP) target for District 5, and rejected alternative plans that reduced District 5's BVAP below 60%. Pls. Ex. 90.

65.     In addition to the 65% BVAP target for District 5, the Commission was focused on maintaining the high concentration of Anglo voting-age population in District 2. Pls. Ex. 90, 92, 94.

66.     The Commission was also attentive to the Hispanic populations in Districts 1, 3, and 4 in 2013. Pls. Ex. 92, 94.

67.     Race predominated in the drawing of all five districts during the 1997–2013 cycles.

**E.  2021–22 Redistricting Cycle**

68.     Following the 2020 Census, the Commission began its redistricting process. 2nd Am. Compl. ¶ 64; Answer ¶ 64.

69.     The process began in 2021 and resulted in the passage of the 2022 Plan.

70.     The mapmaking process proceeded through six Commission meetings and was driven by racial considerations at every turn. Pls. Ex. 1–8; 2nd Am. Compl. ¶ 66; Answer ¶ 66.

71.     The Commission again hired De Grandy and Cody as its redistricting consultants. 2nd Am. Compl. ¶ 65; Answer ¶ 65. They first met with the Commission on November 18, 2021. At that meeting, De Grandy presented an initial report on redistricting considerations and the 2020 Census demographics of the districts under the 2013 Plan. Pls. Ex. 12–14; 2nd Am. Compl. ¶ 68; Answer ¶ 68.

72.     De Grandy shared that redistricting was needed to bring the districts within the allowable population range, to have no greater than 10% difference between the smallest and largest district. Pls. Ex. 1 (11/18/21 Tr. 4:1–12).

73.     Analyzing the 2013 Plan, Districts 1, 3, 4, and 5 were each under the ideal population and needed to gain population. District 2, the district in which Anglo residents were concentrated, was significantly overpopulated and needed to shed population. 2nd Am. Compl. ¶ 71–72; Answer ¶ 71–72.

74.     Under the 2013 Plan, Districts 1, 3, and 4 were majority Hispanic, with Hispanic voting-age populations (HVAPs) of 91.0, 88.5, and 91.6%, and Hispanic citizen voting-age populations (HCVAPs) of 86.6, 86.8, and 90.1%. J. Stip. ¶ 24; 2nd Am. Compl. ¶ 73; Answer ¶ 73.

75.     District 5 was majority Black, with a Black voting-age population (BVAP) of 52.9% and a Black citizen voting-age population (BCVAP) of 59.4%. J. Stip. ¶ 24; 2nd Am. Compl. ¶ 74; Answer ¶ 74.

76.     District 2 under the 2013 Plan had the highest non-Hispanic white ("white" or "Anglo") population of the five districts, at 34.5% white voting-age population (WVAP) and 38.1% white citizen voting-age population (WCVAP). J. Stip. ¶ 24; 2nd Am. Compl. ¶ 75; Answer ¶ 75.

77.     At the November 18, 2021 meeting, De Grandy told commissioners that "we can consider race as one of several factors that we will be conscious of in crafting a plan," Pls. Ex. 1

12

(11/18/21 Tr. 6:23), but that race "cannot be the overriding factor," Pls. Ex. 1 (11/18/21 Tr. 7:6). Despite this warning, race predominated in the drawing of the Commission's maps as the process unfolded.

78.     The Commission gave De Grandy four ranked directives for map-drafting: (1) achieve substantial equality of population between districts, rather than precise mathematical equality; (2) "maintain the core constituencies of the districts;" (3) apart from what the VRA required, "the minority voters must be politically cohesive;" and (4) avoid splitting traditional communities and neighborhoods when feasible. Pls. Ex. 1 (11/18/21 Tr. 4:5–11, 17:19–20, 18:15–22, 19:22–23, 33:4–11, 35:21, 36:1–11).

79.     As to the second directive, the Commission made it clear throughout the process that it sought to maintain existing districts both to carry the 2013 Plan's existing racial divisions forward. In addition, the Commission sought to exacerbate those racial divisions through further changes.

80.     With respect to the third directive, the phrase "political cohesion" was subsequently used throughout the process as shorthand for keeping racially homogenous areas together. *See, e.g.*, Pls. Ex. 1 (11/18/21 Tr. 28:20–21 (Carollo: "minority voters will be politically cohesive within these districts")); Pls. Ex. 3 (2/7/22 Tr. 9:7–8 (De Grandy: "this area has a high percentage of Hispanics and greater voter cohesion with D1 residents"), 10:7–8 ("we tried to find adjacent areas with similar demographics in order to maintain voter cohesion")); Pls. Ex. 4 (2/25/22 AM Tr. 8:3–4 (same), 7:6–7 ("we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion")); Pls. Ex. 8 (3/24/22 Tr. 67:1 (Carollo discussing District 3 going into West Brickell as "not cohesive anymore" because the racial demographics change)).

81.     The Commission abandoned the fourth-ranked directive whenever it interfered with the Commission's race-based goals, splitting communities across the city along racial lines.

82.     Carollo explained at the November 18, 2021 meeting that each district would have to change to carry forward that "the original idea" of districts: "that minority voters will be politically cohesive within these districts" "to assure that there would be an African American sitting in this Commission and there would be an Anglo," and "to make sure that there were three Hispanic districts." Pls. Ex. 1 (11/18/21 Tr. 28:7–10, 28:15–29:3).

83.     The Commission next met on December 9, 2021, with De Grandy recapping his instructions and commissioners discussing what areas might be moved between districts.

84.     Some of the key elements of the 2022 Plan's racial gerrymander originated at this meeting, including the idea to remove parts of Coconut Grove from District 2 to maintain the plan's racial balance and avoid "jeopardiz[ing] the ethnic integrity of [the] districts," and to redraw District 5 to minimize reductions to its Black population. Pls. Ex. 2 (12/9/21 Tr. 9:4–10:10, 13:15–22).

85.     De Grandy also reiterated the Commission's four directives at this meeting and confirmed that drawing compact districts—a traditional redistricting principle—would jeopardize the Commission's racial goals. Pls. Ex. 2 (12/9/21 Tr. 28:23–29:20).

86.     The Commission could not reach a consensus on using major manmade and natural boundaries as a factor. Pls. Ex. 2 (12/9/21 Tr. 18:23–19:21).

87.     De Grandy agreed to take the Commission's directives, meet individually with each commissioner, and develop a draft plan. Pls. Ex. 2 (12/9/21 Tr. 33:18–35:14).

88.     On February 7, 2022, De Grandy returned with his draft plan (the "Feb. 7 Draft"). Pls. Ex. 3 (2/7/22 Tr. 5:16–12:11); Pls. Ex. 15 at 40; Pls. Ex. 68. Walking through each draft

district's racial demographics, De Grandy noted the many race-based decisions he made in developing them. Pls. Ex. 3 (2/7/22 Tr. 7:5–13, 8:4–12:11); Pls. Ex. 16, 17.

89.    Commissioners debated the draft, focusing especially on the decision to move part of the historically Black West Grove neighborhood from District 2 into District 4, extending District 4 across US Route 1. This proposal prompted intense public criticism from Miamians who objected to dividing a cohesive neighborhood and excising it from District 2. *See, e.g.*, Pls. Ex. 3 (2/7/22 Tr. 25:9–26:7, 30:12–31:14).

90.    De Grandy defended the choice in racialized terms. Pls. Ex. 3 (2/7/22 Tr. 41:23–42:11, 42:21–43:6). The Commission voted 4-1 to direct De Grandy to consider going south of US 1 into District 2 to "obtain voter consistency" and balance population. Pls. Ex. 3 (2/7/22 Tr. 95:15–16, 99:9–20).

91.    De Grandy shared a new draft on February 22, 2022 (the "Feb. 22 Draft" or the "Base Plan") and presented it at the February 25 meeting. Pls. Ex. 18, 19, 69. This map incorporated certain feedback shared in earlier Commission meetings and during private meetings De Grandy had with individual commissioners. Pls. Ex. 4 (2/25/22 AM Tr. 4:5–10:2).

92.    Except for three unpopulated census blocks later moved from District 1 to District 5, the Feb. 22 Draft became the 2022 Plan. Pls. Ex. 8 (3/24/22 Tr. 7:12–14, 86:17–18).

93.    Russell sketched out his suggestion for the District 2 border at this meeting, which kept all of Coconut Grove in District 2. Pls. Ex. 5 (2/25/22 PM Tr. 12:7–14:21); Pls. Ex. 70.

94.    The Commission voted 4-1 to make the Feb. 22 Draft the "Base Plan" for future changes. Pls. Ex. 5 (2/25/22 PM Tr. 37:6–11, 39:2, 42:9–23).

95.    On March 11, 2022, the Commission discussed two suggested changes to the Base Plan: an unrealized suggestion of King's—whose racial impacts De Grandy noted—and the "Initial

Russell Plan," which sought to unify Coconut Grove. Pls. Ex. 21.

96.     De Grandy also addressed "allegations of racism" in the Base Plan and defended the map with race-based logic. Pls. Ex. 5 (2/25/22 PM Tr. 37:18–40:16, 47:20–23); Pls. Ex. 20,  at 6–13. Russell and members of the public disagreed with De Grandy by explaining all the race-neutral reasons why Coconut Grove should be unified in one district. *See, e.g.*, Pls. Ex. 6 (3/11/22 AM Tr. 45:18–46:1, 47:1–8, 64:13–65:9). The meeting closed with the commissioners directing De Grandy to meet with them individually and craft different options accommodating each commissioner's wishes. Pls. Ex. 7 (3/11/22 PM Tr. 40:5–22).

97.     The Commission reconvened for its final meeting on March 24, 2022, with De Grandy presenting the options each commissioner directed him to develop. Pls. Ex. 8 (3/24/22 Tr. 5:14–8:19); Pls. Ex. 22. King proposed a small, unpopulated change between Districts 1 and 5; Díaz de la Portilla suggested moving one condo tower from District 1 into District 5; Russell proposed the "Revised Russell Plan," which made changes to Districts 2, 3, and 4 to keep Coconut Grove whole; and Reyes had his own plan (the "Reyes Plan") which altered those same three districts to remove a portion of Coconut Grove from District 4. Pls. Ex. 8 (3/24/22 Tr. 5:14–8:19); Pls. Ex. 22, at 5–11; Pls. Ex. 72, 73.

98.     The Commission debated and eventually adopted the Base Plan with King's small change on a 3-2 vote. Pls. Ex. 8 (3/24/22 Tr. 86:15–18, 89:20–22). King, Díaz de la Portilla, and Carollo voted in favor of the 2022 Plan; Reyes and Russell voted against. J. Stip. ¶ 43.

**F.  District-by-District Analysis of the 2022 Plan**

99.     The Commission's explicit, overriding goal was to separate Hispanic from Black from Anglo voters into separate districts as much as possible, with the aim to have commissioners of particular races and ethnic backgrounds elected.

