```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3                  CASE NO.:  1:22-cv-24066-KMM

 4
     GRACE, INC., et al.,
 5
          Plaintiffs,
 6
     vs.
 7
     CITY OF MIAMI,
 8
          Defendant.
 9   _____/

10
                                4343 W. Flagler Street
11                              Suite 400
                                Miami, Florida
12                              Wednesday, 10:00 a.m.
                                October 11, 2023
13

14

15

16                         DEPOSITION

17                             OF

18                      CHRISTINA WHITE

19

20

21           Taken on behalf of the Plaintiffs

22

23                           ___

24

25
```

```
 1    APPEARANCES:

 2    ACLU FOUNDATION OF FLORIDA, by
      NICHOLAS L.V. WARREN, ESQ., (Via Zoom)
 3    On behalf of the Plaintiffs.

 4    DECHERT, LLP, by
      CHRISTOPHER J. MERKEN, ESQ.,
 5    Co-Counsel for the Plaintiffs.

 6    GRAY ROBINSON, by
      SYDNEY MICHELLE FELDMAN, ESQ.,
 7    On behalf of the Defendant.

 8    GERI BONZON-KEENAN, COUNTY ATTORNEY, by
      MICHAEL B. VALDES, ASSISTANT COUNTY ATTORNEY, and
 9    SOPHIA GUZZO, ASSISTANT COUNTY ATTORNEY,
      On behalf of the Witness.
10

11

12                            WITNESS

13    CHRISTINA WHITE

14        Direct Examination (By Mr. Merken)          3
          Cross Examination (By Ms. Feldman)         98
15

16

17                        E X H I B I T S

18        Plaintiffs' Exhibit Number 1              9
          Plaintiffs' Exhibit Number 12            54
19        Plaintiffs' Exhibit Number 82-23         74
          Plaintiffs' Exhibit Number 82-37         77
20        Plaintiffs' Exhibit Number 2             78
          Plaintiffs' Exhibit Number 3             82
21        Plaintiffs' Exhibit Number 13            88
          Plaintiffs' Exhibit Number 5             89
22

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   THEREUPON:
 2                    CHRISTINA WHITE
 3   was called as a witness by the Plaintiffs and, having
 4   first been duly sworn, was examined and testified as
 5   follows:
 6            THE WITNESS:  I do.
 7                    DIRECT EXAMINATION
 8   BY MR. MERKEN:
 9        Q.  Good morning.
10        A.  Good morning.
11        Q.  Could you please state your name and spell it,
12   for the record?
13        A.  Christina White, C-H-R-I-S-T-I-N-A, W-H-I-T-E.
14        Q.  And could you please state your title?
15        A.  Supervisor or Elections for Miami-Dade County.
16        Q.  My name is Christopher Merken.  I'm a lawyer at
17   Dechert.  We represent the Plaintiffs in this case,
18   Grace, Inc. versus the City of Miami, 22-civ-24066, in
19   the U.S. District Court for the Southern District of
20   Florida.
21            MR. MERKEN:  And could we do appearances
22       for everybody else?
23            MR. VALDES:  Sure.  Michael Valdes,
24       Assistant County Attorney, counsel for
25       Christina White.
```

1          MS. GUZZO:   Sophia Guzzo, Assistant County

2     Attorney, counsel for Christina White.

3          MS. FELDMAN:   Sidney Feldman, of Gray

4     Robinson, counsel for the City of Miami.

5          MR. MERKEN:   Thank you.

6   BY MR. MERKEN:

7     Q.   Ms. White, I know this is going to be boring,

8   going over the ground rules -- I'm sure you have heard

9   them before -- but this a deposition.  A deposition is a

10  question and answer session.  I will ask the questions.

11  You will answer those questions.

12          You took an oath a few minutes ago, and you

13  understand that, just like in court, you must answer

14  each and every question with complete truth and honesty?

15          We have a court reporter present, so you must

16  answer every question verbally.  If the question calls

17  for a yes or no answer, you must answer yes or no.  A

18  nod or uh-huh is not permitted, because the court

19  reporter may not take down everything you say.  Do you

20  understand?

21     A.   I do.

22     Q.   We also need to do our best to speak slowly and

23  clearly and not talk over each other.  I am guilty of

24  that frequently.  I talk very quickly.  I will do my

25  best.  If I'm speaking too quickly, I'm sure the court

*Bailey & Sanchez Court Reporting, Inc.*

1    reporter will let me know, but please feel free to ask

2    me to slow down, but we want to make sure we get a clear

3    record.

4            Your counsel may object to the questions that I

5    ask.  Even if counsel objects, you must still answer my

6    question, unless he directs you not to answer and you

7    decide to follow that instruction.  Do you understand?

8       A.  I do.

9       Q.  If you don't understand my question, please

10   tell me.  Please do not guess, just tell me if you don't

11   understand.  I will do my best to rephrase, to make the

12   question clearer.

13           If you need a break at any time, please let me

14   know.  We have coffee, water, rest rooms.  We can't take

15   a break when a question is pending, but other than that,

16   I'm happy to take a break whenever you need.

17           This a corporate representative deposition,

18   also known as a Rule 30(b)(6) deposition.  You have been

19   designated by the Miami-Dade County Elections Department

20   to answer questions on its behalf.  This means you're

21   not testifying in your personal capacity, but as if you,

22   yourself, were the Elections Department.  Do you

23   understand?

24      A.  I do.

25      Q.  I may refer to the Miami-Dade County Elections

*Bailey & Sanchez Court Reporting, Inc.*

1   Department as the County, the Elections Department, the

2   department or use the full name.   I will try to be

3   consistent, but is it fair that you understand that any

4   permutation of that title, I am referring to the

5   Miami-Dade County Elections Department?

6       A.   Yes, I do.

7       Q.   I will try -- the same thing, I will try my

8   best to ask questions, such as, does the department

9   believe or is it the department's position, I may say

10  you, but, I mean -- after we get through the background

11  and the biographical information, I mean, the County.

12          Have you take any medications or substances

13  that might affect your ability to testify today?

14      A.   No.

15      Q.   Is there any other reason why you would be

16  unable to give your full, complete and accurate

17  testimony today?

18      A.   No.

19      Q.   And you understand that you are under oath and

20  you must give your full and truthful testimony?

21      A.   Yes, I do.

22      Q.   Have you been deposed before?

23      A.   Yes.

24      Q.   How many times?

25      A.   Maybe five or six.

1      Q.   What was the most recent time?

2      A.   It was related to some laws that were passed by

3  the Legislature in Senate Bill 90.

4      Q.   Of any of the five or six times you've been

5  deposed, have they involved elections or redistricting?

6      A.   Elections, yes; but redistricting, no.

7      Q.   With respect to elections, what were those

8  cases that you were deposed in?

9      A.   There have been a variety of cases related to

10 candidate qualifying, and, then, again, like I said,

11 there have been, you know, several cases related to laws

12 that the Legislature implemented throughout the State of

13 Florida.  So I was brought in, you know, as a witness,

14 to speak how we were implementing or were planning to

15 implement those things or what effect they had on

16 Miami-Dade.

17     Q.   Have you ever been deposed as a 30(b)(6)

18 witness before?

19     A.   Yes.

20     Q.   Have you testified in any court cases?

21     A.   Yes.

22     Q.   Do you remember the names of those cases?

23     A.   I do not.

24     Q.   When you testified as a 30(b)(6) witness

25 before, was that on behalf of Miami-Dade County?

```
 1        A.   Yes, the Elections Department.
 2        Q.   And you've kind of answered this, but have you
 3   spoken on behalf of the Elections Department in a
 4   legislative or administrative setting?
 5        A.   Yes.
 6        Q.   Does that include legislative or administrative
 7   settings not related to litigation?
 8        A.   So maybe you should elaborate on your question.
 9        Q.   Have you testified in hearings?
10        A.   I have gone before the legislature, and also
11   before our Board of County Commissioners, to speak on
12   matters that relate to the department.
13        Q.   Understood.
14             Have you ever been a party to a lawsuit
15   yourself?
16        A.   Yes.  I think we have been, right?
17             MR. VALDES:  Are you talking about her
18        individually?
19   BY MR. MERKEN:
20        Q.   I'm talking about you personally.
21        A.   Oh, personally.
22        Q.   This is biographical, yes.
23        A.   Oh, no, I have not.
24        Q.   You have not?
25        A.   No.
```

1     Q.   So you have not been a plaintiff?

2     A.   No.

3     Q.   You have not been a defendant?

4     A.   No.  No.  No.

5     Q.   Have you ever been a party in a criminal case?

6     A.   No.

7     Q.   Have you ever been arrested?

8     A.   No.

9     Q.   Now, when I say, "you," I'm referring to the

10    Elections Department.  We have moved out of the

11    biographical realm.

12    A.   Okay.  Okay.

13    Q.   You have been designated by the Elections

14    Department to answer questions on its behalf, right?

15    A.   Yes.

16    Q.   When did you learn that you would be testifying

17    in this capacity?

18    A.   When I received the subpoena, which I think

19    was, you know, a few weeks ago.

20         MR. MERKEN:  Mark this as Exhibit 1.

21         (Thereupon, Plaintiffs' Exhibit Number 1 was

22    marked for Identification.)

23    BY MR. MERKEN:

24    Q.   You've just been handed what's been marked as

25    Plaintiffs' Exhibit 1.   Do you recognize this document?

```
 1      A.   Yes.
 2      Q.   And what is this document?
 3      A.   This is a subpoena to testify at a deposition
 4   in a civil action.
 5      Q.   And what's the date on this?
 6      A.   The date of the appearance or --
 7      Q.   The date of the subpoena.
 8      A.   Of the subpoena?  I don't know.  Is it 9/19/23?
 9      Q.   Yes.
10      A.   Okay.
11      Q.   And if you could please flip to the fourth
12   page.
13      A.   The fourth page, you said?
14      Q.   The last page, yes.
15      A.   Uh-huh.
16      Q.   And what does this page show?
17      A.   This page shows the topics that we were going
18   to be discussing in today's deposition.
19      Q.   Okay.  We'll come back to this exhibit in one
20   moment.
21           Did you, yourself, receive this subpoena or did
22   somebody else at the County receive it?
23      A.   Somebody in my office signed for it -- in my
24   office, I did not -- and then it was provided to me.
25      Q.   And how did you prepare to testify today?
```

```
 1        A.   Well, of course, I reviewed these questions.  I
 2   spoke to my staff members, to make sure that, you know,
 3   I understood and recalled some of the timelines and what
 4   was required for us to perform these duties in the past,
 5   and, of course, you know, reviewed it with my attorney.
 6        Q.   What staff members did you meet with?
 7        A.   Okay.  So it would be -- do you want all of
 8   their names individually?
 9        Q.   Yes, please.
10        A.   Okay.  So Angela Rivero, Robert Rodriguez,
11   Erika Sierra-Trujillo, Jose Ponce, Michael Johnson,
12   Michelle McClain, and Xavier Pichs, P-I-C-H-S.
13        Q.   Besides those seven staff members, did you meet
14   with anybody else in the Elections Department to prepare
15   for your testimony?
16        A.   I think I've covered everybody.
17        Q.   Did you meet or communicate with any other
18   County employees, outside of the Elections Department,
19   to prepare for your testimony?
20        A.   No.
21        Q.   Did you meet or communicate with anybody from
22   the City of Miami to prepare for your testimony?
23        A.   No.
24        Q.   About how long did you spend meeting with your
25   staff members to prepare for your testimony?
```

```
1        A.   I mean, it was a couple of hours, over several

2   days.

3        Q.   Did you review any documents?

4        A.   Yes.

5        Q.   What documents did you review?

6        A.   I reviewed the questionnaire and

7   correspondences between us and the City, you know, just

8   in terms of the normal protocols for what we receive

9   from them preparing for their elections.  I looked at

10   some maps.  I looked at cost estimates that were

11   prepared.  I looked at like the procedures for

12   redistricting and reprecincting.

13        Q.   So besides those four or five categories, is

14   there anything else you looked at?

15        A.   Our election calendar in 2024, our election

16   calendar in 2023.  I looked at some of the

17   correspondences, to refresh my memory on correspondences

18   that had occurred in the past.

19        Q.   Anything else?

20        A.   I think that covers it.

21        Q.   Okay.  Did you review the Complaint in this

22   case?

23        A.   I don't know if I did.

24        Q.   Have you reviewed any of the parties' initial

25   disclosures?
```

```
1        A.   Can you elaborate on what that is?

2        Q.   No, the initial disclosures that were made as

3    part of the litigation.

4        A.   No.

5        Q.   Have you reviewed any deposition transcripts

6    from any other witnesses?

7        A.   No.

8        Q.   Have you reviewed any other prior testimony in

9    this case?

10       A.   No.

11       Q.   Have you reviewed any other court filings?

12       A.   The initial, I think, court filing.  I don't

13   know the term for it.  But when, I guess, the initial

14   case was settled, I did go through that, because I was

15   looking at the maps and the variations in the maps, but

16   I don't know what that court document is called.

17       Q.   We'll take a look at some of them in a little

18   bit.

19       A.   Okay.

20       Q.   Your mentioned you had reviewed maps.  Do you

21   recall which maps those were that you had reviewed?

22       A.   I just remember it was a page that had, you

23   know, the varying maps, the City's initial map, what the

24   plaintiffs' map looked like, and then the City's -- it

25   was like a spread -- not a spreadsheet, but like a page
```

```
1    that had all of the varying maps on it from one of the
2    court filings.
3         Q.   Okay.  Did you review any Miami-Dade County
4    documents?
5         A.   Can you elaborate?  I think I answered the
6    things that we reviewed, but if there something else
7    that you were looking for, maybe you can be more
8    specific.
9         Q.   Sure.
10            So you had mentioned that there were policies
11   and protocols that the County has for election
12   administration.  What are those policies and protocols?
13        A.   So there's very many steps in redistricting and
14   reprecincting, 37 varying steps, in fact, and so I don't
15   have all of those committed to memory, and so I needed
16   to review, with my staff, exactly what it does take for
17   redistricting, what it took to do it the first time
18   around, and if we're ordered to do it again, what is it
19   going to take, so that I could properly represent to the
20   Court today the timelines that I would need to be put in
21   place, in order for us to be able to do this accurately.
22   And so that was -- the steps that it entails were
23   provided to me.
24            So I asked staff to prepare that.  We talked
25   about it.  We reviewed it, to make sure that I
```

*Bailey & Sanchez Court Reporting, Inc.*

1 understood it, and that's what I was referring to.

