IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  1:22-cv-24066-KMM

GRACE, INC., et al.,

    Plaintiffs,

vs.

CITY OF MIAMI,

    Defendant.
_____/

                               4343 W. Flagler Street
                               Suite 400
                               Miami, Florida
                               Friday, 10:05 a.m.
                               October 6, 2023

DEPOSITION

OF

TODD HANNON

Taken on behalf of the Plaintiffs
Pursuant to a Notice of Taking Deposition

___

```
 1   APPEARANCES:

 2   ACLU FOUNDATION OF FLORIDA, by
     CAROLINE A. MCNAMARA, ESQ.,
 3   NICHOLAS L.V. WARREN, ESQ., and
     DANIEL B. TILLEY, ESQ., and
 4   On behalf of the Plaintiffs.

 5   DECHERT, LLP, by
     CHRISTOPHER J. MERKEN, ESQ.,
 6   Co-Counsel for the Plaintiffs.

 7   GRAY ROBINSON, by
     CHRISTOPHER N. JOHNSON, ESQ., and
 8   On behalf of the Defendant.

 9

10

11                       WITNESS

12   TODD HANNON

13       Direct Examination (By Ms. McNamara)        3

14

15                 E X H I B I T S

16       Plaintiffs' Exhibit Number 7        11
         Plaintiffs' Exhibit Number 8        77
17       Plaintiffs' Exhibit Number 9        116

18

19

20

21

22

23

24

25
```

```
 1    THEREUPON:
 2                      TODD HANNON
 3    was called as a witness by the Plaintiffs and, having
 4    first been duly sworn, was examined and testified as
 5    follows:
 6              THE WITNESS:  I do.
 7                    DIRECT EXAMINATION
 8    BY MS. MCNAMARA:
 9         Q.   Can you, please, state and spell your name, for
10    the record?
11         A.   My name is Todd Hannon.  Todd, T-O-D-D, last
12    name, Hannon, H-A-N-N-O-N.
13         Q.   My name is Caroline McNamara.  I am an attorney
14    representing the Plaintiffs in this case.  It's Grace,
15    Incorporated versus the City of Miami, Case Number
16    22-cv-24066, in the Southern District of Florida.
17    Everyone has been identified.
18              So we're here for deposition today.  It's a
19    question and answer session.  I'm going to ask you
20    questions, and then you just answer them.
21         A.   Okay.
22         Q.   And since it's like in court, you have been
23    sworn in, it's expected that you'll tell the truth.  Do
24    you understand that?
25         A.   Yes.  Yes.
```

*Bailey & Sanchez Court Reporting, Inc.*

1       Q.   We have the court reporter, who is recording

2  this, so it's important that your answers are verbal.

3       A.   Understood.

4       Q.   And your counsel has the ability to object to

5  questions.   You need to answer the question, unless

6  counsel instructs you not to answer, and you decide to

7  follow that instruction.

8            If you don't understand, you can tell me.   I

9  could repeat the question, clarify it.

10            And if you need any breaks, we can take a

11  break.   It's just that you can't take a break while a

12  question is pending.

13            Do you have any questions about that so far?

14       A.   No.

15       Q.   And this is a corporate representative

16  deposition.   You are here representing the City of

17  Miami.   Do you understand that?

18       A.   Yes.

19       Q.   And the City of Miami has designated you to

20  answer questions on its behalf.

21       A.   Yes.

22       Q.   Have you taken any medications or substances

23  that would affect your ability to testify this morning?

24       A.   No.

25       Q.   Any medical conditions or anything else that

```
 1    could affect your ability to testify?
 2         A.   No.
 3         Q.   Any other reason, besides those, that you might
 4    not be able to testify truthfully today?
 5         A.   No.
 6         Q.   Have you been deposed before?
 7         A.   Yes.
 8         Q.   Was that in your role that you're currently in
 9    or elsewhere?
10         A.   Yes, in my role as City Clerk.
11         Q.   How many times, would you say, you've been
12    deposed before?
13         A.   Maybe two to three.
14         Q.   Can you tell me, one of the times, what was
15    that case about?
16         A.   It's been a while.  So one of them had to do
17    with a special election that the City held for a ballot
18    question, and, essentially, there were -- the attorney
19    representing, I guess, the Plaintiff, was simply asking
20    questions about the noticing, such as, for a special
21    election, what time frame do you have to notice the
22    special election within, how did we notice the special
23    election, along those lines.
24              MS. MCNAMARA:  Should we go off the record
25         for a second?
```

```
1              (Short recess taken.)
2    BY MS. MCNAMARA:
3         Q.   And in that case, were you testifying as a
4    representative of the City of Miami or was it in your
5    individual capacity?
6         A.   Oh, no, as a representative of the City of
7    Miami, the City Clerk.
8         Q.   Do you remember another case in which you were
9    deposed?
10        A.   I can't remember the exact specifics of the
11   case.  It's been a long time.  It's been years since
12   I've been deposed.
13        Q.   It's been years?  All good.
14        A.   Which is a good thing for me, no complaints.
15        Q.   Have you ever given testimony like in a City
16   Commission hearing or a government hearing like that?
17        A.   Testimony in a government hearing?
18        Q.   Like have you ever shown up before a government
19   body and been sworn in and testified, like they do in
20   Congress on TV, or something like that?
21        A.   No.  No.
22        Q.   Have you ever given public statements on behalf
23   of the City of Miami?
24        A.   No.  I usually give it to the Office of
25   Communications.  We have a Communications Director for
```

```
 1    that.
 2         Q.   Would you describe yourself as being an
 3    internal employee of the City of Miami, as opposed to a
 4    public facing employee?
 5         A.   That's the way I perceive myself, yes.
 6         Q.   Have you ever been involved in any lawsuits,
 7    outside of your work?
 8         A.   No.
 9         Q.   Have you ever been a party to a criminal case?
10         A.   No.
11         Q.   Have you ever been arrested?
12         A.   No.
13         Q.   Or charged with a crime?
14         A.   No.
15         Q.   When did you learn that you would be testifying
16    on behalf of the City of Miami for this deposition?
17         A.   I believe, about a week ago.
18         Q.   Did you do anything to prepare for this
19    deposition?
20         A.   I reviewed the City's Charter and the City's
21    Code, and some invoices, you know, from previous
22    elections.
23         Q.   Did you talk to anybody else about it to
24    prepare?
25              MR. JOHNSON:  And don't talk about any
```

```
 1        conversations you had with counsel.  Those

 2        would be privileged.

 3             THE WITNESS:  But if I had a meeting, would

 4        I --

 5             MR. JOHNSON:  If counsel is present, then

 6        don't discuss what was discussed.

 7             THE WITNESS:  Okay.

 8             Then, no.

 9   BY MS. MCNAMARA:

10        Q.   So you didn't like, say, go down to talk to

11   someone else in the office and say, "Hey, tell me about

12   what's going on," with something related to the

13   deposition?

14        A.   No.

15        Q.   Would you say that you are familiar with the

16   information that is covered in the topics, such that you

17   did not feel that you needed to talk to other people to

18   know what's going on?

19        A.   To the extent that the City Clerk is involved,

20   yes.  I didn't feel as though there was any real

21   necessity for me to speak with anybody else.

22        Q.   Were there specific individuals you talked to,

23   who are non-lawyers, who are employees of the City, even

24   when maybe you met with lawyers, just the names of them?

25        A.   Again, I didn't have a conversation with
```

1    anyone, really, outside of reading, you know, the

2    Charter, the Code, going over some invoices and so

3    forth, when I learned about the fact that I was going to

4    be deposed.

5         Q.   Did you review any documents?

6         A.   You know, the City of Miami City Commission

7    Resolution that called for a general municipal election

8    this November.  I looked at some invoices from previous

9    elections, from like a special election and a general

10   election.  I went back and looked at the Code,

11   particularly, I think, Section 49 -- I'm sorry, Charter

12   Section 49, and of the Code, Chapter 16 or Section 16,

13   but nothing beyond, really, what I would normally look

14   at.

15        Q.   The materials that you looked at, have those

16   been produced to us in the discovery?

17        A.   Well, I don't know.

18        Q.   Do you know what a Bates number is?

19        A.   No, I do not.

20        Q.   Like a stamp with the numbering that signifies

21   a document that's been marked for keeping track in a

22   court case.

23        A.   I'm not aware of submitting any documents that

24   would have a Bates number, no.

25        Q.   Does the City of Miami use an internal document

*Bailey & Sanchez Court Reporting, Inc.*

1    management system that puts serial numbers on documents

2    you print out?

3         A.   Not serial numbers, no.   When it comes to

4    legislation, we use what's called Mediatrix (phonetic)

5    to administer legislation, documents that are associated

6    with agendas, documents that are submitted into the

7    record during City Commission meetings, but they're not

8    given a unique number or anything.   It's usually

9    associated with the file ID.

10            Oh, here we go.   When it comes to legislation,

11   resolutions, ordinances, there's something known as a

12   file ID, and so for you to be able to find it within our

13   Mediatrix system, you need to have either the file ID

14   number or the enact number.

15            And so what we'll do on documents that's either

16   accompanying -- or, normally, submitted into the record

17   during City Commission meetings, we'll write the file ID

18   number on the document, but we don't have any kind of

19   internal system that assigns a number to documents, like

20   submittals and backup documents, no.

21        Q.   Did you review any of the court filings, like

22   our complaint or any court rulings?

23        A.   No.  No.

24        Q.   Did you review any transcripts of other

25   depositions, for example, Mr. De Grandy's deposition,

1   which we took on Monday?

2     A.  No.

3     Q.  Did you -- I'll withdraw that.

4         MS. MCNAMARA:  I'm going to mark this as

5     Plaintiffs' Exhibit 7.

6         MR. JOHNSON:  Could we go get the coffee?

7         MS. MCNAMARA:  Oh, sure.

8         (Thereupon, Plaintiffs' Exhibit Number 7 was

9   marked for Identification.)

10        (Short recess taken.)

11   BY MS. MCNAMARA:

12     Q.  This is Plaintiffs' Exhibit 7.  Here's the

13   marked copy for you.  Do you recognize this document?

14     A.  Yes.

15     Q.  You've looked at it before?

16     A.  Yes.

17     Q.  Can you describe what it is?

18     A.  Plaintiffs' Notice of Rule 30(b)(6) Deposition,

19   and essentially there are some subject matters that are

20   going to be covered during the deposition.

21     Q.  And do you understand that you've been

22   designated for some of the specific numbered topics on

23   this?

24     A.  Yes.

25     Q.  And which ones are those that you've been

*Bailey & Sanchez Court Reporting, Inc.*

1    designated to testify to?

2        A.   The first and second subject matters.

3        Q.   And you feel comfortable discussing those

4    subject matters today?

5        A.   Yes.

6        Q.   All right.  You can look at that, but I'm not

7    going to ask -- I mean, you can keep it, but I'm going

8    to move on now.

9        A.   Okay.

10       Q.   So do you live in the City of Miami yourself?

11       A.   Yes.

12       Q.   What district do you live in?

13       A.   District 4.

14       Q.   What neighborhood?

15       A.   What neighborhood would that be considered?

16   It's West.  It's over by the Shell Lumber store.  So I

17   don't know if that's a neighborhood, but west of 27th.

18       Q.   How long have you lived there?

19            MR. SPRING:  Shenandoah.

20            THE WITNESS:  That's Shenandoah?  Sorry.

21       My apologies.  I should probably know that.

22            I'd say, about a year and a half.

23   BY MS. MCNAMARA:

24       Q.   Have you lived elsewhere, within the City of

25   Miami, before that?

*Bailey & Sanchez Court Reporting, Inc.*

1      A.   Yes.   Just down the street, where it was in

2  District 2, Southwest 27th and Bird, over by the

3  Flanigan's, if you need a reference point.

4      Q.   How long have you been living in the City of

5  Miami?

6      A.   I would like -- I believe, around ten years,

7  I'd like to say.   Around ten years.

8      Q.   What is your educational background?

9      A.   I have a Bachelor's Degree from the University

10  of California Berkeley in political science and a minor

11  in public policy.

12      Q.   Do you have any professional certifications?

13      A.   No.

14      Q.   And what is your current job title with the

15  City of Miami?

16      A.   City Clerk.

17      Q.   Are you based in City Hall?

18      A.   Yes.

19      Q.   Do you work in-person?

20      A.   Yes.

21      Q.   Do you ever do remote work or --

22      A.   Normally, no.   It's usually in-person.

23      Q.   When did you start as the City Clerk?

24      A.   January of 2013.

25      Q.   And you've been in that position continuously

```
 1   since then?
 2        A.   Yes.
 3        Q.   How did you obtain that position?
 4        A.   I was appointed by the City Commission.  It's a
 5   Charter officer position.
 6        Q.   Did you hold any positions in the City of Miami
 7   prior to that?
 8        A.   Yes.  I was originally employed with the City
 9   of Miami back in February of 2006.  I started out as a
10   Legislative Services Representative 1, an entry level
11   position.  I was promoted to Legislative Services
12   Supervisor.  And, then, from Legislative Services
13   Supervisor, I was promoted to Assistant City Clerk.
14   And, then, from Assistant City Clerk, I was appointed to
15   City Clerk.
16        Q.   Were you surprised when they appointed you to
17   be the City Clerk?
18        A.   I like to think that I earned it, but, no, I
19   was happily surprised.
20        Q.   Did they tell you beforehand or they --
21        A.   No.  No.  It's all done at the Commission
22   Meeting, and it's done by vote, and so you're left on
23   pins and needles until the actual vote is taken.  It's a
24   little nerve-racking.
25        Q.   Does it have a set term?
```

```
 1        A.   Well, every two years, I believe it's pursuant
 2   to the Charter, you're up for reappointment.  And so
 3   essentially --  it's tied with every election cycle.  So
 4   as the election cycle is -- as it's completed, then you
 5   basically will put a Resolution on an agenda to
 6   determine if they're going to reappoint you or not.
 7        Q.   Have you ever had any situations during your
 8   tenure when you were concerned that you wouldn't be
 9   reappointed?
10        A.   No.
11             Sorry, I'm not trying to jinx it, but --
12        Q.   Do you have relationships with the individual
13   City Commissioners themselves?
14        A.   I mean, professional relationships, but not
15   personal, no.  I don't hang out or go to dinner with
16   anybody.
17        Q.   Do you have a direct report, who is considered
18   your boss?
19        A.   I have five different bosses.
20        Q.   Who is the first of those five bosses?
21        A.   Well, the District 1 City Commissioner,
22   District 2 City Commissioner -- so it's the City
23   Commissioners that are my bosses.
24        Q.   So you report directly to the Commissioners?
25        A.   Yes.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1        Q.   And they control whether you stay in the
2   position or not?
3        A.   Correct.
4        Q.   But you don't report to the City Attorney?
5        A.   No.
6        Q.   Or the City Manager?
7        A.   No.  Not even the Mayor.
8        Q.   Is there any mechanism in the City for, say,
9   the voters to vote you out or call a recall or
10  something?
11       A.   No.
12       Q.   It's only through the Commission?
13       A.   Yes.
14       Q.   But in theory -- I mean, I'm not saying this is
15  happening, but, in theory, if there was like a movement
16  of, new Clerk for Miami, the way people would do it is,
17  they would have people run for the Commission, and they
18  might run on that, and, then, when they're sworn in --
19       A.   Yes.  Yes.  Uh-huh.
20       Q.   Okay.  But nothing like that has ever happened?
21       A.   No.
22       Q.   Are you aware of that happening for previous
23  City Clerks?
24       A.   No.
25       Q.   What was your previous job, before you joined
```

*Bailey & Sanchez Court Reporting, Inc.*

1  the City of Miami?

