```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3                   CASE NO.:  1:22-cv-24066-KMM

 4
    GRACE, INC., et al.,
 5
         Plaintiffs,
 6
    vs.
 7
    CITY OF MIAMI,
 8
         Defendant.
 9  _____/

10
                                4343 W. Flagler Street
11                              Suite 400
                                Miami, Florida
12                              Friday, 2:05 a.m.
                                October 6, 2023
13

14

15                        DEPOSITION

16                            OF

17                        LARRY SPRING

18

19

20

21             Taken on behalf of the Plaintiffs
            Pursuant to a Notice of Taking Deposition
22

23                          ___

24

25
```

Bailey & Sanchez Court Reporting, Inc.

```
 1    APPEARANCES:

 2    ACLU FOUNDATION OF FLORIDA, by
      CAROLINE A. MCNAMARA, ESQ.,
 3    NICHOLAS L.V. WARREN, ESQ., and
      DANIEL B. TILLEY, ESQ., and
 4    On behalf of the Plaintiffs.

 5    DECHERT, LLP, by
      CHRISTOPHER J. MERKEN, ESQ.,
 6    Co-Counsel for the Plaintiffs.

 7    GRAY ROBINSON, by
      CHRISTOPHER N. JOHNSON, ESQ., and
 8    On behalf of the Defendant.

 9

10

11                        WITNESS

12    LARRY SPRING

13        Direct Examination (By Ms. McNamara)       3

14

15

16

17

18

19

20

21

22

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1    THEREUPON:
2                          LARRY SPRING
3    was called as a witness by the Plaintiffs and, having
4    first been duly sworn, was examined and testified as
5    follows:
6              THE WITNESS:  Yes.
7                     DIRECT EXAMINATION
8    BY MS. MCNAMARA:
9         Q.   Can you state your name, for the record,
10   please?
11        A.   Larry Spring.
12        Q.   And I'm Caroline McNamara.  I'm doing the
13   deposition.  We already did all of the intros, so we can
14   skip over that.
15             You said you have been deposed before?
16        A.   Yes, I have.
17        Q.   About how many times?
18        A.   Too many to count, actually.
19        Q.   Are those in this representative role for the
20   City or --
21        A.   A number of them, yes.
22        Q.   Have you done them in a context other than in
23   your role with the City of Miami?
24        A.   My context has been City Manager in other
25   cities.
```

1      Q.   Okay.   What is your job title?

2      A.   I am the Chief Financial Officer and Assistant

3  City Manager.

4      Q.   And when did you start that job?

5      A.   Most recently, June of 2022.

6      Q.   Did you hold that job previously, before that

7  period?

8      A.   I did.

9      Q.   Okay.   When were the previous period when you

10  held that?

11      A.   I was with the City from January of 2003 to

12  June of 2011.   During that tenure, I served as Assistant

13  City Manager, initially over budget, strategy and

14  grants, and then was promoted in 2006 to Chief Financial

15  Officer, literally that same job that I'm in now.

16      Q.   What did you do, during the period when you

17  weren't in the City, between them?

18      A.   I started my own company, consulting company,

19  which I continue to operate.   I was Corporate Director

20  of Productivity and Decision Support for Jackson Health

21  Systems, so I was a County employee.   And I was City

22  Manager of the City of North Miami.

23      Q.   And, then, did you leave the position at the

24  City of North Miami to come back to the City of Miami?

25      A.   I did not.

```
1          Q.   What was in between?

2          A.   I continued to run my consulting company.

3          Q.   And how did it end up that you came back to the

4     City of Miami in your current position?

5          A.   City of Miami was one of my consulting clients,

6     and my predecessor, Fernando Casamayor, left to go back

7     to the County, and the City Manager asked me, since I

8     was familiar with the role, to step back in the role.

9          Q.   Were you happy to do that?

10         A.   I love the City, so, yes.

11         Q.   Have you enjoyed working for the City

12    throughout your tenure, the various years?

13         A.   Overall, yes, I'd say I have.

14         Q.   Okay.  All right.  I do want to back up a

15    little bit, just to go over -- you did say you've been

16    deposed before.  You're familiar with the format, with

17    the fact that you're under oath?

18         A.   Uh-huh.  Sorry, yes.

19         Q.   Do you have any reason you're unable to testify

20    truthfully today?

21         A.   No.

22         Q.   And no medication or you ate a big lunch and --

23         A.   Those red beans were good, but, you know, no

24    reason.

25         Q.   All right.  And you understand that if you need
```

```
 1   a break, you can ask for a break --
 2          A.    Absolutely.
 3          Q.    -- if you need me to repeat a question, all of
 4   that stuff.
 5                Have you ever testified, outside the context of
 6   a deposition?
 7          A.    In court, yes.
 8          Q.    What were the circumstances of that?
 9          A.    Probably the biggest I can recall is the SEC
10   matter with the City of Miami.
11          Q.    Were you at trial testifying?
12          A.    I testified at trial, yes.
13          Q.    And that was in your role as --
14          A.    At that point, I guess, as CFO, but I was no
15   longer with the City when I was asked to testify.
16          Q.    Are there other times that you've testified in
17   trials?
18          A.    Not in trials, no.  No.
19          Q.    Do you know the name of the case that was that
20   SEC case?
21          A.    It was SEC versus City of Miami.
22          Q.    And what year was that?
23          A.    I think that case finally made it to court in
24   2013.  I couldn't tell you the month.  I believe that
25   was the time frame.
```

```
 1        Q.   Have you ever been a party in a lawsuit?

 2        A.   No.

 3        Q.   Have you ever been a party in a criminal case?

 4        A.   No.

 5        Q.   Have you ever been arrested?

 6        A.   No.

 7        Q.   So you have no criminal background?

 8        A.   No.

 9        Q.   Do you have any professional certifications?

10        A.   Yes.  I'm a licensed CPA.  I am a licensed real

11   estate broker and realtor.  Those are my official

12   certifications.

13        Q.   When did you obtain your CPA?

14        A.   Oh, my goodness, a long, long time ago.  I

15   think, around 1999, 2000.

16        Q.   Have you maintained that consistently since

17   then?

18        A.   Yes, I have.

19        Q.   Are you subject to any disciplinary

20   authorities?

21        A.   Never.

22        Q.   Anyone ever file a complaint against you for

23   your CPA work?

24        A.   No.

25        Q.   When did you become a licensed realtor?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   In June of 2020.
 2        Q.   Have you maintained that consistently since
 3   then?
 4        A.   Yes, I have.
 5        Q.   Are you subject to any, you know, ethical or
 6   professional standards as a realtor?
 7        A.   None whatsoever.
 8        Q.   Has anyone ever brought a complaint about you
 9   as a realtor?
10        A.   Just that I sell houses really fast.
11        Q.   Please, put that in.
12             And do you understand that you've been
13   designated by the City of Miami to speak on its behalf
14   today?
15        A.   Yes.
16        Q.   Are you happy about this fact?
17        A.   I'm here to serve.  I'm here to serve.
18             MS. MCNAMARA:  Do we still have the same
19        exhibits from before?  Can I use --
20             THE REPORTER:  I am going to give you all
21        of them.
22   BY MS. MCNAMARA:
23        Q.   So Plaintiffs' Exhibit 7, which I believe is
24   the one on the bottom, the deposition notice --
25        A.   Yes.
```

