```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2

 3                    CASE NO.:  1:22-cv-24066-KMM

 4
     GRACE, INC., et al.,
 5
          Plaintiffs,
 6
     vs.
 7
     CITY OF MIAMI,
 8
          Defendant.
 9   _____/

10

11                                  Tuesday, 10:00 a.m.
                                    October 10, 2023
12

13

14

15

16              ZOOM VIDEOCONFERENCE DEPOSITION

17                          OF

18                  STEPHEN CODY, ESQ.

19

20

21

22           Taken on behalf of the Plaintiffs
           Pursuant to a Notice of Taking Deposition
23

24                         ___

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1   APPEARANCES:

 2   ACLU FOUNDATION OF FLORIDA, by
     NICHOLAS L.V. WARREN, ESQ., and
 3   On behalf of the Plaintiffs.

 4   GRAY ROBINSON, by
     GEORGE LEVESQUE, ESQ., and
 5   JASON L. UNGER, ESQ.,
     On behalf of the Defendant.
 6

 7

 8

 9

10                          WITNESS

11

12

13   STEPHEN CODY, ESQ.

14      Direct Examination                      3
        Cross Examination                      62
15

16

17

18

19

20

21

22

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    THEREUPON:
 2              (The following proceedings were held.)
 3              THE REPORTER:  Do you have an ID that you
 4        can show up to the camera?
 5              THE WITNESS:  I don't have one --
 6               THE REPORTER:  Or if the attorneys want to
 7        stipulate that that is Mr. Cody, that is
 8        acceptable, also.
 9              MR. WARREN:  I'm fine attesting that this
10        is Steve Cody.
11              MR. LEVESQUE:  I can verify that that is
12        Steve Cody.
13    THEREUPON:
14                        STEPHEN CODY, ESQ.
15    was called as a witness by the Plaintiffs and, having
16    first been duly sworn, was examined and testified as
17    follows:
18              THE WITNESS:  I do.
19                        DIRECT EXAMINATION
20    BY MR. WARREN:
21        Q.  Good morning, Mr. Cody.  My name is Nicholas
22    Warren.  I'll be taking your deposition.
23              First of all, I'd like to acknowledge that I
24    recognize you and acknowledge that you are Stephen Cody.
25        A.  Well, thank you.  I've been here most of my
```

*Bailey & Sanchez Court Reporting, Inc.*

1  life.

2       Q.   Have you ever been deposed before?

3       A.   Yes, I have.

4       Q.   Okay.  And have you ever taken or defended a

5  deposition?

6       A.   Oh, yes.

7       Q.   I figured.  So I won't belabor all of the

8  introductory ground rules and overview too much, because

9  you understand the format.

10           This is a question and answer session.

11  Everything will be taken down by Ms. Sanchez, the court

12  reporter.  Do you understand that you'll need to answer

13  clearly and preferably with a yes or no, something like

14  that?  We will, of course, try not to talk over each

15  other, to make sure that Ms. Sanchez can take everything

16  down accurately.

17           We're interested today in finding out

18  everything you know about the events that I'm going to

19  ask about relevant to this lawsuit.  So, for that

20  reason, I'm looking for full and complete answers to the

21  questions that I'm going to ask.  Do you understand

22  that?

23       A.   I do.

24       Q.   If I don't state a question very well, if you

25  don't understand it, just ask me to rephrase it.  It's

```
 1   my job to ask understandable questions, so let me know
 2   if I'm doing a bad job and I'll try my best to rephrase.
 3           It may be that you might not recall something.
 4   You may have, at one point, known the answer to a
 5   question, but don't anymore.  If there's something that
 6   might jog your memory, we might be able to provide it to
 7   you, so just let me know if that's the case.
 8           If you need to take a break, that's fine, just
 9   let me know.  I only ask that you -- that we not take a
10   break, if a question is pending, before you provide an
11   answer.
12           I'm also not anticipating this going too, too
13   long.  I'd be surprised if it went more than a couple of
14   hours, just to let you know.
15           Let's see, because it's so critical that we get
16   your complete and accurate answers, I just want to ask
17   whether you're taking any medications or anything else
18   that may make it difficult for you to understand and
19   answer questions today?
20      A.   No.
21      Q.   Okay.  Thank you.
22           You mentioned that you had been deposed before.
23   About how many times?
24      A.   If I had to guess, and this is a guesstimate,
25   maybe nine, ten times.
```

```
 1        Q.   Do you remember the last time?

 2        A.   Probably about fifteen years ago.

 3        Q.   Okay.  And do you remember what the subject

 4   matter of that deposition was?

 5        A.   That was to give an opinion about a fee that

 6   was being sought in a case by another attorney.

 7        Q.   Okay.  Have you ever been a party to a lawsuit?

 8        A.   Yeah.

 9        Q.   And about how many do you think?

10        A.   Nine, ten times.

11        Q.   When was the last one?

12        A.   The last one was in 2021.

13        Q.   What was the nature of that lawsuit?

14        A.   I am a member of the Palmetto Bay Village

15   Council.  The person that I beat, basically, took it as

16   an affront that I beat him, and when I responded to some

17   of the attacks he's made against me, his feelings were

18   hurt, and he claimed that I defamed him.

19        Q.   What is the status of that lawsuit?

20        A.   That's still pending.

21             And the one prior to that was, he also sued me,

22   for the same reason, but different things that I said,

23   but in that case, he claimed that three of my e-mails

24   caused his heart efficiency to drop by 65 percent.

25        Q.   Caused his heart efficiency to drop?
```

1    A.   Yes, his heart function to drop 65 percent.

2    Q.   Okay.

3    A.   So it's going to be interesting to talk to his

4  cardiologist, when we get to that, but, you know.

5    Q.   Have you ever been a plaintiff in a lawsuit?

6    A.   Yes.

7    Q.   And what are those cases?

8    A.   Well, the one that comes to mind was -- well, a

9  couple.  I brought actions to get public records under

10  Chapter 119 of the Florida Statutes.  And I think there

11  may have been three of those, maybe, over the years.

12    Q.   Any besides public records lawsuits?

13    A.   No.  I don't recall any.

14    Q.   Okay.  Thank you.

15         Did you prepare for today's deposition?

16    A.   I did have a conversation with Mr. Unger and

17  George, and I apologize, I don't know whether it's

18  Levesque or Levesque, but with George, on Saturday, and

19  we talked for about 45 minutes.

20    Q.   Did you do anything else to prepare, besides

21  that meeting?

22    A.   No.

23    Q.   No review of any documents?

24    A.   No.

25    Q.   All right.  Did you speak with anyone, besides

1    Mr. Unger and Mr. Levesque, in preparation for the

2    deposition?

3         A.   No.

4         Q.   All right.  Okay.  Turning now to the City of

5    Miami redistricting process after the 2020 census --

6         A.   Uh-huh.

7         Q.   -- when did you begin performing work on that

8    redistricting process?

9         A.   That would have been in 2021, probably the

10   Fall.

11        Q.   And how did your involvement begin?  How did

12   you become involved in the City's --

13        A.   I received a call from Miguel De Grandy.  We

14   had done the two prior redistrictings, and so he

15   basically told me, it's time to get the band back

16   together.  He asked me if I was interested in doing it,

17   and I told him okay.

18             And then we went about setting forth the

19   contracts that we were going to be working under, and

20   when those got signed, I got to work.

21        Q.   Okay.  On that subject, what was your fee

22   arrangement for the redistricting work?

23        A.   I got -- well, I charged them a flat $50,000

24   fee, which would cover everything from the moment we

25   signed up, until the time that they adopted a plan.  And

1    after that, if they wanted me to do any further work, I

2    would be billing them at $500 an hour.

3         Q.   And did they end up wanting you to do

4    additional work?

5         A.   No.

6         Q.   That's a "No"?

7         A.   Yes, that's a no.

8         Q.   Okay.  So the contracts were finalized, and

9    then you began work?

10        A.   Yes.

11        Q.   What work were you doing?  Can you walk me

12   through what work you were engaged in, from the

13   beginning, after the 2020 census?

14        A.   Okay.  Well, I first wanted to establish a

15   baseline, so I got the most recent boundary map for the

16   City of Miami, and then I -- and that would be showing

17   not only the City boundaries, but the boundaries of the

18   five then existing districts, and inputted that into the

19   software, and then prepared a report, with Miguel, on

20   the status, and, you know, how things look currently,

21   based upon the 2020 census figures.

22        Q.   And you said, "How things looked."  Was that

23   looking at just total population from the 2020 census or

24   anything additional?

25        A.   Well, I mean, all of the -- that was looking at

1   the public law, I believe it's 94-171 data, which deals

2   with population, population by race, population by

3   Hispanic or not, and then voting age population, and all

4   of those categories, and then also look at voter

5   registration data, because that was included in the

6   software that we were using.

7       Q.   What program is that?

8       A.   It was a program that the State of Florida put

9   together for its redistricting.

10      Q.   Florida Redistricting, I think it's called.

11      A.   Right.   Well, you access it on the website,

12  FloridaRedistricting.gov.   And so I set up an account,

13  and had several versions, when I would do something to

14  lay it out.   It would generate reports, that gave me an

15  indication of how voters in each of those districts

16  voted in certain statewide races, and so that's

17  preliminarily what I did.

