| From: | Miguel.deGrandy@hklaw.com |
|---|---|
| To: | anoriega@miamigov.com; adiazdelaportilla@miamigov.com; krussell@miamigov.com; JCarollo@miamigov.com; MReyes@miamigov.com; CKing@miamigov.com |
| Cc: | fsuarez@miamigov.com; VMendez@miamigov.com; thannon@miamigov.com |
| Subject: | Initial Report and Suggested Timeline, Process and Legal Primer |
| Date: | Friday, November 12, 2021 5:51:51 PM |
| Attachments: | Redistrictng Initial Report and Legal Primer.pdf |

**CAUTION:** This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Manager and Commissioners.

In advance of the discussion item DI.1 before the Commission on November 18th, attached please find our initial report. We look forward to making a brief presentation and obtaining policy direction from the Commission.

**Miguel De Grandy | Holland & Knight**
Partner
Holland & Knight LLP
701 Brickell Avenue, Suite 3300 | Miami, Florida 33131
Phone 305.789.7535 | Fax 305.789.7799
miguel.degrandy@hklaw.com | www.hklaw.com

Add to address book | View professional biography

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

PLAINTIFFS' TRIAL EXHIBIT
P12
1:22-cv-24066-KMM
exhibitsticker.com

COM24066-000772

# Holland & Knight LLP
### 701 Brickell Avenue, Suite 3300 Miami Florida 33131

## REDISTRICTING THE
## CITY OF MIAMI COMMISSION
## AFTER THE 2020 CENSUS



## INITIAL REPORT  AND SUGGESTED TIMELINE, PROCESS AND LEGAL PRIMER

### Miguel De Grandy, Esq. and Stephen M. Cody J.D
*Redistricting consultants*

1

COM24066-000773

# Table of Contents

**Table of Contents**                                                                 2

**Executive Summary**                                                                 3

Introduction                                                                          3

The Need to Redistrict                                                                3

Redistricting Criteria                                                                3

Process and Timeline                                                                  3

**Process and Commission Direction**                                                  4

Redistricting Standards                                                               4

Direction Regarding Conducting Public Hearings                                        4

Draft Plans to Present to the Commission                                              5

**Current Work and On-Going Analysis**                                                6

The Population Snapshot                                                                6

Population of Existing Districts                                                       7

**Legal Standards for Redistricting**                                                 9

I. Constitutional Mandate to Redistrict and Reapportion                               9

   A) Brief Historical Perspective on Redistricting: United States Constitution       9

   B) Court Imposed Requirement To Redistrict; Population Differences Amongst Districts. 10

      1) The Obligation to Redistrict                                                 10

      2) Population Deviations                                                        11

II. Race, Language Minorities, and Reapportionment                                    11

   A) Predominant Factor Test; Race-Neutral Justifications                            12

   B) Race Neutral/Traditional Redistricting Criteria                                 13

   C) The Federal Voting Rights Act of 1965                                           14

   Summary                                                                            15

COM24066-000774

# Executive Summary

### Introduction

In late July of this year, the law firm of Holland & Knight LLP. and Sub-consultant Stephen Cody, J.D. were engaged by the City of Miami to develop a new Single-Member District Plan for use in City Commission elections beginning in the 2023 election. Due to the COVID pandemic, Census Data files were not released until September.  The purpose of this report is to advise you of the work that we are presently conducting and a suggested timeline and process for future events. As part of this report, we are also providing you with a basic primer to familiarize you with the legal issues relevant to the Redistricting Process.

### The Need to Redistrict

The 2010 Census revealed that the City of Miami has a total population of 399,489. In 2020, the population of the City had grown to 442,241, an increase of 42,752 or 10.7 percent.  The growth, however, has not been uniform across all five of the City's Commission districts. The 14th Amendment to the U.S. Constitution as interpreted by federal case law requires "substantial equality" of population among single member districts. Dividing the City's population by five produces an "ideal" population for each district of 88,448.

Presently, the district with the largest population, District 2, has 116,742 persons, and is 28,364 persons *above* the ideal. District 3, on the other hand, only has 79,309 residents, which is 9,069 *below* the ideal population. Taken together, that 37,433 person variance represents a total deviation of 42.35% from the ideal; far above what is allowed by the U.S. Constitution as interpreted by federal case-law. Thus, the current plan is malapportioned and cannot be used for subsequent elections.

### Redistricting Criteria

The City Charter requires that the five members of the City Commission be elected from single-member districts, but does not contain any other express redistricting criteria. Neither the Florida Constitution nor Florida Statutes contain explicit redistricting requirements that apply to municipalities. The prime directive is always compliance with Federal Constitutional principles and the Federal Voting Rights Act. Additionally, the traditional redistricting criteria considered by a body as it reapportions itself can include the use of natural or man-made geographic boundaries, contiguity, compactness, maintaining the core of existing districts to avoid voter disruption and confusion, and maintaining communities of interest together, such as traditional neighborhoods and business districts, among others.

### Process and Timeline

We are currently engaged in evaluating demographic data and election information. We have met with the county's Elections Supervisor to discuss timing for production of the new redistricting plan and related issues. We are also in the process of meeting with each Commissioner individually to brief them on issues that confront the City during this reapportionment cycle.

COM24066-000775

There are a number of policy issues that need to be determined by the Commission, including which redistricting criteria will be emphasized, and whether public meetings will be held in light of the late production of Census data and the Election Department's need to re-precinct prior to the 2022 elections.

Because of the delay in publication of Census data, as well as the Election Department's need to have a final plan in place prior to re-precincting, we are working towards completing the redistricting of the City of Miami by the end of February 2022. However, this is dependent on the Commission's policy directives.

## Process and Commission Direction

We have requested that the City Manager's Office place an item on the City Commission's November 18, 2021 agenda to allow us an opportunity to make a presentation regarding legal issues relevant to the redistricting process, current population disparity, and to seek policy guidance from the Commission on several issues. While individual meetings with each Commissioner provides us with valuable input, as legal counsel we can only act as directed by the majority of Commissioners acting as a legislative body. At the November 18th meeting, we will be seeking policy direction from the Commission on a number of issues.

**Redistricting Standards**

The Courts have recognized and accepted many redistricting standards, also referred to as "Traditional Redistricting Principles", that are employed in crafting a redistricting plan. Different jurisdictions utilize some or all of these standards, and may prohibit use of other standards that are otherwise accepted by the courts. For example, prior to the last redistricting cycle, the citizens of the State of Florida enacted amendments to the Florida Constitution which prohibit the Florida Legislature from creating a state legislative or congressional plan to be drawn with the intent to favor or disfavor a political party or an incumbent (which prior to enactment was not prohibited by the courts). These amendments also direct that districts shall not be drawn with the intent or result of denying or abridging equal opportunity of racial or language minorities to participate in the political process.[1] The amendments further require that districts shall consist of contiguous territory, be as nearly equal in population as is practicable, that districts shall be compact and shall-where feasible -utilize existing political and geographical boundaries. (Art. III §§ 20 & 21, Fla. Const.)

County and municipal governments are not subject to these standards. In the "Legal Standards for Redistricting" section set forth below, we provide additional information regarding redistricting standards for your consideration.

**Direction Regarding Conducting Public Hearings**

As elected officials, Commissioners have the authority to make redistricting decisions on behalf of their constituents. Citizens' participation in the redistricting process is not constitutionally required, although the City has directed redistricting consultants to provide public hearing

---

[1] This standard is already embodied in the Federal Voting Rights Act.

4

opportunities in prior redistricting cycles. During the last redistricting cycles, the City Commission directed legal counsel to conduct public hearings prior to development of a draft plan. Approximately 75 residents participated during the 2000 redistricting cycle. Well over 100 participated in the 2010 redistricting cycle.

Redistricting data is usually published in April of the year after the Census is taken. Because of the COVID pandemic and related issues, publication of the data during the current cycle was significantly delayed until September of this year. Moreover, the Miami Dade Elections Department informs that it needs to have a final plan in place by the end of February of 2022 in order to complete its re-precincting in a timely manner prior to the 2022 county elections. Providing for public hearings prior to development of a draft Plan may not allow the City to comply with such request and will delay production and approval of a final Plan. Other legislative bodies that must redistrict such as the Florida legislature, have opted to forgo public hearing during this redistricting cycle due in part to the delay in publication of the data. Therefore, the Commission may wish to re-evaluate the need for multiple public hearings.

Moreover, the City must account for the possibility that any enacted plan may be challenged in court. Therefore, the proper and prudent course of action is to complete redistricting well ahead of the qualifying dates for the next election to allow for sufficient time to resolve any challenge that may be lodged against the new plan.

Nevertheless, once a draft plan is completed and presented, the Commission will review and discuss the draft plan in an open public hearing which will also serve to provide a public input opportunity.

