# Holland & Knight LLP

## 701 Brickell Avenue, Suite 3300 Miami Florida 33131

### REDISTRICTING THE
### CITY OF MIAMI COMMISSION
### AFTER THE 2020 CENSUS



### INITIAL REPORT  AND SUGGESTED TIMELINE, PROCESS AND LEGAL PRIMER

### Miguel De Grandy, Esq. and Stephen M. Cody J.D
*Redistricting consultants*

1

PLAINTIFFS' TRIAL EXHIBIT

P13

1:22-cv-24066-KMM

COM24066-000812

## Table of Contents

**Table of Contents**                                                                  2

**Executive Summary**                                                                  3

Introduction                                                                           3

The Need to Redistrict                                                                 3

Redistricting Criteria                                                                 3

Process and Timeline                                                                   3

**Process and Commission Direction**                                                   4

Redistricting Standards                                                                4

Direction Regarding Conducting Public Hearings                                         4

Draft Plans to Present to the Commission                                               5

**Current Work and On-Going Analysis**                                                 6

The Population Snapshot                                                                 6

Population of Existing Districts                                                        7

**Legal Standards for Redistricting**                                                  9

I. Constitutional Mandate to Redistrict and Reapportion                                9

    A) Brief Historical Perspective on Redistricting: United States Constitution   9

    B) Court Imposed Requirement To Redistrict; Population Differences Amongst Districts.  10

       1) The Obligation to Redistrict                                    10

       2) Population Deviations                                           11

II. Race, Language Minorities, and Reapportionment                                     11

    A) Predominant Factor Test; Race-Neutral Justifications                           12

    B) Race Neutral/Traditional Redistricting Criteria                                13

    C) The Federal Voting Rights Act of 1965                                           14

  Summary                                                                              15

COM24066-000813

# Executive Summary

### Introduction

In late July of this year, the law firm of Holland & Knight LLP. and Sub-consultant Stephen Cody, J.D. were engaged by the City of Miami to develop a new Single-Member District Plan for use in City Commission elections beginning in the 2023 election. Due to the COVID pandemic, Census Data files were not released until September.  The purpose of this report is to advise you of the work that we are presently conducting and a suggested timeline and process for future events. As part of this report, we are also providing you with a basic primer to familiarize you with the legal issues relevant to the Redistricting Process.

### The Need to Redistrict

The 2010 Census revealed that the City of Miami has a total population of 399,489. In 2020, the population of the City had grown to 442,241, an increase of 42,752 or 10.7 percent.  The growth, however, has not been uniform across all five of the City's Commission districts. The 14th Amendment to the U.S. Constitution as interpreted by federal case law requires "substantial equality" of population among single member districts. Dividing the City's population by five produces an "ideal" population for each district of 88,448.

Presently, the district with the largest population, District 2, has 116,742 persons, and is 28,364 persons *above* the ideal. District 3, on the other hand, only has 79,309 residents, which is 9,069 *below* the ideal population. Taken together, that 37,433 person variance represents a total deviation of 42.35% from the ideal; far above what is allowed by the U.S. Constitution as interpreted by federal case-law. Thus, the current plan is malapportioned and cannot be used for subsequent elections.

### Redistricting Criteria

The City Charter requires that the five members of the City Commission be elected from single-member districts, but does not contain any other express redistricting criteria. Neither the Florida Constitution nor Florida Statutes contain explicit redistricting requirements that apply to municipalities. The prime directive is always compliance with Federal Constitutional principles and the Federal Voting Rights Act. Additionally, the traditional redistricting criteria considered by a body as it reapportions itself can include the use of natural or man-made geographic boundaries, contiguity, compactness, maintaining the core of existing districts to avoid voter disruption and confusion, and maintaining communities of interest together, such as traditional neighborhoods and business districts, among others.

### Process and Timeline

We are currently engaged in evaluating demographic data and election information. We have met with the county's Elections Supervisor to discuss timing for production of the new redistricting plan and related issues. We are also in the process of meeting with each Commissioner individually to brief them on issues that confront the City during this reapportionment cycle.

