# MEMORANDUM

**To:** The Honorable Francis X. Suarez
Mayor, City of Miami

**From:** Miguel De Grandy, Esq.
Holland & Knight LLP

**Date:** April 2, 2022

**Re:** Response to Mayor's Correspondence Re Redistricting Plan

-------------------------------------------------------------------------------------------------

Thank you for your correspondence regarding the City of Miami's Adopted Redistricting plan[1]. In said correspondence you ask us to address several issues as follows:

1. Respond to the allegations made regarding the Adopted Plan in the March 28, 2022 letter by the NAACP and the March 31, 2022 letter of the ACLU.

2. Address the merits of the argument that the Adopted Plan benefits elected officials in an improper manner.

3. Explain whether the Adopted Plan minimizes the movement of African Americans from D2 to other districts.

4. Advise whether in our professional opinion a general consensus could exist in the Commission to support an alternative plan.

First, it is important to evaluate these issues in their proper context. The Census data indicates that by 2020, the population of the City had grown to 442,241, an increase of 42,752 or 10.7 percent. The demographics of the city are as follow:

- Approximately 70% of the population is Hispanic,
- Approximately 16.3% of the population is black, and
- Approximately 11.9% of the population is non-Hispanic white

The growth in population has not been uniform across all five of the City's Commission districts. Currently, the district with the largest population, District 2, is approximately 32% *above* the ideal

---

[1] Throughout this memorandum we refer to the Plan voted favorably by the Commission as the Adopted Plan.

1



COM24066-000827

district population.[2] District 3, on the other hand, has the lowest population which is over 10% *below* the ideal population. Taken together, that variance represents a total deviation of over 42% from the ideal[3]; far above what is allowed by the U.S. Constitution as interpreted by federal case-law. Thus, the current plan is malapportioned and cannot be used for subsequent elections.[4]

The law governing redistricting combines a myriad of legal principles from a series of different sources, including the United States Constitution and Federal Statutes such as the Voting Rights Act all as interpreted by a number of key court rulings. To oversimplify, the rules of redistricting involve three basic principles:

- Each Commission district must contain a roughly proportional number of residents within the deviation permitted under case law;
- The City must not engage in racial gerrymandering; and
- The new Commission districts must not dilute votes of minority communities.

In summary, the purpose of redistricting is to rebalance the population among the districts to comply with the principle of "one person one vote," where the votes of residents in each district have equal weight. Presently, the district with the largest population, District 2, has over 28,000 residents above the ideal, which have to be redistributed among the districts with population below the ideal.

With that in mind, below we address each of your queries as follows:

## 1) The NAACP and ACLU letters

### A) NAACP Letter

The NAACP letter provides no context or substantive arguments. It simply boldly asserts that:

"We [ NAACP] have a duty to protect our democracy and prevent unfair redistricting plans that pose a threat to equal representation under the law" and urges you to veto the plan. Nevertheless, from their appearance and testimony at the several public hearings, one can determine that the crux of their objection is the movement of black residents from D2 south of US 1 into D4.

Here are the facts:

- In the Initial Plan[5] we developed, we had moved 5071 residents from D2 south of US 1 into D4. That included a total of 497 black residents. This movement encompassed all the

---

[2] The ideal district population is calculated by taking the total City population and dividing it by the number of districts. In this case the ideal district population is 88,448.

[3] Total deviation, also referred to as "overall deviation" is the sum of the percent deviation of the highest district above the ideal and the lowest district below the ideal population

[4] The Fourteenth Amendment, as interpreted through the case law requires "substantial equality" of population. This has come to mean that the overall deviation should not exceed 10% .

[5] The Initial Plan was presented and discussed at the February 7, 2022 public meeting.

2

COM24066-000828

area from US 1 on the north to Day avenue to the south spanning from 27th avenue from the east to 37th avenue and the city limits to the west. When we presented the Initial Plan, there was discussion regarding this movement and many members of the public as well as Commissioner Russell objected to this change, arguing that we were splitting the historically black Grove.

