```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 22-cr-24066-KMM
 3

 4    GRACE, INC., et al.,           Miami, Florida

 5             Plaintiffs,           March 29, 2023

 6        vs.                        9:31 a.m. to 3:19 p.m.

 7    CITY OF MIAMI,                 11th Floor - Atkins Building

 8             Defendant.            (Pages 1 to 160)

 9    _____

          EVIDENTIARY AND MOTION PRELIMINARY INJUNCTION HEARING
10           BEFORE THE HONORABLE LAUREN FLEISCHER LOUIS,
                  UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
       FOR THE PLAINTIFFS:   NICHOLAS L. WARREN, ESQ.
13                           ACLU Foundation of Florida, Inc.
                             336 East College Ave, Suite 203
14                           Tallahassee, FL 32301
                             786-363-1769
15                           nwarren@aclufl.org

16                           DANIEL B. TILLEY, ESQ.
                             CAROLINE A. MCNAMARA, ESQ.
17                           ACLU Foundation of Florida, Inc.
                             4343 West Flagler Street, Suite 400
18                           Miami, Florida 33134
                             786-363-2714
19                           dtilley@aclufl.org
                             cmcnamara@aclufl.org
20
                             CHRISTOPHER J. MERKEN, ESQ.
21                           Dechert LLP
                             Cira Centre
22                           2929 Arch Street
                             Philadelphia, PA 19104
23                           215-994-2380
                             christopher.merken@dechert.com
24

25
```

PLAINTIFFS' TRIAL EXHIBITS

P123

1:22-cv-24066-KMM

```
 1    APPEARANCES CONTINUED:

 2      FOR THE DEFENDANT:        GEORGE T. LEVESQUE, ESQ.
                                  GrayRobinson, P.A.
 3                                301 E Bronough Street, Suite 600
                                  Tallahassee, FL 32301
 4                                850-577-9090
                                  george.levesque@gray-robinson.com
 5
                                  CHRISTOPHER N. JOHNSON, ESQ.
 6                                GrayRobinson P.A.
                                  333 S.E. 2nd Avenue, Suite 3200
 7                                Miami, FL 33131
                                  305-416-6880
 8                                christopher.johnson@gray-robinson.com

 9

10      REPORTED BY:              STEPHANIE A. McCARN, RPR
                                  Official Court Reporter
11                                400 North Miami Avenue
                                  Thirteenth Floor
12                                Miami, Florida 33128
                                  (305) 523-5518
13                                Stephanie_McCarn@flsd.uscourts.gov

14

15

16

17

18

19

20

21

22

23

24

25
```

1
## I N D E X

2
### WITNESSES

3

**WITNESSES FOR THE PLAINTIFFS:**                                   **Page**
4                                                                    --

5

6
**WITNESSES FOR THE DEFENDANT:**                                    **Page**
7
**Miguel de Grandy**
   Direct Examination by Mr. Levesque                                **48**
8   Cross-Examination by Ms. McNamara                                **71**

9

10
**EXHIBITS IN EVIDENCE**                **IDENTIFIED**        **ADMITTED**

11
**Joint Exhibit No. 4**                      **58**              --
**Joint Exhibit No. 10**                     **59**              --
12
**Defendant's Exhibit No. 1**                **51**              --
13

14

15

16
### MISCELLANEOUS

17
                                                                    **Page**
Proceedings.......................................   **4**
Opening Statement on behalf of the Plaintiffs.....   **8**
18
Opening Statement on behalf of the Defendant......  **43**
Closing Argument on behalf of the Plaintiffs......  **89**
19
Closing Argument on behalf of the Defendant.......  **110**
Rebuttal Argument on behalf of the Plaintiff......  **145**
20
Court Reporter's Certificate......................  **160**
21

22

23

24

25

```
 1   you need to, but we can be back in five, okay?  All right.

 2   Thank you.

 3           THE COURTROOM DEPUTY:  All rise.

 4       (A recess was taken from 10:38 a.m. to 10:45 a.m.)

 5           THE COURTROOM DEPUTY:  All rise.

 6                   (Time 10:45 a.m.)

 7                   MIGUEL DE GRANDY,

 8   a witness for Defendant, testified as follows:

 9           THE WITNESS:  I do.

10           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

11   State your name.  Can you spell your first and last name for

12   the record?

13           THE WITNESS:  My name is Miguel de Grandy.

14   M-I-G-U-E-L.  Last name D-E, G-R-A-N-D-Y.

15                   DIRECT EXAMINATION

16   BY MR. LEVESQUE:

17   Q.  Mr. De Grandy, are you an attorney?

18   A.  Yes, sir.

19   Q.  Where are you admitted to practice?

20   A.  I'm admitted in the State of Florida, I'm admitted in the

21   Southern District Federal Court, I'm admitted in the United

22   States Supreme Court.

23   Q.  And can you describe for the Court your experience in

24   redistricting?

25   A.  I started as a member of the legislature.  I was on the
```

1  redistricting committee.  I ended up suing my own legislature

2  for violation of Voting Rights Act; that was *de Grandy vs.*

3  *Wetherell*, I believe.  I was lead plaintiff and also cocounsel.

4       In 1998, I believe, I was appointed by Speaker Thrasher to

5  be lead counsel on the case of *Fouts v. Mortham*, a

6  redistricting case that had been filed against the legislature.

7  I have done Palm Beach School Board.  I have done the City of

8  Miami three times now.  I have consulted with various elected

9  officials on redistricting issues.  That's pretty much it.

10 Q.  And at some time during this most recent cycle, were you

11 engaged by the City to provide advice and counsel for the

12 current redistricting cycle?

13 A.  Yes, sir, I have.

14 Q.  After you were engaged by the City, what did you do?

15 A.  Well, we first -- we were awaiting the census data, the PLA

16 data, which was delayed.  We tried to spend our time officially

17 in doing preliminary work to determine applicability of the

18 Voting Rights Act.  My coconsultant, Steve Cody, conducted that

19 analysis, advised me that he did see patterns of politically

20 cohesive voting, he did see patterns of block voting and

21 polarized voting and that, therefore, in his opinion, the --

22 the Voting Rights Act provisions would apply.

23 Q.  Okay.  In which districts did the Voting Rights Act apply

24 to for the City of Miami?

25 A.  District 5, District 1, District 3 and District 4.

1   Q.  And how many districts are there in the City of Miami

2   districts?

