**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      *Plaintiffs*,

v.

CITY OF MIAMI,

*Defendant*.

_____/

<u>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

      Pursuant to this Court's instructions at the trial on January 30, 2024, Defendant, the City of Miami (the "City" or "Defendant"), hereby files its Proposed Findings of Fact and Conclusions of Law:

**I.**    <u>**FINDINGS OF FACT**</u>

      **a.**  <u>**The Individual Plaintiffs**</u>

          **i.**  <u>**Steven Miro**</u>

1.      Steven Miro resides in Little Havana, in District 3. DE 180, 1/29/24 Tr. Trans. p.9:16-17. He has resided there since 2014. DE 180, 1/29/24 Tr. Trans. p.10:11-13.

2.      District 3 was a predominantly Hispanic district when he moved there in 2014, and has remained a predominantly Hispanic district in both the 2022 and 2023 Plan.  DE 180, 1/29/24 Tr. Trans. p.9:16-17.

3.      Mr. Miro objected to District 3 crossing US-1 to include portions of Coconut Grove (Natoma Manors) in the 2022 and 2023 plans.  DE 180, 1/29/24 Tr. Trans. p.13:4-13.

4.      Mr. Miro believes that change was made to incorporate Commissioner Carollo's house into his district, not because of race, but to benefit to the Commissioner.  DE 180, 1/29/24

Tr. Trans. p.13:14-19; 14:23-25.

5.  Mr. Miro, who ran Commissioner Carollo's 2017 campaign for City Commissioner, worked to target residents who fit a certain demographic profile as part of that campaign: the 65 and older crowd living in affordable housing.  DE 180, 1/29/24 Tr. Trans. p.14:5-25.

6.  Mr. Miro did not identify any portion of District 3 that was drawn for a racial purpose.

### ii.  Clarice Cooper

7.  Clarice Cooper is a long-time resident of Miami who has lived in Coconut Grove all her life. DE 180, 1/29/24 Tr. Trans. p.22:22-23:4.  She is a resident of District 2 and has been since it was created. DE 180, 1/29/24 Tr. Trans. p.25:1-9.

8.  Ms. Cooper is a member of the Coconut Grove Village West Homeowners and Tenants Association (HOTA).  DE 180, 1/29/24 Tr. Trans. p.25:10-23.

9.  HOTA is a member of Grove Rights and Community Equity, Inc., an organization that was formed to compile organizations that worked in the West Grove and to foster their platforms and causes.  DE 180, 1/29/24 Tr. Trans. p.27:4-14.

10.  During the 2022 redistricting process, Ms. Cooper and HOTA had concerns with removal of the Coconut Grove West Village from District 2.  DE 180, 1/29/24 Tr. Trans. p.30:4-21; Pl. Ex. 3, p.25:9–26:7; Pl. Ex. 45.  The removal of the West Village from District 2 raised concerns that the improvements and revitalization, including efforts in the formation of the Community Redevelopment Agency (CRA) and the revisions for Neighborhood Conservation District (NCD-2), would be undermined.  Id.

11.  Ms. Cooper publicly expressed these concerns to the Commission on three separate

occasions during commission meetings held on February 7, 2022, February 25, 2022, and March 11, 2022. DE 180, 1/29/24 Tr. Trans. p.29:21-36:17; Pl. Ex. 3, p.25:9–26:7; Pl. Ex. 4, p.41:5-15; Pl. Ex. 6, p.71:6-18.

12.     While the Commission did not fully address Ms. Cooper's concerns in the 2022 Plan, the Commission did make changes restoring portions of the West Grove to District 2, the changes were moving in the right direction, though not far enough.  DE 180, 1/29/24 Tr. Trans. p.39:5-16.

13.     Ms. Cooper's concerns about splitting the West Grove in District 2 were addressed in the 2023 Plan, and she did not have concerns with the 2023 Plan after that because the areas that were carved out did not have residences that would affect them.  DE 180, 1/29/24 Tr. Trans. p.45:20-46:6.

14.     Ms. Cooper has been politically active and will continue to be politically active regardless of what the City's district maps look like.  DE 180, 1/29/24 Tr. Trans. p.37:5-25.

### iii.  **Jared Johnson**

15.     Jared Johnson is a resident of Miami.  He moved here in July 2021, and resides at 255 Southwest 11th Street, Apartment 1302, Miami, Florida.  DE 180, 1/29/24 Tr. Trans. p.94:15-25; Pl. Ex. 61.

16.     Mr. Johnson is a resident of District 3.  He resident in District 3 when he first moved to Miami, and remained in District 3 in both the 2022 and 2023 Plans.  DE 180, 1/29/24 Tr. Trans. p.95:11-96:7.

17.     Mr. Johnson would also have been in District 3 in Plaintiffs Plans 2, 3, and 4.  DE 180, 1/29/24 Tr. Trans. p.97:3-9.

### iv.  **Alexandra Contreras**

18.      Alexandra Contreras is a former employee of Engage Miami worked in communications.  DE 180, 1/29/24 Tr. Trans. p.124:20-24.

19.      Ms. Contreras was issued a voter registration card in December 2022 that indicated her address was 3237 Southwest 4th Street in the City of Miami, in District 4.  DE 180, 1/29/24 Tr. Trans. p.125:11-23; Pl. Ex. 62.

20.      Although Ms. Contreras had moved to that address in August 2022, she did not change her voter registration to that address until December 2022.  DE 180, 1/29/24 Tr. Trans. p.125:11-23

21.      Ms. Contreras has not lived at that address since July 31, 2023. DE 180, 1/29/24 Tr. Trans. p.125:22-23.

22.      Ms. Contreras lived with her mom in the City of Coral Gables when the 2022 Plan was adopted on March 24, 2022.  Tr. 126

23.      Although Ms. Contreras moved out of the City on August 1, 2023, she did not update her voter registration until November 2023.  DE 180, 1/29/24 Tr. Trans. p.125:22-126:11.

**v.  Yanelis Valdes**

24.      Yanelis Valdes is a former employee of Engage Miami who was the director of organizing. DE 180, 1/29/24 Tr. Trans. p.220:20-25.

25.      Ms. Valdes states she has resided at 58 Northeast 14 Street for the last three years, which is in District 2 in the 2023 Plan, but was in District 5 in the 2022 Plan.   DE 180, 1/29/24 Tr. Trans. p.219:6-220:2.

26.      Despite residing there for three years, Ms. Valdes has not updated the address on her driver's license to that address.  DE 180, 1/29/24 Tr. Trans. p.221:6-24.

27.      Despite residing there for several years, Ms. Valdes only changed her voter

registration in October 2023. DE 180, 1/29/24 Tr. Trans. p.221:14-20.

28.  Ms. Valdes identifies as Hispanic and is fine being represented by a Hispanic commissioner in District 2.  DE 180, 1/29/24 Tr. Trans. p.221:25-223:5.

**b.  The Organizational Plaintiffs**

**i.  Engage Miami**

29.  Rebecca Pelham is the Executive Director of Engage Miami.  DE 180, 1/29/24 Tr. Trans. p.47:17-20

30.  She does not reside in the City of Miami. DE 180, 1/29/24 Tr. Trans. p.61:17-19.

31.  Engage Miami is a nonpartisan, nonprofit entity whose mission is to increase the participation of young people to help advance justice, sustainability, democracy in a way that is bold, vocal, and impactful.  DE 180, 1/29/24 Tr. Trans. p.48:10-13.

32.  Engage Miami maintains a membership list.  DE 180, 1/29/24 Tr. Trans. p.52:3-4.

33.  Ms. Pelham claims to have cross referenced their member list with a list of registered voters to verify that Engage Miami has members in all 5 districts as of the Friday before trial.  DE 180, 1/29/24 Tr. Trans. p.52:12-23.

