UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:22-cv-24066-KMM

GRACE, INC., *et al.*,

      Plaintiffs,

v.

CITY OF MIAMI,

      Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS CAUSE came before the Court following a bench trial held on January 29, 2024, and January 30, 2024. *See* (ECF Nos. 168, 169); Corrected Bench Trial Transcripts (ECF Nos. 179, 180).[1] Plaintiffs GRACE, Inc., Engage Miami, Inc., South Dade Branch of the NAACP, Miami-Dade Branch of the NAACP, Clarice Cooper, Yanelis Valdes, Jared Johnson, Alexandra Contreras, and Steven Miro (collectively, "Plaintiffs") bring suit against Defendant City of Miami ("City," "City of Miami," or "Defendant") alleging that the five Miami City Commission districts as drawn in Resolution R-22-131 ("2022 Plan" or "Enjoined Plan") constitute a racial gerrymander in violation of the Fourteenth Amendment of the United States Constitution. *See generally* ("SAC" or "Second Amended Complaint") (ECF No. 143).  Plaintiffs further allege that each district remains racially gerrymandered in Resolution R-23-271 ("2023 Plan" or "Remedial Plan").  *See id.*  Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered

---

[1] References to the Bench Trial Transcripts shall be referred to as "T1. __" for trial day one (ECF No. 180), and "T2. __" for trial day two (ECF No. 179).

the arguments of counsel along with the remainder of the record, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## I.      INTRODUCTION

Today, the Court adjudicates a racial gerrymandering claim unlike many others.  As described in detail below, the Miami City Commission ("Commission") intentionally designed the 2022 Plan, and subsequently the 2023 Plan, to ensure that both plans would have three majority Hispanic districts, one majority Black district, and one "Anglo" district.  Based on the faulty premise that each district would elect a commissioner who shared the racial demographics of the majority (or plurality) of its voters, the Commission believed that its redistricting strategy would ensure the racial diversity of its members for years to come.  In other words, the Commission racially gerrymandered each district in both the 2022 Plan and 2023 Plan, not necessarily out of malice, but as a means to provide multiracial representation for the City of Miami.

Perhaps the City's ostensible goal of maintaining diversity in the Commission explains why Defendant previously stated that its alleged racial gerrymandering was "insignificant."  *See* (ECF No. 117 at 10).  But accepting Defendant's argument would require minimizing the harm that each Miamian suffered when the Commission classified them on the basis of race.  This, the Court will not do.

Indeed, the Supreme Court has made clear, time and time again, that the harms arising out of racial gerrymandering are unequivocally serious.  In *Miller v. Johnson*, the Supreme Court explained:

> When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests and will prefer the same candidates at the polls. Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as

citizens—according to criterion barred to the Government by history and the Constitution.

515 U.S. 900, 915–16 (2000) (internal quotations and citations omitted).  In *Shaw v. Reno*, the

Supreme Court reiterated the unique dangers of racial classifications in the voting context:

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these reasons that race-based districting by our state legislatures demands close judicial scrutiny.

509 U.S. 630, 657 (1993).  And as the Supreme Court explained in *Alabama Legislative Black*

*Caucus v. Alabama (ALBC)*, the harms arising from racial gerrymandering include "being

represented by a legislator who believes his primary obligation is to represent only the members

of a particular racial group."  575 U.S. 254, 263 (2015).

Therefore, whether the City believed the pursuit of diversity in representation could justify

racial gerrymandering is immaterial.  The harm stems not from the City's objective, but rather,

from the City's racial classification of every Miamian in pursuit of that goal.  By sorting its citizens

based on race, the City reduced Miamians to no more than their racial backgrounds, thereby

denying them the equal protection of the laws that the Fourteenth Amendment promises.

To contextualize the nature and extent of the City's constitutional violations, this Order

begins with a lengthy but necessary recounting of the record.  First, the Court describes this

Action's procedural history.  Second, the Court provides a thorough recitation of the factual

background of the 2021–2022 redistricting process by examining each Commission meeting where

redistricting was discussed.  In doing so, the Court spotlights the numerous instances where the

Commissioners directed their redistricting consultant Miguel De Grandy, Esq. ("De Grandy") to

draw a new map predominantly based on the Commissioners' goal of maintaining three majority

Hispanic districts, one majority Black district, and one "Anglo" district.  The Court finds that De Grandy understood the Commission's directive to ensure that any map he designed adhered to the racial demographics just described.  The Court also emphasizes portions of those meetings where the Commission's race-based directives resulted in the subordination of traditional redistricting criteria such as compactness of districts and maintaining communities of interest.  The Court undergoes the same analysis in reviewing the remedial redistricting process which culminated in the 2023 Plan.  Ultimately, the Court finds that race was the predominant factor in the design of each district in both the 2022 and 2023 Plans.  The Court concludes by providing pertinent information about each of the named Parties.

After establishing the Findings of Fact set forth above, the Court turns to its Conclusions of Law.  Therein, the Court holds that:  (1) each Plaintiff has standing; and (2) no district within either the 2022 Plan or 2023 Plan withstands strict scrutiny.

## II.    LEGAL STANDARD

### A.    Standing

Article III of the United States Constitution vests the judicial power in the federal courts and limits that power to "Cases" and "Controversies."  U.S. Const. art. III, §§ 1–2, *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  A challenge to a plaintiff's standing to assert a claim presents a challenge to the Court's power to entertain the suit, as standing is one of the components of a justiciable case or controversy required for the Court to possess subject matter jurisdiction. *L.M.P. ex rel. E.P. v. Sch. Bd. of Broward Cnty., Fla.*, 879 F.3d 1274, 1281 (11th Cir. 2018).  To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–

81 (2000)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of

establishing these elements." *Spokeo*, 578 U.S. at 338 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S.

215, 231 (1990)).

In a racial gerrymandering case, an injury in fact exists when an individual is classified

based on their race. *See ALBC*, 575 U.S. at 263 (explaining that the harm "include[s] being

personally . . . subjected to [a] racial classification, as well as being represented by a legislator who

believes his primary obligation is to represent only the members of a particular racial group")

(internal quotations and citations omitted). However, a "generalized grievance against allegedly

illegal governmental conduct" will not suffice to demonstrate injury in fact. *United States v. Hays*,

515 U.S. 737, 743 (1995) (citations omitted). Causation exists when the state actor enacts the

challenged plan, and a plaintiff's injury is redressed when she is no longer subject to racial

classification. Put simply, "[w]here a plaintiff resides in a racially gerrymandered district . . . the

plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and

therefore has standing to challenge the legislature's action." *Id.* at 744–45 (citation omitted).

An organization may also have associational standing to assert a racial gerrymandering

claim. The Supreme Court has held that an organization has standing when one of the

organization's members "would have standing to sue in their own right, the interests at stake are

germane to the organization's purpose, and neither the claims asserted nor the relief requested

requires the individual member's participation in the lawsuit." *Friends of the Earth, Inc*, 528 U.S.

at 181.

### B.    Racial Gerrymandering

#### 1.    Two-step Analysis

"The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017)  (quoting *Miller*, 515 U.S. at 911) (alteration in original).   Courts must be sure to "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race" because "[i]t is well settled that 'reapportionment is primarily the duty and responsibility of the State.'"   *Miller*, 515 U.S. at 915–16 (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).   Indeed, "[e]lectoral districting is a most difficult subject for legislatures," which requires a balancing of competing considerations.  *Id.* at 916.

Racial gerrymandering claims require a two-step analysis. *Cooper v. Harris*, 581 U.S. 285, 291 (2017).   "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'"   *Id.* (quoting *Miller*, 515 U.S. at 916).  If racial considerations predominated over others, "the design of the district must withstand strict scrutiny."  *Id.* at 292 (citing *Bethune-Hill*, 580 U.S. at 193).   That is, "[t]he burden shifts to the State to prove that race-based sorting of voters serves a compelling interest and is narrowly tailored to that end."  *Id.* (citing *Bethune-Hill*, 580 U.S. at 193).

#### 2.    Proving Racial Predominance

There is no "special evidentiary prerequisite" that a plaintiff must show to prove racial predominance.  *Cooper*, 581 U.S. at 318.  An individual alleging racial gerrymandering may rely on either direct or circumstantial evidence of legislative intent to show that the State subordinated traditional redistricting criteria to racial considerations.  *Id.* at 291.  In instances where there is an

absence of direct evidence that single-member districts were drawn with race as the predominant consideration, courts may determine legislative intent through an examination of the *Arlington Heights* evidentiary factors. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–267 (1977). Further, certain types of circumstantial evidence, such as a district's "shape and demographics," *Cooper*, 581 U.S. at 291, or the splitting of neighborhoods, "strongly suggest[]" racial predominance. *Covington v. North Carolina*, 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016), *aff'd*, 581 U.S. 1015 (2017) (mem.). Moreover, "[r]ace may predominate even when a reapportionment plan respects traditional principles" if "'[r]ace was the criterion that, in the State's view, could not be compromised.'" *Bethune-Hill*, 580 U.S. at 189 (quoting *Shaw*, 517 U.S. at 907); *see also id.* at 191 ("[S]howing a deviation from, or conflict with, traditional redistricting principles is not a necessary prerequisite to establishing racial predominance.").

Though race-based classifications are inherently suspect, the plaintiff's burden to show that race was the predominant factor in designing each district is "demanding." *Cooper*, 581 U.S. at 319 (citing *Easley v. Cromartie*, 532 U.S. 234, 241 (2001)). And until the plaintiff has made such a showing, the "good faith of a . . . legislature must be presumed." *Miller*, 515 U.S. at 915 (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318–19 (1978)).

Racial gerrymandering claims apply "district-by-district." *ALBC*, 575 U.S. at 262. An individual therefore may not challenge the State, or in this case the City, as an "undifferentiated whole." *Id.* Instead, the plaintiff must demonstrate that "race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." *Id.* at 263 (citations omitted).

### III.    FINDINGS OF FACT[2]

#### A.    Procedural History

In late 2021 to early 2022, the City of Miami engaged in a redistricting process which culminated in the enactment of the 2022 Plan on March 24, 2022.  ("Joint Stip.") (ECF No. 148 at 6 ¶ 10).  On December 15, 2022, Plaintiffs commenced this Action.  *See* (ECF No. 1).  Plaintiffs claim that the 2022 Plan violated the Equal Protection Clause of the Fourteenth Amendment because the City improperly used race as the predominant factor in drawing each of Miami's five districts and the design of each district does not withstand strict scrutiny.  *See generally* SAC.  Plaintiffs further argue that the 2023 Plan maintains the unconstitutional components of the 2022 Plan and remains racially gerrymandered.  *See id.*

On February 10, 2023, Plaintiffs filed an expedited motion for a preliminary injunction.  *See* (ECF No. 26).  Therein, Plaintiffs requested that the Court enjoin Defendant from "calling, conducting, supervising, or certifying any elections under the [2022] Plan, beginning with the [November] 2023 elections until entry of a final judgment."  *Id.* at 36.  The Court referred the preliminary injunction motion to United States Magistrate Judge Lauren Louis for a Report and Recommendation.  *See* (ECF No. 27).

On May 23, 2023, Judge Louis issued a thorough Report and Recommendation ("R&R") recommending that the Court grant the preliminary injunction and set a schedule for the preparation of a remedial map to be used in the then-upcoming November 2023 elections.  *See* (ECF No. 52).  In making this recommendation, Judge Louis first analyzed the contemporaneous statements of various Commissioners during the redistricting meetings that led to the passage of

---

[2] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

the 2022 Plan.  *See id.* at 64–71.  Judge Louis explained that the Commissioners' "intent was, as expressed, to preserve previously-drawn race-based lines of the districts in the 2022 redistricting process."  *Id.* at 67.  Judge Louis supplemented her finding with an examination of the *Arlington Heights* factors, which she also found "strongly support[ed] a finding that Plaintiffs are likely to succeed in establishing that racial considerations predominated in the City's design of [each district]."[3]  *Id.* at 77.  Finding that race was the predominant factor in each district's design, Judge Louis also concluded that none of the districts withstood strict scrutiny.  *Id.* at 78–87.

Over Defendant's objections, the Court adopted the R&R and issued a preliminary injunction on May 23, 2023.  *See* (ECF No. 60).  The Court reaffirmed Judge Louis's findings that race was the predominant factor in the design of each district and that no district could withstand strict scrutiny.  *See id.* at 18–22.  The Court also addressed and rejected Defendant's contention that there was insufficient time to craft a remedial map without violating the so-called "*Purcell* principle."[4]  *See id.* at 27–28.

Shortly thereafter, the Court issued a scheduling order instructing Defendant to enact a proposed remedial map and file it with the Court by June 30, 2023.  *See* (ECF No. 69 at 1). Plaintiffs were to notify the Court if they had any objections to Defendant's proposed remedial map and Defendant was permitted to file a memorandum of law in support of it.  *See id.* at 1–2. The scheduling order set specific deadlines to ensure that the Court could review the proposed

---

[3] The Parties did not dispute that Defendant was required under Section 2 of the Voting Rights Act of 1965 ("VRA") to consider race when drawing District 5 in a manner where race would predominate.  *See* R&R at 60.

[4] Under *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), district courts should generally refrain from enjoining state election laws in a period close to an election.  *See League of Women Voters of Fla., Inc., v. Fla. Sec'y of State*, 32 F. 4th 1363, 1371 (11th Cir. 2022).

remedial plan and any objections prior to August 1, 2023, the date by which the Miami-Dade County Board of Elections required a remedial map to administer the November 2023 elections. *See id.* at 2; *see also* (ECF No. 26 at 36).

On June 30, 2023, Defendant filed its Notice of Passage of Redistricting Plan notifying the Court that the City had enacted the 2023 Plan.[5]  *See* (ECF No. 77).  Plaintiffs objected and argued that the 2023 Plan failed to remedy the likely constitutional violation that the Court identified in the 2022 Plan.  *See generally* (ECF No. 83).  Further, because Plaintiffs believed the 2023 Plan was unconstitutional, they urged the Court to adopt one of their own alternative maps entitled "P4." *See id.* at 2–3.

The Court sustained Plaintiffs' objections and found that "the [2023] Plan does not completely correct the constitutional defects the Court found were substantially likely to exist in the [2022] Plan."  (ECF No. 94 at 1).  Even while presuming the good faith of the Commissioners in the remedial process—as is required under *Abbott v. Perez*, 138 S. Ct. 2305 (2018)—the Court found that Plaintiffs met their burden of demonstrating that the 2023 Plan was unconstitutional. *See id.* at 40.  The Court came to this conclusion after identifying explicit statements from multiple Commissioners expressing their intent to maintain the race-based sorting that tainted the 2022 Plan.  *See id.* at 20–24.  Furthermore, the Court analyzed considerable circumstantial evidence supporting the conclusion that racial considerations predominated in the 2023 Plan's design.  *See id.* at 24–40 (analyzing core retention rates and the specific alterations between the 2022 Plan and 2023 Plan on a district-by-district basis).

---

[5] Defendant also filed a motion to dismiss this Action as moot in light of the Remedial Plan.  *See* (ECF No. 80).  The Court denied the motion and found that Defendant's argument squarely contradicted Eleventh Circuit and Supreme Court precedent.  *See* (ECF No. 91).

Given that Defendant was unable to pass a constitutional remedial map, and because the August 1, 2023 deadline was fast approaching, the Court faced the unenviable task of crafting a new map to use in the November 2023 elections.  With no time for the City to draw a new map and for the Court to approve it, nor for the Court to engage a special master to draft an alternative plan, the Court analyzed Plaintiffs' P4.  *See id.* at 24–29.  The Court found that P4 was constitutional, complied with the Commission's legitimate policy goals, respected traditional redistricting criteria, and adhered to federal and state law.  *See id.* at 41–50.  The Court adopted P4 as the Court's interim remedial plan ("Court's Map") pending final judgment.  *Id.* at 50.

Defendant filed an emergency motion to stay the implementation of the Court's Map in the Eleventh Circuit Court of Appeals.[6]  (ECF No. 96).  A divided panel granted the stay solely on *Purcell* grounds.[7]  *See Grace, Inc., et al. v. City of Miami*, No. 23-12472, 2023 WL 5286232 (11th Cir. Aug. 4, 2023).  Plaintiffs filed an application to vacate the stay with the U.S. Supreme Court, which was ultimately denied.  *See Grace, Inc., et al., v. City of Miami*, 144 S. Ct. 45 (2023) (mem.).  The November 2023 elections proceeded under the unconstitutional 2023 Plan.

Despite the appellate proceedings, the case continued.  In September 2023, Plaintiffs filed a supplemental complaint alleging that the five Miami City Commission districts continue to be racially gerrymandered in the 2023 Plan.  *See* (ECF No. 109).  This supplemental complaint added to but did not replace the allegations in the First Amended Complaint.  *See* ("FAC") (ECF No. 23).

---

[6] Defendant initially filed an appeal challenging the preliminary injunction order, but voluntarily dismissed it.  (ECF No. 88).  Therefore, the result of this motion to stay could not undo the injunction; rather, the subject of the appeal was limited to the sole question of whether the City would use the 2023 Plan or the Court's Plan in the November elections.

[7] In support of its *Purcell* argument, Defendant's brief to the Eleventh Circuit contained multiple misrepresentations that contradicted the record in this case.  For an extended discussion cataloguing such misrepresentations, see ECF No. 132 at 8–11.

Plaintiff subsequently amended the FAC to consolidate the FAC and the supplemental complaint into the Second Amended Complaint.  *See* (ECF No. 142).  Defendant filed a motion to dismiss (ECF No. 117), and later, a motion for summary judgment (ECF No. 131).  The Court denied both motions.  *See* (ECF Nos. 132, 139).

On January 29, 2024 and January 30, 2024, the Court held a two-day bench trial.  Once the trial concluded, the Court ordered the Parties to submit proposed findings of fact and conclusions of law.  Having had the opportunity to review the pleadings, exhibits, witness testimony, and the record as a whole, the Court makes the following findings.

**B.   Background**

Only since 1997 has the City of Miami had five City Commission districts.  Since then, the City has undergone multiple redistricting processes, including in 2021–2022, which culminated in the 2022 Plan.  Below, the Court provides a brief overview of the districts and the Commissioners, both past and present.  Next, the Court describes the brief history of Miami redistricting.  Then, in extensive detail, the Court recounts the six Commission meetings where the Commissioners expressed their intent to redistrict predominantly along racial lines.