16

100.     This objective drove the Commission's entire redistricting process. *See, e.g.*, Pls. Ex. 1 (11/18/21 Tr. 13:13–14 (Carollo urging mapmaking "in a way that the balance is not really shifted" after De Grandy and Díaz de la Portilla discussed racial demographics)); Pls. Ex. 3 (2/7/22 Tr. 51:10–14 (Carollo: districts were established "to assure" a particular racial composition), 100:13–17 (Carollo's "goals:" "to have guaranteed Anglo representation, and to have three districts that were Hispanic")); Pls. Ex. 5 (2/25/22 PM Tr. 22:14–15 (Reyes: "Yes, we are gerrymandering to preserve those seats")); Pls. Ex. 7 (3/11/22 PM Tr. 8:14–16 (Díaz de la Portilla)); Pls. Ex. 8 (3/24/22 Tr. 68:14–17 (Carollo: "I do not want to change the District 3 voting patterns, the types of people that are there with different people. I don't want to do that to District 4, nor to District 1. Just like I want to be able to leave District 2 where it could still elect a guy like you [Russell] . . . . District 5 [] will be a majority-African American district.")).

### 1. Creating an "Anglo Access" District 2

101.     Throughout the process, the Commission acknowledged that District 2 was historically drawn to elect an Anglo commissioner and sought to maintain it as such.

102.     Carollo explained that District 2 originally "was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner." Pls. Ex. 3 (2/7/22 Tr. 51:18–19).

103.     That remained his goal—a goal others shared. Pls. Ex. 8 (3/24/22 Tr. at 56:16–18 (Carollo: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected."), 68:15–16 (Carollo: "I want to be able to leave District 2 where it could still elect a guy like you [Russell], if they want to."), 39:9–11 (Reyes: "What we want to achieve now is" that "the probabilities of electing an Anglo . . . are great")); Pls. Ex. 3 (2/7/22 Tr. 68:7–9 (Reyes

17

asking De Grandy if the Feb. 7 Draft is "the best you can do to protect . . . the Anglo seat")); Pls. Ex. 5 (2/25/22 PM Tr. 19:21–20:4 (Reyes confirming with De Grandy that "the so-called Anglo district will . . . stand the test of time" and "the probability of electing . . . an Anglo" is "very probable")); Pls. Ex. 7 (3/11/22 PM Tr. 8:14–16 (Díaz de la Portilla: "Our goal here is to have . . . a white district")).

104.    De Grandy confirmed that District 2 had a high probability of electing an Anglo commissioner. Pls. Ex. 5 (2/25/22 PM Tr. 20:11–12).

105.    District 2 has the highest Anglo population of the five districts, at 37.4% WVAP, 41.5% WCVAP, and 43.4% white voter registration—higher even than under the 2013 Plan.

### 2.   Attaining a 50% BVAP Quota in District 5

106.    Race predominated in the drawing of District 5.

107.    In District 5, the Commission's overriding goal was to keep the Black population as high as possible by establishing a 50% BVAP target.

108.    From the outset, De Grandy and the Commission were sensitive to maintaining District 5's Black share, with a particular reluctance to make changes to the District 2/5 boundary that would decrease District 5's Black population. *See, e.g.*, Pls. Es. 1 (11/18/21 Tr. 23:6–10).

109.    In De Grandy's initial Feb. 7 Draft, District 5 was 51.7% Black by total population (BPOP), 49.8% BVAP, and 58.7% BCVAP. Pls. Ex. 3 (2/7/22 Tr. 8:17); Pls. Ex. 68.

110.    De Grandy explained that he deliberately underpopulated District 5, "because bringing in additional population from most any side of the district might reduce the African American population percentage." Pls. Ex. 3 (2/7/22 Tr. 8:13–15).

111.    He set the boundary "wall" between Districts 2 and 5, explaining "we could not move further east without affecting the African American population's ability to elect a candidate

of its choice in D5." Pls. Ex. 3 (2/7/22 Tr. 9:19–20).

112.    As De Grandy explained, this caused him to turn to District 2's southern end to equalize its population, resulting in moving areas of District 2 into Districts 3 and 4 in Coconut Grove. Pls. Ex. 3 (2/7/22 Tr. 9:20–21).

113.    Adherence to a Black population target also impacted District 1. Pls. Ex. 8 (3/24/22 Tr. 70:21).

114.    In exchange for moving the "wall" east into less-Black areas of Downtown and Edgewater, De Grandy "rebalance[d] the ethnic and racial population" by removing "overwhelmingly Hispanic" areas along the Miami River from District 5 and moving them into District 1. Pls. Ex. 3 (2/7/22 Tr. 43:1–3; 11:17–20); Pls. Ex. 68, at 3.

115.    The Commission reacted to De Grandy's Feb. 7 Draft—and its District 5 with a BVAP under 50%—with skepticism. Pls. Ex. 3 (2/7/22 Tr. 68:7–8 (Reyes: "is this the best you can do to protect the African American seat?"), 71:22–23 (King likewise "concerned . . . that District 5 is 51% African American.").

116.    De Grandy interpreted this and other feedback as a "directive" to "increase[] D5's Black voting age population above 50%," which he did in his Feb. 22 Draft, "by reconfiguring areas around the boundaries" of the district. Pls. Ex. 4 (2/25/22 AM Tr. 7:1–2, 9:15, 9:17, 5:13–15).

117.    De Grandy again deliberately underpopulated District 5 to increase its Black share. Pls. Ex. 4 (2/25/22 AM Tr. 6:15–16).

118.    Maintaining the minimum-50% BVAP quota remained a priority through all the redistricting meeting. *See, e.g.*, Pls. Ex. 6 (3/11/22 AM Tr. 37:5–9 (De Grandy explaining King proposal would "lower the Black VAP to 49%, but this could be remedied by making additional

changes to . . . increase D5's Black voting age population")); Pls. Ex. 20 at 4 (describing same proposal as a "deficiency"); Pls. Ex. 8 (3/24/22 Tr. 8:7–9 (De Grandy "recommend[ing] additional tweaks to the plan to bring the Black voting age population back above 50%"), 56:12–16 (Carollo: "The only reason [King] doesn't take the rest [of Downtown] is . . . we have to keep one district that is going to have a majority of African Americans."), 64:23–65:2 (De Grandy: "I cannot put one more resident into Commissioner King's district. . . . [G]oing further east would dilute the Black majority."), 68:16–17 (Carollo: "In District 5, that will be a majority-African American district."), 70:21 (Díaz de la Portilla: "I can't go north, because if I go north I jeopardize the African American seat.")).

119.    One of the areas moved into District 5 to achieve the 50% BVAP target included FDC-Miami, a federal detention center with a disproportionately high Black population, but where detainees do not vote.

120.    District 5 in the 2022 Plan has a BVAP of 50.3%.

121.    The 50% BVAP target is unsupported by voting patterns in the City of Miami. Analyses of racially polarized voting show that Black voters can usually elect candidates of their choice even when the Black share of registered voters and VAP  is much lower than 50%.

122.    The Commission and Mayor were on notice that its 50% BVAP target was unsupported by voting patterns in the City. The ACLU of Florida and others raised concerns during the legislative process regarding the arbitrary 50% BVAP floor and overconcentrating Black voters in District 5. Pls. Ex. 4 (2/25/22 AM Tr. 34:4–23); Pls Ex. 23, 24.

### 3.  Districts 1, 3, and 4

123.    Race likewise predominated in the drawing of Districts 1, 3, and 4.

124.    The Commission's overriding goal for these districts was to balance their Hispanic

populations to be as consistently high as possible.

125.    Carollo set the tone before any maps were drafted: "My main interest in my district and [Districts 1 and 4] is that I'm sure that we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there." Pls. Ex. 2 (12/9/21 Tr. 23:4–7).

126.    That goal pervaded the Commission's attitude toward these three districts. *See, e.g.*, Pls. Ex. 2 (12/9/21 Tr. 14:8–9 (Carollo discussing relative "purity" of Hispanic percentages in the three districts)); Pls. Ex. 3 (2/7/22 Tr. 103:18–21 (Carollo expressing desire to "keep the same type of last names, faces" in the districts), 107:13–14 (Reyes agreeing to "working out in a way that we can make it as Hispanic as you can")); Pls. Ex. 8 (3/24/22 Tr. 56:19–20 (Carollo: "we have to keep three districts that are going to be majority-Hispanic"), 70:22–71:2 (Díaz de la Portilla expressing same views)).

### *a. District 1/5 Border*

127.    The District 1/5 border was drawn along racial lines, to put Hispanic residents in District 1 and strip them from District 5. Simultaneously, the border packed Black residents into District 5 and stripped them from District 1.

128.    District 1, which under the 2013 Plan was underpopulated by about 7,000 residents, gained all its new population from District 5.

129.    From the outset, discussions of where District 1 could gain population focused almost exclusively on race, with Carollo highlighting both Wynwood and the north side of the Miami River as "logical" and "attractive" because they are "mainly Hispanic." Pls. Ex. 2 (12/9/21 Tr. 3:12–17).

130.    Díaz de la Portilla reflected how he "really can't go north" to gain population in

Allapattah or Liberty City, because "[i]t's an African American area." Pls. Ex. 2 (12/9/21 Tr. 4:19–20).

131.    Carollo noted there might be an area by 36th Street (District 1's northern border under the 2013 Plan) that District 1 might add, depending on how Hispanic the area was. Pls. Ex. 2 (12/9/21 Tr. 5:6–8).

132.    Díaz de la Portilla agreed the line might extend north to 40th Street, but not past State Road 112, because "north of 112 we are entering into African American neighborhoods—and we can't touch that area." Pls. Ex. 2 (12/9/21 Tr. 5:14–19).

133.    De Grandy's Feb. 7 Draft added to District 1 the riverside areas Carollo suggested. De Grandy explained he did so "because this area has a high percentage of Hispanics and greater voter cohesion with D1 residents." Pls. Ex. 3 (2/7/22 Tr. 9:7–8).

134.    The Base Plan moved a small portion of that riverside area around the Miami Riverside Center back into District 5. In exchange, the plan moved another eight city blocks into District 1. De Grandy explained, "[a]gain, we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion" with the rest of District 1. Pls. Ex. 4 (2/25/22 AM Tr. 7:6–8).

135.    Besides the changes Downtown, the 2022 Plan also moved territory between Districts 1 and 5 in Allapattah. These areas were moved to increase District 1's Hispanic share, decrease its Black share, and do the opposite for District 5. *See, e.g.*, Pls. Ex. 4 (2/25/22 AM Tr. 6:23–7:2).

### b. District 2/3 Border

136.    The Commission also drew the District 2/3 border along racial lines, to pack Hispanic residents into District 3 and strip them from District 2.

137.    Díaz de la Portilla first suggested moving areas "where Hispanic voters live" from District 2 and into Districts 3 and 4 at the second redistricting meeting, mentioning Coconut Grove and Bay Heights specifically. Pls. Ex. 2 (12/9/21 Tr. 7:16–17).

138.    De Grandy incorporated this suggestion into his Feb. 7 Draft, moving portions of District 2 into District 3, stretching from SW 15th Road in the north to SW 17th Avenue in the south, over to South Miami Avenue. Pls. Ex. 3 (2/7/22 Tr. 9:21–23).

139.    After Russell questioned why De Grandy moved this area from District 2 rather than parts of Brickell/Downtown further north, De Grandy said he did so "because the demographics were dissimilar" further north. Pls. Ex. 3 (2/7/22 Tr. 90:10).

140.    Walking through the Base Plan, De Grandy reiterated he "did not feel it was appropriate to move east" into Brickell "because of dissimilar demographics." Pls. Ex. 4 (2/25/22 AM Tr. 7:22–23; Tr. 5B 36:17–37:2 (De Grandy explaining he didn't move parts of Brickell into District 3 because its Hispanic population was "in the 40's, whereas District 3 is in the 80's")); Pls. Ex. 8 (3/24/22 Tr. 75:11–13 (reiterating same point)).