2      Q.   To be clear, those 37 steps, is that only for

3 redistricting or is that for election administration,

4 generally?

5      A.   That's for redistricting/reprecincting.

6      Q.   Is there another set of policies or procedures

7 for general election administration?

8      A.   I mean, that's a very broad question.  We have

9 very many policies and procedures.  I didn't necessarily

10 need to review any of those for this particular case,

11 but I did reference a questionnaire earlier on, that we

12 have, that we developed, that we provide to every single

13 city, not just the City of Miami, in the preparation of

14 their elections.  And so, one of the questions on here

15 was, the relationship, I think it was, between the City

16 and the County.  So I wanted to review what that looked

17 like, so that I could recall, you know, what we're

18 asking them for and what they're directing us to do, in

19 the preparation of their election.  So I reviewed that,

20 as well.

21      Q.   Thank you.

22           I'm also not asking just if you reviewed it,

23 but if it exists, if there is a written handbook policy

24 about election administration that Miami-Dade County

25 has?

*Bailey & Sanchez Court Reporting, Inc.*

1    A.   Oh, okay.  So, in that case, yes.  There are
2    very many procedure manuals that we have --
3    Q.   Approximately --
4    A.   -- for varying tasks.
5    Q.   Approximately how many manuals?
6    A.   I don't want to guess how many.
7    Q.   More than five?
8    A.   Yes.
9    Q.   More than ten?
10   A.   Yes.
11   Q.   More than twenty?
12   A.   Yes.
13   Q.   More than fifty?
14   A.   Yes.
15   Q.   Are there any --
16   A.   Various divisions have different manuals, for
17   different functions that we have.
18   Q.   Understood.
19        With respect to the 37 redistricting steps, is
20   that a single document?
21   A.   It is now a single document, yes.
22   Q.   Okay.  Did you bring any documents with you
23   today?
24   A.   Yes.
25   Q.   What are those documents?

1      A.   Well, what we're talking about now.  So that I
2  make sure I properly represent the varying steps, I have
3  that here, and I also have cost estimates.
4      Q.   Okay.  Anything else?
5      A.   No.
6      Q.   Did you take any notes in preparing for today?
7      A.   I mean, it's what essentially I have here, and,
8  yeah, some other things, just to sort of organize my
9  thoughts, sure.
10      Q.   And in what format are those notes?
11      A.   They are in a Word document.
12      Q.   Okay.  And you don't have those notes with you
13  today?
14      A.   I do.
15      Q.   You do have those notes, in addition to the two
16  sets of documents?
17      A.   Yes.  Yes.
18      Q.   Okay.  Without divulging the subject of
19  attorney/client communications, with whom did you speak,
20  on the counsel side, to prepare for today?
21      A.   The two people that are in the room with me.
22      Q.   And for about how long?
23      A.   I would say, a couple of hours, over a couple
24  of days.
25      Q.   Was anyone else, besides these two, present?

1      A.   I don't believe so.  No, not in these

2    conversations we had.

3      Q.   Okay.  Did you review any documents in those

4    meetings?

5      A.   Yes.

6      Q.   What were those documents?

7      A.   The ones that I have in front of me.

8      Q.   Anything else?

9      A.   And, then, whatever -- I mean, you said you

10   were going to show me the court documents from the past,

11   right, from the previous -- I guess, earlier stages of

12   this case.  We did look at that, as well, together.

13     Q.   Anything else?

14     A.   I don't believe so.

15     Q.   Did you take any notes in those meetings?

16     A.   It's the same notes.

17     Q.   Do you think there was anything else you could

18   have done to prepare to testify today, that you did not

19   do?

20     A.   No.

21     Q.   Was there anybody else you could have talked

22   to?

23     A.   I don't believe so.  The people that I listed

24   there are my deputies and my GIS specialist.  So I think

25   -- and my attorneys.  So I think I've covered everyone.

```
 1        Q.   Okay.  Do you live in the City of Miami?

 2        A.   No, I do not.

 3        Q.   Have you ever lived in the City of Miami?

 4        A.   No.

 5        Q.   How long have you served as Elections

 6   Supervisor?

 7        A.   Nine years.

 8        Q.   Had you worked in the Elections Department

 9   before serving as Elections Supervisor?

10        A.   Yes.

11        Q.   And what was the role?

12        A.   Well, I've been there for over 16 years, and so

13   I've had varying leadership roles in the department.

14        Q.   Can you walk me through, from when you started,

15   to the extent that you can recall, to serving as

16   Elections Supervisor, what those roles were?

17        A.   Sure.  So I first served as Senior Executive

18   Assistant to the Supervisor of Elections at the time.

19   Then I was appointed as Deputy Supervisor of Elections

20   over the Government Affairs and Media Relations

21   Division.  Then I was appointed to Chief Deputy

22   Supervisor of Elections.  And in 2015, I was appointed

23   by the mayor at the time as Supervisor.

24        Q.   So the mayor, individually, appointed you to

25   each of those positions?
```

*Bailey & Sanchez Court Reporting, Inc.*

1      A.   The Supervisor of Elections, at the time,

2    appointed me to the prior positions that I mentioned,

3    but the mayor appointed me as Supervisor.

4      Q.   And who was the mayor who appointed you?

5      A.   Carlos Gimenez.

6      Q.   Have you ever worked for the City of Miami?

7      A.   No.

8      Q.   Have you ever worked for any other county?

9      A.   No.

10     Q.   Before the 16 years that you've spent at the

11   Elections Department, had you worked in elections

12   before?

13     A.   No.

14     Q.   Do you like working for the County?

15     A.   Yes, I do.

16     Q.   Why?

17     A.   Well, while my job is not easy, it gives me a

18   great sense of pride to be able to serve the voters of

19   Miami-Dade County.  I'm a public servant at heart, and

20   so I'm very happy doing what I do.

21     Q.   Did you go to high school?

22     A.   Yes.

23     Q.   Did you graduate from high school?

24     A.   Yes.

25     Q.   Did you go to college?

```
1        A.   Yes.

2        Q.   Where did you go?

3        A.   Florida International University.

4        Q.   What was your major?

5        A.   Environmental Science.

6        Q.   Did you have any minors?

7        A.   No.

8        Q.   Do you have any post-college education?

9        A.   No.

10       Q.   Do you have any professional certifications?

11       A.   No, uh-uh.

12       Q.   Are there any professional certifications in

13  your field?

14       A.   Yes.

15       Q.   What are those?

16       A.   One of them -- well, there's a State

17  certification, which is the Florida Certified Election

18  Professionals, and then there's also more of a

19  nationwide one, through the Election Center, and I'm

20  currently working through that one now.

21       Q.   Are you a member of any trade organizations or

22  professional associations?

23       A.   Yes.  I'm a member of the Florida Supervisors

24  of Election Association.

25       Q.   Any others?
```

*Bailey & Sanchez Court Reporting, Inc.*

1      A.    Uh-uh.

2          Q.    Do you hold any leadership role in that

3    organization?

4          A.    I am the co-chair of the Canvassing Board

5    Training Committee, and I'm a member of the

6    Cybersecurity Task Force.

7      Q.    Sounds like important work.

8              What does your current job, broadly, as

9    Supervisor of Elections, entail now?

10         A.    So I oversee all elections in Miami-Dade

11   County, from municipal elections, to County, State and

12   Federal elections, ensuring that they're accurate and

13   accessible, and in adherence with all of the applicable

14   local, State and Federal laws.  That entails -- it

15   includes, but not limited to, making sure our precincts

16   and polling places are accurately set up in our voter

17   registration system and tabulation system, so that

18   voters will be getting a correct ballot when they come

19   to vote, training all of our poll workers, coding the

20   election, preparing voting equipment, testing all of the

21   voting equipment, sending out Vote-by-Mail ballots,

22   administering up to 33 early voting sites, 758

23   precincts, 550 polling places, and, of course,

24   processing ballots, tabulating the results,

25   disseminating them to the public, post-election audit,

1   after every election, and certifying the election, in

2   the end, that the results are true and accurate.

3        Q.   Wow.  And you love doing that?

4        A.   Very much.

5        Q.   To whom do you report?

6        A.   The mayor of Miami-Dade County.

7        Q.   With whom do you work on a regular basis?

8        A.   I have 130 staff members.  I work with my

9   colleagues through -- that have my same position

10  throughout the State, the County Attorney's Office, the

11  Mayor's Office, and I probably should say that I do have

12  a chief, who is under the mayor, who I report directly

13  to, municipal clerks, candidates, major political

14  parties, activist groups, and the public.

15       Q.   With whom do you work, in the Elections

16  Department, on a day-to-day basis?

17       A.   I mean, day-to-day, I would say, my Deputy

18  Supervisor of Elections, my Assistant Deputy Supervisor

19  of Elections, and anybody else within my department that

20  I need to talk to, you know, regarding whatever is going

21  on at the time.

22       Q.   And who is your deputy?

23       A.   The people that I named before.  I have six

24  deputies.

25       Q.   And the Assistant Deputies are also on that

*Bailey & Sanchez Court Reporting, Inc.*

1  list?

2      A.   Yes.

3      Q.   Okay.  Do you work in-person or do you work

4  remotely?

5      A.   No, I'm in the office every day.

6      Q.   You had mentioned that you report to the Mayor

7  of Miami-Dade County, and, more specifically, to his

8  (sic) chief.  Did you have any conversations with either

9  the Mayor or the Mayor's chief about this litigation?

10     A.   Just that this deposition was happening.  Of

11 course, reporting up that this is something that I

12 needed to do, and that there was ongoing litigation, but

13 nothing, really, more specific than that.

14     Q.   Were there any conversations between your

15 office and the Mayor's Office, between December 2022,

16 when this litigation commenced, and preparing for this

17 deposition?

18     A.    I mean, I would just say, simply letting them

19 know, right.  It's an obligation of mine to make sure

20 that my superiors know what it is that I'm working on.

21 I didn't have any specific conversations with them about

22 what I was going to be reviewing, but, yes, giving them

23 a heads up, sure.

24     Q.   Did the Mayor or the Mayor's chief issue any

25 directives or any give you any instructions about this

*Bailey & Sanchez Court Reporting, Inc.*

1    litigation?

2         A.    No.

3         Q.    Are there individuals that you work with only

4    when elections are underway, as opposed to on a

5    day-to-day basis, besides the Mayor, parties, and the

6    constituencies that you already mentioned?

7         A.    So we always have elections going on.  You

8    know, if it's Tuesday, it's election day, we say in my

9    department.  So, you know, that's a difficult question

10   to answer.  I deal with people, as needed.

11        Q.    Understood.

12             All right.  I promise that's the end of the

13   biographical, and now we're really going to move into

14   the County questions.

15             So this is Topic 1, on Exhibit 1, and we

16   discussed this a little bit, but to confirm, there is

17   now a manual or a policy handbook on how to handle

18   redistricting?

19        A.    It's more the steps that it takes to conduct

20   redistricting.

21        Q.    So there's no formal policy or procedure?

22        A.    No.

23        Q.    How often does the City of Miami hold

24   elections?

25        A.    Well, they have their regularly scheduled

1   election in odd years.  It may or may not have a runoff

2   associated with it, right.  That's to be determined.

3   So, scheduled, it would be every other year.

4           But, then, of course, special elections do come

5   up, as needed, if there's a vacancy that is created for

6   some reason.  We'll conduct that.  And, then, you know,

7   they also do have the option of adding questions onto

8   County-wide ballots.  I don't recall, off the top of my

9   head, when they did that.  That's something that I would

10  probably have to research, but that would be in

11  conjunction with an election that we're already running.

12      Q.  In a regular election, which you said are on

13  the odd years, can you walk me through that process,

14  from start to finish?  So when does the process start,

15  all of the way through certifying the election,

16  post-election?

17      A.  Sure.  So, when it's a regularly scheduled

18  election, it's in the Charter, so we already know that

19  it is happening.  So it's on our election calendar.  And

20  so, usually, no later than 90 days out, one of my staff

21  members will reach out to the City Clerk and have -- you

22  know, go through what's called, you know, the election

23  coordination questionnaire.  So we are asking them at

24  this point to start directing us on how to conduct their

25  election, right.  So we know we're having it and we know

1     the date.

2            So what races are on the ballot, when does

3     candidate qualifying end, are there questions that are

4     going to be on the ballot or do they want -- we have to

5     do English and Spanish, do they want Creole, also.

6     That's a decision that they make, because this is their

7     election, not ours, right, and who's on their canvassing

8     board, are they having early voting, how many sites,

9     what's the schedule going to be, what determines a

10    runoff, right.   There's certain -- you know, a bunch --

11    are they paying for postage on their Vote-by-Mail

12    ballots.  So it's a whole questionnaire that we go

13    through, so that we know how we are going to proceed

14    with running their election.   They answer those

15    questions.