2      A.   I worked for the pro tem of the California

3  State Senate Don Perata.  I worked out of his district

4  offices as a district representative.

5      Q.   How long were you doing that?

6      A.   I would say, four to five years.

7      Q.   Did you have other jobs in California

8  government prior to that?

9      A.   Prior to that?  No.  I was in the military for

10 six years, from 1990 to '96.  I graduated from college

11 in 2001.  So, after I graduated from college in 2001, I

12 started working for the State Senator.

13     Q.   What branch of the military were you in?

14     A.   Me?  United States Navy.

15     Q.   What was your rank that you left at?

16     A.   Operations Specialist 3rd Class Petty Officer.

17     Q.   Were you on boats?

18     A.   Yes.

19     Q.   Did you travel anywhere overseas?

20     A.   Yes, I've been all over the Far East and the

21 Middle East and the South Pacific.

22     Q.   Did you like that?

23     A.   Oh, it was the greatest decision ever made,

24 hands down.

25     Q.   How did you end up coming to the City of Miami?

1        A.   So I have family in West Palm Beach, and so,

2   essentially, I'd been out in California for a long time,

3   and I guess, as you get a little older, you begin to

4   realize that being closer to family sometimes is more

5   important than enjoying living in one of the best states

6   in the country -- again, I'm biased -- and realized that

7   it was probably time to head back east.

8        Q.   Let's say that there was a rivalry between

9   California and Florida, would you put yourself on the

10  California side of that rivalry?

11       A.   Without a question.

12       Q.   I won't make you --

13       A.   Just saying.

14       Q.   So can you describe what your job entails, like

15  as a summary?

16       A.   Briefly, I'm the Clerk of the Board.  So I work

17  with Commissioners on their legislation.  Essentially,

18  we are a repository for City Commission documents,

19  whether it's current or archived documents.  I oversee

20  the lobbyist registration program for the City.  I

21  conduct the elections for the City.  So that's just a

22  few of the things to name.

23       Q.   Do you have any people who report to you?

24       A.   Yes.  There's an office of twelve, including

25  myself.  I have an Assistant City Clerk, and a

1    Legislative Services Supervisor.  There are four people

2    in the Legislative Division, two in the Records

3    Division.  So it's a total of twelve, but they all

4    answer or, I guess -- I'm responsible for supervising

5    them.

6        Q.   You testified a minute ago that you have a

7    professional working relationship with the Commissioners

8    and they are the ones who you report to.  Do you have

9    personal relations with them outside of that?

10       A.   No.

11       Q.   What about any Former Commissioners?

12       A.   No.  I mean, they will call me if they need

13   something related to the City Clerk's Office.  No

14   personal relationship, but definitely still a

15   professional.  If they need legislation, if they need

16   minutes, something along those lines, you know, previous

17   City Commissioners can contact me, just like anyone else

18   from the public, to make a public records request.

19       Q.   Do you see them regularly, when you're at work

20   at City Hall?

21       A.   No.

22       Q.   Are they often elsewhere?

23       A.   The Commissioners?  Yes.

24       Q.   Do you see them outside of the context of an

25   organized meeting that's being held?

1    A.   Very rarely.

2    Q.   What about Mayor Suarez?

3    A.   I do not see him.

4    Q.   Have you met him before?

5    A.   Well, I've met him, but, I mean, it's been a

6 while since we have actually interacted.

7    Q.   Does he have any interaction with your role as

8 the City Clerk?

9    A.   Well, the Mayor can veto City Commission

10 legislation.  So, essentially, I do work with the

11 Mayor's Office to ensure that we take up what's known as

12 a Mayor Signature Report.  So any legislation that's

13 subject to veto by the Mayor, we put it in a report.

14 We'll essentially -- we take it to his chief of staff,

15 not to the Mayor personally, but essentially we do have

16 a relationship with the Mayor's Office when it comes to

17 his Mayor veto authority.

18    Q.   Do you know Miguel De Grandy?

19    A.   Yes.

20    Q.   How long have you known him?

21    A.   I would say, since I became City Clerk, 2013,

22 when he helped us with a redistricting back then.

23    Q.   Do you have a relationship with him, outside of

24 the context of redistricting?

25    A.   No.

1    Q.   How would you describe your relationship with

2    him over the years?

3    A.   Just professional.  If he needed something from

4    the Clerk's Office, again, related to legislation or

5    minutes or so forth or public notices, that was the

6    extent of it.

7    Q.   Are you the person he would come to if he needs

8    information in his work consulting for the City to do

9    the maps?

10   A.   No, not to do the maps, but if he needed,

11   maybe, historical information, such as the legislation

12   that the Commission passed when it came to the

13   redistricting back in 2013, the maps that were produced.

14   I don't produce any maps.  That's usually done by -- I

15   don't know, I think it's done by the GIS Department, but

16   I'm not sure who, but I would provide him more with

17   historical documents.

18   Q.   Are there other departments within the City of

19   Miami government that you interact with on a day-to-day

20   basis?

21   A.   On a day-to-day basis?  Yes.

22   Q.   What's the main other -- outside of the City

23   Clerk's Office, what is the main other organization you

24   work with in the City of Miami?

25   A.   It really depends on, day-to-day, what we're

1   working on.  It could be someone who needs an agreement

2   attested from the Department of Real Estate and Asset

3   Management.  It could be the City Attorney's Office that

4   needs us to unlock a file, so they can make some kind of

5   change, maybe to a piece of legislation that had to do

6   with amendments.  It could come from the Hearing Board's

7   Office, when they're sending us information for -- a

8   public notice pertaining to a lower board.  It really

9   just changes every day.

10       Q.   Do you work at all with staff for the

11   individual Commissioners?

12       A.   Yes.

13       Q.   Are they considered like colleagues that you

14   work with on a regular basis?

15       A.   Colleagues, yes.  Not in a daily basis.  Again,

16   only when they need something from the Clerk's Office.

17       Q.   Okay.  Do you know Stephen Cody?

18       A.   Yes.  Yes.  I had worked with him, with Mr. De

19   Grandy, back in 2013, and then for this latest

20   redistricting.

21       Q.   How has it been working with him, in your

22   experience?

23       A.   We've always had a professional relationship.

24       Q.   And do you know Miami-Dade County Supervisor of

25   Election Christina White?

```
 1        A.    Yes.

 2        Q.    How long have you known her?

 3        A.    Since, at the very least, 2013.

 4        Q.    Is that when she began as the --

 5        A.    I don't remember when --

 6        Q.    That's when you became the Clerk?

 7        A.    Yes.

 8        Q.    Okay.  Is she the only Supervisor of Elections

 9   you've worked with?

10        A.    I believe so.  I remember -- so, I apologize, I

11   think it was Penny, but I think I worked with her more

12   as an Assistant City Clerk, if I remember correctly.

13   That's going way far back.  I'm sorry, I don't remember

14   her actual -- her official name, but I just remember

15   Penny, and then primarily working with Christina.

16        Q.    Do you know when Christina White's term is up

17   as Supervisor of Elections?

18        A.    Well, it's my understanding that there's going

19   to be a requirement that the Sheriff's position -- well,

20   I guess -- I was going to say, Sheriff -- the Sheriff's

21   position, the Supervisor of Elections, will now be

22   elected, and I think that's starting in 2024, I believe.

23        Q.    So that would be on the Fall 2024 election?

24        A.    It's my understanding.

25        Q.    But that's run by the County?
```

*Bailey & Sanchez Court Reporting, Inc.*

1      A.   Correct.

2      Q.   Do you have any role in how the County runs

3   their elections, outside of the City --

4      A.   No.

5      Q.   Do you know -- I'm going to go through a list

6   of the Plaintiffs in this case and just ask you if you

7   know them.  Do you Daniela Pierre?

8      A.   The name doesn't sound familiar, but if I saw

9   the face, it's possible.  I'm sorry, I didn't mean --

10  you see a lot of people in the City.

11     Q.   No, I know.  I mean, if you don't them

12  personally, that's what I am trying to find out.

13     A.   Oh, okay, personally.  Got it.

14     Q.   What about Harold Ford?

15     A.   No.

16     Q.   Caroline Donaldson?

17     A.   No.

18     Q.   The Revered Nathaniel Robinson?

19     A.   No.  I mean, he's been at City Commission

20  meetings.

21     Q.   You recognize him from the Commission?

22     A.   Yes.

23     Q.   But you don't have an outside relationship with

24  him?

25     A.   No.

```
 1        Q.   What about Clarice Cooper?

 2        A.   No.

 3        Q.   What about Steven Miro?

 4        A.   I know him, from when he worked for

 5   Commissioner Carollo, in his professional capacity, but

 6   not outside of work, no.

 7        Q.   Yanelis Valdes?

 8        A.   No.

 9        Q.   Jared Johnson?

10        A.   No.

11        Q.   Rebecca Pelham?

12        A.   No.

13        Q.   Alexander Contreras?

14        A.   No.

15        Q.   So let's go to Topic 1.

16        A.   Okay.

17        Q.   Can you read Topic 1 off of Plaintiffs' Exhibit

18   Number 7?

19        A.   "The administration of City of Miami elections,

20   including the cost and burden of holding special

21   elections."

22        Q.   So how often does the City of Miami hold

23   elections?

24        A.   Well, ours is on an odd year election cycle

25   every two years.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   Do you ever hold even year elections?

 2        A.   Only unless it's a special election, and before

 3   -- I just want to make sure, so we're just kind of

 4   speaking from the same page, when you talk about a

 5   special election versus a general election, and just

 6   bear with me, so I don't bore you too much, but pursuant

 7   to the Charter, when there's a vacancy for the Office of

 8   the Mayor or a City Commissioner, the Commission has two

 9   options.   One, they can either appoint or they can hold

10   a special election.

11        A special election is different from our

12   regularly scheduled general municipal elections, because

13   a special election has a shorter qualifying period, five

14   days, and there's no runoff.

15        And so, with our general municipal elections,

16   when they're held, you know, every two years, on the odd

17   year election cycle, there's almost a three-week

18   qualifying period, and then there's a runoff.   So, in a

19   special election, it's a plurality vote, but in a

20   general election, you have to get fifty percent plus

21   one.   If you don't, then it goes to a runoff.

22        So I just want to kind of make sure we're on

23   the same page, when we start talking about special

24   versus general municipal elections, so that, you know,

25   you understand that there is a difference, at least when
```

```
 1  it comes to the Charter, in that particular scenario.
 2  There is a difference between the type of election.
 3       Q.   For a general election, are they always held in
 4  November?
 5       A.   Of the odd year, yes.
 6       Q.   Is there a primary or other preliminary
 7  election before that?
 8       A.   We do not have a primary.
 9       Q.   So everyone runs, and, then, depending on if
10  one person gets a majority, they get the seat, and if
11  there's two, then they run in a runoff afterwards?
12       A.   Yes.
13       Q.   Is the runoff considered part of the general
14  election?
15       A.   Yes.
16       Q.   It's not like -- like you said before, it's not
17  considered a special election?
18       A.   No.
19       Q.   And a special election -- in order to hold a
20  special election, does the City Commission have to
21  declare it?
22       A.   Yes.
23       Q.   Is it done through a Resolution?
24       A.   Yes.
25       Q.   How often does that happen, would you say?
```

```
 1        A.    Well, from the standpoint of when there has

 2    been a vacancy, not very often.   Recently, you know,

 3    with the District 2 Commissioner, that was something

 4    unique, because when the District 5 Commissioner had

 5    vacated his seat, when he was elected as County

 6    Commissioner -- a Miami-Dade County Commissioner, the

 7    Commission decided to appoint, and so we didn't have to

 8    have a special election for that vacancy, but for the

 9    District 2 vacancy, they decided that they didn't want

10    to make an appointment, so they scheduled a special

11    election, and so that was the most recent special

12    election we've had, which was held in February of this

13    year.

14        Q.    Do you remember when the previous special

15    election, before that one, was held?

16        A.    It would have been over a decade ago, I'm

17    assuming, because I'm trying to -- I think it would have

18    been with Commissioner Spence-Jones, but that would have

19    been around, wow, 2007, maybe.   2007, I'm thinking.

20    It's been a while.   I'm sorry, so I just don't remember

21    the exact year.

22        Q.    Would you say that it's a rare occurrence to

23    hold a special election in Miami for the City?

24        A.    Yes.   For a vacancy, yes.   Now, we do have

25    special elections for ballot questions, but that doesn't
```

1    involve, you know, a qualifying period, there isn't a

2    vote for an actual candidate to fill, you know, a City

3    Commission seat, so that is something entirely

4    different, but we do have special elections for Charter

5    amendment -- for any kind of ballot question.

6        Q.   Do you ever have the Charter amendment or

7    ballot questions on the regular general election?

8        A.   Yes.  For a City of Miami odd year election

9    cycle, yes.

10       Q.   So how do you determine whether the ballot

11   initiative would be on the regular general election

12   ballot versus on a special election ballot?

13       A.   Well, again, the special election ballot is

14   something entirely different, you know, from the

15   standpoint of the purpose that it's being called, and so

16   let's focus on the general municipal election.  You can

17   have a ballot question tied in with that, simply because

18   it's an election that you have already scheduled, and

19   so -- essentially, there's nothing, I guess you're

20   saying, preventing you from having a ballot question on

21   a general municipal election?  I'm just trying to

22   understand the question a little better.  Maybe I'm

23   not --

24       Q.   Is there a regular schedule -- for example,

25   let's say that every ballot initiative that needs to go

```
 1   on a ballot gets held for the next general election, or
 2   is it, let's say, oh, we don't want to wait six months,
 3   let's go ahead and have the election now?  How is
 4   that --
 5        A.  Oh, I don't believe we could call a special
 6   election just for a ballot question.
 7        Q.  So when would there be a special election for a
 8   ballot question?
 9        A.  It would be held either during our normal
10   election year -- you know, odd year election year cycle
11   in November or we would try and piggyback off of the
12   County during an even year election.
13            Sorry, is that making sense?  I apologize.
14        Q.  I'm curious -- I'm trying to figure out, how is
15   the choice made, whether or not to just be part of the
16   regular general election versus making a special
17   election for the ballot question.
18        A.  We could, essentially, work, I think, with the
19   Elections Department to request that.  If we wanted to
20   have a City-wide special election for a ballot question,
21   we would need to work with the Elections Department, to
22   see if they would be able to assist us with a City-wide,
23   you know, special election, just for the ballot
24   question.
25            I think I understand it a little bit better
```

```
 1   now.  So, I think, yeah, we would work with the County.
 2   If we wanted to have a stand-alone election for a ballot
 3   question, then we would need to work with the County to
 4   ensure that they could assist us with a City-wide
 5   election for that ballot question.
 6        Q.   Are there any ballot questions on the November
 7   2023 ballot this year?
 8        A.   No.
 9        Q.   Is it too late for them to be added?
10        A.   Yes.
11        Q.   Is there a deadline for when you would have to
12   have a ballot question presented in order to get on the
13   regular election ballot?
14        A.   Yes.  The County usually provides us with those
15   deadlines and that's what we work with.
16        Q.   The deadline is set by the County?
17        A.   Yes.
18        Q.   Does the City have any influence, like if you
19   said, "Hey, we need an extra week, so push this back"?
20        A.   Potentially.  It just depends on, you know, the
21   length of the ballot, maybe how many elections that they
22   have going on at the same time, because I know they
23   provide election services to all municipalities in
24   Miami-Dade County, but I think we could probably get a
25   little extra time, but they do have their own
```

```
 1    requirements when it comes to being able to code the
 2    ballot, to be able to draft the ballot and then to be
 3    able to get it to the printers, to ensure that, you
 4    know, we meet their deadlines.
 5         Q.   What was the deadline for this year for that?
 6         A.   I don't remember, off the top of my head.
 7         Q.   Was there any plans to have ballot initiatives
 8    this year that didn't go through?
 9         A.   No, there was no -- there were no ballot
10    questions planned for this November election.
11         Q.   Did you do any work related to ballot
12    initiative elections during this calendar year?
13         A.   During this calendar year, no.
14         Q.   What about 2022?
15         A.   I do not remember any in 2022, no.
16         Q.   Are you aware of any that are in the works for
17    the future?
18         A.   Not at this time, no.
19         Q.   So, going back to the election, not the ballet
20    initiatives, but individual representative elections,
21    how many elected positions are in the City of Miami?
22         A.   Six.
23         Q.   Is that the five Commission seats, plus the
24    Mayor?
25         A.   Yes.
```

```
 1         Q.   Are there any other seats that are elected
 2    within the City of Miami government?
 3         A.   Elected by the voters?
 4         Q.   Yes.
 5         A.   I'm only aware of the six.
 6         Q.   Is there any plans, that you're aware of, to
 7    add additional seats?  Like, for example, we talked
 8    about the Supervisor of Elections and the Sheriff
 9    switching over for the County.  Is there any similar
10    plans in the City to add additional elective seats?
11         A.   I'm not aware of any.
12         Q.   Are there term limits for the number of terms
13    you can serve?
14         A.   Yes.
15         Q.   Is that true, both, for Mayor and Commissioner?
16         A.   Yes.
17         Q.   What are those term limits?
18         A.   Two consecutive four-year terms.
19         Q.   What if you serve for four years, take four
20    years off, and then run again, does that still qualify
21    for term limits or could you serve two consecutive years
22    after?
23         A.   It's my understanding you can serve two
24    conservative years after, as long as you have that gap.
25    That's my understanding.
```

1      Q.   So, under your understanding, one person could

2  hold two consecutive seats, take four years off, then

3  run and hold two more consecutive four-year seats and

4  then take four years off?