1    Q.   -- do you recognize this document?

2    A.   Yes, I do.

3    Q.   And you've looked at it before?

4    A.   Yes.

5    Q.   Are you aware of which of those topics you're

6    designated to testify for?

7    A.   My understanding, I'm here to answer questions

8    regarding the third topic.

9    Q.   Can you read the third topic off of that

10   document?

11   A.   Sure.   "The ordinary processes of City

12   Commission business and administration, including the

13   development and adoption of the annual budget."

14   Q.   When did you learn that you would be testifying

15   in this capacity?

16   A.   Maybe a week ago, maybe ten days.

17   Q.   What did you do to prepare for today?

18   A.   Nothing.

19   Q.   Is that because we're talking about what you do

20   every day and you know it?

21   A.   Yes.

22   Q.   Are there other people who know more about this

23   topic than you?

24   A.   I will say, no.

25   Q.   Do you have anybody who reports to you?

1        A.   Yes.

2        Q.   Did you talk to any of them about what they're

3   working on, in preparation for this?

4        A.   No.

5        Q.   Do they give regular reports on what they're

6   working on?

7        A.   I have bi-weekly staff meetings.  So it's not

8   specific to this case, it's just in general.

9        Q.   Did you meet with any other City Officials to

10  prepare for this meeting?