18      Q.   Okay.   And how was that preliminary information

19  used?   You gave that to Mr. De Grandy and then?

20      A.   Well, I prepared a report.   I gave all of our

21  report styling to the members of the City Commission,

22  but made sure that Todd, the City Clerk, had it in both,

23  digital format, so he can post it on the website, if he

24  wanted to, as well as hard copies.

25          We then -- the two of us had a meeting with

1    each of the members of the City Commission, in fact,

2    several, over the entire process, to talk about various

3    things.

4        Q.   Those are the public meetings -- the public

5    redistricting meetings that happened --

6        A.   No.   We also had some individually with them,

7    in their offices.

8        Q.   I see.

9             Is it your understanding that you have a --

10   that the work you were doing, that was not made public,

11   is attorney work product?

12       A.   I don't have an understanding, one way or the

13   other.   I would leave that to the City, whether they

14   wanted to claim that it was attorney work product.

15       Q.   Okay.   Is it your understanding that the

16   meeting -- private meetings that you had with City

17   Commissioners or their staff are protected by some type

18   of privilege?

19       A.   Again, if the City wants to assert a privilege,

20   they can.   I don't have an opinion, one way or the

21   other.

22       Q.   Okay.   Okay.   We may get into that a little bit

23   more later on.

24       A.   Fine.

25       Q.   So you did the preliminary work.   What other

1  work did you do at the beginning of the redistricting

2  process in 2021?

3      A.  Well, I went back and tried to familiarize

4  myself with the different neighborhoods and communities

5  of interest, took a look at what changes had been made

6  over the past ten -- I mean, I live in Miami.  Well, I

7  believe in Palmetto Bay, which is a suburb south of

8  Miami, but to familiarize myself with some of the

9  changes that have gone on in the City of Miami

10 demographically.  I looked at some of the census data

11 from the last census, the 2010 census, in order to see

12 what kind of -- more to refresh my recollection and get

13 an idea of what kind of trends we were looking at, in

14 terms of the increase or the decrease of any constituent

15 population group.

16     Q.  Did you analyze racially polarized voting?

17     A.  Yes.

18     Q.  Can you talk more about that analysis and what

19 you did?

20     A.  Sure.  Well, what I did was, I went to the

21 website of the Supervisor of Elections for Miami-Dade

22 County, and I downloaded the registration data for all

23 of the precincts in the County, the registration data

24 for all of the elections that had taken place, focusing

25 mostly on County-wide elections.  So that would be

1   Statewide elections, because they would cover the entire

2   County, as well as County-wide elections.  It's kind of

3   hard to do -- well, I actually may have -- because I had

4   the data, I may have looked at, I think I did, City

5   elections, but the City elections are done by district.

6         I mean, I was involved also with the lawsuit

7   that eventually caused the City to adopt districts, but

8   I didn't rely on -- I looked at it, but I did not rely

9   upon it, you know, but there are two accepted

10  methodologies to see if there is polarization in voting

11  by either race or ethnicity, and I had done that kind of

12  analysis going back into the 1990s.

13        I was the attorney who handled the case that

14  brought single-member districts to Miami-Dade County's

15  Commission and to the Miami-Dade County's School Board,

16  and because, in neither case, the plaintiffs, who hired

17  me, provided me with the resources, I learned how to do

18  the analysis myself.  I have a political science degree,

19  but, you know -- and so I did that kind of analysis in

20  the City of Miami, and then drew upon what I had learned

21  through those prior matters, because I also looked at

22  it, besides -- during the 1980s, involving the County

23  and the School Board, but in the recurring

24  redistrictings, I looked at it, to make sure that there

25  was still evidence of racially polarized voting going

*Bailey & Sanchez Court Reporting, Inc.*

```
1    on.
2         Q.   And what did you find?
3         A.   I found that -- well, drawing upon the baseline
4    of it being incredibly significantly County-wide, back
5    when I did the School Board and the County case, moving
6    forward, it still existed, not to the same -- I wasn't
7    getting the same high R score values when I did the
8    regression analysis, but when I did a scattergram of the
9    results versus the different ethnic indicators, I did
10   see a significant degree of racial polarized voting,
11   especially in cases where you either had a candidate who
12   was of a particular minority group, and cases where the
13   candidate might not be a member of a minority group, but
14   he identified -- either identified with the group or the
15   group identified with him.
16        Q.   Okay.  And when you say you found patterns of
17   racially polarized voting, I imagine, did you first look
18   to confirm or assess whether each racial group was
19   politically cohesive?
20        A.   Well, that's part of it.  I mean, there is a
21   methodology called Homogeneous Precinct Analysis, which,
22   under the standard that was adopted by the Supreme Court
23   under the Thornburg versus Gingles case, advocated only
24   looking at those precincts that were 90 percent or
25   greater of an ethnic or racial group, which is tough in
```

1    the City of Miami, because I don't think we had any at

2    the time -- for the past ten years or so, any precincts

3    that were 90 percent or greater.  So, you know, you can

4    drop the baseline down, but you do that with the

5    understanding that that gives you less reliability, but

6    you can still see patterns.  And so when I did that, I

7    still saw that there were patterns.

8            The thing that I found, when I did the Carrie

9    Meek and Xavier Suarez's cases, in South Florida, we had

10   a function of shifting coalitions, and this is

11   especially true back before you had a large cohort of

12   non-Cuban Hispanics in the voting population.  You had

13   shifting coalitions in that, when you had a Black

14   candidate running against a White candidate, Hispanics

15   would coalesce with Whites and vote against the Black

16   candidate.  And when you had a Hispanic candidate

17   running against a non-Hispanic White candidate, the

18   Black voters would vote with the White non-Hispanic

19   voters against the Hispanic candidate.  So you could see

20   those shifting coalitions going back and forth being

21   built.

22           It became less important, in a City like Miami,

23   as over the years, the percentage of non-Hispanic Whites

24   has decreased, you know, from the 2000 population census

25   to the one that we had in 2020.

*Bailey & Sanchez Court Reporting, Inc.*

1      Q.   So, for the most recent cycle, you found that

2 voting was racially polarized between Black and other

3 voters?

4      A.   Yes.

5      Q.   Did you find that voting was racially polarized

6 between Hispanic and other voters?

7      A.   Yes, to some degree, but by the time that you

8 get into the last part of the cycle, the non-Hispanic

9 Whites, who had been the predominant voting population

10 of registered voters, became less and less.  I mean,

11 they dropped to a plurality, and, then, eventually, to a

12 minority.  So their effect on the outcome of an election

13 was not -- became insignificant.

14      Q.   Did you find -- so you mentioned the shifting

15 coalitions in past decades.

16      A.   Yes.

17      Q.   Did you find coalition voting or crossover

18 voting in more recent elections?

19      A.   Not really.  Not really.  And, again, that was

20 looking at County elections or County-wide elections in

21 Dade County.  Well, I don't know if I'd call it Dade

22 County.

23           But, yeah, I mean, I did, to some degree, but I

24 did the analysis, but did not see that there was a

25 coalition between White and Hispanic voters that

1    prevented the election of a Black candidate.

2         Q.   But maybe talking more precisely about

3    crossover voting, some percentage of White voters, for

4    example, cross over to support Black preferred

5    candidates?

6         A.   Well, yeah.  I mean, in some instances -- for

7    instance, if you take the Barack Obama election, that

8    had a tremendous amount of support among Whites, among

9    Blacks, and while we don't have voter data -- well, we

10   do have registration data by age and ethnicity.  I don't

11   think the numbers were high enough so I felt comfortable

12   doing an analysis and using that as part of my -- you

13   know, telling them that.

14            As somebody that lives down here, second and

15   third generation people of Cuban descent are more

16   liberal than the people who came over, like my wife,

17   that's a refugee.

18        Q.   Would you say that the patterns of crossover

19   voting with White or Hispanic -- a segment of White or

20   Hispanic voters crossing over to support Black preferred

21   candidates, would you say that that crossover voting is

22   significant in recent elections?