**Draft Plans to Present to the Commission:**

Once all relevant data is analyzed and legal principles are applied, there will be many different approaches to drafting a redistricting plan that are constitutional and compliant with the federal Voting Rights Act -- from a "start from scratch" approach -- to working the contours of existing districts to achieve substantial population equality (discussed further below). The approach is of course dependent on the policy directives of the Commission. In the case of the City of Miami, the main challenge will be to depopulate district 2 and rebalance the population of the remaining 4 districts. After obtaining policy guidance from the Commission, we will prepare a draft redistricting plan and present it to the Commission in a subsequent public hearing. At that time, the Commission as well as the public will have an opportunity to comment on the draft plan. If the Commission requests changes to the draft Plan that are consistent with Constitutional and statutory principles discussed below, we will make those changes and present a final Redistricting Plan for approval.

To be clear, legal counsel's role is not to make policy decisions; only to present a constitutionally sound draft plan and inform the Commission on legal issues relevant to such plan or any proposed changes.

In summary, below are some of the issues on which we will be seeking policy direction from the Commission:

5

- *Whether the districts should be drawn within the deviations permitted by law in order to accomplish legitimate City interests or whether they should be drawn to approximate population equality.*

- *Whether the proposed plan should attempt to preserve the core of existing districts in order to minimize potential voter confusion or employ a "start from scratch" approach.*

- *Whether the proposed plan should use natural and man-made features, to the extent possible, as the boundaries of the districts.*

- *Whether the proposed plan should attempt to keep communities of interest intact, such as traditional neighborhoods, business districts, high and low density areas, etc.to the extent that it is feasible.*

We will also be asking the Commission for policy guidance as to the hierarchy of the principles it wishes to employ. In other words, their order of importance. We will of course follow the guidance to the best extent possible, but keep in mind that there are sometimes competing principles including constitutional and statutory requirements that may not allow us to fully implement these goals.

## CURRENT AND ONGOING ANALYSIS

Throughout the last two months, we have also been engaged in analyzing whether the requirement of the Federal Voting Rights Act, as explained through the case law, have been met so as to allow race to be one of several factors that can be evaluated as we craft a plan. This requires as deep dive into elections conducted during the past decade to determine polarized voting patterns and minority voter cohesion. We have found significant evidence of both in our analysis. We have also been engaged in meeting with individual Commissioners. We have had conversations with Miami-Dade County Elections Supervisor, Christina White to address several issues, including timing for production of the final plan in order to allow time for an orderly re-precincting prior to the county's 2022 election, at which time the Department must have new precincts configured. We are also coordinating with Ms. White's staff to ensure a smooth transition of election plans.

**The Population Snapshot**

The United States Constitution provides that: "Representation and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ... The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct."

The "actual Enumeration" referenced in the Constitution (commonly known as the Census) was conducted during the 2020 cycle, giving a "demographic snapshot" of the nation. The snapshot of the City of Miami revealed that the population of the City had grown by 42,752 or 10.7 percent

COM24066-000778

over the past decade to 442,22. The demographic breakdown of the City's population is shown in the table below.

| District | Hispanic Pop | Non Hisp. Black Pop | Non Hisp. White Pop |
|---|---|---|---|
| 1 | 90.0% | 10.0% | 4.0% |
| 2 | 52.0% | 8.0% | 34.0% |
| 3 | 88.0% | 6.0% | 8.0% |
| 4 | 90.0% | 3.0% | 7.0% |
| 5 | 41.0% | 54.0% | 7.0% |
| | | | |
| Overall | 70% | 16.3% | 11.9% |

Hispanics are counted in the Census as an ethnic group, rather than a race. In 2020, Hispanics residing in the City of Miami represented 70% of the City's population. By contrast, the non-Hispanic White population of the City was only 11.9 percent of the City's population. The Black or African American population was 16.3 percent. The bulk of the City's Haitian population was concentrated in District 5. Finally, please note that some population numbers may exceed 100%. This is because approximately 1.7 percent of city residents self-identified as being of two or more races or ethnicities.

**Population of Existing Districts**

The map included at the end of this section shows the boundaries of the present City Commission districts. The table below shows the population breakdown for each of the five districts.

| District | Population | Deviation | % Deviation |
|---|---|---|---|
| 1 | 80,863 | (7,515) | -8.50% |
| 2 | 116,742 | 28,364 | 32.09% |
| 3 | 79,309 | (9,069) | -10.26% |
| 4 | 81,800 | (6,578) | -7.44% |
| 5 | 83,176 | (5,202) | -5.89% |
| | | | |
| Total Deviation | | | 42.35% |

With a total deviation of 42.35 %, the present districting plan is malapportioned and could not be sustained if a court challenge was brought before the 2023 election cycle.

COM24066-000779



8

COM24066-000780

# Legal Standards for Redistricting

The law governing redistricting combines a myriad of legal principles from a series of different sources, including the United States Constitution and Federal Statutes, all as interpreted by a number of key court rulings. As a result, the rules can often seem confusing and worse, may even seem contradictory.

A comprehensive exposition of every aspect of the law in this area could easily occupy several volumes. In this report, we have tried to summarize the important principles of redistricting in one coherent and, hopefully, easy to understand document. This primer is meant to be a tool to provide the members of the Commission with a working knowledge of the most important terms  and concepts they will need to effectively participate in enacting a new Single-Member District Plan.

The rules of redistricting can be summarized with three basic principles:

- *Each Commission district must contain a roughly proportional number of residents within the deviation permitted under case law;*

- *The City must not engage in racial gerrymandering; and*

- *The new Commission districts must not dilute votes of minority communities.*

Below we have divided the discussion of these issues into two sections. The first section discusses the constitutional mandate to reapportion and the acceptable population deviations permitted under the law. The second section deals with the role of race in the redistricting process, including a discussion regarding the Federal Voting Rights Act and its interplay with the Equal Protection Clause of the United States Constitution.

## I. Constitutional Mandate to Redistrict and Reapportion

Engaging in redistricting legislative districts is required by the United States Constitution if the current districts are otherwise malapportioned. In regard to the current status of the City's districting plan, its overall deviation of roughly 42% requires the City to engage in a redistricting process to rebalance the population among the different districts.

### A) Brief Historical Perspective on Redistricting: United States Constitution

 The concepts of "reapportionment" and "redistricting" are distinct. Reapportionment refers to the process of proportionally reassigning a given number of seats in the United States House of Representatives to apportion districts among the different states based on an established formula, or to reformulate a district plan after the number of districts either increases or decreases. Redistricting refers to the process of changing the boundaries of existing legislative districts. This primer will focus on redistricting. However, it may be beneficial to briefly provide a historical perspective to give background and context to the City's upcoming process and highlight the different rules that govern each process.

COM24066-000781

United States Constitution requires a reapportionment of the House of Representatives to distribute each of the House of Representative's 435 seats between the states and to equalize population between districts within each state. The mandate to reapportion flows from Article I, Section 2, Clause 3 of the United States Constitution. In furtherance of the constitutional mandate to reapportion, the United States Congress adopted the Census Act, 13 USC § 1, *et. seq.* The Census Act delegates the authority to the Secretary of Commerce to "take a decennial census of population as of the first day of April of such year." See 13 U.S.C. § 141(a). It further requires that the Department of Commerce complete a population tabulation for each state and report to the President of the United States the results by December 31st of the census year. See 13 U.S.C. § 141(b). The President must then report to Congress, using the information provided by the Secretary, the number of representatives to which each state would be entitled. Although the Census was created as a vehicle to determine congressional apportionment, the data is utilized by virtually every state and local jurisdiction that engages in the process of redistricting.

By April 1st of the year following the Census enumeration, the Secretary of Commerce provides a detailed population report to the Governor and the Majority and Minority Leaders of each House of the state legislatures. As referenced above, during this cycle, the data was not released until September. These reports provide the basis for federal, state, and local government decennial redistricting plans. It contains census maps and electronic files breaking down population data by blocks, census tracts, voting districts, and the corporate limits of towns, cities and counties. The information also generally contains population totals by race, Ethnic origin and voting age.

**B) Court Imposed Requirement To Redistrict; Population Differences Amongst Districts.**

As discussed above, the mandate to reapportion congressional districts is derived from Article I, Section 2 of the United States Constitution. However, the duty of state, local and municipal governments to redistrict arises from the Equal Protection Clause of the 14th Amendment of the United States Constitution. This distinction is significant because, as will be discussed below, different rules apply with respect to equalizing population of congressional and state or local government districting plans.