COM24066-000814

There are a number of policy issues that need to be determined by the Commission, including which redistricting criteria will be emphasized, and whether public meetings will be held in light of the late production of Census data and the Election Department's need to re-precinct prior to the 2022 elections.

Because of the delay in publication of Census data, as well as the Election Department's need to have a final plan in place prior to re-precincting, we are working towards completing the redistricting of the City of Miami by the end of February 2022. However, this is dependent on the Commission's policy directives.

## Process and Commission Direction

We have requested that the City Manager's Office place an item on the City Commission's November 18, 2021 agenda to allow us an opportunity to make a presentation regarding legal issues relevant to the redistricting process, current population disparity, and to seek policy guidance from the Commission on several issues. While individual meetings with each Commissioner provides us with valuable input, as legal counsel we can only act as directed by the majority of Commissioners acting as a legislative body. At the November 18th meeting, we will be seeking policy direction from the Commission on a number of issues.

**Redistricting Standards**

The Courts have recognized and accepted many redistricting standards, also referred to as "Traditional Redistricting Principles", that are employed in crafting a redistricting plan. Different jurisdictions utilize some or all of these standards, and may prohibit use of other standards that are otherwise accepted by the courts. For example, prior to the last redistricting cycle, the citizens of the State of Florida  enacted amendments to the Florida Constitution which prohibit the Florida Legislature from creating a state legislative or congressional plan to be drawn with the intent to favor or disfavor a  political party or an incumbent (which prior to enactment was not prohibited by the courts). These amendments also direct that districts shall not be drawn with the intent or result of denying or abridging equal opportunity of racial or language minorities to participate in the political process.[1] The amendments further require that districts shall consist of contiguous territory, be as nearly equal in population as is practicable, that districts shall be compact and shall-where feasible -utilize existing political and geographical boundaries. (Art. III §§ 20 & 21, Fla. Const.)

County and municipal governments are not subject to these standards. In the "Legal Standards for Redistricting" section set forth below, we provide additional information regarding redistricting standards for your consideration.

**Direction Regarding Conducting Public Hearings**

As elected officials, Commissioners have the authority to make redistricting decisions on behalf of their constituents. Citizens' participation in the redistricting process is not constitutionally required, although the City has directed redistricting consultants to provide public hearing

---

[1] This standard is already embodied in the Federal Voting Rights Act.

COM24066-000815

opportunities in prior redistricting cycles. During the last redistricting cycles, the City Commission directed legal counsel to conduct public hearings prior to development of a draft plan. Approximately 75 residents participated during the 2000 redistricting cycle. Well over 100 participated in the 2010 redistricting cycle.

Redistricting data is usually published in April of the year after the Census is taken. Because of the COVID pandemic and related issues, publication of the data during the current cycle was significantly delayed until September of this year. Moreover, the Miami Dade Elections Department informs that it needs to have a final plan in place by the end of February of 2022 in order to complete its re-precincting in a timely manner prior to the 2022 county elections. Providing for public hearings prior to development of a draft Plan may not allow the City to comply with such request and will delay production and approval of a final Plan. Other legislative bodies that must redistrict such as the Florida legislature, have opted to forgo public hearing during this redistricting cycle due in part to the delay in publication of the data. Therefore, the Commission may wish to re-evaluate the need for multiple public hearings.

Moreover, the City must account for the possibility that any enacted plan may be challenged in court. Therefore, the proper and prudent course of action is to complete redistricting well ahead of the qualifying dates for the next election to allow for sufficient time to resolve any challenge that may be lodged against the new plan.

Nevertheless, once a draft plan is completed and presented, the Commission will review and discuss the draft plan in an open public hearing which will also serve to provide a public input opportunity.

**Draft Plans to Present to the Commission:**

Once all relevant data is analyzed and legal principles are applied, there will be many different approaches to drafting a redistricting plan that are constitutional and compliant with the federal Voting Rights Act -- from a "start from scratch" approach -- to working the contours of existing districts to achieve substantial population equality (discussed further below). The approach is of course dependent on the policy directives of the Commission. In the case of the City of Miami, the main challenge will be to depopulate district 2 and rebalance the population of the remaining 4 districts. After obtaining policy guidance from the Commission, we will prepare a draft redistricting plan and present it to the Commission in a subsequent public hearing. At that time, the Commission as well as the public will have an opportunity to comment on the draft plan. If the Commission requests changes to the draft Plan that are consistent with Constitutional and statutory principles discussed below, we will make those changes and present a final Redistricting Plan for approval.