- We took those comments into account when we produced a Revised Plan[6]. By moving the boundary up from Day Avenue to Bird Avenue, the Revised Plan reduced the total number of residents moved from D2 to D4 to 1597 residents and it reduced the number of black residents that were moved to D4 from 497 to 114. Those 114 black residents are only 7%, of the total population being moved from south of US 1 into D4.[7]

Its significant to note that the NAACP representatives testified in public hearings in favor of the Russell Alternative Plan, which deleted the proposed movements of D2 population into D3 and D4 in the Revised Plan, and instead proposed a movement of population further north from D2 to D3. This however, would have resulted in moving 271 black residents from D2 to D3, or more than double the amount of black population proposed to be moved into D4 in the Adopted plan.

To be clear, we are of the opinion that neither the Adopted Plan or the Russell Alternative would "pose a threat to equal representation under the law." Nevertheless, it's hard to understand how the NAACP can credibly argue that the Adopted Plan poses "a threat to equal representation under the law" as a result of moving 114 black residents from D2 into D4, while endorsing a plan that moves twice as many black residents from D2 into D3.

### 2) ACLU Letter

The ACLU letter evidences a basic lack of understanding of redistricting principles and law. It begins with an introductory paragraph making conclusory allegations without factual context or evidentiary support. However, the main and only argument made in the letter, is that developing a District 5 with a black voting age population (BVAP) of 50.3% "may constitute unlawful 'packing.'" In support thereof they cite to cases with completely different facts, which are easily distinguishable.

For example, in the case of *Cooper v Harris* 137 S. Ct. 1455 (2017) upon which they rely, North Carolina's legislature redrew two congressional districts, District 1 and District 12, after the 2010 census. Prior to that redistricting, neither district had a majority black voting-age population (BVAP), but both consistently elected the candidates preferred by most African-American voters. The new map significantly altered both District 1 and District 12. The State went to absurd lengths to find black population to increase District 1's BVAP from 48.6% to 52.7%. The State also reconfigured District 12, increasing its BVAP from 43.8% to 50.7%.

---

[6] The Revised Plan was presented and discussed at the February 25th, 2022 public meeting.

[7] The number of Black residents moved from D2 to D3 in the Adopted Plan is 38. Thus, the total number of black residents moved from D2 to D3 and D4 in the Adopted Plan is 152.

3

COM24066-000829

The bizarre configuration necessary to have produced these districts provides clear evidence that race was the predominant factor in the state's configuration of those districts. Indeed, as can be seen below, these districts resembled Rorschach inkblots.



Clearly, these North Carolina congressional districts violate the holding in *Shaw v Reno* 509 U.S. 630 (1993).

In stark contrast, despite the City's irregular boundaries, District 5 in the Adopted Plan is relatively compact, as shown in the figure below.



Moreover, the district was -- as the ACLU letter concedes -- a majority Black district *prior to the redistricting* with 52.9% BVAP. The resulting *redistricting reduces the BVAP* to 50.3%.

Further, the ACLU argues that there was no significance given to the fact that African Americans constitute 56.3% of the registered voters in new D5 and 53.8% of the actual votes at the most recent state general election, implying that these statistics demonstrate that there is unlawful "packing." This allegation results from their lack of knowledge of the work conducted by the City's consultants. Indeed, these issues were factored into our analysis, and certainly do not provide evidence of unlawful "packing".

4

COM24066-000830

Respectfully, the ACLU ignores the fact that this is a plan for the next decade, not simply a snapshot in time. The development patterns in the City demonstrate that some of the areas of the original D5, and areas east of the original D5 like Wynwood and Midtown which were added to new D5, will continue to gentrify. Based on historical trends, as these areas redevelop, most of the new population will most likely be Hispanic or non-Hispanic white. Thus it is prudent to ensure that the Adopted Plan provides the African-American community an equal opportunity to elect candidates of their choice throughout the next decade, not just the next election.

The total black population of the city is approximately 16.3% and somewhat dispersed, with a major concentration in the north end including Liberty City and Little Haiti. The bulk of residents moved into D5 were from the center/western part of D2. This was a logical approach based on the fact that D2 had to shed significant population and had a long border with D5. Of the approximately 10,500 residents moved from that area of D2, only 1544 black residents of voting age were moved into D5 constituting roughly 14.7% of the voting age residents moved from D2 to D5.