3   A.  There's five districts.

4   Q.  And did you also prepare a report for the City commission?

5   A.  I prepared an initial, what I call a primer, which is meant

6   to educate lay people on the basics of redistricting law and

7   redistricting processes.

8   Q.  Did that primer also inform the City of their need to

9   redistrict?

10  A.  Yes, sir.  We had done the preliminary analysis and

11  determined that the overall deviation of the then current map

12  was above 42 percent.  District 2 was highly overpopulated.

13  District 3 was the lowest population.  Put together, the

14  percentage over and the percentage under is how you calculate

15  overall deviation and, therefore, we were of the opinion that

16  you could not use that plan for further elections.

17  Q.  And how many districts were overpopulated in that manner?

18  A.  I recall District 2 was the -- the huge one that was

19  overpopulated.

20  Q.  In fact, that was the only one that was overpopulated,

21  correct?

22  A.  That is correct.

23  Q.  Now, at some point did you have a public meeting with the

24  City commission?

25  A.  We had several public meetings; I believe in November,

1   December, February and March.

2   Q.  And at the November 18th public meeting, did the City give

3   you directions to guide your work?

4   A.  Yes, sir.

5   Q.  And were those directions given in open meetings?

6   A.  Yes.  And they were, I think, later on redacted in the form

7   of a resolution.

8   Q.  And what were those directions?

9   A.  The prime directive was comply with the constitution of the

10  Voting Rights Act.  They wanted to maintain the core existing

11  districts to minimize voter confusion.  They wanted to maintain

12  mathematical -- excuse me, substantial equality as opposed to

13  mathematical equality.  They wanted me to concentrate further

14  on voter cohesion, and they also wanted me to preserve

15  traditional neighborhoods, if feasible.

16  Q.  If you could take a quick look at Defendant's Exhibit 1,

17  and let me know if that is the resolution that you just

18  referenced.

19      (Defendant's Exhibit No. 1 was identified.)

20          THE WITNESS:  Yes, sir.

21  BY MR. LEVESQUE:

22  Q.  Now, I want to talk about some of these criteria that they

23  provided to you.

24      First, did the ordering of the criteria matter to you?

25  A.  Yes, it did.

1   Q.  How did it matter to you?

2   A.  Well, some of these things become mutually exclusive.  If,

3   for example, you are trying to preserve the court of existing

4   districts, it may not be feasible to maintain communities of

5   interest.  And so because some of them can conflict with each

6   other, I ask them to give me a hierarchy, if you will, of which

7   ones they wanted to emphasize more and an order of preference.

8   Q.  So they placed compliance with the United States

9   Constitution and the Voting Rights Act at the top, correct?

10  A.  That was always the prime directive.

11  Q.  And the least important directive was maintaining

12  community -- communities of interest, correct?

13  A.  Where feasible, yes.

14  Q.  How did you interpret maintaining the core of the districts

15  to avoid voter confusion?

16  A.  I mean, that -- that is a principle that is very popular

17  among elected officials.  It is also incumbent protection, but

18  it's -- you know, you invest in, as a commissioner, in getting

19  funds for a local road, a park, etc., you make those people

20  happy.  You expect those people are going to vote for you, so

21  you want to maintain that constituency within your district.

22  Q.  And in the course of the meetings and your map drawing

23  activities, did the commissioners ever indicate that there were

24  constituencies -- and I use that term loosely -- surrounding

25  the geography, such as a park, that were important that they

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 9 of
42
Direct Examination - Miguel De Grandy
March 29, 2023                                                    53
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

 1  wanted to keep in their district?

 2  A.   Yes, sir.

 3  Q.   Can you maybe provide an example or two to that end?

 4  A.   That would violate attorney/client privilege.

 5  Q.   Okay.

 6       Now, one of the criteria also included factoring in voter

 7  cohesion?

 8  A.   That's correct.

 9  Q.   How did you interpret that criteria?

10  A.   Well, voter cohesion, I mean, you've got to understand

11  that -- let me give you an example.  The Hispanic community.

12  The Hispanic community is not monolithic.  So, for example, you

13  have people that would elect a Commissioner Reyes in District

14  4, will not elect that same commissioner in District 2.

15       You have, for example, a commissioner that just got elected

16  in District 2 which is Hispanic, Sabina Covo, who is liberal,

17  who is a democrat; that person -- there is cohesion among the

18  communities in District 2 to elect that type of politician,

19  whereas District 3, 4 and 1 are very much more conservative,

20  old guard, you know, a lot of Cuban Americans that vote a

21  certain way and like a certain type of politician.

22  Q.   And you used District 2, and you referred to it as a

23  Hispanic district.  How did the commissioners refer to that

24  district?

25  A.   They refer to it as an Anglo district, and I told them at

1    one point, I actually said, Fun fact, there is no Anglo

2    district.  And that was just proven in this last election where

3    Ms. Sabina Covo was elected in District 2.  She is Colombian

4    American.  Actually, the first three vote getters in District

5    2, Sabina Covo, Reyes and Torres, all Hispanic sir names,

6    totaled 66 percent of the vote that was cast.  So I never

7    believed it to be an Anglo district.

8    Q.  And the criteria that the commission provided to you, was

9    that the criteria that you utilized in drawing the lines?

10   A.  To the best of my ability, yes.

11   Q.  Now, after the commission gave you that criteria, what did

12   you do?

13   A.  We started -- I mean, the prime directive was obviously

14   comply with the law and Voting Rights Act.  Once you drill down

15   into the principles that they asked us to employ, maintaining

16   the core of existing districts, seriously hampers what else you

17   could do with the plan.  You have to basically play around the

18   edges to comply with that requirement.

19        So we started looking at the areas adjacent to the

20   different districts that could be moved.  You know, we found

21   between 2 and 5, there was a lot of movement, I think over

22   10,000 folks that we were able to move.  And I had to also

23   figure out around the edges of 3 and 4 what, if anything, I

24   could move from District 2.  But I also had to ripple up to the

25   other districts then to equalize their population.

1    Q.  And in terms of maintaining the core of the existing

2    districts, that would require you to, as much as you could, to

3    spread out that additional population that you needed to shed

4    from district 2; would that be fair?

5    A.  That's fair.

6    Q.  At some point did you come up with at least a draft map for

7    the City's consideration?