34.  Ms. Pelham did not personally contact any members to verify if their address or voter information was current.  DE 180, 1/29/24 Tr. Trans. p.52:12-23

35.  Ms. Pelham also did not personally contact anyone prior to her deposition on October 17, 2023 to verify any of their members information was current.  DE 180, 1/29/24 Tr. Trans. p.62:18-20; p.64:8-66:5.  She would need to check with Ms. Valdes if she verified any of this information.  Id. Ms. Valdes did not testify on these matters in this proceeding.

36.  Ms. Pelham acknowledged that when some members move, they may take some time to change their address.  DE 180, 1/29/24 Tr. Trans. p.62:20-63:12

## ii.  **G.R.A.C.E., Inc.**

37.     GRACE is an acronym for Grove Rights and Community Equity.  DE 180, 1/29/24 Tr. Trans. p.27:6-10.

38.     GRACE is an umbrella organization that was formed to compile organizations that worked in the west Grove to foster their platforms and causes.  DE 180, 1/29/24 Tr. Trans. p.27:7-10.

39.     Dr. Nathaniel Robinson is the former chairman of the board for GRACE, and presently serves on GRACE's board of directors.  DE 180, 1/29/24 Tr. Trans. p.74:14-75:5.

40.     Dr. Robinson is also the Senior Pastor at St. Paul African American Episcopal Church and Chief Executive Officer and Chair of the Board for the St. Paul Community Development Corporation, both of which are located in Coconut Grove.  DE 180, 1/29/24 Tr. Trans. p.69:21-72:4.

41.     Dr. Robinson resides in Miami Gardens, and has not been a resident of the City of Miami for at least 20 years.  DE 180, 1/29/24 Tr. Trans. p.68:18-23; p.87:13.

42.     GRACE maintains a list of its member to maintain the validity of its organization. DE 180, 1/29/24 Tr. Trans. p.76:7-21; Pl. Ex. 44; nevertheless, HOTA is not on its member list, though it is purportedly a member.  DE 180, 1/29/24 Tr. Trans. p.81:21:82:11; Pl. Ex. 44.

43.     Dr. Robinson claimed that St. Paul's African American Episcopal Church had members that lived in Districts 2, 3 and 5, but he did not identify the names and address of any individual members and had not checked the membership roll recently to verify their addresses. DE 180, 1/29/24 Tr. Trans. p.79:20-80:3.  Pl. Ex. 44.

44.     The only board members of GRACE that Dr. Robinson identified by name that lived within the City of Miami were Board Members Clarice Cooper and the Apostle John

Chambers, both of whom live in District 2, though he did not provide an address for either.  DE 180, 1/29/24 Tr. Trans. p.92:2-16.

45.      Dr. Robinson also claims that individuals can become members of GRACE by simply coming and participating.  DE 180, 1/29/24 Tr. Trans. p.80:12-15; Pl. Ex. 44.

46.      Only GRACE's Board votes on what GRACE does; organizational members and individuals do not vote on GRACE's activities.   DE 180, 1/29/24 Tr. Trans. p.81:8-15; Pl. Ex. 44.

47.      GRACE's bylaws require just one class of members, and requires members to make application, be approved by the Board, and be maintained on a list.  DE 180, 1/29/24 Tr. Trans. p.87:19-88:11; Pl. Ex. 44; Pl. Ex. 43.

48.      GRACE's membership list only identifies organizations and does not include any individuals.  DE 180, 1/29/24 Tr. Trans. p.88:8-14; Pl. Ex. 44.

### iii.  South Dade Branch of the NAACP.

49.      Carolyn Donaldson is a board member for GRACE, and is an at-large member of the South Dade Branch of the NAACP.  DE 180, 1/29/24 Tr. Trans. p.134:10-17.

50.      Ms. Donaldson presently resides in Miami Lakes, and has not resided in the City of Miami since 1973. DE 180, 1/29/24 Tr. Trans. p.130:25-131:7.

51.      The territory of the South Dade Branch of the NAACP runs south of Flagler Street to Florida City. DE 180, 1/29/24 Tr. Trans. p.135:25-136:9.

52.      The division of the Miami-Dade NAACP was made in 2019. DE 180, 1/29/24 Tr. Trans. p.137:16-20.

53.      An individual may become a member of the NAACP by completing an application and paying dues.  DE 180, 1/29/24 Tr. Trans. p.141:14-15.

54.      The South Dade Branch of the NAACP does not maintain a separate member list

from the national organization, and does not have access to the national organization's list.  DE 180, 1/29/24 Tr. Trans. p.142:14-9.

55.     Ms. Donaldson claims to have verified that the South Dade Branch of the NAACP has members that reside in Districts 2, 3, and 4.  DE 180, 1/29/24 Tr. Trans. p.145:1-21.  However, when she was asked to name any of those individuals, the First Amendment Associational privilege was asserted, and she refused to name the individuals or provide their current addresses.  DE 180, 1/29/24 Tr. Trans. p.161:4-20.

56.     The South Dade NAACP did not identify or present the testimony of any members who were residents of any district.

57.     The South Dade Branch of the NAACP initially communicated to the City its concerns about separating the West Grove from the rest of Coconut Grove. DE 180, 1/29/24 Tr. Trans. p.147:1-22; Pl. Ex. 49.

58.     On February 25, 2022, the South Dade Branch of the NAACP sent additional written communications that reiterated the concerns about the West Grove, but also expressed concerns about diluting the Black vote in District 2 and opposing any dismantling of the Black vote in District 5.  DE 180, 1/29/24 Tr. Trans. p.148:8-17; Pl. Ex. 54.

59.     Ms. Donaldson testified that the South Dade Branch of the NAACP had concerns with splitting up the Grove, but did not believe the inclusion of the area of Natoma Manors in District 3 was done for racial reasons.  DE 180, 1/29/24 Tr. Trans. p.165:6-19.  The splitting of the Grove was its main concern.  DE 180, 1/29/24 Tr. Trans. p.168:16-19.

### iv.  <u>Miami Dade Branch of the NAACP.</u>

60.     Daniela Pierre is the Branch President of the Miami Dade Branch of the NAACP. DE 180, 1/29/24 Tr. Trans. p.177:7-17.

61.    Ms. Pierre is not a resident of the City of Miami.  DE 180, 1/29/24 Tr. Trans. p.174:25-175:3.

62.    Ms. Pierre claims to have verified that the Miami Dade Branch of the NAACP has a member that resides in Districts 2, 3, and 5, respectively.  DE 180, 1/29/24 Tr. Trans. p.180:14-182:6.  However, she never provided the names or address of any of those individuals.  Ms. Pierre did not speak to any members to verify if they still resided at their address that the organization had on file.  DE 180, 1/29/24 Tr. Trans. p.212:18-23.

63.    The Miami Dade Branch of the NAACP advocated for the Grove to be kept together. DE 180, 1/29/24 Tr. Trans. p.185:24-187:25; Pl. Ex. 8, p.22:16-22.

## C. **The City of Miami**

64.    The City is a Florida municipal corporation established under Florida law. The City has the authority to regulate and conduct its elections, including establishing its Commission district boundaries, consistent with state law.  DE 148 p.6 ¶ 1 (Pretrial Stip.)

65.    The City is governed by a five-member City Commission and a Mayor.  *Id*. ¶ 2.

66.    Except where the City Charter provides otherwise, municipal elections are conducted according to the state's general election laws.  *Id*. ¶ 3.

67.    Since 1997, commissioners have been elected from single-member districts. *Id*. ¶4.

68.    Since inception, the City's five districts have had substantially the same racial demographic make-up: three super majority Hispanic districts, a majority Black district, and a plurality district.  *See*, *e.g*., *Id.* pp.8-9; Pl. Ex. 93 p.6, Pl. Ex. 121 p.23; Pl. Ex. 67; Df. Exs. 32, 33, 27, 28.



69.     Following the 2020 U.S. Census (the "2020 Census"), the City's districts no longer

had substantial equality of population. The ideal district size had increased to 88,448.  District 2,

the waterfront district, had grown at a faster pace than the other four districts and needed to "shed"

population to the other four districts in order to bring the population variance back to constitutionally acceptable levels.  DE 148 pp.9-10 ¶¶ 28-29.