### 1.   Overview of the Miami Redistricting Process

Defendant City of Miami is a Florida municipality.  Joint Stip. at 6 ¶ 1.  Under Florida law, the City has the authority to regulate and conduct its elections.  *Id.*  This authority includes the ability to establish commission districts and draw their boundaries consistent with state law.  *Id.*  Aside from candidate qualifying, the Miami-Dade County Elections Department administers municipal elections for the City.  *Id.* at 6 ¶ 7.

The City is governed by a five-member Commission and a Mayor.  *Id.* at 6 ¶ 2.  Since 1997, the Commissioners have been elected from single-member districts.  *Id.* at 6 ¶ 4.  The

Commissioners run on a nonpartisan platform and serve for staggered four-year terms, with Districts 1, 2, and 4 last elected in 2023 and Districts 3 and 5 last elected in 2021. *Id.* at 6 ¶ 5. Commissioners are limited to serving two consecutive terms. *Id.* at 6 ¶ 8. General municipal elections are held on the first Tuesday after the first Monday in November of odd-numbered years. *Id.* at 6 ¶ 6.

The 2021–2022 redistricting process produced the 2022 Plan. *Id.* at 6 ¶ 10. The 2022–2023 remedial redistricting process, discussed more below, produced the 2023 Plan. *Id.* at 7 ¶ 11. On January 11, 2024, the Commission adopted Resolution R-24-1, which amended the 2023 Plan by moving four census blocks and 48 people from District 1 to District 3. *See* (ECF No. 159 at 2). The 2023 Plan as amended is still in place.

The current Commissioners are Miguel Angel Gabela (District 1), Damian Pardo (District 2), Joe Carollo (District 3), Manolo Reyes (District 4), and Christine King (District 5). Joint Stip. at 7 ¶ 11. The District 1 and 2 Commissioners during the 2021–2022 redistricting process were Alex Díaz de la Portilla and Ken Russell. *Id.* at 7 ¶ 12. During the 2022–2023 redistricting process, the District 1 and 2 Commissioners were Alex Díaz de la Portilla and Sabina Covo. *Id.* at 7 ¶ 13. Former Commissioner Díaz de la Portilla and Commissioners Carollo, Reyes, and Gabela are Hispanic and Cuban-American. *Id.* at 7 ¶ 14. Commissioner Pardo and former Commissioner Covo are Hispanic. *Id.* Commissioner King is Black and former Commissioner Russell is White and Japanese-American. *Id.*

Commissioners Pardo and Gabela were first elected in the November 2023 election. *Id.* at 7 ¶¶ 21, 22. Commissioner King was elected in 2021. *Id.* at 7 ¶ 16. Commissioner Reyes was elected in 2017 and then reelected in the November 2023 election. *Id.* at 7 ¶ 17. Commissioner Carollo was reelected in 2021 and is ineligible for reelection when his term ends in 2025. *Id.* at 7

¶ 18.  Both former Commissioners Covo and Díaz de la Portilla lost reelection in the November 2023 election.  *Id.* at 7 ¶¶ 15, 20.  Former Commissioner Russell ran for Congress in the 2022 election and resigned on December 29, 2022.  *Id.* at 7 ¶ 19.

### 2.      History of Redistricting in Miami

Prior to 1997, the Commission was elected on an at-large, citywide basis.  SAC ¶ 56; ("Answer") (ECF No. 150 ¶ 56).  Commissioner Carollo served as Mayor from 1996 to 1997 during which time he appointed a blue-ribbon panel to recommend a single-member district map for the City.  SAC ¶ 57; Answer ¶ 57.  Commissioner Reyes and Miguel De Grandy served among the members of the blue-ribbon panel.  SAC ¶ 58; Answer ¶ 58.  Based on the panel's recommendations, the Commission developed its 1997 map as Resolution 97-495 ("1997 Plan").  SAC ¶¶ 59–60; Answer ¶¶ 59–60.  Shortly thereafter, voters adopted a charter amendment adopting single-member districts and the 1997 Plan was implemented for the November 1997 elections.  SAC ¶ 61; Answer ¶ 61.

When the City implemented the 1997 Plan, race predominated in the drawing of each district.  At a November 18, 2021 Commission meeting, Carollo recounted his rationale as Mayor for single-member district elections:

> When we went to districts, we went to districts when I was mayor.  We had no African American representation in the commission.  So, instead of waiting for more years to go on like that so there could be a solid case made in court, I decided that I was gonna put in my political capital and *make districts to assure that there would be an African American sitting in this commission and there would be an Anglo*.  We've got half of one now [referring to Japanese-American former Commissioner Russell] but we're still good.  *And I wanted to make sure that there were three Hispanic districts* because that's the way that our population was and basically it still is.  It passed . . . That's why I pushed it and it passed.

("Pls.' Ex. 1") (11/18/22 Meeting Tr., ECF No. 170-1 at 28:4–12) (emphasis added).  Carollo doubled down in a February 7, 2022 meeting, explaining that, in 1997, he thought the single-

member districts would ensure "that there would always be an African American commissioner and an Anglo commissioner," and that the original districts in the 1997 Plan were "gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner." ("Pls.' Ex. 3") (2/7/22 Meeting Tr., ECF No. 170-3 at 51:13–14, 51:18–19).

The Commission redistricted the City's map in 2003 through Resolution 03-448 ("2003 Plan") and in 2013 through Resolution 13-208 ("2013 Plan"). SAC ¶ 62; Answer ¶ 62. De Grandy and Stephen M. Cody ("Cody") served as the City's redistricting consultants in both redistricting processes. SAC ¶ 63; Answer ¶ 63. The 2013 Plan remained in effect until after the 2020 United States Census ("2020 Census") was released.

### C.      Race Predominated in the Drawing of the 2022 Plan

After the 2020 Census, the Commission again commenced its redistricting process. SAC ¶ 64; Answer ¶ 64. This process took place over the course of six Commission meetings, the first of which occurred on November 18, 2021. Joint Stip. at 8 ¶ 27. After the final meeting on March 24, 2022, the Commission passed the 2022 Plan by a 3–2 vote. *See id.* at 16 ¶ 44.

As discussed further below, race predominated in the drawing of each district in the 2021–2022 redistricting cycle. The Court begins by chronicling each redistricting meeting and identifying the vast number of occasions where direct evidence demonstrates the Commissioners' clear intent to design each district based on race. Because racial gerrymandering claims are analyzed on a district-by-district basis, the Court then highlights some of this direct evidence as applied to each district. The Court then explains how circumstantial evidence confirms that race predominated in the redistricting process. Last, the Court describes how the Commission subordinated traditional redistricting criteria to racial considerations.

### 1.      November 18, 2021 Meeting

Just as in the 2003 and 2013 Plans, the City hired De Grandy and Cody as redistricting consultants for the 2021–2022 cycle.  Joint Stip. at 8 ¶ 23.  At the November 18, 2021 meeting, De Grandy presented an initial report on redistricting considerations in light of the 2020 Census data showing the racial demographics of the 2013 Plan.  SAC ¶ 68; Answer ¶ 68.  The 2013 Plan is shown below.



*Figure 1: 2013 Plan.*

During his presentation, De Grandy explained that the 2020 Census data showed that the City's population had grown by 42,752 residents (or 10.7%) in the last decade.  Pls.' Ex. 1 at 3:3–4.  Population growth, however, had not been uniform across each district.  *Id.* at 3:6.  According to De Grandy, the 2020 Census demographics indicated that the 2013 Plan now had a population deviation among each district exceeding 42%.  *Id.* at 4:4–5.  And according to federal case law, De Grandy explained, a constitutional map for local governments must achieve substantial equality of population as opposed to mathematical equality, meaning that the map "may not exceed an overall [population] deviation of 10%."  *Id.* at 4:9–11, 4:14–5:3, 5:23–6:1.  Based on the City's

16

total population, the ideal population for each district was 88,448.  *Id.* at 3:10–11.  Each district

deviated from the ideal population (District 2 was substantially overpopulated and other districts

needed to gain population), and thus, to achieve the constitutionally mandated substantial equality

of population in each district, alterations to district borders were necessary.  *Id.* at. 4:1–9.

| District | Population | Deviation | % Deviation |
|---|---|---|---|
| 1 | 80,863 | (7,515) | -8.50% |
| 2 | 116,742 | 28,364 | 32.09% |
| 3 | 79,309 | (9,069) | -10.26% |
| 4 | 81,800 | (6,578) | -7.44% |
| 5 | 83,176 | (5,202) | -5.89% |
| | | | |
| Total Deviation | | | 42.35% |

*Figure 2: Population of 2013 Plan as Prepared in De Grandy's Initial Report (ECF No. 170-12 at 7).*

Though the overall population in each district changed, the racial demographics of each

district in the 2013 Plan remained true to the City's original goal in 1997 of sorting the districts

based on race.  Districts 1, 3, and 4 contained supermajorities of Hispanic voters, with Hispanic

voting age populations ("HVAP") of 91.0%, 88.5%, and 91.6% respectively.  Joint Stip. at 8 ¶ 24.

District 2, the so-called "Anglo" district, had the highest White voting age population ("WVAP")

of 34.5%.  *See id.*  Black voters constituted a majority in District 5 with a Black voting age

population ("BVAP") of 52.9%.  *Id.*

| 2013 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 81,449 | (6,999) | 91.0% | 10.1% | 3.0% |
| 2 | 117,281 | 28,833 | 51.9% | 7.7% | 34.5% |
| 3 | 80,169 | (8,279) | 88.5% | 5.6% | 7.4% |
| 4 | 80,601 | (7,847) | 91.6% | 2.9% | 6.0% |
| 5 | 82,741 | (5,707) | 41.6% | 52.9% | 7.8% |
| Total | 442,241 | | 71.1% | 14.8% | 13.9% |

*Figure 3: 2013 Plan Demographics.  Joint Stip. at 8 ¶ 24.*[8]

Once De Grandy and the Commissioners finished discussing the need to redistrict, racial considerations immediately rose to the forefront of the conversation.  De Grandy advised the Commissioners that "we can consider race as one of several factors that we will be conscious of in crafting a plan." Pls.' Ex. 1 at 6:23.  De Grandy stated that "one can be race-conscious, but not race driven.  In other words, racial consideration may be one of a menu of factors that one considers in developing a plan, but cannot be the overriding factor." *Id.* at 7:4–6.  De Grandy then asked the Commissioners for a directive regarding which criteria to use when crafting a new plan.  *Id.* at 7:13–15.  The Commissioners gave De Grandy four ranked directives for crafting a new map:  (1) create substantial equality of population between districts, as opposed to mathematical equality; (2) maintain the cores of existing districts; (3) establish political cohesion of voters; and (4) keep traditional neighborhoods within one district if feasible.  *See id.* at 35:20–36:11.

---

[8] The Court notes there is a slight discrepancy between the population and deviation values in Figures 2 and 3 but finds their differences immaterial. Although De Grandy may have relied on slightly different population numbers when preparing his initial report, nothing in Figure 3 indicates that De Grandy's conclusion regarding the need to conduct redistricting was incorrect. In any event, the Parties have stipulated to the accuracy of Figure 3, and thus, for the purposes of this discussion regarding the demographics of each district, the Court accepts the values in Figure 3 as true.

The second directive—maintain the cores of existing districts—functioned as a proxy to ensure that any new map would further the Commission's goals of sorting each district based on race.  For example, Commissioner Reyes told De Grandy, "I will strongly request that the districts . . . remain as they are" because the districts were "drawn in a way that every single ethnic group would be represented." *Id.* at 15:22–23, 16:8–9.  Commissioner Carollo, after recounting that the rationale for moving to single-member districts was to "assure that there would be an African American sitting in this commission and there would be an Anglo," and to "make sure that there were three Hispanic districts," emphasized that he "want[ed] to be clear . . . that . . . the core of our districts are gonna be kept." *Id.* at 28:6–10, 28:15–16.  The Commissioners' discussion of district cores as a substitute to reference the race-based districts was most on display during a discussion about District 5 and the Voting Rights Act.  During the discussion, De Grandy stated that the redistricting process "will have to protect District 5," to which Commissioner King responded, "I think what [De Grandy] [is] trying to say is that you have to, you're going to attempt to try to maintain the core of the existing district." *Id.* at 14:21, 15:2–3.  As these quotations show, the Commissioners understood the instruction to maintain the cores of existing districts as a thinly veiled way for the Commissioners to communicate to De Grandy that any new map should preserve the race-based classifications from earlier iterations of the same districts.

Similarly, the Commissioners used the "political cohesion" of voters as another way to ensure a future map kept racially homogeneous groups together.  Indeed, the Commissioners and De Grandy almost never discussed the actual "political cohesion" or "voter cohesion" of any district; rather, they operated on the faulty assumption that moving a large group of citizens belonging to a particular race would result in that group sharing the same political preferences.  In one instance, Commissioner Carollo explained that "minority voters will be politically cohesive

within these districts." *Id.* at 28:20–21.  De Grandy repeated this sentiment in later Commission meetings as well.  *See, e.g.*, Pls.' Ex. 3 at 9:7–8 ("We felt that this movement was needed because this area has a high percentage of Hispanics and greater voter cohesion with D1 residents."); *id.* at 10:7–8 ("[W]e tried to find adjacent areas with similar demographics in order to maintain voter cohesion."); ("Pls.' Ex. 4") (2/25/2022 AM Tr., ECF No. 170-4 at 7:6–7) ("[W]e felt this movement was needed because Hispanics in this area constitute roughly 70% of the population. Thus, they have greater voter cohesion.").  Just as with the Commissioners' priority to maintain the core of existing districts, references to "voter cohesion" functioned as shorthand for keeping racially similar groups together.

### 2.    December 9, 2021 Meeting

The Commissioners reconvened on December 9, 2021 to consider additional criteria and to supplement the directives that they gave to De Grandy at the November 18, 2021 meeting.  *See* ("Pls.' Ex. 2") (12/9/21 Tr., ECF No. 170-2 at 2:20–22).  Despite the stated purpose of the meeting, the Commissioners used this time largely to reaffirm their primary goal of maintaining three Hispanic, one Black, and one "Anglo" district.

Race permeated nearly every aspect of the discussion in this meeting.  Speaking about District 5, Commissioner Carollo stated that there were "non-African American areas, mainly Hispanic or Anglo basically," that could be removed from the district.  *Id.* at 3:15–16.  When discussing other potential district configurations, Commissioner Díaz de la Portilla stated that "if we go beyond 112[th] [street], north of 112 we are entering into African American neighborhoods . . . And we can't touch that area."  *Id.* at 5:18–21.  Carollo concurred, asserting "then you will be taking away from the purpose of why we did the districts to begin with."  *Id.* at 5:23.  Then, speaking about Districts 3 and 4, Commissioner Díaz de la Portilla stated "we have to make sure

that we keep the structural integrity and the ethnic integrity, for lack of a better term again, in those two districts." *Id.* at 7:2–3. To preserve the "ethnic integrity" of Districts 3 and 4, Commissioner Díaz de la Portilla asked, "[i]s there a problem with splitting Coconut Grove as an entity? Based on where the Hispanic voters live?" *Id.* at 7:16–18. De Grandy answered Díaz de la Portilla's question about splitting the districts based on race by stating that "[t]here is no legal impediment to breaking up any community of interest." *Id.* at 7:22–23.

Later in the meeting, Commissioner Díaz de la Portilla continued to question De Grandy about how his mapmaking process would maintain the racial division of the districts. During a discussion about how to shift population among districts and whether De Grandy should adhere to manmade barriers when drawing district borders, Commissioner Díaz de la Portilla asked, "[h]ow do you not dilute, then, District 3 and District 4? Can you survive, can you keep the – again I'll call it the ethnic integrity [of those districts]?" *Id.* at 10:4–5. De Grandy assured Commissioner Díaz de la Portilla that his map drawing process "would not compromise the integrity of those districts." *Id.* at 10:13–14.

Turning specifically to a conversation regarding the Coconut Grove neighborhood, Commissioner Díaz de la Portilla once again used his time to emphasize that any changes made in a new map should reaffirm the racial makeup of the current districts, even at the expense of splitting Coconut Grove:

> It's kind of how we – how the elected officials here represent – how we have categorial representation. How we have people that represent the people that are like them and think like them. Right? And that's important, I think that's important. So that's what we have, we have a representative form of government, we have to have people that think like us, and we represent those people . . . *So if we go into the Grove, what's wrong with just getting a little bit of that to make sure that we don't jeopardize the ethnic integrity of our districts . . . And of course, without touching the racial integrity of District 5*.

*Id.* at 13:10–18 (emphasis added).  Commissioner Carollo reaffirmed this concern, stating that "the Grove is going to have to be split in either two or three parts," or otherwise, the City could face "the biggest danger" of "not . . . keeping an 'Anglo' seat or a Black seat."  *Id.* at 14:13–14, 14:16–17.

Before leaving De Grandy with further instruction on how to draw a new map, Commissioner Carollo reiterated his redistricting priority:

> My main interest in my district and [] Commissioner Díaz de la Portilla['s] [district] and Mr. Reyes' district is that I'm sure we're going to keep the balance of the Hispanic population where we're going to be getting Hispanics elected there . . . The other districts, like I said . . . they're going to have the representation that we intended those districts to have for some time to come.

*Id.* at 23:4–7, 24:9–10.  De Grandy fully understood his objective to maintain the current demographics of these districts in a new map.  *Id.* at 25:11–20 ("Because what I'm hearing from [the Commissioners] is, when you talk about maintaining the integrity of districts, the core of districts, is to minimize disruption . . . And I'll try to do that.").

While the Commissioners emphasized to De Grandy their desire for a map preserving the racial demographics of the 2013 Plan, they also stressed that De Grandy should not consider other traditional redistricting criteria.[9]  Regarding one such criterion, the compactness of a district, Commissioner Russell stated "[c]ompactness is not crucial" and Commissioner Díaz de la Portilla agreed, saying "I have no problem getting rid of compactness at the end of the day."  *Id.* at 18:2, 18:17–18.  Even more bluntly, Commissioner Díaz de la Portilla told De Grandy, "it is not possible to emphasize compactness and draw realistic districts, right[?]  If you want to have an African American district and you want to have an Anglo district it's almost impossible . . . [t]o emphasize[] compactness."  *Id.* at 28:22–29:1.  De Grandy responded, "[r]ight," confirming

---

[9] See Part III.C.9.a., *infra*, for a discussion about traditional redistricting criteria.