141.    Commissioners supported this reasoning, which compelled District 3 to pick up part of Coconut Grove instead. Pls. Ex. 4 (2/25/22 AM Tr. 7:6–8 (Carollo)); Pls. Ex. 5 (2/25/22 PM Tr. 41:13–19 (Carollo: "throw[ing] District 3 into Brickell" is "truly going to change the whole component of one district" with "a domino effect" for other districts' demographic compositions), 9:15–17 (Díaz de la Portilla agreeing that the Grove is "the only place to go" to remove population from District 2)).

142.    The Commission rejected alternatives for the 2/3 border that did not so starkly separate areas along racial lines.

143.    The Initial Russell Plan proposed extending District 3's eastern boundary one block

east to South Miami Avenue, to allow all of Coconut Grove to be united in District 2. Pls. Ex. 21, 71.

144.    De Grandy advised the proposal complied with the VRA, Pls. Ex. 6 (3/11/22 AM Tr. 52:12–13), but other commissioners objected to moving a less-Hispanic area into District 3. Pls. Ex. 7 (3/11/22 PM Tr. 32:11–13 (Reyes: "I don't agree with it because [] there is a lot of Anglos in that area"), 32:10 (Díaz de la Portilla)).

145.    The Revised Russell Plan again united Coconut Grove in District 2 while moving even less of the Brickell area into District 3. Pls. Ex. 72.

146.    The area moved—44.6% HVAP, 39% WVAP—would have decreased District 3's HVAP.

147.    De Grandy again advised that the proposal complied with the VRA, Pls. Ex. 8 (3/24/22 Tr. at 8:6–7), and it met the criteria the Commission originally adopted, *Id.* (3/24/22 Tr. at 61:10–62:8), but the Commission rejected it because it decreased District 3's Hispanic population. *Id.* (3/24/22 Tr. at 64:10–13, 74:2–10 (Reyes explaining why he rejected Russell plans), 70:15–18, 71:7–16, 72:1–3 (Díaz de la Portilla)).

148.    The Reyes Plan made even smaller changes to the 2/3 border, restoring the West Grove sliver to District 2 while moving a bare-HVAP-majority area from District 2 into 3 (51% HVAP). *Id.* (3/24/22 Tr. at 77:6–7); Pls. Ex. 73.

149.    Even though De Grandy advised the Reyes Plan complied with the VRA, Pls. Ex. 8 (3/24/22 Tr. at 8:6–7), the Commission rejected it for the same reasons as Russell's proposals. *Id.* (3/24/22 Tr. at 66:14–18, 67:1–5, 68:13–15, 70:13).

150.    De Grandy summed up the perceived benefit of his District 3 versus Russell's or Reyes' proposals: "Is it [a] stronger Hispanic district under the base plan, absolutely." *Id.* (3/24/22

Tr. 75:21); *see also id.* (3/24/22 Tr. at 78:3–18).

151.    Under the Revised Russell Plan, District 3 was 86.6% HVAP and 84.8% HCVAP. Pls. Ex. 72.

152.    Under the Reyes Plan, it was 87.3% HVAP and 86.0% HCVAP. Pls. Ex. 73.

153.    In the Base Plan and 2022 Plan, it is 88.3% HVAP and 86.9% HCVAP.

### c. District 2/4 Border

154.    The Commission also drew the line between Districts 2 and 4 to pack Hispanic residents into the majority-Hispanic district and strip them from the "Anglo-access" district.

155.    This border was shaped by two major decisions: (1) moving a supermajority-Hispanic area of Golden Pines north of US 1 around Douglas Park into District 4, and (2) moving areas south of US 1 in Coconut Grove into District 4 as well. Pls. Ex. 69 at 6.

156.    Díaz de la Portilla and Carollo discussed the "very Hispanic area" around Douglas Park in District 2 as one that "probably doesn't belong there" because it has "more commonalities" in terms of "political cohesion" (i.e., racial demographics) with District 4 than the rest of District 2. Pls. Ex. 1 (11/18/21 Tr. 24:1–4, 24:14–16); Pls. Ex. 2 (12/9/21 Tr. 19:22–20:2).

157.    This area, which is 81.8% HVAP, was moved into District 4 in all drafts the Commission considered.

158.    The second area moved into District 4, a piece of Coconut Grove, followed Díaz de la Portilla's early suggestion to move areas "where the Hispanic voters live" given the "ethnic diversity in Coconut Grove." Pls. Ex. 2 (12/9/21 Tr. 7:16–17).

159.    The area moved is a 59.2%-HVAP triangle bounded by US 1, Day Avenue, and SW 27th Avenue.

160.    That triangle was not as Hispanic as the rest of District 4, but because the

Commission considered District 4 to be the "purest" Hispanic district already, it was acceptable for it to add "only" "a slice, sliver" of less-Hispanic "bone." Pls. Ex. 2 (12/9/21 Tr. 14:5–6); Pls. Ex. 3 (2/7/22 Tr. 103:18, 104:4–7).

161.    Eventually, Reyes accepted adding part of Coconut Grove because he thought it was needed to maintain District 5's racial balance. Pls. Ex. 6 (3/11/22 AM Tr. 50:13–14).

162.    Rejected proposals for District 4 clarify the Commission's intent to "balance" its Hispanic population.

163.    On February 7, De Grandy proposed giving District 4 a chunk of the North Grove between 22nd and 27th Avenues. Pls. Ex. 3 (2/7/22 Tr. 101:11–14, 102:2–3).

164.    To convince Reyes to take this 55% WVAP area, Carollo reminded him he has "the most Hispanic" and "Cuban district," and that the Feb. 7 Draft already gave him "a huge Hispanic area on the other side of US 1"—the Douglas Park area. Pls. Ex. 3 (2/7/22 Tr. 102:10–12, 103:11–12, 105:2–3); *see also* Pls. Ex. 3 (2/7/22 Tr. 103:16 (Reyes welcoming the Douglas Park area: "I'll take it.")).

165.    Comparing that 82% HVAP Douglas Park addition to his 55% WVAP North Grove proposal, Carollo explained Reyes cannot "*get[] all the sirloin but none of the bone*." Pls. Ex. 3 (2/7/22 Tr. 103:18).

166.    In the end, the Hispanic-rich "sirloin" was moved into the packed Hispanic-majority District 4, while most of the majority-white "bone" remained in District 2.

167.    District 4 in the 2022 Plan is 89.5% HVAP and 88.2% HCVAP.

### d. Internal Borders of Districts 1, 3, and 4

168.    The borders that Districts 1, 3, and 4 share were also drawn to facilitate the 2022 Plan's packing of Hispanic voters into these districts and, more generally, to accomplish the

tripartite racial separation throughout the map.

169.    The Commission treated Hispanic voters on the borders of these districts as fungible because these areas are all predominantly Hispanic. *See, e.g.*, Pls. Ex. 1 (11/18/21 Tr. 33:14–16 (Díaz de la Portilla explaining it did not matter whether Flagami was in District 1 or 4 because those residents "will elect the same kind of representative")).

170.    As commissioners recounted multiple times, Hispanic neighborhoods like Flagami and Little Havana were split between Districts 1, 3, and 4 to effectuate the policy of maximum racial separation. *See, e.g.*, Pls. Ex. 3 (2/7/22 Tr. 52:5–53:2 (Carollo)); Pls. Ex. 8 (3/24/22 Tr. 39:2–12 (Reyes), 79:19–20 (Díaz de la Portilla)).

171.    De Grandy followed the Commission's direction in his Feb. 7 Draft, shifting parts of Little Havana between Districts 3 and 4 because they were "adjacent areas with similar demographics." Pls. Ex. 3 (2/7/22 Tr. 10:7–8).

172.    Workshopping that map and following his comments about District 4 not keeping all the "sirloin," Carollo suggested moving into District 3 a different portion of Little Havana, between SW 27th and 32nd Avenues. Pls. Ex. 3 (2/7/22 Tr. 104:21–23).

173.    When Reyes objected, Carollo explained why it was necessary to add that territory to District 3: "you're getting more than two squares here," referring to the Douglas Park area, "in prime Hispanic area, and you're diluting the Hispanic vote." Pls. Ex. 3 (2/7/22 Tr. 105:1–3).

174.    "There has to be a balance," Carollo continued, and in exchange for getting "a huge chunk of rich Hispanic voters" around Douglas Park, District 4 needed to balance its Hispanic population out with District 3. Pls. Ex. 3 (2/7/22 Tr. 106:3–23).

175.    Reyes agreed to "working out in a way that we can make it as Hispanic as you can." Pls. Ex. 3 (2/7/22 Tr. 107:13–14).

176.    The area Carollo wanted to move into District 3 was indeed moved in the 2022 Plan.

177.    De Grandy explained the change: "we tried to find adjacent areas with similar demographics in order to maintain voter cohesion." Pls. Ex. 4 (2/25/22 AM Tr. 8:3–4).

178.    The area is 96.2% HVAP.

### 4. *The Commission Subordinated Traditional Redistricting Criteria to Race*

179.    Throughout the map, the Commission "subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill I*, 580 U.S. at 187 (quoting *Miller*, 515 U.S. at 916).

### *a. Neighborhoods*

180.    From the start, the Commission wanted to split certain neighborhoods to pack and crack voters based on their race. Díaz de la Portilla noted that some neighborhoods like Flagami could be divided between districts if they "will elect the same kind of representative." Pls. Ex. 1 (11/18/21 Tr. 33:14–16). But putting part of (predominantly Black) Overtown or Liberty City in his district was unacceptable. Pls. Ex. 1 (11/18/21 Tr. 33:16–17).

181.    At the second redistricting meeting on December 9, 2021, Díaz de la Portilla suggested splitting another neighborhood: Coconut Grove. He noted that "there's ethnic diversity in Coconut Grove" and splitting the area between Districts 3 and 4 "based on where the Hispanic voters live" to maintain the districts' "ethnic integrity." Pls. Ex. 2 (12/9/21 Tr. 7:15–16, 13:15–17). The decision to split the Grove stemmed also from the desire to avoid "touching the racial integrity of District 5." Pls. Ex. 2 (12/9/21 Tr. 13:17–18). The District 2/5 "wall" that prevented District 5 from dropping below the arbitrary 50% BVAP threshold compelled the Commission to remove population from overpopulated District 2's southern end instead. *See, e.g.*, Pls. Ex. 2 (12/9/21 Tr. 9:4–7); Pls. Ex. 3 (2/7/22 Tr. 42:21–43:6).

182.    De Grandy's Feb. 7 Draft followed the Commission's direction, going into the Grove to move population from District 2 into 4. Responding to public comment opposing splitting parts of the historically Black West Grove, De Grandy justified his choice in racial terms. Pls. Ex. 3 (2/7/22 Tr. 41:23–42:11 ("put[ting] into conte[x]t what we're moving into, a majority-Hispanic district" and noting statistics of the area moved, indicating it is nearly majority-Hispanic)).