16           And then we wait for the candidate qualifying

17    -- well, with that, then we can start, you know,

18    reaching out to our polling places, start putting our

19    poll workers training calendar together, and start to

20    begin certain functions that are not related to the

21    ballot, right, certain things that we can get a head

22    start with, because we know we're running the election.

23           So then we're waiting for candidate qualifying

24    to end, which is a responsibility of the City Clerk.

25    They do all of the candidate qualifying.   They do all of

1    the campaign finance stuff.  And then they will tell us,

2    when it closes, these are the races, these are the

3    people that are on the ballot.  We'll prepare what's

4    called the master ballot.  We have them sign off on it,

5    to make sure that they agree this is correct, and then

6    we prepare -- do you want to go into exhaustive detail

7    about all of the steps?

8         Q.   Please.

9         A.   Okay.  So then we prepare the actual ballot,

10   which we provide to them again, which they sign off on,

11   to say, yes, all of the contents are correct, send it to

12   the printer, so that we can get some test ballots.  We

13   go through all of the various testing, to make sure that

14   we've coded the ballot correctly and that the printers

15   are printing them properly, feed them through a certain

16   number of tabulators, just to make sure that we've done

17   everything correctly.  Then we can give the ballot order

18   to the printer.

19        We receive the Vote-by-Mail ballots at that

20   point, send those out to their voters, and, you know,

21   then proceed with setting, you know, all of the

22   logistics related to early voting, if they're having it,

23   which the City of Miami typically does, varying sites,

24   depending on the size of the elections, you know,

25   starting to place our poll workers in place, and that's

```
 1    it.

 2            Then we'll start to receive Vote-by-Mail

 3    ballots.  We conduct their early voting, and when

 4    election day is completed, all of the results, of

 5    course, are coming in.  We're the ones that post them

 6    onto the website.

 7            It's their canvassing board, so throughout this

 8    process, their three member canvassing board will be

 9    coming into our office, reviewing Vote-by-Mail ballots

10    that we believe are presumed invalid, for them to make

11    the final determination on that.  They also come back to

12    look at provisional ballots.  And, then, after that, we

13    will certify the results to them.  They ultimately

14    certify the election itself to their Commission.

15            We'll conduct the post-election audit for them,

16    and then that, really, at that point, concludes the

17    election, and then they swear in their elected officials

18    at that point.

19            I think I hit all of the high points.

20       Q.   So, my understanding, and correct me if I'm

21    wrong, please, is that the process, generally, in a

22    regularly scheduled City of Miami election, generally

23    commences, from your end, about 90 days before the

24    election is scheduled to be held?

25       A.   Yeah.  No later than.
```

1    Q.   When is your earliest it would commence, your

2    involvement?

3    A.   I mean, you know, I think like we start, you

4    know, 120 to 90 days out, just to -- it depends on my

5    staff.

6    Q.   Are there any particular members of your

7    department who are designated to handle the City of

8    Miami elections?

9    A.   I mean, the one person, who is our election

10   coordinator -- her name is Liz Prieto -- she's the one

11   that most commonly will deal with not just the City of

12   Miami, but all City Clerks, but then she has superiors

13   that also will communicate with the clerks, because we

14   have relationships with everybody.  So it just depends

15   on who they reach out to.

16          But, no, not specific to cities, right.

17   There's not a point person for the City of Miami, per

18   se.

19   Q.   Okay.  You had mentioned that it's a

20   collaborative process with the City, and we'll get more

21   into that in a little bit, but is there anybody at the

22   City, who is the City's point person, who generally does

23   the outreach to your department?

24   A.   So it's typically two people, Todd Hannon, who

25   is the Clerk, and then his -- and, then, Sandra Forges,

*Bailey & Sanchez Court Reporting, Inc.*

1   who -- I don't know her title off-hand, but she's

2   somebody who deals directly with our department for

3   elections coordination.

4           Q.   Is there -- I'm sorry.

5           A.   No, it's okay.  Those would be the two people.

6           Q.   Is there anybody else?

7           A.   Not commonly.

8           Q.   Within that 90 to 120-day window that you've

9   mentioned, are there interim deadlines for tasks to be

10  accomplished?  You ran through kind of an exhaustive

11  list of all of the steps, but is it the case that the

12  County has, say, at 87 days out, this need to be done,

13  at 80 days out, this needs to be done?

14          A.   Yes.  So we always ask for deadlines, right,

15  and hope that they're adhered to.  So we do ask for all

16  ballot content and everything to be given to me no later

17  than 60 days prior to the election.

18          Q.   Besides ballot content and other ballot-related

19  materials, are there any other internal deadlines?

20          A.   In just the regular election administration,

21  just talking about conducting their election?

22          Q.   Yes.

23          A.   For a regularly scheduled election, it's the

24  dates that I've already given you.  It changes when it's

25  a County-wide.  When you're trying to piggyback onto a

1   County-wide election, it's a completely different

2   situation, because I have Statutes that I need to adhere

3   to, and I cannot wait around for a city to be giving me

4   content late, when I have a huge election to run.

5          So, yeah -- I mean, if there's any Resolutions

6   that need to be passed by the Commission, with

7   questions, let's say, or if they're setting up their

8   early voting dates and stuff like that, we always ask

9   for everything to be given to us no later than 60 days.

10   Q.   You had mentioned a County-wide election and

11   the City piggybacking on that.  Can you explain that a

12   little bit more?

13   A.   Sure.  So, in this case, when I use the term,

14   piggybacking, it's an election that we're already

15   running.  So, in 2024, we're talking about the August

16   primary and the November general election.  We are doing

17   those elections, anyway, because, of course, it's

18   required for all of the other, you know, County and

19   State and Federal races.  So, the cities do have an

20   option, if they want to piggyback onto that election.

21   It's usually not because of a race, because those are in

22   their Charter, it's usually because they would add

23   questions, or if it just so happens that a vacancy

24   occurs and it aligns with our election, then we

25   typically agree to that, as long as they give us

1    everything that we need well in advance.

2         Q.   So, in that context, and we'll talk about the

3    2024 election in a little bit, but in that context, what

4    do those deadlines look like, as opposed to the 90 to

5    120 days and 60 days you mentioned?

6         A.   So I don't have any deadline committed to

7    memory right now, but it's certainly well before the

8    election.  And I will tell you this, that even though

9    you want to put something on the November ballot, we set

10   things up as a cycle, right.  So the August and November

11   election is considered one election cycle, and I don't

12   like to make changes.  I don't like to make precinct

13   changes, I don't like to make polling place changes, I

14   don't like -- candidate qualifying, all of these things

15   have to end before -- well, candidate qualifying, I

16   should probably put that aside for a minute.

17        Everything needs to happen well in advance of

18   the August election, so that it's set and put in place.

19   One, off the top of my head, that I can confidently is,

20   if you are somebody that's putting races on the November

21   ballot, we ask that you have all candidate qualifying

22   ending and the names provided to us by August 23rd,

23   because the primary election is on August 20th, and I

24   know, within a couple of days after that election, who

25   is going to the November election.  So I cannot wait

1   beyond that point.

2         So that would be a good example, that even

3   though the election is November, I need your ballot

4   content in August.

5   Q.   Okay.  We'll talk about the 2024 election in a

6   minute, but since we were in that zone, I just wanted to

7   mention that.

8   A.   Okay.

9   Q.   In a normal, regularly scheduled City election,

10  that occurs after redistricting has happened, what does

11  that process look like for receiving a map from the

12  City?

13  A.   Depends on the election that we're talking

14  about, right.  So, previously, I had asked for an August

15  1st deadline for their November election.  I think you

16  probably know that, right?

17  Q.   Yes.

18  A.   So I asked for that, because, you know, that

19  would give us enough time to do the steps I'm sure we'll

20  get into a minute, for -- you know, in order to conduct

21  their election.

22         When we talk about 2024, I'm going to be asking

23  the Court for more time.  If the Court decides that

24  there's a different map that is going to be provided to

25  the department, it's much earlier in the process,

```
 1   because I need to have all of this work done well in
 2   advance of us preparing for the '24 election cycle.
 3        Q.   Since we're there, what date would that date
 4   be?
 5        A.   So I think the clearest way for me to describe
 6   dates is to give two, and I'm going to work backwards,
 7   because I really want this to be very clear to anybody
 8   who is reading a transcript, right.
 9             I already alluded to the fact that the way we
10   conduct elections is in cycles, right, and so I need to
11   have all precincts and all polling places confirmed,
12   without changes being made, and that's just to not
13   burden my staff, but more importantly, not to be
14   confusing to voters in a presidential election cycle, in
15   advance of the August primary election.  And so all of
16   this needs to be in the voter registration system, my
17   tabulation system and also my automated Vote-by-Mail
18   system before candidate qualifying starts, and that's in
19   June, for August.
20             So when you start backing out from that, what I
21   need to have completely done and finished, and my
22   resources not being dedicated to this particular topic,
23   no later than -- this is my request to the Court -- by
24   May 15th.  That's for me.  That's for all of my internal
25   work to be done, so that my staff can focus their
```

```
 1    attention and my resources on the presidential election
 2    cycle, right.  That's May 15th.
 3              And so, if I back out from there, the question
 4    is, well, how much time do I need?  That is a question
 5    that is very difficult for me to answer here today,
 6    because I have no idea what the changes are going to be,
 7    is it a little bit of a tweak?  Are they major changes?
 8    I have no idea.  And so I need to have some sort of
 9    deadline, to provide to the Court, that gives me
10    confidence that we will be able to do this work
11    accurately and with professionalism, and it's very, very
12    detailed work, 37 steps, that must be done in sequential
13    order.
14              And so my request to the Court is going to be
15    that all of this be complete, all, you know, court
16    cases, and like non-appealable, you know, this is the
17    final, final, final map, by March 31st of 2024.
18         Q.   Thank you.  We'll talk more about the 2024
19    election and that process, but that was a helpful clear
20    answer to the Court.  I really appreciate that.  It will
21    be crystal clear in the transcript.
22              How much does it cost to run the City of Miami
23    elections?
24         A.   A regularly scheduled election?
25         Q.   Yes, a regularly scheduled election.
```

1    A.   A full City election is estimated at $805,000,

2   and that takes into consideration their current early

3   voting model.   I do know they do make changes from time

4   to time.

5    So, as of today, I can say, approximately

6   805,000.

7    Q.   Are all of those costs, the 805,000, passed on

8   to the City?

9    A.   Yes.

10    Q.   None are absorbed by the County?

11    A.   No.

12    Q.   Is that pricing done on an election by election

13   basis?

14    A.   Yes, it is, because costs fluctuate, right,

15   postage changes, and, again, you know, if they change

16   their early voting model and what have you, we will do

17   new estimates for them.

18    Q.   So you mentioned postage changing, which I

19   think will be happening in 2024, and the early voting

20   model that the City uses.   Are there other factors that

21   would impact the price of the election?

22    A.   I mean, if we have changes in, you know, the

23   printing costs from our paper vendor.   We do hire

24   temporary workers, so if there's a change in the

25   temporary rate, then, of course, all of those costs

```
 1   would be passed on.
 2        Q.   Any other --
 3        A.   So I think -- so, I think, printing, postage,
 4   temporary workers, and, then, early voting.  I think
 5   those are probably the biggest factors, variables, that
 6   would impact it.
 7        Q.   Are there any variables on the County side that
 8   would impact the price?
 9        A.   We pass on the direct cost.
10        Q.   Okay.  So all of the testimony we just heard
11   was about regularly scheduled elections.  Now we're
12   going to move into special elections, if we could.  How
13   does the County prepare for a special City of Miami
14   election, that is not concurrent with another regularly
15   scheduled election?
16        A.   All of the steps that I've already described
17   would be applicable here, as well.  I think the biggest
18   nuance that I should mention is just that, you know, at
19   this point, we're not prepared for this election, and so
20   there is communication that has to happen between my
21   office and the City Clerk, as it relates to the timing
22   of it.  I know they do have -- and it depends, because
23   if it's a vacancy, I know that's in their Charter, it's
24   a little bit more -- not a little bit more, but a lot
25   more strict on when they can do it, and if it's not,
```

1    then, there's a little bit more flexibility, but what

2    has to happen is, by Florida Statute, the City Clerk has

3    to request approval from the Supervisor of Elections to

4    conduct said special election, and then we collaborate

5    on the dates that would work for both, and, then, once

6    that's agreed upon, then everything that I've already

7    described would happen.

8        Q.   You said that the County and the City

9    collaborate on dates.  How does that determination get

10   made?

11       A.   It's largely, on our part, based upon

12   resources.  I mean, if you look at our election

13   calendar, and I made that comment earlier, if it's

14   Tuesday, it's election day.  You know, it's a bit funny,

15   but not really, because it's pretty true.  So it just

16   depends on what other elections that we have going on,

17   and if we can accommodate it, and, you know, is there a

18   County-wide election coming up, where I have all of my

19   resources and equipment dedicated to that, that would be

20   a problem, right.

21          So, you know, working within the confines of

22   their requirement by law and what it is that we're able

23   to accomplish with resources, is usually how we get

24   there.