5      A.   My apologies, they serve two consecutive terms,

6  they take four years off, and then they run again?  Yes,

7  that's would be my understanding.

8      Q.   So it's only you're prevented from having a

9  third consecutive term?

10      A.   That is my understanding, yes.

11      Q.   Are there any rules related to, if someone

12  joins in the middle of a term, how they count that?

13      A.   It's my understanding it's not applied -- it's

14  not a full consecutive term.  So we'll take Commissioner

15  Reyes, Commissioner Manolo Reyes.  I can't remember when

16  he -- it was a special election, and this was years ago,

17  to fill a vacant seat, and he was able to serve two

18  years of Mayor Suarez's four-year term.  Those two years

19  were not considered a four-year term, and so he gets to

20  serve two consecutive four-year terms after that two

21  years, if that's making sense.

22      Q.   Is that the current status for Commissioner

23  Reyes?  The current consecutive terms that he's on right

24  now are the terms where he started replacing Mayor

25  Suarez?

```
 1        A.    So he served two years of the remaining
 2   four-year term of Commissioner Suarez, at the time,
 3   before he was elected Mayor, and then he served four
 4   years.   He served one consecutive term.   Now he's up for
 5   re-election for his final -- his second consecutive
 6   term.   So he will be term limited out in 2027.
 7        Q.    What about Commissioner Carollo, what is his
 8   status, as far as terms and term limits?
 9        A.    He will be term limited in 2025.   That will be
10   two full four-year consecutive terms.
11        Q.    And what about Commissioner Sabina Covo of
12   District 2?
13        A.    Well, she gets two four-year consecutive terms,
14   because the special election that she was elected in
15   allowed her to serve just the remaining term of
16   Commissioner Russell's four-year term.   So she will be
17   able to serve for two consecutive four-year terms.
18        Q.    And what is the status of Commissioner King?
19        A.    She's currently serving her first term.   So she
20   would be allowed to serve another four-year consecutive
21   term.
22        Q.    And she's not up for election this year; is
23   that correct?
24        A.    No.
25        Q.    So she's halfway through her first term?
```

*Bailey & Sanchez Court Reporting, Inc.*

1   A.   Yes.  Yes.

2   Q.   Are you aware if the City of Miami has

3   considered amending the Charter to change the length of

4   the term?

5   A.   I'm not aware.

6   Q.   Or to add -- you know, let's say, repeal the

7   term limits or make it so you can serve longer periods

8   of time?

9   A.   I'm not aware, no.

10   Q.   Have you ever had any conversations within the

11   City of Miami about the possibility of that?

12   A.   No.

13   Q.   Has the City of Miami ever considered switching

14   from odd number years to even number years for

15   elections?

16   A.   Well over a decade ago, there was a discussion,

17   but it didn't move beyond just a discussion, and I

18   wasn't the City Clerk at the time.  I just remember

19   that, because I believe I was Assistant City Clerk at

20   the time.

21   Q.   Do you know why it didn't move forward?

22   A.   I don't remember, no.

23   Q.   Are you aware of any analyses of the benefits

24   comparatively between having odd and even year

25   elections?

1        A.   I believe there was some information associated

2   with the discussion, like a backup document, but I don't

3   remember the specifics.

4        Q.   Do you have a personal view?

5        A.   I do not, no.  That's up to the voters.

6        Q.   Does it ever cause issues, where, like in your

7   job, you say, maybe it would be easier if this was on an

8   even number year, instead of odd number year?

9        A.   Again, that's the will of the Commission and

10   it's up to the voters to decide what type of election

11   cycle they'd like for us to have.

12        Q.   So the law tells you what the election

13   structure is and then you execute it?

14        A.   Yes.

15        Q.   Have you ever had any issues with that or like

16   situations --

17        A.   No.

18        Q.   -- where you say, "We can't do this"?

19        A.   No, again, because I think we've got the best

20   elections department in the entire state.

21        Q.   Does the City ever hold recall elections?

22        A.   Well, we've never held a recall election.  I

23   know that a recall was initiated -- I can't remember

24   when -- maybe three years ago, but it didn't meet the

25   threshold needed to move to an actual recall election.

*Bailey & Sanchez Court Reporting, Inc.*

1   Q.   What is that threshold?

2   A.   I'd have to look at the Charter.  I don't

3   remember off the top of my head.  It's kind of detailed.

4   Q.   Is it something that you deal with on any

5   frequency?

6   A.   No.

7   Q.   If a recall was actually organized and

8   happened, was successful, would that be a surprise?

9   A.   No.  I mean, if they were able to meet the

10  threshold in the period to hold a recall election, then

11  that's what we would do.

12  Q.   Are you aware of the City evaluating the

13  possibility of any recall elections over recent years?

14  A.   No.

15  Q.   Has anyone from the public ever communicated to

16  the City -- you know, threatened to organize a recall,

17  if you don't, say, support some position in the

18  government?

19  A.   Not that I'm aware of.

20  Q.   Would you classify the threat of a recall as a,

21  you know, political tactic that is used in the City,

22  that's relevant to what happens in the City?

23  A.   I think it's part of a democracy.

24  Q.   But it's not one that is like actively going on

25  in the City of Miami?

1      A.   No.

2      Q.   And going back to like the Charter amendments,

3  the non-candidate ballots, can you describe the process

4  for how a Charter amendment gets on the ballot?

5      A.   Well, first, we need to request permission from

6  the County, from the Miami-Dade County Elections

7  Department, if we could have an election, and it would

8  be called a special election, to hold a City-wide -- a

9  City-wide special election for a Charter amendment

10 question or a ballot question.  Once we get approval

11 from the Supervisor of Elections, then the Commission

12 essentially would pass legislation indicating what the

13 question entails, the language that makes up the

14 question, and essentially assigning a date for that

15 special election.

16     Q.   When you testified just a moment ago, you said

17 that the County Supervisor of Elections approves it.

18     A.   Well, no, the date.

19     Q.   The date?

20     A.   Only the date, not the legislation.

21     Q.   What triggers going to the County Supervisor of

22 Elections to ask for the date?

23     A.   I believe it's a State Statute.  I don't

24 remember the exact State Statute, but municipalities

25 need to request from the Supervisor of Elections

1    permission to hold a special election that's not -- you

2    know, it's not piggybacking off of their own election.

3         Q.   Does the City Commission pass through

4    Resolution potential ballot initiatives on their own?

5    Like they say, "We want to put this on the ballot, we're

6    going to pass this," and then put it forward?

7         A.   No.  I always ask the Supervisor of Elections

8    first, to have that approval.

9         Q.   Do you know where the initiative comes from in

10   the beginning?  Let's say no one has heard anything

11   about a potential ballot initiative.  Who is the first

12   potential step or person that brings it up?

13        A.   I believe they would -- they would have a

14   discussion item at a City Commission meeting, to see if

15   there is the will to have a ballot question presented to

16   the voters, and, then, the Commission would then direct

17   the City Attorney to draft that ballot question.  Then

18   it would have to come back to the Commission for their

19   approval.

20        Q.   Do the voters have the ability to petition for

21   that on their own, separate from the Commission?

22        A.   Yes.  It's in the Charter, and I just don't

23   remember it verbatim.

24        Q.   Would you say it's more common for the City

25   Commission to instigate the ballot initiative or for the

```
 1   public to petition the process to do that?
 2        A.   The City Commission.
 3        Q.   How much space does it take on a ballot to put
 4   a ballot initiative?
 5        A.   I don't know how much space.  Maybe an eighth
 6   of a page, not -- you know, it depends on the length, I
 7   guess, of the question.  It could be -- not a quarter
 8   page, but -- the way that the ballot is set up, there's
 9   two columns.  So you're not taking up like a full page
10   or a half a page.  It's more like, we'll say, a quarter
11   of a page.
12        Q.   Are you involved in the placement of the City's
13   ballot questions on the ballot?
14        A.   No.  That's done by the Elections Department.
15   Basically, they will code it.  They format it.  They do
16   everything that they need to ensure that the ballot
17   meets the specifications of State Statute, and, you
18   know, that they can use it with their voting equipment.
19        Q.   Are you responsible for presenting the
20   information to the County that they use to then put the
21   ballot through?
22        A.   Yes.
23        Q.   That is your responsibility?
24        A.   Yes.
25        Q.   Is that also true for the candidate elections?
```

1      A.    Yes.   I provide the list of candidates to the

2  County Elections Department.

3      Q.    Is the list of the candidates and the list of

4  ballot initiatives done separately?

5      A.    No.   Basically, the candidates will come first,

6  and then the questions would come afterward.   And I

7  believe that's pursuant to State Statute or maybe the

8  Florida Administrative Code, one or the other, but

9  candidates always come first.

10      Q.    Do you present all of that information at the

11  time to the County?   Do you say, "Here's what we need on

12  this ballot, here's everything"?

13      A.    Not necessarily at one time.   We may have the

14  ballot question first, so that could be sent to them, so

15  that they know exactly -- so they can start the

16  translation, as well.   My apologies, the Elections

17  Department has their own in-house Spanish and Creole

18  interpreters.   So it allows them to start working on the

19  translation, and I guess, it's an idea as to how they

20  may need to format the ballot, and, then, because our

21  qualifying period is so late within the elections

22  process, they may get the ballot question first and we

23  send them the candidates later.

24      Q.    So would you say that the practice you have is

25  to send something over when it's ready for them to

1    consider?

2        A.   Yes.

3        Q.   And the earlier, the better?

4        A.   Yes.

5        Q.   Does the City do anything related to the

6    translations into Spanish or Creole?

7        A.   No.   We leave that to the Elections Department.

8        Q.   Is all of the City business done in English?

9        A.   City business?

10       Q.   I'm sorry, I'll withdraw that.

11            The information related to elections, such as

12   the names of the candidates and the text of the ballot

13   initiatives or Charter amendments, are those all

14   presented in English only?

15       A.   No, English, Spanish and Haitian Creole.

16       Q.   That's on the ballot?

17       A.   Yes.

18       Q.   What does the City present to the County?

19       A.   Oh, I'm sorry.  My apologies.  English.

20       Q.   When the City is considering language for a

21   ballot initiative, do they consider how it will appear

22   in the translated languages before they come up with the

23   final language?

24       A.   I'm not involved in that part of the process,

25   so I don't know.

```
1       Q.   Do you have any role in the translation into
2    other languages?
3       A.   No.
4       Q.   That's all done by the County?
5       A.   Yes.
6       Q.   Has there ever been additional languages to the
7    ballot?
8       A.   No.
9       Q.   Or removing languages from the ballot?
10      A.   No.
11      Q.   Is that any aspect of your job?
12      A.   No.  If someone wanted to have an additional
13   language, and if that's what was required, then that's
14   what we'd do.
15      Q.   Is there a specific amount of space that the
16   City has access to on the County's ballot?
17      A.   No.  I think we would just -- if it were to
18   move to a second page -- let's say, a hypothetical,
19   where the page -- where the ballot is one page, and,
20   then, because of our ballot question, it moves us into
21   two pages, we would just have to pay for the extra cost
22   associated with the ballot --
23      Q.   How is the cost --
24      A.   -- for the length of the ballot, I apologize.
25      Q.   How is that cost determined?
```

*Bailey & Sanchez Court Reporting, Inc.*

1     A.   By the Elections Department.

2     Q.   Does the standard agreement say, oh, if it's

3  one page, it's $10, and if it's two pages, it's $20?

4     A.   You know, there's no standard agreement as to

5  like what the price is.  I think it has a lot to do with

6  how much it takes up on the second page, if there's more

7  translation required.  So I think there are many

8  different variables, I think, that go into the overall

9  cost.

10    Q.   At what point is the cost for a specific ballot

11 determined?

12    A.   That's done by the Elections Department.  We

13 usually will get an estimate before the election, and

14 then we'll get a final invoice afterwards.

15    Q.   Is there ever any discussion within the City of

16 Miami that we need to limit the amount of things we put

17 on the ballot because we don't want to go over a certain

18 budget price?

19    A.   No.

20    Q.   Is there any concern about the cost of how much

21 it will be, on the ballot, when you're determining what

22 goes on the ballot?

23    A.   That would be up to the Commissioners.  So I'm

24 not involved in that part of the discussion.  I would

25 let them know, if we already have a full page, and this

1  could be leading to a second page, you know, we would

2  certainly, you know, share that information with them,

3  and it would be up to them to decide whether or not the

4  extra cost would be something that they'd want to incur.

5      Q.   Has anyone within the City ever asked you to

6  reduce the cost of elections?

7      A.   No.

8      Q.   Do you think that would be necessary?

9      A.   Again, that's the will of the Commission.

10     Q.   Do you think that the City gets a good deal on

11 the prices it pays to the County on the elections?

12     A.   Pennies on the dollar.

13     Q.   Are there any other options, other than going

14 through the County?

15     A.   I do not believe so.

16     Q.   Is it statutorily required that the City run

17 their elections through the County?

18     A.   No.   It's just that they are the most

19 professional, the most efficient.   They have the

20 equipment, the resources, the personnel, the logistics.

21 I just couldn't imagine not, you know, using them for an

22 election.

23     Q.   Has the City ever discussed running its own

24 elections separately?

25     A.   No.

1      Q.   Do you know if they've done that in the past?

2      A.   To the best of my knowledge, no.

3      Q.   Do you think it would be a good idea to do

4   that?

5      A.   No.

6      Q.   Has the County ever told you they don't want to

7   do the City elections?

8      A.   They've never told us, no, but, depending on

9   the election year -- so if we were doing something in an

10  even year election cycle, they would most likely want us

11  to piggyback off of the already scheduled elections.

12  There's one in March -- like let's just take 2024.

13  There's one in March.  There's one in August.  There's

14  one in November.  I do not believe they would want us to

15  have a stand-alone special election, when there's

16  already three elections scheduled for next year.

17          MS. MCNAMARA:  Okay.  Do we want to take a

18      break?