11       A.   Absolutely not.

12       Q.   Do you regularly meet with any of the

13  Commissioners?

14       A.   At least an hour every week.

15       Q.   Is that in individual sessions?

16       A.   Yes.

17       Q.   And that's every week, so does that mean you

18  spend --

19       A.   It could be 30 minutes, could be 45, it could

20  be an hour and a half, but --

21       Q.   And that's for --

22       A.   For general business.

23       Q.   And that's for each Commissioner?

24       A.   Yes.

25       Q.   So if we add, five Commissioners, an hour, it

```
 1   might be five hours a week, in theory?
 2        A.   Yes.
 3        Q.   Do you meet with their staff separately?
 4        A.   Sometimes, yes, but generally they're in the
 5   other discussion.
 6        Q.   Do you work at City Hall in person?
 7        A.   I have two work locations, 444 Southwest 2nd
 8   Avenue, which is the administration building, and I have
 9   an office at Pan American Drive, at City Hall.
10        Q.   Do you go into City Hall regularly?
11        A.   I would say, probably two days a week, on
12   average, a little bit more on a Commission week.
13        Q.   Do you ever meet with the full Commission, like
14   in a meeting, publicly?
15        A.   Only at Commission Meetings.
16        Q.   Have you ever spoken publicly at the meetings
17   to the Commission in public?
18        A.   Too many times to count.
19        Q.   What do you generally discuss with the
20   Commissioners in your weekly meetings?
21        A.   Typically those discussions are regarding the
22   general agenda of the City, that is, you know,
23   forthcoming.  They'll be some drill downs on, you know,
24   specific initiatives they may have.  One of the
25   departments that reports to me is Community Development.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    That's a department -- as an example, that's the
 2    department that oversees all of our entitlement grant
 3    funding from the Federal Government, that's the money we
 4    deploy out to the community.  So, you know, each
 5    Commissioner gets to set policy around that.
 6              So, you know, we specify, you know, what are
 7    their desires.  We talk about how we're performing, that
 8    type of thing, for the most part.
 9         Q.   Do you interact with other City Officials,
10    other than the City Commissioners?
11         A.   I interact with the Mayor.  I interact with
12    the -- I still call him a City Official, the City
13    Manager, who is my boss, I interact with the City Clerk,
14    and I interact with the other constitutional officer,
15    the City Attorney.
16         Q.   So you stated that the City Manager is your
17    boss.  Is that your direct report, is the City manager?
18         A.   Yes, it is.
19         Q.   And who's that?
20         A.   Art Noriega.
21         Q.   And how's your relationship with him?
22         A.   I'd say, very good.
23         Q.   What is the nature of how you interact with him
24    on a regular basis?
25         A.   We probably talk every day, you know, or five
```

```
 1    business days at least a week.  I'm generally in charge
 2    of, you know, finance, budget, procurement, a lot of the
 3    internal services, in addition to asset management.  So
 4    I have a number of initiatives going on.  So I'll talk
 5    to him, like I said, at least once a day, if not several
 6    times a day.
 7         Q.  Does he dictate what you work on?
 8         A.  Yeah.  I mean, generally, yes.  He provides me
 9    with my assignments.
10         Q.  Do you have any discretion on how you choose
11    what you wish to work on?
12         A.  I have a large area of responsibility, so
13    within the context of that, no, but I do get special
14    projects from time to time that will be, you know,
15    assignments that he'd like for me to pursue or lead.
16         Q.  Preparing for this, did you review any written
17    documents?
18         A.  I did nothing to prepare.
19         Q.  Okay.  Your life is your preparation for this.
20         A.  I guess.  I will tell you, I don't know nothing
21    about this, but -- the subject matter, the litigation
22    subject matter.
23         Q.  Okay.  So you have not looked at any court
24    filings in this case?
25         A.  No.  It's not my area.
```

```
 1        Q.   Okay.  Do you live in the City of Miami?

 2        A.   I do.

 3        Q.   Do you know what district you live in?

 4        A.   I live in District 2.

 5        Q.   What neighborhood?

 6        A.   Omni.

 7        Q.   How long have you lived there?

 8        A.   I've lived there now for eight years.

 9        Q.   Did you live in the City of Miami prior to

10   that?

11        A.   Yes.

12        Q.   And where was that?

13        A.   I lived in Brickell and in the Roads.

14        Q.   Is that in District 3?

15        A.   So, in Brickell, District 2; in the Roads, it

16   was District 3 or it is District 3 still.

17        Q.   Have you live continuously -- like when did you

18   first move to the City of Miami?

19        A.   In February of 2003, when I first joined the

20   City.

21        Q.   And where were you before then?

22        A.   In South Dade, so the Colonial Drive area.

23        Q.   So how did you choose to come to the City of

24   Miami for work?

25        A.   I got divorced, and the Mayor said, "We pay you
```

```
 1    enough that you should be living in the City."  So I
 2    found an apartment that day.
 3         Q.   There you go.
 4         A.   And never left.
 5         Q.   You mentioned your consulting work.  Have you
 6    had professional employment for another entity, other
 7    than a government entity, in your career?
 8         A.   Oh, absolutely.
 9         Q.   What was the last private entity that you
10    worked for?
11         A.   With my consulting?
12         Q.   Separate from your consulting.
13         A.   Oh, last prior --
14         Q.   If you were an employee.
15         A.   Oh, if I was an employee?  The last private
16    employer I had was to TotalBank, which was a financial
17    institution here, based in Miami.
18         Q.   And when was that?  What was the period?
19         A.   That period was from 1997 until 2003 or the end
20    of 2002.
21         Q.   And what is your educational background?
22         A.   I hold a Bachelor's of Science in Management,
23    with a Major in Accounting from Tulane University, and I
24    have matriculated through certificate programs at the
25    University of Columbia -- or Columbia University School
```

```
 1  of Engineering and Harvard School of Business.
 2      Q.   Do you have any advanced like degrees or
 3  certificates?
 4      A.   I do have a certificate in entrepreneurialship
 5  from Harvard University.
 6      Q.   So, going back to Topic Number 3, how often
 7  does the City Commission develop a budget?
 8      A.   So we -- and I'm bifurcating my answer.  So we
 9  have an annual budget development process, that results
10  in the annual budget appropriation every year, that is
11  due -- has to be approved and forwarded to the State and
12  the County by September 30th every year.  During the
13  fiscal year, we will have amendments to that budget from
14  time to time, as may be necessary, but typically, at
15  least, you know -- you'll have at least two amendments
16  every fiscal year, a mid year, and then a close-out
17  amendment, and then you have the original appropriation.
18      Q.   The two amendments, those are planned ahead of
19  time to happen every year?
20      A.   Time-wise, yes.  We know generally when we want
21  to bring those forward.
22      Q.   And what is the purpose of having those
23  amendments?
24      A.   To account for additional revenues or grants we
25  may receive during the fiscal year and to deal with
```

1    additional expenditures that may need to be addressed

2    from time to time via an appropriation action by the

3    City Commission.

4          Q.    And do you ever have other amendments, other

5    than those, the mid year and the --

6          A.    No.

7          Q.    Could it come up that you needed to, if there

8    was some significant concern about the budgeting or the

9    finances?

10         A.    Yes.

11         Q.    Has that ever happened before?

12         A.    In my 20 odd years of my involvement with the

13   City, not really.

14         Q.    Would you say, in general, that the City is run

15   fiscally soundly?

16         A.    I absolutely would.

17         Q.    Have there ever been periods when you were

18   concerned about that?

19         A.    Yes.

20         Q.    When was the last time you had a concern about

21   that?

22         A.    2008 to 2010.

23         Q.    Just generally speaking, what was the basis for

24   that?

25         A.    We were in a financial environment in this

1    country where there was a huge real estate bust.  The
2    City of Miami and the Miami region happened to be the
3    epicenter of that.  Simultaneous to that, we have two
4    pension plans -- two, you know, employee pension plans,
5    that were suffering losses that, by contract, the City
6    had to fill in the gap, if you will, financially.  All
7    of that came together at one time.  So we were eating
8    into our reserves.
9           The result of that was a declaration of
10   financial urgency by the City, which is a State
11   designation, which allowed us to actually impose Union
12   contracts and make changes to the pension, in order to
13   ride through that financial kind of crisis period.
14       Q.  Was the SEC case that you testified in arising
15   out of that period of time?
16       A.  Timing-wise -- no.  It occurred -- it arose out
17   of bond transactions that occurred after that time
18   period.
19       Q.  So it wasn't connected to that --
20       A.  No, it was not.
21       Q.  Was there ever any allegations of impropriety
22   or mismanagement in the period of the downturn that you
23   talked about?
24       A.  No.
25       Q.  It was just a matter of, everyone was suffering

*Bailey & Sanchez Court Reporting, Inc.*

1  and it was happening here?

2      A.   Right.  Yes.

3      Q.   You talked about the updating to the current

4  fiscal year budget.  Setting that aside, what is the

5  timeline on the annual budgeting process?