23        A.   I don't really know, because I didn't do it in

24   the City of Miami, and that would be the determinative,

25   because if I looked at it -- if I look at it as the

```
 1    County as a whole, it would take in voters in Pinecrest
 2    or Palmetto Bay, where I live, or it might take in large
 3    portions of Coral Gables, which had -- you know, it's a
 4    wealthier community.  The demographics and background
 5    and social characteristics of the population are
 6    different than the population that you would find in
 7    Flagami or, you know, Little Gables which is part of the
 8    City of Miami.
 9        Q.  Not yet --
10        A.  Well, I understand Coral Gables wants it, too,
11    so there may be, you know, a gun fight over that.
12        Q.  To back up a little bit, so when you were doing
13    your RPB analysis, you were looking at all precincts
14    County-wide or just precincts within the City of Miami?
15        A.  Just precincts in the City of Miami.
16        Q.  Okay.
17        A.  But that gives you -- I mean, I would look at
18    it from the standpoint of, does racially polarized
19    voting exist.  I wasn't looking at it in terms of what
20    level do I have to put in a district to make it perform
21    for this particular racial or ethnic group.
22        Q.  So that second question of what, in this case,
23    Black percentage would you need in a district to be able
24    to perform or to be able to usually perform, you weren't
25    looking at that question?
```

```
 1        A.   No, but I was basing it upon my understanding
 2   of both, the law, psat practices.   I mean, I've drawn
 3   districts in other areas, and so I'm familiar with the
 4   standards.   It used to be that, you know, you would try
 5   to draw a district, especially given evidence of
 6   racially polarized voting, and you'd try to make the
 7   district as high in numbers of the ethnicity, race, in
 8   order to assure that they will be able to elect the
 9   candidate of choice, if the coalition doesn't hold.
10         Given our history of shifting coalitions here
11   in Dade County, I was looking for a way to draw a
12   district that was going to be as sturdy in population,
13   especially for District 5, as I could.
14        Q.   Okay.   Going back a little bit just to drill
15   down a little bit further on what precisely you were
16   getting from the Supervisor's website, so you were
17   taking the precinct level results of the elections that
18   you were studying, right?
19        A.   Right.
20        Q.   And you had the information on -- were you
21   using voter -- the current snapshot of voter
22   registration by race in each precinct and comparing
23   election results to current registration or did you have
24   kind of a snapshot in time from each election
25   registration by race?
```

```
 1        A.    I was using registration numbers that were for
 2   the book closing for each election that I looked at.   So
 3   I did not use 2000 election data to try to analysis a
 4   1992 election.
 5        Q.    Okay.
 6        A.    I know an expert that appeared in one of the
 7   cases I had, Allan Lichtman, who actually did that,
 8   representing the State of Florida, and when I pointed
 9   out that he did that, he was not happy with me, but that
10   was as an attorney, not as an expert.
11        Q.    You're really dating yourself if you remember
12   when Allan Lichtman was appearing as an expert for the
13   State of Florida.
14        A.    Like I said, I've worked --
15        Q.    He's on the other side now.
16        A.     I worked on the redistricting back in 1982.  I
17   was Bill Sawdoski's legislative aide.  Bill was very
18   heavily involved in the redistricting, and so,
19   consequently, I was very heavily involved with the
20   redistricting, and that's where I learned to do a lot of
21   this stuff.  This is back at a time when the computers
22   we used practically ran on steam.  So this was my fifth
23   redistricting cycle, so I am dated, you know.
24        MR. WARREN:  Off the record briefly, Ms.
25   Sanchez.
```

```
 1                (Discussion off the record.)
 2   BY MR. WARREN:
 3       Q.   So you had the book closing voter registration
 4   by race for each precinct that you were looking at?
 5       A.   Right, and for each election that I was looking
 6   at, that I had to match up.
 7       Q.   And comparing that to precincts level results?
 8       A.   Correct.
 9       Q.   Okay.   But did you compare the -- sorry, I'll
10   rephrase that.
11            So you were looking at, for each election
12   studied, the total registered voters by race, by
13   precinct, not the voters who actually voted by race in
14   each precinct?
15       A.   No, but I did look at turnout, in terms of, am
16   I seeing a system -- like, for instance, going back to
17   the 1980s, when I did that -- and, in fact, going back
18   to the '80s, actually, when I was working at Bill
19   Sadowski, one of the things we looked at was voter
20   turnout in different communities, when it was actually
21   repressed, and we may be heading back there now, in
22   terms of what the government is doing, but see what kind
23   of turnout you were getting, and that can inform you as
24   to whether there is a greater need to draw these
25   districts, but that's also one of those of Zimmer vs.
```

```
 1    McKeithen, an old Fifth Circuit District -- or Fifth
 2    Circuit, excuse me, Court of Appeals opinion, that the
 3    Supreme Court cited in Thornburg, saying that these,
 4    while none of them are dispositive, they are all
 5    illuminative.
 6              And so, yeah, I looked at voter turnout to make
 7    sure that there was not -- you know, in a race where you
 8    were only getting 10 percent of the Black population
 9    turning out, 90 percent of the White population turning
10    out, that would warrant an investigation as to why.  If
11    it was a question of 62 versus 63, you know, it would
12    not.
13         Q.   Okay.  One thing that was mentioned at the
14    preliminary injunction hearing in this case, I don't
15    know -- did you attend the preliminary injunction
16    hearing?
17         A.   No.
18         Q.   Did you review the transcript after?
19         A.   No.
20         Q.   Did you hear about the testimony that was given
21    at that hearing from anybody?
22         A.   I read a newspaper article about it.  I had not
23    been retained by the City to work with them on either
24    that hearing and this lawsuit or the subsequent map that
25    was drawn or to give an opinion as to any of the maps
```

```
 1    that the ACLU and Grace have put forward.
 2         Q.   Okay.   So one thing that was -- that Mr. De
 3    Grady testified at the preliminary injunction hearing is
 4    that you did an analysis to confirm the presence of the
 5    three Gingles preconditions in the City of Miami.   Is
 6    that an accurate summation of your --
 7         A.   Yes.
 8         Q.   Okay.   So you did that with respect to Black
 9    voters and confirmed that the Gingles preconditions are
10    present for Black voters?
11         A.   Yes.
12         Q.   Did you --
13         A.   And I also did it for Hispanic voters.
14         Q.   And what did you conclude with respect to
15    Hispanic voters?
16         A.   Well, I mean, the first Gingles precondition,
17    is the population large enough and compact enough to
18    form a majority in any single-member district, the
19    answer to that questions is yes.   The second criteria,
20    does the minority group show political cohesion, I
21    looked at that, and I'm especially looking at some of
22    those County-wide -- you know, statewide, national and
23    county-wide races that cover the City of Miami, as well.
24    Yeah, that Black voters were showing great political
25    cohesion.
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              Again, the Gillum race stands out, for
 2   Governor, against Ron DeSantis.  I can't remember the
 3   name of the attorney general that we had, who ran in
 4   that same election, in the general election.  There was
 5   greater support for him in the Black community, and Bill
 6   Nelson versus Rick Scott.  And while neither of them are
 7   African-American, I wanted to see if there was a
 8   division between how Black voters and other components
 9   of the population voted, and so I noticed that, you
10   know, White voters voted at a higher percentage, I
11   believe, for Bill Nelson.  Hispanic voters, in that
12   race, did not support him.
13        Q.   Okay.  And so, for Hispanic voters, with the
14   second Gingles precondition, same thing, the conclusion
15   was that Hispanic voters are usually generally --
16        A.   Politically cohesive, yes.
17        Q.   And the same thing with the third Gingles
18   precondition for Hispanic voters?
19        A.   Well, looking at it -- I mean, the standard, as
20   announced by Gingles was, do White voters.  And, so,
21   again, in Miami-Dade County, you have to look at
22   non-Hispanic White as a component, as opposed to just
23   White, because White voters will pick up White
24   Hispanics.  So you have to use that figure.
25              But, yeah, I saw political cohesive voting
```

1   among Hispanics.   Again, by the time we got to the end

2   of the election cycle -- excuse me, the census cycle,

3   non-Hispanic White voters, I think, were 15 percent of

4   the registered voters in the City of Miami, and they

5   were about the same number as Black voters, although

6   Black voters were compact, in terms of their residence

7   patterns.   Non-Hispanic White voters were not.

8           So as much as everybody would like to say that

9   District 2 is the White district, that was silly, you

10  know.

11      Q.   Would a fair characterization of the third

12  Gingles precondition be -- well, as it was stated in

13  Gingles, that the White majority vote sufficiently as a

14  bloc usually to defeat the minority groups' preferred

15  candidate?

16      A.   Well, that's a characterization of the Gingles

17  criteria, yes.

18      Q.   Okay.   So that's true of Black voters, the

19  majority of the electorate in the City of Miami usually

20  defeats -- usually votes sufficiently as a bloc to

21  defeat the Black preferred candidate in elections within

22  the City of Miami, right?

23      A.   If those elections were held just in the City

24  of Miami.

25      Q.   Right.

```
 1        A.    And then drawing upon data from the City of
 2   Miami precincts.   Now, granted, those candidates may not
 3   have been defeated, because of the support of people in
 4   the County or in the State, but if we were just
 5   restricting the election to the City of Miami, then,
 6   yeah.
 7        Q.    Sure.
 8              So turning to Hispanics then, is it usually
 9   true that the majority in the City of Miami vote
10   sufficiently as a bloc usually to defeat the choice of
11   Hispanic voters?
12        A.    No, because Hispanic voters are now 70 plus
13   percent of the registered voters, and there isn't a
14   group -- the non-Hispanic groups combined are not large
15   enough to defeat the preferred candidate of Hispanics,
16   The math just doesn't work that way.
17        Q.    Does that mean that the third Gingles
18   precondition isn't present with respect to Hispanic
19   voters in the City?
20        A.    Well, if we were looking at it today, and the
21   City of Miami were still using at large elections, I do
22   not think -- and this is an opinion, I do not think that
23   there would be a viable case today, under Section 2 or
24   the 14th Amendment, on behalf of the Hispanic voter,
25   because there's a very great likelihood that you would
```

*Bailey & Sanchez Court Reporting, Inc.*

1  have five Hispanic City-wide elected Commissioners on

2  the City Commission.