**1) The Obligation to Redistrict**

The City Commission is obligated to redistrict based on the judicially recognized principle commonly referred to as "one person, one vote". *Baker v. Carr,* 369 U.S. 186 (1962); *Reynolds v. Sims,* 377 U.S. 533 (1964). These cases addressed the practice in several states -- as was the case in *Baker* and *Reynolds* -- of maintaining districts for legislative offices that were substantially different in population. The Supreme Court concluded that these wide variations among district populations resulted in each vote in the district with the smaller population carrying more weight than a vote in the larger district. Thus, in *Reynolds,* the United States Supreme Court held that the 14th Amendment required that seats in state legislatures be redistricted on a population basis. The Court in *Reynolds* went on to conclude that decennial redistricting was a rational approach to re-adjust legislative representation to take into consideration population shifts and growth. *id.* at 584. The Court declared that any less frequent re-adjustment would be constitutionally suspect.

COM24066-000782

In *Avery v. Midland County,* 390 U.S. 474 (1968), the United States Supreme Court applied the *Reynolds* decision to local governments. The Court concluded "that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers of the entire geographic area served by the body."

**2) Population Deviation**

During this redistricting process, you may hear and read repeated references to the concept of "deviation". In order to determine the degree of deviation of a district one must first divide the total population of the jurisdiction by the number of districts. The resulting number is known as the "ideal district population". Any variance from the ideal population number is generally referred to as a deviation. For example, if a district has a plus 20% deviation, it means that the population of the district is 20% greater than the "ideal" population.

Another way that deviation is discussed is by comparing the lowest populated and highest populated district to obtain the "overall deviation". For example, in the case of the City of Miami, the most populated district (District 2) is slightly over 32% deviation, and the most underpopulated district (District 3) is at a slightly under 10% deviation. Therefore, the overall deviation of the current plan is roughly 42%.

Because the requirement to reapportion and redistrict flow from different provisions of the U.S. Constitution, the rules which govern the respective processes are different. As a rule of thumb, the population deviation among the largest and smallest district in a Congressional Plan (the overall deviation) is usually plus or minus a single voter. For state legislative and local government districts, the courts have permitted a greater population deviation among districts. As the Supreme Court observed in *Reynolds,* all that is necessary when drafting state legislative districts (or local government districts; *see Avery)* is achieving "substantial equality of population among the various districts". 377 U.S. at 579. The phrase "substantial equality of population" has come to generally mean that a legislative or local government plan will not be held to violate the Equal Protection clause if the overall deviation between the smallest and largest district is less than 10%.

Thus, there is some flexibility in designing the city's districts. However, deviation between districts should only be considered when there is good cause or a rational basis and the deviation furthers an important governmental objective such as preserving traditional neighborhoods, preserving communities of interest and utilizing natural or man-made boundaries that have historical or other significance.

In the City's 2000 and 2010 redistricting process, we developed plans with less than 10% overall deviation, and the report accompanying the plan made note of the governmental objective and rational basis for deviations in each of the districts. The plans were never challenged. The same methodology will be employed during this redistricting cycle.

## II. Race, Language Minorities, and Reapportionment

Federal and state case law almost universally recognizes that "reapportionment is primarily the duty and responsibility of the state through its legislature or other body, rather than the (federal) court." *Chapman v. M eir,* 420 U.s. 1,27 (1975). Therefore, the courts are careful to respect a state's

11

or local government's redistricting decisions, unless those decisions violate the Constitution or the law. *Voinovich,* 507 U.S. at 146. Generally, the courts have intervened in the redistricting choices of local governments for two reasons: (A) to cure violations of the Equal Protection Clause of the 14th Amendment; or (B) To remedy violations of the Federal Voting Rights Act.

After the 1990 Census, the United States Supreme Court was called upon to decide a series of cases regarding the role of the Equal Protection Clause and race in the reapportionment process. *Hunt v. Cromartie,* 526 U.S. 541 (1999); *Abrams v. Johnson,* 521 U.S. 74 (1997); *Bush v. Vera,* 517 U.S. 952 (1996); *Shaw v. Hunt,* 517 U.S. 899 (1996) *(Shaw II); Miller v. Johnson,* 515 U.S. 900 (1995); *Johnson v. De Grandy,* 512 U.S. 1997 (1994); *Shaw v. Reno,* 509 U.S. 630 (1993) *(Shaw* 1). Generally, in these cases, the Supreme Court held that when race was the predominant factor in the creation of a district, the creation of that district was subject to "strict scrutiny" review by the Courts and would, in most circumstances, violate the Equal Protection Clause. "Strict scrutiny" is the most stringent legal standard applied to the judicial review of a state act alleged to violate the Constitution.

The Equal Protection Clause, in and of itself, does not prohibit the creation of districts where the crafters were conscious of the race of the minority of voters in the district. *Vera,* 517 U.S. at 972. However, the Supreme Court has clearly held that the Equal Protection Clause does demand the application of strict scrutiny when race constitutes the principal reason or the predominant factor for the shape of the particular district.

On the other hand, the Federal Voting Rights Act (discussed in more detail below) prohibits any practice which "interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *See Voinovich,* 507 U.S. at 146; *Growe v. Emison,* 507 U.s. 25.

Therefore, reconciling these two competing legal principles, it can be said that a redistricting plan may be ***race-conscious*** to the extent necessary to comply with the Federal Voting Rights Act, but not ***race-driven,*** (where race is the overriding or predominant factor in the creation of a district).

**A) Predominant Factor Test; Race-Neutral Justifications**

The Supreme Court has articulated various formulations of the "Predominant Factor" test. Legislative action to establish new legislative districts is subject to strict scrutiny if:

> *Redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional redistricting principles. Shaw I, 509, U.S. at 642*

> *Race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. Miller, 514 US. at 916*

> *The legislature subordinated traditional neutral redistricting principles ... to racial considerations. Miller, 515 U.S. at 916.*

12

COM24066-000784

> *The state has relied on race in substantial disregard of customary and traditional* •
> *redistricting practices. Miller, 515 U.S. at 928*

Because the legislative body's intent or motivation in adopting a given plan is often the central issue in a redistricting judicial dispute, it is important that the Commission -- as the governing body of the City -- understand the significance of these issues. This is why -- prior to commencing the process of drafting the plans -- our firm will seek policy directives from you as to which traditional redistricting standards you wish to have utilized or emphasized in creation of the new single-member district plan. Our firm will be conscious of racial and language minority issues so far as is necessary to determine applicability and compliance with the Federal Voting Rights Act, (race conscious) but will be guided by policy directives provided by the Commission, utilizing those race neutral criteria as the main considerations in crafting the Plan.

**B) Race Neutral/Traditional Redistricting Criteria**

The courts have encouraged state and local governments to use traditional redistricting principles in designing legislative districts. However, the use of these traditional redistricting principles is not mandated by the courts. The U.S. Supreme Court has repeatedly stated that a compact and "regular looking" district is not a federal constitutional requirement. *Gaffney v. Cummings,* 412 U.S. 735, 752 n18 (1973) (A district's "compactness or attractiveness has never been held to constitute an independent federal requirement.") In *Shaw I,* the Court acknowledged that a compact district shape was "not ... constitutionally required". 509 U.S. at 647, and in *Bush v. Vera,* 517 U.S. 964, the court concluded that "irregular district lines" could be drawn for incumbency protection and "to allocate seats proportionally to major political parties". In Justice Kennedy's concurring opinion in *Vera,* he stated "[d]istricts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one." 517 U.S. at 999.

In our upcoming presentation before the Commission, counsel will solicit policy direction from the Commission in the form of a Resolution as to what neutral or traditional redistricting principles the Commission wants utilized in crafting the draft redistricting plan for the Commission's consideration. Some of the factors that courts have generally identified as Traditional Redistricting principles include:

- *The use of natural or man-made geographic boundaries, i.e. a river, a major* •
  *expressway, major roads such as section lines, roads, or the boundaries of*
  *traditional neighborhoods;*

- *Contiguity;*

- *Compactness;*

- *Maintaining the core of existing districts to avoid voter disruption and confusion;*

13

COM24066-000785

- *Maintaining communities of interest together, i.e., single-family residential, high-density residential areas, traditional neighborhoods, business districts, coastal or environmentally sensitive areas, etc.*

By way of example, other acceptable race-neutral principles that have been employed in the past by the City, such as in the 2000 redistricting cycle were:

- *That the draft plan(s) attempt -wherever possible -to "nest" City Commission District 5 in County Commission District 3 for purposes of providing a more rational combination of services between the County and the City; and,*

- *That the draft plan(s) attempt -wherever possible -to include whole precincts into a district. (Note that, this will not be an issue in this cycle as the re-precincting will occur after the plan is adopted)*

**C) The Federal Voting Rights Act of 1965**

Section 2 of the Federal Voting Rights Act of 1965 (VRA) prohibits any state or political subdivision from imposing a "voting qualification or prerequisite to voting or standard, practice or procedure... in a manner which results in the denial or abridgment of the right to vote on account of race or color." 42 USC §1973. In 1982, the VRA was amended to include language minorities. Moreover, in 1982, reacting to the narrow interpretation of the VRA by the U.S. Supreme Court (requiring proof of discriminatory intent), Congress also amended the VRA to require only proof of a discriminatory result based on the totality of the circumstances.