To be clear, legal counsel's role is not to make policy decisions; only to present a constitutionally sound draft plan and inform the Commission on legal issues relevant to such plan or any proposed changes.

In summary, below are some of the issues on which we will be seeking policy direction from the Commission:

5

COM24066-000816

- *Whether the districts should be drawn within the deviations permitted by law in order to accomplish legitimate City interests or whether they should be drawn to approximate population equality.*

- *Whether the proposed plan should attempt to preserve the core of existing districts in order to minimize potential voter confusion or employ a "start from scratch" approach.*

- *Whether the proposed plan should use natural and man-made features, to the extent possible, as the boundaries of the districts.*

- *Whether the proposed plan should attempt to keep communities of interest intact, such as traditional neighborhoods, business districts, high and low density areas, etc.to the extent that it is feasible.*

We will also be asking the Commission for policy guidance as to the hierarchy of the principles it wishes to employ. In other words, their order of importance. We will of course follow the guidance to the best extent possible, but keep in mind that there are sometimes competing principles including constitutional and statutory requirements that may not allow us to fully implement these goals.

## CURRENT AND ONGOING ANALYSIS

Throughout the last two months, we have also been engaged in analyzing whether the requirement of the Federal Voting Rights Act, as explained through the case law, have been met so as to allow race to be one of several factors that can be evaluated as we craft a plan. This requires as deep dive into elections conducted during the past decade to determine polarized voting patterns and minority voter cohesion. We have found significant evidence of both in our analysis. We have also been engaged in meeting with individual Commissioners. We have had conversations with Miami-Dade County Elections Supervisor, Christina White to address several issues, including timing for production of the final plan in order to allow time for an orderly re-precincting prior to the county's 2022 election, at which time the Department must have new precincts configured. We are also coordinating with Ms. White's staff to ensure a smooth transition of election plans.

**The Population Snapshot**

The United States Constitution provides that: "Representation and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ... The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct."

The "actual Enumeration" referenced in the Constitution (commonly known as the Census) was conducted during the 2020 cycle, giving a "demographic snapshot" of the nation. The snapshot of the City of Miami revealed that the population of the City had grown by 42,752 or 10.7 percent

COM24066-000817

over the past decade to 442,22. The demographic breakdown of the City's population is shown in the table below.

| District | Hispanic Pop | Non Hisp. Black Pop | Non Hisp. White Pop |
|---|---|---|---|
| 1 | 90.0% | 10.0% | 4.0% |
| 2 | 52.0% | 8.0% | 34.0% |
| 3 | 88.0% | 6.0% | 8.0% |
| 4 | 90.0% | 3.0% | 7.0% |
| 5 | 41.0% | 54.0% | 7.0% |
| | | | |
| Overall | 70% | 16.3% | 11.9% |

Hispanics are counted in the Census as an ethnic group, rather than a race. In 2020, Hispanics residing in the City of Miami represented 70% of the City's population. By contrast, the non-Hispanic White population of the City was only 11.9 percent of the City's population. The Black or African American population was 16.3 percent. The bulk of the City's Haitian population was concentrated in District 5. Finally, please note that some population numbers may exceed 100%. This is because approximately 1.7 percent of city residents self-identified as being of two or more races or ethnicities.

**Population of Existing Districts**

The map included at the end of this section shows the boundaries of the present City Commission districts. The table below shows the population breakdown for each of the five districts.

| District | Population | Deviation | % Deviation |
|---|---|---|---|
| 1 | 80,863 | (7,515) | -8.50% |
| 2 | 116,742 | 28,364 | 32.09% |
| 3 | 79,309 | (9,069) | -10.26% |
| 4 | 81,800 | (6,578) | -7.44% |
| 5 | 83,176 | (5,202) | -5.89% |
| | | | |
| Total Deviation | | | 42.35% |

With a total deviation of 42.35 %, the present districting plan is malapportioned and could not be sustained if a court challenge was brought before the 2023 election cycle.