The original D2 had approximately 7.7% BVAP. The new D2 has 7.25% BVAP. Taking into account the fact that D2 had an overpopulation of approximately 28,000 residents, which had to be moved to other districts, a less than half of one percent reduction in BVAP in D2 is not only *de minimus*, but actually a likely result of compliance with the Constitutional mandate to redistribute and equalize population among districts.

Finally, the ACLU's correspondence evidences significant cognitive dissonance. Indeed, this is not a Plan that involves just one protected class (African American) under the VRA. Hispanics are also a protected class under the VRA, and the Plan includes 3 Hispanic majority districts. The ACLU asserts that the configuration of D5, resulting in a bare majority of 50.3% BVAP constitutes "packing," yet it does not even mention the 3 Hispanic districts. These 3 districts have the following Hispanic VAP percentages: D1 at 89.5%, D3 at 88.27% and D4 at 89.54%. Thus, if the ACLU's unenlightened argument on "packing" were to be taken to its logical conclusion, it could result in a Plan with 4 (not 3) Hispanic majority districts, and potentially a fifth district with roughly equal black and Hispanic population.

## 2) Does the Adopted District Plan Benefit Elected Officials in an Improper Manner.

The question requires a speculative response which is outside the purview of our scope of work. Nevertheless, it is apparent that the question results from equally speculative allegations that D3's Commissioner may benefit by having a home he owns in the Grove area moved into his district.

Here are the facts:

- In the Initial Plan we developed and presented for the Commission's consideration, we proposed moving an area from US 1 to South Miami avenue and from Simpson park on the north to 17 Ave to the south. This area consisted of 1313 residents and did not include the property in question.

5

COM24066-000831

- At the February 7th public meeting where we presented the Initial Plan, there were significant objections from the public as well as from Commissioner Russell to including that area in D3, which encompassed the walled in neighborhood of Bay Heights.

- Again, our prime directive in designing the Initial Plan and the subsequent Revised Plan was always to equalize population among the districts. Thus, in the Revised Plan presented at the February 25th public meeting, we deleted the area that included Bay Heights and instead we proposed a movement from D2 to D3 of an area immediately south of Bay Heights from Alatka street to 22nd street. This area has 1392 residents, which provided a near "Apples to Apples" trade off of population.

- As stated above, the speculative analysis of whether the resulting change will benefit a Commissioner is not an issue within our scope of work. Thus, I can only confirm that but for the significant objections to the inclusion of Bay Heights in the initial plan, we would have had no reason to make the change that we did in the Revised (Adopted) Plan, which did include the Commissioner's property.

## 3) Whether The Adopted Redistricting Plan Minimizes The Movement of African Americans from D2 to Other Districts.

We begin our response by emphasizing again that D2 had 7.7% black voting age population prior to the redistricting. It now has 7.25% black voting age population in the Adopted Plan.[8]

This question requires a two part response. First, we made no attempt to minimize the movement of African American residents from D2 into D5. In order to equalize population among districts, we had to use significant D2 population east of D5 going north to south along the border between D2 and D5. As set forth above, of the approximately 10,500 residents moved to D5 from D2, there were 1544 black residents of voting age, constituting roughly 14.7% of the voting age residents.

Second, also as set forth above, after having heard significant objections from the public regarding the configuration of the Initial Plan, which moved 497 black residents from D2 to D4, we did reduce that movement so that the Adopted Plan now moves only 114 black residents from D2 to D4, a reduction of 383 black residents. Expressed another way, the Adopted Plan only includes approximately 29% of the black residents originally proposed to be moved from D2 to D4.[9]

---

[8] It is significant to note that D2 it not the second highest in black population among the 5 districts. Whereas the D2 has 7.25% BVAP, D1 has over 11% BVAP.

[9] In regard to total population moved from D2 areas south of US 1, the Initial plan proposed a total of 6,384. The Revised Plan reduced that number to 2,990 -- a more than 50% reduction.

6

## 4) Whether in our Professional Opinion a General Consensus Could Exist in the Commission to Support an Alternative Plan.

This question would also require a speculative response, but here are the chronology and the facts, including the plans that were considered:

The City Commission held 6 publicly noticed meetings to discuss the redistricting process. Additionally, each Commissioner held a community meeting in his or her district.