8    A.  We did.

9    Q.  Was there a commission meeting on February 7th that you

10   presented that map?

11   A.  There was.

12   Q.  In drawing that map, did you concern yourself with precinct

13   boundaries?

14   A.  No; precinct boundaries were irrelevant because -- well,

15   let me take a step back.  One of the preliminary things that we

16   did was interact with the Department of Elections to

17   understand, you know, their timing, when they needed a plan,

18   etc., etc.

19       Now, what the elections department told us is, you know,

20   because the county was going to be redistributed, the school

21   board was going to be redistricted, the City of Miami, maybe

22   other communities within Miami-Dade county, they were going to

23   re-precinct the entire county.  So to me, precincts were

24   irrelevant.  I concentrated on street boundaries rather than

25   precincts.

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 12 of
42                                                                                          56
Direct Examination - Miguel de Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1   Q.  So when you were actually drawing the lines, you didn't

2   look at precinct lines, you looked at street boundaries; did

3   I --

4   A.  We never even had a precinct map because it was irrelevant.

5   Q.  Now, one of the things that has been brought up in this

6   litigation is the percentage in District 5 of black voting age

7   population.

8       Did you have a specific target that you were looking for in

9   drawing?

10  A.  No.  I wanted to keep it above 50 percent, and I will tell

11  you why.  If you look at each redistricting cycle since 1997,

12  the black community has reduced both in relative and absolute

13  terms.  I'm not drawing a plan for a snapshot in time.  I'm not

14  drawing a plan for the 2023 election.  I'm drawing a plan for a

15  decade.  I have to focus, and I believe the case law says you

16  have to focus on local conditions.  That area is gentrified.

17  And so you can see it statistically in each decade of

18  redistricting how the black percentage has gone down

19  significantly.

20      In my assessment, a 50.3 percent black district, which

21  would have 52 and change percent voter -- black voters was a

22  district that could perform the entire decade.

23  Q.  And the 52 percent figure that you referenced, that's not

24  actually citizen voting age population?

25  A.  It's registered voters.

1                   THE COURT:  Wait, say that again.  Sorry.

2                   THE WITNESS:  It's registered voters.

3                   THE COURT:  I know, but the first part of the question

4      was, the distinction you just drew, I missed it, I'm sorry.

5                   THE WITNESS:  And your question?

6                   MR. JOHNSON:  Citizen voting age population.

7                   MR. LEVESQUE:  Yeah, the distinction between citizen

8      voting age population and black registered voters.  So black

9      citizen voting age population and registered voters.

10                  THE WITNESS:  I believe citizen voting age population

11     was 58, somewhere in that percentage.  Voting -- registered

12     voter population was 52 and change.

13     BY MR. LEVESQUE:

14     Q.  And why would there be a delta in those two numbers?

15     A.  Well, you have Haitian community, you have individuals that

16     simply don't register to vote.  But you have -- you know,

17     within that area, you have a black immigrant community that is

18     a noncitizen community.

19     Q.  Is there also a federal prison in that community where they

20     would be citizens but would not be eligible to register to

21     vote?

22     A.  I believe so, yes.

23                  THE COURT:  What federal prison, FDAC?

24                  MR. WARREN:  Yes, Your Honor.

25                  THE COURT:  FDC is part of District 5?

Direct Examination - Miguel de Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1    MR. WARREN:  Yes, Your Honor.

2    THE COURT:  It's across the street.

3    MR. WARREN:  Yes, Your Honor.

4    THE COURT:  Thank you.  Go ahead.

5  BY MR. LEVESQUE:

6  Q.  And in that February 7th meeting, did the commission give

7  you directions on your draft map?

8  A.  I'm trying to recall if they refined the direction.  There

9  was discussion about whether to move south of U.S. 1.  I don't

10  know if it was that meeting, but there was that discussion.

11  Q.  Now, in that meeting, in your draft map, had you already

12  moved south of U.S. 1?

13  A.  I don't recall that map.  Can I see that map?

14  Q.  Absolutely.  Probably that would be captured in your slide

15  presentation that would be Joint Exhibit 4.

16     (Joint Exhibit No. 4 was marked for identification.)

17     THE WITNESS:  Ah, yes, that would be the version where

18  I had taken a sliver of District 2 into District 3, and I am

19  looking at, just for the record -- it's Exhibit 4 and it says

20  Page 25 of 40.  There was a sliver of District 2 that I brought

21  up to District 3 that was, you know, I thought more

22  esthetically acceptable.

23     There were objections at that meeting that that

24  included the area of Bay Heights, and that those objections,

25  ah, strenuously came from some of the public, as well as

1   vehemently by the commissioner of the district and Bay Heights

2   should not be separated from District 2.  So there was pushback

3   on that movement.

4   BY MR. LEVESQUE:

5   Q.   And was there direction for you to also look at moving the

6   Miami River Center back into District 5?

7   A.   The MRC, yes.

8   Q.   And was there also directions to restore some areas from

9   D-1 to D-4?

10  A.   That's correct.

11  Q.   Now, after the February 7th hearing, what did you do?

12  A.   I tried to make changes to the maps in compliance with the

13  instructions that I had been given, and being sensitive to the

14  community presentations that I had seen.

15  Q.   If I could ask you to turn to Joint Exhibit 10,

16  specifically Page 4.

17       (Joint Exhibit No. 10 was marked for identification.)

18          THE COURT:  Did you say Exhibit 10?

19          MR. LEVESQUE:  Yes, Your Honor, Joint Exhibit 10.

20          THE COURT:  But not this?  My Exhibit 10 is a one-page

21  map.

22          MR. LEVESQUE:  Do we have a copy of this?

23          THE COURT:  Oh, did you mean ECF 24-10?

24          MR. LEVESQUE:  Yes, ECF -- yes.

25          THE COURT:  Oh, sorry.  Thank you.

1          MR. LEVESQUE:  I apologize, Your Honor.

2          THE COURT:  I thought you were referring to your own

3   exhibit.  But I got it.  Okay, slide 3, I have it.

4          MR. JOHNSON:  I think that would be ECF 24-4, Your

5   Honor.  February 7th presentation?  It's No. 10 in the Joint

6   Exhibits, and No. 10 in the Joint Exhibit -- oh, excuse me, it

7   is 24-10, sorry.