70.      On February 25, 2021, the Commission hired Miguel De Grandy and Stephen M. Cody to serve as the City's redistricting consultants (the "Redistricting Consultants") and draw new commission maps.  The Redistricting Consultants had previously served in that role during the redistricting processes in 2003 and 2013. *Id*. p.8 ¶ 23.

71.      The demographics for the 2013 Plan, as it existed after the 2020 Census, are below. *Id*. p.8 ¶ 24.

| 2013 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| **Population and Deviation** | | | **2020 Census Voting Age Population** | | |
| **D#** | **Total Pop.** | **Pop. Dev.** | **Hisp. VAP** | **Black VAP** | **White VAP** |
| 1 | 81,449 | (6,999) | 91.0% | 10.1% | 3.0% |
| 2 | 117,281 | 28,833 | 51.9% | 7.7% | 34.5% |
| 3 | 80,169 | (8,279) | 88.5% | 5.6% | 7.4% |
| 4 | 80,601 | (7,847) | 91.6% | 2.9% | 6.0% |
| 5 | 82,741 | (5,707) | 41.6% | 52.9% | 7.8% |
| Total | 442,241 | | 71.1% | 14.8% | 13.9% |

72.      The districts under the 2013 Plan are set forth in the map below. *Id*. p.9 ¶ 25.



### D. **The Redistricting Process**

73.    In the inaugural redistricting meeting, Mr. De Grandy informed the Commission that he would follow their directions, but he informed them that he could only follow directions provided to him by the Commission as a body (i.e. through majority-approved motions). Pl. Ex. 1, p.17:9-15.

74.    The City provided such express directions which were adopted by motion without objection.  The City gave directions to maintain the core of existing districts. Pl. Ex. 1 p.17:18-19:2. The City gave directions to draw districts with politically cohesive minorities. *Id*. p.19:20-21:15. The City gave directions to draw districts with substantial equality of population, not mathematical equality.  *Id*. p.21:21-22:4. These directions were memorialized in adopted Resolution R-21-0485. Df. Ex. 1. The Commission's instructions to Mr. De Grandy in that official

act were to:

     a. Comply with the United States Constitution and the Voting Rights Act;
     b. Maintain the core of existing districts to avoid voter confusion;
     c. Factor in voter cohesion;
     d. Achieve substantial equality of population as opposed to mathematical equality; and
     e. Maintain communities of interest and neighborhoods where feasible.

*Id*.   At the hearing, Mr. De Grandy testified that these were the directions he followed in drawing the districts.   DE 179, 1/30/24 Tr. Trans. p.63:24-64:4.

75.      As part of the map drawing process, Stephen Cody analyzed the City's population to determine whether a Voting Rights Act ("VRA") district was required; additionally, during the first round of that process, he performed a functional analysis that determined the variations of District 5 that would still provide black residents the ability to elect their candidate of choice in District 5. *Id*. p.98:14-22; 101:12-102:6; DE 166-4 p.12:16-18:8; 18:12-20:4; 21:3-22:12; 23:2-11; 27:24-28:13; 32:18-40:18; 41:7-42.

76.      Mr. De Grandy advised the Commission that there was racially polarized voting and that the VRA applied.  Pl. Ex. 1 pp.6:5-7:15.

77.      Plaintiffs concede that the VRA requires District 5 be a district where Black voters have an opportunity to elect a candidate of their choice.  DE 26 p.33.  They submitted their own expert report supporting that racially polarized voting exists.  Pl. Exs. 35, 118; DE 179, 1/30/24 Tr. Trans. p.54:14-18.

78.      The Commission voted to take the Feb. 22 Draft as the "Base Plan" for future changes, to be debated at the next meeting. Def. Ex. 3 p.5.

79.      On February 25, 2022, relying upon Mr. Cody's analysis, Mr. De Grandy advised the Commission that District 5, with a 50.3% Black Voting Age Population ("BVAP") would comply with the Constitution and the VRA.  Pl. Ex. 4 pp.9:14-10:2.  Later that day, he reiterated that District 5 as drawn would be compliant with the VRA.  Pl. Ex. 5 pp.2:6-3:16; 5:16-23.

80.      The Commission took up the Base Plan again on March 11, 2022.  At that meeting, Mr. De Grandy made a presentation and again informed the Commission that the plan he presented would comply with the VRA.  Pl. Ex. 20 p.13.  Pl. Ex. 6 p.40:9-10; 52:12-16.

81.      On March 24, 2022, the City Commission held its last redistricting meeting of the 2021–22 process.  Mr. De Grandy once more reiterated that the Plan would comply with the Constitution and the VRA.  Pl. Ex 22, p.12; Pl. Ex. 8 p.8:5-9.  The Commission enacted Resolution R-22-131 (the "2022 Plan"), which redrew the district lines and balanced the population among the five districts.

82.      Mayor Suarez did not veto the 2022 Plan, which went into effect ten days after it became law.  Df. Ex. 12.  That map was used in the February 2023 special election for District 2. DE 149 p.7 ¶ 20.  Commissioner Covo was elected.  *Id.*  The map is set forth below.  Pl. Ex. 67.



83.      The demographics for the 2022 Plan are below.  DE 149 p.7 ¶ 45.

| 2022 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 88,108 | (340) | 89.5% | 11.0% | 3.5% |
| 2 | 93,300 | 4,852 | 48.6% | 7.3% | 37.4% |
| 3 | 87,658 | (790) | 88.3% | 5.4% | 7.7% |
| 4 | 86,597 | (1,851) | 89.5% | 3.1% | 7.6% |
| 5 | 86,578 | (1,870) | 40.6% | 50.3% | 10.5% |
| Total | 442,241 | 7.6% | 71.1% | 14.8% | 13.9% |

84.     On December 15, 2022, Plaintiffs filed this action, alleging that the 2022 Plan constituted racial gerrymandering in violation of the Fourteenth Amendment's Equal Protection Clause.  DE 1.

85.     On February 10, 2023, Plaintiffs filed a First Amended Complaint and moved for a preliminary injunction against the implementation of the five districts in the 2022 Plan. DE 23; DE 26.

86.     On May 3, 2023, Magistrate Judge Louis issued a Report & Recommendation in this case, recommending that this Court grant Plaintiffs' motion for a preliminary injunction and enjoin implementation of the five districts in the 2022 Plan. DE 52.  The Magistrate noted particular features that struck the Court as gerrymandering, including a "condo canyon" (a thin rectangle of District 2 intruding into District 5) (DE 52 pp.72-73); a "staircase" like pattern in the northeast corner of District 1 bordering District 5 (*id*. p.74); and a triangle of the "West Grove" moved from District 2 to District 4 (*id*. p.45).  The Court also noted an irregular foot from District 2 that was moved to District 3, which was accepted instead of what the Court felt was a less discriminatory "Reyes plan" that would have extended the foot further north.  *Id*. pp. 6, 77.

87.     On May 11, 2023, the Commission met to discuss the Magistrate's Report & Recommendation, and this litigation.  Mr. De Grandy was not present at this meeting, and to the extent that the Commission issued directions at that meeting, there is no evidence that they were ever communicated to him or were considered in drawing a remedial plan.  Mr. De Grandy testified that he was unaware of the meeting and was given no instruction from it.  DE 179, 1/30/24 Tr. Trans. p.109:4-17.

88.     On May 23, the Court adopted Magistrate Judge Louis's Report & Recommendation, issued a preliminary injunction, and ordered the parties to mediate. DE 60–61. That night, Plaintiffs submitted two proposed maps—"P1" and "P2"—to the Commission, along with a letter explaining them.  DE 149 p.17 ¶ 49; Df. Ex. 58.  Plaintiffs later submitted two additional plans, "P3" and "P4."  Df. Ex. 58.  Plaintiffs' maps all have three supermajority Hispanic districts in the West, a coastal District 2 that is plurality, but contains the largest White population, and a Black District 5 drawn to comply with the VRA.  The major difference between Plaintiffs' maps and the one enjoined is that Plaintiffs' maps swap Hispanic populations between the three Hispanic majority districts.  Pl. Ex. 122 pp. 7-9; Def. Ex. 55 pp.7-9.