Commissioner Díaz de la Portilla's assumption.  *Id.* at 29:2.  As to another traditional redistricting criterion—respecting major manmade boundaries—the Commissioners could not decide if they wanted De Grandy to consider that factor in this meeting.  *Id.* at 18:23–21:8.  And as discussed above, the Commissioners eagerly discussed splitting Coconut Grove, a traditional Miami neighborhood, along racial lines if it would protect the "ethnic integrity" of the districts.  *Id.* at 13:10–18.

In sum, the original purpose of the December 9, 2021 meeting was for the Commissioners to provide further guidance to De Grandy regarding how they wanted him to craft a new map. Although De Grandy was prepared to discuss whether he should emphasize compactness, manmade and natural barriers, or contiguity, the Commissioners repeatedly made clear that those considerations would take a back seat to their racial redistricting goals.  Over and over again, multiple Commissioners emphasized that their primary directive to De Grandy was to preserve the status quo, thereby maintaining three Hispanic, one Black, and one "Anglo" district.  To the extent traditional redistricting criteria would jeopardize that goal, as was the case with compactness and maintaining traditional communities of interest, De Grandy was instructed to ignore them.  With these instructions in mind, De Grandy left the meeting to develop a draft plan that he would show to each Commissioner individually ahead of another meeting in February.  *See id.* at 33:18–35:14.

### 3.    February 7, 2022 Meeting

The Commission's met again on February 7, 2022, and this time, De Grandy prepared a new draft plan ("Feb. 7 Draft Plan").  *See generally* Pls.' Ex. 3.



*Figure 4: Feb. 7 Draft Plan.*

During this meeting, De Grandy gave a presentation to the Commission and described his mapmaking process. *Id.* at 5:16–12:11; ("Pls.' Ex. 15") (2/7/22 Presentation, ECF No. 170-15). In doing so, De Grandy noted multiple race-based decisions he had made. For example, De Grandy explained that the Feb. 7 Draft Plan underpopulated District 5 by 1.6% below the ideal population "because bringing in additional population from most any side of the district might reduce the African American population percentage." Pls.' Ex. 3 at 8:13–15. Referencing one area moved from District 5 to District 1, De Grandy explained that he "felt this movement was needed because this area has a high percentage of Hispanics and greater voter cohesion with D1 residents." *Id.* at 9:7–8. De Grandy further explained that he moved an area from District 1 to District 3 in the Feb. 7 Draft Plan that went south from 17th Avenue going west to 27th Avenue, and from SW 9th Street to SW 12th Street, because he "tried to find adjacent areas with similar demographics." *Id.* at 10:5–8. De Grandy informed the Commission that when adjusting population between the District

5 and District 1 border, he and Cody chose to move a population which was "highly Hispanic." *Id.* at 11:15–20; *see also* ("Pls.' Ex. 17") (ECF No. 170-17) (Cody memorandum describing the demographic populations moved between each district).

The Feb. 7 Draft Plan split portions of Coconut Grove between Districts 2 and 4. This division prompted intense public scrutiny during the meeting. *See* Pls.' Ex. 3 at 13:9–14:7, 16:22–17:19, 19:11–20:3, 20:23–27:15, 28:6–33:20, 34:15–39:23. In response to comments from the public, Commissioner Carollo described the historical background for why the City converted to single-member districts. *See id.* at 50:7–53:9. He explained that District 2 was initially designed to track the coastal region of Miami to ensure that an "Anglo" commissioner would be elected. *Id.* at 51:18–19 ("It was gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner."). Carollo further explained that over the past two redistricting cycles, various neighborhoods such as Silver Bluff, Shenandoah, Little Havana, and Flagami were divided "to make sure there's gonna be an African American elected . . . to make sure there's an Anglo American elected and . . . that in the rest of the districts that are majority Hispanic, that they stayed that way." *Id.* at 52:1–23. Commissioner Carollo informed the public that, to maintain the districts "in the way that [he] described," areas like Coconut Grove would need to be split. *Id.* at 53:9–19; *see also id.* at 54:5–9 ("As I see it, in order to give balance, first of all [to] protect the integrity of what was done in 2000 and making sure that we keep [an] African American district, that we keep an Anglo American district, but that we also keep that same balance . . . in the Hispanic districts[,] I don't see any other way that we're gonna to have to come in. At least a small portion into Coconut Grove.").

Commissioner Reyes reaffirmed that, in his view, changes to Coconut Grove would be necessary to maintain the racial divisions among the districts. He stated that the reason the districts

have "the odd shape they have now . . . was to make sure[,] and let's call a spade a spade[,] [t]o make sure that an African American was gonna be elected and that an Anglo . . . was gonna be elected." *See id.* at 67:19–21. "[T]o protect those two seats," Reyes explained, "[t]here have to be changes" in Coconut Grove. *Id.* at 67:23–68:2. Commissioner Reyes asked De Grandy directly: "I want you to be very honest *because we gave you your marching order*. The most important question that we have is this [the Feb. 7 Draft Plan] the best you can do to protect the African American seat? I'm gonna be blunt[,] and the Anglo seat?" *Id.* at 68:6–9 (emphasis added). De Grandy confirmed that this draft plan adhered to the Commissioners' directives as best as possible, claiming that he could make some alterations between Districts 1 and 5, but doing so would start "disbalancing District 1." *Id.* at 68:10–13.

If it were not already clear enough, for the final time in this meeting, Commissioner Carollo emphasized what De Grandy's top priority should be when making alterations to the Feb. 7 Draft Plan: "[w]hat I am trying to do is, number one: As I stated, were my goals from day 1 in the year 2000 . . . so that we could have African American representation . . . guaranteed Anglo representation, and to have three districts that were Hispanic. These are my intentions here today." *Id.* at 100:13–17. He told De Grandy that "[t]here has to be a balance into the future[,] [s]o that District 3 . . . and District 1, can keep the same type of last names, faces that they have, and that we don't end up [sic] diluting artificially[] [the] Hispanic population." *Id.* at 103:18–21. Carollo addressed De Grandy, saying "*I want to be clear in the instructions* . . . and we have to be clear because look . . . [w]hat I care is that in the future, there [are] sufficient Hispanic votes . . . to elect a Hispanic." *Id.* at 105:20–23 (emphasis added). Commissioner King concurred. *Id.* at 106:1.

After these discussions, the Commission voted 4–1 to direct De Grandy to evaluate alternatives to the Feb. 7 Draft Plan. *Id.* at 99:9–20.

###### 4.      February 25, 2022 AM Session

On February 25, 2022, the Commission reconvened to discuss alterations De Grandy made to the Feb. 7 Draft Plan.  *See generally* Pls.' Ex. 4.  De Grandy met with each Commissioner individually for additional input before crafting a new map with revisions  ("Feb. 22 Draft Plan"). *Id.* at 5:1–2.  Prior to the meeting, De Grandy also provided each Commissioner with a detailed report of the revisions contained in the Feb. 22 Draft Plan.  *Id.* at 4:5–11.

De Grandy began by describing the changes he made to the Feb. 7 Draft Plan.  For example, he noted that the Feb. 22 Draft Plan reduced the number of Coconut Grove residents moved from District 4 to District 2.  *Id.* at 5:3–9.  The Feb. 22 Draft Plan also reconfigured the districts so that Bay Heights would remain in District 2 (rather than District 3), and the Miami Riverside Center ("MRC") would remain in District 5.  *Id.* at 5:9–13.  As a result, De Grandy explained, he was "able to slightly increase the total Black population [in District 5], as well as the voting age population, above 50%."  *Id.* at 5:13–15.

Consistent with the racial focus of the last three meetings, De Grandy provided a detailed discussion of the Feb. 22 Draft Plan's demographics:

> Okay, next slide, District 1 is at a -.41 deviation, which is 340 residents below this ideal.  It has an 88% Hispanic population with 89.5% Hispanic voting age population, it clearly complies with the Voting Rights Act. District 2, next slide, now has a +5.46 deviation, which is 4,832 residents above the ideal.  District 2 remains a swing district with 37% white non-Hispanic population, approximately 7.5% Black population, and roughly 48.7% Hispanic population.  Voting age percentages are almost the same as the total population percentages.  D[istrict] 3 is slightly underpopulated at a -0.92 or 810 people under the ideal population.  District 3 has an 87.25% Hispanic population and approximately 88.3% Hispanic voting age population, and consistent with the Voting Rights Act, the Hispanic community has an equal opportunity to elect the candidate of its choice.  District 4 is now slightly underpopulated with a -2% deviation or 1,774 residents below the ideal. 88.2% of the population is Hispanic, with 89.5% Hispanic voting age population. As I said before, the drop in population compared to our preliminary plan was a direct result of reducing the number of Grove residents that we had moved from

D[istrict] 2 to D[istrict] 4.  The district also complies with the requirements of the Voting Rights Act.

Now finally, we underpopulated D[istrict] 5 by roughly 2.14 under the ideal, this allowed us to slightly increase the Black voting percentage.  The proposed district is now approximately 52.2% Black, with approximately 50.3% Black voting age population.  Our analysis of voting patterns indicates that,[10] consistent with the requirements of the [Voting Rights Act], the Black community does have an equal opportunity to elect the candidate of its choice.

*Id.* at 6:1–19.

De Grandy continued his presentation, further describing the race-based considerations that culminated in the Feb. 22 Draft Plan.  When discussing the border between District 1 and District 5, he told the Commission that "to keep the MRC in D5, we had to reduce this movement with a new boundary at the I-95 expressway.  Again, we felt this movement was needed because Hispanics in this area constitute roughly 70% of the population.  Thus, they have greater voter cohesion . . . ."  *Id.* at 7:3–8.  When discussing the changes to District 3, De Grandy continued to use the term "voter cohesion" as a proxy for whether a particular area was racially homogenous:

The next slide is of the proposed District 3 . . . It was not feasible to cross the river to the north, so our options were to move east, west or south.  We did not feel it was appropriate to move east because of dissimilar demographics.  And the next slide now shows the movements we made . . . [were] done to balance population, and in that regard[,] *we tried to find adjacent areas with similar demographics in order to maintain voter cohesion*.[11]

---

[10] As noted in the R&R, despite De Grandy's claim that he analyzed voting patterns, no such analysis is memorialized in the record.  *See* R&R at 28.

[11] De Grandy's testimony at trial does not disturb the Court's finding that, during the 2021–2022 redistricting process, he used "voter cohesion" as a proxy for race.  He testified that "the Commissioners in District 2 have campaigned on sea rise, climate change" and the electorate is "very sensitive to LGBT issues, etcetera, none of that resonates in the western districts."  T2. at 116:23–117:2.  Be that as it may, nothing in the record indicates that De Grandy ever factored these considerations into his mapmaking process.  These issues were never mentioned in this meeting, or in any other.  Rather, and as shown above, De Grandy mentioned voter cohesion as a convenient shorthand for his decisions to move racially homogenous groups between the districts.

*Id.* at 7:20–8:4 (emphasis added); *see also* ("Pls.' Ex. 18") (Feb. 25, 2022 Redistricting Presentation, ECF No. 170-18 at 17–28) (describing each discrete area moved between the Districts).

> Later, when summarizing the Feb. 22 Draft Plan, De Grandy stated:

> E]very district maintains the core configuration and the vast majority of its existing population [from the Feb. 7 Draft Plan] . . . Wherever possible, we tried to move population based on similar demographics and voting patterns in order to maintain voting cohesion . . . Moreover, because the current configurations and the directives to maintain the core of existing districts as well as a need to balance population, the directive to maintain communities of interest and traditional neighborhoods could not be substantially achieved.

Pls.' Ex. 4 at 8:15–9:1. Put differently, De Grandy made alterations in the Feb. 22 Draft Plan to ensure the preservation of the previous race-based districts at the expense of maintaining united communities and neighborhoods.

> The Commission opened the meeting for public comment on the Feb. 22 Draft Plan. The community feedback was overwhelmingly negative, with most commenters emphasizing their desire to keep Coconut Grove united within one district. *See id.* at 13:5–64:15. Plaintiffs South Dade NAACP and Miami-Dade NAACP expressed their concern that splitting Coconut Grove would "dilute the Black vote within District 2" and voiced their opposition to "any dismantling of the Black vote in District 5." *Id.* at 13:23–14:13. Plaintiff Donaldson echoed her concern that the Grove should remain united, *id.* at 16:10–20, as did Plaintiff Cooper, *id.* at 41:4–15.

> Other parties expressed their concern with the legality of the Feb. 22 Draft Plan. A representative from the ACLU of Florida raised multiple concerns with the redistricting process:

> First, districts must respect the Constitution's prohibition on racial gerrymandering. The Commission is barred from adopting arbitrary numerical demographic targets when fashioning districts. Commissioners have previously discussed a target of 50% Black population for District 5. Such as – such a numerical target divorced from any actual analysis [of what] is necessary to afford Black voters an opportunity to elect preferred candidates raises . . . concerns. Furthermore,

> overconcentrating Black voters in District 5 may constitute unlawful packing . . .
> We urge you to take the full breadth of available data into account rather than
> looking [] merely at . . . surface-level census population totals.

*Id.* at 34:4–14; *see also* ("Pls.' Ex. 23") (2/25/22 ACLU Letter, ECF No. 170-23).  Another resident

raised concerns that the redistricting process engaged in "cracking," or in other words, drawing

electoral districts that divide the population of a community.  Pls.' Ex. 4 at 55:2–12.  Others raised

concerns that the Feb. 22 Draft Plan was an unconstitutional racial gerrymander.  *Id.* at 26:18–22,

65:4–5.

    At the end of the time allotted for public comment, Commissioner Carollo again reiterated

the reason why the City had created single-member districts:

> But let me be as clear as I can. When I did that, I was mayor of the city. We had
> had an election that someone that looked like her [pointing to Commissioner King]
> was no longer here. You had four Hispanic commissioners and you had my dear
> friend J.L. Plummer, that Coconut Grove uh – after serving so many years decided
> that they don't want him when we went to districts. So Plummer was the only non-
> Hispanic in the commission and if we would've had another election, and Plummer
> would not have ran, you probably would have had five Hispanics on the
> commission. Just like now, if it would be a citywide vote, you would have five
> Hispanics up here. So I put my neck on the line and I said, no, I'm not going to wait
> for a couple more elections and not have an African American in this commission,
> because that's what it would've required. Just because you don't have a
> representation from a certain minority group automatically you don't get to go to
> court and you get that. You have to show that it's a pattern, not necessarily that the
> guy that they voted out is someone that people didn't want, and you can't do that
> in one election. So I went out knowing the pluses and frankly, all the negatives the
> districts bring and ask[ed] for the residents of Miami to vote for districts and for
> the mayor to be an executive mayor like it is today, and I was the first executive
> mayor of the city of Miami. And that's how the district came. *We, yes,
> gerrymandered District 2, so that someone that would be of an Anglo background,
> not Hispanic, would be elected*. And that's why District 2 crossed into – across the
> highway, and a big chunk of a Hispanic district was put into District 2 because we
> had to balance the population within the five districts. In order to accommodate that
> and to make sure that there were enough African Americans in District 5 to elect
> an African American from District 5, *we gerrymandered and broke up numerous
> neighborhoods into the other three – in the other three districts, and particularly
> District 3 and District 4*. And that's how we came about today. And we've had
> since then a couple of more revisions, I think Mr. De Grandy has been the guy
> who's been doing it all these years so, I mean, we haven't gone and try to pick

30

> anybody else to put something different or hoodwink people. We kept the same guy
> that we've had, so throughout the different revisions since then, uh we've had to
> cut into other areas.

*Id.* at 60:17–61:19 (alteration in original) (emphasis added).   Shortly thereafter, the meeting

recessed until the afternoon.

### 5.      February 25, 2022 PM Session

In the afternoon session, the meeting started with De Grandy's rebuttal to public comment.

In particular, De Grandy took issue with the concerns that the ACLU mentioned regarding District

5 and whether it was narrowly tailored to VRA compliance.  *See* ("Pls.' Ex. 5") (2/25/22 PM Tr.,

ECF No. 170-5 at 2:6–4:1).  But rather than explain why he believed District 5 in the Feb. 22 Draft

Plan was narrowly tailored, De Grandy simply stated that he was able to design District 5 with a

50.3% BVAP.  *See id.* at 2:6–11.  He dismissed the ACLU's concern by saying "[w]hat [the

ACLU] is basically saying is I put too many Black folks into District 5."  *Id.* at 2:6–8.  De Grandy

concluded his remarks by dismissing concerns about the alleged "packing" and "cracking" of the

Black community in the Feb. 22 Draft Plan.  *See id.* at 2:15–3:16.

Following De Grandy's remarks, the Commissioners each had time to give comments.  *See*

*id.* at 4:2–5.  Just as in the four prior meetings, Commissioner Carollo used this time to repeat his

understanding that the City had purposely divided traditional neighborhoods in other districts to

racially gerrymander District 2, thereby ensuring an "Anglo" commissioner could be elected:

> Commissioner Carollo: Look, what I'm most amazed at is that when we created
> districts from the get-go, and then the redistricting that has been done each decade,
> every 10 years, *we have purposely divided neighborhoods in the other districts to*
> *try to keep District 2 into a district that a non-Hispanic would be elected*. And that's
> why Coconut Grove was kept together. In fact, from the beginning, a big chunk
> across US 1 was given to Coconut Grove because there would not have been
> enough population to balance it out otherwise in District 2. Nobody objected to that
> at the time, nobody objected to numerous neighborhoods in the city of Miami in
> having been divided.

Like someone sen[t] me recently on Silver Bluff some [] information and the history of it which was interesting, this is from an old newspaper article I believe is a short history of Silver Bluff platted in 1941 incorporated in 1920 — excuse me platted in 1911 and incorporated in 1921 the town of Silver Bluff. Was independent for a short period of time, it was one of several municipalities that was annexed by the city of Miami in 1925. Nestled between Miami's original southern boundary and the town of Coconut Grove. Silver Bluff is named for the bluff located along the eastern edge of the quarter that appears silver when touched by morning light. *And Silver Bluff is one of those communities that was split in half to be able to create a District 2 that would elect someone like Mr. Russell —*

Commissioner Russell: Japanese American.