183.    Carollo's defense for dividing this neighborhood was explicit: splitting Coconut Grove was required to keep racial "balance and having a balance in the Hispanic districts." Pls. Ex. 3 (2/7/22 Tr. 54:5–9). Further, he objected to claims that by moving a portion of "the Black part of Coconut Grove to a district that's Hispanic, this disenfranchises them"—but "leav[ing] it in an Anglo area" would be fine. Pls. Ex. 3 (2/7/22 Tr3 18:2–6). He pointed out that no African Americans had ever been elected to District 2, implying that, since District 2 was the "Anglo seat" and District 4 was a "Hispanic seat," Black Groveites had no grounds to complain about being moved from one to the other. Pls. Ex. 3 (2/7/22 Tr. 18:7–11).

184.    Remarkably, the *only* reasons De Grandy and the Commission majority *ever* gave for splitting Coconut Grove and moving portions into Districts 3 and 4 were race-based. In contrast, members of the public, including Plaintiffs, repeatedly implored the Commission to consider the numerous race-neutral reasons for keeping the neighborhood together in District 2, and the ways in which Coconut Grove constituted a "communit[y] defined by actual shared interests" rather than by race. *ALBC I*, 575 U.S. at 272 (quoting *Miller*, 515 U.S. at 916); *see, e.g.*, Pls. Ex. 3 (2/7/22 Tr. 24:17–26:7, 30:12–31:14); Pls. Ex. 4 (2/25/22 AM Tr. 13:23–14:13, 16:10– 20, 27:19–28:18); Pls. Ex. 6 (3/11/22 AM Tr. 63:17–64:3, 64:13–65:9, 71:6–18, 77:23–78:14, 80:9–81:4); Pls. Ex. 8 (3/24/22 Tr. 22:13–23). Russell made similar appeals. Pls. Ex. 5 (2/25/22 PM Tr. 18:20–19:2  (citing area's distinctive interests)); Pls. Ex. 6 (3/11/22 AM Tr. 45:18–46:1

("they're looking for not a Black commissioner, but they're looking for someone to solve those issues"), 47:1–8, 48:4–6, 49:13–18 (responding to De Grandy's point that more Black residents were moved out of District 2 in Golden Pines than in the West Grove, by noting the neighborhoods' Black residents face different issues)).

185.    The Commission split many other neighborhoods to achieve their preferred racial divisions, harming these communities as a result. Little Havana straddles all three majority-Hispanic districts; Silver Bluff and Shenandoah ("distinct" and "historical" communities) are divided between Districts 3 and 4; and Flagami is split between 1 and 4. Pls. Ex. 3 (2/7/22 Tr. 52:5–7, 52:8–14, 52:16–17). Allapattah and Overtown ("traditional communities") cross Districts 1 and 5, with more-Hispanic portions going to District 1 and less-Hispanic parts going to District 5. Pls. Ex. 1 (11/18/21 Tr. 17:20–22); Pls. Ex. 3 (2/7/22 Tr. 60:16). The Commission "cut up communities" like these to facilitate racial separation: "to make sure that there's gonna be an African American . . . to make sure there's an Anglo American" and "that in the rest of the districts that are majority Hispanic, that they stayed that way." Pls. Ex. 3 (2/7/22 Tr. 52:18–23); *see also* Pls. Ex. 8 (3/24/22 Tr. 38:9–16 (Carollo explaining why they split Little Havana, Shenandoah, Silver Bluff, Flagami), 38:23–39:20 (Reyes agreeing that splitting "real established communities" "has to be done in order to keep diversity"), 79:19–20 (Díaz de la Portilla: Carollo "broke up Hispanic neighborhood after Hispanic neighborhood cause he had to for the greater good.")).

### *b. Compactness*

186.    The Commission rejected drawing geographically compact districts early in the process, subordinating this traditional criterion to race. Pls. Ex. 2 (12/9/21 Tr. 29:10–16). Díaz de la Portilla noted that "if you want to have an African American district and you want to have an Anglo district, it's almost impossible to emphasize compactness," so it's "a foregone conclusion"

that districts would not be compact. Pls. Ex. 2 (12/9/21 Tr. 28:23–29:3). De Grandy concurred. Pls. Ex. 2 (12/9/21 Tr. 29:2–6); *see also* Pls. Ex. 2 (12/9/21 Tr. 18:9–11 (Reyes stating only one district is compact), 18:4–5 (Russell: District 2 "the least compact as a district"), 2:10–11 (De Grandy: "Compactness, quite frankly, in this plan would be extremely difficult to achieve."), 17:20 ("Compactness, again, I don't think compactness is a feasible alternative."), 18:7–8 ("I mean look at the districts the way they are drawn, they are not compact."), 29:2–6 ("[Y]our plan is not really a plan of compact districts.")).

187.    The districts are indeed visibly non-compact, featuring "irregular contours," "bizarre designs," and "unnecessary appendage[s]." *Shaw II*, 517 U.S. at 939; *In re Senate Joint Resol. 1176*, 83 So. 3d 597, 634 (Fla. 2012).

188.    District 3 gains an irregular appendage south of US 1 into Coconut Grove, to pick up a more ethnically diverse, Hispanic area. Pls. Ex. 2 (12/9/21 Tr. 7:16–17).

189.    District 2 features a spur in Downtown, scooping out six less-Black city blocks from District 5.

190.    District 1 snakes along the north side of the Miami River to Flagler Street, an appendage designed to move more-Hispanic areas into District 1 from District 5. Pls. Ex. 3 (2/7/22 Tr. 9:5–8); Pls. Ex. 4 (2/25/22 AM Tr. 7:3–8).

191.    Districts 1 and 4 feature long tails stretching west to divide Flagami for racial purposes. Pls. Ex. 8 (3/24/22 Tr. 38:9–15, 39:3–12).

### c. Respecting Major Manmade and Natural Boundaries

192.    Drawing districts to respect major manmade and natural boundaries is another traditional redistricting principle the Commission subordinated to race. De Grandy suggested the Commission consider using such boundaries as a factor, but there was no consensus to ratify it as

a priority. Pls. Ex. 2 (12/9/21 Tr. 18:23–19:21). This debate largely focused on whether US 1 was a boundary that should be respected as the border of District 2, or whether Districts 3 and/or 4 should cross US 1 into Coconut Grove. Pls. Ex. 2 (12/9/21 Tr. 19:5–21). Ultimately, the Commission opted to cross US 1 "where the Hispanic voters live" to maintain Districts 3 and 4's "ethnic integrity." Pls. Ex. 2 (12/9/21 Tr. 7:17, 7:3).

193. The 2022 Plan deviates from major geographic boundaries for racial reasons elsewhere. The District 1/4 border in Flagami winds along two-lane residential streets. *See* Pls. Ex. 2 (12/9/21 Tr. 4:15–17 (De Grandy explaining major boundaries include section-line roads as opposed to local streets)). The piece of Allapattah moved into District 5 is bounded by two-lane streets, rather than I-95 and a federal highway as in the 2013 Plan. Further south, the District 1/5 border again deviates from I-95 to ensure a 61% BVAP tract stays in District 5. Downtown, the District 2/5 border departs from NE 2nd Avenue to scoop out an irregular, 14.2% BVAP six-block area. The border strays from 2nd Avenue again just before the river to ensure a 5.5% BVAP tract stays on the District 2 side of the 2/5 "wall."

### 5. *Circumstantial Evidence Further Demonstrates Racial Predominance*

194. Circumstantial evidence points to race predominating in the design of the 2022 Plan's districts as well.

195. The districts' shapes and demographics explain both the overall shapes of the 2022 Plan's districts, as well as the changes made from the 2013 Plan. The map exhibits patterns of splitting precincts along racial lines, suggesting the lines were drawn to achieve racial separation.

196. Circumstantial evidence about alternative rejected configurations and the evolution of draft plans further illuminates the race-based decisions behind the 2022 Plan. These include several key changes between the Feb. 7 Draft and the Feb. 22 Draft/Base Plan that served to better

separate Anglo from Black from Hispanic residents into their designated districts:

- The Base Plan moved less of Coconut Grove into District 4. The portion moved now had a higher Hispanic population—59.2% HVAP versus 49.1%.

- A 76.6% HVAP area in Allapattah was moved into District 1 from 5, and a 66.7% HVAP area was moved out of District 1 into 5 in exchange. This swap increased District 1's Hispanic share while increasing District 5's Black share.

- District 5 gained a small, 40.4% BVAP area of Downtown from District 1. In exchange, District 1 gained a 72.1% HVAP area west of I-95. This change increased District 1's Hispanic share and increased District 5's Black share.

- Areas were swapped along the District 2/5 "wall": Two 13% BVAP blocks moved into District 2; and a 32.1% BVAP area moved into District 5.

197.   Each of these changes increased the dominant racial group's population share in each district, exacerbating the racial packing and stripping already present in the Feb. 7 Draft. Indeed, the Base Plan managed to increase the dominant-group VAP in Districts 1, 4, and 5. Of the three majority-Hispanic districts, the HVAP of the least-Hispanic district increased. The average HVAP of those three districts also increased.

198.   Three other abandoned changes are probative as well.

199.   *First*, King requested restoring to District 5 part of the riverfront area that the Base Plan moved to District 1. Pls. Ex. 6 (3/11/22 AM Tr. 37:5–6). De Grandy noted the request would lower District 5's BVAP to 49% and suggested "remedying" this to increase the BVAP. Pls. Ex. 6 (3/11/22 AM Tr. 37:6–9). After consulting with King, this change was abandoned in favor of moving just the unpopulated Wharf into District 5, which did not impact the district's BVAP. Pls. Ex. 7 (3/11/22 PM Tr. 4:21–5:7); Pls. Ex. 8 (3/24/22 Tr. 7:12–14); Pls. Ex. 22 at 11.

200.    *Second*, at the final meeting, Díaz de la Portilla suggested moving into District 5 a single 73% HVAP city block with a total population of 510 residents—the Flagler on the River condo tower. Pls. Ex. 8 (3/24/22 Tr. 6:12–15). De Grandy reported this change would lower District 5's BVAP to 49.97%—just below the 50% target. Pls. Ex. 8 (3/24/22 Tr. 6:16–17). De Grandy acknowledged that BVAP would comply with the VRA, but still recommended changing the proposal to bring the BVAP above 50%. Pls. Ex. 8 (3/24/22 Tr. 8:6–9). The Commission rejected the proposal, making further changes unnecessary.

201.    *Third*, Carollo and De Grandy floated an alternative to moving the West Grove sliver into District 4: moving an area roughly between 22nd and 27th Avenues in the North Grove. Pls. Ex. 3 (2/7/22 Tr. 101:11–14, 102:2–3); Pls. Ex. 7 (3/11/22 PM Tr. 3:8–9). This area was even less Hispanic than the West Grove sliver—36.7% HVAP compared to 59.2%—and De Grandy never presented this option as a fully realized map.

202.    Altogether, the evidence demonstrates adherence to "announced racial target[s] that subordinated other districting criteria and produced boundaries amplifying divisions between blacks[,] whites" and Hispanics. *Cooper*, 581 U.S. at 300–01.

**G.  2023 Redistricting Cycle**

203.    After Magistrate Judge Louis issued her May 3, 2023 Report and Recommendation on the Plaintiffs' preliminary injunction motion in this case (ECF 52), the Commission began developing a new map.