25       Q.   What happens if the County cannot accommodate a

```
 1   special election, when the City wants to hold it?
 2        A.   Then there's a provision in Florida Statute
 3   that they're free to conduct the election on their own.
 4   My only requirement is to turn over the voter
 5   registration rolls to them.   Thankfully, we've never had
 6   to get to that point.
 7        Q.   Do you know what Statute that is?
 8        A.   Not off the top of my head.
 9        Q.   Is there anybody in your office that is
10   designated to handle special elections, as opposed to
11   regularly scheduled elections?
12        A.   No.
13        Q.   So, you said, once you know that there's going
14   to be a special election, and once that date for the
15   special election is set, then the same 37 odd steps
16   sequentially occur, right?
17        A.   Well, the 37 steps were related to
18   redistricting.
19        Q.   I'm sorry.   I'm sorry.
20        A.   Yeah.   So, the questionnaire, the back and
21   forth, the directive from them on how they want us to
22   conduct the election, would be the same.
23        Q.   Is there a different election coordination
24   questionnaire for a special election, as opposed to a
25   regular election?
```

```
1        A.    No.

2        Q.    Are there any additional or different questions

3   the County would ask the City, in preparing for the

4   special election, as opposed to a regular election?

5        A.    I cannot think of any, other than, you know,

6   what we've already talked about, which is the date.

7        Q.    And that same 90 to 120 days out is when the

8   County would start its process of preparing for the

9   election?

10       A.    If we're lucky.   We don't always have that

11  luxury, truthfully, because if some -- and I don't know

12  the City of Miami's Charter off the top of my head, but,

13  in some instances, we don't always have that much time,

14  but if it's a small city, then, you know, we're able to

15  accommodate it.

16       Q.    What is the least amount of time you've had to

17  run a special election?

18       A.    You're testing my memory on that.   I'd have --

19       Q.    If you remember.

20       A.    I'd have to look into that.

21       Q.    Are there different costs for a special

22  election that is not concurrent with another election?

23       A.    So, is your question, special, compared to a

24  regular election?

25       Q.    Yes.
```

1      A.   Okay.  So, meaning, a City of Miami special

2    election, versus a City of Miami regularly scheduled

3    election, is there a difference?

4      Q.   Yes, with one qualification, a City of Miami

5    special election that is not concurrent with another

6    regularly scheduled election, and a regularly scheduled

7    City of Miami election.

8      A.   As long as it's the same number of

9    jurisdictions at play here, right, like city versus city

10    or two district versus two districts, right, because

11    there  will be a variable in the cost, I don't -- unless

12    they make a change, right, they say, I want to have

13    three days of early voting in six sites, and five days

14    of early voting in two sites or, you know, something

15    like that, as long as all of the variables are the same,

16    I can't see why there would be a different cost, right.

17         Like for -- just to take it one step further,

18    just to make sure I'm being clear, their regular

19    election estimate is a little bit more than their runoff

20    election, because in their runoff election, because of

21    the way that the timing of the cycle is, their early

22    voting is limited, so that brings the cost down.  So, as

23    long as the variables are the same, the cost should be

24    the same.

25         Q.   So assuming no City requested changes, like

1    different early voting, et cetera, that special

2    election -- a City special election -- would

3    approximately cost $805,000?

4         A.   If it was a standalone, is my verbiage, right,

5    on its own election, yes.

6         Q.   Yes.

7              We're going to now move to the third category

8    of elections, if we could, and you alluded to this a

9    little bit already, but if the City of Miami wants to

10   hold a special election concurrent with other regularly

11   scheduled elections, County, Statewide, how does that

12   change the process on your end?

13        A.   Okay.  So taking redistricting and

14   reprecincting out of this scenario, we're just talking

15   about adding -- piggybacking onto a County-wide

16   election?

17        Q.   Yes.

18        A.   Okay.  So it's really not all that burdensome

19   for a city to piggyback onto our election, unless they

20   decide to add a bunch of questions, making the ballot

21   really long.  Then that gets a little bit tricky.  But

22   if we are already having a scheduled election, and they

23   ask for approval to piggyback, and adhere to our

24   deadlines, then -- in terms of, you know, providing us

25   with their candidate qualifying on time or providing us

*Bailey & Sanchez Court Reporting, Inc.*

1   with the questions on time, then it really is not much

2   of an impact to us or the election.  So that's always

3   approved.

4            And, then, of course, they pay, not as much,

5   but they pay a portion of the election to piggyback,

6   which is mostly printing, postage, if it triggers an

7   additional page, that I wouldn't have to do anyway,

8   some, you know, ballot preparation costs, because now

9   I'm adding additional styles to the election.  So there

10   is -- there's some cost to the City to do this, but it's

11   not as much as having a standalone.

12      Q.   You mentioned that the City can request to

13   piggyback.  Is there a formal request process or is it

14   the City Clerk calls your office and says, "We want to

15   have a special election next year"?

16      A.   So we remind them, over and over, that they

17   have to ask us, by Florida Statute, for approval in

18   advance.  So that would be the formality there.  It

19   would be that they ask us, usually by e-mail, you know,

20   we're asking the Supervisor of Elections to add this

21   particular race or this many questions on the ballot,

22   and then we will reply back to them saying that, you

23   know, yes, we do approve that, as long as you -- and

24   then we give them the ballot deadlines, as long as you

25   do this, and agree to pay this, right, if they ask for a

1    cost estimate, and then that's really it.

2         Q.   Has the County ever rejected a request from

3    anybody to have a special election -- a piggyback

4    special election?

5         A.   I cannot recall a time where we said, no.

6         Q.   You've mentioned, for all three of these, the

7    regularly scheduled Miami election, the special election

8    as a standalone, your words, and the special election

9    piggybacking, you mentioned the costs for the first two,

10   and I want to just make sure I'm clear on the cost for

11   the third, which is the City has a special election

12   concurrent with, piggybacked, on a County election.

13        A.   Right.  So, if the City -- if the City

14   piggybacks on a County-wide election, we're estimating

15   that to be about 115,000.

16        Q.   And that's all in, the cost for the County to

17   run a special City election?

18        A.   Yes.

19        Q.   Now, you've mentioned runoffs, which we haven't

20   yet talked about, and I will have some more questions on

21   runoffs --

22        A.   Small caveat.  If there were additional

23   questions that were added, that would trigger additional

24   ballot pages, then they would take all of the cost of

25   that additional ballot page for the people in their City

1    and the associated postage for the Vote-by-Mail ballots,

2    as well, but this does not assume that that's the case.

3        Q.   Understood.   Thank you.

4            So, for runoffs, just briefly, what do the

5    costs for runoffs look like, and we can go category by

6    category, but for a regularly scheduled City election, a

7    special City election standalone, and a special City

8    election piggybacked?

9        A.   Okay.   So these are estimates, based upon

10   previous decisions that have been made by the City, in

11   terms of what we've already talked about, early voting

12   and such, but just to recap, to piggyback on a

13   County-wide election, I'm estimating it at about

14   115,000.   If there is a runoff, that occurs after the

15   County-wide election, that does increase to $507,000,

16   because that's not an election that we would hold.   We

17   wouldn't be doing that otherwise.   So if there is a

18   runoff, they would be responsible for all of those

19   direct costs.

20           Again, a standalone, using their previous early

21   voting model, is about 805,000, and their runoff, after

22   that election, is 606,000.   And like I said, the reason

23   it's different is just the availability of early voting.

24       Q.   And, then, for regularly scheduled elections?

25       A.   That's what that is.   That's the same thing.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   So, for standalone and for regularly scheduled,
 2   a runoff is the same?
 3        A.   Yes.
 4        Q.   Okay.  And you had said that for piggybacked
 5   elections, the cost of the runoff is 507,000; is that
 6   right?
 7        A.   Uh-huh.
 8        Q.   That's in addition to the 115,000?
 9        A.   Yes, if it goes to a runoff.
10        Q.   If it goes to a runoff.
11             And, then, for a standalone and a regularly
12   scheduled election, the runoff cost would be 606,000 --
13        A.   Yes.
14        Q.   -- in addition to the 805,000?
15        A.   Yes.
16        Q.   Okay.  I want to talk about redistricting.
17   What happens when the City of Miami prepares a new map
18   for the Miami City Commission?  After they have prepared
19   that map, what happens on the County side?
20        A.   So, first thing first, from the City Clerk,
21   because that is our contact, right, that we receive our
22   direction from, on all matters related to City
23   elections, right, we ask that it come from either Todd
24   or Sandra -- those are our two contacts -- telling us,
25   this is the map that we are going to be using for the
```

1    future, these are our new boundary lines.

2         And, then, from there, I'm happy to run through

3    all of these varying steps, if you want me to, but just

4    overview-wise, right, what we would first do is, take

5    the new district maps, overlay them on our precinct

6    maps, and start to do the research of, you know, what

7    does this mean, like how drastic are the changes, and

8    try to get a sense of how much work it's going to

9    entail.  And, then, you know -- it's probably best if I

10   just read from this document, okay.

11        Okay.  So I'm just going to hit highlights.

12   I'm not going to go into all of them, but you can ask

13   me, I guess.

14        Okay.  So the first step is to review the

15   impact to current precincts, which is, I think, as I

16   started to say, you know, we overlay the new district

17   boundary lines over our current precincts and identify

18   how many precincts are impacted.  This would consist of

19   either whole precincts or are we going to have to now

20   take that precinct and split it up.

21        We have to create the core boundary layer,

22   identifying every single district boundary identified

23   within that precinct, and this is used to determine if

24   we can take that precinct and consolidate it with

25   another one or if we're going to actually have to create

```
 1    a brand new precinct by itself, because it doesn't share

 2    representatives with anything else.

 3            If a new precincts is needed, we have to

 4    identify the precinct -- a new precinct number, one that

 5    is not being used.  And, then, from there, we start

 6    doing the identification of how many voters are impacted

 7    by this.  Obviously, we have to quality assure all of

 8    that stuff.

 9            Then -- this is all done in our GIS system.

10    That's where we start.  And, then, once we have all of

11    these steps completed, and we're confident in them,

12    that's when we can start moving it into our voter

13    registration system, which is the live production

14    system.  And so, from there, we have to start

15    identifying each and every street range that needs to be

16    modified and moved, to account for the new lines,

17    quality assure all of those street ranges, and then we

18    update our precinct and City of Miami shapefiles,

19    provide that to the Miami-Dade County Information

20    Technology Department, to make sure that what we have in

21    our system is consistent with what they have in their

22    system, to make sure that no errors have been made.

23            We add all of the new precincts into the voter

24    registration system.  We adjust the district values,

25    which means these precincts used to be, let's say, in
```

```
 1   District 1, and now they're in District 2, adjust any
 2   polling place assignments, right.  So, at this point, we
 3   are figuring out, were these precincts able to be
 4   absorbed, and so, therefore -- and the polling place is
 5   able to accommodate those additional people, or, if not,
 6   that is when we have to actually start going out and
 7   surveying the City of Miami, to determine if we can find
 8   new polling locations.  So it starts to get a little bit
 9   more complicated and more timely there, if I have to
10   start surveying for new locations and trying to convince
11   an owner of a private facility to allow us to use that
12   facility.
13           So once all of the street ranges are identified
14   by precinct in our voter registration system, we then do
15   what's called a yellow dot analysis, and that's to make
16   sure that every single voter, in every single home, was
17   properly moved into the correct district.  And there are
18   many exceptions that occur in this, because of alias
19   addresses and that type of thing, and so we'll have to
20   go one by one and research each one of these addresses,
21   and, you know, move them into -- you know, yes, we
22   reviewed them, and, yes, this has been done properly.
23           Once all of that is done in the system, we
24   provide these files to both, the tabulation team and our
25   automated vote -- automated absentee ballot system, so
```

```
 1    that we can make sure that all of the precincts on their
 2    end match all of the precincts on the voter registration
 3    end, to make sure that not only the voters are going to
 4    receive the correct ballot, but also that the tabulation
 5    system is going to be ready to recognize that from the
 6    system.
 7            We have to update all of our asset management
 8    systems to account for the new precinct numbers, and
 9    then, you know, we already talked a little bit about the
10    polling place analysis.
11            That is -- a lot of what I've already talked
12    about is system type stuff.  The polling places is
13    another function altogether, because there's a lot of
14    review and care that's taken into that.  I don't want --
15    especially going into a presidential election cycle, we
16    need to make sure that we don't have too many people and
17    too much turnout going into any one location, and so we
18    really would have to review, one by one, to make sure
19    that if we're adding an extra hundred people here or 600
20    people there or a thousand people here, that the
21    location can accomodate it, parking, power, equipment,
22    all of these things, and, then, if not, you know, go out
23    and try to locate new locations.
24            My scheduling section needs to have all of this
25    in their system, too, so that we can have the poll
```

```
 1    workers assigned to the proper new precincts.  And once
 2    all of that is done, then we can begin to generate new
 3    voter information cards.  That alone, is a very big
 4    project, because what we need to do is extract them in
 5    batches and send them out in batches.
 6              So, are we talking about here, a few City of
 7    Miami voters, a modest amount of City of Miami voters,
 8    or all City of Miami voters?  That's going to determine
 9    how many batches of cards we need to generate, quality
10    assure and mail out, in a way that we can keep up with
11    the call volume, and, then, of course, all of the maps,
12    all of the statistics, all of the reports that all of
13    the candidates and parties -- that have to be produced,
14    quality assured and placed on the website.
15              That is just an overview of all of the steps
16    that need to happen.
17         Q.   Thank you.
18              You mentioned GIS.  What is GIS?
19         A.   Okay.  GIS is a Geographical Information
20    System.  So it's basically electronic mapping.  So we
21    receive, you know, the files electronically.  That's
22    what we request from everybody that's done
23    redistricting, all of the various jurisdictions, and
24    then we place them over our GIS maps of our precinct
25    boundaries and our current existing boundaries, and we
```

*Bailey & Sanchez Court Reporting, Inc.*

1  start there.

2      Q.  Just to confirm, you said that the County

3  requests GIS files from, say, the City of Miami?

4      A.  Yes.  Shapefiles, correct.

5      Q.  Is a GIS file and a shapefile the same thing?

6      A.  GIS, I guess I would categorize as more of like

7  the generic title of like the system itself, and the

8  shapefile is a specific type of file that we request

9  from the City.

10     Q.  Who, at the County, handles the GIS process?

11     A.  Xavier Pichs, P-I-C-H-S.

12     Q.  Anybody else?

13     A.  I mean, he's my GIS specialist, and then he has

14 superiors, but that is the main GIS person in my

15 department.

16     Q.  What is a Block Assignment File?

17     A.  I can't answer that confidently.

18     Q.  Who, at the City, handles the GIS process?

19     A.  As I said, we receive these files from the

20 Clerk, so I don't know who does them in the background.

21     Q.  Would the County ever communicate directly with

22 the City's GIS folks?

23     A.  Would they ever?  I don't see why not, if they

24 had questions.

25     Q.  Do you know of a time when that has happened?