19          MR. JOHNSON:  Sure.

20          (Short recess taken.)

21  BY MS. MCNAMARA:

22      Q.   So why are there three elections scheduled for

23  next year with the County?

24      A.   You know, again, those aren't my elections, so

25  I'm assuming it's pursuant to State Statute and Federal

*Bailey & Sanchez Court Reporting, Inc.*

1   Law.

2       Q.   Does it vary year to year?  Are you aware of

3   how the County sets up its election timelines?

4       A.   No, I'm not.

5       Q.   So how does the City prepare to hold an

6   election?  Like what is the beginning of the process for

7   the general election?

8       A.   So we will request an estimate from the

9   Elections Department well in advance -- most likely, a

10  year in advance, so we can ensure that it's a part of

11  our budget for that upcoming fiscal year.  So I'll have

12  the cost associated with the election.  And, then,

13  essentially -- case in point, we'll take 2023, the

14  Commission, around April, will pass a Resolution

15  basically memorializing that we're having a general

16  municipal election for whatever the offices are, and

17  that's something that I transmit to the Miami-Dade

18  County Elections Department.

19      Q.   If that process didn't happen, would there not

20  be a general municipal election next year?

21      A.   I don't know the answer to that question.  I

22  think that would have to be the City Attorney's Office,

23  to decide, you know, whether or not the election could

24  be held.

25      Q.   Has there been a planned odd number year when

*Bailey & Sanchez Court Reporting, Inc.*

1  you thought there would be a general municipal election
2  and it didn't happen?

3      A.  No.  We've always had our elections when they
4  were supposed to be scheduled.

5      Q.  How often are there runoffs?

6      A.  It really varies.  Some elections -- I don't
7  think we had -- I don't think we had a runoff in 2020.
8  I don't remember.  But it varies.  It varies.  I think,
9  primarily, depending on the number of candidates on the
10  ballot.  I think that's the driver.

11      Q.  Does holding a runoff increase the cost of the
12  election?

13      A.  Yes.

14      Q.  Do you pay separately for the runoff
15  afterwards?

16      A.  The County Elections Department will include it
17  all in the final invoice.

18      Q.  How often do they invoice?

19      A.  Just after the election cycle.

20      Q.  So, it's like, they don't say, you know, like
21  every month you pay a certain amount of money spread
22  out --

23      A.  No.

24      Q.  It's not like you have a subscription?

25      A.  No.

```
 1        Q.   It's a matter of, the election is run, and,
 2   then, at the end of the election cycle, they say, this
 3   how much it cost?
 4        A.   Yes.
 5        Q.   And they include the runoff cost with the
 6   general election cost?
 7        A.   Yes.   If I remember correctly, yes.
 8        Q.   Do they break it down?
 9        A.   They do.   They have it broken down in certain
10   categories, such as when it comes to the personnel --
11   personnel associated with the polling locations, when it
12   comes to early voting, when it comes to their own
13   election staff that's being used to assist, when it
14   comes to logistics.   They have to either have their own
15   trucks or rent trucks to take the voting equipment to
16   the various polling locations.
17             There is a cost associated with the coding of
18   the ballot, printing of the ballot.   There's a cost
19   associated with vote by mail, when it comes to postage
20   that the City pays.   So it's broken down.
21        Q.   Who is responsible for overseeing that process
22   on the City's side, as far as paying the invoices and
23   reviewing them?
24        A.   The Finance Department.
25        Q.   Do they seek input from you?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.    No.   We send them the invoice and it's simply
 2   paid.
 3        Q.    Is there ever any negotiation, about the amount
 4   on the invoice, after it's been sent?
 5        A.    No.   I think we're all very aware that we're
 6   getting the better end of the deal.   I'm just being
 7   honest.
 8        Q.    Does the County ever ask, hey, can we increase
 9   the price?
10        A.    Surprisingly not.
11        Q.    We don't want to give them any ideas, if they
12   read this transcript and say, wait a minute.
13           When is the money allocated in the budget for
14   an election?
15        A.    It's usually done for that -- well, from what I
16   understand, it's usually done for that fiscal year.   So
17   we recently passed the budget, on October 1st -- well,
18   September 28th, but it goes into effect October 1st, and
19   that has the built-in estimated cost, you know, for the
20   November election.
21        Q.    Does it ever diverge significantly from the
22   budgeted cost?
23        A.    No.
24        Q.    Is it a significant line item, that you're
25   aware of, within the budget?
```

```
 1        A.   It's my understanding, and the CFO can correct
 2    me if I'm wrong, but I think we have a billion dollar
 3    budget, so I don't think it's that much overall.
 4        Q.   Who would you say is the person within the City
 5    who is responsible for overseeing the City's elections?
 6        A.   It would be the City Clerk, me.
 7        Q.   That's you?
 8        A.   Yes.
 9        Q.   Is there anyone else, who you would say is also
10    responsible, beyond you?
11        A.   No.  I am essentially the person who conducts
12    and certifies the election.
13        Q.   Do you consult with the City Manager's Office
14    on that?
15        A.   Regarding the election?
16        Q.   Yes.
17        A.   If I need assistance with polling locations or
18    early voting sites or parking, but not when it comes to
19    the actual election itself, if you know what I mean,
20    from the standpoint of like qualifying, from what we
21    send to the Elections Department as it relates to the
22    ballot, but there may be a supporting role, but more,
23    again, from the sense of what we may need for a
24    particular location, if we need some assistance with
25    parking, things like that.
```

```
 1        Q.   Do the individual Commissioners or the
 2   Commission as a body have a role in the election?  Do
 3   you interact with them, as far as that?
 4        A.   Other than just the passage of the Resolution,
 5   no.
 6        Q.   What about the City Attorney's Office?
 7        A.   Well, they assist us with the drafting of the
 8   legislation to make sure that it's legally sufficient,
 9   and if we have any questions, I guess, regarding the
10   State Statute or something, we would ask the City
11   Attorney's Office, but that's only if we need them to
12   answer certain questions.
13        Q.   So your department controls the process?
14        A.   Yes.
15        Q.   Are you involved in the implementation of a new
16   map after redistricting?
17        A.   The implementation?  No.  And, I guess, what I
18   mean by that is that, if we're talking about
19   implementation from the standpoint of like the zoning
20   program that the City uses, and any other resources,
21   like programs and so forth, no, that would be a
22   different department.  I'm simply really just a
23   repository for the legislation that would have adopted
24   the redistricting and the maps associated with that
25   legislation.  I would be the repository for that
```

*Bailey & Sanchez Court Reporting, Inc.*

1    information.

2         Q.    Does it matter to you, for your job, what the

3    map actually looks like?

4         A.    No.

5         Q.    Are you involved in precincting?

6         A.    No.

7         Q.    Do you get that information from others within

8    the City?

9         A.    No.

10        Q.    Does it come from the County?

11        A.    Yes.

12        Q.    Does the City have any influence on how

13   reprecincting done?

14        A.    No.

15        Q.    Are there additional costs charged by the

16   County related to implementing the new map?

17        A.    Any costs to implement the new map?  I mean,

18   they send out the voter registration cards.  They send

19   out the updated voter registration cards.  They take

20   care of that cost.  I don't know of any cost that the

21   City incurs, when it comes to the implementation of the

22   new map.  Again, talking about the voter registration

23   cards, they have to update their voter information

24   systems, but they don't charge us for that.

25        Q.    So, like you said, the County does not charge

```
 1   the City for the costs of being prepared to run

 2   elections with the new map?

 3        A.   No.

 4        Q.   The only cost is related to the ballot?

 5        A.   Yes.

 6        Q.   Are you aware of requirements of reprecincting,

 7   like whether they have to do it or not --

 8        A.   Yeah, I'm not familiar with that.  No.

 9        Q.   Would you say that you have no involvement in

10   the precinct level of work?

11        A.   Yes.

12        Q.   Has anyone ever suggested that you should be

13   involved in that?

14        A.   No.

15        Q.   Do you want to be involved in that?

16        A.   No.

17        Q.   Is there a time line for when the map gets put

18   into place, as opposed to when you submit the actual

19   ballot contents?

20             MR. JOHNSON:  Objection to form.

21   BY MS. MCNAMARA:

22        Q.   You can answer.  It's a pretty weird question,

23   but --

24        A.   So if you could repeat the question, I'm sorry.

25        Q.   Yeah.  I'll pull it back.
```

```
1              What is the time line for beginning to be able
2    to send materials to the County for an upcoming
3    election?
4         A.   That's determined by the Elections
5    Department -- they would let us know -- because it takes
6    them time to re-tool their systems, so that whatever the
7    new map entails, they have the right voter information
8    for those voters.  So I think they try and give us a
9    deadline as to when something of that nature should be
10   done, so that they have enough time to get everything in
11   place, so that we can, you know, carry out our election
12   like we normally would.
13        Q.   Does that deadline change year to year or
14   election to election?
15        A.   When it comes to a new map, we only do that
16   every ten years, so it's not very common.
17        Q.   Is there like, let's say, August 1st, for a
18   November election -- is there a general time, like, say,
19   August 1st or September 1st or something, that is kind
20   of the known target of this is the point in which
21   everything needs to be finalized?
22        A.   The Miami-Dade Elections Department will
23   communicate that to us -- to the City, I'm sorry.
24        Q.   At the beginning of the calendar year, let's
25   say, on January 1st, 2023, do you have a sense of when
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1   the County will communicate that the deadline -- when

2   the deadline is?

3            MR. JOHNSON:  Objection, predicate.

4            THE WITNESS:  Deadline for what, for a

5        ballot question or election?

6   BY MS. MCNAMARA:

7        Q.   What is the deadline this year to put materials

8   on the November 2023 election ballot?

9        A.   They gave us a deadline.  I just don't remember

10  what the date was.  But the Supervisor of Elections did

11  give us that deadline that we would need to meet, when

12  it came to placing a ballot question on our general

13  municipal  election.  I just don't remember the exact

14  date.

15       Q.   Do you know when they gave you the deadline?

16       A.   Oh, yes, earlier in the year.

17       Q.   Is it the first quarter of the year?

18       A.   I don't remember.  I know it was very early on,

19  though.  We had plenty of advanced notice as to when.

20       Q.   Are there other years in which you felt you did

21  not have plenty of advance notice?

22       A.   No.  They always give us advance notice.

23       Q.   Do you ever have any concerns that you're

24  running out of time to prepare the materials that you

25  need to send to the County for the election?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.    I've never had that issue, no.

 2        Q.    Does that vary when it's a special election?

 3        A.    So are we talking -- and my apologies -- are we

 4   talking about a special election, where we're

 5   piggybacking off of our general municipal election or

 6   piggybacking off of maybe a County-wide election?  I've

 7   never had time constraints when it has involved a ballot

 8   question being placed on, whether it's our election or

 9   piggybacking off of a County-wide election.

10        Q.    Do you recall there was a special election held

11   earlier this year for District 2?

12        A.    Right.

13        Q.    What was the time line that was available for

14   preparing the materials for the ballot for that special

15   election?

16        A.    See, in that particular case, it's very unique,

17   I don't think we would have enough time to place a

18   ballot question on a special election to fill a vacancy,

19   whether it's for the Mayor or City Commission, simply

20   because, within ten days of the vacancy occurring for

21   the Mayor -- for any elected official, within ten days,

22   the Commission either appoints or schedules a special

23   election.  And, then, after a five-day qualifying

24   period, which immediately follows the ten-day period to

25   appoint or schedule the special election, you have to
```

```
 1    have that election within the 38th or 45th day, after
 2    the fifth day of the qualifying.  So I do not believe
 3    there would be enough time to place a ballot question,
 4    on a special election, where you're filling a vacancy
 5    for an elected office.
 6        Q.   And how much time do you have to put the names
 7    of the candidates who are up for the special election
 8    positions?
 9        A.   As soon as the qualifying period is over, it
10    has to go to the Elections Department.
11        Q.   Does the City have any issues complying with
12    that timing?
13        A.   No.
14        Q.   Was it a challange this year to comply with
15    that timing on that election?
16        A.   No.
17        Q.   How much does it cost the City to run a general
18    municipal election?
19        A.   Around 900,000.
20        Q.   Is that an average amount?
21        A.   It would be an average.
22        Q.   Does it vary significantly?
23        A.   No.  And that's for City-wide.
24        Q.   And City-wide, does that mean the mayorial
25    election is going on?
```

*Bailey & Sanchez Court Reporting, Inc.*

1          A.    Yes.

2          Q.    Setting aside the ballot questions, just for

3     the candidates, are there any City-wide elected

4     positions other than the mayor?

5          A.    No.

6          Q.    All of the Commission positions, is it true

7     that only the people who live in the districts that are

8     up for election see those positions on their ballot?

9          A.    Yes.  So, again, let me make sure I understand.

10     We have one election cycle where it's District 3, 5 and

11     mayor, and, of course, that's City-wide.  So someone who

12     live in District 3 will get to vote for the Commissioner

13     in District 3 and they get to vote for the mayor.  But

14     we have another election cycle, where it's 1, 2 and 4 --

15     Districts 1, 2 and 4, my apologies, for this election

16     cycle.  And so someone who lives in District 1 will only

17     get to vote for that District 1 candidate.  They won't

18     get to vote for the District 2 or District 4 candidate.

19          Q.    So someone who lives in District 3, will they

20     have City lines on their ballot this Fall?

21          A.    No, because District 3 is not up for election

22     this year.

23          Q.    How much does it cost to run a City-wide

24     election, when the mayor election is not on the ballot,

25     so on the 1, 2 and 4?

*Bailey & Sanchez Court Reporting, Inc.*

1      A.    It's around 600,000, five to six.

2      Q.    So it's more expensive when the mayor is, also?

3      A.    Yes, because it's City-wide.

4      Q.    Is that because of the space it takes up on the

5  ballot?

6      A.    I think it's just because of the fact that you

7  have a larger number of voters participating in an

8  election.  You have more polling locations, more

9  ballots, more personnel is needed.  So it's City-wide.

10  You're not just focusing on three districts, so the cost

11  increases.

12      Q.    Can you list the costs that factor into --

13  let's pull that back.

14           What are the factors that determine the cost of

15  the election, for a general municipal election?