6      A.   So, typically, we will start our preparation

7  process between January and February.  What that entails

8  is us sending out communications to the various

9  departments, please start readying yourself to, you

10  know, make your request.  We also align our strategy --

11  general strategy, to the budget allocation.  So we're

12  asking for your goals and objectives.

13          The Budget Analyst and Budget Department, that

14  report to me, start doing their forecasting for the next

15  fiscal year.  So they're gathering financial data from

16  numerous sources, so that they can kind of come up with

17  a methodical formulate means of supporting one of those

18  forecasts.

19      Q.   You say you talk to people about what you're

20  expecting.  Is that talking to the Commissioners or is

21  that talking to the staff of the City, who are operating

22  it?

23      A.   So, typically, the commencement of that process

24  is just talking to staff, you know, talking to police

25  operations, fire, GSA, you know, what are, you know, our

1   car replacement needs.  You know, we're literally

2   gathering all of the information.

3            Probably, as we get into the June time frame is

4   when we formally engage with the City Commissioners and

5   the Mayor.  By Charter, the budget is actually the

6   Mayor's presentation.  So, at that point, we have, you

7   know -- through the City Manager, of course, we've kind

8   of formulated what our recommendation is with regards to

9   the millage setting, fee setting, those matters, and we

10  present that information, initially, individually, to

11  the Elected Officials and get their feedback.  We

12  synthesize it and then we come up with a final proposed

13  budget that is shared with the community.

14           There is also community impact.  We do public

15  meetings.  We do several of those during that process,

16  as well, to kind of see what citizens are concerned with

17  or what financial priorities there are, and we try to

18  include all of that in the final proposed budget that

19  gets presented in September for consideration and

20  approved by the City Commission.

21       Q.  And once you've submitted it in September, is

22  it, you've handed it off to the Commission and now

23  they're responsible for it?

24       A.  At that point, by our Charter, they have line

25  item authority to change the budget in any way, shape or

*Bailey & Sanchez Court Reporting, Inc.*

1    form they choose.

2         Q.   If they do that, do they ask you to change it

3    on their behalf?

4         A.   It's a directive to the City Manager or through

5    the City Manager, to make whatever those changes are.

6         Q.   And you just completed that process for this

7    year?

8         A.   Yes, we did.

9         Q.   How did that process go?

10        A.   Fairly -- well, minus a couple of things that

11   everyone knows has occurred with one of our

12   Commissioners, it was a fairly smooth process.

13        Q.   How long does it take to work out that process,

14   starting from when you submitted it to the point --

15        A.   Nine months.

16        Q.   Okay.  And so that's, essentially, from January

17   1st to September 30th?

18        A.   Correct.

19        Q.   Do you ever finish early?

20        A.   No.  We were changing that final proposed

21   literally up to an hour before the actual meeting

22   occurred.

23        Q.   When you're designing the budget, before you

24   submit it, do you take into account potential new

25   projects or Ordinances that the Commission is working on

1   or is it just based on what was already under the law

2   and you were going to be doing anyway?

3       A.   We try to be very forward thinking and take

4   into account any and every input that we can.  So that

5   will include Federal law changes, State law changes,

6   some pending, City Commission Ordinance changes,

7   potential policy changes that they are intending to

8   make, requests that they make, priorities that they

9   share.  So, yes, everything.

10      Q.   If a Commissioner is thinking -- let's say,

11  it's April and one of the Commissioners is thinking

12  about trying to pursue a new initiative or create

13  something that would have a budget impact, would you

14  expect the Commissioner or their staff to reach out to

15  you to discuss the potential budget impacts at that

16  point?

17      A.   Yes, but I will tell you, we're a little bit

18  more proactive, so we're constantly going to them

19  engaging.  And when I say, "We," myself, the Manager,

20  the Budget Director, and, you know, the staff, and, in

21  some cases, some of my colleagues, you know, the other

22  Assistant City Managers, as well, in their engagement

23  with the Elected Officials in their areas.

24      Q.   And that's part of what you talked about, say,

25  the hour a week or whatever with each one?

1      A.   Yes.   Yes.

2      Q.   You're just meeting with them and asking them

3   what they're working on, do you have anything that's

4   budget-wise, let's talk about it?

5      A.   Right.   They'll tell us.

6      Q.   Do they ever ask, is this something that looks

7   good to you or do they ask --

8      A.   Well, no.   They're like, I want to do this,

9   please add it, make sure it's in the budget.

10      Q.   Do they ever ask your advice?

11      A.   Yeah, they do.   They don't listen to it, but --

12      Q.   I was going to say, do they listen to your

13   advice?

14      A.   I'm like the five-year senior in the

15   organization.   I've developed a lot of respect.   I think

16   it's earned.   And so they tend to, you know, take

17   counsel from me when it comes to financial matters.

18      Q.   Do you ever tell them something, you say,

19   "That's not a good idea" or "That's going to be a real

20   big issue"?