3      Q.   So, Mr. De Grady, at the preliminary injunction

4  hearing, testified that you found -- you confirmed that

5  the three Gingles preconditions were present for

6  Hispanic voters in the City?

7      A.   Yes.

8      Q.   Do you think that, at the time you did that

9  analysis, that was incorrect or correct, based on what

10 we've been discussing with Hispanics being a majority of

11 the City electorate?

12     A.   I think doing the analysis was correct, yes.

13     Q.   And the conclusion was that the third

14 precondition was present for Hispanics?

15     A.   Well, I mean, I did find that there was

16 evidence of racially polarized voting.  Was it

17 sufficient to usually defeat their preferred candidate?

18 Today, probably not, but has it existed in the past --

19 and very often, the way the Hispanic voters vote, versus

20 the way that Black voters vote, is different.  And so,

21 to get a baseline, again, of how do Hispanic voters

22 vote, that analysis needed to be done.

23     Q.   Okay.  That makes sense.  Thank you.

24          Did you use -- I guess, so you did this -- you

25 did an analysis, RPB.  Gingles preconditions are

1  present.  At a certain point, draft maps are being made,

2  right?

3      A.  Right.  Well, as I said, the first thing I did

4  was draw a present -- well, a 2020 map, using the then

5  existing districts, to see if we had a problem, given

6  the population growth.  You know, if, for instance, the

7  population in each of the five districts had grown

8  uniformly, then, there wouldn't be a need to redistrict,

9  because there would be no substantial deviation from the

10  Black population.  So that was the first thing that I

11  had to do, and then look at that, to see where,

12  basically, the growth had taken place, just of the gross

13  population.

14      Q.  So I want to fast-forward a little bit to when

15  draft maps are being drafted.

16      A.  Okay.

17      Q.  Who was involved in that process?  How did that

18  play out?

19      A.  It was me, sitting here, in my garage office.

20  I have got a 42-inch high definition resolution monitor,

21  because I have vision problems, and it's great to blow

22  it up and -- I mean, your head is about two feet tall,

23  from where I'm sitting right now, and then I just

24  started looking at the maps and trying to -- because

25  before we started drawing maps, we did go before the

```
 1    Commission, we gave them a breakdown.  I think -- Todd
 2    has a report.  I don't know if you've obtained it.  And
 3    I think that we even did a PowerPoint on where the City
 4    was, in terms of population, where the growth had
 5    occurred, which districts were above ideal population,
 6    and which districts were below ideal population, given
 7    that growth.
 8            And I believe the first hearing we had with the
 9    Commission, we asked them to lay out for us the commonly
10    used criteria that they may want us to emphasize, things
11    like retaining the core of existing districts, whether
12    we were going to use a Congressional standard of
13    deviation, which meant, as close to zero as possible, or
14    whether we wanted to go within the maximum limit of, you
15    know, up to 10 percent deviation from the highest to the
16    lowest population district, whether we were to look at
17    communities of interest, which they understood to be
18    neighborhoods, whether we were going to use natural or
19    man-made boundaries.
20            We also made them aware of the fact that we
21    could not, and I, frankly, would not, try to break up
22    census blocks.  You know, because in some instances,
23    I've been aware of someone saying, "Well, I know that
24    block there.  I want this apartment building, which is
25    over here, but the rest of it, I don't want."  No.  If
```

1   it's a census block, that's what you're getting.  And I

2   didn't see the -- I also went through to see if there

3   were any anomalies in the data.  From the censuses we

4   used, there was an error that put, I believe, a small

5   residential neighborhood, with only about 10 houses,

6   they gave a population of like over 500 people, and so

7   something went wrong, something got inputted wrong, but

8   the time for the City to have notified the Census Bureau

9   had expired.  So I could not go back there and say, even

10  though it says this number, 500, I know that it's

11  probably about maybe -- maybe 80, so I'm going to use

12  that figure, because I had to use the 97-141 data that

13  was given to me, and that's what I drew it on.

14      Q.   So you were drafting different options using

15  the criteria that the Commission had adopted in the

16  Commission Meeting?

17      A.   Yes.

18      Q.   At that point, had you met with individual

19  Commissioners yet?

20      A.   I don't recall.  I think I may have, because

21  they -- one of the criteria was to keep the core of

22  existing districts.  I think I may have made an attempt

23  to equalize out the populations, and then used that as a

24  map, and went with Miguel and we sat down.  I believe I

25  made a 24 by 36 map, you know, large format print, for

1   each of the Commissioners, and as I was going along, I

2   believe I also made sure that Todd got one.

3       Q.   And that was before you presented the very

4   first draft map in early February 2022?

5       A.   I believe so, and we got some feedback from

6   some Commissioners.

7       Q.   Do you remember the feedback that you got?

8       A.   We got some that said, "Oh, I really like this

9   neighborhood.  I have friends who live over here.  I

10  want them to stay in my district.  Can you do that?"

11          And it was always, "I've got to look at the

12  numbers.  And so if I can do that, everything balances

13  out, I'll see what I can do.  If I can't, I'll let you

14  know."

15      Q.   Do you remember any feedback that you got from

16  Commissioners that you did incorporate into the drafts

17  that you presented in public meetings?

18          MR. LEVESQUE:  Objection, and I'm going to

19      instruct him not to answer on the basis of

20      privilege.

21  BY MR. WARREN:

22      Q.   Mr. Cody, will you follow that instruction?

23      A.   I guess I'm going to.  I don't -- once --

24  privilege is kind of like honor, once you lose it, it's

25  kind of hard to get it back.  So I will heed George, but

*Bailey & Sanchez Court Reporting, Inc.*

```
1    I would not take it as an offense if you ask the Judge
2    or the Magistrate to consider the issue, and if you want
3    to come back, we can come back.
4         Q.   Mainly, right now, I just want to be clear what
5    the scope of the privilege is and what you're refusing
6    to answer on the grounds of privilege.  I think it may
7    be quick and easy for me to ask whether conversations
8    that you had with Commissioners, outside of public
9    meetings, whether you'll refuse to answer questions
10   about those conversations?
11             MR. LEVESQUE:  I would certainly be
12        asserting privilege for those conversations,
13        based upon attorney work product, and
14        instructing him not to answer, if that helps
15        you.
16             MR. WARREN:  That helps.
17   BY MR. WARREN:
18        Q.   Okay.  So, another question I have about the
19   work you were doing on draft maps relates to District 5
20   and what role, if any, you played in analyzing whether a
21   particular draft configuration of District 5 would
22   continue to perform for Black voters.
23        A.   I did that throughout.
24        Q.   And could you walk me through what you did when
25   you were looking at that?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   Well, the voter registration data that we had
 2   was imperfect, because the State of Florida and any data
 3   vendor that you go to, when you ask them to give you
 4   voter registration data, they have data for a precinct.
 5   They have not geocoded individual voters to individual
 6   blocks.  So if, for instance, you take half of the
 7   voters or half the population of a precinct, you are
 8   assumed to take half the voters and an even half of
 9   every demographic constituent.
10        So that may not be the case.  You may have,
11   within that block, a building, which, for instance, is
12   overwhelmingly Black and a building over here which is
13   overwhelmingly White, but in terms of that software, it
14   will say, okay, you took half of the Blacks and half of
15   the Whites or the Hispanics or whoever, while it may not
16   be true.  But when it comes to things like that, you're
17   doing this based upon guesstimates.
18        To give you a -- besides a hundred percent
19   data, it's all pretty much based upon understanding and
20   experience and that kind of thing.  So I would look at
21   the data, but I would know that, depending on the
22   precincts that we split -- and we didn't do it based
23   upon precincts, because the County was in the process of
24   reprecincting the entire County and were waiting on the
25   City of Miami's district lines, and that's how they
```

```
 1    would use those as cookie cutters, and then get the
 2    smallest component, and that would become a precinct.
 3           So if we used the 2000 year precincts as our
 4    building blocks, that wouldn't translated over to what
 5    would happen in the plan, after it had been adopted,
 6    under the new precincts.
 7      Q.    So a couple of questions from that.  One is,
 8    did you have a geocoded voter file that you were looking
 9    at or no?
10      A.    No.
11      Q.    Okay.  And, second, when you said you were
12    looking at data to analyze whether a potential district
13    could perform, what exactly were you looking at?
14      A.    What I was looking at was, again, when the
15    district -- when I would look at a conceptual district,
16    I would use the FloridaRedistricting.gov software to
17    generate reports, and I would say, okay, I want to see
18    how -- you know, the population, the demography, the
19    voting age population, the registered voters, you know,
20    the constituencies of the registered voters and then
21    how, for each of those component elections, did those
22    candidates do.
23      Q.    Do you have a particular threshold of Black
24    voting age population that you were mindful of when you
25    were reconfiguring District 5?
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.   I was looking to get it as high as possible.
 2  In years past or cycles past, I believe that we got up
 3  to in the 60s.  That was not possible, just due to the
 4  gentrification that had gone on in District 5.  You
 5  know, the hurricane that we had back in the early '80s
 6  (sic), Hurricane Andrew, was the start of the -- well, I
 7  mean, if you want to go back -- you can go back into the
 8  '50s, when they moved I-95 directly through Liberty City
 9  and Overtown and split that community, but then
10  Hurricane Andrew helped accelerate the depopulation.
11            A lot of those people moved to like Miramar and
12  South Broward, and that led to re-development of that
13  core inter-wedge or intercity wedge, you know, that
14  District 5 is.
15        Q.   You mentioned, past cycles.  Is it fair to
16  characterize your approach or the City's approach in
17  2003 and 2013, that, in District 5, you were trying to
18  get the Black population as high as it could be?
19        A.   Well, we were trying to get the Black
20  population high enough to give us a performing district,
21  in light of the level of polarization that we had seen
22  in those particular, you know, ten-year cycles prior to
23  our sitting down and doing the maps, you know.  You
24  know, I wasn't worried about how voters were voting in
25  the 1980s when I was doing the 2010 election, because a
```