The U.S. Supreme Court has recognized that the manipulation of district lines during a redistricting process can be the basis for a claim that the voting strength of politically cohesive minority voters has been diluted. Vote dilution may happen as a result of fragmenting the minority voters among several districts where the majority can routinely out-vote the minority voters, or unnecessarily packing the minority voters into one or a small number of districts to minimize their influence in the neighboring districts. *See Voinovich, 507 U.S. at 146; Growe, 507 U.S. at 25.* Thus, Section 2 prohibits creation of district lines where the result, "interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters."

In the case of *Thornburg v. Gingles, 478 U.S. 30 (1986)*, the Court held that three threshold conditions are required prior to establishing that a districting plan violates Section 2 of the VRA:

- *The size and geographic compactness of the minority population must be such as to enable the creation of a single-member district in which the minority group can elect a candidate of its choice;*

- *The minority population is a politically cohesive group; and*

- *The majority population often votes as block to defeat the minority group's preferred candidate.*

COM24066-000786

If the plaintiff in a case brought under Section 2 establishes that the challenged district meets these three criteria, then the court will move on to examine the "totality of the circumstances" to determine if the practice in question results in the dilution of the electoral power of the minority population. If the plaintiff fails to establish the existence of the three factors, the court does not need to go any further and the Section 2 claim fails as a matter of law. *See Bartlett v. Strickland, 556 U.S. 1, 7 (2009).*

In order to ensure compliance with the VRA and minimize the probability of legal liability to the City, we have conducted an analysis of relevant elections in the last decade to determine whether the *Gingles* factors apply to the process of crafting a proposed districting plan. In the last two redistricting cycles, legal counsel concluded that the *Gingles* factors were evident within the City. Our current analysis demonstrates that polarized voting and the other *Gingles* factors are still evident within the City.

## SUMMARY

As mentioned before, this primer is by no means the definitive, exhaustive source on this area of the law, but it is intended to serve as a reference tool for understanding certain basic redistricting concepts. In addition to familiarizing yourself with those basic concepts, as you proceed in this historic process, it will serve you well to keep in mind the three basic rules outlined at the beginning of this primer. Those rules form the baseline of what is needed to ensure that the redistricting plans adopted by the City of Miami can withstand judicial scrutiny.

During our upcoming presentation before the Commission, we will provide demographic data for your consideration, and will be seeking policy guidance from you that will become our "rules" for developing the City's new single member district plan. Your consultants have a wealth of experience and substantive knowledge in this field. However, our role is to reflect the Commission's policy objectives in the form of a proposed redistricting plan, and to advise the Commission of the legal consequences, if any, of particular changes or configurations of the plan. Therefore, we will be looking to the Commission to provide the policy directives that will guide us in preparing and presenting a final product for your consideration.

COM24066-000787

| From: | Miguel.deGrandy@hklaw.com |
|---|---|
| To: | VMendez@miamigov.com |
| Cc: | KHardemon@miamigov.com; krussell@miamigov.com; mreyes@miamigov.com; adiazdelaportilla@miamigov.com; jcarollo@miamigov.com; fsuarez@miamigov.com; anoriega@miamigov.com |
| Subject: | FW: Response to erroneous comments made by City Attorney at Oct. 8, 2020 commission meeting Re Applicability of RMI Settlement Agreement |
| Date: | Wednesday, October 21, 2020 8:02:31 PM |

> **CAUTION:** This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Mendez,

Thank you for your email in response to my letter to the Commissioners. I re-read my letter and confirmed that nowhere therein have I asserted that RMI can " bind the city in perpetuity". All we have said and continue to maintain is that based on the terms of the Settlement Agreement, the Holdover Tenancy Period for which RMI paid $750,000 in consideration runs from the execution of the agreement, **"until the successful bidder/new tenant takes possession of the Subject Property, after any and all objections to the Bid and award, including appeals, have been fully and finally resolved."** That is what your office negotiated and exactly what the Agreement says in black and white.

Your statement that the Settlement Agreement was specific to the first RFP because the Agreement uses the term "the bid" instead of "a bid" still leaves open the question of which is "the bid"? Is it the first bid? Or is it the bid -- as set forth in the Agreement -- which results in a "successful bidder/new tenant" that can "take possession of the Subject Property, after any and all objections to the Bid and award, including appeals, have been fully and finally resolved,"? I would think a court of law would read the provisions of the Agreement in *pari materia* and find that it is the latter, not the former. Indeed, if the City intended to tie those provisions to the first RFP, the language of the Settlement Agreement -- which your office drafted, negotiated and agreed to -- would have said that the terms were in force until the conclusion of "RFP no. 12-14-077," to make specific reference to that first procurement process.

Moreover, it is important to note that the first RFP was not terminated as a result of any action by RMI, it was terminated by the city. Indeed, after hearing objections from numerous stakeholders and environmental groups, the commission, in the exercise of its sound and broad discretion, decided not to proceed with the scope developed by DREAM which may have negatively impacted the Historic Basin, leading to the second procurement process with a different scope.

Putting all that aside for a moment, your analysis does not address the fact that the City cannot take possession of the property without violating the Settlement Agreement because it is not a" successful bidder/new tenant;" it is the landlord.

Finally, at no time have we asserted that RMI has more rights to the property than the City. I certainly concede that the City is the owner of the property. But as in any landlord/tenant relationship, we are asserting that during the term of the lease (in this case the "Holdover Tenancy Period"), the tenant has the right to peaceful enjoyment and possession of the leasehold. Thus, as we learned in law school, if a landlord unlawfully evicts a tenant in violation of the terms of a valid

lease, the aggrieved tenant would be entitled to recover damages for such unlawful termination.

As to your other statements seeking to limit the broad powers of the commission to act as the city's governing body in the context of a procurement process, we will respond via letter tomorrow.

Again, thank you for your prompt response.

Sincerely,


Miguel De Grandy | Holland & Knight
Partner
Holland & Knight LLP
701 Brickell Avenue, Suite 3300 | Miami Florida 33131
Phone 305.789.7535 | Fax 305.789.7799
miguel.degrandy@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mendez, Victoria <VMendez@miamigov.com>
Sent: Wednesday, October 21, 2020 3:31 PM
Subject: RE: Response to erroneous comments made by City Attorney at Oct. 8, 2020 commission meeting Re Applicability of RMI Settlement Agreement


[External email]

Thank you Mr. DeGrandy.

I hope you are well. I appreciate your analysis, but it is incorrect. You cannot bind the city in perpetuity to your client. It is against the charter. The settlement agreement referred to "the" bid, and not "a" bid in the future. Your client cannot have more rights to the property than the City does. Your client cannot keep protesting bids in perpetuity to tie the City's hands.

With that said, the city commission can decide to: 1) award to the number one bidder, 2) not to award to the number one bidder and take the property back, or 3) not to award to the number one bidder and maintain the status quo, until they decide what to do. It is entirely their decision as long as long as they have reasons that are not arbitrary. Thank you.

-----Original Message-----
From: Julie.deGrandy@hklaw.com <Julie.deGrandy@hklaw.com>
Sent: Wednesday, October 21, 2020 12:53 PM
To: Carollo, Joe (Commissioner) <JCarollo@miamigov.com>; Diaz de la Portilla, Alex (Commissioner) <adiazdelaportilla@miamigov.com>; Reyes, Manolo (Commissioner) <MReyes@miamigov.com>; Russell, Ken (Commissioner) <krussell@miamigov.com>; Hardemon, Keon (Commissioner) <khardemon@miamigov.com>

Cc: Suarez, Francis (Mayor) <fsuarez@miamigov.com>; Noriega, Art <anoriega@miamigov.com>; Mendez, Victoria <VMendez@miamigov.com>; Miguel.deGrandy@hklaw.com; Daniel.Hanlon@hklaw.com
Subject: Response to erroneous comments made by City Attorney at Oct. 8, 2020 commission meeting Re Applicability of RMI Settlement Agreement
Importance: High

CAUTION: This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Please see attached correspondence.