COM24066-000818



8

COM24066-000819

# Legal Standards for Redistricting

The law governing redistricting combines a myriad of legal principles from a series of different sources, including the United States Constitution and Federal Statutes, all as interpreted by a number of key court rulings. As a result, the rules can often seem confusing and worse, may even seem contradictory.

A comprehensive exposition of every aspect of the law in this area could easily occupy several volumes. In this report, we have tried to summarize the important principles of redistricting in one coherent and, hopefully, easy to understand document. This primer is meant to be a tool to provide the members of the Commission with a working knowledge of the most important terms  and concepts they will need to effectively participate in enacting a new Single-Member District Plan.

The rules of redistricting can be summarized with three basic principles:

- *Each Commission district must contain a roughly proportional number of residents within the deviation permitted under case law;*

- *The City must not engage in racial gerrymandering; and*

- *The new Commission districts must not dilute votes of minority communities.*

Below we have divided the discussion of these issues into two sections. The first section discusses the constitutional mandate to reapportion and the acceptable population deviations permitted under the law. The second section deals with the role of race in the redistricting process, including a discussion regarding the Federal Voting Rights Act and its interplay with the Equal Protection Clause of the United States Constitution.

## I. Constitutional Mandate to Redistrict and Reapportion

Engaging in redistricting legislative districts is required by the United States Constitution if the current districts are otherwise malapportioned. In regard to the current status of the City's districting plan, its overall deviation of roughly 42% requires the City to engage in a redistricting process to rebalance the population among the different districts.

### A) Brief Historical Perspective on Redistricting: United States Constitution

 The concepts of "reapportionment" and "redistricting" are distinct. Reapportionment refers to the process of proportionally reassigning a given number of seats in the United States House of Representatives to apportion districts among the different states based on an established formula, or to reformulate a district plan after the number of districts either increases or decreases. Redistricting refers to the process of changing the boundaries of existing legislative districts. This primer will focus on redistricting. However, it may be beneficial to briefly provide a historical perspective to give background and context to the City's upcoming process and highlight the different rules that govern each process.

9

COM24066-000820

United States Constitution requires a reapportionment of the House of Representatives to distribute each of the House of Representative's 435 seats between the states and to equalize population between districts within each state. The mandate to reapportion flows from Article I, Section 2, Clause 3 of the United States Constitution. In furtherance of the constitutional mandate to reapportion, the United States Congress adopted the Census Act, 13 USC § 1, *et. seq.* The Census Act delegates the authority to the Secretary of Commerce to "take a decennial census of population as of the first day of April of such year." See 13 U.S.C. § 141(a). It further requires that the Department of Commerce complete a population tabulation for each state and report to the President of the United States the results by December 31st of the census year. See 13 U.S.C. § 141(b). The President must then report to Congress, using the information provided by the Secretary, the number of representatives to which each state would be entitled. Although the Census was created as a vehicle to determine congressional apportionment, the data is utilized by virtually every state and local jurisdiction that engages in the process of redistricting.

By April 1st of the year following the Census enumeration, the Secretary of Commerce provides a detailed population report to the Governor and the Majority and Minority Leaders of each House of the state legislatures. As referenced above, during this cycle, the data was not released until September. These reports provide the basis for federal, state, and local government decennial redistricting plans. It contains census maps and electronic files breaking down population data by blocks, census tracts, voting districts, and the corporate limits of towns, cities and counties. The information also generally contains population totals by race, Ethnic origin and voting age.

**B) Court Imposed Requirement To Redistrict; Population Differences Amongst Districts.**

As discussed above, the mandate to reapportion congressional districts is derived from Article I, Section 2 of the United States Constitution. However, the duty of state, local and municipal governments to redistrict arises from the Equal Protection Clause of the 14th Amendment of the United States Constitution. This distinction is significant because, as will be discussed below, different rules apply with respect to equalizing population of congressional and state or local government districting plans.