1. **The Initial Plan:** This plan was the first to be presented to the Commission on February 7, 2022. Most every Commissioner requested changes, including restoring parts of their districts that had been moved to another district. Unlikely to have majority support.

2. **The Revised Plan:** This plan was presented at the February 25th Commission meeting. One commissioner did make the motion to adopt this plan, but others said they needed more time to evaluate it. Ultimately, the Commission voted 4 to 1 to make this the Base Plan for consideration of any future amendments. Some Commissioners did request revisions, and all agreed that they wanted to set community meetings in each district to get additional constituent input.

3. **The Russell Alternative Plan:** This plan may have enjoyed the support of Commissioner King, since it included the Wharf area into D5. However, the plan was opposed by D1, D3 and D4 Commissioners.

4. **The Reyes Alternative Plan:** This plan deleted the area moved from D2 to D4 in the Base Plan. However, Commissioner Russell did not support it because it still moved D2 Grove population south of US 1, albeit into D3. It also would conceivably enjoy the support of Commissioner King since it included the Wharf area going to D5, but did not have the support of D1 or D3 Commissioners.

5. **The King Alternative Plan:** Commissioner King requested only one amendment to the Base Plan to include the area known as the Wharf in D5. In effect, Commissioner King's Alternative is the Adopted plan.

At beginning of this process, the Commission directed the use of several judicially accepted traditional redistricting principles to be employed in designing the plan. The first -- maintaining the core and configuration of existing districts to the extent possible --together with the City's irregular boundaries, significantly constrain the alternatives that can be produced.

It is apparent from the Commissioner's discussion that the main issue preventing a consensus involves the movement of D2 population south of US 1 from areas considered to be part of the traditional neighborhood of the Grove into other districts. There are three Commissioners (D1, D3 and D4) that have consistently advocated for moving population south of US 1 -- including the Grove -- into other districts as necessary in order to equalize population.[10] They have argued that

---

[10] At the February 25th Commission meeting, the Commission voted 4 to 1 to direct the consultants to use population South of US 1 as needed.

7

many other traditional neighborhoods such as Flagami, Shenandoah, Allapattah and Little Havana have been divided. They have also argued that dividing a traditional community may result in enhanced representation since that community can seek support of more than one commissioner for issues of importance to that community.

One Commissioner (D2) is vehemently opposed to this approach, as were the vast majority of residents who spoke at the public meetings. They argue that the Grove is a traditional community that should remain intact in one district and that other areas of D2 can provide population necessary to rebalance the district populations.

Those respective arguments involve policy issues on which we express no opinion.

As of the March 11th meeting, one Commissioner (D4) agreed to delete the area going into his district from the Grove area. However, in order to equalize population, more area north of Alatka Street south of US 1 would be moved into D3, which at least three Commissioners ( D2, D3 And D1) would oppose.

In short, as I informed the Commission at the March 24th meeting, in our opinion all of the alternatives proposed would comply with the Constitution and the federal voting rights act. However, based on the discussions in the six public hearings on redistricting to date, it seems unlikely that a plan which does not move any population from the Grove to other districts would enjoy the support of a majority of Commissioners. Thus the King Alternative consisting of the Base Plan and the Wharf amendment was the only plan which had majority support.

It should be noted that if the plan were vetoed and there was no consensus to approve another plan -- thus creating an impasse -- litigation will ensue and will result in a court ultimately having to draft the plan. The court would not be constrained by any of the traditional redistricting principles directed by the Commission. Moreover, the court's main and only objective will be to comply with the Constitution and the law. This may result in a plan with radically different district configurations where, for example, the Grove may remain whole but within a newly configured majority Hispanic district.

## Number of Commissioners

Finally, although not specifically requested in your letter, we take the liberty of providing a brief response to the recent questions in the media as to why we did not propose a 7 member district plan. As you know, Section 4(b) of the City's Charter sets the number of commissioners. It states in pertinent part that *"The city commission shall consist of five members who shall be elected from districts within the city, numbered 1 through 5."*

Thus, as the City's consultants we have no authority to draft a plan inconsistent with the provisions of the Charter. The decision as to the appropriate number of districts for the City is exclusively reserved to the City's voters.

8

COM24066-000834