8          THE COURT:  All right.  I got it up.

9          THE WITNESS:  I'm at Page 4.

10  BY MR. LEVESQUE:

11  Q.  And does that reflect the -- the map that ultimately was

12  adopted by the commission?

13  A.  I believe so, yes.

14  Q.  And I know it is going to be hard to see and -- if I could

15  just ask you to -- there are several areas on there where you

16  indicate there are movement in changes.

17      In your words, can you just walk us through each of those

18  changes, describing it for the record and then talking about

19  why you moved that and how that complied with the directions

20  from the commission?

21  A.  Okay.

22          THE COURT:  Can I make sure, please, I am on the right

23  slide?  I'm at ECF 24-10, Page 4 of 15 and the title is, The

24  base plan showing areas of movement, correct?

25          MR. LEVESQUE:  That's correct.

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 17 of
42                                                                               61
Direct Examination - Miguel de Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1          THE COURT:  And this is your testimony that this is

2    the final plan as you presented it?

3          THE WITNESS:  I believe so, yes.

4          THE COURT:  Okay.

5          THE WITNESS:  Okay.  You're ready?

6    BY MR. LEVESQUE:

7    Q.  Yes, sir.

8    A.  I will start from the south to the north.  The -- if you

9    look at the first highlighted in red, there were actually two

10   pieces to that.  The piece that is north to U.S. 1, to me, was

11   a natural movement in terms of shedding population from

12   District 2; it would set, you know, a more stable boundary, if

13   you will.  Ultimately, there was a triangle that was added to

14   the south of U.S. 1; again, that was purely to equalize

15   population.

16       I had actually done a bigger movement south of U.S. 1 that

17   was objected to by the folks in the Groves, and so I actually

18   narrowed that piece, I believe, from --

19          THE COURT:  Mr. De Grandy, I am going to tell you that

20   you are losing me.  So if you are going to describe your

21   reasons for moving pieces, I need you to stay on one at a time,

22   because -- I know that they are all very familiar to you, but I

23   was with you on one piece and then I think you are describing

24   another and I am lost.

25          THE WITNESS:  Let me see if I can find slides, Your

1    Honor, that better express.

2            THE COURT:  So I will tell you where you lost me.  You

3    said this western most piece from the District 2 was a natural

4    piece to move.

5            THE WITNESS:  Yes.

6            THE COURT:  I didn't think I got an explanation as to

7    why that was natural to you, but then I think you moved to

8    another piece.

9            THE WITNESS:  Right.  And if you look, Your Honor, if

10   I can draw Your Honor's attention to Page 10 of that exhibit,

11   the second piece that I was talking about is that little red

12   triangle.  Your Honor sees that?

13           THE COURT:  Yes.

14           THE WITNESS:  Okay.  That little red triangle

15   initially was a larger triangle.  There was a lot of opposition

16   regarding that, and what I did was reduce that, in other words,

17   move the line further north to reduce that triangle to address

18   the objections of the folks in the Grove to the effect that I

19   was dividing the traditional Grove.  So that's why that

20   movement was reduced.

21           The area 13 that everybody talks about, previously in

22   my testimony I had talked about the movement that I made in

23   bringing in a portion of District 2 into District 3 that was

24   objected to.  If Your Honor looks at that red box, people call

25   it an appendage, immediately north of that was the movement I

1  originally made.  That was the movement that was objected to in

2  terms of not taking Bay Heights out of District 2.  Bay Heights

3  is a walled-in community.  The commissioner of the district

4  felt strongly it should remain in District 2.  And so actually,

5  I deleted that movement and had it -- I went south, literally,

6  and the north boundary of that red square is the wall of Bay

7  Heights, and I went south instead of going north.

8          Again, that was to bring in more population to

9  District 3 and shed it from District 2.

10  BY MR. LEVESQUE:

11  Q.  And Mr. De Grandy, you referenced north in terms of the

12  area that was of concern, Bay Heights.  If we were being more

13  precise, would that be northeast?

14  A.  Yes, northeast.  To the right of.

15      Going now, ah, moving north on District 2, I felt that the

16  two movements that we did to bring population from 2 to 5 were

17  natural movements.  It's just simply moving east to capture

18  additional population.  I think I moved north of 10,000 people

19  in that movement.

20      The river of movement, my -- my opinion was that it was

21  naturally more adept to District 1 than District 5 because

22  District 1 already had a huge part of the Miami River.  The

23  Miami River has a very strong business constituency; they have

24  a river commission, they are very politically active, they want

25  to maintain the commercial uses of the river.  So I thought it

1    would be good to have a commission that represented the vast

2    majority of the river, and to me, that was a natural movement

3    to move that into District 1.

4            THE COURT:  And you are describing area 6?

5            THE WITNESS:  Area -- I actually can't see it without

6    my glasses, Judge.

7            MR. LEVESQUE:  Yes, Your Honor, I believe he is.

8            THE WITNESS:  Yeah.  And then the other two were just

9    swapped to equalize population between -- north between 1 and

10   5.

11   BY MR. LEVESQUE:

12   Q.  And those would be areas 7 and 8?

13   A.  I can't see the numbers in this map, but I will take your

14   word for it.  It is the two in the north between District 1 and

15   District 5.

16   Q.  And the movements -- let me back up a little bit there.

17   The movement that --

18   A.  Oh, I'm sorry.  I forgot to describe one movement which was

19   the one where I took population from District 4 into District

20   3.  Commissioner Carollo has taken a very, you know, strong

21   position regarding the 8th Street corridor and wants to, you

22   know, control as much of it as possible.  To me, that was the

23   natural movement to, again, rebalance the population.  Once I

24   moved folks from 2 to 4, I had to rebalance the population, and

25   it made sense to move that block of voters into District 3.

1            THE COURT:  That's areas 14 and 15?

2            THE WITNESS:  That is correct.

3    BY MR. LEVESQUE:

4    Q.  If we could just go down and go back through a couple of

5    those.

6    A.  Sure.

7    Q.  Area 13, that's one of those southern movements from

8    District 2 into District 3?

9    A.  Area 13 is the one they call the appendage?

10   Q.  Yes, sir.

11   A.  Okay.

12   Q.  Am I correct that Commissioner Carollo has a residence that

13   is in the foot of that area 13, in the lower corner?

14   A.  That is correct, sir.  There was a lot of discussion about

15   that actually in commission meetings.