89.     On June 14, the City Commission met, during which De Grandy publicly presented a draft plan proposal, named Version 12 ("V12"). DE 149 p.17 ¶ 52.  To create this proposal, Mr. De Grandy started with Plaintiff proposed maps, and worked from there.  DE 179, 1/30/24 Tr. Trans. Pp.121:20-122:2; Pl. Ex. 28 p.9:1-16:13.  This proposal also eliminated the irregular features noted by the Magistrate as a basis for the injunction.  *Id.*  This plan had a slightly lower BVAP (50%) than the plan enjoined by the Court (50.3%).  Pl. Ex. 121 pp.23, 43.  The Commission was advised that this plan complied with the VRA.  Pl. Ex. 28 p.6:16-17.

90.     During the course of that meeting, the Commission discussed Plan V12 and

discussed and approved changes to that plan. Race was not a concern of the Commissioners.   DE

179, 1/30/24 Tr. Trans. P.113:12-15.   The City Commissioners approved "D3 Alt. Map v.3" (the

"2023 Plan") on a 4-1 vote, and the 2023 Plan was later memorialized in writing as Res. 23-271.

*Id*.   ¶¶ 50-53; Df. Ex. 11.   As a result of the changes occurring during this process, that plan ended

up back at a 50.3% BVAP in District 5.

91.     Mayor Suarez let Res. 23-271 become law without his signature, and the City filed

Res. 23-271 with the Court. DE 149 p.17 ¶ 54; DE 77.

92.     The demographics for the 2023 Plan are below.  DE 149 p.17 ¶ 55.

| 2023 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| **Population and Deviation** | | | **2020 Census Voting Age Population** | | |
| **D#** | **Total Pop.** | **Pop. Dev.** | **Hisp. VAP** | **Black VAP** | **White VAP** |
| 1 | 87,455 | (993) | 89.7% | 10.9% | 3.4% |
| 2 | 89,593 | 1,145 | 49.6% | 7.7% | 36.5% |
| 3 | 89.194 | 746 | 84.5% | 5.4% | 10.5% |
| 4 | 89,555 | 1,107 | 90.0% | 3.1% | 7.2% |
| 5 | 86,444 | (2,004) | 40.6% | 50.3% | 10.5% |

93.     Plaintiffs have neither alleged, nor put forth any evidence, the City engaged in

gerrymandering to diminish any group's ability to have influence in any district.  Plaintiffs do not

contend that any group's vote has been diluted by the redistricting process.

94.     The City is a majority-minority city.  It is 70% Hispanic.  Pl. Ex. 28 p.9:3-7.  Once

a VRA compliant District 5 is drawn, then the remainder of the City is 75% Hispanic.   *Id*.

Moreover, a majority of the Hispanic residents live in the central and western parts of the City.   *Id*.

As a result, every plan that the City passed, and every plan that the Plaintiffs proposed, reflect the

substantially similar racial demographics.

95.     District 5 was drawn in a way that afforded Black voters an equal opportunity to

elect a candidate of their choice, in compliance with the VRA.  Pl. Ex. 55, pp.4-5; DE 179, 1/30/24

Tr. Trans. p.56:12-14.  It is narrowly tailored.  DE 179, 1/30/24 Tr. Trans. p.145:12-22.  Because the BVAP is 50.3% there is no issue with packing.  Id. p.149:15-150:24.  Neither the Plaintiffs, nor any of their experts, contend that District 5 is not narrowly tailored.  *Id*. p.56:12-18.

96.     Because most White residents reside near the coast, all plans presented to the Court have a coastal District 2 with the largest concentration of White voters, but that group still fails to comprise a majority.  Pl. Ex. 121 pp.43-45; Df. Ex. 58.  It is impossible to draw a majority White district.  DE 179, 1/30/24 Tr. Trans. p.18:2-6.  In fact, Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the 2023 Plan.  Pl. Ex. 121, compare p.45 to p.44.  District 2 has elected Hispanic commissioners in each of the last two elections.  *Id*. p.115:6-19.

97.     All plans have a VRA-protected Black District 5.  Both the 2022 Plan and the 2023 Plan reduce the BVAP percentage from 52.9% in the 2023 plan to 50.3% in each respective plan.  Pl. Ex. 121 pp.23-24, 43-45.  Plaintiffs accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), but the 2013 Plan had a BCVAP of 59.4%, compared to Plaintiff Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% and the 2023 Plan's 57.4%.  *Id*.

98.     The influence of Black voters is not alleged to have been diluted in any other district as a result of the redistricting.

99.     All plans have three supermajority Hispanic districts, but Plaintiffs' Hispanic Voting Age Population ("HVAP") in District 4 in all plans is maximally packed at higher than 94%.  *Id*.

100.    Given the fact that the City of Miami is 70% Hispanic, after drawing District 5, it is mathematically impossible to draw the rest of the map without at least three majority Hispanic

Districts. Plaintiffs put forth no opinion to the contrary. DE 179, 1/30/24 Tr. Trans. p.11:3-12:!4.

101.     Moreover, because the largest White population lives near the coast, the coastal district will always have the largest concentration of White (or "Anglo") voters, as it does in all of Plaintiffs' plans.

102.     The Districts have had substantially the same cores since inception. Plaintiffs performed no analysis of the original districts to establish that they were racially segregated. Rather they point to statements by one commissioner, Commissioner Carollo, who was mayor at the time the City went to single member districts, as evidence that the Commission originally gerrymandered the City to create one Black majority district, three Hispanic majority districts, and one "Anglo" district. As set forth above, the parties agree that District 5 was a VRA required Black district, there is no White majority district and it is impossible not to have at least three other Hispanic majority districts.

103.     Plaintiffs also point to statements made by Commissioners during the 2022 and 2023 redistricting process. Most of these comments are in reference to protecting the VRA required Black district. For example:

> You're right. There is no Anglo or white protected seat, right. But that we have one now because of the over population that exists there. But when you bring it back and you start distributing that, that can very easily change because you don't have to protect that particular class, is not a protected class, right? Whereas, you will have to protect District 5. Is that correct?
> Mr. De Grandy: I will have to ensure that we do not dilute —
> Commissioner Díaz de la Portilla: I want to use the word protect, I know you're getting very nervous and so is, Libby, she's not here, but she'll be nervous.
> Commissioner King: I think what he's trying to say is that you have to, you're going to attempt to try to maintain the core of the existing district.
> Commissioner Díaz de la Portilla: The core of the existing district.
> Mr. De Grandy: And comply with the Voting Rights Act.

Pl. Ex. 1, p. 14:18-15:5. When one Commissioner suggested that the districts were drawn so every ethnic group would be represented, Mr. De Grandy corrected him. "[I]t was done on race neutral

criteria. For example, District 2 was justified on the basis of being a coastal district, being a high density district, being an environmentally sensitive district." *Id*. pp.16:23-17:2. They could not be drawn any other way.

104.    When redistricting was discussed, it was discussed in the context of how District 2 could shed population as it had to, while still protecting District 5.

> And of course, without touching the racial integrity of District 5. And the only place to go to is District 2. No matter where we go, whether we go east or whether we go south. So that's kind of what my thinking and I'll leave it at this. My thinking is you sort of work with that way of thinking of how we're gonna get there. We have to take away from District 2, no matter what. Figure out a way to just give everybody a little bit, and we can because [looking at Commissioner Russell] you're not a protected category, by the way. District 2 is not — white, Anglos are not protected. So if the district happens to go Hispanic, it goes Hispanic. Right?

Pl. Ex. 2 pp.13:15-14:1.