Commissioner Carollo: I didn't hear — well you didn't quite mention the Oriental part when you were running, only the yo-yo at the time. But I'll leave it at that. It was the — after you got elected that I guess it was more convenient, the — but Silver Bluff, Shenandoah, Little Havana, I mean Little Havana has really been kept major, Little Havana goes to 37th Avenue, so from 27th to 37th Avenue, huge area of Little Havana was cut up. You got Flagami that not originally, but then when growth came in, Flagami was then cut in the second round I think after districts were originally created.  Down the middle. You got other neighborhoods within District 4, others within District 1. Some in District 5. So the arguments that I've heard here today just don't hold any water. As this city grows in population, we have to make adjustments and the adjustments have to be made in — in the best way to try to keep all five of these districts in proportion to our population *for the reasons that we went into districts*.

*Id.* at 4:6–5:10 (emphasis added).  Therefore, not only did Commissioner Carollo reiterate the reasoning about why the City implemented single-member districts, he also reasserted that the intent of this redistricting process was to solidify those same racial demographics in this cycle at the expense of maintaining traditional communities.

Commissioner Reyes was more direct when asking whether De Grandy designed the Feb. 22 Draft Plan to ensure that the "Anglo" and Black districts would remain intact:

Commissioner Reyes: . . . My commitment is that everyone be represented. According to your — all the movement that you have done of population and the way that will the the, the, Afro American district and the so-called Anglo district will stand time. I mean the next ten years, for the next ten years, given the movement of population that we are going to experience, we — there stand the test of time and we will be able, or the probability of electing an Afro American and an Anglo are

that you will — are confident that it is very probable that we, because nothing is
sure but death and taxes, but it is very probable that we will — we will continue to
have a mixed commission, which is my — my main concern.

De Grandy: To answer your question commissioner, we have done our level best
to ensure that District 5 performs for the African American community and that
they will continue throughout the decade to have the ability to elect the candidate
of their choice. As to District 2, as I said in my report, District 2 is a competitive
district, it actually has a greater percentage of Hispanics than of single-race white
individuals, as was self-identified by, in the census. It is my belief that that 48+%
will continue to grow. So, it's gonna be very competitive—

Commissioner Reyes: It's competitive but is there still the probability is high?

De Grandy: Yes.

*Id.* at 19:13–20:12.

Shortly after this exchange, Commissioner Reyes clarified that this redistricting process,

was in reality, a racial gerrymander to protect the demographics of each district:

Commissioner Reyes: Okay, and I heard people, no gerrymandering! *Yes, we are
gerrymandering to preserve those seats. And that's it. And if you want to take us to
court for it*, —

De Grandy: That that actually wouldn't be called gerrymandering —

Commissioner Reyes: But that's what —

De Grandy: That's a tradition —

Commissioner Reyes: Just what — just what some of the —

De Grandy: Yeah.

Commissioner Reyes: Some —

De Grandy: But that is a traditional redistricting principle.

Commissioner Reyes: Okay.

*Id.* at 22:14–23 (emphasis added).  This exchange demonstrates that—despite De Grandy's attempt

to prevent Commissioner Reyes from actually using the word "gerrymander"—maintaining the

33

current racial demographics of each district was the main consideration the Commission wanted De Grandy to consider during the redistricting process.  And though De Grandy stated that "there are thousands of ways to do a plan," he designed the Feb. 22 Draft Plan to adhere to the Commission's racial criterion.  *See id.* at 22:7–8.  Above all else, adhering to the Commission's instructions ensured that the districts remained racially gerrymandered.

At the end of this afternoon session, the Feb. 22 Draft Plan was approved as the "Base Plan" to be discussed with community stakeholders and considered at a redistricting meeting on March 11, 2022 for a final vote.  *Id.* at 42:9–43:1.

### 6.      March 11, 2022 Meeting

The March 11, 2022 meeting, after extended debate between Commissioners Russell and Carollo regarding the former's ability to vote, began with De Grandy attempting to discredit allegations that the Feb. 22 Draft Plan was "racist."  *See* ("Pls.' Ex. 6") (3/11/22 AM Tr., ECF No. 170-6 at 37:18–21).  After explaining Miami's racial demographics generally, De Grandy stated with no justification that "[t]he facts are that this plan complies with both the 14th Amendment and the Voting Rights Act." *Id.* at 37:22–40:10.  At no point did De Grandy address the numerous episodes in prior meetings where the Commission directed him to design a map to ensure that the City would maintain three majority Hispanic districts, one Black district, and one "Anglo" district. *See id.*  Rather, De Grandy used this time to denigrate the Miami Herald Editorial Board and to describe his past successes as a redistricting consultant in other matters.  *See id.* at 39:13–40:7 (describing the Miami Herald Editorial Board's article accusing the Feb. 22 Draft plan of racism as "simply false and inflammatory").

Just moments after De Grandy's remarks about the purported constitutionality of the Feb. 22 Draft Plan, Commissioner Reyes also decided to comment on the allegations that the plan was

racist.  *See id.* at 43:17–44:10.  Commissioner Reyes began by saying that "we should do away with using the race card" and that he "think[s] it is sad that we [are] bringing race into this equation."  *Id.* at 43:23–44:1.  Ironically, he supplemented that statement with the following:

> The only race that we're gonna bring to this equation, I'm gonna tell you what it is. We have to keep diversity on this dais and that's why we have districts. And we have to say and do everything that is needed to make sure that there is diversity in this dais. If not, if we are not gonna do whatever it takes to have diversity in this dais, let's do away with the districts then and then everybody will be — we will have five Hispanics right here since we are 70% of the population. And in order to avoid that, the districts were created. And I will always — *my main concern and I have said it and I repeat it — my main concern is to save that seat that now is occupied by Ms. King [the African American commissioner for District 5]. And I will vote for any plan that will save that seat. Is that clear?* So let's get race out of this.

*Id.* at 44:2–10 (emphasis added).  In other words, Commissioner Reyes would not tolerate commentary accusing the Commissioners of racism, even though the driving force behind this redistricting effort was to entrench the previous race-based districts.

Next, De Grandy presented an alternative configuration of the Base Plan that Commissioner Russell had asked him to consider which would keep Coconut Grove within one district.  *See id.* at 52:3–16.  De Grandy explained that while this alternative would create an overall population deviation of 9.3% among the districts, this revised map would comply with the Commission's directives because it "provides for an African American majority district and three . . . Hispanic districts."  *Id.* at 52:12–13.  Again, De Grandy understood that maintaining these racial divisions among the districts was his primary objective.

After considering this revision, as well as a separate proposal from Commissioner King, the Commission opened the meeting for public comment.  *See id.* at 52:18–53:19.  During the meeting, nearly every commenter expressed their disapproval for the Base Plan and desire for a proposal, like Commissioner Russell's, which would not split Coconut Grove.  Taking issue with

one commenter's remarks about Coconut Grove, Commissioner Reyes responded about why he

believed Coconut Grove must be split:

> Commissioner Reyes: One thing that really amazes me, nobody here cares that we chop up Shenandoah in seven pieces, nobody cares that we chop Silver Bluff, and all the other good neighborhoods that [] have been solid and been neighborhoods that have been in the city of Miami for a long, long time. Nobody cares about that as long as you keep Coconut Grove. And one thing is misrepresented here. It is that we are destroying Coconut Grove, by going to any other district Coconut Grove ceased to exist. You see, that sliver [of Coconut Grove] is not gonna go to Shenandoah or to Flagami, *what we're trying to do is to maintain diversity and trying to do whatever is right. And you should understand that Coconut Grove or any other neighborhoods that are part of the city of Miami have been cut in half and in three or four pieces in order to maintain diversity.* And that is my point. I am gonna vote for what is best for the City of Miami. I am gonna vote my conscious, okay.

> [Speaker]: [j]ust to pick up seats. . .

> Commissioner Reyes: No, I said, I am gonna keep that seat and if by –any other plan . . . *weakens the possibility or the probability that that seat [pointing to Commissioner King] is gonna be there ten years from now I would vote against that*, okay.

*Id.* at 74:22–75:15 (emphasis added). Accordingly, Commissioner Reyes emphasized that

traditional neighborhoods must be split to achieve the Commission's goal of maintaining the racial

breakdowns of each district.

Once public comment ended, the meeting recessed until the afternoon session. When the

Commission reconvened, the Commissioners continued their discussion with De Grandy regarding

suggested alterations to the Base Plan, including whether MRC should be returned to District 5,

which district should retain The Wharf Miami, and whether certain parts of Simpson Park, Bay

Heights, and west Brickell should remain in their current districts. *See generally* ("Pls.' Ex. 7")

(3/11/22/ PM Tr., ECF No. 170-7). Race predominated in these discussions as well:

- Discussing the movement of the MRC, Commissioner Díaz de la Portilla stated: "So the growth that's going to happen over the next ten years, will it affect, [Commissioner King], make your district minority African American[?] Our goal

here is to have an African American district, for the lack of a better term, a white district, which is the coastal district, and three Hispanic districts." *See id.* at 8:9–16.

- Commissioner Díaz de la Portilla rejected Commissioner King's suggestion: "The request that [Commissioner King] is making is that she take away an area that's predominantly Hispanic."); *id.* at 36:5–6 (Commissioner Russell: "Commissioner Reyes said that the western portion of Brickell is too white to put into Commissioner Carollo's district when compared to the Natoma area." *Id.* at 9:11–12.

- De Grandy, in response to questions regarding the potential move of Natoma or Bay Heights: "[T]hey're in the 50 [%] range of Hispanics . . . So I can fit 1,253 Hispanics –I mean 1,253 people that are . . . 50% Hispanic into a D[istrict] 3." *Id.* at 37:11–14.

- Commissioner Russell discussing whether population could be moved from west Brickell or the North Grove into District 3: "Now I don't want to dilute Commissioner Carollo's district either. But it sounds like we're pretty close to where we're splitting hairs, where it would not make much of a difference to Commissioner Carollo's district demographic." *Id.* at 38:16– 9.

The Commission deferred a final vote until the special session on March 24, 2022—in the meantime, De Grandy would prepare alternate map proposals with the Commissioners' requested adjustments. *See id.* at 41:2–9.

## 7. March 24, 2022 Meeting

On March 24, 2022, the Commission convened for the final time to discuss redistricting. *See generally* ("Pls.' Ex. 8") (ECF No. 170-8). The meeting began with De Grandy summarizing the racial demographics of each Commissioners' proposed changes to the Base Plan. *Id.* at 5:19–8:19. These proposed changes included: (1) Commissioner Díaz de la Portilla's request to move a development called Flagler on the River into District 5; (2) Commissioner Russell's earlier proposal to retain Natoma Manors and the entirety of Coconut Grove within District 2 while moving other residents from west Brickell into District 3; and (3) Commissioner Reyes' proposal to restore The Wharf to District 5, return the West Grove to District 2, and move an area from

District 2 to District 3 that includes portions of Bay Heights.  *See id.*  At the end of his presentation, De Grandy informed the Commission that he believed each proposed alteration to the map would comply with the Constitution and the Voting Rights Act.  *See id.* at 8:5–7.  Nevertheless, De Grandy advised the Commission that if they decided to move Flagler on the River into District 5, he would suggest "additional tweaks to the plan" to ensure that District 5's BVAP exceeded 50%.[12] *Id.* at 8:6–9.

The Commission then opened the meeting for public comment again, and like every other meeting, most commenters expressed their opposition to any plan that would divide Coconut Grove.  In response to one particular commenter expressing such a sentiment, Commissioner Carollo explained why, in 1997, Coconut Grove was able to be united in District 2:

> We could not have separated Coconut Grove and kept one Anglo district. In fact, what we had to do was what we're discussing today. To give Coconut Grove enough of a population, even though we were going from one end of the water all the way to the end of the city in the northeast, we had to cross across US 1 to give District 2, the Anglo district, more of a population to balance those populations. And this is why you and the committee recommended that Little Havana had to be broken up, Shenandoah, Silver Bluff, Flagami, and I could go on and on. And that's the only point that I'm trying to make.

*Id.* at 38:9–15.  Commissioner Carollo later explained, however, why in this current redistricting process, Coconut Grove must be split.

> The only reason [District 5] doesn't take the rest [of Downtown Miami] is we need to keep a sliver on Biscayne Boulevard so that the northeast, the part of the northeast that's left, can be connected with Downtown and Coconut Grove, and Brickell etcetera. The reason we're having to do this is because the growth we've had – and *we have to keep one district that is going to have a majority of African Americans. We're gonna have to keep one district that you can get an Anglo*, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected. And City of Miami still has a population that is at least 70%, maybe more, I don't know, maybe De Grandy can clarify that, that's

---

[12] For an examination of the Commissioners' proposed alterations, see ("Pls.' Ex. 22") (3/24/22 Presentation, ECF No. 170-22 at 5–11); ("Pls.' Ex. 72") (Revised Russell Plan, ECF No. 173-13); ("Pls.' Ex. 73") (Reyes Plan, ECF No. 170-14).

> Hispanic. *And we have to keep three districts that are going to be majority-Hispanic.* But since Hispanic comes in all types, colors, creeds, races, religions, not all think alike, not all act alike, we're trying – and based on the federal guidelines – are trying to keep those Hispanic-majority districts within those guidelines of people that are closer to each other so that three Hispanics could be elected in those districts too. And this is why we're going through that process.

*Id.* at 56:12–57:1 (emphasis added).

Commissioner Reyes concurred with Commissioner Carollo's assertion that the object of this redistricting process was to ensure that the districts would contain the racial demographics described above. In doing so, he stated:

> [F]or the city to be the great city that we have, and for me to be proud of my city, I need to look at this [gesturing in direction of Commissioner King and Commissioner Russell] and see diversity here, even if I'm not here. But I need to see that every single group, major group is represented. And every major group has a voice and that's what we're trying to perpetuate, that is my point, we're trying to perpetuate that.

*Id.* at 40:17–21; *see also id.* at 63:20–22 (Commissioner Reyes explaining his support for uniting the West Grove in one district stated: "I hope [alternatives to moving the West Grove area] doesn't require others – that decision to affect our main objective, which is to maintain diversity [] in this dais, you see, having all the city represented.").

Later in the meeting, Commissioner Russell argued in favor of his proposal which would keep Coconut Grove within District 2. *See id.* at 65:9–17. According to Commissioner Russell, his plan would move into District 3 areas in west Brickell that were demographically similar to District 3's population. *See id.* at 69:13–17. Commissioner Carollo disagreed, saying Commissioner Russell's plan "would put District 3 into the future in possible jeopardy." *Id.* at 66:13. Elaborating on his concern, Commissioner Carollo stated:

> I do not want to change the District 3 voting patterns, the types of people that are there with different people. I don't want to do that to District 4, nor to District 1. Just like I want to be able to leave District 2 where it could still elect a guy like

> [Commissioner Russell], if they want to.  In District 5, that will be a majority-African American District.

*Id.* at 68:13–17.  Commissioner Díaz de la Portilla also disapproved of Commissioner Russell's

plan.  He explained:

> [W]hat Mr. Russell's plan does, down the line, not in 2022, but in 2026 or '27, is disintegrate that Hispanic district, District 3 . . . But Commissioner Carollo's district, whoever replaces him, its jeopardized to having an Hispanic American commissioner. And that's wrong. There's no one here, me and you Commissioner Russell, that can argue this Commission should be majority non-Hispanic. The same way that we fought for you [looking at Commissioner King] Madam Chair, to be there, same way we fought for you [looking at Commissioner Russell] to be there, you have to fight for the majority of the city. And Commission District 3 will be compromised severely.

*Id.* at 70:15–71:7.  Commissioner Díaz de la Portilla concluded that a vote for Commissioner

Russell's plan "jeopardizes the Hispanic American seat" and he "cannot do that." *Id.* at 72:2–3.

De Grandy then explained why he did not move portions of west Brickell into District 3.

He told the Commission that "[t]he reason I did not go east when I was doing District 3 is because

I found the population to be dissimilar. It was approximately forty-some percent Hispanic, going

into a district that was approximately 88% Hispanic." *Id.* at 75:11–13.  Simply put, De Grandy

elected not to do so because the population he would have moved belonged to a different race.

Further, when discussing whether to shift areas of Coconut Grove or Brickell, the

Commissioners' predominant concern revolved around the implications of such shifts on the

districts' racial demographics.  For example, Commissioner Russell asked De Grandy, "what is

the Hispanic population of the North Grove?" *Id.* at 76:17–18.  Addressing Commissioner Reyes'

proposal about moving areas of Bay Heights, De Grandy told the Commission that the area was

"more Hispanic [than] moving straight east into Brickell." *Id.* at 77:7.  When discussing high-rise

apartment buildings in Brickell, De Grandy informed the Commission that the occupants of those

residences were "almost even . . . between Hispanic and Anglo . . . but its markedly different than the population in District 3." *Id.* at 78:11–13.

At the end of the meeting, the Commission rejected Commissioner Russell's plan and voted 3–2 to adopt the Base Plan with The Wharf included in District 5. *Id.* at 86:17–21, 89:21–22. Commissioners King, Díaz de la Portilla, and Carollo voted in favor; Commissioners Reyes and Russell voted against. Joint Stip. at 16 ¶ 43. The 2022 Plan became law. *See id.* at 16 ¶ 44.