204.    At the Commission's May 11, 2023 meeting, Díaz de la Portilla suggested returning to at-large elections, noting "then there's no debate about where the lines are drawing, whether it's . . . like Flagami is cut in half where Allapattah's cut in half." Pls. Ex. 27 (5/11/23 Tr. 4:2–4). He doubled down on the Commission's view that representation was racially categorical, and that

redistricting's goal was to reserve one Anglo and one Black seat, and to avoid having five Hispanic commissioners. *Id.* (5/11/23 Tr. 4:16–20, 7:18–19).

205.    Reyes agreed. *Id.* (5/11/23 Tr. 5:13, 5:20, 6:4–14 ("[S]ince day one when their boundaries were drawn, it was to assure diversity in the city of Miami. And the only way that we can assure diversity of the city of Miami is by—I'm going to call a spade a spade—but gerrymandering.")); *see also id.* (5/11/23 Tr. 17:9–13 ("We have to bunch together [] ethnic borders in order to be able to have Afro American . . . and non-Hispanic white . . . in representing the city of Miami.")).

206.    The two stressed that what the Commission did in the 2022 Plan was right. *Id.* (5/11/23 Tr. 8:12–16, 13:8–14, 16:17-20). Concluding the discussion, the Commission voted *unanimously* (with Carollo absent) to direct De Grandy to meet with them "and start redrawing a map, that will guarantee that ten years from now we're going to have the diversity . . . in the city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups." *Id.* (5/11/23 Tr. 17:10-13, 17:14–21, 18:15–23).

207.    The Court issued its injunction on May 23, 2023 (ECF 60). That night, Plaintiffs submitted two proposed maps (labeled P1 and P2) to the Commission, along with a letter explaining them. Pls. Ex. 33 at 46–51; Pls. Ex. 36 at 2–3. On June 9, Plaintiffs shared supplemental information on P1 and P2's compliance with the VRA. Pls. Ex. 34; Pls. Ex. 36 at 2. Plaintiffs followed that up with Dr. Bryant Moy's full analysis on June 12. Pls. Ex. 35; Pls. Ex. 36 at 1. Plaintiffs later submitted a third map (P3) on June 13. Pls. Ex. 33 at 53; Pls. Ex. 34 at 1.

208.    King reiterated the City's commitment to dividing Miamians by race on June 13. She gave a reporter a written statement: "The Supreme Court ruling [in *Allen v. Milligan*, 143 S. Ct. 1487 (2023)] proves that our original redistricting was constitutional and in the best interest of

our community." Pls. Ex. 40. She went on, "My top priority is keeping District 5 neighborhoods intact . . . Overtown, Liberty City, Little Haiti, Wynwood and the Upper East Side share the same needs. It would be unconstitutional to redraw those lines." *Id.*

209.     On June 14, 2023, the Commission met. Pls. Ex. 31. De Grandy publicly presented his "draft plan proposal," named Version 12 ("V12"). Pls. Ex. 28 (6/14/23 Tr. 8:3–16:13); Pls. Ex. 29, 30, 77. De Grandy developed V12 after individual private meetings with commissioners to amalgamate their input. The Commission debated proposed changes to V12 and then took a recess after 103 minutes in session. Pls. Ex. 28 (6/14/23 Tr. 31:22–56:5). During the recess, De Grandy met privately with commissioners and drew alternative maps at each commissioner's request. Pls. Ex. 28 (6/14/23 Tr. 64:5–14).

210.     Commissioners returned from recess for a final 44-minute session where each pushed for changes to their districts. ECF 82-6 at 1. Díaz de la Portilla proposed "Version 14," a draft De Grandy had previously drawn, as the D1 Alt. Map, Pls. Ex. 78; Covo, Carollo, and King each proposed maps of their own based on V12 (the D2, D3, and D5 Alt. Maps), Pls. Ex. 79, 80, 82; and Reyes stood by the original V12. Pls. Ex. 28 (6/14/23 Tr. 59:5–12). After some discussion, De Grandy and the City's retained outside counsel Christopher N. Johnson modified the D3 Alt. Map to move a portion of Overtown from D1 to D5, in a change agreed upon by King and Díaz de la Portilla, resulting in "D3 Alt. v.2." Pls. Ex. 28 (6/14/23 Tr. 70:9–72:12); Pls. Ex. 81. After Díaz de la Portilla objected to the change going too far, some territory was moved back into D1, yielding "D3 Alt. v.3." Pls. Ex. 28 (6/24/23 Tr. 80:16–19, 81:6–15, 87:1–9). The Commission approved that plan on a 4-1 vote, and it was later memorialized in writing as Res. 23-271. Pls. Ex. 28 (6/24/23 Tr. 91:9–19); Pls. Ex. 32, 76.

211.     The 2023 Plan is 94.1% the same as the 2022 Plan. Only 5.9% of Miamians are

moved into a different district.

212.    Narrowing in on the three Hispanic-majority districts which the Commission previously sought to optimally "balance" with as high Hispanic populations as possible, 97.8% of Miamians who were sorted into those districts—because of their race—remain there in Res. 23-271.

213.    The makeup of the 5.9% of Miamians moved suggests continued racial predominance. 5,125 residents were moved into D2 and D5 from the three packed Hispanic districts, but those residents are disproportionately *less* Hispanic (59% HVAP compared to the 2022 districts' 88–90%).

214.    The 4,735 residents moved out of the 2022 Plan D5 are just 16.6% Black, compared to the 2022 Plan D5's 50.3% BVAP. Meanwhile, 90% HVAP areas are shuffled *among* D1, D3, and D4, creating the illusion they changed while maintaining their demographics.

215.    These figures point to continued racial predominance, with Black residents packed in D5 (still 50.3% BVAP), D2 retaining an intentionally large Anglo concentration, and the Hispanic populations of D1, D3, and D4 deliberately "balanced" at an artificially high level.

### 1.  *The Evolution of the 2023 Plan Suggests Racial Predominance*

216.    The City's remedial mapmaking process began with the Commission's directive to De Grandy to preserve the categorical racial divisions in the 2022 Plan. The first version shared publicly was V12, during the June 14 Commission meeting. Then, the Commission made several changes to claw back even more elements of the 2022 Plan that V12 had altered.

217.    ***The D2/D3 Border in the North Grove and Brickell:*** Carollo homed in on an area of the North Grove between 22nd and 27th Avenues which V12 added to D3. Pls. Ex. 84 (Area 21); Pls. Ex. 28 (6/14/23 Tr. 40:12–41:11). At Carollo's request, Area 21 was returned to D2. Pls.

Ex. 28 (6/14/23 Tr. 65:6–7). This area is one of the whitest in the city (54.8% WVAP, 35.9% HVAP), and is the exact same area Carollo previously compared to the bone in a steak, in contrast to Hispanic-rich "sirloin" areas elsewhere. Pls. Ex. 3 (2/7/22 Tr. 101:11–14, 102:2–3, 102:10–12, 103:11–12, 105:2–3). To compensate for the lost population, Carollo requested that D3 add a plurality-HVAP area along South Miami Avenue to Brickell (Area 24). Pls. Ex. 28 (6/14/23 Tr. 38:8–39:9; 77:6–9). Without explanation, an *additional* area of Brickell (Area 25) was moved *into* D2, forming an irregular finger along the Miami River. Area 25 is plurality-white.

218.    ***The D3/D4 Border:*** Carollo's only other requested change was along the D3/D4 border. V12 shifted the border three blocks eastward in Shenandoah and Silver Bluff, from 17th Avenue under the 2013 and 2022 Plans, to 14th Avenue. This united all of Silver Bluff in D4 for the first time, and meant most of Shenandoah—all but two-block-wide slice from 12th to 14th Avenues—was united in D4 as well. Pls. Ex. 28 (6/14/23 Tr. 15:2–9, 15:13–14). Carollo requested restoring the boundary to 17th Avenue south of Coral Way, while also restoring "in that same line as before" an area further north along SW 8th and 9th Streets that both he and Reyes wanted snapped back to the 2022 boundary, "keeping it in District 3 like it was." Pls. Ex. 28 (6/14/23 Tr. 35:11–15, 37:1–23, 53:4).

219.    As for the 17th Avenue/Coral Way restoration, after City Attorney Méndez recast Carollo's "main concerns [as] to keep certain communities together and certain neighborhoods together," Carollo justified "leav[ing] that section as it was" for "the simple purpose of the park we're building . . . in that part of Silver Bluff." Pls. Ex. 28 (6/14/23 Tr. 41:12–13, 53:9–10). But earlier, he stated the park was *still* on the D4 side of the line. Pls. Ex. 28 (6/14/23 Tr. 35:23).

220.    Carollo's request moved nearly 2,000 people between 14th and 17th Avenues back into D3. In response, "to equalize population," De Grandy moved from D3 to D4 an area in

Auburndale/Little Havana—most of which had been in D4 under the 2013 Plan. Pls. Ex. 28 (6/14/23 Tr. 65:13–14). Thus, the D3/D4 border walked back closer to the 2022 (and 2013) Plan at commissioners' requests, continuing the division of Shenandoah, Silver Bluff, and Little Havana that commissioners had kept divided in the 2022 Plan to balance Hispanic populations and facilitate racial separation. Pls. Ex. 3 (2/7/22 Tr. 52:5–14), Pls. Ex. 8 3/24/22 Tr. 38:9–16, 79:19–20).

221.    *Morningside:* V12 proposed moving part of Morningside between 55th Terrace and 61st Street out of D2 and into D5. At 11.8% BVAP and 41.9% WVAP, the area (Area 26) has a much lower Black population and much higher white population than D5. And indeed, V12's D5 BVAP drops from the 2022 Plan's 50.3% to 50.0%. Covo objected to Morningside being split, but acknowledged that parts of the 2013 D2 would have to be moved out to equalize population. Pls. Ex. 8 (6/14/23 Tr. 42:14, 42:18–21, 45:1–6). Realizing that part of Morningside had moved into D5, King objected. Pls. Ex. 28 (6/14/23 Tr. 43:15–22). De Grandy asked if she preferred to keep the neighborhood whole by including all of it into D5, but King said, "No, I don't think that any of Morningside should go to my district. Wouldn't that be splitting up neighborhoods?" Pls. Ex. 28 (6/14/23 Tr. 44:2–3). King requested De Grandy bring back a revision with all of Morningside restored to D2. Pls. Ex. 28 (6/14/23 Tr. 45:13–15).

222.    During the recess, King commented in her office that she was "looking out for the minorities" or had "to look out for the minorities" and did not want a "white affluent" area or areas in her district. The only change from V12 made in King's proposed alternative map, the D5 Alt., was returning that piece of Morningside to D2. Pls. Ex. 28 (6/14/23 Tr. 64:21–65:1). That change was incorporated into Res. 23-271. Significantly, the Commission rejected at least four alternative plans that would have avoided "splitting up neighborhoods" in and around Morningside by adding

the neighborhood to D5. Res. 23-271 excludes from D5 the low-BVAP neighborhoods south of the existing district boundary.

223. ***Defining Overtown Along Racial Lines:*** The only other change to V12 impacting D5 was in Overtown. King and the Overtown Community Redevelopment Area (CRA) sharply criticized Plaintiffs for moving part of Overtown out of D5 in P1 and P2. In response, Plaintiffs submitted P3, which unites in D5 all parts of Overtown that had been in the 2022 Plan D5 (following the CRA boundary), *plus* reunited 11 HVAP-majority Overtown blocks that the 2022 Plan had moved into D1 (between NW 5th and 8th Streets, from I-95 to 7th Avenue.