```
1        A.    No.

2              MR. MERKEN:   Please mark this as Exhibit

3        12.

4              (Thereupon, Plaintiffs' Exhibit Number 12 was

5   marked for Identification.)

6   BY MR. MERKEN:

7        Q.    I have handed you what's been marked as

8   Plaintiffs' Exhibit 12.   Do you recognize this document?

9        A.    I don't believe I've seen this document before.

10       Q.    I will represent to you that this is the City

11  of Miami's reply brief in support of the City's

12  Emergency Motion to Stay the Redistricting Order that

13  they filed in the U.S. Court of Appeals for the Eleventh

14  Circuit on August the 2nd, 2023.

15       A.    Okay.

16       Q.    If you could, please, turn to Page 9, and if

17  you could look at Footnote 3.   I'm going to read this,

18  for the record, and I'd like you to confirm that I read

19  it correctly.

20             It reads, "The Miami-Dade County's

21  reprecincting process is complicated and time consuming

22  (Docket Entry 24-30).   The County needs detailed map

23  with exact district boundaries.   Id.   The City had over

24  a month to work with its Geographic Information Systems

25  team to put the information together for the County.
```

1    With the Mandated Map, the County would have to start

2    from scratch, adding further confusion and delay, and

3    further running afoul of Purcell."  Did I read that

4    correctly?

5          A.   Yes.

6          Q.   Do you know what the City and the County did

7    together, during that month that it said that the City

8    has worked to prepare the detailed GIS shapefiles?

9          A.   Am I missing the month?  When is this?

10         Q.   This is the City's writing.  They say that they

11   had a month --

12         A.   But do you know like when this was, because I

13   can't speak to what happened over that month, unless I

14   know when --

15         Q.   This would have been --

16         A.   -- this is referring to, if at all, but that

17   would help?

18         Q.   Right.  Well, I guess a broader question is, in

19   2023, has the County worked with the City on shapefiles

20   or GIS processes at all?

21         A.   Not to my knowledge, no.

22         Q.   Has the County received any GIS shapefiles from

23   the City?

24         A.   I mean, I know that we received their map on

25   the 1st, right, August 1st.  I would have to look back

1   and see exactly what it was that they gave us.   I think

2   they gave us what we asked for.   I hadn't heard

3   otherwise.

4        Q.   But you're not sure if the City provided you a

5   shapefile on August 1st?

6        A.   No.

7        Q.   We'll come back to this in a little bit.

8             Does the City re-assign voters to Districts 1,

9   2, 3, 4 and 5 or does the County do that, once a new map

10  is implemented?

11       A.   Voters within the City?

12       Q.   Yes.

13       A.   Well --

14       Q.   I can rephrase the question.  I'm sorry if that

15  was a confusing question.

16       A.   Yeah.  Thank you.

17       Q.   After reprecincting has occurred and the County

18  is provided with the map that will be used, does the

19  City or the County actually undertake the process of

20  moving voters from District 1 to District 2?

21       A.   Okay.  So you're talking about redistricting,

22  right, because you said reprecincting, so I just want to

23  be very clear?

24       Q.   Yes.  I'm sorry, redistricting.

25       A.   Right.  So the City provides us with the

*Bailey & Sanchez Court Reporting, Inc.*

 1    boundary lines.  We take the action of moving the voters

 2    from one district into the other in our systems.

 3         Q.   Okay.  Is there a discreet cost for that

 4    process?

 5         A.   So we have not charged them for any of the

 6    first go around.  We did it as part of our larger

 7    redistricting and reprecincting process, right, but if

 8    we are doing this again, and it takes a significant

 9    amount of time, I will be passing that charge onto them,

10    particularly as it relates to mailing new voter

11    information cards.

12         Q.   Can you estimate, if this were to occur again,

13    what that cost would be?

14         A.   Yes.  So, this is an up to number.  Up to

15    $154,000.  And, you know, again, I keep -- I guess I've

16    said it once, I feel like I'm going to say it a lot, I'm

17    at a disadvantage here, because if the Court orders a

18    new map, I have no idea what the severity of those

19    changes are going to be, right, how much time is it

20    going to take to do all of those 37 steps, is it a

21    little tweak or am I redoing all of the district

22    boundary lines, right?

23              So it could take us a small amount of time or a

24    large amount of time.  How many polling places do I have

25    to go out and search for, how many voters is it

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   impacting?  So I don't -- timing and costs are very hard
 2   things for me to say here, but the up to $154,000 is,
 3   you know, for staff time and assuming that we're sending
 4   all voters in the City of Miami new voter information
 5   cards.  So it would adjust, according to what we need to
 6   do.  That's the large bulk of the costs here.
 7        Q.   You mentioned that assumes that you would send
 8   every City of Miami resident a new voter card.  Would
 9   there be a reason that you would not send every City of
10   Miami voter a new voter card, after redistricting has
11   occurred?
12        A.   Yeah.  I think it's just going to be a call --
13   you know, a last minute decision, on our part, as to how
14   many voters are impacted.  You know, I don't feel the
15   need to send every voter a new voter information card,
16   if it's only affecting a small number of voters, but it
17   may get to a point where, if it's a significant number
18   of people impacted, then, you know, we may just make the
19   decision to send it to everybody.
20        Q.   And that would primarily be a mailing cost -- a
21   printing and mailing cost?
22        A.   Printing and mailing.
23        Q.   What laws apply -- you mentioned some of them,
24   but what laws apply to a City of Miami City Commission
25   map and the County's implementation of their map?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1        A.   That's a tough one.  I mean, I think that, you

2   know, in terms of redistricting, there's obviously laws

3   that relate to them.  That's not necessarily my

4   department, how they do that, but you're talking about

5   from our perspective?

6        Q.   Yes.

7        A.   If redistricting occurs, and then

8   reprecincting, which is an inevitable byproduct of

9   redistricting, just because, you know, it's part of

10   election administration, there are requirements in the

11   Florida Statutes that guide us on how we set up our

12   precincts.

13             So I don't know the Statutes off the top of my

14   head, but, you know, there are Statutes that require us

15   to take certain things into consideration when we're

16   creating our precincts, and, then, the approval of those

17   precincts, which have to go before the Board of County

18   Commissioners.

19        Q.   Are there any Statutes that govern the costs of

20   election administration?

21        A.   Not really, no.

22        Q.   So there's no Statute that says it's capped at

23   a certain cost or must meet a minimum threshold?

24        A.   No.

25        Q.   So you've mentioned precincting a lot, and I
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1   know that conflating redistricting and reprecincting can
2   be a bit of a problem.  So can you walk me through what
3   reprecincting looks like, assuming you have received a
4   new map or in any election?  What is reprecincting and
5   what does it look like?
6        A.   Okay.  So proper election administration would
7   mean that a single precinct has all of the same exact
8   representatives, right, so that when voters come into
9   that particular precinct, they all receive the same
10  exact ballot, unless, of course, it's a primary
11  election, and then there's a party differentiation.  But
12  we're laying down Congressional, State Senate, State
13  House, County Commission, School Board, you name it,
14  City of Miami Commission Districts, all on top of each
15  other, and after you do all of that, there are boxes
16  that are created, all throughout the County, right, and
17  that's how you start building your precincts.  So the
18  idea for, again, efficient and professional and error
19  free election administration, every precinct has all of
20  the same representatives.
21           So when new districts, now that we've done all
22  of the redistricting for all of the County and we've
23  done all of the reprecincting for all of the County, and
24  we are in great shape to have a very successful and
25  accurate election in 2024, if now a new map is provided
```

1   to us, which is okay, as long as it's all done within

2   the timelines that I'm hoping will be respected, then

3   those district lines will be dropped on top of our

4   current precinct lines.

5          If I didn't do anything further with that, then

6   those district lines are going to start splitting

7   precincts, right, and then I have, okay, then Precinct

8   1 -- the people in Precinct 1, as an example, now have

9   these representatives, and the other half have these

10  representatives.  That's not a great situation to go

11  into a presidential election with.  So, then, what do

12  you do next?

13         You start to embark upon phase two of

14  redistricting, which is reprecincting.  So that's when

15  you start looking at every single precinct and start to

16  make decisions.  Okay, so if Precinct 1 was split in

17  half, can I take the voters in that half of the precinct

18  and maybe consolidate them with somebody else?  If you

19  can do that, that's fantastic.  Great, re-draw the

20  precinct line to accomodate those people.

21         But then we have to ask ourselves what I had

22  said earlier, can it accommodate those additional

23  people?  And hopefully it can, but, again, going into a

24  presidential election, high voter turnout, we want to be

25  conservative about these decisions, so that takes time.

1    That's an analysis, and review, and that's moving voters

2    again, after we just moved them once, right.

3            If you can't consolidate them to a neighboring

4    precinct, because they just don't share now any of the

5    same districts -- same representatives, then we have to

6    give it a new precinct number and figure out where is it

7    going.  Are we going to leave it in the same polling

8    place or are we going to find a new one?  And, then,

9    that's where all the field work really comes into play

10   for our research.

11           So you do that, so you can have voters of the

12   same -- with the same representatives voting within the

13   same precinct.

14       Q.   Does the County ever administer elections with

15   split precincts?

16       A.   Yes, we did, in 2022.

17       Q.   What happens when that occurs?  I know that

18   you've explained a little bit, but what happens when

19   there's a split precinct?

20       A.   It's just more complicated.  It's more

21   complicated for us, because it's just more of

22   everything, right.  So it's more precincts, because now,

23   this precinct, the one scenario I described, it's a one

24   dot "O" and then a one dot one,  So now we are adding to

25   the number of precincts, and when you start adding to

```
 1    the number of precincts, that just makes all our work
 2    internally more complicated, in terms of, you know,
 3    coding the election, printing additional ballot styles.
 4    That means we have to quality assure additional ballot
 5    styles.  That means we have to process more coming in to
 6    our system, more boxes of ballots going out to the
 7    precincts, poll workers are being told, "Now, you don't
 8    just have one precinct, you have four or six precincts,"
 9    depending on how many splits are occurring, and what is
10    very difficult for them is, they have to get that ballot
11    right.  They need to make sure that you're getting one
12    dot "O", the next voter is gets one dot one, and that
13    gets even more complicated, in a primary election,
14    because for every one of those splits, there's three.
15    There's the Republican, the Democrat and the No Party
16    Affiliation.
17           And so it is really not the efficient and most
18    successful -- has it been done, yes, but is it the way
19    to go into the 2024 election cycle?  It's my opinion
20    that that's not the way to do it.
21       Q.   Understanding it may not be, and this is my
22    phrase, not yours, best practices, to have split
23    precincts, were there any problems with split precincts
24    in the 2022 election administration?
25       A.   There were not.
```

1      Q.   Are voters always assigned a new polling place

2  after redistricting?

3      A.   No.

4      Q.   What would impact the decision to reassign

5  voters or not reassign voters to a new polling place,

6  after redistricting?

7      A.   I think I just answered that, probably, in my

8  long-winded response to the previous question.  If there

9  is, you know, no impact to them, right -- I mean, not

10  every voter, in every precinct, is going to be impacted.

11  So I wouldn't change polling places for those people who

12  are not impacted.  It would just be the consideration of

13  those who are.

14          Another possibility is, if a map was drawn --

15  if there was a new map that was adopted, if that map was

16  drawn to take into consideration the current precinct

17  lines and not split through precincts, that would also

18  help to expedite our work and it would not require those

19  voters to move from their precinct or their polling

20  location.

21      Q.   Is there a current map that shows those current

22  precincts for the 2024 election?

23      A.   Yes.  From our department, you mean, that we

24  can provide?

25      Q.   Yes.

```
 1        A.   Yes.

 2        Q.   Could you please provide that?

 3        A.   Sure.

 4        Q.   Thank you.

 5             MR. VALDES:  Do you want to take a break?

 6             MR. MERKEN:  I have one more segment, if

 7        that's okay with you.

 8             MR. VALDES:   That's fine.

 9   BY MR. MERKEN:

10        Q.   If the City of Miami were to hold a special

11   election for all five City Commissioners in the 2024 --

12   in November of 2024, would that change any of the

13   answers that you've given so far this morning about what

14   that process would look like?

15        A.   No, but I will take the opportunity to

16   reiterate a couple of things.

17        Q.   Please.

18        A.   My request, in order to have that happen with

19   as little burden to my department, is to, again, have a

20   finalized, non-appealable map completed by March 31st,

21   so that we can do all of our work seamlessly and

22   transition into proper election preparation, but, then,

23   the other really important thing is that candidate

24   qualifying must end no later than August 23rd.

25        Q.   Okay.  I think you've answered this, but just
```

1    so I'm clear on reprecincting, reprecincting has already

2    occurred for the November 2024 election, for all of the

3    offices that are being elected in November of 2024?