16      A.    There are a number of costs.  Again, we could

17  start with personnel alone, from the Elections

18  Department.  You need people to man the polling

19  locations.  You have early voting sites.  You have to --

20  some locations, I think, the Elections Department has to

21  potentially rent.  Then you're talking about the

22  voting -- us using their personnel, when it comes to

23  logic and accuracy tests, when it comes to doing the

24  tabulation, when it comes to using their trucks, you

25  know, logistically, to get the voting machines out to

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    the various precincts and polling locations.  I mean,
 2    you're increasing the number of precincts alone for a
 3    City-wide significantly.  And that's just some of the
 4    costs.  There are numerous costs involved.  It's the
 5    same cost, but just on a larger scale.
 6         Q.   Are there any fixed costs that you have to pay,
 7    regardless of the size or scope of the election?
 8         A.   Yes.  You know, the printing of the ballots,
 9    when it comes to vote by mail, postage on the ballots,
10    when it comes to election personnel working at the
11    precincts on election day, early voting and so forth,
12    you still need to have the trucks to be able to get the
13    equipment and resources to the various polling
14    locations.
15         Q.   What about if you're having a special election
16    for just one seat, how much would that cost?
17         A.   For District 2, it was around 220,000.
18         Q.   Do you know what the cost was the previous time
19    before that?
20         A.   I do not.
21         Q.   That was a decade ago, you said?
22         A.   It was a while ago.
23         Q.   Has there been any evaluation of potential
24    costs if there had been a special election for District
25    1 currently?
```

```
1        A.   No, because essentially we are just using the
2   model that we just had with District 2.  It would be
3   very similar.  We're anticipating the cost to be
4   something similar.
5        Q.   Does the cost vary depending on which district
6   it is?  Like is District 1 more expensive to run an
7   election than District 2?
8        A.   It wouldn't be significant.  If you have more
9   voters, the cost goes up a little, bit because you have
10  to print more ballots and so forth, but we're not
11  talking a significant increase.
12       Q.   So if you had a district -- setting aside what
13  the current districts are, but in the previous cycle,
14  when we went into redistricting, District 2 had more
15  population than the other districts.  So does that mean
16  that it would cost more to run an election in District
17  2, if it had more people in the population?
18       A.   It would cost more, but, again, it wouldn't be
19  a significant increase.
20       Q.   Do you have a sense of how much the
21  difference -- you said $900,000 is an entire City
22  municipal election.  How much of that would be the
23  difference of how many ballots are being sent out to
24  different districts?
25       A.   I don't have a sense of what it would cost, but
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    I know there wouldn't be a significant increase.  I just
 2    don't know what the exact amount would be or even an
 3    estimate, but it wouldn't be a significant increase.
 4         Q.    How much do you consider a significant increase
 5    to be?
 6         A.    Hundreds of thousands of dollars.
 7         Q.    So if it costs $50,000 more, would that be a
 8    significant increase?
 9         A.    No, I do not believe so.
10         Q.    But if it were $150,000 more?
11         A.    Yes.
12         Q.    Is it cheaper to hold a special election at a
13    time that the County is already holding other elections?
14         A.    Yes.
15         Q.    How much cheaper is it?
16         A.    My apologies for using this term, significantly
17    lower.  It would be significantly lower.
18         Q.    So for the 2023 District 2 special election,
19    was that the only election held for that special
20    election on the County?
21         A.    Well, that was a City of Miami election, so it
22    was a stand-alone election for the City of Miami for the
23    District 2 vacancy.  So it wasn't like we were
24    piggybacking off of the County's election.  So, like in
25    2024, and I'm just going to use that as an example, if
```

```
 1    we were to piggyback off of the August primary or the
 2    November general, then the cost would be reduced
 3    significantly, because we don't have to have our own
 4    polling locations, we'd be using the County's polling
 5    locations, we'd be using their logistics, we'd be using
 6    basically all of their resources.  What they would need
 7    to do is, print the ballot, code the ballot specifically
 8    for us, but that's not nearly as expensive as having to
 9    pay for the personnel and the trucks and everything else
10    that goes on into having an actual election.
11         Q.   Is it cheaper to hold a special election in an
12    even numbered year or an odd numbered year?
13         A.   So if you're talking about a special election
14    of like a ballot question, it would probably be cheaper
15    to have it on during our election cycle, simply because
16    we're already having an election and you're only adding
17    now that -- so, if you were to try and have a ballot
18    question this November, the cost would increase
19    significantly, because now you've gone from just three
20    districts to City-wide.  So if you were trying to do a
21    ballot question in November, our cost would increase
22    significantly, because now you're using every single
23    precinct, every single polling location in the City of
24    Miami for this November election, but if this was a
25    mayoral election, where we're already having a Cide-wide
```

```
 1   -- so, let's say, 2025 -- then the cost wouldn't be that
 2   significant, because we're already having a City-wide
 3   election, and the only thing that we're doing is just
 4   adding on to the ballot a ballot question or two or
 5   however many ballot questions you want to add.
 6           Same concept, to a certain extent, would apply
 7   to an even year election cycle.  The County's already
 8   having an election.  They're already using their
 9   resources for all of the polling locations within the
10   City of Miami, as well as early voting and so forth.
11   And so, really, what they would be doing is, they would
12   be creating a ballot specifically for the City, so that
13   we could add our ballot question, you know, to that
14   election cycle, to their August or November election.
15      Q.   When the County is running an even year
16   election and the City has something to be in that
17   election, do you pay for the cost of the polling places?
18      A.   I think they give us a significant discount, if
19   we do it all.  I think, primarily, what we're paying for
20   is, some of their personnel, some of the cost that they
21   incur when it comes to the ballot, maybe some percentage
22   of the personnel that are being used at the polling
23   places, but, again, it's dramatically lower than what
24   you would find in a stand-alone City of Miami city-wide
25   election.
```

1      Q.   Other than what we've discussed so far, are

2  there any other factors that influence the cost of a

3  special election?

4      A.   Yeah, we've spoken about them.

5      Q.   Can you describe the process for determining

6  how to deal with the current vacancy in District 1?

7      A.   Well, the City Commission has addressed the

8  vacancy by simply allowing the November 7th election to

9  be used to fill that vacancy.

10      Q.   Is that also considered a special election, in

11  addition to being the general municipal election for the

12  coming term?

13      A.   No.   It's my understanding that the City

14  Attorney's Office issued an opinion basically stating

15  that the November -- since there was already an election

16  scheduled for District 1 on November 7th, that will

17  serve as the election for the vacant District 1 seat.

18  So you had a full qualifying period, and if someone does

19  not receive 50 percent plus one of the vote in the

20  general, then there will be a runoff for that District 1

21  seat.

22      Q.   For a general municipal election, once the

23  results have been certified, how long does it take for

24  the winners to be sworn in?

25      A.   Five days after I've received the official

1   election's results from the Supervisor of Elections.

2       Q.   Does that change for a special election?

3       A.   It would be the same, after I receive the

4   official election results.

5       Q.   So, hypothetically, let's say there was no

6   general municipal election this year, and instead it was

7   just the special for the District 1 -- they didn't do

8   what they're doing.  They were just, we're going to have

9   a District 1 special election, and the vote was

10  certified on November 10th, then the person who wins

11  that election would take office on the 11th or whatever

12  the next business day is?

13      A.   Not even business day; calendar day.  So,

14  essentially, if I receive the official election results

15  from the Supervisor of Election on the 10th, that

16  candidate could be sworn in on the next day, on the

17  11th.

18      Q.   But if it's the general municipal election,

19  they have to wait five days?

20      A.   Pursuant to the Charter.

21      Q.   Is there any like practical difference in that

22  outcome between those?  Do you think it would make a

23  difference, the four days delay?

24      A.   I don't know the answer to that question.  I

25  just know that that's what I follow.

1      Q.   And so for this year, the election -- District

2  1 is already up for re-election anyway, and so it would

3  just be the same as if Former Commissioner Diaz de la

4  Portilla had not been suspended?

5      A.   Yes.

6      Q.   For you, has the fact that he was suspended

7  altered the cost of this election?

8      A.   No.

9      Q.   Have you considered the possibility, if he were

10  to win re-election and the Governor suspends him again,

11  that then there would need to be a special election next

12  year?

13      A.   I think that would be up to the Commission, if

14  they want to either appoint or schedule a special

15  election.

16      Q.   But there has been no discussion of the

17  possibility of needing to hold a special election next

18  year for District 1, if whoever wins were to be

19  re-suspended or otherwise lose?

20      A.   Not as of this time.

21      Q.   Is there any discussion in the budgeting for

22  this year that was just finished about saving money for

23  special elections for 2024?

24      A.   No.

25      Q.   Do you do that in other years?

```
 1        A.   Again, when we know that there's an election

 2   coming up, yes, we do plan, we do get the estimate from

 3   the Elections Department.  I believe I have an estimate

 4   for a District 1 stand-alone special election ready to

 5   go, and I'm not sure if I really shared that with the

 6   Budget Office, because we're simply just waiting to see

 7   what happens on November 7th.

 8        Q.   How much is that estimate?

 9        A.   It's going to be the same as what we pretty

10   much spent for the District 2 special election earlier

11   this year.

12        Q.   And what was that?

13        A.   The County's cost is around 180,000 and then we

14   have to throw in about another 40,000 for public notices

15   associated with the election.  So it comes to about 210,

16   220.

17        Q.   Is there any cost if the City Commission

18   appoints a replacement?

19        A.   No.

20        Q.   So if the City Commission appoints a new

21   Commissioner, that doesn't impact your job at all, as

22   far as elections?

23        A.   An election wouldn't be required, so, no, it

24   would not.

25        Q.   In the budgeting process for your department,
```

```
1   do you set out any sort of reserve to have available for

2   costs that come up, such as special elections?

3       A.   Well, elections costs do not come out of my

4   budget.  It comes out of, I think -- well, I'll let the

5   CFO explain, but I believe it comes out of an NDA

6   account, non-departmental account, and so it's my

7   understanding that that's where the funds are usually

8   set aside for a City of Miami election.  We provide the

9   information to the Budget Office, and then the Budget

10  Office essentially includes that, however it needs to be

11  included, in the overall budget.

12      Q.   Would you say that the potential costs of

13  special elections is a concern of your department, when

14  you're planning the next year's --

15      A.   No.  Again, that's not a decision that I make.

16  So it's up to the Commission to decide whether or not

17  they want to have a special election and incur those

18  costs.

19      Q.   Are there any additional costs, that you can

20  incur, beyond what's required, when you're running an

21  election?

22      A.   Any additional --

23      Q.   I mean, just for example, if you wanted to

24  upgrade to have leather seats, you pay extra.  Are there

25  any like perks that you can get to like, you know, we
```

```
 1  want to have a fancier election?
 2        A.   No, not that I'm aware of.
 3        Q.   It's all fixed?
 4        A.   Yes, it's my understanding.
 5        Q.   Do you get the same treatment from the County
 6  as the other municipalities within the County does?
 7        A.   I wouldn't have any reason to believe
 8  otherwise.  Again, I have no problems putting this on
 9  the record, the Miami-Dade Elections Department is hands
10  down, without question, the best Elections Department in
11  this State, and I would go as far as to say, in the
12  country.  I have a tremendous amount of respect for the
13  work they do.
14        Q.   Do you ever talk to City election
15  administrators from, say, Hialeah or other cities in
16  Miami-Dade County?
17        A.   No.
18        Q.   There's no discussion of comparing notes, how
19  much are you paying?
20        A.   No.  We know that we're getting the better
21  deal.
22        Q.   Yeah, it all sounds right to me.
23             MR. JOHNSON:  Off the record for a second.
24             (Discussion off the record.)
25  BY MS. MCNAMARA:
```

```
1        Q.   If you run a special election that's on an even
2   numbered years that the County is doing especially -- is
3   the only thing that they're doing, for the City, and,
4   then, that election goes to a runoff, is there
5   additional costs for the runoff for the County that they
6   will charge you?
7        A.   So if we were piggybacking off of the County's
8   election, and then we have a runoff, then, yes, the City
9   would incur costs associated with that runoff, because
10  we're no longer piggybacking off the County.
11       Q.   Does the County ever have runoffs otherwise?
12       A.   Well, their primary is their general election,
13  and, then, their November election is essentially the
14  general.  That's my understanding of how that works.  So
15  maybe the best way to explain this is, they have their
16  County Commissioners up for election in August, and if
17  there's a runoff, that runoff would be held in November.
18  That's my understanding of how the County Commission
19  works.  I'm not involved, but that's my understanding.
20       Q.   If the City has a runoff, that's the only thing
21  on the ballot; is that correct?
22       A.   Because it would be a stand-alone.  We're no
23  longer piggybacking off of the County's election, so it
24  would be a stand-alone runoff and we would incur those
25  costs.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   Is that invoiced separately from the other
 2   special election?
 3        A.   I believe it probably would be, in that
 4   circumstances.
 5        Q.   By comparison, when it's a general municipal --
 6        A.   But, again, I'm sorry, I don't know.  I don't
 7   know, because it's not something that we've ever run
 8   into.
 9        Q.   So, by comparison, in the general municipal
10   election context, the invoice comes after the runoff is
11   over, if it happens, because it's considered one
12   election?
13        A.   If I remember correctly.  I don't think we get
14   two separate invoices.  But, again, if there were, they
15   would have the cost associated with the general and then
16   you would just have the cost associated with the runoff,
17   but I just don't remember if it's two separate or one.
18   I'd like to think that it's one, but I just don't
19   remember.
20        Q.   Do you know if it's more expensive to hold a
21   runoff during a year of an odd numbered general
22   municipal election or if it's more expensive to hold a
23   runoff if it's run on an even year through a special
24   election?
25        A.   I don't know the answer to that question.  I
```

```
1    would assume it would probably be the same.

2        Q.   How much does a runoff cost, as opposed to the

3    general election?

4        A.   From what I know, it's usually similar to what

5    you would see with like a special election, because if

6    it's just for that district, you're talking around

7    180,000 or so forth.  But if it's City-wide, if you're

8    having a runoff, let's say, for mayor, and it's

9    City-wide, then the cost would be, I think, commensurate

10   with what you would see with a City of Miami general

11   election that's run City-wide.

12       Q.   And the cost is per seat?

13       A.   Per district, and then the number of voters in

14   that district and the resources needed to hold an

15   election for that district.

16       Q.   Have you ever had a runoff in which multiple

17   Commission seats were both in the runoff?

18       A.   I've only -- from what I recall, it's usually

19   just been one.  I don't remember a situation where two

20   seats have led to a runoff.  I just don't remember.

21       Q.   If two seats did lead to a runoff, would you

22   estimate that it would cost twice as much as the one

23   seat?

24       A.   Yes.

25       Q.   For this 2023 general municipal election, is
```

```
1    your work on the ballot done?

2         A.   Yes.

3         Q.   When you hand it off to the County, is your

4    work done at that point?

5         A.   Well, no.  The County will essentially --

6    again, they need to format the ballot, they need to code

7    the ballot, and then they'll place the names on the

8    ballot, and then they will send what's called a master

9    ballot back to me.  I will review the master ballot, to

10   make sure the names are all spelled correctly, in the

11   correct order and so forth, and then I sign off on that

12   master ballot and then I'll send it back to the

13   Elections Department.  So I do need to sign off on what

14   they would call the master ballot, that they'll use then

15   for the IVotetronics and every other ballot that's used

16   in the election.

17        Q.   Do you interact with the County during that

18   time?

19        A.   Yes.

20        Q.   Who do you interact with at the County?

21        A.   Primarily their Governmental Division, since

22   it's their Governmental Division that's assisting

23   municipalities with the elections.  That's who I would

24   be working with.