21      A.   As with any relationship, absolutely.

22      Q.   Does that happen often?

23      A.   No, not often, but it does happen.

24      Q.   Have there been situations where you gave

25   advice not to do something and they did it anyway?

```
1        A.    Yes.

2        Q.    Does it ever cause problems for you?

3        A.    No.

4        Q.    It just comes with the territory?

5        A.    Yes.

6        Q.    How much City staff work time would you say is

7   spent on the budgeting process?

8        A.    Oh, my God, thousands of hours.

9        Q.    Do you have an estimate of like what percentage

10  of the staff time, of your staff, that you oversee, that

11  is dedicated just to the budget?

12       A.    20 people, times 1,600 hours, somewhere

13  probably in there.

14       Q.    What are the other major tasks that you and

15  your department are responsible for, separate from

16  budgeting?

17       A.    I have finance, which is the accounting

18  function of the City.  I have community development,

19  which is the grants entitlement.  I have grants

20  administration.  I have risk management.  And I'm

21  missing -- I have procurement, and I have asset dream or

22  asset management, the department of real estate.

23       Q.    Are you involved with municipal bond offerings?

24       A.    I lead every one of them myself.

25       Q.    How much staff do you have that support that?
```

```
1        A.   So we have both, internal and external staff
2   supplements.  So PFM is our financial advisor.  We
3   engage five underwriting banks, so all of their staff,
4   outside bond counsel, internal bond counsel, and
5   typically I have my Finance Director and my Treasurer
6   that work on that.
7        Q.   Is the Commission involved in the bond
8   underwriting or issuing process?
9        A.   They're part of the process, because they
10  provide the authorization for me to proceed with the
11  transaction.  So there's a Commission -- so there's a
12  bond ordinance passed for each offering.
13       Q.   How many bond offerings have you done in 2023?
14       A.   None.
15       Q.   How many have you done in 2022?
16       A.   None.
17       Q.   Is that normal?
18       A.   It can be, yes.
19       Q.   When was the last time you did a bond offering,
20  that you recall?
21       A.   My last one was for the Marlins garage, the
22  Marlins Stadium garage, and I think that had to have
23  been 2010.
24       Q.   So it is not a regular occurrence every year?
25       A.   It kind of depends on what's -- you know,
```

1   what's happening.  So, for instance, the City citizens

2   approved a bond referendum authorizing the City to issue

3   up to 400 million dollars in bond proceeds for four

4   different categories.  I can go issue that debt at any

5   time, with the limitation of the millage rate I can

6   assess in order to pay the debt service on an annual

7   basis.

8           So, right now, and you asked about 2023, I'm

9   doing a bond issuance in two weeks for 285 million,

10  which was just approved by the City Commission.  We are

11  already planning to do another, at least, probably 200

12  million of that same referendum.  I'm trying to push

13  them before the end of the calendar year, but it looks

14  like it will be January of 2024.  So it's a little wacky

15  right now.

16      Q.  Are the Commissioners involved in that?

17      A.  Only with regards to prioritizing the projects

18  that are being funded and authorizing the bond

19  ordinance, and if we wanted to do another referendum,

20  they would have to approve that referendum to go out to

21  the voting constituency to be considered.

22          They're not involved in the mechanics of the

23  actual issuance of the debt.

24      Q.  Are the Commissioners involved in the oversight

25  of the finances of the City?

*Bailey & Sanchez Court Reporting, Inc.*

1      A.   From the budgetary standpoint, policy setting,
2   yes.   They do not get involved in the day-to-day
3   operations.
4      Q.   Outside of the budgeting process, what specific
5   interactions or duties do you have with the Commission
6   that you have to work with regularly?
7      A.   I mean, I have to keep it in the context of my
8   position.  I'm an Assistant City Manager, so I assist
9   the Manager in running the day-to-day operations of the
10  City.  So picking up garbage, policing, public safety,
11  parks, all of that.  I could be assigned to do any -- to
12  oversee any portion of that, based on the Manager's
13  will.  So, basically, anything associated with
14  implementing or operating any of the policy decisions
15  that the City Commission has and directs the Manager to
16  follow, I could be responsible for, you know,
17  implementing or overseeing.
18     Q.   When there is a Commission -- whenever the
19  Commission is down a Commissioner, like right now we
20  only have four Commissioners, do you notice it in your
21  work?  Does it impact your work?
22     A.   Given that I've gone through this at the City
23  like five or six times, no, it doesn't.  We are here
24  to -- you know, the City Commission is the board.  You
25  know, I'm the Chief Financial Officer.  So we have a

1    business to run and we run the business.

2        Q.   So you were in the office and doing your work

3    in early 2023 When Commissioner Russell resigned; is

4    that correct?

5        A.   Yes, I was.

6        Q.   What was the impact to your work during the

7    period between when Commissioner Russell resigned and

8    when Commissioner Covo took that seat?

9        A.   No impact to my work.

10       Q.   Has there been any impact to your work, during

11   the current time, since Former Commissioner Diaz de la

12   Portilla was suspended?

13       A.   No impact to my work.

14       Q.   Was there any period this summer, when

15   Commissioner Carollo was unavailable, due to outside

16   obligations?

17       A.   No impact to my work.

18       Q.   Is that true, in general, in these situations?

19       A.   Yes, it is.

20       Q.   When was the last time you recall a reduction

21   in the number of Commissioners impacting your work in a

22   significant way?

23       A.   The period, I think it was either '08, '09,

24   between -- the administrative change between Mayor Diaz

25   and Mayor Regalado.  We had two Commissioners removed

1  simultaneously from office, and then we had an election,

2  a special election, and I recall, during that time, we

3  probably had a six-week period where we couldn't

4  actually hold a meeting, because there was a runoff.  So

5  we only had like one -- I think two duly elected,

6  certified Commissioners, and the others were in the

7  process, if you will.  So that was the only time I

8  recall that we just couldn't have a board meeting.

9  Still did day-to-day operations, you know, all of that

10  stuff did take place.

11      Q.  What is the quorum requirement for the City

12  Commission to have a meeting?

13      A.  Three.

14      Q.  And so as long as there are three active

15  Commissioners, they can act and bind the Commission?

16      A.  Yes.

17      Q.  And that would be through a vote of two of

18  them?

19      A.  It's actually a vote of three of them.

20      Q.  Like are they required to be unanimous?

21      A.  No.

22      Q.  It's just the three of them act, and however

23  they get there?