1   good many of them were dead, and, you know, new
2   populations have moved in, but focusing mostly on the
3   ten years prior.
4          But I did -- I did want to, in this election,
5   to get that number as high as possible, because there
6   was not sufficient population to draw a second district
7   where Blacks could have -- Black voters could have a
8   determinative outcome in the election.  If I put them --
9   a number of them into it, it probably would have turned
10  out to be two or three, maybe four percent of the
11  district population, in District 2, that would not have
12  made, you know -- even with the Black growth in voters,
13  it would not have been determinative, and putting them
14  in District 1 would not have an effect on a district
15  that still was going to be 70 percent Hispanic.
16         So, to my mind, there would not have been no --
17  I was not diluting anybody, and I was not packing
18  anyone, and I was not cracking any population group.
19     Q.   So because it wasn't possible to increase the
20  Black population in any of the surrounding districts in
21  a way that would have a significant impact on the
22  outcome of an election, it made sense to get the Black
23  population of District 5 as high as it could be?
24         MR. LEVESQUE:  Object to the form.
25         You can answer it.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              THE WITNESS:  Okay.  Yeah -- well, given

 2         the trends that I had seen over the twenty plus

 3         years that I've been working on the City of

 4         Miami's redistrictings, and having a pretty

 5         good idea that this outflow of population was

 6         going to continue happening, I didn't feel, for

 7         instance, that putting a district at, let's

 8         say, 45 percent, crossing my fingers, that

 9         enough White voters or second generation

10         Hispanic voters would vote with them, to give

11         them the candidate of their choice, was

12         something that I wanted to put all of my chips

13         on, and I thought it was safer to try to retain

14         as many of the Black voters -- you know, Black

15         voting age population within District 5.

16    BY MR. WARREN:

17         Q.   And you felt that you achieved that in the map

18    that the City eventually passed?

19         A.   Yes, the one that they passed when I was

20    working with them, yes.

21         Q.   Okay.  That's helpful.  Thank you.

22              You mentioned one metric that you were looking

23    at was Black voting age population.

24         A.   Yes.

25         Q.   And you also mentioned that you were looking at
```

1     registered voters, which was in the legislature
2     software?
3          A.   Yes.
4          Q.   How were you factoring in voter registration by
5     race in your analysis of whether a given configuration
6     would perform for Black voters?
7          A.   Well, I was looking to see if Black voters
8     would constitute nearly a majority.  I mean, the
9     standards that have been adopted by the Court, going
10    back to Thornburg and coming down through the cases that
11    have been decided since then, they say you draw
12    districts based upon population.  I was mindful of what
13    voter registration was by race, but I did not -- again,
14    because of the inherent inaccuracy of the data, because
15    once you start splitting precincts up, you're just
16    getting a guess of what you would have, the best number,
17    in my mind, was Black voting age population, as opposed
18    to registration.
19            You know, registration kind of gave you a
20    thumbnail as to where that district would be, but only
21    really a suggestion.  So I did not put a lot of weight
22    on that.
23         Q.   And what about election results for past
24    elections?
25         A.   Well, that was included in the software, and so

1  when I would generate a report, I would go out to the

2  columns that included the different races, you know, all

3  of it.   It had, in the software, all ten years' worth of

4  statewide elections, and so I would generate all of

5  those, some of which I would not pay a whole lot of

6  attention to, some of them, in terms of the Black

7  population, were very important.

8          I can tell you that the Black population in the

9  City of Miami did not support Marco Rubio in his last

10 election.   So if you wanted an example of -- you know,

11 but the Hispanic population in the City of Miami voted

12 for him overwhelmingly, you know.   But as I said, it's

13 an indicator, it's not necessarily, in my mind,

14 determinative.   You know, you have to fall within the

15 population guidelines, within the margins that are

16 allowable, and then these other criteria become, you

17 know, less certain, but certainly things to be evaluated

18 and considered.

19     Q.   And when you're referring to, you have to fall

20 within the population guidelines, are you talking about

21 total equal population or something else?

22     A.   Yes, total population.

23     Q.   Okay.   When you were looking at election

24 results from past elections, did you have a particular

25 candidate vote share that you said, well, if this drops

```
 1    below this threshold, that that's a concern, or if the
 2    Black preferred candidate is not going to prevail in a
 3    certain percentage of these elections that I'm studying,
 4    that's going to be a problem?   Did you look at it that
 5    way or not --
 6         A.   I looked at it more in terms of -- I'm sorry,
 7    did you want --
 8              MR. LEVESQUE:   If I can, object to the
 9         form.
10              THE WITNESS:   Okay.   Sorry.
11              Yeah.   I didn't set out with a threshold
12         and said, this is the bright line that I'm
13         going to apply, but I would just look at the
14         results in each of the elections, for each of
15         the generated districts, and I would see, you
16         know, for instance, in District 5, how did that
17         vote work out, how did it work in the other
18         four districts for each of these candidates.
19    BY MR. WARREN:
20         Q.   Do you recall, in any map that you were looking
21    at for District 5, was there ever an instance where the
22    Black preferred candidate in any of the past elections
23    was not going to prevail?
24              MR. LEVESQUE:   Objection.
25              MR. WARREN:   What's the basis of the
```

```
 1        objection?
 2             MR. LEVESQUE:  When you're referring to any
 3        of the past maps for District 5, it's not clear
 4        if you're talking about for 2022, 20 -- it's
 5        pretty broad.
 6   BY MR. WARREN:
 7        Q.   Any of the maps that you were drafting and
 8   looking at in the 2020 cycle, when you were looking at
 9   District 5 and looking at past election results in the
10   legislature software, was there ever an instance where
11   the Black preferred candidate would not have prevailed
12   in the draft boundaries of District 5?
13        A.   I don't recall any instance where that
14   happened.
15        Q.   Would that have been a concern, if there had
16   been an election where the Black preferred candidate
17   didn't prevail?
18        A.   It would have been, because it might have been
19   an indication that either there's a problem with
20   political cohesion, but that sort of begs the question
21   of, is that a Black preferred candidate, and I would
22   want to do some further analysis.  For instance, in
23   Miami-Dade County, at one point, we had eight County
24   Commissioners who were elected from residence districts
25   but at large, and an at large elected mayor, all acting
```

```
 1    as a legislative body, not an executive major.
 2                We did, at one point, have a Black County
 3    Commissioner, we had a Hispanic County Commissioner, but
 4    neither one of which were the preferred candidate of
 5    either of those communities.  So, yes, using that as an
 6    example, I would say that would concern me, and that did
 7    concern me, in that case.  And one of the reasons I got
 8    involved and volunteered to be a non-paid attorney for
 9    so many years was that I saw that pattern and those
10    candidates didn't have an equal opportunity to get
11    elected.
12        Q.  So going back to analyzing the 2020 draft maps,
13    if you had -- let's say you had to draw a district and
14    there were few elections in the legislature software
15    that the Black preferred candidate would not have
16    succeeded within the boundaries of that district, you
17    looked at what was going on underneath the surface there
18    and you find that, well, in that election, Black voters
19    were not as cohesive as normal, that would impact your
20    analysis of how relevant those elections were?
21        A.  I can't answer that question.  You're asking me
22    to speculate based upon a whole bunch of different
23    layers of what ifs.  I can tell you what I did.  I'm not
24    going to, frankly, speculate on what I would have done
25    had some of the data been different.  I'd have to look
```