Your message is ready to be sent with the following file or link attachments:

Letter to Commission 10.21.20 re erroneous comments made regarding RMI Settlement Agreement

Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

_____

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

COM24066-000790

| | |
|---|---|
| **From:** | Miguel.deGrandy@hklaw.com |
| **To:** | krussell@miamigov.com; adiazdelaportilla@miamigov.com; jcarollo@miamigov.com; mreyes@miamigov.com; kihardemon@miamigov.com |
| **Cc:** | Eferreiro@miamigov.com; RWakefield@miamigov.com; Abarrera@miamigov.com; fsuarez@miamigov.com |
| **Subject:** | setting the record straight |
| **Date:** | Friday, November 13, 2020 1:29:58 PM |
| **Attachments:** | factual proffer between US prosecutor and Shoreline.pdf |
| | Exhibit 5.pdf |
| | Maff Stack letter alleging fraudulent representations re Aero-Docks.pdf |
| | Miguel Diaz De La Portilla protest letter 5.18.2016.pdf |

> **CAUTION:** This is an email from an external source. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Commissioners,

It's come to our attention that Virginia Key LLC  (VK) started spreading disinformation on Spanish language radio stations this morning alleging all sorts of false information about the procurement process and my Client Biscayne Marine Partners, LLC. (BMP). We believe in providing accurate information in order for you to make an informed decision. Therefore, permit me to use this opportunity to set the records straight. Below we present the allegations and the facts, as supported by uncontroverted documentation.

**First false allegation:** they are alleging that one of BMP's principals, Damian Calabrese, is under indictment in Argentina and has fled the country.

**FACT: Mr. Calebrese has no criminal records and is in Argentina and continues to run his business without incident.** When these false allegations first surfaced in July of this year, we asked Mr. Calebrese to obtain irrefutable evidence to demonstrate that this allegation was false. Attached you will find a certificate from the Argentina Ministry of Justice certifying that Mr. Calebrese has no criminal record. In order to request such certificate, Mr. Calebrese had to appear in person and provide his fingerprint. The justice ministry logs all indictments and complaints, thus even if he was just charged with an offense, such would be disclosed in that certificate. The certificate from the Ministry of Justice issued in late July of this year is dispositive on this issue and is attached for your review.

**Second False allegation:** They have denied that any of their team were involved in criminal conduct or malfeasance. Below are the facts:

**FACT number one**: **Shoreline foundation**, the VK team member that was proposed to redevelop the entire "wetside"  of the marina defrauded the coast guard and damaged sensitive coral reefs in our bay. That is not conjecture. Attached is the factual proffer they agreed to with the United States prosecutors as well as their Felony conviction for defrauding the US coast Guard. We will let those documents speak for themselves.

**Fact Number two:** VK falsely represented during the oral presentations that **AeroDocks**,  the team member who will be developing the dry stack automated system, had developed the only fully automated marina in the United States of America at Port marina in Fort Lauderdale. The evaluators awarded points to VK based on this false representation. Attached is the letter from Maff-Stack, the

company that actually developed Port Marina, certifying that such allegation was patently false and that Maff-Stack used their own patented system at Port Marina. Our representation that they lied to the selection committee is not conjecture. It is a fact as demonstrated by the attached correspondence. Moreover, another uncontroverted fact is that even now, 3 years from having made such misrepresentation, they have yet to implement their system in any marina development anywhere in the world. The truth is that Miami was going to be their guinea pig to see if their system worked.

**Fact Number three:** VK's principals, the RCI group, are responsible for the worst sewage spill in the history of south Florida, which they failed to disclose during a city of Miami procurement. That is not our opinion or conjecture. Attached is a letter from attorney Miguel Diaz De La Portilla, in which he explains in excruciating detail the facts regarding this sewage spill and  advocates for disqualification of RCI in the previous procurement as a result of this outrageous incident and RCI'S failure to disclose these crucial facts. In his correspondence Mr. Diaz de la Portilla states : "*RCI should be disqualified for an even more compelling reason:* **RCI and its principals were involved in--and intentionally failed to disclose--one of the largest environmental contaminations in South Florida history…"**

As always, we have made our argument's based on documented facts, and we appreciate the opportunity to set the record straight.

**Miguel De Grandy | Holland & Knight**
Partner
Holland & Knight LLP
701 Brickell Avenue, Suite 3300 | Miami, Florida 33131
Phone 305.789.7535 | Fax 305.789.7799
miguel.degrandy@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** de Grandy, Miguel A (MIA - X27535)
**Sent:** Friday, November 13, 2020 10:22 AM
**To:** 'Aabad Melwani' <am@rmimarina.com>
**Subject:** FW: setting the record straight

FYI,

At Manny's request, I sent the email below to radio host.

**Miguel De Grandy | Holland & Knight**
Partner
Holland & Knight LLP
701 Brickell Avenue, Suite 3300 | Miami, Florida 33131
Phone 305.789.7535 | Fax 305.789.7799
miguel.degrandy@hklaw.com | www.hklaw.com

COM24066-000792

Add to address book | View professional biography

**From:** de Grandy, Miguel A (MIA - X27535)
**Sent:** Friday, November 13, 2020 10:12 AM
**To:** 'robertorodrigueztejera@gmail.com' <robertorodrigueztejera@gmail.com>
**Cc:** Manny Prieguez <Manny@prieguezsolutions.com>
**Subject:** setting the record straight

Roberto,

Manny Prieguez me informo sobre los datos falsos que te habian dado sobre el tema de la marina en Miami. Permiteme ahora darte los datos veridicos y verificables.

Primero, sobre Damian Calabrese. No se de donde sacaron que se habia fugado del pais o que no volvia para no ser encausado. La verdad es que Calabrese esta en Argentina y sigue manejando su negocia alli sin incidente. Cuando se hicieron las allegaciones falsas sobre su supuesto encausamiento, le pedimos que nos proveyera pruebas constantes de que no estaba bajo ningun proceso legal. Adjunto te mando el certificado emitido por el departamento de justicia de argentina certificando que Calabrese no tiene antecedentes penales. Para recibir tal certificado, uno tiene que presentarse en persona y dar su huella dactilar para confirmar su identidad y poder hacar la investigacion. El certificado fue emitido a final de julio del 2020.

En argentina, la ley permite que qualquirer ciudadano abra un caso penal, pero, hasta que la fiscalia no la revise y determine su veracidad, no hay un ecausamiento. Las quejas hechas por inversionistas de su compania, los cuales quieren usar el proceso penal para forzar un acuerdo en una disputa civil, no han tenido exito, pues no hay delito penal envuelto. En conclusion, las alegaciones con completamente falsas.

Segundo, las pruebas que hemos presentado, demuestran que el componente principal para desarrolar todos los muelles y la parte marina del desarrollo es una compania encausada por defraudar al Unites States Coast Guard (Shorline Foundation). Eso no es nuestra opinion, o una calumnia, es un hecho. Adjunto te mando la copia del fallo de la corte declarandolos culpable de dicho crimen federal, y sus declaraciones confirmando que cometieron tal fraude.. Respecto a tu pregunta de porque no se presento esto durante el litigio, la razon es muy simple. Aunque los hechos por los cuales fueron encausados occurrieron durante ese tiempo, los cargos no se presentaron hasta que el litigio habia concluido. Ellos sabian que los estaban investigando, y sabian que ivan a ser encausados, pero lo mantuvieron secreto el mas tiempo possible.

Tercero, en otro componente de este Licitador, es la compania AeroDocks, la cual va a desarrolar el hangar donde se guardan los barcos en tierra, y el sistema mecanico para sacar los barcos del agua y ponerlos en los "racks". Esta compania represento falsamente a el comite de evaluacion, que ellos habian desarrolado **el unico sistema totalmente automatico que existe en los estados unidos**, en una marina en Ft Lauderdale llamada Port Marina. Pudimos descubrir despues de los litigios que tal representacion era completamente falsa. Adjunto te mando una carta emitida por la compania que hizo el desarrollo de Port Marina, indicando que AeroDocks no tuvo nada que ver con ese desarrollo

COM24066-000793

y que usaron sus propios patentes para tal marina.

Por ultimo, tengo entendido que Miguel Diaz De La Portilla iva a  participar en tu programa para criticar a mi cliente. Eso si es muy interesante, pues en la primera licitacion, el represento a una compania(Suntex) en contra del licitador Virgina Key.  En la segunda licitacion, su compania hizo un trato con Virgina Key para licitar juntos. Lo interesante es que en la primera licitacion, Diaz De La Portilla argumento que Virgina Key debia ser descalificada, puesto que causaron la contaminacion de la nuestra bahia grande en la historia de el sur de la Florida. Adjunto te mando la carta que el le presento a la commission en el 2016 dando constancia de estos hechos.

Ahora a lo mejor esta mas claro el porque los que ivan a participar en el programa a favor de esta compania decidieron al ultimo momento no asociar su nombre con esta compania.