**1) The Obligation to Redistrict**

The City Commission is obligated to redistrict based on the judicially recognized principle commonly referred to as "one person, one vote". *Baker v. Carr,* 369 U.S. 186 (1962); *Reynolds v. Sims,* 377 U.S. 533 (1964). These cases addressed the practice in several states -- as was the case in *Baker* and *Reynolds* -- of maintaining districts for legislative offices that were substantially different in population. The Supreme Court concluded that these wide variations among district populations resulted in each vote in the district with the smaller population carrying more weight than a vote in the larger district. Thus, in *Reynolds,* the United States Supreme Court held that the 14th Amendment required that seats in state legislatures be redistricted on a population basis. The Court in *Reynolds* went on to conclude that decennial redistricting was a rational approach to re-adjust legislative representation to take into consideration population shifts and growth. *id.* at 584. The Court declared that any less frequent re-adjustment would be constitutionally suspect.

COM24066-000821

In *Avery v. Midland County,* 390 U.S. 474 (1968), the United States Supreme Court applied the *Reynolds* decision to local governments. The Court concluded "that the Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental powers of the entire geographic area served by the body."

**2) Population Deviation**

During this redistricting process, you may hear and read repeated references to the concept of "deviation". In order to determine the degree of deviation of a district one must first divide the total population of the jurisdiction by the number of districts. The resulting number is known as the "ideal district population". Any variance from the ideal population number is generally referred to as a deviation. For example, if a district has a plus 20% deviation, it means that the population of the district is 20% greater than the "ideal" population.

Another way that deviation is discussed is by comparing the lowest populated and highest populated district to obtain the "overall deviation". For example, in the case of the City of Miami, the most populated district (District 2) is slightly over 32% deviation, and the most underpopulated district (District 3) is at a slightly under 10% deviation. Therefore, the overall deviation of the current plan is roughly 42%.

Because the requirement to reapportion and redistrict flow from different provisions of the U.S. Constitution, the rules which govern the respective processes are different. As a rule of thumb, the population deviation among the largest and smallest district in a Congressional Plan (the overall deviation) is usually plus or minus a single voter. For state legislative and local government districts, the courts have permitted a greater population deviation among districts. As the Supreme Court observed in *Reynolds,* all that is necessary when drafting state legislative districts (or local government districts; *see Avery)* is achieving "substantial equality of population among the various districts". 377 U.S. at 579. The phrase "substantial equality of population" has come to generally mean that a legislative or local government plan will not be held to violate the Equal Protection clause if the overall deviation between the smallest and largest district is less than 10%.

Thus, there is some flexibility in designing the city's districts. However, deviation between districts should only be considered when there is good cause or a rational basis and the deviation furthers an important governmental objective such as preserving traditional neighborhoods, preserving communities of interest and utilizing natural or man-made boundaries that have historical or other significance.

In the City's 2000 and 2010 redistricting process, we developed plans with less than 10% overall deviation, and the report accompanying the plan made note of the governmental objective and rational basis for deviations in each of the districts. The plans were never challenged. The same methodology will be employed during this redistricting cycle.

## II. Race, Language Minorities, and Reapportionment

Federal and state case law almost universally recognizes that "reapportionment is primarily the duty and responsibility of the state through its legislature or other body, rather than the (federal) court." *Chapman v. M eir,* 420 U.s. 1,27 (1975). Therefore, the courts are careful to respect a state's

11

or local government's redistricting decisions, unless those decisions violate the Constitution or the law. *Voinovich,* 507 U.S. at 146. Generally, the courts have intervened in the redistricting choices of local governments for two reasons: (A) to cure violations of the Equal Protection Clause of the 14th Amendment; or (B) To remedy violations of the Federal Voting Rights Act.