16   Q.  And going up to areas 10 and 11 where District 2 shed

17   population to District 5, are there reasons why you picked

18   those areas to move into District 2 -- I'm sorry, District 5

19   versus other areas to move into District 5?

20   A.  Well, in the last redistricting -- if you look at the most

21   northeast part of District 5, that used to be District 2.  In

22   the last redistricting, there was a lot of controversy about

23   actually taking that district through the bay.  A lot of the

24   constituents in that area said, Look, we are concerned with

25   coastal issues, we're concerned with sea rises, we're concerned

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 22 of
42
Direct Examination - Miguel de Grandy
March 29, 2023                                                    66
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1   with a lot of issues that aren't necessarily issues of concern

2   in more inner city areas.  We want to remain part of District

3   2.  I recall the commissioner of the district made me do a

4   couple more hearings in that area to explain to them why I had

5   to move them based on a need to equalize population, etc.

6        So, quite frankly, I didn't want to go through that drama

7   again, so I thought that taking more of the extreme north of

8   District 2 was infeasible.  And again, there is more of a

9   community of interest in the coastal area that I wanted to

10  preserve, and so I moved from more the urban core from west to

11  east.

12  Q.  And specifically for areas 10, 11 and 12 that we were just

13  talking about there, are there any -- can you describe the

14  populations and whether they would be more closely associated

15  with the populations in District 5 or District 2?

16  A.  I believe they will be more cohesive with District 5.

17  The -- as you move further east, you know, waterfront becomes

18  more affluent area.  Those folks, again, are concerned with

19  what I call first world issues, climate change, sea rise,

20  things of that nature, social justice equity.

21       People in the more inner core are concerned about potholes

22  in the street, whether they can pay the rent, whether they are

23  going to have a park in their neighborhood.  So those issues

24  from the municipal perspective, it seemed to me that made more

25  sense to move those folks into District 5.

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 23 of
42                                                                                                    67
Direct Examination - Miguel de Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1   Q.  And in the presentation of their case, the Plaintiffs drew

2   some attention to the little gap that's in between area 10 and

3   11 and area 12.  Can you describe what that gap is?

4   A.  I call it the Condo Canyon.  It's high density,

5   residential, more, you know, professional class affluent folks.

6   And I felt that they would be better served in District 2.

7   Q.  If you were to move that particular piece into District 5,

8   what would that do to the ability of District 5 -- let me

9   rephrase that.  What would that do to District 5's ability to

10  elect a representative of their choice?

11  A.  I think they would still be able to do so.

12  Q.  Would it dilute it?

13  A.  It would dilute it, yes.

14      (Pause in proceedings.)

15          THE COURT:  What condos are there on 8th and 9th

16  Street, because there are condos also at 10th and 11th, aren't

17  there?  What building are you describing in what you are

18  referring to there as the condo what?

19          THE WITNESS:  Condo Canyon.

20          THE COURT:  Condo Canyon, what are the -- what are the

21  buildings that are there?

22          THE WITNESS:  If you look an aerial, Judge, you'll see

23  that basically that sliver has significance high-rise

24  condominiums.

25          THE COURT:  But don't they continue up into 10th

1  Street?

2          THE WITNESS:  They do.  I mean, I don't have the

3  aerial, so I can't tell you for sure, but they very well may.

4  BY MR. LEVESQUE:

5  Q.  And, Mr. De Grandy, why were you moving population from

6  District 2 into District 5 at all?

7  A.  Because I had to shed thousands of people out of District

8  2.

9  Q.  And was District 5 the most under-populated district on the

10  map?

11  A.  No, it was District 3.

12  Q.  And after redistricting, where did it rank, if you recall?

13  A.  I don't recall.

14  Q.  Now, after this map was presented -- let me back up.

15     At the February 25th meeting, did you present a map that

16  was substantially similar to this?

17  A.  At the?

18  Q.  February 25th meeting.

19  A.  Yes.

20  Q.  And did the commission adopt that February 25th map as the

21  base plan in which they would work from?

22  A.  That's correct.  I -- you know, I encouraged them to do

23  that because, you know, if you have five individuals giving you

24  five thoughts, you don't have, you know, a base to work from;

25  it is very hard to draw a map.  So I asked them to, you know --

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 25 of
42                                                                                        69
Direct Examination - Miguel de Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

```
 1   you know, coalesce on a base draft, if you will, and then I --

 2   my charge was to make changes from those base plans.  And

 3   ultimately commissioners also created their own alternatives

 4   from the base plan.

 5   Q.  And at some point did the commission consider a variety of

 6   alternatives to that base plan?

 7   A.  They did.

 8   Q.  And were any of those alternatives ultimately adopted?

 9   A.  No.  Well, there were slight, you know, tweaks, the MRC,

10   the -- there was an area called the Wharf which was joining the

11   river that the district commission in District 5 wanted to

12   keep, it is an entertainment venue.  So that was moved back

13   into D-5, but there were no, you know, substantive changes made

14   otherwise.

15   Q.  So other than that one little move for District 5 related

16   to the Wharf, there were no changes that would have been

17   reflected in this map?

18   A.  Not to my recollection, no.

19   Q.  Now, was there a Reyes alternative plan that was

20   considered?

21   A.  There was.

22   Q.  When you reviewed that plan, did you believe that plan was

23   also constitutionally compliant?

24   A.  Yes.

25   Q.  There was a Russell alternative plan, was there not?
```

1    A.   There were two.  I think she had an initial one and then he

2    refined it to bring down the overall deviation.

3    Q.   And at looking at both of those plans -- either of those

4    plans, were those plans constitutionally compliant in your --

5    A.   I believe them to be.

6    Q.   Were there any other plans that were presented?

7    A.   There was the Reyes plan.  There was.

8    Q.   But at least in terms of all of those other alternatives,

9    those all would have been constitutionally compliant, correct?

10   A.   I believe them to be, yes.

11   Q.   Did any of them get a majority support?

12   A.   No.

13   Q.   If they had, they would be in the map, correct?

14   A.   That's correct.

15   Q.   Now, as the lead consultant working on these maps, what

16   were your goals?

17   A.   My goal was to create a plan that was constitutional and in

18   compliance with the Voting Rights Act.

19   Q.   And your primary directives came from full commission,

20   correct?