105.    Plaintiffs have not brought forward any facts to support their claim that the City engaged in racial gerrymandering to diminish any group's ability to have influence in any district or presented evidence that the Commission subordinated traditional race-neutral districting principles—like the retention of the core of districts which was a primary directive to the City's map drawers—to racial considerations or otherwise demonstrated that a significant number of voters were placed in a particular district because of their race.

106.    Plaintiff's expert offered an opinion regarding some particular redistricting decisions, but did not opine that any of the redistricting decisions in 2022 or 2023 moved a significant number of voters on the basis of race. DE 179, 1/30/24 Tr. Trans. pp.23:24-33:14; 38:23-39:3. In the end, as admitted by Plaintiff's expert, the redistricting process reduced the racial concentrations in each district. DE 179, 1/30/24 Tr. Trans. pp.14:13-15:22.

107.    The City was legally required to move residents as part of the redistricting process. Because of the City's demographics and its rare position as a majority-minority city, it must move

minority residents among those districts.  The Plaintiffs' proposed plans confirm this reality.

108.     At no point during either the 2022 or 2023 Plan redistricting meetings did any of the City's Commissioners vote on, or approve of, any unconstitutional criteria for its map drawers. The City Commissioners also did not direct the Redistricting Consultants to take make any particular change to the plans on the basis of the race of any resident. Moreover, there is no evidence that the consultant employed any race-based motivation in his decisions other than as required by the VRA to protect District 5.

## II.   CONCLUSIONS OF LAW

### a.  Jurisdiction

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

### b.  Standing

In order to bring a suit in federal court, a would-be plaintiff must have standing, a constitutional requirement that derives from the case-or-controversy clause in Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "[T]he standing question in its Art. III aspect is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant His invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976).

"It is well-established that, to establish standing, a plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Schultz v. Alabama*, 42 F.4th 1298 (11th Cir. 2022) (internal citation omitted); *see also Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661

(2013) (explaining "[f]or there to be such a case or controversy, it is not enough that the party invoking the power of the court have a keen interest in the issue").

For redistricting, "[a] racial gerrymandering claim, however, applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'" *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). An individual "plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citing *United States v. Hays*, 515 U.S. 737, 744-45 (1995)). And, as the U.S. Supreme Court expressly affirmed in *Hays*, generalized grievances do not support standing, even for claims of racial gerrymandering. 515 U.S. 737, 743 (1995).

In *Hays*, the Court held that the mere fact that appellees in that case were residents and voters of Louisiana was not sufficient to give them standing to challenge Louisiana's congressional redistricting plan. *Id.* at 743-744. Instead, "[o]nly those citizens able to allege *injury as a direct result of having personally been denied equal treatment*, may bring such a challenge, and citizens who do so carry the burden of proving their standing, as well as their case on the merits." *Id.* at 746 (internal citations omitted and emphasis added) ("The fact that Act 1 affects all Louisiana voters by classifying each of them as a member of a particular congressional district does not mean—even if Act 1 inflicts race-based injury on some Louisiana voters—that every Louisiana voter has standing to challenge Act 1 as a racial classification."); *see also Whitford*, 585 U.S. at 54 ("a plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has a personal stake in the outcome, distinct from a generally available grievance about government) (cleaned up). ). But it is not enough to simply allege harm. "[A]n actual

controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997) (quotation omitted). "The facts necessary to establish standing, however, must not only be alleged at the pleading stage, but also proved at trial." <u>Whitford</u>, 585 U.S. at 69.

In short, standing asks "whether a particular plaintiff even has the requisite stake in the litigation to invoke the federal 'judicial Power' in the first place." *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020). For Plaintiffs, the answer to that question is no.

### i. The Individual Plaintiffs have failed to establish an injury in fact.

None of the Plaintiffs testified to sustaining any cognizable injuries because of the 2023 Redistricting Plan. Just like the plaintiffs in *Gill v. Whitford*, Plaintiffs here may have pleaded personal harms, but they failed to present evidence of their personal harms at trial. *See* 585 U.S. at 69 (observing "not a single plaintiff sought to prove that he or she lives in a cracked or packed district"). No Plaintiff testified to the harms of living in a racially gerrymandered district, how they were personally sorted, or how they were personally impacted. *See Whitford*, 585 U.S. at 65-66 (recognizing "a person's right to vote is individual and personal in nature") (internal quotation omitted); and *Alabama Legislative Black Caucus*, 575 U.S. at 263 (identifying "the nature of the harms that underlie a racial gerrymandering claim" as "personal"). To the contrary, the Plaintiffs' primary testimonial complaint at trial surrounded keeping the West Grove in District 2 and keeping Coconut Grove whole. Moreover, the Individual Plaintiffs do not have standing to challenge Districts 1, 4, or 5 because no Plaintiff presently resides in any of those districts.

### 1. Plaintiff Miro

Miro is a Hispanic male who has lived in District 3 since 2014. Miro's objection to his district is not based on race, but on non-racial voter demographics and the fact that District 3 crossed over US-1 to capture areas like Natoma Manors. He believes that District 3 was drawn to

support Commissioner Carollo's elder voter base of 65-and-over residents living in affordable housing, and readily concedes that the inclusion of Natoma Manors where Commissioner Carollo maintains a residence was not based upon race at all.

Miro's claim is not a race-based claim. The law is clear that it is Plaintiffs' burden to show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Mr. Miro concedes the major changes to District 3 did not involve race and identifies no changes that have caused him harm; moreover, he did not articulate any injury as a result of the way the districts were drawn. As such, Mr. Miro has failed to prove he has standing to bring his claims. *See Hays*, 515 U.S. at 743-44.

### 2. Plaintiff Cooper

Cooper lived in District 2 when the City first drew districts in 1997, and she can only present a challenge to District 2. Her only objection with the 2022 Plan was addressed when the City enacted the 2023 Plan: that the West Grove be kept in District 2. Moreover, she readily concedes that keeping Natoma Manors in District 2 to keep Coconut Grove whole had nothing to do with race. *Miller*, 515 U.S. at 916. Like Miro, Cooper has not articulated an articulated an individualized injury as a result of the way District 2 is drawn. *See Hays*, 515 U.S. at 743-44.

### 3. Plaintiff Johnson

Johnson moved to District 3 in July 2021, and was a resident of District 3 in the 2022 Plan, 2023 Plan, and Plaintiffs Plans 2, 3, and 4. As a resident of District 3, Johnson can only challenge the way District 3 is drawn. *See Gill*, 585 U.S. at 66; *Hays*, 515 U.S. at 744-45. Like Miro and Cooper, Johnson failed to assert he experienced any injury as a result of the way his district was drawn. *See id*.

#### 4. Plaintiff Contreras

Plaintiff Contreras moved into District 4 after the enactment of the 2022 Plan and longer lives in the City of Miami. Contreras can only challenge a district in which she lives.  *See Gill*, 585 U.S. at 66; *Hays*, 515 U.S. at 744-45.  Since she does not presently reside in any district, she lacks standing to challenge any of the City's districts.  *See Arizonans for Off. Eng.*, 520 U.S.  at 67 (1997)(recognizing that standing must be demonstrated "at all stages of review, not merely at the time the complaint is filed."); *Chen v. City of Houston*, 9 F. Supp. 2d 745, 750 (S.D. Tex. 1998)(dismissing Plaintiff who was no longer  a resident of the city in redistricting challenge on standing grounds), *aff'd*, 206 F.3d 502 (5th Cir. 2000); *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 364 (E.D. Va.) (dismissing action challenging election where Plaintiff was not a registered voter), *aff'd*, 333 F. App'x 733 (4th Cir. 2009); *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021)(denying standing where plaintiff was a candidate for a prior election, but not a candidate for upcoming election); *Williams v. Bolivar Cnty.*, No. 204CV282-D-A, 2007 WL 313840, at *3 (N.D. Miss. Jan. 30, 2007) (dismissing claims of intervenor who was not a registered voter in county).  Moreover, like the appellees' in *Hays*, Contreras has failed to put forward any evidence to support that she has suffered an injury "as a direct result of having personally been denied equal treatment" of other voters.  *See Hays*, 515 U.S. at 746 (quoting *Allen v. Wright*, 468 U.S. 737, 738 (1984), abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).  As such, Contreras lacks standing to bring her claim