*Figure 5: The 2022 Enacted Plan.*

The demographics of the 2022 Plan are as follows:

| 2022 Plan Demographics | | | | | |
|---|---|---|---|---|---|
| Population and Deviation | | | 2020 Census Voting Age Population | | |
| D# | Total Pop. | Pop. Dev. | Hisp. VAP | Black VAP | White VAP |
| 1 | 88,108 | (340) | 89.5% | 11.0% | 3.5% |
| 2 | 93,300 | 4,852 | 48.6% | 7.3% | 37.4% |
| 3 | 87,658 | (790) | 88.3% | 5.4% | 7.7% |
| 4 | 86,597 | (1,851) | 89.5% | 3.1% | 7.6% |
| 5 | 86,578 | (1,870) | 40.6% | 50.3% | 10.5% |
| Total | 442,241 | 7.6% | 71.1% | 14.8% | 13.9% |

*Figure 6: 2022 Plan Demographics. Joint Stip. at 16 ¶ 44.*

### 8.    District-by-District Analysis

The extraordinary amount of direct evidence in the record demonstrates that the Commissioners were motivated by race far more than any other consideration in the drawing of each district. Over the course of six redistricting meetings, the majority of Commissioners made clear that their intent in the 2021–2022 redistricting process was to create a new map that ensured Districts 1, 3, and 4 would contain a Hispanic majority, District 5 would contain a Black majority, and District 2 would be created in a way to ensure an "Anglo" could be elected.[13]  *See, e.g.*, Pls.' Ex 1 at 28:6–10, 15–17 (Carollo explaining that he "wanted to make sure that there were three Hispanic districts," and in reference to the Commission's prior emphasis on ensuring that there was a Black and "Anglo" seat, he emphasized that he wanted "to be clear that the core of our districts are [going] [to] be kept."); *id.* at 15:22–23, 16:8–9 (Commissioner Reyes instructing De Grandy, "I will strongly request that the districts . . . remain as they are" because, "the districts [were] drawn in a way that every single ethnic group would be represented."); Pls.' Ex. 7 at 9:11–12 (Commissioner Díaz de la Portilla stating "[o]ur goal here is to have an African American district, for the lack of a better term, a white district, which is the coastal district, and three Hispanic districts."); Pls.' Ex. 3 at 105:20–106:1 (Commissioner King concurring with Commissioner Carollo's statement that: "I want to be clear in the instructions . . . and we have to be clear because look . . . [w]hat I care is that in the future, there [are] sufficient Hispanic voters to elect a

---

[13] While it is true that the Commissioners also discussed the historic reasons for their race-based preferences in redistricting, the Court does not consider those statements particularly probative of legislative intent in passing the 2022 Plan.  Rather, to determine legislative intent, the Court focuses on the Commissioners' contemporary statements in this redistricting process.  *Cf. Jacksonville Branch of the NAACP et al., v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1287 (M.D. Fla. 2022) ("[T]he Court considers the 2011 historical evidence only to the extent it gives rise to inferences regarding the intent of the City Council in 2022.") (citing *Abbott*, 138 S. Ct. at 2327).

Hispanic.").  As cataloged extensively above, the Commissioners were not merely "aware of racial demographics" during the 2021–2022 redistricting cycle.  *Miller*, 515 U.S. at 916.  To the contrary, the Commission's overarching, unequivocal goal was to ensure the 2022 Plan adhered to the racial demographics described above.

And though sometimes "determining the intent of the legislature is a problematic and near-impossible challenge," the Commissioners' repeated, explicit statements about their race-based objectives overcome this obstacle.  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021) (citations omitted).  Although in some cases, like *Greater Birmingham Ministries*, the record may not provide much insight into legislative intent, the Commissioners' intent here is hardly difficult to ascertain.  *Id.* at 1324–25 (finding that legislative intent cannot be inferred from the statement of a bill's sponsor when that sponsor was making a comment on a separate law).  In this case, over and over again, the Commissioners brazenly stated that their objective was to ensure the 2022 Plan would have three Hispanic, one Black, and one "Anglo" district.  *See supra*, Part III.C.1–7.  Thus, the Court finds that the factual uniqueness of this case renders it one where determining legislative intent based on the Commissioners' statements is not a "near-impossible challenge."[14]  *Accord Harris v. McCrory*,

---

[14] As Judge Louis recognized in the R&R on the preliminary injunction motion, ordinarily, courts consider the *Arlington Heights* evidentiary factors to determine legislative intent.  *See* R&R at 62. The Eleventh Circuit recently summarized those factors as follows: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact;  and (8) the availability of less discriminatory alternatives.  *Greater Birmingham Ministries*, 992 F.3d at 1321–22.

It is not clear, however, that the Court must delve into an *Arlington Heights* analysis given the voluminous instances in the record where Commissioners expressed their legislative intent. Whether the Commissioners' intended to draw the 2022 Plan to comport with their race-based objective is not a difficult question.  To the extent such an analysis is necessary, the Court adopts

159 F. Supp. 3d 600, 612 (M.D.N.C. 2016) ("The legislative record is replete with statements indicating that race was the legislature's paramount concern in drawing CD1.").

Not only did the Commissioners reiterate their race-based objectives to De Grandy, but De Grandy understood their instructions and created the 2022 Plan reflecting the Commission's unconstitutional preferences. For example, in response to a comment from Commissioner Carollo regarding his desire to ensure the 2022 Plan would retain the racial demographics from prior redistricting cycles, De Grandy explained, "what I'm hearing from [the Commissioners] is, when you talk about maintaining the integrity of districts, the core of districts, is to minimize disruption . . . And I'll try to do that." Pls.' Ex. 2 at 25:11–12, 25:20; *see also* Pls.' Ex. 6 at 52:12–13 (same); (ECF No. 52 at 64) (finding that "De Grandy acknowledged that he took instruction from the majority of Commissioners"). Further, as the Court described above, De Grandy often attempted to justify his race-based alterations in his mapmaking process as the product of his efforts to retain the cores of the previously drawn districts and to maintain voter cohesion. *See supra*, Part III.C.1. In reality, De Grandy made these alterations to further the Commission's race-based goals—De Grandy's presentations almost always described his alterations in racial terms and any analysis of voting patterns was notably absent. *See, e.g.*, Pls.' Ex. 15; ("Pls.' Ex. 19") (2/25/22 Presentation, ECF No. 170-19); ("Pls.' Ex. 20") (3/11/22 Presentation, ECF No. 170-20). To summarize, De Grandy understood the Commissioners' goals to create three Hispanic, one Black, and one "Anglo" district, and based on his understanding of this directive, he crafted the 2022 Plan to achieve that goal.

---

by reference the reasoning contained in its prior order (ECF No. 60) adopting the R&R and finds that the *Arlington Heights* factors compel the conclusion that each district was drawn with race as the predominant factor.

Because racial gerrymandering claims are evaluated on a district-by-district basis, the Court identifies specific evidence of legislative intent as to each district. *ALBC*, 575 U.S. at 262. In doing so, the Court relies on the extensive factual background identified above, but it will not reiterate them in its entirety. Accordingly, the evidence below is non-exhaustive.

### District 2

Since the City changed its representative model to one with single-member districts, District 2 was designed to ensure that an "Anglo" would be elected. *See* Pls.' Ex. 3 at 51:18–19 (explaining that District 2 was "gerrymandered but it was a legal gerrymander so that you would have an Anglo elected commissioner"). Commissioners Carollo, Reyes, and Díaz de la Portilla emphasized that their goal in this redistricting process was to ensure District 2 remained gerrymandered in this way. *See, e.g.*, Pls.' Ex. 8 at 56:16–18 (Carollo: "We're gonna have to keep one district that you can get an Anglo, whether they're an Anglo that's Japanese or an Anglo that's Russian, Ukrainian, Italian, Polish, English, French, they can get elected"); Pls.' Ex. 3 at 68:6–9 (Reyes asking De Grandy: "The most important question that [the Commissioners] have is [the Feb. 7 Draft Plan] the best you can do to protect the African American seat? I'm gonna be blunt[,] and the Anglo seat?"); Pls.' Ex. 7 at 8:14–16 (Díaz de la Portilla: "Our goal here is to have . . . a white district."). In turn, De Grandy assured the Commission that the map he was creating during the 2021–2022 redistricting process had a high probability of electing an "Anglo" commissioner. Pls.' Ex. 5 at 20:11–12. Indeed, District 2 in the 2022 Plan had a 37.4% WVAP, the highest of any district by a large margin. *See* Joint Stip. at 16 ¶ 45; ("Pls.' Ex. 121") ("Abott Rep.," ECF No. 173-26 at 23).

**District 5**

Race also predominated in the design of District 5.  It isn't clear from the Parties' briefings if this issue is even in dispute.  *See generally* Joint Stip. at 21 ¶ 13 (explaining that "[i]f race was the predominant factor in the design of Districts 1, 2, 3, or 4" remains an issue for the Court to determine); *but see* R&R at 79 (finding "[t]he Parties do not dispute that the City drew the borders of District 5 to comply with Section 2 of the VRA").  Indeed, in their proposed findings of fact and conclusions of law, Defendant concedes "District 5 was drawn to comply with the VRA," thus implicitly acknowledging that District 5 was designed with race as the predominant factor.  (ECF No. 182 at 35).  District 5 has a BVAP of 50.3% in the 2022 Plan.  Joint Stip. at 16  ¶ 45.

In any event, just like with District 2, the Commissioners frequently expressed their intent that District 5 in the 2022 Plan would remain a majority-Black district.  *See, e.g.*, Pls.' Ex. 2 at 13:10–18 (Carollo: "So if we go into the Grove, what's wrong with just getting a little bit of that to make sure we don't jeopardize the ethnic integrity of our districts . . . And of course, without touching the racial integrity of District 5."); Pls.' Ex. 3 at 67:19–21 (Reyes explaining that the reason the districts have "the odd shape they have now . . . was[,] to make sure[,] and let's call a spade a spade[,] [t]o make sure that an African American was gonna be elected."); Pls.' Ex. 7 at 8:14–15 (Díaz de la Portilla:  "Our goal here is to have an African American district").  Moreover, De Grandy explained that during the 2021–2022 redistricting process, he and Cody "have done our level best to ensure that District 5 performs for the African American community and that they will continue throughout the decade to have the ability to elect the candidate of their choice."  Pls.' Ex. 5. at 19:13–20:12.

When designing District 5, the Commission adopted a 50% BVAP quota.  In some instances, De Grandy made recommendations to the Commission solely based on the premise that

District 5 needed to have at least a 50% BVAP. *See* T2. at 101:12–16 (responding in the affirmative when asked if he used a 50% BVAP figure when determining if District 5 was VRA compliant); Pls.' Ex. 8 at 8:7–9 ("recommend[ing] additional tweaks to the plan to bring the Black voting age population back above 50%"); Pls.' Ex. 6 at 37:5–9 (identifying that Commissioner King's proposal was problematic because it "would lower the Black VAP to 49%, but this could be remedied by making additional changes to . . . increase D5's Black voting age population). De Grandy also advised the Commission that he could not make additional changes to District 5 if doing so would result in the district having less than a 50% BVAP. *See* Pls' Ex. 8 at 64:23–65:2 ("I cannot put one more resident into Commissioner King's district . . . [G]oing further east would dilute the Black majority in that district."). The Commissioners then used this quota to inform their districting decisions. *Id.* at 68:16–17 (Carollo: "In District 5, that will be a majority-African American district.").

The Parties agree that De Grandy designed District 5 using this BVAP quota to ensure VRA compliance. *See* (ECF No. 182 at 35) ("District 5 was drawn to comply with the VRA, as Plaintiffs concede."); (ECF No. 181) (explaining that to comply with the VRA, "the Commission's overriding goal was to keep the Black population as high as possible by establishing a 50% BVAP target."). VRA compliance explains a number of De Grandy's design choices as to District 5. For example, De Grandy deliberately underpopulated District 5 in both the Feb. 7 Draft Plan and Feb. 22 Draft Plan to increase District 5's BVAP. *See* Pls.' Ex. 3 at 8:13–15; Pls.' Ex. 4 at 6:15–16. Similarly, De Grandy's focus on District 5's BVAP target resulted in his reluctance to move areas between the District 2 and District 5 border. *See* Pls.' Ex. 1 at 23:6–10. He also moved FDC-Miami, a federal detention center with a disproportionately high Black population of detainees who cannot vote, into District 5. ("Pls.' Ex. 123") (P.I. Hr'g Tr., ECF 173-28 at 57:19–58:3).

Nevertheless, the reason why the Commission considered race is relevant not to the question of predominance, but rather, to the issue of whether District 5 withstands strict scrutiny. The Court undergoes that analysis shortly, but for now, the Court concludes race predominated in the design of District 5.

### Districts 1, 3, and 4

Direct evidence also demonstrates that race predominated in Districts 1, 3, and 4. Commissioner Carollo explained that the Commission "ha[d] to keep three districts that are going to be majority-Hispanic." Pls.' Ex. 8 at 56:19–20. Commissioner Díaz de la Portilla expressed the same views while also emphasizing his desire to keep a Black and "Anglo" district. *See* Pls.' Ex. 7 at 8:14–16. Likewise, Commissioner Reyes, when instructing De Grandy, stated, "I will strongly request that the districts . . . remain as they are" because, "the districts [were] drawn in a way that every single ethnic group would be represented." Pls.' Ex. 6 at 9:11–12. As a result of the Commissioners' instructions, District 1 in the 2022 Plan had an 89.5% HVAP, District 3 had an 88.3% HVAP, and District 4 had an 89.5% HVAP. Joint Stip. at 16 ¶ 45.

Though the Court does not recount every alteration in the 2021–2022 redistricting process here, many of the Commission's suggested changes to these districts, and De Grandy's justifications for those changes, were motivated by the Commissioners' goals to make these three districts heavily Hispanic. Some examples are as follows:

- Along the District 1 and District 5 border, Carollo explained that the border could be moved to include Wynwood and the north side of the Miami River in District 1 because their populations were "mainly Hispanic." Pls.' Ex. 2 at 3:12–17. Similarly, Commissioner Díaz de la Portilla stated that District 1's border "really can't go north" to gain population in Allapattah or Liberty since those are "African American area[s]." *Id.* at 4:19–20, 5:14–19 (expressing same about extending the border north of 112th Street).

- When discussing alterations incorporated into the Base Plan, De Grandy explained that he moved an area around the Riverside Center from District 1 to District 5, saying "we felt

this movement was needed because Hispanics in this area constitute roughly 70% of the population."  Pls.' Ex. 4 at 7:6–8.

- When discussing alterations between Districts 2 and 3, Commissioner Díaz de la Portilla suggested moving areas "where Hispanic voters live" from District 2 into Districts 3 and 4.  Pls.' Ex. 2 at 7:16–17.  De Grandy incorporated this suggestion into the Feb. 7 Draft Plan.  Pls.' Ex. 3 at 9:21–23.  Further, De Grandy explained he moved this area, as opposed to areas of Brickell and Downtown further north "because of dissimilar demographics."  Pls.' Ex. 4 at 7:22–23; Pls.' Ex. 7 at 36:17–37:2.

- The Commission rejected the Reyes and Russell proposed plans that were not as starkly separated along racial lines because, according to De Grandy, District 3 was a "stronger Hispanic district under the [B]ase [P]lan."  Pls.' Ex. 8 at 75:21, 78:3–18; *see also* Abott Rep. at 24 (describing District 3's HVAP as 86.6% under the Russell Plan and 87.3% under the Reyes Plan).

- In Coconut Grove, the Commissioners discussed moving portions of the neighborhood into District 4 because that's "where the Hispanic voters lived."  Pls.' Ex. 2 at 7:16–17.  Later, Commissioner Reyes assented to adding this portion of Coconut Grove into District 4 because he believed it was necessary to maintain District 5's racial demographics.  Pls.' Ex. 6 at 50:13–14.

As mentioned before, these examples of discussions are non-exhaustive.  Race permeated every aspect of the 2021–2022 redistricting process.  *See supra*, Part III.C.1–7.  Just as with Districts 2 and 5, the Commissioners instructed De Grandy on how to design Districts 1, 3, and 4 to ensure they remained "as Hispanic as [they] can."  Pls.' Ex. 3 at 107:13–14.

### 9.    Circumstantial Evidence

Though the record is replete with direct evidence that the Commissioners intended each district to be designed based on their racial preferences, circumstantial evidence also demonstrates the same.  In particular, the Court focuses both on (1) the specific changes made between the Feb. 7 Draft Plan and the Base Plan further separating citizens based on race, and (2) rejected alternative map configurations.  An analysis of this circumstantial evidence further supplements the direct evidence identified throughout this Order.

49

The alterations of the Feb 7. Draft Plan which culminated in the Base Plan exacerbated the racial disparities among each district. For example, the Base Plan moved less of Coconut Grove into District 4 than the Feb. 7 Draft Plan. The portion of Coconut Grove moved into District 4 in the Base Plan was 59.2% HVAP as opposed to the 49.1% HVAP population in the Feb 7 Draft Plan. Abott Rep. at 26. Moreover, in the Base Plan, De Grandy made a change to the border between District 1 and 5, swapping a 76.6% HVAP area in Allapattah into District 1 for a 66.7% HVAP area into District 5. *Id.* (identifying another swap where District 5 gained a 40.4% BVAP area of Downtown from District 1 and, in exchange, District 1 gained a 72.1% HVAP area west of I-95). This change had the effect of increasing District 5's BVAP and District 1's HVAP. Along the border between District 2 and 5, two 13% BVAP blocks were moved into District 2 and a 32.1% BVAP area was moved into District 5. *Id.* Each of these changes to the earlier Feb. 7 Draft Plan function to further the Commissioners' demographic objectives.

The rejected alterations in the redistricting process also provide circumstantial evidence that race predominated in the design of each district. Commissioner King requested restoring part of the riverfront area contained in the Base Plan's District 1 to District 5, *see* Pls.' Ex. 6 at 37:5–6, but, as mentioned above, De Grandy explained that making this change would lower District 5's BVAP to 49%, *id.* at 37:6–9. This suggestion was ultimately abandoned. Pls.' Ex. 7 at 4:21–5:7. Similarly, Commissioner Díaz de la Portilla suggested moving a single 73% HVAP city block containing condominium tower known as Flagler on the River into District 5. Pls.' Ex. 8 at 6:12–15. The Commission rejected the proposal after De Grandy informed them that this change would result in lowering District 5's BVAP below 50%. *Id.* at 8:6–9. Commissioner Carollo suggested moving an area between 22nd and 27th Avenues in the North Grove into District 4. *See* Pls.' Ex. 3 at 101:11–14, 102:2–3. This area was less Hispanic (36.7% HVAP) than the alternative option

of moving a more Hispanic (59.2%) part of the West Grove into District 4.  Abott Rep. at 26, 28.
This option was never presented to the Commissioners in any of De Grandy's drafts.

Taken together, the circumstantial evidence also tends to demonstrate that the
Commissioners approved and De Grandy implemented changes that would exacerbate their goals
of creating race-based districts.  In contrast, the Commissioners rejected proposals that tended to
frustrate those goals.

### a)   *The Commissioners Subordinated Traditional Redistricting Criteria*

While the evidence identified above shows that race predominated in the drawing of each
district, Plaintiffs still bear the burden of demonstrating that "the legislature subordinated
traditional race-neutral districting principles . . . to racial considerations."  *Bethune-Hill*, 580 U.S.
at 187 (citation omitted) (alteration in original).   Traditional redistricting criteria include
"compactness, contiguity, respect for political subdivisions or communities defined by actual
shared interests, incumbency protection, and political affiliation."  *ALBC*, 575 U.S. at 254.  Of
these (non-exhaustive) criteria, the Commission did not mention contiguity or incumbency
protection as factors De Grandy should consider.  The Commission did, however, explicitly
instruct De Grandy to break up traditional neighborhoods with shared interests like Coconut Grove
to achieve their desired racial demographics for each district.   Similarly, the Commission
unequivocally told De Grandy that the 2022 Plan could sacrifice compactness to accomplish their
racial objectives.  The Court outlines their decisions below.