224. Neither De Grandy nor the commissioners discussed P3's treatment of Overtown. Instead, De Grandy criticized P1 and P2's "severing parts of Overtown" and explained how V12 "keeps historic Overtown intact in District 5" at King's request. Pls. Ex. 28 (6/14/23 Tr. 8:15, 10:2–5, :22–11:3, 12:20–22). Contrasting Plaintiffs' "own impression of where Overtown is," De Grandy explained how maps he found on Google and the City's now-defunct Neighborhood Enhancement Team (NET) "shows a configuration consistent with our understanding" and how, "as [he] understand[s] the community of Overtown," V12 included all of it in D5. Pls. Ex. 28 (6/14/23 16:4–7). His presentation included slides with his definition of "Historic Overtown." Pls. Ex. 29 at 23, 26.

225. But De Grandy's Overtown *excludes* large areas that are part of the Google Maps and NET definitions of Overtown—the very sources he cited. Those definitions are shared by the City's Police Department (MPD) and the Convention & Visitors Bureau (GMCVB). The area De Grandy defined as Overtown is 60.5% BVAP. The parts of the Google/NET/MPD/GMCVB definition De Grandy excluded are disproportionately non-Black (63.7% HVAP, 26.2% BVAP). Further, the City Code has an official definition of Overtown that is even broader than

Google/NET/MPD/GMCVB. City Code § 2-1051. The parts of the City Code definition De Grandy excluded from his neighborhood boundary are less Black, and more Hispanic. De Grandy defined Historic Overtown along racial lines, resulting in the area being split into District 1 and District 5 on the basis of race, with his definition shoring up the existing racial composition of District 5 and . . . the Hispanic supermajority in District 1.

226. The Commission objected to one small part of V12's boundary in Overtown. King requested adding to D5 a restaurant, People's Bar-B-Que, located in Overtown under the Google/NET/MPD/GMCVB definition and City Code definition, but outside Overtown under De Grandy's definition. Pls. Ex. 28 (6/14/23 Tr. 69:22, 70:9–10). Díaz de la Portilla consented to the change—stressing *only* the restaurant should move, nothing more—and the restaurant moved into D5 in the D3 Alt. Map v.2. Pls. Ex. 28 (6/14/23 Tr.70:11, 71:14–72:17). But De Grandy and retained outside counsel Christopher N. Johnson incurred too much into the Hispanic-majority part of Overtown for Díaz de la Portilla's taste, moving four whole city blocks between NW 7th and 8th Streets. Pls. Ex. 28 (6/14/23 Tr. 78:5–6, 80:16–19). Díaz de la Portilla directed De Grandy and Johnson to restore to D1 all but the single block with the restaurant, which they did in the final map. Pls. Ex. 28 (6/14/23 Tr. 81:6–15). The three blocks returned to D1 are more than 70% Hispanic. Adding just the restaurant block deviates as little as possible from the 2022 Plan in this area. The block's 10 residents are two-thirds Black.

### 2. Parts of Version 12 the Commission Adopted Suggest Racial Predominance

227. The portions of V12 the Commission chose *not* to alter were principally driven by racial considerations as well.

228. ***Avoiding "Packing Hispanics":*** One of the first criticisms of P1 and P2 lodged during the Commission's meeting was how both plans "intentionally pack the more conservative

Hispanic voters in the western areas of the city" into D4. Pls. Ex. 28 (6/14/23 Tr. 9:9–10), *see also* Pls. Ex. 28 (6/14/23 Tr. 14:21–22 ("the plaintiffs' plan was designed to concentrate the most conservative voters into D4. And you see it right there," showing slide noting 95.03% and 95.55% HVAP in P1/P2)). This was a race-based objection to a compact district unifying neighborhoods in Miami's west. To explain the "problem," De Grandy emphasized D4's HVAP under P1/P2 and showed slides featuring those figures. Pls. Ex. 28 (6/14/23 Tr. 9:10–12).

229.    To fix the "packing" of Hispanics, V12 "restored [D1's] connection to . . . the western part of the city" where "the great majority of Hispanic voters live." Pls. Ex. 28 (6/14/23 Tr. 13:5–6, 14:17–18). Except for a single block, D1's boundary is *identical* to the 2022 (and 2013) Plan from the city limit at 65th Avenue all the way to 22nd. The Commission left this line untouched on June 14.

230.    ***Adding Back an Area "Where the Hispanic Voters Live" to District 3:*** V12 made one notable change from the 2022 Plan along the D2/D3 border, which the Commission chose to accept on June 14. De Grandy proposed moving the Bay Heights region of Coconut Grove from D2 into D3. In the Commission's first redistricting process, Bay Heights was an area Díaz de la Portilla named specifically as "where the Hispanic voters live," suggesting adding it and other parts of the Grove to D3 and D4 because "there's ethnic diversity in Coconut Grove too." Pls. Ex. 2 (12/9/21 Tr. 7:15–17). Following this direction, De Grandy's Feb. 7, 2022 draft moved Bay Heights into D3. Pls. Ex. 68; Pls. Ex. 3 (2/7/22 Tr. 9:21–23, 10:6–12 (De Grandy describing "find[ing] adjacent areas with similar demographics" to add to D3)). After Russell objected, Pls. Ex. 2 (12/9/21 Tr. 26:15–16); Pls. Ex. 3 (2/7/22 Tr. 65:9–13), De Grandy restored Bay Heights to D2 in the Feb. 22, 2022 Base Plan, instead adding to D3 another "ethnically diverse" part of the Grove "with similar demographics" around Natoma Manors, ensuring D3's HVAP dropped only a

tenth of a point. Pls. Ex. 4 (2/25/22 AM Tr. 5:9–11, 6:7–8, 7:22–8:4, 9:18–19).

231.    Nonetheless, Bay Heights' high Hispanic population was the subject of later discussion, and Carollo even expressed interest in adding the area back to D3 and "tak[ing] it all the way down to Simpson Park" northward. Pls. Ex. 5 (2/25/22 PM Tr. 7:21–22); Pls. Ex. 7 (3/11/22 PM Tr. 36:5–37:14 (De Grandy explaining that Natoma and Bay Heights have more similar demographics to D3 than whiter areas that he excluded from D3)); Pls. Ex. 8 (3/24/22 Tr. 74:9–10 (Reyes stating his proposed addition to D3, including Bay Heights, is majority Hispanic), 75:11–16 (De Grandy explaining he added Bay Heights to D3 in Feb. 7 Draft rather than adding less-Hispanic areas further north), 77:5–7 (De Grandy explaining Reyes Plan added majority-Hispanic area from Bay Heights to Simpson Park, in contrast to moving D3 straight east in just Brickell), 78:1–18 (Díaz de la Portilla noting Brickell's "predominantly Anglo" population and confirming De Grandy chose to add Bay Heights "because there are more people in Bay Heights that are more similar to the people that live behind Casola's Pizza [in D3] . . . [t]han to the people that live at Brickell")). But the 2022 Plan kept Bay Heights in D2.

232.    In 2023, De Grandy again moved Bay Heights—and its 62% HVAP—into D3. Just as in 2022, Carollo was happy to add it, and again requested "taking it all the way down to Simpson Park," a request accommodated in Res. 23-271. Pls. Ex. 28 (6/14/23 Tr. 38:15–20).

233.    Thus, the Commission adopted Res. 23-271 with Natoma (and its "similar demographics") retained in D3, *plus* the 62% HVAP Bay Heights—"where the Hispanic voters live" added too.

## H.  District-by-District Analysis of 2023 Plan

### 1. District 5

234.    Race predominated in the drawing of District 5.

235.    Res. 23-271's D5 is driven by a decision to define every distant corner of the 2022 Plan D5 as part of a common "community of interests," thereby attempting to lock in place the unconstitutional borders from the get-go. King prepared a non-negotiable list of neighborhoods to ensure the replication of the 2022 Plan D5's boundaries—including Overtown (itself racially defined), Liberty City, Little Haiti, Wynwood, and the Upper East Side. Pls. Ex. 28 (6/14/23 Tr. 12:15–22). Together, these areas constitute every corner of the 2022 Plan D5 except its Downtown tail. But King requested specific landmarks at the extreme southern end of the Downtown appendage too, yielding jagged edges that scooped up FDC-Miami and its disproportionately Black inmate population (just as in the 2022 Plan), while carefully avoiding less-Black areas like "Condo Canyon" and Overtown south of NW 8th Street that the 2022 Plan D5 excluded. Pls. Ex. 28 (6/14/23 Tr. 12:23–13:2).

236.    Indeed, Res. 23-271 moves from D5 to D2 an area around Omni (which the 2022 Plan moved from D2 to D5, and which King neglected to include in her "community of interests") that is even *less* Black than the Condo Canyon corridor immediately south (11.9% versus 14.2%). D5's incursion into Northeast Allapattah across I-95 and SR 112 remains too, reconfigured slightly, but still dividing the neighborhood along racial lines by following local streets. The Commission rejected adding adjacent areas like Morningside and Edgewater because of their whiter makeup. Just as in 2022, the Commission rejected plans with sub-50% BVAPs, and inched the BVAP back up to 50.3%, from V12's 50.0%, by restoring the 2022 Plan's racially-motivated Morningside/Upper East Side border. The new D5 retains 94.7% of the 2022 Plan population, and is less compact than the 2022 Plan D5 across all metrics.

237.    Before the Commission adopted the 2023 Plan, Plaintiffs submitted an initial report from Dr. Moy regarding the Black population necessary for Black voters to usually elect candidates

of choice. Pls. Ex. 34. He also analyzed P1 and P2, concluding that they "make it easier for Black voters to translate their preferences to higher vote totals for their preferred candidate[s]," who "received the vast majority of the top two-candidate vote share across both newly proposed districts." Pls. Ex. 35 at 1; Pls. Ex. 36 at 1–2.

238.    The City ignored Dr. Moy's analysis and did not analyze racially polarized voting or the Black VAP, CVAP, or share of registered voters necessary to comply with the VRA.

239.    The Commission continued to adhere to a 50% BVAP quota in the 2023 Plan. Morningside was removed from V12's D5, because it was too white. The Commission rejected proposals to solve the "splitting up neighborhoods" problem, Pls. Ex. 28 (6/14/23 Tr. 44:2–3), by uniting Morningside within D5. Those proposals would have yielded a sub-50% BVAP. And commissioners fastidiously ensured not one inch of Hispanic-majority parts of Overtown moved into D5. Through these changes, D5's BVAP increased from 50.0 to 50.3%—the same as the 2022 Plan.

### 2. District 2

240.    Race predominated in the drawing of District 2 in the 2023 Plan.

241.    District 2 remains "not compact," a "relatively thin strip confined to the coast, extending from the northeast in the Morningside area . . . and continuing southwest along the water through Coconut Grove." ECF 52 at 72; *see* Pls. Ex. 1 (11/18/21 Tr. 16:21–17:1 ("District 2 was justified on the basis of being a coastal district")); Pls. Ex. 3 (2/7/22 Tr. 41:19–22, 45:8–16, 50:11–54:19 ("[T]his [is] why we've had a coastal one. It was made that way. It was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner. Even today, the only way that that could happen is if you have that whole coastal area. There's no way that you can separate the Grove or that you can separate downtown or what's left of the Upper East Side

and create just a district for a District 2 so that someone Anglo could be elected.")). It is shaped by the Commission's intent to reserve it as an "Anglo-access" seat, and surgically exclude more-Black or more-Hispanic areas on the north and south end, respectively. To the north, D2 retains "white affluent" Morningside, and adds a thin, low-BVAP adjacent strip. The border zig-zags from NE 2nd Avenue, to the railroad tracks, back to 2nd, and back to the tracks to retain whiter Condo Canyon, add an additional lower-BVAP area around Omni, and separate higher-BVAP areas of Downtown kept in D5.