4        A.   Yes.

5        Q.   If the City of Miami were to hold a special

6    runoff election for the City Commission in late November

7    2024, after the 2024 general election, what would that

8    process look like, from the County's perspective, given

9    the work that it will already be doing for the November

10   2024 elections?

11       A.   Thank you for that question.   So my request

12   will be that the runoff election not be conducted any

13   sooner than four weeks after.   I need at least four

14   weeks.   There's significant post-election stuff that is

15   required by many Statutes after a presidential election,

16   and so I really need additional time to prepare for this

17   election.

18       Q.   You said, at least four weeks.   What would be

19   your ideal time for a runoff election, after the

20   November 2024 election?

21       A.   I would say, four or five weeks is plenty --

22   not plenty, but four or five weeks is adequate.

23       Q.   Is there any difference in cost to the City if

24   there is one City Commission special election -- excuse

25   me, a special election for one City Commission seat

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    versus two, versus four, versus five?
 2         A.    Cost-wise?
 3         Q.    Yes.
 4         A.    Yes.
 5         Q.    What is that difference in cost, approximately?
 6         A.    Well, the election that we had for them for
 7    District 2 earlier this year was 176,000.
 8         Q.    So --
 9         A.    So, depending, you know --
10         Q.    Would you just multiply that by the number
11    of --
12         A.    More or less, yes.
13         Q.    Okay.   Would it be a burden on your office to
14    hold a special election in November of 2024 for the
15    Miami City Commission?
16         A.    With the presidential?
17         Q.    Yes.
18         A.    As long as all of my deadlines are adhered to,
19    we will approve that.
20         Q.    Okay.
21              MR. MERKEN:   You want to take a break?
22              MR. VALDES:   Yeah.
23              MR. MERKEN:   All right.   It's 11:15.   Come
24         back at 11:20, please.
25              (Short recess taken.)
```

```
 1   BY MR. MERKEN:
 2        Q.   Okay.  I want to go over a few things that we
 3   talked about before the break.  First, you're confident
 4   that your office can effectively and properly administer
 5   a special election, if you receive the maps by the dates
 6   you provided?
 7        A.   The special elections you're referring to is
 8   piggybacking onto the --
 9        Q.   November 2024.
10        A.   Then, yes.
11        Q.   You had mentioned that zero split precincts and
12   a new map would make it easier to administer.  If there
13   was zero split precincts in a new map, would that push
14   the date back by which you could receive a new map and
15   still effectively administer the election?
16        A.   I'm not willing to do that, because I just
17   don't know how much work is going to be required right
18   now.  So I would hope that those deadlines would still
19   be respected.
20        Q.   Is there any circumstance which would result in
21   pushing those deadlines back, beyond what you've
22   provided?
23        A.   No.  Simply because I need to have this
24   completed in advance of preparing for the presidential
25   election cycle.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1      Q.   I wanted to make sure I understood your
 2  testimony about the per district cost of running
 3  elections, because I may have gotten a little confused.
 4  Approximately what is the per district cost for running
 5  a special election?
 6      A.   So I don't know if you tried to do some math,
 7  by multiplying out or something, which is what threw you
 8  off.  It's not really a per district, right.  What I
 9  have in front of me and what I've been discussing is
10  based on the historical elections that the City of Miami
11  has had, right.  So, for District 2, I don't have, off
12  the top of my head -- I don't know how many days of
13  early voting, how many sites, right.  So these are all
14  variables that would affect the cost.
15          When you ask me per district, this was just
16  this year and these were actuals, so that's why I can
17  give you that, right.  The standalone full city cost
18  that I gave you, also, again, were based upon, you know,
19  what we're estimating with the early voting schedule,
20  and so, you know, I don't think it's that easy to just
21  go ahead and multiply it out.
22      Q.   I appreciate the clarification.
23      A.   Some districts may have more Vote-by-Mail
24  voters than others, and then that would affect postage,
25  right.  There's just some nuances in there that would
```

1  affect it, but these are estimates that I'm comfortable

2  with now, that could be up or down just based upon

3  circumstances.

4      Q.  Sure.

5          And if you don't mind, if we could just go over

6  them for my edification one more time.

7      A.  Yeah.

8      Q.  If you could just kind of run through them,

9  please.

10     A.  Okay.  So, to piggyback on a County-wide

11  election, we're estimating about 115.000.  Should a

12  runoff, after that piggyback, become necessary, no less

13  than four weeks after the County-wide election, because

14  no early voting is going to be available for that, it's

15  $507,000.  A standalone election, at some other agreed

16  upon time, not in conjunction with a County-wide, using

17  the early voting model from the past, we're estimating

18  at about 805,000.  And, then, if the runoff election is

19  conducted in just a few weeks after the election, early

20  voting is limited, so it's 606,000.  So it went down a

21  little bit.

22          And, then, yeah -- the District 2 election was

23  176,000.

24     Q.  So, the piggyback, the 115,000, that would be

25  the cost for the entire City, if all five Commission

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   Districts were up -- or four Commission Districts, it

 2   would be approximately 115,000?

 3        A.   Yes.

 4        Q.   That is helpful for that.   Thank you for the

 5   clarification on that point.

 6        A.   And just so you understand, it's because we're

 7   already training the poll workers.   We're already

 8   setting up the precincts, right.   We're already doing

 9   all of these things anyway, and so that cost is just

10   associated with them.

11        Q.   Is there a different polling place for each

12   precinct?

13        A.   No.   In some polling places, there are more

14   than one.

15        Q.   How does that work?

16        A.   Well, you know, some precincts are just created

17   really small, right, not out of our discretion, it's

18   just the way -- I had described all of the various

19   district boundary lines dropping on top of each other.

20   Sometimes a precinct is created and it's really small,

21   maybe a hundred voters, 200 voters.   We're not going to

22   have a polling place set up just for a small number of

23   voters, when we know a percentage of them are not going

24   to vote at all, a percentage of them are going to

25   Vote-by-Mail, and a percentage of them are going to vote
```

```
1   early, and so now we have -- just a random number -- 50
2   people showing up to vote on election day.  We're not
3   going to set up an entire poll for that.
4           So we make these decisions, to say, okay, we'll
5   go ahead, and, you know, put you in a neighboring
6   polling location, that fits our other criteria, and,
7   therefore, that particular polling location may have
8   more than one, and that's how we do it.
9      Q.   Are there polling places that would have more
10  than two precincts?
11     A.   There are a few.
12     Q.   More than three precincts?
13     A.   I think, with three precincting, we've dealt
14  with that.  I think we're at three or less.
15     Q.   Okay.
16     A.   Yeah.
17     Q.   So you would never do four?
18     A.   I don't know about never.
19     Q.   It would be unlikely that the County would put
20  four precincts in one polling place?
21     A.   I would like to look at our list, before
22  answering that, but it would be uncommon.
23     Q.   Are there any polling places that are a single
24  precinct?
25     A.   Yes.
```

1      Q.   How does that decision, whether to have

2    multiple precincts in one polling place or one precinct

3    for one polling place work?

4      A.   It's all based upon the dynamics of that

5    particular polling location.  So I don't like changing

6    polling locations, right.  My preference would always be

7    to send people to the same place they've always been

8    voting at forever, because people are a creature of

9    habit, and they usually just go to the same place

10   they've always gone to, which is another reason why I

11   don't like making any changes between August and

12   November.  It is a set.  So where you went in August,

13   you know exactly where to go in November.

14          So we look at each polling location uniquely,

15   and we look at its size, parking, the amount of power

16   and the number of people that we want to send there, can

17   it accommodate it, and if there's a precinct with 3,000

18   people, can that polling location accommodate them?

19   Yes, we have some precincts that have like 5,000 people

20   in them, but it's a larger facility, right, and so it's

21   all just based upon volume turnover assumptions and can

22   the polling place accommodate it.  They're not all

23   created equal, and so we go one-by-one, polling place by

24   polling place, precinct by precinct, and start making

25   the decisions about which ones are going to be a single,

```
 1   because it's big enough and we don't want to put too
 2   many people there, or is it a couple of small ones, and
 3   so, you know -- and the polling location can accommodate
 4   it, and does it not make financial sense to have one for
 5   each of them, and so all of that goes into the analysis.
 6             MR. MERKEN:  Would you please mark this as
 7        Plaintiffs' 82-23?
 8             (Thereupon, Plaintiffs' Exhibit Number 82-23
 9   was marked for Identification.)
10   BY MR. MERKEN:
11        Q.   I have handed you what I'll represent is the
12   City's 2022 map for the Miami of City Commission, which
13   has been marked as Plaintiffs' Exhibit 82-23.  Are you
14   familiar with this map?
15        A.   I have seen this map, and if that's what you're
16   representing, then, yes, this is what we would have been
17   provided and was part of our reprecincting plan.
18        Q.   When did the Elections Department receive this
19   map?
20        A.   I'm not sure if I recall what month.  I want to
21   say it was May, but I'm not sure.
22        Q.   May of --
23        A.   -- '22.
24        Q.   May of 2022 --
25        A.   Yeah.
```

```
1        Q.  -- approximately?
2        A.  I think.
3        Q.  From whom did the County receive this map?
4        A.  From the City Clerk.
5        Q.  And you testified earlier that's the normal
6    process for receiving a map, right?
7        A.  Yes.
8        Q.  What steps did the Elections Department take,
9    after receiving this map in or around May of 2022?
10        A.  So we were waiting for them, because we were,
11    you know, little by little getting all of the other
12    jurisdictions' redistricting maps.  So I had mentioned
13    earlier, right, it's Congressional, State House, State
14    Senate, County Commission, School Board, so that we
15    could do one holistic reprecincting, and so, you know,
16    once we got all of the varying district lines, that's
17    when we started to put together the County-wide
18    redistricting plan and then the subsequent reprecincting
19    plan.
20        Q.  Did the County receive GIS or shapefile data
21    with this map?
22        A.  See, I would have to go back and confirm with
23    my staff.  I mean, I think the answer is, yes, because
24    that's what we had told them we needed, right, and I
25    wasn't told that we didn't receive the things that we
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    needed from the City.
 2         Q.   Fair enough.
 3         A.   Yeah.
 4         Q.   Did there come a time when the Elections
 5    Department learned that this map would not be used for
 6    the November 2023 elections?
 7         A.   Yes.
 8         Q.   When was that?
 9         A.   So that was in the end of July, I believe.  I'm
10    sorry, I don't know the dates off the top of my head.
11         Q.   From whom did the County find out that this map
12    would not be used?
13         A.   From my attorney.
14         Q.   What did the County do, after finding out that
15    this map would not be used for the November 2023
16    election?
17         A.   So, what I recall is that we had the 2022 map,
18    we had the 2023 map, right, and then we were told --
19         Q.   We haven't gotten to the 2023 map.
20         A.   Oh, okay.
21         Q.   I wanted to walk through between finding out
22    that this map would not be used --
23         A.   Okay.
24         Q.   -- and we'll get to that, but what happened
25    after the County found out that this map, the 2022 map,
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1    would not be used?
2         A.   I don't recall what we did after this one.  I
3    have a clear recollection of what happened, you know,
4    after that, yeah.
5         Q.   Okay.  We'll get to that in just a moment.
6         A.   Okay.
7              MR. MERKEN:  Would you please mark this as
8    Plaintiffs' 82-37?
9              (Thereupon, Plaintiffs' Exhibit 82-37 was
10   marked for Identification.)
11   BY MR. MERKEN:
12        Q.   I have handed you what's been marked
13   Plaintiffs' Exhibit 82-37, which says "P4 - Plaintiffs'
14   Map 4," and I'll represent to you that this is the
15   remedial map that the U.S. District Court for the
16   Southern District of Florida ordered the City of Miami
17   to use to remedy the 2022 map that was enjoined.  Have
18   you seen this map before?
19        A.   Yes.
20        Q.   When did you first see this map?
21        A.   I don't recall when I first saw it.
22        Q.   How did the County receive this map?
23        A.   And so maybe I misspoke on the other one,
24   because I think maybe I was actually referencing this
25   one.  So we were instructed to use this one, right.  I
```

*Bailey & Sanchez Court Reporting, Inc.*

1    didn't receive that information from the City, but my

2    department received it from my attorney.

3        Q.   Should the County have received that

4    information from the City?

5        A.   We had asked them for it, because, again, we

6    were waiting for direction from them on which map we

7    were going to be using for their November 2023 election,

8    so we did request it from them, and, you know, we were

9    expecting it, so that we could proceed.

10        Q.   And the City never provided it?

11        A.   They did not.   They did not.

12        Q.   When you received this map, did you receive any

13    other data, like shapefiles, with the map?

14        A.   I know you've asked me that question a couple

15    of times.  I just don't recall what was in the

16    attachments that we received regarding shapefiles.

17            MR. MERKEN:  Could you mark this as

18        Plaintiffs' Exhibit 2, please?

19            (Thereupon, Plaintiffs' Exhibit Number 2 was

20    marked for Identification.)