25        Q.   Is there a specific person you've worked with
```

1   most recently in that context?

2        A.   I just forgot her name.  Elizabeth Prieto, if I

3   remember correctly.

4        Q.   Anyone else you recall?

5        A.   We could be working with Deputy Supervisor of

6   Election Roberto Rodriguez, but it's -- primarily, I

7   think it would be Elizabeth, simply because she is the

8   initial point of contact, you know, with the

9   municipalities when it comes to the ballots.

10       Q.   Do you enjoy working with her?

11       A.   Absolutely.

12       Q.   Have you ever had any disagreements?

13       A.   None.

14       Q.   Is that true for everyone you've worked with

15   over at the County?

16       A.   Every single person I've worked with at the

17   County, yes.

18       Q.   That's great.

19       A.   It is.  It truly is.  It's something that I

20   just feel very -- I'm just happy to be able to share

21   that, because, like you said, it's not as common as you

22   would like it to be.

23       Q.   All right.

24            MS. MCNAMARA:   This is Plaintiffs' Exhibit

25       8.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              (Thereupon, Plaintiffs' Exhibit Number 8 was

 2    marked for Identification.)

 3    BY MS. MCNAMARA:

 4         Q.   The reporter has handed you Plaintiffs' Exhibit

 5    8.  Do you recognize this document?  You can take some

 6    time to look at it.  It's two pages.

 7         A.   Yeah, I see that I was copied on it.  So, yes.

 8    Oh, two pages.  Yes.

 9         Q.   So who is Nicole Ewan?  Is that how you say her

10    name?

11         A.   Yes.  She's the Assistant City Clerk for the

12    City of Miami.

13         Q.   How many Assistant City Clerks do you have?

14         A.   Just one.

15         Q.   And she works directly for you?

16         A.   Yes.

17         Q.   How do you enjoy working with her?

18         A.   She is tremendous.  I wouldn't have been City

19    -- I definitely want to put this on the record.  I

20    wouldn't have been City Clerk for the past ten years if

21    it wasn't for her, plain and simple.

22         Q.   Has she been your assistant throughout all of

23    those ten years?

24         A.   Yes.

25         Q.   Did you work together prior to you becoming the
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   clerk?
 2        A.   Yes.
 3        Q.   Why did she send this e-mail?  Did you tell her
 4   to send it?
 5        A.   I was in Virginia visiting my dad and
 6   stepmother at the time, so she was authorized to be able
 7   to send this e-mail on my behalf.
 8        Q.   And when you say that, you're referring to the
 9   e-mail at the bottom of the first page?
10        A.   Oh, yes.  Thank you.
11        Q.   Tuesday, August 1st, 2023, 3:25 p.m.?
12        A.   Yes.
13        Q.   And what is the purpose of that e-mail?
14        A.   So this was, essentially, to communicate the
15   legislation and the map associated with the latest
16   redistricting to the County.
17        Q.   Would you have sent this e-mail, if you hadn't
18   been on vacation?
19        A.   Absolutely, yes.
20        Q.   Do you have any disagreements with the content
21   of the e-mail that Nicole sent?
22        A.   No.
23        Q.   Did you approve it?
24        A.   I saw it, so, yes, I would say I approved it.
25        Q.   Did she write it herself?
```

1        A.    That I do not know.

2        Q.    Is this a type of e-mail that's sent regularly?

3        A.    No, because of the nature of redistricting, and

4    it's something that we do once only every ten years,

5    that this wouldn't be a common e-mail.

6        Q.    Do you know why this e-mail was sent, on the

7    day it was sent?

8        A.    So the Elections Department had requested the

9    naps that they were going to use for the reprecincting,

10   so the voter registration cards could be sent by August

11   1st.

12       Q.    Was there any discussion of sending it earlier

13   than August 1st?

14       A.    No.  Not to my knowledge, no.

15       Q.    Do you usually send it on the day that it's

16   due?

17       A.    Again, it just depends on the nature of the

18   subject.

19       Q.    And, then, if you turn back over to the top, so

20   this was sent, I see it is indicating, 3:25 p.m., on

21   Tuesday, August 1st.  And, then, above it, there's an

22   e-mail from Vanessa Innocent, responding, and it says,

23   Tuesday, August 1st at 3:42 p.m.  Looks like she's

24   confirming receipt of the e-mail.  Would you agree with

25   that characterization?

```
1        A.   Yes.

2        Q.   And who is Vanessa Innocent?

3        A.   I want to say that she's an Assistant Deputy

4   Supervisor of Elections.

5        Q.   Have you worked with her before?

6        A.   Yes.

7        Q.   Do you enjoy working with her?

8        A.   Very much so.

9        Q.   And, then, on top, Nicole responds, it looks

10  like a few hours later, saying, "You're welcome."  Is

11  there anything else, that you're aware of, that happened

12  in this interaction, other than just them both writing

13  back and forth, thank you, that was easy to do?

14       A.   Not that I'm aware of, no.

15       Q.   Are you aware of any further discussions

16  related to this, after this was sent?

17       A.   No.

18       Q.   All right.  You can --

19       A.   Okay.

20       Q.   You never know, we might come back to it, but

21  that's my questions for that.

22       A.   Understood.

23       Q.   I mean, there's two topics, and obviously some

24  of the topics overlap, we've been talking about the

25  County, but I'm planning now to move to Topic 2.
```

*Bailey & Sanchez Court Reporting, Inc.*

1        Can you pull back up Plaintiffs' Exhibit 7 and
2    read to me what Topic 2 is off of that?
3        A.   "The relationship between the City of Miami and
4    the Miami-Dade County Elections Department."
5        Q.   So how would you describe that relationship?
6        A.   As an excellent relationship, very
7    professional, and, you know, one that I've never had an
8    issue with, when it comes to any of the elections that
9    I've dealt with, as it relates to their assistance.
10       Q.   Is it a formal relationship?
11       A.   Yes.  I mean, formal relationship from the
12    standpoint that they provide us with election services
13    and assistance.
14       Q.   Do you have a written contract?
15       A.   No, we've never had a written contract, to the
16    best of my knowledge, with the Elections Department, for
17    the services and assistance they provide.
18       Q.   How do you determine the nature of the
19    interaction?  Like is there some sort of Statute or
20    guidelines that say how you'll interact or that governs
21    it?
22       A.   Well, I guess, pursuant to the Charter and the
23    City Code, you know, I'm empowered to exercise all of
24    the powers to be able to conduct the functions and
25    duties of an election.  And so, essentially, I work with

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    the Elections Department, as the official representative
 2    of the City, when it comes to the conducting of
 3    elections.
 4         Q.   Is there a set schedule of prices that the
 5    County uses?
 6         A.   Not that I'm aware of, no.   You know, like I
 7    said, early on in the year, we'll ask for an estimate,
 8    so we have a general idea of how much the election is
 9    going to cost, and that rarely deviates from what we get
10    when it comes to the final invoice.
11         Q.   But there's nothing written down, separate from
12    the individual year to year negotiations, of how that
13    would go?
14              MR. JOHNSON:   Objection, predicate.
15              THE WITNESS:   I mean, they send me an
16         election verification form that asks for
17         information, such as when is our qualifying
18         period, do you have a runoff, do you want us to
19         pay for the postage when it comes the to vote
20         by mail.   So I do sign an election verification
21         form.
22    BY MS. MCNAMARA:
23         Q.   Is this every year?
24         A.   For our elections, yes, all of our elections.
25         Q.   So that is the odd numbered years?
```

*Bailey & Sanchez Court Reporting, Inc.*

1        A.   Yes.

2        Q.   Odd numbered year budgets are enacted the

3   previous year?

4        A.   So it would be for -- so just like we were

5   talking about a little earlier, the budget for this

6   fiscal year, that encompasses the November election, was

7   passed -- was implemented on October 1st, passed

8   September 28th.  So we had an estimate for the cost that

9   was built in for the fiscal year 23-24 budget, which

10  accommodates the District 1, 2 and 4 election.

11       Q.   Is the City of Miami on an October 1st fiscal

12  year?

13       A.   Yes.

14       Q.   So, today is, let's say, October 6th.  This is

15  the first week of your fiscal year?

16       A.   Yes.

17       Q.   And so the general municipal elections for 2023

18  is in the current budgeted year that we're in right now?

19       A.   Yes.

20       Q.   Is that true, also, if you happen to have any

21  elections in March or August of 2024?

22       A.   So, for planned elections, we'll have the

23  estimate in advance, but if a special election case in

24  -- well, we had plenty of time to prepare for the

25  District 2 vacancy, but let's say, District 1, if they

```
 1   decided to have a special election, then I would have
 2   needed to -- which we already have -- receive, you know,
 3   an estimate.   It wouldn't have been built in to this
 4   current fiscal year, because the budget has already been
 5   passed.   So, essentially, I think, it would have to come
 6   from some other reserve account that the City has.
 7        Q.   And, then, the general County election that's
 8   being held in November of 2024, that would be part of
 9   the next fiscal year's budget?
10        A.   So, our current budget goes from October 1st,
11   2023 until September 30th, 2024.   So if we're to do
12   something in August, it would be with the current fiscal
13   year budget.   But, then, if we were to do something in
14   November of 2024, it would be the fiscal year 24-25
15   budget.
16        Q.   Do you have any reason to think that the budget
17   for the next fiscal year, 24-25, will be more or have
18   more money allocated for elections than otherwise?
19        A.   We don't have any elections in '24 or '25, up
20   to the fiscal year.
21        Q.   Uh-huh.
22        A.   There would maybe be some money set aside for
23   noticing, because that occurs usually in September, but
24   the 25-26, that fiscal year, we would have had to have
25   some funds allocated, because that's when we're going to
```

*Bailey & Sanchez Court Reporting, Inc.*

1   be having the City-wide, for mayor, District 3 and

2   District 5, in 2025.  Is that what we're talking about?

3        Q.   Yes.  So if we assume that there are no special

4   elections, there's the November 2023 general municipal

5   election that's going to happen, that's on this current

6   fiscal year?

7        A.   Yes.

8        Q.   The next fiscal year, which begins October 1st,

9   2024 through September 30th, 2025, you do not expect to

10  hold any actual elections during that time?

11       A.   Correct.

12       Q.   Although you have testified that there are some

13  costs preparing for the November election that happen

14  before --

15       A.   Yes.  There's some notices that we will go

16  ahead and publish in September, and maybe even August,

17  to prepare for the November 2025 election.

18       Q.   And the actual costs of the November 2025

19  election that the County will invoice to you after the

20  election goes on the '25 to '26 fiscal year budget?

21       A.   Yes.  Yes.

22       Q.   How does it feel that we're talking about 2025

23  and 2026?

24       A.   I'm just trying to get to November 7th.

25       Q.   Do you have any plans after the election ends?

*Bailey & Sanchez Court Reporting, Inc.*

```
1   Do you take vacation immediately?
2        A.   I wish it was that simple.
3        Q.   How long do you have to keep working on the
4   election materials after the election is over?
5        A.   It still takes additional time, because if
6   everyone wins on November 7th, then you still have to
7   prepare for the swearing in, and then there are still
8   responsibilities when it comes to making sure that the
9   incoming elected official has filled out all of the
10  appropriate forms, such as, you know, ethics training
11  and financial disclosure and so forth.  So it's an
12  ongoing process.
13       Q.   Is there ever any negotiations between the City
14  and County over the cost and pricing?
15       A.   No.
16       Q.   And you don't want there to be?
17       A.   No, because, again, I know that we're getting
18  the better end of the deal.
19       Q.   Okay.  Is there any one, other than the County,
20  that the City pays in connection with election
21  administration?
22       A.   No.
23       Q.   Do you have any other vendors who you hire?
24       A.   Well, let me -- so, to give a little context,
25  we require that our campaign treasurer report be
```

1   submitted electronically.  So we do have an outside

2   vendor, when it comes to the submission of campaign

3   treasurer reports.  And so while that's not necessarily,

4   quote/unquote, like a part of the election cost, because

5   if you're a candidate running in 2025, you're going to

6   have to start filing your campaign treasurer reports

7   electrically.  So there is an outside cost with the

8   vendor that we use, VR Systems, when it comes to the

9   filing of campaign treasury reports, but that's maybe

10  $5,000 a year, $6,000 a year.

11      Q.   How long has that system been in place?

12      A.   I would say, close to about ten years.  When I

13  became City Clerk, I think we had the opportunity to

14  implement that.

15      Q.   Did you work with it prior to it being

16  electronic filing?

17      A.   Before the electronic filing, it was all done

18  by paper.

19      Q.   Do you prefer the electronic or the paper?

20      A.   Electronic, yes.

21      Q.   Has it made your life easier?

22      A.   Yes, and increased transparency.

23      Q.   Has it influenced the cost of running the

24  election?

25      A.   We're talking about $5,000, $6,000, so I would

1   say, no.

2       Q.   Do you consider that there are any significant

3   expenses in the budget absent the money you pay to the

4   County?

5       A.   No.

6       Q.   Is your salary or like your personnel costs for

7   your office to run generally, considered in the cost of

8   elections?

9       A.   No, but I'm going to start to think that maybe

10  I should start to align my salary with the number of

11  elections we have in any given year, but, no.

12      Q.   Give yourself a bonus.  And they are like, why

13  is the City having twelve elections next year?

14      A.   But, no, it does not.

15      Q.   Okay.  Do you ever sign contracts on behalf of

16  the City yourself?

17      A.   No, I do not.

18      Q.   Are you involved in procurement or any choice

19  of vendors, in general?

20      A.   Well, when it came to the vendor that we use,

21  VR Systems, I mean, the Manager entered into the

22  agreement with VR Systems.  So that was something that

23  we had recommended to the Manager, as being a vendor

24  that we thought was highly qualified to be able to

25  provide the services needed.

1      Q.   So how does that process work, when you are

2  choosing that?  Do you give a recommendation to the

3  Manager, and then the Manager handles everything from

4  there?

5      A.   Yes.

6      Q.   Is there any issues with that, in general?

7      A.   I've never experienced any issues, no, but,

8  again, we're not talking about a million dollar

9  contract.  So the threshold is so slow, that it doesn't

10  really have the same scrutiny as if I was trying to -- I

11  don't know, if VR Systems is going to require $500,000,

12  to provide us with the same service.

13     Q.   Are you involved in any contracting, outside of

14  the election context?  I mean, similar to how you

15  contracted with VR Systems for this, is there anything

16  else, that's not an election thing, that you experience

17  with contracting with a vendor and then handing it off

18  to the City Manager?

19     A.   That's usually handled by the Procurement

20  Department.

21     Q.   Would you describe it as a regular part of your

22  job?

23     A.   No.

24     Q.   Is the contract for VR Systems the only

25  contract like that, that you have, where you've procured

1  something?

2      A.   We've procured other services through the

3  Procurement Department.  FTR is a recording system that

4  we use, For The Record, when it comes to recording City

5  Commission meetings.  We also have an online equipment

6  system for our passport operation, but the Procurement

7  Department assisted us with those vendors.

8      Q.   Do you ever hold any audits of the cost of

9  elections after the fact?

10     A.   We've never had an audit of the elections after

11 the fact.

12     Q.   Has there ever been a question raised that too

13 much money is being spent on elections by the City?

14     A.   I think a lot of people realize that we're

15 getting pennies on the dollar for the services that we

16 get in return.

17     Q.   Okay.  Has the City ever refused to pay the

18 County for an election?

19     A.   For an election?  No.

20     Q.   Is there a dispute process in place if you

21 needed to?

22     A.   Since we've never rejected or denied paying an

23 invoice, I don't know the answer to that question.

24     Q.   What if something happens -- let's say there's

25 a hurricane or something -- and the cost of the election

1  is significantly higher than it would have otherwise

2  been  expected, is that extra cost born by the City or

3  the County?

4       A.   I don't know.  I've never experienced a

5  situation like that.  First, I don't know how the County

6  would want to deal with those incurred extra expenses.

7       Q.   But that's not something that has happened for

8  you before?

9       A.   Not while I've been City Clerk.

10       Q.   Do you ever recall a situation when a general

11  municipal election was rescheduled due to a hurricane?

12       A.   To the best of my knowledge, no, from what I

13  can remember.

14       Q.   Is that also true for special elections that

15  are held at other times of the year?

16       A.   If there was going to be a hurricane --

17       Q.   A hurricane or, let's say, a weather-related

18  event, that causes something to be rescheduled.  You've

19  set an election for February 1st, and the something

20  happens and it has to be pushed to March 1st, has that

21  ever happened?

22       A.   No.

23       Q.   Do you ever recall an election, that was in the

24  works and in place, then being rescheduled for another

25  time?

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   Not to my knowledge, no.

 2        Q.   Do you ever consider the possibility of that

 3   happening as part of budgeting and costs preparations?

 4        A.   No.

 5        Q.   Do you think it's likely that would ever

 6   happen?

 7        A.   No.

 8        Q.   How would you feel if the election, let's say,

 9   this November 2023 municipal election, was pushed and

10   happened in December, instead of November, just for no

11   particular reason?

12        A.   I mean, since it's our election, I don't see

13   why there would be any additional cost.  If we were

14   piggybacking off of the County, maybe there would be

15   additional costs, because we no longer would be able to

16   piggyback on their election, but since it's our

17   election, I don't know why there would be additional

18   costs.

19        Q.   In a year in which you have a general municipal

20   election, do you have a general schedule of what you

21   expect to do during that year to make that election

22   happen?

23        A.   Yes.

24        Q.   Is it consistent year to year?

25        A.   Yes.
```

1      Q.   When do you begin preparing for the November

2   2023 municipal election?