24      A.  Correct.

25      Q.  Had there been any preparations or

```
 1   considerations for the possibility currently, while we
 2   only we have four active Commissioners, what would
 3   happen if another one were to leave?
 4        A.   No.  No.
 5        Q.   Do you have any concern that that would happen?
 6        A.   No.
 7        Q.   Since the time when that you discussed, you
 8   know, the 2008 era, when two of the Commissioners left
 9   at once, has there ever been a time when you thought
10   that it was possible that there would be that level of
11   disruption of the Commission?
12        A.   No.
13        Q.   Do you worry about that now at all?
14        A.   I don't.
15        Q.   What about the staff of the Commissioners,
16   like, for example, does the staff for the District 1
17   Commissioner stay in place when the Commissioner is
18   gone?
19        A.   As an operating concern, we do our best as, you
20   know, I'll call it, swift management, to not disrupt
21   those individuals, you know.  Those are employees of the
22   City, that have families and count on their paychecks,
23   and so we leave them in place.  They're still doing
24   things.  You know, they're working.  They're not sitting
25   at home.  So they're working, waiting on the elected
```

```
1   position to be filled, and, you know, then, whatever
2   decisions will be made, will be made.
3        Q.   Does that staff still perform constituent
4   services?
5        A.   Yes, they do.
6        Q.   Have you heard any complaints about lack of
7   constituent services in District 1 since the
8   Commissioner was removed?
9        A.   I have not.
10       Q.   Did you hear anything along those lines related
11  to District 2, during the time between Commissioner
12  Russell and Commissioner Covo?
13       A.   I did not.
14       Q.   Have you ever had concerns that you've heard
15  expressed to you -- concerns from other people,
16  expressed to you, about constituent services in any
17  district in Miami?
18       A.   I mean, the normal -- in the normal course of
19  business, of course, but not in relation to someone not
20  being there to serve -- not being present in the elected
21  seat.
22       Q.   How does the fact that it's an election year
23  impact the work that you do with the Commission related
24  to budget?
25       A.   You know, again, I've been doing this for a
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    very long time.  In my view, the only thing I've ever

 2    seen is that there tends to be more conservatism when it

 3    comes to assessment of the millage and of setting of

 4    fees.  It seems there will be a prioritization of

 5    projects, you know, that we need to get them done, so

 6    there's, you know, a push to really broadcast and really

 7    show results.  So that's the biggest thing I see ever.

 8         Q.   Was that true for this year's budgeting

 9    process?

10         A.   It absolutely was.

11         Q.   Do you see a difference between the

12    Commissioners who are up for re-election and the ones

13    who aren't, during this process, when you work with them

14    individually?

15         A.   No.

16         Q.   Would you say that a Commissioner that's up for

17    re-election is less engaged in the budgeting process

18    than the one that isn't?

19         A.   No, they're very well engaged in the budget

20    process.

21         Q.   If you didn't know it was an election year and

22    you were just -- but you had done your job for many

23    years and you were dropped in, would you be able to tell

24    whether a Commissioner was up for re-election or not,

25    based on your interactions and request --
```

1      A.   With my eyes closed.

2      Q.   You would know that they were up for

3   re-election?

4      A.   Yes.

5      Q.   Is that based, you're saying, on like the

6   conservatism of how careful they want to be with things?

7      A.   That's a portion of it.

8      Q.   Is it also like their body language?

9      A.   No.   They're very focused on constituent

10  services.   Not to say they're not focused all of the

11  time, but there's a heightened level of focus during

12  re-election time, because they are typically trying to,

13  oh, yeah, I did this already, I did this already, you

14  need to know.

15     Q.   Has there ever been a situation where there was

16  something that needed to be done in the City, you know,

17  related to the Commission and the administration, and

18  because it was an election year, that was unable to be

19  done?

20     A.   No.

21     Q.   Is there ever anything that the Commission or

22  the City is supposed to do, that they don't do because

23  of what you would assess as like fear of political

24  impacts in the election?

25     A.   No.

1    Q.   Would you say that the budget process runs

2  similarly whether it's an election year or non-election

3  year?

4    A.   The process, absolutely runs the same every

5  year.

6    Q.   Do you prefer it election years or non-election

7  years?

8    A.   It doesn't matter to me.   The information that

9  I provide, the feedback that I give, is always focused

10  on the running of the business.   So I will make -- you

11  know, not that they're always accepted, but we will make

12  professional recommendations with regards to, again, fee

13  setting, dollar allocations to certain things that we

14  know need to be addressed the same way every year,

15  regardless of whether it's an election year or not.

16    Q.   Does the staffing of your department change

17  whether it's an election year or not?

18    A.   No.

19    Q.   Is that true across the City?

20    A.   Yes.

21    Q.   There's never any, oh, it's an election year,

22  so we need to get more people working?

23    A.   No.   You know, there's a hard line between

24  their political staff and our staff.   So that stuff

25  is -- I don't even know -- that's their private stuff.

```
1    We have our 4,600 employees and they're here.
2         Q.   Is there any impact of a special election,
3    outside of the regular course, on this work?
4         A.   No, not really.  I mean, you know, other than
5    an invoice, no.
6         Q.   You haven't had an experience where, let's say,
7    you were going to go and work on the budget, and one of
8    the Commissioners said, you know what, I've got a
9    special election coming up.  I know no one else is
10   dealing with it, but just don't anything, don't talk to
11   me right now?
12        A.   Never.
13        Q.   They always meet with you, when you want to
14   meet with them?
15        A.   Every time.
16        Q.   That's nice.
17        A.   No, it's not, for the record.
18        Q.   What is the procedure that the City follows
19   before holding a public meeting?
20        A.   Generally speaking, I don't know the specific
21   mechanics, you know, of that detail.  I couldn't one,
22   two, three, four it, but there's always -- the biggest
23   thing, there's a public notice requirement before every
24   public meeting.
25        Q.   Are you involved in that process?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   Thank God, not at all.
 2        Q.   You don't contribute any language that gets put
 3   into it?
 4        A.   Never.
 5        Q.   That's probably good.
 6             Do you see the agendas for the public meetings
 7   before they're finalized?
 8        A.   I'm part of a draft agenda, and this is related
 9   to the general City Commission agenda, specifically.  So
10   I see that agenda, and we review it usually 30 days
11   before it is to be published.
12        Q.   Are there any types of public meetings in which
13   that process is not followed?
14        A.   None that I'm aware of.
15        Q.   Are there any like emergency justifications for
16   not following those processes?
17        A.   No.  You always have to give notice.  Even if
18   it's 24 hours, you have to give notice.
19        Q.   Do you consider the elections part of the
20   ordinary business administration of the City Commission?
21        A.   I consider it part of the ordinary course of
22   the City's business, yes.  It doesn't -- it is not a
23   part of the administration's business.
24        Q.   Are you involved at all in the planning of
25   elections?
```

1     A.   No.

2     Q.   Are you involved at all in the administration

3  of the elections?