```
1    at it.
2         Q.   Okay.   Going back to, you had mentioned that
3    you just weren't going to draw a District 5 with a 45
4    percent Black voting age population; is that a fair
5    characterization?
6         A.   If I could draw one that was higher, yes.   If
7    45 percent -- if an influence district was the best that
8    we could have accomplished, I would have encouraged the
9    County Commissioners -- excuse me, the City
10   Commissioners to adopt a plan that at least does that,
11   and I think that's backed up by the recent decision out
12   of the Supreme Court involving Alabama, where they said
13   you had to draw one Black majority district and one
14   strong influence district.   So I think that there is
15   some merit in drawing an influence seat, but where I had
16   an instance where I could draw a majority Black voting
17   age population district, I would have said, we need to
18   draw that --
19        Q.   I see.
20        A.   -- especially where the excess population above
21   that couldn't be moved to a neighboring district where
22   it would help determine the outcome of that election, in
23   terms of the Black preferred candidate.   But, again,
24   looking at this area of the law, as far as I understand
25   it, a minority group that could only be four or five
```

1    percent of a district doesn't have the right to be in

2    another district.  The Supreme Court has drawn the

3    lines.

4         Q.   I see.

5              So, because you could draw a District 5 with an

6    over 50 percent Black voting age population, it wasn't

7    advisable to draw one below 50 percent?

8         A.   I didn't think it was advisable, although --

9    no, scratch that, I didn't think it was advisable.

10        Q.   And in the end, the Commission did adopt a

11   District 5 with over 50 percent BVAP?

12        A.   Yes.

13        Q.   Okay.  Going back a little bit to past cycles,

14   are you -- do you remember any discussion of the 65

15   percent rule coming up in past redistricting cycles?

16        A.   Oh, yeah.

17        Q.   Can you talk about what the 65 percent rule is

18   and how it factored in, in previous decades?

19        A.   Okay.  Well, my understanding from just being a

20   student of this whole process, especially coming out of

21   an era, the '60 and '70s -- well, I mean, going back to

22   the '60s, when Black -- we had to enact a Voting Rights

23   Act to ensure that people had an opportunity to register

24   to vote, and when dealing and working through that whole

25   inertia against registration, putting a district at

1   something like 65 percent, if you could, would mean that

2   you were building a castle around this voting

3   population.   It was secure from outside onslaughts of

4   people not wanting to vote the way -- and would give

5   this group, as the Court has said, a reasonable

6   opportunity to elect a candidate of their choice.

7          So, yes, 65 percent, at one point, early on,

8   was one of the bright-lines, and, then, you know, in the

9   literature, it was like, well, what if you could only

10  get 62 percent, was 62 percent okay.   We did draw large

11  percentage districts in the City of Miami, in terms of

12  Black population, in the 2000, 2010 census, but that's

13  because we had the population.

14          I mean, I don't know if you're familiar with

15  Midtown.   Okay.   Midtown, that re-development, moved a

16  whole lot of people out of the City of Miami, the

17  overwhelming majority of whom were Black, and the people

18  who could afford to move into the condos that they built

19  was not the population that was moved out.   So that

20  decreased the Black population.

21      Q.   In 2003 and in 2013, do you recall a

22  bright-line, like 65 percent, being used in drawing

23  District 5?

24      A.   I believe we were -- well, we were always

25  looking to see was there a population large enough and

```
 1   compact enough to do as many districts, as could be
 2   done, in terms of majority.  And then we would say,
 3   okay, well, how high a majority could we do.  At no
 4   point did we ever see that we could do two districts,
 5   and that continued.
 6           One of the questions was, when we got the
 7   census data, and, you know, Miguel and I were hired, I
 8   went to go, just to make sure -- I pretty much knew, but
 9   I wanted the statistics to show me.
10      Q.   Okay.
11      A.   And so, you know, I looked at the present -- or
12   at least the 2020 census figures for District 5 and saw
13   that it was, I believe, the least populated district in
14   the City.  Again, I have not reviewed, and it's been a
15   year and a half since I looked at the stuff, but
16   District 5 was way underpopulated.  So part of the
17   challange is, how do we bring people in, without
18   diluting the cohesive minority group that's here, and so
19   we had to work around the edges.
20      Q.   And looking for areas with as high a Black
21   population around the edges to add, as you could?
22      A.   As we could, yeah.
23      Q.   Okay.
24      A.   I mean, it might have been easier had they
25   said, you know what, forget the boundaries, start with a
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1    fresh map and start drawing districts, and it may have
 2    been easier to get something else or get something
 3    higher, but having been told to use the core of the
 4    existing districts, and the other criteria that's going
 5    through those different check boxes, the District 5 that
 6    we came up with in that plan was the one that fit those
 7    criteria and met our understanding of the law.
 8         Q.   Okay.  I wanted to follow up on something that
 9    you said about past cycles.  You know, you said that
10    first we look to see whether you could draw more than
11    one Black performing district in every decade.  You
12    confirmed that it's not possible, right?
13         A.   Right.
14         Q.   And, then, at that point, the goal then is to
15    shore up the one Black performing district with as high
16    a Black population as you can get?
17         A.   Right.  Now, one of the things that was talked
18    about publicly by Commissioners during all of those
19    cycles was, should we amend our Charter to add more
20    seats?  The Dade County Commission went from eight seats
21    and the mayor to thirteen, because that's what they
22    proposed during the remedy phase that we had in that
23    case, and so a Judge could order, you know, via the
24    Supremacy Clause, a remedy that is not provided for in
25    your government documents, and especially since they
```

```
 1   were the ones that proposed it.  You know, we did get
 2   some citizens who intervened, who complained about what
 3   the County did.  So, I mean, I'm aware of it, and had we
 4   gone to seven or nine, could there have been more
 5   African-American majority voting age population
 6   districts, very possibly.
 7            I didn't do a full analysis.  My back of the
 8   envelope was, maybe, but they first had to amend the
 9   Charter, and to do that, they had to take up a Charter
10   amendment election or get sued under the Voting Rights
11   Act and offer that as a settlement, but dealing with the
12   situation I had before me, yeah, I could not -- I could
13   not, in any of those cycles, see a way to draw two Black
14   voting age population districts, even setting aside
15   would they perform or not or do you have an opinion as
16   to whether they would perform, just in terms of those
17   numbers, no.
18        Q.   So, knowing that, then, the goal is to shore up
19   the existing district with as high a Black population as
20   possible, right?
21        A.   No.  The goal is to draw a district that allows
22   the members of the cohesive minority group to elect
23   their candidate of choice, and, again, given the amount
24   of polarized voting that I saw, I did not see the sense
25   in importing large numbers of, especially, Hispanic
```

1  voters, into District 5, and, then, saying, let's cross

2  our fingers and hope that it performs, when I know that

3  if I had kept the Black population, voting age

4  population, there, it would very probably perform, where

5  if you move that population out, it would be a coin

6  toss.

7      Q.   You say it would be a coin toss.  Is that

8  assessment looking at recent election results or

9  something else?

10      A.   It's based upon the analysis that I had done,

11  and also my understanding of the political conflicts

12  between non-Hispanic Blacks, Hispanics and non-Hispanic

13  Whites.

14      Q.   Okay.

15      A.   And so diluting the Black population in

16  District 5 below a majority, and especially, in light of

17  the likely trend of the deforestation, if you will, of

18  the Black population in that district, it didn't make

19  sense to me to try to calculate what today is the bare

20  minimum that will perform in this next election cycle,

21  and not try to take into account movements of population

22  over time.  We did that in -- after the 2000 census.  We

23  did that during in the 2010 census.  We looked at

24  population trends during this cycle, too.  We were not

25  interested in just making sure that a Black preferred

1    candidate got elected from District 5, in 2023, and then

2    through the remaining elections, until the next

3    redistricting cycle, we didn't care.  We tried to take

4    that into consideration.

5        Q.   You mentioned relying on population trends to

6    make that prediction?

7        A.   Yeah.  Well, I mean, one of the things that we

8    looked at in past cycles, I mean, this is -- again, I

9    don't know if you're from Miami --

10       Q.   My family is.

11       A.   Okay.  Well, if you grew up down here, and you

12   knew Bill Sadowski, you probably grew up down here, but

13   I don't know if you recall, but on Biscayne Boulevard,

14   in Downtown, right across from the water, there were

15   numerous empty areas that were parking lots, and the

16   developer owned them, and didn't do anything but have

17   those parking lots.

18            Those have been developed now into these

19   massive condo towers, and the people who moved in,

20   again, just like Midtown, were not African-American

21   voting age population.  So you've had both, a

22   diminution, in terms of the gross numbers decreasing,

23   and also the numbers of other ethnicities increasing,

24   and what we did was try to account for the fact that

25   we're probably going to continue that pattern of either

*Bailey & Sanchez Court Reporting, Inc.*

1    the non-Hispanic Black population increasing and/or the

2    none -- well, the Hispanic; and the Black population

3    decreasing.

4         Q.   So based on past history and the past trend,

5    the expectation is that that trend will continue?

6         A.   Yes.   I expect it to continue.

7         Q.   Okay.   One second.

8              Going back to past cycles, again, I'm trying to

9    relive the history, since you've got so much of it in

10   your head.

11        A.   That's a nice way of saying I'm old.

12        Q.   The role that the 65 percent, you know, rule of

13   thumb played in the Commission's crafting of District 5

14   in 2003 and 2013, would you say that the Commission was

15   applying a 65-percent rule of thumb in those cycles?

16        A.   I don't recall.   I honestly just do not recall.

17   Also one of the hazards of being old.

18        Q.   I'll have to take your word for it.

19        A.   I have socks older than you, so --

20        Q.   Okay.   I don't have a response to that.

21             I think this is most of what I wanted to talk

22   about.   I guess, there was a lot of discussion in the

23   Commission meeting about gentrification and guarding

24   against the impact of future gentrification in District

25   5.   Beyond what you already stated, how did that factor

1  into your assessment of whether a potential District 5

2  would continue performing?

3       A.   I mean, I knew through the meetings that they

4  were concerned about that.  That's something that I had

5  been aware of, for the three election -- three census

6  cycles that we, you know, worked on, and I've seen.  So

7  what they said really didn't have a whole lot of impact

8  on me or my approach.

9       Q.   Okay.  I'm just looking over to see what else I

10  want to wrap up with.

11            Your involvement in the process concluded after

12  the Commission passed the map in 2022?

13       A.   Yes.  Well, there were some cleanup things I

14  had to -- I think Todd couldn't read the thumb drive

15  that I gave him at that last meeting, so I had to

16  regenerate that, but in terms of doing work or analyses,

17  no.

18       Q.   Okay.  Okay.  Going back to -- you said, you

19  know, you would not have advised drawing a 45 percent

20  BVAP district because of the risk that such a number

21  had, and the fact that you could draw one over 50

22  percent; is that a fair characterization?

23       A.   Right.  And that there was no benefit to be

24  achieved in another district by moving that Black

25  population to another district.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        Q.   Okay.  Okay.  And those reasons -- I guess
 2   those are -- it almost doesn't really matter, then,
 3   whether a 45 percent BVAP district, looking at all of
 4   the recent elections where there's racially polarized
 5   voting, would perform for the Black preferred candidates
 6   in those elections, because of the other reasons that
 7   you just mentioned, it just doesn't matter?
 8        A.   Well, again, you come at this from the
 9   standpoint of, with that software, you are
10   disarticulating the election results for a precinct and
11   breaking them up evenly for all of the blocks within
12   that precinct.  So it doesn't necessarily follow that a
13   45 percent district will give you that result, because
14   you don't know where, within that district, those
15   particular voters are.  That's only for us to associate,
16   at least legally, here's the ballot that was slid into
17   the machine, and here's, you know, Mrs. Alvarez.  I can
18   associate her, and I know how Mrs. Alvarez voted, and if
19   I can do that with enough people, I can tell you I know
20   exactly how these people, regardless of where they are,
21   which blocks they're in, I can tell you how they voted.
22   You can't do that.
23             So the best you do are estimates, and I am not
24   comfortable saying that, at 45 percent, you're going to
25   get the results, because that data doesn't exist, just
```