Por ultimo, se alego que la ciudad estaba perdiendo un Millon de dollares anuales producto de nuestra protesta. Simplemente no es verdad. Es mas, mi cliente accepto pagar $100,000. Al mes mas en renta para aseguran que la cuidad no perdiera un centavo mientras se investigan estos hechos. Facilmente lo puedes comprobar llamando a Art Noriega. En fin, en ves de perder un millon annual , estan ganadndo $200,000 mil mas que los que hubieran conseguido con la otra compania.

En resumen, ni mi cliente ni su socio Calabrese son delinquentes. Pero las prueban contundentes demuestran lo contrario de la otra compania.

Roberto, entiendo que como periodista con integridad, que tu tienes de sobra, estarias bien molesto con estas declaraciones que se habian hecho con respecto a esta licitacion. Pero ahora tienes los hechos, no las calumnias. Espero que puedas reportar estos hechos para que el pueblo este correctamente informado. Si tienes alguna otra pregunta, sabes que siempre estoy a tu disposicion.

**Miguel De Grandy** | **Holland & Knight**
Partner
Holland & Knight LLP
701 Brickell Avenue, Suite 3300 | Miami, Florida 33131
Phone 305.789.7535 | Fax 305.789.7799
miguel.degrandy@hklaw.com | www.hklaw.com

Add to address book | View professional biography

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

"2020 - AÑO DEL GENERAL MANUEL BELGRANO"



**RNR**
REGISTRO NACIONAL DE REINCIDENCIA


Ministerio de Justicia
y Derechos Humanos
Presidencia de la Nación

## CERTIFICADO DE ANTECEDENTES PENALES

FOTOGRAFÍA



NOMBRE COMPLETO
CALABRESE, DAMIAN

TIPO Y NÚMERO DE DOCUMENTO

FECHA DE NACIMIENTO

NACIONALIDAD
Argentina

IMPRESIÓN DACTILAR

> Pursuant to 5 U.S.C. § 552(b)(6), personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy are exempt.

> Under § 119.07(1), F.S, biometric identification information is exempt from disclosure.

NO REGISTRA ANTECEDENTES PENALES A INFORMAR POR ESTA REPARTICIÓN.

Buenos Aires, 21 de Julio del 2020

Art. 8 Inciso f) Ley Nro. 22.117

El presente Documento Digital es el Certificado de Antecedentes Penales conforme los términos de la Ley 25.506, el Decreto 2628/2002 y el Decreto 283/2003, siendo su código de trámite: P13010832, de solicitud: 07100025403 y de seguridad: 837A6E8860

Conforme a la Disposición D.N.R.N.R N° 3/2012 este documento electrónico firmado digitalmente constituye el único instrumento por el cual la Dirección Nacional del Registro Nacional de Reincidencia certifica los antecedentes penales, su validación se efectúa en: https://www.dnrec.jus.gov.ar/ConsultaCAP/

El plazo de validez del CERTIFICADO resulta de lo dispuesto por el Art 6° del Decreto N° 2004/80 reglamentario de la Ley N° 22.117


**RNR**
REGISTRO NACIONAL DE REINCIDENCIA


Ministerio de Justicia
y Derechos Humanos
Presidencia de la Nación

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 18-20708-cr-KMW

UNITED STATES OF AMERICA

v.

SHORELINE FOUNDATION, INC.,

Defendant.
_____/

## FACTUAL PROFFER

The United States of America and the defendant, SHORELINE FOUNDATION, INC.,
agree that that if this matter were to proceed to trial, the United States would prove the following
facts beyond a reasonable doubt:

1.      The U.S. Coast Guard ("USCG") is an agency of the United States Department of
Homeland Security responsible for the care and maintenance of maritime aids to navigation.

2.      In 2012, the U.S. Coast Guard ("USCG") began the process of replacing four aging
channel marker range lights in the Port of Miami.   Embedded into the sea floor and rising out of
the water, the range lights are aids to navigation that guide boats through the Miami channel.

3.      The USCG obtained a permit from the Florida Department of Environmental
Protection ("FDEP") on January 30, 2013, and a permit from the United States Army Corps
("USACE") on March 27, 2013.   The permits established terms and conditions designed to protect
marine and benthic resources.

4.      On May 3, 2013, the USCG solicited bids for a project to replace the channel
marker range lights in the Port of Miami.   As part of a competitive bidding process, the defendant
submitted a bid to complete the project for $2,864,454.00.   On June 5, 2013, the USCG awarded

1

COM24066-000796

the project to the defendant.   At every stage of the bidding process, the USCG alerted the defendant of the FDEP and USACE permit requirements.

5.     The USCG's contract with the defendant established specifications for the construction of the four new range markers.   Through incorporation of the USACE permit, the USCG's contract with the defendant also specified terms and conditions for the protection of coral during construction.   Some of the specifications for the protection of coral included:

    a. Pre-construction surveys within the radius of the construction impact zone;

    b. Relocation of coral meeting size parameters prior to construction;

    c. The assistance of a scientific diver during barge movements and spudding to mitigate impact to benthic resources in the secondary construction zones; and

    d. Post-construction surveys within thirty days of the completion of the work.

The USCG contract and USACE permit required the same terms and conditions for the demolition of the old range makers as well.   The USCG contract and the USACE permit required compliance with these conditions.

6.     The defendant hired a subcontractor to perform the required environmental compliance for the total amount of approximately $74,000.

<u>Non-Performance of Required Safeguards During Construction</u>

7.     In May and June 2014, the subcontractor performed pre-construction surveys of the four construction sites, as required.   The subcontractor identified 162 different species of coral in the construction sites.   While one of the sites had no coral, and a second site had only 33 coral colonies meeting the parameters for relocation, two of the sites had substantial coral.   The site "Government Cut Rear – Proposed" ("GCR-P") was in a coral reef with abundant coral and several colonies of endangered Staghorn coral (*Acropora cervicornis*) in the radius of the construction

2

COM24066-000797

footprint.   The site contained 231 colonies of coral and octocoral that met the parameters for relocation.   Likewise, the site "Miami Main Rear – Proposed" ("MMR-P") contained abundant coral and at least one colony of endangered Staghorn coral.   The site contained 332 colonies of coral and octocoral that met the parameters for relocation.

8.   In July and September, 2014, the defendant performed construction at sites MMR-P and GCR-P respectively, but the subcontractor had not initiated coral relocation at these sites, Responsible senior SFI managers were aware of the requirement for relocation and the fact that it had not yet occurred.   Additionally, the defendant's work barges spudded at these sites without scientific diver guidance on spudding locations.   Likewise, senior SFI managers were aware not only of the permit requirement for scientific diver assistance but also that spudding occurred at these sites without it.

Non-Performance of Required Safeguards During Demolition

9.   In the spring of 2015, the subcontractor reminded responsible senior SFI managers that it was necessary to perform pre-demolition surveys of coral at the four demolition sites and indicated that the subcontractor was standing by to perform the surveys.

10.   From approximately April 21, 2015 through June 5, 2015, the defendant performed the demolition of the existing channel marker range lights.   The demolition occurred without pre-demolition coral surveys.   The defendant performed the demolition despite the knowledge of senior SFI managers that pre-demolition surveys had not occurred, that there had been no opportunity for the relocation of any coral within the demolition work zone and attached to the range lights, and that SFI crews had no guidance from scientific divers about where to spud.

3

COM24066-000798

<u>Submission of a Representative False Claim</u>

11.     Specifically, on May 6, 2015, the defendant's work logs indicate that the defendant went to the old range marker at site Government Cut Rear-Existing ("GCR-E"), spudded down, and removed the channel marker.

12.     Because there was no pre-demolition survey, it is impossible to know the impact of the demolition on coral at GCR-E and the other three demolition sites.

13.     Throughout the construction and demolition, the defendant submitted claims to the USCG for payment.

14.     On June 3, 2015, the defendant submitted an invoice for May 2015.   The May 2015 invoice indicated that the USCG had paid the defendant $2,439,888.00 to date and requested $375,061.75 for all of the work performed in May 2015, including the demolition of GCR-E.   As with all of the previous twelve progress payment invoices that the defendant had submitted to the USCG, the invoice certified that the "amounts requested are only for performance in accordance with the specifications and conditions of the contract."