After the 1990 Census, the United States Supreme Court was called upon to decide a series of cases regarding the role of the Equal Protection Clause and race in the reapportionment process. *Hunt v. Cromartie,* 526 U.S. 541 (1999); *Abrams v. Johnson,* 521 U.S. 74 (1997); *Bush v. Vera,* 517 U.S. 952 (1996); *Shaw v. Hunt,* 517 U.S. 899 (1996) *(Shaw II); Miller v. Johnson,* 515 U.S. 900 (1995); *Johnson v. De Grandy,* 512 U.S. 1997 (1994); *Shaw v. Reno,* 509 U.S. 630 (1993) *(Shaw* 1). Generally, in these cases, the Supreme Court held that when race was the underlined predominant factor in the creation of a district, the creation of that district was subject to "strict scrutiny" review by the Courts and would, in most circumstances, violate the Equal Protection Clause. "Strict scrutiny" is the most stringent legal standard applied to the judicial review of a state act alleged to violate the Constitution.

The Equal Protection Clause, in and of itself, does not prohibit the creation of districts where the crafters were conscious of the race of the minority of voters in the district. *Vera,* 517 U.S. at 972. However, the Supreme Court has clearly held that the Equal Protection Clause does demand the application of strict scrutiny when race constitutes the principal reason or the predominant factor for the shape of the particular district.

On the other hand, the Federal Voting Rights Act (discussed in more detail below) prohibits any practice which "interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *See Voinovich,* 507 U.S. at 146; *Growe v. Emison,* 507 U.s. 25.

Therefore, reconciling these two competing legal principles, it can be said that a redistricting plan may be ***race-conscious*** to the extent necessary to comply with the Federal Voting Rights Act, but not ***race-driven,*** (where race is the overriding or predominant factor in the creation of a district).

**A) Predominant Factor Test; Race-Neutral Justifications**

The Supreme Court has articulated various formulations of the "Predominant Factor" test. Legislative action to establish new legislative districts is subject to strict scrutiny if:

> *Redistricting legislation ... is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional redistricting principles. Shaw I, 509, U.S. at 642*

> *Race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. Miller, 514 US. at 916*

> *The legislature subordinated traditional neutral redistricting principles ... to racial considerations. Miller, 515 U.S. at 916.*

12

COM24066-000823

> *The state has relied on race in substantial disregard of customary and traditional . redistricting practices. Miller, 515 U.S. at 928*

Because the legislative body's intent or motivation in adopting a given plan is often the central issue in a redistricting judicial dispute, it is important that the Commission -- as the governing body of the City -- understand the significance of these issues. This is why -- prior to commencing the process of drafting the plans -- our firm will seek policy directives from you as to which traditional redistricting standards you wish to have utilized or emphasized in creation of the new single-member district plan. Our firm will be conscious of racial and language minority issues so far as is necessary to determine applicability and compliance with the Federal Voting Rights Act, (race conscious) but will be guided by policy directives provided by the Commission, utilizing those race neutral criteria as the main considerations in crafting the Plan.

**B) Race Neutral/Traditional Redistricting Criteria**

The courts have encouraged state and local governments to use traditional redistricting principles in designing legislative districts. However, the use of these traditional redistricting principles is not mandated by the courts. The U.S. Supreme Court has repeatedly stated that a compact and "regular looking" district is not a federal constitutional requirement. *Gaffney v. Cummings,* 412 U.S. 735, 752 n18 (1973) (A district's "compactness or attractiveness has never been held to constitute an independent federal requirement.") In *Shaw I,* the Court acknowledged that a compact district shape was "not ... constitutionally required". 509 U.S. at 647, and in *Bush v. Vera,* 517 U.S. 964, the court concluded that "irregular district lines" could be drawn for incumbency protection and "to allocate seats proportionally to major political parties". In Justice Kennedy's concurring opinion in *Vera,* he stated "[d]istricts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one." 517 U.S. at 999.