21   A.   That's correct.  And I had told them on several occasions,

22   if you go through the transcripts, that -- and I believe in the

23   initial primer that I wrote, that I can't take directions from

24   any individual commissioner.  I have to have, you know, a --

25   the body directs me as to how I need to move the plan.

Cross-Examination of Miguel de Grandy
March 29, 2023                                        71
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1              MR. LEVESQUE:  If I could have one moment, Your Honor?

2              THE COURT:  Okay.

3         (Pause in proceedings.)

4              MR. LEVESQUE:  No further question, Your Honor.

5              THE COURT:  All right.

6         (Pause in proceedings.)

7              THE COURT:  Do you mind repeating your last name for

8    me, please?

9              MS. MCNAMARA:  Caroline McNamara on behalf of --

10             THE COURT:  McNamara.

11             MS. MCNAMARA:  McNamara, yes.

12             THE COURT:  Okay.  I wanted to make sure the court

13   reporter had it as well.

14             MS. MCNAMARA:  And I'm on behalf of the Plaintiffs.

15             THE COURT:  Okay.

16                        CROSS-EXAMINATION

17   BY MS. MCNAMARA:

18   Q.  Now, Mr. de Grandy, you stated that you're the consultant

19   and you're hired by the City, correct?

20   A.  That's correct.

21   Q.  And the City, the commissioners are the ones who made the

22   policy decisions about what would go into the map?

23   A.  They provided the policy directives, yes.

24   Q.  And that's like those five numbered that we went through in

25   Defendant's Exhibit 1?

1   A.   That's correct.

2   Q.   And did you have any input into how they chose those five?

3   A.   I put them out there to them.  I suggested others that they

4   didn't include, but I put them all out there for them.

5   Q.   You raised the possibility to them that they could, quote,

6   start from scratch if they wanted to?

7   A.   I did, yes.

8   Q.   But they instead wanted to preserve the cores and that's

9   why after the Voting Rights Act, that's the next priority on

10  the list?

11  A.   That's correct.

12  Q.   And -- and you briefly testified here that that decision

13  constrained the further decisions you would make?

14  A.   That's correct.

15  Q.   And you were required to follow those instructions?

16  A.   Yes.

17  Q.   And because, you know, we test -- you testified that

18  because of the focus on maintaining the cores, that the final

19  priority about the neighborhoods was not something you could

20  substantially achieve?

21  A.   No.  And actually, that hadn't been achieved in the -- in

22  the plan that I was revising.  And there were multiple

23  neighborhoods already that were divided.

24  Q.   The district plan as the Benchmark from 2013 as it came to

25  you already had, say, Flagami, and some of the other districts

1  split up?

2  A.  That's correct, yes.

3  Q.  And over the process of this provision, the result was, you

4  know, the Grove and maybe a couple other neighborhoods that got

5  divided, in addition to the ones that had already been divided

6  that weren't really changed?

7  A.  Yes, the Grove was -- well, was impacted.  I wouldn't say

8  it was divided.  The majority of the Grove is in tact.

9  Q.  And there was some discussion about the goal of

10 compactness, and you agree that compactness was not a goal that

11 was assigned to you?

12 A.  Compactness would be a very difficult goal when you look at

13 the boarders of the city; it would be challenging to draw a

14 compact plan.

15 Q.  Are the boarders of the city the only reason it is

16 difficult to draw compact districts?

17 A.  Other than the borders of the district, making it

18 challenging it, are you talking about once I got the

19 instructions?

20 Q.  Um-hmm.

21 A.  Yeah, once I got the instructions and maintained the core

22 of the existing districts, you can't draw compact districts.

23 Q.  Now, the -- there is the -- Exhibit 1 that we have that has

24 the five listed ordered priorities.  Once you presented the

25 plan and then there were some tweaks in the late February into

1    March area, the commission added the point about increasing the

2    black voter -- voting age population in District 5 over 50

3    percent?

4    A.   That was never done by resolution.

5    Q.   It wasn't done by --

6    A.   There was discussion on that, yes.

7    Q.   Did you feel -- you felt you were bound to do that for them

8    because they asked for it?

9    A.   I felt I needed to do it regardless of whether they asked

10   me in order to maintain the ability of that community to elect

11   candidates of choice throughout that entire decade.

12   Q.   With the initial plan that you submitted on February 7th

13   that had the black voting age population, I think 49.8 percent,

14   that was just below the 50 percent line, and that was when

15   Commissioners Reyes and King raised the concern that they

16   wanted to get it over 50.  So you -- you indicated affirmative

17   in that?

18   A.   Yes.  To me, 49.8, 50.3, I mean, we are quibbling about a

19   couple dozen people.

20   Q.   Yeah.

21        You don't think it makes -- you don't think it's a

22   significant difference between 49.8 and 50.3?

23   A.   No.  I mean, from an electoral perspective, listen, I'll

24   tell you, my first election I lost by one vote, so to me, every

25   vote is important.  But, you know, statistically it is not that

1    significant.

2    Q.   But Commissioners Reyes and King wanted the number to be

3    over 50 percent?

4    A.   They felt that was important, yes.

5    Q.   Okay.  Did the change of the threshold from 49.8 to, say,

6    50.2 change the analysis of the Voting Rights Act compliance?

7    A.   No.

8    Q.   So overall would you say that the main -- you know, setting

9    aside the population equality, that once -- you are required to

10   do the population equality and balance the districts, and the

11   main driver beyond that was maintaining the cores?

12   A.   The main driver after what, I'm sorry?

13   Q.   The driver of how you made the map was driven by

14   maintaining the cores, that was the highest priority?

15   A.   No.  The highest priority was draft a constitutional plan

16   in compliance with the Voting Rights Act, and the next priority

17   was maintaining the core districts.

18   Q.   Now, you testified you did a racially polarizing voting

19   analysis of the city?

20   A.   Steve did.

21   Q.   Did you make a determination that the three Gingles

22   preconditions were met for the black community in the City of

23   Miami?

24   A.   Mr. Cody did.

25   Q.   Did he made a determination that the three Gingles

1   preconditions were met for the Hispanic population of the City

2   of Miami?

3   A.   He did.

4   Q.   Did he determine that the three --

5          THE COURT REPORTER:   I'm sorry, can you --

6          THE COURT:   You need to slow down.

7          THE COURT REPORTER:   I need you to please repeat the

8   question slower.