#### 5. Plaintiff Valdes

Valdes claims to be a resident of District 2 for the last three years; however, she did not change her voter registration to her present address until October 2023.  *See* § 97.1031, Fla. Stat. ("When an elector changes his or her residence address, the elector must notify the supervisor of elections.")  Not only did Valdes not change her voter registration until after the Complaint, the

Amended Complaint, and the Supplemental Complaints were filed, she admitted that she has never changed her driver's license to reflect that her claimed legal residence.  *See* § 322.19(2), Fla. Stat. ("If a person, after applying for or receiving a driver license or identification card, changes the legal residence or mailing address in the application, license, or card, the person must, within 30 calendar days after making the change, obtain a replacement license or card that reflects the change.") Failure to do so constitutes a nonmoving violation subject to the penalty as provided in s. 318.18(2), Florida Statutes.  Even if her current claims of residency could be accepted, her own documentation and testimony fails to demonstrate that she was a legal resident and registered voter of District 2 at the time the complaint was filed.  *See Chen v. City of Houston*, 9 F. Supp. 2d 745, 750 (S.D. Tex. 1998) (dismissing Plaintiff who was improperly registered to vote in district contrary to state law requirements), *aff'd*, 206 F.3d 502 (5th Cir. 2000).  Standing must be demonstrated at all stages of the litigation.  *See Arizonans for Off. Eng.*, 520 U.S.  at 67; and *Hotze v. Hudspeth*, 16 F.4th at 1125.  Valdes has not carried her burden.

Like the other Individual Plaintiffs, she also failed to articulate an injury as a result of the design of her district.  In fact, she expressly stated that she was fine with being represented by Commissioner Covo, elected under the 2022 Plan, and Commissioner Pardo, elected under the 2023 Plan.  Accordingly, Valdes has failed to establish her standing to bring her claims.  *See Gill*, 585 U.S. at 66; *Hays*, 515 U.S. at 744-45.

### ii.  The Associational Plaintiffs have failed to establish an injury in fact.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 169 (2000) (citing *Hunt v. Washington State*

*Apple Adver. Com'n*, 432 U.S. 333, 343 (1977). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon*, 426 U.S. at 40.  Instead, an organization "can establish standing *only as representatives of those of their members who have been injured in fact*, and thus could have brought suit in their own right." *Id.* (emphasis added).  The standing question with respect to the Organizational Plaintiffs in this suit therefore turns upon whether the organizations have "established actual injury to any of their [ ] members." *Id.*

In *Anderson v. City of Alpharetta*, the Eleventh Circuit affirmed the district court's holding that the NAACP lacked associational standing to assert the constitutional claims of its members because the organization had not been able to identify any member who had been harmed by the city's allegedly unconstitutional actions. 770 F.2d 1575, 1582-83 (11th Cir. 1985).  In that case, the NAACP had identified the "names, addresses, incomes, and the number of family members for 10 persons who allegedly would have desired to live in public housing," and identified another "four individuals who would have enjoyed social, economic and political benefits" of public housing. *Id.* at 1583.  But, because the NAACP "failed to identify a single plaintiff who has been personally and concretely injured by the alleged discriminatory practices of the City of Alpharetta," the Eleventh Circuit held that "the NAACP ha[d] failed to aver adequately injury in fact, directly or derivatively to any of its members[,]" and held that it "is not the role of the court to speculate concerning the existence of standing nor to piece together support for the plaintiff." *Id.* at 1582.

Likewise, in *National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners of St. John's County*, the Eleventh Circuit affirmed dismissal of the associational plaintiff's claims for lack of standing because the plaintiff could not identify any members that

had been injured to the defendant's alleged actions. 376 F.3d 1292, 1296 (11th Cir. 2004). Therefore, the plaintiff's failure in that case "to identify an injured constituent prevent[ed] them from asserting associational standing." *Id.* (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66, 117 S.Ct. 1055, 1068, 137 L.Ed.2d 170 (1997) ("An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right.") (citations omitted).

Here, Plaintiffs Grace, Engage Miami, South Dade Branch of the NAACP, Miami-Dade NAACP (together, the "Associational Plaintiffs"), lack standing on their equal protection claim because they have failed to identify *any member* who had been harmed by the City's allegedly unconstitutional actions, and have therefore failed to establish having suffered an injury that is: (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical, both as required to under applicable precedent. *See Lujan*, 504 U.S. at 556 (plaintiffs lacked standing "on the ground that the statute's citizen-suit provision confers on all persons the right to file suit to challenge the Secretary's failure to follow the proper consultative procedure, notwithstanding their inability to allege any separate concrete injury flowing from that failure").

      **1.** <u>Plaintiff Engage has failed to present facts that demonstrate its standing.</u>

Rebecca Pelham, Engage's Executive Director, claims to have verified the residential addresses of certain individuals that purportedly live in all 5 districts, but her efforts to prove such list as a reliable indicator ring hollow. She did not contact any of the individuals identified in the list to verify whether they were, in fact, still residing at their addresses. She readily conceded that their members, mostly young people, move and may not update their information. Indeed, two of Engage's members who were Individual Plaintiffs—Contreras and Valdes—failed to timely update their voter information when they moved their residence. None of the individuals who were identified were witnesses at trial, and no one testified as to how the specific features of any

particular district harmed any of the members of Engage, including Individual Plaintiffs Johnson, Contreras, and Valdes.

As the Eleventh Circuit explained in *Doe v. Stincer*, the right of an association to sue on behalf of its constituents does not relieve it of its obligation to show that one of its constituents otherwise had standing to sue. 175 F.3d 879, 886 (11th Cir. 1999).  Moreover, Engage would have been obligated to demonstrate how each of its members were harmed by particular changes in each respective district.  Engage has failed to present any such evidence on behalf of any individual member in a respective district, let alone all of its members residing throughout the City of Miami.

**2.** Plaintiff GRACE has failed to identify any members who have been injured by the City's actions.

Although GRACE claims to have individual members in Districts 2, 3, 5, its bylaws and membership list belie the fact that only organizations are members.  GRACE has only identified two individuals—Plaintiff Cooper and Apostle Chambers—as residents in District 2.  No other individuals were named or identified. And because Plaintiff Cooper's testimony is insufficient to establish an injury to give rise to standing for herself in District 2, her testimony is likewise insufficient to establish an injury that gives rise to standing for GRACE in District 2 or any other district.  To the extent she ever had a cognizable injury, her concerns were addressed when the West Grove was put back into District 2.  The Court should dismiss GRACE's claim for lack of standing because it has failed to identify *any* members that reside in a particular district and have been injured as a result of the City's alleged drawing of that particular district. *See National Alliance for the Mentally Ill,* 376 F.3d at 1296.

**3.** Plaintiffs South Dade Branch of the NAACP and the Miami Dade Branch of the NAACP have failed to identify any members who have been injured by the City's actions.

Ms. Donaldson, an at-large member of Plaintiff South Dade NAACP who is not a resident of the City of Miami, testified that the organization does not maintain a separate member list from the national organization, and does not have access to the national organization's list;. Nevertheless, she claims to have to have verified that the South Dade Branch of the NAACP has members that reside in Districts 2, 3, and 4. Yet, she never when asked to identify those members, the First Amendment Associational Privilege was asserted.

Similarly, Ms. Pierre, the Branch President of the Miami Dade Branch of the NAACP but not a resident of the City of Miami, claims to have verified that the Miami Dade Branch of the NAACP has members that resides in Districts 2, 3, and 5. But Ms. Pierre never actually contacted any of those members to verify their current residence, and did not disclose the names of any of those individuals.