51

### (1)      The 2022 Plan Split Neighborhoods[15]

Over the course of the redistricting process, the Commissioners were clear that neighborhoods would be split to preserve the racial demographics of each district.  At the first November 18, 2021 meeting, Commissioner Díaz de la Portilla stated that neighborhoods like Flagami could be split if the voters "will elect the same kind of representative."  Pls.' Ex. 1 at 33:14–16.  In the December 9, 2021 meeting, Commissioner Díaz de la Portilla suggested splitting Coconut Grove "based on where the Hispanic voters live."  Pls.' Ex. 2 at 7:15–16.   Later, Commissioner Carollo defended the Commission's decision to split Coconut Grove, stating that "the Grove is going to have to be split in either two or three parts," or otherwise, the City could face " the biggest danger" of "not . . . keeping an 'Anglo' seat or a Black seat."  *Id.* at 14:13–14, 14:16–17.  Despite a wave of public opposition at multiple Commission meetings where individual citizens presented race-neutral reasons not to split Coconut Grove, the Commissioners consistently reaffirmed that the neighborhood must be split to maintain the "ethnic integrity" of the districts. *Id.* at 7:16–18.

The Commissioners readily split other neighborhoods as well.  Little Havana is split between each of Districts 1, 3, and 4, Silver Bluff and Shenandoah are split between Districts 3 and 4, Flagami is split between Districts 1 and 4, and Allapattah and Overtown are split between Districts 1 and 5.  *Id.* at 52:5–7, 52:8–17, 60:16–17; Pls.' Ex. 1 at 17:20–22.  Though some of these neighborhoods had been broken up in prior redistricting cycles, the Commission made clear that

---

[15] As noted in Part III.C.1, the Commission did not craft the 2022 Plan with respect for political subdivisions.  The record demonstrates that the terms "voter cohesion" or "political cohesion" were used as a proxy for race.  Thus, while the Commission did not necessarily subordinate respect for political subdivisions to the same extent they subordinated other criteria, the Court finds that any consideration of this factor actually constituted an effort to create race-based districts.

these divisions were necessary in this redistricting cycle to preserve the racial makeup of the districts. *See* Pls.' Ex. 5 at 4:6–5:10; *supra*, Part III.C.1–7.

Accordingly, the Court finds that the Commission set aside the redistricting criterion of keeping traditional neighborhoods together within a single district. The Commission's primary objective to retain the racial composition of each district resulted in the subordination of this redistricting criterion.

### (2)     The 2022 Plan Was Not Compact

Regarding compactness, another traditional redistricting criterion, the Commissioners explicitly disclaimed any need for compactness if designing the districts in such a manner would adversely affect the districts' racial composition. As noted above, Commissioner Russell stated "[c]ompactness is not crucial" and Commissioner Díaz De La Portilla agreed, saying "I have no problem getting rid of compactness at the end of the day." Pls.' Ex. 2 at 18:2, 18:17–18. Commissioner Díaz de la Portilla asked De Grandy, "it is not possible to emphasize compactness and draw realistic districts, right[?] If you want to have an African American district and you want to have an Anglo district it's almost impossible . . . [t]o emphasizes compactness." *Id.* at 28:22–29:1. De Grandy concurred that compactness would not be achievable in light of the Commission's directives. *See id.* at 17:20 ("Compactness, again, I don't think compactness is a feasible alternative."); *id.* at 18:7–8 ("I mean look at the districts the way they are drawn, they are not compact.").

And when examining the 2022 Plan, it is indeed non-compact. District 3 contains an irregular appendage south of US 1 stretching into Coconut Grove where a high proportion of Hispanic voters reside. District 2 features an offshoot into Downtown removing an area from District 5 with a lower BVAP. Abott Rep. at 28. District 1 also runs along the Miami River to

Flagler Street in an effort to move areas with a higher HVAP into District 1 from District 5. Pls.'
Ex. 3 at 9:5–8; Pls.' Ex. 4 at 7:3–8.

Thus, the Commissioners were clear about their intent to sacrifice compactness in order to
achieve their goals of having three Hispanic, one Black, and one "Anglo" district. They achieved
their goal. The 2022 Plan is visibly non-compact and contains irregular appendages designed to
exacerbate the districts' racial divisions.

### (3)    The 2022 Plan Deviated from Manmade and Natural Boundaries

The Commission also subordinated respect for manmade and natural boundaries to racial
considerations. Though De Grandy and the Commission considered using these boundaries—
particularly US 1—as a factor, the Commission never ratified whether to do so. *See* Pls.' Ex. 2 at
18:23–19:21. The 2022 Plan thus departs from these boundaries in multiple instances. For
example, the 2022 Plan crosses US 1 into areas "where the Hispanic voters live" in Districts 3 and
4. *Id.* at 7:17. Moreover, the border between Districts 1 and 4 winds along residential streets in
Flagami based on racial demographics. Pls.' Ex. 20; ("Pls.' Ex. 67") (ECF No. 173-8). Allapattah
was moved into District 5 along a two-lane street as opposed to I-95 and a federal highway as in
the 2013 Plan. On the border between Districts 1 and 5, the border separates from I-95 to capture
a 61% BVAP area in District 5. *See* Abott Rep. at 28; Pls.' Ex. 67. And in Downtown, the border
between Districts 2 and 5 departs from NE 2nd Avenue to gather a six-block, low BVAP area into
District 2. Abott Rep at 28; Pls.' Ex. 67. Accordingly, the Court finds that the 2022 Plan deviates
from adherence to manmade and natural boundaries when necessary to further the Commission's
racial considerations.

*b)*        *The 2022 Plan Was Not Designed to Protect Incumbents*

Though not a factor that the Commission subordinated, the Court also finds that the 2022 Plan was not designed to protect incumbent Commissioners.  Among other traditional redistricting criteria mentioned above, another race-neutral consideration is incumbency protection.  *See ALBC*, 575 U.S. at 272.  During his testimony, De Grandy opined that the Commissioners wanted him to maintain the core of existing districts from past redistricting cycles in the 2022 Plan because "quite frankly, it is an incumbent protection criteri[on]."  T2. at 122:18–19.  But the vast swaths of direct evidence demonstrate that maintaining the core of existing districts was an instruction designed to further entrench the racial divisions among districts.  *See supra*, Part III.C.1–7.  The Commissioners were not focused on drawing districts to ensure that they themselves could be reelected, but rather, they sought to ensure that future commissioners would share similar racial and ethnic backgrounds to them.  Perhaps that explains why the Commission never raised incumbency protection in any redistricting meeting, or why Defendant doesn't advance this argument.  *See generally* (ECF No. 182).  The 2022 Plan was not designed to protect incumbents.

**D.        Race Predominated in the Drawing of the 2023 Plan**

On May 3, 2023, Judge Louis issued an R&R recommending that the Court enjoin the City from using the 2022 Plan in the upcoming November elections.  *See* R&R.  Concerned about the R&R and the prospect that the Court would grant the preliminary injunction motion, the City Commission met on May 11, 2023 and again on June 14, 2023 to discuss redistricting.  *See generally* ("Pls.' Ex. 27") (5/11/23 Tr., ECF No. 170-27); ("Pls.' Ex. 28") (6/14/23 Tr., ECF No. 170-28).  In the first meeting, the Commissioners made clear that any remedial plan must ensure the racial divisions from the 2022 Plan remained.  Circumstantial evidence from the second meeting further demonstrates that the Commission intended to change the unconstitutional 2022

Plan as little as possible.  Expert reports support this conclusion considering that hardly any Miamians were moved between districts from the 2022 Plan to the 2023 Plan.  And finally, while the City raised the argument earlier in this Action that partisanship influenced the 2023 Plan's creation, the Court rejects that proposition for lack of record support.

### 1.    May 11, 2023 Meeting

The meeting began with Commissioner Díaz de la Portilla, shortly after the issuance of the R&R, suggesting a return to at-large City Commission elections.  *See* Pls.' Ex. 27 at 2:7–11. Commissioner Díaz de la Portilla, expressing frustration with this lawsuit and reiterating that the goal of the 2021–22 redistricting cycle was to sort the districts based on race, stated the following:

> So, we want an African American representation, we want a non-Hispanic white representation, we want that. I think it adds to the . . . fiber of our city and adds to the representation that we provide up here.  But if that's being questioned by [Plaintiffs] . . . like the NAACP and others, well, let's do citywide [elections] and let's see what the results are and then can they argue against that[?]

*Id.* at 4:19–5:2.  He continued, "What we've been trying to do . . . is to be fair and to provide representation for all communities in our city."   *Id.* at 5:12–13.  To Commissioner Díaz de la Portilla, a return to at-large citywide elections could resolve the racial gerrymandering allegations.

Commissioner Reyes shared in Commissioner Díaz de la Portilla's frustration.  Telling Plaintiffs that they "should be careful what [they] wish for," Commissioner Reyes explained "the only way that we can assure diversity of the city of Miami is by – *I'm going to call a spade a spade – b[y] gerrymandering*.  We have to bunch together ethnicity, ethnic borders in order to be able to have Afro American, to make sure that they are represented, and non-Hispanic White in the – in representing the City of Miami."  *Id.* at 6:3–10 (emphasis added).  Accordingly, and not for the first time, a commissioner explicitly stated in a public hearing that the Commission engaged in

racial gerrymandering during the 2021–2022 redistricting cycle and that gerrymandering was the only way to achieve their redistricting goals.

As the conversation continued, multiple Commissioners doubled down on the view that the Commission correctly focused their redistricting efforts on race. *See id.* at 8:12–18. Commissioner Díaz de la Portilla explained, "[w]hat we did was the right thing to do. What we did was to protect Miami's diversity and representation of all groups in our city." *Id.* at 8:12–13. Commissioner Reyes, expressing his reluctance to support a shift to at-large elections, stated that the main consequence of such a change would be that "[w]e could eliminate diversity . . . as Commissioner Díaz de la Portilla said, most probably, if we eliminate the districts, we're going to have five Hispanics sitting here." *Id.* at 13:11–13.

The meeting concluded with the Commissioners establishing a singular directive to De Grandy.  The Commission voted unanimously (without Carollo who was absent from the meeting) to instruct De Grandy to "start redrawing a map[] that will guarantee that ten years from now we're going to have the diversity in this – in the . . . city government and we are going to elect an Afro American to a seat, that they're going to be properly represented, as well as other groups." *Id.* at 17:9–13, 18:16–23.  To be clear, City Commission's *only instruction* to De Grandy when constructing a new map was to ensure that a potential remedial plan would maintain the racial demographics of the existing districts.  This time, the Commission did not even entertain the idea that other traditional redistricting criteria should factor into De Grandy's analysis.  Their sole priority and only instruction was to ensure that the districts continued to be drawn based on race.

### 2.    June 14, 2023 Meeting

The Court adopted the R&R and issued its injunction order on May 23, 2023.  (ECF No. 60).  That same night, Plaintiffs submitted two proposed maps ("P1" and "P2") and a letter

explaining them to the City Commission.  *See* ("Pls.' Ex. 33") (ECF No. 172-5).  Plaintiffs

provided additional information to the Commission regarding P1 and P2's compliance with the

VRA.  *See* ("Pls.' Ex. 34") (ECF No. 172-6); ("Pls.' Ex. 36") (ECF No. 172-8).  On June 12, 2023,

Plaintiffs provided the Commission with Dr. Bryant Moy's (Plaintiffs' expert) full analysis of their

alternative plans.  *See* ("Pls.' Ex. 35") (ECF Nos. 172-7, 172-8).  The next day, Plaintiffs submitted

a third map ("P3") to the Commission.  *See* ("D.'s Ex. 58") (ECF No. 171-19).

On June 14, 2023, the Commission reconvened to discuss Plaintiffs' alternative maps as

well as De Grandy's newly proposed draft plan.  *See* Pls.' Ex. 28.  Prior to the meeting, De Grandy

met with each Commissioner and created a new map ("V12" or "Version 12") "that took into

consideration the policy and political suggestions of the City Commissioners."   ("Pls.' Ex. 32")

(ECF No. 172-4); T2 at 68:4–12, 69:10–20.  According to De Grandy, his understanding of the

Commission's "political and policy considerations" came from the six meetings that occurred

during the 2021–2022 redistricting process.  T2. at 68:10–16.  As discussed above, those policy

and political considerations amounted to little more than ensuring that a future plan would have

three Hispanic, one Black, and one "Anglo" district.  Thus, De Grandy followed two directives

when developing V12:  (1) comply with the Constitution and the VRA; and (2) "maintain the cores

of existing districts."  *Id.* at 70:7–25.  The existing districts, clearly, were the ones the Court just

enjoined.

The meeting began with Plaintiff Valdes advocating for P1, P2, and P3.  Pls.' Ex. 28 at

5:21–7:2.  Valdes opined that each of Plaintiffs' maps "feature compact and logical districts that

respect neighborhoods, follow major geographic boundaries, and preserve genuine communities

of interest.  They don't pack Hispanic voters into three specific districts and no longer designate

one district as an Anglo access seat.  They also fully comply with the VRA and provide[] Black

voters with the ability to elect their preferred candidate in District 5." *Id.* at 6:13–17. Valdes also explained that P3 kept together key neighborhoods such as "Flagami, Edgewater, Allapattah, and Shenandoah." *Id.* at 6:19–20.

Following Valdes's presentation, De Grandy opined that he had not yet had the opportunity to review Plaintiffs' P3. *Id.* at 8:5. Accordingly, De Grandy's presentation focused on a comparison of V12 to Plaintiffs' P2. *Id.* at 8:5–9.



*Figure 7: De Grandy's Proposed V12.*

De Grandy informed the Commission that when crafting V12, he used P2 as a template and made "changes consistent with the policy choices of the majority of this elected body." *Id.* at 9:2–3. According to De Grandy, he considered "where Commissioners have invested district resources," "the need to balance poor areas with areas that have significant economic potential or activity," "natural and manmade boundaries," and "keeping as many communities of interest together as feasible." *Id.* at 11:23–12:3, 12:10–11. De Grandy then described the changes he made to each district.

For example, De Grandy explained that V12 incorporated Commissioner King's desire to retain traditional neighborhoods as well as areas that would generate significant economic activity like Wynwood, Midtown, and the Design District.  *Id.* at 12:2–3, 12:15–18.  In District 1, V12 now "restored the connection to the western part of the city," contained "the bulk of the Miami riverfront," and purported to adhere to manmade and natural boundaries.  *Id.* at 13:5–19.  V12 extended District 2 to include significant portions of Morningside, Bay Point, Omni, Downtown, Brickell, and Coconut Grove.  *Id.* at 13:20–14:11.  Larger differences between the 2022 Plan and V12, however, arose in the border between District 3 and 4.  In V12, Flagami is split between both Districts, and most of Shenandoah, Silver Bluff and Coral Gate were in District 4.  *Id.* at 15:3–6.  In turn, V12's District 3 "wraps around District 4" but retains Little Havana.  *Id.* at 15:13–15.

Following De Grandy's presentation, multiple Commissioners commented on V12 and suggested some alterations.  Commissioner Covo emphasized her desire that Coconut Grove should remain united within one district.  *See id.* at 42:9–43:3.  Commissioner King suggested an alteration to move Morningside entirely into District 2.  *See id.* at 43:21–47:4.  Commissioner Carollo requested that Domino Park should be completely in District 3.  *See id.* at 52:21–53:5.  Moreover, Commissioners Covo and Díaz de la Portilla each made copies of alternative maps that they wanted De Grandy to examine.  *See id.* at 48:20–49:1, 50:4.  The meeting recessed for three hours to permit De Grandy to consider the requested adjustments.  *Id.* at 55:3–22.

De Grandy returned with five alternative maps for consideration:  an unaltered V12 and maps suggested by Commissioners King, Carollo, Díaz de la Portilla, and Covo.  *See id.* at 58:21–23.  After discussion, the Parties agreed to alter V12 so that the People's Bar-B-Que restaurant would be included in District 5, the "Bahamanian Grove" would be restored into District 2, and

Domino Park would be placed entirely into District 3.  *See id.* at 69:9–18, 70:8–11, 72:16–17, 87:20–22, 89:14–91:19.  By majority vote, the Commissioners passed V12 with these adjustments.



*Figure 8: 2023 Plan.*

### 3.    De Grandy's Testimony

Direct evidence demonstrates that the Commission intended the 2023 Plan to retain the racial divisions in each district from the 2022 Plan, and De Grandy's testimony does not alter that conclusion.  At trial, De Grandy testified that he did not receive any instructions prior to his presentation of V12 at the June 14, 2023 meeting.  T2. at 109:4–13.  According to De Grandy, he never learned of the May 11, 2023 meeting, and therefore, he did not receive any instruction that he should design the 2023 Plan to maintain the 2022 Plan's racial demographics.  *See id.* at 109:9–13.  The Court does not find his testimony credible for multiple reasons.  But even if it did, the Court is still satisfied that De Grandy's alterations to the 2022 Plan which culminated in the 2023 Plan ensured that the five districts would retain largely identical racial demographics.

61

There are multiple instances where De Grandy gave testimony showing his lack of credibility.[16]  For example, De Grandy testified that before he developed V12, he did not meet with any Commissioners.  This testimony, however, contradicts both his own prior testimony as well as Resolution R-23-0271, which confirm that De Grandy did meet with the Commissioners prior to the June 14, 2022 meeting.  Pls.' Ex. 32 at 2; T2. at 66:18–25.  Indeed, during the June 14, 2023 meeting, Commissioner Díaz de la Portilla asked De Grandy:  "Version 12 is the city's map, the one that takes into account everybody's input in different conversations . . . But my understanding is that [V12] [has] been discussed for about over a week in long meetings, different commissioners, independent [of] each other[,] right?"  Pls.' Ex. 28 at 51:22–23, 52:5–7.  De Grandy, answered, "Correct."  *Id.* at 52:8.  Further demonstrating De Grandy's lack of credibility, in a separate discussion about the 2021–2022 redistricting process, defense counsel asked De Grandy if he recalled "race being discussed . . . in the Commission."  T2. at 132:8–9.  Incredibly, and despite the extensive discussions focusing on race catalogued above, De Grandy responded: "Yes.  It was [discussed] to the extent that we needed to comply with the Voting Rights Act."  *Id.* at 132:10–11.  Discussions of race during the 2021-22 redistricting process were clearly not so limited.[17]   Given the contradictions between De Grandy's testimony and the record, the Court

---

[16] This is not the first time the Court has found that De Grandy is not credible.  *See* R&R at 84 ("The Court declines to afford De Grandy's testimony much weight, given his testimony at the March 29, 2023 hearing contradicted his statements made during the redistricting process.  For example, De Grandy presented on February 7, 2022 a preliminary plan with a BVAP of less than 50% in District 5 but later testified on March 29, 2023 that he believed the VRA required a BVAP of more than 50% in District 5.").