242.    To the south, "ethnically diverse" areas of the Grove "where the Hispanic voters live" are either kept in D3 (Natoma), or moved back in after having been returned to D2 under the 2022 Plan for non-racial reasons (Bay Heights to Simpson Park). Whiter areas on Brickell's north end remain excised from D3, achieved via an irregular finger. D2 retains 92.2% of its 2022 population, and its compactness scores are identical to the 2022 Plan D2.

### 3. Districts 1, 3, and 4

243.    Race predominated in the drawing of Districts 1, 3, and 4 in the 2023 Plan.

244.    The three predominantly Hispanic districts continue to be driven by a desire to optimally "balance" the Hispanic population at 84.5 to 90.0% HVAP rather than having a 95%+ HVAP district. Together, these districts are 97.8% the same as the 2022 Plan; individually, they still have staggeringly high core retention (90.6% to 98.2%). The D1/D4 and D3/D4 borders maintain the nearly untouched division of Flagami, Silver Bluff, Shenandoah, and Little Havana to balance Hispanic population and "preserv[e] the racial and ethnic composition of the Commission." ECF 52 at 75.

245.    D1 maintains the "staircase-like stepping pattern in its northeastern corner in Allapattah," reconfigured slightly. ECF 52 at 74. It maintains "an appendage extending toward

Downtown Miami along the Miami River," "described by the Commissioners as an 'attractive' area that was 'mainly Hispanic or Anglo.'" *Id.* It excludes De Grandy's racially-defined Overtown, while scooping up Overtown landmarks in majority-HVAP areas.

246.    D3 becomes less compact, even as it smooths out its "ethnically diverse" Natoma Manors appendage by adding the area "where the Hispanic voters live" in Bay Heights, all while minimizing additions from the whiter northern end of Brickell.

### I. The Role of Partisanship

247.    Commissioners explicitly denied on the record any partisan motivations during the development of the 2023 Plan.

248.    Carollo emphasized the Commission's nonpartisan nature and disclaimed partisan motivations. Pls. Ex. 28 (6/14/23 Tr. 32:13–20). Covo agreed. Pls. Ex. 28 (6/14/23 Tr. 45:6–8). *No* commissioner expressed a partisan motivation for *any* decision in the 2023 Plan. Objective election data also contradict claims that the map was drawn to achieve a partisan outcome.

249.    Race and party are correlated in Miami, with Black and Anglo voters usually preferring Democratic candidates, and Hispanic voters often preferring Republican candidates (albeit at lower margins). During the remedial process, De Grandy treated party and race interchangeably, criticizing P1 and P2 for packing "conservative Hispanic voters." Pls. Ex. 28 (6/14/23 Tr. 9:9–10). Indeed, De Grandy accompanied his comparison of P1/P2's and V12's partisan impact with slides prominently showing the HVAP of D3 and D4 in P1 and P2—which De Grandy criticized as too high. Pls. Ex. 28 (6/14/23 Tr. 9:10–12). After criticizing P1/P2 for allegedly "packing conservative Hispanic voters" into D4, De Grandy explained how V12 "restored [D1's] connection to [] the western part of the city, thereby distributing the more conservative voters in the west within two districts." Pls. Ex. 28 (6/14/23 Tr. 13:5–6).

### J. *Covington II* Factors Regarding Special Elections

250.    Holding special elections would not negatively impact the ordinary operations of the City Commission—regardless of the number of commissioners who are up for election. Spring Dep. Tr. at 43:9–15. Having all five commissioners up for election at the same time would not negatively impact the City's budgeting process, either. *Id.* at 43:16–20.

251.    The City follows the election structure required by law. The City has never had any issues with executing an election structure mandated by law. Hannon Dep. Tr. at 37:12–20, 95:15–23.

252.    The City has held special elections in the past featuring tight timelines, and has not had problems complying with that timing. *Id.* at 58:10–59:16, 114:22–115:5.

253.    In general, the City considers the cost of running an election to be "very insignificant" and "fairly minute." Hannon Dep. Tr. at 51:24–52:3; Spring Dep. Tr. at 38:18–20, 39:17–25. The City believes the cost it pays for the County to run elections is minimal compared to the services they receive in return. Hannon Dep. Tr. at 46:10–12, 51:3–7, 91:12–16.

254.    It would be easy for the City to hold special Commission elections concurrent with the regularly scheduled November 2024 election. *Id.* at 66:6–25. It would not be a burden on the City Clerk's office or any other City office to hold a special citywide election concurrent with the November 2024 elections. *Id.* at 114:10–21. The City Clerk's office would be prepared to hold a special citywide election in November 2024. *Id.* at 116:6–13.

255.    It would not have much of an impact on the City Clerk's office if a city election were held in November, but the City Clerk's office could not start preparing for that election until April. *Id.* at 97:9–24, 112:24–113:14.

256.    The cost of holding a special election concurrent with the regularly scheduled

November 2024 election would not be significant to the City. *Id.* at 66:15–25.

257. As long as the County Elections Department has the new City Commission map by March 31, 2024, it will be able to "seamlessly" prepare for special City Commission elections concurrent with the regular November 2024 election. White Dep. Tr. at 36:8–17, 65:18–24. As long as the County Elections Department's deadlines are adhered to, it will not be a burden to hold special elections concurrent with the November 2024 elections. *Id.* at 67:13–19. The County Elections Department is confident it can effectively and properly administer special elections in those circumstances. *Id.* at 68:2–10.

258. If any runoffs are necessary after special City Commission elections in November 2024, holding them four or five weeks later would be adequate for the County Elections Department. *Id.* at 66:5–22.

259. The County Elections Department estimates that it will cost $115,000 to hold a special City Commission elections concurrent with the November 2024 election. *Id.* at 45:6–18.

260. If all five Commission seats advance to runoffs after the November 2024 election, the citywide runoff election would cost about $507,000. *Id.* at 46:4–19. If fewer than all Commission races advance to a runoff, the cost would be less.

261. The County Elections Department passes all of the costs of running a municipal election onto the City. *Id.* at 37:7–11.

262. Separate from the costs of administering any special elections, the County Elections Department estimates that it will cost $154,000 implement a new redistricting map. The County plans to pass those costs onto the City. *Id.* at 57:3–15.

263. There would be no additional burden to the County Elections Department to hold elections for all five City Commission districts in 2025, rather than just the two that will be

regularly up in that year. *Id.* at 97:2–6, 17–20. Holding elections for all five districts would not increase the cost of the 2025 election either, since it will already be a citywide election with the mayor's race on the ballot. *Id.* at 97:17–20. In other words, there would be no cost to holding special elections in Districts 1, 2, and 4 concurrent with the regular municipal election in 2025. Hannon Dep. Tr. at 65:24–66:5.

### III.  CONCLUSIONS OF LAW

#### A.  Plaintiffs Have Standing to Sue

Plaintiff Cooper has standing to challenge District 2. Plaintiff Valdes has standing to challenge District 2 under the 2022 Plan and District 5 under the 2023 Plan. Plaintiffs Johnson and Miro have standing to challenge District 3. Plaintiff Contreras has standing to bring her nominal-damages claim against the City because she lived in District 4 under an unconstitutional racial gerrymander. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).

The Organizational Plaintiffs demonstrated their standing to sue on behalf of their members living in the challenged districts. The interests at stake in this suit are germane to each of the Organizational Plaintiffs' purposes. Neither the claims asserted nor the relief requested requires individual members' participation in the lawsuit. Engage Miami has standing to challenge all five districts. The South Dade NAACP has standing to challenge Districts 2, 3, and 4. The Miami-Dade NAACP has standing to challenge Districts 1, 2, 3, and 5. GRACE has standing to challenge Districts 2 and 4 under the 2022 Plan, and District 2 under the 2023 Plan. Independently of its standing to sue on behalf of its direct members, GRACE has standing to sue on behalf of the individual members of its constituent organizations. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9–10 (1988) (holding that consortium organization has standing to sue on behalf of constituent organizations' members, as long as those constituent organizations would have

standing to sue); *Perez v. Abbott*, 267 F. Supp. 3d 750, 791 n.51 (W.D. Tex. 2017), *aff'd in relevant part*, 138 S. Ct. 2305 (2018); *Perez v. Abbott*, 253 F. Supp. 3d 864, 931 n.82 (W.D. Tex. 2017) (collecting cases).

### B. All Five Districts Fail Strict Scrutiny

Because the City concedes race predominated in District 5, and the facts demonstrate race predominated in each of the other districts, each district must survive strict scrutiny. The Parties stipulate that if race predominated in Districts 1, 2, 3, and 4, then the use of race was not justified by a compelling state interest. J. Stip. at 21. These four districts are therefore unconstitutional racial gerrymanders.

District 5 likewise fails strict scrutiny. "The City's determination of a minority population percentage for VRA compliance must . . . be well-supported." ECF 52 at 82 (citing *Bethune-Hill I*, 580 U.S. at 195). But the City failed to conduct the required "functional analysis of the electoral behavior within the particular election district" required to "determin[e] what minority percentage will satisfy [the VRA's] standard." *Bethune-Hill I*, 580 U.S. at 194 (cleaned up). In the 2021–22 process, the City adhered to an arbitrary 50% BVAP numerical quota not supported by any functional analysis. Despite their consultant advising that District 5 would perform for Black voters with lower BVAPs, commissioners insisted on increasing the BVAP above their arbitrary 50% target. The City was on notice that Black voters could usually prevail in elections when they were not so packed. The City did not have "good reasons" to believe that this quota was necessary to comply with the VRA.

In 2023, the City likewise did not narrowly tailor its use of race in District 5. Dr. Moy's initial report put the City on notice that its conclusions lacked the required "evidentiary foundation" needed to support "[s]electing a BVAP figure." *Bethune-Hill II*, 326 F. Supp. 3d at

176. He also analyzed P1 and P2, concluding that they "make it easier for Black voters to translate their preferences to higher vote totals for their preferred candidate[s]," who "received the vast majority of the top two-candidate vote share across both newly proposed districts." Pls. Ex. 34; Pls. Ex. 35 at 1; Pls. Ex. 36 at 1–2.

The City ignored Dr. Moy's analysis, instead relying on De Grandy's unsupported conclusions that "plaintiffs' plan *may* also negatively impact the ability of Black voters to elect a candidate of choice throughout the decade in D5," Pls. Ex. 28 (6/14/23 Tr. 10:22–11:2), without explaining how he expected their margins (ranging from 56.4 to 82.7%, compared to 58.4 to 84.3% in the 2022 Plan) to decline such that Black voters' choice would fail usually to prevail. Pls. Ex. 35 at 3. Without justification, the Commission rejected alternative configurations that did not have a sufficiently high Black population (based on their misunderstanding of how to comply with the VRA, which resulted in more Black voters than necessary being placed in the district, thus lacking the narrow tailoring required by strict scrutiny). For example, the Commission excluded Morningside from District 5 because it was a white area, despite their consultant advising that configurations that moved Morningside into District 5 would comply with the VRA. The final District 5 in the 2023 Plan adheres to the unsupported 50% BVAP quota. Strict scrutiny requires narrow tailoring and an accurate understanding of the law, not arbitrary quotas. Under these circumstances, the City's use of race in drawing District 5 was not narrowly tailored.