21    BY MR. MERKEN:

22        Q.   I have handed you what has been marked as

23    Plaintiffs' Exhibit 2, which is the City of Miami

24    Emergency Motion to Stay the District Court's Order,

25    which was dated July 31st, 2023, and it was filed in the

```
1    U.S. Court of Appeals for the Eleventh Circuit.  Have
2    you seen this document before?
3         A.  Give me a minute.
4         Q.  Please.
5         A.  So, yes, I have seen it.
6         Q.  When did you first see it?
7         A.  I was actually just reviewing this the other
8    day in preparation for this, because I wanted to look at
9    the differences in the maps, to refresh my memory.
10        Q.  Had you seen this before you had began
11   preparing for this deposition?
12        A.  No.
13        Q.  If you could turn to Page 25, please.  Near the
14   bottom of the page, and I'll read this, to confirm that
15   it is correct, the brief states, "The Order," which I am
16   parenthetically stating refers to the District Court's
17   Order, quotes, "throws out the core of districts for the
18   entire redistricting plan that have been in place since
19   1997 and draws an incumbent out of his district.  This
20   change is sweeping and disruptive."  Did I read that
21   accurately?
22        A.  Yes.
23        Q.  If you could please refer back to Exhibit
24   82-37, which is Plaintiffs' Map 4.
25        A.  Okay.
```

*Bailey & Sanchez Court Reporting, Inc.*

1    Q.   Do you agree with the City's statement that

2  this map, quote, throws out the core of districts for

3  the entire redistricting plan?

4    A.   I can't answer that.

5    Q.   Why not?

6    A.   I -- maybe you should elaborate on your

7  question.

8    Q.   I'm just asking, the City has argued that this

9  map, Plaintiffs' Map 4, throws out the core of the

10  districts for the entire redistricting plan that's been

11  in place since 1997.  So my question is, if the

12  Elections Department agrees that Plaintiffs' Map 4

13  throws out the core of the districts that have been in

14  place since 1997?

15    A.   And where -- I mean, I think I have to refer to

16  the 1997 map to answer that.

17    Q.   You can also --

18    A.   I'm not -- I'm sorry, go ahead.

19    Q.   No, please.

20    A.   No.  No.  No.  Go on.

21    Q.   That's fair.

22    A.   Okay.

23    Q.   Does the County agree that Plaintiffs' Map 4

24  would be, quote, sweeping and disruptive?

25    A.   I mean, I just don't -- in what regard?  I

```
 1   don't know if that's a question for me to answer.
 2   Disruptive how?
 3        Q.   In administering the elections.
 4        A.   So, regardless of the map that the Court seems
 5   to find lawful, we will implement that.  You know, I
 6   don't know that my opinion about the map or the
 7   districts or how disruptive it is to voters, you know,
 8   is -- that's not for me to say.  In order for us to be
 9   able to conduct the election, we're fine with any map
10   that the Court finds to be lawful, as long as the
11   deadlines are adhered to.
12        Q.   I appreciate that clarification.
13        A.   Yeah.
14        Q.   My question about the sweeping and disruptive
15   language is more directed at the County.
16        A.   Okay.
17        Q.   Does the County Elections Department believe
18   that this Plaintiffs' Map 4 would have been sweeping and
19   disruptive to the County to administer in elections
20   moving forward?
21        A.   We will be able to make the changes and notify
22   the voters in time for the election.
23        Q.   Okay.
24             MR. MERKEN:  If you could please mark this
25        as Plaintiffs' Exhibit 3.
```

```
 1              (Thereupon, Plaintiffs' Exhibit Number 3 was

 2    marked for Identification.)

 3    BY MR. MERKEN:

 4         Q.  I've handed you what has been marked as

 5    Plaintiffs' Exhibit 3, which is the City of Miami's

 6    Response to the Emergency Application to Vacate the

 7    Eleventh Circuit Stay filed in the Supreme Court of the

 8    United States on -- the date is actually not on the

 9    brief.  I'll confirm the date, but I am representing to

10    you that this is the brief that the City filed in the

11    Supreme Court.

12         A.  Okay.

13         Q.  Have you seen this document before?

14         A.  No.

15         Q.  If you could, please turn to Page 6.

16              MR. VALDES:  Counsel, are you using the

17         pagination at the bottom of the document, Page

18         6?

19              MR. MERKEN:  Yes.  I may have done the

20         pagination on these, yeah, which is why I am

21         not quickly finding what I'm looking for.  I

22         apologize.

23    BY MR. MERKEN:

24         Q.  I'm sorry.

25         A.  No problem.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   We're going to set that aside.  My apologies
 2   about that.
 3            As of August 1st, 2023, did the County
 4   Elections Department have a detailed map with the exact
 5   district boundaries it needed to implement, the
 6   court-ordered map, for the 2023 elections?
 7            MR. VALDES:  Objection to the form.  When
 8        you say, "Court-ordered map" --
 9   BY MR. MERKEN:
10        Q.   I'm sorry, Plaintiffs' Exhibit 82-37.
11        A.   Okay.
12        Q.   I'm sorry, Plaintiffs' Map 4.
13        A.   Okay.
14        Q.   As of August 1st, 2023, you said the County had
15   this map?
16        A.   Yes, we did have this map.
17        Q.   And the County had the data it needed to
18   implement this map?
19        A.   To my knowledge, we did, yes.
20        Q.   Would the County have had to start from scratch
21   with this map in implementing it for the elections?
22            MS. FELDMAN:  Object to the form.  What
23        election?
24            MR. MERKEN:  The November 2023 elections.
25            THE WITNESS:  And so what do you mean by
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1       starting from scratch?
 2   BY MR. MERKEN:
 3       Q.   I'm going to represent to you, the City has
 4   said the County would have to start from scratch, which
 5   would add confusion and delay to the election process,
 6   if the County were to implement Plaintiffs' Map 4.
 7       A.   So, I mean, starting from scratch is not a
 8   term -- so we had the City's map, right, then we were
 9   provided the Plaintiffs' map, and then the City's map,
10   again, officially, from the City.  There were a few days
11   in time where we were actually able to do some
12   preliminary work on both maps, because we didn't have a
13   choice, right.  We had given a deadline, that we were
14   hoping was going to be respected, again, to be able to
15   do everything in a very methodical, orderly and
16   sequential order, that's necessary to get it all
17   completed, and so we were in a position where we were
18   like, okay, let's do some assessment on both maps, to
19   get a little bit of a head start, while we wait to see
20   which one is going to be final, and so there were some
21   preliminary steps that were done on the Plaintiffs' map,
22   as well as the City's map, waiting to find out from the
23   Court what the ultimate decision was going to be.
24           So, if this one was upheld, if that's the right
25   term to use here, then, you know, there were several
```

*Bailey & Sanchez Court Reporting, Inc.*

1    steps that we had started, if that answers your

2    question.

3         Q.   It does.  It does.  Thank you.

4              At that point in time, you had also received

5    the City's 2023 map, right?

6         A.   Right.

7         Q.   Because you testified that you were working on

8    both sets of maps to prepare to implement one or the

9    other?  Yes?

10        A.   Yes.

11        Q.   Okay.  The amount of work that had to be done

12   to implement the City's map -- the City's 2023 map, and

13   the amount of work that had to be done to implement

14   Plaintiffs' Map 4, was that the same amount of work for

15   one map or the other map?

16        A.   So, once we realized what the impact of each

17   was going to be, are you asking about the work that

18   would then succeed that, or in those preliminary stages?

19        Q.   Both, and we can break those down.  So you had

20   said that you had started -- the County had started to

21   do preliminary work on both, Plaintiffs' Map 4 and the

22   City's 2023 map.

23        A.   Uh-huh.

24        Q.   What I'm trying to get at is, the amount of

25   work that would have had to be done for either map,

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    would that have been the same work that would have had

 2    to be done if the County had been told, we're

 3    implementing the City's 2023 map or Plaintiffs' Map 4?

 4        A.    So my staff has represented that the

 5    Plaintiffs' map actually would have taken a bit less

 6    time for us to do, than the City's map, because of

 7    something that I had alluded to earlier on, which is

 8    that the district -- and I don't know if this was

 9    coincidental or if it was taken into account in the

10    front end, but what was happening is that the district

11    lines -- the new district lines, the proposed district

12    lines, took into consideration full precincts.

13              And so, what that was going to require on our

14    end, in the system, was to just take the district

15    boundary lines and move them over, to just change where

16    the precincts were going to lie.  So that the precincts

17    that were in District 1, let's say, now they're in

18    District 2, whereas -- and so that's work, of course,

19    steps within our system to make sure that all of the

20    street ranges were done properly, and, you know, all of

21    our quality assurance and all of that, that I mentioned

22    earlier.  All of that still has to be on the system, but

23    not as much of the field work of identifying polling

24    places, and it didn't have as big of an impact on voters

25    moving to new polling locations.  So that ended up
```

1   being, you know, less work on us, whereas the City's map

2   split more precincts, and so not only did it take all of

3   the work in the system of, again, moving all of the

4   street ranges and doing all of the things that we need

5   in our various systems, but it also then required us to

6   do the additional polling place work, of where are we

7   now going to move all of these people.  I hope that was

8   clear.

9        Q.   Crystal.

10        Were there any other differences from the

11   County's perspective implementing Plaintiffs' Map 4 over

12   the City's 2023 map?

13        A.   Maybe you can elaborate.

14        Q.   Sure.

15        You gave examples of where the Plaintiffs' map

16   was more cognizant, my words, not yours, of the

17   precincts, and the City's map split more precincts,

18   which required more on the ground work.  Were there

19   other differences, from the County's perspective, in the

20   work it would take to implement one map over the other

21   map?

22        A.   I don't know what else to add to that.

23        Q.   Okay.

24        MR. MERKEN:  Mark this as Exhibit 13,

25   please.

```
 1              (Thereupon, Plaintiffs' Exhibit Number 13 was
 2    marked for Identification.)
 3              MS. FELDMAN:  Just to be clear, have these
 4         been disclosed, the extent of the documents
 5         that you're providing, in the Rule 26
 6         disclosures?
 7              MR. MERKEN:  They're all public files, so I
 8         presume so.
 9              MS. FELDMAN:  Okay.
10    BY MR. MERKEN:
11         Q.   I'm handing you what's been marked as
12    Plaintiffs' Exhibit 13, which is a letter dated August
13    2nd, 2023, to the Clerk of Court of the U.S. Court of
14    Appeals for the Eleventh Circuit, and it says, "Citation
15    of Supplemental Authority in GRACE, Inc, versus City of
16    Miami," signed by Nicholas Warren of the ACLU.  I'm
17    going to represent to you that this was filed in the
18    Eleventh Circuit as part of the appeal process.  If you
19    could turn to page 2.
20              This is a tweet or an "X," I'm not sure which
21    one we're calling it now, from Christina Vazquez, who
22    says, and I'm going to quote this, for the record, it
23    says, "@MDCElections spokesperson confirms requested
24    from the City a copy of the map the majority of the
25    Commissioners approved in June.  We did ask for the maps
```

```
 1    so that we can do certain preliminary work with both
 2    sets of maps while waiting for an order from the
 3    Appellate Court."  Did I read that correctly?
 4         A.   Yes.
 5         Q.   And that was on August the 2nd, 2023?
 6         A.   Uh-huh.
 7         Q.   Who gave that statement, if you can recall?
 8         A.   I would be guessing, because, I mean, at that
 9    point in time, I only had one spokesperson, but I don't
10    know for sure.
11         Q.   Okay.   Who was your one spokesperson at that
12    time?
13         A.   Robert Rodriguez.
14         Q.   So, as of August 2nd, 2023, the County could
15    have implemented either map?
16         A.   Yes.
17              MR. MERKEN:   Mark this as Exhibit 5,
18         please.
19              (Thereupon, Plaintiffs' Exhibit Number 5 was
20    marked for Identification.)
21              THE WITNESS:   I feel like now is a good
22         time to put on the record that part of the
23         reason that we were able to do this, is because
24         I had two very experienced GIS specialists at
25         the time.   There was somebody that worked under
```

1       Xavier, who I had mentioned earlier, who is no

2       longer with the department, and so now I have

3       somebody, who is relatively new, that just

4       started in that role, and so I don't want to

5       misrepresent to the Court that this type of

6       activity, where I'm on a dual track, can

7       continue, right, which is why I continue to

8       reiterate the importance of us getting a

9       finalized map, one time, starting from Step 1,

10      all of the way down to 37, as soon as possible,

11      just to make sure that we do it properly and

12      accurately.

13  BY MR. MERKEN:

14      Q.   Understood.

15           I've handed you what's been marked Plaintiffs'

16  Exhibit 5.  This has a Bates stamp range.  Just for the

17  record, the Bates stamp range is COM24066 --

18      A.   I'm sorry, where are you?

19      Q.   I'm sorry, I'm just reading the Bates stamp,

20  for the record.

21      A.   Oh, okay.

22      Q.   COM24066-003283.

23           MS. FELDMAN:  Again, I don't think that

24      these were included in the Rule 26 disclosures,

25      so just to the extent that they weren't, we

1          would object, on that basis.

2               MR. MERKEN:  Noted.

3  BY MR. MERKEN:

4      Q.   Do you recognize this document?

5      A.   Okay.  Give me a second.

6      Q.   Please.

7      A.   Okay.  Yes, I do recall it now.

8      Q.   And what is this document?

9      A.   Okay.  Let me see.  I want to see about the

10 shapefile here.

11     Q.   Sure.

12     A.   Okay.  Yeah, it doesn't specifically mention --

13 okay, so this is from Nicole, who I don't know, which is

14 why I didn't reference her earlier.  I think she might

15 be new.  I'm not sure.

16               So this is an e-mail to me, saying that we are

17 to proceed with using the City's map.

18     Q.   Okay.  What happened after your office received

19 this map on August 1st, 2023?

20     A.   We started doing the same, you know,

21 preliminary work that we were doing with the Plaintiffs'

22 map, right, which is, you know, about four or five of

23 the first initial steps that we were able to do.

24     Q.   What was the format of the map that was sent

25 along with this?

```
 1        A.    So that's the part that I just don't recall.

 2        Q.    Okay.  Did the County receive any other -- has

 3   the County received any other correspondence or

 4   communication from the City regarding implementation of

 5   the 2023 map?