3      A.   January of 2023, if not earlier.

4      Q.   Are you currently doing any work for the 2025

5   general municipal election?

6      A.   At this time, no.

7      Q.   Are you still doing any work related to the

8   2021 November municipal election?

9      A.   No.

10      Q.   How long after the November 2021 municipal

11   election was it before you finished work related to that

12   election?

13      A.   Maybe a month, at the most, later.

14      Q.   Is it common that you work on two separate

15   general municipal elections at the same time?

16      A.   They're so far spaced out that I would say, no,

17   and the reason why I talk about how there's still more

18   work to be done, after a general election, you have

19   termination reports.  And so candidates, within 90 days

20   of, you know, either being elected or defeated, have,

21   within 90 days, to submit their termination reports to

22   ensure that their contributions met their expenditures

23   and so forth.  So it's really just kind of wrap up

24   work.

25            MS. MCNAMARA:  Let's look at the time.

```
 1          It's 12:10.  I mean, I think we're pretty close
 2     to ending Topics 1 and Topics 2.  Do you want
 3     to take a break, we'll assess, and then we can
 4     come back?
 5          MR. JOHNSON:  Yes.  I don't want to do a
 6     lunch break or anything.
 7          MS. MCNAMARA:  My plan is to do a lunch
 8     break once we're done with Todd and then we can
 9     reassess and then we can come back.
10          MR. JOHNSON:  Okay.  How much time do you
11     need?
12          MS. MCNAMARA:  Ten minutes now.
13          (Short recess taken.)
14  BY MS. MCNAMARA:
15     Q.   Does the law tell you what the structure of the
16  election will be?
17     A.   So can you elaborate on "structure"?
18     Q.   You're told what to do based on the law, and
19  then you execute it; is that correct?
20     A.   Yes.
21     Q.   Do you have any discretion in that process of
22  how the election was operated?
23     A.   No.  I do not believe so, no.
24     Q.   We talked a little bit about extra costs.  Does
25  the length of the ballot cost extra?  Like if there's
```

*Bailey & Sanchez Court Reporting, Inc.*

1  four inches of page versus two inches of page --

2      A.   It goes by page.  So if it's just on one page,

3  then there's no extra cost, per se.  I wouldn't think

4  anything significant.  I think we incur an additional

5  cost, but it's not significant, when you start having

6  two or three pages associated with your election, the

7  length of the ballot.

8      Q.   And I believe you testified earlier that no

9  one's ever asked you to reduce the cost of elections?

10     A.   No.

11     Q.   Do you consider the cost of the elections

12  something that is a policy that you put in place?

13     A.   I think that's pursuant to the Charter and

14  State Statutes.

15     Q.   Is that a political question for the

16  Commission?

17     A.   But it's definitely not a question for me to

18  answer.

19     Q.   Okay.  So you were talking about before how you

20  started to work on the November of 2023 election in

21  January or maybe a little bit earlier.  What do you do

22  in the beginning?

23     A.   It's just a roadmap.  I guess I should

24  elaborate.  It's not like we're doing any substantial

25  work.  It's more knowing when the campaign treasury

*Bailey & Sanchez Court Reporting, Inc.*

1    reports are going to be due, when -- the last day to

2    register to vote.  For us, it's just a time line of

3    important dates, essentially, that we work on towards

4    the beginning of the year, so we know what we need to be

5    doing, when we need to be doing it.

6         Q.   You're planning it out, so you don't have any

7    surprises?

8         A.   Yes.

9         Q.   Let's say, on January 1st -- assume it's true,

10   let's assume that January 1st was the first day you

11   worked on this election, and you came in and someone

12   said, "Hold on.  Hold on.  We've got to put this off for

13   two months and we're going to start on March 1st

14   instead," how would that impact your time line and your

15   work?

16        A.   Well, we would simply just need to work with

17   the Miami-Dade Elections Department to ensure that we

18   can accommodate for that length of time that the

19   election has been moved it.  So, you know, again, it

20   wouldn't require a tremendous amount of work on my side,

21   just from the standpoint of, you know, the timelines and

22   the deadlines that we have for a regularly scheduled

23   election.  We would just have to adjust to this new

24   election date.

25        Q.   Do you talk to someone at the County and give

1    them a heads up, that you need to revise the time line?

2         A.   Oh, absolutely.

3         Q.   Does that happen regularly?

4         A.   No.

5         Q.   Do you recall the last time you had to do that?

6         A.   I don't know if I've ever had to do that, from

7    what I can recall.

8         Q.   Has there ever been a time when the County is

9    asking you to hurry up or do something faster?

10        A.   When it comes to our regularly scheduled

11   elections, they will usually give us the time frame in

12   which they need various documents.  And so where they've

13   asked us to hurry up, not that I recall.

14        Q.   So, after the initial period of laying out the

15   schedule, what's the next bit of important work that you

16   do on the election preparation?

17        A.   I guess it would be the preparation of public

18   notices.

19        Q.   When does the first public notice need to go

20   out?

21        A.   For a general municipal election, I believe

22   it's around August.  So a couple of months before the

23   actual election occurs.

24        Q.   When do you begin drafting that notice?

25        A.   Maybe the month prior.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   How complicated is that process?

 2        A.   Not very complicated.

 3        Q.   Do you need the entire month or is it just a

 4   matter of you plan it out a month in advance to make

 5   sure you get it done?

 6        A.   We plan out a month in advance just so that we

 7   can begin to work with the County to begin the

 8   translation for the notices.  So that's where the bulk

 9   of the work, I think, occurs, just making sure that we

10   have the notice done, so it can be translated.

11        Q.   Are there like approval steps, like you have to

12   get it approved by the attorney's office or anyone else?

13        A.   Yes.  We do show the City Attorney's Office

14   what the notice will entail, and then they will, you

15   know, indicate whether or not any changes need to be

16   made.  And, then, after we get their approval, then we

17   would send it to the Elections Department for

18   translation.

19        Q.   Do you ever get in a situation where the

20   deadline is looming and you're in a hurry, because

21   you're waiting on someone else to approve something?

22        A.   No, I've never run into that problem before.

23        Q.   Would you say, as a general matter, that you

24   run on schedule?

25        A.   Yes.
```

*Bailey & Sanchez Court Reporting, Inc.*

1    Q.   Do you have experience with situations where

2    the schedule has gotten messed up?

3    A.   No.

4    Q.   How do you think it would be, if that did

5    happen?

6    A.   I guess it would depend on what the situation

7    entails.  Can you elaborate?

8    Q.   What if -- like you said, August 1st is the

9    deadline for the notice.

10   A.   Well, it's not really the deadline for the

11   notice.  We send them out in August.  We have to send

12   them out within a particular time frame.  So there's

13   flexibility there.

14   Q.   Let's say it's June 1st and you're planning on

15   August 1st being when you send out the notices, and on

16   June 1st, you get a message that actually the notice

17   needs to go out on July 1st, instead of August 1st.  How

18   would that impact the work that you do?

19   A.   So, essentially, I guess, I would just have to

20   expedite the approval process from the City Attorney's

21   Office, and if the Elections Department can perform the

22   translation, but I've never experienced something like

23   that before, so I don't exactly know.

24   Q.   Have you ever been in a situation where you

25   needed to hire like extra contract staff to help you get

*Bailey & Sanchez Court Reporting, Inc.*

1  work done, because you don't have enough personnel to

2  get the work done?

3      A.   No.

4      Q.   What is the City's role in candidate

5  qualifying?

6      A.   So I'm the qualifying officer for the City, and

7  so when it comes to qualifying, there are various

8  documents that are required.  There's an affidavit of

9  candidate that we review, and that either myself or a

10  deputy can notarize.  And so, between the affidavit of

11  candidate, there is a financial disclosure form that's

12  required, and then the State of Florida's non-partisan

13  oath for candidates is required.

14     Q.   Is there anything that happens between the

15  notice period and the candidate qualifying period?

16     A.   Well, the notice brings attention to the

17  qualifying period.  So, essentially, we're just

18  preparing, I guess, in between the time that the notice

19  goes out and the qualifying period.  We're answering any

20  questions the candidates may have or preparing, making

21  sure that we have all extra forms, but that usually is

22  just preparation for the qualifying period.

23     Q.   Are there any specific tasks that you have to

24  do to prepare for the election, prior to the notices?

25     A.   Other than I'm receiving an estimate from the

1    Elections Department, which is something that we do for

2    our regularly scheduled elections.  We come up with our

3    deadlines, you know, early on in the year, so that we

4    can go ahead and go over, again, you know, when campaign

5    treasury reports are due, when -- you know, the last

6    date to register to vote and so forth, when the

7    qualifying period will begin, when various notices go

8    out, but that's primarily what's involved in the

9    preparation.

10       Q.  And, then, once the candidate qualifying

11   begins, what is your role in that?

12       A.  So, once it begins, again, the Clerk serves as

13   the qualifying officer.  So we receive the qualifying

14   documents, and we make sure that they are complete, you

15   know, on their face, that there aren't any -- what you

16   would call any defects with the qualifying documents,

17   and that's usually what the qualifying process entails.

18       Q.  When does the qualifying period end?

19       A.  It's a specific period of time, and it's laid

20   out pursuant to the Charter.  I believe it's no greater

21   than 60 days before an election and no less than 45.

22   There's a window that you always have before your

23   general municipal election for the qualifying period.

24       Q.  Once the candidates are qualified, what other

25   responsibilities do you have for the election?

*Bailey & Sanchez Court Reporting, Inc.*

1      A.   So, once they've been qualified, then we need

2  to start to send that information to the candidates --

3  the names of the candidates to the Elections Department,

4  so that they can draft the master ballot.  And like I

5  was explaining before, the Elections Department will

6  draft the master ballot, they will send it back to me

7  for my approval, and so then they use that master

8  ballot, again, for the IVotetronics, the optical, so

9  forth, vote by mail.

10      Then we also need to start preparing for the

11  canvassing board activities, which involves logic and

12  accuracy testing.  So I go up to the Elections

13  Department, where they perform a test on a sample number

14  of voting machines, and they'll do a tabulation from the

15  number.

16      So, logic and accuracy involves basically a

17  sample number of voting machines, where ballots are fed

18  in, where they've already been pre-filled out, and so

19  once those ballots are fed through the machines, then

20  the Elections Department will tabulate those results and

21  then there's just a report that's produced, that I sign,

22  showing that the ballots that were run through the

23  voting machines match what was tabulated.

24      Q.   And this is done before the election?

25      A.   Yes.

1      Q.   And this is just to make sure there's no

2   problems?

3      A.   That's required, pursuant to State Statute, is

4   my understanding.

5      Q.   How long does that period take?

6      A.   It's just a day, maybe it takes them a couple

7   of hours, two or three hours.

8      Q.   After that's done, is the ballot ready to be

9   sent to the County -- materials on the ballot?

10     A.   Oh, I'm sorry.

11     Q.   Is this before the --

12     A.   My apologies.   The finalizing of the ballot is

13   done before logic and accuracy.   So the ballot is done.

14   Yeah, we're done with the ballot.   Essentially what

15   they're getting ready to do, I'm sure they're in the

16   process of printing it and getting ready to send the

17   vote by mail ballots out, if not this week, early next

18   week.   So that part of the process is done.

19          Now we get into more of the kind of nuts and

20   bolts, I guess you could say, with logic and accuracy

21   testing, and then, you know, the submittal of campaign

22   treasury reports.   We'll have early voting coming up

23   towards the end of the month, so we start to prepare for

24   the next phase of the election.

25     Q.   Do you know what the County is doing during

*Bailey & Sanchez Court Reporting, Inc.*

1    this time?

2        A.   I don't know specifically.   I just know that

3    they do it very well.

4        Q.   Do you communicate during that period?

5        A.   I mean, they're letting us know when vote by

6    mail ballots are going out, when we need to appear for

7    the logic and accuracy testing.   So they're handling the

8    operation side of the election.

9        Q.   Does the same thing happen for a special

10   election that's being held separately from the general

11   municipal election?

12       A.   Yes.

13       Q.   Does it take longer or less time when it's just

14   a special election?

15       A.   It's the same process, so essentially the same

16   amount of time.   You may have -- the logic and accuracy

17   testing may be happening a little sooner, simply because

18   there's a shorter period of time between when the

19   qualifying period ends for that election and the

20   election is actually going to occur, but there isn't

21   that much of a difference.

22       Q.   Is there any cost to holding the election

23   concurrent with the County scheduled election, when you

24   have a special election?

25       A.   So -- yeah, if you could elaborate.

```
 1        Q.    Let's say that the County is already running
 2   their election, and you're adding a special -- you know,
 3   District 1, let's just say, has an election that's going
 4   to be put on that ballot.   What additional costs does
 5   the City bear to fit into that County election ballot?
 6        A.    You know, I believe, and -- I don't know
 7   exactly, but I believe it would be more the cost
 8   associated with the ballot, because whereas before the
 9   County didn't have to worry about creating a ballot for
10   the City for District 1, now they do have to create a
11   ballot, so there would be cost incurred associated with
12   the ballot, but if we're still using their polling
13   locations and we're using, you know, their canvassing
14   board and we're using all of their resources, the cost
15   wouldn't be that significant.
16        Q.    Is the City's ballot separate from the rest of
17   the ballot that the County puts out?
18        A.    Well, I mean, if it's a County-wide election,
19   then obviously everyone in the County is getting a
20   ballot.   We're just adding on to that ballot.   And so,
21   essentially, that becomes our ballot, because we're
22   adding either a candidate or a question to it, but it's
23   still going to include all of the other information that
24   the other voters would be receiving in the County.   So
25   if it's like a County-wide referendum question, they
```