4     A.   No.

5     Q.   Do you have any inside knowledge of what

6  happens, before the rest of the public, as to what

7  happens in elections?

8     A.   No.

9     Q.   You sit and watch the results just like

10 everyone else?

11    A.   Well, as a citizen of Miami, I'm a voter, so

12 I'm being at the polls.

13         MR. JOHNSON:  It's a little concerning if

14     you see the results before the election.

15 BY MS. MCNAMARA:

16    Q.   I can't imagine that you'd be like, oh, yeah,

17 they run it by me, and I say, yeah, change it --

18    A.   And, remember, that data and all of that stuff

19 is with the County's Elections Department.

20    Q.   Oh, right.  Absolutely.

21         Do you have any relationships with the County

22 in your work?

23    A.   Plenty.

24    Q.   What kind of interactions do you have with the

25 County?

```
 1        A.   I interact with my counterparts at the County
 2   quite often with regards to intergovernmental issues,
 3   typically, you know, obviously, more focused on
 4   financial matters, but could be a property or, you know,
 5   we need to do something in collaboration, because it's
 6   in the City, but it's their street.  You know, it could
 7   be a number of things.
 8        Q.   Are you involved in the invoicing and payment
 9   of invoice processed for the elections to the County?
10        A.   I am charged with overseeing finance, so they
11   process the invoice.
12        Q.   Have you ever had an issue with an invoice for
13   the City -- a City invoice from the County Elections?
14        A.   No.
15        Q.   Do you foresee that it's likely that you would
16   ever have an issue with that?
17        A.   No.
18        Q.   How significant is the cost of running
19   elections to the City's budget?
20        A.   Fairly minute.
21        Q.   So how much is the annual budget for this year?
22        A.   One billion sixty-eight million.
23        Q.   What was last year's budget?
24        A.   965 hundred million, so just shy of a billion.
25        Q.   What about 2021?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   I don't know that one right off the top of my
 2   head.
 3        Q.   Would you say it's going up --
 4        A.   It's absolutely going up.
 5        Q.   Always goes up?
 6        A.   Yeah.   Yeah, it always goes up.
 7        Q.   Would you attribute that to inflation or --
 8        A.   No.   No.   No.   There is a natural increase in
 9   fees and costs, also, so, you know, you have to offset
10   that.   So, yes, it always goes up.
11        Q.   Have you ever been told that you need to
12   significantly lower the budget to get it back down?
13        A.   People have used those words with me, but then
14   I have to give them context, and so significant might
15   be, I'll cut a million dollars over here, but that's not
16   significant.
17        Q.   If you had to guess the percentage of the
18   annual budget that's dedicated to elections, what would
19   you guess?
20        A.   .0001, something like that.   It's a very small
21   number.   And, remember, it's not every year, so -- and,
22   then, we save money, I know, when we do have election
23   cycles that fall within the County's election cycle.   So
24   that's a little bit cheaper, but, yeah, it's very
25   insignificant.
```

1       Q.   Is there an approval process for expenditures
2  that need to be signed off by someone within the City?
3       A.   Yeah.  We use the Oracle ERP system, that has
4  the approval hierarchies already built into the system.
5  So say you initiated an invoice and you were a part of
6  my organization.  It will go through whatever the
7  hierarchy is.  I won't necessarily approve it.  It may
8  be -- depending on the dollar amount, it will go to your
9  supervisor and that's all that's needed for it.  If
10 you're a manager, and that's all that's needed, or the
11 Finance Director, that's all that's needed, but not
12 necessarily to me.
13           I think the only expenditures I really approve
14 on a regular basis is that of the City Manager.
15      Q.   And why do you approve the expenses of the City
16 Manager?
17      A.   Because he can't approve it himself, and he's
18 the number one person in our organization, and it can't
19 be approved by the Elected Officials, because they're
20 not part of the day-to-day operations.
21      Q.   Are there thresholds for amounts that influence
22 the level of approval needed?
23      A.   Absolutely.
24      Q.   What is the lowest threshold?
25      A.   I couldn't tell you.

```
 1        Q.   What is the high threshold?

 2        A.   A billion dollars, whatever that appropriation

 3   is.

 4        Q.   Where would you put election expenses on that

 5   continuum of very small to very high?

 6        A.   I mean, I know it tends to be in between 200 to

 7   maybe a half million bucks, so probably not that high.

 8             MS. MCNAMARA:  It's approaching 3:00.  Do

 9        you want to stop and talk?

10             Do you want to take a break?

11             THE WITNESS:  If you need to take a caucus,

12        I'm definitely for that, if you need to.

13             (Short recess taken.)

14   BY MS. MCNAMARA:

15        Q.   So, at the earlier portion, you testified that

16   the impact of election years on the performance of the

17   Commission during the budgeting process mostly reflects,

18   you know, more interesting constituent services?

19        A.   Conservatism and results.

20        Q.   Yeah.  Are there any other impacts that you see

21   to the budgeting process as a result of it being an

22   election year?

23        A.   No.

24        Q.   In an average election year, can you tell the

25   difference -- let's cut that off.
```

1          Can you tell the difference between an election

2  year in which there's two Commissioners and the Mayor

3  up, versus an election year where there's three

4  Commissioners up?

5      A.   No.

6      Q.   What if all five of the Commissioners happen to

7  be up for election, do you think that would change it?

8      A.   It's going to be an interesting year.

9      Q.   Why do you say that?

10      A.   This is a personal response.  You have the

11  opportunity to have 100 percent turnover in elected

12  officials, which would undoubtedly result in a hundred

13  percent potential change in how policy is derived and

14  implemented, and, you know, that would be a lot, a lot

15  of change at one time, without having, you know, some

16  historical, political knowledge, on the dais, and, you

17  know, potentially some level of balance, but that's a

18  personal thing.