1   like the citizenship data doesn't exist on a block

2   level.   It is data which comes from a community survey,

3   just like a political polling survey.   It's not tied

4   down to each block and each house.   I get, in the

5   computer, the surveyors will give a number, which I

6   believe is a rolling five-year average, of citizenship

7   within the geographic area, meaning the city or the

8   county or the state, but not what is it in this

9   particular block bounded by US-1.

10          So I can't say, I know that I could draw a

11   district with this, because I applied the City's

12   citizenship number city-wide, either in general or for a

13   particular ethnic group, and that gives me the

14   citizenship level in this district.   You can't do that,

15   and you can't say that, at 45 percent, you're going to

16   get that result.   I think you need to go as high as

17   possible, not to the point where you're packing.

18          I mean, I have seen instances, in other cases,

19   where they wanted to take a Black district to 90

20   percent.   The attitude, when I did the Carrie Meek case

21   on the County was, we don't mind there being a Black

22   County Commissioner.   We, the White community, just want

23   to be the one who picks him.   And so I think that you

24   run too much risk of uncertainty, if you say that we're

25   going to assume the data exists and shows certain things

*Bailey & Sanchez Court Reporting, Inc.*

1    concretely, when it doesn't.

2         Your background is kind of blurred.  Your face

3    is clear.  The background is blurred.  Your face is a

4    hundred percent data.  The blurriness behind you is the

5    survey data, and I can tell that you have some kind of

6    painting with yellow and orange over your left shoulder.

7    I can't tell you what it shows or who it is, but I can

8    get an indication that there's a painting behind -- or

9    an illustration behind your shoulder.  That doesn't mean

10   that I can tell you exactly what that is.

11        And if you say, we're going to use citizenship,

12   we're going to take that voting data and use it

13   concretely, when that's not what it's really there for.

14   You're inviting error and mistake.

15   Q.   So because there's a margin of error in the

16   reconstituted election results, when you're splitting

17   precincts, because there's a margin of error in citizen

18   voting age population in the American Community Survey,

19   you know, you're suspicious of relying on that, it's

20   better just to use --

21   A.   Well, no.  It's not -- I didn't even get into

22   margin of error.  What I talked about is, there is no

23   way to disaggregate the information from the city level

24   down to each individual block, and so that would be like

25   me plucking a hair from your head and saying, I can tell

```
 1   what color your eyes are.  Those two things are not
 2   related.  So there's no way for me to just say, I've got
 3   this huge number, the entire city.  You know, I'm going
 4   to assume that the citizenship level for the entire city
 5   is what's in this particular City block.  You can't do
 6   that.
 7             I mean, it may be tempting, and from a
 8   marketing standpoint, if you're a marketer and you got
 9   your MBA in marketing, if you say, I want to sell beans
10   to the residents of this community, and I know that you
11   have a certain number of Hispanics who like "frijoles,"
12   and, you know, our study shows us that our Black
13   residents prefer three bean salad, that may tell you
14   something, but it's not going to tell you about the
15   behavior in this one individual household.  Citizenship
16   data is not going to tell you what that is, in one
17   particular household, and if you can't do that, you then
18   can't aggregate it out into a perspective district that
19   you've put together.  It doesn't work.
20       Q.  Are you familiar -- and this is reminding me of
21   this -- are you familiar with the Census Bureau's use of
22   differential privacy in this past census?
23       A.  Somewhat.
24       Q.  It brings to mind some of the same issues with
25   imprecision or error in the --
```

1      A.   Do you mean the fact that if they have a very
2   low population in a particular census block, they will
3   suppress the data?  So, I mean, if you know that it's in
4   a farm area and there are two households that live on
5   this particular block, we will not report race,
6   ethnicity, other factors, at that block level, for that
7   block, because we don't want to -- or just one family
8   living there, we don't want to give data so somebody
9   could target them.  Is that what you're talking about
10  of --
11     Q.   Yeah.  My understanding is that every census
12  block had some level of uncertainty injected into it
13  now.
14     A.   It depends on what you're trying to protect.
15  You would -- I don't know of any of the census blocks in
16  the City of Miami -- let me take that back.  I'm not
17  aware of there being a substantial number of census
18  blocks that only have one or two residents.  We do have
19  a number that have no population, but those are out in
20  the bay, but I don't know -- I would have to look.  I
21  don't know of any that would have that population data
22  suppressed, but it would show up once you start
23  aggregating.
24     Q.   So your understanding of differential privacy
25  is that, unless you're talking about a census block with

*Bailey & Sanchez Court Reporting, Inc.*

1    an extremely small number of a couple of people, that

2    the data is accurate?

3        A.   Well, no.   The data is accurate, but the data

4    may not be -- the data at the block level may be

5    suppressed.   It's not that it's not accurate.   You may

6    not be able to see what's in that particular block, but

7    when you pulled back and you saw, at the next level of

8    geography -- let's say you said, okay, show me the City.

9    Those would have those two people in that tiny, tiny

10   de-populated district included in that number, but when

11   you went back down to that regular level, you wouldn't

12   be able to see what the characteristics are of that

13   particular -- and this is -- you know, again the 94 --

14   97-1 -- it's either 97-141 or 94-171, yeah, but it is

15   not that we have that each district has an amount of

16   error built into it.

17            There may be error in the sense that people

18   didn't respond and -- my son worked as an enumerator

19   for the census many, many cycles ago, and it may be that

20   you had to go out, knock on doors, for somebody who

21   didn't respond.   In the end, you can accept, by talking

22   to a couple of neighbors, "Do you know who lives there?

23   Do you know how many kids they have?   Do you know if

24   anybody is over the age of 18," and with several

25   sources, you can say, okay, we feel comfortable in

*Bailey & Sanchez Court Reporting, Inc.*

```
1    reporting, for that household, this is the number, and
2    that may be an error, but just like that 550 person
3    block -- you know, a ten-house block was an error, sure.
4            There are errors in the census, but when you
5    come to redistricting, you start with the assumption
6    that that congressionally mandated data, which Congress
7    this last cycle through said, we're not going to collect
8    census data -- I mean, they had been doing it on the
9    long form, but they said, we're not going to do it on
10   the long form or the short form, the short form being
11   the a hundred percent, everybody got those questions.
12   And, then, a certain percentage got the rest of the
13   questions, characterizing them as the long form people.
14           You know, but the hundred percent data, you
15   have to assume it's accurate; population, voting age
16   population, population by race, population by ethnicity,
17   voting age population by race and ethnicity.  And, then,
18   beyond that, you know, you can take into account things
19   like the Zimmer factors, what is the income level, and
20   you could say, okay, I can get that data for the City,
21   and I know that people, who have a lower income --
22   especially during the '70s, people with a lower income
23   level tend to vote at lower rates than people of a
24   higher income status.  You could take that into account,
25   but you have to understand the differences between the
```

1    different kind of data, and to say that, well, there's
2    uncertainty built into all of this, well, there might
3    be, but the law presumes that the hundred percent data
4    is correct, and that's what we draw congressional
5    districts on and that's what we draw state districts on,
6    and that's what I used in drawing these districts.