4

COM24066-000799

15.   The defendant completed all construction and demolition in approximately June 2015 but did not submit its post-construction and demolition survey until the spring of 2016. During the process of preparing its final report, a senior manager for the defendant discouraged the subcontractor from reporting the environmental compliance failures to the USCG.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 10/23/18                    By: _____
                                         JAIME A. RAICH
                                         ASSISTANT UNITED STATES ATTORNEY

Date: 10/23/18                    By: _____
                                         DOUGLAS MOLLOY
                                         ATTORNEY FOR DEFENDANT

Date: 10/23/18                    By: _____
                                         JOHN MCGEE, VICE PRESIDENT
                                         AUTHORIZED REPRESENTATIVE OF
                                         DEFENDANT

5

COM24066-000800

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                   Page 1 of 5

# UNITED STATES DISTRICT COURT
## Southern District of Florida
### Miami Division

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| v. | |
| SHORELINE FOUNDATION, INC. | Case Number: **18-CR-20708-WILLIAMS** |
| | USM Number: |

Counsel For Defendant: **Douglas Molloy**
Counsel For The United States: **Jaime A. Raich**
Court Reporter: **Patricia Sanders**

**The defendant pleaded guilty to Count 1 of the Information.**

The defendant is adjudicated guilty of these offenses:

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 U.S.C 287 | False, Fictitious and Fraudulent Claims to an Agency in the United States | 08/29/2018 | 1 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

ι is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

Date of Imposition of Sentence: **1/9/2019**

Kathleen M. Williams
**United States District Judge**

Date: _1/10/19_

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                                                         Page 2 of 5

DEFENDANT: **SHORELINE FOUNDATION, INC.**
CASE NUMBER: **18-CR-20708-WILLIAMS**

## PROBATION

The defendant is hereby sentenced to probation for a term of **5 years**.

The defendant shall not commit another federal, state or local crime.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

**The defendant shall cooperate in the collection of DNA as directed by the probation officer.**

**The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the court or probation officer;
2. The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first fifteen days of each month;
3. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. The defendant shall support his or her dependents and meet other family responsibilities;
5. The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                    Page 3 of 5

DEFENDANT: **SHORELINE FOUNDATION, INC.**
CASE NUMBER: **18-CR-20708-WILLIAMS**

## SPECIAL CONDITIONS OF SUPERVISION

1. **Disclosure of Business/Financial Records:** The defendant corporation shall make full and complete disclosure of its business finances/financial records to the U.S. Probation Officer. The defendant corporation shall submit to an audit of its business financial records as requested by the U.S. Probation Officer.

2. **Permissible Search:** The defendant corporation shall submit to a search and/or inspection of any of its properties and places of business conducted at a reasonable time and in a reasonable manner by the U.S. Probation Officer and shall permit the U.S. Probation Officer to accompany any law enforcement or regulatory official during any enforcement or inspection of the defendant's properties or places of business.

3. **Required Notification - Financial:** The defendant corporation shall be required to notify the U.S. Probation Officer immediately upon learning of any material adverse change in its business or financial condition or prospects, the commencement of any bankruptcy proceeding or any major civil litigation in excess of $25,000.

4. **Required Notification - Breach of Compliance:** The defendant corporation is to inform the U.S. Probation Officer of any breach of compliance involving the defendant company. A description of the nature, date and time of the breach of compliance shall be provided to the U.S. Probation Officer within three days of the breach.

5. **Corporate Compliance:** The defendant corporation shall not, through a business transaction of any type, including but not limited to, a change of name, business reorganization, sale or purchase of assets, divestiture of assets, or any similar action, seek to avoid the obligations and conditions set forth in the plea agreement. The plea agreement, together with all of the obligations and terms thereof, shall inure to the benefit of and bind assignees, successors-in-interest, or transferees of the defendant.

6. **Required Compliance Program:** The defendant corporation shall establish and maintain an effective compliance program which shall comply with all federal rules and regulations pertaining to false, fictitious and fraudulent claims to an agency of the United States, in violation of 18 U.S.C. § 287, and shall employ an appropriately qualified Compliance Officer, subject to the approval of the Court. This Compliance Officer shall have the responsibility for implementing the compliance program and overseeing the compliance program. The Compliance Officer shall be a senior level management or supervisory level officer. The entire compliance program shall remain under the supervision of the Court for the duration of the term of probation.

COM24066-000803

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                          Page 4 of 5

DEFENDANT: **SHORELINE FOUNDATION, INC.**
CASE NUMBER: **18-CR-20708-WILLIAMS**

### CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $400.00 | $70,000.00 | $0.00 |

**If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.**

| NAME OF PAYEE | TOTAL LOSS* | RESTITUTION ORDERED |
|---|---|---|
| | | |

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Assessment due immediately unless otherwise ordered by the Court.

COM24066-000804

USDC FLSD 245B (Rev. 09/08) - Judgment in a Criminal Case                                                                    Page 5 of 5

DEFENDANT: **SHORELINE FOUNDATION, INC.**
ASE NUMBER: **18-CR-20708-WILLIAMS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A. Lump sum payment of $400.00 due immediately.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

This assessment/fine/restitution is payable to the CLERK, UNITED STATES COURTS and is to be addressed to:

**U.S. CLERK'S OFFICE**
**ATTN: FINANCIAL SECTION**
**400 NORTH MIAMI AVENUE, ROOM 08N09**
**MIAMI, FLORIDA 33128-7716**

The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

| CASE NUMBER DEFENDANT AND CO-DEFENDANT NAMES (INCLUDING DEFENDANT NUMBER) | TOTAL AMOUNT | JOINT AND SEVERAL AMOUNT |
|---|---|---|

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

COM24066-000805

**Maff - STACK LLC**

BOAT STORAGE SYSTEMS

231 EAST BROAD STREET
SUITE 102
COOKEVILLE, TN 38501
PHONE: 931 526 5143
FAX:    931 526 5153
E-MAIL: maffett@citlink.net

February 21, 2019

Emilio T. Gonzalez
City Manager
City of Miami
444 SW 2nd Avenue, 10th Floor
Miami, Florida 33130

Mr. Gonzalez:

I write to you as an owner of Maff-Stack, LLC, the designer and developer of the watercraft storage system currently operating at Port Marina in Fort Lauderdale, Florida. As a part of Maff-Stack, I am also the holder of several patents for large-scale water craft storage systems.  Maff-Stack has become aware of false claims that have been made to the City of Miami regarding the work experience of one of the City's proposed contractors.

Mr. Carter N. McDowell, on behalf of Virginia Key, LLC, at an evaluation meeting for RFP No. 16-17-01 in Miami City Hall Chambers on June 12, 2017, made the following statements regarding the dry stack storage system currently in place at Port Marina in Fort Lauderdale, Florida:

> [T]he only real automated dry stack in the United States, Port Marina in Fort Lauderdale . . . interestingly enough the cradle that they used in that automated system is a patented air-cushioned water cradle **designed by none other than Aero-Docks**.

Transcript of Virginia Key, LLC Presentation for Virginia Key Marina, pg. 14, lines 2-12 (emphasis added).  In addition, Mr. McDowell stated:

> Port Marina, as I mentioned before, **uses the Aero-Dock cradle**.

Transcript of Virginia Key, LLC Presentation for Virginia Key Marina, pg. 14, line 25 – pg. 15, line 1 (emphasis added).

These statements by Mr. McDowell on behalf of Virginia Key, LLC, are categorically and demonstrably false.  As referenced previously, the entire dry stack storage system at Port Marina, including the cradle system, was exclusively designed and developed by Maff-Stack – not Aero-Docks. Further, Maff-Stack has a protected patent on the cradle system installed at Port Marina.

The information contained herein is the Property of Maff-Stack, llc and is covered by one or more patents or patents pending.  Copyright reserved.  Reproduction or use for any purpose than that authorized by Maff-Stack is prohibited.

COM24066-000806

As further proof of the falsity of Mr. McDowell's statements, attached for your review (as Exhibit A) are copies of the Patent License Agreement and the Standard Form of Agreement Between Owner and Contractor that Maff-Stack executed with the owner of Port Marina, Everglades, LLC. In fact, Port Marina's own website affirms that "[t]he **Port Marina is a Maffstack designed and engineered facility** and is a hidden gem among boat owners." *See* The Port Marina, Fort Lauderdale, https://theportmarina.com/ (emphasis added).

Frankly, Maff-Stack cannot comprehend what compelled Mr. McDowell to make such a patently false claim to the City of Miami. Whatever the reason, as the proud and only legitimate designer of the dry stack storage system at Port Marina, Maff-Stack felt compelled to correct the record. **To be clear, at no time has Aero-Dock been involved with the design or development of the Port Marina**.

Should you have any further questions regarding this matter, or desire additional information to further establish the falsity of Mr. McDowell's claims, please feel free to reach out to me directly.

Sincerely,

Brian D. Maffett, PE
Maff-Stack, LLC
931-252-2299 cell
brian@maffett-loftis.com
www.maff-stack.com


CC: Bill Maffett, PE, RA, Maff-Stack, LLC
    Mark Williams, PE, SE, Maff-Stack, LLC

The information contained herein is the Property of Maff-Stack, llc and is covered by one or more patents or patents pending.  Copyright reserved.  Reproduction or use for any purpose than that authorized by Maff-Stack is prohibited.