In our upcoming presentation before the Commission, counsel will solicit policy direction from the Commission in the form of a Resolution as to what neutral or traditional redistricting principles the Commission wants utilized in crafting the draft redistricting plan for the Commission's consideration. Some of the factors that courts have generally identified as Traditional Redistricting principles include:

- *The use of natural or man-made geographic boundaries, i.e. a river, a major . expressway, major roads such as section lines, roads, or the boundaries of traditional neighborhoods;*

- *Contiguity;*

- *Compactness;*

- *Maintaining the core of existing districts to avoid voter disruption and confusion;*

13

COM24066-000824

- *Maintaining communities of interest together, i.e., single-family residential, high-density residential areas, traditional neighborhoods, business districts, coastal or environmentally sensitive areas, etc.*

By way of example, other acceptable race-neutral principles that have been employed in the past by the City, such as in the 2000 redistricting cycle were:

- *That the draft plan(s) attempt -wherever possible -to "nest" City Commission District 5 in County Commission District 3 for purposes of providing a more rational combination of services between the County and the City; and,*

- *That the draft plan(s) attempt -wherever possible -to include whole precincts into a district. (Note that, this will not be an issue in this cycle as the re-precincting will occur after the plan is adopted)*

**C) The Federal Voting Rights Act of 1965**

Section 2 of the Federal Voting Rights Act of 1965 (VRA) prohibits any state or political subdivision from imposing a "voting qualification or prerequisite to voting or standard, practice or procedure... in a manner which results in the denial or abridgment of the right to vote on account of race or color." 42 USC §1973. In 1982, the VRA was amended to include language minorities. Moreover, in 1982, reacting to the narrow interpretation of the VRA by the U.S. Supreme Court (requiring proof of discriminatory intent), Congress also amended the VRA to require only proof of a discriminatory result based on the totality of the circumstances.

The U.S. Supreme Court has recognized that the manipulation of district lines during a redistricting process can be the basis for a claim that the voting strength of politically cohesive minority voters has been diluted. Vote dilution may happen as a result of fragmenting the minority voters among several districts where the majority can routinely out-vote the minority voters, or unnecessarily packing the minority voters into one or a small number of districts to minimize their influence in the neighboring districts. *See Voinovich, 507 U.S. at 146; Growe, 507 U.S. at 25.* Thus, Section 2 prohibits creation of district lines where the result, "interact[ing] with social and historical conditions, impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters."

In the case of *Thornburg v. Gingles, 478 U.S. 30 (1986)*, the Court held that three threshold conditions are required prior to establishing that a districting plan violates Section 2 of the VRA:

- *The size and geographic compactness of the minority population must be such as to enable the creation of a single-member district in which the minority group can elect a candidate of its choice;*

- *The minority population is a politically cohesive group; and*

- *The majority population often votes as block to defeat the minority group's preferred candidate.*

14

COM24066-000825

If the plaintiff in a case brought under Section 2 establishes that the challenged district meets these three criteria, then the court will move on to examine the "totality of the circumstances" to determine if the practice in question results in the dilution of the electoral power of the minority population. If the plaintiff fails to establish the existence of the three factors, the court does not need to go any further and the Section 2 claim fails as a matter of law. *See Bartlett v. Strickland, 556 U.S. 1, 7 (2009).*

In order to ensure compliance with the VRA and minimize the probability of legal liability to the City, we have conducted an analysis of relevant elections in the last decade to determine whether the *Gingles* factors apply to the process of crafting a proposed districting plan. In the last two redistricting cycles, legal counsel concluded that the *Gingles* factors were evident within the City. Our current analysis demonstrates that polarized voting and the other *Gingles* factors are still evident within the City.

# SUMMARY

As mentioned before, this primer is by no means the definitive, exhaustive source on this area of the law, but it is intended to serve as a reference tool for understanding certain basic redistricting concepts. In addition to familiarizing yourself with those basic concepts, as you proceed in this historic process, it will serve you well to keep in mind the three basic rules outlined at the beginning of this primer. Those rules form the baseline of what is needed to ensure that the redistricting plans adopted by the City of Miami can withstand judicial scrutiny.

During our upcoming presentation before the Commission, we will provide demographic data for your consideration, and will be seeking policy guidance from you that will become our "rules" for developing the City's new single member district plan. Your consultants have a wealth of experience and substantive knowledge in this field. However, our role is to reflect the Commission's policy objectives in the form of a proposed redistricting plan, and to advise the Commission of the legal consequences, if any, of particular changes or configurations of the plan. Therefore, we will be looking to the Commission to provide the policy directives that will guide us in preparing and presenting a final product for your consideration.

COM24066-000826