9          MS. MCNAMARA:   Do you want me to --

10         THE COURT:   For me, yeah.   I think the court reporter

11  needs it too.   I couldn't keep up.

12  BY MS. MCNAMARA:

13  Q.   Did you determine that the three Gingles preconditions were

14  met for the black population within the City of Miami?

15         THE COURT:   Pause there.

16         Stephanie, G-I-N-G-L-E-S.

17         Go ahead.

18         THE WITNESS:   Mr. Cody did.   C-O-D-Y.

19  BY MS. MCNAMARA:

20  Q.   Did you determine that the three Gingles preconditions were

21  made for the Hispanic population for the City of Miami?

22  A.   Mr. Cody did.

23  Q.   Did you determine that the three Gingles preconditions were

24  met for the non-Hispanic white population for the City of

25  Miami?

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 33 of
42                                                                                      77
Cross-Examination - Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1   A.   There are not Gingles preconditions for white populations.

2   It's not considered a protected class in the VRA.

3   Q.   During the February 25th hearing, Commissioner Reyes asked

4   you if the probability of District 2 electing a white,

5   non-white -- or a non-Hispanic white candidate was still high,

6   and you said it was a high probability?

7   A.   And it still is.

8   Q.   It's a competitive district, but there is a good chance

9   that a white candidate would win, even notwithstanding what has

10  happened in the -- the special election last month.

11  A.   There is a good chance that a non-Hispanic white can win,

12  and there is a good chance that a Hispanic can win.

13       (Pause in proceedings.)

14  BY MS. MCNAMARA:

15  Q.   Now, you testified about the concerns over gentrification

16  and the impact over the course of the next decade on the

17  population in District 5?

18  A.   Yes.

19  Q.   Did you perform any specific studies to assess the degree

20  of gentrification that's expected over the next decade?

21  A.   No.  We -- again, you have to look at local conditions.  I

22  think one of the reasons that the City continued to retain me

23  throughout the cycles is because I grew up in this community.

24  I know this community very well.  I can drive through and see

25  the condo buildings going up.  The permitting activity is not

Case 1:22-cv-24066-KMM  Document 173-28  Entered on FLSD Docket 02/02/2024  Page 34 of
42
Cross-Examination of Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM
78

1    ceasing.

2        You know, my law firm, what I do normally other than, you

3    know, everyday redistricting is land use and governmental

4    procurement.  So I am very aware of what is being permitted in

5    those areas, and I can see it -- you know, I can see those high

6    rises coming up and they will continue to come up and that area

7    will continue to gentrify.

8    Q.  This is based on your experience in the past and what you

9    predict will happen in the future?

10   A.  And having seen the demographic trends in the last three

11   decades, whereas the black population continues to decrease in

12   that area.

13   Q.  Did you create any models that would predict the extent to

14   which it would decrease over the next ten years?

15   A.  No.

16   Q.  Did you present anything to the commission to quantify

17   that, saying this is how much more we need to protect the black

18   community in District 5 beyond what it already is?

19   A.  No.  I figured if those patterns continue, the 52.

20   something percent of registered black voters would be in the

21   40s by the end of the decade.

22   Q.  Now, we --

23            THE COURT:  Pause there for a second.

24            Did you communicate that to the commissioners, or is

25   that just something you've estimated?

Cross-Examination - Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1           THE WITNESS:  I -- I communicated in terms of concerns

2    to keep the population above the 50 percent threshold, because

3    that would keep my voter population in the 50 to 52 percent

4    range.

5           THE COURT:  It's specifically your opinion that by the

6    end of the decade, the black population, voting black

7    population would be in the upper 40s, you said?

8           THE WITNESS:  Did I communicate that explicitly as I

9    did now, no.

10          THE COURT:  Okay.

11   BY MS. MCNAMARA:

12   Q.  Okay.  Now we talked a little bit about the federal

13   detention center and this sliver where this courthouse is

14   located that's --

15          THE WITNESS:  I'm sorry, let me qualify that, Your

16   Honor.  I did not in public meetings.

17          THE COURT:  Okay.

18          THE WITNESS:  I did have multiple discussions with

19   commissioners one-on-one.

20          THE COURT:  Okay.  Do you want to flesh that out for

21   me?

22          THE WITNESS:  Without getting into attorney/client

23   privilege, but I gave them my thoughts.

24          THE COURT:  I already know the sword and shield, so

25   you choose.

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 36 of
42
Cross-Examination - Miguel De Grandy
March 29, 2023                                                    80
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1          THE WITNESS:  I gave them my thoughts, Your Honor.

2   Can't go further than that.

3   BY MS. MCNAMARA:

4   Q.   Coming back to the sliver that we are in currently that is

5   bound between Northeast and 2nd Avenue in Miami, right here

6   that this courthouse is in, that also includes the Federal

7   Detention Center, that's one of the districts that you talked

8   about on direct that moved from District 2 into District 5?

9   A.   That's correct.

10  Q.   When you were moving that block, did you assess the -- did

11  you assess how much of that population is incarcerated in the

12  Federal Detention Center?

13  A.   Did I explicitly count them, no.  No.

14  Q.   You -- when you say -- are the people who reside within the

15  Federal Detention Center within the population that was added

16  to D-5 in your analysis?

17  A.   In other words, were those counted as people?  They were

18  counted by the census.  They were counted as people, yes.

19  Q.   Did you count them as to when you were measuring the

20  performance of the district, whether those inmates would affect

21  the performance of the voting in the district?

22  A.   Did I do that insular analysis, no.  I looked at citizen

23  voting age population and then citizen registered voter

24  population; there is a delta there.  And I assume part of that

25  delta is the Federal Detention Center.  Part of that delta is,

1    you know, people of African descent, like Haitians, that are

2    non-citizens.

3    Q.   And this -- the move that you did, that was in response to

4    the reclassify commission to make sure it was over a 50 percent

5    eval?

6    A.   Which move?

7    Q.   The move -- this move of this sliver and -- plus the one a

8    little bit north of here from District 2 to District 5, that

9    happened after you had presented the 49.8 percent BVAP and then

10   some of the commissioners said, We really want to get that over

11   50, and you were looking for additional black population to get

12   in to District 5 in order to get the BVAP over 50 percent?