No Individual Plaintiffs claimed to have been members of either the South Dade or the Miami Dade Branches of the NAACP, and no individual testified to the personal harms that were experienced by any particular member in any particular district. Moreover, like the testimony presented by Plaintiff Cooper, their primary concerns was keeping the West Grove in District 2—a nonracial concern that was addressed in the 2023 Plan. As such, the South Dade or the Miami Dade Branches of the NAACP failed to carry their burden to present evidence of how particular members were injured by particular changes to specific districts. An organizational plaintiff that cannot articulate whether their members are injured at all by a challenged law certainly lacks standing under *Lujan* and *Hayes*.

  **iii. Plaintiffs have failed to establish an injury that is redressable by this Court.**

Plaintiffs also lack standing because their alleged injuries cannot be redressed by this Court.  Although Plaintiffs assert the City racially gerrymandered the districts, there is no plan (including any of Plaintiffs' four proposed plans) that materially changes the racial makeup of the City's districts.  First, Miami is a majority-minority city with no White majority district, and no plan proposes one. All plans have a coastal District 2 with the largest concentration of White voters, but which still fail to comprise a majority. *compare* DE 82-24 *with* 34-37.  Plaintiffs' Maps 2, 3 and 4 have a greater White Voting Aged Population (WVAP) in District 2 than the New Plan. All plans have a VRA-protected Black District 5. Plaintiffs previously accused the City of "packing" Black voters into District 5 by looking at Black Citizen Voting Age Population (BCVAP), but Plaintiff Plan 3's BCVAP is 56.5% and Plan 4's BCVAP is 55.8% compared to the New Plan's 57.4%. All plans have three, supermajority Hispanic districts, but Plaintiffs' Hispanic Voting Age Population ("HVAP") in District 4 in all plans is maximally packed at higher than 94%.

The differences between the plans' demographics are simply not significant.  For example, the Hispanic population in District 1 in Plaintiffs' Plans ranges from 70.1% HVAP to 86.6% HVAP, compared to 89.7% in the New Plan. For District 3, Plaintiffs' Plans ranges from 84.8% HVAP to 90.1% HVAP, compared to 89.7% in the New Plan. In each instance there is a more than 15% and 5% deviation in Hispanic population, respectively. If such deviations are not constitutionally significant in each of Plaintiffs plans, the deviations between Plaintiffs plans and the New Plan are even less significant, regardless of which population is being examined.

The significance of these demographics also demonstrate the practical difficulty of crafting a remedy that addresses what the Plaintiffs' claim as their injury.  For example, Johnson resided in District 3 when he moved there in 2021, was in District 3 in the 2022 Plan and the 2023 Plan,

and was placed in District 3 in three of the four plans proposed by Plaintiffs.  There is no evidence
that Johnson was placed in District 3 because of racial gerrymandering, and the remedies proposed
by Plaintiff support that conclusion.

The reality is that the City has a majority Hispanic population, and the racial composition
of the City's five districts will generally remain the same as it has been since 1997: three majority
Hispanic districts, one majority African-American district, and one plurality district.  Plaintiffs'
four proposed maps confirm this reality, thereby completely undermining their claim that the City
engaged in such division for "the predominant purpose of maintaining racially segregated
districts[,]" as they allege. (DE 23, ¶1).

In *Hays*, the Court noted that the record contained "evidence tending to show that the
legislature was aware of the racial composition of [the districts]," but the Court also noted that
"the legislature *always is aware of race* when it draws district lines." 515 U.S. at 744 (emphases
added) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)) (internal quotation marks omitted). "That
sort of race consciousness does not lead inevitably to impermissible race discrimination" and proof
of that race consciousness "in the redistricting process is inadequate to establish injury in fact." *Id.*
at 745–46. "Discriminatory purpose implies more than intent as volition or intent as awareness of
consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action
at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515
U.S. 900, 916 (1995) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279
(1979) (cleaned up).

Under applicable U.S. Supreme Court precedent, it must be likely, as opposed to merely
speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61
(citations omitted).  Here, the only adverse effects Plaintiffs have advanced are that the City drew

a map for the purpose of maintaining racially segregated districts and that alleged racial gerrymandering discriminatorily resulted in three majority Hispanic districts, one majority African-American district, and one plurality district.  Yet, as Plaintiffs have confirmed in their four proposed maps, the only remedy that may be proposed is the same poison that Plaintiffs complain of: three supermajority Hispanic districts, one VRA-required Black district, and a plurality district.

Plaintiffs' ability to have standing in this case relied upon them demonstrating that their proposed remedy looked very different than the City's New Plan, but that is simply not the case. Consequently, Plaintiffs lack standing on their equal protection claim because they have demonstrated that their claimed injuries are not redressable given that no plan would result in the material changes to the racial makeup of any of the City's Districts.  As such, the Plaintiffs have failed to demonstrate that their claimed injury is redressable as an injury and have not carried their burden to demonstrate standing.

### c.  Plaintiffs Have Failed To Establish Racial Gerrymandering

To prove a racial gerrymandering claim under the Fourteenth Amendment, Plaintiffs bear the burden of establishing that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  But "redistricting differs from other kinds of state decision making in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." *Shaw v. Reno*, 509 U.S. 630, 646 (1993).  Thus, "[t]hat sort of race consciousness does not lead inevitably to impermissible race discrimination," *id.*, and, instead, "[t]he test for racial gerrymandering" goes beyond "merely whether race was discussed," and requires a showing that redistricting actually resulted in a racial

gerrymander of a significant number of voters. *Cooper*, 591 U.S. at 291. This analysis must be conducted as to each district alleged to be unconstitutional; a challenge to a map as a whole is improper. *Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015).

If the Plaintiff establishes that race was the predominant factor in a particular district, then the burden shifts to the City to satisfy strict scrutiny: that is, to prove that the use of race "serve[d] a 'compelling interest and is 'narrowly tailored' to that end.'" *Cooper*, 581 U.S. at 292. The purpose of requiring a district to be narrowly tailored is "to ensure that "the means chosen fit th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (citing *Richmond v. J. A. Croson Co*., 488 U. S., at 493 (plurality opinion) (internal quotations omitted)). But the government *does* have a compelling interest to consider race in order to comply with the Voting Rights Act (VRA) and maintain a majority-minority district that will perform for a minority candidate of choice. Thus, the state's burden to prove narrow tailoring in this respect requires only that the State prove it "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Cooper*, 581 U.S. at 292. This standard "gives States 'breathing room' to adopt reasonable compliance measure[.]'" *Id.*

In *Hays*, the Court noted that the record contained "evidence tending to show that the legislature was aware of the racial composition of [the districts]," but the Court also noted that "the legislature *always is aware of race* when it draws district lines." 515 U.S. at 744 (emphases added) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)) (internal quotation marks omitted). "That sort of race consciousness does not lead inevitably to impermissible race discrimination" and proof of that race consciousness "in the redistricting process is inadequate to establish injury in fact." *Id.* at 745–46. "Discriminatory purpose implies more than intent as volition or intent as awareness of

consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up).  And when reviewing such decisions, the "allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott v. Perez*, 585 U.S. 579, 603 (2018).

### a. The VRA-<u>District</u>—District 5—is narrowly tailored to serve a compelling government interest and is thus constitutional

District 5 was drawn to comply with the VRA, as Plaintiffs concede.  Rather, Plaintiffs merely contend that the City packed Black residents into District 5 and lacked a sufficiently strong basis in evidence to set the BVAP in District 5 at 50.3%.  As an initial matter, 50.3% is a bare majority.  This Court would be the first to conclude that a bare majority is not narrowly tailored. Next, Plaintiffs do not contend, and none of their experts contend, that it is not narrowly tailored. Plaintiffs instead argue that the number was arbitrary.