[17] Other instances also demonstrate De Grandy's lack of credibility.  For example, he testified that though the initial map he brought to the June 14, 2022 meeting was entitled Version 12, he did not know whether earlier versions of the plan existed, nor how the plan came to be named V12.  T2. at 66:22–68:3.  Further, though De Grandy denied that when presenting V12, he was "looking to make one commissioner happy," *id.* at 111:20–21, De Grandy expressed the opposite when describing why he drew District 3 to include Commissioner Carollo's home.  *Id.* at 86:21–24 ("My

does not find him credible and declines to offer much weight to De Grandy's assertion that he did not take any instruction from the Commission to maintain the racial demographics from the 2022 Plan in V12.

Instead, the Court finds that the Commission unanimously directed De Grandy to create a remedial map that would maintain three Hispanic, one Black, and one Anglo district. De Grandy understood this directive to mean that he should, "to the greatest degree possible," retain the core of existing districts while still adhering to the Constitution and the VRA. *Id.* at 70:20–23, 82:17. De Grandy complied with this directive and designed V12 so that over 94% of the population would remain in the same districts that the Court found were substantially likely to be unconstitutional in the 2022 Plan. *See id.* at 177:18–22.

### 4.    Circumstantial Evidence

The 2023 Plan is staggeringly similar to the 2022 Plan. 94.1% of Miamians remain in the same district in the 2023 Plan as they were in the 2022 Plan. ("Pls.' Ex. 122") ("McCartan Rep." ECF No. 173-27 at 8). The racial demographics of the 5.9% of Miamians who were moved into new districts in the 2023 Plan suggests continued racial predominance.

In Districts 1, 3, and 4, where the Commission sought to maximize Hispanic population, 97.8% of the citizens residing in one of those three districts in the 2022 Plan continue to reside there in the 2023 Plan. *Id.* Of the 5,125 residents moved from these three districts into District 2 and District 5, those residents were disproportionately less Hispanic. *See* Abott Rep. at 38 (explaining that the citizens moved into Districts 2 and 5 in the 2023 Plan were 59% HVAP, a number far lower than the HVAP of Districts 1, 3, and 4 in the 2022 Plan). And areas that were

---

first plan did not go that far south [to include Carollo's home in District 3]. Later on, when I saw all the newspaper accounts, etcetera, I thought yes, that would make him happy.").

approximately 90% HVAP were shuffled among Districts 1, 3, and 4, thus creating the illusion that these districts changed while maintaining their racial demographics.  *See id.*

Further, the Commission only removed 4,735 residents from District 5 in the 2023 Plan. *See id.*  The BVAP of that population which the Commission placed into other districts was 16.6%. *See id.*  As noted above, District 5's BVAP in the 2022 Plan was 50.3%.  Joint Stip. at 16 ¶ 45.

The 2023 Plan not only retains the vast majority of the 2022 Plan's district cores, but the racial demographics of the citizens that the Commission chose to move in the 2023 Plan indicate continued racial predominance.  Hardly any voters changed districts in the 2023 Plan.  The populations that were moved, and what districts they were moved into, conspicuously align with the racial breakdown of the enjoined 2022 Plan.  The Court considers this circumstantial evidence that race predominated in the design of each district in the 2023 Plan.

### a) *Adjustments to V12 Show Continued Racial Predominance*

Multiple changes to V12 that were incorporated into the 2023 Plan also provide circumstantial evidence that the Commission intended to preserve the racial divisions from the 2022 Plan during this redistricting process.  In other words, the evolution of the 2023 Plan provides circumstantial evidence of the Commission's intent to change the unconstitutional 2022 Plan as little as possible.



*Figure 9: ("Pls.' Ex. 84")  (ECF No. 173-23).*

Between District 2 and 3, the Commission removed Area 21 from District 3 and returned it to District 2, just as it was in the 2022 Plan. Pls.' Ex. 28 at 65:6–7. This area had a 54% WVAP. Abott Rep. at 48. Though never discussed in either the May 11 or June 14 meetings, the Commission moved Area 25, a plurality-white portion of the City, into District 2. *Id.*; T2. at 95:25–96:4 (De Grandy explaining that he did not know why this area was moved other than to equalize population). The Commissioners then moved Area 24, a plurality HVAP area, into District 3. Pls.' Ex. 28 at 38:5–39:10.

The Commission's alterations to V12 that resulted in the splitting of Morningside also provide circumstantial evidence of racial predominance. V12 proposed moving a portion of Morningside—Area 26—out of District 2 and into District 5. T2. at 94:18–95:1. This area had a 41.9% WVAP and 11.8% BVAP. Abott Rep. at 48. Following extensive discussion where Commissioner Covo objected to the splitting of Morningside and where Commissioner King

requested that the neighborhood be restored to District 2, *see* Pls.' Ex. 28 at 43:15–47:6, Area 26 was moved into District 2 and incorporated into the 2023 Plan.  *See id.* at 64:21–65:1.

That the Commission restored Area 26 to District 2 is problematic for multiple reasons. As an initial matter, Morningside remains divided between Districts 2 and 5.  The Commission rejected each of Plaintiffs' alternatives that would have maintained the entirety of the neighborhood within District 5.  *See* ("Pls.' Ex. 78") (Version 14 Map, ECF No. 173-17); ("Pls.' Ex. 29") (Plaintiffs' alternative maps P1 and P2, ECF No. 172-1); Pls.' Ex. 36.  The 2023 Plan also excludes from District 5 low-BVAP neighborhoods south of the existing boundary.  *See* Abott Rep. at 49.  In sum, this evidence supports the inference that the 2023 Plan divided Morningside along racial lines to preserve the racial demographics of Districts 2 and 5 from the 2022 Plan.

The Commission and De Grandy also defined the District 5 neighborhood Overtown along racial lines, and as a consequence, they excluded majority Hispanic areas.   When describing how he included Overtown entirely in V12's District 5 rather than splitting the neighborhood with District 1 (this definition of Overtown was incorporated into the 2023 Plan), De Grandy explained that he relied on Google Maps and the City's Neighborhood Enhancement Team ("NET") to determine his understanding of that neighborhood's parameters.  Pls.' Ex. 28 at 16:4–7.  The area De Grandy defined as Overtown had a 60.5% BVAP.  *See* Abott Rep. at 38–40, 50.  But De Grandy's conception of Overtown actually excludes large areas that are part of Google Maps' and NET's version of Overtown.  *See id.*  The areas that De Grandy excluded are disproportionately non-Black.  *See id.* at 50 (explaining that these areas are 63.7% HVAP and 26.2% BVAP).  The City Code and the City Police Department also define Overtown to include the areas that De Grandy excluded.  *See id.* at 38–40; City Code §2-1051.  The manner in which De Grandy defined Overtown resulted in the continued racial divisions of both Districts 1 and 5.

*b)*        ***District-by-District Analysis***

**District 5**

The Parties agree that race predominated in District 5 in the 2023 Plan.  Joint Stip. at 18–

19 ¶¶ 10–13 (explaining that the Court must determine "[w]hether race was the predominant factor

in the design of Districts 1, 2, 3, and 4"); *supra*, Part III.C.8.  The Court concurs.

**District 2**

Race predominated in the design of District 2 in the 2023 Plan.  Just as in the 2022 Plan,

District 3 in the 2023 Plan is still a non-compact "thin strip confined to the coast, extending from

the northeast in the Morningside area . . . and continuing along the water though Coconut Grove."

R&R at 72; *see also* McCartan Rep. at 6–8 (explaining that District 2 is equally as compact in both

the 2022 and 2023 Plans).  The district's design adheres to the Commission's initial goal of

reserving an "Anglo" seat in District 2.  It surgically excludes higher BVAP or HVAP areas to the

north and south of the district.  *See* Abott Rep. at 35–36.  Further, District 2 retains higher WVAP

portions of Morningside from the 2022 Plan while also adding an adjacent low BVAP area.  *Id.* at

46, 49.  The border also snakes from NE 2nd Avenue to the railroad tracks, back to NE 2nd Avenue,

and then back again to the railroad to retain a higher WVAP "Condo Canyon," adds an additional

low BVAP area near Omni, and moves higher BVAP areas into District 5.  *Id.*  Moreover, the

Commission moved into District 3 higher HVAP areas of Coconut Grove which were in District

2 in the 2022 Plan.  Areas with a greater WVAP in north Brickell remain in District 2 in the 2023

Plan, thus excising this population from District 3.  Between the 2022 and 2023 Plans, 92.2% of

District 2 residents remain there.  McCartan Rep. at 6–8.

**Districts 1, 3, and 4**

Race likewise predominated in the design of Districts 1, 3, and 4 in the 2023 Plan. The districts each have staggeringly high core retention rates. *Id.* at 8 (ranging from 90.6% to 98.2%). Flagami, Silver Bluff, Shenandoah, and Little Havana remain split between each of the three districts. District 1 maintains its "staircase-like stepping pattern in its northeastern corner in Allapattah" with slight deviations that still deviate from major highways. R&R at 74. Indeed, District 1 excludes portions of Overtown with high BVAP areas but includes portions of Overtown that contain majority-HVAP areas. *See* Abott Rep. at 38–40. District 3 is less compact, adding a high HVAP area in Bay Heights while minimizing additions from a high WVAP area in north Brickell. Overall, the 2023 Plan succeeded in maintaining the cores of these three districts as drawn in the 2022 Plan while making slight alterations that exacerbated the racial divisions the Commissioners desired.

### 5.     Partisanship

Partisanship does not explain the design of any district in the 2023 Plan. At the outset, the Commissioners expressly denied that partisanship played any role in the remedial redistricting process. Pls.' Ex. 28 at 32:13–21. In fact, the record is devoid of any evidence that partisanship played any role in the Commissioners' decisionmaking. Plaintiffs' expert Dr. Abott also demonstrated that objective election data shows that the 2023 Plan was not drawn to achieve a particular partisan outcome. *See* Abott Rep. at 40–42. During his testimony, De Grandy responded in the affirmative when asked "[t]he Commission never publicly gave political consideration[s] as a redistricting principle that they followed, though, right[?]" though he noted he inferred those preferences from the directive to maintain the cores of existing districts. T2. at 77:23–78:21. Considering the record as a whole, the Court cannot find that partisanship influenced the 2023

Plan's creation.  To the contrary, the record indicates the Commission explicitly disclaimed partisan considerations.

### E.      Summary of Racial Predominance

Though the Court presumes the good faith of the Commission, Plaintiffs have met their demanding burden of proving that race predominated in the 2021–2022 redistricting cycle.  Over the course of six Commission meetings, the Commissioners repeatedly instructed De Grandy to design a map containing three majority Hispanic, one majority Black, and one plurality "Anglo" district.  More than any other consideration, this objective was of paramount importance.  During the redistricting process, the Commissioners reiterated that this was their goal *on over fifty different occasions*.  The Commissioners also made clear that De Grandy should achieve this result at the expense of traditional redistricting criteria such as compactness, adherence to manmade or natural barriers, and respect for traditional neighborhoods.  De Grandy understood his directive, often including race as the primary discussion point in his presentations and by frequently describing his mapmaking process in racial terms.  The 2022 Plan adhered to the Commissioners' primary objective of sorting voters based on race.  This was not an instance where Commissioners were merely aware of race during redistricting.  Rather, it was the Commissioners' conscious objective to ensure that any redistricting plan resulted in the race-based sorting they preferred.

In the remedial process culminating in the 2023 Plan, race likewise predominated.  On May 11, 2023, the Commissioners unanimously voted to instruct De Grandy to begin crafting a remedial plan that would preserve the racial demographics of the 2022 Plan.  De Grandy understood this objective and created V12 based on the Commissioners' desire to preserve the district cores from the 2022 Plan and the policy directives he received from the Commissioners in the 2021–2022 redistricting process.  The result of his process resulted in a remedial plan that retained 94.1% of

the 2022 Plan.  Even presuming the good faith of the Commission, the Court finds that the direct evidence of legislative intent and circumstantial evidence demonstrate that the 2023 Plan remains unconstitutionally racially gerrymandered.

### F.      The Parties[18]

#### 1.      The Individual Plaintiffs

##### a)      *Clarice Cooper*

Plaintiff Cooper is a Black resident of the City of Miami.  T1. at 20:19–20, 21:17–19.  She resides in Coconut Grove—a neighborhood within the City of Miami—at 3735 Oak Avenue, Miami, Florida.  *Id.* at 22:22–23:2.  Her residence was located in District 2 in the 2022 Plan and the 2023 Plan.  *Id.* at 24:24–25:9.  Plaintiff Cooper is a registered voter who voted in the 2023 Commission elections.  *Id.* at 24:7–12.

##### b)      *Yanelis Valdes*

Plaintiff Valdes identifies as "Hispanic or Latina" and has lived in the City of Miami since 2019.  *Id.* at 218:16–17, 219:2–3.  She resides at 58 Northeast 14th Street, Miami, Florida.  *Id.* at 219:6–9.  Her residence was located in District 5 in the 2022 Plan, and District 2 in the 2023 Plan. *Id.* at 219:14–220:2.  Plaintiff Valdes is a registered voter.  *Id.* at 219:4–5.

##### c)      *Jared Johnson*

Plaintiff Johnson is a Black resident who has lived in the City of Miami since July 2021. *Id.* at 93:22–23, 94:15–18.  He resides in Brickell—a neighborhood within the City of Miami—at 255 Southwest 11th Street, Apartment 1302, Miami, Florida.  *Id.* at 94:22–25.  His residence was

---

[18] The Court separates Plaintiffs into two groups.  Plaintiffs Cooper, Valdes, Johnson, Contreras, and Miro are hereinafter referred to as the "Individual Plaintiffs."  The Court uses the term "Organizational Plaintiffs" to collectively refer to Plaintiffs Engage Miami, Inc., GRACE, Inc., South Dade Branch of the NAACP, and Miami-Dade Branch of the NAACP.

located in District 3 in the 2022 and 2023 Plans.  *Id.* at 95:21–96:7.  Plaintiff Johnson is a registered voter.  *Id.* at 96:8–9.

### d)      *Alexandra Contreras*

Plaintiff Contreras is a White-Hispanic individual who formerly lived in the City of Miami. *Id.* at 124:7–8, 127:1–16.  From August 14, 2022, to July 31, 2023, she resided at 3237 Southwest 4th Street.  She therefore occupied this residence when this lawsuit was initiated on December 15, 2022, and when the City passed the 2023 Plan.  *See* (ECF No. 1); T1. at 124:22–23, 126:22–25. Her address was located in District 4 in both the 2022 and 2023 Plans.  T1. at 125:24–126:2, 126:22–25.  Plaintiff Contreras was registered to vote at this address until she moved out of the City of Miami.  *See id.* at 125:6–126:11.

### e)      *Steven Miro*

Plaintiff Miro is a Hispanic resident of the City of Miami.  *Id.* at 9:14–15, 11:20–21.  As a former law enforcement officer of five years, his address is not available to the public.  *See id.* at 9:18–25.  His unrebutted testimony, however, demonstrates that he resides in District 3 under the 2022 and 2023 Plans.  *See id.* at 10:14–11:3.

### 2.      **The Organizational Plaintiffs**

### a)      *Engage Miami, Inc.*

Plaintiff Engage Miami, Inc. ("Engage Miami") is a nonpartisan, nonprofit organization founded in 2015 with the mission to increase civic engagement among the youth.  T1. at 48:4–9. The organization's mission is to advance justice, sustainability and democracy.  *Id.* at 48:10–13. In carrying out its mission, Engage Miami is particularly active in advocating for voting rights, focusing on issues such as access to voting, election protection, and ensuring fairness in local redistricting.  *See id.* at 48:14–49:11.  With respect to the 2022 Plan, Engage Miami advocated

against the Commission's use of race in the redistricting process.  *See id.* at 49:15–50:15.  The 2023 Plan did not assuage Engage Miami's concern.  *See id.* at 50:16–24.  Engage Miami has a database where it tracks its members and their addresses.  *See id.* at 52:3–9.  The organization has members who reside in all five districts under both the 2022 and 2023 Plans.  *Id.* at 52:10–18.

### b)      *GRACE, Inc.*

Plaintiff GRACE, Inc., short for Grove Rights and Community Equity, Inc. ("GRACE"), is a 501(c)(3) nonprofit corporation.  *See* ("Pls.' Ex. 43") (ECF No. 172-14 at 1).  The corporation contains a coalition of Coconut Grove churches, civic groups, other nonprofit organizations, small business owners, tenants, and homeowners.  *Id.*  GRACE's stated mission is to (1) protect vulnerable black tenants and homeowners at risk of eviction, displacement, and resegregation; (2) restore the rights of the wrongfully displaced; (3) preserve the community culture, and history of the West Grove and its people; and (4) to advocate for equitable economic development.  *Id.*  To further its purpose, Plaintiff GRACE has, among other pursuits, advocated against inequity in voting rights.  T1. at 77:18–24.  The unrebutted evidence shows that GRACE has both organizational and individual members who reside in various districts.  *See id.* at 79:17–80:8 (organizational member Greater St. Paul African American Episcopal Church has individuals who live in Districts 2, 3, and 5); *id.* at 91:24–92:16 (individual members Clarice Cooper and Apostle John Chambers live in District 2).

### c)      *South Dade Branch of the NAACP*

Plaintiff South Dade Branch of the NAACP ("South Dade NAACP") is an affiliate branch of the Florida chapter of the NAACP (National Association for the Advancement of Colored People).  *Id.* at 135:7–14, 137:1–9.  The South Dade NAACP is one of two branches within the City of Miami.  *Id.* at 137:8–9.  It operates in Miami-Dade County south of Flagler Street.  *Id.* at

135:25–136:9.   Consistent with the NAACP's national guidelines, the South Dade NAACP's mission is to advocate for the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.  *See id.* at 140:4–11; ("Pls.' Ex. 47") (ECF No. 172-17).  Part of that mission includes advocating for the equitable treatment of voters and the protection of voting rights.  T1. at 140:20–141:11.