### C.  Special Elections Are Warranted

"[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (cleaned up), *aff'd sub nom. Cooper v. Harris*, 137 S.

Ct. 1455 (2017); *accord Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015); *Smith v. Beasley*, 946 F. Supp. 1174, 1212 (D.S.C. 1996); *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981).

Here, the Court should exercise its equitable power to order special elections for all five Commission districts, to be held concurrent with the November 2024 presidential election. Alternatively, Plaintiffs request all five Commission seats be up during the November 2025 municipal elections. Because the Parties and the public would be served by knowing as early as possible when the next elections will occur, Plaintiffs request that the Court set special elections in its post-trial order, with the question of the remedial map being resolved subsequently in a post-trial remedy phase.

### *1. Plaintiffs Suffer a Severe Constitutional Violation*

The last elections for Districts 1, 2, and 4 were held in November 2023 under the unconstitutional 2023 Plan after the nearly identical 2022 Plan was enjoined and implementation of the Court's interim remedial plan was stayed. The last elections for Districts 3 and 5 were held in November 2021 under the 2013 Plan, which was likewise impermissibly driven by race. In this case, plaintiffs are suffering immense constitutional harm. "Classifications of citizens on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). Miami's districting scheme sorts residents by race into separate districts, dividing communities along racial lines, and thus undermining the quality of representation for the people living in those communities and districts.

The harm is not limited to individual Plaintiffs or other voters, which is important because in determining equitable relief, the Court must engage in a "'balancing of the individual *and*

*collective* interests' at stake." *Covington II*, 581 U.S. at 488 (quoting *Swann v. Charlotte–Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971) (emphasis added)). Beyond the harm to voters, the "elected representatives" of racially gerrymandered districts receive a "pernicious" message that will make them "more likely to believe that their primary obligation is to represent only the members of [one racial] group." *Shaw*, 509 U.S. at 648. These serious harms are "altogether antithetical to our system of representative democracy." *Id.* Indeed, "[r]acial gerrymandering strikes at the heart of our democratic process, undermining the electorate's confidence in its government as representative of a cohesive body politic in which all citizens are equal before the law." *ALBC I*, 575 U.S. at 283 (Scalia, J., dissenting).

The scope and duration of this grievous harm also underscore its severity. In evaluating the severity of the constitutional violations at issue, courts have weighed the geographic scope of the violation, the number of individuals harmed, and the duration of the harm. *See, e.g., Covington v. North Carolina* (*Covington III*), 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017); *Sumter Cnty.*, 361 F. Supp. 3d at 1305; *League of Women Voters of Mich. v. Benson*, 373 F. Supp. 3d 867, 959 (E.D. Mich.), *vacated sub nom. Chatfield v. League of Women Voters of Mich.*, 140 S. Ct. 429 (2019).[2] Here, the scope could not be broader: all five Miami City Commission districts are racially gerrymandered.

The duration of Miami's racial gerrymandering is nothing short of stunning. The evidence reflects a history of racial gerrymandering dating back to the first single-member district plan in

---

[2] *Benson* involved a Fourteenth Amendment challenge to alleged partisan gerrymandering. The decision was vacated following the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), that partisan gerrymandering does not present a justiciable claim, but the court's analysis of special elections can be instructive here.

1997. In *Covington III*, the district court on remand found it significant that the "harms ha[d] persisted for over six years, tainting three separate election cycles." 270 F. Supp. 3d at 894. The violations here lasted even longer. *Navajo Nation v. San Juan County* is also instructive. No. 2:12-cv-39, 2017 WL 6547635 (D. Utah Dec. 21, 2017), *aff'd*, 929 F.3d 1270 (10th Cir. 2019). There, the court found that race was the predominant factor in choosing to maintain the lines of a majority-minority district "for decades." *Id.* at *18–19 & n.150. Under those circumstances, the court found it clear that the violations were "severe and longstanding" enough to warrant special elections. *Id.* at *18–19. Importantly, this holding was unaffected by the fact that the districts had not been challenged in the past—the court did not ignore the reality of what had occurred in prior decades. *See id.* at *18 & n.150. Likewise, in assessing the severity of Miami's gerrymander, this Court need not ignore a history that is necessarily part of the "careful case-specific analysis" in which the Court must engage. *Covington II*, 581 U.S. at 489.

## 2. Ordering Special Elections Will Not Significantly Disrupt Governance

The second *Covington* factor, "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed," also weighs in favor of ordering special elections. *Covington II*, 581 U.S. at 488. Plaintiffs seek special elections to be held concurrent with either the November 2024 presidential election, or the November 2025 citywide municipal election. Representatives from the City testified that such elections will have no negative impact on the ordinary operations of the City. The Miami-Dade County Supervisor of Elections likewise testified that the County Elections Department would be able to administer special elections with no trouble as long as certain deadlines are met. The cost of special elections will also be relatively modest in relation to the cost of administering elections, and not a significant concern for the City.

From the voters' perspective, adding City Commission races to an existing election carries

little "risk of generating voter confusion [or] low voter turnout." *Sumter Cnty.*, 361 F. Supp. 3d at 1305. Indeed, holding special elections concurrent with either the presidential or mayoral election will minimize voter confusion and increase turnout. *See Navajo Nation*, 2017 WL 6547635, at *18 ("The special elections will proceed under the regularly scheduled 2018 election deadlines and processes, thus minimizing their impact."); *Benson*, 373 F. Supp. 3d at 959 ("Because the special Senate election would occur on a regular election day and at a regularly-scheduled interval, it would not result in any additional election being held during the calendar year.").

Finally, Florida election administrators and voters are well-acquainted with truncated terms following redistricting. In the first election following each decennial redistricting, the entire Florida Senate is on the ballot to account for shifted district lines, with some senators elected to two-year terms instead of the ordinary four-year terms. FLA. CONST. art. III, § 15(a); *In re SJR 1176*, 83 So. 3d 597, 658 (Fla. 2012). After litigation forced changes to the Senate map in 2015, the entire Senate stood for election in 2016. The same thing occurred in the 1960s. *Swann v. Adams*, 263 F. Supp. 225, 227–28 (S.D. Fla. 1967) (truncating terms of all 165 state legislators and ordering special elections to be held in March 1967 to remedy equal protection violations). Moreover, the Legislature recently required certain county commission terms be truncated following redistricting. Fla. Stat. § 124.011(2)(a). This makes good sense. The combination of redistricting and staggered terms can disenfranchise many voters. That's what has happened in Miami. Voters who live in Districts 3 and 5 last voted in 2021; in the ordinary course, they should next vote four years later, in 2025. But if a voter is moved from one of those districts to District 1, 2, or 4, they will not be able to vote for six years (when Districts 1, 2, and 4 are next up, in 2027).

Florida's practice of truncating terms has been lauded as a model for states to follow to avoid one-person, one-vote concerns. *See* Margaret B. Weston, Comment, *One Person, No Vote:*

*Staggered Elections, Redistricting, and Disenfranchisement*, 121 YALE L.J. 2013, 2018–25 (2012). Several other states have similar systems. *Id.* at 2018–19. Florida's statewide practice reflects two important points for the Court to consider. First, the fact that Florida law requires truncated post-redistricting terms for the state legislature and county commissions demonstrates a strong statewide policy on how to handle post-redistricting elections; granting Plaintiffs' request against this backdrop would be significantly less intrusive to governance. *See In re Apportionment Law, SJR 1E*, 414 So. 2d 1040, 1049 (Fla. 1982) (The truncation requirement "was intended as a means to implement a fair reapportionment plan at the earliest possible date."). Second, because Miami's voters are already used to voting for truncated State Senate terms after redistricting, there is less chance of confusion; that, too, makes special elections less intrusive.

Ordering special elections will reduce confusion and is particularly appropriate in this case because the scope of the changes between the 2023 Plan and a posttrial remedy is likely to be significant. *See Navajo Nation*, 2017 WL 6547635, at *18 (ordering "elections in all districts because the boundaries of the present districts and recommended districts overlap" and otherwise, "if an election was not held in all districts it would create confusion as to which representative represented which voters" (internal marks omitted)).

### 3. Ordering Special Elections Will Not Unduly Intrude on State Sovereignty

Ordering special elections as a remedy is consistent with judicial restraint. Sovereignty is evaluated from the standpoint of the electorate—not the elected officials sitting in unconstitutionally drawn districts. *See Benson*, 373 F. Supp. 3d at 958 ("[B]ecause sovereignty is vested in the people, by preventing the people . . . from fairly and effectively exercising their franchise, the [challenged plan] infringes on state sovereignty, further exacerbating its constitutional harm." (citation omitted)); *Covington III*, 270 F. Supp. 3d at 897 ("By unjustifiably

relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans interfered with the very mechanism by which the people confer their sovereignty on the General Assembly."). The City cannot invoke sovereignty to deprive voters of the right to choose their elected officials; to the contrary, sovereignty provides a reason for special elections.

Any inconvenience of a new election to commissioners is no reason to let serious constitutional harm persist, especially when it deprives voters of their right to representation. A special election is necessary to remedy the widespread and serious constitutional harm arising from the City's racial gerrymander—as such, the principle of judicial restraint does not militate against intervention. *See Navajo Nation*, 2017 WL 6547635, at *19 (finding *Covington*'s judicial restraint factor satisfied where special elections were "specifically aimed at remedying constitutional violations that have affected . . . voters for decades"). Miami's racial gerrymander is severe not just in duration, but also in scope and number of voters affected. Accordingly, the City's actions not only permit but also necessitate court intervention.

Finally, to the extent there are burdens on the City, they do not rise to the level of undue intrusions on sovereignty. The additional costs of holding such elections are "insignificant" to the City. Even so, any administrative costs are significantly outweighed by the interests of voters in constitutional representation. Proper representation, rather than administrative convenience, is the primary concern of the third *Covington* factor, *see Covington III*, 270 F. Supp. 3d at 895; *Benson*, 373 F. Supp. 3d at 959. Ordering special elections does not offend the principles of sovereignty and judicial restraint.

"[I]n cases involving unconstitutional . . . racial gerrymandering, numerous courts—including the Supreme Court—have concluded that shortening the terms of elected officials and

ordering a special election does not unduly intrude on state sovereignty, particularly when the constitutional violation is widespread or serious." *Covington III*, 270 F. Supp. 3d. at 896 (collecting cases). This case is no different. Miami's residents have the right to vote in constitutional districts, and that right should be effectuated as quickly as practicable through special elections.

Respectfully submitted this 22nd day of January, 2024,

*/s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
Janine M. Lopez (FBN 1038560)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Gregory P. Luib*
**Dechert LLP**
1900 K Street NW
Washington, DC 20006
(202) 261-3413
gregory.luib@dechert.com

Neil A. Steiner*
Julia Markham-Cameron*
**Dechert LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
julia.markham-cameron@dechert.com

Christopher J. Merken*
**Dechert LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-2380
christopher.merken@dechert.com

*\* Admitted pro hac vice*

*Counsel for Plaintiffs*