 6        A.    Since this?

 7        Q.    Yes.

 8        A.    Not that I came across in my review.

 9        Q.    Okay.  You can set all of these aside.

10        A.    All right.

11             MR. VALDES:  Counsel, with respect to

12        Plaintiffs' Exhibit 5, do you have the original

13        e-mail, with the attachments associated with

14        them?

15             MR. MERKEN:  I do, in my e-mails, because I

16        was copied on it.  This was what was produced

17        to us in discovery, so this is what we were

18        using, but we can go through the e-mails --

19             MR. VALDES:  Okay.  We'd be happy to

20        provide the attachment, so you can see what

21        format they were in.

22             MR. MERKEN:  I appreciate that.  We will

23        take you up on that.

24   BY MR. MERKEN:

25        Q.    I just have a handful of questions about the
```

1     administration of the February 2023 special election,

2     because that was not involved -- the February 2023

3     election was not impacted at all by this litigation,

4     right?

5          A.   Right.

6          Q.   So how did the February 2023 special election

7     operate, from the County's perspective, in terms of

8     timing and administration?

9          A.   Really, no differently than what I've already

10    described, right.  I mean, we were put on notice that a

11    vacancy occurred, and, therefore, a special election was

12    going to be necessary.  My recollection is that the

13    vacancies do have a bit of a tighter timeline, which is

14    what I also alluded to earlier, right, but it's, you

15    know, one district within the City of Miami.  As long as

16    the timing wasn't in the way of a County-wide or

17    something like that, you know, that we work with

18    everybody, because of the Charter.  The Charters are

19    strict.  Sometimes they don't have that flexibility.

20              And so I think we did that in a bit less time,

21    because the timing of it worked out for us, but every

22    step that I've already described, would have also, you

23    know, applied to that election.

24         Q.   And you mentioned the cost, but just so it's in

25    the same place in the transcript, that was approximately

```
 1  $176,000?
 2      A.  Yes.  Uh-huh.
 3      Q.  With respect to the November 2023 election for
 4  the Miami City Commission, what steps are you taking to
 5  prepare for that election?
 6      A.  Well, I mean, for us, the election is here.  We
 7  just placed Vote-by-Mail ballots in the mail yesterday,
 8  so people are voting in that election, and so, you know,
 9  at this point, our polling places are confirmed, our
10  poll workers -- I believe we're still in the process of
11  training our poll workers.  Vote-by-Mail ballots are
12  out.  We'll continue to process those are they are
13  coming in.   Their equipment testing is coming up
14  shortly, which is a public test, for the candidates and
15  the public, to come in and observe that we coded
16  everything properly and that the machines are working,
17  and early voting begins on October 28th.
18          So, you know, ramping up with temporary workers
19  and making sure we're ready for that, to get those
20  locations set up, and, you know, making sure that we
21  have the proper number of poll workers, sending out
22  those assignment letters, so they know where to show up
23  on election day, and, you know, their canvassing board
24  will be coming in to meet, I'm sure, in the next week or
25  two, to start looking at Vote-by-Mail ballots, and then
```

*Bailey & Sanchez Court Reporting, Inc.*

1   tabulate results and certify the election.

2       Q.   And then start all over again?

3       A.   Yeah.

4       Q.   How much, if you know, is the November 2023

5   election going to cost the City of Miami for the County

6   to administer?

7       A.   That's a three district.  So I didn't actually

8   ask for that estimate from my staff.

9       Q.   Okay.  And like with other elections, if

10  there's a runoff, that would increase the cost?

11      A.   Right.  Depending on how many voter runoff,

12  right.

13      Q.   Right.

14      Okay.  I just have a handful of questions about

15  the relationship between the City and the County.  We

16  covered some of this, but just so that I'm clear on it

17  all.

18      Is there any written agreement between the City

19  and the County with respect to elections administration?

20      A.   Formalized, no, but, you know, there's a lot of

21  correspondence by e-mail back and forth about these

22  things, and like I said, the questionnaire that I spoke

23  to.  You know, we receive Resolutions from them, that

24  their Board has called for certain things, but a formal

25  agreement, formal contract, no.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   Does the City timely pay the County for its

 2   elections administration?

 3        A.   To my knowledge, yes.

 4        Q.   Has there ever been a time when the City has

 5   refused to pay the County the full amount requested?

 6        A.   Not to my knowledge, no.

 7        Q.   How would the Elections Department assess the

 8   quality of the relationship between the City and the

 9   County, with respect to elections administration?

10        A.   I think we have a great relationship with the

11   City Clerks there.

12        Q.   Does that depend on whether it's a regular

13   election or special election?

14        A.   No.

15             MR. MERKEN:  Okay.  Do you want to take a

16        five-minute break?  I think we're done, but I

17        just want to --

18             MR. VALDES:  Yeah.

19             (Short recess taken.)

20   BY MR. MERKEN:

21        Q.   Okay.  I just have one or two questions about

22   2025.

23        A.   Okay.

24        Q.   There are currently three City Commission

25   districts up for election in 2025, right?
```

```
1          A.   Yes.

2          Q.   Would there be any additional burden to the

3    County, to administer that election, if all five

4    districts, instead of the three districts, were up for

5    election in 2025?

6          A.   No.

7          Q.   Would there be any additional cost?

8          A.   Yes.   Cost-wise, yes.

9          Q.   And what would those additional costs be?

10         A.   It would be associated with, you know, the

11   additional training -- the additional temporary workers

12   that we would need, the additional poll workers that we

13   would need, the additional polling places that we would

14   need, but I think the mayoral race is on the 2025

15   election.

16         Q.   That's my understanding, as well.

17         A.   Okay.   So, then, if that's the case, it's

18   coming to me now, then there would be no burden at all,

19   and it wouldn't affect the cost, because we're already

20   doing those things, anyway, for the full City.

21         Q.   That's all of the questions that I have.   Just

22   in closing, has all of the testimony you gave today been

23   truthful?

24         A.   Yes.

25         Q.   Is all of the testimony you gave today
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   complete?

 2        A.   Yes.  I believe so, yes.

 3        Q.   Do you wish to correct any statements that you

 4   made?

 5        A.   No.

 6             MR. MERKEN:  I have no further questions.

 7                        CROSS EXAMINATION

 8   BY MS. FELDMAN:

 9        Q.   I'm going to have just a few questions.  If you

10   can give me a moment to just gather my thoughts and just

11   scroll back here.

12        A.   Okay.

13        Q.   Okay.  So, again, just a couple of questions,

14   very briefly.  I think that you had testified earlier

15   that implementing the Plaintiffs' Map 4, before the

16   November '22 election, would have required somewhat less

17   work than implementing the City's map, to the extent

18   that it aligned better with the precincts; is that

19   correct?

20        A.   Yes.

21             MR. VALDES:  Object to the form.  I believe

22        you said the 2022 election.  I think you meant

23        the 2023.

24             MS. FELDMAN:  I did.  Thank you very much.

25             THE WITNESS:  Sorry.  So, yes, that is what
```

```
1         the GIS people have represented, correct.
2    BY MS. FELDMAN:
3         Q.   Okay.  And just to clarify, and if you could
4    look at Plaintiffs' Map 4, and then the '22 enjoined
5    map, which was Plaintiffs' Exhibit -- I don't recall
6    what the number off the top of my head -- 82-23 and
7    82-37.
8         A.   Okay.
9         Q.   So I just want to clarify, in terms of -- does
10   your testimony in any way relate to how implementing one
11   map versus the other might impact voter confusion in
12   different districts?  In other words, would the
13   implementation of one map -- or Plaintiffs' map create
14   more or less voter confusion than the implementation of
15   the City's map?
16        A.   Had we done one or the other, is that your
17   question?
18        Q.   Yes.
19        A.   I mean, that's very difficult to say, but in
20   the Plaintiffs' map, by moving just the district lines
21   in certain precincts, those people -- those voters, they
22   would have been able that stay with their same precinct
23   number, in their same polling location, right.  So, in
24   the City's map, there was more voter movement, because
25   the new line being -- by splitting a precinct, we had
```

1  to, you know, leave some and move some, and so more

2  voters moved with the City of Miami's map, but, you

3  know, we took it very seriously, with our outreach,

4  leading up to the election, and we're going to continue

5  to do this for the entire County, because there's been

6  reprecincting and redistricting all over Miami-Dade

7  County, and notify all voters of the changes, in every

8  way.  So, you know, regardless, voters were notified by

9  mail that there was a change, so hopefully they will not

10  be confused.

11     Q.   So, in terms of -- you know, other than the

12  precinct location that the voter is going to, in terms

13  of voter confusion, you know, what candidates are on the

14  ballot, what district am I located in, if Plaintiffs'

15  map -- for example, District 1, if Plaintiffs' map moves

16  more voters out of District 1 and into a different

17  district -- if the City's map retains a greater core of

18  District 1 than the Plaintiffs' map, you're not speaking

19  to whether that would create more or less confusion, are

20  you?

21     A.   No, I'm not representing that.

22     Q.   And the same thing with respect to candidates

23  being able to canvass and to reach out to their voters,

24  if the lines change more in the Plaintiffs' map, you're

25  not speaking to whether it would prejudice or cause

1    confusion among the candidates, are you?

2         A.   No, I'm not making those kinds of claims, no.

3    For my microcosm and this larger issue, it's all about

4    just doing things in a timely manner, so voters can be

5    appropriately notified, right.   That's one of the

6    reasons why our deadlines are what they are, so we can

7    do our part to do outreach, and, then, you know, the

8    City can do the outreach to the candidates, so that

9    they're clear -- or potential candidates, so that

10   they're clear.

11        Q.   Understood.   Thank you.

12             I think that's all of my questions -- and just

13   to clarify, that would be with respect to every -- so I

14   used District 1 as an example, but you have the same

15   testimony as to District 2, 3, 4 and 5?

16        A.   Yes, I do.

17             MS. FELDMAN:   Thank you.

18             MR. MERKEN:   Anything for you?

19             MR. VALDES:   Nothing for us.

20             MR. MERKEN:   We're good.   Thank you.

21             MR. VALDES:   We'll read.

22             (Thereupon, the reading and signing not

23        being duly waived, the deposition was concluded

24        at 12:20 p.m.)

25

```
1

2

3

4
                         _____
5                              DEPONENT

6

7

8            Sworn to and subscribed before me this _____

9     day of _____, 2023.

10

11

12
                         _____
13                             NOTARY PUBLIC

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                     CERTIFICATE OF OATH

 2    STATE OF FLORIDA     :
                        SS
 3    COUNTY OF MIAMI-DADE:

 4              I, NIEVES SANCHEZ, Court Reporter, and a
      Notary Public for the State of Florida at Large, do
 5    hereby certify that CHRISTINA WHITE personally appeared
      before me and was duly sworn.
 6              WITNESS my hand and official seal in the
      City of Miami, County of Miami-Dade, State of Florida,
 7    this 23rd day of October, 2023.

 8

 9                              _____
10                              NIEVES SANCHEZ
      Notary Commission Number HH 385498
11    My Notary Commission expires August 11, 2027

12              REPORTER'S DEPOSITION CERTIFICATE

13    STATE OF FLORIDA     :
                        SS
14    COUNTY OF MIAMI-DADE:
              I, NIEVES SANCHEZ, Court Reporter and a Notary
15    Public for the State of Florida at Large, do hereby
      certify that I was authorized to and did report the
16    deposition of CHRISTINA WHITE; that a review of the
      transcript was requested; and that the transcript is a
17    true and complete record of my stenographic notes.
              I further certify that I am not a relative,
18    employee, attorney, or counsel of any of the parties,
      nor am I a relative or employee of any of the parties'
19    attorney or counsel, nor am I financially interested in
      the action.
20
              DATED this 23rd day of October, 2023.
21

22

23                              _____
24                              NIEVES SANCHEZ

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              BAILEY & SANCHEZ COURT REPORTING, INC.
                         (305) 358-2829
 2

 3                                  October 23, 2023

 4

 5   Christina White
     c/o Michael B. Valdes
 6   Geri Bonzon-Keenan, County Attorney
     111 N.W. First Street
 7   Suite 2800
     Miami, Florida 33130
 8
     RE:  Grace, Inc. vs. City of Miami
 9
     Dear Ms. White
10
     The transcript of your deposition, taken in the
11   above-styled cause on October 11, 2023, is at my office
     awaiting your examination and signature.  PLEASE
12   TELEPHONE BEFORE COMING IN so that we may arrange a
     convenient time.
13
     Please be advised that unless I hear from you by
14   November 23, 2023, I will forward the original of your
     deposition to the deposing attorney, as though you had
15   read and signed your deposition.

16   IN THE EVENT a copy of the transcript is being sent to
     the witness by counsel, kindly instruct the witness to
17   make any changes thereto on a separate sheet of paper
     and refer to the page number and line number which
18   corresponds to the change desired.  DO NOT MAKE THE
     CORRECTIONS ON THE TRANSCRIPT.  If you have any
19   questions, please call.

20   Very truly yours,

21

22
     NIEVES SANCHEZ
23   Court Reporter

24
     cc:      Christopher J. Merken, Esq.
25            Sydney Michelle Fledman, Esq.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1                    ERRATA SHEET
 2   IN RE:   GRACE, INC., ET AL. vs. CITY OF MIAMI
 3   DEPOSITION OF TODD HANNON
 4   TAKEN OCTOBER 6, 2023
 5
 6   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 7
 8   PAGE #          LINE#   CHANGE
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
21            _____
22                 SIGNATURE
23
24
25
```

*Bailey & Sanchez Court Reporting, Inc.*