```
 1    would now just see, in District 1, this additional part
 2    to their ballot for a candidate.
 3         Q.   Does the City bear any of the costs for the
 4    County's lines on the ballot?
 5         A.   No.   Well, let me rephrase that, because we now
 6    -- that is now our ballot.   Again, sorry, if I'm not
 7    being clear, but if it's a County-wide election, and
 8    let's just say it's a Charter amendment question that is
 9    going to every voter in Miami-Dade.   So we don't incur
10    any cost, because it's going to every voter in
11    Miami-Dade County, because the County is having an
12    election to pose a Charter amendment question.   But if
13    we now add something to that ballot, that ballot becomes
14    ours, per se, from the standpoint that they now have to
15    code it a little differently, is my understanding, and
16    so we would now pay to be able to add that candidate or
17    question to the ballot, but, again, it's not -- it's not
18    a significant cost, but there would be some cost
19    associated, because now it becomes our ballot for the
20    City of Miami, because they have to code it in a
21    different way, is my understanding.
22         Q.   Does it change the cost of the public notices
23    when you hold a special election that's concurrent with
24    the County election?
25         A.   Well, we wouldn't have any public notices, if
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1   we don't have an election.  So there's no cost incurred
2   for the County having its County-wide election, but
3   there would be some cost incurred for having a piggyback
4   off of a Miami-Dade County election.
5       Q.   And are there any costs that come in that
6   piggyback situation that we haven't already discussed
7   here?
8       A.   Not -- again, the public notices would be an
9   additional cost, but outside of that, not that I would
10  be aware of.
11      Q.   So if there is a County -- a regular County
12  election coming up, and the City has a special election
13  that is going onto that ballot, there is a separate
14  notice that the City needs to do?
15      A.   Yes.  Yes.
16      Q.   In addition to the notice that the County does?
17      A.   Yeah.  The County will do its own notice as to
18  what it needs to do to comply with State Statute, and
19  then we would have to notice the special election in
20  accordance with State Statute.
21      Q.   Do other municipalities that are also on that
22  ballot do the same thing, do their own notices?
23      A.   It would be my understanding, yes.
24      Q.   I think you mentioned costs of parking at some
25  point related to elections.
```

1      A.   I don't know if there's a cost associated with

2   parking, but we would help them, if they're having a

3   hard time with parking.   So let me put it this way,

4   there are some polling locations, particularly Downtown,

5   that don't have a lot of parking, and so what we

6   normally do is, we work with the Miami Parking Authority

7   to -- I guess, they put like bags or something over it,

8   so that, you know, it's reserved for voting only and so

9   I don't know if that's necessarily really a cost, but

10  it's something that we would help the Elections

11  Department with, the managing of it.

12     Q.   Is the goal to have parking available for

13  voters?

14     A.   Yes.

15     Q.   Does it also provide parking for the poll

16  workers?

17     A.   Yes, we do need to provide parking for the poll

18  workers, as well.

19     Q.   What about early voting, how much early voting

20  does the City do on a City general municipal election?

21     A.   Nine days.

22     Q.   How many days of early voting does the County

23  do on their general election?

24     A.   Two weeks, I believe, two full weeks.

25     Q.   If the City has a special election that's on

1    the County, do you get the full two weeks that the

2    County does?

3        A.   Yes.

4        Q.   Does that cost you anything extra to get that?

5        A.   Again, I don't believe we incur that much cost

6    associated with that part of the election process,

7    because they're already paying for those sites.  The

8    only thing that we're doing is adding to the ballot.

9    And so they've already secured those sites.  They

10   already have their personnel -- you know, trained their

11   personnel for those particular sites.  They're already

12   providing the equipment for those sites.  So I do not

13   believe we would incur -- if anything, it may be a

14   nominal charge, if that.

15       Q.   What about for a runoff?

16       A.   That's when we incur all of those costs by the

17   City.  The City would incur those costs.

18       Q.   Do you do early voting on a runoff?

19       A.   We do.  It's something I'm very proud, so I can

20   put it on the record, that I was able to implement

21   runoff voting.  We never had it before.  And I'm not

22   trying to, you know, brag or anything, but it's

23   something I'm very proud of, because we didn't have

24   runoff -- I'm sorry, we didn't have early voting for

25   runoffs until I became City Clerk.  We do three days.

1    It's usually a Friday and then Saturday and Sunday

2    before the election.

3        Q.   If you had a special election that was on the

4    County's general election, on an even numbered year, and

5    it led to a runoff, would you do the same amount of

6    early voting that the City would do in a City odd

7    numbered year or would you do the amount of early voting

8    that the County would do in their general?

9        A.   If we're piggybacking off the County, we're

10   going with what the County has or provides.

11       Q.   So, hypothetically, November of 2024, let's say

12   that District 5 is, for whatever reason, up for election

13   in a special election, and then it goes to a runoff

14   later, after November.  That runoff election would be

15   the only election being held by the County; is that

16   correct?

17       A.   Right, for the City of Miami.

18       Q.   And it's your understanding that the County

19   would control how much early voting is done for that

20   runoff?

21       A.   Yes.  We would request three, like we normally

22   would, for our runoffs, but it would be up to them to

23   decide if they could accommodate that request.

24       Q.   And then they charge you based on how much it

25   costs to do that?

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   Yes.
 2        Q.   If you told them you wanted seven early days
 3   for the runoff instead of three, would it cost more?
 4        A.   It would, but it's just not possible.
 5        Q.   Okay.  So it's just three days?
 6        A.   We were lucky to get three days.
 7        Q.   Okay.  And no one else does the runoffs; is
 8   that right?  I mean, the County doesn't?
 9        A.   Yes.  It's my understanding.
10        Q.   Do you know of any other municipalities in
11   Miami-Dade that do the runoff structure the way the City
12   does?
13        A.   I know Miami Beach, I believe, does.  Since we
14   were able to request it, I think they are also asking
15   for it, but I don't know about the others.  Our election
16   cycle is usually aligned with Homestead, Hialeah and
17   Miami Beach.  So I just know Miami Beach, that they do
18   like three days for a runoff, and they have fewer sites,
19   as well.
20        Q.   What would the impact be on the City's election
21   prep work if you started roadmapping and doing other
22   prep in March instead of in January?
23        A.   Can you repeat the question?
24        Q.   What would the impact be on the City's election
25   prep work, if you started roadmapping and doing other
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   prep in March instead of January?
 2        A.   I don't think it would have that much effect.
 3   Again, the roadmap is really for us to know -- it's a
 4   very simple document, that just kind of lines out
 5   various -- that outlines various deadlines, what should
 6   we be doing, what should we be doing, public notices,
 7   you know, again, campaign treasury report, when the
 8   qualifying period begins, when it comes to poll
 9   watchers.  It's just a document that provides us with a
10   timeline.
11        Q.   What if, instead of starting in March, you
12   started in April?
13        A.   I don't think it would have that much of an
14   impact.
15        Q.   Is that the same if it's May?
16        A.   Well, as we start getting closer then -- you
17   kind of know what you're facing as you get closer to the
18   actual election.  So I would prefer to try to do it to
19   earlier rather than later.
20        Q.   Would the City be capable of implementing a
21   City-wide special election in November of 2024?
22        A.   That would be up to the Elections Department,
23   but we would simply be requesting a piggyback.  We would
24   be requesting a City-wide to piggyback off of their
25   November election.  The question becomes whether or not
```

*Bailey & Sanchez Court Reporting, Inc.*

1   they could assist us with a runoff, because our runoff

2   is basically two weeks after the general, and so, with

3   them, they are, I'm sure, still with their canvassing

4   board, probably still getting through vote by mail

5   ballots, trying to get their certification to the

6   Division of Elections, but it's not something that would

7   be out of the ordinary to ask, because, again, we're

8   requesting to piggyback off of an already established

9   election.

10      Q.   How much of a burden would it be on your office

11  if that were to happen?

12      A.   If we were to piggyback off of the County

13  election?

14      Q.   If you were to hold a City-wide special

15  election in November 2024.

16      A.   I don't see it as being a burden.  It would be

17  something that we would pretty much treat like a general

18  municipal election on an odd year election cycle.

19      Q.   Would it be a burden on other departments of

20  the City, other than your department?

21      A.   I do not believe so.

22      Q.   And were there any issues relating to

23  conducting the District 2 special election?

24      A.   No.

25      Q.   Was it any burden on the City, in general,

*Bailey & Sanchez Court Reporting, Inc.*

1  related to that?

2      A.   I mean, it's a tighter time frame in which

3  you're having to get things done, so granted, obviously,

4  it's stressful, but, no, we've done it before, and so we

5  know what the work entails.

6      Q.   Do you have an estimate of how much you think

7  it would cost to hold a City-wide special election in

8  November of 2024?

9      A.   It would definitely be below the 900,000.  I

10 can't give you an exact amount, but it would be lower.

11     Q.   Would you expect it to be higher than 500,000?

12     A.   I wouldn't expect it to be, no.

13     Q.   Would you expect it to be higher than 300,000?

14     A.   That I don't know.  It's been a while since

15 we --

16     Q.   And in that situation, would it vary if there

17 was one seat -- I mean, it's City-wide, so -- City-wide,

18 you're taking into account that everyone in the City is

19 getting a ballot, and it would be cheaper if you were

20 limited to, say, only one district?

21     A.   So if there was just one -- yes.  I understand.

22     Q.   Instead of a City-wide special election, it was

23 just an individual --

24     A.   Yes, it's fewer ballots, as long as we're

25 piggybacking off of the County.

1    Q.   Okay.  Do you consider the cost of that to be

2  significant?

3    A.   I mean, I guess that would really be up to the

4  Commissioners to determine if the cost is significant.

5  It's whatever I'm instructed to do.

6    Q.   If the Commissioners instructed you to hold a

7  City-wide special election in November of 2024, would

8  you be prepared to do that?

9    A.   Yes, again, upon the approval of the Elections

10 Department.

11   Q.   Once they tell you what to do, then you're able

12 to do it?

13   A.   Yes.

14   Q.   Have they ever told you to do something and you

15 thought, I can't do that?

16   A.   No.

17   Q.   Can you imagine a situation where that might

18 happen?

19   A.   Because I've never experienced it, I just don't

20 know of a situation where that would occur.

21   Q.   All right.  I have one last document.  I think

22 we'll say this is Plaintiffs' Exhibit 9.

23        (Thereupon, Plaintiffs' Exhibit Number 9 was

24 marked for Identification.)

25 BY MS. MCNAMARA:

1    Q.   This has been marked as Exhibit 9 for the

2    Plaintiffs.  Do you recognize this document?

3    A.   No.

4    Q.   Have you ever looked at it before?

5    A.   No.

6    Q.   Do you generally look at legal materials or

7    briefs that are filed on behalf --

8    A.   No.

9    Q.   Okay.  Can you turn to Page 9 of this brief?

10   And, then, down, you see Footnote 3 at the bottom of

11   this page?

12   A.   Yes.

13   Q.   Can you read the first sentence of that

14   footnote?

15   A.   "The Miami-Dade County's reprecincting process

16   is complicated and time consuming."

17   Q.   Can you read the second sentence?

18   A.   "The County needs a detailed map with exact

19   district boundaries."

20   Q.   And can you read the third sentence?

21   A.   "The City had over a month to work with its

22   Geographic Information Systems team to put the

23   information together for the County."

24   Q.   Can you describe the process of the Geographic

25   Information Systems team, what they do in that

*Bailey & Sanchez Court Reporting, Inc.*

1   situation?

2        A.   I'm not involved in that process, so I don't

3   know.

4        Q.   Do you have any involvement at all in how that

5   goes?

6        A.   No.

7        Q.   Are you aware of the cost of that?

8        A.   No.

9        Q.   Do you understand that this is referring to

10   what just happened in --

11        A.   Yes.

12        Q.   -- whatever, August, July, like a month or two

13   ago?

14        A.   I do understand.

15        Q.   Were you involved -- scratch that.

16             Were you involved in any way in that process

17   there?

18        A.   No.

19        Q.   Do you know what the City was doing in the

20   month of July of 2023 related to implementing the new

21   map?

22        A.   I do not, no,  I'm not involved in that

23   process.

24        Q.   Do you know what was going on prior to the

25   e-mail that we looked at earlier being sent on August

1   1st, that was Exhibit 8, that we went over?

2       A.   Well, I know that the Elections Department had

3   given us the deadline for August 1st to submit the maps

4   that we would use for the November 7th election.  I am

5   familiar with that.

6       Q.   What would have happened if the map that had

7   been implemented was, instead of the map that the City

8   passed, the map that the Court ordered on July 30th?

9       A.   Whatever map I'm given is the map that I work

10  with.  So I don't know the answer to that question.

11      Q.   I mean, let's say that you had gotten the map

12  on July 30th, when the Court issued its ruling, and you

13  were told, you know -- all of this didn't happen,

14  there's no appeal, they just said, "All right, that's

15  the map.  It's July 30th.  Go forward."  How would that

16  have worked out for you?

17      A.   I would have submitted it to the Elections

18  Department, and it seems like since the Elections

19  Department gave an August 1st deadline, that they would

20  have been able to perform the reprecincting in the time

21  they needed for our November election.

22      Q.   And just to be clear, the Elections Department

23  is hired to conduct elections for the City; is that

24  correct?

25      A.   I don't know if I would say hired.  I know that

*Bailey & Sanchez Court Reporting, Inc.*

1    we use their services and their assistance, and they

2    provide us with the support for the operations side of

3    election, but they're not indemnified or anything like

4    that.  So they're not hired by me.

5        Q.  What if you wanted to choose -- and I know that

6    you don't want to choose someone else, but let's say you

7    wanted to, could you do that?

8        A.  I don't think it's possible -- I really

9    don't -- when you look at the totality of what an

10   election entails, and I don't know who would even

11   provide those services.

12       Q.  Have you ever talked to other municipalities

13   that might do something other than work through their

14   counties?

15       A.  No.

16       Q.  Do you ever discuss with municipalities outside

17   of Miami-Dade County?

18       A.  No.

19           MS. MCNAMARA:  All right.  No more

20       questions for you from us.

21           MR. JOHNSON:  I have no questions.  Read.

22           (Thereupon, the reading and signing not

23       being duly waived, the deposition was concluded

24       at 12:59 p.m.)

25

*Bailey & Sanchez Court Reporting, Inc.*

```
 1

 2

 3

 4

 5                    _____
                              DEPONENT
 6

 7

 8          Sworn to and subscribed before me this _____

 9   day of _____, 2023.

10

11

12

13                    _____
                            NOTARY PUBLIC
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2   STATE OF FLORIDA      :
                         SS
 3   COUNTY OF MIAMI-DADE:

 4             I, NIEVES SANCHEZ, Court Reporter, and a
     Notary Public for the State of Florida at Large, do
 5   hereby certify that TODD HANNON, personally appeared
     before me and was duly sworn.
 6             WITNESS my hand and official seal in the
     City of Miami, County of Miami-Dade, State of Florida,
 7   this 18th day of October, 2023.

 8

 9                        _____
10                        NIEVES SANCHEZ
     Notary Commission Number HH 385498
11   My Notary Commission expires August 11, 2027

12             REPORTER'S DEPOSITION CERTIFICATE

13   STATE OF FLORIDA      :
                         SS
14   COUNTY OF MIAMI-DADE:
               I, NIEVES SANCHEZ, Court Reporter and a Notary
15   Public for the State of Florida at Large, do hereby
     certify that I was authorized to and did report the
16   deposition of TODD HANNON; that a review of the
     transcript was requested; and that the transcript is a
17   true and complete record of my stenographic notes.
               I further certify that I am not a relative,
18   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
19   attorney or counsel, nor am I financially interested in
     the action.
20
               DATED this 18th day of October, 2023.
21

22

23                        _____
24                        NIEVES SANCHEZ

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1                BAILEY & SANCHEZ COURT REPORTING, INC.
                        (305) 358-2829
2

3                               October 18, 2023

4

5    Todd Hannon
     c/o Christopher N. Johnson
6    Gray Robinson
     333 S.E. 2nd Avenue
7    Suite 3200
     Miami, Florida 33131
8
     RE:  Grace, Inc. vs. City of Miami
9
     Dear Mr. Hannon:
10
     The transcript of your deposition, taken in the
11   above-styled cause on October 6, 2023, is at my office
     awaiting your examination and signature.  PLEASE
12   TELEPHONE BEFORE COMING IN so that we may arrange a
     convenient time.
13
     Please be advised that unless I hear from you by
14   November 18, 2023, I will forward the original of your
     deposition to the deposing attorney, as though you had
15   read and signed your deposition.

16   IN THE EVENT a copy of the transcript is being sent to
     the witness by counsel, kindly instruct the witness to
17   make any changes thereto on a separate sheet of paper
     and refer to the page number and line number which
18   corresponds to the change desired.  DO NOT MAKE THE
     CORRECTIONS ON THE TRANSCRIPT.  If you have any
19   questions, please call.

20   Very truly yours,

21

22

     NIEVES SANCHEZ
23   Court Reporter

24

25   cc:  Caroline A. McNamara, Esq.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1                    ERRATA SHEET

 2  IN RE:   GRACE, INC., ET AL. vs. CITY OF MIAMI

 3  DEPOSITION OF TODD HANNON

 4  TAKEN OCTOBER 6, 2023

 5

 6  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 7

 8  PAGE #          LINE#   CHANGE

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20

21              _____

22                 SIGNATURE

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*