19      Q.   Do you think that a Commissioner whose up for

20  re-election, and, therefore, uncertain whether they will

21  still be in the position six months from now, behaves

22  differently in the budget process from one who is in the

23  middle of their term and is not concerned about whether

24  they're going to be there in six months?

25      A.   No, because, generally -- and the reason why I

*Bailey & Sanchez Court Reporting, Inc.*

1  said it doesn't change a lot, remember, this is their

2  one and only time a year that they get to really have an

3  impact on the operations via the money.  So they can

4  say, only hire -- I'm only going to give you money to

5  hire five people, or they can eliminate a specific

6  position, you know.  So they're always engaged, because

7  it's that one and only opportunity to do so, you know,

8  the big time to do so.

9      Q.   Does the presence of it being an election year

10 negatively impact the ordinary operations of the

11 Commission?

12     A.   No.

13     Q.   Is that true regardless of the number of

14 Commissioners who are up for re-election?

15     A.   Yes.

16     Q.   If there happens to be all five Commissioners

17 up for re-election, let's say, right now, in November of

18 2023, do you think that would have negatively impacted

19 the budgeting process that you just completed?

20     A.   No.

21     Q.   Do you think it would negatively impact any

22 other administration processes that you're involved in?

23     A.   I mean, I might quit, but --

24     Q.   It would negatively impact you, because you

25 would leave.

```
 1        A.    Again, it's a personal thing.  I've been
 2   through this.  I've been a City Manager in a city.  I've
 3   gone through political change, a lot of it, here, in my
 4   tenure here.  So, for me, personally, yeah, I'll
 5   probably make some different decisions for me, but I'm
 6   also the guy who's been through five City Managers, and
 7   I've been through a lot, change-wise, not negative, but
 8   budget process-wise.  No, they're still going to, I want
 9   five of these, you know, I want two of this, I want this
10   to happen, I want to support this CBO.  All of those
11   things are still going to be there.  And, again, I go
12   back to the same thing, the only thing I know generally
13   happens is, they're very conservative with regards to
14   the millage assessment.  By that I mean, they typically
15   want to reduce taxes during that time, and that's what
16   happens.  Like last year, it happened, and you saw, this
17   year, it happened again.
18             MS. MCNAMARA:  No further questions from
19        us.
20             MR. JOHNSON:  No Cross.  Read.
21             (Thereupon, the reading and signing not
22        being duly waived, the deposition was concluded
23        at 3:07 p.m.)
24
25
```

```
 1

 2

 3
                      _____
 4                            DEPONENT

 5

 6

 7          Sworn to and subscribed before me this _____

 8   day of _____, 2023.

 9

10

11
                      _____
12                          NOTARY PUBLIC

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA    :
                         SS
 3    COUNTY OF MIAMI-DADE:

 4              I, NIEVES SANCHEZ, Court Reporter, and a
      Notary Public for the State of Florida at Large, do
 5    hereby certify that LARRY SPRING personally appeared
      before me and was duly sworn.
 6              WITNESS my hand and official seal in the
      City of Miami, County of Miami-Dade, State of Florida,
 7    this 17th day of October, 2023.

 8

 9
                      _____
10                    NIEVES SANCHEZ
      Notary Commission Number HH 385498
11    My Notary Commission expires August 11, 2027

12              REPORTER'S DEPOSITION CERTIFICATE

13    STATE OF FLORIDA    :
                         SS
14    COUNTY OF MIAMI-DADE:
                I, NIEVES SANCHEZ, Court Reporter and a Notary
15    Public for the State of Florida at Large, do hereby
      certify that I was authorized to and did report the
16    deposition of LARRY SPRING; that a review of the
      transcript was requested; and that the transcript is a
17    true and complete record of my stenographic notes.
                I further certify that I am not a relative,
18    employee, attorney, or counsel of any of the parties,
      nor am I a relative or employee of any of the parties'
19    attorney or counsel, nor am I financially interested in
      the action.
20
                DATED this 17th day of October, 2023.
21

22

23
                      _____
24                    NIEVES SANCHEZ

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              BAILEY & SANCHEZ COURT REPORTING, INC.
                          (305) 358-2829
 2

 3                              October 17, 2023

 4

 5   Larry Spring
     c/o Christopher N. Johnson
 6   Gray Robinson
     333 S.E. 2nd Avenue
 7   Suite 3200
     Miami, Florida 33131
 8
     RE:  Grace, Inc. vs. City of Miami
 9
     Dear Mr. Spring:
10
     The transcript of your deposition, taken in the
11   above-styled cause on October 6, 2023, is at my office
     awaiting your examination and signature.  PLEASE
12   TELEPHONE BEFORE COMING IN so that we may arrange a
     convenient time.
13
     Please be advised that unless I hear from you by
14   November 17, 2023, I will forward the original of your
     deposition to the deposing attorney, as though you had
15   read and signed your deposition.

16   IN THE EVENT a copy of the transcript is being sent to
     the witness by counsel, kindly instruct the witness to
17   make any changes thereto on a separate sheet of paper
     and refer to the page number and line number which
18   corresponds to the change desired.  DO NOT MAKE THE
     CORRECTIONS ON THE TRANSCRIPT.  If you have any
19   questions, please call.

20   Very truly yours,

21

22
     NIEVES SANCHEZ
23   Court Reporter

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1                    ERRATA SHEET
 2  IN RE:  GRACE, INC., ET AL. vs. CITY OF MIAMI
 3  DEPOSITION OF LARRY SPRING
 4  TAKEN OCTOBER 6, 2023
 5
 6  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 7
 8  PAGE #          LINE#   CHANGE
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20
21                _____
22                    SIGNATURE
23
24
25
```

*Bailey & Sanchez Court Reporting, Inc.*