7         Q.   A question, going back to the precinct election
8    results and using the election results from the
9    legislature software in estimating what the given
10   election results would be in a proposed district, do you
11   know how the legislature used the election results in
12   their software in analyzing VRA compliance?

13        A.   I'm not sure.  In 2000, Miguel De Grandy and I
14   represented the Florida House of Representatives, and
15   Jason Unger was part of our team.  So I know that the
16   data was available at that point.  I'm not aware as to
17   whether state legislators looked at it, other than from
18   the standpoint of, let me see the district that I live
19   in, how did they vote for this candidate or that
20   candidate.

21        Q.   Talking about not 20 years ago, but this last
22   cycle --
23        A.   Right.
24        Q.   -- do you know how the legislature used the
25   election results in its software in the 2020 cycle?

*Bailey & Sanchez Court Reporting, Inc.*

```
 1        A.    No.    No.
 2        Q.    Okay.   I think I only have one other question,
 3   which is just to clarify, because you had mentioned
 4   that -- well, you had mentioned packing, and I think you
 5   said that a goal was to get the Black, as high as
 6   possible, but not to the point where you're packing, and
 7   I just wanted --
 8        A.    Correct.
 9        Q.    -- to clarify what your understanding of
10   packing is.
11        A.    My understanding of packing is that, that is
12   concentrating a population of a protected class, that
13   could have formed a majority in one -- well, in more
14   than one district, for instance, into to just one
15   district, where if I have an area that's a hundred
16   percent African American, and I say, no, no, I'm going
17   to -- well, I can make a district that's a hundred
18   percent African-American population, or I could make,
19   you know, if I wanted, a 150 percent African-American
20   district, but I'm going to split that population among
21   three districts, so that Black voters can't elect a
22   candidate of choice in any of the three, but if I had
23   done it in two, I could do it, but instead, I'm going to
24   do it in one, and pack them together like sardines, and
25   they get one elected voice in the representative body
```

1    that, you know, we're talking about.

2         Q.   First of all, if you're able to draw a 150

3    percent African-American district, I think you should

4    increase your fee, but --

5         A.   Well, no.  I mean, if you had enough

6    population, so that you could do -- you have enough

7    population, that's compact, and it's 150 percent of the

8    ideal district population, and you decide to split that

9    out over three or four or five districts, that's where

10   the problem comes in, and you try to put, let's say, all

11   of them in one, and then you dilute the rest, that would

12   be packing.

13        Q.   Okay.

14        A.   Now, obviously, it's not the only example of

15   packing, but just off the top of my head.

16        Q.   That makes sense.  So, to summarize, to you,

17   packing is where you increase the concentration of a

18   protected class in a district, but if the levels were

19   decreased -- or that's done at the expense of creating

20   an additional majority seat nearby?

21        A.   One or more majority seats, yeah.

22             MR. WARREN:  Okay.  I don't think I have

23        any more questions.  Thank you.

24                       CROSS EXAMINATION

25   BY MR. LEVESQUE:

```
 1        Q.   Mr. Cody, I've got just one question on that
 2   last topic that you were discussing.
 3        A.   Sure.
 4        Q.   If you were able to draw District 5 with a max
 5   Black population, ignoring all of the other directions
 6   that the City Council gave you, such as keeping the core
 7   of the existing districts, voter cohesion and some of
 8   the other instructions that they gave --
 9        A.   Right.
10        Q.   -- put all of those to the side and draw a max
11   Black, would you be able to draw a district that was
12   higher than 50.3 percent?
13        A.   Well, without engaging in violating the law in
14   other ways, like trying to extend a tendril out the
15   width of a street to get a pocket of Black population,
16   assuming those rules still exist, and that I'm not, you
17   know, gerrymandering, no.  Like I could extend -- go
18   down 95, the width of 95, until it got to US-1, go down
19   the width of US-1, then go up and capture the Black
20   Grove and make that part of District 5.  Would that
21   withstand a legal challange under the 14th Amendment,
22   that that was a violation of other voters' rights, I
23   don't think.
24        Q.   So would it be fair to say, then, that the
25   population -- the Black voting age population that you
```

*Bailey & Sanchez Court Reporting, Inc.*

1  captured in the current district was generally

2  geographically compact, so that what you've got is

3  really what you've got, and there's not really another

4  way to draw it, if you're going to do a Black district

5  that is a majority Black district?

6      A.   If you're looking for majority, which, again,

7  was one of the key words that we saw on the Gingles

8  decision, Miguel and I, the goal was to draw a district

9  that had a majority Black voting age population, and so,

10 yeah, given that as the criteria -- I mean, could I have

11 gotten to 50 percent plus one person?  Maybe.  But it

12 wouldn't have made sense in terms of keeping a

13 neighborhood together.  I pretty much came down to where

14 I was trying to make sure that I wasn't dividing a Black

15 neighborhood, such that somebody would say, okay, I live

16 across the street from you, but I've got this other

17 County Commissioner, who may not care about my concerns,

18 but you've got the one in District 5, and I got thrown

19 out of District 5.

20      So I think 51.03 percent was probably the best

21 that we could do -- the best we could do within the law,

22 without looking at any other criteria.

23          MR. LEVESQUE:  That's all for me, Mr. Cody.

24          THE WITNESS:  Thank you, sir.

25          MR. UNGER:  No questions from me.

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              MR. WARREN:  I think we are done.

 2              MR. LEVESQUE:  Okay.  We'll read.

 3              (Thereupon, the reading and signing not

 4       being duly waived, the deposition was concluded

 5       at 11:45 a.m.)

 6

 7

 8

 9

10              _____
                           DEPONENT
11

12

13              Sworn to and subscribed before me this _____

14   day of _____, 2023.

15

16

17
                _____
18                   NOTARY PUBLIC

19

20

21

22

23

24

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
1                      CERTIFICATE OF OATH

2   STATE OF FLORIDA     :
                         SS
3   COUNTY OF MIAMI-DADE:

4             I, NIEVES SANCHEZ, Court Reporter, and a
    Notary Public for the State of Florida at Large, do
5   hereby certify that STEPHEN CODY, ESQ. appeared before
    me via Zoom and was duly sworn.
6             WITNESS my hand and official seal in the
    City of Miami, County of Miami-Dade, State of Florida,
7   this 19th day of October, 2023.

8

9                         _____
10                        NIEVES SANCHEZ
    Notary Commission Number HH 385498
11  My Notary Commission expires August 11, 2027

12            REPORTER'S DEPOSITION CERTIFICATE

13  STATE OF FLORIDA     :
                         SS
14  COUNTY OF MIAMI-DADE:
              I, NIEVES SANCHEZ, Court Reporter and a Notary
15  Public for the State of Florida at Large, do hereby
    certify that I was authorized to and did report the
16  deposition of STEPHEN CODY, ESQ.; that a review of the
    transcript was requested; and that the transcript is a
17  true and complete record of my stenographic notes.
              I further certify that I am not a relative,
18  employee, attorney, or counsel of any of the parties,
    nor am I a relative or employee of any of the parties'
19  attorney or counsel, nor am I financially interested in
    the action.

20
              DATED this 19th day of October, 2023.
21

22

23                        _____
24                        NIEVES SANCHEZ

25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1              BAILEY & SANCHEZ COURT REPORTING, INC.
                          (305) 358-2829
 2

 3                           October 19, 2023

 4

 5    Stephen Cody, Esq.
      c/o George Levesque, Esq.
 6    Gray Robinson
      333 S.E. 2nd Avenue
 7    Suite 3200
      Miami, Florida 33131
 8
      RE:  Grace, Inc. vs. City of Miami
 9
      Dear Mr. Cody:
10
      The transcript of your deposition, taken in the
11    above-styled cause on October 10, 2023, is at my office
      awaiting your examination and signature.  PLEASE
12    TELEPHONE BEFORE COMING IN so that we may arrange a
      convenient time.
13
      Please be advised that unless I hear from you by
14    November 19, 2023, I will forward the original of your
      deposition to the deposing attorney, as though you had
15    read and signed your deposition.

16    IN THE EVENT a copy of the transcript is being sent to
      the witness by counsel, kindly instruct the witness to
17    make any changes thereto on a separate sheet of paper
      and refer to the page number and line number which
18    corresponds to the change desired.  DO NOT MAKE THE
      CORRECTIONS ON THE TRANSCRIPT.  If you have any
19    questions, please call.

20    Very truly yours,

21

22
      NIEVES SANCHEZ
23    Court Reporter

24
      cc:  Nicholas L.V. Warren, Esq.
25
```

*Bailey & Sanchez Court Reporting, Inc.*

```
 1                         ERRATA SHEET
 2   IN RE:   GRACE, INC., ET AL. vs. CITY OF MIAMI
 3   DEPOSITION OF STEPHEN CODY, ESQ.
 4   TAKEN OCTOBER 10, 2023
 5
 6   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 7
 8   PAGE #         LINE#    CHANGE
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
21                    _____
22                         SIGNATURE
23
24
25
```

*Bailey & Sanchez Court Reporting, Inc.*