# ARNSTEIN & LEHR LLP
*Accomplished lawyers who understand your goals.*

200 E. Las Olas Boulevard · Suite 1000
Fort Lauderdale, Florida 33301
Phone 954.713.7600 · Fax 954.713.7700
www.arnstein.com

Gary L. Brown
Board Certified in Construction Law
954.713.7615
glbrown@arnstein.com

May 18, 2016

**Via Hand Delivery**
Mr. Daniel Rotenberg
Director of Real Estate & Asset Management
City of Miami
444 SW 2nd Avenue, 3rd Floor
Miami, FL  33130

Re:   **Supplement to Protest of Recommended Award – Request For Proposals No. 12-14-077 – Lease of City-Owned Waterfront Property for Marina/Restaurant/Ship's Store Uses ("Project")**

Dear Mr. Rotenberg:

## I. INTRODUCTION

As you know, this firm represents Virginia Key SMI, LLC a/k/a Suntex Marinas ("SMI" or "Suntex"), the second ranked proposer, in connection with the above matter. On behalf of SMI, and in accordance with Article XI, Section 2 of the RFP, and relevant provisions of section 18-104 of the City of Miami Code ("Code") which are incorporated into the RFP, on April 7, 2016, SMI filed its Notice of Intent to Protest the recommended award of the Project to Virginia Key LLC a/k/a RCI Group ("Virginia Key" or "RCI").  In accordance with Section 18-104(a)(2)(c) of the Code, on April 12, 2016, SMI timely filed its formal Protest and filing fee. On May 10, 2016, you issued a response recommending that the City Commission deny the Protest and allow the City Manager, or his designee, to proceed to negotiate with the top-ranked bidder, RCI. SMI's grounds for protesting an award to RCI (or New Rickenbacker Marina, LLC a/k/a Tifon Miami ("Tifon")) are fully set forth in its Protest and will not be repeated here. Suffice to say, however, SMI respectfully disagrees with your analysis and conclusion the RCI (of Tifon) was a responsive or responsible bidder. Clearly, they were not for the reasons stated in SMI's Protest. Moreover, RCI should be disqualified for an even more compelling reason: **RCI and its principals were involved in--*and intentionally failed to disclose*--one of the largest environmental contaminations in South Florida history**, which SMI discovered subsequent to submitting its Protest. Accordingly, SMI hereby supplements its Protest with additional information concerning the incident, as set forth in more detail below.

CHICAGO   SPRINGFIELD   MILWAUKEE
FORT LAUDERDALE   MIAMI   TAMPA   WEST PALM BEACH   BOCA RATON

Arnstein & Lehr LLP is a member of the International Lawyers Network

113227436.1

COM24066-000808

ARNSTEIN & LEHR LLP

Mr. Daniel Rotenberg
May 18, 2016
Page 2

## II. FACTUAL AND LEGAL GROUNDS FOR PROTEST

As a further basis for its Protest, SMI respectfully submits that RCI should be deemed a non-responsive and non-responsible Proposer due to the involvement of RCI and its principals in the environmental contamination of Biscayne Bay and/or its failure to disclose the incident to the City in its response to the RFP. Specifically, on or about June 20, 2000, a contractor[1] hired by, through, or under, Miami Beach Marina Associates, Ltd., ("Marina Beach")[2] and/or RCI to install pilings at the marina ruptured a 54-inch Miami-Dade County force main "causing and allowing millions of untreated human waste to be discharged into Biscayne Bay and the adjacent tidal waters of Miami-Dade County…(which) created a serious public health threat…cause[d] injury or damage to property and the environment…and (was) detrimental or harmful to the health, welfare and safety of inhabitants of Miami-Dade County." Further, the work was done without a required DERM Class I Coastal Construction Permit. *See* Exhibit "B," p. 1-2. Not only was the work done without a mandatory DERM permit, but the contractor did not even request any "locates" of "clearances" at the marina prior to proceeding with the work, as required by law. *See* Exhibits "C" and "D."[3] The incident resulted in enforcement action by the Florida Department of Environmental Protection ("Department") against the City of Miami Beach, the Miami Beach Redevelopment Agency, the contractor, Marina Bay, and RCI. *See* Exhibits "E" and "F." The incident also resulted in millions of dollars in costs, fines and/or penalties against Marina Beach, RCI, and others, as well as criminal charges against the contractor and others. *See* Exhibit "F," "G," "H," and "I." [4]

In accordance with the RFP, a Proposer may be deemed non-responsive and/or non-responsible if it has caused any city-owned land or improvements to incur environmental damage. *See* RFP, Section II.N(viii). Further, should a Proposer or any principals of its principals fail to disclose information relating to their role in causing city-owned land or improvements to incur environmental damage, the Proper shall be deemed automatically disqualified. *See* RFP, Section II.O. Here, RCI failed to disclose the Biscayne Bay incident when it submitted its Proposal. *See*

---

[1]   Marin and Marin Construction, Inc.

[2]   Owned by Robert W. Christoph and Robert W. Christoph, Jr., the same principals of RCI. *See* Exhibit "A," Attachment 4, Section IV.

[3]   *See generally* Ch. 556, Florida Statutes (Underground Facility Damage Prevention and Safety Act).

[4]   Pursuant to Exhibit "F" (Consent Order), paragraph 11(b), Marina Beach agreed  to pay $29,000.00 to the Department. Pursuant to Exhibit "G" (Settlement Agreement), paragraph 1, Marina Beach and RCI, along with others, agreed to pay Miami-Dade County the total sum of $2.5 Million. Pursuant to Exhibit "H" (Settlement Agreement), paragraphs 2 and 3, Marina Beach, RCI, and the contractor agreed to pay the City of Miami Beach the total sum of $260,000 (of which Marina Beach was responsible for $60,000). Pursuant to Exhibit "I," the State Attorney for Miami-Dade County filed charges for unlawful nuisance and unlicensed contracting.

113227436.1

COM24066-000809

ARNSTEIN & LEHR LLP

Mr. Daniel Rotenberg
May 18, 2016
Page 3

Exhibit "A," Attachment 4, Section IX, paragraph H. For this reason alone, it must be disqualified. *See* RFP, Section II.O ("...the Proposer *shall* be automatically disqualified...)". Moreover, even if disqualification were not mandatory for failure to disclose (which it clearly is), the City should properly deem RCI non-responsive and/or non-responsible due to its involvement in this environmental disaster. Considering the troubled history of RCI and its principals, and the environmental concerns attendant to the Project, the City should not entrust RCI with a Project of such significance to the City and its residents.

## III. RELIEF SOUGHT

Based upon SMI's Protest, and the forgoing additional grounds, RCI should be disqualified and SMI, as the 2nd ranked Proposer, should be recommended for award of the Project.

## IV. PERTINENT DOCUMENTS

In accordance with Article XI, Section 2 of the RFP and Section 18-104(a)(2)(c) of the Code, included herewith are the following supplemental documents:

Exhibit "A" – Letter dated June 25, 2015 from Carter N. McDowell to Jason Spalding with attached registration form.

Exhibit "B" – Notice of Violation and Orders to Cease and Desist dated July 11, 2000.

Exhibit "C" – Letter dated June 27, 2000 from John A. Patterson of Sunshine State One-Call of Florida, Inc. to Jorge Ferrer of Miami-Dade Water & Sewer Department.

Exhibit "D" – Letter dated June 26, 2000 from Walter Gill of Miami-Dade Water and Sewer Department to Rafael Marin of Marin & Marin, Inc.

Exhibit "E" – Warner Letter dated October 3, 2000 from Melissa L. Meeker of the Department of Environmental Protection to Jorge Gonzales of the City of Miami Beach.

Exhibit "F" – Consent Order.

Exhibit "G" – Settlement Agreement dated June 29, 2001.

Exhibit "H" – Settlement Agreement dated July 10, 2002.

Exhibit "I" – Information by State Attorney dated February 6, 2001.

113227436.1

COM24066-000810

ARNSTEIN & LEHR LLP

Mr. Daniel Rotenberg
May 18, 2016
Page 4

**V. CONCLUSION**

For the reasons set forth in SMI's Protest and herein, and applicable Florida law, SMI protests the recommended award to RCI and respectfully requests that SMI be recommended for award of the Project, as required by the RFP. Alternatively, the City has the right to reject all Proposals be rejected and new solicitation issued.

Respectfully submitted,

*[signature]*

Gary L. Brown
Miguel A. Diaz de la Portilla

GLB/mt
Enclosures
cc:    Daniel Alfonso, City Manager (via email)
      Rafael Suarez-Rivas, Assistant City Attorney (via email)
      Todd Hannon, City Clerk (via email)
      Aldo Bustamante, Assistant Director – Real Estate and Asset Management (via email)
      Jason Spalding, CBRE (via email)
      Virginia Key SMI, LLC (via email)

113227436.1