13   A.   What specific movements are you talking about?

14   Q.   I am talking about the -- the movement of the sliver that

15   we're standing in now that includes this courthouse and the

16   Federal Detention Center.

17            THE COURT:  Area 12?

18            THE WITNESS:  Area 12.  Okay.  What about area 12?

19   BY MS. MCNAMARA:

20   Q.   That -- you did that after the February 7th hearing, when

21   you presented your original plan with the 49.8 percent BVAP for

22   District 5, and then the commissioners asked you to increase it

23   to 50?

24   A.   I believe -- yeah, I believe that that was in the later

25   phases, yes.

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 38 of
42                                                                                         82
Cross-Examination - Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

```
1   Q.  Adding the sliver which included the prison population was

2   in the service of increasing the black population within the

3   district?

4   A.  No.  It was to equalize population and shed population from

5   District 2.

6   Q.  But it didn't -- you -- you didn't consider the impact on

7   the black voting age population number when you made that?

8   A.  I was always cognizant of what the percentages were.

9   Q.  Okay.

10          THE COURT:  Is that a yes?

11          THE WITNESS:  Yes.

12      (Pause in proceedings.)

13  BY MS. MCNAMARA:

14  Q.  Just one more question.  Going back to the discussion of --

15  or discussions that you had with individual commissioners, and

16  the Court asked the question of, if you discussed the

17  gentrification models with individual commissioners.

18      Did you, in those individual discussions, discuss the --

19  you know, statistics about potential gentrification models with

20  those individual commissioners in those meetings?

21  A.  I can't go into those details without violating

22  attorney/client.  I can just tell you that I gave them my

23  thoughts.

24          MS. MCNAMARA:  No more -- further questions.

25          THE COURT:  All right.
```

1           MR. LEVESQUE:  Your Honor, we don't have any redirect.

2           THE COURT:  Okay.  I have a question.

3           THE WITNESS:  Okay.

4           THE COURT:  You have heard that the -- the explanation

5  and response by the Defendant, that the discussions by the

6  commissioners that focused explicitly and exclusively on race

7  were intended to be a proxy for political cohesiveness.

8           You were here in the courtroom for that discussion?

9           THE WITNESS:  Yes.

10           THE COURT:  Okay.  I would like to know what your

11 understanding was and what it was based on when, for example --

12 I don't remember who said it, but someone pointed out in

13 District 2 there could still be a commissioner, like Ken

14 Russell, right, among other examples.  But I would like to hear

15 what your understanding and what it's based on when the

16 commissioners addressed race explicitly and exclusively.

17           THE WITNESS:  To me, the direction of voter confusion,

18 and I touched on it a little bit before, is, again, you start

19 with the fact, at least my experience, Your Honor, the Hispanic

20 community is not monolithic.  You have --

21           THE COURT:  That's a good point, and let me just ask

22 you to pause there, there isn't any distinction that I have

23 seen in the transcripts that I have reviewed, and I have

24 reviewed them all, so if you can point me to anything or you

25 can recall from your presence there if there was something

Cross-Examination - Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

1    different.  But the only discussions that I have been pointed

2    to that address Hispanic voters do treat them as a monolithic

3    voting group.  So if even you could flesh that out, that would

4    be helpful.

5              THE WITNESS:  That's -- that's why I believe they were

6    trying to emphasize voter cohesion, because, again, if you look

7    at the type of voters in a District 4 or a District 3, they are

8    older, more conservative voters, very anti-communist because of

9    their life experience, etc.  You have the people in District 2

10   that just elected a Hispanic commissioner, are different, are

11   younger generation, more assimilated into the American

12   experience, more liberal.  Whereas District 3, District 4, more

13   conservative.

14             So that's how I interpreted voter cohesion.  It is not

15   only just look at, hey, how many Hispanics can I dump into a

16   place?  What kind of voters are they?  What -- what interests

17   them?  What are their issues?

18             THE COURT:  Can you direct me to any part of any

19   transcript that's consistent with that understanding that there

20   was a description of political or partisanship cohesiveness?

21   Do you remember any of the dates on which that discussion --

22             THE WITNESS:  I can't -- I remember when one of the

23   commissioners asked to focus on that, and I -- I think my

24   response to them was pretty much the understanding that I have

25   conveyed to Your Honor.  But other than that, I -- I don't have

Case 1:22-cv-24066-KMM   Document 173-28   Entered on FLSD Docket 02/02/2024   Page 41 of
42                                                                                              85
Cross-Examination - Miguel De Grandy
March 29, 2023
Grace, Inc., et al., v. City of Miami, 22-cr-24066-KMM

 1    any specific transcript references that I can point to.

 2              THE COURT:  Can you remember which commissioner you

 3    think that that conversation occurred with?

 4              THE WITNESS:  If I had to guess, I would say Carollo.

 5              THE COURT:  Okay.  And the generalized voting patterns

 6    that you are describing, can -- is there anywhere in the record

 7    of proceedings that support your conclusions that you relied on

 8    or shared with commissioners?

 9              THE WITNESS:  To support my conclusions?  Other than

10    the fact that, you know, a liberal Hispanic was elected to

11    District 2.

12              THE COURT:  But who were the other candidates?

13              THE WITNESS:  There was Martin Zilber, who was the

14    preferred candidate of the commissioners; they actually

15    endorsed him.  He came in fourth.  Again, I can't point you to

16    anything in the transcript.  I could tell you what I understood

17    and how I acted based on what I understood.

18              THE COURT:  Okay.  If anyone has follow-up questions

19    to mine.

20              MR. WARREN:  Not from us, Your Honor.

21              MR. LEVESQUE:  Not from us, Your Honor.

22              THE COURT:  Okay.  Thank you for coming forward.

23              THE WITNESS:  Thank you, ma'am.

24              THE COURT:  Let me ask just a procedural and planning

25    question.  There is no further evidence coming forth from the

1     **(The proceedings adjourned at 3:19 p.m.)**

2

3                **C E R T I F I C A T E**

4

5     **I hereby certify that the foregoing is an**

6 **accurate transcription of the proceedings in the**

7 **above-entitled matter.**

8

9

10   **_06/13/2023_**

      **DATE**          **STEPHANIE A. McCARN, RPR**

11                **Official United States Court Reporter**
               **400 North Miami Avenue, Thirteenth Floor**

12                **Miami, Florida 33128**
               **(305) 523-5518**

13

14

15

16

17

18

19

20

21

22

23

24

25