In evaluating the narrow tailoring of a district, the Court examines "whether the racial distinctions are necessary and whether they are over-inclusive or under-inclusive."  *Grutter*, 539 U.S. at 333.  But "[t]he law cannot insist that a state legislature, when redistricting, determine *precisely* what percent minority population" is required by section 5 of the VRA.  *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178 (2017) (internal quotations omitted; emphasis in original).  Such a requirement would "afford state legislatures too little breathing room, leaving them 'trapped between the competing hazards of liability' under the Voting Rights Act and the Equal Protection Clause."  *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)).  Thus, instead, "the question is whether the State had 'good reasons' to believe'" that a particular

"BVAP floor was necessary to avoid liability under § 5." *Id.* If there was a good reason, the Court does not second-guess the decision.

"[A] "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in others." *Rucho v. Common Cause*, 139 S.Ct. 2484, 2492 (U.S. 2019) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (U.S. 2018)).   This is not a case, however, where there is any contention that the vote of Black residents has been diluted in any other District.  In other words, the City was not robbing other Districts of Black voters to dilute their influence in those other Districts.

District 5 is, objectively, narrowly tailored.  It is neither over-inclusive nor under-inclusive: the BVAP in both the 2022 Plan and the 2023 Plan is just over 50%—the mathematical minimum to constitute a majority.  And notably, the difference between the BVAP and BCVAP between Plaintiffs' plans and the 2023 Plan is as small as 1.5% and .9% respectively.  The law does not mandate that the majority required by the VRA be pared down to the absolute minimum with zero margin for error.

Plaintiffs argue, based upon *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178 (2017), that the Court should apply a purely subjective test to evaluate whether District 5 was narrowly tailored: namely, Plaintiffs contend that the court should evaluate whether the legislative body subjectively had a "*good enough*" reason to believe that the map was narrowly tailored.  The law does not require such an analysis, and this Court rejects it.  The purpose of a "narrow tailoring" inquiry is to prevent over- and under-inclusivity; that is, to prevent vote-packing or vote-dilution. Where the data does not support a finding that either of these concerns is valid or present, the Court declines to look beyond that objective evidence to speculate about the legislature's subjective intent.

Finally, the Redistricting Consultants hired by the City performed a functional analysis and determined that a 50.3% BVAP was narrowly tailored and therefore complied with the Constitution.  Plaintiffs do not contend that the analysis was wrong or that a 50.3% is not sufficiently narrowly tailored.  The Redistricting Consultants repeatedly advised the City that the plan was Constitutional.  There is no duty to memorialize that analysis at the meeting or compile a comprehensive record.  *Bethune Hill*, 580 U.S. at 194-95.  The BVAP did not change significantly between the 2022 plan and the 2023 plan.  The same analysis therefore applied.  The City was entitled to rely upon their consultants.  As a result, the City was entitled to use race as a factor in constructing District 5, which adjoins Districts 1, 2 and 3.

   **b.  The remaining Districts—1, 2, 3, and 4—were not racially gerrymandered and were based upon permissible criterion, so they are constitutional**

The numbers belie Plaintiffs' assertion that the remaining districts in the City's 2022 Plan or 2023 Plan demonstrate any sort of impermissible racial gerrymandering.  Again, the Court observes that it is undisputed that the City of Miami is a majority-minority city, with approximately 15% of its population Black and 70% of its population Hispanic.  As a result of the City's demographics, it appears to the Court that any district map with a VRA-protected Black District will also have three majority-Hispanic Districts.  Plaintiffs' proposed maps merely reinforce this point and undermine their claims: each, like the 2022 Plan and 2023 Plan, has a VRA-protected Black District and three Hispanic Districts.  Plaintiffs' plans predominantly swap Hispanic populations between the three Hispanic Districts.

There is no evidence that the City originally racially segregated the City when going to singe member districts other than some record statements by a single Commissioner.  Determining legislative intent from statements by a minority of the Commission is always problematic. *Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir.

2021) (observing "determining the intent of the legislature is a problematic and near-impossible challenge" and rejecting the assertion that discriminatory intent could be found in the statements of one legislator, even where the legislator may be the sponsor).   In this case, the racial considerations with regard to District 5 were required by the VRA, there is no White District and it is impossible not to have at least three majority Hispanic Districts.

Although Plaintiffs assert that the 2022 Plan was meant to further pack districts that were originally racially gerrymandered when they were drawn in 1997, redistricting through the 2022 Plan actually *reduced* racial concentrations.  The Consultant informed the Commissioners that Race would not be a consideration.  Additionally, there is no evidence that "significant" numbers of voters were placed into any district for racial considerations.  Finally, in drafting the 2023 plan, the consultant made changes to areas that were specifically pointed out by the Court in the injunction.  Those changes cannot be deemed to have been done for Constitutionally impermissible reasons.

The 2023 Plan reduced racial concentrations even further: it lowered the WVAP in District 2 from 40.5% to 38.6%, had the same BVAP, less than a 1% difference in the HVAP in Districts 1 and 4, and lowered the HVAP in District 3 from 88.3% to 84.5%.  Plaintiffs' experts do not contend that a significant number of voters were placed into a District for racial reasons.

Far from proving that the 2022 Plan or the 2023 Plan were motivated by race, the evidence established that the demographics in both Plans are the result of demographic realities in the City and the preservation of the cores of the original, 1997 districts—which is a legitimate, permissible redistricting criterion and does not support a claim for racial gerrymandering.  *Miller v. Johnson*, 515 U.S. 900, 906 (1995).  Stated simply, the evidence presented by both the Plaintiffs and the Defense merely established that the maps at issue reflect the racial makeup of the City, and there

was no gerrymandering which placed significant numbers of minority voters in any district in any way inconsistent with the City's actual demographics.

In the face of the foregoing, Plaintiffs rely heavily upon statements made by certain of the Commissioners wanting to create three Hispanic seats, and Anglo seat and a Black seat on the Commission.[1]   Many of the statements were justifiably concerned with preserving the VRA required District 5, where race is a permissible factor.  There is no majority White district, it is impossible to create one, and the last two Commissioners elected in District 2 are Hispanic.  The whitest population lives near the Coast, and therefore the City did not create that simple demographic reality.  If anything, Plaintiffs' maps, by preserving all of Coconut Grove in one district, tend to make District 2 even whiter.  And the Commissioners could not gerrymander three Hispanic seats when it is impossible not to have them.  Moreover, the Commissioners did not draw the maps, the Consultant did.  Statements, problematic or not, will not render a City's district maps unconstitutional without a racial gerrymander of significant numbers of voters.  That did not occur here.  The 2022 and 2023 Plans are not unconstitutional.

GRAYROBINSON, P.A.

By:  _s/ George T. Levesque_
Jason L. Unger, Esquire
Florida Bar No. 991562
George T. Levesque
Florida Bar No. 55551
Andy Bardos
Florida Bar No. 822671
301 S. Bronough Street
Suite 600
Tallahassee, Florida 32301
Telephone: (850) 577-9090

---

[1] There is no evidence that statements made by Commissioners at the May 11, 2023 meeting were ever conveyed to the consultants.

Facsimile: (850) 577-3311

Christopher N. Johnson
Florida Bar No. 69329
Email: Christopher.Johnson@gray-robinson.com
Marlene Quintana, B.C.S.
Florida Bar No. 88358
Email: Marlene.Quintana@gray-robinson.com
Fabian A. Ruiz
Florida Bar No. 117928
Email: Fabian.Ruiz@gray-robinson.com
333 S.E. 2nd Avenue, Suite 3200
Miami, Florida 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

CITY OF MIAMI
VICTORIA MÉNDEZ, City Attorney
Florida Bar No. 194931
JOHN A. GRECO, Chief Deputy City Attorney
Florida Bar No. 991236
KEVIN R. JONES, Deputy City Attorney
Florida Bar No. 119067
KERRI L. MCNULTY,
Litigation & Appeals Division Chief
Florida Bar No. 16171
Office of the City Attorney
444 S.W. 2nd Avenue
Miami, FL 33130
Telephone: (305) 416-1800
Facsimile: (305) 416-1801
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of February, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will serve this document on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

 *s/* George T. Levesque
Counsel for Defendant