Though the NAACP maintains a membership roster, it does not publish its membership publicly, nor does it provide the roster to affiliate branches.  *See id.* at 143:17–21.  This policy stems from the history of intimidation that members could potentially be exposed to by virtue of their affiliation.  *Id.* at 144:2–18.  Nevertheless, the corporate representative for the South Dade NAACP verified that it had individual members residing in Districts 2, 3 and 4 by identifying specific members who attend South Dade NAACP meetings, cross referencing their identities with the voter database to confirm their addresses and submitting this information to be confirmed by the national branch.  *Id.* at 143:19–26.  No party disputes this verification occurred.  The corporate representative, despite verifying the residences of some South Dade NAACP in the above-mentioned Districts, did not identify any member by name.  *Id.* at 160:19–161:19.

### d)    *Miami-Dade Branch of the NAACP*

Similarly, Plaintiff Miami-Dade Branch of the NAACP (Miami-Dade NAACP) is an affiliate branch of the Florida chapter of the NAACP.  *Id.* at 177:24–180:1.  The Miami-Dade NAACP operates in Miami-Dade County north of Flagler Street.  *Id.* at 204:11–12.  As with the South Dade NAACP, the Miami-Dade NAACP adheres to the national organization's mission. *See id.* at 178:7–179:7.  The Miami-Dade NAACP accordingly, as part of its purpose, focuses on voting rights regarding its members.  *See id.* at 179:25–180:10.  Just as described above, the corporate representative for the Miami-Dade NAACP had to contact the national branch to verify

that Miami-Dade NAACP members resided in the City of Miami.  *See id.* at 180:11–22.  Through this process, the corporate representative confirmed that the Miami-Dade NAACP members resided in Districts 1, 2, 3, and 5 in both the 2022 and 2023 Plans.  *Id.* at 181:8–182:5.  The representative did not provide the names of the members she verified but confirmed that she could provide a list of names *in camera* if asked by the Court.  *Id.* at 182:11–14.

## IV.    CONCLUSIONS OF LAW

Plaintiffs allege that the 2022 Plan was racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.  SAC ¶¶ 503–506.  Plaintiffs further allege that the 2023 Plan remains racially gerrymandered and is likewise unconstitutional.  *See id.* Accordingly, the Court makes the following conclusions of law and explains them below:  (1) Plaintiffs have standing; (2) the design of each district in the 2022 Plan and the 2023 Plan constitutes a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.

### A.    Standing

The Court need only establish that one Plaintiff has standing.  *See, e.g.*, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (holding that "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint"); *Arlington Heights*, 429 U.S. at 264 n.9 (finding that, because one plaintiff had standing, the Court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit"); *Common Cause Fla., et al., v. Byrd*, No. 4:22-cv-109-AW-MAF, 2024 WL 1308119, at *25 (N.D. Fla. Mar. 27, 2024) ("Where at least one plaintiff has standing to maintain the action, and to seek each form of relief, it is unnecessary to address the standing of the other plaintiffs.").  Nevertheless, the Court finds that each Plaintiff has standing to bring this Action.

Each Individual Plaintiff has standing.  As noted above, "[w]here a plaintiff resides in a racially gerrymandered district, [] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Hays*, 515 U.S. at 744–45.  Plaintiff Cooper has standing to challenge District 2 because her residence was located there in the 2022 and 2023 Plans.  Plaintiff Valdes lived in District 2 under the 2022 Plan and District 5 under the 2023 Plan, meaning she has standing to challenge each of those districts in both Plans.  Plaintiffs Johnson and Miro have standing to challenge District 3 because they both resided in that district under both Plans.  Finally, Plaintiff Contreras has standing—even though she moved from her home in District 4 on July 31, 2023—because she (1) resided in a gerrymandered district under the 2022 Plans and 2023 Plans, and (2) though she no longer resides in the City of Miami, she is seeking nominal damages.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) (holding that the doctrine of standing assesses whether the plaintiff's personal interest in the dispute exists at the outset of litigation and that nominal damages may redress a past injury).

The Organizational Plaintiffs also have standing to sue on behalf of their members who reside in the challenged districts.   An organization has standing when one of the organization's members "would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted, nor the relief requested requires the individual members' participation in the lawsuit." *ALBC*, 575 U.S. at 269 (cleaned up).  There is no dispute as to the latter two elements.  First, this lawsuit is germane to each organization's purpose.  *See* T1. at 48:4–13 (describing Plaintiff Engage Miami's purpose as advancing democracy through voting rights advocacy); *id.* at 77:18–24 (describing Plaintiff GRACE's purpose to include voting rights advocacy); *id.* at 140:4–24 (describing South Dade NAACP's

purpose as including advocacy for equitable treatment of voters and the protection of voting rights); *id.* at 179:24–180:10 (describing same for Miami-Dade NAACP).  Further, the Court finds no reason why the claims asserted would necessitate an individual member's participation in the lawsuit.  Therefore, the Court's analysis below focuses on whether the Organizational Plaintiffs have demonstrated that they have a member with standing to sue in their own right.

After reviewing the record and the testimony of the organizations' corporate representatives, the Court finds that Plaintiffs Engage Miami and GRACE have members who reside in one of the challenged districts.  As to Plaintiff Engage Miami, the Court credits its corporate representative's testimony that Engage Miami maintains a membership database demonstrating that the organization had members residing in all five districts.  *See id.* at 52:3–23 (explaining that the corporate representative confirmed the addresses of their members and cross-referenced their addresses with where they were registered to vote).  Moreover, individual Plaintiffs Valdes and Johnson are both members of Engage Miami, and as the Court has already found, they have standing to sue in their own right.  *See id.* at 55:17–56:6.  Regarding Plaintiff GRACE, Inc., the Court likewise credits the testimony of its corporate representative and finds that it has individual members residing in District 2, as well as other organizational members containing individuals residing in Districts 2, 3, and 5.  *Id.* at 79:17–80:8, 92:2–16; *see also N.Y. State Club Ass'n, Inc., v. City of New York*, 487 U.S. 1, 9–10 (1988) (holding that an organization has standing to sue on behalf of its constituent organization's members if the constituent organization itself would have standing to sue).  The corporate representative presented unrebutted testimony that Plaintiff GRACE, Inc. has individual members—Clarice Cooper, Reynold Martin, and Apostle John Chambers—who were residents of District 2.  T1. at 92:2–16.  Because both Plaintiffs Engage Miami and GRACE, Inc. have residents who reside in a gerrymandered district,

and those residents would have standing to sue in their own right under *Hays*, these two Plaintiffs satisfy the remaining element of associational standing.

As to the two remaining organizational Plaintiffs—South Dade NAACP and Miami Dade NAACP—the Court finds that each organization has shown that it has members with standing to sue.  Both branches emphasized that they would not identify a specific member by name given the history of intimidation and violence that members of the NAACP historically faced.  *See id.* at 143:19–21, 144:2–18, 182:15–23.  Carolyn Donaldson, the representative for the South Dade NAACP, testified that she was able to verify that the organization had members residing in Districts 2, 3, and 4.  *See id.* at 145:10–21.  She confirmed their membership by:  (1) collaborating with the chapter secretary to confirm member's addresses; (2) cross-referencing those members' addresses with the voter database; and (3) confirming with the national chapter that these members were active in the South Dade NAACP throughout the life of this lawsuit.  *Id.* at 143:7–144:1.  Daniela Pierre, testifying on behalf of the Miami Dade NAACP, underwent a nearly identical process to confirm that the organization had members residing in Districts 1, 2, 3, and 5 during the same period.  *Id.* at 180:14–182:5.  Both Donaldson and Pierre testified that they could provide the specific names and addresses of their members *in camera* if necessary.  *Id.* at 170:19–24, 182:11–14.  The Court finds their testimony credible.  Accordingly, the Court is satisfied that both branches of the NAACP contain members who would have standing to sue, and thus, both the South Dade and Miami-Dade NAACP have standing.  *Cf. Common Cause Fla.*, 2024 WL 1308119, at *22 (holding that the Florida NAACP had standing without identifying a specific member when its representative confirmed their members' addresses by cross-referencing each members' ZIP code with Florida Supervisor of Election voter rolls).

## B.      Racial Gerrymandering

### 1.      The 2022 Plan Was Racially Gerrymandered

Because the Court finds that race predominated in each district under the 2022 Plan, each district must survive strict scrutiny, that is, the districts must be narrowly tailored to a compelling state interest.   The Parties stipulate that if the Court finds that race predominated in the design of Districts 1, 2, 3, and 4, then  the City's use of race when designing those districts was not narrowly tailored to achieve a compelling state interest.  Joint Stip. at 21 ¶ 13.  The Court made that finding above, *see supra*, Part III.C, and therefore, Districts 1, 2, 3, and 4 do not withstand strict scrutiny and are unconstitutional racial gerrymanders.   Therefore, the only remaining question for this Court is whether District 5 withstands strict scrutiny.

The Court has already found that it does not.  The Court adopted in full Judge Louis's R&R which framed the analysis as follows:  (1) the City drew District 5 to comply with the VRA, which is a compelling government interest; and (2) District 5's design would be narrowly tailored to VRA compliance if the Commission had a strong basis in evidence constituting good reason for the race-based districting decisions.  R&R at 79–81.  Quoting *Cooper*, Judge Louis opined, "as relevant here, [i]f [the City] has good reason to think that all the *Gingles* preconditions are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district.  But if not, then not."  *Id.* at 80 (quoting *Cooper*, 581 U.S. at 302) (alterations in original).   The R&R also made clear that when determining if District 5 was narrowly tailored, "[t]he City is not necessarily required to memorialize in writing the functional analysis undertaken in determining the minority population percentage required for compliance with the VRA—but the City's determination of a minority population percentage . . . must nonetheless be well supported."  *Id.* at 82 (citing *Bethune-Hill*, 580 U.S. at 195).  In other words, the City was not required to "'determine precisely what

percent minority population' compliance with the VRA demands," but "rather, the question [was] whether the City 'had good reasons to believe' the BVAP floor it selected 'was necessary to avoid liability' under the VRA." *Id.* (quoting *Bethune-Hill*, 580 U.S. at 194).

With those principles in mind, and after reviewing the record, Judge Louis found that: (1) nothing in evidence memorializes that the Commissioners were ever presented with a pre-enactment analysis regarding what level BVAP or Black Citizen Voting Age Population would facilitate VRA compliance;[19] (2) the Commissioners selected an arbitrary 50% BVAP quota in District 5 based on their subjective belief about what Section 2 compliance required and De Grandy's personal opinions about population trends which were unsupported by any quantitative analysis; and (3) both the Commission and De Grandy were on notice that VRA compliance did not require a 50% BVAP quota—to the contrary a lesser figure would have been sufficient according to Plaintiffs' expert. *Id.* at 82–85.

Based on those findings, Judge Louis concluded that the City lacked a strong basis in evidence for how it drew District 5 and they "instead mechanically set a minimum BVAP for the District." *Id.* at 85. Judge Louis continued, "[t]here is no evidence in the record before the Court of any pre-enactment analysis that informed the Commission's decision to select 50% as a BVAP floor; nor does the City point the Court to evidence that the Commissioners considered in selecting 50%." *Id.* at 85 (citation and quotation omitted). Accordingly, Judge Louis concluded that District

---

[19] To be clear, Judge Louis did not suggest that De Grandy conducted a pre-enactment analysis that was deficient because it did not identify a precise BVAP percentage at which VRA compliance could be achieved. Rather, Judge Louis identified that while De Grandy alluded to conducting an analysis of the *Gingles* preconditions, nothing in the record indicates that he communicated any details of this analysis to the Commission, nor does any evidence explain how his purported analysis compels the conclusion that District 5 requires a 50% BVAP floor. *See id.* at 82–83.

5 was not narrowly tailored to VRA compliance in the 2022 Plan and thus, District 5 did not withstand strict scrutiny.

The Court adopted those findings and conclusions in full.  (ECF No. 60).  Defendant objected to Judge Louis's findings and argued that District 5's design was narrowly tailored to VRA compliance.  *See* (ECF No. 55 at 12–15).  After a *de novo* review, the Court denied Defendant's objections and held that District 5 did not withstand strict scrutiny.  *See* (ECF No. 60 at 19–22).  Now, having had the opportunity to review all the evidence, testimony, and available record material, the Court arrives at the same conclusion.  On the record before it, the Court cannot conclude that the City had "good reason" to adhere to an arbitrary 50% BVAP floor when designing District 5.  *Bethune-Hill*, 580 U.S. at 194.  For the same reasons explained in both the R&R and the Order adopting it, the Court reiterates today that District 5 in the 2022 Plan does not satisfy strict scrutiny because its design was not narrowly tailored to VRA compliance.

Therefore, every district in the 2022 Plan fails to withstand strict scrutiny and is thus racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.

**2.      The 2023 Plan is Racially Gerrymandered**

Like with the 2022 Plan, the Parties stipulate that should the Court find race predominated in the design of Districts 1, 2, 3, and 4, then none of those districts withstand strict scrutiny.  Joint Stip. at 21 ¶ 13.  Similarly, then, the sole question for the Court is whether the 2023 Plan's District 5 was narrowly tailored to a compelling state interest, namely, VRA compliance.  The Court concludes that it is not.

The Court has already answered this question as well.  *See* (ECF No. 94).  Once more, the Court reiterated that "the narrow tailoring requirement insists only that the legislature *have a strong basis in evidence* in support of the (race-based) choice that it has made," and that by

performing a functional analysis of electoral behavior within District 5, "Defendant could demonstrate it had 'good reasons to believe' it must use race [in the manner that it did] to satisfy § 2 of the VRA."[20]  *Id.* at 38 (quoting *ALBC*, 575 U.S. at 262; *Bethune-Hill*, 580 U.S. at 194). Defendant could not make that showing.  Suffering from the same fatal flaw that doomed District 5 in the 2022 Plan, Defendant was unable to identify what functional analysis occurred to determine that a 50% BVAP floor was necessary in the 2023 Plan, nor could Defendant identify when that analysis was communicated to the Commission or that the analysis played any role in the Commission's decision to adhere to that BVAP quota.  *Id.* at 39.  Instead, Defendant argued that the 2023 Plan's District 5 was narrowly tailored based on the post-hoc analysis of its expert, Dr. John Alford.  *See id.* at 38–39.  Dr. Alford's report, however, was not submitted until July 12, 2023, nearly a month after the 2023 Plan was enacted.  *Id.* at 39.  Thus, the Court found that aside from its expert report, Defendant had again failed to explain how District 5 was narrowly tailored to achieve VRA compliance.  *See id.*  The Court held that District 5 did not withstand strict scrutiny.  *Id.*

Defendant has not produced any evidence after the issuance of this Order, whether at trial or otherwise, that alters the Court's conclusion.  Nor has Defendant identified any material in the record that would warrant deciding the matter differently.  The Court previously held, based on the findings recounted above, that the 2023 Plan's District 5 does not withstand scrutiny.  For the

---

[20] The Court is not imposing a requirement that, to satisfy the narrow tailoring requirement, the City must "determined with precision" a particular BVAP percentage or that "the City has [a] duty to memorialize the analysis or compile a comprehensive record of that analysis," as Defendant claimed earlier in this litigation.  *See* (ECF No. 97 at 8).  Nor is the Court articulating a "purely subjective" test about whether the City's analysis was "good enough."  (ECF No. 182 at 36). Rather, the Court is simply stating that when there is no evidence of how a purported functional analysis led to the Commission's adherence to an arbitrary BVAP quota, the City has not met its burden to show it had good reason to implement that quota into District 5's design.

same reasons articulated in ECF No. 94, the Court holds that District 5 was not narrowly tailored to the compelling state interest of VRA compliance.

Accordingly, the Court finds that no district in the City of Miami under the 2023 Plan withstands strict scrutiny.   In other words, each district is unconstitutionally racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment.[21]

## V.    CONCLUSION

In light of the overwhelming evidence demonstrating that the 2022 Plan and 2023 Plan are unconstitutional, it bears repeating what the Court emphasized at the outset of this Order.  Voters who reside in a racially gerrymandered district suffer a serious harm:

> When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests and will prefer the same candidates at the polls. Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to criterion barred to the Government by history and the Constitution.

*Miller*, 515 U.S. at 915–16 (internal quotations and citations omitted).  Sorting voters on the basis of race, as the City did here, deprives Miamians of the constitutional promise that they receive equal protection under the law:

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire. It is for these

---

[21] As the Court noted at the outset of this Order, the City passed Resolution R-24-1 less than two weeks before trial.  *See* (ECF No. 151).  "By its own terms, Resolution R-24-1 merely 'amends' the 2023 Plan" by moving 48 people from District 3 back into District 1, thereby restoring the District 1/3 boundary line to follow the Dolphin Expressway as it existed in the 2022 Plan.  *See* (ECF No. 159 at 1) (citing ECF No. 151 at 7).  Resolution R-24-1 does not otherwise alter the 2023 Plan.  In sum, Resolution R-24-1 does not disturb the Court's conclusion that the map currently in place, the 2023 Plan with this exceedingly small alteration, is unconstitutionally racially gerrymandered.

reasons that race-based districting by our state legislatures demands close judicial scrutiny.

*Shaw*, 509 U.S. at 657.   These are the serious harms that the City perpetuated, and Miamians suffered.  Today, the Court permanently prevents the City from racial gerrymandering any longer.

**UPON CONSIDERATION** of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **ORDERED AND ADJUDGED** that:

1. All five districts in both the 2022 and 2023 Plans (including as amended by R-24-1) are unconstitutionally racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment;

2. The City of Miami and its officers and agents are permanently enjoined from calling, conducting, supervising, or certifying any elections under the unconstitutional districts;

3. Each Plaintiff is awarded nominal damages in the amount of $1.00;

4. The Court retains jurisdiction to adjudicate the remedial phase of this Action.  By separate order, the Court will set a status conference to discuss potential remedies, including but not limited to the imposition of special elections or a remedial map. Accordingly, the Court does not rule on Plaintiffs' request for special elections at this time.

DONE AND ORDERED in Chambers at Miami, Florida, this  10th   day of April, 2024.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record